```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                             —   —   —

 4   IN RE:  AUTOMOTIVE PARTS
     ANTITRUST LITIGATION                MDL NO. 2311
 5
     _____/
 6

 7                 STATUS CONFERENCE / MOTION HEARING

 8           BEFORE THE HONORABLE MARIANNE O. BATTANI
                    United States District Judge
 9            Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
10                       Detroit, Michigan
                    Wednesday, February 12, 2014
11

12   APPEARANCES:

13   Direct Purchaser Plaintiffs:

14                 DOUGLAS ABRAHAMS
                   KOHN, SWIFT & GRAF, P.C.
15                 One South Broad Street, Suite 2100
                   Philadelphia, PA  19107
16                 (215) 238-1700

17                 THOMAS C. BRIGHT
                   GOLD, BENNET, CERA & SIDENER, L.L.P.
18                 595 Market Street, Suite 2300
                   San Francisco, CA  94105
19                 (415) 777-2230

20                 WILLIAM G. CALDES
                   SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
21                 1818 Market Street, Suite 2500
                   Philadelphia, PA  19103
22                 (215) 496-0300

23                 DAVID H. FINK
                   FINK & ASSOCIATES LAW
24                 100 West Long Lake Road, Suite 111
                   Bloomfield Hills, MI  48304
25                 (248) 971-2500
```

```
 1   APPEARANCES: (Continued)

 2   Direct Purchaser Plaintiffs:

 3               LEWIS H. GOLDFARB
               McELROY, DEUTSCH, MULVANEY & CARPENTER,
 4             L.L.P.
               1200 Mount Kemble Avenue
 5             Morristown, NJ  07962
               (973) 993-8100
 6
               GREGORY P. HANSEL
 7             PRETI, FLAHERTY, BELIVEAU &
               PACHIOS, L.L.P.
 8             One City Center
               Portland, ME  04112
 9             (207) 791-3000

10             CINDY CARANELLA KELLY
               KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
11             1633 Broadway
               New York, NY  10019
12             (212) 506-1737

13             JOSEPH C. KOHN
               KOHN, SWIFT & GRAF, P.C.
14             One South Broad Street, Suite 2100
               Philadelphia, PA  19107
15             (215) 238-1700

16             SARAH BIGGS LEIVICK
               KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
17             1633 Broadway
               New York, NY  10019
18             (212) 506-1765

19             HAROLD G. LEVISON
               KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
20             1633 Broadway
               New York, NY  10019
21             (212) 506-1716

22             WILLIAM H. LONDON
               FREED, KANNER, LONDON & MILLEN, L.L.C.
23             2201 Waukegan Road, Suite 130
               Bannockburn, IL  60015
24             (224) 632-4504

25
```

Status Conference • February 12, 2014

3

```
 1    APPEARANCES: (Continued)

 2    Direct Purchaser Plaintiffs:

 3                        ERIC J. PELTON
                          KEINBAUM, OPPERWALL, HARDY & PELTON, P.L.C.
 4                        280 North Old Woodward, Suite 400
                          Birmingham, MI  48009
 5                        (248) 645-0000

 6                        JASON J. THOMPSON
                          SOMMERS SCHWARTZ, P.C.
 7                        2000 Town Center, Suite 900
                          Southfield, MI  48075
 8                        (248) 355-0300

 9                        HECTOR TORRES
                          KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
10                        1633 Broadway
                          New York, NY  10019
11                        (212) 506-1730

12                        RANDALL B. WEILL
                          PRETI, FLAHERTY, BELIVEAU &
13                        PACHIOS, L.L.P.
                          One City Center
14                        Portland, ME  04112
                          (207) 791-3000

15

16    End-Payor Plaintiffs:

17                        WARREN T. BURNS
                          SUSMAN GODFREY, L.L.P.
18                        901 Main Street, Suite 5100
                          Dallas, TX  75202
19                        (214) 754-1928

20                        FRANK C. DAMRELL
                          COTCHETT, PITRE & McCARTHY, L.L.P.
21                        840 Malcolm Road
                          Burlingame, CA  94010
22                        (650) 697-6000

23                        LISA GRAY
                          OLIVER LAW GROUP
24                        950 West University Drive, Suite 200
                          Rochester, MI  48307
25                        (248) 436-3385
```

In Re:  Automotive Parts Antitrust Litigation - 12-02311

Status Conference • February 12, 2014

4

```
 1   APPEARANCES: (Continued)

 2   End-Payor Plaintiffs:

 3                   JOANNA LI CALSI
                     COTCHETT, PITRE & McCARTHY, L.L.P.
 4                   840 Malcolm Road
                     Burlingame, CA  94010
 5                   (650) 697-6000

 6                   BERNARD PERSKY
                     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 7                   601 Lexington Avenue, Suite 3400
                     New York, NY  10022
 8                   (212) 9980-7404

 9                   WILLIAM V. REISS
                     LABATON SUCHAROW
10                   140 Broadway Avenue
                     New York, NY  10005
11                   (212) 907-0858

12                   HOLLIS L. SALZMAN
                     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
13                   601 Lexington Avenue, Suite 3400
                     New York, NY  10022
14                   (212) 980-7405

15                   ADAM T. SCHNATZ
                     THE MILLER LAW FIRM, P.C.
16                   950 West University Drive, Suite 300
                     Rochester, MI  48307
17                   (248) 841-2200

18                   MARC M. SELTZER
                     SUSMAN GODFREY, L.L.P
19                   190 Avenue of the Stars, Suite 950
                     Los Angeles, CA  90067
20                   (310) 789-3102

21                   STEVEN N. WILLIAMS
                     COTCHETT, PITRE & McCARTHY, L.L.P.
22                   840 Malcolm Road
                     Burlingame, CA  94010
23                   (650) 697-6000

24

25
```

```
 1   APPEARANCES: (Continued)

 2   Dealership Plaintiffs:

 3               DON BARRETT
                 BARRETT LAW OFFICES
 4               P.O. Drawer 987
                 Lexington, MS  39095
 5               (601) 834-2376

 6               JONATHAN W. CUNEO
                 CUNEO, GILBERT & LaDUCA, L.L.P.
 7               507 C Street NE
                 Washington, DC  20002
 8               (202) 789-3960

 9               BRENDAN FREY
                 MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON,
10               P.C.
                 1361 East Big Beaver Road
11               Troy, MI  48083
                 (248) 457-9200
12
                 GERARD V. MANTESE
13               MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON,
                 P.C.
14               1361 East Big Beaver Road
                 Troy, MI  48083
15               (248) 457-9200

16               VICTORIA ROMANENKO
                 CUNEO, GILBERT & LaDUCA, L.L.P.
17               507 C Street NE
                 Washington, D.C.  20002
18               (202) 789-3960

19
     For the Defendants:
20
                 GARY K. AUGUST
21               ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.
                 31700 Middlebelt Road, Suite 150
22               Farmington Hills, MI  48334
                 (248) 851-4111
23
                 RICHARD D. BISIO
24               KEMP KLEIN LAW FIRM
                 201 West Big Beaver Road, Suite 600
25               Troy, MI  48084
                 (248) 528-1111
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                STEVEN F. CHERRY
                  WILMER HALE
 4                1875 Pennsylvania Avenue NW
                  Washington, DC  20006
 5                (202) 663-6321

 6                JAMES W. COOPER
                  ARNOLD & PORTER, L.L.P.
 7                555 Twelfth Street NW
                  Washington, DC  20004
 8                (202) 942-5000

 9                KENNETH R. DAVIS, II
                  LANE POWELL, P.C.
10                601 SW Second Avenue, Suite 2100
                  Portland, OR  97204
11                (503) 778-2100

12                DEBRA H. DERMODY
                  REED SMITH
13                225 Fifth Avenue
                  Pittsburgh, PA 15222
14                (412) 288- 3131

15                DAVID P. DONOVAN
                  WILMER, CUTLER, PICKERING, HALE and DORR,
16                L.L.P.
                  1875 Pennsylvania Avenue NW
17                Washington, DC  20006
                  (202) 663-6868
18
                  DAVID F. DuMOUCHEL
19                BUTZEL LONG, P.C.
                  150 West Jefferson Avenue
20                Detroit, MI  48226
                  (313) 225-7000
21
                  DAVID A. ETTINGER
22                HONIGMAN, MILLER, SCHWARTZ AND COHN, L.L.P.
                  2290 First National Building
23                660 Woodward Avenue
                  Detroit, MI  48226
24                (313) 465-7368

25
```

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3                   PETER M. FALKENSTEIN
                     JAFFE, RAITT, HEUER & WEISS, P.C.
 4                   27777 Franklin Road, Suite 2500
                     Southfield, MI   48034
 5                   (248) 351-3000

 6                   JAMES P. FEENEY
                     DYKEMA GOSSETT, P.L.L.C.
 7                   39577 Woodward Avenue, Suite 300
                     Bloomfield Hills, MI  48304
 8                   (248) 203-0841

 9                   MICHELLE K. FISCHER
                     JONES DAY
10                   51 Louisiana Avenue NW
                     Washington, DC  20001
11                   (202) 879-4645

12                   LARRY S. GANGNES
                     LANE POWELL, P.C.
13                   1420 Fifth Avenue, Suite 4100
                     Seattle, Washington  98101
14                   (206) 223-7000

15                   MEGAN HAVSTAD
                     O'MELVENY & MYERS, L.L.P.
16                   Two Embarcadero Center, 28th Floor
                     San Francisco, CA  94111
17                   (415) 984-8700

18                   FRED K. HERRMANN
                     KERR, RUSSELL & WEBER, P.L.C.
19                   500 Woodward Avenue, Suite 2500
                     Detroit, MI  48226
20                   (313) 961-0200

21                   HOWARD B. IWREY
                     DYKEMA GOSSETT, P.L.L.C.
22                   39577 Woodward Avenue, Suite 300
                     Bloomfield Hills, MI  48304
23                   (248) 203-0526

24

25
```

In Re:  Automotive Parts Antitrust Litigation - 12-02311

```
 1   APPEARANCES: (Continued)

 2   For the Defendants:

 3            TIFFANY LIPSCOMB-JACKSON
              JONES DAY
 4            51 Louisiana Avenue NW
              Washington, DC  20001
 5            (202) 879-4645

 6            HEATHER LAMBERG KAFELE
              SHEARMAN & STERLING, L.L.P.
 7            801 Pennsylvania Avenue, NW
              Washington, D.C.  20004
 8            (202) 508-8097

 9            SHELDON H. KLEIN
              BUTZEL LONG, P.C.
10            41000 Woodward Avenue
              Bloomfield Hills, MI  48304
11            (248) 258-1414

12            JAY L. LEVIN
              PORTER, WRIGHT, MORRIS & ARTHUR
13            1900 K Street NW, Suite 1110
              Washington, DC 20006
14            (202) 778-3054

15            FRANKLIN LISS
              ARNOLD & PORTER, L.L.P.
16            555 Twelfth Street NW
              Washington, DC  20004
17            (202) 942-5000

18            ERIC MAHR
              WILMER, CUTLER, PICKERING, HALE and DORR,
19            L.L.P.
              1875 Pennsylvania Avenue, NW
20            Washington, D.C.  20006
              (202) 663-6099
21
              ANDREW S. MAROVITZ
22            MAYER BROWN, L.L.P.
              71 South Wacker Drive
23            Chicago, IL  60606
              (312) 701-7116
24

25
```

In Re:  Automotive Parts Antitrust Litigation - 12-02311

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3                   KELSEY A. McPHERSON
                     LATHAM & WATKINS, L.L.P.
 4                   555 Eleventh Street NW, Suite 1000
                     Washington, DC  20004
 5                   (202) 637-2200

 6                   BRIAN M. MOORE
                     DYKEMA GOSSETT, P.L.L.C.
 7                   39577 Woodward Avenue, Suite 300
                     Bloomfield Hills, MI  48304
 8                   (248) 203-0772

 9                   GEORGE A. NICOUD, III
                     GIBSON, DUNN & CRUTCHER, L.L.P.
10                   555 Mission Street
                     San Francisco, CA  94105
11                   (415) 393-8200

12                   JOSHUA S. PRESS
                     WILMER, CUTLER, PICKERING, HALE and DORR,
13                   L.L.P.
                     1875 Pennsylvania Avenue, NW
14                   Washington, D.C.  20006
                     (202) 663-6914
15
                     MICHAEL RUBIN
16                   ARNOLD & PORTER, L.L.P.
                     555 Twelfth Street NW
17                   Washington, DC  20004
                     (202) 942-5094
18
                     TIANA LEIA RUSSELL
19                   ARNOLD & PORTER, L.L.P.
                     555 Twelfth Street NW
20                   Washington, DC  20004
                     (202) 942-6807
21
                     WM. PARKER SANDERS
22                   SMITH, GAMBRELL & RUSSELL, L.L.P.
                     Promenade Two, Suite 3100
23                   1230 Peachtree Street NE
                     Atlanta, GA  30309
24                   (404) 815-3684

25
```

```
 1    APPEARANCES:  (Continued)

 2    For the Defendants:

 3                  LARRY J. SAYLOR
                    MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
 4                  150 West Jefferson, Suite 2500
                    Detroit, MI  48226
 5                  (313) 496-7986

 6                  CRAIG SEEBALD
                    VINSON & ELKINS, L.L.P.
 7                  2200 Pennsylvania Avenue NW, Suite 500 West
                    Washington, DC  20037
 8                  (202) 639-6585

 9                  STEPHEN J. SQUERI
                    JONES DAY
10                  901 Lakeside Avenue
                    Cleveland, OH  44114
11                  (216) 586-3939

12                  JENNIFER M. STEWART
                    WINSTON & STRAWN, L.L.P.
13                  200 Park Avenue
                    New York, NY  10166
14                  (212) 294-4743

15                  ANITA STORK
                    COVINGTON & BURLING, L.L.P.
16                  One Front Street
                    San Francisco, CA  94111
17                  (415) 591-7050

18                  MARGUERITE M. SULLIVAN
                    LATHAM & WATKINS, L.L.P.
19                  555 Eleventh Street NW, Suite 1000
                    Washington, DC  20004
20                  (202) 637-2200

21                  JOANNE GEHA SWANSON
                    KERR, RUSSELL & WEBER, P.L.C.
22                  500 Woodward Avenue, Suite 2500
                    Detroit, MI  48226
23                  (313) 961-0200

24

25
```

```
1    APPEARANCES:  (Continued)

2    For the Defendants:

3                      THOMAS TALLERICO
                       BODMAN, P.L.C.
4                      201 West Big Beaver Road, Suite 500
                       Troy, MI  48084
5                      (248) 743-6000

6                      MAUREEN T. TAYLOR
                       BROOKS, WILKINS, SHARKEY & TURCO
7                      401 South Old Woodward, Suite 400
                       Birmingham, MI  48009
8                      (248) 971-1721

9                      KATHERINE A. TREFZ
                       WILLIAMS & CONNOLLY, L.L.P.
10                     725 Twelfth Street NW
                       Washington, DC  2005
11                     (202) 434-5648

12                     MICHAEL R. TURCO
                       BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
13                     401 South Old Woodward Avenue, Suite 400
                       Birmingham, MI  48009
14                     (248) 971-1713

15                     LINDSEY ROBINSON VAALA
                       VINSON & ELKINS, L.L.P.
16                     2200 Pennsylvania Avenue NW, Suite 500 West
                       Washington, DC  20037
17                     (202) 639-6585

18                     A. PAUL VICTOR
                       WINSTON & STRAWN, L.L.P.
19                     200 Park Avenue
                       New York, NY  10166
20                     (212) 294-4655

21
     Also present:    TIMOTHY FRASER
22                     OFFICE OF THE ATTORNEY GENERAL, STATE OF
                       FLORIDA
23                     The Capital, PL-01
                       Tallahassee, fl  32399
24                     (850) 414-3733

25
```

```
 1                    TABLE OF CONTENTS
```

```
 2                                            Page

 3    FUJIKURA'S MOTION TO DISMISS...................... 55

 4    FIRST SUPPLEMENTAL DISCOVERY PLAN................. 71

 5    MOTION OF GORDON BALL TO SERVE AS INTERIM CO-LEAD.. 160

 6    MOTION TO DISMISS (FUEL SENDERS).................. 164
```

```
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Detroit, Michigan

2    Wednesday, February 12, 2014

3    at about 11:00 a.m.

4                          —   —   —

5              (Court and Counsel present.)

6              THE CASE MANAGER:  All rise.

7              The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10             You may be seated.  Court calls In Re: Automotive

11   Parts Anti-Trust litigation.

12             THE COURT:  Good morning.

13             ATTORNEYS PRESENT:  Good morning.

14             THE COURT:  We are down some defendants today.  We

15   usually have every seat filled here.  Okay.

16             Welcome.  I am sorry that this day turned out to be

17   so frigid.  I'm kind of amazed some of you from the east made

18   it out from what I heard on the weather report this morning,

19   so we will have to make good use of this day to reward you

20   for that.  All right.

21             Let's start.  I thought we would simply start with

22   the agenda and go through it as we did before, and will start

23   our motions as soon as we get here.  Okay.

24             Mr. Fink, are you going start this?

25             MR. FINK:  Certainly, Your Honor, thank you.  Your

```
 1    Honor, there are not very many issues at the beginning that
 2    really require any discussion.
 3               THE COURT:  Yes.  I have looked over the status of
 4    the service.  It seems to me that, because I was looking
 5    ahead as to how many motions we may have coming in, that we
 6    have approximately ten more parts where there is service
 7    completed roughly.  You don't have to count them, just --
 8               MR. FINK:  Roughly that sounds correct.
 9               THE COURT:  Yes.  Okay.
10               MR. FINK:  So far.
11               THE COURT:  So far.
12               MR. FINK:  Your Honor, the first -- I'm not trying
13    to rush the Court, it appears that the first item that
14    involves any issue to be addressed is related to -- in the
15    depositions, number 3(B), the issue of Ford's request for
16    additional language to be added prior to their support for
17    the stipulation.  And if that is the first item the Court
18    wants to hear on -- hear from, Eugene Spector is here to
19    speak to that.
20               THE COURT:  Let me just -- which number is that,
21    you said --
22               MR. FINK:  That's 3(B).  I'm not trying to rush the
23    Court through this -- I just have looked.
24               THE COURT:  I'm going go back but I have 3(B) as
25    endorsement of the stipulation between Yazaki.  Is that what
```

1    you are talking about?

2         MR. FINK:  Yes.

3         THE COURT:  Let me go back for everybody else.

4    Does anybody have anything to add or any questions on number

5    2(A) or (B), the discovery requests?

6         (No response.)

7         THE COURT:  Okay.  So then we are on 3.

8    Mr. Spector?

9         MR. SPECTOR:  Good morning, Your Honor.

10        THE COURT:  Good morning.

11        MR. SPECTOR:  I think that the problem that we have

12   with the Ford situation is this, we are faced with Ford suing

13   one defendant and seeking to participate in depositions of

14   multiple defendants.  And, for example, the stipulation that

15   has been presented to the Court in the Yazaki -- with Yazaki,

16   Ford hasn't sued Yazaki, and how we can allocate time to Ford

17   under those circumstances since they are not directly a party

18   with regard to Yazaki is a problem.

19        THE COURT:  Well, you know, before you go on with

20   that, as I am thinking of this, this Ford issue, which is

21   prominent in the orders that we need to resolve today on

22   discovery, I think this is all pretty well related, do you

23   not?

24        MR. SPECTOR:  I agree.

25        THE COURT:  Let's just hold off on that until we go

Status Conference • February 12, 2014

16

1   through the others and do that particular issue -- we will do

2   all of Ford at one time.

3           MR. SPECTOR:  Fine.  Thank you, Your Honor.

4           THE COURT:  Thank you.  So the next item, because

5   I'm holding off on Ford, is the settlement on the instrument

6   panel cases with the -- I have the end payers and the auto

7   dealers, that is with Nippon.

8           MS. SALZMAN:  I believe it is Nippon.

9           THE COURT:  Nippon.  Okay.

10          MS. SALZMAN:  Your Honor, Hollis Salzman.  We have

11  a settlement, which is part of our preliminary approval

12  papers which we believe is an excellent settlement for the

13  class.  It is an all-cash payment of $4.56 million plus

14  extensive and early cooperation with the plaintiffs in

15  prosecuting the case against the remaining defendants.  We

16  are here seeking preliminary approval of that settlement

17  agreement.

18          THE COURT:  Let me ask you one thing that I have a

19  question on, the preliminary approval.  I will hear any

20  opposition to it, I don't know that there is any opposition

21  to it because I haven't received it.  The one thing I had a

22  question about under the notice, you know under the rules you

23  have to give notice, and you asked to delay your notice,

24  which makes sense, but my question to you is is there any

25  provision for this delayed notice in any case law?

```
 1           MS. SALZMAN:  Well, there are other cases in which
 2   notice has been delayed for similar reasons; to provide an
 3   opportunity for other settlements to occur in the case so
 4   that when notice is disseminated to the class that there is
 5   a -- you know, the expense is shared among those cases.  I
 6   can give you some of the cases where that has happened, if
 7   you would like.  That's not necessarily case law because what
 8   you have is you have a preliminary approval order and then a
 9   notice motion sometime later.
10           THE COURT:  All right.  Is there any harm to anyone
11   by delaying -- to any of the claimants by delaying the
12   notice?
13           MS. SALZMAN:  I don't think there is harm and, in
14   fact, I think there is a benefit to the class because
15   typically the notice is paid out of the settlement funds, so
16   if there is economy to sharing the costs of notice across
17   settlements then the class members would ultimately have more
18   when distribution happens to the class members.
19           THE COURT:  Okay.  All right.  And at this stage of
20   the proceeding you need an approval of the Court for this
21   preliminary process?
22           MS. SALZMAN:  Yes, we do, Your Honor.  And
23   preliminary approval is a trigger for some of the more
24   significant cooperation that we would be entitled to under
25   the settlement agreement.
```

```
1              THE COURT:  I read that.  That is a very

2   interesting part of the settlement agreement.

3              MS. SALZMAN:  It is.  It is not -- it is typical in

4   settlements.

5              THE COURT:  In the antitrust cases?

6              MS. SALZMAN:  Yes, yes.

7              THE COURT:  Okay.  I know that we had two

8   objections -- well, I don't know if they were objections but

9   statements from I think it was Yazaki and Denso regarding the

10  class.

11             MS. SALZMAN:  Right.  I can speak to that for a

12  moment, and then if they want to speak.  I think that there

13  were responses to the motion, and the response was their

14  concern that as part of preliminary approval you are

15  preliminarily approving a settlement class, and as is

16  typically done in these cases, in our order on preliminary

17  approval we have language that preserves the remaining

18  defendants, the non-settling defendants' rights to oppose

19  class certification when it is appropriate to hear a

20  contested class certification motion.  And, in fact, I think

21  that the defendants acknowledge that it is in the order but

22  they merely wanted to bring the Court's attention if you were

23  going to modify the proposed order in any way that if you

24  didn't include that provision to protect their rights they

25  would like to be heard.
```

1           THE COURT:  Okay.

2           MS. SALZMAN:  I don't know if that covers it.

3           THE COURT:  Do you want to comment on that?

4           MS. FISCHER:  Michelle Fischer from Jones Day on

5    behalf of Yazaki, but also speaking on behalf of Denso.

6    Yazaki and Denso are the non-settling defendants, and Hollis

7    did accurately represent we do not oppose the settlement but

8    definitely endorse and encourage the inclusion of

9    paragraph 11 of their proposed order to protect our rights,

10   and in the event that the Court chooses not to include the

11   language in paragraph 11 we would simply request time to

12   fully develop the record and fully oppose any motion for

13   class certification.

14          THE COURT:  All right.  You have no objections with

15   the provision that is now in the order preserving exactly

16   what you're saying?

17          MS. FISCHER:  No.  We actually believe that

18   paragraph 11 is important and would promote its inclusion.

19          THE COURT:  Okay.

20          MS. SALZMAN:  And then just certainly down the road

21   the plaintiffs' position is that defendants do not have

22   standing at preliminary approval to challenge a motion for

23   preliminary approval for settlement despite the fact that

24   they have raised this issue, I don't want the Court to think

25   that plaintiffs agree that they have standing to file any

1    objections.

2         THE COURT:  Okay.  But it is in the order and --

3         MS. SALZMAN:  It is.

4         THE COURT:  And you are going to keep that in the

5    order -- the Court will keep it in the order that it signs.

6         MS. SALZMAN:  Yes, please.

7         THE COURT:  Okay.  Do you want to put down the

8    basics for it on the record so that you have it on the

9    record?

10        MS. SALZMAN:  Well, I can go through it,

11   absolutely.

12        THE COURT:  Yes.

13        MS. SALZMAN:  The settlement is an excellent result

14   for the class.  It is an icebreaker settlement which

15   strengthens plaintiffs' hand in litigation.  It calls for

16   4.56 all-cash settlement and invaluable significant and early

17   cooperation in assisting plaintiffs in the prosecution of the

18   case against the remaining defendants.  Nippon Seiki has

19   already made the payment into the escrow fund which would be

20   subject to the return if the Court did not preliminarily

21   approve the settlement.  And I would also like to commend

22   Nippon Seiki defendants for coming forward to settle with the

23   class plaintiffs here.  As Your Honor is probably aware, in

24   the criminal court -- excuse me.  In the criminal court plea

25   the criminal court judge here in the Eastern District of

 1  Michigan specifically held that he would not be ordering

 2  restitution as part of the guilty plea because of the

 3  parallel civil class actions, and so Nippon Seiki here is

 4  making restitution to the class, and I commend them for doing

 5  so.

 6        In evaluating whether settlement is fair,

 7  reasonable and adequate courts consider a number of factors

 8  including the expense, duration and uncertainty of continued

 9  litigation.  Here while you can see that the motions were

10  hard fought at the motion to dismiss stage, we have

11  discovery, class certification, trial and appeal, and even if

12  successful, which plaintiffs believe they will, that will not

13  occur until many years down the road.

14        The settlement is the result of arm's-length

15  negotiation between experienced counsel on both sides.

16  Again, the settlement negotiations took place over a period

17  of 13 months of numerous in-person and telephone meetings

18  among counsel, and for those reasons we believe that the

19  Court should preliminarily approve the settlement.

20        THE COURT:  All right.  Do you want to say anything

21  on behalf of Nippon?

22        MR. VICTOR:  Paul Victor.  We are fine with it.

23        THE COURT:  We just don't want a one-sided

24  settlement.  Okay.  All right.  The Court has reviewed --

25  Counsel.

```
 1            MR. CUNEO:  Your Honor, Jonathan Cuneo for the auto
 2   dealers.  We would respectfully adopt Ms. Salzman's statement
 3   of the benefits of the settlement as our own.  I don't need
 4   to take the Court's time in rehashing it.  The consideration
 5   that is flowing to us though is 1.44 million.
 6            THE COURT:  Okay.  I noted that.
 7            MR. CUNEO:  That would be flowing to us.  Thank
 8   you, Your Honor.
 9            THE COURT:  Thank you.  Okay.  I think that's
10   everybody.
11            MS. SALZMAN:  Thank you, Your Honor.
12            THE COURT:  The Court does note the terms of the
13   settlement, they have just been put on the record.  I find
14   that they are fair, reasonable and adequate, and I give
15   preliminary approval.  I take great heed in the fact that
16   learned counsel has worked out the settlement amongst
17   themselves over a period.  The Court is well aware of the
18   qualifications of counsel, and experienced counsel.  I
19   believe this is an arm's-length transaction.  As to the
20   amount of money, it appears to be a reasonable amount given
21   that the cooperation agreement in this settlement is quite
22   extensive.  The Court notes that also it has to consider the
23   fact that this settlement considers that it's the expense and
24   duration, certainly the uncertainty of continued litigation
25   goes to enhance its reasonableness.
```

```
 1            Next we get to the class.  The Court would include

 2   the provision that is in there -- what was that, paragraph

 3   11, so that these rights are preserved for future

 4   adjudication in terms of class, but will approve the class as

 5   stated right now provisionally.

 6            Certainly there is numerosity, commonality,

 7   typicality, there is adequacy of representation that the

 8   Court has already gone over, so I do believe that this class

 9   meets the requirements of Rule 23, and the Court also would

10   appoint the interim co-lead counsel as class counsel in that

11   I think that needs to be stated.  So I will sign the

12   settlement document if you -- I'm not sure if I have a

13   proposed or the final here, I don't remember what the title

14   is, but if you would send me the document the Court will sign

15   it.  Okay.  So that provisional --

16            MR. CUNEO:  Your Honor --

17            THE COURT:  -- approval is done.

18            MR. CUNEO:  You used the word settlement.  I want

19   to make sure we are clear it is not settlements.

20            THE COURT:  It is what?

21            MR. CUNEO:  It applies to the dealers as well.

22            THE COURT:  Yes, it is settlements applying to both

23   the dealer and the direct.

