```
 1                  UNITED STATES OF AMERICA

 2               EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4                      —   —   —

 5

    IN RE:  AUTOMOTIVE PARTS        Master File No. 12-md-02311
 6  ANTITRUST LITIGATION            Hon. Marianne O. Battani

 7  _____/

 8

            STATUS CONFERENCE / MOTION HEARINGS
 9
         BEFORE THE HONORABLE MARIANNE O. BATTANI
10              United States District Judge
           Theodore Levin United States Courthouse
11              231 West Lafayette Boulevard
                     Detroit, Michigan
12              Wednesday, January 28, 2015

13  APPEARANCES:

14
    Direct Purchaser Plaintiffs:
15

16  WILLIAM G. CALDES
    SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
17  1818 Market Street, Suite 2500
    Philadelphia, PA  19103
18  (215) 496-0300

19
    MANUEL J. DOMINGUEZ
20  COHEN MILSTEIN
    3507 Kyoto Gardens Drive, Suite 200
21  Palm Beach Gardens, FL  33410
    (561) 578-6850
22

23  DAVID H. FINK
    FINK & ASSOCIATES LAW
24  100 West Long Lake Road, Suite 111
    Bloomfield Hills, MI  48304
25  (248) 971-2500
```

```
 1   APPEARANCES:  (Continued)
     Direct Purchaser Plaintiffs:
 2
     GREGORY P. HANSEL
 3   PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
     One City Center
 4   Portland, ME  04112
     (207) 791-3000
 5

 6   WILLIAM E. HOESE
     KOHN, SWIFT & GRAF, P.C.
 7   One South Broad Street, Suite 2100
     Philadelphia, PA  19107
 8   (215) 238-1700

 9
     JONATHAN M. JAGHER
10   SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
     181 Market Street, Suite 2500
11   Philadelphia, PA  19103
     (215) 496-0300
12

13   STEVEN A. KANNER
     FREED, KANNER, LONDON & MILLEN, L.L.C.
14   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
15   (224) 632-4502

16
     SARAH GIBBS LEIVICK
17   KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
     1633 Broadway
18   New York, NY  10019
     (212) 506-1765
19

20   MICHAEL MOSKOVITZ
     FREED, KANNER, LONDON & MILLEN, L.L.C.
21   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
22   (224) 632-4502

23
     MATTHEW RUAN
24   COHEN MILSTEIN
     1100 New York Avenue NW, Suite 500 West
25   Washington, D.C.  20005
     (202) 408-4600
```

```
 1   APPEARANCES:  (Continued)
     Direct Purchaser Plaintiffs:
 2

 3   EUGENE A. SPECTOR
     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
 4   1818 Market Street, Suite 2500
     Philadelphia, PA  19103
 5   (215) 496-0300

 6

 7   JASON J. THOMPSON
     SOMMERS SCHWARTZ, P.C.
 8   2000 Town Center, Suite 900
     Southfield, MI  48075
 9   (248) 355-0300

10   RANDALL B. WEILL
     PRETI, FLAHERTY, BELIVEAU &
11   PACHIOS, L.L.P.
     One City Center
12   Portland, ME  04112
     (207) 791-3000
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES:  (Continued)
      End-Payor Plaintiffs:
 2
      WARREN T. BURNS
 3    SUSMAN GODFREY, L.L.P.
      901 Main Street, Suite 5100
 4    Dallas, TX  75202
      (214) 754-1928
 5

 6    DAVID C. KURLANDER
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 7    601 Lexington Avenue, Suite 3400
      New York, NY  10022
 8    (212) 980-7400

 9
      OMAR OCHOA
10    SUSMAN GODFREY, L.L.P.
      901 Main Street, Suite 5100
11    Dallas, TX  75202
      (214) 754-1913
12

13    ADAM T. SCHNATZ
      THE MILLER LAW FIRM, P.C.
14    950 West University Drive, Suite 300
      Rochester, MI  48307
15    (248) 841-2200

16
      MARC M. SELTZER
17    SUSMAN GODFREY, L.L.P.
      190 Avenue of the Stars, Suite 950
18    Los Angeles, CA  90067
      (310) 789-3102
19

20    STEVEN N. WILLIAMS
      COTCHETT, PITRE & McCARTHY, L.L.P.
21    840 Malcolm Road
      Burlingame, CA  94010
22    (650) 697-6000

23

24

25
```

```
 1     APPEARANCES:  (Continued)
       Dealership Plaintiffs:
 2
       DON BARRETT
 3     BARRETT LAW OFFICES
       P.O. Drawer 987
 4     Lexington, MS  39095
       (601) 834-2376
 5

 6     JONATHAN W. CUNEO
       CUNEO, GILBERT & LaDUCA, L.L.P.
 7     507 C Street NE
       Washington, D.C.  20002
 8     (202) 789-3960

 9
       JOHN KAKINUKI
10     KAKINUKI LAW OFFICE, P.C.
       2 Civic Center Drive, #4222
11     San Rafael, CA  94913
       (415) 492-2011
12

13     BRENDAN FREY
       MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
14     1361 East Big Beaver Road
       Troy, MI  48083
15     (248) 457-9200

16
       GERARD V. MANTESE
17     MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
       1361 East Big Beaver Road
18     Troy, MI  48083
       (248) 457-9200
19

20     SHAWN M. RAITER
       LARSON KING, L.L.P.
21     30 East Seventh Street, Suite 2800
       Saint Paul, MN  55101
22     (651) 312-6500

23
       VICTORIA ROMANENKO
24     CUNEO, GILBERT & LaDUCA, L.L.P.
       507 C Street NE
25     Washington, D.C.  20002
       (202) 789-3960
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      ALDEN L. ATKINS
 3    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
 4    Washington, D.C.  20037
      (202) 639-6613
 5

 6    GARY K. AUGUST
      ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.
 7    31700 Middlebelt Road, Suite 150
      Farmington Hills, MI  48334
 8    (248) 851-4111

 9
      RICHARD D. BISIO
10    KEMP KLEIN LAW FIRM
      201 West Big Beaver Road, Suite 600
11    Troy, MI  48084
      (248) 528-1111
12

13    MICHAEL G. BRADY
      WARNER, NORCROSS & JUDD, L.L.P.
14    2000 Town Center, Suite 2700
      Southfield, MI  48075
15    (248) 784-5032

16
      LISA BROWN
17    DYKEMA GOSSETT, P.L.L.C.
      400 Renaissance Center
18    Detroit, MI  48243
      (313) 568-6943
19

20    JEREMY CALSYN
      CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
21    2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
22    (202) 974-1500

23    PATRICK J. CAROME
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
24    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
25    (202) 663-6610
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      MATTHEW CELESTIN
 3    WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
      1875 Pennsylvania Avenue NW
 4    Washington, D.C.  20006
      (202) 663-6600
 5

 6    STEVEN F. CHERRY
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
 7    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
 8    (202) 663-6321

 9
      JAMES L. COOPER
10    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
11    Washington, D.C.  20004
      (202) 942-5000
12

13    MOLLY CRABTREE
      PORTER, WRIGHT, MORRIS & ARTHUR
14    41 South High Street, Ste. 2900
      Columbus, OH  43215
15    (614) 227-2015

16
      DAVID CROSS
17    CROWELL & MORING
      1001 Pennsylvania Avenue NW
18    Washington, D.C.  20004
      (202) 624-2774
19

20    KENNETH R. DAVIS, II
      LANE POWELL, P.C.
21    601 SW Second Avenue, Suite 2100
      Portland, OR  97204
22    (503) 778-2100

23
      DAVID P. DONOVAN
24    WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
      1875 Pennsylvania Avenue, NW
25    Washington, D.C.  20006
      (202) 663-6868
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      DAVID F. DuMOUCHEL
 3    BUTZEL LONG, P.C.
      150 West Jefferson Avenue
 4    Detroit, MI  48226
      (313) 225-7000
 5

 6    J. CLAYTON EVERETT, JR.
      MORGAN, LEWIS & BOCKIUS, L.L.P.
 7    1111 Pennsylvania Avenue NW
      Washington, D.C.  20004
 8    (202) 739-5860

 9
      PETER M. FALKENSTEIN
10    JAFFE, RAITT, HEUER & WEISS, P.C.
      535 W. William, Suite 4005
11    Ann Arbor, MI  48103
      (734) 222-4776
12

13    MICHAEL FELDBERG
      ALLEN & OVERY, L.L.P.
14    1221 Avenue of the Americas
      New York, NY  10020
15    (212) 610-6360

16
      DANIEL T. FENSKE
17    JENNER & BLOCK
      353 N. Clark Street
18    Chicago, IL 60654-3456
      (312) 222-9350
19

20    MICHELLE K. FISCHER
      JONES DAY
21    51 Louisiana Avenue NW
      Washington, D.C.  20001
22    (202) 879-4645

23
      LARRY S. GANGNES
24    LANE POWELL, P.C.
      1420 Fifth Avenue, Suite 4100
25    Seattle, Washington  98101
      (206) 223-7000
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     JASON R. GOURLEY
 3   BODMAN P.L.C.
     1901 St. Antoine Street, 6th Floor
 4   Detroit, MI  48226
     (313) 259-7777
 5

 6   FRED K. HERRMANN
     KERR, RUSSELL & WEBER, P.L.C.
 7   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
 8   (313) 961-0200

 9
     BROOK HOPKINS
10   WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
     1875 Pennsylvania Avenue, NW
11   Washington, D.C.  20006
     (202) 663-6868
12

13   WILLIAM R. JANSEN
     WARNER, NORCROSS & JUDD, L.L.P.
14   2000 Town Center, Suite 2700
     Southfield, MI  48075
15   (248) 784-5178

16
     FREDERICK JUCKNIESS
17   SCHIFF HARDIN, L.L.P.
     350 South Main Street, Suite 210
18   Ann Arbor, MI  48104
     (734) 222-1507
19

20   STEVEN M. KOWAL
     K&L GATES
21   70 West Madison Street, Suite 3100
     Chicago, IL  60602
22   (312) 372-1121

23
     FRANK LISS
24   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
25   Washington, D.C. 20004
     (202) 942-5969
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      TIMOTHY J. LOWE
 3    McDONALD HOPKINS, P.L.C.
      39533 Woodward Avenue, Suite 318
 4    Bloomfield Hills, MI  48304
      (248) 220-1359
 5

 6    ERIC MAHR
      WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
 7    1875 Pennsylvania Avenue, NW
      Washington, D.C.  20006
 8    (202) 663-6099

 9
      JOHN M. MAJORAS
10    JONES DAY
      51 Louisiana Avenue NW
11    Washington, D.C.  20001
      (202) 879-3939
12

13    MICHELLE A. MANTINE
      REED SMITH, L.L.P.
14    225 Fifth Avenue, Suite 1200
      Pittsburgh, PA  15222
15    (412) 288-4268

16
      ANDREW S. MAROVITZ
17    MAYER BROWN, L.L.P.
      71 South Wacker Drive
18    Chicago, IL  60606
      (312) 701-7116
19

20    BRIAN M. MOORE
      DYKEMA GOSSETT, P.L.L.C.
21    39577 Woodward Avenue, Suite 300
      Bloomfield Hills, MI  48304
22    (248) 203-0772

23
      WILLIAM H. RAWSON
24    LATHAM & WATKINS, L.L.P.
      555 Eleventh Street NW, Suite 1000
25    Washington, D.C.  20004
      (202) 637-2200
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     ALEXANDER B. REICH
 3   CALFEE, HALTER & GRISWOLD, L.L.P.
     1405 East Sixth Street
 4   Cleveland, OH  44114
     (216) 622-8621
 5

 6   JOHN ROBERTI
     ALLEN & OVERY, L.L.P.
 7   1101 New York Avenue, NW
     Washington, D.C.  20005
 8   (212) 683-3682

 9   COURTNEY ROSEN
     SIDLEY AUSTIN, P.C.
10   1 South Dearborn Street
     Chicago, IL 60603
11   (312) 853-7669

12
     MICHAEL RUBIN
13   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
14   Washington, D.C.  20004
     (202) 942-5094
15

16   WM. PARKER SANDERS
     SMITH, GAMBRELL & RUSSELL, L.L.P.
17   Promenade Two, Suite 3100
     1230 Peachtree Street NE
18   Atlanta, GA  30309
     (404) 815-3684
19

20   LARRY J. SAYLOR
     MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
21   150 West Jefferson Avenue, Suite 2500
     Detroit, MI  48226
22   (313) 496-7986

23
     CRAIG SEEBALD
24   VINSON & ELKINS, L.L.P.
     2200 Pennsylvania Avenue NW, Suite 500 West
25   Washington, D.C.  20037
     (202) 639-6585
```

```
 1   APPEARANCES:  (Continued)
     For the Defendants:
 2
     CHARLES SKLARSKY
 3   JENNER & BLOCK
     353 N. Clark Street
 4   Chicago, IL 60654-3456
     (312) 923-2904
 5

 6   JESSE T. SMALLWOOD
     WILLIAMS & CONNOLLY, L.L.P.
 7   725 Twelfth Street NW
     Washington, D.C.  2005
 8   (202) 434-5162

 9
     JASON STARLING
10   PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
     41 South High Street, Suites 2900
11   Columbus, OH  43215
     (614) 227-2147
12

13   ANITA STORK
     COVINGTON & BURLING, L.L.P.
14   One Front Street
     San Francisco, CA  94111
15   (415) 591-7050

16
     MARGUERITE M. SULLIVAN
17   LATHAM & WATKINS, L.L.P.
     555 Eleventh Street NW, Suite 1000
18   Washington, D.C.  20004
     (202) 637-2200
19

20   JOANNE GEHA SWANSON
     KERR, RUSSELL & WEBER, P.L.C.
21   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
22   (313) 961-0200

23
     MAUREEN T. TAYLOR
24   BROOKS, WILKINS, SHARKEY & TURCO
     401 South Old Woodward, Suite 400
25   Birmingham, MI  48009
     (248) 971-1721
```

```
 1    APPEARANCES:  (Continued)
      For the Defendants:
 2
      MICHAEL F. TUBACH
 3    O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
 4    San Francisco, CA  94111
      (415) 984-8700
 5

 6    MICHAEL R. TURCO
      BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
 7    401 South Old Woodward Avenue, Suite 400
      Birmingham, MI  48009
 8    (248) 971-1713

 9
      LINDSEY ROBINSON VAALA
10    VINSON & ELKINS, L.L.P.
      2200 Pennsylvania Avenue NW, Suite 500 West
11    Washington, D.C.  20037
      (202) 639-6585
12

13    ALISON WELCHER
      SHEAVMAN & STERLING
14    801 Pennsylvania Avenue, NW, Suite 900
      Washington, D.C.  20004
15    (202) 508-8112

16
      OTHER APPEARANCES:
17
      PATRICK F. MORRIS
18    MORRIS & MORRIS, L.L.C.
      4001 Kennett Pike, Suite 300
19    Wilmington, DE  19807
      (302) 426-0400
20

21    ROB NOBLIN
      GREEN & NOBLIN, P.C.
22    4500 East Pacific Coast Highway, Fourth Floor
      Long Beach, CA  90804
23    (562) 391-2487

24

25
```

```
1    APPEARANCES:  (Continued)

2    R. SCOTT PALMER
     OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
3    The Capital, PL-01
     Tallahassee, FL  32399
4    (850) 414-3300

5

     JAYE QUADROZZI
6    YOUNG & ASSOCIATES
     27725 Stansbury Boulevard, Suite 125
7    Farmington Hills, MI  48334
     (248) 353-8620
8

9    LESLEY E. WEAVER
     GREEN & NOBLIN, P.C.
10   700 Larkspur Landing Circle, Suite 275
     Larkspur, CA  94939
11   (415) 477-6700

12

13   Attorneys Present Via Telephone:

14   ELIZABETH A. CATE
     WINSTON & STRAWN, L.L.P.
15
     J. MANLY PARKS
16   DUANE MORRIS, L.L.P.

17   HOLLIS L. SALZMAN
     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
18
     A. PAUL VICTOR
19   WINSTON & STRAWN, L.L.P.

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

STATUS CONFERENCE................................. 18

DEFENDANTS' JOINT MOTION TO DISMISS END PAYERS'
CONSOLIDATED CLASS ACTION COMPLAINT............... 62

DEFENDANTS' COLLECTIVE MOTION TO DISMISS CLASS
ACTION COMPONENTS OF THE PUBLIC ENTITIES'
COMPLAINT......................................... 66

DEFENDANTS' MOTION TO DISMISS END PAYERS' AND
AUTO DEALERS' CONSOLIDATED AMENDED CLASS
ACTION COMPLAINTS.................................105

```
 1   Detroit, Michigan

 2   Wednesday, January 28, 2015

 3   At about 10:04 1

 4                        —    —    —

 5           (Court and Counsel present.)

 6           THE CASE MANAGER:  Please rise.

 7           The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10           All those having business before this Honorable

11   Court, please draw near and you shall be heard.  God save

12   these United States and this Honorable Court.

13           You may be seated.

14           The Court calls Case No. 12-md-02311, Automotive

15   Parts Antitrust Litigation.

16           THE COURT:  All right.  Good morning, everyone.

17           THE ATTORNEYS:  (Collectively)  Good morning, Your

18   Honor.

19           THE COURT:  I didn't expect to see so many of you,

20   I thought that storm might keep some of you away, but we do

21   have several people on the phone.  All right.  Let's begin

22   the agenda.

