```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3                    —   —   —

 4    IN RE:  AUTOMOTIVE PARTS
      ANTITRUST LITIGATION          Case No. 12-md-02311
 5
            MDL NO. 2311            Hon. Marianne O. Battani
 6

 7

              STATUS CONFERENCE & MOTION HEARINGS
 8
           BEFORE THE HONORABLE MARIANNE O. BATTANI
 9                United States District Judge
          Theodore Levin United States Courthouse
10              231 West Lafayette Boulevard
                     Detroit, Michigan
11                Wednesday, May 6, 2015

12
      APPEARANCES:
13
      Direct Purchaser Plaintiffs:
14
      THOMAS C. BRIGHT
15    GOLD, BENNET, CERA & SIDENER, L.L.P.
      595 Market Street, Suite 2300
16    San Francisco, CA  94105
      (415) 777-2230
17

18    WILLIAM G. CALDES
      SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
19    1818 Market Street, Suite 2500
      Philadelphia, PA  19103
20    (215) 496-0300

21    MANUEL J. DOMINGUEZ
      COHEN MILSTEIN
22    3507 Kyoto Gardens Drive, Suite 200
      Palm Beach Gardens, FL  33410
23    (561) 578-6850

24
          To obtain a copy of this official transcript, contact:
25           Robert L. Smith, Official Court Reporter
             (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   APPEARANCES:

 2   Direct Purchaser Plaintiffs:

 3   DAVID H. FINK
     FINK & ASSOCIATES LAW
 4   100 West Long Lake Road, Suite 111
     Bloomfield Hills, MI  48304
 5   (248) 971-2500

 6

 7   GREGORY P. HANSEL
     PRETI, FLAHERTY, BELIVEAU &
     PACHIOS, L.L.P.
 8   One City Center
     Portland, ME  04112
 9   (207) 791-3000

10

11   WILLIAM E. HOESE
     KOHN, SWIFT & GRAF, P.C.
     One South Broad Street, Suite 2100
12   Philadelphia, PA  19107
     (215) 238-1700
13

14   JONATHAN M. JAGHER
     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
15   181 Market Street, Suite 2500
     Philadelphia, PA  19103
16   (215) 496-0300

17

18   STEVEN A. KANNER
     FREED, KANNER, LONDON & MILLEN, L.L.C.
19   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
20   (224) 632-4502

21   JOSEPH C. KOHN
     KOHN, SWIFT & GRAF, P.C.
22   One South Broad Street, Suite 2100
     Philadelphia, PA  19107
23   (215) 238-1700

24

25
```

1      APPEARANCES:

2      **Direct Purchaser Plaintiffs:**

3      SARAH GIBBS LEIVICK
       **KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.**
4      1633 Broadway
       New York, NY  10019
5      (212) 506-1765

6

7      MATTHEW RUAN
       **COHEN MILSTEIN**
       1100 New York Avenue NW, Suite 500 West
8      Washington, D.C.  20005
       (202) 408-4600
9

10     EUGENE A. SPECTOR
       **SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.**
11     1818 Market Street, Suite 2500
       Philadelphia, PA  19103
12     (215) 496-0300

13

14     RANDALL B. WEILL
       **PRETI, FLAHERTY, BELIVEAU &**
       **PACHIOS, L.L.P.**
15     One City Center
       Portland, ME  04112
16     (207) 791-3000

17

       **End-Payor Plaintiffs:**
18

19     CHANLER A. LANGHAM
       **SUSMAN GODFREY, L.L.P.**
20     1000 Louisiana, Suite 5100
       Houston, TX 77002-5096
21     (713) 651-9366

22

23     E. POWELL MILLER
       **THE MILLER LAW FIRM, P.C.**
       950 West University Drive, Suite 300
24     Rochester, MI  48307
       (248) 841-2200

25

```
 1    APPEARANCES:

 2    End-Payor Plaintiffs:

 3    OMAR OCHOA
      SUSMAN GODFREY, L.L.P.
 4    901 Main Street, Suite 5100
      Dallas, TX  75202
 5    (214) 754-1913

 6

      WILLIAM V. REISS
 7    ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
      601 Lexington Avenue, Suite 3400
 8    New York, NY  10022
      (212) 980-7405
 9

10    HOLLIS L. SALZMAN
      ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
11    601 Lexington Avenue, Suite 3400
      New York, NY  10022
12    (212) 980-7405

13

      ADAM T. SCHNATZ
14    THE MILLER LAW FIRM, P.C.
      950 West University Drive, Suite 300
15    Rochester, MI  48307
      (248) 841-2200
16

17    ELIZABETH T. TRAN
      COTCHETT, PITRE & McCARTHY, L.L.P.
18    840 Malcolm Road
      Burlingame, CA  94010
19    (650) 697-6000

20

      STEVEN N. WILLIAMS
21    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
22    Burlingame, CA  94010
      (650) 697-6000

23

24

25
```

```
 1    APPEARANCES:

 2    Dealership Plaintiffs:

 3    DON BARRETT
      BARRETT LAW OFFICES
 4    P.O. Drawer 927
      Lexington, MS  39095
 5    (601) 834-2376

 6    ALEXANDER E. BLUM
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
 7    1361 East Big Beaver Road
      Troy, MI  48083
 8    (248) 457-9200

 9

10    JONATHAN W. CUNEO
      CUNEO, GILBERT & LaDUCA, L.L.P.
11    507 C Street NE
      Washington, D.C.  20002
12    (202) 789-3960

13    GERARD V. MANTESE
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
14    1361 East Big Beaver Road
      Troy, MI  48083
15    (248) 457-9200

16

17    SHAWN M. RAITER
      LARSON KING, L.L.P.
18    30 East Seventh Street, Suite 2800
      Saint Paul, MN  55101
19    (651) 312-6500

20    VICTORIA ROMANENKO
      CUNEO, GILBERT & LaDUCA, L.L.P.
21    507 C Street NE
      Washington, D.C.  20002
22    (202) 789-3960

23

24    ANDREW R. SPERL
      DUANE MORRIS, L.L.P.
25    30 South 17th Street
      Philadelphia, PA  19103
      (215) 979-7385
```

1    **APPEARANCES:**

2    **For the Defendants:**

3    JEFFREY J. AMATO
     **WINSTON & STRAWN, L.L.P.**
4    200 Park Avenue
     New York, NY  10166
5    (212) 294-4685

6

7    GARY K. AUGUST
     **ZAUSMER, KAUFMAN, AUGUST & CALDWELL, P.C.**
     31700 Middlebelt Road, Suite 150
8    Farmington Hills, MI  48334
     (248) 851-4111

9

10   BRUCE ALLEN BAIRD
     **COVINGTON & BURLING, L.L.P.**
11   850 Tenth Street, NW
     Washington, D.C. 20001
12   (202) 662-5122

13

14   MICHAEL G. BRADY
     **WARNER, NORCROSS & JUDD, L.L.P.**
     2000 Town Center, Suite 2700
15   Southfield, MI  48075
     (248) 784-5032

16

17   LAWRANCE BUTERMAN
     **LATHAM & WATKINS, L.L.P.**
18   555 Eleventh Street NW, Suite 1000
     Washington, D.C.  20004
19   (202) 637-2200

20

21   JOHN GREGORY BUTLER
     **WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.**
     1875 Pennsylvania Avenue NW
22   Washington, D.C.  20006
     (202) 663-6535

23

24

25

 1    **APPEARANCES:**

 2    **For the Defendants:**

 3    JEREMY CALSYN
      **CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.**
 4    2000 Pennsylvania Avenue NW
      Washington, D.C.  20006
 5    (202) 974-1500

 6

      PATRICK J. CAROME
 7    **WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.**
      1875 Pennsylvania Avenue NW
 8    Washington, D.C.  20006
      (202) 663-6610

 9

10    SCOTT CARVO
      **WARNER, NORCROSS & JUDD, L.L.P.**
11    900 Fifth Third Center, 111 Lyon Street, N.W.
      Grand Rapids, MI 49503
12    (616) 752-2759

13

      ELIZABETH CATE
14    **WINSTON & STRAWN, L.L.P.**
      200 Park Avenue
15    New York, NY  10166
      (212) 294-6700

16

17    STEVEN F. CHERRY
      **WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.**
18    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
19    (202) 663-6321

20

      JAMES L. COOPER
21    **ARNOLD & PORTER, L.L.P.**
      555 Twelfth Street NW
22    Washington, D.C.  20004
      (202) 942-5000

23

24

25

```
 1   APPEARANCES:

 2   For the Defendants:

 3   MOLLY CRABTREE
     PORTER, WRIGHT, MORRIS & ARTHUR
 4   41 South High Street, Suite 2900
     Columbus, OH  43215
 5   (614) 227-2015

 6

     KENNETH R. DAVIS, II
 7   LANE POWELL, P.C.
     601 SW Second Avenue, Suite 2100
 8   Portland, OR  97204
     (503) 778-2100

 9

10   DAVID P. DONOVAN
     WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
11   1875 Pennsylvania Avenue, NW
     Washington, D.C.  20006
12   (202) 663-6868

13

     ABRAM ELLIS
14   SIMPSON, THACHER & BARTLETT, L.L.P.
     1155 F Street, N.W.
15   Washington, D.C. 20004
     (202) 636-5579

16

17   J. CLAYTON EVERETT, JR.
     MORGAN, LEWIS & BOCKIUS, L.L.P.
18   1111 Pennsylvania Avenue NW
     Washington, D.C.  20004
19   (202) 739-5860

20

     PETER M. FALKENSTEIN
21   JAFFE, RAITT, HEUER & WEISS, P.C.
     535 W. William, Suite 4005
22   Ann arbor, MI  48103
     (734) 222-4776

23

24

25
```

```
 1    APPEARANCES:

 2    For the Defendants:

 3    MICHAEL FELDBERG
      ALLEN & OVERY, L.L.P.
 4    1221 Avenue of the Americas
      New York, NY  10020
 5    (212) 610-6360

 6
      STACY E. FRAZIER
 7    WILMER, CUTLER, PICKERING, HALE and DORR, L.L.P.
      1875 Pennsylvania Avenue, NW
 8    Washington, D.C.  20006
      (202) 663-6076
 9
10    LARRY S. GANGNES
      LANE POWELL, P.C.
11    1420 Fifth Avenue, Suite 4100
      Seattle, Washington  98101
12    (206) 223-7000

13
      MEGAN HAVSTAD
14    O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
15    San Francisco, CA  94111
      (415) 984-8700
16
17    ADAM C. HEMLOCK
      WEIL, GOTSHAL & MANGES, L.L.P.
18    767 Fifth Avenue
      New York, NY  10153
19    (212) 310-8281

20
      FRED K. HERRMANN
21    KERR, RUSSELL & WEBER, P.L.C.
      500 Woodward Avenue, Suite 2500
22    Detroit, MI  48226
      (313) 961-0200

23

24

25
```

```
 1    APPEARANCES:

 2    For the Defendants:

 3    HOWARD B. IWREY
      DYKEMA GOSSETT, P.L.L.C.
 4    39577 Woodward Avenue, Suite 300
      Bloomfield Hills, MI  48304
 5    (248) 203-0526

 6

 7    WILLIAM R. JANSEN
      WARNER, NORCROSS & JUDD, L.L.P.
      2000 Town Center, Suite 2700
 8    Southfield, MI  48075
      (248) 784-5178

 9

10    FREDERICK JUCKNIESS
      SCHIFF HARDIN, L.L.P.
11    350 South Main Street, Suite 210
      Ann Arbor, MI  48104
12    (734) 222-1507

13

14    HEATHER LAMBERG KAFELE
      SHEARMAN & STERLING, L.L.P.
      801 Pennsylvania Avenue, NW
15    Washington, D.C.  20004
      (202) 508-8097

16

17    TIMOTHY J. LOWE
      McDONALD HOPKINS, P.L.C.
18    39533 Woodward Avenue, Suite 318
      Bloomfield Hills, MI  48304
19    (248) 220-1359

20

      JEFFREY L. KESSLER
21    WINSTON & STRAWN, L.L.P.
      200 Park Avenue
22    New York, NY  10166
      (212) 294-4655

23

24

25
```

```
 1    APPEARANCES:

 2    For the Defendants:

 3    SHELDON H. KLEIN
      BUTZEL LONG, P.C.
 4    41000 Woodward Avenue
      Bloomfield Hills, MI  48304
 5    (248) 258-1414

 6
      STEVEN M. KOWAL
 7    K&L GATES
      70 West Madison Street, Suite 3100
 8    Chicago, IL  60602
      (312) 372.1121
 9

10    FRANKLIN LISS
      ARNOLD & PORTER, L.L.P.
11    555 Twelfth Street NW
      Washington, D.C.  20004
12    (202) 942-5000

13
      MICHELLE A. MANTINE
14    REED SMITH, L.L.P.
      225 Fifth Avenue, Suite 1200
15    Pittsburgh, PA  15222
      (412) 288-4268
16

17    ANDREW S. MAROVITZ
      MAYER BROWN, L.L.P.
18    71 South Wacker Drive
      Chicago, IL  60606
19    (312) 701-7116

20
      ALLYSON M. MALTAS
21    LATHAM & WATKINS, L.L.P.
      555 Eleventh Street NW, Suite 1000
22    Washington, D.C.  20004
      (202) 637-2200
23
      STUART McPHAIL
24    GIBSON, DUNN & CRUTCHER, L.L.P.
      555 Mission Street, Suite  3000
25    San Francisco, CA 94105
      (415) 393-8200
```

```
 1    APPEARANCES:

 2    For the Defendants:

 3    IAIN R. MCPHIE
      SQUIRE PATTON BOGGS, L.L.P.
 4    1200 19th Street, N.W., S. 300
      Washington, D.C. 20036
 5    (202) 626-6600

 6

 7    BRIAN M. MOORE
      DYKEMA GOSSETT, P.L.L.C.
 8    39577 Woodward Avenue, Suite 300
      Bloomfield Hills, MI  48304
 9    (248) 203-0772

10    JOHN L. MURINO
      CROWELL MORING
11    1001 Pennsylvania Avenue, NW
      Washington, D.C.  20004
12    (202) 624-2663

13

14    RONALD NIXON
      KEMP KLEIN LAW FIRM
15    201 West Big Beaver Road, Suite 600
      Troy, MI  48084
16    (248) 528-1111

17    JOSEPH E. PAPELIAN
      DELPHI CORPORATION
18    5725 Delphi Drive
      Troy, MI  48098
19    (248) 813-2535

20    MATTHEW L. POWELL
      KERR, RUSSELL & WEBER, P.L.C.
21    500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
22    (313) 961-0200

23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:

 3   WILLIAM H. RAWSON
     LATHAM & WATKINS, L.L.P.
 4   555 Eleventh Street NW, Suite 1000
     Washington, D.C.  20004
 5   (202) 637-2200

 6

 7   ALEXANDER B. REICH
     CALFEE, HALTER & GRISWOLD, L.L.P.
 8   1405 East Sixth Street
     Cleveland, OH  44114
 9   (216) 622-8621

10   STEVEN REISS
     WEIL, GOTSHAL & MANGAS L.L.P.
11   767 Fifth Avenue
     New York, NY 10153
12   (212) 310-8174

13

14   COURTNEY A. ROSEN
     SIDLEY AUSTIN, L.L.P.
15   One South Dearborn Street
     Chicago, IL 60603
16   (312) 853-7669

17   KAJETAN ROZGA
     WEIL, GOTSHAL & MANGES L.L.P.
18   767 Fifth Ave,  STE. 3360
     New York, NY 10153
19   (212) 310-8518

20

21   MICHAEL RUBIN
     ARNOLD & PORTER, L.L.P.
22   555 Twelfth Street NW
     Washington, D.C.  20004
23   (202) 942-5094

24

25
```

1  APPEARANCES:

2  **For the Defendants:**

3  TIANA LEIA RUSSELL
   **ARNOLD & PORTER, L.L.P.**
4  555 Twelfth Street NW
   Washington, D.C.  20004
5  (202) 942-6807

6

7  WM. PARKER SANDERS
   **SMITH, GAMBRELL & RUSSELL, L.L.P.**
   Promenade Two, Suite 3100
8  1230 Peachtree Street NE
   Atlanta, GA  30309
9  (404) 815-3684

10

11 LARRY J. SAYLOR
   **MILLER, CANFIELD, PADDOCK & STONE, P.L.C.**
   150 West Jefferson Avenue, Suite 2500
12 Detroit, MI  48226
   (313) 496-7986
13

14 JOHN E. SCHMIDTLEIN
   **WILLIAMS & CONNOLLY, L.L.P.**
15 725 Twelfth Street NW
   Washington, D.C.  2005
16 (202) 434-5901

17

18 SCOTT T. SEABOLT
   **FOLEY & LARDNER, L.L.P.**
   500 Woodward Avenue, Suite 2700
19 Detroit, MI  48226
   (313) 234-7100
20

21 MICHAEL LEONARD SIBARIUM
   **PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.**
22 1200 Seventeenth Street, NW
   Washington, D.C. 20036-3006
23 (202) 663-9202

24

25

```
1    APPEARANCES:

2    For the Defendants:

3    STEPHEN J. SQUERI
     JONES DAY
4    901 Lakeside Avenue
     Cleveland, OH  44114
5    (216) 586-3939

6

7    JACQUELYN LEIGH STANLEY
     Wilmer, Cutler, Pickering, Hale, and Dorr, L.L.P.
8    1875 Pennsylvania Avenue, NW
     Washington, D.C. 20006
     (202) 663-6706
9

10   ANITA STORK
     COVINGTON & BURLING, L.L.P.
11   One Front Street
     San Francisco, CA  94111
12   (415) 591-7050

13

14   MARGUERITE M. SULLIVAN
     LATHAM & WATKINS, L.L.P.
15   555 Eleventh Street NW, Suite 1000
     Washington, D.C.  20004
16   (202) 637-2200

17   WILLIAM M. SULLIVAN
     PILLSBURY, WINTHROP, SHAW & PITTMAN, L.L.P.
18   1200 Seventeenth Street, N.W.
     Washington, D.C.  20036
19   (202) 663-8027

20

21   JOANNE GEHA SWANSON
     KERR, RUSSELL & WEBER, P.L.C.
22   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
     (313) 961-0200
23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:

 3   MAUREEN T. TAYLOR
     BROOKS, WILKINS, SHARKEY & TURCO
 4   401 South Old Woodward, Suite 400
     Birmingham, MI  48009
 5   (248) 971-1721

 6

 7   MICHAEL F. TUBACH
     O'MELVENY & MYERS, L.L.P.
     Two Embarcadero Center, 28th Floor
 8   San Francisco, CA  94111
     (415) 984-8700
 9

10   MICHAEL R. TURCO
     BROOKS, WILKINS, SHARKEY & TURCO, P.L.L.C.
11   401 South Old Woodward Avenue, Suite 400
     Birmingham, MI  48009
12   (248) 971-1713

13

14   LINDSEY ROBINSON VAALA
     VINSON & ELKINS, L.L.P.
     2200 Pennsylvania Avenue NW, Suite 500 West
15   Washington, D.C.  20037
     (202) 639-6585

16

17   AUSTIN van SCHWING
     GIBSON, DUNN & CRUTCHER L.L.P.
18   555 Mission Street, Suite 3000
     San Francisco, CA 94105
19   (415) 393-8200

20

21   WILLIAM J. VIGEN
     WILLIAMS & CONNOLLY, L.L.P.
     725 Twelfth Street, N.W.
22   Washington, D.C.  20005
     (202) 434-5868

23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:

 3   MASA YAMAGUCHI
     LANE POWELL, P.C.
 4   601 SW Second Avenue, Suite 2100
     Portland, OR  97204
 5   (503) 778-2174

 6

 7   MARGARET M. ZWISLER
     LATHAM & WATKINS LLP
 8   555 Eleventh Street NW, Suite 1000
     Washington, D.C. 20004
 9   (202) 637-1092

10   OTHER APPEARANCES:

11   TIMOTHY FRASER
     OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
12   The Capital, PL-01
     Tallahassee, FL  32399
13   (850) 414-3733

14

15   JAYE QUADROZZI
     YOUNG & ASSOCIATES
16   27725 Stansbury Boulevard, Suite 125
     Farmington Hills, MI  48334
17   (248) 353-8620

18

19   Also Present:  SPECIAL MASTER GENE ESSHAKI

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2                                                            Page

3
     STATUS CONFERENCE.................................... 19
4
     CHIYODA DEFENDANTS' MOTION TO DISMISS
5        Motion by Mr. Kowal.............................. 92
         Response by Ms. Tran............................104
6        Reply by Mr. Kowal.............................110

7    BOSCH DEFENDANTS' MOTION TO DISMISS
         Motion by Mr. Feldberg.........................111
8        Response by Mr. Langham........................121
         Reply by Mr. Feldberg..........................127
9
     KEIHIN NORTH AMERICA'S MOTION TO DISMISS
10       Motion by Mr. Baird............................130
         Response by Mr. Ochoa..........................143
11       Reply by Mr. Baird.............................147

12   DELPHI AUTOMOTIVE L.L.P.'S & DELPHI POWERTRAIN SYSTEMS
     KOREA LTD.'S MOTION TO DISMISS
13       Motion by Ms. Zwisler..........................149
         Response by Mr. Reiss..........................166
14       Response by Mr. Williams.......................172
         Reply by Ms. Zwisler...........................176
15

16

17

18

19

20

21

22

23

24

25

1   Detroit, Michigan

2   Wednesday, May 6, 2015

3   At about 10:00 a.m.

4                          —    —    —

5           (Court and Counsel present.)

6           THE CASE MANAGER:  Please rise.

7           The United States District Court for the Eastern

8   District of Michigan is now in session, the Honorable

9   Marianne O. Battani presiding.

10          All those having business before this Honorable

11  Court, please draw near and you shall be heard.  God save

12  these United States and this Honorable Court.

13          Please be seated.

14          The Court calls Case No. 12-md-02311, In re:

15  Automotive Parts Antitrust Litigation.

16          THE COURT:  Good morning everybody.

17          MASTER ESSHAKI:  Good morning, Your Honor.

18          ATTORNEYS:  (Collectively)  Good morning.

19          THE COURT:  We have a full house today.  Must be a

20  popular day, no weather restrictions.  Okay.  We are ready to

21  go.

22          Mr. Esshaki is here to participate with us, and I

23  know that -- I guess I don't know what but some of you have

24  motions with him after we complete our hearing today.

25          Okay.  Let's just start.  Who is going to review

 1   status of settlements?  And, again, we will follow the same

 2   procedure; give your name and who you represent.

 3          MS. SALZMAN:  Good morning, Your Honor.

 4   Hollis Salzman for the end payors.

 5          We just have two settlements to report on.  One is

 6   the T. Rad settlement which was previously announced to the

 7   Court.  We are working out the final details and hope to be

 8   able to present to the Court shortly.

 9          We have another settlement with one of the

10   defendants, we can't disclose the amount or the party yet,

11   but we hope to be able to do so shortly.

12          THE COURT:  Okay.

13          MS. SALZMAN:  Thank you.

14          THE COURT:  Very good.  So we have two settlements

15   coming.  We have end-payor plaintiffs and dealerships'

16   motions to disseminate -- there you are.

17          MR. CUNEO:  Jonathan Cuneo for the dealers.

18          We are in the same position on settlement as

19   Ms. Salzman.

20          THE COURT:  Okay.

21          MR. CUNEO:  I just -- ditto.  Okay.  Thank you.

22          THE COURT:  Let me ask both of you in terms of

23   these settlements, Mr. Cuneo and Ms. Salzman, do you

24   anticipate that you will have these resolved by our next

25   status conference or do you need some interim dates?

1     MS. SALZMAN:  We are not prepared to ask for

2 interim dates at present because some of it is out of our

3 control, it is working out details of settlement agreements.

4     THE COURT:  Okay.

5     MS. SALZMAN:  But if we are able to do so prior to

6 the status conference, we would ask the Court at that point

7 for interim dates otherwise we would wait until the September

8 date.

9     THE COURT:  Okay.  Mr. Cuneo, same thing?

10     MR. CUNEO:  Same thing.

11     THE COURT:  Okay.  Very good.  If you need dates in

12 between you will just call and I'm sure we'll be able to

13 accommodate it.

14     MS. SALZMAN:  I didn't realize, I wasn't looking at

15 the agenda, but we are up for point two on the notice.

16     THE COURT:  Okay.  You might as well stay right

17 there.

18     MS. SALZMAN:  I shouldn't have sat down.  Again,

19 Hollis Salzman for the end payors.

20     Notice, Your Honor, we are working very closely

21 with our notice providers and notice experts to provide the

22 Court with the best notice possible for the class.  We hope

23 to have something to the Court within the next 30 to 60 days

24 but preferably sooner if we can.  We are looking at some

25 type -- proposing a schedule to the Court with the notice

1    plan so that final approval would occur during this fiscal

2    year -- or during 2016.

3            THE COURT:  2000 --

4            MS. SALZMAN:  2015.

5            THE COURT:  2015?

6            MS. SALZMAN:  Yes.

7            THE COURT:  Okay.

8            MR. CUNEO:  We are in the same position -- Your

9    Honor, the dealers are in the same position, and we hope to

10    be able to do even better than the time schedule that

11    Ms. Salzman --

12            THE COURT:  Okay.  We have a race.

13            MS. SALZMAN:  It is a race.

14            THE COURT:  Okay.  Thank you.

15            MR. MAROVITZ:  Thank you, Your Honor.

16    Andy Marovitz for Lear Corporation.  I'm here to speak for

17    Lear and for Kyungshin Lear.

18            We are obviously very much in agreement with

19    getting these settlements as to Lear and Kyungshin Lear by

20    the end payors and the dealers noticed and to get final

21    approval by the end -- no later than the end of 2015.  These

22    are the only two cases in this entire auto parts litigation

23    that remain against these two entities so when we come before

24    Your Honor next time we are very hopeful that we can get a

25    final hearing and approval hearing set for calendar year

1   2015.  It is important to our clients to get the piece that

2   they negotiated.

3            THE COURT:  Okay.

4            MR. MAROVITZ:  Thank you.

5            THE COURT:  Thank you.  All right.  Anybody else?

6            (No response.)

7            THE COURT:  Okay.  The next issue, the depositions

8   of incarcerated non-U.S. citizens.

9            MR. HANSEL:  Good morning, Your Honor.  Greg Hansel

10  for the direct purchasers.

11           In Section 6 of the status report is a list of

12  non-U.S. citizen incarcerated defendants in related criminal

13  cases who have not yet been released.  Three of those are

14  affiliated with Takata Corporation including Mr. Fujino, who

15  is scheduled for release on May 17th, 2015, which is coming

16  right up.

17           We are in advanced discussions with Takata

18  regarding a stipulation similar to the ones entered into with

19  Denso and other defendants in the past providing that the

20  plaintiffs may take depositions of their employees at agreed

21  locations in the United States or nearby, and therefore if we

22  are able to finalize that stipulation with Takata we would

23  not need to ask the Court to depose Mr. Fujino or other

24  Takata personnel while they are still in prison or when they

25  are released and before they return to Japan.

1          So we are hopeful in discussions with counsel for

2     Takata that we will be able to reach agreement on that.  The

3     same is true with others; we will continue to attempt to

4     reach those agreements, and in cases in which the direct

5     purchasers do not yet have an action pending, we understand

6     that the indirect purchasers likewise are pursuing those

7     discussions with defendants with regard to their personnel.

8          THE COURT:  Has that worked out that all of the

9     defendants who have been incarcerated have been deposed here

10    so far -- or, I mean, will be deposed here so far?

11          MR. HANSEL:  We haven't deposed any of them yet but

12    we have agreements to depose all of them at a convenient

13    location in or near the United States.

14          THE COURT:  Because you have a whole 'nother

15    problem going to Japan to do this, do you not?

16          MR. HANSEL:  That's correct, depositions there are

17    limited in the embassy.

18          THE COURT:  Okay.

19          MR. HANSEL:  Thank you, Your Honor.

20          MR. REISS:  Your Honor, Will Reiss for the

21    end-payor plaintiffs.

22          I just wanted to echo Greg's sentiments for the

23    end-payor plaintiffs.  We have been involved with the directs

24    in trying to coordinate those depositions and are moving

25    forward with that, so we are in the same position.  Thank

```
 1    you.
 2            THE COURT:  Okay.  Good.  Thank you, Mr. Reiss.
 3            Mr. Hansel, I forgot to ask you while you were up
 4    here, did you do this agenda today too?  I know you did it
 5    last time.
 6            MR. HANSEL:  My partner, Randall Weill, did the
 7    agenda.
 8            THE COURT:  Okay.  Thank you.  Thank you again.
 9            MR. HANSEL:  Thank you.
10            THE COURT:  The Court website.
11            MR. FINK:  Your Honor, I think that Mr. Iwrey, who
12    has --
13            THE COURT:  I was looking -- yeah.
14            MR. FINK:  -- been working hard on this should be
15    the one to speak to it.
16            THE COURT:  All right.
17            MR. IWREY:  Good morning, Your Honor.  Howard Iwrey
18    for -- on behalf of the defendants.
19            We have come to an agreement on the format of the
20    website.  We are currently in discussion over the breadth of
21    the content, and we suggest that we go to the administrator
22    of the website to determine the size limitations and the
23    process.
24            THE COURT:  Okay.  Let me before you begin get the
25    others on the record who have assisted you.
```

1           MR. SCHNATZ:  Adam Schnatz for the end payors.

2           MR. FINK:  David Fink for the direct purchaser

3    plaintiffs.

4           MR. BLUM:  Alexander Blum for the dealership

5    plaintiffs.

6           THE COURT:  Okay.  Did you meet with Josh?

7           MR. IWREY:  We had a telephone call, and then what

8    I suggest is we set up something where we meet in person in

9    the next few weeks.

10          THE COURT:  Okay.  Because, you know, first, I

11   think that he would be very interested in adding this now

12   that I explained to him -- I have talked to him -- why I

13   think it is important that we be there, so I'm sure they will

14   be cooperative.  If you have any issues you want me to help

15   with, please -- not technical but --

16          MR. IWREY:  There may be a few but I think we'll be

17   able to work things out.

18          THE COURT:  Okay.  Good.  Thank you, Mr. Iwrey.

19          MR. SCHNATZ:  Thank you.

20          MR. IWREY:  Thank you, Your Honor.

21          MR. FINK:  Thank you, Your Honor.

22          THE COURT:  Global stipulations and orders

23   regarding confidential information, experts, ESI and document

24   preservation?

25          MR. WILLIAMS:  Steve Williams for the end payors.

