```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3                          —    —    —

 4   IN RE:  AUTOMOTIVE PARTS
     ANTITRUST LITIGATION
 5
                    MDL NO. 12-2311
 6   _____/

 7
                  STATUS CONFERENCE / MOTION HEARINGS
 8
              BEFORE THE HONORABLE MARIANNE O. BATTANI
 9                  United States District Judge
              Theodore Levin United States Courthouse
10                  231 West Lafayette Boulevard
                         Detroit, Michigan
11                  Wednesday, September 9, 2015

12   APPEARANCES:

13

14   Direct Purchaser Plaintiffs:

15   DOUGLAS ABRAHAMS
     KOHN, SWIFT & GRAF, P.C.
16   One South Broad Street, Suite 2100
     Philadelphia, PA  19107
17   (215) 238-1700

18   THOMAS C. BRIGHT
     GOLD, BENNET, CERA & SIDENER, L.L.P.
19   595 Market Street, Suite 2300
     San Francisco, CA  94105
20   (415) 777-2230

21   WILLIAM G. CALDES
22   SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
     1818 Market Street, Suite 2500
23   Philadelphia, PA  19103
     (215) 496-0300

24

25
```

```
 1   APPEARANCES:

 2   Direct Purchaser Plaintiffs: (Continued)

 3   MANUEL J. DOMINGUEZ
     COHEN MILSTEIN
 4   3507 Kyoto Gardens Drive, Suite 200
     Palm Beach Gardens, FL  33410
 5   (561) 578-6850

 6

     DAVID H. FINK
 7   FINK & ASSOCIATES LAW
     100 West Long Lake Road, Suite 111
 8   Bloomfield Hills, MI  48304
     (248) 971-2500
 9

10   NATHAN FINK
     FINK & ASSOCIATES LAW
11   100 West Long Lake Road, Suite 111
     Bloomfield Hills, MI  48304
12   (248) 971-2500

13

     GREGORY P. HANSEL
14   PRETI, FLAHERTY, BELIVEAU &
     PACHIOS, L.L.P.
15   One City Center
     Portland, ME  04112
16   (207) 791-3000

17

     WILLIAM E. HOESE
18   KOHN, SWIFT & GRAF, P.C.
     One South Broad Street, Suite 2100
19   Philadelphia, PA  19107
     (215) 238-1700
20

21   JONATHAN M. JAGHER
     SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
22   181 Market Street, Suite 2500
     Philadelphia, PA  19103
23   (215) 496-0300

24

25
```

```
 1    APPEARANCES:

 2    Direct Purchaser Plaintiffs: (Continued)

 3    STEVEN A. KANNER
      FREED, KANNER, LONDON & MILLEN, L.L.C.
 4    2201 Waukegan Road, Suite 130
      Bannockburn, IL  60015
 5    (224) 632-4502

 6

 7    JOSEPH C. KOHN
      KOHN, SWIFT & GRAF, P.C.
 8    One South Broad Street, Suite 2100
      Philadelphia, PA  19107
 9    (215) 238-1700

10    SARAH GIBBS LEIVICK
      KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
11    1633 Broadway
      New York, NY  10019
12    (212) 506-1765

13

14    MATTHEW RUAN
      COHEN MILSTEIN
15    1100 New York Avenue NW, Suite 500 West
      Washington, DC  20005
16    (202) 408-4600

17    EUGENE A. SPECTOR
      SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
18    1818 Market Street, Suite 2500
      Philadelphia, PA  19103
19    (215) 496-0300

20

21    JASON J. THOMPSON
      SOMMERS SCHWARTZ, P.C.
22    2000 Town Center, Suite 900
      Southfield, MI  48075
23    (248) 355-0300

24

25
```

**4**

```
 1   APPEARANCES:

 2   Direct Purchaser Plaintiffs: (Continued)

 3   RANDALL B. WEILL
     PRETI, FLAHERTY, BELIVEAU &
 4   PACHIOS, L.L.P.
     One City Center
 5   Portland, ME  04112
     (207) 791-3000
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   APPEARANCES:

2   **End-Payor Plaintiffs:**

3   CHANLER A. LANGHAM
    **SUSMAN GODFREY, L.L.P.**
4   1000 Louisiana, Suite 5100
    Houston, TX 77002-5096
5   (713) 651-9366

6

7   E. POWELL MILLER
    **THE MILLER LAW FIRM, P.C.**
    950 West University Drive, Suite 300
8   Rochester, MI  48307
    (248) 841-2200
9

10  OMAR OCHOA
    **SUSMAN GODFREY, L.L.P.**
11  901 Main Street, Suite 5100
    Dallas, TX  75202
12  (214) 754-1913

13

14  WILLIAM V. REISS
    **ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.**
    601 Lexington Avenue, Suite 3400
15  New York, NY  10022
    (212) 980-7405
16

17  HOLLIS L. SALZMAN
    **ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.**
18  601 Lexington Avenue, Suite 3400
    New York, NY  10022
19  (212) 980-7405

20

    MARC M. SELTZER
21  **SUSMAN GODFREY, L.L.P**
    190 Avenue of the Stars, Suite 950
22  Los Angeles, CA  90067
    (310) 789-3102
23

24

25

```
 1   APPEARANCES:

 2   End-Payor Plaintiffs: (Continued)

 3   ELIZABETH T. TRAN
     COTCHETT, PITRE & McCARTHY, L.L.P.
 4   840 Malcolm Road
     Burlingame, CA  94010
 5   (650) 697-6000

 6
     STEVEN N. WILLIAMS
 7   COTCHETT, PITRE & McCARTHY, L.L.P.
     840 Malcolm Road
 8   Burlingame, CA  94010
     (650) 697-6000
 9

10   Dealership Plaintiffs:

11   DON BARRETT
     BARRETT LAW OFFICES
12   P.O. Drawer 987
     Lexington, MS  39095
13   (601) 834-2376

14
     RICHARD R. BARRETT
15   BARRETT LAW OFFICES
     P.O. Drawer 987
16   Lexington, MS  39095
     (601) 834-2376
17

18   JONATHAN W. CUNEO
     CUNEO, GILBERT & LaDUCA, L.L.P.
19   507 C Street NE
     Washington, D.C.  20002
20   (202) 789-3960

21
     J. MANLY PARKS
22   DUANE MORRIS, L.L.P.
     30 South 17th Street
23   Philadelphia, PA  19103
     (215) 979-1342
24

25
```

```
 1    APPEARANCES:

 2    Dealership Plaintiffs: (Continued)

 3    SHAWN M. RAITER
      LARSON KING, L.L.P.
 4    30 East Seventh Street, Suite 2800
      Saint Paul, MN  55101
 5    (651) 312-6500

 6

 7    For the Defendants:

      JEFFREY J. AMATO
 8    WINSTON & STRAWN, L.L.P.
      200 Park Avenue
 9    New York, NY  10166
      (212) 294-4685

10

11    ALDEN L. ATKINS
      VINSON & ELKINS, L.L.P.
12    2200 Pennsylvania Avenue NW, Suite 500 West
      Washington, DC  20037
13    (202) 639-6613

14

      BRUCE ALLEN BAIRD
15    COVINGTON & BURLING, L.L.P.
      850 Tenth Street, NW
16    Washington, DC 20001
      (202) 662-5122

17

18    DONALD M. BARNES
      PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
19    1919 Pennsylvania Avenue, NW, Suite 500
      Washington, DC  20006
20    (202) 778-.3056

21

      RICHARD D. BISIO
22    KEMP KLEIN LAW FIRM
      201 West Big Beaver Road, Suite 600
23    Troy, MI  48084
      (248) 528-1111

24

25
```

```
1    APPEARANCES:

2    For the Defendants:  (Continued)

3    MICHAEL G. BRADY
     WARNER, NORCROSS & JUDD, L.L.P.
4    2000 Town Center, Suite 2700
     Southfield, MI  48075
5    (248) 784-5032

6

7    JEREMY CALSYN
     CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
     2000 Pennsylvania Avenue NW
8    Washington, D.C.  20006
     (202) 974-1500
9

10   PATRICK J. CAROME
     WILMER HALE
11   1875 Pennsylvania Avenue NW
     Washington, D.C.  20006
12   (202) 663-6610

13

     ELIZABETH CATE
14   WINSTON & STRAWN, L.L.P.
     200 Park Avenue
15   New York, NY  10166
     (212) 294-6700
16

17   STEVEN F. CHERRY
     WILMER HALE
18   1875 Pennsylvania Avenue NW
     Washington, D.C.  20006
19   (202) 663-6321

20

     HEATHER SOUDER CHOI
21   BAKER BOTTS, L.L.P.
     1299 Pennsylvania Avenue NW
22   Washington, DC  20004
     (202) 639-7700
23

24

25
```

```
 1    APPEARANCES:

 2    For the Defendants:  (Continued)

 3    EILEEN M. COLE
      WHITE & CASE, L.L.P.
 4    701 Thirteenth Street NW
      Washington, DC  20005
 5    (202) 626-3642

 6

      JAMES L. COOPER
 7    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
 8    Washington, DC  20004
      (202) 942-5000
 9

10    KENNETH R. DAVIS, II
      LANE POWELL, P.C.
11    601 SW Second Avenue, Suite 2100
      Portland, OR  97204
12    (503) 778-2100

13

      DEBRA H. DERMODY
14    REED SMITH, L.L.P.
      225 Fifth Avenue, Suite 1200
15    Pittsburgh, PA  15222
      (412) 288-3302
16

17    DANIEL J. DULWORTH
      CLARK HILL
18    500 Woodward Avenue, Suite 3500
      Detroit, MI 48226
19    (313) 365-8411

20

      J. CLAYTON EVERETT, JR.
21    MORGAN, LEWIS & BOCKIUS, L.L.P.
      1111 Pennsylvania Avenue NW
22    Washington, DC  20004
      (202) 739-5860
23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants: (Continued)

 3   PETER M. FALKENSTEIN
     JAFFE, RAITT, HEUER & WEISS, P.C.
 4   535 W. William, Suite 4005
     Ann arbor, MI  48103
 5   (734) 222-4776

 6

 7   DANIEL T. FENSKE
     JENNER & BLOCK
     353 N. Clark Street
 8   Chicago, IL 60654-3456
     (312) 222-9350
 9

10   MICHELLE K. FISCHER
     JONES DAY
11   51 Louisiana Avenue NW
     Washington, D.C.  20001
12   (202) 879-4645

13

14   MARK. A. FORD
     WILMER HALE
     60 State Street
15   Boston, MA 02109
     (617) 526-6423
16

17   LARRY S. GANGNES
     LANE POWELL, P.C.
18   1420 Fifth Avenue, Suite 4100
     Seattle, Washington  98101
19   (206) 223-7000

20

21   DAVID C. GIARDINA
     SIDNEY AUSTIN, L.L.P.
     One South Dearborn Street
22   Chicago, IL  60603
     (312) 853-4155
23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:  (Continued)

 3   MEGAN HAVSTAD
     O'MELVENY & MYERS, L.L.P.
 4   Two Embarcadero Center, 28th Floor
     San Francisco, CA  94111
 5   (415) 984-8700

 6

     ADAM C. HEMLOCK
 7   WEIL, GOTSHAL & MANGES, L.L.P.
     767 Fifth Avenue
 8   New York, NY  10153
     (212) 310-8281

 9

10   FRED K. HERRMANN
     KERR, RUSSELL & WEBER, P.L.C.
11   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
12   (313) 961-0200

13

     GRETCHEN HOFF VARNER
14   COVINGTON & BURLING, L.L.P.
     One Front Street
15   San Francisco, CA  94111
     (415) 591-7056

16

17   MAURA L. HUGHES
     CALFEE, HALTER & GRISWOLD, L.L.P.
18   1405 East Sixth Street
     Cleveland, OH  44114
19   (216) 622-8335

20

     HOWARD B. IWREY
21   DYKEMA GOSSETT, P.L.L.C.
     39577 Woodward Avenue, Suite 300
22   Bloomfield Hills, MI  48304
     (248) 203-0526

23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:  (Continued)

 3   WILLIAM R. JANSEN
     WARNER, NORCROSS & JUDD, L.L.P.
 4   2000 Town Center, Suite 2700
     Southfield, MI  48075
 5   (248) 784-5178

 6

 7   FREDERICK JUCKNIESS
     SCHIFF HARDIN, L.L.P.
 8   350 South Main Street, Suite 210
     Ann Arbor, MI  48104
 9   (734) 222-1507

10   HEATHER LAMBERG KAFELE
     SHEARMAN & STERLING, L.L.P.
11   801 Pennsylvania Avenue, NW
     Washington, D.C.  20004
12   (202) 508-8097

13

14   FRANK LISS
     ARNOLD & PORTER, L.L.P.
15   555 Twelfth Street NW
     Washington, D.C. 20004
16   (202) 942-5969

17   TIMOTHY J. LOWE
     McDONALD HOPKINS, P.L.C.
18   39533 Woodward Avenue, Suite 318
     Bloomfield Hills, MI  48304
19   (248) 220-1359

20

21   KURT G. KASTORF
     WILMER HALE
22   1875 Pennsylvania Avenue, NW
     Washington, D.C.  20006
23   (202) 663-6868

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:  (Continued)

 3   JEFFREY L. KESSLER
     WINSTON & STRAWN, L.L.P.
 4   200 Park Avenue
     New York, NY  10166
 5   (212) 294-4655

 6

 7   MEREDITH JONES KINGSBY
     ALSTON & BIRD, L.L.P.
 8   1201 West Peachtree Street
     Atlanta, GA  30309
 9   (404) 881-4793

10   SHELDON H. KLEIN
     BUTZEL LONG, P.C.
11   41000 Woodward Avenue
     Bloomfield Hills, MI  48304
12   (248) 258-1414

13

14   ANDREW S. MAROVITZ
     MAYER BROWN, L.L.P.
15   71 South Wacker Drive
     Chicago, IL  60606
16   (312) 701-7116

17   SHANNON McGOVERN
     SIMPSON, THACHER & BARTLETT, L.L.P.
18   425 Lexington Avenue
     New York, NY  10017
19   (212) 455-2896

20

21   IAIN R. MCPHIE
     SQUIRE PATTON BOGGS, L.L.P.
22   1200 19th Street, N.W., S. 300
     Washington, DC 20036
23   (202) 626-6600

24

25
```

```
 1  APPEARANCES:

 2  For the Defendants:  (Continued)

 3  NOEL E. MILLER
    LATHAM & WATKINS, L.L.P.
 4  885 Third Avenue
    New York, NY  10022
 5  (212) 906-1200

 6

    W. TODD MILLER
 7  BAKER & MILLER, P.L.L.C.
    2401 Pennsylvania Avenue NW, Suite 300
 8  Washington, DC  20037
    (202) 663-7822
 9

10  BRIAN M. MOORE
    DYKEMA GOSSETT, P.L.L.C.
11  39577 Woodward Avenue, Suite 300
    Bloomfield Hills, MI  48304
12  (248) 203-0772

13

    GEORGE A. NICOUD, III
14  GIBSON, DUNN & CRUTCHER, L.L.P.
    555 Mission Street
15  San Francisco, CA  94105
    (415) 393-8200
16

17  JOSEPH E. PAPELIAN
    DELPHI CORPORATION
18  5725 Delphi Drive
    Troy, MI  48098
19  (248) 813-2535

20

    ADAM PERGAMONT
21  ARNOLD & PORTER, L.L.P.
    555 Twelfth Street NW
22  Washington, DC  20004
    (202) 942-5000
23

24

25
```

```
 1    APPEARANCES:

 2    For the Defendants:  (Continued)

 3    STEVEN REISS
      WEIL, GOTSHAL & MANGAS L.L.P.
 4    767 Fifth Avenue
      New York, NY 10153
 5    (212) 310-8174

 6

      JOHN ROBERTI
 7    ALLEN & OVERY, L.L.P.
      1101 New York Avenue, NW
 8    Washington, DC  20005
      (212) 683-3682
 9

10    KAJETAN ROZGA
      WEIL, GOTSHAL & MANGES L.L.P.
11    767 Fifth Ave,  STE. 3360
      New York, NY 10153
12    (212) 310-8518

13

      MICHAEL RUBIN
14    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
15    Washington, DC  20004
      (202) 942-5094
16

17    TIANA LEIA RUSSELL
      ARNOLD & PORTER, L.L.P.
18    555 Twelfth Street NW
      Washington, DC  20004
19    (202) 942-6807

20

      WM. PARKER SANDERS
21    SMITH, GAMBRELL & RUSSELL, L.L.P.
      Promenade Two, Suite 3100
22    1230 Peachtree Street NE
      Atlanta, GA  30309
23    (404) 815-3684

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants:  (Continued)

 3   LARRY J. SAYLOR
     MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
 4   150 West Jefferson Avenue, Suite 2500
     Detroit, MI  48226
 5   (313) 496-7986

 6

 7   SCOTT T. SEABOLT
     FOLEY & LARDNER, L.L.P.
 8   500 Woodward Avenue, Suite 2700
     Detroit, MI  48226
 9   (313) 234-7100

10   CRAIG SEEBALD
     VINSON & ELKINS, L.L.P.
11   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, DC  20037
12   (202) 639-6585

13

14   MICHAEL LEONARD SIBARIUM
     PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.
15   1200 Seventeenth Street, NW
     Washington, DC 20036-3006
16   (202) 663-9202

17   PETER L. SIMMONS
     FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, L.L.P.
18   One New York Plaza
     New York, NY  10004
19   (212) 859-8455

20

21   CHARLES SKLARSKY
     JENNER & BLOCK
22   353 N. Clark Street
     Chicago, IL 60654-3456
23   (312) 923-2904

24

25
```

```
 1    APPEARANCES:

 2    For the Defendants:  (Continued)

 3    JESSICA SPROVTSOFF
      SCHIFF HARDIN, L.L.P.
 4    350 South Main Street, Suite 210
      Ann Arbor, MI  48104
 5    (734) 222-1518

 6

      STEPHEN J. SQUERI
 7    JONES DAY
      901 Lakeside Avenue
 8    Cleveland, OH  44114
      (216) 586-3939
 9

10    MARGUERITE M. SULLIVAN
      LATHAM & WATKINS, L.L.P.
11    555 Eleventh Street NW, Suite 1000
      Washington, D.C.  20004
12    (202) 637-2200

13

      JOANNE GEHA SWANSON
14    KERR, RUSSELL & WEBER, P.L.C.
      500 Woodward Avenue, Suite 2500
15    Detroit, MI  48226
      (313) 961-0200
16

17    MAUREEN T. TAYLOR
      BROOKS, WILKINS, SHARKEY & TURCO
18    401 South Old Woodward, Suite 400
      Birmingham, MI  48009
19    (248) 971-1721

20

      MICHAEL F. TUBACH
21    O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
22    San Francisco, CA  94111
      (415) 984-8700

23

24

25
```

```
 1   APPEARANCES:

 2   For the Defendants: (Continued)

 3   RANDALL J. TURK
     BAKER BOTTS, L.L.P.
 4   1299 Pennsylvania Avenue NW
     Washington, DC  20004
 5   (202) 639-7700

 6

 7   LINDSEY ROBINSON VAALA
     VINSON & ELKINS, L.L.P.
 8   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, DC  20037
 9   (202) 639-6585

10   WILLIAM J. VIGEN
     WILLIAMS & CONNOLLY, L.L.P.
11   725 Twelfth Street, N.W.
     Washington, D.C.  20005
12   (202) 434-5868

13
     OTHER APPEARANCES:
14
     ANTHONY T. AGOSTA
15   CLARK HILL
     500 Woodward Avenue, Suite 3500
16   Detroit, MI  48226
     (313) 965-8523
17