24            MR. CUNEO:  That's the way I took it but I just

25   wanted to make sure.
```

Status Conference • February 12, 2014

24

```
 1              THE COURT:  It is end payers, dealers.  What
 2    happened to the direct, somebody called it?
 3              MR. FINK:  Your Honor, Joe Kohn will speak to that.
 4              MS. SALZMAN:  Just one housekeeping item, Your
 5    Honor.  We will make sure that your chambers has the
 6    appropriate orders to sign.
 7              THE COURT:  Okay.
 8              MS. SALZMAN:  Thank you.
 9              THE COURT:  Now, the only papers that I had dealt
10    with the end payer and the auto dealers, they did not deal
11    with the direct, but we are going to hear about that right
12    now.
13              MR. KOHN:  Thank you, Your Honor.  Good morning,
14    Joseph Kohn for the directs.  May it please the Court.
15              We are pleased to be able to inform the Court that
16    the direct purchaser class has also reached an agreement in
17    principle with Nippon Seiki -- the three Nippon Seiki
18    entities.  We have not finalized the agreement, we have
19    exchanged papers, we anticipate doing so shortly.  We are not
20    at liberty to get into terms but they will be apparent, we
21    would hope, within a couple weeks until they have their
22    official announcements, et cetera.
23              We would be submitting those -- a similar motion
24    for approval, a draft order that we are preparing will
25    include that same language that Yazaki and Denso has been
```

1    concerned about, which has become somewhat typical in cases

2    where there are partial settlement or a settlement with an

3    initial defendant.

4         THE COURT:  Okay.

5         MR. KOHN:  And while it is never possible to

6    predict when this many lawyers will actually get papers with

7    all Is dotted and Ts crossed, we would hope it should be

8    within a couple weeks.  As I said, we had drafts that have

9    already gone out.  We would be prepared to be available for a

10   conference or a hearing on preliminary approval of that

11   settlement promptly and perhaps not wait if the Court

12   preferred until the next status conference, we think maybe

13   that could be something that could be handled in the interim.

14        THE COURT:  We could handle that on a motion with

15   just the necessary parties, it doesn't seem like everybody

16   would have to be here for that, so why don't we do that.  I

17   don't want to wait that long, if you have got it resolved

18   let's gets it on the record.

19        MR. KOHN:  Thank you, Your Honor.

20        THE COURT:  Thank you very much.  Okay.  All right.

21        Then the next item is the update on the

22   stipulations between plaintiffs and defendants regarding the

23   depositions.  Who is speaking to that?  This is on instrument

24   panel except as it relates to Ford, let's not argue that.

25        MR. FINK:  Your Honor, Greg Hansel, one of the

Status Conference • February 12, 2014

```
 1    co-leads for the direct purchasers, will speak to that.
 2              THE COURT:  Okay.
 3              MR. HANSEL:  May it please the Court, good morning,
 4    Your Honor.
 5              THE COURT:  Good morning.
 6              MR. HANSEL:  Greg Hansel for the direct-purchaser
 7    plaintiffs.
 8              Denso has agreed with the class plaintiffs on a
 9    form of stipulation to depose incarcerated employees of
10    Denso, and I believe that has been circulated and signed
11    by -- is it signed by everybody now?  Has it been filed yet?
12              MR. CHERRY:  No.
13              MR. HANSEL:  So we expect to file that today or
14    tomorrow with the Court for the Court's consideration.
15              THE COURT:  So there is some agreement and these
16    people will be able to be deposed before they leave this --
17              MR. HANSEL:  Or they would come back or make
18    themself available at some agreed-upon location.  The purpose
19    behind these stipulations such as the Yazaki stipulation, the
20    Denso stipulation, is to just make sure people don't leave
21    the country and become very difficult to locate and depose
22    say in Japan.  So we have been trying to reach these
23    stipulations before people get out of prison and leave so
24    that it is -- there is a procedure and we don't have to
25    attempt to take their depositions in prison on a hurry-up
```

1    basis.

2              THE COURT:  Okay.  Thank you.

3              MR. HANSEL:  Thank you.

4              THE COURT:  All right.  Then there is the Nippon

5    Seiki move to dismiss the Florida complaint.  Is there

6    anything else going on with that?  Otherwise that's just on

7    the pleadings.  Any comments on that?

8              MR. VICTOR:  Your Honor, Paul Victor.  Is

9    Mr. Fraser --

10             MR. FRASER:  Tim Fraser for Florida.

11             MR. VICTOR:  Do you want us to give a report?

12             THE COURT:  No, there is nothing really to report,

13   right?

14             MR. FRASER:  No.

15             MR. VICTOR:  No.

16             THE COURT:  The pleadings are in, it looks like

17   with the reply due in May, the beginning of May, maybe we can

18   schedule that for our June oral argument for our June

19   meeting.  Does that work with you?

20             MR. VICTOR:  I guess maybe this is not clear, we

21   are in settlement discussions with them and we do have sort

22   of an agreement in principle.

23             MR. FRASER:  Yeah, we have reached an agreement in

24   principle and --

25             MR. VICTOR:  We need to try to paper it now, so

 1    this may disappear.

 2            THE COURT:  That was not clear to me.  Okay.  Good.

 3    Then we won't -- okay.  Although if you don't resolve it --

 4    I'm assuming that you will resolve it, but if you don't

 5    resolve it then you would be ready to argue in June?

 6            MR. VICTOR:  Yes.

 7            THE COURT:  Okay.  The fuel senders, we are going

 8    to get to oral argument on that soon so we don't need

 9    anything else.

10            Heater control, I see there is a stipulation as to

11    the depositions also?

12            MR. HANSEL:  Your Honor, it is the same situation

13    that I just discussed with respect to instrument panel

14    clusters, the same holds true for heater control panels with

15    Denso.

16            THE COURT:  Okay.  Thank you.

17            MR. HANSEL:  Thank you.

18            THE COURT:  On the bearings, this is -- will be

19    ready to argue at our June 4th meeting although I see a note

20    that the plaintiffs suggest they don't need oral argument.

21    Defendants have any comment on that.

22            MR. MAHR:  Your Honor, Eric Mahr, Wilmer Hale,

23    representing the Schaeffler defendants and speaking on behalf

24    of the join defendants groups.  We disagree, we think you do

25    need oral argument and it would be helpful, and you have

1   already ruled it is appropriate.

2           THE COURT:  Thank you.

3           MR. WILLIAMS:  Good morning, Your Honor.  Steve

4   Williams for the plaintiffs.

5           Obviously it is a suggestion, whatever the Court

6   deems appropriate would be what we will do.  Having just done

7   our opposition briefs, having had Two or three rounds of

8   argument, another one today, it seems plain, almost

9   everything in those papers you have already heard, you have

10  already considered.  Does AGC apply or not?  Nothing about

11  the facts alleged in that case will be any different here,

12  and it would seem to create greater efficiencies and move

13  these cases forward if where appropriate some of these could

14  be ruled on on the papers, and if oral argument is necessary

15  in part or in whole of course we will be here and we will

16  argue.

17          THE COURT:  Okay.

18          MR. WILLIAMS:  Thank you.

19          THE COURT:  We'll be talking about that in just a

20  minute.

21          MR. VICTOR:  Your Honor, on behalf of the NTN

22  defendants in that matter, we filed our own separate motions

23  as well and requested argument, the plaintiffs requested

24  argument, we do want that argument, please.

25          THE COURT:  All right.

1    MR. MAHR:  Your Honor, if you are considering their

2    motion I would like to go into more depth why I think it is

3    inappropriate to unschedule oral argument that has been

4    scheduled for many months now.  I don't know if you are

5    considering their suggestion seriously.

6    THE COURT:  Well, no, I'm not considering that

7    because I told you, the defendants, that you each would have

8    an opportunity to present their case, that because I rule on

9    one doesn't mean that you don't get to argue, but we are

10   going to talk about that a little later because some of these

11   things are quite repetitive, and if you get repetitive you

12   don't need to repeat, at least not that part of the argument.

13   MR. MAHR:  We got that part of the message but also

14   got the part of the message that we would have our chance to

15   be heard.

16   THE COURT:  All right.  So those are scheduled for

17   June 4th.

18   MR. MAHR:  Thank you.

19   THE COURT:  Occupant safety, same thing on the

20   depositions?

21   MR. HANSEL:  We are not quite as far along on this

22   one, Your Honor.  AutoLiv, one of the defendants in the

23   occupant safety systems, has an employee who is currently

24   incarcerated who is expected to be released in October of

25   this year, and we have either -- this morning one of my

1    colleagues indicated that he may approach the AutoLiv counsel

2    here today to begin discussions of a similar stipulation with

3    AutoLiv that we hope to enter into.

4              THE COURT:  Okay.

5              MR. HANSEL:  Thank you.

6              THE COURT:  Thank you.  And these also --

7              MR. SPECTOR:  If I might, Your Honor?

8    Eugene Spector on the occupant safety cases.  There is a

9    reference to an amendment to the consolidated-amended

10   complaint, item C on the agenda, under paragraph 6.  I wanted

11   to address that very briefly to the Court, if I might?

12             THE COURT:  Okay.  Yes, because I had a question on

13   that too.  I want to know whether -- just think about this,

14   if there is going to be supplemental briefs necessary.

15             MR. SPECTOR:  Well, that's the situation I wanted

16   to raise with the Court.

17             THE COURT:  Okay.

18             MR. SPECTOR:  As you know and as contained in the

19   pleadings that have already been filed, after the initial

20   motion to dismiss was filed -- or right before I believe,

21   guilty pleas were entered in the case that had not been -- in

22   addition to what had already been, I think it was the Takata

23   guilty plea, and that did two things, it added another guilty

24   plea and it extended the class period because the Takata plea

25   went back several more years.

Status Conference • February 12, 2014

**32**

1    The question we then had was whether we should at

2    that point file a consolidated -- second consolidated-amended

3    complaint, seek permission to do that, and therefore

4    basically disrupt the briefing schedule that was already in

5    place or continue using as was done judicial -- a request for

6    judicial notice of the plea and the information contained in

7    it for purposes of the briefing and argument and getting all

8    of the facts before the Court.

9    It has now been fully briefed, scheduled for

10   argument June 4th.  We are prepared, if Your Honor would want

11   it to be this way, to file a second consolidated-amended

12   complaint within two weeks of this hearing.  If the

13   defendants want to then file something to dismiss that

14   complaint on whatever additional issues are contained in it

15   based on that guilty plea and extend the class period, they

16   could do that and we could have a briefing schedule that

17   would conclude by mid May and still maintain the June 4th

18   hearing date, and I would suggest that to the Court.  We are

19   prepared to file our second consolidated-amended complaint by

20   March 1st and would suggest that 30 days would be ample time

21   for the defendants to address any new issues that are

22   contained therein.

23   THE COURT:  Okay.

24   MR. SPECTOR:  We could then reply in 30 days, or

25   even a little less, they could have a reply to our answer

```
 1    within 14 days and we would still be in early to mid May at
 2    the latest.
 3             THE COURT:  Okay.  We have any -- there's two of
 4    you coming up.
 5             MS. TREFEZ:  Hi.  I'm Katie Trefz on behalf of
 6    Takata.  And, you know, we -- the plea was entered -- or the
 7    plea was announced in -- on October 9th, 2013, which was a
 8    couple weeks before our motions to dismiss were filed.  And I
 9    just -- I would also just like to note that this proposal for
10    this timing and the proposed amendment hasn't been raised
11    with us so far.  So I think our initial reaction would be
12    that without having seen the amendment is that it should come
13    sort of after the motions to dismiss are decided, but -- so
14    that all that briefing, you know, won't have gone to waste
15    and it is a little bit -- I think -- it is a little bit
16    frustrating for us that this wasn't raised at any time in the
17    past several months including the last status conference if
18    this is what they were planning to do.
19             THE COURT:  Why not, why wasn't it raised?
20             MR. SPECTOR:  Your Honor, I think first of all we
21    hadn't decided that that was the way to approach it.
22    Secondly, we had a briefing schedule and the problem we had
23    was how are we going to deal with the briefing -- without
24    disrupting the briefing, was it necessary to disrupt the
25    briefing schedule at this point?  Our conclusion was that it
```

Status Conference • February 12, 2014

1   was not because, first of all, the defendants raised it in

2   their pleadings, we then responded to it in our pleadings,

3   and they replied to it in their pleadings.  So the only thing

4   that this really does, quite candidly, is almost a

5   housekeeping matter of making the complaint meet what we

6   already know are the facts that occurred afterwards.

7           And one other thing, Your Honor, this would be all

8   of the class plaintiffs, there would be three new second

9   consolidated-amended complaints all filed in that period of

10  time to reflect the information that has really already been

11  presented to the Court.

12          THE COURT:  All right.  I'm not doing this twice so

13  we are going to do it at one time.  You may amend your

14  complaint to -- I mean, it is already known and argued.  I

15  don't know what other -- what else you are going to do.

16          MS. TRAFZ:  Yeah, I mean, I just don't know what

17  else they are going to add, and obviously we haven't had a

18  chance to discuss it with other defendants because he's just

19  raising it now.

20          THE COURT:  So let's just clean it up now then.

21  You will have your two weeks to file your amended -- second

22  consolidated-amended complaint and then 30 days thereafter

23  for the defendant to file a motion, so that would be like the

24  beginning of April.

25          MR. SPECTOR:  I believe so, Your Honor.  If we file

 1    by March 1st, they can file by April 1st, we can file a reply

 2    by April 30th -- or an answer by April 30th and they can file

 3    a reply by May 15th and we are still three weeks before the

 4    hearing, if that's acceptable to the Court?

 5              THE COURT:  All right.  The Court will follow that

 6    schedule.  Please prepare an order to that effect.

 7              MR. SPECTOR:  Thank you, Your Honor.

 8              THE COURT:  All right.  How about -- this is just

 9    the same thing, the anti-vibration rubber parts regarding the

10    depositions.

11              MS. ROMANENKO:  Your Honor, we have got a

12    stipulation as --

13              THE COURT:  Your appearance, please.

14              MS. ROMANENKO:  Victoria Romanenko with Cuneo,

15    Gilbert & LaDuca for the dealership plaintiffs.

16              I just wanted to announce, as Your Honor already

17    knows, the dealership plaintiffs and the end-payer plaintiffs

18    have a stipulation with regard to the deposition of one of

19    the incarcerated individuals in the anti-vibration rubber

20    parts case, and that's Hiroshi Yoshida.  Your Honor entered

21    that order I believe a few months back.

22              THE COURT:  Okay.  Thank you.

23              MR. SQUERI:  Your Honor, if I could speak to that

24    for a moment?

25              THE COURT:  Yes.

Status Conference • February 12, 2014

36

```
 1          MR. SQUERI:  Your Honor, Steven Squeri, and I'm
 2   speaking here now on behalf of Mr. Yoshida, the individual
 3   that Ms. Romanenko just referred to.
 4          As part of that order and stipulation that was
 5   agreed to by the parties, it also calls for the dismissal of
 6   the claims against Mr. Yoshida without prejudice.  He was one
 7   of the few people that were named individually in these
 8   complaints.
 9          THE COURT:  Thank you.
10          MR. REISS:  Good morning, Your Honor.  Will Reiss
11   from Robins Kaplan on behalf of the end payers.
12          Just with respect to the stipulation of
13   Mr. Yoshida, because the end-payer plaintiffs did not
14   actually file an action naming Mr. Yoshida, we have a
15   stipulation but the stipulation wasn't actually filed with
16   the Court because the Court has no jurisdiction over that
17   claim but we do, in fact, have a stipulation for the same.
18          THE COURT:  Okay.  Thank you.  I think the next
19   item, B(8), is simply the other actions so we are up to, as I
20   understand it, 28 parts now.  I know the auto dealers just
21   filed a number of cases this week, two parts that already
22   existed, I don't remember the part even.
23          MS. SALZMAN:  This is Hollis Salzman.  I don't know
24   if you are asking for verification that there are 28 --
25          THE COURT:  Yeah.
```

1    MS. SALZMAN:  But there are 28 end-payer

2  plaintiffs.

3    THE COURT:  All right.  What do we know about -- do

4  you have something that you want to say, Counsel?

5    MS. ROMANENKO:  Your Honor, we have a list of the

6  new parts with regard to which we filed complaints on Friday

7  and they are --

8    THE COURT:  Say that again.

9    MS. ROMANENKO:  We have a list of the newly-filed

10  cases.  I can either read them off or our liaison counsel can

11  deliver the list?

12    THE COURT:  You are talking about for the auto

13  dealers?

14    MS. ROMANENKO:  For the auto dealers, yes.

15    THE COURT:  Yes.  No, you don't have to read them,

16  we know they have been added.  I don't think anything else

17  needs to be done on that.  Thank you.

18    And just out of curiosity, is anybody here for the

19  Government?

20    (No response.)

21    THE COURT:  No.  I'm curious as to other parts.

22  Nobody knows that now.  Okay.  We hear all kind of rumors,

23  you know.

24    MR. FINK:  Please spread those rumors, Your Honor.

25    THE COURT:  Okay.  Let's get to the administrative

```
 1    matters now.  The next status conference will be June 4th.
 2    The time was left blank.  We have been meeting at 11:00.  I
 3    don't know if that continues to suit you or if you want some
 4    other time.  Everybody okay with 11:00?
 5                (No response.)
 6                THE COURT:  Okay.  You are shaking your head.
 7    Okay.  We will have 11:00 on June 4th.
 8                We need to schedule the next status conference,
 9    will probably be in October, I was looking at October 8th.
10    Is there any comments on the October dates?
11                MR. FINK:  That's my wife's birthday.
12                THE COURT:  Well, bring her in.  I'm sure she will
13    enjoy it.  Okay.  Let's plan then for October 8th.
14    October 8th is a Wednesday.
15                Now, I have got scheduling of interim conferences
16    and, again, that would be as-needed, for instance on that
17    settlement that we have talked about, we should have a
18    conference but you all don't need to come in, please, only
19    those who are part of that settlement need to be here.  Okay.
20                The next item, we -- or I mentioned before and I
21    just want to clarify it because I have never ever used a
22    special master for anything so the special master thing is a
23    little bit new to me, but I have heard some suggestions about
24    special masters in discovery.  I don't know what your
25    experience is.  I'm really throwing this out, I have no idea
```

1    if this is a good idea, a bad idea, but I would like some

2    help from you.  Right now I'm totally neutral on this

3    subject.

4         MR. WILLIAMS:  Good morning, again, Your Honor.

5    Steve Williams for the end payers.

6         I don't know we have complete agreement on the

7    plaintiffs' side.  I think some of us have a preference of

8    staying within the Court with the magistrate judge.  In our

9    experience a number of these cases sometimes there are

10   special masters, sometimes there's a magistrate.  I think we

11   find when it stays within the Court it facilitates

12   communications between the magistrate and Your Honor, and it

13   also gives us the opportunity under the procedure the

14   magistrate would have to promptly raise discreet disputes and

15   get them resolved.

16        Certainly a number of courts have used special

17   masters.  They can be useful.  They could also be certainly

18   more expensive because they are paid by the hour, and then

19   there is the issue of how we would select them, where they

20   would sit, how frequently we would see them.  Sometimes that

21   can generate more work than if it stays within the Court.

22        THE COURT:  In terms of staying within the Court,

23   the use of a magistrate judge in a case of this size, my

24   question is when we sit down to -- when I sat down with the

25   magistrate judges, you know, how much time, how can she do

```
 1    this, and here in our court we are actually soon to be down
 2    two magistrates, so we have a little bit of -- now, I don't
 3    know that those two magistrates will make a difference
 4    because I don't know when anything is going to come up on
 5    discovery and we may have new magistrates by then, I don't
 6    know, but there are problems that are foreseeable in the next
 7    six months with the magistrate system.  I just wonder in
 8    other large cases like this how much time a magistrate judge
 9    devotes to it and how a Court accommodates it.
10              MR. WILLIAMS:  Well --
11              THE COURT:  If you know.
12              MR. WILLIAMS:  This case is a little different, and
13    we are certainly mindful of the resources.  It depends on the
14    parties and the magistrate.  So taking examples from the
15    Northern District where we stayed within the court, the
16    magistrates would typically see us on discovery matters say
17    every two months on discreet issues that come up that are
18    usually after meet and confer, they are narrowed down, they
19    are focused, you present your letter briefs, which are
20    typically very short, you see the magistrate judge for an
21    hour and-a-half, then you leave with your issue resolved.
22    They are also available telephonically, but they are not
23    devoting days and days of time because I think with the
24    counsel in this case who are experienced in these actions we
25    usually have our disputes fairly crystalized when they are
```

```
1    presented to the magistrate judge.  It has not been unduly
2    burdensome, I think, to the courts in those instances where
3    we have done it.
4            We haven't had anything yet to present to the
5    magistrate, that may change in the next few months, and
6    perhaps when that happens that will give us an idea of
7    whether or not this is going to become too burdensome or not,
8    but to this point we have not had anything yet to present.
9            THE COURT:  Okay.  Good.  Anybody else have any
10   comments?
11           MR. SQUERI:  Your Honor, Steven Squeri for the
12   defendants.
13           Similar to plaintiffs, there are mixed views
14   amongst defense counsel on the issue of whether or not we
15   ought to try to have a special master here.  I mean, one of
16   the concerns would simply be the ability of the Court to
17   handle whatever the volume may be of the issues that may come
18   up.
19           Right now the parties are just really beginning the
20   meet-and-confer process in discovery, so it is really
21   difficult to predict the volume, and we are comfortable
22   waiting and seeing but it is possible that later on down the
23   road it may be necessary to consider a special master.  The
24   question is when the Court thinks would be the most
25   appropriate point in time to do so.
```

```
 1              THE COURT:  I don't want to wait until the Court is
 2   sinking, that's my only --
 3              MR. SQUERI:  Understand, and I appreciate that.
 4              THE COURT:  It may not happen at all.  I'm kind of
 5   loath to give up any of my work.  Okay.  Thank you.
 6              MR. BARRETT:  May it please the Court, I'm
 7   Don Barrett for the auto dealers.
 8              The auto dealers would prefer that we have a
 9   special master appointed.  I was lead counsel for the
10   plaintiffs in the welding fume litigation, and Judge Kat
11   O'Malley.
12              THE COURT:  The Wellbutrin --
13              MR. BARRETT:  No, ma'am.  The welding fume
14   litigation over in Cleveland, Judge O'Malley.  And
15   Judge O'Malley appointed a special master for discovery
16   matters, and it was wonderful really for both sides.  The
17   issue is accessibility.  I mean, sure, we are paying somebody
18   but if you are in a deposition the special master is
19   reachable right then as to whether a question is going to be
20   answered or not, and it saves the months of getting a motion
21   ready, a motion to compel ready, you hash it out, get on the
22   telephone with the special master and hash it out and pretty
23   much that resolves it.  We found it in that particular case,
24   of course, you have to have a qualified special master, but
25   assuming that you have a qualified special master it really
```

1    makes the litigation go so much easier and smoother for all

2    the parties.  Thank you.

3             THE COURT:  Do you appeal the special master's

4    ruling?

5             MR. BARRETT:  Yes, ma'am, you appealed it directly

6    to the Court, to Your Honor, and after one or two appeals

7    there were no more appeals because the Court pretty much

8    adopted the ruling of the special master.

9             THE COURT:  I suppose as to with counsel it would

10   be the quality and character of the special master that would

11   determine --

12            MR. BARRETT:  Of course, and there are special --

13   there is a group of so-called special master specialists,

14   they have a newsletter, I mean, it is a national thing that

15   perhaps they can be invited to make applications with Your

16   Honor and the Court could choose one.

17            THE COURT:  Are they also specialized in electronic

18   discovery?  I foresee in this that this is going to be an

19   electronic discovery nightmare, you know, to come with the

20   terms that have to be determined, the search terms,

21   et cetera.

22            MR. BARRETT:  I think they best be.  I think that

23   the way the courts that I have been involved in lately

24   require that both sides have a retained third-party vendor

25   expert that speaks the language and generally speaking the

```
 1    two of them get together and work it out.  The wonderful
 2    thing about it is neither the plaintiffs' lawyers nor the
 3    defendants' lawyers understand it so they rely on the
 4    experts, at least for now.
 5              Thank you, Your Honor.
 6              MR. SQUERI:  Your Honor, one point that we would
 7    like to add is that if the Court thinks that a special master
 8    is appropriate, what we would recommend is that the Court
 9    direct the parties to sit down together to come up with a
10    process for selecting a special master and also some
11    agreement as to how the costs of that special master will be
12    shared.
13              THE COURT:  Exactly.  I think there is a lot that
14    would have to be worked out and agreed to amongst the
15    parties.  I mean, the cost is one thing and I know it would
16    be costly, although as I look at the expenses so far,
17    plaintiffs in this case, it probably would be a drop in the
18    bucket.  That's -- I mean, my thing was why spend more money
19    but then again given the volume in this case if this keeps
20    going up and given the expenses that have already been
21    incurred, it really is not going to be significant in total I
22    would think.  Okay.
23              MR. HANSEL:  Your Honor, Greg Hansel, again for the
24    direct purchasers.
25              We have also discussed amongst ourselves the
```

1    question of a possible special master, and in our view

2    discovery disputes tend to melt away the closer they are

3    brought to an Article III judge.  You know, when lawyers are

4    sitting in their offices firing off e-mails or letters to

5    each other a lot of discovery disputes arise.  When they are

6    forced to sit down or talk on the telephone some of them go

7    away, when they sit down in person more of them go away.

8    When they have to approach the Court through a magistrate

9    they start to see the unreasonableness of some of their

10   positions and more of those disputes are resolved and

11   remaining ones are narrowed.  And finally when they reach an

12   Article III judge you really get down to the hardest ones,

13   the closest ones, the most difficult to resolve.

14        So for the direct purchasers, Your Honor, we

15   believe Your Honor has been well in control of this

16   litigation.  If the Court feels that it needs assistance or

17   may need assistance in the future I believe it was at the

18   first hearing in this matter Your Honor introduced all --

19   those of us who didn't know her already, to U.S. Magistrate

20   Judge Majzoub, and I understand she is still serving and --

21        THE COURT:  She is.

22        MR. HANSEL:  -- may be available and is assigned to

23   this case, so respectfully, the direct purchasers would

24   prefer to keep it within the court.

25        THE COURT:  Okay.

1        MR. HANSEL:  Thank you, Your Honor.

2        THE COURT:  Well, it appears to me that what you

3    are saying is that this case is no different than any other

4    case, which means that the closer it gets to the judge the

5    faster these discovery disputes go away.  Of course, the

6    magistrate judge and I are a lot cheaper than a special

7    master.

8        So, you know, I'm not ready to appoint a special

9    master at this time.  I appreciate what all of you have said

10    and I'm going to take that into consideration.  I think we

11    will continue, we will use the magistrate judge and see how

12    it goes between her and I, and then if you know, if it

13    doesn't, if it is taking too long, I mean, that's my biggest

14    thing because I don't want this case -- it is dragging on

15    already and I guess it is going to drag on just by the nature

16    of the case, and if it is taking too long and we need to move

17    it along then we will go with the special master.  Don't

18    discount the special master, keep in mind how you would

19    select one because you would be the one selecting the special

20    master, the discovery master.

21        And I would -- since it has been raised here about

22    the electronic discovery I'm assuming you all have your own

23    experts already, maybe I'm wrong, but at least in-house

24    within the defendants I'm sure you have individuals who are

25    experts in this area, plaintiffs, of course, maybe not so

 1   much, but, you know, you really need to have one.  If we get

 2   into electronic discovery disputes then it may be we are

 3   going to be having a court-appointed electronic-discovery

 4   expert.  I don't know whether -- I guess you wouldn't call

 5   that person a master, but I want you to be on top of this, be

 6   ready to handle those, and I know with all of your

 7   experiences that you've had to have dealt with this before,

 8   and I just, you know, I just want to acknowledge your

 9   expertise and make sure that you be prepared to use it in

10   this case.

11       I'm a little concerned about when we get to the

12   discovery about coordination of the discovery, and it is like

13   you will have to amongst yourself administer this discovery

14   so that -- almost so that everybody knows what everybody else

15   is doing from each part.  Now, I'm not saying you get the

16   discovery from each part but in terms of what is being

17   requested, because I think we have talked about this before,

18   we don't want duplication of discovery and we will get into

19   that more when we get into that discovery order.

20       Okay.  Schedule for motions on parts where service

21   has been completed.  I brought up before that I thought there

22   were ten because I just did a quick rough count of parts

23   where all parties have been served, which means that it is

24   going to be appropriate to have motions pretty soon.  I'm

25   concerned with having ten parts or more have motions all at

1    one time because these motions become overwhelming.  Even

2    though you may say I ruled this way once or twice, we still

3    have to read and we do go through all of this, and it is a

4    lot of work, so I am concerned about that.  I don't know if

5    anybody has any idea about how to stagger these motions.

6    Counsel?

7              MR. REISS:  Your Honor, Will Reiss, again on behalf

8    of the end-payer plaintiffs.

9              I just want to preface it by saying we haven't had

10   an opportunity to speak with the other plaintiffs groups, I

11   think it would obviously behoove us to coordinate with them,

12   but in talking about it our initial thought is thus far we

13   have done things in tranches in terms of when the cases were

14   filed, trying to bring several cases together and attack them

15   that way and negotiate case-management orders with the

16   defendants, and I think the next logical place, at least from

17   our perspective, is there were about six cases that were

18   filed right around the same time up through the automotive

19   lighting case, and so our thought process would be that we

20   would start to negotiate case-management orders with the

21   defendants for those cases and we would, of course,

22   coordinate -- I don't think the directs are parties in all of

23   those cases?

24             THE COURT:  Right.

25             MR. REISS:  I believe the dealers are and, again,

1   we would need to coordinate, but the idea would be to speak

2   with the defendants, determine a time to file a

3   consolidated-amended complaint and then propose a briefing

4   schedule and, again, we would propose to begin those

5   discussions and hopefully have something proposed to you in

6   the next few weeks.

7          THE COURT:  Okay.  Good.  That would be very good.

8   Thank you.  All right.  I will wait to see what that is.  It

9   is just I don't want to have a bunch of motions and then they

10  all are delayed six months or nine months because I can't --

11  we can't get them written in that period of time, so a

12  schedule would be good.

13         All right.  Unpublished case law used in briefs.

14  We have been getting stacks of the unpublished case law and

15  it is all very nice, thank you very much for printing those

16  out, but in order to save some trees and actually it is

17  easier if, in fact, the unpublished case law is on West Law,

18  West Law, you do not have to include it, okay, because we can

19  just as easily look it up.  If it is not published then

20  obviously you will have to submit it.  Okay.  Everybody

21  understands that?

22         Use of stipulations.  This is Molly and I trying to

23  figure this out.  There may be some things that are extremely

24  similar as the various parts come through and the motions so

25  that you know how I would rule because I've ruled on it

 1    before.  As I said, you know, I certainly could be wrong, I

 2    have been wrong, but at least I'm consistent, so you can

 3    count -- hopefully count on that.  So I don't know if there

 4    are any of those situations coming up where when, say,

 5    defendants are briefing and they say oh, well, she ruled on

 6    this issue before, that you can either adopt the argument

 7    before or somehow stipulate to it to preserve your right to

 8    appeal but yet not have to go through doing all of the

 9    briefing.

10          Am I confusing you?  You understand what I'm

11    saying?  I tried to think of things, I mean, could we say we

12    have got 15 issues that come up, number them 1, 2, 3, 4, and

13    can you then say you agree or disagree or you just preserve

14    your right to appeal?  I don't know.  Counsel?

15          MR. DAMRELL:  Your Honor, Frank Damrell for the

16    end-payer plaintiffs.

17          We discussed that among ourselves, this particular

18    item, and we have a suggestion.

19          THE COURT:  Good.

20          MR. DAMRELL:  It might be helpful to borrow from

21    some other districts that have dealt with these issues

22    somewhat -- not exactly the same because you have multiple

23    complaints, multiple motions you are going to be faced with,

24    and different parts as opposed to the same part.  It would

25    seem that it might be well to consider the technique, for

1    example, that the Southern District of New York has adopted

2    for complex litigation, not dealing with this precise issue

3    but dealing with motions to dismiss, and the possibility that

4    we could have a conference pre-motion so that the parties

5    could at least understand are there issues that would be

6    raised in the motion that have been ruled upon by the Court

7    or that could be affected by prior rulings of the Court.  And

8    then we could submit to the Court what we believe it to be,

9    either party could say you make the submission but none of

10   the other, so the Court would understand what this motion

11   contains in terms of its effect on prior rulings or the

12   effect of prior rulings on the motions.  I'm sure there is

13   going to be quite a dispute on that but on the other hand if

14   we had a process that would allow us to anticipate that type

15   of an issue in a motion I think it would simplify matters.

16   There are other techniques such as waiving oral argument if

17   it involves an issue that the Court has already ruled upon or

18   feels it ruled upon there is no oral argument, just submit it

19   on the papers, you reduce pagination.  There is also a

20   technique that is used quite often on issues that have been

21   previously ruled upon by the Court so that the focus is now

22   on issues that have not been ruled upon that is the subject

23   of a motion to dismiss.

24          In any event, I would suggest, Your Honor, that

25   perhaps what we could do is to meet and confer, discuss it

1    amongst ourselves, both sides, and see if we can't come up

2    with a procedure that might be acceptable.  If we don't come

3    up with a procedure that is acceptable to all parties we

4    would submit our own suggestion to the Court and have an

5    interim conference on just this issue.  You're faced with 25

6    more motions to dismiss and it will be overwhelmed unless we

7    streamline that process, and I think we are all capable of

8    doing that in assisting the Court in that regard.

9           So I would suggest, as I said, meet and confer with

10   defendants and plaintiffs regarding this specific issue and

11   if we can't agree to submit at least our proposals to the

12   Court for you to consider at a subsequent interim conference

13   hopefully prior to the June status conference.  It could be

14   done telephonically, it could be done in person, but I think

15   it is so critical because to proceed with the idea that

16   nothing has ever happened before and this is a brand-new

17   motion makes no sense and that's not the idea of an MDL.  We

18   are here to help the Court, to reduce the burden on the

19   Court, and I think we need to do this quickly, so hopefully

20   we can meet and confer, make our submissions to you and then

21   have an interim conference on it.

22          THE COURT:  Okay.  Any other comment on that?

23          (No response.)

24          THE COURT:  I think that that's an excellent idea.

25   Let's talk about who is going to meet and confer.  I mean,

```
1    you will have to determine that amongst yourself.  It should
2    be a small group.  We don't need everybody meeting and
3    conferring, and maybe you could even be in charge of that,
4    Mr. Damrell?  With your experience --
5            MR. DAMRELL:  If we can meet and confer within
6    30 days and in the following 30 days you could have an
7    interim conference on this subject, I think that's kind of
8    the time frame, so we can have this resolved hopefully by
9    April before the June conference.
10           THE COURT:  All right.  Any other comment?
11           (No response.)
12           THE COURT:  Okay.  All right.  You will take care
13   of getting the ball rolling in that respect?
14           MR. DAMRELL:  I will do so, Your Honor.
15           THE COURT:  Thank you very much.
16           All right.  Now we go into I think the next item is
17   Fujikura's motion to dismiss Ford Motor Company.
18           The question that Molly raises is whether we want
19   to have a hearing or at least a telephone conference in
20   60 days to see where we are at with that.  Actually what I
21   would like is kind of an update in 30 days as to what it is
22   that you have accomplished to date in your meet and confer,
23   let's do that by telephone conference of a small group of
24   you, a representative group, and then we will discuss where
25   we go from there.  Is that fair?  Okay.
```