23           First of all, I have a question because this is

24   kind of mysterious to me, who actually prepares this agenda

25   and the status report?
```

1    MR. HANSEL:  Your Honor, I take full responsibility

2    but not the blame.

3    THE COURT:  Put your appearance on the record.

4    MR. HANSEL:  Thank you, Your Honor.  Greg Hansel

5    for the direct purchasers.

6    We usually coordinate it, and we start off by

7    trying to get the plaintiffs to agree and then we try to get

8    the defendants to agree, and if there is a disagreement we

9    put the disagreement in the proposed agenda but they often

10   disappear, and so I hope these are satisfactory to Your

11   Honor.

12   THE COURT:  I think they are wonderful, and I just

13   wanted to acknowledge, I didn't know who amongst you was

14   principal for getting this ready, and it is extremely helpful

15   and I particularly like the status report, so I thank you.

16   MR. HANSEL:  Happy that's helpful, and I'm sure

17   everyone shares that view because we all do put some work

18   into it, everyone contributes.

19   THE COURT:  I'm sure everyone contributes, and if

20   there is anybody who wants something added to the agenda that

21   we don't have there, you know, we kind of get into our

22   protocol I guess for meetings and sometimes maybe don't think

23   of other things, but if anybody ever does, when you get the

24   agenda please do not hesitate to call and say I would like

25   this or talk to counsel to have it added.  Okay.  Thank you

1    very much.

2              MR. HANSEL:  Thank you.

3              THE COURT:  Again, I want to thank those that came

4    in, and I know some of you came in a couple days in advance

5    to be here, I know Mr. Morris particularly, but I thank you

6    for doing that.  This meeting, it was kind of up in the air,

7    I didn't know if it was going to come off or not come off

8    today, but I'm very, very glad it did.  Thank you.

9              I want to, first of all, change the schedule in the

10   agenda because Mr. Esshaki, our master, is here and he's

11   going to have to leave, so I would like to deal with some

12   matters while he's here.

13             Gene, I would like to start first of all with your

14   report, there are pending matters referred to the master, it

15   is number 3 on the agenda.

16             MASTER ESSHAKI:  Yes.  Thank you very much, Your

17   Honor.

18             Again, I want to thank everyone who I have been in

19   contact with for the professionalism and the level of work

20   that you have provided me.

21             Right now the only matter that I have pending is

22   the discovery protocol in the wire harness cases.  We had a

23   conference call on that with the interested parties last

24   Wednesday.  The parties were kind enough to prepare the

25   deposition protocol and lay out all of the points that they

1     agreed upon and then highlighted six points upon which there
2     was disagreement.  They then each provided me with a position
3     statement as to their respective positions on those six
4     contested points.
5            I conducted a conference call where I believe each
6     side was provided adequate opportunity to argue their
7     respective positions.  I -- these were points that could not
8     really be consolidated or mediated, and as a consequence I
9     made rulings and I asked counsel for the defendants,
10    Ms. Romanenko, to redraft the deposition protocol order, to
11    identify those six points in which the master made the ruling
12    so that it would be clear which ones were ruled upon, and to
13    add at the bottom of the order that the order is subject to
14    appeal to Judge Battani pursuant to the order appointing
15    special master.  She was then to submit it to counsel for the
16    plaintiffs, obtain their consent as to the language, and then
17    give it to me to be signed and filed with the Court.  And I
18    would image that at least one side or perhaps both may take
19    an appeal.  So I think the ball is in Ms. Romanenko's court
20    or it may be in the plaintiffs' court, I just don't know.
21           MS. SULLIVAN:  Good morning.  Maggie Sullivan from
22    Latham & Watkins on behalf of Sumitomo, and I will be
23    speaking on behalf all the defendants on this.
24           Just to clarify, Master Esshaki, you asked me --
25           MASTER ESSHAKI:  Yes, you are right.  I

1    apologize.

2          MS. SULLIVAN:  -- Ms. Sullivan, to draft an order.

3          No apologies necessary, sir.

4          MASTER ESSHAKI:  Sorry, Ms. Romanenko.

5          MS. SULLIVAN:  We did draft the order and we sent

6    it along to the plaintiffs on Friday last week, and all

7    parties have signed off except for the auto dealers.  We

8    received some edits late last night from the dealers that we

9    believe are inconsistent with your rulings on one of the

10   disputes in particular and so we are going to talk with them

11   about that after the hearing and I hope that we would be able

12   to work it out.  If we aren't able to we will present it back

13   to you.

14         MASTER ESSHAKI:  Please give me an e-mail and let

15   me know what you need of me.

16         MS. SULLIVAN:  We will.  There was one point that

17   came up during the mediation and also in the submissions

18   related to the deposition protocol that relates to the

19   coordination of depositions generally, and so we wanted to

20   clarify --

21         THE COURT:  Coordination amongst the parts?

22         MS. SULLIVAN:  Well, we have committed in the wire

23   harness protocol to attempt to coordinate with the other

24   parties in the other cases on the plaintiffs' side

25   depositions, so we have indicated that we will send them --

1    we will notify the plaintiffs -- the defendants in the other

2    cases of the depositions, provide the transcripts subject to

3    the plaintiffs' agreement, and also provide our preparation

4    materials in an effort to avoid duplication across the auto

5    parts cases.  And during the course of the submissions and

6    also in the mediation the end payers and auto dealers both

7    represented to us and to the Court that they are dropping or

8    withdrawing their claims based on purchases of replacement

9    parts in the wire harness case, and so we would like that to

10   be confirmed.  And we also would like both the end payers and

11   auto dealers to inform the Court as to whether they intend to

12   pursue those claims in the other auto parts cases or whether

13   they have also dropped the claims in those other cases.

14          Thank you.

15          THE COURT:  So if I understand you correctly, the

16   auto dealers in the wire harness --

17          MS. SULLIVAN:  Correct.

18          THE COURT:  -- have dropped the aftermarket -- the

19   replacement parts claims --

20          MS. SULLIVAN:  Correct.

21          THE COURT:  -- those parts of their cases, okay,

22   but the end payers have not?

23          MS. SULLIVAN:  No, the end payers have as well in

24   the wire harness case.

25          THE COURT:  Okay.

1          MS. SULLIVAN:  So the question is whether they have

2     also withdrawn or are intending to withdraw those claims in

3     the other auto parts cases other than wire harnesses.

4          THE COURT:  Thank you.

5          MR. WILLIAMS:  Good morning, Your Honor.

6     Steve Williams for the end payers.  It is good to see you

7     again.

8          What Ms. Sullivan has said is correct, and we did

9     confirm that with her this morning, that we are not pursuing

10    claims for replacement parts, we are pursuing claims for

11    people who purchased automobiles -- vehicles with price-fixed

12    parts in them.

13         THE COURT:  Thank you, Mr. Williams.

14         MR. WILLIAMS:  Thank you.

15         THE COURT:  Ms. Romanenko?

16         MS. ROMANENKO:  Good morning, Your Honor, Special

17    Master Esshaki.

18         With regards to the deposition protocol order, as

19    Ms. Sullivan stated, they sent us their draft, we sent them

20    our edits a couple days later, we believe our edits

21    memorialize what the special master stated but, of course, we

22    are going to meet and confer with them so we can avoid any

23    further disputes and get the order to the master for entry.

24         With regard to the replacement part issue, as

25    Ms. Sullivan stated, we have agreed to withdraw claims with

1    regard to replacement parts in wire harness, we are reviewing

2    the other cases and we will let defendants know our

3    determination as quickly as possible.

4            THE COURT:  Thank you.  Ms. Sullivan?

5            MS. SULLIVAN:  I apologize, but it was not entirely

6    clear what the end payers' position is with respect to the

7    other auto parts, whether he was speaking -- Mr. Williams was

8    speaking just in the wire harness case or across all the auto

9    parts cases.  I just want to make sure it is clear.

10           THE COURT:  Mr. Williams?

11           MR. WILLIAMS:  Thank you.  I apologize if I was not

12   clear but, yes, what I said about pursuing claims for people

13   who purchased or leased automobiles with the price-fixed

14   parts in them applies across the board to all the cases we

15   presently have filed.  We are not pursuing damage claims for

16   replacement parts, only parts.

17           THE COURT:  In any of the cases?

18           MR. WILLIAMS:  Correct.

19           THE COURT:  Thank you.

20           MR. WILLIAMS:  Thank you.

21           THE COURT:  Okay.  Something has come up, and this

22   may be a first time when I run into a master, as I said, I

23   haven't used a master before, but I have been thinking about

24   this deposition protocol and I know -- I can't get into

25   details with Mr. Esshaki at all because I may be doing

1    appeals for it, but let me put my two cents' worth in here.

2         I was thinking about the depositions for the

3    individual plaintiffs in all of the auto parts.  I have been

4    thinking about the issue, do you take a deposition of each

5    plaintiff in each part?  That's impossible, that is not going

6    to happen.  First of all, certainly end payers and, unless

7    somebody could convince me otherwise, auto dealers don't buy

8    cars by parts, they buy the car.  Certainly your end payers

9    probably don't even know these parts exist in their cars.  So

10   I would assume, and I don't know this, but I would assume

11   what you want to know is about how much they paid for the car

12   and where they purchased the car, that type of thing.  And I

13   would also assume that that's true for every defendant would

14   want this basic information and that this can all be done in

15   one deposition of a named plaintiff.

16        I don't know in detail what you have discussed in

17   your protocol but, you know, maybe I'm jumping the gun here

18   but I'm throwing this out because this case has to move along

19   with a little more swiftness, and that is that it is my

20   intention to do something -- I mean, if we have to innovative

21   we will be innovative but that there be one deposition.

22        So, Mr. Williams, before I go on, go ahead.

23        MR. WILLIAMS:  I just want to respond, Your Honor,

24   to your point.  This actually was a matter that the parties

25   discussed and mediated with Mr. Esshaki.

```
 1              THE COURT:  See, I'm already interfering with --
 2              MR. WILLIAMS:  It is in the proposal but I don't
 3     think that rules out us and the defendants and the master, if
 4     he's so willing, from evaluating this in light of the
 5     comments that you have made today.  I think we are all in
 6     favor of efficiencies.
 7              THE COURT:  Well, I have thought about this and I
 8     know particularly from defendants' point of view, I mean,
 9     maybe each defendant has something unique they want to do so
10     I thought about this, well, okay, defendants, and you haven't
11     even answered yet, a lot of you, but that's okay, discovery
12     can start anyway, we don't need to have the answers to do
13     discovery, under the rules I can allow it and, of course, I
14     am in this case.  You can if you want, each of you, submit
15     questions you would ask of a plaintiff, be it an auto dealer
16     or an end payer, I don't think the OEMs are a big deal, but
17     in terms of those two groups you can also submit questions
18     and then either the master or myself could call those
19     questions so that you would literally have your questions
20     asked, so when the person comes in he's going to be asked the
21     question, or she, only one time, and you could decide for
22     yourself a group of you that will be taking these depositions
23     using this script.
24              Or another way of doing it is a group of you could
25     get together and come up with one set of questions so you're
```

 1     not all doing it.  Either -- which way I don't care but I

 2     want you to have the opportunity to ask, you know, to get the

 3     information you need and at the same time only do a single

 4     deposition of most of these named plaintiffs.  Granted there

 5     may be something that comes up that would require an extra

 6     deposition, I don't know what that could be, you would know

 7     that, and we would deal with that, but that's kind of what I

 8     had in mind for the depositions.  So I just throw that out so

 9     when you are doing your protocol it may be a little late but

10     I've just been thinking about this.

11          Ms. Sullivan?

12          MS. SULLIVAN:  I do think that the language that

13     Master Esshaki has instructed the parties to include in the

14     protocol does envision the types of things that you may be

15     thinking about in terms of cooperating with each other and

16     trying to avoid duplication.  This is one of the reasons why

17     I asked for clarification regarding replacement parts because

18     speaking only on behalf of the wire harness defendants, not

19     on behalf of any defendant in any of the other cases, for us

20     it seems much more likely that we will be able to accomplish

21     having only a single deposition of the end payers when if it

22     is true that that's all that they are claiming is damages

23     based on the purchase of a car, and that applies in all of

24     the cases.  Again, I'm not speaking on behalf of any of the

25     other defendants in those other cases but I do expect that we

1    should be able to accomplish what you are envisioning with

2    respect to the end payers.

3        The auto dealers are differently situated.  First,

4    they have not yet withdrawn their replacement part claims in

5    the other cases and that will make a difference, I suspect,

6    because if they are claiming damages based on those other

7    purchases of the other parts the parties in those other cases

8    will need to explore the prices that they paid, whether the

9    prices were negotiated, the prices for which they sold those

10   parts, et cetera, et cetera, and so that will add to the

11   complexity significantly.

12        THE COURT:  Unless they drop as they did in the

13   wire harness?

14        MS. SULLIVAN:  Correct.  In addition, the auto

15   dealers are more complicated as well because of where they

16   sit in the distribution chain, so not only do we need to

17   explore their purchases of cars but also their sales of cars,

18   and that relates to the pass-through issue that Your Honor

19   identified back in the motion to dismiss ruling back in 2013

20   I believe.  So those are more complicated depositions.  We

21   are hopeful that we will be able to avoid as much duplication

22   as possible.  We are making -- we have committed to using our

23   best efforts to do that, and we will take every step that we

24   can think of to try to avoid duplication.

25        THE COURT:  Okay.  Well, there is not going to be

```
1   duplication unless it comes before me first that you need a
2   second deposition, let me start with that, because we just
3   cannot start doing two depositions or more of everyone, so
4   I'm not barring it, I'm just saying I need to know why.
5           MS. SULLIVAN:  Your Honor, for the wire harness
6   defendants, our primary concern is that our depositions are
7   not delayed and because many of the other cases are far
8   behind us we have been concerned that if there is a ruling
9   that only one deposition may occur across the entire auto
10  parts MDL that we will then have to wait for those other
11  cases to catch up, and it is very important to us that we not
12  have to wait.  As you know, we have been in discovery in this
13  case for a very long time, and we would like to move forward
14  with our depositions.
15          THE COURT:  Well, you may have to wait, you may
16  have to wait.  I don't think this is a big deal.  I think
17  that every one of these defendants knows right now what
18  information they want from each person.
19          MS. STORK:  Your Honor if I could just say a word?
20  Good morning.  My name is Anita Stork and I represent
21  Alps Electric, with case number 4, heater control panels, and
22  I also represent another defendant who was just recently
23  served in fuel injection systems, namely Tahen (phonetic)
24  North America.
25              I think -- and I know that we are all for
```