```
 1              This issue may not be ready for the Court to do
 2     something today, and it might be appropriate to go to the
 3     master first.  The issue is --
 4              THE COURT:  I had down here master so that's why I
 5     want you to tell me why I --
 6              MR. WILLIAMS:  We on the plaintiffs' side believe
 7     that we are at a point where there should be uniform orders
 8     that apply in these cases, that we shouldn't be negotiating
 9     in each of what are the constituent cases of 2311, the same
10     documents that we have all done, and for that reason we have
11     made those proposals.  I actually think other than the
12     confidential information document we are more or less in
13     agreement with one key distinction being is it one order that
14     would apply to everything that we think makes perfect
15     sense --
16              THE COURT:  Okay.
17              MR. WILLIAMS:  -- or should it be one for every
18     single case?
19              THE COURT:  Let me stop you there because I really
20     don't want to get into it.  I do want the master, and we are
21     going to -- there is another issue here, maybe we should just
22     take it now on that other protocol, but I do want you to go
23     to the master and, you know, work with him and work out these
24     protocols, and then any objections, I will hear objections
25     but they must be formal objections.  I don't want to be in a
```

1    position of advising the master or advising any party as to

2    how it should be.  And I may have overstepped my bounds last

3    time when I made a comment as to what I was thinking because

4    what I'm thinking on these issues right now is not really

5    important, it is the decision between the -- the argument

6    between the parties and the decision of the master that

7    counts, and then if there is an objection I will deal with

8    it.

9            MR. WILLIAMS:  Thank you.  And I think we can do

10   that promptly.  We have met and conferred with the

11   defendants, the positions have been framed, so I think we can

12   present that to the master very quickly.

13           THE COURT:  Good.  Thank you very much.

14           MR. WILLIAMS:  I'm going to stay here because of

15   the next item.

16           THE COURT:  Okay.  The next one is yours.

17           MR. WILLIAMS:  Not solely mine.  So the next

18   item --

19           THE COURT:  The subpoenas to the original

20   equipment --

21           MR. WILLIAMS:  As the Court may recall, the parties

22   were directed, and this is in the indirect-purchaser cases,

23   the end-payor cases and the auto-dealers case, to work with

24   the defendants on what we refer to as a joint subpoena and

25   over the course of the last few months the end payors, the

1    auto dealers, the truck dealers, the City of Richmond and the

2    defendants have all worked together to come up with one form

3    of subpoena so that the OEMs are not being burdened with

4    multiple subpoenas, and so that it can be done in a

5    coordinated fashion to minimize disruption to the OEMs.

6         The directs have interposed comments about those

7    subpoenas.  Our view, and I believe the defendants share this

8    view, is that the most appropriate and the most efficient way

9    to address this issue would be to permit the subpoenas to be

10   served, the result of the process that we went through, and

11   then at that time any party who believes it has a stake or an

12   interest in that can file whatever the appropriate paper

13   would be, whether it be a motion to quash, an objection, and

14   therefore the OEMs or the directs if they choose could

15   interpose those objections at that point, but our view

16   certainly for the plaintiffs is it is premature now to have

17   what in the sense is an advisory opinion because nothing has

18   been served, so we believe the appropriate step would be to

19   serve the subpoenas that are the product of the work we have

20   all done together and then address anyone's objections to

21   those subpoenas.

22        THE COURT:  All right.  Defense -- well, I see we

23   have another plaintiff but go ahead.

24        MR. CHERRY:  I'm sorry.  Just to support what

25   Mr. Williams said -- I'm Steve Cherry with Wilmer Hale

1     representing Denso.

2            We agree with Mr. Williams, we believe -- first of

3     all, we have worked several months together with all the

4     defendants and all the parties other than the direct

5     purchasers and we actually -- the direct purchasers asked not

6     to be involved in that process, I mean, we were copying them

7     on this and they asked not to be involved, but to come up

8     with this subpoena and now they have objected.  And we

9     believe the most efficient process here again is to serve

10    these, let the OEMs -- whatever we worked out with the DPPs,

11    the direct-purchaser plaintiffs, will not determine what any

12    OEM produces.  They will come in with their own counsel and

13    have their own objections, whatever the direct purchasers

14    think, and we will have to go through the process of dealing

15    with those objections.  And so the most efficient way to do

16    this is to deal with that all at once, go ahead and serve

17    them, let them object, hear from the DPP -- the direct

18    purchasers at that time and just resolve it all at once.

19            THE COURT:  Okay.

20            MR. KANNER:  Good morning, Your Honor.

21    Steve Kanner on behalf of the direct-purchaser plaintiffs.

22            THE COURT:  Good morning.

23            MR. KANNER:  Not surprisingly, I couldn't disagree

24    more with my friends and colleagues.  This is one of those

25    odd situations where not just politics but law creates

1    strange bedfellows, but I'm glad to see plaintiffs and

2    defendants together on certain issues.

3              As I said, I think this is the wrong issue.  The

4    Court established a procedure months ago with respect to how

5    we work with Special Master Esshaki, who has done a great

6    job, and, secondly, how we should deal with discovery

7    disputes.  This is a discovery issue.  We received the draft

8    OEM subpoena, which I understand has been the product of

9    months of work between the end-payor group and the

10   defendants.  We received it a few weeks ago.  We responded to

11   Special Master Esshaki on the 28th of April with comments,

12   not objections.  You know, an objection implies a formal

13   filing.  We filed some comments.

14             Special Master Esshaki asked the defendants when

15   can we expect your thoughts on plaintiffs' comments?  The

16   next thing we know that this was tied up with subpoenas to

17   not the OEMs but to tier one suppliers which has ripened to

18   the point where objections may be filed now.  But with

19   respect to the OEMs, we are really at the nascent stages in

20   terms of discussing this.  We are in front of Special Master

21   Esshaki.  I understand that end-payor plaintiffs and

22   defendants would like to move ahead with this, but it is not

23   ripe for that, that's number one.

24             Number two, it is important to note, Your Honor,

25   the OEMs aren't parties to this particular matter.  These

32

1    subpoenas focus on end-payor-related issues.  In fact, and

2    Your Honor hasn't seen the subpoena yet, but they go to the

3    most privileged, secret, confidential information that OEMs

4    have.  And I understand my colleagues' desire to have these

5    done formally, let them come in, but, Your Honor, and under

6    the guise of it is convenient to have one subpoena, there are

7    57 products that are included here, they go across the board.

8    If this Court wants to invite the type of protracted

9    discovery litigation that my colleagues are suggesting I

10   submit we are going to be here months and months and months.

11   Each OEM is going to come in and tell you any number of

12   things, first of which, we are not parties, we are not even

13   punitive class members.  This is an entirely separate issue.

14   The end payors would like to prove their case, the damages

15   element of it with this, and the defendants want to respond

16   to the end payors showing their damages through this.  And so

17   who is in the middle?  The OEMs, the largest most significant

18   companies in America who don't have, as the saying goes, a

19   dog in that fight.

20          So what we sought to do, what Your Honor suggested

21   several months ago, was that we comment on subpoenas to the

22   OEMs at the appropriate time.  Well, we did it within two

23   weeks of receiving the subpoenas.  This is the opportunity

24   for us to meet with our colleagues and discuss and present it

25   to Special Master Esshaki so we can narrow down the issues so

1   this Court doesn't end up buying six months or a year of

2   hard-fought litigation. You know, there is another party in

3   this case -- or another party over here who ought to have

4   some comments today and that's counsel for Ford. Ford is an

5   OEM subject to the same subpoenas, and it is interesting, you

6   know, that Ford has been served with Rule 34 subpoenas with

7   respect to their case, a direct-purchaser case. The material

8   included in the subpoena we are talking about now is far

9   afield from that information, it is an entirely different

10  subpoena, and it seeks, as I said, the information that goes

11  to the heart of how the OEMs price their vehicles, how they

12  pay for them, the total bill of costs -- what it cost to

13  build an automobile, how they sell it, whether there is any

14  pass on.

15          First of all, we don't know if that information

16  even exists. Secondly, it is outrageously overburdensome for

17  these entities, and our job -- I see our job, both -- counsel

18  for all sides, is to try to streamline what is disputed,

19  bring it to Special Master Esshaki, and then bring it to you

20  if need be.

21          So I urge this Court to reconsider the position

22  being taken by my colleagues. It is not ripe and frankly it

23  is an end runaround to the system that we have established to

24  work with Judge Esshaki -- with Special Master Esshaki. I

25  cannot break that habit. Thank you.

1          MR. WILLIAMS:  Your Honor, if I could respond

2     briefly?  And with respect to my colleagues, I didn't want to

3     and I don't want to now get into the merits of the particular

4     request, frankly I think that's really a question if we are

5     going to go down this road and hold it up that would be

6     suitable for briefing.  What I would say is these subpoenas

7     are not being issued in the direct purchasers case, they are

8     not parties to this, they don't have standing to object to

9     anything, these are only being issued in the indirect

10    purchaser cases.  They don't represent the OEMs in the

11    indirect purchaser cases, the cases are not consolidated,

12    they are coordinated, so I think as a threshold matter first

13    there was something about the argument that suggested

14    delaying further for protracted negotiations somehow would

15    make this more quick, and I don't think that makes sense but

16    more important the parties with standing to be heard on this

17    are the defendants, the plaintiffs in the indirect purchaser

18    cases and the OEMs who will be receiving the subpoenas.

19          THE COURT:  Okay.

20          MR. WILLIAMS:  The directs are strangers to that.

21          THE COURT:  So, Mr. Esshaki, you know what's

22    coming?

23          MASTER ESSHAKI:  I welcome it.

24          THE COURT:  I have no comment on it.  I'm not

25    reconsidering because I didn't consider this matter.  This is

1    going to have to go to Mr. Esshaki first, and you do what you

2    need to do with Mr. Esshaki, he will come to a resolution,

3    enter in an order, and then you can file your objections if

4    there are any and I will hear it, but I think it is a good

5    discussion, everybody while they are all here knows what the

6    issues are now and we will see what happens.  Okay.

7         MASTER ESSHAKI:  Your Honor, may I just request

8    that the objections be put in a formal motion and that a

9    formal response be replied?  Right now I just have e-mail

10   comments so we need to formalize this in an objection.

11        MR. WILLIAMS:  May I --

12        MR. KANNER:  Certainly.

13        MR. WILLIAMS:  May I suggest?

14        MASTER ESSHAKI:  Please.

15        THE COURT:  Mr. Williams.

16        MR. WILLIAMS:  I think they submitted a letter

17   brief.  I would suggest we respond to that letter brief,

18   treat that as an objection, and then that might help us

19   accelerate this process.  Is that --

20        MR. CHERRY:  Yes, we agree with that.  I think

21   anything we can do to try to move this along.

22        MR. WILLIAMS:  Because this is very important

23   and --

24        THE COURT:  Okay.  Let me be just concerned about

25   one thing because I'm always thinking about the docket too

1    because I like to see what's going on. It needs to be a

2    motion -- in the form of a motion so that it can get on the

3    docket and then have the resolution so that everybody can

4    look at it, that's one thing I just want to be sure,

5    everybody in any part can see what's going on.

6          MR. KANNER: Your Honor, Steve Kanner again.

7          That's certainly fine with us and we are happy

8    to -- as my colleague indicated, what we submitted was

9    essentially a letter brief. We will turn it into the formal

10    motion, and if Mr. Esshaki wants it briefed per se we are

11    happy to do that because we have already started the first

12    step.

13          THE COURT: Okay.

14          MR. CHERRY: I assume, can you do that within a

15    week?

16          MR. KANNER: I don't know.

17          MASTER ESSHAKI: With all deliberate speed?

18          MR. KANNER: With all deliberate speed. They spent

19    four months putting it together, it is exhaustive, and we are

20    trying to coordinate with the parties that would be impacted

21    by this. I have to agree with what Mr. Williams said, these

22    are non-parties, it is an --

23          THE COURT: Okay. Don't argue it here, that's

24    fine. Can we get a date?

25          MR. WILLIAMS: Yes, I would like a date, and I

1    would also like to request, I'm not sure it makes sense for

2    them to be coordinating with the recipient of these subpoenas

3    before this issue is resolved.

4          THE COURT:  Mr. Esshaki, do you want a date to have

5    these motions?

6          MASTER ESSHAKI:  Yes.  I would like to set a

7    deadline for when the objections can be filed formally in a

8    motion and docketed, and the responses filed and docketed.

9          MR. KANNER:  After consulting with my colleagues we

10   can do it in two weeks.

11         THE COURT:  Okay.

12         MR. WILLIAMS:  It seems extraordinarily long, Your

13   Honor.

14         MASTER ESSHAKI:  It does to me too.  I would

15   suggest you can do it in a week.  It is in the letter

16   already, all you have to do is convert the letter into a

17   motion.  Can we do a week, Counsel?

18         MR. KANNER:  Yes, we will do a week.

19         MASTER ESSHAKI:  Can we do a response in a week?

20         MR. KANNER:  The brain trust has decided a week is

21   doable.

22         MASTER ESSHAKI:  And a response in a week?

23         MR. WILLIAMS:  Yes.

24         MASTER ESSHAKI:  Do you want a reply?

25         MR. KANNER:  We do, Your Honor.

1          MASTER ESSHAKI:  Three days.

2          MR. FINK:  A month.

3          MASTER ESSHAKI:  Three days is accepted.  Thank

4     you.

5          MR. FINK:  I tried.

6          MR. CHERRY:  Shall we schedule a hearing?

7          MASTER ESSHAKI:  We can do that later, I don't want

8     to take up the Court's time on that.

9          THE COURT:  Okay.  The next issue kind of goes

10    along with the ruling on the protocol for coordination.

11    Counsel.

12         MR. RAITER:  Good morning, Your Honor.  I'm

13    Shawn Raiter on behalf of the automotive dealers.

14         There are two issues remaining open in our mind on

15    the deposition protocol, and we were prepared to argue those

16    today or talk about those.  One is the number of automobile

17    dealer plaintiffs' depositions.

18         THE COURT:  Okay.  Wait a second.  Is this not a

19    master issue?  Has the master ruled on this?

20         MR. RAITER:  We don't believe so, no.

21         THE COURT:  Mr. Esshaki, what is --

22         MASTER ESSHAKI:  Your Honor, I believe this is a

23    master issue, and I made an initial ruling, I think it was

24    revised, I made a subsequent ruling, I think we need to

25    revisit it.  I think we are on the schedule today to do that

1    this afternoon or after this hearing problem.

2            MR. RAITER:  And if that's what the Court believes

3    we will do it this afternoon, Your Honor.  Thank you.

4            THE COURT:  We will do it this afternoon.

5            MR. RAITER:  Thank you.

6            THE COURT:  The Court is trying very hard not to

7    interfere with the master.  As I said, it is the first time I

8    have had a master and I don't want to interfere with him,

9    so --

10           MR. SPECTOR:  Good morning, Your Honor.

11   Eugene Spector on behalf of the direct-purchaser plaintiffs.

12           There was another item included within the

13   subpoenas to the original equipment manufacturers, and that

14   is the subpoenas to the suppliers to those manufacturers.  We

15   raised an issue as to whether, in fact, the subpoenas that

16   have been served should be held up, the service should be

17   stayed so that there can be coordination between the

18   defendants who have served those subpoenas and the end-payor

19   and auto-dealer plaintiffs who have an interest in the

20   information that is being sought for purposes of being able

21   to establish their pass-on issues.

22           All we are suggesting is that there should be

23   coordination.  The subpoenas have been served, we haven't

24   seen objections, we haven't seen anything.  We only know that

25   they have been served because of some of the communication we

1    have had back and forth with regard to this issue and once we

2    had received the notice our concern was that these absent

3    class members not be served with multiple subpoenas.  The

4    defendants have coordinated amongst themself, there is no

5    issue with regard to that, the only question is at some point

6    the end payors or the auto dealers may, in fact, want

7    additional information or other information and we thought

8    rather than have the suppliers go through a multiple subpoena

9    situation that it just be coordinated at this time like the

10   OEM subpoenas were coordinated.  That's what we were

11   suggesting and that's what we have raised and why the issue

12   is on the agenda.

13        THE COURT:  But not raised in a motion to stay

14   specifically these subpoenas?

15        MR. SPECTOR:  No, no, no, not at this point.  If we

16   need to file a motion we will but we thought we could try to

17   do this informally with Special Master Esshaki, and it got

18   onto the agenda along with the OEMs.

19        MASTER ESSHAKI:  We would be glad to talk about it

20   later.

21        MR. SPECTOR:  That's fine.

22        THE COURT:  We will move that to Mr. Esshaki's

23   agenda later on.

24        I like that next issue, defendant liaison's

25   counsel.  Mr. Reiss.

1          MR. REISS:  Good morning, Your Honor.  Will Reiss

2     for the end-payor plaintiffs again.

3          So we initially brought up the issue during the

4     status conference back on June 4th, 2014, and I believe the

5     Court was receptive to the idea of appointing at least one,

6     if not a group, of defendant defense liaison counsel, and at

7     the time we were dealing with the appointment of a special

8     master so we tabled the issue.  We would like to revisit.

9     The case has grown more complicated; we now have 29 cases.

10    As my colleagues mentioned, we are trying to negotiate global

11    protective orders, other global documents, and it is

12    difficult for to us proceed ad hoc.  I mean, in some

13    instances we found that counsel for a particular defendant

14    will be speaking just for that defendant in the action, and

15    other times it seems sometimes when it suits defendants'

16    convenience they will speak for multiple actions.

17         We, Your Honor, we need some certainty going

18    forward.  There is not a significant burden on the part of

19    the defendants, we are just asking for one or a group of

20    defendants to help coordinate, lead us to the right person,

21    explain to us who is talking about what issues so we don't

22    have to guess and expend the class' resources trying to

23    figure out who we need to speak to about various issues.

24    Your Honor, we think that would be easy.

25         For example, I mean, Denso is a defendant in 18 of

1    these cases, I believe.  Wilmer Hale represents another

2    defendant.  That's 19 of the 29 cases one counsel represents

3    the vast majority of the defendants.  Maybe another one or

4    two counsel from other firms are appointed and you will have

5    counsel for all the cases, so we think it is a very limited

6    burden on defendants and something that would be extremely

7    helpful for the plaintiffs in this case.

8              THE COURT:  Okay.  I would like to hear from -- all

9    right.  Mr. Cherry?

10             MR. CHERRY:  Since our name was invoked I will

11   speak.

12             THE COURT:  All right.  Mr. Cherry, let's hear what

13   you have to say.

14             MR. CHERRY:  Your Honor, we don't believe there is

15   any need for some formal appointment of liaison counsel.

16   Most of the issues that come up in this case are very case

17   specific because we are moving forward on different

18   schedules.  There's a lot going on in the wire harness cases

19   and the discussions are between counsel for the wire harness

20   defendants and the plaintiffs.  I think bearings is trying to

21   move forward and they are talking to the plaintiffs, and

22   those are very case-specific issues.

23             On the few occasions where issues have come up that

24   are sort of broader, like there was a discussion some time

25   ago about the DOJ stay when that was initially entered, these

1    initial orders that the plaintiffs have requested -- actually

2    we initially requested and they responded to our request.  We

3    have -- some of us that were interested in those issues have

4    come together, we have coordinated among ourselves, put

5    together the defendants' positions and responded to the

6    plaintiffs and done that.  I think we have done a very good

7    job throughout this case, and the few times when there are

8    issues that cut across cases, to assemble a group of

9    defendants that are interested in those issues and to present

10    them and coordinate well with the plaintiffs, but there is no

11    need to -- to appoint some formal liaison counsel.  That, in

12    fact, makes us less flexible in terms of putting together the

13    defendants who have a stake in that issue and who want to

14    participate in a discussion of it.

15            I'm not aware of any situation where somebody has

16    failed to do that or failed to tell the plaintiffs who they

17    are speaking for, tried to make that process difficult in any

18    way.  We think we have done a great job of that, we plan to

19    continue to coordinate well among ourselves and with the

20    plaintiffs when it is appropriate to do so, and we don't

21    think there is any need for any formalization of that

22    process.

23            THE COURT:  All right.  I think I need to ask other

24    defendants if they have any comments on this.

25            MR. KESSLER:  Your Honor, Jeffrey Kessler for NTN

1   from the bearings case.

2        I will just make a brief comment.  The bearings

3   defendants completely agree with what was just stated, and

4   this is really just a solution looking for a problem.  There

5   has been no situation that has come up in the three years of

6   the bearings case where there has ever been any issue

7   figuring out who to talk to, how to coordinate.  For example,

8   we worked out our own protocols with the defendants in that

9   case; they raised it with us, we worked it out.  The few

10  times there have been cross product issues there has been

11  defense counsel communication, those who were interested

12  participated.

13       As stated, I don't think plaintiffs can point to

14  one situation in the many years of this proceeding where this

15  has ever been a problem, so we very much think it would be a

16  problem to designate people here because the reality is the

17  29 different product groups have different interests, they

18  are different cases with different people, with different

19  problems, with different discovery things.  So to charge

20  anyone saying you're responsible for those 29 cases, let

21  alone the fact that all the defendants in the case don't

22  always agree so it is not even 29, it is 29 with like 60

23  companies to represent, it simply is not possible and it is

24  not needed most importantly, Your Honor.

25       THE COURT:  Wait a minute.  Let me hear from

1    defendants first so I get --

2          MR. REISS:  Good morning, Your Honor.  Steve Reiss

3    from Weil, Gotshal & Manges.  We represent Bridgestone in the

4    anti-vibration rubber parts and Calsonic Kansei in the

5    radiators case.

6          I completely agree with the comments that

7    Mr. Kessler just made.  I have two clients in two separate

8    cases and their interests are often not the same, and having

9    a small number of liaison defense counsel --

10          THE COURT:  You're representing defendants who have

11    conflicts with each other?

12          MR. REISS:  No, no, no, we would never do that,

13    Your Honor.

14          THE COURT:  That's on the record.

15          MR. REISS:  You have to give me a chance to expand.

16    Their interests are not always the same, it doesn't mean they

17    are in conflict.  For example, one client may have an

18    interest in more expeditious resolution of certain issues

19    than another client, may have different issues with respect

20    to scheduling, and those are issues that are not conflicts

21    but they have different views of how litigation ought to

22    proceed, and that is exactly why those kinds of strategic

23    decisions about how this litigation ought to proceed are

24    exactly why you can't have one person or one small group of

25    people representing all of the defendants.  It makes no

 1    sense, and I agree this is a solution that makes no sense.

 2              MR. TUBACH:  Your Honor, Michael Tubach.  I

 3    represent Leoni in the wire harness cases.

 4              I just wanted to echo the comments of Mr. Cherry

 5    and Mr. Kessler.  I think it is entirely unnecessary to have

 6    a defense liaison counsel.  I just wanted to make sure you

 7    heard from the chorus before you heard from Mr. Williams.

 8              THE COURT:  I take it there is no defendant who

 9    supports plaintiffs' position in this?

10              MR. TUBACH:  The jury is unanimous, Your Honor.

11              THE COURT:  Okay.

12              MR. WILLIAMS:  Your Honor, I just wanted to respond

13    briefly to Mr. Kessler's comments that he didn't think there

14    had ever been an instance where this has come up.  That's not

15    true.  The deposition protocol that we are going to discuss

16    with the master this afternoon, six months ago at least we

17    sought to engage all the defendants in that discussion and

18    that's what it has now evolved to, and we are told, no, we

19    are only speaking for wire harness, we won't speak for anyone

20    else, you have to go and find them all separately and talk to

21    them.

22              Now after the last hearing, in fact, the

23    negotiations have become engaged in by one counsel

24    communicating to the plaintiffs on behalf of all the

25    defendants.  I think the point is no one is forcing strategic

1    decisions or forcing anyone to give up the right to make

2    decisions on behalf of their client, but there are certain

3    things that are overarching that apply across the board in

4    this MDL that can be done.  So defendants aren't going to

5    fight with each other within one case about a deposition

6    protocol.  We have templates and it has been done and we

7    certainly don't think that has to be done over and over

8    again, and there are many things for which a point person

9    accelerates communications.  So no one is having their right

10   to represent their client as they see fit taken away, we

11   would just prefer and we think the Court would benefit from a

12   point person for overarching issues that do apply broadly to

13   this MDL.

14         MS. SULLIVAN:  Your Honor, Marguerite Sullivan from

15   Latham & Watkins on behalf of the Sumitomo defendants.

16         The dispute about the deposition protocols I won't

17   get into the details because we heard you loud and clear that

18   that's Master Esshaki's issue, but it is actually a perfect

19   example of Mr. Cherry's comments about how when we need to

20   work together and when it makes sense to work together we do

21   so.

22         On March 19th Master Esshaki ordered that the

23   defendants and all parties actually meet and confer to

24   develop a deposition protocol that covered end-payor

25   plaintiffs and auto-dealer plaintiff witnesses, and so we

1    have done that.  So that's an instance where following his

2    ruling we got together and one of us spoke on behalf of all

3    the defendants, we negotiated a protocol and we are in the

4    process of finalizing that, and we will need to work through

5    some of the remaining disputes with Master Esshaki.

6          But there is a wire harness deposition protocol

7    that does not cover depositions that are in all of the auto

8    parts cases, that addresses depositions that are going to

9    occur in the wire harness case, that is a separate issue

10   altogether and with respect to that protocol it is not

11   appropriate to have other defendants in other cases involved

12   in those negotiations, that is a wire harness specific

13   protocol and the wire harness defendants will work with the

14   plaintiffs on finalizing that protocol.

15         THE COURT:  Okay.  All right.  I mean, listening to

16   the parties I don't hear right now that there is a need for

17   this liaison.  I think it is an interesting issue because

18   when I wanted something with defendants but it all had to do

19   with the technology, and Mr. Iwrey was called -- we contacted

20   him or he volunteered to be on the committee, but as things

21   come up I think that you can work amongst yourselves.  It

22   sounds like some of these matters that were brought up that

23   the defendants worked it out without a liaison counsel, so

24   I'm not going to appoint a liaison counsel -- or a liaison

25   counsel group, I should say, because we would never have just

1   one, but I'm not going to do that right now.  If it, in fact,

2   becomes a problem and, Mr. Esshaki, if you would simply let

3   me know if there is -- it becomes a problem and there needs

4   to be a subgroup then I will reconsider this matter and you

5   could ask the parties to put it back on the agenda, but I

6   need more than what I have heard before I would appoint such

7   a group.

8          Okay.  The next item on the agenda is the wire

9   harness, that's a ruling on issues not resolved by the

10  parties on order of Special Master.  We have no objections

11  right now, do we?

12         MR. WILLIAMS:  Well, I was just going to ask, I

13  will ask Ms. Sullivan, it seems this is something now that we

14  are going to address with the master.

15         MS. SULLIVAN:  That's correct.  That's my

16  understanding is that Master Esshaki ruled on our motion for

17  clarification on March 19th, there have been no objections to

18  that.  I think there was a misunderstanding and the auto

19  dealers believed the Court was also going to rule on that

20  motion, but based on what you said this morning I don't

21  believe that that is the case, so we will meet with

22  Master Esshaki this afternoon and finalize -- or work through

23  our remaining disputes.

24         THE COURT:  Okay.

25         MR. WILLIAMS:  And I have to say I don't speak for

1    the auto dealers, I'm not sure they would agree with the

2    characterization, but my understanding is all of this is

3    going to be discussed with the master.

4            THE COURT:  Counsel?

5            MR. RAITER:  Shawn Raiter on behalf of the auto

6    dealers.

7            We do not agree with Ms. Sullivan's

8    characterization that there was a ruling on these issues.

9    There are a number of issues that are open, and while there

10   was a preliminary order that said we need to meet and confer

11   to come up with the protocol, there still isn't a protocol.

12           THE COURT:  No.  I understand that there may not be

13   a protocol but that's going to be developed through the

14   master -- or with the master.

15           MR. RAITER:  And there are a number of issues that

16   the parties have generally reached agreement on on some of

17   the subtopics but there are some very major issues that

18   remain open that need to be either agreed upon or ruled upon

19   by the Special Master.

20           THE COURT:  Okay.  Thank you.  You will, I'm sure,

21   today or through motions bring those to the master's

22   attention?

23           MR. RAITER:  Yes, Your Honor, we will.

24           THE COURT:  Okay.  The next issue is class

25   certification and discovery schedules for Rush Trucks and

1    City of Richmond.

2            MR. SQUERI:  Good morning, Your Honor.

3    Steven Squeri from Jones Day on behalf of Yazaki.

4            Your Honor, at the January conference before the

5    Court -- the January hearing before the Court, the Court

6    instructed or indicated that you wanted us to get the Rush

7    Truck case on the same track as the other wire harness cases,

8    and we have done as instructed.  Your Honor, I just wanted to

9    state preliminarily that defendants have done so without

10   prejudice to our motions to dismiss that we are expecting to

11   file later this week.  We believe that those are good serious

12   motions, but we also wanted to accommodate the Judge's

13   instructions that we move forward and get Rush Truck on the

14   same plan.

15           What we have done is we've met with the Rush Truck

16   plaintiffs on several occasions, we have exchanged drafts,

17   and I'm pleased to report, Your Honor, that we have been able

18   to arrive at a mutually agreed upon discovery plan which

19   essentially places -- is intended to get them on the same

20   track with the other automotive wire harness cases so that --

21   we have already provided them documents, we have talked about

22   how we are going to address depositions.  And the actual plan

23   itself I believe has already been filed or will be filed

24   today with the Court, we were able to basically put aside the

25   remaining issues last night and this morning and we are ready

1     to move on it, but that will be presented to the Court very

2     shortly if it hasn't already been filed.

3          THE COURT:  Very good.  Wonderful.  Thank you.

4          MR. SPERL:  Your Honor, this is Andrew Sperl

5     representing rush trucks.

6          Just to second what Mr. Squeri reported, my

7     understanding is that my colleague, Mr. Parkes, gave consent

8     today to have the discovery protocol filed so that should be

9     filed very soon, and we are pleased to report we had a

10    productive meet and confer process with defendants on this.

11         THE COURT:  Wonderful.  Thank you.

12         MR. SPERL:  Thank you.

13         MS. QUADROZZI:  Good morning, Your Honor.

14    Jaye Quadrozzi on behalf of City of Richmond.

15         Your Honor, we were involved in discussions along

16    the same line in terms of getting on the same page with

17    respect to discovery.  We received Your Honor's order with

18    respect to the motion to dismiss, and we are in the process

19    of discussing the implications of that order with the various

20    clients, and so we need to do that before we proceed any

21    further.

22         THE COURT:  Okay.  Do you think -- how long would

23    it take you to do that, let me ask you that?

24         MS. QUADROZZI:  In short shrift, whether or not we

25    are able to accomplish it in a week or ten days, that's sort

Case 2:12-md-02311-SFC-RSW  ECF No. 975, PageID.13018  Filed 05/19/15  Page 53 of 182
REDACTED      Status Conference & Motion Hearings • May 6, 2015      REDACTED

53

1    of the time frame we are looking at.

2              THE COURT:  Okay.  And then you will --

3              MS. QUADROZZI:  To the extent that there was issues

4    with respect to the discovery protocol, we would bring those

5    to Master Esshaki, and then objections to the extent they

6    existed would come to Your Honor.

7              THE COURT:  All right.  Thank you.

8              MS. QUADROZZI:  Thank you.

9              MR. SQUERI:  Your Honor, if I could just comment on

10   that briefly?

11             I understand that my co-counsel has been in contact

12   with counsel for the City of Richmond about setting up at

13   least conference calls for the purpose of trying to get at a

14   discovery plan which we would anticipate would be very close

15   to what we have done in Rush Truck.  The only difference

16   would be is that unlike Rush Truck where there is a class

17   cert briefing schedule, given the current status of the City

18   of Richmond case there would not be such a briefing schedule,

19   but as far as we are concerned it makes all the sense in the

20   world to get them on the same schedule to avoid duplicative

21   depositions and unnecessary duplication of discovery, and we

22   are prepared to do that forthwith.

23             THE COURT:  Yes, that would be excellent if you

24   could coordinate those dates, okay, and I think you will be

25   able to.  I don't think it is going to take that long for

 1    you -- as you said, it might be a week or so to deal with

 2    your clients.

 3              MS. QUADROZZI:  Yes, Your Honor.

 4              MR. SQUERI:  Your Honor, while I am up here would

 5    you mind my jumping ahead two places on the agenda because it

 6    is related to what we were just discussing?

 7              THE COURT:  Okay.

 8              MR. SQUERI:  That is with respect to the Rush Truck

 9    motions to dismiss and the argument on those motions.  The

10    parties have agreed to a briefing schedule.  As indicated we

11    will be filing those motions later this week, the briefing is

12    expected to conclude on August 28th, and then we have a

13    conference with the Court on September 9th, I believe, is the

14    date.

15              THE COURT:  Right.

16              MR. SQUERI:  I don't know whether or not that would

17    be sufficient time for the Court to consider those motions,

18    we are anxious to have them heard, if not we would suggest

19    that perhaps we schedule a hearing date a few weeks -- a

20    couple of weeks or so down the road.

21              THE COURT:  Your briefing will be done August 28th,

22    and we are scheduled September 9th.

23              MR. SQUERI:  Yes.  I understand and I expect, Your

24    Honor, that it is going to be extensive briefing based on

25    what my colleagues have shared with me, so what we are

1    suggesting is if the September 9th hearing on the motions

2    does not work we would like to see if we could have a special

3    hearing date set for sometime in the latter part of September

4    in order to try to get those motions heard particularly since

5    we have discovery going on in parallel with those -- with the

6    motion.

7            THE COURT:  Okay.  We probably will end up with a

8    special hearing date, it just depends on what other motions

9    are filed.  If we end up with another dozen motions then it

10   would be very difficult to get yours in.  If we end up with

11   not that many ready to go and we could spend the whole week

12   just on your motion, that would be great, so I don't know

13   yet.

14           MR. SQUERI:  Understood, Your Honor.

15           THE COURT:  But I could understand why you wouldn't

16   want to wait until the next date.  Okay.  Would you

17   indicate -- I guess I would ask all of you to indicate if you

18   could when you file whether oral argument is required.  Okay.

19           Counsel?

20           MR. SPERL:  We simply defer to the Court's

21   scheduling of the argument.

22           THE COURT:  Okay.  Thank you.  The Ford action.

23           MS. LEIVICK:  Good morning, Your Honor.

24   Sara Leivick for Ford Motor Company.

25           Your Honor, Ford and the Fujikura defendants have