18   TIMOTHY FRASER
     OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
19   The Capital, PL-01
     Tallahassee, FL  32399
20   (850) 414-3733

21

22

23

24

25
```

1          TABLE OF CONTENTS

2                                              Page

3   Status Conference..................................

4

5   Defendants' Objections to, and Motion to Modify
    Master Esshaki's June 18, 2015 Order (regarding
    Auto Dealer and End Payor Plaintiffs' depositions
6   in all parts...................................... 28

7   Defendants' Motion for Entry of a Scheduling Order
    filed July 6, 2015 (Bearings)..................... 74

8

9   Keihin Corporation's Motion to Dismiss the
    End Payor's Corrected Consolidated Amended Class
    Action Complaint filed July 29, 2015..............108

10

11  Auto Dealer Plaintiffs' Motion for preliminary
    Approval of Settlement with Fujikura..............124

12  End Payor Plaintiffs' Motion for Preliminary
    Approval of Proposed Settlement with T. Rad and
13  Provisional Certification of Settlement Classes....126

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Detroit, Michigan

 2   Wednesday, September 9, 2015

 3   at about 10:03 a.m.

 4                        —   —   —

 5           (Court and Counsel present.)

 6           THE CASE MANAGER:  Please rise.

 7           The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10           All persons having business therein, draw near,

11   give attention, you shall be heard.  God save these

12   United States and this Honorable Court.

13           Please be seated.

14           THE COURT:  Good morning.

15           ATTORNEYS:  (Collectively) Good morning, Your

16   Honor.

17           THE CASE MANAGER:  The Court calls Case

18   No. 12-md-02311, in re:  Automotive Parts Antitrust

19   Litigation.

20           THE COURT:  All right.  Welcome everybody.  Got

21   enough room back there?  Do you need seats?  Oh, they can

22   push over.  Come on, sit down.

23           This is like church, you don't want to sit down,

24   come to the front or anything like that.

25           Let's begin our agenda, which is not too bad for
```

```
 1    today, I think we have got a pretty good agenda.
 2            The first one is the status of the settlements of
 3    all actions in the MDL.  I don't know if anybody needs to
 4    speak on that, I don't think that's -- no.  Okay.  This was
 5    all in your status report so I'm just going over a few
 6    things.
 7            The depositions of incarcerated U.S. --
 8    non-U.S. citizens.
 9            MR. FINK:  Your Honor, Greg Hansel will speak to
10    that for the direct purchaser plaintiffs.
11            MR. HANSEL:  Good morning, Your Honor.  Greg Hansel
12    for the direct purchaser plaintiffs.
13            At the end of the status report is a list of
14    incarcerated persons whose release times are estimated in
15    that table.  As to all other persons who have been released
16    who are non-U.S. citizens, the various plaintiff groups have
17    worked out stipulations for those persons to appear for their
18    depositions either in the United States or as agreed in the
19    stipulations.  There's one stipulation that we were
20    continuing to hammer out, and I believe as of this moment we
21    have probably been able to reach an agreement on that, so we
22    really have nothing to report today that requires the Court's
23    attention other than the parties appear to be working through
24    this well.
25            THE COURT:  So it is going as you had anticipated?
```

```
 1              MR. HANSEL:  Yes.

 2              THE COURT:  Good.

 3              MR. HANSEL:  Thank you, Your Honor.

 4              THE COURT:  Okay.  Thank you.

 5              I have a couple of notices -- oh, let me,

 6    Mr. Hansel, while you are up here, you are still the one

 7    primarily doing the agenda?

 8              MR. HANSEL:  Yes, Your Honor.

 9              THE COURT:  Thank you.

10              MR. HANSEL:  You're welcome.

11              THE COURT:  I just wanted to say that.

12              Local counsel, there was one circumstance in which

13    I signed an order waiving local counsel but otherwise you all

14    have to have local counsel, this is not the type of case that

15    I'm going to change the rules on, so pro hac vice, we don't

16    have that here so there is no such animal in this district.

17              Motion to withdraw, I think my clerk tells me, Kay,

18    that most of you have had this, but I have a new order and

19    this is due to the volume of the attorneys in the litigation,

20    and it says that an attorney -- any attorney withdrawing from

21    this litigation is to submit a proposed order withdrawing

22    appearance.  Once the order has been filed, the attorney

23    shall docket a discontinuance of NEFs, you probably know more

24    about what that is than I do, which is found under order

25    filing and other documents, and the attorney shall also
```

1    remove his or her name from all cases listed in the order, so

2    this will be posted and you will have it.  The problem we had

3    is when we have to remove the attorney from every case it

4    takes an inordinate amount of time given the numbers here so

5    we will follow this protocol.

6         All right.  And the status report, I have the

7    pending matters referred to the master.  Does anyone else --

8    our master is here today, Mr. Esshaki is here.

9         Mr. Esshaki, do you have anything that you wish to

10   say before we proceed?

11        MASTER ESSHAKI:  Your Honor, just that I believe we

12   are handling the motions on a timely manner and every one of

13   them I'm making somebody happy and somebody sad.  And I do

14   appreciate, as I have said each time, the quality of the work

15   that people have sent me to review, so I thank you all for

16   your professionalism.

17        THE COURT:  Thank you.  Now you get the idea of

18   what it is like to be a judge, right?  Somebody comes up to

19   you and says I just had a case before her and then you wait

20   for the shoe to drop; they either liked it or they didn't.

21   Okay.

22        Dates for the next status conference, we have one

23   already scheduled for January 20th, I think that still is on

24   at 10:00 in the morning, and we will hope for no snow.  And

25   then we need to set a date for the next conference, how is

1 May 11th, May 11th?  I know we are thinking ahead but is

2 there any big thing scheduled for that day that I might not

3 know about?

4    (No response.)

5    THE COURT:  Okay.  Let's schedule it then for

6 May 11th, 2016 at 10:00.

7    Before we get into the motions, are there any other

8 procedural administrative matters?  Yes, please approach the

9 podium.

10    MR. BARRETT:  May it please the Court, I'm

11 Don Barrett, co-lead for the auto dealers.

12    Your Honor, because of the auto dealer

13 representation of so many different auto dealers, different

14 makes all over the country, we have -- and because we have

15 money in the bank that we are about to distribute, we

16 hopefully will distribute by the end of the year if things go

17 well, that we have sought an independent consultant who would

18 assist in formulating an appropriate allocation system with

19 regard to damages.

20    During that search we contacted the National

21 Automobile Dealers Association, which represents virtually

22 all the new car dealers in the United States, and we asked

23 for a recommendation.  They recommended quickly Mr. Stuart

24 Rosenthal, who is here, as a highly-appropriate individual to

25 assist us in this regard.  He's in the past participated in

1   numerous NADA programs.  He served as a representative of the

2   industry as a participant in Federal Trade Commission panels

3   on matters affecting dealership operations at the request and

4   recommendation of the National Automobile Dealers

5   Association.

6          Mr. Rosenthal, who is here beside me, is a lawyer.

7   He is admitted to the bar in the state of New York and then

8   the Southern District of New York in 1978.  He started

9   working in the New York City Department of Consumer Affairs

10  in 1979 holding management positions in that agency for the

11  next ten years.  He has been vice chairman of the National

12  Conference on Weights and Measures, which is an office of the

13  U.S. Department of Commerce.  In 1989 he joined the New York

14  State Attorney General's Office as assistant AG where he

15  focused primarily on consumer protection matters.

16         After 16 years of public service Mr. Rosenthal

17  became the general counsel of the Trade Association of the

18  Greater New York Automobile Dealers Association which

19  represents virtually all of the automotive dealers in the

20  downstate New York.

21         THE COURT:  What did he become to the Automotive

22  Dealers Association, say that again?

23         MR. BARRETT:  In 1989 he --

24         THE COURT:  General counsel, he became general

25  counsel, is that what you said?

1          MR. ROSENTHAL:  Yes.

2          MR. BARRETT:  Okay.  He's continued to work with

3    regulators to improve the industry's relations with

4    government and to assist dealers staying on top of expanding

5    regulatory requirements.

6          We asked him to come here today just mainly so that

7    he can meet the Court and the Court could -- if the Court

8    happened to have any questions for Mr. Rosenthal either now

9    or in the future we will certainly make him available.

10         THE COURT:  All right.  I don't have any questions.

11   I didn't know you were doing this.  His fees will be paid out

12   of the proceeds?

13         MR. BARRETT:  He's a consultant to us, and his fees

14   will be paid by us, and we want this to be a transparent deal

15   and he's working on that.  We have to have an allocation plan

16   by October 15th, we are on schedule to do that and to present

17   it to the Court for approval at that time.

18         THE COURT:  All right.  Does anybody else have any

19   comments, other auto dealers?

20         (No response.)

21         THE COURT:  Nobody.  Okay.  What I would like you

22   to do so that I have it is if you would formally file his

23   resumé?

24         MR. BARRETT:  We will be happy to do that, Your

25   Honor.

1       THE COURT:  I would appreciate it.  I don't know

2   how you get it on the docket, like a motion to approve or

3   something.

4       MR. BARRETT:  Yes, ma'am.

5       THE COURT:  Just so we have a record that's open

6   and available to everybody.  It certainly sounds, sir, that

7   you are more than qualified to do this, and I hear no

8   objections so I'm going to approve it.  If you would submit

9   an order along with the resumé.  I'm going to hold it for

10  seven days so all of these folks who are here, if there's any

11  question they all have the opportunity to ask their questions

12  or file anything if there is an objection, I don't think

13  there will be obviously but I think that's the proper way to

14  do it.

15      MR. BARRETT:  Thank you, Your Honor.

16      THE COURT:  Thank you very much.  Anything else

17  before we go on to the motions?  Anybody have anything?

18          (No response.)

19      THE COURT:  Okay.  We are going to start the

20  motions then.  Mr. Esshaki, you are free to stay or free to

21  go.

22      MASTER ESSHAKI:  Well, as I said, Your Honor, I

23  have enough people saying bad things about me so I don't need

24  to sit here and listen to them, but it was nice to see

25  everybody again.  I hope you all stay well, and we will see

1    you in January.  Judge, thank you very much.

2              THE COURT:  Thank you.

3              MR. TUBACH:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. TUBACH:  Michael Tubach.  I will be presenting

6    the argument on behalf of the wire harness defendants

7    challenging Master Esshaki's order relating to two specific

8    issues.

9              The first issue is the number of auto dealer

10   depositions that the defendants will be allowed to take, and

11   the second relates to whether the defendants should be

12   required to provide an outline of topics of fact witnesses to

13   the plaintiffs ahead of time.

14             Now, in both cases and in both of those issues we

15   believe Master Esshaki misinterpreted your instructions at

16   the January 28th conference regarding both the auto dealer

17   depositions and the outline of topics.  Now, the Court said

18   it was only putting its two cents' worth in at that hearing.

19             THE COURT:  I should learn not to indicate that.

20             MR. TUBACH:  I think given all the briefing I think

21   you may have undersold those comments.  It is quite clear

22   that Master Esshaki interpreted what you said as an

23   instruction to him to allow only one deposition of each

24   plaintiff, and it is pretty clear if you look at the May 26th

25   transcript, which is Exhibit G of our motion, he says

1    there -- he starts talking about the template, the outline of

2    issues, but he talks about both issues, and this is on

3    page 7.  "Now, with respect to the issue of the template I

4    was attempting to follow Judge Battani's instructions at the

5    January conference where she indicated a template for a

6    deposition protocol should be prepared that can be utilized

7    in all cases because auto dealers and end payors are going to

8    be deposed only once."

9         Now, the problem with that is that's not what Your

10   Honor said at the hearing, and I feel at a bit of an odd

11   position to tell the Court what its intentions were when it

12   was speaking, but reading the transcript, a fair reading, is

13   what the Court was concerned about that any individual

14   person, and primarily the end payor plaintiffs, would be

15   deposed more than once, so they would be deposed about their

16   car purchase in the wire harness case and in bearings and in

17   windshield wipers and in anti-vibration rubber parts, and

18   that I think is a fair reading of what the Court was

19   concerned about.  That issue has been addressed so now end

20   payor plaintiffs are going to be deposed only once

21   notwithstanding the fact that there are 31 separate cases

22   filed here.

23        That's not what we're here to talk about today.

24   What Master Esshaki did essentially was to take that two

25   cents' worth from the Court and transform that into one

1    deposition for even a corporate entity, and we think that was

2    in error.  And it is quite clear -- now, he ended up

3    modifying it because as a corporate entity there would be a

4    30(b)(6) deposition, right, as well as a fact witness, so he

5    ended up saying well, you get one of each but only because he

6    couldn't really square the nature of the corporate entities

7    of the auto dealers with what he thought was the Court's

8    instruction to allow only one deposition per auto dealer.

9         And if we were to let Master Esshaki exercise his

10   discretion to determine how many depositions we should be

11   allowed to take of the auto dealers we don't have to guess

12   what he would have done, we already know the answer to that.

13   At the -- prior to the January 28th hearing, on January 21st

14   Master Esshaki got competing proposals from the defendants

15   and from the plaintiffs, we had asked for more time, they had

16   asked for less time, and he said okay, here's what you get to

17   do, you get three fact witnesses, you get 18 hours of

18   30(b)(6) depositions per auto dealer.  That's not a lot of

19   time.  Each of these auto dealers has filed many individual

20   cases, you know, there are 31 cases out there now, and the

21   auto dealers each have their own separate claim and that

22   claim needs to be explored.

23        And some of these -- I know the auto dealers want

24   to portray their clients as mom-and-pop shops but many of

25   these auto dealers are really large companies, hundreds of

1   employees, with one -- Landers is part of a group that has

2   $1.4 billion in sales annually.  These are large companies

3   some of them.  And so the fact that Master Esshaki said you

4   can take three fact witness depositions and 18 hours of

5   30(b)(6) for a class case that's lasting 10 to 15 years for

6   everything the company does, that's not a lot of time, and it

7   is not a lot of time particularly because the auto dealers

8   sit at the crux of two very important transactions.

9          The first transaction is between the OEM and the

10  auto dealer, and that is not simply a sale of widgets for a

11  given price, there are all kinds of different aspects to that

12  transaction that need to be explored; there are holdbacks,

13  there are discounts, there are rebates, there are

14  end-of-month sales, and you can't simply say well, they paid

15  X for a car and that's what it was.  And the reason why

16  that's important is because the plaintiffs' obligation at the

17  auto-dealer level is to show that any overcharge that any of

18  the wire harness defendants imposed in the sales of wire

19  harnesses upstream, that that overcharge they can trace that

20  through to their purchase, and that's going to be true with

21  every part.

22         And if there is an overcharge of -- we don't know

23  what they are going to claim, $5, $10, $20, who knows, they

24  are going to have to show that that $20 somehow traced

25  through to the auto dealers' purchase of that car.  We think

```
 1    it is going to be very difficult for them to do that given
 2    there are thousands of dollars in holdbacks and rebates and
 3    discounts that are swinging back and forth.  They may win, we
 4    may win, the Court shouldn't decide that now.  All we are
 5    asking for is we have the opportunity to discover those
 6    issues.  And so that's the first transaction.
 7         The second transaction is probably slightly less
 8    complicated, I think most of us have probably bought cars,
 9    but there are lots of things going on with a car purchase
10    also, it is not simply you walk into the 7-Eleven and buy a
11    Slurpee; you are negotiating over the price, you are
12    negotiating over financing, over trade-ins, all kinds of
13    things that potentially go into a transaction like that, and
14    so the auto dealers really sit at the middle of both of those
15    transactions and in order to properly explore those we need
16    to have a little bit of opportunity to do that.
17         So I don't think the Court indicated that we
18    shouldn't have that opportunity at the January 28th hearing,
19    and I believe Master Esshaki quite clearly thought we should
20    have three fact witnesses and 18 hours of depositions because
21    that's the decision he made after full briefing and a
22    hearing.  The plaintiffs keep saying well, that just goes to
23    damages, damages, you don't really need to explore that, but
24    I think what the plaintiffs and they try to do this -- I have
25    been in a number of these cases, this is -- they try to
```

1    obscure the difference between damages and impact.  Impact is

2    an element of an antitrust claim, and what that means is --

3    that's also called sometimes fact of injury.  And so in order

4    to get a class certified the plaintiffs have to be able to

5    show that every class member suffered injury in fact, that

6    they were, in fact, overcharged.  Now, there are cases that

7    say that individualized questions of damages, the amount of

8    that impact may not defeat class certification.  We can argue

9    about that later, but there is no case that says you don't

10   have to prove impact on a common basis, and so that's what we

11   are talking about here and the question is can they trace

12   that impact from wherever it started between a wire harness

13   defendant and a tier one supplier a couple chains up down

14   through the OEM to the auto dealer and then down to the end

15   payor, and that's what we are arguing about.

16          And so for us to say we need to do a little bit of

17   exploring to try to get to that is not asking for a lot.

18   They keep throwing out big numbers about how many

19   depositions, how many hours, this is going to end the world.

20          THE COURT:  Well, this is on your first set of

21   depositions under this protocol so can you not go back to the

22   master and say look at, we did your one deposition and this

23   is how far we got, we need this other information?  I mean,

24   you know, this is the beginning.

25          MR. TUBACH:  It is, Your Honor.  I would turn it

1    around and what I would say is Master Esshaki in his

2    discretion said we should have three fact witnesses and

3    18 hours --

4         THE COURT:  Well, he didn't because he then had --

5    you filed briefs and he had meetings with you and in the end

6    he came up with what he came up with.

7         MR. TUBACH:  But the only reason he did that, Your

8    Honor, is because he thought you told him to.  That's not an

9    exercise of discretion.  I mean, what I just read for you is

10   not him exercising his discretion, it is, as he put it,

11   attempting to follow Judge Battani's instructions.  So on a

12   clean slate what Master Esshaki thought was that we should

13   get three fact witnesses and 18 hours of 30(b)(6)

14   depositions.

15        Let me just translate that into what this means for

16   my client.  They keep throwing out a lot of numbers about how

17   many hours of depositions that's going to be.  My client is

18   Leoni, one of eight defendants in the auto dealer cases just

19   in wire harness.  We don't make any other parts, we didn't

20   sell windshield wipers, we didn't sell any of that stuff.

21   Translating all of those numbers back down to us means that

22   in a multiple billion dollar case where the plaintiffs are

23   trying to get from my client potentially billions of dollars

24   in damages, the total number of hours allocated to Leoni,

25   seven, that's how many hours Leoni gets on an allocated basis

```
 1    to try to defend itself in this litigation from the auto

 2    dealers.  That's not very much at all.  I need to be able to

 3    explain to my client our -- that was our proposal that we

 4    would only take seven hours.  The plaintiffs are saying you

 5    shouldn't even get that, you should get even less than that.

 6    And we suggest that notions of due process and basic

 7    fairness, Counsel, that we should get at least seven hours

 8    for my client to defend itself in this huge piece of

 9    litigation.

10              Unless the Court has questions about the auto

11    dealers' depositions, and -- we think it is quite --

12              THE COURT:  So you believe -- as I understand it,

13    you believe that the master came to a resolution of three

14    fact witnesses and 18 hours of 30(b)(6), is that --

15              MR. TUBACH:  He quite clearly did.  On January 21st

16    he did, and the parties were in the process of memorializing

17    that as -- I will use his term -- when the Court upset the

18    applecart.

19              THE COURT:  Gee, what can I do today?

20              MR. TUBACH:  I know, it is like --

21              THE COURT:  You will see.

22              MR. TUBACH:  -- you are the Federal Reserve making

23    a statement, everyone pays very close attention to it.

24              We appreciate the Court's effort to try to move

25    things along and give us your thoughts.  I think in this
```

1    instance what happened is Master Esshaki took what you said

2    quite literally and was following your instructions when, in

3    fact, those weren't your instructions, and on a clean slate

4    he came up with a different decision a week before the Court

5    had the hearing.  So, you know, from our point of view we

6    think we need these depositions.  What I would suggest is we

7    are probably not going to end up taking all of these

8    depositions anyway, this is the outer limit of what we are

9    allowed to take.  What I would suggest to the Court is these

10   are the caps, give us the three facts and the 18 hours, and

11   if we don't need it we are not going to use it.  Plaintiffs

12   keep thinking we are going -- I really want to go to some

13   auto dealer in -- I won't pick a town that somebody might be

14   from, and just spend time there just because I can.  That's

15   not what we -- we have a lot to do, and we are going to do it

16   as efficiently as we can particularly now that we have

17   31 cases all of whom are going to be deposing any single

18   person only once.