```
 1              All right.  Does anybody else have any --
 2              UNIDENTIFIED ATTORNEY:  I'm the Fujikura --
 3              THE COURT:  Before we get to that, is there
 4    anything else administratively that anybody has to raise?
 5              (No response.)
 6              THE COURT:  Is there anything else that the --
 7              MS. SALZMAN:  Your Honor, Hollis Salzman.
 8              I do know that most of the plaintiffs, but I
 9    haven't discussed it with the defendants, would request if
10    Your Honor was open at some point -- our hearing started at
11    11:00 a.m. and we are not sure the genesis of how we moved to
12    11:00, but if Your Honor was open to entertaining maybe
13    starting a little earlier because I think most of the counsel
14    do come in the night before and by moving it even slightly
15    earlier it would allow us easier access to getting out that
16    same day?
17              THE COURT:  Okay.  We had this discussion before,
18    we were meeting at 10:00, which I don't care, it is fine, I
19    can start --
20              MS. FISCHER:  That's fine with wire harness --
21              THE COURT:  I can start at 9:00 but no earlier than
22    9:00.  It is what?
23              MS. FISCHER:  It is fine with the wire harness
24    defendants.
25              THE COURT:  To start at 10:00?
```

1        MR. FINK:  The direct plaintiffs are okay with

2   that.  We were the ones that originally raised the issue

3   initially.  It is more convenient, but 10:00 is fine for us.

4        THE COURT:  Okay.  So that's better.  Let's go back

5   to what we discussed before, that June 4th meeting will be at

6   10:00, not at 11:00.  Okay.  Very good.  Anything else?

7        (No response.)

8        THE COURT:  Okay.  Now we have our first motion,

9   which is the Fujikura's motion.

10       MR. COOPER:  Good afternoon, Your Honor.

11  James Cooper from Arnold & Porter on behalf of the Fujikura

12  defendants.

13       I'm mindful of the discussion that we just had, and

14  I think the Court has raised that issue previously.  We have

15  fully briefed Fujikura's motion to dismiss Ford's lawsuit

16  brought as individually against Fujikura, and I don't want to

17  delay things too much but there are a couple things that I

18  think are worth covering this afternoon.

19       THE COURT:  Okay.

20       MR. COOPER:  The basic issue in front of the Court

21  presented by the motion is how far afield of the guilty plea

22  can an individual plaintiff push.  In this particular case,

23  as Your Honor knows, we have had a lot of prior discussion

24  about the guilty pleas.  Fujikura's guilty plea was with

25  respect to Subaru.  There was -- not with respect to the

1   entire wire harness market, which would differentiate it from

2   the Carrier case which I think is kind of an important

3   guidepost here as the Court is looking at the motion.  In

4   Carrier the European investigations were as to the whole

5   market and that became relevant when Carrier was explaining

6   the relevance of the European pleas to the United States, and

7   I will come back to that.

8           Certainly the fact that we only pled with respect

9   to Subaru doesn't stop Ford, and we are not arguing that that

10  stops Ford from using that in its allegation and using that

11  to support its claim, but at the same time it has to relate

12  in a specific plausible way the allegations in the complaint

13  to conduct targeted against Ford.

14          With regard to the relationship between Fujikura

15  and Ford, as the Court is aware from the papers, there isn't

16  one essentially other than one bid.  Ford has never --

17          THE COURT:  That's why you are sued?

18          MR. COOPER:  Well, Your Honor, I asked that same

19  question but I haven't gotten an answer.  Ford has never

20  purchased anything from Fujikura, it is not a direct

21  purchaser from Fujikura.  I think Ford's allegation is it

22  purchases from other people and it is alleging that those

23  other people must have conspired with Fujikura, but it has no

24  relationship with the exception of one bid that I'm going to

25  come --

Status Conference • February 12, 2014

```
 1          THE COURT:  There is no direct except for the
 2    first-round bid, no direct relationship?
 3          MR. COOPER:  There is no relationship at all except
 4    for one bid that didn't get past the first round and
 5    furthermore in which Fujikura provided its cost information
 6    to Ford, which is -- maybe typical in certain auto parts bids
 7    but is not typical actually if you review the case law, it is
 8    not something that typically happens in or facts that you
 9    typically have in antitrust cases.
10          So the one bid related to the one Ford supply
11    contract was in 2009, although Ford alleges conspiracy
12    beginning in 2000, and by the way, Fujikura's plea is only
13    back to 2006, so there are six years with no support from the
14    plea and there are nine years with no support from any
15    contact.
16          THE COURT:  But the dates in the plea do not limit
17    the dates in the civil action?
18          MR. COOPER:  Right, that's the argument we keep
19    having.  Is the plea -- the plea is not a limit, it doesn't
20    require that you can't allege something more, but then you
21    have to come forward with something that connects -- they
22    have got to say we are not limited by the plea but here is
23    what we have got, we have got something else, that's fine,
24    and then we can't stand on the plea and say no, that's
25    impossible, DOJ or JFTC or whoever looked into this, so they
```

1    have to come forward with something else, and they haven't

2    done that in this complaint.

3           With respect to the -- with respect to that, there

4    essentially are no other non-conclusory allegations about

5    Fujikura's conduct.  They allege that Fujikura was priced --

6    that its bid was too high, which, you know, obviously we

7    don't dispute, they didn't accept the bid, they had

8    presumably lower bidders although they don't allege that they

9    had lower bidders.  They also don't allege who won the bid.

10   Presumably, if their theory is correct, that there was a

11   conspiracy with respect to this bid for this CD4 it would be

12   to benefit a member of the conspiracy, but they don't allege

13   who won the bid or whether the winner of the bid was part of

14   the conspiracy they are alleging.  That's obviously something

15   they know and they don't allege anything about pricing with

16   respect to the bids, that's obviously something they know.

17   They have Fujikura's cost data, they don't allege anything

18   about how -- why they think the bid was a product of the --

19   how they know now that the bid was a product of the

20   conspiracy when they have the cost data.

21          Ford also knows, and these are the kinds of facts

22   that were alleged by Carrier in the Carrier case, they also

23   know what do they pay for wire harnesses outside of the CD4

24   bid and how do those prices relate.  Is that some -- if the

25   prices are much higher in the CD4 bid then maybe there is an

1    argument that there is -- that might be some evidence to push

2    the complaint towards plausibility.  They know what they paid

3    for wire harnesses outside of the conspiracy that they are

4    alleging, in other words, before or after the conspiracy or

5    in other markets where they are not alleging a conspiracy.

6             THE COURT:  You raised the CD4, it is your argument

7    that -- not that it should be at all but that if it is it

8    should be related only to the CD4 platform?

9             MR. COOPER:  In the papers, Your Honor, what we say

10   is that -- we obviously believe that the complaint should be

11   dismissed in its entirety.

12            THE COURT:  Right.

13            MR. COOPER:  However, if the Court is not inclined

14   to do that then there is no basis to extend the case beyond

15   the question of the CD4.  And that's -- that's something that

16   is very discreet, and if Your Honor is inclined to let the

17   case go forward that's something that is you know, that's

18   something we can bite off and chew, and that's what

19   Judge Altonaga did in Florida Cement was that it was pretty

20   much the same idea.  In that case the plaintiffs had alleged

21   a conspiracy in the cement business and a conspiracy in the

22   concrete business, and she said -- in the first round of

23   motions she said well, the allegations don't support cement

24   so let's take that out, and then she looked at concrete and

25   said the allegations support only with respect to a

 1   particular time period and a particular set of business

 2   activities so let's chew that, let's bite that off, we will

 3   have discovery on that and we will move the case forward.

 4   And we were able to efficiently move that case forward and it

 5   ended up resolving.

 6            We don't think that Your Honor needs to do that

 7   here.  We think the complaint should be dismissed in its

 8   entirety, but if you are not going to do that then we believe

 9   that it should be limited to the CD4, and we will have

10   discovery, we will move forward.

11            THE COURT:  Okay.

12            MR. COOPER:  Thank you, Your Honor.

13            THE COURT:  Response?

14            MR. TORRES:  Good morning, Your Honor.  May it

15   please the Court, Hector Torres for Ford.

16            Your Honor, this motion should be denied for two

17   reasons.  The first reason is that it is largely a rehash of

18   arguments that the Court has already heard and issued its

19   decision on June 13th of 2013.  The other reason is that it

20   is premised on a series of legal arguments that have been

21   rejected by the 6th Circuit.

22            With respect to the first issue, the allegations

23   that Ford has made here are not limited to the CD4.  The

24   allegations --

25            THE COURT:  How do you expand that beyond the CD4?

 1          MR. TORRES:  The allegations are that there was a

 2    conspiracy involving Fujikura, an admitted co-conspirator,

 3    with Yazaki and with Sumitomo and others that expand -- that

 4    was in effect in a period of ten years, from January 2000 up

 5    through February of 2010.  During that time period when the

 6    cartel was in effect Ford purchased billions of dollars in

 7    wire harnesses from Fujikura's co-conspirators.  Basic

 8    principles of joint and several liability in antitrust law

 9    provide that it is not our obligation to desegregate the

10    liability that Fujikura has because they are jointly and

11    severally liable with respect to the conduct of its

12    co-conspirators during the conspiracy period.

13          So the focus of the argument here has been only on

14    the CD4 but it is ignoring all of the other allegations in

15    the complaint, which is that Ford was victimized and paid

16    prices that were artificially inflated as a result of a

17    cartel that was in operation for ten years.

18          THE COURT:  Explain the basis of the cartel again.

19    You have got Fujikura pleading guilty to --

20          MR. TORRES:  Fujikura is pleading guilty with

21    respect to Subaru according to the complaint, you have Yazaki

22    and you have Furukawa pleading guilty to a conspiracy that

23    was in effect for ten years.  What the courts have held is

24    that in connection with the plausibility analysis the

25    standard that has to be met is whether the claims that Ford

 1    has alleged are plausible.  In other words, is it plausible

 2    that it was victimized by a cartel that was in operation for

 3    ten years that Fujikura was a part of?

 4         THE COURT:  Well, we know that Fujikura from the

 5    plea dealt with one person, one entity, the Subaru?

 6         MR. TORRES:  Correct, Your Honor.

 7         THE COURT:  Now tie them into the other.

 8         MR. TORRES:  Well, Your Honor, with respect to the

 9    plea agreement, what the courts have said is that -- and what

10    this Court held in the June 2013 decision was that once you

11    establish that a member is a part of a conspiracy you are not

12    bound by the guilty plea.  So to the extent that their guilty

13    plea was limited to the Subaru, the guilty plea as this Court

14    has held and 6th Circuit has held in the Carrier decision.

15         THE COURT:  I don't think there is any question I

16    have ruled they are not bound by the guilty plea, but tell me

17    what else connects it.

18         MR. TORRES:  Well, Your Honor, what connects it is

19    they admitted they were allocating customers, they were

20    fixing prices, they were bidding -- they were bidding --

21    rigging the bids in connection with the sale of wire harness.

22         THE COURT:  Who admitted they were allocating

23    customers, was that the Fujikura plea?

24         MR. TORRES:  Yes, that's in the plea.  Your Honor,

25    I have a slide that I can show you.  Do you have the -- may

1    it please the Court, may I?

2              THE COURT:  Do you have another copy for my clerk?

3              MR. TORRES:  Yes, Your Honor.  We turn to three,

4    this is basically a recitation of the guilty pleas in the

5    investigations, and you will see that the first one refers to

6    the Fujikura plea, the time period that it pled guilty,

7    January 2006 through February 2010.  Furukawa, the same --

8    the longer period from January 2000 through January 2010.

9    And the Yazaki plea during that same period.

10             In the guilty pleas the -- what they are pleading

11   guilty to are three things, that there was allocation of the

12   market, that they were fixing prices and that they were

13   rigging the bids, and that's exactly the conduct that is

14   alleged with respect to Ford because Ford was in the market

15   and was purchasing wire harnesses from the co-conspirators

16   during that entire time period.

17             The argument that we had to be the primary target

18   of the --

19             THE COURT:  Just a minute.  The DOJ didn't connect

20   Ford or Fujikura to -- wait a minute, didn't connect to an

21   American OEM, right, until the ignition coil?

22             MR. TORRES:  Your Honor, the guilty pleas do not

23   refer to an American OEM.  Their evidence with respect to

24   what DOJ did or did not do does not bind or dictate what the

25   contours are of the complaint.  Your Honor is correct that

```
 1    the guilty pleas did not make any reference to an American
 2    OEM.  Their evidence that Ford was not impacted is
 3    essentially a press release which is -- should be accorded
 4    even less weight than other documents, or if the Court even
 5    takes judicial notice of it, because a press release just
 6    refers to the investigation that was conducted by the DOJ and
 7    reflects the guilty pleas that they negotiated but the courts
 8    in the 6th Circuit have been very clear that a complaint in a
 9    civil case is not constrained, cannot be controlled, cannot
10    be limited by the terms of a guilty plea.
11              In fact, the 6th Circuit has also --
12              THE COURT:  For a press release.
13              MR. TORRES:  On a press release, and there's
14    actually two arguments in response to that.  Number one is
15    that the press release itself is just reflecting these guilty
16    pleas and the Government's investigation, which itself in
17    Your Honor's decision in June referred to the fact that there
18    could be a million reasons why the Government conducts an
19    investigation, stops an investigation at a certain point, but
20    that certainly does not limit a civil plaintiff.
21              And the second point is simply that if you were to
22    accept the truth of a statement like the press release that
23    is advanced here by Fujikura, essentially you would be
24    depriving Ford the benefit at the pleading stage that the
25    Court is required to accept the factual allegations as true.
```

1    You would be accepting an unsworn statement from out of court

2    to refute at the pleading stage a well-pleaded allegation

3    with respect to Ford being impacted by the cartel's conduct.

4              THE COURT:  Okay.

5              MR. TORRES:  Your Honor, if I could just address

6    quickly a couple of other arguments that were raised?

7              This direct targeting argument also -- in your

8    decision you essentially addressed it with respect to

9    allegations that refer to a cartel that is in operation and

10   affects the market prices over the time period that a cartel

11   is in operation, and there was no requirement according to

12   the allegations in the complaint that there be a direct link

13   between the conduct of the conspirator and a specific

14   purchaser.  That was clear that they were operating, they

15   artificially inflated the price of the wire harnesses, they

16   control more than 88 percent of the market, they were

17   controlling it for more than a decade, they were dictating

18   the price in the market and Ford was in that market.  Ford

19   purchased in that market, Ford was harmed in that market.

20             THE COURT:  So Ford was harmed just even as -- not

21   as a direct target but the fact that it was in the market as

22   part of it?

23             MR. TORRES:  Exactly, Your Honor.  The other

24   argument that Ford did not purchase and somehow that's

25   relevant to a motion to dismiss should also be rejected.  It

1    flies in the face of the 6th Circuit's decision in

2    Chattanooga that made very clear that the absence of

3    purchases from an antitrust defendant is irrelevant as long

4    as the plaintiff can establish that it made purchases from a

5    co-conspirator, a non-defendant co-conspirator.  That was a

6    6th Circuit decision, and it has been the law in the 6th

7    Circuit for a long time.

8          One of the principal cases that Fujikura's counsel

9    relies on in their briefs is the Iowa Ready-Mix Concrete

10   case, Your Honor has already dealt with that case in terms of

11   the plausibility of the allegations there.  If you recall,

12   that's the case where there was an inherent quality with

13   respect to concrete, and the plaintiffs were alleging that as

14   a result of that inherent quality the product could only be

15   sold in a limited geographical region and the plaintiffs were

16   alleging a statewide conspiracy.  In that case it was found

17   that it was not plausible.  That clearly is not the case

18   here, as Your Honor found in your decision in 2013, because

19   here you have a global market and there is no argument that

20   there was any inherent limitation with respect to wire

21   harnesses.

22         Another argument that they raise in their reply for

23   the first time is that the complaint is somehow deficient

24   because Ford did not explain the reason that Fujikura would

25   submit a losing bid or that Sumitomo would decline to bid,

```
 1   but that argument ignores the allegations in the complaint,

 2   which is that -- these allegations are at paragraphs 58 and

 3   59 where Ford alleges that Fujikura agreed to submit an

 4   intentionally high bid and Sumitomo refrained from bidding on

 5   the CD4 in furtherance of the cartel's agreement to rig bids

 6   and allocate customers.

 7            The -- they come forward with a more-plausible

 8   explanation with respect to why they submitted a high bid,

 9   but as the 6th Circuit has held in the Watson case and in the

10   Flagstar Bank case, at the pleading stage if the plaintiff

11   introduces sufficient facts to state a plausible claim, the

12   fact that the defendant can come in with an alternative

13   explanation seemingly innocuous or seemingly reasonable is

14   not sufficient to defeat the motion for --

15            THE COURT:  It probably only provides for --

16            MR. TORRES:  Pardon me?

17            THE COURT:  It only provides Twombly for

18   plausibility, not that may be something that is more

19   plausible.

20            MR. TORRES:  Exactly, Your Honor, and they make the

21   argument, and that decision, the 6th Circuit has squarely

22   rejected it as well.

23            Two other -- the one decision, the Florida Cement

24   case that was raised as a basis for trying to limit the

25   discovery to the CD4, is completely distinguishable.  That
```

```
 1    was a case where the president -- the basis for the
 2    allegations concerning cartel conduct was based on a
 3    statement that was made by a president that was in office for
 4    a certain period of time.  The allegation was made that the
 5    conspiracy started before that time.  That clearly was not --
 6    is not what we have here.  Here we have a ten-year admitted
 7    conspiracy of guilty plea in the cases, completely
 8    distinguishable, and is not a basis for limiting discovery,
 9    certainly not limiting to the CD4 or limiting discovery at
10    all.  Ford is entitled to discovery for the entire period
11    they were purchasing wire harnesses at these inflated prices.
12            THE COURT:  Okay, thank you.
13            MR. TORRES:  Thank you, Your Honor.
14            THE COURT:  Mr. Cooper?
15            MR. COOPER:  Your Honor, I will try to be very
16    brief.
17            Just working backwards, Florida Cement, I was in
18    that case.  It is exactly the same situation.  It is a
19    situation where the one -- what Judge Altonaga said was the
20    one allegation that is specific here is this allegation about
21    the president of a particular company being at a meeting and
22    making some comments.  She said -- they had alleged there was
23    a conspiracy going back ten years, and she said -- and they
24    had alleged market conditions and all of this kind of generic
25    stuff.  She said that's the one concrete, so to speak,
```

1    allegation that you have, and so we are going to bite that

2    one off, we are going to limit discovery, let's chew that and

3    see where we are.  It is exactly the same as the CD4

4    allegation in Ford's complaint.

5            With respect to -- I think counsel said you had

6    decided all of these issues before.  I don't want to --

7            THE COURT:  Tell me what I have decided.

8            MR. COOPER:  I don't want to tell you what you have

9    decided, but I just want to make the point this is a

10   different case than the direct purchaser class.  Ford has

11   individually sued Fujikura.  It is -- I think what's going to

12   happen, Your Honor, a preview of what we are going to get to

13   when we get to class certification in the direct purchaser

14   case.

15           THE COURT:  I think it is too.

16           MR. COOPER:  Ford has sort of preempted that, and

17   this is what I was going to come to with my last point about

18   expanding, you know, they are trying to drive their complaint

19   through this hole created by the class cert -- or by the

20   class decision and expand it, so counsel just said that --

21   told you that Ford's injury was because Ford was in the

22   market, and that I think at the bottom line they purchased

23   wire harnesses, we don't dispute that.  They never bought

24   them from us, they are not Subaru, but their real theory, it

25   is not the theory that is in their complaint but their real

1    theory seems to be what is referred to as the umbrella

2    theory, that, hey, we were in the market, something happened

3    in the market, it affected us.  That is not what they allege

4    in their complaint.  In their complaint they allege a cartel

5    targeted at Ford.  And they can if -- we would have legal

6    arguments -- separate, different legal arguments about that

7    theory if they amend their complaint and they want to allege

8    that theory, but that's not what is in their complaint so the

9    pitch that Ford is throwing that we have to swing at is a

10   different allegation.

11           THE COURT:  Okay.

12           MR. COOPER:  Thank you, Your Honor.

13           THE COURT:  Thank you very much.  All right.  The

14   Court will issue an opinion on that.

15           Ready to go on to the discovery --

16           MR. HANSEL:  Yes, Your Honor, unless the Court

17   wants to take a break.

18           THE COURT:  I was wondering when you want to break

19   for lunch.  I don't want a long lunch hour either.

20           MR. SQUERI:  Let's go for a short lunch now.

21           THE COURT:  Yeah, I think this is going to be the

22   most time-consuming motion.  Let's take -- do you think you

23   can do it in an hour, get out and get back in?  Yes.  Let's

24   try that.  12:30 to 1:30.  Okay.  Very good.

25           THE LAW CLERK:  All rise.  Court is in recess.

```
 1              (Court recessed at 12:28 p.m.)

 2                        _   _   _

 3              (At 1:33 p.m. Court reconvenes, Court, counsel and

 4              all parties present.)

 5         THE CASE MANAGER:  All rise.  The United States

 6    District Court is now in session.  You may be seated.

 7         THE COURT:  Good afternoon.  All right.  Let's get

 8    on with the Ford motions now.  Who is going to argue what?

 9         MR. HANSEL:  May it please the Court, Your Honor,

10    Greg Hansel for the direct-purchaser plaintiffs, and I

11    appreciate Mr. Squeri allowing me to go first.  That's a good

12    example of something I was going to talk about anyway.

13         The good news on the proposed supplemental

14    discovery plan or plans is that plaintiffs and defendants

15    have had many meet and confers and we have agreed on the vast

16    majority of the issues, the vast majority of the language in

17    the plan.  That is important for at least three reasons.

18    One, it is good in itself; second, walking in here this

19    afternoon from lunch I saw the civility award plaque in the

20    hallway so we are conducting this litigation the way Your

21    Honor asked us to at the beginning; and, third, it bodes well

22    for the future.

23         Specifically, if after this hearing the Court

24    chooses to leave some issues for another day, such as the

25    deadline for class certification or certain discovery
```

1    disputes that may arise in the future for the parties to try

2    to agree in the future, there is a good chance that we will,

3    we will be able to resolve those without the assistance of

4    the Court.

5           There are four disputed issues in the supplemental

6    discovery plan submissions by -- the primary ones, I'm now

7    referring to the Ford issues.

8           THE COURT:  Okay.  We are talking now, you proposed

9    in docket number 183, your joint memorandum, okay?

10          MR. HANSEL:  Yes.

11          THE COURT:  If we could use that as an outline of

12   how we go through them?

13          MR. HANSEL:  Very well.  That was going to be my

14   outline.  I do have one question for Your Honor.  I'm

15   prepared to address all four issues, the whole thing, and

16   then sit down, or if it would be easier we can go one by one

17   so we keep our focus on the particular issue and then --

18          THE COURT:  Let's focus on a particular issue

19   because I would like to rule on them as we go along, if

20   possible.

21          MR. HANSEL:  Great.  Very well.

22          So the first issue is the document discovery

23   schedule.  Under the plaintiffs' proposal, and, in fact, this

24   is in both parties' proposals, the parties -- the plaintiffs

25   must serve additional, quote, comprehensive document

1    requests, end of quote, by March 15th, 2014, so in about a

2    month.  And under the plaintiffs' proposal, in particular,

3    the plaintiffs are permitted to serve additional document

4    requests after that date.  This is a plain vanilla approach

5    to discovery under Rule 26, and we believe it is appropriate.

6    And I want to say I am speaking on behalf of all three groups

7    of the class plaintiffs who are referred to in the papers by

8    the title, plaintiff groups in contrast to Ford and the

9    Attorney General, who are referred to as individual

10   participates, that's a defined term.

11          THE COURT:  Okay.

12          MR. HANSEL:  So for three reasons the plaintiffs'

13   approach is proper.  First, as in the Intel case, courts have

14   held that broad scope of discovery is particularly

15   appropriate in antitrust cases.  Second, the DOJ stay -- the

16   Court's order granting the Department of Justice's request

17   for a limited temporary stay limits discovery in this case.

18   And third, it is -- this is an international case which

19   creates complications.

20          The defendants propose unprecedented restrictions

21   and limitations by asking to limit plaintiffs to, quote,

22   targeted, end of quote, requests for, quote, very specific

23   and limited, end of quote, categories after March 15th, 2014.

24   Not content with the federal rules, the defendants want to

25   create a new burden on plaintiffs seeking discovery to

1    justify their discovery by making a showing of need, that

2    there is a need for new discovery -- additional discovery

3    from newly discovered information or new developments in the

4    case.

5         Beside being unprecedented the defendants' novel

6    approach is unnecessary.  If the defendants have an objection

7    they can make it if they have an objection to discovery.  If

8    they believe it is duplicative or it creates burden and

9    expense out of proportion to the potential benefit they can

10   object to the discovery requests in the ordinary course, and

11   chances are the parties will work it out.  If not, they can

12   ask for Your Honor's assistance or as we discussed earlier

13   perhaps Magistrate Majzoub's assistance.  If it is -- in this

14   case the defendants know the facts about the conspiracy, not

15   the plaintiffs.  The plaintiffs need normal discovery to find

16   the truth.

17        The second aspect of document discovery in this

18   first overall issue is in paragraph I(B)(3) with regard to

19   the timing and manner of responses to requests for

20   production.  The plaintiffs propose a workable framework

21   whereas the defendants wish to leave actual production of

22   documents on an open-ended, indeterminate, quote, rolling

23   basis, end of quote.  The plaintiffs propose that --

24        THE COURT:  What exactly does that rolling basis

25   mean, does it mean when they have so many documents they will

```
 1    give them to you, and then as they go along they --
 2         MR. HANSEL:  Yes, yes.  And the problem we have
 3    with rolling discovery is that a party could theoretically be
 4    in compliance with it by producing something at the beginning
 5    of rolling discovery and not producing some very important
 6    documents perhaps until the very end of the rolling
 7    discovery.
 8         THE COURT:  So you are saying don't give it to me
 9    when you find it, hold it until you find everything?
10         MR. HANSEL:  I don't --
11         THE COURT:  Is that what you're saying??
12         MR. HANSEL:  I don't want to put words in the
13    defendants' mouth but --
14         THE COURT:  What are you saying?  If you don't want
15    it rolling, are you saying don't give it to me until a
16    particular date?
17         MR. HANSEL:  No, we are not saying that.  We are
18    happy to receive documents anytime, but what we are saying is
19    there should be a deadline and we propose specific what we
20    believe to be generous deadlines.  So one of them is for
21    electronic documents, the plaintiffs propose 120 days from
22    the requests, and for hard-copy documents the plaintiffs
23    propose 150 days, so four months or five months depending on
24    whether you have to process hard-copy documents.
25         And so to expedite and facilitate that document
```

1    production, plaintiffs also propose that within 14 days of

2    the service of a request for production the parties should

3    begin their negotiations about issues involving two

4    particular areas that are classic issues that arise in

5    document discovery in cases of this type, which are search

6    terms, the Court mentioned that earlier, and custodians.

7    Search terms is pretty self-explanatory, you know, what terms

8    do the defendants have to use to search through their

9    databases to find things that may be relevant or

10   discoverable.  And custodians may be a little less

11   self-explanatory, but basically the defendants may say well

12   within the breadth of your discovery request there may be 30

13   potential document custodians or employees who have their own

14   e-mail accounts, but we believe that only 20 of those really

15   had anything to do with what you are after, so would you

16   agree that we not have to search through the other ten

17   people's Outlook mailbox?

18          So what the plaintiffs are proposing -- and in a

19   case like this it is appropriate to have some special element

20   of process to move things along.  Plaintiffs are proposing

21   that within 14 days the parties sit down or talk on the phone

22   and meet and confer about document custodians and search

23   terms.

24          THE COURT:  For documents which defendant would

25   agree at least some of them would be in response to your

1    request or vice versa as opposed to -- the example that you

2    gave, say you have 20 and they are willing to give you 10

3    custodians so you are really only fighting over the number of

4    custodians but you are not fighting over the content of what

5    you want from the custodian?

6            MR. HANSEL:  Well, the content I guess would be

7    under the search term category so within those custodians we

8    could talk about what search terms --

9            THE COURT:  What I'm thinking is you could do the

10   search terms because you know you are going to need them

11   because some custodians are going to be requested to give

12   this information, right?

13           MR. HANSEL:  That's true.

14           THE COURT:  And the Court could determine later

15   whether it is 10 custodians or 20 custodians?

16           MR. HANSEL:  That's true, although I guess if you

17   were doing the search terms you wouldn't know which

18   custodians to run the search terms through so you sort of

19   need to do both at the same time, and we would certainly

20   endeavor to try to agree, as we have frequently been able to

21   do, on both of those issues.

22           THE COURT:  Okay.

23           MR. HANSEL:  So the defendants' proposed rolling

24   discovery means that as long as a party produces some

25   documents at the beginning of rolling production they are not

Status Conference • February 12, 2014

1    required to produce the rest until the last day of discovery

2    after depositions may have been taken already, after experts

3    have started their work perhaps without the benefit of key

4    documents.  I don't want to impugn any motives to anyone but

5    it presents a moral hazard if a party has sort of a license

6    not to produce important documents until the last day of

7    discovery.  Incriminating documents could conceivably not be

8    produced until the end, and that's not in the spirit of

9    discovery under the federal rules, so that's why the

10   plaintiffs suggest a deadline.  That's my presentation on the

11   first issue, Your Honor.

12          THE COURT:  Okay.

13          MR. HANSEL:  I will turn it over to Mr. Squeri.

14          MR. SQUERI:  Thank you, Your Honor.  May I

15   approach?  We just have a few very short slides to share with

16   the Court.

17          THE COURT:  All right.

18          MR. SQUERI:  Your Honor, Steven Squeri for

19   defendants Yazaki Corporation, Yazaki North America.  I'm

20   also speaking now, Your Honor, on behalf of all defendants,

21   although with respect to one of the issues that's going to

22   come up a little bit later Michael Rubin of Arnold & Porter

23   will be addressing the Court.

24          THE COURT:  Okay.

25          MR. SQUERI:  First, I do want to agree with

```
 1    Mr. Hansel's initial comment, and that is that the parties
 2    have managed to reach agreement with respect to a number of
 3    issues that required a fair amount of negotiation.  We first
 4    sent to plaintiffs, Your Honor, a draft of the discovery plan
 5    back on September 19th, and the negotiation over the plan
 6    began in earnest in late November and continued until
 7    January, and we were able to resolve many issues involving
 8    interrogatories, a number of interrogatories, requests for
 9    admissions, some issues regarding depositions.
10            One thing I should point out, Your Honor, is that
11    the plan does contemplate an additional document being
12    generated, a deposition protocol, which is going to address
13    some additional issues concerning the ways in which
14    depositions will be conducted.  None of those are at issue
15    today.  We are expecting that the meet and confers with
16    respect to those matters are going to take place in the very
17    near future.
18            Your Honor, turning to the document requests and
19    production issues, the way defendants view this is that it is
20    really a question of sequencing and being able to prepare the
21    document productions in the most efficient, effective way
22    possible and having the opportunity to present the issues to
23    the Court in an efficient way.  We agree with the basic
24    language quoted by plaintiffs concerning the Federal Rules of
25    Civil Procedure that the goal is, quote, to secure the just,
```

1     speedy and inexpensive determination of this action.

2         We also agree with plaintiffs' observations that

3     this is a complex antitrust action, and that plaintiffs at

4     least are seeking, you know, very -- are asserting very broad

5     claims and seeking very broad discovery.  We are not here to

6     address those discovery issues, but there is a great deal

7     involved here.  But we would submit, Your Honor, that the

8     complexities and realities of this case and the broad

9     discovery that is being sought is precisely why we need a

10    rational, orderly process for addressing how these document

11    production issues are going to be addressed and the sequence

12    for addressing the issues and the sequence for resolving

13    those issues and then making the production of documents that

14    we are ultimately required to produce, and that's precisely

15    what we are trying to address, Your Honor, through the

16    various provisions that we have suggested in the discovery

17    plan.

18        In sum, Your Honor, what we look to do -- what the

19    plan as drafted by defendants would do is try to first get

20    out all of the comprehensive discovery requests from

21    plaintiffs, then to resolve the issues, and then to begin the

22    production of documents in accordance with a schedule that is

23    agreed upon by the parties once we know what the scope of

24    that production is going to be.  As we address these issues,

25    Your Honor, we think it is important to consider both the

```
 1    context of where we stand and what has happened so far.
 2          If I could refer the Court to the second slide,
 3    page 2 of the handout that I handed to the Court, this is a
 4    rough time line that the Court has of what has occurred in
 5    connection with plaintiffs' document requests directed to
 6    defendants.  What you don't see there is that the initial
 7    request for production of documents were served by the
 8    end-payer plaintiffs and the direct-purchaser plaintiffs in
 9    the July/August time frame of last year.  These two sets of
10    requests included approximately 60 specifications that
11    demanded production of an extraordinary broad range of
12    documents concerning the business of the defendants.  In many
13    respects, Your Honor, these requests overlapped many of the
14    same type of documents that had already been provided to
15    plaintiffs back at the end of 2012, if Your Honor will
16    recall.
17          THE COURT:  We are talking about the wire harness?
18          MR. HANSEL:  Yes, Your Honor.  The defendants
19    produced in the last quarter roughly of 2012 about 12
20    and-a-half million pages of documents to plaintiffs at that
21    time.  We have these new requests, which we have responded to
22    as reflected in this time line that the Court has before you
23    at this time, and that response was served by defendants back
24    on October 8th and that was by agreement of the parties.
25    Defendants made a request of plaintiffs back on November 10th
```

1    of 2013 for joint meet and confer to begin addressing those

2    issues.  That didn't happen for a variety of reasons.  The

3    first letters from plaintiffs though, and this was reflected

4    in the agenda that was originally circulated to the Court --

5    submitted to the Court, I should say, the original letters

6    from plaintiffs addressing issues on the document requests

7    and suggesting a meet and confer came first on December 20th

8    to some defendants and then on January 6th to other

9    defendants including my client.

10          In some cases, Your Honor, plaintiffs and

11   defendants have already begun now the process of discussing

12   the document-request issues but in other cases those

13   discussions have either just begun or they are about to

14   begin, for example, the discussions involving my clients and

15   plaintiffs are scheduled to begin next week.

16          Notably, Your Honor, defendants have on a number of

17   occasions suggested to plaintiffs joint discussions for the

18   purpose of addressing common issues.  Plaintiffs have

19   generally resisted that happening.  There was one call that

20   we were permitted to participate in which defendants -- some

21   defendants were permitted to listen in but they could not

22   participate in that conversation.  That was plaintiffs'

23   choice and we respected it.

24          What defendants though -- let me back up as well,

25   Your Honor.  I mentioned that the end-payer plaintiffs and

 1    direct-purchaser plaintiffs have served comprehensive

 2    discovery requests, which is a defined term in the plan which

 3    both sides agreed to, but the auto-dealer plaintiffs are yet

 4    to serve any document requests on defendants.  The

 5    auto-dealer plaintiffs have, however, been participating in

 6    and are expected to continue to participate in the

 7    meet-and-confer process on the document requests of the

 8    direct-purchaser and end-payer plaintiffs, which defendants

 9    welcome because all of us would like to bring closure to

10    whatever issues might exist between the parties, but it is

11    important to add that even as of this week we still do not

12    know whether the auto-dealer plaintiffs will be serving their

13    own set of comprehensive document requests upon defendants.

14            So where we stand right now is that we have two

15    comprehensive document requests that would require massive

16    collections of documents beyond the 12 plus million pages of

17    documents that have already been provided, and they would

18    come from the files of, just as I say, many individuals or

19    custodians, but we don't yet know the full scope of what we

20    are going to need to produce, and the principal reasons that

21    we don't know, Your Honor, are twofold.  I mean, first, we

22    don't know yet whether we are going to see more in terms of

23    comprehensive document requests, again, we haven't seen the

24    auto dealers' document requests yet.  But second, we are --

25    since we are just starting the meet-and-confer process and

```
 1   still need to reach agreement with plaintiffs on production

 2   scope issues and possibly to have certain issues perhaps

 3   resolved by the Court, we don't know yet -- we don't yet know

 4   what the universe of documents is that we need to produce,

 5   and we need that -- this process to conclude, Your Honor, in

 6   order to begin to provide plaintiffs with the documents over

 7   and above the 12 million pages that they have already gotten.