```
 1    efficiency and coordination as much as possible, but I think
 2    one issue to consider is that the deposition protocol so far
 3    has only been negotiated between wire harness defendants and
 4    plaintiffs in auto dealers, end payers and also directs, but
 5    the defendants in the later cases haven't been involved in
 6    that at all so it is a little bit difficult to say that
 7    negotiations that one set of defendants is doing now is going
 8    to bind everybody in the subsequent 24, 25, however many
 9    cases there are.
10            I'm not saying that we are not eager to do this,
11    I'm just saying that some defendants really aren't in a
12    position to know because they have just been served or are
13    recently in the case to know exactly what information they
14    need, and that submitting questions really is no substitute
15    for at some point being able to ask additional questions if
16    you think that's needed.  I mean, I certainly wouldn't
17    contradict anything Your Honor has said -- the Court has said
18    about the approach to it, I'm just suggesting that, one,
19    these later defendants haven't been involved in this
20    negotiation but that secondly one alternative for the Court
21    to consider would be to have depositions of the named
22    plaintiffs sooner rather than later but then keep in reserve
23    like an extra two hours if defendants in later cases feel
24    like they have to ask additional questions and can make a
25    case to the Court that these are additional questions that
```

1    need to be asked.  It is just very difficult when you have

2    only just been served and other defendants have been in their

3    wire harness case for four years to immediately know what

4    your client who just got the summons really needs to ask.

5              THE COURT:  Okay.

6              MS. STORK:  Thank you, Your Honor.

7              THE COURT:  Mr. Williams?

8              MR. WILLIAMS:  Just speaking on behalf of end

9    payers, we are all in favor of doing whatever we would need

10   to do to avoid duplication.  We had offered across all the

11   cases to make our discovery responses in the first cases

12   available to all defendants, and we think that it makes a lot

13   of sense to think of ways to avoid the duplication.  I think

14   the suggestions the Court made makes a lot of sense.  From

15   the top of my head, an alternative could also be a set of

16   depositions upon written questions for the basic facts of

17   purchases.  There are a lot of creative ways -- really not

18   that creative ways to do this to create efficiencies that the

19   Court is talking about, and we for the end payers will do

20   everything we can to make that happen and to not cause any

21   delay for defendants whether they have been in the cases or

22   whether they are new defendants.

23             THE COURT:  All right.

24             MR. KANNER:  Good morning, Your Honor.

25   Steve Kanner on behalf of direct purchasers.

1    We have been listening with interest, and we have

2    been involved in these discussions.  Of course the direct

3    purchasers are in a slightly different position, there are

4    certainly fewer plaintiffs in each of these cases.  And with

5    respect to wire harness I believe the protocols have largely

6    been worked out in an extremely cooperative fashion.  Of

7    course, we also buy the product somewhat differently than the

8    end payers, we are not buying the cars, we are actually

9    buying the parts directly, but certainly off the top of my

10   head I think three plaintiffs who bought -- at least two who

11   bought wire harness parts and other parts, Findlay and ACAP,

12   and certainly another client, Tiffin, purchased four or five

13   different parts directly from the defendants, so we are

14   certainly in favor of doing whatever is necessary to make the

15   process more efficient and to have these people sit for one

16   deposition as opposed to four and five separate times.

17        It makes sense -- it certainly makes sense from the

18   standpoint of the economy of efforts by the attorneys as

19   opposed to all going to four and five separate depositions,

20   we can do it at one time.  And to the extent that we can do

21   this in a written form beforehand, certainly the purchase

22   information, the defendants from whom we have purchased know

23   exactly what our clients have purchased, when and for how

24   much.  So that ought to be considered in terms of how we

25   streamline this process, and we are certainly open to, as

 1     Your Honor suggested, being creative and innovative.

 2              THE COURT:  Okay.

 3              MR. KANNER:  Thank you, Your Honor.

 4              MS. SULLIVAN:  Your Honor, just very briefly to

 5     respond to one of Mr. Williams' suggestion about some form of

 6     written questioning.  We have served written discovery

 7     requests on the plaintiffs and really have not been able to

 8     collect the information that we need from them.  We really do

 9     need to move forward with depositions.  We've been working

10     hard with the plaintiffs to set a class certification

11     schedule, and I believe that that proposed schedule will be

12     filed today with the Court, so we have succeeded in agreeing

13     upon a schedule and it really is critical that we move

14     forward now and take the depositions that we need in the wire

15     harness case so that we can meet those deadlines for class

16     certification that the parties agreed upon.

17              THE COURT:  All right.  I have to tell you, even

18     though I want you to go ahead with the class cert for the

19     wire harness as we discussed at our last meeting, and, again,

20     I think we mentioned this at the last meeting, I don't know

21     that that's going to be the way it is going to go for the

22     future but we need to get one of these class certs under our

23     belt so we see where we are heading, but, but I am not going

24     to allow the depositions to go forward on the one part, I'm

25     simply not going to do that.  You will have to get together

1    and there is some urgency here because wire harness does need

2    to proceed, but you are going to have to do these depositions

3    on behalf of all of the defendants.

4         I'm not asking you to do them written first, you

5    can start taking your depositions, but what we need to know

6    what's the template, what's the template of the questions

7    that are going to be asked, and who amongst the defendants --

8    which groups are going to actually be taking the depositions.

9    So you will have to get together, form a group of, I don't

10   know, three, four, five -- well there are a lot of defendants

11   so you can decide how many you want to take the depositions

12   but only one person is going to be questioning at a time.

13   And we are going to hold it up because I think it is well

14   worth it to extend the class cert a little bit in order to

15   get this all done, but I really don't see any reason why it

16   could not be done with, for the most part, a single dep.  And

17   I say for the most part because I really -- you know your

18   cases and you know there may be something specific that you

19   have to ask but how you do it I don't know.

20        And, Gene, I would like to address to you because

21   this may change whatever you have done in the protocol, but

22   we need like a time period in which the defendants can submit

23   either individually their list of questions they would ask

24   each end payer and each auto dealer, recognizing the auto

25   dealers may be a little different than the end payers, or

 1    time for all of the defendants to have their representatives

 2    get together and come up with one format.

 3              MASTER ESSHAKI:  Judge, I think your ruling just

 4    now alters completely the deposition protocol that we

 5    discussed and I ruled upon, and I think the parties are going

 6    to have to get back together and redraft that deposition

 7    protocol to implement what I think was a direct instruction

 8    that there will be one dep of each end payer or whoever it

 9    may be and it is going to cover all the parts so that the

10    defendants need to get together, they need to come up with a

11    template of what the deposition outline is going to look

12    like, all of the parts the defendants will have input into

13    that, if they have any particular questions they can add

14    those questions, and they will designate who's going to be

15    conducting the examination.

16              But the problem here is that, as we said during our

17    discussions, there are approximately as I remember 50

18    dealers, there were four deps, we agreed I think on the 50

19    dealers, that's 200 deps, maybe there were less, I think in

20    my mind it is 160, but if we have to do that for wire harness

21    and then for air bags and then for motors it is impossible.

22    So the judge, I think, made this instruction very clear, one

23    dep, one person, across all parts and you need to figure out

24    how you are going to do that, and we need to start from

25    scratch on that protocol, salvage as much as you can but we

1    need to feed in the judge's new ruling.

2           THE COURT:  So, Gene, before we go on, you are

3    agreeing with what I said?

4           MASTER ESSHAKI:  I agree completely.

5           THE COURT:  I don't want to have a run-in with my

6    master.

7           MASTER ESSHAKI:  I agree completely, I think

8    otherwise you are going to have thousands of depositions in

9    this case.

10          MR. WILLIAMS:  Your Honor, once we receive a

11   transcript, which we will order today, we will promptly put

12   together a revised draft keeping as much as we can from what

13   was done, send it to the defendants so we can take care of

14   this without delay.

15          THE COURT:  Let me say I am going to set some

16   deadlines here.  Do you think -- the defendants, do you think

17   in 45 days you can come up with such a template, I mean,

18   questions together?  And also those who just entered in

19   response to what was said here -- I'm sorry, I forgot your

20   name?

21          MS. STORK:  Anita Stork.

22          THE COURT:  Okay.  In terms of what you said just

23   coming in the case and maybe not knowing, I want you to

24   participate and, yes, there may be things as you do your

25   preliminary discovery that you decide that you need to ask

```
 1    then just bring that to my attention, but I think after, you
 2    know, at least the first 20 of you have to be ready and know
 3    the case well enough to come up with a template that there is
 4    probably not much more any one party would ask but, you know,
 5    it may be, I don't know, I just don't want you to think that
 6    you are barred, it is just that we have to proceed.
 7            MS. SULLIVAN:  Your Honor, may I just ask a point
 8    of clarification?  Are you requesting that we submit a
 9    template to Master Esshaki or to other parties or just among
10    the defendants in the various cases?  We agree amongst
11    ourselves --
12            THE COURT:  You can do whatever you want.
13    Hopefully you come to terms amongst yourself and you don't
14    have to bother Mr. Esshaki, these are the questions -- we as
15    a group are saying these are the questions that we need to
16    ask of every named party.  Okay.  If you can't do that then
17    I'm going to say submit your conflicting whatever -- I'm
18    calling them templates for want of any better word, and then
19    Mr. Esshaki can determine which questions will be asked.
20            MS. SULLIVAN:  Thank you.  With respect to the
21    protocol itself, the wire harness protocol, the parties have
22    been negotiating that protocol since February of 2014, and
23    this issue that you are identifying that relates to the
24    number of times an end payer or an auto dealer may be deposed
25    throughout the entire auto part MDL really only impacts a
```

```
 1    couple of the provisions, so I would like to suggest that we
 2    move forward with the wire harness deposition protocol and
 3    just revise those provisions to account for Your Honor's
 4    ruling.  I think we can accomplish that without significant
 5    delay and we can get moving with the -- or enter the wire
 6    harness protocol as negotiated by the parties in the wire
 7    harness case.
 8            THE COURT:  Wonderful, if you can do that quickly
 9    I'm all for it but you have to get all of these other
10    defendants to join in with you.
11            MR. WILLIAMS:  I know Mr. Barrett wants to speak,
12    but that's more or less what I just said I would do, I will
13    receive the transcript and revise those portions that are
14    affected by what we have discussed today.
15            MR. BARRETT:  Right, and auto dealers concur with
16    that.
17            THE COURT:  All right.
18            MS. STORK:  Your Honor, I would just say -- repeat
19    again that the defendants in the later cases certainly are
20    all for efficiency.  I would just suggest again that there be
21    some type of stopgap measure if parties in the later cases at
22    some point as those cases progress and motions have gone
23    through and discovery actually begins that they could apply
24    to the Court or Mr. Esshaki for permission for additional
25    questions if that's needed.  It may not be, I guess I'm just
```

1    suggesting that --

2              THE COURT:  I agree with you, don't worry about it.

3              MS. STORK:  Okay.

4              THE COURT:  Okay.

5              MS. STORK:  Thank you.

6              THE COURT:  If there is something that comes up and

7    you haven't thought about it then I will entertain that in

8    the future.  I am, of course, depending upon all of these

9    legal brains to think of everything up front.  Okay.

10             So with that let's see if we can't have a revised

11   protocol, Gene, maybe in 45 days.

12             MASTER ESSHAKI:  Yes, Your Honor.

13             THE COURT:  All right.  Now, the next issue that I

14   would like to get to before we go to the beginning of the

15   agenda is the class cert deadlines which may have been -- you

16   said you've worked something out, and I would like to know

17   whether this would change what you have worked out?

18             MR. BURNS:  Good morning, Your Honor.  Warren Burns

19   for the end payers, and I believe Steve Cherry will be

20   joining for the defendants.

21             We actually have worked out a stipulation -- a

22   proposed stipulation that we had planned on submitting to you

23   today.  I think in light of this ruling we probably want to

24   have a discussion about whether those dates make sense, and I

25   haven't had a chance to confer with Mr. Cherry yet.

1          THE COURT:  Okay.

2          MR. BURNS:  But we were prepared to go forward with

3   that.  The deadlines that we were going to propose for the

4   initial motions was July 1st, 2016 but I'm happy to go back

5   and quickly confer with Mr. Cherry and see if we need to add

6   just those dates at all in light of your ruling.

7          THE COURT:  Your motion for cert was July 1st,

8   2016?  Okay.

9          MR. BURNS:  Built into the stipulation, Your Honor,

10  actually a number of discovery deadlines as well and

11  recognizing the fact that even with your ruling this morning

12  we are facing in excess of 100 depositions in wire harness

13  alone, especially given the number of defendants and what

14  needs to be done there.  And the current status of discovery

15  and production of documents in addition to those that were

16  previously produced as part of the DOJ production, but I'm

17  happy to confer with Mr. Cherry and we can --

18         THE COURT:  100 in wire harness alone, so before

19  this you were thinking of 100 times 29?

20         MR. BURNS:  No, I don't think that's true, Your

21  Honor, it is going to vary by case and defendant, and there

22  is no formula in that regard.

23         THE COURT:  Let's keep it to 100.  All right.

24         MR. CHERRY:  We can talk but I don't think this

25  should affect the schedule at all.  I mean, we were already

```
 1   undertaking a commitment to coordinate with the other cases
 2   and I think in particularly with the plaintiffs dropping the
 3   replacement part claim --
 4           THE COURT:  Could you speak up a little bit?
 5           MR. CHERRY:  Yes.  Again, I'm Steve Cherry from
 6   Wilmer Hale.
 7           MR. VICTOR:  Your Honor, this is Paul Victor.  It
 8   is very hard for us to hear not you but the other speakers.
 9   I wonder if they can come to the microphone?
10           THE COURT:  Let's see if we can -- let me turn this
11   around and see if it helps.  Keep your voices up.
12   Mr. Cherry?
13           MR. VICTOR:  Thank you.
14           MR. CHERRY:  Yes.  So I don't believe this should
15   affect the schedule.  We were already contemplating just that
16   type of coordination and sharing of our outlines with the
17   other defendants and inviting input and coming up with a
18   master outline, that was already part of our contemplated
19   process so I don't see why this would affect the schedule.
20           MR. BURNS:  Mr. Cherry, I have canvassed the --
21           THE COURT:  Speak into the microphone so everyone
22   can hear.
23           MR. BURNS:  Certainly.  I have canvassed the
24   plaintiffs' groups and we are prepared to go forward with the
25   dates that we have negotiated.
```

1          THE COURT:  I know you will prepare an order but
2    will you tell me what those dates are now?  You said --
3          MR. CHERRY:  Actually it is -- it has been filed
4    so --
5          THE COURT:  It has been filed?
6          MR. CHERRY:  Yes.
7          MR. BURNS:  By memory, Your Honor, July 1st, 2016
8    for the filing of motions for class certification, four
9    months later, which would be November 1st, 2016, would be the
10   responses, and then we have -- I believe it is March 1st for
11   the replies.  We have not agreed as to whether sur replies
12   are appropriate, we have kicked that can down the road a
13   little bit, and then there are a number of discovery
14   deadlines built in before those dates.
15         THE COURT:  So basically we are talking about
16   arguments maybe in the middle of 2017?
17         MR. BURNS:  That's right, Your Honor.
18         THE COURT:  Wow.  Both sides have agreed to the
19   schedule?
20         MR. BURNS:  We have after quite a bit of
21   negotiations back and forth on those points.
22         MR. CHERRY:  Yes.
23         THE COURT:  Okay.  Given the amount of work that
24   needs to be done I think it is reasonable, I also think that
25   the other parts classes should be thinking ahead to do this

1    and it may be able to move along faster and we will get more

2    of these motions resolved in 2017.

3            MR. CHERRY:  There is one issue that I think is

4    related to the schedule, Your Honor, and that is discovery of

5    third-party OEMs because that data will be very important for

6    both of us I think to our respective experts' analysis and to

7    our motions.  And we have made some efforts and Mr. Williams

8    has made some efforts to talk to each other to try to

9    coordinate on that so we can do that together, and I think

10   there has been from our perspective a little delay in trying

11   to get together on a call and just make sure that we can come

12   to finality on some subpoenas that we can serve to the OEMs

13   so we can do that jointly and do it one time.

14           And I think what we would benefit from is to have a

15   deadline that just sort of holds our feet to the fire so that

16   we can keep our schedule in place and maybe agree within two

17   weeks or just some date that we will either come to agreement

18   on a joint subpoena or go forward together or if we have a

19   dispute I guess submit it to Master Esshaki, but I think we

20   need something here because it is sort of dragging on trying

21   to come to some coordinated process.

22           THE COURT:  Well, how does this fit in with the

23   OEMs and all the other defendants?  I mean, we are not

24   going to be -- the OEMs especially we don't want to be

25   taking --

**43**

```
1              MR. WILLIAMS:  Your Honor --

2              THE COURT:  -- a lot of deps.

3              MR. WILLIAMS:  Your Honor, that's a very important

4    question, and I want to make a couple points first.  We are

5    committed to doing this.  We need to do this.  In fact, we

6    are the ones who reached out to them in the last month to

7    have this discussion.  We don't need an arbitrary deadline

8    imposed though because, as you just noted, this affects

9    third-party OEMs not just in one case or two or three cases

10   but a lot of cases, it relates to my class, the auto dealers,

11   the directs, the City of Richmond and the new truck case, we

12   don't want to delay, we want to do it soon too because this

13   is critical for us but what we don't need is an arbitrary

14   make it happen in two weeks deadline, it is much too

15   important to the case and the schedule to have an arbitrary

16   deadline.

17             We will commit to engaging with them right away,

18   they have sent us a draft, we have a draft we can share with

19   them.  My suggestion though would be we have all worked very

20   well with Master Esshaki, if there is a problem that needs to

21   be brought up with the master we can do it that way but we

22   shouldn't set an arbitrary deadline of two weeks or anything

23   like that.