```
 1    agreed upon a discovery schedule in the Ford action and we

 2    submitted a proposed stipulated order to Your Honor, and we

 3    would just request respectfully that Your Honor enter that

 4    proposed order.

 5            THE COURT:  Okay.  You submitted it to my clerk

 6    already?

 7            MS. LEIVICK:  Yes, Your Honor.

 8            THE COURT:  Okay.

 9            MS. LEIVICK:  Thank you.

10            THE COURT:  Plaintiffs' motion to amend on the

11    bearings case.

12            MR. HOESE:  Your Honor, William Hoese, H-O-E-S-E,

13    with Kohn, Swift & Graf.

14            We recently filed a motion for leave to amend the

15    bearings complaint.  We provided it to the defendants on

16    April 8th.  As they foreshadowed for us in the earlier

17    discussions, they have objected to it and have filed a motion

18    in opposition.  I do want to point out initially that

19    according to their own schedule that they have been

20    proposing, and my partner, Mr. Kohn, will address that next,

21    they provided for motions for leave to amend being filed by

22    March 30th, 2015, so even in their own schedule that they are

23    presenting is somehow amending this complaint would interfere

24    with, they provided for motions for leave to amend and I

25    understand the Court has final say.
```

57

1          THE COURT:  Wait a minute.  I don't have -- you

2     have plaintiffs' motion to amend complaint and then they

3     filed a motion?

4          MR. HOESE:  They filed a -- pardon me, Your Honor.

5          THE COURT:  A response to your motion?

6          MR. HOESE:  They did, that was filed yesterday, and

7     they raised certain objections to it that if Your Honor would

8     like me to address this morning?

9          THE COURT:  No, no, I don't need the objections.

10          MR. HOESE:  I would like to address their

11     objections now and we can short circuit the reply briefing

12     and things like that, if I could tell you why we think their

13     objections are misguided and that the Court should, in fact,

14     grant our motion.

15          Essentially what the defendants would propose is we

16     have added -- we propose to add a number of subsidiaries of

17     current defendants who have pled guilty to or whatever the

18     procedure is in Europe to in part of a bearings conspiracy.

19     Also we were provided information only after the argument on

20     the initial motions to dismiss, this was important, new

21     information, it was unknowable to us at the time, we have

22     those materials, we had to evaluate them, consider how they

23     could be integrated into a complaint, which we have done,

24     and --

25          THE COURT:  Okay.  Let me ask you, you are

1    proposing to -- I haven't read any motions and we didn't get

2    a reply so that's why I'm asking you.

3            MR. HOESE:  All right.

4            THE COURT:  You're saying that your motion is to

5    add the subsidiaries who have pled guilty in the proceedings

6    but you have to look at what papers, what are you saying?

7            MR. HOESE:  Oh, no, Your Honor, I was explaining --

8    one of the things they do is complain about the fact that we

9    didn't do this earlier.  In addressing that objection by the

10   defendants to allowing us to amend the complaint, I wanted to

11   explain to the Court what was going on with the plaintiffs in

12   obtaining this new information or being provided to them and

13   the process that we had to go through, which is why we

14   integrated all of this into our amended complaint.  Their

15   proposal is to essentially have us file two new complaints

16   which would then be consolidated and presumably then the

17   original case would go forward and these cases would go

18   forward and I just don't see how that would be more efficient

19   for the defendants or the Court to file two new complaints

20   when we can integrate this all into a single complaint which

21   can be slotted into any schedule that is ultimately agreed

22   upon by the parties.

23            There are other things that they provide, I

24   understand you haven't had an opportunity to read all the

25   papers, but they are real Janus faced about their argument;

1    on the one hand they claim we are delaying things and that

2    this delay would prejudice them, on the other hand what they

3    have said in their papers is well, you are going to sue these

4    foreign subsidiaries of ours, well, we are not going to

5    accept service so you have to do Hague service.  Originally

6    they all accepted service of process and got the case moving

7    along more speedily.  They could rescind their objection and

8    let us file it understanding that the Court has the final say

9    about whether or not they would allow it.  Third, they could

10   provide us the documents -- the DOJ documents, and, again, as

11   I left the office yesterday my understanding is that it was

12   only one -- I could be wrong so I don't want to say but only

13   one of the defendants that had promised to provide these

14   documents to us by April 28th, and that only one had provided

15   them and I think one may have asked for an extension.

16        Our schedule suggests actually a speedier -- to get

17   the transaction data, to get these other materials to us and,

18   again, as Mr. Kohn will describe to you, we have kind of a

19   middle ground on the schedule but all of the new defendants

20   would be integrated into this schedule, whatever schedule is

21   ultimately agreed on, without causing undue delay or any

22   prejudice that I could see to the defendants so --

23        THE COURT:  But you either add them to this

24   complaint or you sue them separately?

25        MR. HOESE:  Well, that's the defendants' proposal,

 1  right, which we would do that, yes, Your Honor, if that were

 2  the case we would do that.

 3          THE COURT:  Let's hear from the defendants.

 4          MR. HOESE:  Thank you, Your Honor.

 5          MR. KESSLER:  Good morning, Your Honor.

 6  Jeffrey Kessler again for the NTN defendants, and I will

 7  address this.

 8          I'm sorry, Your Honor, we didn't know that they

 9  were going to raise their right to file a reply brief so that

10  this was up, but I'm happy to address right now.

11          THE COURT:  I didn't either.  We did not get a

12  reply brief.

13          MR. KESSLER:  But let me take a minute to explain

14  what the amendment is for Your Honor's benefit since I know

15  you haven't had a chance to read the papers and why we are so

16  strongly opposed to it.

17          This amendment does not simply add new information

18  that came out somehow and they just want to add that, there

19  is a little bit of that in the complaint but that's not the

20  basis of the objection.  What it does is, first of all, it

21  adds an entirely new defendant, Minebea, who recently had a

22  plea that has nothing to do with the issues in this case.

23  Okay.  They are a small bearings manufacturer that entered a

24  plea about bearings that go into things like ATM machines and

25  toasters.  Okay.  Nothing to do with auto parts.  This is

```
 1    called the auto parts MDL, nothing to do with auto parts,
 2    nothing to do with the industrial bearings that have also
 3    been raised in our case, and this should be a separate case
 4    if it is one against Minebea.  Okay.  So it has nothing to
 5    do -- they are not related to any of the other defendants,
 6    the other defendants says when you look at the DOJ's
 7    discussion of this at the sentencing hearing it had nothing
 8    to do with this case, these allegations, the two pleas that
 9    are in this case completely unrelated.  Now we are going to
10    come back why are they doing it, why are they putting it
11    together other than the fact it's a metal-coated bearing but
12    I will come back to that.
13          The second thing it does is it adds a group of
14    European defendants, some of whom the Court has previously
15    dismissed in other context for lack of personal jurisdiction.
16    Okay.  And all of these new European companies may not be
17    here, I don't know if it is true for all of them, but many of
18    them would have personal jurisdiction arguments regarding
19    this.  And the reason they are adding them is one year ago --
20    I want to emphasize that, Your Honor, one year ago the EU
21    entered a final resolution consent decree in the bearings
22    industry which included these European companies, so one year
23    ago they could have moved to add them if they wanted to do
24    this, and I will talk about the significance of waiting for
25    this now.  So it would both add an entirely unrelated case,
```

1   okay, because the new small bearings will now require

2   discovery of ATM makers, small appliances, medical devices,

3   all these things that have nothing to do with our matter, and

4   the foreign defendants, some of them already have prevailed

5   before Your Honor on personal jurisdiction, are likely to

6   have a group of new personal jurisdiction motions which as

7   Your Honor knows takes a long time to resolve, they may seek

8   discovery just on that, and doing that.

9           So the question is Rule 15 is liberal but it is not

10  unlimited.  Liberal does not mean unlimited.  And so the

11  question is what are the limitations that the courts have

12  recognized, and this is all in our brief, Your Honor, I am

13  sorry for repeating it but you haven't had a chance to read

14  it yet.  So what the courts say is look at two very important

15  factors.  First, has there been diligence on the part of the

16  plaintiffs, have they waited too long?  Well, this is a

17  three-year-old case, I want to emphasize that, a

18  three-year-old case where they knew about the foreign

19  companies in the EC decision a year ago, and the Minebea one

20  doesn't belong in this case, and so the question is seven

21  months ago when Your Honor denied the motions to dismiss the

22  direct purchaser counsel came to us right at that hearing and

23  said will you consent now to a motion to amend, and we said

24  well, could you tell us what it is, we want to know what it

25  is.  They wouldn't tell us in advance so we didn't consent,

1   but that was seven months ago even on that schedule, so there

2   is no explanation that could justify this delay.

3            Now, if it was just delay you would say well, okay,

4   is it no harm, no foul, because the other factor is prejudice

5   to the defendants.  What I'm going to tell you, Your Honor,

6   is the delay has caused severe prejudice to these defendants

7   if you are to allow this.  What is the prejudice?  The

8   prejudice is the second item on this agenda.  The second item

9   on this agenda for bearings is that we are going to be

10  pleading with Your Honor, and I mean pleading when we get up

11  on this, to please set July 2016 consistent with Your Honor's

12  admonishment last time that the cases should move forward to

13  be decided for a date of filing the class certification in

14  bearings.  We think that is critical to move this case

15  forward.  It will allow Your Honor to decide class

16  certification five years after the complaints have been

17  filed, which is hardly extraordinary expedition.  We think

18  this is crucial in terms of the interest of our clients and

19  we think the federal rules entitle us to that.

20           They didn't file these amendments, Your Honor, I'm

21  not going to cast stones but I'm going to say the facts,

22  until after we raised this scheduling request and they

23  started to say no, no, no, we can't move on that schedule

24  with you and the indirects said you should coordinate it with

25  five other groups of parts people, we want you all together,

1    we can't move that fast, we don't want to do this suddenly

2    after telling us seven months ago there is going to be a

3    motion to amend.  Well, what drops on our desk?  A motion to

4    amend that includes a company Minebea that has no conceivable

5    relationship to this case and these foreign defendants they

6    knew about a year ago.  So what is the result of what they

7    have done if this were granted?  It is going to make it

8    impossible or near impossible for us to get the expeditious

9    consideration of this case, and I use the word expeditious,

10   Your Honor, mildly, it would be five years that we are

11   entitled to, that's exactly when Rule 15 says you don't grant

12   the motion for leave to amend.  So, yes, in Minebea they

13   should file a separate action if they want to do that; it is

14   a separate plea, it is a separate part, it becomes number 30,

15   it should be number 30 if there is going to be one.

16          With respect to the foreign defendants, there is no

17   excuse for waiting the year.  Now, I don't know if they want

18   to file a separate case against them or not, they could and

19   then their personal jurisdiction motions can play out over

20   the next six months or whatever they are going to in that

21   case, that's up to them, I frankly don't think they need any

22   of those companies and that the only reason they have added

23   those companies, they have plenty of companies here in the

24   bearings case, is really just for the delay that this will

25   do.  Your Honor, we think for all of these reasons this is a

1    classic case where other courts in this circuit which we have

2    cited to you, both district judges and at the circuit level,

3    would say this is why Rule 15 exists and why the rule is not

4    like you get to amend once as of right, you don't get to

5    amend again when these factors are present.  Thank you, Your

6    Honor.

7              THE COURT:  Mr. Reiss?

8              MR. REISS:  Hi, Your Honor.  Will Reiss for the

9    end-payor plaintiffs.

10             We, similar to the directs, filed a motion to

11   amend.  We haven't received an opposition from the defendants

12   yet, hopefully maybe we won't get one, although I suspect we

13   will.  I want to point out one important distinction.  Our

14   case is limited to automotive bearings and so similar to the

15   defendants we added Minebea as a defendant but only as to

16   automotive bearings.  So with respect to Minebea, this new

17   party, we just learned about a guilty plea I believe it was a

18   couple of months ago, it is part of the case, it fits within

19   the case.  Clearly if Minebea wants to file a motion to

20   dismiss and contest their allegations they are welcome to do

21   so, but to have other defendants come in and take up

22   arguments for another defendant they simply don't have

23   standing to do that.

24             With respect to some of the additional information

25   we pleaded, we received confidential information several

1    months ago that we added to our complaints.  We wanted to be

2    prudent, we wanted to wait to file our amended complaints

3    until we had sufficient and additional information so they

4    weren't required to do it piecemeal.  I'm hearing a lot from

5    defendants about prejudice but let's talk about where we are

6    in the case.  As I understand it I think the stay in bearings

7    ended three months ago.  We don't have any documents, we just

8    started I think, as Mr. Hoese pointed out, we got the DOJ

9    documents from one foreign defendant in bearings so it is not

10   as if defendants have started producing documents and busy

11   preparing for this case, they haven't produced a single

12   document and nothing precluded them from doing that.  So we

13   are in a position now where there is no prejudice.

14            To the extent there are foreign subsidiaries that

15   we have added to the complaint, defendants can simply agree

16   to accept service as they should and we can move forward.  If

17   they want to file a personal jurisdiction motion we can

18   resolve that expeditiously.  We have done it, Your Honor, in

19   wire harness.  We learned --

20            THE COURT:  Let me ask you a question, what are you

21   adding beside the foreign subsidiaries and the other company?

22            MR. REISS:  For instance, Your Honor, there --

23            THE COURT:  What are you amending?

24            MR. REISS:  There were some guilty pleas that we

25   learned about subsequent to the filing of our last complaint,

1    so we have expanded --

2             THE COURT:  For parties already in the case?

3             MR. REISS:  For parties that are already in the

4    case, and we have expanded the class period to account for

5    that because the guilty pleas predated what we had initially

6    thought the class period was, we have added new defendants,

7    we have included some additional facts, just background facts

8    that don't affect anything.

9             THE COURT:  All right.  Just a minute.  Could you

10   respond as to those issues, I'm not talking about the foreign

11   subsidiaries?

12            MR. KESSLER:  Or Minebea.

13            THE COURT:  Yes.  What is the name of that?

14            MR. KESSLER:  First of all --

15            THE COURT:  Spell that company you are talking

16   about.

17            MR. KESSLER:  M-I-N-E-B-E-A.  That's the other

18   unrelated company.

19            THE COURT:  Okay.

20            MR. KESSLER:  With respect to the guilty pleas, it

21   is true I believe about one year ago -- how long ago was the

22   guilty plea?

23            MS. KAFELE:  2013.

24            MR. KESSLER:  2013, Your Honor, two years ago there

25   were guilty pleas which Your Honor I believe addressed in

 1    your decision in 2014 that discussed the fact that two of the

 2    defendants in this case entered into guilty pleas which had a

 3    different period of time than was originally in their

 4    complaint.  They could have two years ago moved to make that

 5    allegation.  In any event, the period of time is classically

 6    something where the pleadings are going to conform to the

 7    proof anyway, they don't have to amend if it turns out they

 8    have a longer period of time, so that's not the controversial

 9    issue here in terms of that but they could have done that two

10    years ago if they thought there was a legal and important

11    reason for them to do that.  It wasn't, Your Honor, from some

12    secret information they got from somebody, it was in the

13    public record two years ago.

14          Second, Your Honor, they made the very strange

15    statement that they couldn't get any discovery for the last

16    two years because of the stay.  As Your Honor knows, this

17    stay was very carefully negotiated to permit them to do full

18    transactional discovery and other related class discovery the

19    entire period of time.

20          THE COURT:  Okay.

21          MR. KESSLER:  And they sought nothing, Your Honor,

22    during that time.  That's my point.

23          THE COURT:  That's enough.  I'm not going to allow

24    you to amend your complaint.  You may file other cases, but I

25    think we are going to proceed with the bearings case and we

 1   are going to proceed with your class cert, you are going to

 2   have to do a schedule as indicated.

 3          MR. KESSLER:  Your Honor, let me just address that.

 4   What I think Your Honor should decide on that is the

 5   following:  If you agree that July 2016 is the correct end

 6   date for the class certification motion, because that's the

 7   big dispute, that's when they would file.  We could -- there

 8   may be other disputes, we proposed interim dates, we are

 9   happy to work out all interim dates with them or with the

10   master, that would seem too detailed for Your Honor.  What we

11   would need from you is the date for filing should be

12   July 2016, which we figure that's more than 14 months from

13   now, it is a very long time for them to do what they need to

14   do.  Number two, that we get our own class certification date

15   where obviously we don't want to wait to coordinate, other

16   parts may have other issues and other desires, we shouldn't

17   be there.

18          By the way, the direct purchasers agree with that,

19   only the indirects have said no, we would like you to wait

20   until you coordinate and come up with a proposal with five

21   other parts groups, which we don't think is appropriate.

22   Their rationale is some of those groups have cases filed

23   first but Your Honor knows very well it is not like it is a

24   grocery store where who has the earlier docket number moves

25   on a certain schedule, it depends on which case is ready,

1   that's how all cases work.  This isn't even as Your Honor

2   notes an MDL for our cases, they are just related cases

3   before Your Honor is how they have been filed at least for

4   the later parts like ours, so we need that.

5        And then the third point of all of this, we would

6   like the directs, the indirects and rush trucks, who are the

7   same all seeking class to all be on the same schedule.  Those

8   are the only three things we think we need Your Honor to

9   address, and then if there are interim date issues we have

10  made a proposal, they would have certain changes, we propose

11  giving them 11 months for our transaction documents to review

12  before class certification, maybe they want 12 months, which

13  they seem to say they need a year, that's certainly not

14  anything Your Honor has to worry about; if we have a dispute

15  on that we can work that out with the Special Master.

16        THE COURT:  Why shouldn't the master determine this

17  when he's going to have the information on the discovery that

18  is necessary?

19        MR. KESSLER:  Your Honor, we actually presented

20  this to the master so I will let him speak to this because he

21  wrote back a letter to us saying he thought that the main

22  issue of the date of filing was your schedule and he did not

23  feel it was appropriate that he would express a view on your

24  schedule of that, so that's why we are here with this issue

25  but we did try to present it to the master.

1          MASTER ESSHAKI:  That's accurate.

2          THE COURT:  Mr. Esshaki, I'm sorry, I can't hear

3    you.

4          MASTER ESSHAKI:  They provided me with a letter

5    asking me to adopt the July 16th class certification deadline

6    and adopt the schedule in the wire harness case for their

7    case, and I indicated to them that I felt the decision of

8    whether the class certification motion should be set for

9    July 16th and that they track with the wire harness case is

10   your style decision.

11         THE COURT:  Okay.

12         MASTER ESSHAKI:  I can deal with discovery disputes

13   and discovery schedules, but whether this should be set for

14   certification with wire harness schedule really I believe was

15   your decision to make.

16         THE COURT:  Okay.  But the issue of discovery you

17   don't have any issues -- there is no reason --

18         MASTER ESSHAKI:  I have no problem.

19         THE COURT:  -- that you know of at this point why

20   that date cannot be met, I mean, it seems like an awful long

21   way away?

22         MASTER ESSHAKI:  Your Honor, let me just point out

23   one other thing and I think this has general application.

24   The issue came to me via a letter, and this is the second or

25   third time I have received a letter asking me to intervene on

Case 2:12-md-02311-SFC-RSW ECF No. 975, PageID.13037 Filed 05/19/15 Page 72 of 182
REDACTED       Status Conference & Motion Hearings • May 6, 2015       REDACTED

72

1   something, and truly it needs to be -- all of this needs to

2   be filed in formal motions so there is a court record, a

3   motion, a response, a reply, and then I can get involved and

4   then we will have it papered in the docket and the ruling

5   will be papered in the docket, so letters just I've got to

6   ignore.

7           MR. KESSLER:  Let me apologize for that.  We

8   misunderstood your rules as saying you wanted letters for

9   scheduling issues, and we interpreted that to mean this type

10  of matter should be presented this way but we now understand

11  that you would like a motion for that and we obviously could

12  immediately convert that.

13          But in any event, Your Honor, I think the master

14  agrees we need you to set the date and then any interim

15  issues we could certainly work out.  I hope we'll be able to

16  work -- I think once we have the date we'll be able to work

17  it out, but if not we'll go to the master.

18          THE COURT:  Let me hear from the plaintiffs before

19  I decide on this.

20          MR. REISS:  Your Honor, with the Court's

21  permission, if I could just address very quickly the

22  amendment issue, and I respect the Court's opinion that you

23  are not permitting us to amend to the extent it prejudices

24  defendants, but I would ask the Court's permission for a

25  limited amendment for two issues, one, for the end-payor

73

1   plaintiffs to add Minebea.  Again, our claims as to Minebea

2   are just limited to auto parts so there should be no

3   prejudice --

4           THE COURT:  No, it is a separate defendant and we

5   are going to do that separately, and if that's all it is

6   there will be a motion and we will handle it, but I don't

7   want to delay the main bearings case defendants.

8           MR. REISS:  So just to clarify, when you say a

9   separate --

10          THE COURT:  You will file a separate complaint.

11          MR. REISS:  A separate individual complaint that

12  would name just Minebea?

13          THE COURT:  Yes.

14          MR. REISS:  And then with respect to the class

15  period reflecting the guilty pleas that we learned about

16  several months ago, again, no prejudice to defendants in that

17  situation, they haven't produced any documents, this now

18  reflects their guilty pleas.  Could we be permitted to amend

19  the complaint to at a minimum reflect this extended class

20  period, as I said, reflects the facts that we have learned

21  about in their guilty pleas with no prejudice to them?

22          THE COURT:  Do you need an amendment to do that?

23          MR. REISS:  Again, I think it frames discovery, I

24  think it frames what the issues are so defendants can defend

25  their case and we can proceed and litigate our case as we

1   understand it.

2         THE COURT:  So you would like to amend simply to --

3   excuse me, yes, to amend?

4         MR. REISS:  Simply to extend the class period to

5   reflect the information we know as to the guilty pleas.

6         THE COURT:  Okay.

7         MS. SALZMAN:  Your Honor, Hollis Salzman for the

8   end payors.

9         To respond to the motion for discovery schedule in

10  bearings, a couple of things, Your Honor.  One is we think

11  that the schedules should be set forward in all of the cases,

12  not -- right now we have wire harness schedule, we need to

13  have schedules in all of the other 28, 29 cases.

14        THE COURT:  Not at the same time you are saying?

15        MS. SALZMAN:  Well, it was my understanding that

16  your court was looking -- we set wire harness out, wire

17  harness has been already speeding through discovery, we have

18  gotten the documents, we are close to taking depositions.

19  There are many other cases that may want also a July 2016

20  date.  In fact, we were just contacted by counsel for the

21  AVRP defendants who also want that date.  So we are taking a

22  more global -- this is an MDL, we are taking a more global

23  look at what is going on, and what we propose is that the

24  parties or a subset of the defendants' parties sit down

25  either with the Special Master or not to bother the Special

1  Master but to come up with a schedule of perhaps groupings.

2      So we have wire harness, that's the first one out

3  of the gate, that will give Your Honor an understanding, a

4  taste of what the class certification proceedings are going

5  to look like in these cases, and then set not with a huge

6  difference in between but to set some kind of space between

7  wire harness where we will all have gotten a level of

8  learning curve, and then set the next group of cases. So it

9  wasn't that we were insisting that it has to be the next

10  eight out of the gate in terms of filing date, that made the

11  most sense to us because those are the cases that are further

12  along in discovery.

13      The bearings defendants have come to the Court

14  saying this is unfair, we have to rush, it is, you know, we

15  are being prejudiced, meanwhile they have not -- although

16  there was a DOJ stay they were certainly more than able to

17  produce voluntarily discovery to us. They never produced one

18  document except for the amnesty applicant who produced a very

19  small number of documents to us and that was only last

20  summer. In addition, the DOJ documents which they now say

21  they are going to produce to us are already late, we've only

22  gotten them from one of the defendants. These defendants

23  have already gathered these DOJ documents, they have them in

24  their possession and they have yet to give it to them, so for

25  them to come in and claim, oh, we are late, we are late,