19              THE COURT:  32 as of --

20              MR. TUBACH:  Oh, there's another one, 32, maybe 33

21   by the time the hearing is over.  We are not going to be

22   wasting time.  What I would suggest instead is turnaround

23   what the Court suggested and say give us those limits and if

24   there is any indication that we are abusing those limits, any

25   indication at all, you can be quite sure the auto dealers

1    will vigilantly protect their clients.

2              THE COURT:  Okay.  All right.

3              MR. TUBACH:  The only other issue I was going to

4    mention has to do with this outline, the topics.  I will just

5    start by saying I have been doing this 25 years, I have never

6    had anybody tell me that I have to give an outline of a fact

7    witness deposition, even topics, to anybody else.  30(b)(6)

8    depositions are entirely different, they are by definition

9    different than fact witnesses, you have to give topics on

10   30(b)(6) depositions because the other side needs to know who

11   to put forward as a witness.  So if you say I want to know

12   about your sales operations, they are not going to go to

13   somebody who knows nothing about sales, they are going to go

14   to somebody who knows about sales.

15             THE COURT:  But what's wrong with doing it, what's

16   wrong with doing it?  You have got how many fact witnesses

17   you are going to be taking, now you say you want three from

18   each.  What are you going to do, create some new idea when

19   you sit down for your deposition?  No, you are going to be

20   basically following -- you are going to have your own outline

21   you are going to follow anyway so why can't you give them the

22   areas?

23             MR. TUBACH:  It is not that we can't, Your Honor,

24   of course we can.  And I venture to guess if we ask them --

25             THE COURT:  You think they are not going to know

1    generally what you are going to ask them anyway?  I mean,

2    what are we doing here?

3         MR. TUBACH:  Well, if they are going to know anyway

4    what's the point of us -- here's the risk.  What is the point

5    of us preparing this outline if they know and we know the

6    topics that we are likely to cover, the only reason to do it

7    is -- not the only reason -- the only result of it is going

8    to be mischief because they are then going to say, ah, you

9    know what, that question you asked I think that falls outside

10   one of those topics so we don't get to ask it.  If they don't

11   have that right then what's the point of the topics?  Fact

12   witnesses by definition we can ask them anything that we want

13   that is relevant, and it may very well be -- there still has

14   to be some element of surprise left in litigation here.  It

15   may very well be that the defendants decide for any one

16   particular witness to focus on a different issue, and that's

17   our right.  It is not rocket science, it is not great

18   secrecy, we are going to focus on the things that are

19   relevant, but in fact witnesses we get to ask the questions

20   that we want to ask.

21        And plaintiffs for their part are having a hard

22   time defending this outline idea for fact witnesses.  The

23   best the auto dealers could do really was to say well, if we

24   don't have an outline ahead of time there is a risk that it

25   is going to run over -- the deposition is going to run over

1   the seven hours because the witnesses will be confused about

2   the questions we are asking.  That's not a very good

3   argument.

4           THE COURT:  Okay.  All right.

5           MR. TUBACH:  Thank you, Your Honor.

6           MR. REISS:  Your Honor, I don't know if you prefer

7   a response from the plaintiffs to that or you want to hear --

8           THE COURT:  I want to hear all of defendants.

9           MR. REISS:  Okay.  Good morning, Your Honor.

10  Steve Reiss, I represent the Bridgestone defendants in the

11  AVRP case, and we represent the Calsonic Kansei defendants in

12  the radiators and now air-conditioning and ATF warmers case.

13          We have filed objections to Master Esshaki's ruling

14  on behalf of 27 of the later defense groups, and let me just

15  chime in two words on the points that Mr. Tubach has made.

16  By the way, I think the location he was struggling for where

17  no one would really want to go is probably New York.

18          Two points.  One, Your Honor, I think it is

19  absolutely clear that Master Esshaki changed his initial

20  ruling which is made after full briefing and extensive

21  argument where he said finally I think the fair thing to do

22  is allow three 30(b)(1) depositions of the ADP auto dealers

23  and one 30(b)(6) for 18 hours, that decision was made after

24  extensive, full and careful briefing.  And, Your Honor, the

25  only thing that changed that decision was the Court's

```
 1   remarks, I think that's absolutely clear from the record.
 2         By the way, I would tell you from the standpoint of
 3   the later-filed defendants, 27 defendant groups that I'm here
 4   on behalf of, three 30(b)(1) depositions and one 30(b)(6)
 5   deposition for 18 hours is the bare minimum.  I would tell
 6   the Court that I think that 23 out of 47 of the auto dealers
 7   sell more than one brand of car, so it is not like there is
 8   just a Honda dealer, 23 of those 47 auto dealers sell
 9   multiple brands.
10         THE COURT:  Let's talk about what the master did
11   though because I am concerned about him taking my words as
12   this is the way it should be, okay, I'm concerned, but after
13   that was there not a full briefing and hearing or no?
14         MR. REISS:  There was, Your Honor, but the Special
15   Master started that proceeding under the assumption that he
16   had a directive from the Court, and honestly, Your Honor, I
17   think he was struggling -- I think he literally interpreted
18   the Court's directive as allowing only one deposition per
19   auto dealer.  He realized that was impossible because in
20   addition to a 30(b)(6) deposition you obviously needed at
21   least one fact deposition, so he struggled to get out from
22   under what he thought the Court's view was and ordered the
23   one 30(b)(6) and the one 30(b)(1) deposition.
24         I think it was absolutely clear from that hearing
25   that he felt bound and constrained by the Court's remarks.  I
```

1   was there, that was in my view, I'm sure the view of the

2   defendants, plaintiffs may have a different view, but I think

3   the record is absolutely clear that allowed to exercise his

4   full discretion he awarded three 30(b)(1) depositions and one

5   18-hour 30(b)(6) deposition, that's what he did.  He changed

6   his mind because of the Court's remarks.

7          And as we said, we think that original, original

8   order was the bare minimum necessary when you have 23 or 47

9   ADPs that sell multiple brands of cars, I think the majority

10  are close to the majority of the auto dealers have multiple

11  locations, we've got to be able to depose those folks.  I

12  think there are auto dealers with as many as ten brands of

13  cars that they sell and as many as ten locations.  We are not

14  going to notice somebody from every one of those locations or

15  brands, but clearly it shows why Master Esshaki's original

16  ruling was the bare minimum necessary to allow the defendants

17  to defend themselves.

18          I will say, I agree with what Mr. Tubach said on

19  the provision of a deposition topic and 30(b)(1), I'm

20  actually older than Mr. Tubach and been practicing longer and

21  I have never seen that in my life and there is no reason for

22  it.  By the way, I would remind the Court the plaintiffs

23  didn't even ask for it, they didn't ask for that, they also

24  did not ask for the limitation of three defense counsel per

25  deposition.  And by the way, defense lawyers, we have no

```
 1    interest, and I think Master Esshaki put it really well, they
 2    are very good lawyers in this case, Your Honor, there are
 3    very good lawyers on the plaintiffs' side, there are really
 4    good lawyers on the defense side, none of us have any
 5    interest in extending any deposition longer than necessary,
 6    that goes for the auto dealers, that goes to the end payors,
 7    but we do have an interest in being able to defend our
 8    clients, that's pretty fundamental.  And I think it would be
 9    unusual if more than three defense counsel feel the need to
10    ask questions but if a particular defense counsel in one of
11    the 50 defendant groups says hey, I have two or three
12    questions I really need to ask, this is my only shot, we
13    don't want to be in a position of the plaintiff saying well,
14    you have already had three defense counsel ask questions, you
15    can't ask a question.
16            THE COURT:  Well, the Court never addressed the
17    number of defense counsel.
18            MR. REISS:  Well, we objected to that, that was in
19    the order, Master Esshaki placed a limit of three defense
20    counsel per deposition.
21            THE COURT:  I know but I'm looking at a breach of
22    the standard here, which is abuse of discretion, so you tell
23    me how that's an abuse of discretion?
24            MR. REISS:  I think it is a clear abuse of
25    discretion to the extent it denies any defendant group the
```

1    ability to ask any questions in a particular deposition.

2    These -- Your Honor, we have now 32 but I think ultimately it

3    is going to be more than that because we have seen the class

4    notices that indicate there are two or three new cases coming

5    down the line.  We have 50 defendant groups confined to a

6    very, very, very narrow number of depositions with the

7    prospect that a particular defense lawyer will not be able to

8    ask any questions, and I think that defense lawyer and that

9    defendant group will have a very powerful argument that we

10   were denied our rights, we attended that deposition, we had a

11   small number of meaningful questions to ask and the order

12   precluded us from doing that, it is a denial of our discovery

13   rights, frankly it is a denial of due process.

14          I don't think we need to be in that position, Your

15   Honor.  Trust me, the defense counsel have no interest in

16   being inefficient.  We want to have these depositions go

17   forward with one, maybe two, questioners, but if it becomes

18   necessary because some lawyer for -- some defense lawyer for

19   some defense group says I'm sorry, I really need to ask some

20   questions given these answers, we have the right to do that,

21   Your Honor.

22          And by the way, I will say that that limitation to

23   my knowledge has never been imposed in any other MDL

24   proceeding, any other antitrust class-action proceeding.

25   Defense lawyers typically do allocate very carefully among

1   themselves but that limitation is, one, unnecessary, and two,

2   has the potential to cause the denial of discovery rights and

3   due process to any of the defendant groups who were shut out

4   because of that limitation. So, yes, I have no problem

5   saying it is an abuse of discretion.

6       I would then, Your Honor, address if I may the

7   limitations on the end payor depositions, and Your Honor may

8   recall what's not in dispute -- what's not in dispute is that

9   the end payors only have to sit for one deposition. We have

10  agreed to that. By the way, these end payors are folks who

11  have chosen -- and I should drop a footnote here because many

12  of these end payors are not new to class-action litigation.

13  Nine of the end payors were involved in other class-action

14  litigation, and I should note that 11 of the auto dealers

15  have been involved in other class-action litigation, so they

16  are not naive -- at least some of them are not naive to what

17  class-action litigation involves.

18      The end payors will only have to sit once, the only

19  question is whether they may have to sit for 7 hours or

20  14 hours. We have 50 defending groups with multiple parts,

21  and let me make it simple mathematically for the Court. I

22  believe, Your Honor, because I think it was the assumption in

23  the courtroom generally that when Your Honor made the remark

24  about one deposition per end payor, which we are not

25  challenging, and seven hours because I think the Court said

1   well, they only just bought a car.  I think the assumption,

2   Your Honor, was one car, one car per end payor.

3           We know the facts are different because we've

4   gotten discovery.  The fact is of 55 end payors 44 have

5   purchased two or more cars, 22 have purchased three or more

6   cars, so the vast majority of end payors have been involved

7   in multiple transactions, some as many as five or six, so the

8   Court's initial instinct you only need one day per one car,

9   fine, you know what, Your Honor, we can live with that, but

10  most of the end payors have multiple transactions and we need

11  to depose them precisely because, again, it is not

12  surprising, their own records are not very good, most of

13  these end payors have virtually no records about their

14  transaction.  We get some, some from the auto dealers but, of

15  course, there is not asymmetry between the auto dealer

16  plaintiffs and the end payor plaintiffs.

17          We have got to get records for the end payors from

18  other sources, but even after we get those records, Your

19  Honor, records are not the same as depositions, that's why

20  they are different discovery devices.  We need to be able to

21  ask those end payors very detailed questions about their

22  transactions because it is no secret, the defendants believe

23  many of these end payors were not injured at all, and if they

24  are not injured they have no standing and they can't be class

25  members and there may be no class for those non-injured

 1    plaintiffs.  The Supreme Court has just taken cert on this

 2    issue whether you can even have a class where members of a

 3    class suffered no injuries.

 4              So, yes, that's a very, very important issue for us

 5    and we want to be able to examine in detail each end payor

 6    who made the conscious decision to file 32, soon to be 33 or

 7    34 or 35, separate massive class actions, and our request

 8    that if necessary each of these end payors sit for 14 hours

 9    of a single deposition instead of just seven given the

10    massive burden they have imposed on every defense group in

11    this room is hardly unreasonable, I would tell the Court it

12    is the bare minimum.

13              Can I represent to the Court that we will take

14    14 hours with every end payor, of course not.  I'm hopeful

15    that we will take far less and maybe with the handful of

16    end payors there are only a handful that only have one

17    transaction at issue maybe seven hours would be more than

18    enough, but with the 44 out of 58 end payors that have two or

19    more cars at issue we likely are to need more than seven

20    hours and we don't want to be running back to the Court and

21    bothering Your Honor with requests saying we have two

22    transactions, we need more time, here is why.  It is not

23    efficient, it is not efficient.  Thank you, Your Honor.

24              THE COURT:  Thank you.  Plaintiff?

25              MR. RAITER:  Good morning, Your Honor.

```
 1   Shawn Raiter for the auto dealers.

 2          I certainly speak for myself and the auto dealers

 3   very clearly, we have a lot more respect for what Special

 4   Master Esshaki did here in his process than what we just

 5   heard from the defendants.  He did not do exactly what you

 6   suggested during the hearing.  He had a subsequent set of

 7   proceedings, he used his own discretion and his judgment and

 8   he didn't award the defendants one deposition per automobile

 9   dealer plaintiff because if he were just blindly following

10   what you said during the January 28th conference he would

11   have said one, which is what the Court did in the Optical

12   Disk Drive case for each set of the direct and indirect

13   purchaser plaintiffs, awarded one deposition per plaintiff.

14   He didn't do that.  He stood up and he said we are going to

15   start from scratch, I'm going to hear from you, I'm going to

16   take submissions, I'm going to have conferences, and he

17   issued a new protocol, and the defendants don't like it

18   because it didn't give them everything they wanted, it

19   certainly didn't give us everything we wanted, which was a

20   single deposition, but in doing that, Your Honor, he

21   exercised his discretion.

22          And this Court as an MDL court has an obligation to

23   streamline discovery, that's why we are here, that's why the

24   1407 transfer talks about to promote the just and efficient

25   conduct of these actions for the convenience of the parties
```

1  and the witnesses.  An MDL necessarily involves streamlining

2  discovery, it necessarily involves limiting discovery in a

3  way that is different than if each of these cases were being

4  litigated individually, which they obviously are not.  The

5  fact that we have consolidated-amended complaints took those

6  30 some auto dealer actions and put them into one complaint.

7  If we were in a case where we had individual plaintiffs in

8  each state suing these defendants for these conspiracies, we

9  would have another situation where we would be faced with the

10  defendants saying, whoa, whoa, whoa, hold on, you don't get

11  to take our depositions 30 times across 30 cases, this is

12  crazy, we need to only do this one time, yet when it suits

13  them that's what they want to do with our plaintiffs, they

14  want to treat our plaintiffs as if there are 30 some separate

15  actions and they want to have all of these depositions

16  because it suits them but, again, if you look at what you are

17  supposed to be doing here as an MDL court.

18         The Duke University Law School has an interesting

19  best practices -- MDL best practices position.  MDL standard

20  number one says that -- excuse me, the objectives of an MDL

21  proceeding should usually include the elimination of

22  duplicative discovery reducing litigation costs, saving the

23  time and effort of parties and witnesses, and streamlining

24  key issues.  That's what the Special Master did here.  He

25  reached a compromise which was essentially a recognition that

1    these defendants have an enormous amount of information about

2    the auto dealer transactions, about how they do their

3    business, and about how they were impacted by these

4    conspiracies.

5            We right now, Your Honor, I can tell you from the

6    auto dealers' perspective feel we are being harassed by the

7    defendants, that they are doing everything in their power to

8    force our plaintiffs out of these cases.  Every time we turn

9    around we have another deficiency letter, another motion,

10   they are alleging that we haven't produced this, we haven't

11   done that, there are subpoenas going out by the hundreds to

12   automobile dealers across the country and yet they come in

13   and they essentially say you folks should be subjected to

14   depositions for each dealership that would last more than a

15   week of testimony, it would be several hundred depositions of

16   auto dealer plaintiffs or witnesses.  These would be

17   depositions, 30(b)(6), 18 hours, take an enormous amount of

18   time to prepare those dealers to respond to the topics.

19           And why are they doing that, what is it that they

20   hope to gain?  What they have already been provided, Your

21   Honor, includes things like the following:  They have

22   received about a half a million pages of documents from

23   dealership plaintiffs, the class representatives, those

24   include acquisition documents, downstream documents, rebates

25   and incentives from the OEMs, communications from the OEMs

1    about various promotions and incentives made available during

2    the class periods.  They have received DMS data, that's

3    Dealership Management Data, which is an electronic system

4    that both dealers use to report back to OEMs and vice versa.

5    The DMS fields that we have negotiated with them to produce

6    are over 200 fields of information for these dealers.

7         As of today or by the end of today we will have

8    produced that data for 40 of the dealerships.  Just so you

9    know, what that information is is things like the VIN number,

10   the price, the sales cost, the model year, the rebates,

11   incentives, warranties, trade-ins, financing and insurance

12   purchased with the vehicle all broken down on a

13   vehicle-by-vehicle basis.  Again, if the defendants want to

14   talk about well, what did you do and how did you do it and

15   how were you impacted, and did you make a profit or didn't

16   you make a profit, or did you sell a warranty or insurance,

17   they are getting all of that in the DMS data.  They are

18   getting it in the acquisition and downstream documents, the

19   half a million pages we have already produced.

20        We have responded to interrogatories about certain

21   questions they have asked.  The parties are negotiating and

22   issuing subpoenas to the OEMs.  Again, what information is

23   being sought in those subpoenas to the OEMs?  Well, it

24   relates to a variety of dealership cost issues, things like

25   taxes, legal, salaries, advertising, mortgage, rent, credits

1   from the factory, sales figures, profitability and various

2   other pieces of information about how dealerships do their

3   business.  Again, each of the OEMs at issue are receiving

4   those subpoenas, those are negotiated with court supervision

5   and the parties have that process underway.

6           So ultimately you stand back and you say well, what

7   purpose would be served by taking more than the two

8   depositions than they have already been allowed, and how is

9   it an abuse of discretion for the Special Master to say start

10  with two because his protocol does say we can always come

11  back to the Court, of course, but how is it an abuse of

12  discretion given all of this information, the best evidence

13  about these transactions will be in the defendants' hands

14  before these depositions.  You are not going to be able to

15  ask any of these witnesses about a particular sales

16  transaction and expect that they have independent

17  recollection or knowledge of that transaction.  What they are

18  going to do is go to the documents and say well, for that VIN

19  here is what happened, here is what our documents show, here

20  is what the information shows, and they certainly can spend

21  two days with these dealerships asking questions about what

22  does this mean and how do you do this and why do you do this

23  and all of these questions they want to ask about impact

24  which, by the way, the standard that was suggested earlier is

25  an improper standard, we don't have to show impact at every

1    transaction.