 8            THE COURT:  You know what the end payer and direct

 9   purchasers want, you have got their comprehensive requests?

10            MR. SQUERI:  Yes, Your Honor, we have their

11   requests and we responded and we objected to a number of

12   those requests.  We received the first letter from them where

13   there is disagreement as to what the scope of that production

14   should be.  We know what their requests are but we don't what

15   the outcome is going to be of the meet and confer and what it

16   is that we are ultimately going to need to produce to the end

17   payers and direct-purchaser plaintiffs.

18            THE COURT:  Give me an example of like the scope

19   that you are talking about that you don't know?

20            MR. SQUERI:  Certain types of documents that they

21   might want, just as an example, trade association documents,

22   do we need to look for trade association documents with --

23            THE COURT:  They have asked for it and you say you

24   object to it?

25            MR. SQUERI:  We objected to it.
```

Status Conference • February 12, 2014

1          THE COURT:  I get what you are saying, because of

2    your objections you don't know the scope of what you have

3    to --

4          MR. SQUERI:  That's right, Your Honor, and we

5    expect that both parties will engage in a good-faith

6    meet-and-confer process as to what they ought to have, but

7    until that process is completed we don't know what it is that

8    is going to be the universe that we need to look for, and

9    there are some real cost efficiency and burden issues if we

10   don't have that closure and understanding before we actually

11   begin the process of looking for these additional documents.

12   I mean, just -- for example, there is inefficiency in the

13   collection process that takes place.  If the scope of the

14   discovery substantially changes after we begin the

15   document-collection process we would need to send a team back

16   to go back and collect files from some of the same locations,

17   we would have to hire the ESI experts, for example, that

18   would need to assist us in gathering those documents.  It is

19   a lot more efficient if we can do it all at once, and I think

20   it is more --

21         THE COURT:  So your request -- let me just get this

22   straight.  You want to meet and confer first?

23         MR. SQUERI:  Yes.

24         THE COURT:  And plaintiffs' position -- you said

25   you had a meeting, I don't know, or you are going to have a

1    meeting?

2            MR. SQUERI:  Plaintiffs have started to meet with

3    one of the defendants.  I think there was a meet and confer

4    about two weeks ago approximately.  Our first meeting is

5    coming up next week.

6            THE COURT:  So you are going to have a meeting and

7    the meet and confer, and when you have that meeting you are

8    going to come to terms of some kind, you may object still to

9    giving certain information?

10           MR. SQUERI:  Yes, Your Honor.

11           THE COURT:  Then you would have to file a motion

12   with the Court as to whether that's appropriate.  Am I

13   following this right so far?

14           MR. SQUERI:  That's exactly right, Your Honor.

15           THE COURT:  And if that's the case you don't want

16   to give any information until you have the decision on that,

17   as I read your documents, because of the costs in duplicative

18   effort or hiring experts, et cetera, et cetera, that would

19   cost?

20           MR. SQUERI:  That's exactly right, Your Honor.  So

21   what we have tried to build into the process because we --

22   defendants have been concerned about this because as I

23   mentioned we served our responses back in the beginning of

24   October, so one of the things that we suggested and that the

25   plaintiffs agreed to, including the plan, was a deadline for

1    serving comprehensive document requests.  The date we agreed

2    upon was March 15th.  And hope -- we also tried to build into

3    the plan as well an agreement that the parties would complete

4    whatever meet-and-confer process that needed to be done

5    within 45 days and that any motions that needed to be filed

6    would at that point have to -- any issues, I should say, that

7    weren't resolved between the parties after their good-faith

8    efforts to do so would need to be brought to the Court's

9    attention within 45 days.  Our intention is simply to try to

10   move the process along.  I mean, we are talking -- we are now

11   almost two and-a-half years into this litigation, and the

12   goal of the defendants is to be able to get the litigation

13   moving, we want to complete the document requests but we want

14   to do it efficiently.

15         And -- but one of the key provisions that Mr. --

16   that counsel for plaintiffs referred to during his

17   presentation is this provision that relates to what happens

18   after March 15th.  Our proposal says March 15th should be the

19   deadline for comprehensive discovery requests.  We think

20   that's reasonable.  We think that's reasonable, two

21   and-a-half years into the litigation, 16 months after

22   plaintiffs had our 12 and-a-half million pages of documents.

23         THE COURT:  Okay.  And you recognize -- according

24   to what you said in your briefs, you recognize that as a

25   result of that discovery that you are getting there may be

1    more discovery, more requests that plaintiffs want.  Now,

2    you -- both sides seem to be in disagreement, one uses the

3    term targeted and the other one says, you know, you can ask

4    for --

5            MR. HANSEL:  Additional --

6            THE COURT:  Just additional whatever.

7            MR. SQUERI:  It is unlimited.

8            THE COURT:  Right.  Okay.  I'm not so sure that's

9    that much of a dispute but go ahead.

10           MR. SQUERI:  Your Honor, I would think that it

11   wouldn't be and plaintiffs were willing to agree to the

12   March 15th date but it becomes illusory if they keep the door

13   open so that they can simply come back later on and ask for

14   anything else.  All we are asking them to do is based upon

15   where we are in the case right now to make their best effort,

16   and quite honestly I think the end-payer plaintiffs and the

17   direct-purchaser plaintiffs have done that for the most part,

18   but that we need to know that this -- these are the sets of

19   comprehensive requests that we are going to see.

20           THE COURT:  All right.  And when you talk about a

21   rolling production, you are talking about -- you begin giving

22   them information after these disputes have been resolved but

23   that you end that at -- plaintiffs' is that you give that at

24   a particular date, so really you would roll it out up until a

25   particular date.  Is that it, you would roll out until that

1    date to --

2          MR. SQUERI:  Yes, Your Honor.  I mean, what we

3    would contemplate is once we have an agreement, and our draft

4    of the plan contemplates this, once we have a resolution of

5    the issues we would also agree with them as to what the end

6    date would be.  It is difficult for us in good faith to come

7    up with a meaningful end date until we know what it is

8    that -- what the full scope is of what we are going to have

9    to provide, but we are not looking for open-endedness but we

10   need to have some understanding of the universe of what it is

11   that we are going to have to do before we get to that point.

12         THE COURT:  Okay.  I'm ready to rule on this.

13         MR. SQUERI:  Okay.

14         THE COURT:  It seems to me that defendants are

15   correct that they should have, and I think plaintiffs have

16   agreed mostly to this, a comprehensive request for documents.

17   You have agreed on that particular date of March 15th, was

18   it?

19         MR. SQUERI:  Yes, Your Honor.

20         THE COURT:  So that date should stand, and

21   plaintiffs need to do everything they can to make that

22   request truly comprehensive so that you don't go back later

23   and say, you know, now I need this and that, but the Court

24   recognizes that there probably will be times when you have to

25   come back to the defendants for further information.  Okay.

1    I don't want to call that targeted, I don't like that word, I
2    don't think anything is targeted.  I don't see why it can't
3    be just the normal positions.  Plaintiffs asked for whatever
4    information, maybe it would be a second comprehensive -- you
5    know, nobody has talked about that but it could be that there
6    would be a second comprehensive review but it has to be
7    because you didn't know about it beforehand and that's why
8    you didn't ask for it now, you know, there has to be some
9    good reason, and so they can ask, and you can object, and
10   then the Court could rule on it and I could say you knew you
11   needed that before, that's fooling around, you don't get it;
12   or the Court could say yeah, I see where that has come from,
13   information you received that you would have no way of
14   knowing.
15          So I think we will just follow our normal
16   procedure, give a comprehensive -- plaintiffs give a
17   comprehensive request, and then what happens if there are
18   objections?  I think the objections should be ruled on first,
19   I agree with defense, I think those objections need to be
20   resolved.  After the objections then you could use -- there
21   has to be a deadline by which you have to give all of that
22   information.  I don't have any problem with a deadline
23   proposed by the plaintiff after the objections, it could be a
24   rolling deadline where you do it as you go along, but you
25   would do that -- I forget, I wrote it down here, it is four

1    months and five months, right, for discovery?  I mean, the

2    electronic data is four months --

3              MR. HANSEL:  Yes, Your Honor.

4              THE COURT:  -- and the written is five months?

5              I think the only -- the Court results, from what I

6    see, the big dispute there is that the Court has to resolve

7    or you have to resolve first the objections before these time

8    lines start running.  There was one other thing first and

9    I've forgotten already what it was?

10             MR. HANSEL:  Did the Court wish to address the meet

11   and confers?

12             THE COURT:  Yes, that's what it is, the meet and

13   confer.  Yes, I think the meet and confer needs to happen.  I

14   think you need to get together.  Now, you have a March 15th

15   date so you are going to have to get together relatively

16   quickly.

17             MR. HANSEL:  Yes, Your Honor.  For example, if --

18   let's say all of the plaintiff groups serve additional final

19   comprehensive requests on March 15th, then within 14 days of

20   that date the parties would need to commence meeting and

21   conferring with regards to the search terms and custodians.

22             THE COURT:  Any problems with that?

23             MR. SQUERI:  Yes, Your Honor.  If I could, that was

24   one issue I did not get an opportunity to address.

25             THE COURT:  But aren't we talking a little bit

1    about meet and confer before this date or no?

2              MR. SQUERI:  Yes, Your Honor.  We are prepared to

3    sit down with plaintiffs next week, we have -- actually we

4    have a date and time already set, I can't recall exactly what

5    it is off the top of my head but it is next week, we are

6    going to be talking about various issues.  And issues like

7    custodians are necessarily going to be a part of it.  You

8    know, the suggestion that within 14 days after we serve our

9    requests we should need to tell them that we are going to use

10   custodians, I mean, that's somewhat unprecedented, I mean,

11   you generally discuss who the custodians are when you sit

12   down and meet and confer, but I should say even to some

13   extent it is a moot issue at this point because they already

14   know we are going to be using custodians, they know we need

15   to talk about how we are going to go about retrieving and

16   finding ESIs.

17             THE COURT:  The question is when are you going to

18   do that?

19             MR. SQUERI:  We expect to do that next week.

20             THE COURT:  Counsel?

21             MR. WILLIAMS:  Steve Williams, Your Honor.  I just

22   wanted to clear up any misapprehension.

23             We are going to do it with his client next week.

24   We have done it with most of the others, and we have the last

25   one scheduled, so there is no issue about getting these

```
 1    things scheduled and getting them done by this March 15th
 2    date.  The last one I think one of the defense counsel had
 3    other things that delayed him from being able to do it but we
 4    now have a date set for that, so this is all worked out,
 5    there is no real issue about this.
 6             THE COURT:  So the meet and confers are all done or
 7    going to be done?
 8             MR. WILLIAMS:  Done or scheduled.
 9             THE COURT:  Within the next week?
10             MR. WILLIAMS:  Within the month of February.
11             MR. HANSEL:  Your Honor, just to be clear, that is
12    the meet and confers that Mr. Williams is referring to that
13    are already underway, those are with respect to discovery
14    requests that direct-purchaser plaintiffs served back in July
15    of 2013, and that end payers served sometime after that.  So
16    those are the existing document requests on which the
17    defendants have responded and objected -- not produced any
18    documents yet but they have responded and objected, then the
19    plaintiffs sent letters in an effort to identify, you know,
20    in the plaintiffs' view deficiencies in the defendants'
21    responses and to begin a meet-and-confer process, and with
22    respect to those older discovery requests the parties have
23    now commenced a meet and confer, so there has been a little
24    confusion, I just want to make it clear and simple.
25             THE COURT:  Well, now I'm confused.  Let me --
```

```
 1            MR. HANSEL:  Let me explain this.  There is the old

 2   discovery and there is the new.

 3            THE COURT:  Wait, I understand that, but what I'm

 4   trying to do is a process here.  So from your old discovery

 5   you get -- you -- could you close that door back there,

 6   please?  Thank you.  They are not as interested in this as we

 7   are.

 8            You serve a request or plaintiffs serve requests

 9   for -- a comprehensive request for discovery, okay, and is

10   your process then that you meet and confer over the requests

11   that were filed or is it the other way around, do you meet

12   and confer and then file your requests?

13            MR. HANSEL:  What plaintiffs are proposing from now

14   on, Your Honor, is that with respect to future requests for

15   production --

16            THE COURT:  Okay.

17            MR. HANSEL:  -- that --

18            THE COURT:  So now March 15th you have got this

19   future date request?

20            MR. HANSEL:  Correct.

21            THE COURT:  So what happens?

22            MR. HANSEL:  With respect to future requests to

23   produce the plaintiffs require that the parties meet and

24   confer commencing within 14 days --

25            THE COURT:  After.
```

```
 1            MR. HANSEL:  -- after they are served in an effort
 2   to narrow any differences on search terms and custodians, and
 3   then that a written response to those requests for production
 4   be served in the ordinary course, which is 30 days after the
 5   service of the requests, and --
 6            THE COURT:  Okay.  Let me stop you there.
 7            MR. HANSEL:  Yes.
 8            THE COURT:  It has been a long time since I've
 9   practiced so I'm really out of this.  You are saying 14 days,
10   I mean, depending upon the magnitude of your request that
11   doesn't seem to be a lot of time.  Maybe because you are so
12   into it it is.  I just want to make sure that time period is
13   correct, but my main thing is then you get together and you
14   talk about search terms and custodians.  I wonder why don't
15   you talk about the things that you think you are going to
16   object to, just discuss them before they ever get to --
17            MR. HANSEL:  Plaintiffs would be happy to discuss
18   those also, but I guess in an effort to sort of target
19   specific areas of known difficulty the custodians and the
20   search terms come to mind.  And as Mr. Squeri acknowledged,
21   you know, the -- before this -- since we don't have a
22   supplemental discovery plan yet we have just been operating
23   under the initial discovery plan in the federal rules, so we
24   issued discovery requests, defendants objected, we've had
25   meet and confers and, in fact, it is important to know that
```

1    this case is not new to the defendants, the defendants have

2    been handling the criminal cases for many years in some

3    cases, the civil cases for two and-a-half years, the

4    defendants in some or all cases have -- their counsel is

5    international, sophisticated counsel and they have performed

6    internal corporate investigations, they have identified the

7    document custodians long since and they have reviewed

8    documents.

9           THE COURT:  Okay.

10          MR. HANSEL:  So it is not new, it is not like they

11   have to reinvent the wheel starting March 15th so --

12          THE COURT:  So you have requests, 14 days you meet

13   and confer on search terms and custodians, and then what's

14   next?

15          MR. HANSEL:  So then under the federal rules, which

16   this -- the proposals don't alter --

17          THE COURT:  Forget the federal rules, what are you

18   going to do?

19          MR. HANSEL:  There is a 30-day deadline to respond

20   to a request for production in writing with a written

21   response including any objections.  Normally that's when the

22   meet and confer begins, we are saying let's start the meet

23   and confer even earlier to try to expedite it.  So the next

24   thing that happens under the plaintiffs' proposal --

25          THE COURT:  So it is not 30 days from the meet and

Status Conference • February 12, 2014

```
 1   confer, it is 30 days from --
 2            MR. HANSEL:  Service of the request.
 3            THE COURT:  -- service of the request?
 4            MR. HANSEL:  Yes.
 5            THE COURT:  Okay.
 6            MR. HANSEL:  And then the next thing under the
 7   plaintiffs' plan is the production of -- well, excuse me, the
 8   next thing is within 45 days after service of the request
 9   motions to compel or for protective order with regard to any
10   unresolved objections should be filed -- must be filed by
11   that deadline.  And then we would hope and request that the
12   Court be available, of course, to assist in resolving those
13   issues, and then if the Court is available in sufficient time
14   then the production -- certainly the production of documents
15   for which there is no pending objection could easily begin
16   within 120 days in the case of electronic and 150 days for
17   the hard copy.
18            THE COURT:  But that's the stumbling block there.
19            MR. HANSEL:  But if we do have pending objection --
20   let's say the Court is just simply not available, you know, I
21   would ask my colleagues, I'm not sure what's our collective
22   position on that but I will speak for myself at the risk of
23   being dragged off the podium.  You know, if the Court simply
24   wasn't able to reach a bona-fide discovery dispute within
25   that 120 days then it would seem reasonable for the defendant
```

1    to withhold production as to the items subject to that

2    dispute until the Court can make a ruling.

3            THE COURT:  Okay.  But the question I have, because

4    I think this is what defendants' position is, is they don't

5    want to produce anything until they have all of the

6    objections taken care of because maybe they would have to go

7    through all of the same documents again, same databases,

8    whatever they are called nowadays, you know, maybe they would

9    have to get another -- or use their expert to --

10           MR. HANSEL:  I think the current default rule in

11   federal discovery is that if you don't object to producing a

12   document you have to produce that document and so plaintiffs

13   would request that that remain the order of the day.

14           THE COURT:  Okay.  Let's hear from Mr. Squeri.

15           MR. SQUERI:  Your Honor, a few points.  Your Honor,

16   you've just articulated our position regarding the need to

17   not have to go back multiple times.

18           With respect to this issue regarding --

19           THE COURT:  What about the federal rules that, you

20   know, if you don't object you have to --

21           MR. SQUERI:  Of course, Your Honor, we have

22   asserted our objections.  The problem comes when we sit down

23   with plaintiffs and we try to work it out and if we decide as

24   a result of those discussions, those good-faith discussions,

25   or the Court ends up deciding otherwise we have to broaden

```
 1    that search, that's what we are trying to address.  We are
 2    not trying to say that if we didn't object and we missed it
 3    that we don't have to go back and look for it.  I mean, I
 4    think we have to do that.
 5              THE COURT:  No, no, if you didn't object to
 6    producing certain documents they are saying you have to
 7    produce those documents within this time frame, not after you
 8    have the ones that you have objected to resolved, those
 9    objections.
10              MR. SQUERI:  Well, Your Honor, this goes back to
11    the whole point of efficiency.  What we are saying is that we
12    need to know what the scope is of what we are going to have
13    to produce.  We need the scope to -- we need to know what
14    documents we are going to need to produce and what we are
15    not.  We are going to object -- we have objected, we are
16    going to try to resolve those objections with plaintiffs, and
17    then once we know what the scope is we go in and we review
18    the documents and we make the production.
19              You know, when it comes to issues like custodians,
20    you know, it is hard to talk about custodians until you have
21    your response and you know what the scope is going to be of
22    your production.  It is hard to talk about, you know, search
23    terms or other methodologies for searching for documents
24    until you know what the substantive scope is going to be.
25    Again, I expect we are going to have those conversations with
```

Status Conference • February 12, 2014

1    plaintiffs beginning next week so I don't see that there is

2    going to be any delay in that process.

3            THE COURT:  Okay.

4            MR. SQUERI:  But there is one other request that I

5    would make, Your Honor, the four-month and five-month time

6    periods for producing documents, I assume we are talking

7    about after issues are resolved, I think that's the way you

8    phrased it.  It is -- from my co-counsel they are cringing a

9    bit only because of the magnitude -- the potential magnitude

10   of that task, I mean, keeping in mind that we may be talking

11   about foreign-language documents, et cetera, that need to be

12   produced and given the fact that we do not know right now

13   what the full scope is going to be, I would ask for the

14   opportunity once we reach closure on what it is that we have

15   to produce to be able to address that issue.  We have no

16   problem dealing with the deadline, I think that's the right

17   way to do it, but it is very hard to commit to something like

18   that given the magnitude and scope of the requests that have

19   been made.

20           THE COURT:  So you just don't know whether you can

21   meet this deadline --

22           MR. SQUERI:  That's right.

23           THE COURT:  -- because you don't know what you are

24   going to be requested?

25           MR. SQUERI:  That's right.

Status Conference • February 12, 2014

```
 1              THE COURT:  That makes sense.  Okay.
 2              MR. RUBIN:  Your Honor, Mike Rubin of Arnold &
 3    Porter for the Fujikura defendants.
 4              I just wanted to note that we are slightly
 5    differently situated than the rest of the defendants in the
 6    class action because there is --
 7              THE COURT:  Which defendants are you with?
 8              MR. RUBIN:  Fujikura, because of Ford, and Ford's
 9    discovery may overlap with, may be different than, may have
10    different time periods than what the class defendants are.
11    Ford has agreed to get us comprehensive discovery requests by
12    March 15th as well, but until we see those we are not going
13    to be in the position to really figure out who the right
14    custodians are to do this once because the last thing my
15    client wants or I think this Court would want is for us to
16    have to review one set of documents, go through a million
17    documents, and then have to go back through them again
18    because of Ford or because of another set of discovery from
19    the class plaintiffs.  So as the Court considers this we
20    would ask that you keep in mind that the Fujikura defendants,
21    or at least until your motion to dismiss ruling, are
22    differently situated.
23              THE COURT:  Any comments on Fujikura?  Do you agree
24    they are different to some extent?
25              (No response.)
```

```
 1              THE COURT:  Okay.  All right.  You are going to
 2   have the meet and confers, those will take place within
 3   14 days after the requests are served, then you will have
 4   30 days for your written responses and 45 days for your
 5   motion to compel or to have any of your objections or
 6   anything that you might have to have it resolved, and then we
 7   will go with the four months and five months to start at that
 8   point.
 9              Now, it might not be enough but we don't know that
10   now.  I mean, I don't want to drag this out indefinitely.  If
11   it is not enough then you come in with good reason why it is
12   not enough time and we will look at it then.  Okay.  So we
13   will exclude Fujikura at this time from this until this
14   Ford-Fujikura thing is resolved.
15              Now, does that take care of that first part?  You
16   know it so you can put it into an order?
17              MR. HANSEL:  Yes, Your Honor.
18              MR. SQUERI:  Yes, I believe it does, Your Honor.
19   Thank you.
20              Your Honor, one of the next issues that -- the next
21   issue to address relates to class certification scheduling.
22              MR. HANSEL:  I think it is Rule 502.
23              MR. SQUERI:  I'm going defer to Mike Rubin on that,
24   he's going to take over.
25              THE COURT:  Okay.  Mr. Rubin?
```

 1            MR. RUBIN:  Thank you, Your Honor.  This is, I

 2   think, a fairly narrow dispute between the parties.  It

 3   relates to -- we have agreed on all the language except at

 4   the very end of our 502(D) clause.  The plaintiffs want to

 5   exempt out from those protections everybody who has a case in

 6   the auto parts MDL other than the wire harness parties.  So

 7   they are creating a universe in which the wire harness

 8   parties are bound by this agreement because they have agreed

 9   to, anybody outside of auto parts MDL are bound by -- or

10   cannot come in and argue waiver, but all of the other

11   plaintiffs in all the other auto parts cases can come in and

12   say because you used paralegals to review documents you have

13   waived privilege.

14            Let me take a step back and discuss why this

15   provision is so important.  As Mr. Squeri noted, one of the

16   big challenges in this case is going to be the amount of

17   foreign language, in particular Japanese language documents

18   the defendants are going to have to collect, process and then

19   have somebody look at and review.  With the assistance of

20   search terms, sure, but ultimately somebody has to look at

21   those and make judgments on them.  There's obviously a lot of

22   Japanese investigations going on.  Japanese language skills

23   are limited to begin with.  Getting U.S. barred attorneys

24   that are bilingual in both Japanese and English is very

25   difficult to have.

```
 1            We -- recognizing that, recognizing the risk of
 2   delay that would cause, we approached the plaintiffs and they
 3   agreed that they would not argue that because we used
 4   paralegals or other non-U.S. barred attorneys to review those
 5   Japanese documents that somehow we didn't take sufficient
 6   care to protect the privilege, and thus a document that
 7   slipped through, it wasn't an inadvertent production but it
 8   was an intentional production because we were too sloppy.
 9            There has been some case law, I think it is bad
10   case law, but there's some out there where plaintiffs have
11   argued that.  So to be careful to allow us to have the
12   comfort to expedite the process we asked the plaintiffs to
13   agree to this, they agreed, but as Rule 502(D) and the
14   comments to it note, that's very little protection when other
15   parties who are not a party to that agreement can come in and
16   say well, you waived with respect to me even though the
17   plaintiffs in the wire harness case decided not to argue that
18   but I get to still argue waiver.
19            That's where 502(D) comes in.  We propose language
20   that would allow the defendants with comfort to know that
21   nobody is going to come in later and say because you were
22   trying to be efficient, because you were dealing with a
23   massive amount of discovery in a foreign language where there
24   is just not enough U.S.-barred attorneys to deal with it you
25   have now waived privilege.
```

 1          THE COURT:  So basically what you want is all of

 2     these people who are going to be looking at it who are

 3     non-lawyers are to be treated like lawyers in the sense that

 4     this would all be privileged?

 5          MR. RUBIN:  Yes, and the wire harness plaintiffs

 6     have agreed to that.  The difference in our language solely

 7     is that somebody who is not a plaintiff in this MDL they

 8     could not come in and argue waiver, someone who is a party to

 9     the wire harness case could not argue waiver, but someone in

10     instrument panels or windshield wipers they could argue

11     waiver, which is in our view, an absurd sort of outcome.  I'm

12     not sure if that's really what the plaintiffs intend but

13     that's what their language creates by adding in at the end to

14     the 502(D) language where they agree that no one else --

15     there will not be waiver in any other federal or state

16     proceeding other than In Re: Auto Part Antitrust Litigation.

17     That language creates that doughnut hole, so to speak, and

18     that's what we would object to, and we would ask the Court to

19     adopt our language instead in the interest of efficiency.

20          THE COURT:  Okay.

21          MR. RUBIN:  Thank you.

22          MR. HANSEL:  Greg Hansel again for the wire harness

23     plaintiffs.

24          THE COURT:  What are you saying?

25          MR. HANSEL:  What are we saying?

1     THE COURT:  Yes.  What is your position?  You agree

2     it is waiver, it is not waivable because they are using

3     paralegals or whoever, right?

4          MR. HANSEL:  So we agree on that.

5          THE COURT:  You agree on that.  What's that last

6     little bit?

7          MR. HANSEL:  The last little bit, Your Honor, is

8     suppose that -- to pick an arbitrary example, suppose Yazaki

9     produces a document in the wire harness case that might

10    otherwise be considered privileged and they do so on purpose

11    intentionally -- I want to be clear, this is not about

12    inadvertent production, it is about intentional waiver of

13    privilege by producing a document.  So if Yazaki waives a

14    privilege by producing a document in the wire harness case

15    Yazaki would not be permitted under the plaintiffs' proposal

16    to reinvoke the privilege in the fuel senders case as to the

17    same document in a case where Yazaki is also a defendant.

18         So it is only -- this only applies to defendants in

19    the wire harness case who are also defendants in some other

20    case who intentionally produce a privileged document in the

21    wire harness case not inadvertently.

22         THE COURT:  They waive privilege in wire harness?

23         MR. HANSEL:  Right.

24         THE COURT:  So if they waive privilege basically in

25    one part do they waive it in all parts?

1          MR. HANSEL:  That's exactly the issue.  Your Honor

2    put your finger on it.  The rule gives the Court discretion

3    and the rule is very short, this is 502(D) of the Federal

4    Rules of Evidence, a federal court may -- so it is up to the

5    Court -- may order that the privilege or protection is not

6    waived by disclosure connected with the litigation pending

7    before the court in which event the disclosure is also not a

8    waiver in any other federal or state proceeding.  So the

9    Court has discretion in general in this area.

10         THE COURT:  Okay.  Let's hear what you have to say

11   about this.

12         MR. RUBIN:  Thank you, Your Honor.

13         This provision has nothing to do with an

14   intentional waiver by Yazaki, Sumitomo, Fujikura or anybody

15   else.  The normal -- the bogeyman of using the privilege as a

16   shield and a sword where we intentionally waive on this one

17   document because it is helpful in this case.

18         THE COURT:  So you agree with him, if they

19   intentionally waive it then they have waived it?

20         MR. RUBIN:  Correct, we agree with that.  The

21   language that is here all talks about the use of paralegals,

22   that they are not going to argue waiver there, no one else

23   should be able to do that as well, documents produced that

24   might be inadvertent as the term is defined under the

25   protective order, or otherwise pursuant to production

1    procedures agreed to by the parties.  Again, an agreed-to

2    procedure regarding other efficiency measures to get

3    documents to the plaintiffs in a less burdensome manner.

4    This has nothing to do with intentional productions and

5    intentional waivers for privilege and sword reasons.  So the

6    concerns there are just this language doesn't get to that in

7    any way, shape or form.

8               THE COURT:  So you need better language to deal

9    with the inadvertent waiver -- well, it is not even a waiver,

10   the inadvertent production?

11              MR. RUBIN:  Respectfully, Your Honor, I think this

12   language deals with it clearly.  I don't think -- there is no

13   suggestion here that anybody is waiving as to an intentional

14   production.  In fact, the last sentence of it says the

15   parties reserve the right to challenge a party's assertion of

16   privilege or any other protection from disclosure on any

17   other grounds.  Other grounds would certainly include an

18   intentional disclosure.  It is simply the carve-out for the

19   other auto parts plaintiffs, aside from the wire harness

20   plaintiffs, that seems to be -- that's the dispute here.

21              THE COURT:  So if you waived as to wire harness

22   plaintiffs you don't waive as to another part, instrument

23   panel or --

24              MR. RUBIN:  I don't think that's correct, Your

25   Honor.  This isn't really about waiver.  It is about

```
 1    producing something that was privileged -- something that
 2    slips through the cracks, not an intentional waiver.  It is
 3    about the -- in a massive production privileged documents
 4    will almost invariably slip through the cracks, and 502(D)
 5    recognizes that.  Rule 502 generally recognizes that, and
 6    that's the purpose of it, so that reasonable protections are
 7    put in place.  The question is in a later case can fuel
 8    senders argue that because we use paralegals or because we
 9    agreed to some other efficiency means with the wire harness
10    plaintiffs in the future that we didn't take adequate
11    protection, something slips through the cracks and sorry,
12    that waiver wasn't inadvertent but it was rather simply from
13    sloppiness on your side because one of the components of
14    inadvertence is taking reasonable protection of the
15    privilege.  So we want to take those arguments off the table
16    so that we can make reasonable steps to get documents to the
17    plaintiffs more quickly.
18             THE COURT:  Okay.
19             MR. RUBIN:  Thank you.
20             THE COURT:  You have another comment?  Okay.  Go
21    ahead.
22             MR. HANSEL:  I wanted to propose a solution, Your
23    Honor, because -- this is Greg Hansel again.
24             Counsel just stated that defendants have no
25    objection to a waiver -- an intentional waiver in wire
```

```
 1    harness also being a waiver in other parts for the same
 2    defendant.  I have a suggestion --
 3            THE COURT:  Is that all you want?
 4            MR. HANSEL:  I have a suggestion about a sentence
 5    that we could use to fix the plaintiffs' proposal along those
 6    lines.
 7            THE COURT:  Okay.  I'm looking now on page 13 of
 8    your brief, which the -- I guess this is the defendants'
 9    proposal.
10            MR. HANSEL:  I'm looking on page 11 of Exhibit A --
11            THE COURT:  Okay.
12            MR. HANSEL:  -- which has both sides' version.
13            At the end of the plaintiffs' proposal there is a
14    phrase, other than in the automotive parts antitrust
15    litigation.  So perhaps the way to solve this would be to end
16    the previous -- end the sentence after the word proceeding,
17    and then have a new sentence that says however, an
18    intentional waiver in the wire harness case shall also be
19    deemed a waiver in other automotive parts cases.
20            THE COURT:  Okay.  Seems reasonable.  Mr. Squeri,
21    any objections?
22            MR. RUBIN:  No, that works for the defendants.
23            MR. SQUERI:  That's fine, Your Honor.
24            THE COURT:  Got it.  Thank you.
25            MR. HANSEL:  Thank you, Your Honor.
```

```
 1              THE COURT:  If I may turn to the third issue -- do
 2    you want to go this time?
 3              MR. SQUERI:  Yes.
 4              THE COURT:  We are talking now about the
 5    class-certification issue?
 6              MR. SQUERI:  Yes, Your Honor.  This is the issue
 7    regarding scheduling on class certification.
 8              Your Honor, it cannot be disputed but that in a
 9    case of this nature class certification is truly a critical
10    issue, if not the critical issue, to be decided.  Our
11    difference with plaintiffs comes down to something very
12    simple, plaintiffs want to put off the briefing on this very
13    critical issue until after the conclusion of all merits
14    discovery.  Defendants believe that such a delay is
15    unwarranted and cannot be justified.  Defendants instead
16    propose the start of -- the start of class certification
17    briefing taking place within 180 days after the DOJ-related
18    stay is lifted, but I think it is important to point out,
19    Your Honor, what that really means in terms of time line.
20              Even under the schedule -- the shorter schedule
21    that defendants are proposing here, at the very earliest
22    class-certification briefing would begin December of 2014.
23    And briefing and the hearing on class certification would not
24    be completed until the third or fourth quarter of 2015,
25    approximately four years after this case was -- these cases
```

```
 1    were first filed.  And if the DOJ's stay is postponed just

 2    another six months, we are talking about getting class-cert

 3    briefing and the hearing done in 2016.  And then if we were

 4    to consider what plaintiffs are proposing you would add at

 5    least another six months onto those time periods, and we

 6    could be looking at briefing class certification in 2016 or

 7    even 2017.