24             THE COURT:  Mr. Spector?

25             MR. SPECTOR:  Good morning, Your Honor.
```

1    Eugene Spector on behalf of direct purchasers.

2         I only wanted to say that we would like to

3    participate in this process of defining what is in the

4    subpoenas to the OEMs because that's the class that we

5    represent, and we would like to have some view as to what is

6    going on, what is going to be asked and maybe some input as

7    to what might be in the interest of the OEMs with regard to

8    that.  We are in regular contact with them in any event and

9    we would like to see what we can do to help move this process

10   along so it works for all of us.

11        THE COURT:  You can talk to counsel and participate

12   in that.  I don't think that's a problem.  You all have to

13   work together.

14        MS. SPECTOR:  We have, Your Honor.

15        THE COURT:  Mr. Cherry?

16        MR. SPECTOR:  Thank you.

17        MR. CHERRY:  Your Honor, again, we can coordinate

18   with the other defendants and try to do this in the most

19   efficient manner possible, but it is -- it will be very

20   difficult to do this one time with the OEMs because we are

21   talking about different products being purchased by them and

22   they do have different divisions and different product groups

23   that do that purchasing, it is not even the same people, it

24   may be different data in different places we are seeking.

25   The downstream data ought to all be the same, you know, the

1  cars coming from the auto manufacturers we can obtain that

2  one time and it will fit every case, but the purchasing may

3  be different and we can coordinate with the other defendants

4  to be efficient as possible and minimize that but --

5       THE COURT:  Well, I think that's all that can be

6  asked, if you can coordinate those parts that make sense I

7  think you can do that.  And, I mean, I wouldn't think you as

8  defendants would want to irritate your OEMs.

9       MR. CHERRY:  Exactly, Your Honor, exactly.  And the

10  idea of an arbitrary deadline, I think these things, as

11  Ms. Sullivan mentioned, our deposition protocol, which took

12  from February until now to get resolved, is this can't take

13  six months or no schedule is going to stick.  I think --

14       THE COURT:  Okay.  Let me --

15       MR. CHERRY:  -- whatever the deadline is we have 30

16  days, some period of time --

17       THE COURT:  Let me do this, I have given you

18  45 days on the other one, I will give you 45 days on this one

19  max.  If you can do it sooner, wonderful.  If you need to --

20  if that's not suitable then you have an issue and you will

21  have to bring that up before Mr. Esshaki.

22       MR. CHERRY:  Thank you, Your Honor.

23       MR. WILLIAMS:  Your Honor, I apologize but just to

24  clarify, 45 days to do what?  They -- I think that Mr. Cherry

25  was saying was 45 days to actually serve the discovery.

1    THE COURT:  No, no, just to coordinate all of it.

2    MR. WILLIAMS:  Certainly.  Thank you.

3    THE COURT:  Okay.  Anything else on discovery or

4  other protocols?

5    (No response.)

6    THE COURT:  Mr. Esshaki, anything else?

7    MASTER ESSHAKI:  No, Your Honor, I have nothing

8  further.

9    THE COURT:  Okay.  Ms. Sullivan?

10    MS. SULLIVAN:  Yes, Your Honor.  Mr. Williams

11  mentioned the new truck dealer class complaint, and I just

12  want to confirm that all of these deadlines that Your Honor

13  is imposing will, in fact, apply to the truck dealer

14  plaintiffs as well.  I know that one of their lawyers

15  submitted a letter to Your Honor I believe yesterday

16  indicating that they expected that they would have different

17  deadlines and a different schedule, and we would like them to

18  be on the same schedule.  It is very important that they --

19    THE COURT:  But they won't have different deadlines

20  on what we are talking about now unless something comes up,

21  as I indicated for the later groups, that requires something

22  different but that's going to have to be brought specifically

23  to the Court's attention.

24    MS. SULLIVAN:  Thank you, Your Honor.

25    THE COURT:  Okay.  All right.  Let's go back to one

1    on the agenda, the status of the settlements.

2         MR. WILLIAMS:  Your Honor, Steve Williams, again,

3    for the end payers.  I'm here with John Cuneo.

4         We are very pleased to announce to the Court that

5    we have arrived at a settlement with the Hitachi defendants.

6    Hitachi are defendants in nine separate cases, and this will

7    resolve end payer and auto dealer claims against Hitachi in

8    all of those cases.  We are hard at work on the final written

9    settlement agreement, and we would hope to present that to

10   the Court well before the May 6th date, I think that's our

11   desire and I think Hitachi shares this, would be to have this

12   done if we can within the next 30 days, present it to the

13   Court for preliminary approval.  And I would add to that that

14   as the Court may recall, we have reached agreement with

15   Panasonic and we have made progress on finalizing that

16   agreement, and what I would hope we could do would be to

17   consult with the parties and identify a date for which

18   preliminary approval of both Panasonic and Hitachi can be

19   presented to the Court in the next 30 to 45 days.

20        THE COURT:  Mr. Cuneo?

21        MR. CUNEO:  Just to be clear, I represent the auto

22   dealers.  I second everything he said, and we would like to

23   at least pencil in a date for preliminary approval and

24   maybe --

25        THE COURT:  What are you thinking of?

1           MR. CUNEO:  March 1st, somewhere around there.

2           THE COURT:  Okay.  Just one minute.

3           MR. CUNEO:  Somebody here said March 1st is a

4    Sunday.

5           THE COURT:  So we are all available, right?

6           MR. CUNEO:  Maybe later in the week.

7           THE COURT:  Yes, March 2nd is Monday.

8           MR. WILLIAMS:  Your Honor, I have been consulting

9    with counsel for Hitachi, and at least for Hitachi and us we

10   are thinking essentially any date the first or second week of

11   March.

12          THE COURT:  I have an afternoon on Wednesday,

13   March 1st, it would be in the afternoon, is that --

14          MR. WILLIAMS:  That's fine for the end payers.

15          MR. CUNEO:  That's fine for the auto dealers.

16          THE COURT:  Okay.  So I'm going to put down

17   March 11th at 2:00.

18          MR. ATKINS:  Your Honor, Alden Atkins for Hitachi,

19   and I have with me Craig Seebald, and that date works for us.

20          THE COURT:  Works for you.  Okay.  Good.

21          MR. ATKINS:  The one thing I would add with respect

22   to Hitachi is we have pending a motion to dismiss in the

23   motor generators case which is one of the motions scheduled

24   to be heard today.  We would like to suspend consideration of

25   the motion as to Hitachi only, we know that the motion will

1    continue as to Denso, and I believe that Mr. Cherry intends

2    to argue that.

3             In addition, as Mr. Williams stated, we have some

4    cases that are scheduled for motions to dismiss coming up in

5    the next few weeks, that would be valve timing control

6    devices, fuel injectors and inverters, and we would like to

7    follow the same process that Panasonic followed, which is to

8    suspend those dates while we are completing the settlement

9    agreement.

10            THE COURT:  We will adjourn all of those matters

11   without a date pending resolution of this.  Okay.  That takes

12   care of Hitachi, but what about Panasonic, do we have a date

13   for preliminary --

14            MR. WILLIAMS:  What I would suggest, Your Honor, is

15   we will confer with Panasonic's counsel after court today and

16   see if the 11th date will work with them as well, if not we

17   will consult with Hitachi and Panasonic and contact the Court

18   with alternate proposed dates.

19            THE COURT:  Okay.  But right now we are keeping

20   3/11, I'm going to put Panasonic on there, and then you can

21   call to change the date if not so we keep track of that.

22            MR. WILLIAMS:  Thank you, Your Honor.

23            MR. BURNS:  Your Honor, Warren Burns for the end

24   payers.

25            We actually have a pending settlement with T. Rad

Status Conference / Motion Hearings • January 28, 2015

50

```
 1    as well, and we anticipate that we should be able to move for
 2    preliminary approval on the same date.  We will confer with
 3    T. Rad's counsel and hopefully have it teed up.
 4              THE COURT:  Mr. Cuneo, you agree with that?
 5              MR. CUNEO:  Yes, Your Honor.
 6              THE COURT:  Why don't I put all three of them on
 7    for the 11th and if something happens that one of you can't
 8    make it we will have to do another date, that's all, and then
 9    we have dates for them.
10              MR. CUNEO:  Thank you.
11              MR. BURNS:  Thank you, Your Honor.
12              THE COURT:  Thank you.  How about steering angle
13    sensors, is that one of the -- who represents steering
14    angle --
15              MR. WILLIAMS:  If my recollection is correct,
16    sensors are part of the Panasonic settlement.
17              THE COURT:  And the ballast, is that part of
18    Panasonic?
19              MR. WILLIAMS:  I believe they are.
20              THE COURT:  And T. Rad, the automotive transmission
21    fluid --
22              MR. WILLIAMS:  I'm informed that that is correct,
23    Your Honor.
24              THE COURT:  I'm trying to keep track of these
25    parts, you know, I've never heard of them either, so -- all
```

```
 1    right.  That's all of the dates we need to set for the
 2    preliminary approvals, right?
 3              MR. WILLIAMS:  Yes, Your Honor.
 4              THE COURT:  Okay.  Thank you.
 5              MR. WILLIAMS:  Thank you.
 6              THE COURT:  Anything else on the status?  Do we
 7    have any problem on service with the last group or are they
 8    all in process?
 9              (No response.)
10              THE COURT:  No problem.  Okay.
11              MR. CHERRY:  Your Honor, can I just --
12              THE COURT:  Yes, Mr. Cherry.
13              MR. CHERRY:  On scheduling, Your Honor set a
14    schedule for responding to a set of the next wave of
15    complaints, wipers and some other things.
16              THE COURT:  Just before we do that I want to --
17    there is one other I have down here and I think this is part
18    of the Panasonic -- no, the T. Rad, the radiators, is that
19    right?
20              MR. BURNS:  Excuse me, Your Honor, I'm sorry.
21              THE COURT:  For the end payers -- the T. Rad for
22    auto dealers and end payer settlement that's going on the
23    11th also?
24              MR. BURNS:  Yes, Your Honor, we had planned to do
25    it then, we will confirm with Mr. Simmons, T. Rad's counsel
```

1    -- I was actually just e-mailing him.

2              THE COURT:  Okay.  Thank you.

3              MR. BURNS:  Thank you.

4              THE COURT:  All right.

5              MR. CHERRY:  Your Honor, there are two scheduling

6    issues.  So Your Honor set a briefing schedule for the next

7    wave of motions, and one of the issues is we have agreed to

8    follow the same sort of briefing that we did with the last

9    wave, so for state law issues there will be one big brief up

10   to 85 pages that can address those issues so we don't have to

11   do it in separate cases.

12             THE COURT:  Right.

13             MR. CHERRY:  But when Your Honor set the schedule

14   you truncated it and left only one week for the reply and so

15   what we would like -- what the plaintiffs have agreed to is

16   just one additional week, so we have two weeks for that reply

17   because we really need that for that one brief.

18             THE COURT:  So the reply would be due when?

19             MR. CHERRY:  March 20th rather than March 13th, and

20   that would still give you all the time before May 6th so --

21             THE COURT:  May 6th is our next conference?

22             MR. CHERRY:  Yes.

23             MR. SELTZER:  Mark Seltzer for the end-payer

24   plaintiffs, and we are agreeable to that proposal.

25             THE COURT:  Very good.  That's fine.

 1              MR. SELTZER:  Thank you.

 2              MR. CHERRY:  The only other scheduling issue is for

 3     the wipers case, I understand that the direct purchasers

 4     intend to file an amended complaint today.

 5              MR. HOESE:  Your Honor, William Hoese, Kohn, Swift

 6     & Graf for the directs.

 7              Mr. Cherry and I spoke earlier, and it will be

 8     either today or tomorrow, Your Honor.

 9              MR. CHERRY:  So we are going to receive the

10     complaint today or tomorrow, and as it stands motions are due

11     I think February 13th, and so the plaintiffs are amenable to

12     a two-week extension, so we will keep -- what we propose is

13     to keep the schedule Your Honor proposed but just to move

14     everything two weeks out so we have a little more time with

15     that complaint which we haven't received yet.

16              THE COURT:  Okay.  When would that end?  I would

17     like the end date to see if I can get it down.

18              MR. CHERRY:  So two weeks beyond March 13th.

19              THE COURT:  So the end of March, and we have April

20     and May?

21              MR. CHERRY:  Yes.

22              THE COURT:  Okay.  That's fine.

23              MR. CHERRY:  Thank you, Your Honor.

24              MS. ROMANENKO:  Your Honor, just a request for

25     clarification.  With regard to wipers I wanted to clarify we

1   are just talking about the directs' motion, the defendants'

2   motion against the directs' wipers complaint and not the

3   motions concerning the end payer and auto dealers'

4   complaints, I assume those deadlines will stay the same.

5           MR. CHERRY:  Yes, Your Honor, this -- just because

6   we are just now getting the complaint, everything would stay

7   the same with the auto dealers and end payers.

8           THE COURT:  Okay.  It is just the amended complaint

9   that is being filed that he needs the extension so direct

10  purchasers only.  Okay.  Good.

11          MS. SULLIVAN:  Your Honor, I have one more deadline

12  request.  May we have a deadline for the auto dealers to

13  inform defendants whether they will be withdrawing their

14  replacement part claims?

15          THE COURT:  Okay.  Auto dealers, who is going to

16  speak for auto dealers?  Ms. Romanenko?

17          MS. ROMANENKO:  Good morning, again, Your Honor.

18  We think we can inform the defendants by the end of the week.

19          THE COURT:  Okay.  So let's -- we will just say one

20  week from today.  Okay.  Any other dates?

21          (No response.)

22          THE COURT:  All right.  The next item is the status

23  of the temporary stay of the discovery.  Is there anyone here

24  from the DOJ, or I will give you the report that they gave

25  us?

 1        (No response.)

 2        THE COURT:  Okay.  The DOJ says that the document

 3   discovery may proceed on all parts but air conditioning

 4   systems and constant velocity boosters and any new part that

 5   was filed, which we haven't had any new parts recently.

 6   Okay.  Counsel?

 7        MR. WILLIAMS:  Your Honor, Steve Williams for the

 8   end payers.

 9        In light of the DOJ's position I would like to move

10   the Court that, as we did at the outset of all of these

11   cases, when we began the Court had ordered that defendants

12   would provide to the plaintiffs whatever productions they had

13   made to the Department of Justice.  We did that in the first

14   four cases, and that only ceased when the Department came in

15   and asked for the stay.  We are not at least today asking for

16   full merits discovery because we know there are motions being

17   briefed, but it has been our experience that those

18   productions of the DOJ documents have significantly advanced

19   our ability to prosecute, understand the cases, to

20   significantly advance our ability to try to resolve cases,

21   and we don't think that there is any justification to change

22   the approach that the Court had taken.

23        THE COURT:  So you are basically asking the

24   defendants to give you all of the DOJ documents they

25   received?

1        MR. WILLIAMS:  That's correct.

2        THE COURT:  They submitted, excuse me?

3        MR. WILLIAMS:  Yes.  Thank you.

4        THE COURT:  Any defendant want to speak on that?

5        (No response.)

6        THE COURT:  Okay.  Let's follow that same protocol

7   then as to the defendants, if you would submit to the

8   plaintiffs all the documents that you gave to the DOJ.

9        The Government also says that the deposition

10  discovery may proceed on wire harness, fuel sender, heating

11  control panels, instrument panel clusters, bearings, occupant

12  safety systems and anti-vibration rubber parts.

13  Mr. Williams?

14       MR. WILLIAMS:  Thank you, Your Honor.  I don't have

15  a comment on the deposition discovery, I think that is

16  something we would need to address in light of what we have

17  talked about concerning the deposition protocol and timing

18  because I know some of those cases don't yet have motion to

19  dismiss decisions.

20       I wanted to though step back a moment to the

21  Department of Justice documents and see if we can set a

22  deadline for those productions, and also to confirm that, as

23  was done before, that would include translations of documents

24  that were provided by defendants to the department.

25       THE COURT:  How much time did we give defendants in

1    the first four parts, do you recall?

2            MR. WILLIAMS:  I have a recollection, I'm not

3    certain but it was about 90 days.

4            THE COURT:  Defendants, any comment?  Do you think

5    90 days is sufficient?

6            (No response.)

7            THE COURT:  Okay.  90 days.

8            MS. STORK:  Your Honor, Anita Stork.

9            I'm just asking for clarification.  90 days for the

10    later cases from what triggering date?

11            THE COURT:  From what?

12            MS. STORK:  What triggering date?

13            THE COURT:  Let's say 90 days from now, from today.

14            MS. STORK:  Or is it finish of rulings on motions

15    to dismiss because there are a number of cases that just

16    started?

17            THE COURT:  No, no, no, just 90 days from today,

18    not from motions to dismiss.

19            MR. HANSEL:  Greg Hansel for the direct purchasers,

20    Your Honor.

21            The direct purchasers have conferred with the

22    end payers and the auto dealers, and we are -- in light of

23    the DOJ's new, you know, comments on their stay, we are

24    working on a discovery plan for the next three cases after

25    wire harness, which are instrument panel clusters, heater

1    control panels and fuel senders, similar to the supplemental

2    discovery plan in the wire harness case, with the goal of

3    moving the discovery forward in those cases.  So the

4    plaintiffs are working on a proposal which we will eventually

5    present to the defendants on that.

6          THE COURT:  Okay.  Let me -- I hate to even ask

7    this, but I thought I heard some mumblings that there may be

8    three more parts.  Are there more parts that plaintiffs -- is

9    plaintiff -- any plaintiff know about three more parts?  This

10   is not from the DOJ so this is --

11         MR. WILLIAMS:  Your Honor, Steve Williams.

12         Again, if my memory serves me correct, there are a

13   couple of additional parts, the investigations had become

14   public with some guilty pleas probably a few months ago, and

15   we will be filing those but those could have a slightly

16   different presentation to the Court in terms of the

17   relationship between those parts, which is the reason why it

18   has not yet been filed, but I -- we had hoped to have those

19   filed before today, but they will be filed I think within the

20   next two weeks.

21         THE COURT:  Okay.  Thank you.

22         MR. CHERRY:  Your Honor, with respect to the

23   90 days, can we agree that if we think that's going to be a

24   problem we will discuss it with the plaintiffs and try to

25   come to agreement on another date?

Status Conference / Motion Hearings • January 28, 2015