```
 1    things aren't speeding, it is not right and --
 2              THE COURT:  Okay.
 3              MS. SALZMAN:  So my proposal is that we come up
 4    with a plan for the Court to carefully --
 5              THE COURT:  I can tell you something now, and I
 6    know defendant can argue all you want, but I will tell you I
 7    want to get a grasp on these class certs, and I set wire
 8    harness because it was the first one and I thought it would
 9    be ready, I'm sorry it is so far out, but I did agree to
10    that.  Okay.  I want to do wire harness first.  I want to
11    know what's -- how to handle this best and I don't really
12    have the staff or the time to deal with multiple parts class
13    cert, so I can tell you now I'm going do the wire harness
14    alone first.  That's just -- that's all I can handle at one
15    time.  I think the others will go much faster once I have
16    that and once we all have that under our belt, we will see
17    how it is going.  This is not to prejudice any defendants
18    that are waiting or any plaintiff classes that are waiting,
19    but we are going to go with wire harness.
20              MS. SALZMAN:  I just suggest, Your Honor, if you
21    would indulge the parties, that we could sit down as a group
22    and figure out a logical plan for the successive class cert
23    motions, you know, they can be grouped together so that it is
24    not just one every six or eight months --
25              THE COURT:  Right.
```

77

1      MS. SALZMAN:  -- but a group of them so that you

2   are not inundated with 30 class cert motions to hear on a

3   single day, but I think if we can be practical about it and

4   try to measure them out with some ease, you know, all the

5   experts are very costly and I don't think the defendants want

6   to hire multiple experts nor is it good for the class to hire

7   multiple experts just to keep up with the pace to have 30

8   motions filed on the exact same day, and I think that would

9   be a burden to the Court as well.

10      THE COURT:  Okay.

11      MS. SALZMAN:  So I would suggest that we be allowed

12   to try to meet and confer, come up with a schedule, and if we

13   can't come up with a schedule perhaps by the next status

14   conference to present the plans of each side either to

15   Special Master Esshaki or to Your Honor and to have a

16   meaningful discussion and come up with a practical approach

17   to the schedule for the rest of the cases.

18      THE COURT:  Okay.

19      MR. KESSLER:  Your Honor, if I may?

20      THE COURT:  Yes.

21      MR. KESSLER:  First of all, I'm going to urge Your

22   Honor to set July 2016 for bearings as the date, to not delay

23   that to the next status conference which is another four,

24   five months.  It is building -- it is granting plaintiffs'

25   request for delay before we even get to a proposal, that's

 1    urgent for us, Your Honor.  And, Your Honor, I want to be

 2    clear we -- NTN, Natchi, we have already given them their DOJ

 3    documents so I don't understand that.  We were ready to do

 4    all transactional discovery, they never requested it from us

 5    this whole period of time.  Now, plaintiffs have a lot of

 6    lawyers and I understand that there are only a few liaison

 7    lawyers but they chose to have 29 parts classes, they

 8    represented to the Court they had the resources to do this.

 9         With respect to the Court, I fully appreciate Your

10    Honor will set whatever schedule for hearing you deem most

11    appropriate, but I would respectfully suggest having the

12    briefing and the expert reports in perhaps one or two other

13    parts besides wire harnesses available to Your Honor, even if

14    you are going to decide just wire harnesses first, I will

15    represent to you will be of great benefit to the Court to see

16    how the plaintiffs' proposed methodology might or might not

17    apply in different circumstances so -- and there will be

18    different experts providing --

19         THE COURT:  So kind of like you want to file amicus

20    briefs and --

21         MR. KESSLER:  But rather than do that we would

22    brief our motion, Your Honor might decide I'm just going to

23    decide wire harnesses but sort of the worst thing for the

24    Court would be to take a particular view based on what are

25    really unique facts about wire harnesses, okay, because there

1    are some unique facts, and then perhaps take a view of

2    certain things and then find out when I look at two or three

3    others, jeez, this really informs me now because they are

4    going to have the same expert approaches to these different

5    matters so we are trying to present what's more efficient and

6    effective to the Court in terms of -- I certainly agree you

7    cannot hear 30 motions at once.  However, I would note that

8    their proposal of taking it to its logical conclusion, which

9    would say like six, seven-month intervals between the motion,

10   I hate to say this, Your Honor, it is 25 years before you

11   reach the last class certification motion under that

12   approach.  I don't think that's what the Court has in mind,

13   so what our thinking is --

14           THE COURT:  Have we talked settlement?

15           MR. KESSLER:  I won't be here, Your Honor.  Look,

16   what we thought was most efficient we are willing to go

17   forward, perhaps vibration parts is willing to go forward.

18           THE COURT:  Okay.  I don't need any more of this.

19   Thank you.

20           MR. KESSLER:  Thank you, Your Honor.

21           THE COURT:  Thank you.

22           MS. SALZMAN:  Well, Mr. Kessler is slightly

23   misstating what I'm saying, although I think Your Honor

24   understands what I'm saying, which is not to have one case

25   every X number of days but just to put the cases in some kind

1    of order where there's waves.  So we have wire harness,

2    that's the first case, that's the case that's furthest along,

3    we are going to have a lot of experience after seeing how

4    wire harness shakes out, and then the next group of cases

5    within a reasonable amount of time.  We are not talking about

6    3,000 cases, we are talking about 30 cases, and if they are

7    blocked together in a large group once you have a good

8    understanding of what the class proceedings look like I think

9    Your Honor is going to be more than able to conquer a more

10   aggressive schedule, and I think that if we work together we

11   can propose that to you.  This idea of amicus briefs from

12   some defendants, not all the defendants, then we would have

13   to file oppositions to those amicus briefs, and these are

14   different defendants in some of the cases and that would

15   become quite complex I think over time when we are trying to

16   ease the burden on the Court in understanding let's look at a

17   picture of one case and then as we do with all the other

18   cases that's the model for cases two, three, four, five, six,

19   et cetera.

20           THE COURT:  Okay.

21           MS. SALZMAN:  Thank you.

22           THE COURT:  Okay.  What do you want?

23           MR. KOHN:  Good morning, Your Honor.  May it please

24   the Court, and good morning, Special Master Esshaki, may it

25   please the Court, Joseph Kohn from Kohn, Swift & Graf in

1    Philadelphia for the direct purchaser plaintiffs.

2            THE COURT:  It's these Philadelphia lawyers that

3    have to get the last words.  Go ahead.

4            MR. KOHN:  Our position is the direct purchasers

5    are somewhat in the middle between where the defendants have

6    presented and where our friends on the indirects' side have

7    presented.  I promise I will not take as long as the other

8    presentations you've had, I don't speak as quickly as

9    Mr. Kessler but I won't take as much time I hope, but there

10   are several key points I want to set forth to the Court with

11   respect to how we fit into this.

12           We are not -- we do not want to delay, we are the

13   plaintiffs, we want to move this case along.  We are

14   perfectly happy to engage in a discussion of a schedule just

15   on the bearings case.  If other cases can dovetail with that

16   or be staggered relative to that we are happy to engage in

17   those discussions.

18           The counterproposal that we made to the defendants

19   and as Your Honor knows, the motions to dismiss were decided

20   seven months ago, the stay was lifted the end of January.

21   February was cold and no one moved.  In March they proposed a

22   schedule to us, we had discussions back and forth, we sent

23   our counterproposal.  Our proposal was about six months

24   beyond their dates although we asked for some key discussion

25   and negotiation around some of the interim dates.  The

82

1    schedule we propose and we are happy to live with and

2    negotiate further from is a much more rapid schedule than the

3    wire harness schedule.  The documents in wire harness began

4    production in the end of 2012.  We just are getting DOJ

5    documents here in April, May of 2015.  If we had the same

6    time lapse as wire harness we'd be talking about 2019, we are

7    not talking about that.

8         We began receiving the transaction data in harness

9    in the fall of '14.  The motion is due 20 months

10   approximately after the transaction data.  Here we propose --

11   we have asked can you get the transaction data to us in May?

12   They suggested August, the middle of August they would give

13   the transaction data.  Well, it has been five years and

14   that's where we get some concern, there is a lot of very

15   tricky and time-consuming issues around that transaction

16   data.  It is their data, it is their computer system, it is

17   their IT folks, and when it takes them four months to gather

18   it and hand it to us that starts to give us some concern

19   about the complexity of analyzing it.

20        By way of example, in wire harness we had experts

21   and IT people, and the economists have their own number of

22   crunching folks, we had letters with questions, there were

23   17-page letters, single spaced, with 120 separate questions

24   with respect to these fields, what date is this, can you have

25   customer names and numbers, so those are issues to be worked

1    through.

2           We would propose if we could get the data sooner we

3    will work sooner, but we don't propose a 20-month lag time

4    between getting the data and our motion as was the case in

5    harness, we propose a shorter time period, perhaps 15 to 16

6    months.  We had requested they want to start depositions well

7    before the document production is over.  That's not what is

8    happening in harness, it doesn't make sense in most cases, so

9    we had proposed move up your date to finish your document

10   production.  They proposed they would complete document

11   production by February of next year with our motion due in

12   July and depositions are supposed to have been completed

13   by -- or depositions would continue into September even

14   though our motions were due in July.  So there's a lot of

15   things that don't make sense.

16          In harness the document production was completed --

17   is to be completed August of this year with the motion to

18   follow.  So we think we can work with those schedules whether

19   it was a six-month lag or a three-, four-, five-month lag.

20   We also proposed to the defendants if they want to move this

21   stuff and they are ready to, you know, rumble, as we say in

22   the world of the big boxing match we just had, bring

23   witnesses to the United States, you could consent to that so

24   you don't have to wait for the embassy in Japan, we don't to

25   have take depositions in Europe.  They said that we -- that

1    there was a negotiation in harness on a much longer schedule

2    that there were compromises reached in that case.  It is much

3    cheaper for everyone if the defendants would bring a witness

4    to the United States, that's one person with their staff or

5    aide-de-camp flying to the U.S. and this whole group of

6    lawyers then could stay here and take those depositions

7    rather than all us de-camp to Asia or to Europe.

8            So, again, we are not about delay, we are ready to

9    move with this thing, we don't think the Court, as you have

10   indicated, wants five motions on the same day, we are happy

11   to stagger that, but we think that a schedule should not be

12   used as a sword or as a shield, a schedule should be kind of

13   a neutral principle, and we are happy to work with the

14   parties and the special master to facilitate that.

15           MR. KESSLER:  Could I have one minute, Your Honor?

16           THE COURT:  No.

17           MS. SALZMAN:  I'm just waiting --

18           THE COURT:  You don't have anything particular?

19           MS. SALZMAN:  I don't have anything particular --

20   nothing new than what I have already said which is a more

21   practical approach.

22           MR. KESSLER:  Just one minute, Your Honor.  I

23   largely endorse Mr. Kohn's view to move it more quickly, so

24   the only thing to do is if you set our July 2016 date because

25   surely he said he wants it more quickly, if we have internal

1    disputes about producing the transaction data a little

2    sooner, completing substantive things, we will either work

3    that out with him because we are happy to have the dates set

4    and we'll either work out earlier internal deadlines or bring

5    them to Special Master Esshaki and Your Honor doesn't have to

6    worry about that, but it doesn't sound like he's saying there

7    should be any delay, he's saying faster, we are ready to talk

8    about faster, not slower, that is the most important point.

9         THE COURT:  I'm going to let you know, I'm not

10   making any ruling on this today, I have some time so I'm not

11   doing that, but I will let you know at the next conference

12   how we are going to schedule it.  Okay.  Thank you for

13   bringing it to my attention.  We will put that on the agenda

14   next time.

15        Okay.  Any other matters now?  Anybody have

16   anything else?

17        MS. SALZMAN:  Your Honor, Hollis Salzman for the

18   end payors.

19        I may have missed an order from the Court, but we

20   had those motions to intervene that were filed sometime

21   before the last status conference.  The end-payor plaintiffs

22   responded to that as well as some of the defendants, and I

23   don't believe I saw a ruling on it but I could be mistaken.

24   Those were the incarcerated --

25        THE COURT:  The incarcerated person?

1        MS. SALZMAN:  Yes, yes, so I wanted to bring that

2    to your attention that that may be still an open issue.

3        THE COURT:  We'll be having a ruling shortly on

4    that.

5        MS. SALZMAN:  Thank you.

6        THE COURT:  It will be done on the briefs.  We

7    didn't realize the person was incarcerated when we first got

8    them.

9        MR. KESSLER:  Just one question.  Your Honor

10   said -- I understand you are not going to decide today, you

11   said by the next conference, which is obviously four months

12   away.  What we would ask, could we move forward with our

13   schedule for the next four months?  You always can make it

14   longer, the end date, but I think that would make sense so

15   let's assume we are working to July 2016 so we don't --

16       THE COURT:  You can assume that's what you are

17   working for because you will just have your work done when --

18       MR. KESSLER:  One hand can't clap by itself.  I

19   need plaintiffs to agree to work toward that schedule without

20   prejudice to their view that the end date should be later so

21   that we don't lose four months and we come back and say

22   nothing has happened.

23       THE COURT:  Let's hear what plaintiffs say about

24   that.

25       MS. SALZMAN:  Your Honor, I mean, we have been over

Case 2:12-md-02311-SFC-RSW   ECF No. 975, PageID.13052   Filed 05/19/15   Page 87 of 182
REDACTED        Status Conference & Motion Hearings • May 6, 2015        REDACTED

87

1    this, I just don't want to be prejudiced because I'm not

2    nagging the Court with the same issues.  I really think that,

3    you know, we have stated on the record that wire harness

4    should be the paradigm for the other cases.  We have no

5    problem moving forward in discovery with bearings.

6            THE COURT:  I take it that's what he's talking

7    about.

8            MS. SALZMAN:  Please, give us your documents and

9    we'll start looking at them just --

10            THE COURT:  I'm not seeing an issue here.

11            MS. SALZMAN:  Just for your Court's edification,

12    the end-payor plaintiffs have produced all of the class rep

13    depositions to all of the defense counsel in all of the

14    cases, so we are doing what we can on our end.  If bearings

15    defendants want to give us the documents, the transactional

16    data, and start working, we are happy to accept.

17            THE COURT:  Okay.  You may continue to move

18    forward.

19            MR. KESSLER:  We will move forward with that in

20    understanding.

21            THE COURT:  Okay.  Counsel?

22            MR. HANSEL:  Your Honor, Greg Hansel for the direct

23    purchasers.

24            There is one more agenda item, which is the

25    scheduling of the status conference after September.

```
 1              THE COURT:  Yes.  Okay.  The next one is, of
 2   course, September 9th.  I'm proposing January 13th for the
 3   next conference after the September conference.
 4   January 13th, do you want to check schedules and see if
 5   there's any --
 6              MR. WILLIAMS:  Your Honor, Steve Williams for the
 7   end payors.
 8              THE COURT:  Mr. Williams.
 9              MR. WILLIAMS:  On that date in the Northern
10   District of California there is another antitrust MDL for
11   which Mr. Tubach is the liaison counsel for the defendants,
12   and I think a number of defense counsel here are also going
13   to be in that court.
14              THE COURT:  Let's take a look at the calendar.
15   That's fine.  Do you want to back it up to early December or
16   do you prefer to push it forward?
17              MR. TUBACH:  January 20th.
18              MR. WILLIAMS:  Mr. Tubach suggested the following
19   week, January 20th.  No objection on --
20              THE COURT:  Let me see.  The 20th?  Any problem
21   with that, January 20th?
22              (No response.)
23              THE COURT:  Okay.  Let's set it January 20th.  Do
24   you want to keep the same time, which is 10:00, everybody
25   okay with that?
```

```
 1              (No response.)

 2              THE COURT:  Okay.  We will set the next one then

 3    for January 20th at 10:00.

 4              MR. WILLIAMS:  Thank you.

 5              THE COURT:  All right.  Anything else -- January

 6    20th.  We hope we'll have good weather so we can get you all

 7    here.  All right.  We're ready to go to motions unless

 8    anybody has an issue?  Okay.  Let's take a ten-minute break

 9    and then we'll start our motions.  Thank you.

10              THE LAW CLERK:  All rise.

11              (Court recessed at 11:35 a.m.)

12                                  —   —   —

13              (Court reconvened at 11:53 a.m.; Court, Counsel and

14    all parties present.)