2           But with that said, what else do they need and how

3    is it an abuse of discretion?  They simply come and say,

4    well, there is just so many of us we have so many questions,

5    but if you look back at the limits placed by the Special

6    Master in the deposition protocol that applies to the

7    defendants what do we have there?  Let's look at that.  Well,

8    what it says is that the plaintiffs groups collectively,

9    collectively all three of us can take up to 15 depositions of

10   each corporate defendant family, so essentially we each get

11   five, and these are the people who actually conspired, went

12   to jail, pleaded guilty, there are many more witnesses

13   involved on their end yet we collectively get 15.

14          On the 30(b)(6) topic the defendants are asking for

15   only three hours less of 30(b)(6) time of our people than we

16   get of theirs.  So they want nearly the same amount of

17   30(b)(6) time as the plaintiffs collectively get against any

18   one of their defendants.  It simply doesn't make sense.  And

19   if you look at, again, the protocol and how we got here, in

20   January 2015 parts were still in these cases.  There was a

21   question from the Court about well, are parts in this or not,

22   and you had a discussion with counsel for Sumitomo about that

23   and whether that might change something.  Parts are now out.

24   So what we have are the acquisition and sales of new

25   vehicles, and fundamentally what they are asking for is

1    abusive discovery quite frankly.

2          Yes, Landers is a large group.  Many of these are

3    single dealership locations, they are not large businesses,

4    and asking them to sit and put their people up for a week of

5    testimony, we would be doing depositions of auto dealers for

6    a year straight, one year straight if they were running

7    consecutively.  Does that make sense?  Well, their question

8    is well, there are multiple brands, multiple OEMs.  Well, we

9    all know there are only so many OEMs, right, there are only

10   so many OEMs in this litigation.  Some of the dealers, of

11   course, sell the same types of vehicles so there are multiple

12   GM dealers, there are multiple Honda dealers.  The fact that

13   those dealers are getting the vehicles from the same OEM, the

14   same process, at some point you really say you have taken one

15   Honda deposition, you have taken them all in some sense.

16         Now, there may be again some individual issue that

17   they want to ask about, something that is different and

18   unique to a particular dealer or a particular state, and

19   that's fine, that's why they get two depositions of each one

20   of these dealerships, but right now what the Special Master

21   did was reach a very reasonable compromise, given the status

22   of the litigation, given the number of defendants left in

23   wire harness, remember we don't have the same number of

24   defendants anymore, it just doesn't make sense, it would be

25   abusive, it would be a huge waste of time.

 1          THE COURT:  How about the outline of the topics,

 2    what do you have to say about that?

 3          MR. RAITER:  Your Honor, it is an interesting

 4    question.  If the purpose of these depositions is to get

 5    answers to the questions that they wish to ask, having those

 6    outlines ahead of time would be helpful because we could be

 7    sure that our people are prepared and have the information

 8    hopefully to answer the questions.  So do we have to have it

 9    from my perspective, no.  Would it be helpful in moving the

10    process forward, yes.  Does it make sense, yes.

11          THE COURT:  What if questions come up that weren't

12    on the outline and you are in the deposition and you say, oh,

13    there is this issue, just came up?

14          MR. RAITER:  I personally, Your Honor, think

15    there's always some degree of reasonableness and discretion,

16    and if a lawyer has to stray from the outline a bit if I were

17    sitting there in the chair defending the deposition I would

18    be hard pressed to hold that lawyer to the outline assuming

19    that these are reasonable questions that are relatively

20    related to the topics on the outline.  I don't think any of

21    us want to be in here bothering the Special Master or

22    bothering the Court based on a particular question at a

23    particular deposition.  But from a big-picture standpoint if

24    you wish to streamline this and if they, the defendants, wish

25    to have the information provided to them in a deposition it

```
1    would be good to know what is going to be asked of a

2    particular witness.

3            We can then ask the witness whether they know these

4    answers, we can figure out whether they are the right

5    witness, we can do the work necessary to streamline the

6    process, give them their chance, give them their due process,

7    but not spend a ton of time wasted with people not recalling

8    a particular transaction.  I mean, that's the problem here,

9    these dealerships sell thousands of cars so if somebody comes

10   in and says well, I want to talk about this Honda Accord that

11   you sold in 2009, most likely the dealership witness is going

12   to stand there and say I have no independent recollection of

13   that transaction, I'm happy to look at the documents and try

14   to answer your questions, and if they have questions about

15   notations or acronyms or things like that it would be good to

16   know ahead of time so our witness knows, yeah, I know what

17   that acronym means and I can tell them what that means, I can

18   tell them what these documents actually say, I can tell them

19   about this transaction if I know the types of questions they

20   are going to ask me.

21           The last point, Your Honor, the number of defense

22   lawyers questioning.  Again, from the auto dealers'

23   perspective it seems reasonable to limit it to three, again,

24   both on the plaintiffs' side you require coordination, you

25   require the lawyers to work together and try to minimize
```

1    duplicative discovery and questioning, it is common on the

2    defense side that you ask the same from them.  How it is an

3    abuse of discretion to allow three but not four or not five

4    doesn't make sense to me.  I think the Special Master, again,

5    reached a nice compromise here, he looked at it and probably

6    thought if you all can't amongst yourself figure out all the

7    questions that need to be asked and allow three lawyers to do

8    so we are going to have a much larger problem as the

9    depositions start.

10          So unless Your Honor has questions, we believe that

11   the Special Master clearly exercised his discretion, there

12   was no abuse of discretion.  The number of depositions for

13   auto dealers should be one 30(b)(1) and one 30(b)(6) as he

14   ordered.  Just so I'm clear, that's not what I would like but

15   I don't think he abused his discretion in so ordering.  We

16   think there should be one deposition but we are not here

17   challenging his ruling.  Thank you.

18          THE COURT:  All right.

19          MR. WILLIAMS:  Good morning, Your Honor.

20   Steve Williams for the end payors.

21          And, one, I want to join Mr. Raiter in saying I'm

22   somewhat surprised at the attacks on the master in the

23   briefing and the argument.  I don't think there has ever been

24   a deposition protocol that has had the history of

25   negotiating, briefing and argument that this one has

 1   including briefing and argument after we saw you last time,
 2   Your Honor.  And I'm not always happy with the Master's
 3   rulings but I understand he makes rulings and you live with
 4   them, and I don't think there is anything that he did in his
 5   rulings that's unusual or inappropriate.
 6        I think on a lot of the issues we talked about Your
 7   Honor made a very good point, which is if the limits aren't
 8   working for you, number one, before a particular deposition
 9   you have the right to ask for more time if you think you need
10   it, and number two, if you go forward and it turns out it is
11   not working well then you can come back then and say you need
12   more time, but to say now that these things should be
13   expanded, and I'm talking for the end payors, okay, so these
14   are people who went to a car dealership and bought a car,
15   they are not people who went into a car dealership and said I
16   would like to talk about the wire harness now, tell me about
17   that wire harness and how much did that cost, and tell me
18   about the heating control panel, they bought a car.  And to
19   suggest that 14 hours of time is necessary to ask about that
20   car purchase is crazy and, you know, we are kind of focused
21   on details and Mr. Tubach when he was arguing made a point
22   about how the plaintiffs tend to mix up damages and impact
23   and they don't focus in the right place.
24        I would like to focus on the fact that there's a
25   conspiracy or a set of conspiratorial conduct that went on

1    for 10 or 12 years that affected almost every vehicle that

2    came out of Japan, but the witnesses and the people who

3    engaged in that conspiracy when I take their deposition I get

4    seven hours to ask them about that 10- or 12-year conspiracy,

5    and they want 14 hours to ask my client about when he bought

6    his Toyota Camry.  It is preposterous, it makes no sense.  I

7    don't care if he bought four cars, two hours of time to talk

8    about your car purchase is a form of torture that most people

9    shouldn't have to go through.

10         You know, I heard these comments and I didn't quite

11   understand what they meant.  These are folks who have chosen

12   to file this suit and they are not naive so --

13         THE COURT:  Are they professional plaintiffs?

14         MR. WILLIAMS:  No.  I don't even know what that

15   word means.  They certainly are not people who pled guilty to

16   violating the antitrust laws.  They bought a car and they

17   brought a claim.  It is an irrelevant point.  I don't know if

18   it is supposed to incite somehow that they are bad people but

19   they are not felons, unlike most of the defendants in this

20   case.  So there is no tainting or suspicion that my clients

21   bring into this that justifies this extra time they are

22   asking.  The time they have got is more than enough.  If

23   there's any special circumstances they can raise it

24   beforehand or they can raise it after the deposition, but

25   there is nothing to justify 14 hours of time to talk about

1    buying a car, period.

2           The alleged lack of records.  First of all, they

3    are subpoenaing all the dealers to get all the transaction

4    files.  Second of all, how does that justify more time?  If I

5    don't have records what are you going to do, ask me for four

6    hours can you remember any better now that I have asked you

7    the fifth time what the terms of the deal were?  It just

8    doesn't make sense.

9           And then we heard about the massive burden our

10   clients have imposed on the defendants.  Our clients didn't

11   engage in these conspiracies.  Our clients didn't impose

12   heightened costs on virtually everyone who bought a Japanese

13   car for the last 15 years.

14          So I always start with Rule 1 and we are going to

15   talk about Rule 1 later of the Federal rules, and the part

16   that I focus on isn't the speedy and expensive, and those are

17   important, I focus on just and justice, and that's what this

18   case is about.  And every time we come in here from every

19   different direction there are shots taken at us like we are

20   the bad guys and we did something wrong, and that's not how

21   this should be.  In fact, on the speedy and expensive, it is

22   up to the Court and the Master to put procedures in place to

23   focus discovery, to limit costs, and that's exactly what the

24   Master did and that's now what they are complaining about.

25          So, first, the finger pointed at us for putting the

1    massive burden on the poor defendants over here, and then

2    Master Esshaki got it wrong because he won't give us more

3    time to ask questions but take our word for it, we will be

4    judicious with it.

5            I brought the manual on complex litigation, I

6    understand that's what Federal courts frequently look to, and

7    in the section on depositions for the supposedly unheard of

8    idea of how many people can question, it says courts can

9    issue guidelines about who may examine witnesses, it is right

10   out of the manual, that's not novel, that's the job of a

11   court presiding over multiple-district litigation to focus

12   discovery on issues in dispute and to manage it in a

13   cost-efficient manner.  And frankly I don't have as much

14   experience as Mr. Reiss or Mr. Tubach, I'm closer to

15   Mr. Tubach, it is almost unheard of that more than one

16   defense attorney examines a class rep at a deposition.  It is

17   not a denial of due process to say coordinate your questions

18   beforehand, you all know what you are going to ask, there is

19   no unique question for part A versus part C.  We have to do

20   the same thing when we examine their witnesses, we have to

21   coordinate, we have to not repeat ourselves.

22           And the suggestion was made that this somehow came

23   out of nowhere, Master Esshaki made it up, that's not true

24   either, this limit, it came out of the discussion about us

25   wanting protection against repetitive and duplicative

1    examination by sort of a tag team, one attorney asked the

2    questions and then the next one does, that's where it came

3    from, and it is justified and it should be upheld.

4         Finally, on the list of questions, it kind of ties

5    together to me.  They are saying they need 14 hours, that's

6    preposterous.  They are saying they have all of these issues

7    they need to examine on, well, in that case what the outline

8    does -- it is not a list of the questions, it is an outline,

9    and it helps us prepare the witness to answer their questions

10   so that their time is meaningful.  There is a benefit to it,

11   if they ask something outside of the outline, you know, the

12   objections are what the Federal rules let us object to.  I'm

13   not going to tell a witness not to answer because it wasn't

14   in the outline but it is a tool, a helpful tool, to make the

15   depositions more productive so that we are not wasting time

16   and wasting money on these depositions.

17        The reality is, I think defendants will admit it,

18   and I will admit it, and the Court knows it, most of us know

19   what we're going to be asked about at the class rep

20   deposition, but there are things they want to know about and

21   they complain you don't have your records so we can't go by

22   those.  It is a helpful tool, that's all it is, it doesn't

23   hurt, it doesn't deny due process, there is really no harm

24   here but I think in sum, if any of these horrible things they

25   think are going to happen in reality take place then they

1    know where to reach the Master to bring that up again, but

2    for now this order is perfectly appropriate to manage this

3    case.  Thank you.

4           THE COURT:  Okay.  Thank you.

5           MR. TUBACH:  Your Honor, briefly in response.

6    Michael Tubach again for the wire harness defendants.

7           To be very clear, Your Honor, there is no attack on

8    Master Esshaki at all here, and I hope the Court hasn't taken

9    anything that any of us have said as an attack on

10   Master Esshaki.  I think he was doing his levelheaded best to

11   do what the Court -- what he thought the Court told him to

12   do.  The Court raised the issue that well, after that hearing

13   you know I did tell him that I wasn't trying to tell him what

14   to do, but to be clear, that transcript I read earlier on

15   May 26th was after the Court had held its status

16   conference -- to set the stage, January 21 he issued his

17   ruling, January 28th the Court upsets the apple cart with its

18   two cents, May 6th there is another case-management

19   conference where the Court said maybe I overstepped my

20   bounds, I don't mean to be telling the Master what to do, and

21   thereafter Master Esshaki had a hearing at which he said I

22   was attempting to follow Judge Battani's instructions.  So

23   despite the Court's best efforts not to give him instructions

24   it is real hard for a Special Master not to take very

25   seriously what he thinks the Court has said he should be

1    doing.  We are not attacking, we simply think he got it

2    wrong.

3           With regards to the Optical Disk Drive case,

4    Mr. Raiter simply misspoke, the direct purchaser corporate

5    defendants I believe they got 15 -- there were 15 fact

6    witnesses and five 30(b)(6) depositions that they were

7    allowed to take for corporate representative, corporate

8    entities, and that make sense because you have a large

9    organization and you need to try to discover facts from this

10   large organization.  We are not asking for anything close to

11   15, we are not asking for anything close to five 30(b)(6)

12   depositions.  What we are saying is we should get one

13   30(b)(6) of 18 hours, so one substantial deposition of

14   30(b)(6), and three fact witnesses, that's all we are asking.

15   That is in no way comparable to what the plaintiffs are

16   getting from us, we are putting up 15 witnesses, other than

17   Leoni we have been given fewer, other defendants are putting

18   up 15 fact witnesses, which is five per defendant group,

19   that's considerably more.

20          What I heard a lot from Mr. Raiter is we are

21   somehow harassing the auto dealers in this discovery process.

22   Nothing could be further from the truth.  They have been

23   dragged kicking and screaming into this discovery process.

24   They have not been diligent in pursuing discovery and in

25   fulfilling their discovery obligations, and that's not me

1   talking, that's Special Master Esshaki talking, he has said

2   that.   And so when the auto dealers are complaining that we

3   are trying to enforce our discovery rights, yeah, we are

4   trying to enforce what we are allowed to do and what Special

5   Master Esshaki has ordered them to do and that they have not

6   done.

7          What they neglected to tell you in the many

8   documents they have produced is that for a lot of these auto

9   dealers they have produced very few years' worth of data or

10  documents and yet they want to cover a 15-year period.   This

11  is not a complete production of documents by any stretch of

12  the imagination.

13         I heard a lot about we really shouldn't be

14  bothering with any of this because we conspired, pleaded

15  guilty and went to jail.   That's not how the Federal Rules of

16  Civil Procedure work.   And just to be clear, my client has

17  not pleaded guilty to anything.   We have been dragged into

18  this litigation and we are getting under our own proposal

19  only seven hours to defend ourselves from this

20  multi-billion-dollar litigation, that's not a lot, but

21  frankly it doesn't matter whether we pleaded guilty or not,

22  even defendants who have pleaded guilty are entitled to

23  rights, they pleaded guilty, they have paid their fines, and

24  now they get to decide did, in fact, what they did cause

25  impact to people several streams -- several layers down the

1   chain, and that's what we are entitled to do.

2       The only thing I would say about the outline and

3   the topics, I promise the Court no good will come of this.

4   Forcing the defendants to give an outline of topics to be

5   covered will only result in problems, and it is a solution

6   looking for a problem, there is no reason for it.  If the

7   Court is inclined to do it, which we certainly hope the Court

8   is not inclined to allow that, then it should be reciprocal.

9   If we are going to have to give them outlines of topics for

10  our witnesses so that their witnesses aren't confused by the

11  questions we ask them and we don't run the risk of running

12  you over, well, then they ought to give us outlines for all

13  of the fact witnesses they want to question us about.  We

14  don't need it, we just don't need it.

15          THE COURT:  Okay.

16          MR. TUBACH:  Thank you very much.

17          THE COURT:  Counsel.

18          MR. REISS:  Thank you, Your Honor.  I don't want to

19  try to prolong this.  Let me just second what Mr. Tubach said

20  about being in this courtroom because I know Your Honor knows

21  this but frankly it is a little bit difficult sometimes.  I

22  will tell the Court two things about the big picture.  The

23  first is that the majority of the named defendants in these

24  cases, the majority, have not pled guilty to anything.  Okay.

25  So they are -- they walk into this courtroom as every party

1   walks into this courtroom, without any preconceptions about

2   whether they have done something right or wrong, whether

3   there is a class or not a class, whether the plaintiffs have

4   been injured or not, those defendants as with the defendants

5   who have pled guilty are entitled to defend themselves.

6          And let's have another major sort of reality check

7   here.  This litigation, which I think the one thing that

8   everyone is in agreement with Your Honor is I'm the oldest

9   guy standing up here, so this litigation is structured in a

10  way that is unprecedented, and it is not because the

11  defendants have done it, the plaintiffs, both the auto

12  dealers and the end payors, have chosen to put together in a

13  totally unprecedented and frankly, my own view, improper

14  fashion, so this isn't one case.  Mr. Raiter I think said

15  this is one case; no, it is not, it is 32, soon to be 33 or

16  34 or 35 major sets, not even individuals, sets of class

17  action.  Does this litigation have to be structured this way?

18  Absolutely not.

19         Your Honor, there were a number of class actions --

20  antitrust class actions involving computer parts, six

21  different separate MDLs all went to the same District Court

22  in California, the Northern District of California.  Six

23  separate parts, six separate MDLs, every plaintiff in every

24  one of those separate MDLs was deposed.