 8            Again, Your Honor, I'm sure I don't need to mention

 9    to you, this is case number 1 of 27, and if we are looking at

10    class certification briefing on that time schedule I would

11    submit that's problematic but also for defendants --

12            THE COURT:  We will have to build in some

13    retirement party.

14            MR. SQUERI:  We can call it the auto parts

15    retirement plan.

16            But, Your Honor, I think the analysis that ought to

17    be applied here is straightforward.  As we consider the

18    timing issues and the consideration of class certification we

19    have to start with the simple directive of Rule 23(C)(1) that

20    most of us are familiar with, and that is, quote, at an early

21    practicable time after a person sues, or is sued, as a class

22    representative the court must determine by order whether to

23    certify the action as a class action.  How soon is, quote,

24    early as practicable has not always been clearly defined, but

25    I respectfully submit that it should not and need not mean
```

1    more than the completion of briefing on class cert beyond

2    four years after the cases were filed.

3              And, Your Honor, you know, not too long ago I can

4    remember in antitrust cases -- the law has changed a little

5    bit but in antitrust cases at times you would bifurcate

6    discovery between class and merits.  The law has changed

7    where we are now required and it is appropriate to look into

8    merits, but there's still a considerable amount of

9    class-certification discovery that can go on before we even

10   begin the merits process.  Although we have already begun to

11   provide written merits discovery in terms of document

12   productions, the documents we produced previously or that

13   will soon be producing, we've already begun the process of

14   responding to interrogatories, and plaintiffs will have a

15   full opportunity even before the DOJ stay is lifted to

16   conduct the type of discovery that is oftentimes part of

17   class certification.

18             THE COURT:  So you are saying that discovery would

19   go on for 180 days after the DOJ lifts its stay?

20             MR. SQUERI:  Before they would have to file their

21   class-cert briefs, yes.

22             THE COURT:  Yes, before they file their briefs.

23   And at that point they have to file their class-cert

24   briefs --

25             MR. SQUERI:  That's right.

 1          THE COURT:  -- depending upon which case, which

 2    part and where they are?

 3          MR. SQUERI:  Right.  We are only addressing the

 4    wire harness case at this point in time, Your Honor.  And

 5    part of the reason why we think that's reasonable is, again,

 6    I go back to the point that we recognize that now under the

 7    case law merits is part of the consideration, but there is no

 8    case law out there that suggests that -- at least that we are

 9    aware of that there is any requirement that you have to

10    complete all merits discovery, which is what plaintiffs are

11    proposing, before they have to file their class cert briefs.

12    The question really is how much in terms of depositions they

13    are going to need to do once that DOJ stay is lifted?

14    Whether it is 10 or 20 depositions or whatever to help them

15    get the information that they need in order to complete

16    whatever other discovery they've got -- they've completed in

17    order to file those class cert briefs is really the issue

18    that needs to be resolved in connection with that.  And we

19    submit, Your Honor, that, you know, 180 days is more than

20    sufficient to do what they need to do although I would

21    candidly say we have asked plaintiffs on a couple of

22    occasions how many depositions do you think you need to take,

23    merits deps you need to take before filing the

24    class-certification briefs, and they have not given us a

25    number, so I'm throwing out 10 to 20 but I think certainly

1    they should be able to do what they need to do in that period

2    -- in that period of time.

3              There are a couple other issues regarding the

4    class-cert briefing issues.  I can address those now as well,

5    Your Honor?

6              THE COURT:  All right.  Go ahead.

7              MR. SQUERI:  You know, one relates -- these are

8    more administrative than anything else.  One relates to the

9    question of how much time defendants and plaintiffs will get

10   in filing -- preparing their responses and reply briefs.

11   We've proposed 120 days for us to be able to respond to their

12   class-certification motion because as part of the proposal

13   that both parties have agreed to -- both sides have agreed to

14   we would be submitting -- they would be providing us their

15   expert witness reports contemporaneous to the service of the

16   briefs, so we would need during that period of time to study

17   those expert witness reports, take their experts'

18   depositions, prepare our reports, prepare our response.  We

19   are asking for 120 days, they propose 90 days.

20             One of the other differences is we have asked

21   for -- we have suggested 60 days for their reply brief, they

22   have suggested 90 days, we think the 60 is more reasonable.

23             There are two other differences.  Both proposed

24   schedules contemplate that plaintiffs would have the

25   opportunity if appropriate to submit rebuttal expert reports

 1    after we provide them with our expert report.  We have no
 2    problem with that.  However, our language says that it needs
 3    to be rebutting our expert report, they don't have that
 4    particular qualification or limitation assigned to --
 5    included in their language.
 6         And finally there is a provision in our proposed
 7    schedule that would build in a time for a sur reply brief
 8    from defendants but that sur reply timing is if appropriate,
 9    and we recognize we don't necessarily have a qualified right
10    to a sur reply brief but we just felt that it would be
11    appropriate in looking at the schedule to have everyone
12    understand if there was going to be one, if it was
13    appropriate, when that would be filed, and I think we have it
14    set in our proposed schedule at 45 days after we get their
15    reply brief.
16         There is one other thing I had forgotten, our
17    version of the plan, and I'm not sure whether the plaintiffs
18    intended to exclude this or not, but our version allows for
19    depositions of experts who submit either rebuttal or sur
20    rebuttal reports.
21         THE COURT:  All right.
22         MR. SQUERI:  Thank you, Your Honor.
23         THE COURT:  Mr. Hansel?
24         MR. HANSEL:  Thank you, Your Honor.  In the view of
25    all of the class plaintiffs it is premature to set a deadline

```
 1    now for the class-certification motions because merits
 2    discovery is stayed.  Plaintiffs propose that immediately
 3    upon the lifting of the DOJ stay the parties meet and confer
 4    and within 30 days of the lifting of the stay submit to the
 5    Court either a joint schedule or separate proposed schedules.
 6    Call me an optimist, but based on our experiences in this
 7    case many orders have been stipulated to and there's a good
 8    chance the parties will agree to this proposed stipulation as
 9    well.
10         Defendants propose only 180 days after the stay is
11    lifted before all class plaintiffs would be required to file
12    their motions for class-certification briefs and expert
13    reports.  That short time denies the plaintiffs a reasonable
14    opportunity to take discovery on merits issues that apply at
15    the class-certification stage.
16         In the Whirlpool case, a Sixth Circuit case, cited
17    in our section of the joint submission, it was determined
18    that merits questions may be considered, if relevant, or to
19    the extent relevant, in determining if the elements of
20    Rule 23 are satisfied.  There may be some overlap, in other
21    words, between class-certification issues and merits issues.
22    We expect the defendants to raise a number of merits issues
23    at the class-certification stage including impact and other
24    merits issues.  Mr. Squeri has readily acknowledged that the
25    Court, as he puts it, is required to look into the merits at
```

1    the time of a class-certification motion.  So the plaintiffs

2    believe that based on things that we don't know and other

3    things that we do know the 180 day hard-and-fast deadline is

4    just insufficient.  Here is --

5              THE COURT:  You want 30 days after this to meet and

6    confer and come up with a schedule?

7              MR. HANSEL:  Yes, Your Honor, that's what we

8    propose.  This is really a supplemental discovery plan, not a

9    class-certification schedule that we are here for today.  So

10   there are some things we just don't know today.  We don't

11   know when the stay will be lifted.  By its terms the DOJ stay

12   may be lifted as early as six months after it was entered on

13   December 23rd, that would be around May 23rd of this year.

14   However, we don't know what the DOJ's position, as the Court

15   determined earlier, they are not apparently here today.

16             We also don't know how much discovery the parties

17   will get done before the stay is lifted.  We know they won't

18   get done any merits discovery but we don't know how much

19   other discovery they will get done before the stay is lifted.

20             Let's look at what we do know.  We know the scope

21   of the stay, and I'm going to point out from the Court's

22   order on the DOJ stay on December 23rd, at page 2, there are

23   sort of two categories of discovery that is stayed.  The

24   first is with respect to documents.  Plaintiffs are stayed

25   and prevented from getting documents that include information

1    with regard to later case products.  So you recall the stay

2    divides all the cases into the first four products and then

3    everything else.  So if there is a document, for example,

4    with regard to wire harnesses that also mentions a later case

5    product, plaintiffs are not allowed -- or defendants are

6    allowed to withhold that document at this stage as a result

7    of the stay.

8            Another category of documents has to do with

9    contacts with competitors who are involved in later cases,

10   and then a third category is documents with respect to

11   conspirators who have not yet pled guilty.

12           THE COURT:  So you are saying there's lot of

13   discovery you may need?

14           MR. HANSEL:  There's lot of document discovery

15   stayed, and the second big category is deposition discovery

16   that's stayed, and likewise there are three categories.

17           THE COURT:  You don't have to go through that

18   because I'm ready to rule.

19           MR. HANSEL:  Okay.  If the Court --

20           THE COURT:  What?

21           MR. HANSEL:  If the Court wants me to sit down I

22   will sit down, I do have some more points, but if the Court

23   would prefer to go ahead and rule?

24           THE COURT:  I would prefer to go ahead and rule.

25           MR. HANSEL:  All right.  Very well.

```
 1            MR. SQUERI:  Your Honor, respectfully may I respond
 2   to --
 3            THE COURT:  I didn't let him finish, but you can
 4   respond for two minutes.
 5            MR. SQUERI:  Your Honor, the reason that I want to
 6   respond to Counsel's comments is we would take strong issue
 7   with the suggestion that somehow they are being kept from
 8   merits discovery.  Again, we provided them our DOJ production
 9   16 months ago.  And they -- and they are serving, we have
10   responded to interrogatories on merits issues.  Their
11   document requests that they served on us that we are meeting
12   and conferring on relate to merits issues.  The fact that,
13   you know, there is a stay with respect to other parts doesn't
14   change the fact that they are able to continue with the
15   discovery in this case, and they will be able to take
16   Rule 30(b)(6) depositions that are all going to be relevant
17   to the class-certification issue.
18            THE COURT:  Okay.  I have heard enough.  Thank you.
19            MR. SQUERI:  Thank you.
20            THE COURT:  I mean, what it all comes down to is we
21   don't know yet what we don't know, we don't know where we are
22   going here.  I have no problem with plaintiffs' proposition
23   that after the stay is lifted within 30 days you meet and
24   confer and come up with a schedule, or you come to the Court
25   and the Court will make it and it may be that it will be six
```

1    months from then.  I'm not disagreeing with what defendants

2    propose, that the six months would be enough, but I need to

3    know more about what is happening with this discovery, and I

4    just don't know it yet.  I do not have a feel for your

5    discovery.  I know that plaintiffs may have eaten up the

6    12 million pages but I'm not getting anything from them about

7    what it means.

8           So, you know, I think we need to know a little bit

9    more.  I do think we need to have a definite plan and

10   schedule for our class certification, I agree with that

11   wholeheartedly, I just think that we need to wait a little on

12   that schedule, but I don't think plaintiffs should take the

13   position or take the belief from me that you are going to

14   have all kinds of time now because I'm not granting exactly

15   what defendant says.  I'm just saying I will wait those

16   30 days and see what you come up with, but you are not having

17   unlimited discovery, we need to move on this.  So when we are

18   thinking six months, that sounds good, it may be nine months,

19   I don't know, but that's kind of what I'm thinking.  I just

20   need to wait and see what that is going to be.  Let's do

21   that, let's do the 30-day meet and confer.  Okay.  Thank you.

22           MR. HANSEL:  Turning to the fourth issue, Your

23   Honor?

24           THE COURT:  The amendment?

25           MR. HANSEL:  The amendment and joinder of the

```
 1    parties.  Plaintiffs propose the following sentence, class
 2    representatives may be added or dropped up to the time that
 3    motions for class certification are filed upon such terms as
 4    the Court may order.
 5            Plaintiffs believe this is a very ordinary
 6    provision.  The Court has discretion to do this anyway under
 7    the federal rules, but we think it is just worth noting that
 8    various of the plaintiffs, the auto dealers, the end payers,
 9    the direct-purchaser class plaintiffs, all agree on this,
10    that sometimes in a case it is possible that a new class
11    representative may appear, may need to be added.  In fact,
12    there are cases where courts have allowed that after ruling
13    on a class-certification motion or after class certification
14    has been fully briefed, a new plaintiff files a lawsuit, it
15    gets incorporated in the overall case.  So the guiding
16    principle here in class-action litigation is that if the
17    Court is inclined to find a class should be certified the
18    plaintiffs should have -- the class should have a reasonable
19    opportunity to be represented by a class representative, and
20    the class should not fail for lack of a representative if a
21    representative comes forward to serve in that capacity.  So
22    plaintiffs respectfully ask for that provision to be included
23    in the supplemental discovery plan.
24            THE COURT:  Mr. Squeri?
25            MR. HANSEL:  Thank you, Your Honor.
```

Status Conference • February 12, 2014

```
 1          MR. SQUERI:  Your Honor, the parties are in
 2   agreement as to what the general deadlines should be for
 3   amending motions to amend the pleadings in the case.  Where
 4   we do disagree, as Mr. Hansel pointed out, is on this issue
 5   of when they should be able to add class representatives,
 6   named class representatives, in a case.  And their proposal
 7   is to name these class representatives up until the day that
 8   they file their class-certification motions.
 9          Your Honor, part of our process in preparing to
10   respond to the class-certification motions is going to be to
11   conduct discovery directed at the named representatives.  In
12   fact, some of that is ongoing, and it is -- and it has been a
13   few months since we served some of that discovery on some of
14   the named class representatives and we haven't gotten it yet.
15   In order for us to adequately prepare to allow enough time to
16   proceed with defending class certification we should know
17   well, well in advance, Your Honor, of any -- the filing of
18   any class-certification motions, who it is that is actually
19   seeking to have this case made into a class action.
20          THE COURT:  Okay.  Well, as you are preparing your
21   motion to certify the class I'm assuming you are looking at
22   who is in your class, what your named plaintiffs are, right?
23          MR. HANSEL:  Yes.  The named plaintiffs are already
24   current -- the current named plaintiffs are before the Court,
25   they are the plaintiffs.
```

```
 1              THE COURT:  But, I mean, at the time you are filing
 2    your motion wouldn't you know?  I mean, you want to have the
 3    time right up to that date, and I know that there are cases
 4    where people are added later but it seems to me if you are
 5    going to modify or substitute a named plaintiff, say, that
 6    you should really know about it in almost all circumstances
 7    well before you are ready to file your motion to certify,
 8    right?
 9              MR. HANSEL:  Not necessarily, Your Honor.
10              THE COURT:  Why not?
11              MR. HANSEL:  Because during discovery the parties
12    all learn about facts and, for example, merits discovery is
13    now stayed but even after merits discovery recommences we may
14    learn that there are certain facts that come out in the case
15    that suggest that a certain class representative is
16    inadequate and another class representative may be adequate,
17    a certain class representative may be typical, another one
18    may not be typical.  And I think the principle is a principle
19    of equity the courts apply in class-certification decisions
20    to try to reach the merits.  Courts don't like to say, you
21    know, gotcha, you had the wrong class representative and your
22    case goes down the tubes, and so courts normally afford
23    plaintiffs an opportunity to substitute a class
24    representative where appropriate.
25              Now, there shouldn't be any prejudice to the
```

1    defendants whatsoever from adding a class representative as a

2    result of such a process.  The defendants absolutely have the

3    right to depose that class representative to get documents,

4    that could be all done on an expedited basis if, indeed, a

5    named plaintiff were added on the eve of a

6    class-certification motion.

7         THE COURT:  Okay.  I don't think anything here we

8    are saying got you because I certainly don't want to say got

9    you on anybody but I think at some point in time we have to

10   say we are done, I mean, there has to be an end, but I do

11   think that there are circumstances when class plaintiffs have

12   to be substituted.  If that should occur I think we will deal

13   with it when it comes up.  I don't think it is something I'm

14   going to say now that you can't add until the end -- I mean

15   until you file your motion.  Obviously if you need to add or

16   substitute at the time that you file your motion that's going

17   to affect defendants and it may certainly affect defendants'

18   time necessary to respond to your motion if there is further

19   discovery.  So I would only say which I believe is --

20   generally the process is that in the exceptional circumstance

21   when you need to do it it may be allowed, so you tell me what

22   the exceptional circumstance is when we come there, when we

23   get there.

24        So I'm not going to grant what defendant wants but

25   I'm also going to warn plaintiff I want good cause, I want to

```
 1   know why we would do this at the last minute.  Okay.  So I
 2   guess you could say that the substitution or addition would
 3   be with permission of the Court.
 4            MR. HANSEL:  Your Honor, would the Court like an
 5   order on the various --
 6            THE COURT:  I would very much so.
 7            MR. SQUERI:  We will work on it together, Your
 8   Honor.
 9            THE COURT:  Yes, please do it together.  All right.
10   Now we have Ford.
11            MS. KELLY:  Good afternoon, Your Honor.
12   Cindy Kelly for Ford.
13            Your Honor, there are three issues in dispute -- in
14   connection with the supplemental discovery plan in dispute
15   with defendants, and that is the sharing of discovery, the
16   timing of discovery from Ford and the production of
17   transactional data.  I can either discuss them one by one or
18   altogether, however you want?
19            THE COURT:  Well, I think, first of all, there is
20   one thing, I have an order that I -- that has not been
21   entered, which is a proposed order, and it basically is
22   Ford's status in this case.  Somebody at our last meeting I
23   think hit it on the head, we were talking about what is
24   Ford's status?
25            MR. KELLY:  I believe Your Honor entered that order
```

1    on Monday.

2              THE COURT:  Did I do that?

3              MR. KELLY:  Yes, that was entered.

4              THE COURT:  Okay.  I didn't even look as of Monday.

5    I had it here and I had questions, and I went back and read

6    the transcript of the last status conference and there was a

7    lot of discussion on this.  So is the order -- this proposed

8    order that you submitted or was it modified, do you know?

9              MR. KELLY:  Yes, it was stipulated, Your Honor.

10             THE COURT:  All right.  Then that's fine.  Thank

11   you.

12             MR. KELLY:  Thank you.

13             THE COURT:  Okay.

14             MR. KELLY:  Ford is only asking for what is

15   commonplace in an MDL, and that is that there be shared

16   discovery and that it have access to the previous discovery

17   conducted by the parties, that it be included in discussions

18   about discovery disputes and that it have the same

19   enforcement rights with respect to discovery as the other

20   parties do.  And, Your Honor, there is absolutely nothing

21   unusual about this request.  This is how MDLs are routinely

22   conducted.  Otherwise, coordination and conservation of

23   resources, the main goals of an MDL, would be absolutely

24   impossible.  And defendants' position just doesn't make any

25   logical sense.

 1              Ironically the defendants include in their proposed

 2      supplemental discovery plan a provision which requires Ford

 3      to engage in best efforts to coordinate discovery and avoid

 4      duplication.  And Ford has agreed to do that as all parties

 5      should in an MDL, but it can't be done unless Ford has access

 6      to the previous discovery that has been provided to

 7      plaintiffs.  What we are essentially talking about at this

 8      point are the documents provided to the DOJ.  Other than

 9      Fujikura, which just yesterday finally produced their DOJ

10      documents to Ford, defendants refuse to provide this

11      discovery, and their only argument is that Ford, they claim,

12      would not necessarily be entitled to this discovery under

13      Rule 45 if this were not an MDL, but, Your Honor, this is an

14      MDL.

15              The cases were consolidated for pretrial purposes

16      because they were related.  None of the parties objected to

17      that consolidation and they had ten days to do so under the

18      case-management order.  Now they have to live with the

19      results of consolidation.  There is supposed to be shared

20      discovery in an MDL, and the defendants have not come forward

21      with a single case, not one case, in the context of an MDL,

22      in which discovery was restricted in the way that they seek

23      to do here.  Instead, what they do is they rely on

24      exclusively non-MDL case law dealing with the scope of

25      Rule 45 discovery on non-parties and non-MDLs, which is just

1   wholly irrelevant here.

2          Your Honor, we have cited several cases which

3   support the concept of shared discovery; In Re: Facebook, In

4   Re: Asbestos; the manual on complex litigation discussing MDL

5   says discovery already taken shall be available and useable

6   in tagalong cases, end quote.

7          THE COURT:  This isn't a tagalong though?

8          MR. KELLY:  No, but it is essentially -- Your

9   Honor, it is the same scenario where you have an action later

10  filed and the idea is you share the discovery to expedite the

11  process, put everybody on the same schedule, share the

12  discovery and share the efficiencies of what an MDL is

13  intended for.

14          Your Honor, the NCFE case is a perfect example

15  where that happened.  There were 16 actions consolidated in

16  that case.  Moodys was named as a defendant in only one case.

17  Nevertheless, discovery was shared.  Moodys provided their

18  documents to plaintiffs who did not name them as a defendant,

19  provided their interrogatory responses to plaintiffs who did

20  not name Moodys as a defendant.  That is how the NCFE case,

21  Your Honor, which I was involved in, was able to operate so

22  efficiently.  Nobody was arguing that certain parts of

23  discovery should not go to certain parties.  Once you are

24  consolidated into an MDL the idea is you share all the

25  discovery.

1          Your Honor, even if Ford did have to make some

2     showing of relevance to gain access to the previous discovery

3     in the MDL, which, as I said, defendants have not come

4     forward with even a single case to support this idea, but

5     obviously the same discovery that is relevant in the punitive

6     class actions is also relevant in the Ford action.  There is

7     a clear overlapping of issues among the actions, that's why

8     the Ford action was consolidated in the first place.  The

9     consolidated actions, including Ford, are all based on the

10    very same conspiracy in the wire harness industry which

11    involved price fixing, bid rigging and allocation, which,

12    Your Honor, is a decision among the co-conspirators to not

13    bid.

14          That's exactly what happened in the case of Ford.

15    Fujikura's counsel was making a big deal before about not

16    bidding with respect to Ford's RFQs, but it is black letter

17    law, Your Honor, that allocation is also an antitrust

18    violation so, for example, conspiring and saying, okay, we

19    won't bid with respect to Ford because they are yours and we

20    will get other suppliers, we will get other OEMs, and those

21    will be our OEMs.  That's the very same violation, so we are

22    talking --

23          THE COURT:  You are saying it is the same

24    conspiracy even though you are only directly suing one of

25    the --

1        MR. KELLY:  Exactly, Your Honor, it is the very

2    same conspiracy, it is different aspects of antitrust

3    violations, whether we are talking about price fixing, bid

4    rigging or allocation not to bid, it is the very same

5    co-conspirators that have been name as defendants in the

6    punitive class actions as we have identified as

7    co-conspirators in the Fujikura complaint.  Yazaki, Sumitomo,

8    Furukawa, those are the co-conspirators that we have

9    identified.  It is the very same guilty pleas have been

10   identified and support the allegations in the Ford complaint

11   as are identified and support the allegations in the punitive

12   class actions.

13        And, again, while defendants seem to recognize that

14   the scope of guilty pleas does not limit what you can plead,

15   they don't recognize that those same guilty pleas provide

16   support for Ford's allegations, so when you have guilty pleas

17   that span from a ten-year period, from 2000 to 2010, which we

18   do with respect to several of the co-conspirators, does that

19   make Ford's allegations as to a conspiracy directed at Ford

20   involving allocation and bid rigging less speculative?  Of

21   course it does.

22        So Fujikura's attempt to use those guilty pleas to

23   limit Ford's claim is exactly the opposite from what we

24   should be talking about.  They support Ford's claims because

25   those guilty pleas make it more likely that Ford was also a

```
 1    target and damaged by this conspiracy, and that's what we
 2    need to keep in perspective here.
 3              THE COURT:  So tell me what you want, you want all
 4    the discovery?
 5              MR. KELLY:  Absolutely, Your Honor, that's just the
 6    way an MDL works, and there is no reason to limit it.  There
 7    is no reason to make us jump through hoops and serve Rule 45
 8    subpoenas when clearly all of those DOJs -- we are talking
 9    about the documents that were provided in connection with the
10    DOJ investigation.  Of course they are relevant to Ford's
11    claims.  It is the very same conspiracy that we are talking
12    about.  So to make us jump through those hoops and engage in
13    arguments back and forth, the relevance, is just a waste of
14    everybody's time.
15              THE COURT:  Okay.  Who is going to --
16              MR. SQUERI:  I will.
17              THE COURT:  Mr. Squeri.
18              MR. SQUERI:  Your Honor, before I address all of
19    Ms. Kelly's points, let me first start to address two
20    preliminary matters.
21              I mean, one, Ms. Kelly suggested that somehow our
22    cases have been consolidated.  In fact, the stipulation we
23    entered into was coordinated, these are not the same case at
24    this point in time from the standpoint of procedure.
25              Second of all, one of the issues that came up this
```

 1    morning, Your Honor, was the stipulation involving the Yazaki

 2    employees and their participation and the right of Ford to

 3    come in and ask questions during their depositions.  We have

 4    made clear the position of Yazaki and those individuals is

 5    Ford can come in, they just need to share time with the

 6    plaintiffs.  I mean, we are --

 7         THE COURT:  You mentioned that -- one of the notes

 8    that I made is to distinguish this coordinated versus

 9    consolidated, these terms, and how that -- what position that

10    puts Ford in relationship to this case.

11         MR. SQUERI:  Well, I think that the consolidated --

12    it is interesting the Court should ask that question because

13    I was asking that amongst some of our colleagues earlier.

14    Consolidated means it actually becomes the same case, it is

15    the same litigation.  Coordinated simply means that they

16    become coordinated with each other, and that's what the

17    parties stipulated to from the standpoint of procedure here.

18    The cases are not themselves merged, they are part of the

19    same MDL, they are coordinated with each other but they are

20    not consolidated with each other.

21         If I could --

22         THE COURT:  Okay.

23         MR. SQUERI:  If I could move on, Your Honor?

24         THE COURT:  I suppose it has some meaning, but go

25    ahead.