```
 1            THE COURT:  Sure.
 2            MR. CHERRY:  Because we are in several cases and
 3     that might be a problem meeting all of that in 90 days.
 4            THE COURT:  You are in more than several cases.
 5            MR. CHERRY:  We are in several.  Thank you.
 6            THE COURT:  Okay.  Absolutely.  If you can agree on
 7     a different date or you need more time and you agree, that's
 8     fine.
 9            Okay.  We did the next two.  And, again, if there
10     is any other protocols that need to be developed as these
11     come in that you can't use the others, please see Mr. Esshaki
12     about doing that.
13            I have -- okay.  The next settlement conference is
14     May 6th, and we will keep that date.  Then I was thinking for
15     the next conference September 16th.  Does anybody have any
16     known conflicts for that period?
17            (No response.)
18            THE COURT:  We will set May 6th and we will set
19     September 16th.  On May 6th I'm not sure what motions to
20     dismiss, I will have to look at that, will we be looking at.
21     We talked about the extended dates for a couple of those so
22     we will do those.  If there's any other motions that come in,
23     you know, all I ask, regardless of what they are on, is that
24     you give us some time before May 6th to prepare for them but
25     I think we have the list, and then we will look at the next
```

1    group that will come in for September 16th, okay, and have a

2    schedule on those.

3              MR. HANSEL:  Excuse me, Your Honor.  Greg Hansel

4    for direct purchasers.

5              What time on the 16th?

6              THE COURT:  Well, we will do it at 10:00, the same

7    as we do now.

8              We need a briefing schedule for the

9    direct-purchaser plaintiffs' motions for leave to amend the

10   consolidated complaint or has that been -- that was filed on

11   1/26/15.

12             MR. HOESE:  Your Honor, William Hoese again for the

13   direct purchasers.

14             This has been consented to by Denso and Mitsuba, I

15   think, according to what Mr. Cherry has told me.

16             MR. CHERRY:  Yes.

17             MR. HOESE:  So unless Your Honor deems it

18   necessary, we were just going to file it as a consented to --

19             THE COURT:  No, that's great, I just had a note to

20   take care of.

21             MR. HOESE:  Thank you, Your Honor.

22             THE COURT:  All right.  Is there any other matter

23   anyone has before we proceed to the motions?

24             (No response.)

25             THE COURT:  No.  Okay.  We will go into motions.

1   We will take a ten-minute break and then resume on motions.

2   Thank you.

3            THE LAW CLERK:  All rise.  Court is in recess.

4            (Court recessed at 11:06 a.m.)

5                          _   _   _

6            (Court reconvened at 11:21 a.m.; Court, Counsel and

7            all parties present.)

8            THE LAW CLERK:  All rise.  Court is back in

9   session.  You may be seated.

10           THE COURT:  Mr. Spector?

11           MS. SPECTOR:  Your Honor, Gene Spector again.

12           I would like to ask the Court if we can change the

13  date for the status conference in September from the 16th to

14  the week before, to the 9th if possible, because of the

15  Jewish high holidays on the 14th, 15th and then again on the

16  22nd?

17           THE COURT:  Okay.  Let me just take a look.  I can

18  do it on the 9th, that is -- Labor Day weekend would have

19  been the 7th, I don't know if that means anything to anybody,

20  but if you agree on the 9th, we can do it the 9th -- no, the

21  2nd is before Labor Day.

22           MR. SPECTOR:  The 9th is fine, Your Honor,

23  apparently.

24           MR. TUBACH:  The 2nd, Your Honor.

25           THE COURT:  Pardon me?  The 9th is not good for

 1    defendants, is that what we are saying?

 2              MR. MAJORIS:  No, it's good.

 3              THE COURT:  It's good.  Okay.

 4              MR. SPECTOR:  Thank you.

 5              THE COURT:  We will do it the 9th.  Thank you.  For

 6    motions -- I'm sorry, Chris, was that motor generators that

 7    you wanted to take first?

 8              THE LAW CLERK:  Yes, that's the one they wanted to

 9    do.

10              THE COURT:  Just give me a minute to clear up here.

11    All right.  This is defendants' joint motion to dismiss the

12    end payers consolidated class action.  Mr. Cherry?

13              MR. CHERRY:  As to motor generators, yes, Your

14    Honor.  Thank you.

15              So this morning we've spoken with the plaintiffs

16    and I believe have reached an agreement.

17              MR. SELTZER:  Yes.

18              MR. CHERRY:  So for the end payers I understand --

19    we have pointed out, I guess, that they were 38 in our

20    initial motion, we have determined now it is 41 of the 58 end

21    payers who we know did not purchase hybrids and there are

22    some that's unknown still, but I think what we have agreed to

23    stipulate that end payers would dismiss those who didn't buy

24    hybrids, those 41 from the case without prejudice, and we

25    will -- and they will inform us let's say within 30 days of

1    the others when they have determined those unknowns whether

2    they bought hybrids or not and if they didn't they would be

3    dismissed as well.

4          MR. SELTZER:  Yes, Your Honor, Mark Seltzer for the

5    end payers.

6          What we have agreed to is that we will prepare a

7    stipulation and proposed order which will dismiss those end

8    payer named plaintiffs who did not buy a hybrid car or lease

9    a hybrid car or purchase or lease an electric car.  We will

10    verify the identity of those plaintiffs and that will be part

11    of the stipulation.  The case will proceed as to the ten

12    plaintiffs who are conceded to have purchased hybrid cars and

13    who have standing to pursue the case.

14          MR. CHERRY:  Actually as to that, Your Honor, we do

15    have an argument -- a Twombly argument as to the other ten, I

16    guess, who did purchase hybrids which we fully briefed.  We

17    don't believe further argument is necessary on that, but we

18    don't agree that those should not be dismissed, but I think

19    that's along the lines of some of the arguments that you have

20    already heard, Your Honor.

21          THE COURT:  So you're maintaining your Twombly

22    argument as to the ten, it doesn't really make any

23    difference?

24          MR. CHERRY:  Yes, and the point there is really

25    from our perspective the claim rests on a single plea as to a

```
 1   single RFQ involving GM for cars that haven't gone to market
 2   yet, and the ten here bought Priuses and two bought a Camry,
 3   and we just see a disconnect there but we don't think there
 4   is argument necessary beyond that.
 5             THE COURT:  The Court will do an opinion on that.
 6             MR. SELTZER:  We are submitting on the papers too
 7   but I would invite the Court's attention to the Hitachi plea
 8   agreement, particularly paragraphs 2, 4-A and 4-B regarding
 9   the scope of conspiracy.
10             THE COURT:  All right.
11             MR. SELTZER:  Thank you.
12             THE COURT:  Thank you.
13             MR. CHERRY:  Your Honor --
14             THE COURT:  You know, I was going to come to that
15   same conclusion.
16             MR. CHERRY:  Your Honor, as to the auto dealers, we
17   have also spoken about working out a stipulation that would
18   accomplish approximately the same thing with respect to the
19   auto dealers to determine which of these dealerships actually
20   bought hybrids and which didn't and where a dealer has
21   multiple brands which -- for which ones did they actually buy
22   a hybrid and which they didn't.  And I think we would like to
23   try to work out within let's say 30 days some resolution of
24   that and then stipulate to a dismissal without prejudice as
25   to those who did not buy a hybrid and for brands for which
```

1      they did not buy a hybrid so we know what's left in the case.

2                THE COURT:  Okay.

3                MR. CHERRY:  Thank you.

4                THE COURT:  Ms. Romanenko?

5                MS. ROMANENKO:  Your Honor, we are happy to enter

6      into a stipulation with the defendants with regard to motor

7      generators concerning just the standing of the dealerships to

8      bring motor generator claims, and we are hopeful that

9      defendants will withdraw that portion of their motion.  We do

10     want to state for the record that we investigated the claims

11     of those dealers who are listed in the motor generators

12     complaint or who are bringing motor generator claims and we

13     believe, and we named them, that they each had a good-faith

14     basis to proceed in this case.  However, if the defendants

15     can demonstrate to us that some of them should be removed we

16     are happy to negotiate with them on that basis.

17                And Your Honor notes there is another motion coming

18     up on inverters where we believe defendants will raise the

19     same issue.  We hope that the issue about whether certain

20     plaintiffs are able to bring these claims based on purchases

21     of hybrid or electric vehicles is not going come up again in

22     the inverters' motion given the resolution we discussed in

23     motor generators.  If defendants want to meet and confer with

24     us on that issue before they file their motion that's

25     certainly fine but we don't see a need to engage in any

1    further briefing or oral argument on that particular issue.

2              THE COURT:  Okay.  Mr. Cherry?

3              MR. CHERRY:  Yes, Your Honor.  I think we have

4    pointed out at least one auto dealer who did not -- certainly

5    did not buy any hybrids and they have agreed that was

6    inadvertently part of the complaint, and we believe there are

7    a fair number who assert claims on behalf of certain brands

8    that we pointed out didn't sell hybrids, so I expect we

9    should be able to come to resolution on this.

10             THE COURT:  So you are going to work that out with

11   the information that you have and have in the case only those

12   dealers that, in fact, purchased hybrids?

13             MR. CHERRY:  And as to the brand for which they

14   purchased hybrids.

15             THE COURT:  And the brand.  Okay.

16             MR. CHERRY:  Thank you.

17             THE COURT:  Thank you.  And the public entities

18   argument?

19             MR. CAROME:  Good morning, Your Honor.  My name is

20   Patrick Carome.  I'm with the law firm of Wilmer Hale.  We

21   are counsel for Denso.  I'm going to be arguing the

22   collective motion to dismiss in the public entity wire

23   harness case.

24             THE COURT:  Okay.

25             MR. CAROME:  This motion is unlike any that this

1    Court has considered to date in these MDL proceedings.  In

2    this case five local governments from four states represented

3    solely by private counsel seek injunctive relief on behalf of

4    every local government in the entire country, and they also

5    are seeking to assert damage claims on behalf of every local

6    government in 17 states and on behalf of every state level

7    government entity in 9 of those 17 states.

8           THE COURT:  So I wasn't quite clear, so this local

9    unit -- one of these named local units is going to represent

10   for the damages part the state?

11          MR. CAROME:  That's correct and, in fact, there is

12   an interesting hodgepodge.  I mean, for example, the original

13   lead plaintiff in this case, the City of Richmond from

14   California, is purporting to represent eight other states but

15   not its own State of California.  It is a bit of a mystery to

16   us how we got this hodgepodge of claims, they are not

17   bringing -- they are only choosing damages claims on behalf

18   of 17 states, not all of the Illinois Brick repeller states,

19   so there is an interesting hodgepodge of claims being made

20   here by solely private lawyers.

21          THE COURT:  These states did not join Florida in

22   the Florida case?

23          MR. CAROME:  That's exactly right, Your Honor.

24          THE COURT:  And we have no attorney general or

25   anybody like that?

```
 1          MR. CAROME:  That's exactly right, even though it
 2    is nearly a year since City of Richmond filed this action,
 3    not a single government lawyer for any member of the punitive
 4    class or even any of the five local governments that purport
 5    to be named plaintiffs have appeared in this case or have
 6    stepped forward to give any indication whatsoever that it is
 7    okay that this broad government entities proceeding is going
 8    on on their behalf.
 9          THE COURT:  Now we have 11th Amendment issues as to
10    the state?
11          MR. CAROME:  That's correct, I have a chart which I
12    have given to your law clerk and I think we are going to put
13    up on the screen to sort of lay out the arguments, but before
14    I get there a lot is riding on this motion, Your Honor, and
15    on this Court's willingness to decide this motion now rather
16    than letting this case proceed on behalf of a massive complex
17    class of governments.  This is especially so because
18    governments are very different from private litigants.
19          Four months ago in the In Re: Lithium Ion Batteries
20    antitrust litigation, another federal district judge
21    dismissed at the threshold a similarly massive punitive class
22    action on behalf of government entities from across the
23    country.  That court ruled that the sensitive issues that may
24    arise in the context of government plaintiffs and the
25    prospect of massive discovery concerning a class comprised of
```

1    municipal and regional governments across the nation made

2    immediate dismissal of the case both appropriate and

3    necessary.  That result should also be the same here.

4              Referring to the chart, I have laid out -- this

5    chart sort of explains the scope of each of the three basic

6    arguments that the defendants are making here.  On the

7    left-hand in the blue column this just reflects the damages

8    class.  The blue column is the states for which the

9    plaintiffs are purporting to assert state law damages claims.

10   The next column relates to our -- the 11th Amendment issue,

11   those are the -- that second column, the highlight of red

12   with respect to each of those states, those are the nine

13   states that they purport to be bringing claims on behalf of

14   the states and every state level entity, every state

15   university, every state agency, those are all immune entities

16   and we assert dismissal is necessary as to all of those

17   entities based on the 11th Amendment.

18             Then the next column relates to our argument that

19   all of these states -- this applies to all of the 17 states,

20   each of those jurisdictions has laws that specify that only

21   official government counsel for government entities there in

22   general can represent those government entities.  Some allow

23   there to be special circumstances where private counsel can

24   step in in lieu of or in assistance to those official

25   government counsel but there are special detailed procedures

1    for when that has happened and there has been no indication

2    of anything like that has happened.

3              THE COURT:  You argue, yes, that there is no

4    indication that any of these representatives have filed on

5    behalf of their counsel, it is just this private counsel that

6    has filed on behalf of the state?

7              MR. CAROME:  And then just previewing the last

8    argument is the third column, those are the states where they

9    are in red for which there is no named plaintiff from that

10   state, and we have a standing argument there which we think

11   goes well beyond the type of standing argument that this

12   Court has addressed before.

13             So if I may, let me first turn to the

14   11th Amendment sovereign immunity point.  So under the

15   11th Amendment the state and their sovereign subunits may not

16   be subject to federal jurisdictional authority absent a clear

17   and affirmative advance consent and waiver of sovereign

18   immunity.  Therefore to proceed on behalf of state entities

19   the plaintiffs here would have to show that each state entity

20   in the class has affirmatively authorized and consented to

21   this Court's jurisdiction.  They have completely failed to do

22   that, and dismissal is therefore necessary.

23             The plaintiffs concede that the 11th Amendment

24   applies to efforts to include nonconsenting states on the

25   offensive side of the case, which is what is happening here,

```
1    and they also concede I believe that the 11th Amendment
2    applies to class members -- bringing class members into a
3    certified class.  I think the only thing that they contest is
4    whether the 11th Amendment applies with respect to absent
5    class members before class certification.
6           Despite all of the bluster, plaintiffs have not
7    identified a single case in which any federal court has
8    permitted states to remain in a class action in the face of
9    an 11th Amendment challenge.
10          THE COURT:  Even though they may be able to opt
11   out?
12          MR. CAROME:  That's correct, Your Honor.  The key
13   case on this point is the Walker vs. Liggett case, that's the
14   only case to address this issue, and it held that absent
15   states must be dismissed from a class action at the threshold
16   based on the 11th Amendment.
17          Now, while dismissal occurred in that Walker case
18   after there had been a preliminary certification of a class,
19   that happened at the very front end of that case, the court
20   was very clear that this was a matter of threshold
21   jurisdiction, and it used the device of 12(b)(1) -- a
22   12(b)(1) motion as the basis for dismissing from that case
23   all of the state entities that were purportedly included in
24   that case.
25          THE COURT:  Even though in that case they did get
```

Status Conference / Motion Hearings • January 28, 2015

1    to class cert?

2            MR. CAROME:  That was a strange case, Your Honor,

3    it was within a few days of the filing of that case, it was

4    sort of a pre-set-up class.  There was an immediate --

5    without any motions practice or anything there was an

6    immediate filing of a settlement class and a proposed

7    settlement.

8            THE COURT:  But the court decided this on the

9    12(b)?

10           MR. CAROME:  The court decided it at the 12(b)(1)

11   stage, and it dismissed all of the states who were

12   purportedly within that class.  Only a handful of the states,

13   not all of the states who were in that class came forward and

14   objected, but the court spelled out that all of the states

15   had to be dismissed at the threshold because the court simply

16   cannot assert jurisdiction with respect to nonconsenting

17   states.

18           THE COURT:  And there was no state here -- as I

19   looked again at that complaint there is no state that is

20   named?

21           MR. CAROME:  Amazingly, Your Honor, yes, we have a

22   village in New York and a county here and there and a city

23   here and there purporting to assert claims on behalf of

24   states, it is really an extraordinary thing.

25           So Walker rejected explicitly the argument that the

1    plaintiffs make here, which is somehow this whole

2    11th Amendment problem can be made to evaporate by an opt-out

3    proceeding.  Walker said no, you cannot do it, an opt-out

4    proceeding would itself involve the court exercising

5    jurisdiction over states, and that cannot -- that cannot

6    happen.

7              Walker's ruling has been cited favorably by other

8    courts, including the McKesson and Sobel cases, and there are

9    no -- there's no case in which Walker has ever been

10   criticized.

11             So the plaintiffs' main response to the

12   11th Amendment problem here doesn't go to the substance of

13   the problem, it goes -- they argue that the issue is not

14   justiciable, that somehow we, the defendants in this case,

15   don't have standing to raise the issue, and that just doesn't

16   work.  The 11th Amendment issue is a jurisdictional issue, it

17   is jurisdictional in nature, and for that reason the

18   6th Circuit has stated repeatedly that even if no party

19   raises the issue courts can and should, should, that's a

20   quote from multiple 6th Circuit cases, including the Nair

21   case, should raise the 11th Amendment sua sponte to avoid

22   subjecting nonconsenting states to the jurisdiction of a

23   federal court.

24             Courts always have jurisdiction to determine their

25   own jurisdiction, that's one of the most basic things that

1    courts have to do, and questions of standing and they also

2    argue ripeness are simply inapplicable to these kinds of

3    threshold issues.

4        Plaintiffs also argue as we noted that -- their

5    other main argument is as well, yeah, there may be an

6    11th Amendment problem but we are going to solve it without

7    opt-outs.  I have already pretty much addressed that, but an

8    opt-out procedure by definition would either compel each of

9    these sovereign states and all of their state universities

10   and different state-level agencies in the class they would

11   have to come before this Court to request exclusion, and if

12   they didn't then they would be bound by the results of the

13   litigation without ever having consented to it, and Walker

14   said that it is simply inappropriate to require any state to

15   opt out because that would suggest the court claims

16   jurisdiction over the states which it cannot do.

17       Plaintiffs also seem to suggest that well, maybe

18   there can be some sort of special sets of notice here where

19   we can let states give them notice and let them come forward

20   and join the class if they want to.  The problem with that is

21   that Rule 23 has been held time and time again not to permit

22   opt-in classes, and that would be a classic opt-in situation,

23   and that doesn't -- that doesn't solve the problem.

24       Plaintiffs -- you know, I don't think we need to go

25   here but the plaintiffs also suggest well, the states aren't

1    going to be bothered at all if we just kick the can down the

2    road on --

3            THE COURT:  They claim there is no harm until they

4    have the opportunity to opt out?

5            MR. CAROME:  Yes, and that's wrong at two levels.

6    One, the court's exercising -- or purporting to exercise

7    jurisdiction over them itself is the very harm that the

8    11th Amendment --

9            THE COURT:  Even though they don't know about it?

10           MR. CAROME:  Even though they don't know about it

11   and especially because they don't know about it, especially

12   because they don't know about it.  And in addition, you know,

13   there is -- they will also -- to pick one thing that is

14   clear, if the states and the agencies are not dismissed at

15   the threshold we will have to immediately start taking

16   discovery from some of those entities.  As the Court noted,

17   states, you know, are a world of difference from the Village

18   of Northport, New York, and we'll have to be engaged in lots

19   of discovery as to how do they buy their cars, how do they

20   buy their fleets of cars, all kinds of issues to figure how

21   can the Village of Northport and the City of Richmond even

22   represent them.  We -- I think we can be fairly confident

23   that those states are not going to be very happy and it is

24   going to actually present an immediate 11th Amendment issue

25   if we begin --

1      THE COURT: Slow down, slow down.

2      MR. CAROME: -- if we begin serving them with

3   discovery requests.

4      This is not an issue -- the law on this issue is

5   clear, there is nothing more to be developed between now and

6   some further states.

7      THE COURT: Well, it would be interesting to see

8   how our little vacation spot of Traverse City can represent

9   17 states.

10      MR. CAROME: It is quite curious, it is quite

11   curious. It is nine states because they have this

12   hodgepodge, we don't know why they have chosen the nine, no

13   rhyme or reason to it that they have been willing to explain

14   to us. So that's the 11th Amendment arguments.

15      Let me turn now to the government attorneys'

16   statute problem. So as we have laid out in our brief, under

17   state law applicable to all of the jurisdictions included in

18   the damages class and absent exceptional circumstance and

19   special government approvals, state and local governments

20   generally may be represented in court only by their official

21   government lawyers such as the attorneys general, county

22   attorneys, city attorneys. This is a big problem for these

23   public entities here who are represented solely by private

24   counsel, and it is a problem just as much for the named

25   plaintiffs as it is for the absent ones.