15              THE LAW CLERK:  All rise.  Court is in session.

16    You may be seated.

17              MASTER ESSHAKI:  A number of you have asked me what

18    my intentions are with respect to the motions that are on my

19    docket for this afternoon.  I have consulted with the court

20    reporter, the most important person in the room, and my

21    intentions would be seeing how long we go on the Judge's

22    docket motions, we could then take perhaps a ten-minute break

23    and just come back and plow through those motions that are

24    left on my docket without taking a lunch break or anything

25    like that.  The court reporter has indicated that's
```

```
 1    acceptable to him, and that's the way I would like to plan it
 2    for this afternoon.  Thank you.  Thank you, Judge.
 3            THE COURT:  Okay.  I wanted to make clear because I
 4    didn't actually say this on the ruling, on the motion to
 5    amend regarding the class period allegations, that you can do
 6    that, you can amend as to that.
 7            Okay.  All right.  Let me just get my other list
 8    out here.  The first motion is -- oh, before we begin even
 9    the first motion I have some concern about the fact that some
10    of these motions contain sealed information.  I don't exactly
11    know how you want to handle that, if you need to argue the
12    sealed information then we may have to clear the courtroom or
13    you may indicate -- I don't know.  Let's hear what --
14            MR. WILLIAMS:  Steve Williams.
15            THE COURT:  Yes.
16            MR. WILLIAMS:  If I could briefly address it?  I
17    believe as to the Chiyoda motion and as to the Delphi
18    motions, we now have agreement from the affected parties that
19    those things we need to address can be addressed in open
20    court.
21            THE COURT:  That's Chiyoda and Delphi.
22            MR. WILLIAMS:  On one of the later motions there
23    still is a concern so what we would suggest is to move that
24    to the end if the Court does need to be closed because a
25    party has designated it confidential or highly confidential,
```

1    and if we treat those last then just the parties affected can

2    remain.

3            THE COURT:  Why don't we proceed in the order they

4    are on the agenda and then if one of them does need to be in

5    a sealed environment if you would just let me know that and

6    we will put it in the end.

7            MS. STORK:  Good afternoon, Your Honor -- or good

8    morning, Your Honor.  Anita Stork for Keihin North America.

9            I think that motion is one where there might be

10   some sealed material.  From the defendants' perspective if

11   those in the courtroom agree to treat it as highly

12   confidential I think we would be fine with having those

13   people -- those attorneys that agree to treat it as highly

14   confidential remain in the courtroom, but I think the

15   plaintiffs might have a different view.

16           THE COURT:  Okay.

17           MR. LANGHAM:  Your Honor, Chanler Langham with

18   Susman Godfrey for the end payors but speaking on behalf of

19   the indirect purchasers on the Bosch motion.

20           I haven't had an opportunity to confer with them.

21   There is a very small portion which is likely confidential

22   from our complaint that I would mention, but the vast

23   majority of what we have to say is all public information.

24           THE COURT:  Okay.

25           MR. LANGHAM:  And if Bosch's counsel could identify

 1    themself I could probably talk to them briefly about it.

 2    Thank you.

 3         THE COURT:  I do want you to please let the court

 4    reporter, you know, indicate what is sealed so that we can

 5    seal the record.  If everybody here agrees to keep the

 6    information confidential we could seal that portion of the

 7    record by you simply indicating what you are about to say is

 8    to be sealed.  Okay.  Does everybody understand that?

 9         (No response.)

10         THE COURT:  Okay.  The first motion is Chiyoda's

11    motion to dismiss auto dealers and end payors.

12         MR. KOWAL:  Good morning, Your Honor.  If it please

13    the Court and counsel for the plaintiffs, my name is

14    Steven Kowal, I'm the attorney representing the Chiyoda

15    defendants in this case.

16         I'm going to address the motions by the Chiyoda

17    defendants to dismiss the complaints that were filed by the

18    end-payor plaintiffs and auto-dealer plaintiffs.  I would

19    like to address two points to the Court this morning, and I

20    guess we are still in this morning.

21         The first is that we submit to the Court there are

22    significant deficiencies in the conspiracy allegations that

23    the plaintiffs have made relating to Chiyoda.  There are no

24    factual allegations in the complaint that shows that Chiyoda

25    knowingly joined the conspiracy that is alleged in the

1    complaint, that is a massive decades-long conspiracy to fix

2    the prices for wire harnesses generally.  In essence there

3    are no factual allegations that would show Chiyoda knowingly

4    joined a collective venture to achieve that common goal which

5    is the general definition of a conspiracy.  The plaintiffs

6    have offered a theory in their briefs which I submit to the

7    Court is foreclosed by decisions of the United States Supreme

8    Court.  That's point one.

9         The second point I want to address is that with

10   respect to Chiyoda U.S.A., the U.S. subsidiary, there is no

11   factual allegation of conduct by Chiyoda U.S.A. that would

12   show that it committed any violation.  In essence, the web

13   page which is referenced in the complaint shows that

14   Chiyoda U.S.A. does not manufacture wire harness products

15   or --

16        THE COURT:  The web page -- the website is an

17   important element here?

18        MR. KOWAL:  Yes, Your Honor, and I will address it

19   more specifically as we go through this.

20        So let me go to the first point, what we see as the

21   deficiencies in the conspiracy allegation of the complaint.

22   A little background about Chiyoda.  There are two Chiyoda

23   entities that are defendants.  Chiyoda Manufacturing Company

24   is a company in Japan that manufactures some automotive

25   products.  The complaint alleges that Chiyoda Manufacturing

1  alleges wire harness products and sells them to Subaru.  The

2  only purchaser that is identified in the complaint is Subaru.

3  Chiyoda U.S.A. is the wholly-owned subsidiary of Chiyoda

4  Manufacturing Company, it is a U.S. company in Greencastle,

5  Indiana.  The plaintiffs allege that Chiyoda U.S.A. sold

6  products to Subaru, also sold products to Ford which are not

7  relevant here.  If we looked at the web page we would see

8  that Chiyoda U.S.A. was established in 2005, and it does not

9  manufacture wire harness products.

10          THE COURT:  Wait a minute.  It does not right now,

11  the web page is current --

12          MR. KOWAL:  That's correct, Your Honor.

13          THE COURT:  -- as opposed to back when?

14          MR. KOWAL:  The -- a little background about the

15  companies.  As the complaints allege what is the market share

16  of many of the companies, and Chiyoda is in stark contrast to

17  many of them, it is a very small company.  I believe that at

18  least one of the complaints has a pie chart of the market

19  shares of the companies with the lowest being about

20  1.5 percent.  Chiyoda is not on that chart, it is not listed,

21  it is somewhat -- certainly less than 1.5 percent of the

22  sales of wire harnesses.  It is in effect a sliver of the

23  kind of conduct we are talking about before the Court.

24          THE COURT:  It may be a sliver but that wouldn't

25  excuse it.

1            MR. KOWAL:  Of course not, Your Honor, but I think

2    it does play into how this will evolve when we go through the

3    argument.

4            But another fact that I think is in stark contrast

5    to many of the other defendants in these cases is the lack of

6    involvement of Chiyoda in any of the government enforcement

7    actions.  The first involvement that Chiyoda had in any of

8    the litigation or enforcement involving wire harnesses was

9    when it was named as a defendant in the fourth-amended

10   complaint in the wire harness litigation in October of 2014.

11   Neither Chiyoda Manufacturing or Chiyoda U.S.A. has entered

12   into a plea agreement for wire harnesses or any other

13   products.  It was never served with a Grand Jury subpoena in

14   the United States for wire harnesses or any other products.

15   It has not been involved in any U.S. investigation.  None of

16   its individuals have been involved in any U.S. investigation.

17   As far as we know -- as far as I know at least it has never

18   been identified as an unindicted co-conspirator in any of

19   these actions.

20           So in contrast to many of the other companies and

21   apart from what has been the approach in many of the

22   complaints of making a lot of -- drawing a lot of conclusions

23   from the existence of those investigations and plea

24   agreements, that does not exist for Chiyoda.  I submit to the

25   Court that one of the effects of that is where with other

1    defendants there are general allegations that they engaged in

2    conduct, I have to assume at least that those general

3    allegations are to some extent supported by the conclusions

4    drawn from plea agreements and investigations in these or

5    other products.  Those factual bases or the credence that

6    those investigations give to those general allegations do not

7    exist for Chiyoda.

8           So what I wanted to do, Judge, is turn to what it

9    is that is alleged that would tie Chiyoda to the conspiracy

10   that is charged, the massive decades-long conspiracy for wire

11   harness generally, and to put it into words of the Twombly

12   decision, which we all like to talk about in these cases,

13   what is the plausible basis for that conspiracy?  There are

14   two -- there is one paragraph in each of two complaints that

15   focuses specifically on conduct by Chiyoda.

16          THE COURT:  You are talking about the 2003?

17          MR. KOWAL:  Yes, and this would be one of the

18   things that I think came from the unredacted complaints but

19   in the auto dealers' complaint there is a reference to

20   communications involving three Subaru models beginning in

21   1999, I'm not quibbling with the dates here, but there are

22   communication involving three Subaru models, the Forester,

23   the Legacy and the Impreza.  There is no differentiation in

24   the complaints between Chiyoda Manufacturing and

25   Chiyoda U.S.A.  There's no other allegation of any

1    communication by any other customer except for Subaru.

2            In the end-payors' complaint there is one paragraph

3    that is similar, it's beginning in 2003, the allegation is

4    that there were communications involving Subaru for the same

5    models.  Once again, no differentiation between Chiyoda

6    Manufacturing and Chiyoda U.S.A.

7            So the question that I posed to the Court and we

8    posed in our pleadings is how do you take those allegations

9    of communications involving Subaru and turn those into

10   sufficient allegations of the massive decades-long conspiracy

11   involving all wire harnesses?  And when courts have addressed

12   this issue, they have done it in many contexts, there is

13   situations where there is communications involving one

14   customer, one contract or one account, and the question is

15   always is the conspiracy related to that overall -- all of

16   the customers, all of the contracts, all of the accounts, or

17   is the conspiracy allegation one of this customer, this

18   account, this contract?  Is it a big conspiracy or is it a

19   series of little conspiracies?

20           And when courts have focused on this issue what

21   they have looked at are several factors but primarily they

22   have looked at interdependence between and among the

23   co-conspirators.  Were the actions of the co-conspirators

24   mutually supportive to bring about the common goal that's

25   charged.  Did the conspirators depend on the success of each

1    other's activities to bring about that common goal?  And I

2    submit to the Court that there are no factual allegations in

3    this complaint that show interdependence of actions by

4    Chiyoda and actions involving sales to others.  What is

5    alleged only relates to sales to Subaru.  There is no

6    interdependence between the sales to Subaru and the sales to

7    anybody else, and if we want to put in the words of the

8    antitrust complaint, if there was an anti-competitive effect

9    concerning the discussions that occurred with Subaru there is

10   no reason to believe that had anything to do with anybody

11   else.

12          THE COURT:  Those discussions would be by

13   Chiyoda Japan because you said the U.S.A. Chiyoda wasn't

14   established until 2005; is that right?

15          MR. KOWAL:  Well, that's true, Judge.  Here's my

16   assumption from the complaint.  As I said, the complaints do

17   not differentiate in any way about who had -- which of the

18   Chiyoda entities or both I assume would have had the

19   communications involving Subaru.  In fairness, I think

20   that -- I take the dates that the plaintiffs have alleged in

21   the complaint are beginning on or about that and going

22   forward, so I don't want to -- I'm not trying to pin the date

23   down as something that I'm relying on.  I think that fairly

24   interpreted, I understand what the plaintiffs' allegations

25   mean, and they talk over a broader period of time, but you

```
 1   are correct that there is no indication in the complaints,

 2   there is no differentiation in the complaints of whether

 3   those communications that are alleged, the one paragraph in

 4   each complaint alleging the communications to Subaru, were

 5   from Chiyoda Manufacturing in Japan or Chiyoda U.S.A.

 6          Now, even though the complaints don't contain any

 7   factual allegations that shows this interdependence of the

 8   activities of conspirators, the plaintiffs do express a

 9   theory of conspiracy in the response.  And I want to -- I'm

10   going to try to read this because I think it is important for

11   us to focus on it.  It is on pages 8 and 9 of their response,

12   and I will put together a few sentences and leave out a

13   little in between because I don't think it is material.  The

14   plaintiffs' response says, begin at page 8, this contention,

15   that is the defendants' contention that sales are only

16   Subaru, this contention is misguided because that one other

17   defendant, and I think it is for the end-payor complaint,

18   there is allegation of communication with only one other

19   party, this contention is misguided because that other

20   defendant is Fujikura, which has already pled guilty to

21   participating in a criminal conspiracy to rig bids for and to

22   fix, stabilize and maintain prices for automotive wire

23   harnesses from at least as early as January 2006 continuing

24   to at least February of 2010.

25          And then I skip a couple sentences but the
```

1    conclusion is this, there is no question that a criminal

2    conspiracy existed in this market.  That part I would accept

3    because of the allegations involving others that the

4    plaintiffs have made in other cases, but then it continues,

5    and these allegations directly show that the Chiyoda

6    defendants are inextricably linked to the heart of that

7    conspiracy.  I would submit to the Court that there are no

8    allegations that the Chiyoda defendants are inextricably

9    linked to that conspiracy.

10        What there is is an allegation that Chiyoda had

11   communications involving Subaru, and what the plaintiffs are

12   saying is those communications mean that Chiyoda is linked to

13   all of these other communications, all of the other

14   purchasers, and that's why they are part of a massive

15   conspiracy to sell wire harnesses generally.  So it is

16   Chiyoda, we are talking about Subaru and then everybody else.

17        And I submit to the Court, and we addressed this in

18   our brief, it is in the Baldridge case, but the Baldridge

19   case relies on the Kotteakos decision.  I'm sure Your Honor

20   in dealing with many criminal cases has addressed Kotteakos.

21   Basically what happened in Kotteakos is there was a central

22   conspirator and a bunch of financial transactions of other

23   conspirators with that central point.  What the Supreme Court

24   said in Kotteakos is that does not define one conspiracy;

25   there must be a single purpose for the activity of the

1  conspirators.  As we know, in many cases it is the scope of

2  the agreement that defines the conspiracy.  And what

3  Kotteakos said and other cases is that it is not enough to

4  have similar objectives, it is not enough to have parallel

5  objectives by similarly-situated parties, you have to have

6  parties that have jointly -- knowingly join a collective

7  venture, an agreement, for a common purpose.  I submit to the

8  Court there are no facts in this case that show that Chiyoda

9  defendants joined in the conspiracy that is defined by the

10  complaint.

11         Despite the absence of those factual allegations

12  there's significant prejudice for Chiyoda.  One of the

13  obvious ones is the cost of being involved in this massive

14  litigation.  Listening to all of the presentations this

15  morning of all of the issues that go on, and Chiyoda, which

16  is this very small company, is now being drawn into this

17  massive conspiracy based on allegations that we think are

18  deficient.  And this is one of the issues that was addressed

19  by Twombly by the Supreme Court and one of the issues that

20  the judges focused on about why it is important for the court

21  to find a plausible theory before a case proceeds, and what

22  the Supreme Court said in essence, I will paraphrase, we have

23  to recognize that the cost of litigation and particularly of

24  discovery, particularly for cost-conscious companies, Chiyoda

25  with its position in the market is a cost-conscious company,

1   may cause them to settle even anemic claims, I think that is

2   the phrase from the court, when they shouldn't.

3           That's part of the prejudice I think that Chiyoda

4   is now experiencing being brought into this massive

5   litigation over these types of allegations.  And in addition,

6   going forward I think we should recognize or I submit to the

7   Court we should recognize that there will be evidentiary

8   issues that will prejudice Chiyoda and cause a great deal of

9   heartache because in dealing with what are the

10  co-conspirators' statements, what evidence can be used to

11  show Chiyoda was involved in the scope of the conspiracy was

12  involved in are going to be very difficult to sort out in a

13  situation where there is no legally-accepted plausible theory

14  of Chiyoda's connection to this massive conspiracy.  So

15  that's point one, Your Honor.

16          THE COURT:  Okay.

17          MR. KOWAL:  The second point, and I will be much

18  shorter, I promise, deals with the conduct of the Chiyoda

19  subsidiary.  The plaintiffs allege that Chiyoda U.S.A. sold

20  product to Subaru and they said they sold wire harnesses to

21  Subaru, and they cite as the basis for that the web page from

22  Chiyoda U.S.A.  And so we say -- we looked at the same

23  website product description and it doesn't say they make wire

24  harnesses; they don't make wire harnesses, they don't make

25  wire harness systems.  What has happened is the plaintiffs

1    say we can use the referenced website to support our first

2    position but we can't use the referenced website to support

3    the second proposition.  And my suggestion to the Court is

4    that is a position that is manifestly unfair.  If it is good

5    enough to support the allegations in the complaint that

6    supports going forward, it also should be good enough to

7    support the allegations in our motion to show we shouldn't go

8    forward.

9         Both sides cited a bunch of cases about whether the

10   Court could review the website or not.  I recognize that's a

11   matter for the Court's discretion, there is no doubt about

12   that, I'm not going to try to parse through those cases.  I

13   submit to the Court the focus, however, is that where

14   information is reliable and significant courts have accepted

15   it, and here I submit that the information on the website is

16   reliable, the plaintiffs used it, in essence conveying their

17   belief and its reliability.

18        THE COURT:  Okay.

19        MR. KOWAL:  And secondly, it is not the kind of

20   information that was reviewed by courts that refused to

21   acknowledge that information, it was not something prepared

22   in litigation, it is not an advocate's position, it is a

23   business document, and here it is significant because it

24   would show that Chiyoda U.S.A. does not belong in this case

25   because it didn't sell these products.

1    Now, Your Honor asked early on the same question

2  that plaintiffs raised and it is a very good question, it is

3  the website at the time it was reviewed by the plaintiffs or

4  the website at the time we reviewed it.  That's true, we

5  can't do anything else.  However, there is nothing that I am

6  aware of and there is no information that has been advocated

7  that either the website was not accurate or that situation

8  was different at some time earlier, and unless the plaintiffs

9  can come forward with that I don't think there is a basis for

10  Chiyoda U.S.A. to remain in the case.

11    THE COURT:  All right.  Thank you.

12    MR. KOWAL:  Thank you, Your Honor.

13    THE COURT:  Response?

14    MS. TRAN:  Good afternoon, Your Honor.  May it

15  please the Court, my name is Elizabeth Tran of Cotchett,

16  Pitre & McCarthy, and I will be arguing on behalf of the end

17  payors as well as the auto dealers.

18    Chiyoda is no different from any other defendant in

19  this multi-district litigation.  Although Chiyoda says it

20  sits in a strikingly different position than other

21  defendants, Mr. Kowal has advanced the same arguments in this

22  motion to dismiss that other defendants before Chiyoda have,

23  the same arguments that this Court has rejected.  Chiyoda is

24  no different for several reasons.

25    First, Chiyoda may not have pled guilty or been

1    subject to a DOJ investigation but neither had Lear whose

2    motions to dismiss this Court had denied and with whom

3    plaintiffs settled.  Next, Chiyoda Japan concedes that it

4    sells wire harnesses to one purchaser but fails to mention

5    that other defendants in this case, such as Yazaki, with whom

6    plaintiff settled last year, also sold to that same

7    purchaser.  Chiyoda also minimizes the fact that that one

8    purchaser is Subaru, a major automotive manufacturer who

9    sells into the U.S.  Additionally Chiyoda U.S.A. claims that

10   it neither manufactures nor sells wire harnesses based on a

11   printout of its products web page.  This is extrinsic

12   evidence in direct conflict with what plaintiffs have offered

13   in their complaint, and the Court contrary to what --

14            THE COURT:  Wait a minute.  You are saying Chiyoda

15   admits -- well, they did, that they sold wire harnesses?

16            MS. TRAN:

17

18            THE COURT:  But now it is saying that it doesn't

19   make wire harnesses?

20            MS. TRAN:  It says Chiyoda U.S.A. doesn't

21   manufacture or sell wire harnesses.

22            THE COURT:  That's Chiyoda U.S.A. but what about

23   Chiyoda Japan?

24            MS. TRAN:  Chiyoda Japan does sell and manufacture

25   them.

1        THE COURT:  Okay.

2        MS. TRAN:  Going back to the website argument, the

3    Court can't consider it on a motion to dismiss because it

4    directly conflicts with what we have offered in our

5    complaints, and even considering the website shows nothing

6    more than Chiyoda U.S.A.'s products as of February 5th of

7    this year.

8        And finally Chiyoda argues that it has been thrust

9    into this massive antitrust class action without any factual

10   basis.  On the contrary, it was only after two years of

11   hard-fought discovery and extensive investigation that we've

12   alleged Chiyoda's participation in the wire harness

13   conspiracy for the first time.

14       I would like to turn to Mr. Kowal's first argument

15   regarding the significant deficiencies as to Chiyoda specific

16   allegations.  His argument blatantly ignores plaintiffs'

17   allegations about Chiyoda.  First we have alleged that

18   Chiyoda Japan manufactured, marketed and sold wire harnesses

19   directly or through its subsidiaries.  Second, we've alleged

20   that Chiyoda U.S.A. is a subsidiary that is wholly owned and

21   controlled by Chiyoda Japan and has its principal place of

22   business in Indiana and manufactured, marketed and/or sold

23   wire harnesses.  Third, we have alleged that the

24   Chiyoda U.S.A. customers include Subaru of Indiana Automotive

25   and Ford, both of whom sell cars into the United States.

1

2

3

4

5

6

7

8          Chiyoda's argument that we don't have -- our

9    allegations against them are scarce completely disregards our

10   allegations concerning all defendants.  The complaints

11   include dozens of these allegations that relate to

12   defendant's co-conspirator status, price-fixing and

13   bid-rigging agreements and market characteristics

14   facilitating collusion.

15          In the Court's order denying G.S. Electek's motion

16   in this case, this Court asserted that the complaints must be

17   viewed as a whole and detailed allegations regarding each

18   defendant's participation are unnecessary per Carrier Corp.

19   The allegations concerning Chiyoda coupled with the

20   allegations relating to all defendants plausibly suggest that

21   there were agreements between Chiyoda and co-conspirators

22   that raise a reasonable expectation that discovery will

23   reveal evidence of legal agreements per Twombly.

24          As to Mr. Kowal's second argument about

25   Chiyoda U.S.A., as I mentioned earlier, the Court can't

1       consider it.  Chiyoda U.S.A. has introduced it to show that

2       it hasn't manufactured or sold wire harnesses although the

3       complaints do cite Chiyoda U.S.A.'s website, albeit without

4       attaching it or incorporating it by reference to identify

5       Chiyoda U.S.A. customers.  The 6th Circuit in Media Com held

6       that it is improper for the Court to rely on extrinsic

7       evidence where the facts in the complaint directly conflict

8       with the facts in the referenced documents.

9               THE COURT:  Why did you even throw in that

10      reference to the website?  I mean, I know you wish you didn't

11      now but --

12              MS. TRAN:  We wanted to show that Chiyoda U.S.A.'s

13      customers included major manufacturers of automobiles in the

14      U.S.  We had discussed other defendants and their customers

15      in the U.S. as well.

16              If the Court were to credit defendants' version of

17      the facts instead of ours at this time, Media Com states that

18      this Court would inappropriately be raising the Twombly and

19      Iqbal pleading standards from plausible to probable or

20      persuasive.

21              While it is accurate that the Court may consider

22      extrinsic evidence so long as it is central to the claims in

23      the complaint per Media Com, the contents of Chiyoda U.S.A.'s

24      website are neither central or integral to plaintiffs' claims

25      here.

 1          I would also like to mention that Mr. Kowal's

 2    standard of reliable and significant is not actually the

 3    standard.

 4          Paragraph 110 of the end-payors' complaint and 103

 5    of the dealers' complaint standing alone already allege that

 6    Chiyoda U.S.A. manufactured, marketed or sold wire harnesses.

 7    And as a further example, if the Court ignores the passing

 8    reference to Chiyoda U.S.A.'s websites in the complaints the

 9    central allegations of collusion and market conditions that

10    facilitated collusion remains, all of which the existing

11    guilty pleas support.

12          THE COURT:  Okay.

13          MS. TRAN:  And I would just like to address another

14    point raised by Mr. Kowal as to Chiyoda's size.

15          THE COURT:  As to what?

16          MS. TRAN:  Chiyoda's size.  Chiyoda's assertion

17    that it is a small player in the wire harness market doesn't

18    save them.  Like Chiyoda, neither Denso or G.S. Electek were

19    included in figures 3 and 4 of the end-payors' complaint,

20    which depict the global wire harness market and the 11

21    largest manufacturers.  The Court denied both of their

22    motions to dismiss in this case.

23          THE COURT:  Okay.  Thank you very much.

24          MS. TRAN:  Thank you.

25          THE COURT:  Brief reply?

1    MR. KOWAL:  Your Honor, if I may just very briefly.

2  On the conspiracy issue, the basic issue remains after the

3  plaintiffs' recitation, the scope of the conspiracy is the

4  scope of the agreement of the parties, and there are no facts

5  alleged in the complaint that would show, even assuming them

6  to be true, that would show Chiyoda was involved in anything

7  other than communications involving Subaru and there is no

8  connection between Subaru and the massive conspiracy alleged,

9  that's the conspiracy side.

10    On the Chiyoda U.S.A. side, I think Your Honor

11  asked a very perceptive question of why did you cite it.  My

12  suggestion would be the reference appears in the complaint

13  because the plaintiffs needed it to show that Chiyoda U.S.A.

14  sold to Subaru, but once having done that I think they also

15  should have to deal with the fact that the website shows that

16  although certain products are sold to Subaru, Chiyoda U.S.A.

17  does not sell wire harnesses.

18    And the argument that the Court should reject that

19  because it is in conflict with other general statements I

20  find difficult to comprehend because what it is basically

21  saying is from the plaintiffs' standpoint, allow us to make

22  whatever general statement we want irrespective of the

23  factual basis but when there is a factual basis and it is

24  drawn from the same support the plaintiffs used the Court

25  should not review that.  I don't -- I submit to the Court

1    that's not the holding of any of the cases that were cited

2    but more importantly it is not what should be done in this

3    sort of situation from the standpoint of reasonable

4    interpretation of the pleadings and the Court's decision to

5    hold Chiyoda U.S.A. in this case.  Thank you.

6              THE COURT:  Thank you.

7              MS. TRAN:  If I may just one minute?

8              THE COURT:  One second.

9              MS. TRAN:  Even if the Court considers

10   Chiyoda U.S.A.'s website converting this motion to dismiss

11   into a motion for summary judgment, like I said, it shows

12   nothing more than Chiyoda's products as of February 5th of

13   this year.  The Chiyoda U.S.A. website therefore doesn't

14   contradict the complaints filed well before then detailing a

15   decade long wire harness conspiracy and Chiyoda's discussions

16   with conspirators about Subaru's wire harness RFQs from 2003

17   to 2010.

18             THE COURT:  Okay.  Thank you.

19             MS. TRAN:  Thank you.

20             THE COURT:  All right.  The next one is the

21   windshield wipers, Bosch.

22             MR. FELDBERG:  Good afternoon, Your Honor.  I'm

23   Michael Feldberg from Allen & Overy.  I represent the Bosch

24   parties.

25             There were three Bosch parties involved in the

1    windshield wipers case; Bosch Korea, an entirely Korean

2    company, Bosch L.L.C., which is a U.S. company, and the

3    parent company, Bosch GmbH, which is a German company.

4         This is a straightforward motion --

5         THE COURT:  Let me just ask because in the two

6    motions there is use of different terms.  Bosch, the German

7    company, is also referred to as GmbH?

8         MR. FELDBERG:  Yes, those are the initials

9    signifying the German corporation, the equivalent of inc. in

10   the U.S.

11        THE COURT:  And that's called Bosch Global also?

12        MR. FELDBERG:  Yes.

13        THE COURT:  And it is also known as Bosch

14   Electrical?

15        MR. FELDBERG:  No.  Bosch Electrical Drives is

16   sometimes called Bosch Korea.  We have Bosch -- for ease of

17   reference, if it please the Court, we will refer to them as

18   Bosch Korea, Bosch U.S., and the parent Bosch GmbH.

19        THE COURT:  Bosch Korea, Bosch U.S. and Bosch GmbH.

20   It would be nice if both sides used the same terms, it would

21   be so much easier.

22        MR. FELDBERG:  We will try to work that out if

23   there is any need to after the Court decides this motion,

24   Your Honor.

25        THE COURT:  I hate to spend time on charts of

1   names.  Okay.  Go ahead.

2           MR. FELDBERG:  There's really two points to make

3   today, Your Honor, and that's -- and those are the following:

4   There are in these two complaints, and they are essentially

5   the same, they are each over a hundred pages, there are only

6   three allegations that are specific to Bosch.  One of those

7   allegations is specific to Bosch Korea and it says that Bosch

8   Korea was fined by the Korean Fair Trade Commission, but

9   Bosch Korea is a company over which the Court does not have

10  jurisdiction; it is an entirely Korean owned, operated and

11  managed business which has no offices or employees or bank

12  accounts or anything else in the United States and does no

13  business in the United States and whose matter has been

14  entirely and completely addressed by the Korean Fair Trade

15  Commission.

16          With respect to the other two allegations that are

17  Bosch specific in these two complaints, and the allegation is

18  simply against Bosch, it doesn't specify which entity, the

19  allegations are simply that Bosch received RFQs.  There is no

20  allegation that Bosch did anything with respect to those

21  RFQs, that Bosch communicated with anyone with respect to

22  those RFQs, that Bosch did anything at all with respect to

23  those RFQs, there is no allegation that Bosch did anything

24  wrong.

25          THE COURT:  They opened the mail, they opened the

1   RFQs.

2           MR. FELDBERG:  Even under the most elastic

3   interpretation of the mail fraud statute, Your Honor, I don't

4   think opening the mail would qualify.

5           THE COURT:  Okay.

6           MR. FELDBERG:  Now, let's talk about Bosch Korea

7   first.  This is a 12(b)(2) motion to dismiss for lack of

8   jurisdiction.  It is supported by two declarations from

9   Mr. Woo, who has been employed by Bosch Korea for 30 years,

10  he's the representative director, he's responsible for

11  operations, he's responsible for logistics, quality,

12  financial, human resources and general affairs.  And we

13  learned from Mr. Woo that Bosch Korea is a private Korean

14  company, it is a sub of the German parent, it has its

15  headquarters in Korea, it has no presence in the United

16  States, it has no office in the United States, it has no

17  telephone number or address in the United States, it is not

18  licensed to do business in the United States, it has never

19  had a registered agent in the United States, it has no

20  manufacturing facility in the United States, it has no

21  employees, agents or representatives in the United States or

22  any that regularly travel to the United States, it has no

23  real estate in the United States, no bank accounts in the

24  United States, does not pay U.S. taxes, doesn't hold meetings

25  in the United States, targets Korea for its business and does

1    not target the United States, does not provide support or

2    services for products in the United States, sells primarily

3    to Korean companies and has no control over any further sales

4    those companies may make.  Bosch Korea has its own employees

5    who are separate from the employees of other Bosch entities,

6    it has its own budget also separate from other Bosch

7    entities, it has its own office and management board separate

8    from other Bosch entities, has its operations and income,

9    purchases its own supplies, maintains its own capital.

10            THE COURT:  Does it have anything in common with

11   its parent or other entities?

12            MR. FELDBERG:  Anything?  I'm sure there are

13   elements of business strategy that like any global company

14   are shared by different units but Your Honor has held in

15   other cases that's not sufficient to establish jurisdiction.

16   This company has -- in terms of the key operational logistics

17   we learned from Mr. Woo that it has everything independent;

18   offices, management board, employees, budget, revenue,

19   capital, isn't dependent upon other Bosch units for supplies

20   or services, separate employees, separate bank accounts, I

21   could go on.

22            In short, Bosch Korea is an entirely Korean company

23   doing business in Korea and not in the United States, and

24   just as this Court held in Ichikoh and AB SKF and Schaeffler

25   and Leoni and S-Y, it should be dismissed for lack of

1    jurisdiction.  Whatever matter it had with the Korean Fair

2    Trade Commission was dealt with in Korea, it was a Korean

3    matter.

4          Now, what do the plaintiffs say in response?  Well,

5    they concede that the Court lacks general jurisdiction, it is

6    right in their brief, but they claim that the Court has

7    specific jurisdiction because they say that Bosch wipers were

8    sold in the U.S.  Now, they rely for that proposition in

9    their brief, not in their complaints but in their brief, on a

10   website which they say shows sales to the United States.

11   Unfortunately they have misinterpreted the website as Mr. Woo

12   has explained to the Court.  The website does not show sales

13   of wipers by Bosch Korea, in fact, it does not show sales by

14   Bosch Korea.  It shows sales by all Bosch units globally for

15   electrical drive products which includes wipers, window lift

16   motors, seat actuators, engine cooling systems and HVAC

17   blowers.  So the website does not support the proposition for

18   which it is cited in plaintiffs' brief, there is no

19   allegation in the complaint, and most importantly once their

20   misunderstanding was pointed out plaintiffs have offered no

21   response.  And with that fact established there is simply no

22   allegation and no evidence that Bosch Korea does anything in

23   the United States or targets anything to the United States.

24         To cite the case that plaintiffs themselves rely

25   on, the Carrier decision from the 6th Circuit, there is no

1    evidence that Bosch Korea purposefully availed itself of the

2    privilege of acting in the United States, no evidence that

3    the causes of action alleged here arise from any activity of

4    Bosch Korea in the United States, and for the Court in these

5    circumstances to exercise jurisdiction over Bosch Korea would

6    be entirely unreasonable.

7              THE COURT:  What about the plaintiffs' theory that

8    Bosch Korea business in the United States was indirect and

9    that they knew that their product was going to come into the

10   United States?

11             MR. FELDBERG:  That's answered by Mr. Woo's

12   declaration, Your Honor, who says that we sell primarily to

13   Korean businesses and we have no control over any ongoing

14   sales which there may be, there may not be.  And I believe

15   there is substantial case law for the proposition that if a

16   non-U.S. company sells to another non-U.S. company and

17   that -- the buyer then sells to the U.S. that's not specific

18   to -- that does not create specific jurisdiction unless that

19   was the plan and intention of the seller originally, and we

20   cite those cases I believe in our briefs, Your Honor.

21             THE COURT:  Okay.

22             MR. FELDBERG:  Now, what happens if the Court, as

23   we argue it should, dismisses Bosch Korea just as it has

24   granted motions to dismiss in the other cases I have

25   mentioned in this MDL?  The only allegation that remains

1   against the remaining Bosch defendants was that they received

2   RFQs.

3          And if the Court will permit me I would like to

4   actually hand up the relevant paragraphs from the end-payors'

5   complaint just so the Court can see it graphically.  May I

6   approach?

7          THE COURT:  You may.

8          MR. FELDBERG:  Counsel, here you are.

9          MR. LANGHAM:  Do you have the auto dealers?

10         MR. FELDBERG:  I don't have it printed out but the

11  allegations are identical in the auto-dealers' complaint.

12  Thank you.

13         And, Your Honor, if you would -- we have the cover

14  page and then on the second page we have both paragraphs, and

15  then on the third and fourth pages we have the paragraphs

16  separately in case, like me, you would prefer larger type.

17         In any event, if you look at paragraphs 166 and

18  167, all that is alleged, and these are the only remaining

19  allegations against Bosch, is that Bosch and some other

20  companies got RFQs.  And if Your Honor continues reading

21  through those paragraphs you will see there is nothing else

22  alleged as to Bosch.

23         MR. LANGHAM:  Your Honor, I would just like to

24  point out that the auto-dealers' complaint is different and

25  it is quoted on page 12 of our brief.  I will point it out to

**119**