25         The notion that we are --

```
 1              THE COURT:  Separate judges?
 2              MR. REISS:  Separate judges, Your Honor.  Very
 3      good.  Six different judges in the Northern District of
 4      California.  SRAM, DRAM, LCD, CRT, Optical Disk Drive and
 5      Capacitors, every one of those was a separate MDL even though
 6      every one of those parts are in computers, all went to the
 7      same district, all went to different judges, precisely to
 8      avoid some of the problems we are standing here encountering.
 9      There is unreality to the notion that I am begging for
10      14 hours of a plaintiff who chose -- I'm not casting
11      aspersions on the plaintiffs but the fact is they chose to
12      file 31 or 32 suits.  No one -- they didn't drop from the
13      sky, they were presumably informed about their obligations as
14      class representatives, they were presumably informed that
15      meant they were going to be deposed.  I don't know if they
16      were told they were going to be deposed in 1, 2, 18, 30, 32
17      cases but the fact is they are only going to be deposed once
18      in 32 cases, and all we are saying is we don't want to depose
19      them any longer than we have to with the end payors or with
20      the auto dealers, but if an end payor bought five cars, and
21      some of them did, yeah, we are going to need more than seven
22      hours, and if they bought two cars we may need more than
23      seven hours, maybe not.  And by the way, a lot of these cars
24      involved parts that were optional, there's a lot of stuff we
25      want to ask the end payors about.
```

```
 1              I did want to make it clear to the Court that we
 2    are here in this litigation as it is structured because of
 3    the choice the plaintiffs have made.  And by the way they say
 4    we have so many plaintiff depositions, we have so many, they
 5    could have brought the case with 10 plaintiffs or 15, no, but
 6    they chose, they chose, to file these cases with 57
 7    end payors and they chose, they chose, we didn't choose, they
 8    chose to file these cases with 40 some odd auto dealers,
 9    that's why we are here.  And the notion -- I think Mr. Raiter
10    said well, you depose one Honda dealer you depose them all.
11    Really?  We don't agree with that because we think every
12    Honda dealer may have different deals, relationships with its
13    OEMs, they may have different relationships, different deals
14    with their end payors.
15              By the way, they also compete against each other so
16    an end payor who tries to buy a Honda Acura from one dealer
17    may get one offer and they may get a very different offer
18    from another dealer, and we want to understand why that is.
19    And if they went to the dealer with the better offer then
20    maybe they weren't injured and if they were injured they
21    can't be a class rep because they have no standing.  You
22    don't have to agree with us, all you have to do is agree that
23    we have the right to find those things out to defend
24    ourselves.
25              THE COURT:  Okay.
```

1          MR. REISS:  Thank you, Your Honor.

2          MR. WILLIAMS:  Your Honor, may I speak briefly?

3          THE COURT:  All right.

4          MR. WILLIAMS:  A couple things.  There has been a

5   lot of crazy math, seven hours that they only get, the

6   majority of defendants have pled guilty, and I don't know if

7   that's sort of the -- there are five corporate defendants and

8   one took the plea for the rest of the family so you are

9   counting those other four, and I don't know if it is the guys

10  who pled in Japan or paid a fine in Japan and didn't plead

11  here, but no one should accept this suggestion that there is

12  not a lot of misconduct on this part.  Even Mr. Tubach who

13  said I didn't plead guilty, well, he did pay a fine in Europe

14  for collusion.

15          I want to talk about those cases in California

16  because I know these cases very well.  Number one, they were

17  not all treated separately precisely to avoid whatever this

18  problem is that was referred to because I don't know there is

19  a problem here.  I actually think we are doing a good job

20  here, we are managing this, and we have put together this

21  case that is complex not because of what we did but because

22  of what they did in a good way because here is the

23  difference.  In LCD, liquid crystal diode TV, if that's what

24  LCD means, doesn't have a catheter ray tube in it, those are

25  two separate conspiracies, you can't put them together.  That

1    LCD does not have an optical disk drive in it, two separate

2    conspiracies, you can't put them together.  That does not

3    have a DRAM chip or an SRAM chip in it, separate

4    conspiracies, you can't put them together.

5         My guy bought a car, my guy bought a Honda with a

6    bunch of those price-fixed parts in it.  It does belong

7    together.  And frankly as Mr. Seltzer pointed out, no

8    disrespect, he may be the oldest attorney in the room, he's

9    never seen a class rep deposition that went on for more than

10   seven hours, and there is no reason for it here, there is

11   simply no reason.  Thank you.

12         THE COURT:  Okay.  Thank you.  All right.  I have

13   to tell you I read with great interest the pleadings that

14   have been filed here -- or the briefs.  Let me start by

15   saying, we are a little late into the game to talk about this

16   should not be one case.  I don't know if it should be or not,

17   I told you in the beginning I had no class action -- or

18   multi-district, excuse me, experience.  I tried to find other

19   cases because you all cite in your briefs this is what

20   happened in this particular multi-district litigation and

21   this is what happened in this other multi-district

22   litigation, and when I go to look at those pieces of

23   litigation none of them are like this, this is I think -- it

24   is unique, at least it is unique to me because I haven't

25   found one with so many parts.

 1           I feel a little irresponsible when I might be at a

 2    conference and say oh, you have only 200 cases or something

 3    in your MDL, you know, we've got 1,000 or 1,500 or some other

 4    humongous number and I think this isn't so bad, and then I

 5    come back and I look at it and I say wait a minute, this

 6    still is different, so we are trying to deal with a creature

 7    that is new, and I think that both sides have done a

 8    tremendous job.  I do not think that defendants are maligning

 9    the Master, I think you are presenting your side of this very

10    interesting and important argument.  And the Court looks --

11    you talk about this, how this case is structured, well, this

12    is how it was given to me so you kind of come in with it, and

13    it just became this creature, but we are dealing with this

14    structure, we are not changing the structure of the case so

15    now we simply need to look at what's the best way of handling

16    this kind of structure.

17           I am very intent, and defendants might not

18    appreciate this in this particular motion, but I'm very

19    intent on respecting the jurisdiction, so to speak, of the

20    Master.  You have to show me in this motion that he abused

21    his discretion.  The abuse of discretion you are talking

22    about is that he thought he had no discretion because of what

23    the Court said.  I went back and reviewed those transcripts

24    and I can certainly see your point of view.  However, where I

25    differ with you is after the Court's discussion he had other

1    hearings and briefing and obviously didn't follow what the

2    Court said because he allowed two depositions instead of the

3    one deposition.  And, you know, I think it was also fairly

4    clear when I was talking about this I wasn't even thinking of

5    the auto dealers, I was thinking of the end payors and some

6    poor soul who bought a car or the poor richer soul who bought

7    five cars had more depositions, I mean, I just think that the

8    Master was trying to deal with what he saw as guidelines of

9    the Court, but I don't think that him even considering that

10   is an abuse of discretion.  He considered it and he didn't

11   abide by it.

12          There is no problem in my mind with his number of

13   depositions.  Yes, he might have had more numbers in January

14   then he did after the Court's discussion, but it is what he

15   decided.  The -- I think the number of depositions it may

16   turn out are not adequate for the defendants but you have the

17   right to go back to the Master, you have the right to go back

18   to the Master and say -- I mean, even before your

19   depositions, you know, here is the outline that we did and we

20   need this information from one person and we can't -- or else

21   we can't possibly get it down in the number of hours, I don't

22   know, there are any number of circumstance and I fully expect

23   that you will be back at the Master.

24          So as much as even I -- I'm not saying I want to, I

25   don't want to put my two cents in again, but if I may have

1    done it differently, if I had first considered your briefs

2    and that I may have, but we have a certain protocol we are

3    going to follow here with the Master because it is important

4    to do it now and for the whole case, and I really cannot say

5    that it is an abuse of discretion to limit these depositions

6    as he has limited whether or not he used the Court's info as

7    a guideline.

8            In terms of the outline of the topics, I know this

9    is not generally done for the fact witnesses.  I don't see --

10   I mean, it was interesting, it was almost like we were

11   getting into a Constitutional argument here and, I mean, I

12   don't see it right now, I think that these outlines because

13   of the number of depositions, the number of parts, the

14   structure of the case, taken all of those things into

15   consideration I think that we have to be innovative so this

16   may be a new thing with giving this outline but I think it is

17   well worth the try, certainly it is not an abuse of

18   discretion.

19           In terms of limiting the number of attorneys who

20   can question a witness, again, I don't think that's an abuse

21   of discretion.  I mean, we do it here in trial, sometimes you

22   have to pick one attorney that's going to be the person to

23   question the witness with multiple parties, be it plaintiff

24   or defendant.  It is, of course, allowed for the 30(b)(6)

25   issues for very good reasons.  It may cause -- it may cause

1    some problems and I hope it is not true that no goodwill

2    comes out of it but it may be, but then it will have to be

3    altered, you can go back and say now we have this experience

4    and this is what is not working in this protocol.

5          So the Court in reviewing this finds that the

6    master has not abused his discretion and I will adopt the

7    protocol or the protocol stance as he has entered it.  Nobody

8    is trying to limit your right to go back to the protocol with

9    the Master and if there's objections to bring them to the

10   Court.  Okay.

11         Let's go to the next issue, which is the bearings

12   class cert.  I think we have both the bearings and the

13   anti-vibration rubber parts.

14         MR. KESSLER:  Yes, Your Honor.

15         THE COURT:  Let me move this stuff out of the way.

16         MR. KESSLER:  Good morning, Your Honor.

17   Jeffrey Kessler, I represent in connection with this motion

18   the NTN defendants, and I will speak for the entire bearings

19   group with respect to this issue.

20         I should note that no member of the NTA group is a

21   felon and prefer not to be called that since it is not true.

22         Your Honor, we are operating with the premise of

23   the Court that this is a new creature what we have in this

24   MDL.  And I'm also operating from the premise that I heard

25   advocated by plaintiffs' counsel focusing on Rule 1 that the

1    Court's obligation is to have a speedy, inexpensive and just

2    way of moving this case forward, and the Manual for Complex

3    Litigation and the MDL procedures which is also designed to

4    streamline and find the just and efficient way to move this

5    new creature forward.

6            What we propose with respect to the bearings track

7    and also very similar to what the anti-vibration rubber parts

8    have proposed is to find a way to manage this MDL in a way

9    that will make sense for the Court, that will make sense for

10   the defendants, and frankly we think makes sense for all

11   parties including the plaintiffs as well and, in fact, one

12   part of the plaintiffs' group agrees with us, which is that

13   the direct purchaser class has proposed a schedule almost the

14   same as ours, there are a few internal deadlines that are a

15   little different which we can certainly work out, but they

16   agree with us that the type of schedule we are proposing is

17   the correct one.

18           Now, how should Your Honor decide this?  I think

19   Your Honor has to look at this from three different

20   perspectives.  Perspective number one is the objectives of

21   the Federal rules and the MDL rules; will this proposal lead

22   to a speedy, inexpensive and just resolution?  Number two,

23   from the perspective of the Court, will this schedule help

24   the Court manage the MDL, and will it help for the overall

25   group of defendants in terms of moving forward and the

1    plaintiffs as well?  And number three, will this be just and

2    provide due process to the parties, including the defendants

3    who we represent?  So I want to focus on from those three

4    different perspectives.

5            Before we get to those three perspectives though

6    there are some important things to note about bearings that's

7    different.  It is very interesting, Mr. Williams is talking

8    about, well, he just has an auto parts case, he only cares

9    about auto parts.  The bearings case is the only case that

10   involves industrial parts, industrial bearings as well as

11   auto bearings.  We are going to have unique issues unless

12   there are future industrial parts that come up in some of the

13   other cases.  So the idea that somehow wire harness is going

14   to tell us something about the industrial parts in bearings

15   doesn't make any sense at all, so we are unique in that

16   regard.

17           As I mentioned, the direct purchaser class has

18   joined us in saying bearings are different from wire

19   harnesses, bearings have different issues, they have

20   different markets, they have a different alleged conspiracy,

21   and no overlapping defendants of wire harness, we don't have

22   a single overlapping defendant.  I'm going to call -- we talk

23   about the elephant in the room, I'm going to talk about the

24   Denso in the room.  Okay.  There are lots of cases that

25   involve Denso, and this is not one of them, okay, and there

Status Conference / Motion Hearings • September 9, 2015

77

```
 1    is absolutely no connection between the bearings case and the
 2    wire harness case on any of these issues.
 3         Number two, as I mentioned, the direct purchasers
 4    agree.  Now, what the indirect purchasers have said, the EPPs
 5    and auto dealers, is they said okay, let's have different
 6    tracks for the direct purchaser class and for the indirect
 7    purchase action.  Now, that would make the least sense of
 8    all.  The one thing Your Honor would not want to do is
 9    consider class certification separately for the direct
10    purchaser class and the indirect purchasers because the
11    overcharge issues completely overlap at each level.  There
12    are different issues as you go down the level in terms of
13    passthrough, which is very, very important, but the
14    overcharge issues completely overlap for bearings.
15         Now, what they don't overlap with, and I'm going to
16    come to this when we talk about managing the MDL, the
17    overcharge issues in bearings will be entirely different from
18    the overcharge issues for wire harnesses, okay, because it is
19    a different alleged conspiracy, it is a different type of
20    part, it is a different magnitude of alleged overcharge, all
21    of which is going to affect the class analysis as I will come
22    to.
23         So when we are looking at this we then turn to how
24    should we do this?  What are the competing proposals?  And
25    this goes to the management of the MDL.  Our proposal is that
```

1    the Court will benefit by having three parts, wire harnesses,

2    bearings and anti-vibration rubber parts, on approximately

3    the same track because each one, which is very different from

4    the other, will give the Court different factual perspectives

5    in considering what's going to be the crucial class motion

6    issue.  One of the most important decisions the Court will

7    make in this unique animal is class certification, and class

8    certification has to be decided in each case but we don't

9    fool ourselves, we know your first decisions are certainly

10   going to have an impact on all the other cases, even though

11   they are all unique it is going to have an impact, so the

12   Court has to decide before making that first decision do I

13   want to look just at a narrow single product that might have

14   unique characteristics that don't apply to any of the other

15   products that could be at issue here such as wire harnesses?

16   Or would the Court benefit from considering -- you can't

17   consider 32, Your Honor, but you could consider three at

18   approximately the same time to see, for example, my

19   prediction is they are going to have the same expert but

20   their expert analysis might yield one result for one part and

21   a different result from a different part, and looking at how

22   that intersects together may tell the Court a lot about how

23   reliable is this methodology, which is something you are

24   going to have to consider under Daubert when you make your

25   class certification, the Supreme Court has indicated others.

```
 1            You will be looking at Daubert issues on their
 2    experts, you are going to want to see how the methodology
 3    plays itself out on a few different examples.  And the fact
 4    that bearings has industrial products which has its own set
 5    of issues is another reason to consider it early because
 6    that's also going to be looking at how the overcharge is
 7    calculated, does it work in that context or not, how is this
 8    put together, although we also have bearings to auto parts as
 9    well so we are in both pieces in terms of this.
10            So we believe from the standpoint of overall
11    administration of this unique animal, having three makes
12    sense.  Now, what is the schedule we propose?  We haven't
13    proposed some incredibly aggressive schedule, we would allow
14    the Court to reach class certification rulings in bearings,
15    in anti-vibration rubber parts and in wire harnesses around
16    the middle of 2017, and that will be five years after our
17    case has been filed.  Okay.  Your Honor, yourself, has said I
18    would like to get more cases on board for 2017.  Well, we
19    have two volunteers, bearings and anti-vibration rubber
20    parts, who have said we want to be in that schedule because
21    under the Federal rules and our rights we don't want to sit
22    in this courthouse for years and years and years, and Your
23    Honor doesn't want to if, in fact, these classes are not
24    going to be certified.  And we have reason to believe in the
25    end we'll be proved right or wrong that these classes may
```

1    never be certified when they get down to it.

2         And what plaintiffs would like to do is they would

3    like to just keep this in limbo.  I'm sure they would be

4    happy if the Court didn't decide class certification until a

5    decade from now because what they have is they keep the

6    uncertainty and the discovery going and the expense and the

7    effort that everybody is doing but we are all entitled to

8    know under Rule 1 is this a valid class action or not, and we

9    are asking for that determination in five years.

10         THE COURT:  Okay.  Let me just ask you this, you

11   are asking to add to wire harness, bearings and

12   anti-vibration rubber parts?

13         MR. KESSLER:  On approximately the same schedule,

14   not add them but to combine them.

15         THE COURT:  Now I understand that.

16         MR. KESSLER:  Right.

17         THE COURT:  And a number of the other defendants

18   have filed, you know, notice that they agree or basically --

19         MR. KESSLER:  Here is the situation, Your Honor,

20   they will speak for themselves.  The other defendants have

21   all indicated to us that they have no objection to our going

22   on this schedule and they are not objecting at all.  What

23   they have said is the plaintiffs proposed as the alternative,

24   that's why I said you have to look at the alternative, they

25   propose moving us and moving I guess anti-vibration rubber

 1    parts, I'm not sure if they are moving or not, but at least
 2    bearings into a group of six that would be heard together as
 3    six, okay, sometime I think the minimum is six months after
 4    Your Honor rules in wire harnesses we can first file our
 5    motion.  And what the others are saying is wait a minute,
 6    they don't know if they can go on that schedule, they don't
 7    know -- they haven't spoken to this, the other five
 8    defendants have their own interest, and that's one of the
 9    problems, we are ready to go, anti-vibration is ready to go.
10    If heater control panels is not ready that shouldn't be a
11    reason to hold us back into 2018, 2019, 2020 waiting for some
12    other case.
13         I will give you an example of this.  So a new case
14    was filed yesterday, Your Honor, on an amended complaint in
15    the air-conditioning case, and in the air-conditioning
16    systems case there is a footnote that says plaintiffs now
17    believe that air-conditioning systems may be related to
18    heater control panels and they reserve the right after
19    discovery in that case to decide it is all one conspiracy.
20    Well, what does that mean?  That means the heater control
21    panel case, which is one they want to put in the next six,
22    may be delayed for years while they are trying to figure out
23    in the discovery whether it is a separate conspiracy they are
24    claiming or one that is integrated with air-conditioning
25    systems where they just filed an amended complaint and you

1    haven't even had motions to dismiss or answers or anything,

2    it was just filed yesterday.

3            This is an example why Your Honor I think has to

4    look at each part track separately to decide what schedule

5    they can meet because each one is going to be different, but

6    then you should say would the Court benefit by having three

7    on this -- I'm not even going to call it a fast track, three

8    on a reasonable track to mid 2017 because it is hardly fast.

9    The only reason frankly that we can think of why plaintiffs

10   oppose this, okay, is because plaintiffs' view is that they

11   don't want to prosecute three actions at around the same time

12   I guess because it's resources, it's attention, whatever it

13   is.

14           Here is the problem, Your Honor, look at that nice

15   group over there, incredibly competent lawyers, the bench --

16   I say you have a big deep bench, I got nine rows deep of

17   competent, incredibly smart good plaintiffs' lawyers, they

18   can't proceed with three of the tracks out of the 32 they've

19   chosen to file?  If that's true, Your Honor, then this

20   creature is not living, this new creature that they've

21   created.  For this creature to live, if you could rule

22   approximately -- Your Honor may decide to rule a decision on

23   one first and then one second or third, but the point is,

24   Your Honor, if you have all three records before you, if you

25   hear from the experts in bearings, the experts in

1    anti-vibration rubber parts, the experts in wire harnesses,

2    all of these different experts and you have that perspective,

3    and you look at it, then your first three rulings may be

4    truly informed on looking at this and Your Honor said this is

5    a unique animal as to what is the right way to do this.  So

6    we believe the only thing that makes sense from the

7    standpoint of the Federal rules, from the MDL management and

8    frankly for justice to our -- my non-felonous defendants as

9    well as the others is to put this at a reasonable track where

10   you could have the benefit of those three rulings.  Thank

11   you, Your Honor.

12          THE COURT:  Let me hear first from the defendants.

13   What are you --

14          MR. CHERRY:  Your Honor, Steve Cherry, speaking for

15   both the wire harness defendants and this other -- the

16   defendants other than bearings and anti-vibration rubber

17   parts in what plaintiffs have referred to as tranche one.

18          So there's really two issues.  One, I think

19   Mr. Kessler mentioned that we had no objection to their

20   motion and that's true, we don't take a position -- I think

21   it is wire harness defendants or the other defendants to that

22   motion, but as a wire harness defendant I think we have no

23   objection to what they are seeking so long as it doesn't slow

24   down what we are doing.