```
 1          MR. SQUERI:  Ford has raised essentially four
 2   objections to the plan.  I submit, Your Honor, none of them
 3   have any merit.  First they want the plan to require, as we
 4   just heard Ms. Kelly, that all discovery produced by
 5   defendants to plaintiffs -- to the group plaintiffs is turned
 6   over to them automatically and without regard for whether it
 7   has anything to do with Ford or is relevant.
 8          Second, they want the right to enforce discovery
 9   requests that are served on us by punitive class-action
10   plaintiffs without regard for whether or not Ford could
11   have -- could have even sought such discovery itself.
12          Third, they want the plan to stay third-party
13   discovery of Ford.
14          Fourth, they have some issues regarding the plan's
15   provisions on transactional data, which Mr. Rubin will
16   address a little bit later.
17          But first turning to Ford's claim to all discovery.
18   Contrary to Ford's suggestion there is no requirement in the
19   case law that Ford should get all of the discovery provided
20   by defendants in the punitive class action that defendants
21   which Ford has not sued, neither in the rules nor the case
22   law.
23          THE COURT:  But isn't Ford saying this is the same
24   conspiracy even though they haven't sued them?
25          MR. SQUERI:  Your Honor, we heard that this morning
```

 1    and we just heard it now from Ms. Kelly.  You know, two

 2    points to be made here.  First of all, once again, they have

 3    only sued Fujikura but we heard counsel for Ford this

 4    morning, and Ms. Kelly repeat, that somehow there is some

 5    broader conspiracy.  As we heard this morning, there is --

 6    first of all, there is no umbrella conspiracy that has been

 7    alleged by Ford.  Second of all, and I think critically

 8    because there was -- I think there was a very significant

 9    misstatement this morning, Your Honor, the plea agreements I

10    can tell you with respect to my client and with respect to

11    the other wire harness defendants that I'm aware of did not

12    include any type of customer allocation of material.  Our

13    plea agreement said that it related to certain OEMs, and

14    while I recognize that it is not evidence, Your Honor, DOJ

15    made clear this past August that the preceding plea

16    agreements had nothing to do with Ford, they were related to

17    other car makers.  And for Ford to come in here and say that

18    somehow they include a customer-allocation conspiracy, that's

19    just not there, it is not in the document.

20          I think what is also critical here, Your Honor, is

21    that, yes, Ford is asserting similar claims, I don't deny

22    that there is some amount of overlap that exists, but it is

23    not complete overlap.  They are asserting a conspiracy that

24    affected Ford, not all of the other OEMs, which is what the

25    class plaintiffs are asserting.  And to be clear, we

1    recognize, Your Honor, that we need -- they need to get --
2    assuming that the Court allows their complaint to continue,
3    that we would need to provide them a big part of the
4    discovery that we turn over in the case.
5         All we are saying is it shouldn't automatically be
6    all of it.  There is some need for a relevance test to be
7    applied.  We are not just being technical about it, Your
8    Honor, I mean, just to give you an example, you know, of a
9    concern that we might have.  Let's say we are talking about
10   discovery and this is, in fact, reflected in some
11   interrogatory responses and some of the documents that
12   plaintiffs are seeking, that asks for the details of the RFQ
13   process and the way other car manufacturers actually cost
14   their products.  Let's say it relates to GM, Chrysler, Honda,
15   Toyota.  Why does Ford necessarily get those documents?  Our
16   customers -- those customers would certainly expect us to
17   resist that discovery just as I would expect Ford would.  We
18   are not going to be crazy about this, Your Honor.  We
19   recognize we need to be pragmatic and that there are certain
20   fights that's not going to be worth fighting, but all that we
21   are saying is that Ford doesn't simply get automatically what
22   they are asking for.
23        And just to be clear, from my client's perspective
24   with respect to the DOJ production, we are prepared to
25   provide Ford with those documents.  We have been waiting for

 1    them to officially become subject to the protective order,

 2    which is something that we have been relating to them.

 3           The other issue, Your Honor, is whether or not they

 4    are necessarily entitled to step in the shoes of the

 5    plaintiffs.

 6           THE COURT:  To enforce the --

 7           MR. SQUERI:  To enforce them.  Your Honor, they

 8    cite no authority to support the proposition that they can

 9    stand in the shoes of somebody else.  Just as we are limited

10    in the discovery we can obtain from Ford under Rule 45, that

11    is what they are limited to as well.  They are not entitled

12    to somehow assume the rights of parties who are, in fact, in

13    litigation with us who have a great deal more additional

14    rights when it comes to discovery.  You know, I don't know of

15    any authority that suggests that they have the right to

16    simply just stand in their shoes and demand the same

17    discovery, and I don't think what they are seeking there is

18    in any sense appropriate.

19           You know, with respect to some of the case law that

20    counsel cited, none of those cases support the broad order

21    that Ford is seeking.  I'm going back now to, you know, they

22    give us everything.  They don't say that they are

23    automatically entitled to it.  They vary from case to case.

24    In fact, the Moodys case, the case involving Moodys which

25    counsel was talking about, which they were involved in,

Status Conference • February 12, 2014

```
 1    Moodys shared their interrogatories with some plaintiffs, at
 2    least that's the way the documents read to us, and not
 3    others.  It is not -- there is a need, there is an undeniable
 4    need, for the parties to recognize that we are in a
 5    coordinated proceeding, we need to proceed in a rational way,
 6    but that doesn't mean that all of a sudden their rights are
 7    expanded and that they have the right to get things that they
 8    wouldn't otherwise get or that they necessarily should get
 9    everything that a group of plaintiffs are getting who are
10    asserting a much broader set of claims.
11            MR. KELLY:  Your Honor, if I may just address a few
12    points?
13            Defense counsel are trying to rewrite MDL law, and
14    what I think is clear is that they don't have any case
15    support.  They do not bring a single case to Your Honor's
16    attention for this idea that in MDL there should be some kind
17    of segregation of discovery.  It is just not the way it is in
18    any MDL case.
19            With respect to counsel's argument about allocation
20    and --
21            THE COURT:  Why are you coordinated then instead of
22    consolidated?
23            MS. KELLY:  Your Honor, that's really a distinction
24    without a difference.  We are coordinated for pretrial
25    proceedings, and that's often the way it is in an MDL
```

```
 1    proceeding, and then after all of the pretrial proceedings
 2    the cases will often go back to their original jurisdictions
 3    for trial, but for terms of discovery it is a distinction
 4    without a difference.  We are part of the MDL proceeding.  We
 5    are coordinated for pretrial discovery purposes, and that's
 6    the way it is.  That's the way it was in the NCFE case,
 7    that's the way it often is in these cases, so while counsel
 8    is trying to make something of these distinctions it has
 9    absolutely no relevance here.
10         I would like to read to you from the Yazaki plea
11    agreement.  It states, quote, during such meetings and
12    conversations agreements were reached to allocate supply of
13    automotive wire harnesses and related products sold to
14    certain automobile manufacturers on a model-by-model basis.
15    The Fujikura plea agreement has the very same language.  So
16    counsel's attempt to say that there was no plea with respect
17    to allocation is just inaccurate.
18         Also I think what defense counsel continuously
19    ignores is the very basic concept of joint and several
20    liability.  These co-conspirators are responsible for all
21    damages to Ford for the entire conspiracy, whether they bid
22    on one, for example, the CD4 bid -- Your Honor, just to be
23    clear, the CD4 bid was included in Ford's complaint solely as
24    an example because it is a very complicated process, the
25    bidding process, and so we included it there as an example of
```

```
 1    how the RFQ bidding process worked.  That level of

 2    specificity is absolutely not required in a complaint to

 3    allege an antitrust allegation, so it is kind of ironic that

 4    defendants are trying to limit it to the CD4 when we use that

 5    to go above and beyond --

 6              THE COURT:  Slow down.

 7              MS. KELLY:  Sorry.  To go above and beyond what is

 8    required in a pleading simply for exemplary purposes.

 9              THE COURT:  Let me ask you this, I assume you are

10    going to be coordinating with the other plaintiffs in the

11    discovery requests?

12              MR. KELLY:  Yes, Your Honor.  We have committed to

13    do that.  We have committed to do that provided that we get

14    the other discovery because obviously we can't make efforts

15    not to duplicate when we don't know what has already been

16    produced, but we have committed to serve comprehensive

17    document requests by March 15th as long as we get access to

18    the prior discovery so that we can see what is going on, so

19    we can actually make significant efforts to cooperate and to

20    facilitate the process.

21              THE COURT:  But are your comprehensive discovery

22    requests going to be done with the other plaintiffs or are

23    you going to be doing your own, I mean, how separate are you

24    in this case?

25              MR. KELLY:  We are happy to cooperate with the
```

 1   plaintiffs as much as possible.  If that means submitting

 2   joint document requests that's something we would be amenable

 3   to as long as we have all of our requests incorporated in

 4   that, but in order to do that we have to have enforcement

 5   rights, that's one of the issues that counsel just addressed.

 6   They don't want us to be involved, they don't want to give

 7   Ford even notice of discovery disputes, even if we have the

 8   very same issues, the very same problems, they don't want to

 9   give Ford notice of discovery disputes.  They said it is not

10   required.  They don't want to give us enforcement rights.

11            So what they are saying, for example, is all of the

12   other plaintiffs, if one plaintiff serves discovery any other

13   plaintiff can then decide, okay, I won't duplicate that

14   because that discovery demand has already been made and I

15   know later on I can go and enforce that discovery request.

16   They don't want to give Ford that ability.  So they want us

17   to make efforts not to duplicate, but they don't want to give

18   us the right to enforce other people's discovery requests.

19   It just can't work that way.  We are happy to coordinate our

20   requests with the other plaintiffs, to not duplicate what has

21   already been requested, but then we obviously have to be able

22   to enforce those requests that have already been made, other

23   than -- otherwise we are just proceeding at our own peril.

24            THE COURT:  Okay.

25            MR. KELLY:  Your Honor, with respect to the Yazaki

1    depositions, Your Honor already decided that issue.  That was

2    briefed and argued at the prior conference in November.

3    Mr. Spector I think was trying to revisit and reargue Ford's

4    ability to attend those depositions and that's an issue that

5    has already been decided.  I believe the only issue was to

6    make clear in the order that Ford has the right to attend

7    those deposition and that we would work out our time with the

8    plaintiffs.  I believe that's something that we can do.  I

9    don't see that there should be any problem in other MDL --

10              THE COURT:  That's done, I agree with you.  Okay.

11          Mr. Squeri?  I'm sorry, but we have to move along

12   here.

13              MR. KELLY:  Yes.  Thank you, Your Honor.

14              MR. SQUERI:  Your Honor, if I could respond to a

15   couple of issues?

16          First of all, the plan does contemplate Ford's

17   participation and coordination.  To be clear, we have no

18   objection letting Ford know when we engage in meet and

19   confers.  In fact, it is my understanding that, you know,

20   that Ford was invited to the Sumitomo meet and confer, they

21   are invited to our meet and confer, we have no problem with

22   that whatsoever.  We have -- all we are asking is that they

23   proceed pursuant to Rule 45, that's what they are entitled

24   to.  To the extent there is overlap we will deal with that

25   and we will provide them discovery that they are entitled to.

1    Your Honor, the last chart of -- slide amongst the
2    charts that we provided you compares the cooperation
3    requirements in the plan as drafted between defendants,
4    plaintiff groups and Ford, and it recognizes that with Ford
5    it is going to be necessary for them to simply do the best
6    they can to avoid duplication.  Duplication is not forbidden.
7    We recognize that there may be some that occurs but that with
8    coordination it probably can be minimized.
9        Finally, Your Honor, the plea agreement that they
10   just read includes nothing about customer allocation.  The
11   language was read quickly but let me read it slowly.  During
12   such meetings and conversations agreements were reached to
13   allocate the supply of automotive wire harnesses and related
14   products sold to certain automobile manufacturers on a
15   model-by-model basis, et cetera.  It doesn't say anything
16   about allocating customers.  It limits it to certain
17   customers.  DOJ made clear in its recent press release that
18   it did not relate to Ford.
19        THE COURT:  All right.  Yes?
20        MR. COOPER:  Your Honor, there was some reargument
21   I think of the motion to dismiss, and I just didn't want the
22   Court to think because we weren't responding to the argument
23   Ms. Kelly made that we agree with those.  Thank you.
24        MR. KELLY:  Your Honor, I believe that the only two
25   issues that haven't been addressed are discovery from Ford

 1    and the transactional data issue.  May I address those

 2    briefly?

 3            Your Honor, defendants would have you think that

 4    Ford is trying to avoid its own discovery obligations.  It is

 5    not.  It is only asking that discovery be coordinated between

 6    the Ford action and the punitive class actions to alleviate

 7    the burden on Ford of duplicative discovery, again, one of

 8    the goals of an MDL, and exactly what defendants have been

 9    arguing for all afternoon.  And this, of course, would allow

10    the Court to address discovery disputes once rather than

11    twice.

12            The discovery in the Ford action itself, as

13    Fujikura has essentially agreed, is stayed by virtue of the

14    pending motion to dismiss.  This has been the practice in the

15    MDL and set forth in the initial discovery plan, and it

16    obviously just makes sense.  So all we are asking from the

17    defendants in the punitive class actions, whether they seek

18    discovery from Ford as an absent class member or under

19    Rule 45, is just to wait until the resolution of the motion

20    to dismiss so that we can forward on one schedule with

21    respect to Fujikura and the punitive class defendants so that

22    we can avoid duplication.

23            There is obviously no prejudice to defendants by

24    this short delay, especially in light of the DOJ's stay.  It

25    is supported by the case law pertaining to discovery sought

```
 1    from absent class members, they can pursue party discovery
 2    first.  And it is just really the same courtesy that the
 3    defendants have asked for.  We have agreed to expedite and
 4    serve our comprehensive requests on March 15th so that they
 5    can do one comprehensive search.  We are asking them to just
 6    do the same, wait until the motion to dismiss so we know what
 7    the scope of the action is in Fujikura and let's deal with
 8    one set of comprehensive requests at one time so we can do
 9    one comprehensive search.
10          Finally, with respect to transactional data,
11    defendants and class plaintiffs, Your Honor, have been
12    negotiating the scope of transactional data to be produced to
13    each other for well over a year, and they have agreed to
14    complete their meet and confer on those requests by
15    February 15th.  Defendants have asked Ford to also serve its
16    requests for transactional data by February 15th.  Given the
17    infancy of the Ford action it would be extremely difficult
18    for Ford to do this, however, we stated that we would
19    endeavor to do so if the requirement was mutual and if
20    defendants also served their requests for transactional data
21    on Ford by February 15th, that way the parties together could
22    negotiate the appropriate parameters of the requests and make
23    decisions that would have mutual burdens upon each other.
24    This is precisely what was ordered under the initial
25    discovery plan which states that, quote, the parties will use
```

1    their best efforts to mutually agree on the scope of the wire

2    harness transactional data to be produced.  The data,

3    mutually agreed upon, will be reciprocally exchanged, but

4    defendants once again wants to change the rules only for

5    Ford, so there is mutuality and reciprocity for all the other

6    plaintiffs but not for Ford, so what would happen is Ford has

7    to scramble to get our requests together in three days and

8    defendants were able to do so at their leisure without a date

9    even being set now.  These are obviously the types of

10   obligations that should be mutual so that each party can kind

11   of determine --

12         THE COURT:  Could you slow down?

13         MS. KELLY:  I'm so sorry -- can determine the

14   amount of give and take during the negotiations.

15         Ford would be prejudiced by having to do this

16   unilaterally in just a few days.  Ford has tried to make

17   efforts to expedite its transactional data requests but it

18   has been impossible to complete this task because defendants

19   have refused to engage in any mutual discussion with Ford of

20   what the parties need from each other.  There has been

21   absolutely no back and forth process yet.  Ford has been

22   excluded from any of the ongoing discussions concerning

23   transactional data until just recently, it was finally

24   included in one call about two weeks ago, but there has been

25   over a year's worth of communications back and forth between

```
 1    the plaintiffs and defendants which obviously we were
 2    excluded from.
 3              THE COURT:  Well, you weren't in the case?
 4              MR. KELLY:  Yes, Your Honor, but when we came into
 5    the case we made it known obviously that we wanted to be
 6    included but we were excluded, there was some transactional
 7    communications back and forth in September, October,
 8    November, December, and we were excluded from those.  So my
 9    point is just we haven't been able to get up to speed, and so
10    defendants are claiming that it is too burdensome for them to
11    make their request from Ford by the 15th, and for the same
12    reasons it is too difficult for to us do that, so what we
13    would suggest is let's just have a mutual date, let's put it
14    off until March 15th, and let's both get together in that
15    time period and make our mutual requests.  It might be
16    difficult to do it in a month but we are willing to do that,
17    as long as it is mutual, as long as we can get together and
18    have a back and forth with defendants --
19              THE COURT REPORTER:  Please slow down.
20              MS. KELLY:  I'm sorry.
21              THE COURT:  You don't want to have to start all
22    over so --
23              MS. KELLY:  As long as we can get together and have
24    a mutual conversation with defendants back and forth as to
25    the appropriate parameters of the discovery, that is
```

```
 1    something that I think that we can do by March 15th.  It just
 2    seems to be the fairest way and the way that the defendants
 3    and plaintiffs have been doing it over the past year.
 4    Everything has been mutual.
 5            Your Honor, there just seems to be a pattern here
 6    of trying to exclude Ford from full participation in the MDL.
 7    Defendants have done that, they have done it with their
 8    proposed supplemental discovery plan, and we request that the
 9    Court put an end to that and adopt Ford's proposed
10    supplemental discovery plan, get us on the same track as
11    everyone else, let's conserve everybody's resources and let's
12    conduct this MDL the way it is to supposed be done with
13    coordination amongst all of the groups.
14            Thank you, Your Honor.
15            THE COURT:  Okay.
16            MR. SQUERI:  Your Honor, if I could just address
17    Ford's issues regarding the requested stay of discovery as to
18    them?
19            First of all, it is hypothetical.  We haven't
20    served any discovery on them as of yet.  Ford's
21    characterization of itself as an absent class member and
22    somehow that means that they should receive some special
23    protection, it is not supported by the cases that they have
24    cited, Your Honor.  The cases that they have cited involved
25    generally some type -- kind of abuse of the discovery process
```

Status Conference • February 12, 2014

1    that was being used by a defendant usually served on

2    individuals as a means of limiting the number of class

3    members.  That's not what we are looking for here.  We are

4    looking to have basic Rule 45 discovery from Ford, reciprocal

5    between defendants and Ford in the case.  It is based upon

6    the fact that Ford is a material witness in this case.  It is

7    not something that defendants like.  Defendants don't like

8    the idea of having to serve Rule 45 subpoenas on their

9    customers like Ford and others, but we need to do it and we

10   need to do it within a reasonable period of time.  We can

11   certainly talk to them about trying to coordinate, you

12   know --

13           THE COURT:  Well, you don't know the result of the

14   motion yet.

15           MR. SQUERI:  No, we don't.

16           THE COURT:  So why would discovery go on before you

17   know that?

18           MR. SQUERI:  We don't know the discovery of the

19   motion as to Ford, but we are talking about Rule 45 discovery

20   from us to them, Your Honor, in order to move along with the

21   process that we need to as we address class certification and

22   other issues in the case.

23           THE COURT:  Okay.  All right.

24           MR. RUBIN:  Your Honor, can I address the

25   transactional data issues?

 1          THE COURT:  Yes.
 2          MR. RUBIN:  Again, Mike Rubin of Arnold & Porter
 3   speaking for the Fujikura defendants, but with respect to the
 4   transactional data I'm also addressing it on behalf of the --
 5   all of the wire harness class-action defendants.
 6          The issue here, Your Honor -- and let me back up.
 7   Ford's counsel noted that while they can't get it together in
 8   three days, these discussions on transactional data and
 9   coordination and providing and completing the meet and
10   confers by the 15th of February, that was in December when we
11   were on the phone, class counsel for the plaintiffs and Ford
12   agreed that Ford to get up to speed pretty easily, class
13   counsel accurately noted it is a couple letters that are a
14   few pages long, it is a list of data.  In reality, Your
15   Honor, class plaintiffs have asked for virtually all of our
16   transactional data.  It is difficulty for us to imagine what
17   else Ford wants or would want.
18          For Fujikura, we didn't sell anything to Ford.  It
19   is apparent that the transactional data they want involves
20   sales by either other defendants to Ford or our sales to
21   other OEMs and other direct purchasers.  So it is unclear
22   exactly what they are going to want, but if they want
23   something that is different than the universe class
24   plaintiffs have asked for, it is easy for them to say this is
25   what we want, they should speak up or forever hold their

1    peace.  It is not the same going the other way, Your Honor.

2           Ford has multiple hats in this litigation.  They

3    are, with respect to my clients, a party.  We will have to

4    take certain discovery as a party from them on transactions.

5    In the direct-purchaser class action the direct-purchaser

6    defendants and our experts are going to want certain types of

7    transactional data from Ford, different transactional data is

8    going to be relevant to the indirect purchasers -- both

9    indirect-purchaser cases.  Getting all of that together,

10   pulling it together, and coordinating it with other

11   transactional data that we are going to request from other

12   OEMs, from GM, from Toyota, from Chrysler, doing that in a

13   consolidated coordinated way, coordinating and making sure we

14   get one single set of requests out that will satisfy the

15   needs of our various experts in the various cases takes a lot

16   of time and is not something that we as defendants are in a

17   position to do with respect to Ford by the 15th, even back in

18   December, that's simply not the process in the amount of time

19   we had, it is not the order in which we usually do discovery

20   in cases like this.

21          Ford chose when they decided to file this case,

22   they could have filed it the same time as the class

23   plaintiffs but they did not, so we would request very simply

24   that Ford let us know if they actually think they are going

25   to need additional transactional data so that we are not

Status Conference • February 12, 2014

1    holding up getting our transactional data to the class

2    plaintiffs, holding up the litigation for the class

3    plaintiffs because Ford won't come to the table and, Your

4    Honor, they have been invited to the table, they were invited

5    to the table for the meet and confer --

6           THE COURT:  So you want them by February 15th but

7    as to what you are requesting of Ford you want when?

8           MR. RUBIN:  Ford doesn't want us to conduct

9    discovery of Ford generally.

10          THE COURT:  Right.

11          MR. RUBIN:  So they are speaking out of both sides

12   of the mouth on this point.  We would like to serve discovery

13   transactional data in a consolidated way, give them a single

14   set of consolidated transactional data requests in an

15   appropriate time so that Ford has to do the work once.

16   That's what they want, that's what we want.  When that

17   precisely will be ready we are not sure, we are still working

18   with our experts in the relatively near future, and for

19   Fujikura it may be completely moot or our requests may be

20   different depending on how Your Honor rules on the motion to

21   dismiss.  That motion won't affect what the class plaintiffs

22   -- I'm sure the class defendants will need from Ford.

23          THE COURT:  Right, and that's what I'm asking, what

24   the class defendants will need from Ford, when will you have

25   that together?

 1          MR. RUBIN:  One moment, Your Honor.

 2          (An off-the-record discussion was held at

 3          3:36 p.m.)

 4          MR. RUBIN:  Your Honor, I have conferred and we can

 5   be in a position to serve those March 15th.

 6          THE COURT:  Okay.

 7          MR. RUBIN:  That is for the class, Your Honor.  For

 8   Fujikura we don't know what the scope of the case is or even

 9   if there is going to be a case, which makes it more difficult

10   for us to serve our coordinated party discovery in a sort of

11   ironic wrinkle.

12          THE COURT:  Okay.  Thank you.

13          MR. KELLY:  Your Honor, defendants have said they

14   can serve their transactional questions by March 15th.  Ford

15   has said that we can do the same.  There really just doesn't

16   seem to be any basis not to have that be the mutual date so

17   we can mutually discuss the transactional data requests.

18   While they have said that plaintiff --

19          THE COURT:  Because the other class plaintiffs are

20   doing February 15th, right?

21          MR. KELLY:  And defendants are also serving their

22   transactional data requests on plaintiffs by February 15th

23   so, you know, for the same reasons they said we should be

24   able to latch on to plaintiffs' requests, they should be able

25   to hook forward into their requests from plaintiffs.  They

```
 1    are extremely broad, the requests that defendants have
 2    indicated with respect to the class plaintiffs are extremely
 3    broad.  I can't imagine that there could be anything more
 4    they could want from Ford, so we both have that as our
 5    starting points so why can't we just take an extra couple
 6    weeks, a month, to formulate what we need from each other?
 7    It just doesn't make any sense why Ford should be the only
 8    party that is compelled to work on this short time frame when
 9    they are having reciprocity with respect to the other
10    plaintiffs.  Give us the same reciprocity.
11              I mean, the idea that Ford is talking out of both
12    sides of its mouth is just simply untrue.  We are trying to
13    help accommodate them.  Yes, would we prefer that all
14    discovery be stayed with respect to Ford?  Sure, but I
15    understand that plaintiffs are trying to move things along,
16    defendants are trying to move things along, so that's why we
17    said yes, we will make our transactional requests on an
18    expedited schedule.
19              THE COURT:  It just seems to me that your
20    transactional requests can't be that different from the class
21    plaintiffs' transactional requests, and if they are going to
22    be done on the 15th I think you should be done on the 15th of
23    February, so I'm going to order that's the date for you to
24    submit your transactional data requests.  Defendants will
25    submit their requests by March 15th to Ford.  Okay.
```

 1          MS. KELLY:  Your Honor, if there arises a need if

 2    we realize down the line that there is a specific type of

 3    data that was missed for some reason, may we seek leave from

 4    the Court to serve a targeted transactional data request?

 5          THE COURT:  I have said before I would expect all

 6    of this to be done, but if you need something else that you

 7    didn't know about then you can bring it to my attention,

 8    certainly.

 9          MS. KELLY:  Thank you.

10          MR. RUBIN:  Your Honor, speaking with my

11    class-action hat on, class-action defendants' hat, on the

12    February 15th date was put into the stipulation -- the

13    proposed stipulation.  The parties have been working to

14    schedule meet and confers.  As Yazaki's counsel noted, theirs

15    isn't scheduled to occur until next week.  I know a lot of

16    defendants haven't scheduled and haven't completed meet and

17    confers with Fujikura.  When we spoke with plaintiffs several

18    weeks ago a lot of items were left still for further

19    discussion for the parties to get back together.  The

20    February 15th date may have --

21          THE COURT:  Is that going to be extended for

22    everybody?

23          MR. RUBIN:  That's what I was going to propose.

24          THE COURT:  That's what I was thinking.  If you all

25    do it the same time you can pick your own date, I don't care,

1    but you all have to be together on it.

2           MR. WILLIAMS:  We have been discussing it.  I think

3    that we are likely to be done by the end of February.  If you

4    want to make it safe or easier for everybody so there's time

5    for Ford to be a part, I would just say make it March 15th

6    for everybody to be done for meet and confer and

7    transactional data.

8           THE COURT:  Okay.  So we have just spent the last

9    15 minutes wasting our time.  Okay.  March 15th.

10          MR. RUBIN:  I'm sorry, Your Honor.  Co-counsel just

11   noted that we are required to serve our data requests on Ford

12   by March 15th.  The February 15th date was when we were to

13   complete the meet and confers.  Obviously we can't complete

14   the meet and confer until we served the discovery requests,

15   so I just wanted to clarify that and make sure that was

16   clear.

17          THE COURT:  Oh, it is not clear at all.  So you are

18   going to change your meet and confers now to be after

19   March 15th?

20          MR. RUBIN:  No, Your Honor.  For the class actions

21   what I think we're jointly proposing is that instead of

22   completing the meet and confers by this Saturday, just the

23   reality of scheduling, we would like in the order, so we are

24   not in violation of a court order when it is entered, to

25   complete those meet and confers by March 15th, which would

```
1    include having Ford tell us before then if there is more that

2    they want.

3            THE COURT:  Okay.  Ms. Kelly, what do you say about

4    that?

5            MR. KELLY:  That's fine with us, Your Honor.

6            MR. RUBIN:  And then in terms of serving stuff onto

7    Ford, our requests for transactional data both for the class

8    actions would do that by March 15th.  The open issue is

9    Fujikura depending on your ruling on the motion to dismiss

10   would also like sort of the -- in the event that we end up --

11   when we know what the case is actually about, if we need

12   additional data having an opportunity to do that.

13           THE COURT:  Okay.  Submit a schedule to the Court

14   in writing, please, so everybody knows what these dates are.

15           MR. RUBIN:  Yes, Your Honor.

16           THE COURT:  All right.  In terms of Ford's position

17   in this case as a coordinated party -- coordinated case, I

18   guess I should say, versus consolidated, the issue which I

19   will be very frank with you I have been struggling with is

20   does Ford, in fact, get all of the discovery, that's just the

21   issue that was argued that the other plaintiffs in the wire

22   harness get or does Ford only get the specific discovery that

23   it requests?  It seems to me as a practical matter that

24   Ford's conspiracy, if they are still in the case after the

25   motion, that this conspiracy theory involves these other wire
```

 1    harness plaintiffs, and that probably all of this other

 2    information is relevant, so I am going to order that Ford

 3    receive all of the information given to the other plaintiffs.

 4            May Ford stand in the position to enforce

 5    discovery?  I think I have to say yes, and the reason I have

 6    to say yes is that if Ford is coordinating, which we want,

 7    their discovery to the defendants then they have to have the

 8    right to enforce that discovery, otherwise you are going to

 9    be getting duplicative discovery, that is Ford would be --

10    have to send Ford's discovery to defendant in order to -- in

11    order to maintain defendants' position that Ford cannot

12    enforce the other plaintiffs' discovery.  So I guess what I

13    am saying, maybe I should say it that way, Ford may enforce

14    discovery that it participates in, so if it gives a joint

15    discovery request with the other plaintiffs to defendant, of

16    course Ford can enforce it.  If it is strictly the other

17    plaintiffs who give the discovery to the defendants then Ford

18    cannot enforce it.

19            MR. SQUERI:  Can I ask a question about that, Your

20    Honor?  Would that include discovery that Ford would not

21    otherwise have the right to seek?  Would it include

22    interrogatories, would it include request for production,

23    would it include Rule 45 subpoenas, requests for documents

24    that it wouldn't be authorized by law to get?

25            THE COURT:  Well, if it is not authorized by law to

 1   get, if you say it is not authorized by law to get, then you

 2   would -- Ford could not get it and you could -- or they could

 3   request it and you can file an objection and let me know why

 4   it is not authorized that they should get it.  I will wait

 5   and see what that is.  You gave some good examples why would

 6   Ford get certain information from other manufacturers that

 7   would be detrimental to the other manufacturers but it may be

 8   in the conspiracy that they are going to get some of that, I

 9   don't know, but I'm not ready to rule on that.  You may

10   maintain objections to what Ford gets, but other than that,

11   other than things that are specific, anything you give to the

12   others will be given to Ford.  Okay.

13           Anything else on that, Counsel?

14           MS. ROMANENKO:  Victoria Romanenko for dealership

15   plaintiffs.

16           Just one more thing before we leave the

17   supplemental discovery plan issue.  With regard to the 45-day

18   provision in the discovery schedule that Your Honor stated

19   earlier, we -- plaintiffs have proposed one small clause that

20   we did not hear defendants object to today, and that is

21   absent agreement of the parties since the parties will be

22   meeting and conferring at the same time as they will be

23   working on their motions to compel.  If the parties decide in

24   ten more days we can get this done then we would just like to

25   have the ability to make --

 1          THE COURT:  I don't think anybody would object to

 2     that, would you, absent agreement of the parties?  If you

 3     agreed just as you did a couple minutes ago then that's fine.

 4     Okay.

 5          MS. ROMANENKO:  Thank you.  And just one more

 6     thing, we would just like to note that dealership plaintiffs

 7     have been participating in every meet and confer with regard

 8     to discovery requests that were issued by the directs and

 9     end payers.

10          MR. SQUERI:  Your Honor, just very quickly, we just

11     want to make clear that whatever discovery we provide Ford

12     obviously is subject to the protective order.

13          THE COURT:  Absolutely, absolutely, and I was going

14     to mention that before that you remember there is a

15     protective order in this case.  Okay.  Please present an

16     order.

17          Then Ball, we are going to complete Ball by 4:00,

18     and we will start our next -- who is going to prepare that

19     order, Ford -- do it jointly, that last order, Ford and

20     Mr. Squeri?

21          MR. KELLY:  Yes, we will do it jointly.

22          MR. SQUERI:  Yes.

23          MR. SELTZER:  Your Honor, Mark Seltzer of Susman

24     Godfrey on behalf of the end-payer plaintiffs, and on behalf

25     of the end-payer plaintiffs interim co-lead counsel, we

 1   oppose Gordon Ball's motion to be appointed as an interim

 2   lead counsel in this case.

 3           THE COURT:  Where is Mr. Ball?

 4           MR. SELTZER:  Not here.

 5           THE COURT:  What?

 6           MR. SELTZER:  He is not here.  He's a failure to

 7   appear, and there has been no contact with us, Your Honor,

 8   about the failure to appear.  I submit, Your Honor,

 9   respectfully that in and of itself is sufficient grounds to

10   deny the motion.  This is not the kind of performance one

11   would expect from somebody who wants to be appointed as a

12   lead counsel in a case.

13           THE COURT:  Excuse me.  Molly, have we heard from

14   Mr. Ball?

15           THE LAW CLERK:  Just the pleading.

16           THE COURT:  Just the pleadings.  We haven't had any

17   telephone message?

18           THE LAW CLERK:  No.  Do you want me to check with

19   Colette?

20           THE COURT:  Okay.

21           MR. SELTZER:  So he's a no show, Your Honor.

22           THE COURT:  He's a no show.

23           MR. SELTZER:  Again, I say, Your Honor, somebody

24   who wants to be appointed as a lead counsel in the case, not

25   to appear on the motion for appointment as lead counsel that

1  says a great deal about that person's capacity and

2  willingness to actually serve as a lead counsel in the case

3  and provides sufficient basis to deny the motion.  That said,

4  there is zero good cause for this motion.

5        Merely asserting that he has got claims under

6  Tennessee law that he claimed are better than the claims that

7  we are prosecuting on behalf of the very same class members

8  is not a sufficient reason to have somebody appointed as an

9  additional lead counsel in the case.

10        THE COURT:  The Court has read it.  There is no

11  sense in taking time.  I have read it, and it is my decision

12  that he not be allowed to be a lead counsel in the case.  I

13  will issue an opinion on it.  Since he's not here I'm going

14  to do an opinion.

15        MR. SELTZER:  Very well.

16        THE COURT:  Just so you know that's what I'm

17  ruling.

18        MR. SELTZER:  The last thing I would like to note

19  just for the record, we did cite in our papers the Toyota

20  case as an example of how an MDL actually works.  Once the

21  Court has appointed interim class counsel those are the

22  attorneys who make the decisions and have the responsibility

23  to make the decisions about what claims should be asserted on

24  behalf of the class.  In the Toyota case, for example, there

25  were hundreds of cases that were MDL'ed to Judge Selna's