```
1              Now let me just give you an example of what these
2    laws are like.  We have given you a full appendix in our
3    briefs of examples -- of the laws in these jurisdictions but
4    at the state level here is New York's executive law 63(1),
5    the attorney general shall prosecute and defend all actions
6    and proceedings in which the state is interested.  The other
7    state statutes are discussed in our memorandum at pages 14
8    and 15 and, as I said, they are in the appendix.
9              At the local level, just an example, the charter
10   for the Michigan cities of Alpena, Cheboygan, Buchanan and
11   Hillside all provide as follows, I quote, the city attorney
12   shall conduct for the city all cases in all courts and before
13   all legally-constituted tribunals whenever the city is a
14   party thereto.
15             So this is -- and the plaintiffs admit that these
16   laws are ubiquitous.  They don't contend that these are -- we
17   have just picked out a handful, they concede that these laws
18   are ubiquitous.  Every published case that has addressed the
19   impact of these types of government attorneys' laws on class
20   actions brought on behalf of government entities has held
21   that these laws preclude class actions on behalf of
22   government entities when they are attempting to be
23   represented by private counsel.
24             THE COURT:  Do we know or have any indication of
25   any delegation of this authority by counsel for the cities or
```

1      the states to private counsel?

2              MR. CAROME:  We asked that even as to the five

3      named plaintiffs here, Your Honor, we asked it in repeated

4      meet and confer sessions and we even went so far as to write

5      a letter before we filed our motion, it is in -- actually

6      those are appendix B and C of our brief are the letters on

7      this.  We asked even to the five named plaintiffs, how is it

8      that you, represented by the plaintiffs, have the authority

9      to proceed just on these five named plaintiffs?  They refused

10     to give us any answer to that question at all, and that's

11     just the five named plaintiffs, we have thousands and

12     thousands of government entities around these 17 states.

13             THE COURT:  So they argue that a named attorney on

14     any pleading -- we don't question whether they have the

15     authority by the plaintiff?

16             MR. CAROME:  That's the difference between private

17     litigants and government entities, Your Honor.  Government

18     entities are a special kind of litigant and they, unlike

19     private plaintiffs, have state laws that specify how they can

20     proceed, and this -- they are different and they must -- they

21     must do this.

22             Now, as I said just -- I said every published case

23     that has considered this has gone our way, and just so the

24     Court has those, those are -- the key cases on this are the

25     Walker case, which ruled on this alternative ground in

1    dismissing the states in that case, the Ackel case from the

2    5th Circuit, and the Dallas County vs. MERS Corp. case.

3            There is also a case that plaintiffs brought to the

4    Court's attention from Nevada, Southwest Gas, relying on the

5    Nevada government attorney statute to dismiss class actions

6    on behalf of all Nevada counties, so the case law actually

7    goes really one way on this issue.

8            Now, they try to argue that a couple of cases from

9    states don't -- you know, have sanctioned this kind of

10   private representation but, in fact, they are wrong about

11   that too.  They point to a case from the California Supreme

12   Court called County of Stanislaus, and that Court -- that

13   case, the Stanislaus case, did not involve any representation

14   of a government entity by a private counsel.  In that case

15   the counsel for the named plaintiff, the County of

16   Stanislaus, was represented by its official county counsel.

17   And the issue in this case actually that was decided and

18   presented to the California Supreme Court involved could it

19   be the county counsel for the County of Stanislaus or the

20   state attorneys general -- the state attorney general that

21   could litigate that antitrust claim in California.

22           The issue of the government attorney statute was

23   not presented at all or decided at all in the California

24   Supreme Court, there was some consideration of that issue in

25   the California Intermediate -- this Court, which plaintiffs

```
 1    have improperly cited in their brief, that case was
 2    depublished by the California Supreme Court and it is
 3    impermissible at least as a matter of California law even to
 4    cite that case, and so there is no decision in California
 5    remotely suggesting that private counsel can represent
 6    government entities.
 7            They also refer to some Texas state cases.  Texas
 8    is not one of the states at issue here, but they point out
 9    that there have been some class actions that have gone
10    forward on behalf of counties -- or actually cities in Texas.
11    The issue of the government attorney statute was not actually
12    at issue in those cases so they don't even stand for it.  And
13    the 5th Circuit in Ackel has made clear that this is a
14    question of Rule 23, and you can't -- you can't -- what Ackel
15    says is you can't do a class action in this fashion without
16    making it an opt-in class contrary to Rule 23 because each
17    and every jurisdiction would have to go through a process to
18    authorize -- both for the named plaintiff and for the absent
19    plaintiffs to authorize representation by private counsel and
20    obviously we haven't even begun -- there is no way that can
21    happen in a massive nationwide effort such as this.
22            So again the plaintiffs' main argument here is to
23    sort of dodge these statutes and say well, those statutes are
24    overridden here by Rule 23 and Shady Grove -- the Supreme
25    Court's decision in Shady Grove Orthopedics vs. Allstate, and
```

```
1    that's their main argument as to how to get around these
2    government attorney statutes, and they are wrong on that
3    score on multiple scores as well.
4         Most fundamentally when that Shady Grove issue
5    comes up when there is a conflict between the state laws that
6    you are talking about and the federal rule, and here there is
7    no conflict except in sort of the way -- sort of the
8    consequence to how these laws end up playing out, but the
9    government attorneys' laws don't have anything to do with
10   class actions and the criteria for when a class action can
11   proceed, they concern the structure of state government, how
12   states and their political subdivisions may act and which
13   officials can control that action.  Rule 23 obviously deals
14   with when is a class action appropriate.
15        These are completely different laws that go in
16   completely different directions, address completely different
17   topics.  There is not a conflict, there is just a problem, it
18   wouldn't be just a class action even if the City of Richmond
19   was bringing this case just on its own behalf without -- as a
20   class action it would still have to comply with this law and
21   get around this problem.  But even if there were a conflict
22   between Rule 23 and the government attorneys' laws, the test
23   for resolving that conflict would actually not be the Shady
24   Grove test, rather it be the much more stringent -- or more
25   stringent, I think Shady Grove is a stringent test as well,
```

1    but it would be the more stringent plain statement test that

2    the Supreme Court has prescribed for determining whether a

3    federal law may be interpreted to override a state law

4    concerning core attributes of state sovereignty.

5         The Supreme Court has made clear that when it comes

6    to matters of state prerogative federal law does not abrogate

7    the state law unless Congress makes it -- makes its

8    intention, I'm quoting it, makes its intention unmistakably

9    clear in the language of the statute, that's the Will vs.

10   Michigan Department of State Police case from the Supreme

11   Court.

12        Government attorneys' laws are within this special

13   sovereign sphere as the Supreme Court has said through, and

14   I'm quoting, through the structure of its government and the

15   character of those who exercise government authority, a state

16   defines itself as a sovereign.  That's the Gregory vs.

17   Ashcroft case.

18        So applying the plain-statement test to this

19   alleged conflict between the state attorneys' laws and

20   Rule 23 makes clear that Rule 23 or the Rules Enabling Act

21   does not displace these state government attorneys' laws

22   because nothing in either of the Rules Enabling Act or

23   Rule 23 makes it, quote, unmistakably clear, close quote,

24   that a federal rule of civil procedure can override a state

25   sovereign determination regarding who may represent the state

```
 1    and its subdivisions.  In fact, the Rules Enabling Act does

 2    just the opposite, it says that the rules promulgated

 3    pursuant to the Rules Enabling Act cannot, quote, abridge or

 4    modify any substantive right, that's the opposite of a plain

 5    statement that Congress intended for these rules to abrogate

 6    something as fundamental as the state's laws regarding how

 7    its government is organized.

 8            THE COURT:  What would it abrogate though even

 9    if -- I mean, Rule 23 --

10            MR. CAROME:  I would say, Your Honor --

11            THE COURT:  It doesn't seem to have much connection

12    with the attorneys -- the government attorneys law.

13            MR. CAROME:  Go back to that New York statute, the

14    attorney general shall prosecute and defend all actions or

15    proceedings in which the state is interested.  Here there is

16    no doubt that the State of New York is an -- interested in

17    this case, and there is no doubt that the state attorney

18    general is not going to be representing the State of New York

19    and the universities of New York and all of those agencies if

20    the case proceeds as the plaintiffs want it to proceed.  I

21    think it is direct abrogation.

22            So that's -- we think that this conflict if it

23    exists would have to be resolved under this plain-statement

24    rule and that clearly the state laws prevail under that even

25    if just -- I won't go into this in too much detail, but even
```

```
 1   if you went to the Shady Grove test for trying to reconcile
 2   this alleged conflict between state law and federal rules,
 3   which we don't believe exist, but even if you went there
 4   there are two prongs to the Shady Grove test.  The first is
 5   do the federal rules and the state laws answer the same
 6   question?  And courts have made clear that in answering -- in
 7   assessing that issue, do the laws and the rule address the
 8   same question, you look at the face of the state laws and the
 9   face of the rule.  And here, you know, perhaps I've already
10   addressed it, it couldn't be clearer I would say that the
11   state government attorneys' laws and Rule 23 don't remotely
12   address the same question, they are addressed at two
13   completely different matters, and that just ends the inquiry
14   at that point and state law prevails.
15           Even if you had to get to prong two, prong two
16   would permit Rule 23 to trump the government attorneys' laws
17   only if such application did not abridge or modify any
18   substantive right under state law, and it absolutely would,
19   we submit.  Plainly the government attorneys law define as
20   substantive state right, i.e., the state's right to delegate
21   to particular public officials the responsibility for
22   representing the state or its divisions -- political
23   subdivisions in court.
24           This Court -- Your Honor's ruling in June and
25   July -- this didn't involve government entities but I think
```

85

```
 1    that your own decision in the wire harness and fuel senders
 2    cases regarding the Illinois statute which says that class
 3    actions in Illinois under the Illinois antitrust laws may
 4    only be pursued by the attorney general, this Court found
 5    that that law was not trumped by Rule 23, and really the same
 6    analysis I would submit applies here.  These government
 7    attorneys' laws are not part of the states' procedural laws
 8    and they clearly address matters of important policy and
 9    sovereign right of the states.
10            THE COURT:  All right.  What about your third issue
11    here?
12            MR. CAROME:  Turning to the third issue, just as
13    you can see from the chart there's no named plaintiff from 13
14    out of the 17 states under the laws the plaintiffs are suing,
15    and we submit for this reason all claims brought under the
16    state laws other than California, Michigan, New York and
17    North Carolina should be dismissed.
18            Now, there are critical differences between this
19    public entity's case and the other auto parts cases in which
20    Your Honor has ruled that this standing -- this type of
21    standing question should be addressed later.  The first of
22    those few differences is there's an extreme disconnect here
23    between the named plaintiffs and the states that are covered
24    by their punitive class.  I mean, in prior cases that Your
25    Honor considered there was only one or a couple of states
```

1    that were without representation by the named plaintiffs.

2    Here the entire size and shape of this case would be

3    fundamentally altered and the burden of litigation would be

4    greatly increased by permitting this case to proceed on

5    behalf of government entities in 17 states rather than four.

6            The second big difference between this case and the

7    prior decisions by this Court on standing matters is that

8    there is a big difference, as I said before, between

9    government entities and private plaintiffs but it is quite

10   specific here.  Private plaintiffs move from state to state,

11   they are free to do so and as we know people move around

12   during their lives and so it is at least conceivable that

13   private plaintiffs -- end payer plaintiffs may have made a

14   purchase in the state that is different from which they now

15   live or that they went and purchased a car outside of their

16   own home state.  Government entities are quite different.  By

17   definition government entities don't move around the country,

18   they stay in one place, and they also have special reasons

19   and sometimes even laws to buy products like automobiles for

20   their use within their own borders at home.

21           So this Court indicated in the bearings part case

22   that the inability of a nonresident of a state to bring a

23   claim under that state's laws is certainly a consideration,

24   and I would say even a basis, for dismissing for lack of

25   standing where there is no instate plaintiff for that, and so

```
1    I think that the Court has already set itself on a path
2    towards dismissing in this situation.
3              THE COURT:  Let me back up.  There really are no
4    named states here, there are municipalities -- I keep asking
5    this question but the way the argument goes I get confused
6    again.  There are --
7              MR. CAROME:  We have one village, two cities and
8    two counties.
9              THE COURT:  Within these states while --
10             MR. CAROME:  Those five named plaintiffs come from
11   four states.
12             THE COURT:  But they have not named those states, I
13   mean, they are not a named plaintiff?
14             MR. CAROME:  There is no state or state level
15   agency, we don't have the University of California, City of
16   New York, et cetera, none of those -- we don't have a state
17   entity at all.
18             THE COURT:  Okay.  I just want to get that clear
19   because by the argument I'm getting a little confused as
20   to --
21             MR. CAROME:  So we think that it is important,
22   because of the differences I pointed to it makes a lot of
23   sense for this Court not to kick the can down the road on the
24   standing question; to allow the case to proceed here would be
25   really extraordinary I think.
```

```
 1            So lastly, in the later part of the briefing we
 2   cited a number of specific statutes, Maryland, Nevada, West
 3   Virginia, Iowa and Nebraska, which all make it very clear we
 4   submit that a government that under -- for example, under
 5   Maryland's law only the State of Maryland itself or one of
 6   its political subdivisions could bring an action under
 7   Maryland law -- Maryland's antitrust law.  Maryland's
 8   antitrust law does not allow a California government entity
 9   to sue under the Maryland law.  And I think that's probably
10   true for all of these state laws but specifically for
11   Maryland, Nevada, West Virginia, Iowa and Nebraska, that's
12   very clear on the face of the statute, that's just another
13   reason why there is a massive standing problem here.
14            THE COURT:  Okay.  Thank you.
15            MR. CAROME:  Thank you.
16            THE COURT:  Let's hear what plaintiff has to say.
17            MR. NOBLIN:  It is barely but good afternoon, Your
18   Honor.
19            THE COURT:  Good afternoon.
20            MR. NOBLIN:  I'm Rob Noblin of Green & Noblin for
21   the public-entity plaintiffs.
22            Defense counsel stated more than once --
23            THE COURT:  How do you spell your last name?
24            MR. NOBLIN:  N-O-B-L-I-N.
25            THE COURT:  Thank you.
```

```
 1          MR. NOBLIN:  Sure.  Defense stated more than once,
 2    I wrote this down, government is different than private
 3    litigants, and he said I think that was a big difference but
 4    in this context that's actually not true.
 5          THE COURT:  How is that?
 6          MR. NOBLIN:  The reason we know that is a U.S.
 7    Supreme Court case interpreting the federal antitrust law and
 8    the County of Stanislaus case interpreting the California
 9    Cartwright Act.  Each of those cases drew a distinction when
10    you are talking about a government plaintiff in an antitrust
11    action, and on one side of the distinction is when the
12    government is exercising sovereign or quasi sovereign powers,
13    in other words, prosecuting for criminal antitrust violations
14    or seeking to impose civil penalties for those violations.
15          On the other side of the distinction is when a
16    government entity is suing for injury to its business or
17    property.  On that side of the distinction government
18    entities are simply another consumer.  As the County of
19    Stanislaus case --
20          THE COURT:  But when you read the laws of those
21    states regarding counsel representing them it sounds like
22    they require their own attorneys to represent them even when
23    they are claiming injuries to themselves?
24          MR. NOBLIN:  Well, those statutes talk about -- for
25    example, counsel quoted some Michigan municipal statutes that
```

1    said the city attorney must represent the city when the city

2    is, quote, a party thereto, close quote.  The absent class

3    members here are not parties.  The law is clear on that that

4    they are not parties and therefore those statutes don't apply

5    on their face.  They aren't retaining us, just like in a

6    consumer class you would not --

7            THE COURT:  But who is retaining you, you have got

8    four municipalities -- four or five, I forgot?

9            MR. NOBLIN:  We have five.

10           THE COURT:  You're claiming -- five municipalities

11   and you're claiming that they represent states, the

12   municipality, the little city represents the state?

13           MR. NOBLIN:  We maintain that they are named

14   representatives of all the absent class members, the nine

15   states we are talking about, I should emphasize out of this

16   class the states are nine, that they represent all of the

17   members of the class.  Now, as to their adequacy to do so

18   that's an issue for class certification but that's a far cry

19   from saying that these statutes prevent anyone from

20   representing government entities as absent class members,

21   something that has not been held by any of these states

22   themselves.

23           Now, as we are -- when we are trying to apply state

24   statutes the job here is to predict how the Supreme Court of

25   that state would apply the statute.

1        THE COURT:  So let me -- I have to stick with these

2    municipalities.  So you have authority from these

3    municipalities to sue on their behalf?

4        MR. NOBLIN:  Yes, Your Honor.  So the -- but if I

5    could return to that point about that the government here

6    when they are acting this way they are acting like consumers?

7    County of Stanislaus said, quote, counties that have been

8    injured by price fixing are no different than other persons

9    or businesses that have been injured by such conduct, close

10   quote.  The court went on to make that clear that that

11   includes the power to bring a class action in federal court

12   based on the state antitrust law.

13       THE COURT:  That's the County of Stanislaus?

14       MR. NOBLIN:  Yes, Pacific Gas and Electric vs.

15   County of Stanislaus, and the quote I read appears at

16   947 Pacific 2nd at 300.

17       So when we come to that point that Your Honor

18   raised about representing -- these class members representing

19   states and others, the absent class members, as I said,

20   aren't parties therefore the statutes that say who can

21   represent a city or county as a party are inapplicable.  Here

22   the absent class members, just as in all the consumer

23   classes, they are protected by the court and the named

24   plaintiffs, and then through class certification the various

25   obligations to the class as a whole but class actions would