```
 1    the Court, but I just want to make sure that it is aware that
 2    the complaints are, in fact, different.
 3              MR. FELDBERG:  Your Honor, I'm happy to deal with
 4    the other complaint.  The allegations are substantively the
 5    same.  There is no allegation that Bosch did anything with
 6    respect to the RFQs that it received.  There is no allegation
 7    that it communicated with anyone, that it agreed with anyone,
 8    that it bid on anything, that it did anything at all with
 9    respect to those RFQs.
10              Let me just turn to the other complaint which
11    counsel referred to and --
12              THE COURT:  You are talking now about the
13    auto-dealers' complaint?
14              MR. FELDBERG:  Yes, it is in paragraphs 186 and
15    187, and substantively the same principle applies, no
16    allegation that Bosch did anything.
17              Now, under Twombly and its progeny it is simply not
18    enough to say well, they received an RFQ.  You have to allege
19    that they did something that arguably at least is in --
20    states a cause of action, is in violation of the law.  So
21    what do the plaintiffs say in response to this argument?
22    They make essentially two arguments.  They say there are
23    broad allegations of an industry-wide conspiracy so the Court
24    should apply a conspiracy theory, even though as the
25    plaintiffs concede at page 16 of the brief the Court has
```

1    declined to apply a conspiracy theory in this very MDL in

2    other cases.  And there's certainly no reason in this case

3    where there are no specific allegations of wrongdoing against

4    Bosch for the Court to depart from its reasoning in prior

5    decisions.

6           Secondly, the plaintiffs attribute or attempt to

7    attribute the allegation against Bosch Korea that it was

8    fined by the Korean Fair Trade Commission and there is only

9    one such allegation to the other Bosch entities, and they

10   cite a decision by Your Honor in this MDL that if a parent

11   uses its subsidiary to commit a fraud the Court may treat the

12   parent and the subsidiary as a single entity and that's, of

13   course, a valid proposition of law, but there is no

14   allegation here and there's certainly no evidence that the

15   parent, in this case the German company, did that.  There is

16   no allegation that the parent did anything at all except

17   possibly if it is what they mean by Bosch received an RFQ.

18          As the plaintiffs acknowledge at page 13 of their

19   brief, the burden is on the plaintiff if they are seeking to

20   pierce the corporate veil, and they need to demonstrate

21   affirmatively the parent's control over the sub is so

22   extensive as to permit imputation.  There is no allegation of

23   that and there is certainly no evidence of that here.

24          To the contrary, the undisputed evidence is that

25   the parent did not control the sub and that the sub was

1    entirely independent.  So the plaintiffs are left with only

2    their allegations against Bosch and there is no allegations

3    that those companies did anything wrong.

4         Plaintiffs finally argue that it is plausible to --

5    this is in the brief -- to conclude that Bosch must have done

6    something wrong or must have conspired.  That's pure

7    speculation, Your Honor.  They don't allege it, they don't

8    allege a single communication, they don't allege a single

9    agreement to survive a motion to dismiss under Twombly and

10   its progeny.  Plaintiffs have to allege some facts.

11        THE COURT:  Okay.  Let's hear what plaintiff has to

12   say --

13        MR. FELDBERG:  Thank you, Your Honor.

14        THE COURT:  -- what those facts are.

15        MR. LANGHAM:  Thank you, Your Honor.

16   Chanler Langham from Susman Godfrey speaking on behalf of the

17   end-payors and auto-dealer plaintiffs, the indirect purchaser

18   plaintiffs.

19        I just want to point out first for the Court that

20   this case is different than a holding company like AB SKF

21   that never sold any product anywhere.  This case is different

22   than Ichikoh who say they never sold any products at all in

23   the United States.  This case is different from some other

24   defendants that say they never pled guilty or were sanctioned

25   for bid rigging and fixing prices, that's not this case.

1    That is not the same facts that this Court has ruled on in

2    the past.

3            The allegations in our complaint are sufficient to

4    show that Bosch Korea has sufficient contacts with this

5    jurisdiction because we allege that Bosch Korea sold products

6    in the United States.

7            THE COURT:  Yes, but what do you have, what

8    products did they sell in the United States, Bosch Korea?

9            MR. LANGHAM:  Well, you know, it is interesting

10   because when you look at the affidavit that they submitted

11   they actually don't deny that Bosch Korea sells windshield

12   wipers in the United States.  They had ample opportunity to

13   deny that even though it is almost summary judgment here when

14   they submit an affidavit, but they didn't deny that they sell

15   windshield wipers in the United States.  And when we look at

16   how they try to distinguish things about the website and what

17   it says about 19 percent of Bosch's sales being in the United

18   States, they say that those sales include windshield wipers

19   but they don't tell us what company of Bosch actually sent

20   those and sold those and shipped those.

21           THE COURT:  But you're saying that Bosch Korea is

22   the one that sold these windshield wipers directly to the

23   U.S., not through some third party?

24           MR. LANGHAM:  Absolutely, and the thing is that we

25   have the press release that was issued by the Korean Fair

1    Trade Commission that tells us about their own investigation

2    into this, and they tell us that from August 2008 to

3    February 2009 Denso and Bosch Electrical Drivers agreed upon

4    a --

5              THE COURT:  Slow down, please.

6              MR. LANGHAM:  They agreed upon a successful bidder

7    and implemented such agreement in regard to six tenders for

8    wipers held by Hyundai Kia including the Hyundai Elantra or

9    Avanta and the Hyundai Sonata.  They also tell us that all

10   models of the Hyundai Kia were actually subject to the

11   cartel, and it is anticipated that the ripple effects of the

12   present sanctions by the Korean authorities will be

13   significant.  They also tell us that uncovering the cartel

14   required close cooperation such as on-site investigations in

15   exchange for information with competition authorities in the

16   United States and the European Union.  In order to uncover

17   this international price-fixing cartel they had to rely on

18   information in the United States about sales that they don't

19   deny they made in the United States.  That is sufficient just

20   based on Exhibit B of their own motion we see that.

21             This suggests that as plaintiffs allege that the

22   conspiracy not only involved windshield wiper systems sold in

23   Korea but also involved windshield wiper systems sold in the

24   United States.  Indeed, the fact that this international

25   conspiracy involved all models of Hyundai Kia and that

1   Hyundai Kia manufactured its vehicles right here in the

2   United States, in Alabama for Hyundai, and that Bosch Korea

3   does not deny that it sells products in the United States are

4   telling because Bosch Korea says -- it tells us in its motion

5   the bids that it won, only for the bids that it won, it

6   shipped products to Korea, but it doesn't tell us about any

7   of the bids in which it agreed to lose and where those

8   products were shipped or it doesn't tell us about the other

9   products that it ships to the United States.  And counsel

10  told us that it primarily deals with Korean entities but it

11  doesn't tell us about the United States entities that it

12  deals with because if it was all Korean entities they would

13  have said that but they just said summarily; we have to read

14  between the lines here.

15          In addition, they --

16          THE COURT:  They do sell Hyundai in Korea too?

17          MR. LANGHAM:  They do absolutely.

18          THE COURT:  And China.

19          MR. LANGHAM:  And in addition, this is somewhat hot

20  off the press, March 31st, 2015, one month and six days ago,

21  headline reads Robert Bosch GmbH agrees to plead guilty to

22  price fixing and bid rigging on automotive parts installed in

23  U.S. cars.  They explain the participants in this conspiracy

24  were not located in just one country or region of the world,

25  and that collusion related to automotive parts was global in

1    nature.

2         Now, I will submit that the actual parts that

3    Bosch GmbH pleaded guilty to was conspiracy to fix prices and

4    rig bids for spark plugs, oxygen sensors and starter motors,

5    but just because they pleaded guilty to that doesn't mean

6    that their conduct didn't go all the way to windshield wipers

7    as well and this Court has addressed that in the past that

8    there are all sorts of reasons why a guilty plea or an

9    affidavit may not -- not an affidavit, an indictment may not

10   go to several different products.

11        THE COURT:  The Court could say or could entertain

12   that there is a claim but how about jurisdiction, this is not

13   a 12(b)(6) motion, it is 12(b)(2)?

14        MR. LANGHAM:  In terms of jurisdiction I think that

15   the jurisdiction over Bosch Korea I think our allegation that

16   we -- that Bosch Korea sold these windshield wiper products

17   into the United States and that they have pled guilty to a

18   conspiracy involving -- a conspiracy that, you know, even the

19   Korean authorities tell us that the companies recognize the

20   illegality of cartel meetings and the desire to keep the

21   meetings confidential, just because we can't find out exactly

22   where every single product was shipped and what was done with

23   them doesn't mean it didn't exist, and I think this screams,

24   if the Court is inclined, for additional discovery on

25   jurisdictional issues if the Court isn't already convinced

1  that our allegations are sufficient because there is

2  definitely enough in just this press release and the press

3  release that implicates Bosch GmbH that there was a

4  conspiracy that involved shipment into the United States of

5  products that were subject to this cartel.

6        With respect to Bosch GmbH and the Bosch America

7  plaintiffs, we do make specific allegations of conspiratorial

8  conduct against all three Bosch defendants.  Indeed, the

9  Korean Fair Trade Commission directly implicated Bosch GmbH

10 and described Bosch as, quote/unquote, the German company

11 that manufactures wiper systems, they didn't talk about the

12 Korean company, they said on page 2 at the top Bosch

13 Electrical Driver Co. Limited, quote/unquote --

14        THE COURT:  That's Bosch Korea, right?

15        MR. LANGHAM:  It is but they say German company

16 that manufactures wiper systems.

17        Korean authorities also tell us that they

18 coordinated with the EU authorities to bring down the cartel

19 which again suggests this is not just limited to Korean

20 conduct.

21        Plaintiffs further allege that Bosch colluded with

22 Denso in response to an RFQ.  If we look at the auto-dealer

23 plaintiffs' paragraphs 186 and 187, in 2003 Honda issued a

24 request for quote to Bosch and two other defendants.  It is

25 plausible given its other collusive conduct as to windshield

1    wiper systems with Denso and the fact that the described

2    collusion as to this RFQ involved its co-conspirator Denso,

3    that Bosch voluntarily submitted a losing bid so that the --

4         MR. FELDBERG:  Your Honor, he's not reading from

5    the complaint.

6         MR. LANGHAM:  I'm reading from --

7         MR. FELDBERG:  Your brief, and the complaint

8    doesn't say that.

9         MR. LANGHAM:  Hmm --

10        MR. FELDBERG:  The argument that it is plausible is

11   argument, it is not in the complaint.  May I hand you the

12   complaint?

13        THE COURT:  All right, all right, all right, I will

14   look at it.  Counsel, I've got the quotes from the complaint

15   right here.

16        MR. FELDBERG:  All right.

17        MR. LANGHAM:  So plaintiffs' allegations of broad

18   industry-wide conspiracy and the sanctions of Bosch Korea and

19   Bosch GmbH's guilty plea support jurisdiction and support

20   plaintiffs' causes of action against all three Bosch

21   defendants.

22        THE COURT:  All right.  Thank you.  Reply?

23        MR. FELDBERG:  Very briefly, Your Honor.  As in

24   reverse order, I noted during counsel's argument, and I

25   apologize for the interruption, the plausibility argument

1    came from the brief not from paragraphs 186 and 187, they are

2    the same as the paragraphs from the end-payors' complaint

3    that Your Honor has.

4         On the guilty plea, Your Honor, the guilty plea has

5    nothing to do with wipers.  If we credit plaintiffs'

6    underlying theory, massive Justice Department investigation,

7    there is nothing about wipers in the guilty plea, it involves

8    entirely different parts, entirely different products than

9    are alleged in the wipers complaints against Bosch.

10        And finally the heart of counsel's argument as I

11   understood it was what -- was captured by a colloquy in which

12   the Court asked are you arguing that Bosch Korea sells

13   directly into the United States?  Now, I'm not sure exactly

14   what counsel said.  The answer to that is established by

15   Mr. Woo's reply declaration paragraphs 14 and 15 in which

16   Mr. Woo tells us that Bosch Korea sells wiper systems and

17   other products primarily to Korean companies pursuant to the

18   contracts and specifications of its customers and Bosch Korea

19   has no control over the sale, distribution or destination of

20   its customers' products or vehicles.

21        And fortunately for us the 6th Circuit in the

22   Bridgeport Music case has addressed that very issue because

23   it has held that mere knowledge that a plaintiff's product

24   will or in this case might, because we don't know that they

25   will, be sold in the United States does not demonstrate

1     purposeful availment.  In other words, if as is the case

2     here, Bosch Korea sells wipers to a Korean company pursuant

3     to a contract and specification with that customer, and Bosch

4     Korea, as we know from Mr. Woo's declarations, does not

5     control what happens next, if some of those products are then

6     on sold into the United States, and we don't know that that

7     happened, but even assuming they did, under Bridgeport Music

8     that does not demonstrate purposeful availment and therefore

9     the court lacks specific jurisdiction.  We have already --

10     plaintiffs have already conceded general jurisdiction.

11          The fact -- finally, counsel's argument that the

12     press release of the Korean Fair Trade Commission said it

13     relied on information from the United States is immaterial to

14     the jurisdictional analysis.  The question before the Court

15     is whether under any theory of general or specific

16     jurisdiction the Court has jurisdiction over Bosch Korea, and

17     for all the reasons stated it is an entirely Korean business,

18     the Court does not have that jurisdiction.

19          THE COURT:  All right.

20          MR. FELDBERG:  Thank you, Your Honor.

21          THE COURT:  Thank you.  The next one is the fuel

22     injection.

23          MR. BAIRD:  Good afternoon, Your Honor.

24          THE COURT:  Good afternoon.

25          MR. BAIRD:  We have an iron constitution.

1          THE COURT:  We are going to move along here.

2          MR. BAIRD:  Your Honor, my name is Bruce Baird and

3     I represent Keihin North America, which I will call Keihin or

4     KNA.

5          THE COURT:  We call it KNA because we didn't know

6     how to pronounce it.

7          MR. BAIRD:  Exactly, Your Honor.  KNA is a

8     defendant in the fuel injection systems case and believes

9     that these complaints against it should be dismissed.

10          KNA is majority owned by Honda, 56 percent owned by

11    Honda, and Honda is the only carmaker to which KNA sells

12                                              and when I

13    say factual allegations I mean there is extensive boilerplate

14    but in terms of actual facts                and that's

15    because it couldn't be more than that.  Honda is their

16    customer.

17          There was once a DOJ investigation of KNA but it is

18    now over, officially closed without any action as of

19    June 16th, 2014, a year ago almost.  That's Exhibit A to

20    KNA's memo in support of the motion.  And based on these

21    facts KNA moves to dismiss the case against it for two

22    reasons.  First, there is a well-known antitrust doctrine

23    named for the Supreme Court case Copperweld, holding that

24    when one company, like Honda here, owns more than half of

25    another, like KNA, and so by definition controls it, one of

1    those companies cannot conspire with or against the other

2    because they are for antitrust purposes the same company.

3    The owner, Honda, can ensure that the owned, KNA, has no

4    purpose or activity at odds with its own, and the owned

5    company, KNA, has no rational motive to cheat the owner with

6    whom its fortunes are bound up, that's especially true when

7    as here the owner is KNA's only customer.

8           Now, there is a second reason why the Court should

9    dismiss these cases, it is that the only conspiracy alleged

10   by the plaintiffs against KNA, a conspiracy they themselves

11   talk about as broad and market wide involving many

12   wrongdoers, many victims, with a common plan, common design

13   and overall plan cannot be connected to KNA in any way

14   through any inference Your Honor can draw from the

15   complaints, and I will discuss this in more detail.  Your

16   Honor has in several opinions grappled with these instances.

17   And it is for two reasons here uniquely to KNA, there is no

18   other company before Your Honor that has these two facts.

19   DOJ has definitively in a letter closed its investigation of

20   KNA, and Honda controls KNA and is the exclusive customer of

21   KNA.

22          So let me address each of these two in more detail

23   starting with the Copperweld.  So KNA's corporate disclosure

24   statement, which is a required part of the record before this

25   Court, reflects the Honda Motor Company owns a total of

 1   56 percent of KNA.  What that means, as the Supreme Court

 2   said in the Copperweld case, is that Honda and KNA are not

 3   separate entities for purposes of the antitrust claim.  They

 4   have unitary economic interests so they are treated as one

 5   company so they can't conspire with or against each other to

 6   create an antitrust defense, and that makes sense.  I mean,

 7   Honda controls KNA so what interest can KNA have in cheating

 8   Honda?  And, again, that's especially true where Honda is

 9   KNA's only customer.

10            THE COURT:  With Copperweld it is held that a

11   parent corporation and its wholly-owned subsidiary was not

12   legally --

13            MR. BAIRD:  That's the way the doctrine started,

14   Your Honor, it was 100 percent in the case itself, that's

15   right.  The cases since then, and we cited the cases in your

16   brief -- in our brief, have extended that only insofar as it

17   makes sense to the 50 percent margin.  I mean, Your Honor,

18   you can argue less than 50 percent there is realistic control

19   and some cases have argued about that, but over 50 percent

20   there is really no question about control, it is as a matter

21   of elementary corporate law that's control, and the

22   controlling company can make the controlled company do what

23   it wants to ultimately, and also the controlled company has

24   no motive to do something other than what the controlling

25   company wants.

1          As the 7th Circuit said in a car company case,

2    Car Carriers against Ford Motor Company, allegations like the

3    plaintiffs here are implausible because they have to be

4    arguing.  In that case it was a car carrier company that Ford

5    controlled would conspire against its own interest.

6          So what do plaintiffs say?  They say basically four

7    things in response.  First, they say don't consider the

8    corporate disclosure statement which is in the record before

9    this Court.  They cite no authority and in our reply at

10   page 7 we cite cases making it clear that statement can be

11   considered and has been considered, but the plaintiffs don't

12   actually dispute the fact either and nor could they.  Those

13   are easily ascertainable facts.  56 percent is the number.

14         Second, plaintiffs say the cases we cite are

15   factually distinct or were not decided on a motion to

16   dismiss.  Again, they try to distinguish our authorities but

17   cite none of their own.  Again, they have no authority for

18   the proposition that Copperweld cannot result in a dismissal,

19   and we cite cases in a written reply brief at page 8 saying

20   they can.  There seems no doubt it is only a question of

21   whether the percentage is established.

22         Third, plaintiffs say that because KNA is not

23   wholly owned by Honda, and this is Your Honor's point, it is

24   simply affiliated and the Copperweld doctrine does not apply.

25   Again, the only authority they cite is a case involving a

1   34 percent owned affiliate, and we agree that a 34 percent

2   affiliate does not raise a Copperweld concern because

3   34 percent, unlike the 56 percent of KNA that Honda owns,

4   does not give the owner indisputable control, it is not to

5   say that a case like that might not move forward and by the

6   summary judgment time there might be evidence that there was

7   control, that's a different case.  Copperweld stands for it

8   is really over 50 percent you don't need to go through that,

9   you can assume it because it is true as a matter of

10  elementary corporate law.

11          THE COURT:

12

13          MR. BAIRD:  Against Honda is the notion.  I mean,

14  it is even more observed than the usual Copperweld case.

15  Usually these cases are -- the controlled and the controlling

16  are conspiring with each other or said to be, alleged to be.

17  Here the allegation is

18                                              , that's -- we

19  found no case like that, Your Honor, and I submit that is

20  because that would be ridiculous to bring a claim like that.

21          THE COURT:  There's a first for everything.

22          MR. BAIRD:  I suppose that's right, Your Honor, but

23  there is no reason to infer it.  There is reason to infer the

24  opposite, isn't there?  There is reason to infer, if

25  anything, that this is not really happening and the

```
 1    plaintiffs have to make an allegation that overcomes that.
 2              Finally, plaintiffs claim to allege that
 3
 4                         , and it is just wrong, there is no
 5    factual allegation to that effect nor could there be.  Honda
 6    is the customer and Honda controls it, they work together, it
 7    is a family.  The only paragraphs in the complaint alleging
 8
 9                                              .
10         The Copperweld doctrine exists for a good reason,
11    it makes no sense for courts and litigants to delve into the
12    specifics of control when the control is over 50 percent.
13    That just makes sense, it is a matter of logic, there is no
14    question.  And I submit that because Honda owns 56 percent
15    plaintiffs' two complaints against KNA should be dismissed.
16    The fact that KNA is alleged
17    and that KNA is Honda's only customer that just makes that
18    result more obvious.
19              THE COURT:  All right.
20              MR. BAIRD:  So that's the Copperweld argument, Your
21    Honor.
22              And then the second ground -- I submit if Your
23    Honor was to dismiss for Copperweld reasons there would be no
24    reason to dismiss with anything but prejudice because there
25    is no way to fix that.
```