25          I think the Court has indicated that you would like

1    to get to a prompt resolution in wire harnesses.  We do see

2    the parties being under some stress to keep to that schedule

3    just for wire harness, people working very hard on the

4    plaintiffs' side as well as the defendants' side, I think

5    there have been difficulty meeting deadlines and we do worry

6    about additional stress on the parties in trying to meet that

7    deadline as we throw in more cases.

8              THE COURT:  I understand that.

9              MR. CHERRY:  That's our only concern.

10             The other issue is in connection I believe with the

11   plaintiffs' filings in opposition to their motion, they

12   submitted this tranche one schedule proposal and we filed

13   something just to make clear the Court shouldn't rule on a

14   schedule that affects the other cases in that proposed

15   tranche one without allowing us to continue to meet and

16   conferring and if there is a dispute to present our

17   positions, and we are meeting and conferring about that and

18   maybe we will meet -- we will work that out.  We are hopeful,

19   and if not then we should brief that for Your Honor.  Okay.

20   Thank you.

21             MR. KESSLER:  Your Honor, if I could just clarify?

22             THE COURT:  Wait a minute.

23             MR. WILLIAMS:  Do I get to respond at some point?

24             MR. EVERETT:  If I could just address

25   anti-vibration rubber parts.

1    THE COURT:  Just a minute, just a minute.  Calm
2  down.  Why does plaintiff want to speak before I hear
3  defendants?
4    MR. WILLIAMS:  Well, I guess partly because there
5  were a lot of things Mr. Kessler said that calls for a
6  response, and they may get lost in the shuffle.
7    THE COURT:  You won't forget them.  Sit down.
8  Let's do the defendants.
9    MR. KESSLER:  Just to clarify, Your Honor, just so
10  the Court knows, we absolutely are not seeking to delay wire
11  harnesses in any way, shape or form.  In fact, our schedule
12  mirrors it but it is separate and so I just wanted to be
13  clear from the Court and what --
14    THE COURT:  I know that's clear.
15    MR. KESSLER:  Thank you.
16    THE COURT:  Let's hear from you.
17    MR. EVERETT:  Good morning, Your Honor.
18  Clay Everett for Tokai Rubber and on behalf of the
19  anti-vibration rubber defendants.
20    So anti-vibration rubber is really in the same
21  position as bearings, and I don't want to repeat the points
22  Mr. Kessler made but I just wanted to note a couple points so
23  you can understand the products and frankly the benefit both
24  to our case, to justice and ultimately to the operation of
25  the MDL of adopting the schedule that we propose for

1    anti-vibration rubber.

2         So first of all the products -- anti-vibration

3    rubber products there's a constellation of different

4    products, they are used in different parts of a vehicle, they

5    are little rubber pieces that are used to control the

6    vibration of for instance the road vibration as it is

7    transmitted to the vehicle.

8         So like Mr. Williams said before in relation to

9    electronic products, there is really no overlap between for

10   instance wire harness products and anti-vibration rubber

11   products, they may go into the same vehicles in some

12   instances just like an optical disk drive goes into a

13   computer as does a TFT LCD product.  So there are really

14   different products at issue, they are operating in different

15   markets, and I think there is going be different effects in

16   relation to the underlying conduct.  So we are dealing with

17   different conspiracies, different defendants and different

18   products, and even where there are some potential

19   commonalities downstream those are likely to impact the

20   different plaintiffs differently depending on how the

21   different underlying conduct operated.

22        There is no reason to believe that what happened in

23   wire harness is the same as may have had in relation to

24   anti-vibration rubber products.  They are different products,

25   I think ultimately there are going to be different models

1    that are at issue, and frankly we both think it benefits the

2    Court and the parties in general to have an opportunity, as

3    Mr. Kessler explained, to see a variety of different

4    products, how it may affect ultimate purchasing decisions and

5    in particular the critical issue for class certification,

6    which is one of the elements of the claim as Mr. Tubach

7    explained previously that each individual class member was,

8    in fact, impacted by the particular conduct, the particular

9    conspiracy that's alleged in that particular place.

10         So even though we have now 32, 33, 34 different

11    cases here involving different auto parts, each one is really

12    a different conspiracy, that's the way they have been alleged

13    and ultimately it will be the Court's duty in assessing class

14    certification to determine that for that particular

15    conspiracy there was impact on a wide enough basis that the

16    plaintiffs can rely on common proof to establish the basis

17    for their claims.

18         THE COURT:  Thank you.

19         MR. EVERETT:  Just briefly, we have proposed a

20    schedule that I don't think there is any dispute from the

21    plaintiffs that is practicable that the parties could meet,

22    it is inline with schedules and other complex antitrust cases

23    of this type, the only dispute is whether our case and really

24    the other cases should have to wait and see what the Court

25    rules in relation to wire harness before the Court considers

1    class certification.  We don't think that delay is warranted.

2             Thank you, Your Honor.

3             THE COURT:  Thank you.  Mr. Williams?

4             MR. WILLIAMS:  Thank you, Your Honor.

5    Steve Williams for the end payors, and I think probably for

6    auto dealers.  The directs have some different issues so they

7    are going to speak for themselves.

8             I would like to let some of the air out of

9    Mr. Kessler's arguments if I could.  Starting with just a

10   silly one, pointing at all of those people, so unless that

11   row of Cleary Gottlieb lawyers are about to help the

12   plaintiffs I think that's just kind of maybe a joke, I don't

13   know.

14            THE COURT:  What did you say, they can't help the

15   plaintiffs?

16            MR. WILLIAMS:  Well, this argument of look at all

17   of these plaintiffs' lawyers over here, well, half of that

18   gallery is defense counsel, but it is a silly point.

19            And to point a finger at us and say we are

20   inadequate because we don't agree with their proposal is a

21   silly point too because that's what it is about, we don't

22   agree with them.  It is not that we couldn't do it, it is not

23   that we don't have resources.  In fact, if you look at our

24   proposal we propose doing six cases at once, not three, six.

25   Our proposal, Your Honor, and we think given the history of

```
 1    this case it makes so much more sense and that's really what
 2    this is about, it is just a different proposal, and frankly
 3    if AVRP and bearings defendants did not think they had a
 4    tactical advantage here they wouldn't have made this
 5    proposal.
 6              Our proposal is timed from six months from your
 7    decision on the wire harness class-certification motions we
 8    would file in those other six cases.
 9              THE COURT:  Okay.  Let's look at what that schedule
10    is.  The argument in the wire harness was in mid -- maybe it
11    was May 2017?
12              MR. WILLIAMS:  I believe that is correct.
13              THE COURT:  And then I have to decide so I have to
14    give myself four or five months, I don't know, say the end of
15    2017 to be sure, and then you said six months off --
16              MR. WILLIAMS:  And then we file.
17              THE COURT:  So it would be 2018 for six parts?
18              MR. WILLIAMS:  At least six parts.
19              THE COURT:  Well --
20              MR. WILLIAMS:  Let me tell you why I think this is
21    a more realistic proposal.  First of all, as -- and I
22    hesitate to tell the Court what it thinks or what it intends,
23    but at our last hearing when pretty much the same argument
24    was made what the Court said is I'm going to do wire harness
25    first because then we will know, we will know some important
```

1     things that are going to guide how these cases go.  This is a

2     critical point that I think shows why the argument that these

3     defendants are making to you is very misleading when they say

4     these are very different cases, the defendants aren't the

5     same, the conspiracy is not the same.  For our purposes, the

6     end payors and the auto dealers, that's not the key part of

7     this case and frankly that was really the basis of

8     Mr. Tubach's and Mr. Reese's arguments about why they needed

9     more time for depositions because they need to show the

10    passthrough from the defendant to the OEM to the auto dealer

11    to the end payor.

12          So at the first level where there is a difference

13    where they conspired, where they fixed the price of the

14    bearing or the anti-vibration rubber or the wire harness,

15    that's not the relevant inquiry in determining what's the

16    best approach to class certification because those facts are

17    going to be what they are, and with all of the pleas -- if I

18    can pause to say, Mr. Kessler says not a felon, maybe not but

19    paid $400 million to the Japanese Fair Trade Commission and

20    the European Commission so they are not an innocent party

21    here, but the point of it is at the liability part I don't

22    think there is going be a huge contest for whether misconduct

23    occurred and whether it caused an overcharge from defendants

24    to the OEMs.

25          Our case, auto dealers and end payors, is about

 1   what happens after, and that work and that analysis that we

 2   present to you and defendants contest and you rule on in wire

 3   harness is going to guide all of us on the successive

 4   motions.   It is not a better use of time and resources to do

 5   three at once because those differences at the top end where

 6   the conspiracy took place from the defendants to the OEMs

 7   aren't really a pertinent part of the analysis for the end

 8   payors and the auto dealers.   The pertinent part of the

 9   analysis for the end payors and the auto dealers is can we

10   show you that the overcharge passed through the chain, and no

11   one has pointed to any reason why there is a material

12   difference depending upon the parts that would make it more

13   efficient to do three of these at once before you've even

14   ruled on the first one.   It would be wasteful, it wouldn't be

15   efficient, it is a strategy designed to gain a tactical

16   advantage to the detriment of the plaintiffs.

17           And we can talk about Rule 1, but the first word in

18   it is just so let's look at who's moving here for this

19   accelerated schedule to say let's do three motions all at

20   once before you have decided a single one.   In anti-vibration

21   rubber parts Yamashita pled guilty, Bridgestone pled guilty,

22   Toya plead guilty, there is one more defendant we talked

23   before about the fact that there is usually somebody who

24   cooperates with the government in these cases and doesn't

25   plead.

1    In bearings, JTEKT pled guilty, was fined by China

2  and the JFTC, and SK pled guilty, and they were fined by the

3  JFTC, Canada, the Europe Commission, Singapore, China and the

4  Korean Fair Trade Commission.  Schaeffler, they were fined by

5  the Europe Commission.  SKF-U.S.A., their parent -- I correct

6  that, Schaeffler and SKF-U.S.A., their parents fined by the

7  Europe Commission and NTI I talked about.

8    The reason I say that is the core of those AVRP and

9  bearing defendants' argument, the core of it, if you read the

10  papers, the sole thing holding their argument up is we the

11  defendants are being prejudiced because the schedule is not

12  fast enough for us.

13    So if you balance this and you say these are the

14  people who have all been found by governments all around the

15  world to engage in the conduct and on this side are the

16  plaintiffs who are trying to prove their claim, I don't think

17  that scale tips in favor of the people who did the bad

18  conduct to say we should give you a better schedule because

19  you're the one suffering here.  There is no due-process claim

20  supported under these facts.  And the five years is also

21  pretty misleading given we didn't proceed with discovery

22  until stays were lifted, until motions to dismiss were

23  decided, so that's just an irrelevant fact to throw out

24  there.

25    And the industrial parts, that's not an issue

Status Conference / Motion Hearings • September 9, 2015

93

1    either because that's not in the end payor auto dealers case,

2    that's only in the direct purchaser case, they plead how they

3    plead, we plead how we plead, that has nothing to do with our

4    case.

5            So the affected vehicles from the guilty pleas,

6    from discovery, from investigation, for all the parts that we

7    have gotten information because notwithstanding the bearings

8    defendants wanting to rush and move, we are ready to go, they

9    are not real forthcoming with information, is all Toyotas,

10   Hondas, Nissans, Subarus, Isuzus, Mitsubishis, it is all the

11   same Japanese cars that are in every other case.

12           So the core of where these cases overlap for the

13   end payors and the auto dealers is in Japanese vehicles that

14   are the same for bearings and AVRP that they are for every

15   other case.  The proposal being made here, it doesn't advance

16   anything except the interest of those two defendant groups

17   and it really sets for the Court a pretty dangerous precedent

18   which is to do 32 of these at one time -- seriatim I should

19   say, one after the other after the other.  And the delay we

20   are talking about I grant you it is further out than what

21   they are talking about, but what they are talking about doing

22   the three before you decide one doesn't make sense.

23           What we are proposing, while it has a longer delay

24   it then puts more cases up for resolution sooner.  We agree,

25   class certification is very important.  We disagree, I could

1    not disagree more vehemently with the suggestion made that we

2    would be happy waiting forever, we would be happy if class

3    cert never happened, that's absurd.  It is as important to us

4    as if not more than it is to the defendants.  We have all

5    known since we walked into this courtroom the first time that

6    this case is about class certification, it is not about

7    liability, they can't make it about liability, it is all

8    about class certification, and to prejudice us with this type

9    of proposal is frankly contrary to why there is an MDL, why

10    we are here, what Rule 1 says.

11         And I know the Department of Justice is going to be

12    reporting to you soon, I know they have communicated with

13    some of the defendants, that could drastically change things

14    as well depending on what they tell you about the stay.  We

15    may be in a position to present to you something that would

16    get everything on the table within a couple of years so that

17    we are not doing this in 2020, 2025.

18         So from our perspective this proposal doesn't serve

19    anyone's interests except those two groups, and to refer to

20    what Mr. Cherry said, we are talking with all the other

21    defendants, we are actually in a lot of ways in a similar

22    place with all the other defendants, so for these two groups

23    to leapfrog the heart of this case in the manner that they

24    are proposing is unfair, doesn't serve anyone's interest

25    except their own selfish interest, doesn't serve the Court's

1    interest because now you are going to do three

2    class-certification motions at one time before you have

3    decided one, it doesn't make any sense.

4            So for us we think this is simple, as simple as it

5    could be in this case.  We think the proposal that learns

6    from what you do on that first certification motion and then

7    presents as much as can reasonably be presented to you for

8    resolution at a practical early time is the best proposal.

9            I just want to lastly comment, the briefs talk a

10   lot about that language in the rule.

11           THE COURT:  About what?

12           MR. WILLIAMS:  About early practicable time, and

13   then there is a lot of discussion about in other cases they

14   did this.  Well, other cases take longer sometimes because

15   every case should have a schedule that's appropriate to serve

16   justice in that case, and all we want is a rule that

17   appropriately serves justice in this case.

18           Thank you.

19           THE COURT:  Okay.  Anything else?

20           MR. SPECTOR:  Your Honor --

21           THE COURT:  Sorry, Mr. Spector.

22           MR. SPECTOR.  It's still morning.  Good morning,

23   Your Honor.

24           THE COURT:  Good morning.

25           MR. SPECTOR:  Eugene Spector on behalf of the

1    direct purchaser plaintiffs.

2          We have all written our briefs and we have given

3    you the law and our positions, there are some things though

4    that I think need to be dealt with.  The -- and we are

5    talking about bearings because we are at this time not in the

6    AVR case so our concern is with this bearings' motion only.

7    There is a schedule that has been proposed by the bearings

8    defendants that would be quick, it would get the

9    class-certification motion presented to you shortly after the

10   wire harness class-certification motion.  We are okay with

11   doing something that says we don't have to wait until after

12   your wire harness decision if that's what you want to do.

13   Does it make sense to wait?  A great part of me says yes, a

14   great part of me says that we would get a lot of clues about

15   how our experts should be dealt with, what issues we should

16   focus on, things that would make it easier in dealing with

17   the other cases, but I think we can proceed reasonably

18   without that.  I think we can proceed with an earlier motion,

19   I can agree with Mr. Kessler for a change on one thing, that

20   we can do it that way, but not on the schedule that they have

21   proposed.

22          Would it be unusual to have a different schedule

23   for the direct purchasers and the indirect purchasers?  The

24   answer to that question is no.  That happens far more often

25   in these kinds of cases than it doesn't happen, and so the

1    fact is that we can proceed on a separate schedule if that's

2    what the Court decides.

3             THE COURT:  Okay.

4             MR. SPECTOR:  The one thing that we disagree with

5    Mr. Kessler on in his argument is when he says to you that

6    you would get a benefit from seeing two other cases as well

7    as wire harness at the same time because you could get

8    different nuances about how the class should be decided.  If

9    the cases are completely separate as they say they are, and

10   the conspiracies are completely different as they say they

11   are, and the products are completely different as they say

12   they are, I am not sure how that helps you in wire harnesses.

13   It doesn't seem to me to make sense but that's me.

14           Also in terms of the schedule that they are

15   proposing, they haven't produced any documents yet, we don't

16   have the transaction data yet, so I'm not sure how we could

17   meet the schedule that they have proposed in any event.  We

18   have proposed a schedule that modifies what they have, we are

19   very close, I think we propose having class certification --

20   let's see, we would propose that our class-certification

21   motion be filed in January of 2017, and they are talking

22   about August of 2016, but with our proposal we would say the

23   class certification hearing could be held anytime after say

24   June 30th, or June 30th on, while they are talking about

25   June 6th.

```
 1              So at the end of the day in terms of how you
 2   resolve the class certification schedule, we are less than a
 3   month apart, we are just proposing some discovery options
 4   that we think make more sense in terms of giving us the time
 5   to evaluate the documents and the transaction data they have
 6   produced and take the depositions that we are going to have
 7   to take because all of that takes time, not three or four
 8   months, which is about what they would give us from the
 9   completion of document production, but more likely 11 or
10   12 months to be able to do that.  Those are the differences
11   between us.
12              THE COURT:  Okay.
13              MR. SPECTOR:  Any other questions for me, Your
14   Honor?
15              THE COURT:  No.  I understand your position.
16              MR. SPECTOR:  Thank you.
17              THE COURT:  Okay.
18              MR. KESSLER:  Your Honor, I think the first most
19   important point is that all counsel agree we can meet this
20   schedule.  Mr. Williams made it very clear, and I'm happy to
21   hear that, he said it is not a question of whether they could
22   do it, it is just a question of whether they should do it, so
23   we have no doubt that everybody can meet this schedule.  The
24   difference is in the directs' proposal and ours are weeks on
25   internal deadlines, and I'm confident we can work that out
```

1    with the Special Master if that was the issue.  The real

2    issue for the Court is the overall framework you want for

3    these.

4             Now, on this issue Mr. Williams is not correct that

5    the only issue for the auto dealers and the end payors is

6    passthrough.  That is a very important issue but the first

7    issue in every indirect case is they must have a common

8    methodology for showing that all class members suffered an

9    overcharge, and you have to start first with a common

10   methodology for showing what the overcharge is.  Numerous

11   class actions are denied at the indirect level because that

12   first critical point which cannot be avoided must be met, and

13   the problem is since that is an essential issue for every

14   indirect case and every direct case it is going to be one of

15   the most important issues you make in this entire MDL.  So

16   the idea that you wouldn't benefit from seeing how it plays

17   out with different parts in different markets with different

18   market forces, how that works, I just don't understand it.

19   If I was the judge sitting there I would certainly want to

20   see -- let me see a few of these before I start issuing my

21   decisions, that's number one.

22            Number two, the indirects are going to have the

23   burden to show you not just that there was some passthrough

24   in general but that in a case involving bearings on measuring

25   a way to show this is how much was due to bearings, that

1     wasn't due to wire harnesses, that wasn't due to one of the

2     other 32 parts.   In other words, what the Supreme Court case

3     in Comcast makes clear, they are going to have to sort out

4     one effect from another effect because a class member in the

5     bearings could only recover the bearings overcharge, not some

6     other.

7           Now, they can't say it is all the same models

8     because it is not, some of these alleged conspiracies

9     affected some models and not others.   Some of these alleged

10    conspiracies were directed at some OEMs and not others, so

11    they are going to have to sort all of this out through some

12    common methodology, it is an enormously daunting task, but

13    the Court by looking at a few of these is going to have a

14    much better idea when they are looking at this effect well,

15    is this mixing up bearings effect on this auto dealer?  With

16    a wire harness effect, can I tell a difference -- will the

17    jury actually be able to tell the differences on a common

18    methodological basis?  The Court has to be benefited by

19    looking at a few of those at the same time.