```
 1    court in Santa Ana.  After he appointed interim lead counsel,
 2    and I was one of them, we looked at the complaints that had
 3    been filed by various lawyers around the country and made the
 4    decision as to which claims should be presentence and which
 5    claims should be omitted, and Judge Selna expressly ruled
 6    that was our responsibility, that is the role of lead
 7    counsel, and that's what's happened here.  This is exactly
 8    the way an MDL should work.  And to allow somebody -- one
 9    plaintiff lawyer to say well, I have an additional claim, I
10    should be appointed as lead counsel, that would lead to great
11    mischief in the management of an MDL case.  With that, Your
12    Honor, unless Your Honor has any question, I will subside.
13    Thank you.
14            THE COURT:  You sound a little angry about this.
15            MR. SELTZER:  Well, you know what, it is really an
16    affront to the dignity of the proceeding for somebody to make
17    this kind of a motion and then not have the courtesy to show
18    up or call the court or call counsel and say I'm not going to
19    show up or give a reason why they can't show up.  In my
20    experience that's absolutely unheard of.  Thank you, Your
21    Honor.
22            THE COURT:  Maybe he knows it wasn't going to be
23    granted and he didn't want to waste his time.
24            Okay.  We have two more motions to go, as I
25    understand it, the fuel senders, the direct purchasers and
```

1    the indirect purchasers.  Who wants to go first?  Okay.

2           MR. DONOVAN:  Good afternoon, Your Honor.

3    David Donovan on behalf of Denso.  I will be addressing the

4    direct purchaser -- the motion to direct -- to dismiss the

5    direct-purchaser claim.

6           Compared to the plaintiffs in the wire harnesses

7    case and even compared to what we think are the relatively

8    weaker complaints in heater control panels and meters, which

9    are under advisement by the Court, we think the Vitec

10   complaint for direct-purchasers action stands apart in

11   virtually every relevant respect.

12          All Vitec has here is a very narrow --

13          THE COURT:  I just want to clarify what Vitec is.

14   Is this -- well, I shouldn't ask you, right?  You are the

15   wrong person.

16          MR. DONOVAN:  I went on the Internet and looked,

17   Your Honor, and I think you know about as much as I do.  It

18   is a Michigan L.L.C., that seems to be about all you can

19   figure out.

20          All Vitec has here, and I apologize if I'm

21   pronouncing it wrong, I say Vitec, but all they have here is

22   a very narrow guilty plea and a claim to have bought the

23   product.  If this complaint states a claim then it is hard to

24   imagine any complaint involving a guilty plea that would not

25   state a claim and that's not the law.

 1          In the wire harness cases we had multiple

 2    defendants who allegedly controlled 70 to 90 percent of an

 3    alleged worldwide market for wire harness products, several

 4    of whom had pled guilty to fixing prices on billions of

 5    dollars in sales on as many as 11 different products to

 6    multiple auto manufacturers over overlapping periods who

 7    allegedly used their market power to hold prices stable

 8    during a period of declining costs, for which they were fined

 9    $800 million.

10          Here we have one plea by one defendant, Yazaki, for

11    conspiring with one co-conspirator regarding approximately

12    $1.6 million in fuel senders sales, not billions of dollars,

13    $1.6 million in fuel senders sales to one OEM between 2004

14    and 2010 for which he was fined less than $400,000, and a

15    plea by Denso also for conspiring with respect to just one

16    automobile manufacturer but with respect to two other

17    products, neither of which is fuel senders.

18          There is nothing in the Yazaki plea with respect to

19    fuel senders regarding allocation of customers, I just wanted

20    to make that point because it has come up in the other

21    context today, nothing in there about that at all.

22          The plea, just to be clear, this is on page 8 of

23    the Yazaki plea, in furtherance of the conspiracy the

24    defendant, Yazaki, through certain of its officers and

25    employees engaged in -- and I will allie (phonetic) here a

1    little bit, Your Honor -- engaged in meetings with a

2    co-conspirator involved in the manufacture and sale of fuel

3    senders.   During such meetings agreements were reached to

4    maintain the prices including price adjustments requested by

5    an automobile manufacturer of fuel senders sold to an

6    automobile manufacturer, A-N, one, in the United States and

7    elsewhere.

8             There is nothing in that plea to plausibly suggest

9    any impact on anyone other than that single OEM.   Vitec does

10   not allege that it ever sold anything to the OEM referenced

11   in that plea.   The Court in wire harnesses and the Courts in

12   the other cases cited by Vitec in its opposition to our

13   motion concluded that a conspiracy broader than a bare plea

14   could be stated -- could be plausibly alleged based upon

15   allegations about market power.

16            In SRAM, which Vitec cites at page 8, the top nine

17   producers, who were defendants, controlled 79 to 84 percent

18   and maintained uniform prices.   In BMG the defendants

19   controlled more than 80 percent of digital music sales, and

20   there was a bunch of other facts alleged.   In Carbon Black a

21   majority controlled by defendants.   In the DIPF case, which

22   Vitec cites, there were detailed facts demonstrating

23   collusion in the market in which the defendants controlled 90

24   to 100 percent of relevant sales.   The same thing is true in

25   the chocolate case, and in aftermarket filters and in flash

```
 1   memory in which the defendants controlled 75 percent,
 2   80 percent and 90 percent respectively of the markets.
 3          What's alleged here?  Unlike wire harnesses, not a
 4   single allegation about market power, nothing.  They don't
 5   even allege what the market is.  In what market did Vitec buy
 6   fuel senders?  You will read the complaint front to back and
 7   you will not find an answer to that question.  Did they buy
 8   in the United States?  Did they buy in Japan?  Did they buy
 9   in Europe?  Is it a worldwide market?
10          THE COURT:  But is there something about it's only
11   like .07 percent in terms of the total sales for which Yazaki
12   was fined in this case, is that --
13          MR. DONOVAN:  Yes.  If you look at the Yazaki plea
14   with respect to the products they pled guilty to and the
15   amount of commerce with respect to each of those products,
16   for wire harnesses I believe it was $2 billion in commerce.
17   For -- what is the other product?  Instrument panels it was
18   $2 million -- 2. -- actually I have the numbers here,
19   $73 million for instrument panel clusters and $1.6 million
20   for fuel senders, that was the total volume of commerce it
21   involves, 2 billion, wire harnesses; 73 million, panel
22   cluster; 1.6 million, fuel senders.  It is just -- if you
23   look at the total fine of $470 million, Your Honor, you can
24   figure out which portion of the fine was allocated based on
25   the relevant volume of commerce.  So the total fine to Yazaki
```

```
 1    related to the sale of fuel senders would have been under
 2    $400,000 out of a $470 million fine.
 3              Again, with respect to the market, Vitec alleges
 4    nothing unlike wire harnesses about what the market was.
 5    Probably more importantly, Vitec doesn't allege anything
 6    about how many suppliers there were.  How many competitors
 7    are there -- were there in the United States whenever Vitec
 8    bought its fuel sender from Denso or Yazaki, whenever that
 9    was, they don't say.  How many suppliers were there of fuel
10    senders in that market at that time?  10, 20, 50, 3, there is
11    no telling from this complaint.
12              How much of the market, whatever that market was,
13    was controlled by Yazaki or Denso?  2 percent, 50 percent?
14    There is no telling.
15              How did prices behave during the period that Vitec
16    bought its fuel senders from whoever they bought full senders
17    from?  Did Vitec, in fact, pay more for fuel senders from
18    Denso or Yazaki than it paid from any other of the many
19    suppliers of fuel senders from whom it could have or
20    presumably did buy fuel senders?  There is -- the only thing
21    in this complaint about market power is some boilerplate
22    about barriers to entry and price elasticity.  I won't --
23    well, yes, I will.
24              If you look at the complaint with respect to the
25    allegation about price elasticity, it actually doesn't even
```

 1    make any sense.  It is paragraph 47.  46 says when a seller

 2    of goods and services can increase prices without suffering a

 3    reduction in sales pricing is inelastic.  Okay.  That makes

 4    sense.

 5              47 says OEM must use fuel senders, because you have

 6    to have a fuel sender in your gas tank otherwise you can't

 7    tell how much gas is in your car, therefore price is highly

 8    inelastic.  That is a complete non sequitur.  It doesn't even

 9    make sense.  The Court doesn't need to give credence to

10    allegations that don't make any sense.  Pricing would be

11    inelastic if there were only two or three competitors.  If

12    Denso and Yazaki controlled the market then Denso or Yazaki

13    could raise the price of fuel senders at will because people

14    have nowhere else to go and they have to have a fuel sender.

15    If there are 12 other competitors selling fuel senders at the

16    time then the price is not inelastic.

17              THE COURT:  There is nothing in that complaint that

18    shows that defendants could influence the sale of --

19              MR. DONOVAN:  Nothing, absolutely nothing.

20              THE COURT:  Okay.

21              MR. DONOVAN:  What do we know about Vitec?  You

22    asked the question earlier, Your Honor.  It is a Michigan

23    L.L.C. that supplies fuel tanks that contains fuel senders to

24    somebody.  It bought at least one fuel sender from Yazaki or

25    Denso, we don't know, at some point since January 1st, 2001.

1    That's it.  Nothing about who else it bought fuel senders

2    from, nothing about whether it bought any fuel senders

3    between 2004 and 2010, which is the time period of the Yazaki

4    plea regarding fuel senders, nothing about who it sold to,

5    nothing about the prices it paid ever for fuel senders or how

6    those prices were set, did it buy them in a catalogue, did it

7    call the dealer down the street, did it call Denso, we have

8    no idea how prices were set for the fuel senders Vitec

9    bought, or whether it paid more for fuel senders from Yazaki

10   or Denso than it paid for fuel senders from other suppliers.

11        THE COURT:  How about -- I'm forgetting, how

12   about -- we know what the Yazaki sales representative -- or

13   percentage.  What about Denso?

14        MR. DONOVAN:  There is nothing in the complaint?

15        THE COURT:  Nothing.

16        MR. DONOVAN:  Nothing, absolutely nothing.  Vitec

17   knows whether it was ever directed to buy a fuel sender from

18   any particular supplier.  Vitec knows whether any OEM, in

19   particular the OEM referenced in these pleas, and I think in

20   the sealed briefs the parties have made it clear who that OEM

21   is, Vitec knows whether any OEM ever directed Vitec to buy

22   from Yazaki or Denso.  And Vitec knows whether any OEM ever

23   told it the price that Vitec had to pay.  Vitec alleges none

24   of those things and they certainly cannot state a claim based

25   on an alleged injury to somebody else, and that's all they

1    have tried to do here.

2           We agree that Vitec is not limited by the plea

3    agreements, it is not limited by the Yazaki plea agreement,

4    it is not limited by the Denso plea agreement.  Vitec can

5    plead and allege anything it wants unless, of course, all it

6    has is the plea and that's all it has got.  We are also not

7    insisting that Vitec plead a highly detailed set of facts on

8    the price, method and nature of our alleged collusion.  We

9    are just insisting that Vitec plead something beyond the face

10   of the pleas to plausibly suggest the existence of a

11   conspiracy that impacted literally all sales of all fuel

12   senders to all buyers in the United States as it has alleged

13   here.

14           THE COURT:  What about the injury to Vitec?

15           MR. DONOVAN:  That's my next point, Your Honor.

16   Vitec has to plead something to link its purchases to some

17   wrongdoing by Denso and Yazaki.  Now, on that point I went

18   through Vitec's brief last night and they say the well-pled

19   facts in the complaint allege that plaintiff purchased fuel

20   senders directly from one or more of the defendants at prices

21   that were higher due to anti-competitive conduct.  I thought

22   to myself, well, that's certainly the issue but where do you

23   find that in the complaint, so I read further, and they say

24   here on page 5, the complaint contains numerous factual

25   allegations establishing that plaintiff was harmed by a

1    conspiracy to rig bids for, allocate the supply of and fix

2    prices for fuel senders.  Again, it is a nice conclusory

3    sentence but where is the beef?

4         So I get to page 13 and they lay it out there and

5    they are really pretty bold about the argument they make.

6    The heading is complaint sufficiently alleges that plaintiff

7    was injured as a direct result of defendants' conspiracy to

8    fix prices.  And, again, I will skip over a few words, but

9    here is what they argue on page 13, plaintiff plainly alleges

10   it was injured, the complaint states that Vitec purchased

11   fuel senders from one or more of the defendants, it alleges

12   that defendants engaged in that conspiracy that impacted the

13   bids submitted to OEMs and also the prices paid by all other

14   direct purchasers of fuel senders, and the complaint alleges

15   that the plaintiffs paid a higher price than they otherwise

16   would have paid and therefore were injured.  The law does not

17   require anything more.

18        The law requires everything more.  That is

19   completely conclusory, and if that's all it takes to state a

20   claim then all we need is a guilty plea, and that's not the

21   law.

22        I mean, simply put, Your Honor, standing and injury

23   are not pled by asserting that you have standing and were

24   injured.  You have got to plead some facts to establish that

25   the events, the wrongdoing you have alleged, in fact impacted

1    you, and Vitec has not done that.

2            In static control in 2012 the Sixth Circuit

3    squarely held that the mere allegation of conspiracy and

4    injury is entirely conclusory, that's all you have got here,

5    and that it is not enough to plead causation.  What's the

6    market?  What's the plaintiff's role in the market?  What

7    place did the plaintiff pay?  How is that price that was paid

8    by the plaintiff impacted by the alleged anti-competitive

9    behavior?  The plaintiff in static control alleged numerous

10   facts to try to link its purchases to the defendants'

11   conduct.  The Court found those facts did not establish the

12   link.  Here there are no facts, there is just the plea, there

13   is just a plea about what Yazaki did with respect to sales to

14   one OEM and its engagement in that activity with one

15   co-conspirator, there is nothing else, nothing at all.

16           Your Honor, we will rest on our papers with respect

17   to the statute of limitations and the failure to state a

18   claim for injunctive relief with just one -- if I could just

19   say one fact that relates to both of those issues?  Vitec

20   alleges that it bought at least one fuel sender from one of

21   the two of us or perhaps both of us, it doesn't say, at least

22   once since 2001.  Vitec knows when and from whom but it has

23   pled nothing to establish either that its purchase was within

24   the limitation period or even that it occurred during the

25   time of the conspiracy.  If its purchase was before the

 1   conspiracy, which according to the Yazaki plea is 2004 to

 2   2010, then neither -- there would neither be causation nor

 3   any reason to believe any affirmative act of concealment,

 4   neither of which is plead.  Likewise, any allegation of any

 5   business with either Yazaki or Denso in the last decade,

 6   absent that, there is no showing sufficient to give Vitec any

 7   basis to seek an injunction.

 8           THE COURT:  Okay.

 9           MR. DONOVAN:  That's it, Your Honor.  I think Vitec

10   plainly has no claim and its claim should be dismissed.

11           THE COURT:  All right.  Response?

12           MR. KOHN:  Thank you.  Good afternoon, Your Honor.

13   Joseph Kohn for direct-purchaser plaintiffs.

14           I don't want to repeat the entire approach we took

15   at the wire harness argument in terms of the categories of

16   allegations, at the same time we don't want to sell short the

17   fuel senders class, which is a different class and a

18   different case.

19           With respect to the case law, this is what there

20   is, there is no case which grants the relief that the

21   defendants propose.  There is no case in the antitrust field

22   post-Twombly where there is a guilty plea of any shape, kind

23   or description where the complaint has been dismissed in its

24   entirety with prejudice, and that's what the defense is

25   asking.

1          THE COURT:  So what do we know, what do we know

2   about your client -- who is your anyway?

3          MR. KOHN:  Vitec is a Michigan company, it is

4   operating, it is in business.

5          THE COURT:  What does it make?

6          MR. KOHN:  It makes the fuel tanks for automobiles.

7   It is a speciality manufacturer, it buys fuel senders to put

8   into the gas tanks, and it is doing a healthy --

9          THE COURT:  Who does it buy its fuel senders from

10  since it seems like there is some real iffy it may have

11  bought it from one --

12         MR. KOHN:  We don't think there is, Your Honor.

13  They bought from the defendants and that's alleged in the

14  complaint three different ways.  Plaintiffs buy from the

15  defendants.

16         There is no case law, Your Honor, that I have seen

17  in the antitrust field, and there is a Twombly industry now I

18  call it after the Twombly decision where any plaintiff has

19  been required to give invoice dates, purchase dates, there is

20  no such case.

21         THE COURT:  What's the impact alleged in your

22  complaint on your client?

23         MR. KOHN:  The impact, Your Honor, is very

24  straightforward.  It is the same as was alleged in Ice, which

25  Judge Borman upheld, it is the same as Your Honor upheld in

```
 1    wire harness.  You buy product in a price-fixed market you
 2    are clearly the consumer of that product.  This is not an
 3    exotic market such as that ATM case which defendants rely
 4    upon where, I'll be darn, I have read that case five times, I
 5    can't understand what the market was or who was charging whom
 6    for what in that case.  It is not that kind of case.
 7              In every cartel price-fixing case the allegations
 8    of injury are made the way we have made them.  Your Honor
 9    upheld them in the wire harness case.  There was several
10    paragraphs at page -- it is asterisk page --
11              THE COURT:  But here we know --
12              MR. KOHN:  -- 9 of the wire harness decision.
13              THE COURT:  Here we know there's -- I mean, there
14    is a plea so we know that there is a price fixing, right, at
15    least from Yazaki?
16              MR. KOHN:  Correct.
17              THE COURT:  But it seems to be just such a small,
18    small part of the market?
19              MR. KOHN:  No, Your Honor.  Defense -- when counsel
20    said we don't know what the market is, we don't know who
21    Vitec bought from, really, they don't have purchase records
22    of their customers?  I mean, they chose to proceed under a
23    Rule 12 motion.  There are other rules.  If you don't think
24    there is a purchase you can convert a Rule 12 motion into a
25    summary judgment motion, you could attach an affidavit from
```

 1    the salespeople at Denso or at Yazaki and say we have no

 2    record of purchase.  Plaintiffs allege we purchased from the

 3    defendants during the class period, that's what we alleged in

 4    the Packaged Ice case before Judge Borman post-Twombly, there

 5    was no requirement, no ruling that you had to attach invoices

 6    or say on what date you purchased ice from which of the

 7    defendants.

 8          The impact we allege in paragraphs 62 and

 9    thereafter and then again in paragraph 69 of this complaint,

10    the methodology by which the suppliers, the non-OEMs, are

11    also affected by the bid rigging to the OEMs.  Those are the

12    same type of allegations as Your Honor upheld squarely in

13    wire harness.  There are two or three paragraphs where you go

14    through that even though the guilty plea talks about the bid

15    rigging being aimed at a manufacturer and plaintiffs are not

16    manufacturers, they supply the OEMs, they are nonetheless

17    direct purchasers of these products and we have alleged the

18    methodology by which that market is affected.  We make the

19    same allegations here which were upheld there.

20          There is no mystery in the Sixth Circuit decision,

21    Your Honor, in static control, we briefed it as well, I think

22    it was pages 13, 14, 15 of our brief.  Those are the classic

23    elements of --

24          THE COURT:  How far do you go -- I mean, it is

25    like -- I mean, this complaint looks very limited to me and

1    it is almost like could we pull in every car part here and

2    say because there is price fixing in alleged 28 parts that

3    there must be in all parts?

4              MR. KOHN:  No, that's exactly what we have not

5    done, Your Honor.

6              THE COURT:  But you are getting there, aren't you?

7              MR. KOHN:  No.  We did not do it in wire harness

8    when there was initial discussion about plaintiffs are

9    alleging an overarching conspiracy about all products, no.

10   We had a claim for people who purchased wire harnesses who

11   were in the supply chain.  This is a case not for all

12   products, this is a case for fuel senders.

13             And if I could maybe speak a little bit more to the

14   categories of allegations that we submit nudge us across the

15   Twombly line, and that's what we need to do.

16             The first, of course, is the guilty plea of Yazaki.

17   Now, Your Honor already ruled that it is improper to

18   dismember the complaint into its component allegations.  We

19   think now there is a process where they are dismembering the

20   guilty plea.  What does the Yazaki guilty plea mean?  It is a

21   factual admission of wrongdoing by this defendant with

22   respect to this product.  That it -- not only is it an

23   allegation in a complaint that we believe they had meetings,

24   they have admitted it, it is in evidence, I could take that

25   guilty plea and introduce it as our first exhibit to the

1     jury.  I mean, we are so far beyond the plaintiffs saying we
2     thought you folks might get together at trade associations.
3            The guilty plea speaks about meetings, plural,
4     communications, plural.  These are facts that nudge us across
5     the line.  Again, I would say Twombly, the quote from the
6     Supreme Court, I think it is pages 561 and 564, state there
7     were no allegations of any fact in Twombly, the plaintiffs
8     simply relied on the parallel conduct which was created by
9     operation of law and from that decision where the Court said
10    a complaint that alleges no facts, and that is a quote from
11    the Supreme Court, does not meet your Rule 12 obligation,
12    from that we have had, as I said, the Twombly industry was
13    born.
14           We talked about opportunities.  Your Honor cited in
15    the wire harness, opportunities to conspire, and I think you
16    made -- not only did plaintiffs allege opportunities but
17    obviously the defendants availed themselves of those
18    opportunities, I think Your Honor wrote, so the guilty plea
19    also talked -- gives you evidence, admitted evidence, of
20    opportunities to conspire, which is itself another category.
21           Now, the Denso guilty plea, it relates to other
22    products, and our colleagues I think on the indirect case may
23    have been a little more assertive about the ex para issues.
24    We certainly believe they are properly inferred from these
25    complaints, but they pled guilty to two other products yet

1   Yazaki's pleading to fuel sender conspiracy.  I think your

2   court -- the Court can take notice and inference of the

3   cooperation in the ex para procedures.

4           We also I think rely at this stage, which we did

5   not in wire harness, which was the first of these matters,

6   the line of cases as in SRAM.  580 f. supp. 2nd 896, Northern

7   District of California, where the court said it is part of

8   the plausibility analysis under Twombly if there is price

9   fixing in a related product.  We didn't argue that in the

10  first case, wire harness, but this is now the fourth case.

11  And Denso --

12          THE COURT:  Wait a minute.  Is that how you are

13  getting Denso in there is because there is price fixing in a

14  related --

15          MR. KOHN:  Your Honor, that is a factor that the

16  Court can look at.  If it is -- and it is not the only

17  factor.  We have admissions, as I say, of the meetings and

18  opportunities to conspire.

19          THE COURT:  How do you get Denso and Yazaki tied

20  up?

21          MR. KOHN:  Because they are --

22          THE COURT:  Fuel sender suppliers, is that

23  basically it?

24          MR. KOHN:  Yeah, and the ex para inference that can

25  be drawn from the other products that Denso is cooperating

 1    with, which is recited in their guilty plea, and they also

 2    now appear in not only some of the first products but in

 3    many, many others, so that we do rely on that line of cases

 4    as an additional factor that the Court can look to to

 5    determine, again, the plausibility of the case.

 6          Now, is it plausible in the conspiracy -- they say,

 7    well, it is only one manufacturer in the guilty plea.  Now,

 8    of course, there was similar language in a number of the

 9    guilty pleas in wire harness which, of course, the Court

10    considered and ruled on with respect to those complaints, but

11    is it plausible that they would have just a one-off price fix

12    for their best customer, is that plausible, or is it

13    plausible as we have alleged in our paragraphs 62 through 69

14    that that bidding process was a mechanism for controlling

15    price in the market for them having that price apply to the

16    other?  Was this just a rogue employee who did this on fuel

17    senders?  Or what about the other 15 rogue employees who have

18    dealt with all of these other products or the other 10 or the

19    other 4?

20          Your Honor, I think at this point we think it is

21    plausible that there is an epidemic of price fixing in this

22    industry.  You have 28 cases, the biggest investigation, and

23    yet we didn't make these arguments quite so stridently in the

24    first case but now we have seen the development.

25          THE COURT:  Now you sound like the Department of

1    Justice.

2         MR. KOHN:   This is not just a one-off, and lo and

3    behold Yazaki is in a number of the earlier cases and Denso

4    is in a number of them and moving forward.   But what is

5    plausible, I think I have beaten the example of the bid

6    rigging to the big hotels in the city that might affect then

7    the prices paid for the distributors to smaller...

8         Let me try another example.   What is plausible?

9    You have some family over, maybe some young nieces and

10   nephews over for the holiday.   You come into the kitchen and

11   two or three of them are in the kitchen, one is on the

12   counter, there's three cookie jars.   One has a hand in the

13   oatmeal raisin cookie jar, the other one is standing there

14   next to him.   There is also the chocolate chip cookie jar and

15   another one.   Did you take a cookie out of the cookie jar you

16   ask little baby Yazaki?   At first they will deny it, of

17   course, as any kid, no, I didn't do it, but then they admit

18   it.   Okay.   That's the guilty plea.   But Yazaki's friend

19   Denso is there too.   Is it plausible that Denso also had a

20   cookie out of the cookie jar?   Is it plausible that you might

21   want to -- you know, would you have enough basis to ask them

22   to open their mouths and see if they have crumbs or to ask

23   who made the cookies how many did you make?   Is it plausible

24   they were taking the oatmeal raisins that they might have

25   also been dipping into the chocolate chips?   I mean, I think

1      that's far more plausible than this notion that we just had

2      some one rogue employee who made a conspiracy to fix fuel

3      senders to one customer.  Of course, all the other law about

4      how guilty pleas are negotiated and pled down, et cetera.

5              Your Honor, a second category of evidence which you

6      cited and discussed at page 6 of the wire harness decision,

7      I'm referring to those asterisk pages 6 in the CCH versions.

8      You wrote this, quote, the scope of investigations by

9      government entities, as well as the global coordination of

10     the investigation, was itself another factor in favor of the

11     plausibility of the conspiracy.  That was then.  This is now.

12     The scope of that investigation has only been validated, has

13     only been shown to be more plausible than it was when we

14     first addressed the wire harness case.

15             Third category of allegation, we do make economic

16     allegations about the market, and defendants have seized on

17     this argument, and I think it is kind of a savvy move, I

18     would call it like a judo move or a jujitsu move to try to

19     use your opponent's momentum against them, because in wire

20     harness you were able to identify four or five or six

21     different factors, it is not a requirement that we have to

22     have those same four or five or six in every single case, we

23     only need to go back and be plausible and push over the line.

24             We had the same arguments in, you know, Packaged

25     Ice.  The same law firms said we didn't have a claim in

```
 1   Packaged Ice, and now they say well, if only you have the
 2   evidence you had in Packaged Ice.  These are the same people
 3   who argued that we didn't have a claim in wire harness but,
 4   you know, now to say because we don't use some -- or we did
 5   not specifically use the words or make the allegations about
 6   market concentration, we did specifically allege, this is
 7   paragraphs 43 to 47, specific allegations about difficulty
 8   with barriers to entry, and that was cited separately as a
 9   separate factor by Your Honor at both pages asterisk 7,
10   asterisk 8 of wire harness.  Barriers to entry stood on its
11   own as a separate plausible economic allegation separate and
12   apart from an allegation about market concentration.
13          The allegations about inelasticity which counsel
14   mentions obviously are in the complaint.  We use the language
15   of cartel in those allegations, and they do make sense if
16   you, in fact, have the market concentration but we didn't
17   utter magic words.  Now, are they saying only if we had a
18   little pie chart --
19          THE COURT:  But you have no allegation of market
20   concentration?
21          MR. KOHN:  Well, sure, if you have a cartel that
22   exercises -- that can control pricing where that demand --
23   the very paragraph being quoted that implies that you have
24   that power.
25          THE COURT:  Yes, but as to these defendants?
```

```
 1              MR. KOHN:  Yes, yes, Your Honor.  I would point out
 2    it is not some kind of magic words.  Indeed, I believe the
 3    end-payer complaint, I haven't studied it, does make an
 4    allegation about market concentration, and lo and behold they
 5    are moving to dismiss that complaint too.
 6              So -- and I don't think they are seriously saying
 7    if only you had that market concentration chart.  Now,
 8    remember we spent some time at the wire harness argument,
 9    certain defendants tried to take the chart apart and say we
10    are not even on the chart, how could we be included in the
11    conspiracy?  So there is no one magic word or --
12              THE COURT:  Okay.  I'm going to have to cut you
13    short because I need to hear from the indirects.
14              MR. KOHN:  Yeah, but we do believe when you have
15    all of those categories, again, we don't need to show
16    everything in every case identically, we don't need to have
17    our own success in the other cases held against us, but we
18    think we have covered that.
19              One quick note, Your Honor.  There were several
20    cases they did cite with respect -- in several recent Eastern
21    District of Michigan cases on pleadings, and they were
22    exhibits -- actually Exhibits D and F to theirs.  These were
23    two-page decisions in pro se cases in this mortgage
24    foreclosure mess where some homeowners had sued everyone who
25    ever had or transferred the mortgage, and then they attached
```

```
 1    the last mortgage and they obviously had no claim against the
 2    other mortgage companies.  These are good lawyers, these are
 3    good antitrust lawyers, and if there was case law out there
 4    that said we had to attach invoices or cite specific dates
 5    when we made purchases they would have those cases.  And I
 6    think your decisions in wire harness stand as the -- and
 7    Judge Borman's decision in Packaged Ice stand as the leading
 8    cases on plausibility under Twombly in this district and
 9    would take precedence over those cases.
10              THE COURT:  All right.  Thank you.
11              Mr. Donovan, briefly.
12              MR. DONOVAN:  Very briefly, Your Honor.
13              Plaintiffs' counsel dances as well as anyone I have
14    ever heard, but he didn't answer your question.  You asked
15    him several times to show how the events pled to in the
16    Yazaki plea agreement linked to Vitec, and he never answered
17    that question.  He said well, you buy a product in a
18    price-fixed market you are a consumer in that market.  Well,
19    that begs the question whether Vitec bought a product in a
20    price-fixed market.  The only facts they have alleged are the
21    Denso and Yazaki fixed prices to the OEM in the Yazaki plea
22    agreement, the one OEM for 1.6 million worth of fuel senders.
23    That's all they've got.
24              He points to paragraph 62, and it is very -- very
25    simply it says, 62, the winning price in an RFQ is used when
```

```
 1    a supplier to that OEM, who is not part of the process,
 2    purchases fuel senders directly from the winning bidder for
 3    incorporation into a product sold to that OEM.  That OEM
 4    selects the winning bidder, that OEM directs the supplier to
 5    buy fuel senders from that bidder at the winning price and
 6    the OEM supplier issues a purchase order.
 7            Vitec doesn't allege it was any of those things.
 8    Vitec never says that the OEM -- the OEM in the plea, which I
 9    can't say the name out loud in court, that that OEM -- that
10    it ever sold to that OEM.  It never says that that OEM ever
11    directed it to buy a fuel sender from anybody including my
12    client or Yazaki, and it never says that that OEM directed
13    Vitec the price to pay.  No part of that link, and they would
14    have to show -- allege facts, at least allege that those
15    things were true, it is alleged no part of that to be true.
16            Paragraph 69 is the other one, and that's
17    completely conclusory.  He's identified 62 and 69 as the nub
18    of his complaint.
19            THE COURT:  What about the fact we have a plea and
20    counsel says in these cases there has never been a case where
21    there has been a plea where the case has been dismissed?
22            MR. DONOVAN:  With prejudice.  There has been lots
23    of dismissals where plaintiffs have tried to allege things
24    broader than a plea, and the courts either allowed it to be
25    pled based on additional facts alleged in the complaint or
```