```
 1   be impossible if somebody had to run around and retain all
 2   the individual members of the class, that's one reason why we
 3   have class actions.
 4        The other point is that the purposes of these
 5   statutes about retaining private counsel would not be
 6   furthered by applying them here.  The cases we cite in our
 7   papers make clear there are two purposes behind these
 8   statutes.  One is to control who exercises the sovereign
 9   power of the government, but as the Hawaii case and the
10   County of Stanislaus I just referred to you indicate, here we
11   are not talking about an exercise of sovereign power, here we
12   are talking about a government who suffered damage to its
13   business or property by buying something just like consumers,
14   so in this context they should be treated like consumers.
15        The other rationale for these statutes is to
16   protect the public fisc to prevent unwarranted expenditures
17   of public funds, but that rationale clearly doesn't apply
18   hereto because the absent class members are not going to have
19   to pay the attorneys' fees and litigation costs and, indeed,
20   if things go well the public fisc will receive revenue, not
21   an expenditure from this.
22        Turning to the 11th Amendment point, we think the
23   standing situation is very different here from the
24   6th Circuit cases as cited by defendants because in those
25   cases the state was a named defendant, and so the state can
```

1   raise the issue itself or the court could sua sponte say to

2   the state is there any realistic prospect the state would

3   want to be a defendant here.

4          We are in a much more unusual situation where the

5   state here is an absent class member of a plaintiff class,

6   and in that context the state may well want to waive its

7   11th Amendment rights, there are benefits to doing so in

8   terms of perhaps being able to recover for alleged harm

9   through the usual class process.  The 11th Amendment entitles

10  the state to make that choice, not the defendants, because

11  the state is going to weigh the benefits and costs of

12  allowing this to go forward.  The defendants, their only

13  incentive is to get the state out of court, so they can't

14  possibly fairly weigh the competing considerations the state

15  would.

16         THE COURT:  But the state would be in the class

17  until it opts out?

18         MR. NOBLIN:  Well, that's true for everybody.  I

19  mean, until the class is certified there is nothing for them

20  to do --

21         THE COURT:  Right, but isn't their sovereign

22  immunity impinged by automatically being a member of the

23  class until such time as they opt out?

24         MR. NOBLIN:  I don't believe so.  They are -- there

25  is no binding consequence that happens to them until they

```
 1    have to decide whether to be in or out of the class.  As for
 2    any precertification discovery, it is the rule in this
 3    circuit that there would have to be a particularized showing
 4    approved by the Court for such discovery and that since they
 5    aren't parties that discovery should be conducted as -- by
 6    way of witness discovery and it's long been held that the
 7    11th Amendment does not preclude states, just like every
 8    other witness, from having to comply with witness discovery.
 9             THE COURT:  Okay.
10             MR. NOBLIN:  The cases relied upon by defendants --
11    well, some just don't get as far as they want.  The
12    defendants cite the Ackel case but in Ackel the plaintiff
13    conceded all the big points that we're arguing here including
14    Shady Grove and the applicability of the statute, they
15    conceded that they would have had to get retention agreements
16    for every absent class member, we certainly do not.
17             In the Walker case, which is only really on the
18    11th Amendment, they -- Walker did not even try to construe
19    Rule 23 in a Constitutionally permissible manner, which is
20    its obligation, and then referred to those 11th Amendment
21    cases that really say it is a matter of consent, is the state
22    consenting to the jurisdiction, and what do you need to
23    establish that consent.  We believe that Rule 23 opt out is
24    sufficient in that the state's probably in a lot better
25    position to respond to one of those than is a typical
```

1    consumer.

2         THE COURT:  Well, you're talking about assuming the

3    class is certified notifying every state, municipality,

4    governmental entity all over and if they don't opt out of

5    course they are in the class for which they may not have

6    waived -- they may simply ignore it like we all ignore a lot

7    of these notices for class actions, so here they are in the

8    class without any waiver or any of their own attorneys if

9    these laws apply coming in.

10        MR. NOBLIN:  Well, first I would like to draw the

11   line between the nine states which have an 11th Amendment

12   argument and all the other local government entities --

13        THE COURT:  Which do not.

14        MR. NOBLIN:  -- which do not.

15        We are only talking about the nine states as to

16   waiver, and that's where we pointed out in our papers we

17   believe this is an issue more suited for certification, what

18   exact sort of notice do you want to give the states.

19        THE COURT:  And why do we have only nine states,

20   why not all the states except for Florida of course?

21        MR. NOBLIN:  We have various -- we looked at the

22   facts and the law of each one as we proceeded and through the

23   meet and confer process, and we believed that this was the

24   most appropriate plaintiff grouping for strategic purposes.

25        THE COURT:  It must be very strategic because I

```
 1    don't know -- I mean, certainly the states know about this
 2    one would assume, we have got Florida in here and once one
 3    attorney general files something we know just from past
 4    actions that they all know about it.
 5           MR. NOBLIN:  We certainly know that a lot of states
 6    are aware of the litigation, yes, Your Honor.
 7           THE COURT:  So you are just saying these states you
 8    don't want to get in there but don't worry about it because
 9    we will get you in there anyway?  I'm having a hard time with
10    this concept.
11           MR. NOBLIN:  We filed a complaint shortly before
12    that we believed was a possible statute-of-limitations state
13    but we thought would preserve the rights of some states but
14    if any state objected we certainly wouldn't go forward in
15    their name, you know, because we know that if they assert
16    that 11th Amendment right they wouldn't be here for long.
17           THE COURT:  Or could they decide not to assert
18    their 11th Amendment right by not having their attorney
19    general file an action?
20           MR. NOBLIN:  Well, now you are having to read the
21    tea leaves.  There's are a lot of reasons why an attorney
22    general --
23           THE COURT:  Well, I am --
24           MR. NOBLIN:  -- wouldn't file an action besides the
25    11th Amendment.
```

1    THE COURT:  I agree, I'm just trying to get over

2  this how you can as a municipality bring in all of these

3  states.

4    MR. NOBLIN:  Well, all nine of the states we are in

5  the class but I don't want that part of the case to get

6  conflated with all the thousands of municipalities which

7  don't have an 11th Amendment right to assert.

8    THE COURT:  Okay.

9    MR. NOBLIN:  The Dallas County case really gave no

10 reasoning for extending these statutes to absent class

11 members, didn't mention Shady Grove at all, and distinguished

12 the City of San Benito in which the Texas Supreme Court said

13 sure, Texas local government entities can be in a class

14 action and the distinctions are completely unpersuasive as

15 far as distinguishing cities from counties and distinguishing

16 the Texas statute from Rule 23 when they are virtually

17 identical on the pertinent points.

18    The County of Stanislaus case that was derogated by

19 defense counsel we think is right on point because the issue

20 there was a particular county government official was

21 asserting a class action of all others similarly situated

22 including all the other California counties, so as to those

23 California counties they weren't being represented by their

24 own county counsel, and the court said that's not a problem

25 at all, the case should proceed.

1          If I could turn to Shady Grove because we think

2     that does govern here.  When it comes to -- defendants say

3     that it doesn't because Rule 23 and the statutes answer

4     different questions, but that's clearly wrong and we know

5     that from Shady Grove itself where under prong one as it is

6     put, which we believe defendants have overstated, in Shady

7     Grove it was put this way, quote, we must first determine

8     whether Rule 23 answers the question in dispute, close quote.

9     And that -- and the Supreme Court said it did because

10    plaintiffs there just wanted to proceed under the rule, they

11    just wanted to establish typicality and numerosity and common

12    questions and proceed, and that's what we want to do.  It is

13    defendants here as defendants did in Shady Grove that said

14    oh, no, there are these other provisions that keep you from

15    doing that.  So prong one is clearly met.

16          And when you get to prong two we believe defense

17    counsel has just misunderstood the Shady Grove as far as what

18    it is saying about substance and procedure and how they

19    interrelate.

20          THE COURT:  Well, let's stick with prong one a

21    minute which says that Rule 23 answers the question in --

22    must answer the question in dispute.  What is the question in

23    dispute?

24          MR. NOBLIN:  Can we proceed -- can our named

25    representatives proceed in a class action in representing