```
 1          Our second ground would be a dismissal without
 2   prejudice I think.  The second ground is that plaintiffs have
 3   pleaded this broad, far-reaching conspiracy.  Your Honor has
 4   heard about that from a number of people in a number of
 5   motions with many wrongdoers and victims, with an overall
 6   plan, an overall design, all talking to each other and
 7   dealing with each other, that's the plaintiffs' theory.
 8          But in light of the DOJ's closing the investigation
 9   of KNA and in light of KNA's relationship to Honda, they have
10   pleaded no facts that makes KNA's connection with that big
11   conspiracy plausible.  Your Honor has considered the
12   plaintiffs' pleadings in a number of opinions, and as I read
13   them, and Your Honor will correct me if I'm wrong, you have
14   recognized that the concrete facts alleged by plaintiffs
15   relating to particular people, particular meetings,
16   particular bids would by themselves not be enough to support
17   this broad conspiracy that they allege.  They really haven't
18   enough specific facts to allege an overall plan or a common
19   design, but Your Honor has fixed on some other factual
20   allegations they make.
21          The plaintiffs have pleaded specific facts relating
22   to a broad and continuing DOJ investigation, and they have
23   pleaded a number of guilty pleas, and they have pleaded some
24   facts relating to market structure, and Your Honor's ruled
25   that taken together, and you've done this in a number of
```

1   opinions, that taken together these additional facts allow

2   the Court to infer that a broader conspiracy is plausible.

3        But KNA's connection to this broad conspiracy is

4   not plausible because of facts that are specific to KNA and

5   to no one else that has been before Your Honor.  These facts,

6   the letter proving that there is not now and will not in the

7   future be a DOJ investigation of KNA, and the relationship

8   between KNA and Honda mean that the inferences of a broad

9   conspiracy, which Your Honor has drawn as to others based on

10  the investigation, the pleas and the market structure cannot

11  be drawn as to KNA.

12        So let me look at these one at a time.  Let's talk

13  about the investigation.  Your Honor's ruled that the

14  existence of this continuing broad DOJ investigation is a

15  fact for which Your Honor may infer that a broad conspiracy

16  is plausible.  Plaintiffs may not yet have concrete facts but

17  Your Honor said what is public now may not be all that

18  eventually becomes public, more facts may come out in

19  discovery or in another DOJ case, and the continuing

20  investigation may result in more facts.  But if Your Honor

21  knew for a fact that a company is not now and would not be in

22  the future part of the investigation the inference of a

23  connection to a broad conspiracy Your Honor has drawn as to

24  others from the existence of that investigation you could not

25  draw, you would not, and there is nothing from which the

1    inference could be drawn.  To hold otherwise would purely be

2    to allow an inference of guilt by association.  Unlike any

3    other company Your Honor's yet ruled on, that's KNA's

4    position.

5           Exhibit A is this June 16th letter from 2014 that I

6    mentioned, they -- DOJ definitively closes their

7    investigation.  Now, I'm not claiming as plaintiffs say at

8    one point in their brief that Your Honor should infer from

9    the closing of a case that KNA is innocent, that's not what

10   we are asking, we are not asking Your Honor to draw an

11   inference from that.  We are just saying the inference that

12   the plaintiffs want you to draw, the inference there is a

13   connection -- because of the investigation there is a

14   connection to a broader conspiracy that that inference can't

15   be drawn.  Your Honor should draw no inference from that,

16   it's out of the case as far as Keihin is concerned there is

17   no investigation, it is closed, so in the future there will

18   not be any more from that investigation with respect to

19   Keihin, and there were no charges, no action of any kind.

20          Your Honor has also mentioned guilty pleas as

21   supporting the inference of a broad conspiracy with an

22   overall plan, a common design, and KNA has pled guilty to

23   nothing, no one has pled guilty to doing anything with KNA,

24   there is no connection between KNA and the guilty pleas.

25   Whatever the guilty pleas may say about other companies it

1    would be nothing but guilt by association to infer from

2    someone else's guilty plea to other parts with other

3    companies that KNA is itself involved in a common design, an

4    overall plan.

5            THE COURT:

6

7            MR. BAIRD:  Well, Your Honor, I'm going to get to

8    that.  I think that's an important question.  What I say is

9    it doesn't bear on the overall design, the common plan, it

10   doesn't bear on the big conspiracy because

11

12

13

14                               .  And if Your Honor

15   sees this Your Honor might well say all right, I should

16   dismiss without prejudice, there may be a conspiracy here

17   that they can plead,

18       -- based on these allegations.  But what I'm talking

19   about here, Your Honor, is a connection between

20           and the overall plan, the common design, that we

21   know is required for the big conspiracy.

22           Your Honor has done multiple conspiracy cases, you

23   know there are just differences.  There might be one

24   situation in which several smaller conspiracies might be

25   appropriate, another situation in which a bigger conspiracy

1   might be appropriate.  Here there is no connection alleged,

2   and I think -- the way I read Your Honor's prior decision you

3   have recognized that might be an issue for the plaintiffs but

4   you have said to yourself and written that because there is

5   this investigation and because there are these guilty pleas

6   and because of the market structure it pushes it over the

7   line, nudges it over the line into plausibility, and that is

8   what Your Honor has said.

9        What I'm saying to Your Honor is that those extras

10  that push this from a small conspiracy to being a part of the

11  overall plan just don't exist as to KNA because of the DOJ

12  letter and also because of the relationship to Honda.  If you

13  think about market structure, the notion of market structure

14  is that you have the opportunity to conspire with others.

15  Well, that's not really KNA's situation, they've only got one

16  customer and they are controlled by that customer.  If

17  anything, the natural inference is that they are not trying

18  to cheat Honda, that's the -- that would be the natural

19  inference.

20       Plaintiffs' response is that the complaints are

21  replete with factual allegations but when they list the

22  factual allegations that they say their complaints are

23  replete with they mention the investigation, the guilty pleas

24  and the market structure, which I have just been talking

25  about.  They also mention nonfactual boilerplate allegations

```
 1   of common purpose, communications, secret meetings, and

 2   those -- the reason I say those are boilerplate, they don't

 3   mention any specifics and they don't mention KNA.  They

 4   mention the true but irrelevant allegation that KNA sells

 5   parts of fuel injection systems, they don't mention it sold

 6   only to Honda.

 7        And finally,

 8

 9

10

11          .

12        THE COURT:  Okay.

13        MR. BAIRD:  Plaintiffs end that section of their

14   brief, Your Honor, with a revealing misunderstanding of the

15   law.  They try to distinguish authorities for the undeniable

16   proposition that all the accused conspirators must have

17   agreed on an overall plan by saying that they are not

18   alleging a hub-and-spoke conspiracy, which is interesting

19   because it is really the only kind of conspiracy they have.

20   They say they are not alleging a hub-and-spoke conspiracy in

21   which -- like in Kotteakos in which there is a central

22   conspirators and others at the sides who don't know each

23   other but they know there is some kind of common plan.  They

24   disclaim that.  They say in their brief that really they are

25   alleging a broad conspiracy, everyone knows everyone,
```

1    everyone talks to everyone, everyone communicates with

2    everyone, that's fine if you can prove it, but as to KNA I

3    submit they just haven't begun to pick up that burden.

4            There is not a factual allegation

5

6            . With control by Honda and the DOJ closing its

7    investigation, I submit there is no inference possible that

8    KNA is part of something broader.

9            Plaintiffs' argue in a single sentence that the DOJ

10   letter should not be considered.  I just want to briefly

11   mention that, Your Honor.  It is an argument they seem to

12   recognize should not succeed because it is integral to their

13   claim, they claim a continuing investigation.  Well, DOJ says

14   as to KNA there is no continuing investigation, and it is

15   also a public record once it is sent to KNA, and we cite

16   cases for that in the reply brief.

17           We have a third point in our brief that I will just

18   rely on my papers for, Your Honor.

19

20

21           . I commend our papers to Your Honor

22   on that one.

23           So, Your Honor, for all of those reasons I submit

24   that whether it is with or without prejudice, for the

25   Copperweld reason or the conspiracy reason, we really ask

1    Your Honor to dismiss this complaint.  This is a company

2    which --

3               THE COURT:  All right.  That's enough.

4               MR. BAIRD:  Thank you, Your Honor.

5               THE COURT:  Response?  Thank you.

6               MR. OCHOA:  Good afternoon, Your Honor.  Omar Ochoa

7    with Susman Godfrey on behalf of the end payors and auto

8    dealers.

9               To start, Your Honor, any percentage that Honda may

10   own of KNA was not in the pleadings, and KNA has offered no

11   affidavits or corporation documents in support of that

12   assertion, and the same is true with that assertion that

13   Honda is the only customer of KNA, there is no affidavit,

14   there is no document in support of that, so there really is

15   no information in front of this Court, properly before this

16   Court, to consider on a motion to dismiss.

17              But more important the plaintiffs have expressly

18   alleged that KNA's conspiratorial conduct affected more than

19   just Honda vehicles.  Plaintiffs allege that KNA's

20   involvement in a global price-fixing conspiracy and provides

21   specific examples of price fixing and bid rigging of Honda

22   vehicles was purely an illustrative example, but those

23   examples no way limit the scope of KNA's alleged conduct that

24   the plaintiffs have alleged in their complaints.  Simply put,

25   KNA's arguments regarding Honda's ownership percentage in KNA

1   are misleading because the ownership percentage of KNA no

2   matter what that number is doesn't matter or doesn't warrant

3   dismissing plaintiffs' claims against KNA.

4        THE COURT:  Well, what if -- I mean, what if KNA --

5   excuse me, Honda is its only customer?  I suppose now you are

6   saying you don't know that.

7        MR. OCHOA:  Right, we don't know that and we have

8   no way of knowing that.  Again, KNA themself have not put

9   forth any evidence to suggest that other than an assertion in

10  their brief.  But KNA has never asserted that Honda actually

11  controlled KNA's pricing or any aspect of KNA's actual

12  operations.  And KNA, as Your Honor already pointed out, has

13  not asserted and cannot assert that it is a wholly-owned

14  subsidiary of Honda, which was the test in Copperweld.

15        Regarding the linkage to the broader conspiracy,

16  Your Honor, KNA's entire argument rests on its assertion that

17  the DOJ concluded its investigation of KNA and did nothing,

18  but as this Court has previously pointed out, we can't make

19  any conclusions from that information because there are many

20  reasons why the government would close its investigation, not

21  simply because KNA did nothing wrong.  The fact of the matter

22  is is that the declaration only really shows that the

23  government investigated KNA for potential antitrust activity

24  that the plaintiffs' alleged, and if that was all that the

25  plaintiffs relied on, that an investigation was done by the

1    DOJ, there might be some danger of simple guilt by

2    association, but far from that the plaintiffs have actually

3    alleged guilt by specific example.  In the complaints

4    plaintiffs describe specific instances of KNA's collusive

5    conduct, and on top of those --

6         THE COURT:  What are you talking about, the

7    meetings with Denso?

8         MR. OCHOA:  Yes, Your Honor, yes, Your Honor, the

9    meetings with Denso specifically, and this is the

10   confidential information that was sealed in the response, but

11   specifically for RFQs that are issued for the Acura model

12   year 2009 and the Accord model year 2008, and conversations

13   that they had with Denso --

14        THE COURT:  Both of these are Honda?

15        MR. OCHOA:  Yes, both of those are Honda vehicles.

16   Again, plaintiffs use these Honda examples as illustrative

17   examples but that doesn't limit the broad allegations made in

18   the complaint that KNA's conspiratorial conduct affected more

19   than just Honda.

20        THE COURT:  But it would if its only customer was

21   Honda, so I guess we are getting --

22        MR. OCHOA:  Exactly.  If that's its only customer

23   that's something completely different but, again, we don't

24   know that, there is no evidence before this Court other than

25   an assertion made by KNA's conduct -- by KNA's counsel in its

1    brief.  And plaintiffs have provided a host of other

2    allegations including that the fuel injection systems market

3    is susceptible for colluding, the defendants conspired with a

4    single purpose to extract higher prices, and that KNA was

5    part of this global conspiracy.

6            KNA says that it is unique because it never pleaded

7    guilty to price fixing of fuel injection systems but that's

8    not unique.  Other defendants in other cases have made the

9    same argument unsuccessfully, co-counsel, Ms. Tran, mentioned

10   Lear, but there is also Tokai Rika in the wire harness cases

11   and SKS U.S.A. in the bearings cases.

12           And finally and briefly, Your Honor, to the third

13   point that was made, that KNA's counsel relied on its papers

14   for, end payors will just say that it is unclear as to what

15   relief is actually being sought by that specific argument, it

16   is unclear -- the briefs suggest that the Court should

17   dismiss end-payors' allegations, this may have been simply an

18   unartful way of requesting that those allegations be

19   stricken.  If that's the case that's an incorrect or an

20   improper request for a few reasons.  It fails to appreciate

21   the context of those specific allegations, it basically is an

22   illustrative example again of a market-wide conspiracy and

23   not necessarily a claim all on its own, it only supports

24   end-payors' and auto-dealers' complaints.

25           THE COURT:  Would one OEM know what another OEM

 1   paid for a particular part?  It's a little off topic but I'm

 2   curious because --

 3             MR. OCHOA:  Sure.  I'm not certain, Your Honor.  I

 4   don't believe I can provide an answer at this point.  But

 5   that only makes the further point that this Court should

 6   allow this case to go forward so the parties can actually

 7   discover this information and determine it, but on the

 8   pleadings and on the allegations made in the complaint before

 9   the Court all of this is sufficient to establish that the

10   end-payor plaintiffs and the auto dealers have sufficiently

11   pled their claims against KNA.

12             THE COURT:  Thank you.

13             MR. OCHOA:  Thank you.

14             THE COURT:  Brief reply?

15             MR. BAIRD:  Your Honor, thank you.  If I may

16   briefly, I think the plaintiffs have the shoe on the wrong

17   foot.  It is not up to Honda to prove that Honda is its only

18   customer, although it is, it is up to the plaintiffs to

19   allege something beyond that and they don't.  That's the very

20   reason why some specific factual allegations are necessary in

21   a complaint, that that's what you have to grapple with,

22   what's specifically alleged.  What's specifically alleged is

23   only Honda, that happens to be the fact, if it makes a

24   difference to Your Honor we could have discovery very briefly

25   on that particular point and within a week could establish

 1    that, but I submit it is not necessary because the

 2    allegations don't go there.  The allegations are not --

 3    plaintiffs have no idea, and the fact of the matter is that

 4    Honda is the only customer.  Your Honor can infer that also

 5    by the relationship, that's a 56-percent owned company.

 6    Honda -- Keihin North America does whatever Honda wants it to

 7    do, and there are more facts beyond the record, but the

 8    reason for that Copperweld doctrine is once you are over

 9    50 percent you are really talking about control and

10    everything else is gravy.

11            THE COURT:  All right.

12            MR. BAIRD:  Thank you, Your Honor.

13            MR. OCHOA:  Very briefly, Your Honor.  I'm sorry.

14    Very briefly.

15            If the parties were to go forward with the

16    discovery over Honda as a customer, I believe we would also

17    need discovery over Honda's actual control over the

18    operations of KNA and not have it simply be limited to

19    whether or not Honda is the sole customer of KNA.  Thank you.

20            THE COURT:  Okay.  I have two more, they both

21    really are Delphi motions.  Do you want to have a break

22    before we argue these motions?

23            MS. ZWISLER:  I'm fine, Your Honor, but if you or

24    the court reporter need a break I'm fine with that too.

25            THE COURT:  I mean, I would like to give you your

```
1   full time to argue it but I don't know that we can go on for
2   another half hour without something.
3             MS. ZWISLER:  Okay.  Then let's pause, Your Honor,
4   it is very important obviously.
5             THE COURT:  Let's take -- do you think you can grab
6   a sandwich downstairs in a half hour?  Do you think we can do
7   that?  Try.  We will wait for you to come back.  Thank you.
8             MS. ZWISLER:  What time, Your Honor?
9             THE COURT:  How about 2:00.
10            (Court recessed at 1:26 p.m.)
11                          —   —   —
12            (Court reconvened at 2:02 p.m.; Court, Counsel and
13            all parties present.)
14            THE LAW CLERK:  All rise.  You may be seated.
15            THE COURT:  Okay.  We are all refreshed to begin.
16            MS. ZWISLER:  Thank you, Your Honor.  Peggy Zwisler
17  from Latham & Watkins on behalf of the Delphi defendants.
18            I have to confess I feel a little bit like the last
19  kid in a piano recital and only her parents really want to
20  hear her.
21            I have some slides here that I think might move
22  things along and also keep us awake after lunch.  I would
23  like to pass a couple up to you, Your Honor, but they will be
24  on the screen.
25            THE COURT:  All right.
```

**150**

1    MS. ZWISLER:  In an unusual display of chivalry I

2  already gave them to the plaintiffs.

3        Your Honor, our motion presents a question that you

4  have decided five times in favor of the defendants and I'm

5  hoping to make it six.  The question is -- I'm going to

6  address --

7        THE COURT:  You are keeping count?  I don't have

8  any count at all.

9        MS. ZWISLER:  Believe me, you are going to see all

10  five of them on these slides.  I'm going to address both

11  motions that are before you.  They have two people that they

12  need to use to combat our case but I have -- I'm going to

13  address both of them.

14        So the question is do you have personal

15  jurisdiction over two completely foreign entities, one of

16  which is a pure holding company and the other of which has

17  absolutely no contacts with the U.S. and doesn't ship

18  products into the U.S.  And the answer to that question is

19  no.

20        Let me show you a schematic of the two

21  defendants -- the Delphi defendants that are in this case.

22  So there are no Delphi U.S. defendants in this case at all.

23  The plaintiffs initially named one when they filed the

24  complaint in December, but they dropped it voluntarily after

25  they filed their con -- when they filed their consolidated

1    amended complaint, so this case has two completely foreign

2    entities.

3            And also unlike many of the other cases that you

4    have here, I think this is important as well, neither these

5    two entities nor any Delphi entity in the U.S. or anywhere in

6    the world has been charged or pled guilty to price fixing any

7    product, let alone valve timing control devices, which is the

8    product that this case is about, and on those facts in

9    addition to the ones we will discuss you should dismiss these

10   cases against these two defendants.

11           Now, this slide depicts the organizational

12   structure of these clients.  DPSK is Delphi Powertrain System

13   Korea, that's in the corner there.  Now, DPSK is a joint

14   venture -- a Korean joint venture.  It is partially owned by

15   a Korean company, an independent Korean company, who is not a

16   defendant in the United States.  The rest of its shares are

17   owned by another Delphi entity, Delphi France Holding.

18   Delphi France is not a defendant in this case.  Like all of

19   the rest of the defendants, Delphi defendants didn't plead

20   guilty, no charge, no nothing.  Those are the companies that

21   actually own DPSK.

22           The other Delphi defendant in this case is

23   Delphi L.L.P. in the United Kingdom.  The L.L.P. is a pure

24   holding company; it has no employees, no assets, no

25   operations, no functions, its principal place of business for

1   the last three years and change has been in Kent, England,

2   not in the United States.  It is not the ultimate global

3   parent of the Delphi entities.

4        Now, the entity that is relevant -- loosely

5   relevant to this case is DPSK, it's the entity that

6   manufactures valve timing control devices that's the

7   defendant here.  It is in Korea, and it makes valve timing

8   control devices exclusively in Korea.  It sells them only to

9   Korean car manufacturers.  So you can see on this schematic

10  it sells to Hyundai and Kia.  They do something with them

11  after that, the record doesn't tell us what exactly except

12  that the plaintiffs claim they come to the United States.

13  DPSK does not ship or sell valve timing control devices to

14  the U.S. at all, and all of this is supported by the two

15  declarations of our witness, James Rim.

16        There are 17 paragraphs of things that he says

17  there that are similar to what Mr. Feldberg described about

18  his Korean entity, and I won't go through them in the

19  interest of time.  The central ones are they exclusively sell

20  in Korea, they exclusively make in Korea, they do not sell to

21  the United States, they do not ship to the United States, and

22  they do not control the decisions of Hyundai or Kia or

23  anybody else as to where their parts are going to go or where

24  the cars they have got are going to be shipped.  In fact,

25  Mr. Rim says we don't design our parts for particular

1    countries.

2          DPSK structurally then is exactly like two other

3    defendants in this huge MDL that you dismissed on personal

4    jurisdiction grounds, S-Y Europe and Ichikoh.  So here is a

5    schematic of S-Y Europe.  S-Y Europe, like DPSK, was a joint

6    venture of two non-defendant entities.  I'm not sure how

7    relevant that is but it is like DPSK.  S-Y Europe, like DPSK,

8    manufactured parts and sold them to companies in Europe, car

9    companies in Europe, and they shipped them or the cars that

10   had them elsewhere.  S-Y Europe, like DPSK, did not control

11   the decisions of those car manufacturers of where the parts

12   went or where the cars went.  And DPSK like -- or S-Y Europe,

13   like DPSK, did not ship or sell directly to the U.S., and

14   Your Honor rightly held no personal jurisdiction, no personal

15   jurisdiction, totally foreign events.

16          The second case that this is just like is Ichikoh,

17   you just decided that on March 4th.  Ichikoh is in Japan.

18   Like DPSK, Ichikoh is a foreign entity.  Like DPSK, it sells

19   only to foreign car manufacturers.  We have got the Japanese

20   one in the picture there.  What those companies do after the

21   sale, it is not up to Ichikoh, Ichikoh did not control those

22   decisions, and Ichikoh, like DPSK, did not itself sell or

23   ship into the United States.  So this Court rightly held

24   there no personal jurisdiction over that company.

25          So the question on this motion is given that DPSK

1  is just like S-Y Europe and Ichikoh, what are the plaintiffs

2  giving you to make your life difficult and change your mind?

3  What are they telling you?  They say you have jurisdiction in

4  the first instance over DPSK because they are going to tell

5  you you have jurisdiction over that Nothinberger (phonetic)

6  Company in the United Kingdom which is called Delphi L.L.P.

7  So they are saying if you have jurisdiction over the L.L.P.

8  then they can make an alter-ego argument and claim that you

9  have jurisdiction over the Korean entity.

10         Now, I'm going to tell you in a minute why you

11  don't have jurisdiction over the holding company but the

12  first point why you don't have general jurisdiction over DPSK

13  is because the Supreme Court last year in Daimler vs. Barnum

14  held that general jurisdiction in these kinds of global

15  enterprise cases has to be looked at on the basis of the

16  conduct of each party separately.

17         So let me tell you about that because it is

18  relevant to both cases.  Daimler vs. Barnum involved

19  Mercedes-Benz U.S. so that's a subsidiary of the global

20  company Daimler-Benz.  So the federal court in California

21  undeniably had jurisdiction over Mercedes-Benz U.S.  The

22  plaintiffs alleged that they could get jurisdiction over

23  Daimler, a German company, by virtue of the contacts of its

24  U.S. sub and, in fact, that the parent controlled in some way

25  the U.S. sub, and the Supreme Court said unanimously, which

1    in this day and age is a miracle, no, that doesn't work.

2    They held that the -- the majority held, there was a

3    concurring opinion but it was unanimous, that for general

4    jurisdiction you have to analyze the conduct -- contacts

5    rather, the minimum contacts of each company separately.

6         So the fact that the Court had jurisdiction over

7    Mercedes-Benz U.S. and even if you imputed those contacts,

8    imputed the contacts to Daimler in Germany, no jurisdiction

9    over Daimler in Germany.  So that means the mere fact even if

10   you had jurisdiction over the L.L.P. that would not mean you

11   have jurisdiction over DPSK in terms of lose control

12   allegations.  The commentators are saying that the alter-ego

13   theory is dead after Daimler.  You don't need to get there

14   because I'm going to tell you in a minute why you don't have

15   jurisdiction over the L.L.P.

16        So what's the real way that plaintiffs are trying

17   to get you to get jurisdiction over the Korean entity that

18   doesn't sell or ship in the U.S.?  Specific jurisdiction.

19   Now, they tried again the conspiracy theory of jurisdiction

20   and as Mr. Feldberg told you, you rejected that five times.

21   They tried the Calder effects theory, you rejected that five

22   times.  But they tried something different on purposeful

23   availment on our case, and what they say is that DPSK put its

24   products into the stream of commerce and they say there are

25   facts that are different here and that means you should find

1    that DPSK specifically targeted the U.S., that's their

2    primary argument.  And the argument they are making there,

3    the specific targeting of the U.S., is based on a

4    confidential factual allegation but I'm not going to go into

5    it in detail, they can if they want to.  They claim that they

6    have sufficiently alleged that DPSK specifically targeted the

7    U.S. because generally speaking, not with respect to DPSK,

8    car manufacturers who put out RFQs sometimes say the

9    destination of the vehicle ultimately.  Allegation one.

10        Now, I should pause here and say none of this is in

11    the complaint, they would have to amend to allege these.

12    This is kind of a hail Mary pass, if you ask me.

13        So allegation one, generally speaking some RFQs say

14    where the cars are going.  Allegation two, an alleged

15    co-conspirator of DPSK had an RFQ from a car manufacturer in

16    Korea and was, quote, aware, close quote, that the cars were

17    coming to the U.S.  On the basis of these two allegations,

18    plaintiffs are saying Delphi put its products in the stream

19    of commerce and specifically targeted the U.S.  That's a very

20    attenuated allegation but it is also not sufficient as a

21    matter of law, and it is also something you have already

22    decided so you shouldn't permit them to amend to add those

23    RFQ allegations anyway.

24        Why is that?  That's because those allegations are

25    really not different than the S-Y Europe allegations that you

 1   already rejected on this subject.  S-Y Europe, as I said, was

 2   a joint venture; it was created to sell products to BMW.  The

 3   plaintiffs in that case alleged that BMW imported 250,000

 4   vehicles into the United States so essentially they alleged

 5   S-Y Europe knew or must have known that its products were

 6   going to the United States and that means that S-Y Europe

 7   specifically targeted the U.S.  Your Honor rejected that, and

 8   you said --

 9          THE COURT:  Not that they knew they would end up in

10   the United States, some of them.

11          MS. ZWISLER:  Right, they rejected that as a

12   factual basis for permitting specific targeting.  Really

13   knowledge alone is not enough.  The mere fact that you knew

14   or should have known they were going there is not specific

15   targeting.  So you could ask yourself what is enough, and

16   again I don't want to repeat what Mr. Feldberg said but the

17   three cases in the 6th Circuit that you cited in S-Y Europe,

18   including actually a Supreme Court case, hold that what's

19   necessary beyond knowledge that your products might get there

20   is an affirmative act, some affirmative act.  The three cases

21   are Bridgeport, Schelling and Fortist.

22          In Bridgeport the court found no personal

23   jurisdiction over a foreign defendant.  The defendant had

24   contracted with another party who shipped into the forum.

25   The Court said that because the informed defendant did not

1    affirmatively require its contracting party to ship to the

2    forum there was no targeting.  So what the 6th Circuit said

3    is there has to be an allegation of an affirmative act, you

4    have to require your contracting party to affirmatively ship

5    into the forum.  Okay.  So there was another defendant there,

6    and it shows you the difference.

7         The other defendant had a contract with its

8    contracting party to ship products into the forum, and that

9    contract said essentially I will ship into all 50 states of

10   the United States.  That defendant, the 6th Circuit said, did

11   specifically target the U.S. because the contract required

12   the intermediary to ship into all 50 states.  So Bridgeport

13   shows you you have to have an affirmative act of targeting.

14   So here what that would mean is plaintiffs would have to

15   allege and establish for purposes of a personal jurisdiction

16   motion that DPSK required its Korean customers to ship cars

17   with its products or its products alone into the U.S. and

18   there is no allegation of that.  There is no allegation of an

19   affirmative act of targeting, which in this context would be

20   a contractual obligation to ship to the U.S.

21        The other two 6th Circuit cases are similar.

22   Schelling involved power saws made by I believe a German

23   company who had a U.S. distributor.  That company while it

24   distributed in the U.S. and itself did not sell affirmatively

25   came to the United States and marketed the product here, so

1    the 6th Circuit said that's specific targeting.

2         The last case, Fortist, involves ships on the Great

3    Lakes.  In this case the contract between the foreign

4    defendant and the U.S. specifically required the defendant to

5    design the ship for the Great Lakes and for docking at

6    Toledo.  So the Court held that's specific targeting, they

7    took an affirmative act to require the product essentially to

8    be fit for distribution in the U.S.

9         So what these cases mean for the main argument,

10   this RFQ argument that the plaintiffs have now put into their

11   brief and want to put into their complaint, is that DPSK

12   would have had to require its customers to ship to the U.S.,

13   and in the absence of that allegation or without more than

14   knowledge this case is no different than S-Y Europe and the

15   conclusion that you reached there on the stream of commerce

16   theory.

17        THE COURT:  Okay.  Basically knowledge is not the

18   equivalent of targeting?

19        MS. ZWISLER:  That's right, and that's what you

20   held in S-Y Europe, and those three cases that I just

21   described, which are 6th Circuit cases, have that in them and

22   they draw that out of the Supreme Court trilogy of cases that

23   you cited in your opinion.

24        THE COURT:  I also take it these Hyundais or Kias,

25   they could go to any country --

1          MS. ZWISLER:  They could.

2          THE COURT:  -- they just happen also to go to the

3   United States?

4          MS. ZWISLER:  Yes, and what our evidence shows,

5   Mr. Rim's affidavit says we don't design our products for the

6   U.S., there is no allegation even actually of knowledge that

7   DPSK knew that its products were going to the U.S. except for

8   this RFQ that the co-conspirator allegedly was aware about,

9   but what I'm saying even if that's true about DPSK, let's say

10  that DPSK knew from the RFQ, oh, these products are going to

11  go to the United States, knowledge alone is not enough.  That

12  contract would have to say to Kia and Hyundai you must

13  distribute this product to the U.S.  That's what Bridgeport,

14  Schelling and Fortist are holding, knowledge alone is not

15  enough.

16          Okay.  Let me spend a minute on the L.L.P. which is

17  the holding company.  As a matter of organization structure

18  the L.L.P. -- Delphi L.L.P. is not different than the three

19  other holding companies that you already dismissed.  So the

20  L.L.P. is a true holding company.  In some of the other

21  cases -- the three that I'm talking about are Leoni, AB SKF

22  and Schaeffler AG, you dismissed all three of those holding

23  companies on personal jurisdiction, they are cited in our

24  brief.  A couple of them actually were functioning holding

25  companies; for example, they had administrative services that

1   they ran for their subs.

2       Delphi L.L.P. is not even that, it is a U.K.

3   holding company that doesn't manufacture or sell products

4   anywhere in the world, any products.  It is not incorporated

5   or licensed in the U.S.  It doesn't control its U.S.

6   subsidiary because it has no employees.  How could a paper

7   company control anybody?  And, of course, the U.S. indirect

8   subsidiary is no longer a defendant in the case, that's also

9   a different circumstance but in my judgment not material.

10      In Leoni, Leoni was a German holding company that

11  did not manufacture or sell any products, and on the evidence

12  there that was submitted you said it doesn't control the

13  co-defendant U.S. subsidiary.

14      Same story with Schaeffler or -- the first one is

15  AB SKF, it was a Swedish holding company and does not

16  manufacture or sell any goods, doesn't control the

17  co-defendant U.S. subsidiary.

18      The third one is Schaeffler, exactly the same, a

19  German holding company that does not manufacture or sell any

20  goods and does not control its U.S. defendant.

21      So here applying these three cases to our situation

22  we are a holding company, we don't manufacture or sell any

23  products and we can't possibly control the L.L.P., cannot

24  possibly control any entity because there is no people

25  involved in it, control is a factual issue which means the

1    entity is making decisions for some other entity.  Our

2    evidence, here and there is a declaration from Isabelle

3    Vagne, V-A-G-N-E, that supports this, the L.L.P. doesn't

4    control anything, it doesn't do anything, it has no

5    functions, no operations, no assets, no money, so it doesn't

6    control either.  The jurisdiction over the L.L.P. then is

7    controlled by those three cases which you have already

8    decided.

9         Now, plaintiffs have given you no legal argument

10   why you should change your mind and find a holding company

11   with no functions is subject to U.S. jurisdiction.  They

12   don't give you any legal argument to that effect.  In fact,

13   it had become kind of a pyrrhic victory because it doesn't

14   have any documents, I mean, it is not a thing, but what they

15   have given you is a fact.

16        THE COURT:  What is it, is it a robot?

17        MS. ZWISLER:  No, it is a paper, it is a square on

18   a piece of paper, and actually -- actually it is not the --

19        THE COURT:  A website?

20        MS. ZWISLER:  Yeah, it is like -- it was created --

21   it is a long story but it is created as a result of -- Delphi

22   went into bankruptcy, as you probably know, at one point, and

23   when it came out of bankruptcy it had a number of iterations

24   and --

25        THE COURT:  Did the L.L.P. take it over or --

 1          MS. ZWISLER:  Not exactly.  Basically it is a

 2    partnership in the United Kingdom that has an ultimate parent

 3    called Delphi P.L.C. -- Delphi Automotive P.L.C., that's

 4    actually the ultimate global parent.

 5          THE COURT:  Wasn't that created -- or that was

 6    created before and then Delphi L.L.P. became --

 7          MS. ZWISLER:  I'm not sure about the time and it is

 8    not alleged in the complaint, but what I'm saying is it

 9    doesn't have any functions, it is an organizational

10    structure, not a thing.

11          Now, plaintiffs have, as I said, given you one fact

12    that is relevant to this argument, which is that after -- so

13    the entities emerged from bankruptcy in 2009 and after a

14    number of other steps the L.L.P. was created, and from

15    October 2009 to November 2011 the L.L.P. listed its principal

16    place of business as Troy, Michigan.  It was not an

17    operational entity at that time either but it listed it on a

18    piece of paper as Troy, Michigan.  In November of 2011 when

19    the complete -- reorganization was complete it listed its

20    principal place of business as Kent, England and that's where

21    it has been ever since three and-a-half years ago.

22          So the question is does a holding company that for

23    25 months, three and-a-half years ago, listed in Troy,

24    Michigan as its principal place of business mean that you

25    have general jurisdiction over it?  The answer to that is no.

1    General jurisdiction is continuous, systematic contacts with

2    the forum, that's how the Supreme Court defines it.

3    Principal place of business is an indicia of one of those

4    continuous systematic contacts.

5         In the absence of any other facts the mere legal

6    listing of a principal place of business doesn't tell you

7    anything about continuous systematic contacts in the face of

8    the evidence that this entity had no functions, number one.

9         Number two, it certainly doesn't have a principal

10   place of business here today.  That means the case is

11   governed by the Sioux Breeders case in this district, that's

12   S-I-O-U-X.  That case involved an operational company that at

13   one point had its principal place of business in Michigan.

14   It moved.  The court found -- this court found, and I forget

15   which judge it was, that it did not have personal

16   jurisdiction over Sioux Breeders anymore because its

17   principal place of business had been outside Michigan or

18   outside of the forum for over three years, so the contacts

19   were no longer continuous and systematic.

20        THE COURT:  That was a Judge Ludington case I

21   think?

22        MS. ZWISLER:  I think it was.  So that case is

23   actually more -- our case is actually less persuasive for

24   personal jurisdiction and general jurisdiction than that one

25   because this entity didn't operate anything when it was here.

1    There is a U.S. entity that's here, it's the operational

2    entity.  This square on a piece of paper didn't do anything

3    except list its principal place of business, and that ended

4    three and-a-half years ago.  Under Sioux Breeders it is for

5    certain that entity is not subject to the general

6    jurisdiction of this Court.  Plaintiffs in their brief didn't

7    address or distinguish the Sioux Breeders case at all.

8            So let's go back in sum here and look at the two

9    entities that they are trying to get you to exert

10   jurisdiction over.  There is no middle U.S. entity in that

11   map.  You've got the holding company that has no functions

12   and has been in the U.K. for three and-a-half years.  You

13   have the DPSK entity unrebutted facts that it did not sell or

14   ship any products into the U.S., and even if it had knowledge

15   that the ultimate products would go to the U.S. there is no

16   evidence or allegations of an affirmative targeting.

17           Plaintiffs attempt to create jurisdiction on the

18   basis of these facts as essentially saying I think that this

19   Court could exercise jurisdiction over any company in the

20   world upon an allegation that it was involved in the

21   conspiracy, and keep in mind there is nobody here that has

22   pled guilty or been charged even.  There has got to be more

23   than what they have got.

24           The Supreme Court said general jurisdiction and

25   personal jurisdiction, federal courts are courts of limited

1    jurisdiction and exercising jurisdiction over a

2    nonfunctioning holding company or a company that ships

3    nothing into the U.S. would exceed those limits.

4            THE COURT:  Okay.

5            MS. ZWISLER:  Thank you, Your Honor.

6            THE COURT:  Mr. Reiss?

7            MR. REISS:  Good morning, Your Honor -- good

8    afternoon I guess.  My name is Will Reiss and I will be

9    speaking for the end-payor plaintiffs and I will be

10   addressing the automobile-dealer plaintiffs as well.

11           Before I get into the thrust of my argument I think

12   it bears emphasizing that we have alleged specific examples

13   of Delphi Korea's anti-competitive conduct that has harmed

14   American consumers and American businesses.  Those are our

15   plaintiffs in this case, American businesses and consumers

16   that were injured.

17           In telling you Delphi Korea they haven't filed a

18   Twombly motion, they don't contest the sufficiency of our

19   allegations, they are just moving to dismiss for lack of

20   jurisdiction, and I'm not undermining that argument, but it

21   is notable that unlike virtually every single case they cite

22   we have American plaintiffs here, we have the Department of

23   Justice that has repeatedly said that the conspiracy for

24   which we have alleged specific examples of Delphi Korea's

25   participation affected more than 25 million automobiles