20          So if there is no prejudice to them and if this

21    would help the Court, which I believe it will.  Their

22    proposal is you should do six at once, I don't see how doing

23    six at once after you have read that your wire harness

24    decision six months later so now a year later is going to be

25    any better for the Court than not having three around the

1    same time, we are not even saying at once, around the same

2    time, to inform those first group of decisions for the rest.

3            My last points are as follows:  This is also a

4    hedge for this MDL.  What if the wire harness defendants

5    settle?  If the wire harness defendants settle somehow

6    between now and then, and we have put this off because we are

7    going to be at some prolonged scheduled and not ready to go,

8    well, the whole MDL will be waiting because this case didn't

9    happen.  Okay.  That's number one.

10           What if you find something unique about wire

11   harnesses as the direct purchasers said they are all unique

12   so it doesn't inform you of the others, you need a few to get

13   together.  This is a hedge for the case to move forward

14   correctly.

15           And finally, Your Honor, I would say there can't be

16   any harm in allowing this.  If you allow these schedules to

17   go forward, which they said they could meet, you could decide

18   at the time of filing, you could keep considering it, get us

19   ready to file, get these three cases ready to file, okay, and

20   then you could decide six months from now do I want to have

21   all three filed around the same time but don't let --

22           THE COURT:  When will discovery be done in all of

23   these parts?

24           MR. KESSLER:  Your Honor --

25           THE COURT:  I mean, enough to be ready for class?

1        MR. KESSLER:  Your Honor, we are confident we have

2   proposed a schedule we can meet, we believe we can meet it

3   just as easily as the wire harness defendants can meet it.

4   That's another problem, what happens if the wire harness

5   schedule gets delayed some way for some reason we don't know.

6   We think we can meet in the bearings.  And it is interesting

7   they said we haven't produced everything yet, we have met

8   every deadline we proposed, we haven't hit any of the

9   deadlines we haven't met yet, we intend to hit every

10  deadline, Your Honor.

11       THE COURT:  What about the Department of Justice

12  stay, is that affecting --

13       MR. KESSLER:  It has no impact at all on bearings

14  at all anymore or anti-vibration rubber parts, we are

15  100 percent ready to go.

16       THE COURT:  Okay.

17       MR. KESSLER:  Thank you, Your Honor.

18       MR. WILLIAMS:  Your Honor, I will be brief.  A

19  couple things.

20       First, we didn't say we would meet his schedule,

21  and frankly all of the plaintiffs agree vehemently with the

22  suggestion that they are doing great in providing us data,

23  starting with the most important type of data, which is

24  transactional, it is not happening.  More importantly though

25  we alluded to the fact that as to every defendant except for

1    bearings and AVRP we are in the middle of discussions, they

2    have been fruitful, they have been comprehensive, and what

3    those discussions have been looking at is this whole MDL

4    which Your Honor is presiding over, not just serving the

5    interest of one or two groups but figuring out a plan for the

6    whole MDL, which is what all of us would benefit from having

7    a plan that leads to a resolution, and we may not ultimately

8    agree with everything the defendants propose, we may agree on

9    a lot, but what I would propose since we are in the midst of

10   those discussions, we have exchanged positions as recently as

11   Thursday and Friday of last week, is that we have an

12   opportunity, a few weeks perhaps, to bring those discussions

13   to an end and present to you whatever the results of those

14   discussions are and then you can make a decision.

15          THE COURT:  Okay.

16          MR. SPECTOR:  If I might, Your Honor, very briefly?

17          THE COURT:  All right.

18          MR. SPECTOR:  In terms of the schedule and

19   Mr. Kessler telling you that the defendants are right on

20   time, we have a separate problem.  As you may remember, we

21   had tried to amend the bearings complaint to add some

22   defendants which are generally foreign subsidiaries or

23   related companies of defendants that are already in the

24   proceeding.  They asked you to deny us that motion, which you

25   did, and said file your complaint and move forward.  Well, we

1    filed our complaint and some will accept service of those

2    complaints but we are going to have to make Hague service on

3    several of those defendants.  That's going to delay the

4    resolution of the bearings case from our standpoint.  That's

5    going to make it harder to be able to meet that class

6    certification schedule because there's going to be catch-up

7    discovery and there's going to be other defendants.  I'm not

8    sure how that affects and would affect the resolution of

9    class cert in bearings.

10             THE COURT:  Okay.

11             MR. SPECTOR:  So I just wanted to make sure that

12   the Court was aware of that.

13             MR. KESSLER:  Your Honor, if I could just address

14   that new point?

15             THE COURT:  Yes.  How will that affect class cert

16   if it was to follow your schedule?

17             MR. KESSLER:  It has no effect, Your Honor.  In

18   fact, this is the issue we argued before the Court last time,

19   and what I argued to the Court is they should not be allowed

20   at this late date to add additional defendants to the

21   existing case which would have the effect of them coming in,

22   I predicted, of saying let's slow down bearings because now

23   we have to start all over again for new defendants.  And what

24   the Court ruled is you were not going to permit that, you

25   said this was going to be a separate track.

1    So, yes, there are going to be issues of personal

2    jurisdiction and others for those foreign defendants, and

3    what the Court already ruled is they can't come in years

4    later and when they knew about these other defendants and

5    suddenly say we are now going to put a stake in the heart of

6    bearings and throw it to the back by adding companies.  So

7    this is exactly what I argued why they shouldn't be joined

8    and, Your Honor, I'm glad to say you agreed with that.  So

9    our case goes forward with the class certification.  These

10   other cases they may or may not be subject to jurisdiction.

11   Okay.  They may -- they are on a separate track, that was the

12   whole point of that.

13       And the last point, Your Honor, is one thing about

14   the point that Mr. Williams made about all of the other

15   defendants, no other defendant groups want to go on this

16   schedule, that's clear, only these three groups want to go in

17   this, so putting us into the mix doesn't work because

18   everybody else wants to go really slow, I don't know why, we

19   don't, Your Honor.  Your Honor, we have a right to do that.

20       THE COURT:  All right.  I'm ready to rule on this.

21       MR. WILLIAMS:  I just wanted to clarify.  I was not

22   suggesting they be in that mix, I know they are not in the

23   mix.  I'm just suggesting let's see what every other

24   defendant except these two has to say and then have a plan.

25       THE COURT:  Okay.  I mean, certainly the class

1    certifications are critical in this case.  I think it has

2    been recognized here that this is the decision that will have

3    greatest impact in this litigation but considering that,

4    considering that, the Court, as it said, wants to do wire

5    harness first and wire harness is -- will be first, but I

6    never implied that I was holding everything else until wire

7    harness was done.  If you knew me and I want to move things

8    along, that would never be something that I would imply.  We

9    are not going on here for ten years before we have all of our

10   class certs done.

11          So I have read with great interest, I have listened

12   to your arguments, I have given it great thought, and I am

13   happy to hear about the fact that from plaintiffs'

14   perspective that it is not an impossibility, there are just

15   other reasons why it should go with wire harness totally

16   done.

17          I like the idea of having the information from

18   other parts, I do, it is a new thing, I think it gives me a

19   different perspective.  I'm not saying I'm going to rule on

20   those other parts right away, but I would like to have the

21   information so I consider everything while I'm considering

22   wire harness, so I have proposed a schedule that's none of

23   your schedules but it is a very short schedule.

24          My schedule is as follows -- oh, and let me just

25   add another thing, I made a note here while you were arguing.

1    You're arguing some of you about what the issues are that you

2    have to determine in this class action and what comes first,

3    I think that's even more of a reason to have more than one

4    part to consider so that I will know -- at least get some

5    idea of what these issues are from all the different

6    perspectives.

7         Okay.  Wire harnesses' motion for certification to

8    be filed July 1st of 2016.  Bearings' motion for

9    certification to be filed July 29th, 2016.  Anti-vibration

10   rubber parts' motion for certification to be filed

11   August 12th, 2016.

12        The responses in wire harness are to be filed

13   November 1st, 2016, in bearings November 29th, 2016, in

14   anti-vibration rubber parts December 13th, 2016.

15        Replies in wire harness March 1st, 2017, in

16   bearings March 29th, 2017, anti-vibration rubber parts

17   April 12th, 2017.

18        The hearings, these are target dates understanding

19   that schedules could be changed depending upon in two years

20   what is going on.  May 3rd for the wire harness, I think we

21   had that date before but May 3rd, for bearings May 24th, and

22   the anti-vibration rubber parts May 31st.

23        It is a short schedule but we have got to get this

24   case moving along.  I think this will be helpful to the

25   Court, and I hope to be able to follow it.  I will enter an

1   order to this effect which will be on the docket.

2           Okay.  With that we have some other motions but I

3   would like to take a short break.  Can we take ten minutes

4   and then we'll resume?  Thank you.

5           THE LAW CLERK:  All rise.  Court is in recess.

6           (Court recessed at 12:13 p.m.)

7                          —  —  —

8           (Court reconvened at 12:28 p.m.; Court and Counsel

9           present.)

10          THE LAW CLERK:  All rise.  Court is back in

11  session.  You may be seated.

12          THE COURT:  The next item on the agenda is the fuel

13  injection motion.

14          MR. BAIRD:  Yes, Your Honor.

15          THE COURT:  Let me just pull it out here.  Now, I

16  know a lot of yours is sealed so if you want it sealed on the

17  record you will have to say so or don't mention if you don't

18  want it --

19          MR. BAIRD:  Well, Your Honor, I think it will need

20  to be, I need to mention some specifics.

21          THE COURT:  Okay.  So you tell us when that is

22  so --

23          MR. BAIRD:  Yes, Your Honor, and I will be glad if

24  I miss something to correspond with the reporter afterwards.

25          THE COURT:  Okay.

1        MR. BAIRD:  Bruce Baird for Keihin Corporation, and

2  appearing on Keihin's motion to dismiss the end payor's

3  complaint only, that's the only complaint that has been

4  served on Keihin.

5        I should tell you, Your Honor, to start with I saw

6  a copy of your redacted opinion in the Keihin North America

7  case last evening.  I have not had a chance to look at the

8  unredacted copy, it was too late for us to get a copy,

9  although I now have it, I got it during the break.

10       I want to start by focusing on the two factual

11  allegations, the only two factual allegations in the

12  complaint against Keihin.

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3     a global conspiracy the plaintiffs allege or any aspect of

4     that conspiracy.

5

6

7

8

9

10

11

12

13

14

15          Every other allegation in the complaint involving

16    Keihin is boilerplate alleged as to all defendants.

17                                             And as you

18    know, Your Honor, in return for being subject only to single

19    rather than treble damages, the amnesty applicant in this

20    case is required to talk to the plaintiffs.  If there was

21    more to say about Keihin you would have seen it in the

22    complaint.

23

24

25          Now, Your Honor is familiar with multiple

1    conspiracy law, I know Your Honor has written on it, these

2    two allegations might well support at this early stage a

3    conspiracy                                          We think

4    we have defenses but I'm talking about the allegations.  What

5    they do not suggest in any way is some global conspiracy with

6    an overall plan and a common design to cheat automobile

7    manufacturers all over the world.

8

9          So it is a classic multiple conspiracy situation.

10   It is not that there is nothing that would support a

11   conspiracy allegation, it is that there is nothing in these

12   allegations, nothing at all that supports the big global

13   conspiracy.  If Keihin's involved in the conspiracy it is a

14   different one from the one alleged by the plaintiffs.

15         And so let's go away from the narrow specifics now

16   to ask what else is there in the complaint against Keihin

17   from which Your Honor could infer that Keihin is or is not

18   part of the big global conspiracy with an overall plan and

19   common design that plaintiffs allege?  There are plenty of

20   boilerplate allegations that allege everyone talked to

21   everyone and agreed with everyone to cheat everyone.  Your

22   Honor knows that none of that can be considered on a motion

23   to dismiss.

24         Against most defendants you have a continuing

25   Department of Justice investigation but as Your Honor knows

```
 1   from the KNA motion, the Department of Justice has closed its
 2   investigation of Keihin so that's not going to support any
 3   inference, and I noted in your KNA opinion Your Honor did not
 4   use that investigation as supporting the inference.
 5        So now what about guilty pleas?  We have had talk
 6   about guilty pleas this morning, there are lots of guilty
 7   pleas here, plenty of guilty pleas.  They certainly and
 8   rightly suggest to the Court that there's something going on
 9   here, but the plaintiffs still have to tie them to individual
10   defendants.  None of these pleas relate to events involving
11   Keihin in any way.  The argument can't be made that because
12   defendant A pleaded guilty to a crime on facts not alleged to
13   involve defendant B that an inference can be drawn that
14   defendant B is part of similar criminal activity.  That's
15   just not a logical inference.  It doesn't matter if
16   defendant B is in the same industry, it doesn't matter if
17   defendant B committed some other crime even with a convicted
18   criminal, the question is whether they were involved in that
19   crime and the crime that's charged or alleged here.
20        As Your Honor knows, no court would allow a jury to
21   draw any inference whatsoever from a -- against defendant B
22   from defendant A's plea to a crime on facts not involving
23   defendant B, and that would be routine in a criminal case,
24   and I submit, Your Honor, the same reasoning ought to apply
25   here as to whether an inference can be drawn against Keihin
```

1   from other people's guilty pleas that have nothing to do with

2   Keihin.  As Your Honor knows, no plea, no charge,

3   investigation closed, Keihin is not involved in any criminal

4   matter here.

5        So how about market conditions?  Can they support

6   an inference that Keihin is part of a global conspiracy?

7   Together with other allegations market conditions can be used

8   and Your Honor has used them in that way, but standing alone

9   clearly one can't say that because conditions are ripe for a

10  conspiracy and others are involved in a conspiracy that any

11  other company in that same market can be inferred to be part

12  of the conspiracy.

13       THE COURT:  But inferences are much more common and

14  allowed procedurally in a civil case versus a criminal case.

15       MR. BAIRD:  Yes, Your Honor, I agree with that, but

16  I'm talking about here the logical -- it isn't even possible

17  in logic to say that because conditions are ripe and others

18  are involved that necessarily that means I can draw an

19  inference that someone else is involved in that same big

20  conspiracy where there are no specific allegations, nothing

21  tying -- nothing other than these narrow points perhaps tying

22  the company to a narrower conspiracy, but there is nothing

23  tying to the big conspiracy, and to look at market conditions

24  and say well, conditions are ripe, there's nothing else, it's

25  not narrow, nothing else that's not -- doesn't look like a

1    narrower conspiracy but I'm going to say market conditions

2    alone are enough, I submit that would not be logical, Your

3    Honor.  It is not -- it is the conditions, yes, but you need

4    something else, you need something specific, something

5    criminal, if you will, something that suggests illicit

6    activity, not just the fact that conditions are ripe for it.

7         But in addition -- I want to make more than the

8    general point on market conditions.  In addition to the

9    logical point, Keihin is differently situated with respect to

10   this market; it is not a member of the same market because

11                                      And it -- the fact

12   that market conditions in general are ripe for a conspiracy

13   does not mean that Keihin,                    , is part of

14   this overall scheme, common design involving allegedly all

15   the automakers, so it is just not in the same market.

16        Let's think about that one customer logically.  The

17   actual inference I submit to Your Honor --

18        THE COURT:  Is it connected to        though in the

19   fuel injections?

20        MR. BAIRD:  Well, the two allegations

21        and       has pled guilty

22               , but there is no connection -- I mean, there

23   is a connection -- Your Honor could absolutely draw a

24   connection            in the narrow, in the two-allegation

25                                        .  If that

```
1    were the allegation I would not be standing here.  That
2    conspiracy survives a motion to dismiss.  We have substantive
3    defenses, we don't think it is there, but it survives a
4    motion to dismiss for sure, but that's not what we are
5    talking about.
6            We are talking about this global -- all the -- I
7    mean, if Your Honor reads -- Your Honor has certainly read
8    the complaint, all the automakers, everyone has discussed
9    together, everyone has dealt with each other, everyone is
10   dealing, and here is Keihin with                , the only
11   company that can say that before Your Honor,
12           , not really in the same market because
13              .  Yes, they dealt with      and, yes,
14                    but that doesn't mean Keihin is
15   involved in everything.  Did     tell them about everything
16   and make them part of it in some way?  We have no allegation
17   of that, not a whisper about that.  The fact that       pled
18   guilty to                  I submit can't be used against
19   Keihin.  That is really that allegation, you know, in the
20   criminal case would you let a jury infer from         guilty
21   plea in another case that Keihin must be guilty in the case
22   before Your Honor.
23           And look at the logic of it, why join an
24   industry-wide conspiracy if you have only one customer?
25   There is no motive to do it.  There are no other customers to
```

1    gain.  They have nothing to do with the broad -- not to say

2    they couldn't join the narrow conspiracy

3        , but there is no one else to conspire with respect to

4    for Keihin.

5            The natural inference, I submit, is that Keihin

6    would not be involved in a broad conspiracy, forget about

7        conspiracy, the broad conspiracy, and that's consistent

8    with the only factual allegation made against Keihin of

9                                        .

10            So now what do plaintiffs say?  They claim, first

11   of all, that Keihin is arguing the Copperweld Doctrine which

12   requires over 50 percent ownership to apply, and Your Honor

13   dealt with that doctrine in the KNA opinion, I'm not arguing

14   that, we have never been arguing that in this motion.  We

15   made -- we are making the point as to Keihin that between the

16   41 percent ownership which, of course, is very substantial

17   but not control, and the one customer, that the natural

18   inference is Keihin was not part of a broad

19   multi-manufacturer conspiracy rather than that they are part

20   of that.

21            The plaintiffs also say one customer is enough, and

22   they cite opinions to this Court that don't say that.  The

23   opinions concerning whether enough detail has been pled,

24   whether small players as well as big players could be

25   involved and, of course, those are totally different issues.

1    Your Honor can correct me, but I believe no company in this

2    or any other auto parts case can -- in any such -- in any

3    other case can plaintiffs factually allege that

4

5                                                           , owns

6    41 percent.

7            THE COURT:  Would a conspiracy -- could a

8    conspiracy exist in this market relative to only one OEM

9    involving this?

10           MR. BAIRD:  Sure, absolutely, Your Honor.  It could

11   be -- if they -- as I say, if they allege a conspiracy

12                                                         ,

13   well, that's a conspiracy and they could allege that and that

14   would be on the allegations in their complaint against Keihin

15   that would survive.  That's a different -- that's not the

16   conspiracy they alleged.  We invite them after Your Honor

17   dismisses without prejudice to come back and allege that

18   conspiracy and we will defend that conspiracy, but as Your

19   Honor knows, for Keihin to be involved in this huge case is a

20   huge burden for a small company, and if they should be well,

21   that's fine, they should be, just because they are a smaller

22   player doesn't mean they can't be involved, but because

23                            it is not logical that they are

24   involved, it is not logical that they would be involved, that

25   they would care beyond       .

 1          Plaintiffs also refer to the boilerplate

 2    allegations and they refer to                    , and

 3    we have already discussed that.  I submit that between the

 4    strength of the inference from                       that

 5    they are not part of the broad conspiracy and the weakness of

 6    the contrary inference that Keihin is part of something

 7    broader than just            , plaintiffs' global

 8    conspiracy complaint against Keihin should be dismissed.

 9          That's really my argument on that, Your Honor.  I

10    have one other point to mention very briefly.  We make a

11    jurisdictional argument, and on this, Your Honor, Your Honor

12    will have to do all the work for plaintiffs if this motion is

13    denied because they have made absolutely no jurisdictional

14    allegations as to Keihin that are factual in nature.  I don't

15    know whether they could or not, but they haven't.  They

16    haven't even tried to do more than just boilerplate

17    applicable to everybody, and that's enough I submit Your

18    Honor should not stand for that and should dismiss with leave

19    to amend on that ground.