```
 1    they have dismissed it with a chance to re-plead to show up
 2    with the additional facts that justify a claim broader than
 3    the plea, but it is not the case that no complaint thas has
 4    relied solely on a plea has never been dismissed.
 5            THE COURT:  Okay.
 6            MR. DONOVAN:  I'm not aware of one being dismissed
 7    with prejudice, although frankly we did argue for that, Your
 8    Honor, and I have no problem asking for that.
 9            Finally, Your Honor, one last thing.  He points
10    back to the barriers to entry and says, look, we allege
11    barriers to entry in wire harnesses, and we have alleged
12    barriers to entry here.  Barriers to entry were relevant in
13    wire harnesses because they allege that the defendants
14    controlled 90 percent of the market.  If there are 200
15    sellers of fuel senders and there's high barriers to entry
16    and Denso and Yazaki get together and try to set prices, so
17    what, there are still 198 other people out there to buy fuel
18    senders from, and that's the piece that is completely missing
19    in this complaint.  We are not trying to dismember their
20    complaint, Your Honor.  I'm trying to find something in it to
21    talk about, something concrete.  If anything, it appears that
22    the plaintiffs are trying to dismember your decision in wire
23    harnesses, and we don't think that's proper either.
24            THE COURT:  Thank you.  Indirects?
25            MR. KOHN:  If I could just say, Your Honor, with
```

 1    the conclusion of our motion some of us in the east coast are
 2    trying to get back before a snowstorm which is hitting, so if
 3    we do walk out the door -- normally we would stay until the
 4    conclusion of the hearing but that would be the reason.
 5              THE COURT:  I understand.
 6              MR. KOHN:  Thanks.
 7              MS. FISCHER:  Your Honor, I have some handouts.
 8    May I approach?
 9              THE COURT:  You may.  If you have to leave to catch
10    a plane, and I could see why you don't want to miss it, go
11    ahead.
12              MS. FISCHER:  Thank you, Your Honor.  Michelle
13    Fischer on behalf of Yazaki, speaking on behalf of both
14    defendants in fuel senders.
15              My focus today will be on two things, obviously
16    differences and/or similarities as relevant between this case
17    and wire harnesses, and a limited number of issues that I
18    have not previously addressed in oral argument in either wire
19    harnesses or instrument panel clusters starting with the
20    plaintiffs' claim for injunctive relief here.
21              Your Honor, this is a fuel sender.  It costs less
22    than $5.  That's the cost of the entire fuel sender, not the
23    cost of any alleged overcharge on a fuel sender, yet
24    plaintiffs' theory in this case is that, first, although they
25    can point to communications between just two fuel sender

 1    suppliers involving just $1.6 million in total sales to a

 2    single OEM, the defendants' communications somehow resulted

 3    in overcharges on every single sale of every single fuel

 4    sender to every single OEM since as far back as March 2001

 5    according to the auto dealers and March 2004 according to the

 6    end payers.  That's the first part of their theory.

 7         The second part of their theory is that their

 8    supposed overcharges on this less than $5 part somehow

 9    affected the price that they paid links down the distribution

10    chain for cars costing tens of thousands of dollars and in

11    some cases many tens of thousands of dollars.  That's the

12    conspiracy that is alleged in this case, Your Honor.

13         Yet unlike their complaints in wire harnesses here

14    plaintiffs have pled only very limited conduct involving a

15    small, very inexpensive part with very few sales to a single

16    customer.  That is simply not enough to support either the

17    incredibly expansive conspiracy they have outlined in their

18    complaints or the injunctive relief they are seeking.

19         Specifically in wire harnesses this Court allowed

20    the plaintiffs' claim for injunctive relief under section 1,

21    their only federal claim, to proceed, quote, in light of the

22    length of the conspiracy alleged and the market conditions

23    pled, unquote.  That's at page 31 of the West Law version.

24         But here the Court can look to neither of those

25    things because they pled neither as lengthy a conspiracy nor

Status Conference • February 12, 2014

```
 1   facts even remotely close to those that they pled in support
 2   of the market conditions on which this Court relied in wire
 3   harnesses.  Plaintiffs' counsel certainly knows how to plead
 4   facts, and while we just heard them try to dismiss them, look
 5   at what they did -- look at what the indirect purchaser
 6   plaintiff counsel did in wire harnesses as shown on page 2 of
 7   the handout I just gave you.
 8          Here they plead nothing like that.  In wire
 9   harnesses they set forth detailed factual allegations
10   regarding who the suppliers in the market were, what their
11   respective market shares were, and they supported their
12   claims that the market was highly concentrated by showing
13   that six defendants accounted for over 70 percent of sales in
14   that market.  They also pled that five of those defendants
15   had pled guilty to wire-harness related conduct.
16          Here what do we have?  They name just two
17   defendants, only one of which pled guilty to fuel senders
18   related conduct.  We know nothing about the percentage of
19   sales for which either one of them account.  We know nothing
20   about who or how many other fuel sender suppliers there are,
21   and we know nothing about to whom either defendant sells fuel
22   senders beyond the single OEM referenced in the plea and
23   identified in the redacted portion of their complaints.
24          THE COURT:  Now they say that they dominate the
25   fuel sender market?
```

1          MS. FISCHER:  You are correct, Your Honor, that the

2    end-payers' complaint does say that they make -- that Yazaki

3    and Denso dominate the fuel sender market, but that's a

4    conclusory allegation entitled to absolutely no presumption

5    of truth.  It needs to be supported by factual allegations,

6    and I refer the Court to Twombly and Iqbal for that.

7          Similarly the auto dealers allege only that, quote,

8    a small number of manufacturers supply fuel senders to OEMs,

9    but they pled again not one fact in support of that.  We have

10   no idea how many a small number is, nor do we even know for

11   what market share any one of them accounts.  For all we know,

12   even if there is a small number of fuel sender suppliers,

13   again, a conclusory assertion that is not entitled to any

14   presumption of truth, one or more of those other suppliers

15   may, in fact, be the 800-pound gorilla of the industry

16   rendering anything that Yazaki and Denso might have talked

17   about incapable of affecting the industry or prices in the

18   industry as a whole.

19         Beyond that, all the plaintiffs do is toss around

20   antitrust buzz words like inelastic demand and high barriers

21   to entry.  We just heard about barriers to entry, and I want

22   to talk about that.  Here they point the court to the fact

23   that Yazaki owns patents, unidentified patents, on component

24   parts used in fuel senders, but they don't plead what those

25   patents cover, they don't plead where or when the patents

1  were issued, and most importantly they do not plead whether
2  that patented technology has substitutes for it.
3          The U.S. Supreme Court has made eminently clear
4  that just because you have a patent doesn't mean that there
5  are barriers to entry or that that patent constitutes a
6  barrier to entry, nor does it support the existence of market
7  power in the patent by the patent holder if there are other
8  alternatives to which buyers can turn.
9          And remember, Your Honor, in terms of assessing
10 whether or not there are substitutes for this patented
11 technology this is about as low tech as it gets.  It is a few
12 wires, an arm and a float.  Without the wires it is pretty
13 close to the float in your toilet.
14         So here, Your Honor, the plaintiffs have pled
15 neither the market conditions nor the lengthy conspiracy to
16 which this Court pointed in denying the defendants' motion to
17 dismiss plaintiffs' claim for injunctive relief in wire
18 harnesses, and this is particularly fatal here because since
19 the argument in wire harnesses the Supreme Court came out
20 with another case called Clapper, which heightened the
21 standard for pleading -- for pleading the right to injunctive
22 relief.  Specifically we already knew that the plaintiffs
23 must allege particular and concrete allegations of future
24 injury, but in Clapper the court made clear that they must
25 plead facts to demonstrate that any threatened future injury

```
 1   is, quote, certainly impending, unquote.
 2         They haven't done anything like that here.  They
 3   make absolutely no factual allegation supporting a conspiracy
 4   that continues to the present day or that shows that the
 5   prior conspiracy is likely to reoccur.  In fact, the only
 6   factual allegation they refer to, the ones redacted, refer to
 7   conduct that happened about a dozen years ago relating to a
 8   single OEM.  What they basically plead is at best lingering
 9   monetary injury without any ongoing threat of recurring
10   violations, and that's not good enough under Supreme Court
11   precedent, especially when their other allegations undermine
12   their assertion of continuing conspiracy or impending harm.
13         What other allegations am I referring to?  Well,
14   they affirmatively plead that the defendants have been
15   subjected to criminal investigations in multiple
16   jurisdictions that would have alerted their customers to the
17   conspiracy, and that, in fact, led to plea agreements that
18   require the defendants' continuing cooperation with the DOJ
19   under the threat of subsequent criminal prosecution.  And
20   their argument is further undercut by the fact that their
21   argument -- that the conspiracy might resume and cause them
22   harm is further undercut by the public details, for example,
23   of Yazaki's very hefty compliance program, and the fact that
24   the sentencing judge for Yazaki expressly acknowledged, and
25   I'm quoting, that the size of the fine and the many
```

1    consequences that go even beyond the fine imposed here will

2    be quite sufficient to deter the company from making this

3    mistake in the future and will deter others as well.

4           Neither of those things were brought to the Court's

5    attention, I concede, Your Honor, in wire harnesses.  Rather

6    the Court looked to the fact that we pointed to the

7    investigations, the pleas, the orders and the publicity

8    surrounding them, and you found them insufficient but you

9    found them insufficient again in light of the length of the

10   conspiracy alleged and the market conditions pled, but now in

11   fuel senders the defendants have pointed to more and the

12   plaintiffs have pointed to less in a situation where the

13   standard has been clarified.  Under that standard the

14   plaintiffs have not demonstrated their right to injunctive

15   relief and that claim should be dismissed in its entirety.

16          Your Honor, the same pleading failures that I just

17   referred to also require dismissal of plaintiffs' complaint

18   alleging this incredibly broad conspiracy in their entirety

19   for failure to meet Twombly and for failure to establish

20   standing, both antitrust and article 3.  Now, as you know,

21   under Twombly we have been through this, basically they have

22   to plead sufficient facts, facts to allow you to draw the

23   reasonable inference that the defendant is liable for the

24   misconduct alleged.  Here, as you just pointed out, that's a

25   very broad conspiracy.  It is a conspiracy to fix the prices

1    of every fuel sender sold to every OEM since back as far as

2    March 2001.  In wire harnesses you said they -- the

3    plaintiffs satisfied that by pleading specific facts

4    regarding the market and the defendants' place within it.

5              What do we have here?  Here all we know is that

6    defendants are alleged to be two out of an unknown number of

7    suppliers with unknown share selling in unknown market

8    conditions.  Plaintiffs basically offer only bare,

9    unsupported assertions, which the Supreme Court has made

10   clear are not entitled to any presumption of truth, and to

11   understand why this is and, in fact, must be the rule, one

12   has to only look at paragraphs 182 and 185 of the auto

13   dealers' complaint.  In those paragraphs the auto dealers

14   claim that fuel senders are, quote, pieces of sophisticated

15   electrical equipment that comprise a non-insignificant

16   portion of the cost of a vehicle.  Their failure to plead

17   facts beyond the conduct addressed in the plea and in the one

18   example -- in the exemplary examples of conduct pleaded in

19   their complaint means that they have failed to give this

20   Court any basis to find that the very broad conspiracy that

21   they have alleged is plausible, and they have failed to show

22   the Court that they have nudged their complaint over the

23   Twombly standard, and for that reason the complaints should

24   be dismissed in their entirety, and for the same reasons

25   because there is nothing in their allegations that would

1   permit the conclusion that any conspiracy among Yazaki and

2   Denso impacted all buyers of all fuel senders of every kind

3   during the relevant period.  They have failed to show or even

4   suggest that every one of them suffered injury at all, much

5   less injury that you could fairly trace back to the conduct

6   of these defendants, but that's exactly what is required

7   under article 3, standard and antitrust standing, and for

8   this reason as well their complaint should be dismissed.

9         Your Honor, this is not a case like LCD where the

10   product at issue accounted for 60 or 70 percent of the final

11   cost of the finished product.  It is not like flash memory

12   where it was an overwhelming majority.  This is a tiny

13   fraction of the cost of a finished vehicle, and at some point

14   it is just not reasonable to assume pass through, and that is

15   what the plaintiffs are asking you to do.

16         THE COURT:  Okay.  Thank you.  Response?

17         MS. ROMANENKO:  My colleague, Mr. Reiss, will start

18   but I have a couple of slides.  I'm just going to note before

19   I hand them out that they contain highly confidential

20   materials, so they can only be seen by this Court and

21   attorneys in the fuel senders case.

22         THE COURT:  All right.

23         MS. ROMANENKO:  May I approach the bench?

24         THE COURT:  Yes.

25         MR. REISS:  Will Reiss for the end-payor

```
 1    plaintiffs, and I'm going to be speaking on behalf of the

 2    indirect-purchaser plaintiffs as well, and the dealers are

 3    going to speak after me and they are going to address some of

 4    the state-specific issues and some additional issues that I

 5    don't cover.

 6            I'm going to do my best to be brief this afternoon.

 7    I realize I have the dubious distinction of arguing last.  I

 8    have to tell you standing here again today I haven't heard

 9    anything new.  I mean, we have heard the same argument and I

10    think it bears noting that Yazaki and Denso and their counsel

11    were defendants in the wire harness case and they raised

12    these same arguments in the wire harness case.  They are

13    great lawyers, I will give them credit, they can put new

14    spins on these arguments and new slant, but they are the same

15    old arguments, and the Court rejected these arguments.  And,

16    you know, they are trying to find a distinction here.  They

17    are really trying to grapple hard how can they distinguish

18    this case from wire harness because they recognize the

19    precedential value of that case, and so they grapple onto

20    this distinction in the guilty pleas and they say well, in

21    wire harness we had a number of defendants who pleaded guilty

22    to price fixing wire harnesses for multiple OEMs, and in this

23    case we have a Yazaki guilty plea and they only admit to

24    price fixing just fuel senders for one OEM in this case, and

25    so somehow that's different but, Your Honor, I would say that
```

1    that's a distinction without a difference because we have

2    multiple facts that we allege that render the conspiracy

3    plausible.

4         First and foremost we have an express agreement --

5    we allege an express agreement.  We have a guilty plea from

6    Yazaki, that's a smoking gun, that's a concession that they

7    pleaded guilty to price fixing in the conspiracy but, Your

8    Honor, I would submit that we have more than that, our case

9    is actually better here than in wire harness because we

10   allege we have express allegations relating to Denso and

11   relating to Yazaki with respect to their conspiratorial

12   conduct, with respect to their price-fixing conduct, and

13   unfortunately we had to file those allegations under seal so

14   I can't get into all the specifics but I will highlight one

15   point, and that's the fact that these allegations are more

16   expansive than what Yazaki pleaded guilty to.  In other

17   words, they are not limited to the guilty plea.  Unlike some

18   of the other cases you have heard about we pled facts above

19   and beyond what is included in the guilty plea.  So that's

20   one big factor that I want to highlight.  And if I can I will

21   draw your attention the paragraphs in the complaint, it is in

22   the auto-dealers' complaint paragraph 145 and 146, and it is

23   included in the end-payers' complaint at paragraphs 118 and

24   119.

25        So what else do we have here?  Well, what else do

1    we have that renders this broader conspiracy plausible?  We

2    have got the largest ever antitrust investigation.  To date

3    it has resulted in over $7 billion in criminal fines.  26

4    companies have pled guilty.  In many of the guilty pleas the

5    companies have admitted to price fixing products sold to

6    multiple OEMs, not to just one OEM.  And then we have got

7    Yazaki, an admitted price fixer, they paid $470 million in

8    criminal fines, they admitted to price fixing wire harnesses

9    sold to multiple OEMs, and they admitted price fixing

10   instrument panel clusters again sold to multiple OEMs.  So

11   this is a pattern.  This is a pattern of behavior.  This is

12   an admitted habitual price fixer.  We pled the likelihood of

13   an amnesty applicant.  We have allegations that support that.

14   Then we have got Denso, another admitted habitual price

15   fixer, they paid a $78 million fine, they admitted again to

16   price fixing various products.

17           So, Your Honor, we come in here every time, and I

18   think you see this, the case just gets bigger and bigger;

19   each time we learn of new guilty pleas, we learn of new OEMs

20   that are involved.  So clearly these facts -- we cite the

21   SRAM case to you and the SRAM case stands for the proposition

22   that when you have a conspiracy in a related market, you have

23   guilty pleas in a related market, there is an inference and

24   it renders the parallel complaint more plausible that that

25   conspiracy may have taken place in that industry.  So we have

 1    got guilty pleas, we have got specific allegations that go

 2    beyond the guilty pleas, and we have massive fines in the

 3    industry and we have got habitual price fixers.  I think

 4    that's pretty strong stuff.

 5              And so what are defendants doing again?  They are

 6    desperately trying to distinguish this case from wire

 7    harness.  So they say unlike wire harness you don't have

 8    specific allegations of market share, and they point to

 9    Twombly.  Well, the direct purchasers talked about this

10    before, Twombly is a case that involved parallel conduct, no

11    smoking gun, no guilty plea, no specific allegation of

12    conspiracy.  And I would submit to you that when you have an

13    express agreement like we do, when you have the smoking gun,

14    you don't need market factors.  Now, we pled and we can get

15    into specifics that we pled about the market, we pled the

16    inelasticity of the man (sic) in the barriers to entry and we

17    pled the rising cost of fuel senders despite the fact that

18    input costs remain steady, so we've got all the bells and

19    whistles but we don't need to get there because we have got

20    the guilty pleas and we have got the specific allegations and

21    we've also got a market that is rife with conspiratorial

22    conduct.  So when you take all of those factors together as

23    you are required to do, you can infer a conspiracy broader

24    than one that the guilty plea is limited to.

25              Now, there is another argument that defendants

```
 1   didn't raise here but they do raise it in their papers, and I
 2   want to address that, this notion that they dumped thousands
 3   of pages of documents on us and somehow that requires a
 4   heightened pleading standard which should go beyond Twombly
 5   because they dumped all of these documents on us.  Well, the
 6   defendants admit in their guilty pleas that they concealed
 7   the conspiracy.  I mean, they used code words, they had
 8   secret meetings.  We are at the beginning of discovery, we
 9   have a DOJ temporary stay in place right now, we haven't
10   taken a single deposition, most of these documents were
11   produced helter-skelter along with wire harness production.
12   We are not required to plead at this point every single
13   aspect of the conspiracy, all that we are required to do is
14   to demonstrate that it was plausible, and I would submit that
15   we do that.
16           Now, there is another argument that Ms. Fischer
17   raised today.  She went well beyond the four corners of the
18   pleading, and we pled -- and the dealers actually have a
19   specific allegation about this that I think Ms. Fischer
20   referenced, a fuel sender is not an insubstantial cost of the
21   entire automobile.  We don't plead anything about the price,
22   we don't plead anything about how it is made.  Ms. Fischer
23   came in here with a demonstration, that's a summary judgment
24   point, that's not a motion to dismiss point, but more
25   importantly the issue is raised in wire harness that the
```

 1    defendants made the same argument that wire harnesses are an

 2    insubstantial cost of the overall automobile and you rejected

 3    that argument because you recognized that maybe it would be

 4    difficult for plaintiffs down the line to potentially prove

 5    that, but for purposes of a complaint, for purposes of a

 6    motion to dismiss, we are just required to prove that the

 7    overcharge was fairly traceable, that it was fairly traceable

 8    down the chain, and Your Honor found that we did that in wire

 9    harness and we do the exact same thing here.

10          So unless you have additional questions for me I'm

11    going to concede the floor to my dealer colleagues so they

12    can address some of the state specific issues.

13          THE COURT:  No.  Thank you.

14          MR. REISS:  Thank you.

15          THE COURT:  We have five minutes to conclude so

16    you're going to be cut real short.

17          MS. ROMANENKO:  Your Honor, given that Ms. Fischer

18    did not make any argument about the state-law claims we

19    will --

20          THE COURT:  I don't want any argument on the

21    state-law claims because they are so detailed in each one,

22    and it is like every time I look at them I have to sit down

23    with my charts and, to be very honest, I really couldn't keep

24    track of it unless there is something overarching that you

25    want to say.

Status Conference • February 12, 2014

```
 1         MS. ROMANENKO:  Understood, understood.  So I would
 2   like to start off by addressing Ms. Fischer's statement that
 3   perhaps the fuel sender is an inexpensive item and therefore
 4   we should not be permitted to bring claims for it.
 5   Judge Wilkins in the SRAM litigation stated defendants may
 6   not shield themself from liability by fixing prices on a
 7   relatively inexpensive item.  It is not the law that you can
 8   choose to fix prices on something that you say is inexpensive
 9   and therefore there is no liability for you, you can hold it
10   up in court and say we get to walk off scot free.
11         Ms. Fischer also raised a point about the amount of
12   guilty pleas.  This is not different from wire harness.  In
13   wire harness, for instance, the end payers filed suit against
14   nine defendant families and there were five guilty pleas.  So
15   55 percent of the defendant families had entered guilty
16   pleas.  The odds here are better.  50 percent of the
17   defendants in this case have entered guilty pleas.  In fuel
18   senders 100 percent of the defendants in this case have
19   entered guilty pleas in an auto part conspiracy case, namely
20   I'm referring to Denso's guilty plea in heater control panels
21   and ECUs.
22         Ms. Fischer also pointed to the amount of affected
23   commerce set forth in the plea agreement.  However, that
24   affected commerce is for the limited time period that they
25   pled to.  It doesn't include any commerce from a period of
```

1   time before that which they pled to, and it also doesn't

2   include the commerce that flows from a price-fixed contract

3   that they won, let's say, in 2010 that goes for four to six

4   years as our complaints allege.  That is not the entirety of

5   the commerce that's at issue in this case.

6          Ms. Fischer also made a point about the length of

7   the conspiracy.  She stated that that was a major factor in

8   Your Honor ordering that the injunctive relief claim was not

9   properly dismissible.  We allege a conspiracy going from 2001

10  to the time of the filing of the complaint.  There is a

11  one-year difference between the class period alleged and the

12  conspiracy demonstrated in wire harness and in this case.  In

13  fact, there are a number of similarities that I think it is

14  worth looking at between the wire harness case and this case.

15  And we should note these two defendants were both before you

16  in the wire harness case.  They both engaged in the fuel

17  senders' conspiracy at the same time they were engaging in

18  the wire harness conspiracy through the same type of

19  collusive conduct, and now they are back here and they are

20  making the same argument they made there.  There they said if

21  you look at the individuals who pled guilty they worked in

22  the Honda, Toyota and Subaru departments, so it is not

23  plausible that somebody who bought something other than that

24  was injured.  Now here they are back and they are saying

25  let's limit this case to a certain OEM, but, Your Honor, we

 1    already know that the defendants engaged in conduct beyond
 2    what they pled to.
 3           I will refer Your Honor to paragraphs 145 to 146 of
 4    the dealership complaint on pages 39 through 40, and Your
 5    Honor can also look at our very first slide in the handout
 6    that we handed up.
 7           Nor would it make sense to limit this case to one
 8    OEM based on the facts. Plaintiffs describe a sophisticated
 9    systematic conspiracy that functioned according to certain
10    rules. Collusion was not comprised of isolated incidents
11    planned on an ad hoc basis. These defendants were working
12    together to maintain a certain order in the market, and I
13    will refer Your Honor to paragraph 144 of the dealership
14    complaint that is also replicated on the third page of Your
15    Honor's handout. You don't create special systematic rules
16    if you are just going to rig bids this one time, if it is
17    just one little incident, one little bit of commerce. This
18    is clearly an overarching conspiracy, and if Yazaki wants to
19    look at guilty pleas let's look at its guilty plea for ICPs,
20    that's a product that is closely related to and literally
21    connected to the fuel sender, they work as a set, you can't
22    have the gas gauge without the fuel sender, they are
23    connected, the complaint explains a lot of areas where the
24    two products overlap.
25           And if Your Honor could flip the page on the

     1     handout, that information that we replicated in the first
     2     three bullet points can be found on pages -- paragraphs 116,
     3     118 and 145(D) of the dealership complaint.  Now Yazaki
     4     pleaded guilty to fixing prices to numerous OEMs for ICPs.
     5     Why would it fix prices to numerous OEMs for ICPs and only
     6     one OEM for fuel senders when if an OEM is buying an ICP it
     7     will be undoubtedly buying a fuel sender.  They work as a
     8     set, the fuel sender is connected to the gas gauge, that's
     9     how the gas gauge works.
    10          We should also take a look at the other related
    11     cases in this MDL.  As we stated previously, Yazaki and Denso
    12     are both defendants in the wire harness case for instance.
    13     That conspiracy occurred at the same time as fuel senders,
    14     involved the same conduct, contained some of the same
    15     conspirators, both Yazaki and Denso, and that case was not
    16     limited to any OEMs on the motion to dismiss.  We also know a
    17     number of defendants involved in the auto parts MDL have pled
    18     guilty to rigging bids and fixing prices to a whole host of
    19     OEMs beyond the ones to which defendants are trying to limit
    20     this case.  I will just read off some of them; they include
    21     Chrysler, Ford, GM, Honda, Mazda, Suzuki, Mitsubishi, Nissan,
    22     Toyota, Subaru and two German OEMs.  These companies, and I
    23     will direct Your Honor to the last slide, these companies,
    24     Denso and Yazaki, they advertise on their web sites the fact
    25     they supply nearly every OEM.  How can we limit this case to

1    one OEM at the motion to dismiss stage when these are the

2    facts?

3            And as Ms. Fischer admitted, we do allege that

4    Yazaki and Denso -- sorry, that only a handful of

5    manufacturers supply OEMs with fuel senders.  None of this

6    points to it being rational to limit this case to one OEM at

7    the motion to dismiss stage.

8            THE COURT:  Okay.

9            MS. ROMANENKO:  Just one more point with regard to

10   the injunctive relief point that Ms. Fischer made.  She said

11   well, we have guilty pleas, the guilty pleas make statements

12   that the government hopes that we are not recidivists, and as

13   Your Honor knows, you rejected speculation by collective

14   defendants that the pleas will prevent further misconduct,

15   but I would also point, Your Honor, for instance, to numerous

16   defendants in this auto parts MDL who pled guilty to engaging

17   in the conspiratorial conduct in 2011, that's a year after

18   the dawn raids occurred.  It just cannot be determined that

19   just because this guilty plea was entered it is appropriate

20   to decide at this time that injunctive relief is not

21   necessary.

22           THE COURT:  Okay.

23           MS. ROMANENKO:  Thank you -- oh, I apologize.  One

24   more thing, if there is one more minute, my colleague,

25   Jonathan Cuneo, will address unjust enrichment.

1              MR. CUNEO:  Thank you, Your Honor, Jonathan Cuneo.
2         I don't intend to go through this state by state
3    although I have spent a lot of time on two occasions reading
4    the cases from every state.  What you have is an incredibly
5    rich mosaic of circumstances that involve kind of competing
6    claims, like up in New Hampshire the lead case is a case in
7    which somebody who didn't have a real estate license sold
8    something, whether that person could collect a commission was
9    the issue.  Down in South Carolina there is a case of medical
10   providers who provided services to pretrial inmates and made
11   a claim against the county.  Same thing in Utah, they came
12   out in different ways, but what you have in Mississippi is
13   there is a case with a business where a dissatisfied -- whose
14   accountant got them in trouble with the IRS and so the
15   employer sued for effectively back wages, and what you've got
16   as you go around this are situations which there is not
17   really a contract remedy that applies and the Courts are
18   called upon to determine the equities of the situation
19   consistent with section 1, but I will tell you what they
20   don't have, none of the cases I saw involved a deliberate
21   attempt or scheme to steal money from anybody else.  There
22   wasn't a single case that I saw that involved a criminal
23   conspiracy.  There wasn't a single case that I saw that
24   involved any involvement by the United States Department of
25   Justice.  There wasn't a single case that involved an

 1    indictment or information or a multi-hundred million dollar

 2    fine.  And so those are circumstances that in my judgment

 3    should in a very broad way inform the equity powers of this

 4    Court.  And there are courts in the past -- there are really

 5    competing presence in this area, and there are competing

 6    presence in the antitrust area, but Judge Edmunds in the

 7    Cardizem case correctly looked at what the interests that

 8    were involved in and she easily disposed of the principal

 9    objection, and that is that an indirect purchaser doesn't

10    directly deal or confer a benefit upon the defendant.  And

11    what she said there is direct doesn't equal privity, means

12    that money flowed from the plaintiff to the defendant, and

13    the test really is whether the benefit and the detriment

14    flowed from the same conduct.

15         In this case it clearly does, so it is our position

16    that as the Court looks at these things and chooses among

17    competing presence it should keep with the overall context is

18    in mind.

19         Now, as to the issue of do we have an adequate

20    remedy of law?  Well, I think you just heard the defendants

21    say for a lot of times we don't.  And, of course, we say we

22    do but it is an alternative remedy.  Courts that talk about

23    adequate remedy of law, what they are concerned about is the

24    plaintiff doesn't collect damages and collect restitution

25    too, so it is really premature to make that kind of a

1    determination.

2            So those are the points that I wanted to make, Your

3    Honor.  I promised to be brief, and I hope I have kept that

4    promise.  Thank you very much.

5            THE COURT:  Thank you.  Ms. Fischer?

6            MS. FISCHER:  Thank you, Your Honor.  Just three

7    short points.

8            First, both counsel pointed out that they had, in

9    fact, pled facts.  They pointed to paragraphs 144, I believe,

10   to 146 of the auto-dealer complaint and paragraphs 118 to 119

11   of the end-payer complaint, both of those detailed

12   allegations that are completely consistent with the Yazaki

13   plea, it does not go beyond the sales to the single OEM

14   referenced in the plea, and that's precisely the problem that

15   we keep pointing to.

16           Secondly, with all due respect, Your Honor, I think

17   there is confusion as to what constitutes a factual

18   allegation versus what constitutes a bare allegation

19   disentitled to the presumption of truth.  I submit, Your

20   Honor, that except with respect to those facts that relate to

21   the plea and that relate to what was pled guilty to and in

22   the exemplary conduct examples, that's all they have done is

23   put out conclusory assertions.  And I refer the Court to

24   Iqbal, 556 U.S. 662, specifically at pages 680 to 681, where

25   the Supreme Court rejects conclusory allegations, just

1  calling somebody a principal architect without facts of a

2  plan is not enough, and I refer the Court to that in

3  analyzing their allegations.

4        Lastly I want to talk about two of the slides.  The

5  second to the last slide that the auto dealers gave you

6  claims that Yazaki's plea on instrument panel clusters said

7  we plead guilty with respect to numerous manufacturers.  The

8  word is certain, certain is not numerous.

9        The last page says -- the last page was referred to

10 as showing you all the customers that Yazaki and Denso sold

11 to.  Those are customers of auto parts, they are not

12 necessarily customers of fuel senders.  They still have not

13 pointed to a single customer beyond the one OEM identified in

14 the plea and the conduct.

15       Lastly, with respect to unjust enrichment we refer

16 you back to what you did before, they still have not pled the

17 facts -- the required factual basis of an unjust enrichment

18 claim on a state by state basis, that's why you rejected the

19 claim initially and that's why it should be rejected here,

20 but it would fail anyway for all the reasons we detailed in

21 our complaint and frankly for all the reasons set forth on

22 the last page of my handout to you.

23       Thank you very much, Your Honor.

24       THE COURT:  Thank you.  Okay.

25       MS. ROMANENKO:  Very quickly.  This is only going

1    to address unjust enrichment, just in response to what

2    Ms. Fischer stated.

3         This Court dismissed the unjust enrichment claims

4    in wire harness because, quote, IPP's failure to identify the

5    unjust enrichment laws of any particular jurisdiction

6    subjects the causes of action to dismissal.  There is no

7    federal common law of unjust enrichment.  So this was the

8    concern that we were seeking to allege unjust enrichment

9    claims under our common law of unjust enrichment.

10        So we understood that before when we saw the motion

11   to dismiss and we modified our claims from the wire harness

12   complaint.  Our complaint states that dealerships seek

13   damages under the unjust enrichment laws of the indirect

14   purchaser states.  The unjust enrichment counts state that

15   plaintiffs bring this claim under the laws of all states

16   listed in the second and third claim supra, and the second

17   and third claims are, of course, those that contain the

18   dealers' causes of action under the consumer protection and

19   antitrust laws of the indirect purchaser states.

20        So what we have here is a statement by the

21   defendants that it is necessary to specify what state laws

22   are being invoked so defendants know what to analyze, and we

23   have done that and they have obviously analyzed them from the

24   motion to dismiss and the opposition they have gone through

25   in a state by state basis and attacked our unjust enrichment

1    claims under the laws of every one of the indirect purchaser

2    states.  I don't think that they can possibly point you to a

3    complaint that does any more than what we have done here, so

4    I think it is just reasonable for us to say that our unjust

5    enrichment claims are properly analyzed this time.

6         THE COURT:  Thank you, Counsel.  All right.  The

7    Court will issue opinions hopefully soon.  Thank you very

8    much, all of you.  We will see you in June at 10:00.

9         THE LAW CLERK:  All rise.  Court is in recess.

10         (Proceedings concluded at 5:05 p.m.)

11                         —   —   —

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              *CERTIFICATION*

2

3              I, Robert L. Smith, Official Court Reporter of

4     the United States District Court, Eastern District of

5     Michigan, appointed pursuant to the provisions of Title 28,

6     United States Code, Section 753, do hereby certify that the

7     foregoing pages comprise a full, true and correct transcript

8     taken in the matter of In Re: Automotive Parts Antitrust

9     Litigation, Case No. 12-02311, on Wednesday, February 12,

10    2014.

11

12

13                               *s/Robert L. Smith*
                               Robert L. Smith, RPR, CSR 5098
14                             Federal Official Court Reporter
                               United States District Court
15                             Eastern District of Michigan

16

17

18    Date:  03/06/2014

19    Detroit, Michigan

20

21

22

23

24

25