```
 1    these absent class members?  And we want to do so by meeting
 2    the elements of Rule 23.
 3             THE COURT:  How does Rule 23 answer that question?
 4             MR. NOBLIN:  As they said in Shady Grove, it
 5    provides the exclusive mechanism for proceeding on a class
 6    action.  If you meet its elements you may -- and it is the
 7    plaintiff's option, you may proceed as a class action.  Those
 8    are all the elements we need to meet.  Defendants are trying
 9    to erect other hurdles to doing so.
10             THE COURT:  Okay.  Question two?
11             MR. NOBLIN:  On prong two -- and I think it becomes
12    clear when you see prong two as well as how this should work,
13    both the plurality in Shady Grove and Justice Stevens were
14    completely in agreement that sometimes the federal rules will
15    override state substantive matters.  That's not the question.
16    In fact, the Shady Grove plurality would say as long as the
17    federal rule is procedural it will trump the state provision
18    and since the Federal Rules of Civil Procedure almost all
19    proceed they are always going to trump.
20             As for requiring a plain statement of that, the
21    plain statement of that intent is in the Rules Enabling Act
22    itself and Shady Grove is the last word on the U.S. Supreme
23    Court interpretation of that statute, but we have to look at
24    Justice Stevens carefully because his vote turned the
25    plurality into a majority.  And he wanted to create a narrow
```

 1  exception going beyond the plurality, and his exception is if

 2  a state is creating a cause of action it can define the

 3  limits of that cause of action short of the federal rules and

 4  the federal courts should respect that.

 5       And we know that from the dialogue essentially

 6  between Justice Stevens and the plurality on a case called

 7  Sibbach v. Wilson decided a year after Erie in which it was a

 8  state personal injury action in federal court on diversity

 9  and the defendant wanted a physical exam which he could get

10  under federal rules.  The plaintiff there said well, I

11  wouldn't be subjected to that in state court and that's an

12  important right I have, an important substantive right, yet

13  Sibbach followed the federal rules, and they did so in

14  language which I think undermines what defendants are saying

15  about the importance of these state statutes because Sibbach

16  said that's not the test.  Quote, if we were to adopt the

17  suggested criterion of the importance of the alleged right we

18  should invite endless litigation and confusion where it's

19  confounded, close quote.  It is not the importance.

20       What Stevens -- Justice Stevens indicated what is

21  important when he described Sibbach v. Willis as, quote,

22  reasoning that the phrase substantive rights embraces only

23  those state rights that are sought to be enforced in the

24  judicial proceedings, close quote.  In other words, the cause

25  of actions being asserted in the case itself.

1    Now, I know this is all pretty abstract but

2    fortunately Justice Stevens gave us a practical test for at

3    least determining when this exception doesn't apply, and he

4    said if the provisions being asserted would apply not only to

5    the causes of action at issue but other causes of action of

6    that state or the laws of other states or federal claims then

7    we know it can't be part of the state's definition of that

8    single cause of action.

9        We know from this motion that the defendants

10   flunked that test because they are not trying to dismiss our

11   state claims, we have a federal claim under the federal

12   antitrust laws for injunctive and equitable relief, and they

13   want to throw that out on these same grounds, so under

14   Justice Stevens' test the state grounds do not apply and

15   Rule 23 does, and I think it is actually an illustrative

16   contrast of when the exception does apply with what Your

17   Honor did earlier with the Illinois Antitrust Act that was

18   referenced by defense counsel.  That act within the Antitrust

19   Act itself says this act will not be enforced by a class

20   action and that fits what Justice Stevens is saying, it is

21   defined in that cause of action that won't include a class

22   action, we will respect that.

23       THE COURT:  Okay.

24       MR. NOBLIN:  For all of these reasons, there is a

25   long history and we cited it in our papers of class actions

1   consisting of government entities.  There is no way that can

2   happen if defendants' arguments prevailed.  And it is

3   important to understand that the logic of defendants'

4   argument does not depend upon the class consisting only of

5   government entities.  If that logic is followed in the class

6   of all purchasers of some item that was allegedly

7   overinflated by an antitrust violation all of those classes

8   would have -- the government entities would have to be

9   stripped out.

10          So that leaves us that if these government entities

11  wanted to recover they would have to -- in every case across

12  the country they would have to retain counsel and appear on

13  their own behalf, and that's just not practical.  I think

14  defendants admit that's not practical and would thwart the

15  case, but it has real-world consequences.  For example, the

16  County of Oakland here in Michigan has about 1.2 million

17  residents, it has 12 full-time lawyers and one part-time

18  lawyer in the civil unit applicable.  They have to handle all

19  the suits against the county at which there are over 100 at

20  times, and each attorney gets about 116 requests per year for

21  legal advice from within the county.

22          There is simply no way that they can retain and

23  appear in all of the cases, which means that what the

24  defendants are arguing is essentially the government agencies

25  should never be entitled to recover as consumers in

1   class-action cases, and, one, that would give defendants an

2   incentive -- would decrease the deterrence for them to

3   violate antitrust laws and everybody else, but it is also

4   nothing that any of the -- I would think many taxpayers in

5   these entities would want to see that other consumers can

6   recover except the one that spends their tax dollars.

7          THE COURT:  Okay.  Thank you.  Brief response?

8          MR. CAROME:  Thank you, Your Honor.  I think most

9   of what counsel just said was already pretty much addressed

10  in my opening so I'm not going to try to cover everything at

11  all.

12         The County of Stanislaus, I just want to emphasize

13  again that there was no private counsel involved in the

14  California County of Stanislaus case, it was only government

15  counsel was involved.  And the issue of the application of

16  the California government attorney statutes was not addressed

17  in the California Supreme Court, so that is not -- that's not

18  really relevant here.

19         Counsel said that they -- he's now finally said

20  they have authority from these five government entities to

21  sue, that's more than he was actually willing to say when we

22  wrote them about this.  But we have moved for a more definite

23  statement under Rule 12(E) spelling out exactly how that is

24  the case so we can then respond to it and see whether, in

25  fact, what they are doing here is in conformity with the laws

1    of these local jurisdictions.

2         The -- one of counsel's last points was well, this

3    is going to leave the government entities out in the cold

4    somehow.  Not at all.  The tried and true way for these kinds

5    of claims to be litigated is through actions by the state

6    attorneys general on behalf of sometimes even the people of

7    the state but certainly it can be on behalf of the government

8    entities within the state.  So this not a question of anyone

9    being left out in the cold, these issues can be addressed in

10   a far more appropriate way that conforms with these laws

11   through parens patriae actions on behalf of or other actions

12   on behalf where the state AG is running the case.

13        I think the other points have already been

14   addressed.  Thank you very much for hearing us out at such

15   length.

16        MR. NOBLIN:  Your Honor, if I may, just two brief

17   points in response to what was just said?

18        It is just not true that there was no private

19   counsel involved in the County of Stanislaus, there was for

20   the County of Stanislaus in addition to the county counsel.

21        THE COURT:  What are you saying, there was private

22   counsel along with --

23        MR. NOBLIN:  Along with the county counsel in

24   County of Stanislaus.

25        THE COURT:  Okay.

1       MR. NOBLIN:  And then as far as the argument that

2   the state attorney general can always bring all of these

3   actions for the local government entities, that's not always

4   true either.  In the State of California the state attorney

5   general cannot represent the local government entities and

6   also then you run into the simple fact of limited

7   prosecutorial resources and that there is simply no way they

8   can bring every valid claim that they have and thus they

9   should be entitled, as are other persons and corporations, to

10  bring it by way of a class action which was designed for the

11  situation where individuals may not be able to bring it for

12  themself.

13      THE COURT:  Okay.  Thank you.

14      MR. NOBLIN:  Thank you.

15      THE COURT:  All right.  The Court will issue an

16  opinion on that interesting issue.

17      What's our next motion?  This is the

18  vertical/horizontal motion?

19      MR. SKLARSKY:  Yes, that's a good description, Your

20  Honor.

21      THE COURT:  Okay.

22      MR. SKLARSKY:  I am Charles Sklarsky.  I represent

23  Mitsubishi Electric Company in this matter and the other

24  cases.  I'm here with my colleague, Dan Fenske.

25      I'm speaking on behalf of all of the defendants

 1   with regard to the joint motion that we filed and on behalf

 2   of Mitsubishi and Mitsuba on behalf of the motion that

 3   Mitsubishi filed on its own behalf and in which Mitsuba

 4   joined in.

 5          We filed this motion because we believed after

 6   reading the complaint that it raised an issue the Court had

 7   not considered before in connection with the auto parts

 8   cases.  We have also raised -- and that's the

 9   vertical/horizontal issue that Your Honor has referenced.  We

10   have raised a number of other motions -- issues in the

11   motions, but I only intend to address the vertical/horizontal

12   issue in argument today.

13          THE COURT:  I realize the other motions are there.

14          MR. SKLARSKY:  They are there but we stand on the

15   pleadings with respect to those.

16          THE COURT:  But you do -- you argue about this

17   vertical/horizontal but plaintiff in response has said, and I

18   would like you to address this, that's not what they said in

19   their complaint.

20          MR. SKLARSKY:  And I will address that and that's

21   really where I will direct the argument.

22          THE COURT:  Okay.

23          MR. SKLARSKY:  But before I get to that specific

24   issue I think it is important by way of background because it

25   would help us understand the horizontal/vertical issue to

1   understand the defendants in this case and the differences

2   between them --

3        THE COURT:  Okay.

4        MR. SKLARSKY:  -- based on what the complaint says.

5        So there are four defendants.  The first defendant

6   is JTEKT.  JTEKT is a manufacturer of electric power steering

7   assemblies, so what they sell is a finished product to

8   various markets, primarily to OEMs, original equipment

9   manufacturers, to the Fords, the Chryslers, the Nissans, the

10  Hondas of the world.  They entered a plea of guilty with

11  respect to sales of those finished power steering assemblies

12  to manufacturers.

13       Showa, the other defendant, is also a manufacturer

14  and seller of these finished power steering assemblies, and

15  they entered a plea of guilty in connection with the sale of

16  a different kind of assembly than JTEKT manufactured or pled

17  to but nonetheless a finished power steering assembly.

18       There is Mitsuba, the third defendant.  It is a

19  maker of electric motors and seller of electric motors, and

20  that motor is one component of this finished electric power

21  steering assembly.

22       THE COURT:  But does the complaint say that Mitsuba

23  also manufactured power steering assemblies?

24       MR. SKLARSKY:  Only by way of definition.  The

25  plaintiffs in the complaint say a broad statement that all

1     defendants -- all four defendants manufactured and sold,

2     rigged bids and allocated markets in connection with the sale

3     of power steering assemblies, but then the complaint goes on

4     to define power steering assemblies as including all of the

5     component parts. So what the plaintiffs are saying, if you

6     sold an electric motor, put aside the issue of to whom you

7     sold it, if you sold an electric motor you have by their

8     definition sold an electric power steering assembly. Now,

9     that's sort of a slight-of-hand definition but that's what

10    they plead in their complaint.

11         It is like saying that if you sell a car and I --

12    my company sells a tire that goes on that car by definition I

13    have sold a car. It is clearly not the case but that's what

14    their complaint says, but I think we can get away from that

15    issue because of the response they filed.

16         So Mitsubishi is like Mitsuba, it makes motors and

17    it sells those motors. Neither Mitsuba nor Mitsubishi has

18    entered any guilty plea with respect to motors. So we said

19    well, who do we sell these motors to? We sell them to

20    companies that make these finished assemblies that a motor is

21    one component and that's to whom we sell those products. So

22    right away on the face of the complaint we have got two

23    defendants that are customers in the category of people that

24    are our customers, so that's a very unusual situation. So

25    that would be -- and if that were the sales they were

1    including that would be a vertical conspiracy.  That's the

2    basis of our motion.

3          In response and in briefing plaintiff said no,

4    that's not the sales we mean to have as part of this

5    conspiracy.

6          THE COURT:  So they may be but that's not what they

7    are talking about.

8          MR. SKLARSKY:  Well, their complaint doesn't make

9    that clear and obviously I don't think they can amend their

10   complaint by the briefing on the issue.  If that's really

11   what they are saying then they ought to amend their complaint

12   to make it clear that they are not including sales that

13   Mitsubishi or Mitsuba made to these assembly manufacturers.

14   They ought to say that.  But if that's really their position

15   that addresses the issue of whether there is a vertical or

16   horizontal conspiracy, if they eliminate those sales that

17   eliminates the verticality issue, but it begs the question of

18   what are they saying the conspiracy is?  Are they saying that

19   they are conspiring -- that all four defendants are

20   conspiring with respect to the sale of finished assemblies to

21   automobile companies?  I mean, that would be a horizontal

22   conspiracy if that's what they are alleging, but if they are

23   alleging that they would have to establish some facts to show

24   that, indeed, Mitsubishi and Mitsuba even make finished

25   assemblies, they would have to plead some facts to show that

1   a conspiracy existed because they can't rely on guilty pleas,

2   we didn't plead guilty in those areas.  You know, when did

3   this conspiracy start?  What communications were there?  Who

4   was involved with them?  What RFQs were at issue?  I don't

5   believe they can plead those in good faith.

6          Or are they saying that the conspiracy is that the

7   two assembly -- finished assembly manufacturers, JTEKT and

8   Showa, conspired with the motor manufacturers to rig the bids

9   in the sale of motors to the motor customers?  If that's what

10  they are saying that would be a horizontal conspiracy but it

11  would be an implausible one.  Why would the assembly

12  manufacturers want to raise the price of motors which they

13  buy from us?

14         Or are they saying the opposite, that the motor

15  manufacturers conspired with the assembly -- finished

16  assembly manufacturers to rig the bids on the prices of the

17  finished assemblies?  That would make no sense, but I suppose

18  that would state a horizontal conspiracy but it is

19  implausible.

20         Or are they saying both?  You can't tell from this

21  complaint, and their response is not helpful on that point,

22  it only eliminates the vertical issue.

23         Their other response is, well, it is horizontal so

24  it is just like wire harness, but it is not wire harness.

25  Wire harness really didn't have defendants that sold to each

1    other these parts.  It didn't have that issue.  So they have

2    cured that issue but they still leave us wanting to know what

3    conspiracy are they alleging?  Why is it plausible and what

4    are the facts because they don't have guilty pleas for

5    Mitsuba or Mitsubishi that they can rely on?  That's really

6    the essence of our argument.

7            THE COURT:  Okay.

8            MR. SKLARSKY:  Thank you.

9            THE COURT:  Let's get them to answer those

10   questions.

11           MR. WILLIAMS:  Good afternoon, Your Honor.

12   Steve Williams for the end payers.

13           I want to get right to the answer of the question

14   but I kind of feel like this is old wine in new bottles.

15   This is a motion to dismiss, there is no discovery and, in

16   fact, these defendants, including this defendant, when we

17   asked back last summer for them to tell us what are the parts

18   that were involved in their guilty pleas, they refused, they

19   would not tell us and they were not required to, but now they

20   come and say well, you didn't say who met with who, you

21   didn't say what was the agreement, we don't have to do that

22   at the motion to dismiss.  So what did we plead?  We pled

23   exactly what our complaint says and exactly what we say on

24   page 1 of our brief.  We allege based on what we know now,

25   which is very little, that these four defendants conspired to

1    fix the price of electronic powered steering assemblies which

2    include steering motors.  Okay.  So all four of these

3    defendants make those parts, as counsel said.

4        THE COURT:  I'm not understanding that.  They

5    conspired to fix the power steering assemblies which include

6    motors?

7        MR. WILLIAMS:  Correct.

8        THE COURT:  Right.

9        MR. WILLIAMS:  And there is no reason why those

10   defendants who make those parts because the motors are

11   required to be part of the assembly could not conspire

12   together to fix the prices to the OEMs, and, in fact, all of

13   them have pled guilty to fixing the prices of parts they sell

14   to OEMs.

15       THE COURT:  But even if some of them don't do the

16   finished product, even if they don't do the assemblies --

17       MR. WILLIAMS:  Correct, it doesn't matter.

18       THE COURT:  -- they still conspire on the motors,

19   but why would the assembly manufacturer conspire on the cost

20   of the motor?

21       MR. WILLIAMS:  Well, one, because they conspired to

22   fix the price to manufacturers.

23       THE COURT:  Except to keep it low.

24       MR. WILLIAMS:  Two, we are alleging a price cartel

25   and we are alleging market allocation, and I don't want to

1    keep repeating we don't have discovery but we don't.  So it

2    is very plausible that when Nissan, who JTEKT, Mitsuba and

3    Mitsubishi have all admitted fixing prices to, say we need a

4    new electronic power steering assembly that Mitsuba, JTEKT,

5    Mitsubishi say we are going to respond to this bid from

6    Nissan, we want to coordinate the pricing, we want to make

7    sure this time JTEKT and Mitsubishi get the business,

8    Mitsuba, you will get it next time, you bid lower, now JTEKT

9    and Mitsubishi get together and say what prices are we going

10   to put in so we can raise the numbers to the level we want

11   without arising the suspicions of Nissan.

12          Now, the point of all of this, and counsel may get

13   up and say that's not in your complaint, our point is it

14   doesn't have to be in our complaint, that is what discovery

15   is going to tell us.  For now the question is have we

16   plausibly pled enough to let us go forward in discovery to

17   find out if there is a claim here.  I don't see how they

18   could argue we don't other than through discretion of it is a

19   horizontal rule of reason conspiracy, and it is not, or to

20   say Matsushita, that Supreme Court court case about summary

21   judgment standards that says you have to exclude

22   possibilities, we should import that standard to the motion

23   to dismiss stage which the Supreme Court in Iqbal went

24   carefully to say no, that's not what we are doing at all, and

25   I think this is the Morton's Salt case from the 6th Circuit

1    that explicitly rejects that.

2          In their arguments they say that's really not what

3    we are doing, we are just saying this is so implausible that

4    it doesn't make sense but I think in the end that's what they

5    are doing because they are asking the Court to accept their

6    version of what the ultimate facts will be by saying it is

7    impossible that we, us four, all admitted price fixers to the

8    same OEMs at issue in this case, it is impossible we would

9    have gotten together to conclude on the pricing we submit.

10   That's not a standard we have to meet now when there are

11   guilty pleas, when these markets are both so closely related,

12   we are not talking about the Southeast Area Milk case, I

13   think that was the name, which was at summary judgment where

14   the only way that the Court could read the evidence presented

15   at summary judgment was one of the three conspirators would

16   have agreed to be harmed, that was on a full evidentiary

17   record at summary judgment.

18         We are at a motion to dismiss, they don't have to

19   be harmed.  It is entirely possible, for example, for

20   Mitsubishi to coordinate with JTEKT to whom it is going to

21   sell to ensure the pricing they both submit will satisfy

22   their interests in elevating those prices, will satisfy their

23   interest in securing Nissan against a competitor who might

24   seek that business, and there is no reason to then say well,

25   this turns it into a horizontal rule of reason conspiracy, it

1    is simply not the law.

2         And, in fact, in the cases they cite to, and I

3    think if I can find it it is called Care Heating, it is a

4    6th Circuit case, I think if I'm quoting it right it makes

5    the point of saying, and this was in the context of talking

6    about group boycotts to which the rule of reason does apply,

7    and the court says actions like price cartels are entirely

8    void of any redeeming value, they are always per se, and

9    that's what this is, this is a price cartel, this is not

10   within this rule of reason scenario.

11        But coming back to the more important point, it is

12   not implausible that these four guilty pleaders would have

13   worked together on the motors which are necessary to make the

14   steering assembly work when they are all responding to these

15   bids.

16        Earlier when the Court asked about some complaints

17   that are going to be filed and I mentioned the fact they

18   haven't been yet, it is for that very reason, we are further

19   along in understanding how the defendants' conspiracy worked

20   in this case and understanding that it is not this strict

21   division for just finished parts, that there is a

22   relationship because these defendants have to work together

23   to make this conspiracy work to the OEMs who ultimately buy

24   these parts.

25        And counsel mentioned the wire harness case and

1    said this -- plaintiffs just point to wire harness and they

2    say this isn't like that, but here is how it is like that.

3    If you recall in wire harness Denso's argument was we only

4    make electronic control units, that's not a wire harness, it

5    is part of the wire harness but it is not part of the wire

6    harness and we can't be in that case.  That argument was

7    rejected, and there is -- really was no meaningful difference

8    between the argument that MELCO makes here and the argument

9    that Denso made there with the point being it is a motion to

10   dismiss.  We don't know facts, we know the floor that the

11   guilty plea set and what has been presented to you in many

12   ways was that same argument from before; the guilty pleas say

13   A, and therefore that's all that ultimately discovery may

14   show.  The guilty --

15            THE COURT:  They never limited to the guilty plea?

16            MR. WILLIAMS:  The guilty pleas for us are the

17   floor, and they are entitled to go forward to try to

18   determine what are the rest of the facts but the question for

19   now is is what we pled so implausible that we shouldn't have

20   an opportunity to plead that, that we should be forced to go

21   back and guess what it is these defendants did before we can

22   state a claim when they have all pled guilty to a per se

23   price-fixing cartel?  I think the answer is no, that this is

24   enough to go forward and the evidence and the facts will show

25   what really took place but we can't be forced into this box

1    of having to guess what the ultimate answers will be while

2    they on their side have those facts and come back and say we

3    wouldn't do this because then it would have made it cost more

4    for the tier one or tier two, we don't know those answers

5    now.

6              THE COURT:  Okay.

7              MR. WILLIAMS:  But we do know -- and there are

8    other arguments made in the papers and I'm not going to

9    address them now that counsel has chosen not to so I will

10   submit on the papers as to those.

11             THE COURT:  All right.

12             MR. WILLIAMS:  Thank you.

13             THE COURT:  Counsel, reply?

14             MR. SKLARSKY:  Very briefly, Your Honor.

15             Arguments of counsel are fine but they are not in

16   the complaint, and what we are entitled to is not whether all

17   of his statements, we are entitled to a complaint that

18   clearly states with well-pleaded facts the nature and scope

19   and definition of the conspiracy with which we are charged.

20   This complaint does not do that.  And once they have clearly

21   defined the nature, scope and definition of the conspiracy

22   then they need to well plead some facts that show it is

23   plausible, not counsel's argument about why it is plausible

24   but some facts that establish its plausibility.

25             We don't have to define from Supreme Court justices

1    about that requirement.  Everybody agrees that's the law, and

2    the starting point is to clearly describe the conspiracy, and

3    they haven't done that.  They have relied on this definition

4    which throws in all of the component parts as part of a

5    finished assembly.  Well, yes, in reality they are a finished

6    assembly but when you sell an electric motor you are not

7    selling a finished assembly, those are different things

8    although they have eliminated that difference by their

9    definition in the complaint.

10            THE COURT:  Okay.

11            MR. SKLARSKY:  I will say one other thing just

12   about wire harness, when Ford or Chrysler or whoever goes to

13   buy they don't buy a wire harness system, they can buy a

14   power steering assembly, that is a part, it has a lot of

15   components to it but they buy a part, but our understanding

16   of the industry is in wire harness they call it a system but

17   it consists of lots of parts which are sold separately, not

18   as an integrated system, and that's an important distinction

19   it seems to me between this case and the wire harness case.

20            THE COURT:  So your distinction is that the OEMs

21   put together the wire harness system themselves?

22            MR. Sklarsky:  Yes, and all of those parts.

23            THE COURT:  And here you are saying you sell the

24   system all together, the power steering --

25            MR. SKLARSKY:  Right, we -- at least two of the

```
 1    defendants do.  Thank you.
 2            MR. WILLIAMS:  Your Honor, I just want to respond
 3    very briefly.
 4            I was criticized for talking about things not in
 5    the complaint, which I don't think I did, but the argument
 6    just now about what wire harnesses are as bought by Ford or
 7    GM, that's nowhere in any of the facts, and I think it
 8    illustrates why we should get to discovery to find out what
 9    the facts are and not have counsel just asserting how it is
10    that GM buys a wire harness.
11            THE COURT:  Okay.
12            MR. WILLIAMS:  Thank you.
13            THE COURT:  Okay.  Next actually continuing
14    along -- do we have another -- we have another part of a
15    motion, part of it was settled?  No, it was all settled.
16    Okay.
17            MR. WILLIAMS:  Well, I think we have completed the
18    agenda.
19            THE COURT:  I'm looking at MELCO but MELCO was the
20    one that we took care of today.
21            MR. SKLARSKY:  We did, Your Honor.  There was a
22    third part to it that Showa and American Showa is on the
23    agenda but --
24            THE COURT:  But there is no argument, I think
25    they --
```

1          MR. WILLIAMS:  I believe, Your Honor, that's all

2     been resolved, there is nothing to address with the Court

3     today.

4          THE COURT:  Okay.  So that's it.

5          MR. WILLIAMS:  That's it.

6          THE COURT:  Okay.  Anything else before we get

7     dismissed, anything we need to handle?  All right.  Our next

8     meeting then will be May 6th.  Everybody have a safe trip

9     back.

10          MR. WILLIAMS:  Thank you, Your Honor, and at least

11     a few of us might see you before.

12          THE LAW CLERK:  Court is adjourned.

13          (Court recessed at 12:52 p.m.)

14                         —   —   —

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of AUTOMOTIVE PARTS ANTITRUST LITIGATION,

 9    Case No. 12-02311, on Wednesday, January 28, 2015.

10

11

12                              s/Robert L. Smith
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17    Date:  02/04/2015

18    Detroit, Michigan

19

20

21

22

23

24

25
```