```
 1    purchased by Americans.  Delphi Korea knows full well, unlike
 2    many of these other cases, Korea doesn't have class actions
 3    for the U.S. consumers and businesses injured.  If Delphi
 4    Korea is dismissed here it is game over.  They escape, and
 5    those who were injured have no opportunity to vindicate their
 6    rights in the United States, and I think that's an important
 7    policy consideration that is distinguishable from a number of
 8    the other cases that Delphi Korea cites.
 9             THE COURT:  But their jurisdiction is not a policy
10    issue.
11             MR. REISS:  Jurisdiction is not a policy issue but
12    one of the tests for specific jurisdiction is whether it is
13    reasonable for the foreign defendant to come before the
14    United States courts or for whatever the jurisdiction is at
15    issue, and there are different factors that are balanced in
16    terms of determining whether in fact jurisdiction is
17    reasonable.  But I want to get into the elements of specific
18    jurisdiction because you are right, there are other factors
19    that need to be considered, and I think we have strong
20    arguments as to why Delphi Korea should be subject to the
21    United States' jurisdiction.
22             There are a number of arguments we raise in our
23    brief but you have heard a lot of these arguments, you have
24    heard numerous motions to dismiss, so I want to cut to the
25    chase and get to the real heart of the issue, which is
```

1  specific jurisdiction, does this Court have specific

2  jurisdiction, and the question is did Delphi Korea

3  purposefully avail itself of the United States?  And Delphi

4  Korea cited to a number of cases they claim foreign

5  defendants were similarly situated to Delphi, and the Court

6  found that personal jurisdiction didn't exist.  We can't shy

7  away from those cases, Your Honor, but I have to say those

8  cases, and Delphi Korea says this themself, we are premised

9  on the understanding -- the Court has said this, in order for

10 the court to exercise jurisdiction over a foreign defendant

11 that sold to another foreign company, so like here where

12 Delphi Korea didn't sell directly into the United States,

13 that the foreign defendant would have to control the

14 distribution decisions of the entity to whom it purchased.

15 So, for instance, Delphi Korea sold to Hyundai, sold valve

16 timing control devices.  Hyundai installed those valve timing

17 control devices in its cars, sold those cars directly into

18 the United States.

19          THE COURT:  But other places; they didn't do

20 anything special because it was the United States, right?

21          MR. REISS:  Well, Your Honor, I wanted --

22          THE COURT:  They weren't required to send them to

23 the United States?

24          MR. REISS:  Correct, and the 6th Circuit, and I

25 want to just read from the Fortist case, and I'm quoting, a

1    defendant's interposition of an independent middleman between

2    itself and the forum does not itself place a defendant

3    outside of the forum's reach.  So the Fortist case

4    specifically held, this is an instance where Fortist was a

5    shipping company, they had franchised out their ships to a

6    Canadian company so you have two entities, two foreign

7    entities.  They didn't know what the Canadian company was

8    going to do.  There was some documentation saying that the

9    ship was outfitted for the Great Lakes, which, by the way,

10   the Great Lakes are in a lot of different places and there

11   was some suggestion that it may go to Ohio but there was no

12   certainty it was going to go to Ohio, and, in fact, the

13   Canadian company wasn't even the company that was controlling

14   the ships, they ultimately ended up franchising it out to

15   another company that ultimately sailed the ship into Ohio and

16   that's where the damage occurred.

17            But the court was clear that they were following

18   Justice O'Connor's test in the Asahi test, and that is this

19   notion of commerce plus.  So, number one, does the foreign

20   defendant place its goods into the stream of commerce?  There

21   is no debate here that Delphi Korea placed its goods into the

22   stream of commerce.  And so the second question, and these

23   cases uniformly hold this, is there additional facts that

24   indicate that the foreign defendant knew or could concede

25   that those products would end up in the United States?

 1   That's what those cases hold and the additional facts that we

 2   allege, and, Your Honor, I will concede they are not all in

 3   our complaint because some of those facts we learned

 4   subsequently, and we would be happy to amend our complaint if

 5   we needed to, but those cases show that -- those facts that

 6   we allege show that, yes, it is very important that the RFQ

 7   in some instance specify the destination of the automobile,

 8   and that's the important fact because automobiles are

 9   different depending upon where they go.

10        So, for instance, you have in Japan -- in some

11   countries you have the steering wheel on one side of the car,

12   in the United States you have got the steering wheel on the

13   other side of the car.  Now, I don't proffer to be an expert

14   in automotive parts but this product we are talking about

15   here is valve timing control devices, that deals with engine

16   management system.  Different countries I imagine have

17   different emission requirements, so there very well may be

18   reasons and justifications why these foreign defendants,

19   Delphi Korea, need to know where the product is ultimately

20   going to be sold and shipped.  Unlike any of these --

21        THE COURT:  You haven't alleged that and there is

22   no indication anywhere that they changed the valve timing

23   control device to fit any specific country.

24        MR. REISS:  Yes, Your Honor, well, it is difficult

25   for us because unlike many of these cases we haven't had the

1    benefit of discovery so how can we know this, but we do know

2    that Delphi Korea sold the products to Hyundai among other

3    makers knowing full well those products were going to reach

4    the U.S.  We plausibly allege that in many instance the RFQs

5    specified where it was going.  I mean, one would think there

6    is a reason as to why the RFQ would specify.  We know, as I

7    mentioned before, that again cars are different depending

8    upon where they go and there are different specifications.

9    Can we allege that as to Delphi Korea?  Well, we can't

10   without the benefit of any discovery and any documents, but

11   we --

12           THE COURT:  In general are valve timing control

13   devices different, I mean, what are they -- are there

14   different models or different aspects of these devices?

15           MR. REISS:  Well, I will say that one point that

16   defendants have made repeatedly to us is not one that we

17   necessarily agree with on every point but that these products

18   are different and customized depending upon the vehicle.

19   Defendants have repeatedly told us that over and over again.

20   I think it is possible that --

21           THE COURT:  These valves are different?  Where have

22   they said that?

23           MR. REISS:  They have made those representations to

24   us repeatedly through negotiations and through discussions,

25   that it is -- in terms of how the products are manufactured

1    that they are customized products in certain situations.

2            THE COURT:  In other component parts or in this --

3            MR. REISS:  Well, again, we haven't had the benefit

4    of discovery for valve timing control devices so we don't

5    know the parameters or the specifics but we do know this

6    much, that valve timing control devices differ upon the car

7    that they are being manufactured in.

8            THE COURT:  You know that?

9            MR. REISS:  Yes, and that's why there is an RFQ

10   process.  The RFQ specifies the type of valve timing control

11   devices and it needs to be compatible with the given make or

12   model.

13           THE COURT:  Okay.

14           MR. REISS:  Thank you, Your Honor.

15           THE COURT:  Thank you.

16           MR. WILLIAMS:  Good afternoon, Your Honor.

17   Steve Williams for the end payors.

18           As you saw, Ms. Zwisler is a very good lawyer,

19   which is why we need two of us to try to respond to her

20   arguments.  I'm going to be brief because we have had a long

21   day and we still have some things to get to, but I think as

22   to the Delphi L.L.P. motion it is pretty clear it should be

23   denied.  If it is not denied on the record before the Court,

24   then there should be discovery but it can't be granted.

25           Carrier Corp. in the 6th Circuit says our burden --

1    plaintiffs' burden on this motion is, quote, relatively

2    slight, the facts must be construed in our favor, and

3    weighing contested facts is inappropriate.  You have heard a

4    lot of facts put in and we have contested it.  You can go up

5    to 5725 Delphi Drive in Troy, U.S. government today believes

6    that's where Delphi L.L.P. does business.

7          THE COURT:  Today?

8          MR. WILLIAMS:  Today.  The IRS maintains that

9    Delphi L.L.P. is a U.S. domestic corporation headquartered in

10   Troy.  Their SEC filings, as we set forth in our papers,

11   still say they are there.  Beyond that without discovery,

12   which we haven't had, the materials that Mr. Reiss'

13   declaration submit show people being hired by Delphi L.L.P.

14   to work in Troy.  People in Troy being responsible for things

15   like the power train systems division, which this product

16   fits within.

17          So we have some declarations, we have some facts

18   controverting those.  Under Carrier that should go in our

19   favor if it is decided on this record, and if it is not then

20   there should be discovery, but we would submit it cannot be

21   granted.

22          And one of the things I enjoyed about preparing for

23   this motion is it was reminding me of law school because we

24   are talking about specific and general jurisdiction.

25   Ms. Zwisler talked about the Daimler case a little bit, and I

1    think the presentation may have stretched that case a little

2    far or perhaps suggested that dicta was the holding, and I

3    think that's why she made the comment that the commentators

4    suggest a certain conclusion because, number one, in Daimler

5    neither defendant at issue in the case had any connection to

6    the forum where the injuries took place, it is not like here.

7           Number two, it was an errant (phonetic) tort claim

8    act case, and the Court was very clear that principles of

9    commodity and foreign relations heavily weighed into the

10   decision there.

11          What I found very interesting about the Daimler

12   case and the Goodyear case we cited though are the two most

13   recent Supreme Court cases on jurisdictional issues, is I

14   believe they both cited with approval the case called Perkins

15   vs. -- I will not pronounce this correctly -- Benguet,

16   B-E-N-G-U-E-T, Consolidated Mining.  This is a case from 1952

17   from the Supreme Court again cited with approval in Daimler

18   and in Goodyear, and what it said is when a Philippine mining

19   company during World War II temporarily for a few years only

20   moved to Ohio and conducted what the court referred to there

21   as limited operations in Ohio, Ohio was a forum for suits

22   against that company that had nothing to do with the state of

23   Ohio, and if that case is still good law, those facts are

24   very similar to what we have here for whatever reason, and we

25   don't need to decide what that reason is today, Delphi L.L.P.

1    was here in Troy for years.

2         THE COURT:  Are you saying now -- I just want to

3    get this clear, it is your position that the L.L.P. is now in

4    Troy?

5         MR. WILLIAMS:  Our position is the facts are

6    controverted, the IRS says they are in Troy, the business

7    press says they are in Troy, we have had no discovery, we

8    have not been up to Delphi Drive to see what they are doing

9    up there, but certainly the imprimatur of the government and

10   the local Detroit business press in all allegations in the

11   materials we have submitted, as I said, if this is decided on

12   this record we don't think under Carrier the Court is

13   permitted to make that call in their favor.  We are not after

14   chasing pyrrhic victories, if it turns out that what they are

15   saying after there is a proper opportunity to evaluate it

16   rather than declarations by someone in Jersey, England or

17   somewhere else, they don't support that then we are not going

18   to pursue it, but on this record here I don't think the Court

19   can come to that conclusion.  And I think that --

20        THE COURT:  And I don't want to offend the IRS.

21        MR. WILLIAMS:  None of us do.  I think this case is

22   very similar to Carrier Corp., and I think that is the

23   governing case here.

24        THE COURT:  Okay.

25        MR. WILLIAMS:  And I think both on the specifics of

 1   how you look at it, and you know we all put forth in our

 2   papers, you can either decide on the papers, you can have an

 3   evidentiary hearing, but the posture right now is whether or

 4   not this can be decided on the paper.  We would submit no.

 5          THE COURT:  Okay.  Ms. Zwisler?

 6          MS. ZWISLER:  Just briefly, Your Honor.  With

 7   respect to specific jurisdiction, everything that Mr. Reiss

 8   says with respect is all conjecture about what they have

 9   alleged that our client knew about cars in Korea.  What the

10   facts are is Mr. Rim's declaration, paragraph 17, DPSK does

11   not now and has never designed its products for the U.S.

12   market.  So what that is saying is that the companies sells

13   the products and there is no evidence that it has anything

14   other than -- any idea where the cars are going.  And as we

15   discussed, knowledge alone is not enough, there has to be

16   something else, and they haven't alleged anything else

17   including that Fortist case.  The Fortist case had a contract

18   that said that the distributors had to make the product --

19   make the ships rigged for the Great Lakes and dockable in

20   Toledo, Ohio.  There is no contract here that says you need

21   to send our products into the United States so there is no

22   specific jurisdiction over DPSK.  You can't get this

23   jurisdictional discovery by saying that guy's declaration

24   might be false.  I think that's a bedrock principle here.

25          We have got sworn declarations, they have no way of

 1    challenging it other than saying if you give us discovery

 2    maybe we will find out something different.  That's not a

 3    basis to order jurisdictional discovery.  They have to have

 4    something that calls that -- the truth of those declarations

 5    into question and they don't, they have just got conjecture.

 6    Maybe they knew that products might go to the United States,

 7    maybe Hyundai ships some cars to France, I mean, who knows?

 8    They can't get there like that.

 9            THE COURT:  What about Mr. Williams' argument in

10    Troy?

11            MS. ZWISLER:  Okay.  So there is an entity in Troy.

12    In fact, my client is here and I should have introduced him,

13    Joe Papelian, he's counsel to the Delphi Troy entity.  That

14    company is called Delphi Automotive Systems, L.L.C., that is

15    not --

16            THE COURT:  It's a separate company?

17            MS. ZWISLER:  It is a totally separate company.  It

18    is a U.S. company, it used to be a defendant and as I said it

19    was dropped voluntarily.  So that Troy, Michigan company is

20    not the L.L.P., number one.  Number two, the IRS has said

21    that it is pursuing an argument that Delphi is -- not the

22    L.L.P. but the Delphi global entity is actually a domestic

23    entity.  They are essentially saying that because Delphi

24    Automotive Systems, L.L.C. is resident in Troy, it is a

25    domestic company and the L.L.P. is -- even though it is in

1   the United Kingdom doesn't change that fact.

2          Well, Delphi itself is contesting that, it has not

3   been decided, the IRS has not won, just because they said it

4   doesn't mean it is true.  So the only thing that you need to

5   know is the former defendant that is in Troy, Michigan is

6   Delphi Automotive Systems, L.L.C., that is one of the global

7   Delphi entities that is indirectly related to the two

8   defendants that are in this case in the sense that they are

9   all in the same umbrella of a company that has not even been

10  named.  So that's the answer to my argument is that the Troy,

11  Michigan presence of a subsidiary of a global company doesn't

12  require discovery to figure out whether it is true, just

13  drive up there, that's what the sign says, it doesn't says

14  Delphi Automotive L.L.P.

15         The other thing I would say about the

16  jurisdictional argument that Mr. Williams made is that what's

17  the hook for jurisdiction in the U.S. under Carrier Corp. or

18  otherwise?  Those cases are holding that if you have

19  jurisdiction over a subsidiary the question is can you get

20  the foreign parent?  This is the reverse because there is no

21  jurisdiction, there is no defendant that you have

22  jurisdiction over.  So basically they are trying to have you

23  exercise jurisdiction by virtue of their claiming

24  jurisdiction over DPSK, means that you have jurisdiction over

25  a parent.  And the Alexander Associates case that you have

1    cited a number of times holds that while you might be able to

2    get jurisdiction over a foreign parent by virtue of its

3    control of a sub, the reverse is not true, so even if you had

4    jurisdiction over DPSK, which you don't, no specific

5    jurisdiction as we have discussed, even if you did that

6    wouldn't mean that you could get jurisdiction over the

7    parent, it has got to be the reverse.

8              THE COURT:  Okay.

9              MS. ZWISLER:  So that's -- but I would go back to

10   my final point to this idea, of course plaintiffs would love

11   to have pre-complaint discovery in every case I have ever

12   been in they would love to get into our records before.  They

13   have to have a factual basis to counter sworn declarations.

14   They can't just say the guy is lying.  That's basically what

15   they have told you, he might be lying, if he's not, okay, we

16   won't put the client through any problem.  That's not a basis

17   to order jurisdictional discovery.  Thank you.

18             THE COURT:  Thank you.

19             MR. REISS:  If I might make one point?  Ms. Zwisler

20   suggested that it was mere conjecture on our part that Delphi

21   Korea may or may not have known the products were going to

22   the United States, but I just want to clarify that in our.

23             THE COURT:  Let's assume they did know they were

24   going to the United States, does that mean they targeted the

25   United States?

1         MR. REISS:  I think that's part of the problem is

2    that the defendants have introduced this targeting

3    requirement, that language is nowhere in the 6th Circuit

4    opinions that we have cited to you.  I would submit that

5    there is no requirement that they, quote/unquote, target.

6    The only thing that is required is that, A, they put the

7    goods into the stream of commerce, and B, they had knowledge

8    or could anticipate that the goods would end up there.

9         THE COURT:  Or maybe do some affirmative act, isn't

10   that what they have to do?

11        MR. REISS:  I would submit the affirmative act is

12   knowing full well the goods were going to be there and

13   deriving revenue as a result of that, and they are engaging,

14   as we have alleged, in price-fixing conduct.

15        THE COURT:  Okay.  Thank you.  I appreciate it,

16   Mr. Reiss.

17        MR. REISS:  Thank you, Your Honor.

18        THE COURT:  All right.  Anybody else on this

19   next -- we are all done.  Okay.  Is there anything else

20   before we conclude this session?

21        MR. WILLIAMS:  I would say for plaintiffs and maybe

22   everyone, I don't think for Your Honor, but we still have

23   matters with the master.

24        THE COURT:  Yes, you still have matters.  Okay.

25        (An off-the-record discussion was held at

1            2:54 p.m.)

2            THE COURT:  Okay.  Thank you.

3            THE LAW CLERK:  All rise.  Court is in recess.

4            (Proceedings concluded at 2:55 p.m.)

5                              _   _   _

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            *CERTIFICATION*

2

3              I, Robert L. Smith, Official Court Reporter of

4    the United States District Court, Eastern District of

5    Michigan, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing pages comprise a full, true and correct transcript

8    taken in the matter of Case No. 12-02311, on Wednesday,

9    May 6, 2015.

10

11

12                             *s/Robert L. Smith*
                             Robert L. Smith, RPR, CSR 5098
13                           Federal Official Court Reporter
                             United States District Court
14                           Eastern District of Michigan

15

16

17   Date:  05/19/2015

18   Detroit, Michigan

19

20

21

22

23

24

25