20          THE COURT:  Okay.  Thank you.

21          MR. BAIRD:  Thank you, Your Honor.

22          THE COURT:  Response?

23          MR. OCHOA:  Good afternoon, Your Honor.  Omar Ochoa

24    on behalf of the end payors.

25          Your Honor, Keihin's arguments presented today in

```
 1    its motion to dismiss are substantially similar to the
 2    arguments previously presented by its U.S. subsidiary
 3    Keihin North America, and yesterday the Court denied in its
 4    entirety KNA's motion to dismiss.  I know counsel mentioned
 5    that he did not have a chance to review that in full before
 6    the argument today, but EPPs are prepared to fully argue the
 7    merits of Keihin's motion to dismiss but we don't believe we
 8    need to do that because yesterday's decision essentially
 9    controls almost all of the issues before the Court in
10    Keihin's motion to dismiss with the exception of the
11    jurisdictional argument, so if Your Honor has questions about
12    the overlapping issues --
13            THE COURT:  No, but the jurisdiction you can
14    address.
15            MR. OCHOA:  Yes, I'm happy to address the
16    overlapping issues if Your Honor would like but otherwise we
17    don't want to take up the Court's time unnecessarily, we
18    simply ask that the Court apply its opinion for denying
19    Keihin North America's motion to dismiss and similarly deny
20    Keihin Corporation's motion to dismiss where the arguments
21    overlap.
22            THE COURT:  Okay.
23            MR. OCHOA:  So as I mentioned, the only portion of
24    Keihin Corporation's motion not addressed by yesterday's
25    ruling is the jurisdictional argument, but even that
```

1    argument, Your Honor, is controlled by another previous

2    ruling and that is this Court's order denying Denso Korea's

3    motion to dismiss the EPPs' complaints for several parts

4    including this part at issue, fuel injection systems.  There

5    is no West Law citation but the court's citation is

6    Case No. 13-cv-903, docket number 89.

7            The Court issued this opinion denying Denso Korea's

8    motion to dismiss after the EPPs submitted their response to

9    Keihin's motion to dismiss so we didn't have a chance in our

10   brief to discuss it, but that opinion controls Keihin's

11   jurisdictional argument as well because the situation is

12   identical.  There, just as here, the main point of contention

13   regarding jurisdiction is that the purposeful availment prong

14   of specific jurisdiction is not met.  Denso Korea did not,

15   however, submit an affidavit in support of its motion to

16   dismiss, and so the Court determined that this failure to not

17   submit an affidavit, quote -- meant that, quote, no evidence

18   contradicted to EPPs' allegations supporting jurisdiction.

19   As a result, the court focused exclusively on the EPPs'

20   jurisdictional allegations and determined that they were

21   sufficient.

22           Similarly here, Keihin did not submit an affidavit

23   in support of its motion to dismiss so there are no -- there

24   is no evidence contradicting the EPPs' allegations supporting

25   jurisdiction.  And the -- those allegations are -- those

1    allegations against Keihin are identical to those that were

2    alleged against Denso Korea, which this Court already upheld

3    to be sufficient to extend jurisdiction, mainly the specific

4    allegation that this Court has personal jurisdiction over

5    Keihin, that Keihin transacted business in the United States

6    by directly selling fuel injection systems into the

7    United States, and therefore purposefully availing itself to

8    the forum, and that Keihin directed its price-fixing

9    conspiracy at the United States.

10           So all of these allegations are in EPPs' complaint

11   against Keihin, they are not controverted because Keihin did

12   not submit an affidavit in support of its motion to dismiss,

13   and just as the result was in Denso Korea those allegations

14   were sufficient, they are sufficient here on their own to

15   establish jurisdiction over Keihin.  Again, Your Honor, EPPs

16   can argue more fully the merits of Keihin's jurisdictional

17   arguments and some of the points raised by counsel if Your

18   Honor would like but, again, we don't want to unnecessarily

19   take up the Court's time because we think the ruling denying

20   Denso Korea's motion to dismiss controls a decision here as

21   well.

22           THE COURT:  Okay.  Thank you.

23           MR. OCHOA:  Thank you, Your Honor.

24           THE COURT:  Reply?

25           MR. BAIRD:  Your Honor, obviously plaintiffs would

1    like Your Honor to rule the same way on both of these

2    motions, they are different however.  In the KNA motion there

3    were two parts of Your Honor's opinion -- well, three parts,

4    one we are not challenging and I have not argued today, which

5    is the joint-venture point.  The other two that I have not

6    dealt with because they are different points here today, one

7    was the Coppperweld argument and Your Honor dealt with that,

8    analyzed Copperweld and decided against KNA on that point but

9    that's not Keihin is arguing.

10         Your Honor also dealt with the closed-investigation

11   point, and we are not arguing about the closed investigation,

12   I think Your Honor actually adopted our position that the

13   closed investigation was not part of Your Honor's analysis on

14   what tied KNA to the larger conspiracy.

15         We are arguing two different points here and they

16   are two points that plaintiffs haven't addressed and I don't

17   think can address effectively and obviously don't want to

18   address.  One is that the inference -- the inference from one

19   customer is key, it shows they are in a different market, it

20   shows that they are not part of the same conspiracy, and then

21   in addition -- the multiple conspiracy argument, that's the

22   word I was looking for, was not argued in that way in the KNA

23   motion.  There is a conspiracy here, I dealt with that

24   explicitly today, we didn't deal with it in the same way in

25   the KNA motion.  It is a conspiracy Your Honor might well

1    find between Denso and Keihin but that's not the conspiracy

2    that's charged, and the question is what else can they find,

3    and all that they found are market conditions, guilty pleas

4    and boilerplate.  And, Your Honor, I submit we have dealt

5    with both the market-condition point based on the one

6    customer and the guilty-plea point based on the fact that

7    Keihin has no such guilty pleas that it is part of or

8    referred to in or can be -- or that anything can be inferred

9    against Keihin from.

10          THE COURT:  Okay.

11          MR. BAIRD:  Thank you, Your Honor.

12          THE COURT:  Okay.  Thank you.  The Court will issue

13   an opinion.

14          The next issues have to do with the settlements, I

15   believe, wire harness, and Fujikura is first.

16          MR. SELTZER:  That's correct, Your Honor.

17   Mark Seltzer for the end payor plaintiffs.

18          Your Honor, we are not going to be proceeding with

19   the motion for preliminary approval today with respect to

20   Fujikura.  An issue has been raised regarding the settlement.

21   The parties are involved in discussions to see if it can be

22   resolved.  If it can't be, then we plan to ask the Court to

23   hear the matter and set up a procedure to see if it can't be

24   resolved, but we are not prepared to proceed today.

25          THE COURT:  Okay.  We will hold that one then.

1    Then we have auto dealers' motion for settlement.

2         MR. RAITER:  Yes, Your Honor.  On Fujikura the auto

3    dealers have submitted the preliminary approval papers for

4    the Fujikura settlement.  We did not request a hearing, that

5    is ready for your ruling without a hearing unless you wish to

6    hear from us.

7         THE COURT:  No, you didn't request a hearing on

8    this.  The Court reviewed your papers, and I think that you

9    have hit absolutely everything in the settlement that is

10   necessary under the rules, and the Court does approve that

11   adopting what you have said in your motion.

12        MR. RAITER:  Thank you, Your Honor.

13        THE COURT:  Now, we have an add-on though, this is

14   the proposed order permitting Fujikura defendants to withdraw

15   from the deposition protocol.  Can we address that?

16        MR. RUBEN:  Mike Ruben, of Arnold & Porter, for

17   Fujikura.

18        Your Honor, pursuant to the settlement agreements

19   with both the auto dealers and the end payors, I think it is

20   paragraph 39, it simply provides that within five days the

21   parties will mutually withdraw from any pending motions.

22   This order that we submitted to Your Honor has been approved

23   by both the auto dealers and the end payors.  It simply

24   effectuates --

25        THE COURT:  The end payors now aren't out because

1    they have withdrawn that?

2         MR. RUBIN:  Right, they can certainly speak for

3    themselves as to this piece, I don't think -- the settlement

4    agreement is still signed so I'm not sure where that stands,

5    whether they agree on this withdraw issue or not.  The

6    purpose of it, Your Honor, was simply -- I think the only

7    pending motion was the one you already heard today and has

8    already ruled upon, it was just a formality to take our name

9    off of the papers so we are complying with the settlement

10   agreement.  It is modelled on what you signed in I believe

11   the AutoLiv case that had a similar provision.

12        MR. SELTZER:  And, Your Honor, for the end payors,

13   Mark Seltzer.

14        We would suggest that the status quo just be

15   maintained for the next five days or so and we will see if we

16   can resolve this issue, and if we can't we will advise the

17   Court.

18        MR. RUBIN:  Honestly, Your Honor, given that you

19   have ruled on the motion it is essentially a moot order so I

20   don't know even with the status quo you would have to do

21   anything further on this document.

22        THE COURT:  So I don't even need to enter this

23   order?

24        MR. RUBIN:  Assuming the auto dealers and end

25   payors agree with that, I think that's probably right.

Status Conference / Motion Hearings • September 9, 2015

```
 1              MR. SELTZER:  I think that's right, Your Honor.

 2              THE COURT:  So I'm going to moot this order.

 3              And on the preliminary approval order -- wait a

 4    minute -- that we just talked about.

 5              MR. SELTZER:  The preliminary order in auto

 6    dealers, Your Honor?

 7              THE COURT:  Yes.

 8              MR. SELTZER:  Yes.

 9              THE COURT:  Do you have the order, one was

10    submitted but I don't --

11              MR. RAITER:  I don't have a hard copy with me but

12    we will get one to you.

13              THE COURT:  You will present the order then.

14              MR. RAITER:  We did submit one but we will submit

15    another --

16              THE COURT:  Yes, I thought there was but I don't

17    have it here.  You will present another one so that we have

18    it.

19              I think I made clear for the record I haven't gone

20    through all of the Rule 23 things but I'm adopting it as you

21    stated in your motion, and your order laid it out all very

22    clearly.

23              MR. RAITER:  Thank you, Your Honor.

24              THE COURT:  Okay.  Let me just see what we have

25    here.  These are the radiator end payor plaintiffs?
```

1          MS. TRAN:  Radiators and ATF warmers.

2          THE COURT:  And ATF warmers, yes.  May I have your

3     appearance, please?

4          MS. TRAN:  Elizabeth Tran for the end payor

5     plaintiffs.

6          As you are aware, we are seeking preliminary

7     approval of our settlement with the T. Rad defendants.  We

8     have alleged claims against them in two cases, radiators and

9     ATF warmers.  The settlement of $7.41 million is fair,

10    adequate and reasonable for a variety of reasons.  The

11    settlement offers significant compensation to the settlement

12    classes that will be available much earlier than if this case

13    had gone to -- continued through trial and appeal.  We are

14    going to allocate 6.7 to radiators and about 700,000 to

15    ATF warmers, and that's based on affected sales.

16          The settlement arises from extensive arm's-length

17    good-faith negotiations between experienced counsel over a

18    period of several months.  The settlement comes pretty early

19    in this litigation.  It is the first settlement in both

20    ATF warmers and radiators.  The settlement calls for

21    significant cooperation from T. Rad in the continued

22    prosecution of end payors' claims.  It calls for attorney

23    proffers, witness interviews, depositions, relevant

24    documents, transactional data.  The settlement further

25    enjoins T. Rad for 24 months from per se violations of the

1    Sherman Act with respect to the sale of radiators and ATF

2    warmers.

3            End payors are also seeking provisional

4    settlement -- provisional approval of the proposed settlement

5    classes per Rule 23.  Provisional certification is warranted

6    here as it is in the other settlements before -- that have

7    come before this Court because the settlement classes are so

8    numerous, that joinder is impractical, the claims presented

9    here involve common issues and are typical of the respective

10   settlement classes.  End payors and the settlement class

11   counsel will fairly and adequately represent the settlement

12   classes because our interests are aligned and common issues

13   predominate over any individual issues.  Settling these cases

14   on a class basis is simply superior to other means of

15   resolution.

16           Finally end payors request that the Court stay the

17   proceedings against T. Rad in accordance with the settlement.

18   We ask the Court authorize end payors to provide notice of

19   the settlement agreement to the class members at a later

20   date, and we also ask that the Court appoint interim co-lead

21   class counsel as the settlement class counsel for this

22   settlement.  Thank you.

23           THE COURT:  Okay.  The Court has reviewed the

24   pleadings that you submitted here and certainly the Court is

25   aware the governing standard is contained in Rule 23(e) which

 1   requires this Court to determine that the settlement is fair,

 2   reasonable and adequate, and the Court looks at the proposed

 3   classes also in proving this, and based on the information

 4   that has been presented as well as the briefs relating to

 5   these component parts, the Court finds the proposed

 6   settlement does deserve preliminary approval.

 7        Certainly we know that federal policy favors

 8   settlement.  The factors here favoring the settlement, one is

 9   the amount of money which settlement is which you put on, I

10   think the total was $7.4 million, right, between the two

11   parts.  Considering the expense, duration and uncertainty of

12   this litigation the Court finds that it is fair, there are

13   complex issues here, foreign parties, so there is great risk.

14   Also the Court notes that this was negotiated at arm's-length

15   by experienced counsel and therefore the Court finds that it

16   is fair.

17        The proposed settlement classes should be

18   provisionally certified under Rule 23.  There certainly is

19   numerosity, commonality, typicality and adequacy of

20   representation.  There is a common question that predominates

21   in this antitrust action, and the Court finds that the class

22   resolution is a superior method to handle this matter.

23        The Court will therefore approve the --

24   preliminarily approve the proposed settlement and certify

25   provisionally the settlement classes as outlined in the

 1    briefs, and the Court will appoint the class counsel for the

 2    settlement class as requested.

 3          There was also I thought part of it a motion to

 4    stay the proceedings against T. Rad; is that correct?

 5          MS. TRAN:  That's correct.

 6          THE COURT:  Yes, in accordance with the terms of

 7    the settlement agreement, and the Court will authorize the

 8    settlement class counsel to defer notice to a later date.

 9    Okay.  I will sign an order to that effect if you will

10    present it.

11          There is an add-on which is the motion -- the

12    end payor's motion for authorization to disseminate notice to

13    the end payor plaintiffs settlement class and appoint notice

14    of the settlement claims administrator.  Is anybody

15    addressing that one?

16          MR. SELTZER:  Your Honor, Mark Selzter, again, for

17    the end payors.

18          We have submitted the motion which covers two of

19    the settling defendants.  We are prepared to have the Court

20    act on the proposed notice, but in light of the issue that I

21    have referred to with Fujikura and certain of the other

22    defendants we would like to see if we could work out whatever

23    the problems or differences are between us before actually

24    proceeding at this time with a notice, we would be on a very

25    short fuse, and then let the Court know whether we should

1    proceed with the notice as filed or perhaps as modified.

2    Thank you, Your Honor.

3            THE COURT:  Okay.  Thank you.

4            MR. RAITER:  Your Honor, Shawn Raiter on behalf of

5    the auto dealers.

6            On the agenda you have T. Rad for preliminary

7    approval of settlements between the auto dealers and T. Rad.

8    You have already preliminarily approved that on the papers --

9            THE COURT:  Yes.

10           MR. RAITER:  -- so that need not be addressed

11   today.

12           The auto dealers also have submitted to you for

13   consideration on the papers our motion for leave to

14   disseminate notice, and we would request that we proceed with

15   that motion at this time, not to argue it but we are not

16   taking it down as the end payors are.

17           THE COURT:  Okay.

18           MR. RAITER:  Thank you.

19           THE COURT:  The Court has reviewed the motion by

20   the auto dealer plaintiffs -- now, this involves 11 parts?

21           MR. RAITER:  It involves all of the settlements for

22   which you have granted preliminary approval to date including

23   the Fujikura settlement that you just granted.

24           THE COURT:  Okay.

25           MR. RAITER:  So that would be all of the

1   settlements that we have put before the Court as of this

2   time.

3          THE COURT:  All right.  And I believe you said the

4   defendants agreed or there was no objection?

5          MR. RAITER:  We -- they consented to the language

6   of the notice, yes, we --

7          THE COURT:  The notice needs dates though.

8          MR. RAITER:  The notice has dates -- it should have

9   dates in it, the one that was presented to you.

10          THE COURT:  The one I have has the blank dates.

11          MR. RAITER:  We had talked with your clerk and

12   scheduled the final fairness for November 18th.

13          THE COURT:  Okay.

14          MR. RAITER:  We are right up on needing to get the

15   notice out if we are going to hold that date, we certainly

16   would like to, but it should be ready for your consideration.

17          THE COURT:  Okay.

18          MR. RAITER:  Thank you.

19          THE COURT:  The Court will sign that order.  All

20   right.  On the end payors we are holding it until when --

21   when are we holding it to?

22          MR. SELTZER:  Your Honor, I think we should know

23   whether we can resolve these issues over the next week or so,

24   and then we will advise the Court if it is resolved or if we

25   should proceed with the notice as presently filed with the

1    Court.  Thank you, Your Honor.

2              THE COURT:  Okay.  Thank you.

3              MR. IWREY:  Your Honor --

4              THE COURT:  Yes, Mr. Iwrey, come on forward.

5              MR. IWREY:  This is Howard Iwrey on behalf of

6    ZF TRW defendants.

7              With respect to Mr. Raiter's motion to disseminate

8    notice, we did consent to the language in the notice.  We

9    have also filed a motion to stay proceedings in the Rush case

10   which may have an impact depending on how it is resolved, but

11   the end payors and ZF TRW are discussing that.

12             MR. RAITER:  Auto dealers?

13             MR. IWREY:  Auto dealers, excuse me.

14             MR. RAITER:  Correct.  So we have -- the plan would

15   be right now we would proceed with our notice plan and the

16   notice because the language of the notice was agreed upon.

17   Depending on the outcome of this Rush Truck's motion, there

18   may be some reason to come back to the Court about

19   supplemental notice recipients, we don't agree that it is

20   necessary to at this time --

21             THE COURT:  Recipients, not notice?

22             MR. RAITER:  Correct.

23             MR. IWREY:  That's correct.

24             THE COURT:  Okay.

25             MR. RAITER:  In other words, we would have to

1    potentially come to the Court to discuss supplementing the

2    notice plan, not the notice itself.

3              THE COURT:  Okay.

4              MR. IWREY:  And we did not want to delay at least

5    the first wave of notice.

6              THE COURT:  Okay.  So it is just a matter of there

7    may be more people who are going get it --

8              MR. IWREY:  That's correct.

9              THE COURT:  Okay.

10             MR. RAITER:  Yes.

11             THE COURT:  Got it.  Thank you.  Anything else?

12   Anybody else?

13             (No response.)

14             THE COURT:  No.  We are done.  All right.  Thank

15   you.  Good luck to all of you.

16             THE LAW CLERK:  All rise.  Court is in recess.

17             (Proceedings concluded at 1:06 p.m.)

18                          _   _   _

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4     the United States District Court, Eastern District of

 5     Michigan, appointed pursuant to the provisions of Title 28,

 6     United States Code, Section 753, do hereby certify that the

 7     foregoing pages comprise a full, true and correct transcript

 8     taken in the matter of In re:  Automotive Parts Antitrust

 9     Litigation, Case No. 12-02311, on September 9, 2015.

10

11

12                          s/Robert L. Smith
                            Robert L. Smith, RPR, CSR 5098
13                          Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15

16

17     Date:  09/17/2015

18     Detroit, Michigan

19

20

21

22

23

24

25
```