```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3                      —   —   —

 4   In Re:  AUTOMOTIVE PARTS         Master File 12-md-02311
     ANTITRUST LITIGATION
 5   _____   Hon. Marianne O. Battani

 6   In Re:  Wire Harnesses

 7   _____

     THIS TRANSCRIPT RELATES TO:
 8                                      Case No. 14-cv-14451
     All Truck and Equipment Dealer
 9   Actions

10   _____/

11                   MOTION HEARING

12        BEFORE THE HONORABLE MARIANNE O. BATTANI
                United States District Judge
13        Theodore Levin United States Courthouse
                231 West Lafayette Boulevard
14                   Detroit, Michigan
                Tuesday, October 6, 2015
15
     APPEARANCES:
16
     For the Plaintiff:    J. MANLY PARKS
17                         DUANE MORRIS, L.L.P.
                           30 South 17th Street
18                         Philadelphia, PA  19103
                           (215) 979-1342
19
                           ANDREW R. SPERL
20                         DUANE MORRIS, L.L.P.
                           30 South 17th Street
21                         Philadelphia, PA  19103
                           (215) 979-7385
22

23

24
           To obtain a copy of this official transcript, contact:
25             Robert L. Smith, Official Court Reporter
                (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   Appearances:  (Continued)

 2    For the Defendants:   JOHN M. MAJORAS
                            JONES DAY
 3                          51 Louisiana Avenue NW
                            Washington, D.C.  20001
 4                          (202) 879-3939

 5                          MICHELLE K. FISCHER
                            JONES DAY
 6                          51 Louisiana Avenue NW
                            Washington, D.C.  20001
 7                          (202) 879-4645

 8                          TIFFANY LIPSCOMB-JACKSON
                            JONES DAY
 9                          51 Louisiana Avenue NW
                            Washington, D.C.  20001
10                          (202) 879-4645

11                          CHARLES SKLARSKY
                            JENNER & BLOCK
12                          353 N. Clark Street
                            Chicago, IL 60654-3456
13                          (312) 923-2904

14                          MICHAEL RUBIN
                            ARNOLD & PORTER, L.L.P.
15                          555 Twelfth Street NW
                            Washington, D.C.  20004
16                          (202) 942-5094

17
      Also Present:         DANIEL T. FENSKE
18                          STEVEN F. CHERRY
                            MICHAEL F. TUBACH
19                          HOWARD B. IWREY
                            JOANNE GEHA SWANSON
20                          SHELDON H. KLEIN

21

22

23

24

25
```

# TABLE OF CONTENTS

Page

MOTION TO DISMISS FIRST AMENDED COMPLAINT

Motion by Mr. Majoras............................... 6
Response by Mr. Parkes.............................19
Reply by Mr. Majoras...............................34

MOTION TO DISMISS TRUCK AND EQUIPMENT DEALERSHIP'S
FIRST AMENDED CLASS ACTION COMPLAINT

Motion by Mr. Sklarsky.............................38
Response by Mr. Parkes.............................41
Reply by Mr. Sklarsky..............................43

MOTION TO DISMISS TRUCK AND EQUIPMENT DEALERSHIP'S
FIRST AMENDED CLASS ACTION COMPLAINT

Motion by Mr. Rubin................................45
Response by Mr. Parkes.............................51
Reply by Mr. Rubin.................................51

MOTION TO DISMISS TRUCK AND EQUIPMENT DEALERSHIP'S
FIRST AMENDED CLASS ACTION COMPLAINT FOR LACK OF
PERSONAL JURISDICTION

Motion by Mr. Rubin................................53
Response by Mr. Parkes.............................58
Reply by Mr. Rubin.................................61

1    Detroit, Michigan

2    Tuesday, October 6, 2015

3    at about 2:10 p.m.

4                    —   —   —

5            (Court and Counsel present.)

6            THE LAW CLERK:  Please rise.

7            The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable

9    Marianne O. Battani presiding.

10           You may be seated.

11           THE COURT:  Good afternoon.  It's kind of strange

12   to see so few of you here.  Okay.  Let's start -- for no

13   other reason than I have them in this order, I'm going to

14   start with the collective motion, defendants' motion, so who

15   is going to argue that?

16           MR. MAJORAS:  Good afternoon, Your Honor.

17   John Majoras from the Jones Day firm on behalf of the Yazaki

18   defendants, and for purposes of this motion on behalf of the

19   wire harness defendants.

20           Before I begin, may I approach, Your Honor, just to

21   hand up a few slides that I will be referring to?

22           THE COURT:  Certainly.

23           MR. MAJORAS:  Your Honor, as a fair point, I

24   noticed as the Court personnel were walking in with their

25   large set of binders it seems to be a fair question about if

 1     we can boil this down into 12 or 13 slides why we couldn't

 2     have done that in the briefing, and it is actually --

 3               THE COURT:  Yes, before I read it, that would have

 4     been nice.

 5               MR. MAJORAS:  It actually goes directly to the

 6     merits of the argument on the statute of limitations, Your

 7     Honor.  Fundamentally this is a straightforward statute of

 8     limitations issue.  The 6th Circuit law is very clear on the

 9     requirements for when the statute of limitations begin to

10     run, the standard is straightforward.  There is actually very

11     little debate as to the amount of publicity and information

12     that was in the public arena going back into the

13     February 2010 time frame.  And the only reason I think that

14     we have such an interesting issue, if you will, about statute

15     of limitations really goes down to the fact that the

16     plaintiffs, after they had filed their initial complaint, and

17     after we had responded with a motion to dismiss on the

18     statute of limitations, realized the one event they point to

19     as triggering the statute of limitations and giving them

20     notice put them outside of the limitation period for a number

21     of their state claims.  So at issue in this case are the

22     three-year statute of limitations and four-year statute of

23     limitations.

24               THE COURT:  Okay.  Mr. Majoras, before you go on,

25     it just occurs to me, I'm sorry, I didn't get the appearances

1    of the other attorneys.  Just for the record I would like to

2    have that clear.  Okay.

3            MS. FISCHER:  Michelle Fischer, Your Honor, from

4    Jones Day as well, on behalf of Yazaki and the rest of the

5    defendants today.

6            MR. JACKSON:  Good morning, Your Honor.

7    Tiffany Lipscomb Jackson, Jones Day, on behalf of Yazaki and

8    today on behalf of the collective defendants.

9            THE COURT:  Plaintiffs, you're confusing because

10   you are on opposite ends of the courtroom here.

11           MR. PARKS:  Your Honor, Manly Parks from

12   Duane Morris on behalf of the Rush entities, with my

13   colleague Andrew Sperl.

14           THE COURT:  Thank you.  I just wanted to make sure

15   the appearances are noted.

16           MR. MAJORAS:  As I was mentioning, the only issue

17   that seems to have brought on this question on the issue on

18   the statute of limitations results from the efforts by the

19   plaintiffs once they realized that they had missed the

20   statute of limitations was to amend their complaint while our

21   motion was pending, and in doing so trying to scramble to

22   find some type of a factual allegation they could make that

23   otherwise explains why their complaint was timely.

24           The statute of limitations in this case relate to

25   state statutes, these are indirect purchaser claims, and the

1    state statutes that we are moving on are three-year statute

2    of limitations and four years.

3                THE COURT:  Four years?

4                MR. MAJORAS:  Yes, ma'am, and we have in our

5    briefing papers, I think it is an Exhibit A to our brief, we

6    have a chart demonstrating where all of these fit and it is

7    part of what I just handed up to you.

8                The fundamental issue as we get back to it, before

9    we get into what happened about the allegations in the

10   complaint, the changes and why they had to be made, is really

11   the straightforward one that I started with you.  In this

12   case there is no doubt and the plaintiffs in their -- the

13   Rush Truck plaintiffs in their briefing note on page 2 of

14   their opposition that they do not contest that there was

15   substantial publicity about the Department of Justice

16   investigation into the wire harness industry.

17               They also acknowledge that the defendants are

18   essentially the same parties that were identified in that

19   substantial publicity and that the wire harnesses, which is

20   the product at issue for purpose of this motion, the wire

21   harnesses are fundamentally the same products that are being

22   supplied to truck and equipment suppliers.

23               As we point out on section 2 of the handout --

24               THE COURT:  Can I ask you a question on that

25   because I was trying to determine this throughout all the

1    motions?  In the wire harness -- the wire harness itself, I

2    know now we call it vehicle wire harness, is there some

3    difference in a truck, is a wire harness made with heavier

4    wires or something because it is a truck, or is it the actual

5    same product?

6            MR. MAJORAS:  Well, the wire harnesses across any

7    vehicle, whether it is a truck, a light truck, a car, are

8    going to have differences depending on what the requirements

9    are of the manufacturer.  Some will have particularly heavy

10   loads, some will have further distance that the wires need to

11   travel.

12           THE COURT:  That's true amongst the cars too, the

13   automobiles?

14           MR. MAJORAS:  Yes, ma'am, but the wire harness -- a

15   wire harness as such is delivering power to certain parts of

16   the vehicle that need power, and fundamentally there is no

17   difference between how that works in trucks versus how it

18   works in cars.

19           THE COURT:  I know the definition is the same but I

20   didn't know if the product was the same.

21           MR. MAJORAS:  Yes, ma'am.

22           THE COURT:  Okay.

23           MR. MAJORAS:  As we point out, it is curious that

24   in the plaintiffs' briefing in this motion they seem to make

25   no effort to refer to 6th Circuit law.  Obviously that's the

1    controlling law in this jurisdiction and in this case with

2    relation to statute of limitations the case law is very

3    clear, as we point out in our briefing and the highlights are

4    on page 2 of the handout, we have the Dayco opinion which is

5    the one that talks about it is an objective test as to when

6    someone should be -- someone's suspicion should be excited.

7    There is information in the record by which somebody could

8    look at that and say I wonder if this applies to me or maybe

9    it applies to me.  It is nothing more than that.  It is not a

10   situation where you have to have the specific facts of every

11   part that will make up the claim, and that's made very clear

12   in the Ball case, Your Honor, in which the case makes very

13   clear that the relevant inquiry is an objective one, and that

14   a definite link between the published information and the

15   potential claim need not be established with finality.  Does

16   it raise the curiosity of somebody who may have a complaint?

17            Now, Your Honor is well aware of the curiosity that

18   has been raised in these cases as indicated by the number of

19   complaints that have been filed over time, and particularly

20   it is noteworthy that with respect to wire harnesses until

21   the Rush Truck complaint was filed the last one was filed in

22   2014, February 20, and that's an important date because the

23   date in which the substantial publicity, the phrasing that

24   the plaintiffs use and acknowledge in their own briefing, the

25   substantial publicity began immediately after the Department

1    of Justice announced its investigation in February of 2014

2    and continued throughout that year, and it certainly

3    continued as claims were being filed in this Court.

4           Plaintiffs have not in their briefing contended

5    that the Court cannot take judicial notice of that publicity,

6    it is certainly something that is done throughout the case

7    law and we have cited the cases indicating that the Court may

8    view that publicity in deciding this motion, and certainly

9    that this motion can be decided on a motion to dismiss.  It

10   is a fairly typical thing to have statute of limitations

11   issues decided on motions to dismiss.

12          So we have for you the fundamental issue of there's

13   substantial publicity relating to wire harnesses, these

14   defendants, that occurs throughout February and into the

15   calendar year of 2010.  The Rush plaintiffs do not file their

16   case until November of 2014, approximately four and-a-half

17   years after the publicity began of which they acknowledge.

18   That really is the end of the inquiry, there is nothing more

19   that needs to be done because the case law is very clear that

20   at the time the publicity comes out they are on constructive

21   notice of it and their claims can then be brought within

22   whether it is a three-year or four-year period.

23          This is not a situation where the curiosity is

24   whetted, if you would, and the plaintiffs are obligated

25   within a day or so or a week or whatever the case might be to

    1   file their claims.   Under the relevant state statutes there's

    2   three years or four years to determine what that publicity

    3   might mean, to observe what is taking place in this Court,

    4   and to observe the various other activities that are

    5   happening relating to wire harnesses and the ongoing

    6   investigation that occurs throughout 2010 and 2011.

    7          Yet the plaintiffs contend that that's not enough,

    8   it is not until some period later -- well, actually that's

    9   not right, Your Honor, because their first contention was

   10   that was enough.   Their initial complaint in this case says

   11   that they were looking to a plea by Furukawa on wire

   12   harnesses that took place in 2011 -- September of 2011

   13   related to wire harnesses.   The plea itself talks about

   14   automobiles, nothing beyond that.   And in their first

   15   complaint they say this is sufficient to give us notice to --

   16   that we have a complaint to file.

   17          Now, that date I think is chosen because it does

   18   fit within the four-year statute of limitations.   Our

   19   contention quite clearly is that the publicity was strong

   20   enough going back into earlier 2010, that the statute started

   21   running in the February time period of 2010.

   22          We filed our motion.   The plaintiffs recognize

   23   there were problems at least in those states where there is a

   24   three-year statute of limitations because even their

   25   allegations of the Furukawa plea doesn't cure that, and now

1    they scramble to find something new.  The best thing they can

2    come up with is that there is a report out of Japan, the

3    JFTC, the Japan Fair Trade Commission, in which there is a

4    comment specifically about heavy equipment and somehow that

5    actually is what triggers the curiosity they should have had

6    going back to February.

7              THE COURT:  That was on the bearings?

8              MR. MAJORAS:  Yes, ma'am.  So, Your Honor, on

9    page 4 and 5 of our slides we summarize the publicity that

10   makes up a large chunk of the binders that everyone was

11   carrying in because there was a great deal of publicity which

12   talks about the investigation into wire harnesses, talks

13   about it being in the automotive, area which we think is

14   actually a key point.  If we are going to get into

15   wordsmithing in this case which, as I said, Your Honor, I

16   don't think is necessary under the objective standard of the

17   6th Circuit, but if we are going to get into wordsmithing the

18   plaintiffs only talk about automobiles and they point to a

19   couple of the plea agreements, and the Furukawa plea

20   agreement, which was good enough for them, by the way, the

21   first time they filed their complaints, those pleas related

22   to automobiles, but as you can see from the publicity there

23   is a great discussion of automotive, and combining them we

24   cite the Merriam-Webster Dictionary term of automotive which

25   is obviously something broader than simply automobiles, but

 1    even beyond that if we go back and we talk about the fact

 2    that these are wire harnesses, these are the same suppliers,

 3    the same type of equipment that's used in trucks, that are

 4    used in cars, that are used in automotive vehicles, then the

 5    plaintiff should have been on notice in February of 2010,

 6    just like every other wire harness plaintiff in this case,

 7    and filed their claim within the applicable statute of

 8    limitations in the states under which they are bringing their

 9    claims.

10          That's the point I think we make in our sixth

11    slide, Your Honor, which is fundamentally there are a few

12    things known that are important to deciding this motion in

13    terms of the suppliers of the wire harness were the same

14    suppliers that were identified in the publicity, the wire

15    harnesses were the same, and that even with respect to the

16    original equipment suppliers that were identified in that

17    publicity many of those make a variety of vehicles including

18    even into the trucks.

19          Your Honor, whether the Court decides to look at

20    this as we believe it should be the case which is simply

21    looking at the abundant publicity in 2010 and the objective

22    nature of the inquiry in terms of whetting the curiosity of a

23    potential claimant, or if you want to go through and parse

24    the language and what is automotive and what is automobile,

25    the result is still the same.  The plaintiffs have missed the

```
 1    statute of limitations with respect to the three and four
 2    years in the states that are at issue and the claims that go
 3    back farther than that are going to be barred, and on page 7
 4    of our slides we identify the specific states, it is also
 5    abundant throughout our briefing but it gives you a quick
 6    rapid demonstration that those states that have a three-year
 7    statute of limitations and a four-year statute of
 8    limitations, and then on slide 8 we talk specifically about
 9    the -- those states and which claims are barred under those
10    states.
11            As I began my presentation, Your Honor, I talked
12    about that perhaps for an observer this issue becomes more
13    interesting if look at what happens after we point out to the
14    plaintiffs that they have missed at least the three-year
15    statute of limitations and we believe the four-year statute
16    of limitations, and then we see there is an amendment to the
17    complaint, there is briefing back and forth about whether one
18    can do that or not but, Your Honor, one doesn't forget, it
19    could be the operative part of a complaint but if one is
20    saying in November this is what triggered it that's not a
21    memory that just disappears because the pleading is
22    different, the pleading that they have, the factual
23    allegations that they have in their initial complaint is
24    something that the Court ought to be considering, but going
25    back the basic issue here is whether there was -- whether
```

1  there was sufficient publicity in February of 2010 that these

2  plaintiffs should have been on notice, should have had some

3  curiosity as to whether or not they had a claim here, and

4  they should have brought their complaint within the time

5  periods allowed by the three- and four-year statute of

6  limitations.

7       Your Honor, unless you have some questions about

8  the statute of limitations issue I would like to turn briefly

9  to two other topics?

10       THE COURT:  All right.

11       MR. MAJORAS:  The first is the interstate nexus

12  standard, and this is an issue that the Court has had to

13  address on a number of the cases before it, and this relates

14  specifically to Mississippi, Nevada, New York, South Dakota

15  and West Virginia.  And in this case the plaintiffs make no

16  effort whatsoever to aver any factual allegations that there

17  was an effect that occurred in these states, and these states

18  have their statutes which require that there be an interstate

19  connection between the harm that is being alleged here.  In

20  this case the plaintiffs make no effort to try to satisfy

21  that burden, and they try to conflate in their response to

22  the briefing the issue between the Constitutional standing

23  and then really ignore the issue about the standing within --

24  or the state requirements in those states, and this is all we

25  are asking the Court to do is to treat these cases

 1    consistently with the many rulings you have already issued.

 2         The plaintiffs try to use those rulings to say

 3    these rulings prove we have a claim, but if you look to the

 4    rulings, and these are on page 9 and we summarize some of

 5    them, in some of the other cases, whether it is fuel senders

 6    or IPC or the OSS cases, there the Court made very specific

 7    findings that factual allegations had been made that make the

 8    connection necessary to at least pursue the claims in those

 9    states.  Here the plaintiffs have not done that.  There is

10    nothing that satisfies the interstate nexus requirements

11    needed of these states, and based on the Court's previous

12    rulings these claims should also be dismissed.

13         THE COURT:  Okay.

14         MR. MAJORAS:  Your Honor, as I was walking over to

15    the Court this morning it occurred to me I have the honor to

16    actually address an issue that has not yet arisen in this

17    Court, and that's the State of Vermont.  To do that if you go

18    to page 10 --

19         THE COURT:  That big state?

20         MR. MAJORAS:  Yes, ma'am.  And if you look at

21    page 10 of our brief -- or our materials that we handed up

22    you see the state shown there.  And this is a question of

23    whether under the VCFA, the relevant Vermont statute that is

24    being used by the plaintiffs in this case, whether these

25    plaintiffs, who are dealer plaintiffs, business plaintiffs,

1    have standing to bring claims, and the statute is very clear,

2    it is the people of Vermont, it is individuals, consumers,

3    who have the claim that can be brought under the VCFA.  So it

4    is very clear under the plain language of the statute that

5    only a consumer can bring a VCFA claim, and, in fact, the

6    statute defines the consumer, and these points are on page 11

7    of our slides.

8         As defined by statutes consumer does not include a

9    plaintiff who makes purchases for resale.  By definition

10   that's what dealers are, they are not consumers, they are

11   buying vehicles or whatever their products are that they are

12   selling and they are trying to resell them ultimately to end

13   consumers whether in Vermont or elsewhere.  Plaintiffs'

14   pleadings couldn't be any clearer that they are a dealer.  We

15   even go through and parse the language of what a dealer means

16   in our slides, I won't bore you with that because I think it

17   is very plain, a dealer is a reseller, a dealer is not a

18   consumer, and there should be no doubt whatsoever that the

19   plaintiffs cannot bring claims on behalf of consumers in

20   Vermont or that there is no one in the plaintiff group that

21   has a claim under the State of Vermont because they are not

22   consumers, and those claims should also be dismissed.

23        THE COURT:  Okay.

24        MR. MAJORAS:  Your Honor, there is one other point

25   I am going to raise because I suspect it will come up in MR.

1    PARKS' presentation, and that is, as you know, we have also

2    made a motion that the claim should be dismissed under the

3    Twombly standard.  That, as you are quite aware, is not a new

4    issue that we have raised with the Court, and quite certainly

5    one of the reasons we raised it is in part for record

6    purposes in this case, Your Honor.

7              THE COURT:  Okay.

8              MR. MAJORAS:  But here it is a bit unique because

9    of the tension created by the plaintiffs' claims in terms of

10   what they say in response to the Twombly where they are

11   saying we do have a plausible claim and how they are

12   responding that they nonetheless had any -- no curiosity

13   should have been raised because of the publicity in this

14   case.  That is they are saying there is a plausible claim,

15   but if you look at the particular points in this case where

16   they go back to whether it is the plea agreements or the

17   other activities that occur as part of the DOJ investigation,

18   they run into the problem that they are not, in fact, talking

19   about trucks, they are not talking about equipment, we don't

20   think that is sufficient, certainly under the statute of

21   limitations, we think that the publicity is clear enough that

22   it covers all of that, but the plaintiffs are taking this

23   position that these same facts, these same allegations now

24   give them a plausible claim in part because they point to

25   pleadings of other products, pleadings of other defendants,

1    and that's sufficient to give them a plausible claim, yet

2    when they look to the arguments on the statute of limitations

3    there is not even enough to give them curiosity.

4           That can't be the case, Your Honor, and we believe

5    if the 6th Circuit law is applied as it is clearly written

6    the statute of limitations that we have detailed in our

7    briefing are applicable, should be applied and under the

8    relevant states claims prior to or longer than three years in

9    those states, and longer than four years in the others,

10   should be barred by this Court.  There is nothing further.

11          THE COURT:  Thank you, Mr. Majoras.

12          MR. MAJORAS:  Thank you, Your Honor.

13          THE COURT:  MR. PARKS?

14          MR. PARKS:  Good morning, Your Honor.

15          THE COURT:  It seems like the plaintiffs are

16   dancing on a fine line between this statute of limitations

17   and the allegations in their complaint?

18          MR. PARKS:  Well, Your Honor, the defendants would

19   characterize it that way but I wouldn't, and the reason I

20   wouldn't is because I think that the two questions require

21   different perspectives.  When you're looking at the question

22   of plausibility under Twombly you have the benefit of

23   hindsight, you can look back and you can look at the events

24   and you connect the dots because you know where you are

25   today.  When you are considering what information should

1    excite the plaintiff to be -- to investigate you're forward

2    looking, you are looking at a plaintiff who doesn't have the

3    advantage of knowing where the story ends, which the

4    plaintiff who is pleading the claim does have that advantage.

5    So in this particular instance it is not until we have some

6    information that the conspiracy goes beyond cars, goes beyond

7    passenger vehicles, and that comes with the bearings

8    announcements as we have indicated in the briefing, that the

9    Rush Truck plaintiffs are put on notice that, wait a second,

10   this isn't just about cars and wire harnesses, this is about

11   wire harnesses and other things too.

12          THE COURT:  But why wouldn't they be on notice when

13   they hear about wire harnesses?  I mean, it is a vehicular

14   wire harness, it goes into all of these vehicles as I

15   understand it?

16          MR. PARKS:  Well, in a general sense, yes, wire

17   harnesses are wire harnesses, and we certainly are contending

18   that this is part of a broad conspiracy about wire harnesses.

19   The point I think that defense counsel glossed over a little

20   bit, although he hinted at it, is there are quite different

21   grades of wire harnesses for trucks, for heavy equipment, and

22   you would imagine that.  You would probably need a different

23   kind of wire harness for a compact car than you would need

24   for a road grader or a bulldozer because you're carrying

25   different loads of electricity, different distances and so

1    forth.  There has been some suggestion -- now, we agree that
2    wire harnesses generally perform the same function in trucks
3    as in cars and in heavy equipment as in cars, but the idea
4    that parts for cars and parts for trucks or parts for cars
5    and parts for heavy construction equipment are obviously the
6    same thing and you should inquire about one because there is
7    a conspiracy about the other I think goes too far,
8    particularly here where we are talking about a pleading
9    standard.  This is a 12(b)(6) motion, and so I think that
10   here where we are arguing and we are advancing the notion
11   that the scope of the conspiracy, the public information
12   about the scope of the conspiracy was such that there was no
13   indication that it branched out beyond automobiles, beyond
14   passenger vehicles in the commercial vehicle space, that's
15   enough under the 12(b)(6) standard to get through a motion to
16   dismiss and, indeed, we even cite cases that says that's
17   enough to get past a Rule 56 motion for summary judgment, it
18   is inherently a fact question for the jury to evaluate about
19   whether that distinction -- the distinction between cars or
20   passenger vehicles on the one hand and commercial vehicles on
21   the other is a meaningful one.
22          Now, Your Honor, if I might approach for a moment?
23          THE COURT:  All right.
24          MR. PARKS:  I have here a slide which should
25   indicate some visual representation of what I'm talking about

```
 1    here a little bit, although I think the point has been made
 2    fairly clear nevertheless.  Ours is the first complaint in
 3    this entire proceeding that talks about something other than
 4    passenger vehicles, that's undisputed, that's quite clear.
 5    It is also I think undisputed that there is no mention of
 6    trucks until the EC, the European Commission competition
 7    authority, announces that there is some enforcement action
 8    with respect to bearings in automobiles and trucks in March
 9    of 2014.  There is no --
10               THE COURT:  2013, right?
11               MR. PARKS:  No, 2014, Your Honor.  2013 was
12    industrial machinery bearings and that was the Japan Fair
13    Trade Commission.
14               THE COURT:  All right.
15               MR. PARKS:  And before then there were no
16    enforcement actions involving anything other than cars.  Now,
17    there is some language games perhaps I would say where the
18    word automotive is being dissected; auto means goes by
19    itself, motive means move, we look at the Latin roots or the
20    Greek roots or whatever and say, oh, well, that means it is
21    anything that moves by itself, but that seems to go too far.
22    It is pretty clear when you look at the press releases and
23    the statements by the enforcement authorities, by our
24    Attorney General Eric Holder and by the deputy attorney
25    generals who speak to this, they specifically talk about
```

 1    cars, this was all about cars.  And in that sense it puts it

 2    into a false box, Your Honor, to say this is really about

 3    wire harness, and wire harness is in everything, anything

 4    that moves, a wire harness in a Segway scooter should have

 5    been on notice, wire harness in a forklift should have been

 6    on notice.

 7          Now, I think that's a question of fact, and the

 8    cases we have cited I think make it pretty clear it is a

 9    question of fact.

10          For example, there is a case we cite called In re:

11    Board of Education of Evanston, and that case involved claims

12    of bid rigging, and the court was considering allegations of

13    whether the publicity about bid rigging by the same very

14    defendants on the very same types of projects in downstate

15    Illinois should have put the plaintiff on notice of a

16    bid-rigging conspiracy in upstate Illinois.  In that case the

17    court even acknowledges in the text and a footnote, even in

18    the publicity about downstate Illinois there was some

19    references to some upstate Illinois activity, and the court

20    said even those references aren't clear enough, it was about

21    the scope of the conspiracy and the general publicity was

22    about the scope of the conspiracy being a downstate Illinois

23    conspiracy.

24          The plaintiff said well, that didn't put us on

25    notice of the upstate Illinois conspiracy we are complaining

Motion Hearing • October 6, 2015

**24**

 1  about, even if it is the same one, it is just bigger than we

 2  thought.  And the court says -- I think it is a Rule 56

 3  motion if I recall correctly, even a Rule 56 summary judgment

 4  that's a question for the jury, and if it is a question for

 5  the jury on Rule 56 in that scenario where you are talking

 6  about geographic scope, as opposed to the scope of the

 7  products involved, which is what we are talking about here,

 8  then it has to be here as well.

 9          In fact, Your Honor has also considered this same

10  question in the context of this case, at least the question

11  about the scope of the conspiracy and what is sufficient to

12  put plaintiffs on notice.  So in the occupant safety

13  restraints case the defendants argued, hey, these raids back

14  in 2010 on Tokai Rika in wire harnesses should have put you

15  on notice about potential price fixing with respect to

16  occupant safety.  And this Court noted that those were two

17  different things and it is a question of fact ultimately

18  anyway, and that's exactly what it is here again today, a

19  question of fact, so --

20          THE COURT:  What exactly would a jury do with that?

21  I mean, just think about this.  They get information about

22  whether plaintiff should be on notice in 2010, what are they

23  going to judge on, what more than what we have in these

24  briefings right now would there be for these jurors to make a

25  determination?

1    MR. PARKS:  Well, Your Honor, I believe we'll be

2    able to present significant evidence that the truck world,

3    the heavy equipment world and the car world are different

4    worlds.  That if you are -- you don't see a lot of

5    dealerships for example where you can buy a compact car next

6    to a road grader or a bulldozer.  You don't see a lot of

7    places where you can buy a class-A, heavy-duty trash truck

8    next to a F-150 pickup truck, a light-duty passenger truck.

9    These are different worlds, you deal with different customers

10   who are buying different products for different purposes.

11   There is a fundamental distinction, and we think we'll be

12   able to present ample evidence of it to the jury, that

13   passenger vehicles are a different world than commercial

14   vehicles.  And we think that that evidence will help the jury

15   conclude that publicity about price fixing of passenger

16   vehicle components is something different than -- that it

17   wouldn't necessarily put a reasonable person on notice of

18   price fixing on those same types of components in commercial

19   vehicles.

20        THE COURT:  Okay.  Thank you.

21        MR. PARKS:  So as the slide deck shows our case

22   involves heavy-duty vehicles, the first couple of slides are

23   heavy-duty, class-A trucks at various configurations,

24   medium-duty trucks, think of the box truck that delivers the

25   stationery supply or a mattress or something, agricultural

1   equipment, for example, tractors, four-by-four ATVs that are

2   used in agricultural applications, transportation would be

3   buses, there are also construction equipment, as I mentioned,

4   mining equipment.  And, again, generally the point is our

5   case involves commercial vehicles, not passenger vehicles.

6   And the publicity issue is really a question, as I said

7   before, of scope and the court -- the courts recognize that

8   the scope of publicity is really a question of fact to be

9   assessed by a jury, and this Court has, indeed, recognized

10  that in its own decisions, as I have mentioned.

11          Now, there is here I think two different questions

12  in terms -- or there are here I think two different questions

13  about the statute of limitations.  One question involves the

14  discovery rule, and the other involves fraudulent

15  concealment.  The discovery rule says the statute of

16  limitations doesn't begin until a reasonable person like you,

17  like the plaintiff, is on notice of the potential for injury.

18  And that, Your Honor, is a key here because what we are

19  saying is that under the discovery rule our claims couldn't

20  have reasonably been discovered until the bearings news broke

21  and it was understood that these auto parts conspiracies

22  weren't restricted to passenger vehicles, to cars and pickup

23  trucks, light pickup trucks, that there was something more

24  here and that expanded out into the commercial-vehicle world.

25          So there is the discovery rule question which we

1    believe the cases are pretty clear raise question of fact,

2    and then there is the issue of fraudulent concealment which I

3    think comes into play when a contention is made, well, that

4    plaintiff -- reasonable plaintiff should have known and that

5    plaintiff can come back and make certain allegations and say,

6    well, the defendant engaged in tricks and artifice, and we

7    actually didn't have actual knowledge, and then there is the

8    due-diligence questions.  We make the same allegations that

9    the Court has already found sufficient about tricks and

10   artifice, we make the same allegations the Court has already

11   found sufficient in other parts of this case about not having

12   actual knowledge until we began our investigation after the

13   bearings news broke.

14        And the defendants really focus in on the third

15   prong, which is due diligence, but as the Court has decided

16   time and again in the fuel senders case, in bearings and

17   occupant safety restraints, the Court has pointed out the

18   plaintiffs allege they have no knowledge and could not have

19   discovered the conduct earlier through the exercise of

20   reasonable diligence.  We make exactly those allegations.  We

21   allege at paragraph 252 of our amended complaint we had no

22   knowledge, we allege at paragraphs 255 and 263 of the amended

23   complaint we could not have discovered the conspiratorial

24   conduct or our injury to an exercise of reasonable diligence.

25        So we make the exact allegations this Court has

1    recognized time and time again creates an issue of fact, and

2    here is really no different than those other cases although

3    the particular circumstances the defendants point to are

4    somewhat different issues --

5            THE COURT:  Well, they are different because you

6    already know that you've got this wire harness situation in

7    automobiles.  The question is --

8            MR. PARKS:  Correct.

9            THE COURT:  -- I think defendant raised, you know,

10   is this enough to raise your curiosity?

11           MR. PARKS:  And if it was, was there anything we

12   could have done about it?  There are a number of cases, and

13   we cite them in our brief, that point out that even at the

14   summary judgment level there is a responsibility on the

15   defendant to come forward and say well, what could they have

16   discovered that would have put them on notice of their claims

17   if they had exercised an inquiry?  And there is no discussion

18   of that here at all, in fact, and it is a totally

19   inappropriate discussion to have at the motion to dismiss

20   stage.  And, in fact, although defense counsel argued that it

21   is routine or common, let's see, fairly typical to decide

22   statute of limitations issues on a motion to dismiss, the

23   case law says something else entirely.

24           For example, we cite to the Funduluc Bumper

25   Exchange case out of the Eastern District of Wisconsin

1     which -- an opinion which cites Your Honor's opinion in one

2     of the auto parts cases for the proposition that it is out of

3     the ordinary to decide these questions of statute of

4     limitations and due diligence and notice at the motion to

5     dismiss level and that they are inherently factual in nature.

6          Another case, for example, I mentioned Board of

7     Education of Evanston vs. Admiral Heating, that was a summary

8     judgment case, not even a motion to dismiss, and the court

9     really parsed the facts of what was known and whether that

10    was enough to excite the plaintiff or not -- excite the

11    plaintiff's inquiry or not, and the Court concluded it is a

12    question for the jury.

13         We cite Morton's Market out of the 11th Circuit, a

14    1999 case, also a motion for summary judgment case, not a

15    motion to dismiss.  And the Court there points out that it is

16    important to recognize that the obligation of the Court is to

17    resolve all doubts in favor of the non-movant and it must be

18    applied with particular stringency, the language of the

19    Court, with particular stringency where plaintiff claims that

20    defendant's conduct prevented plaintiff from discovering the

21    claims prior to the expiration of the statute of limitations,

22    and that's exactly what we have alleged here just like the

23    other plaintiffs in the other auto parts cases, we have

24    talked about the destruction of documents, we have talked

25    about the secrecy of the procedures, we have talked about the

1    public and false denials of involvement and so forth.

2          And the point -- the court in Morton's Market also

3    makes the following point, and I think it is important to

4    keep in mind here, it is not enough for a defendant to point

5    out facts that might have caused plaintiff to inquire or

6    could have led to evidence supporting plaintiffs' claims,

7    that evidence just creates the factual question for the jury,

8    that just creates the disputed fact on the question, and it

9    is for the jury to decide if that evidence was enough.

10   That's exactly, Your Honor, where we would say we are here.

11         We also cite a number of other cases that I think

12   stands for these same propositions.  We cite In re:  Copper

13   Antitrust out of the 7th Circuit which itself reiterates the

14   Morton's Market standard I just mentioned.  We cited a case

15   out of the Northern District of Ohio, In re:  Polyurethane

16   Foam, which applies the 6th Circuit standard and finds the

17   complaint sufficient, and interestingly does what I think is

18   a nice job of dealing with the potential tension of trying to

19   understand what does the due-diligence requirement mean in a

20   fraudulent-concealment scenario when the plaintiff is

21   claiming I really didn't even know that I was hurt yet.  And

22   there the court points out that in that scenario alleging you

23   didn't know and alleging you couldn't apply reasonable

24   diligence have known creates a factual question and

25   essentially adopts the exact analysis that Your Honor has

1   adopted in your prior decisions in this case considering that

2   question.

3          We also cite In re:  Petroleum Products, a Central

4   District of California case, again, a summary judgment case,

5   not a motion to dismiss.  And there the court notes that the

6   diligence requirement is only meaningful where facts exist

7   that would excite the inquiry of a reasonable person, and

8   essentially what they are saying there is that, as I read it,

9   if the -- one of the prongs of the discovery rule isn't

10  triggered, in other words, if you didn't know that you were

11  injured yet, then you can't really have a particular useful

12  discussion about how much diligence you did to figure out if

13  you were injured, so I point that out only to re-emphasize,

14  Your Honor, that we are not simply arguing the diligence

15  point, we are actually arguing discovery rules as well and

16  saying we didn't realize that we were potentially injured

17  until this information came out in 2013 and 2014 that these

18  conspiracies involving auto parts weren't specifically

19  limited to passenger vehicles.

20          THE COURT:  Okay.

21          MR. PARKS:  Now, opposing counsel talked about the

22  issue of the residency question and the standing question.

23  We didn't speak that much about Constitutional standing, and

24  I would simply on that issue say this Court has considered

25  that question repeatedly and has, with the exception of the

1    public entities, determined that that question should be

2    deferred until class certification.  We would argue that we

3    are much more like the auto dealers for whom the Court

4    determined that it should be deferred than we are like the

5    public entities where the Court said it shouldn't be, and

6    there are a lot of unique considerations that the Court

7    pointed out in its opinion and its citation of the Walker

8    case about public entities, there are 11th Amendment

9    considerations, there are considerations about who is even

10   authorized to appear in court on behalf of state actors and

11   so forth.  Those are not here, we are in the same shoes and

12   the same boat on this question as the auto dealers and that

13   question has been decided by this Court repeatedly, and we

14   respectfully suggest that the defendants haven't raised any

15   reason why the Court should revisit what it has already done

16   on that issue.

17          THE COURT:  Do you want to address just very

18   briefly that Vermont issue?

19          MR. PARKS:  Sure.  A couple of issues on the

20   Vermont thing.  First of all, we never allege that every

21   vehicle we purchased or every vehicle the class purchased was

22   for resale.  They would like to impose that allegation on us

23   but we don't allege it.  And, in fact, common sense tells

24   you, you know, from going to your local dealership -- local

25   car dealership is a suitable example as any that a dealership

 1    will purchase a number of vehicles not for resale.  A truck

 2    dealership, for example, will have trucks, bigger medium-duty

 3    trucks for example, to ferry parts out to customers so they

 4    can do replacements and ship parts to customers that need to

 5    be delivered, there will be training vehicles for customers

 6    to learn on, there will be demos.  These vehicles aren't

 7    sold, these vehicles are owned by a dealership and then used

 8    in the normal course of that dealership's business.  So to

 9    say that every vehicle a dealership purchases must be for

10    resale is inconsistent with common understanding and

11    certainly nothing we have alleged.

12         On the question of whether we are in Vermont, we

13    clearly are not in Vermont but we are advancing claims on

14    behalf of dealerships in Vermont, and we would argue that at

15    this point in the case at this juncture that's sufficient.

16         With respect to -- there is a somewhat different

17    issue about the interstate nexus, and I would point out

18    that's with I believe Mississippi, Nevada, New York, South

19    Dakota and Wyoming.  Our client -- or our clients are all

20    part of a publicly-traded organization that is, as far as I

21    know, the largest truck dealership operation in the

22    United States.  They sell vehicles to customers in every one

23    of the 50 United States' states, and here where it is an

24    indirect purchaser case and the injury in part when you

25    purchase the vehicle with the overcharge built in but

1   manifests itself when you sell the vehicle not being able to

2   pass the whole overcharge on, we would argue that selling to

3   a customer in the state and not being able to pass the whole

4   entire overcharge on and then being injured as a result

5   creates a sufficient interstate nexus.

6           Now, I will grant you we don't specifically plead

7   in the complaint that we sell in all 50 states including

8   these states but we do, and if we need to amend to clarify

9   that we can, but that's certainly our answer on the

10  interstate nexus question.

11          THE COURT:  Okay.  Thank you.

12          MR. PARKS:  Thank you.

13          THE COURT:  Reply, briefly?

14          MR. MAJORAS:  Thank you, Your Honor.  I will jump

15  around and address specifically the points that MR. PARKS

16  raised.

17          First, he started off and talked about hindsight

18  and whether there was a -- in Twombly there is hindsight, the

19  statute of limitations there is not.  I am not -- I don't

20  mean to mischaracterize what he was saying, I know hindsight

21  was in there, and I'm curious why.  Hindsight isn't an issue

22  on the statute of limitations.  The question is has something

23  occurred, has something, whether it is in the public record

24  or something that you know of on your own, given you some

25  curiosity as to whether you have a claim, and then you've got

 1   this period of time, the three years or the four years, to

 2   make an inquiry into it, to learn whether there is a claim,

 3   to do anything else that you might do to see whether you can

 4   bring a claim.  So it is not the situation ends at the moment

 5   that you're on notice.

 6            THE COURT:  You agree it is a jury question?

 7            MR. MAJORAS:  No, ma'am.

 8            THE COURT:  Or disagree with that?

 9            MR. MAJORAS:  I completely disagree with that.  I

10   think if you look at the cases that we cite, the 6th Circuit

11   cases that we cite in our opposition brief on pages 13 and 14

12   make it very clear that the Court in a motion to dismiss

13   stage with the record complete and with the objective

14   standard that is available and the Dayco and the Ball cases,

15   it is very clear that it is a gatekeeping function that the

16   Court can exercise at that point.  Now, if the Court were to

17   disagree with this then it would still be an issue, and if it

18   were then ultimately presented to a jury it would be a

19   factual issue to the jury.  It is kind of a rather

20   interesting point that the plaintiffs are saying that it is

21   not until the European Commission identified trucks, I

22   believe, in 2014 that that somehow was the light bulb moment

23   where we know we have a claim, yet four months later, five

24   months later when these careful lawyers draft a complaint

25   there is no mention of it.

```
 1          The facts are very clear in terms of the publicity
 2   that's out there, there is really no disagreement about the
 3   publicity that's out there, there is no -- there should be no
 4   disagreement about the objective standard that the Court
 5   applies, and it is done throughout the 6th Circuit in the
 6   cases that we cite.
 7          In the fraudulent concealment argument I think it
 8   is a pretty straightforward one, and this again goes to the
 9   Dayco decision where if the argument is this fraudulent
10   concealment up to the point at which there is now some
11   publicity or some information that's out in the record,
12   that's a different matter.  What they are trying to use
13   fraudulent concealment for here is to say that
14   notwithstanding the publicity that somehow erases, minimizes,
15   I'm not sure what, to the publicity that is clearly in the
16   record that we believe should have put them on notice at the
17   time.  So to take the fraudulent concealment aspect of the
18   tolling of the statute of limitations is totally inapplicable
19   to what is at issue in this case, and it is -- there is
20   simply nothing they can allege including whether they made
21   the sufficient inquiry under that standard to go forward that
22   it somehow tolls the statute of limitations.  The limitation
23   period starts to run in February of 2010, there is no doubt
24   about that, the publicity is strong, the publicity is clear.
25          THE COURT:  Well, isn't it established that this
```

1    fraudulent concealment -- alleged fraudulent concealment

2    existed prior to all of this publicity, and then once

3    everything came out it was, you know, you didn't know it

4    before because of the fraudulent concealment, but are there

5    any indications of fraudulent concealment after this 2010

6    date?

7            MR. MAJORAS:  There's nothing that has been pled.

8    There's certainly -- the elements of fraudulent concealment

9    have not been pled including the diligent inquiry that must

10   be made once there is something suggesting that you should be

11   taking a look at it, perhaps even a stronger standard than

12   the statute of limitations.  It is simply taking a standard

13   that sounds like well, that should have something to do with

14   statute of limitations and applying it in a situation where

15   it clearly can have no effect because of the widespread

16   publicity that existed at the time.

17           And finally, Your Honor, on the Vermont claim, we

18   are kind of getting this again, well, maybe there is some

19   aspect here that can save our Vermont claim, just like maybe

20   there is something we can do to save our statute of

21   limitations.  So maybe somebody bought a truck that did this

22   or maybe some people that buy trucks -- I'm not sure exactly

23   all of the issues that were raised.  The fact is none of that

24   is alleged, there is nothing in the complaint that makes any

25   of the allegations specific to Vermont, the statute is clear,

```
 1   those claims should be dismissed.

 2          Thank you, Your Honor.

 3          THE COURT:  All right.  Thank you very much.  All

 4   right.  The Court will issue an opinion.

 5          The next one is the MELCO defendants.

 6          MR. SKLARSKY:  Good afternoon, Your Honor.

 7   Charles Sklarsky appearing on behalf of Mitsubishi Electric.

 8          THE COURT:  Okay.

 9          MR. SKLARSKY:  Your Honor, the issue that we

10   present -- and I should preface my remarks by saying that we

11   have been very reticent to file motions to dismiss and have

12   not done so in many cases taking into account Your Honor's

13   prior rulings, but we filed a motion to dismiss in this case

14   because it strikes us that the Rush Truck complaint is quite

15   different than many of the other complaints this Court has

16   had to rule on with respect to motions to dismiss.  The issue

17   is really a very simple one.  The question is whether the

18   fact that Mitsubishi Electric pled guilty to antitrust

19   violations with respect to alternators, starters and ignition

20   coils which were used in automobiles whether that is a

21   sufficient fact to make the allegation that the plaintiffs

22   have made here plausible, that is that because of that guilty

23   plea it is somehow plausible that Mitsubishi Electric also

24   participated in a conspiracy -- an antitrust conspiracy to

25   fix the price of wire harnesses sold for trucks.
```

 1          I'm not going to get into the debate of whether the

 2     trucks and the cars are a separate market or anything like

 3     that, but trucks are different from cars, and the issue of

 4     notice and suspicion is different than plausibility for the

 5     purposes of a complaint.

 6          It is particularly troubling when in their

 7     complaint they do not even make the allegation that

 8     Mitsubishi Electric manufactured or sold wire harness parts

 9     for use in trucks and equipment.  Of course they don't make

10     that allegation because Mitsubishi Electric does not make

11     wire harness parts for trucks and equipment.

12          Here is what they say in their complaint, and for

13     Your Honor's reference most of these allegations are set

14     forth at paragraphs 77, 78 and 79 at page 23.  They bring out

15     the fact of the guilty plea as to alternators, starters,

16     ignition coils with respect to automobiles.  They make the

17     point that Mitsubishi Electric sold alternators, starters,

18     ignition coils not only for automobiles but for trucks and

19     equipment.

20          As to wire harness what they say is that Mitsubishi

21     Electric made a body, an electric sensor, which is an

22     electronic body unit, and that's true, we make it.  They say

23     we sell it to Fuji Heavy Industries, they don't say for what,

24     but very telling they do not say that Mitsubishi Electric

25     makes that part for use in trucks and equipment, and for the

1    reasons I have stated they can't say that.  And they don't

2    say that there is any RFQ with respect to this supposed

3    conspiracy that Mitsubishi Electric had any association with.

4    They don't allege any contacts with co-conspirators, alleged

5    co-conspirators, with respect to the sale of wire harness

6    parts for trucks and equipment.  There is nothing.

7              What they say in their pleadings to justify this

8    absence of facts is that, well, in the other cases Your Honor

9    has looked at least in part to the guilty pleas of the

10   defendant and weighed that or considered that in finding that

11   it was plausible that there was a conspiracy to fix parts for

12   which the defendant had not pled guilty, but in all of those

13   others cases where Your Honor ruled that way there was at

14   least an allegation that the defendant made and sold the part

15   in question.  And in many of those cases -- well, not only

16   made and sold the part but made and sold the part in the

17   market to which -- the same market in which they pled guilty,

18   the automobile market, and in many of those cases there were

19   also allegations which cited RFQs or contacts with

20   competitors, there was more; there was not just this asking

21   you to take this huge leap that a guilty plea over here in

22   the automobile market somehow makes you plausibly guilty of

23   price fixing in the truck market for a part that they can't

24   even allege we make, and that's the argument.  Your Honor has

25   declined to do that in any other case -- actually I don't

1    think you have been confronted with that in any other case

2    and you shouldn't do it now.  Thank you.

3         THE COURT:  Thank you.  MR. PARKS?

4         MR. PARKS:  Your Honor, the Mitsubishi motion is

5    based on false premise, and the false premise is that the

6    plaintiffs did not allege in the amended complaint that

7    Mitsubishi sold wire harnesses for trucks and equipment.  In

8    fact, in paragraph 98 on page 28 of the amended complaint

9    plaintiffs allege defendants and their co -- and the

10   co-conspirators supplied vehicle wire harness systems to OEMs

11   for installation in trucks and equipment manufactured and

12   sold in the United States and elsewhere.  Defendants and

13   their co-conspirators manufactured vehicle wire harness

14   systems, A, in the United States, including in all the states

15   having laws permitting recovery of damages by indirect

16   purchasers listed intra for installation in trucks and

17   equipment manufactured and sold in the United States.

18        Skipping the parenthetical, B, in Japan and

19   possibly other countries for export to the United States, and

20   skipping the parenthetical, and installation in trucks and

21   equipment manufactured and sold in the United States, and

22   skipping a parenthetical, and, C, in Japan and possibly other

23   countries for installation in trucks and equipment

24   manufactured in Japan and possibly other countries for export

25   to and sale in the United States.  It is very specific, very

1    clear, includes all the defendants.

2         As this Court has noted, that type of allegation in

3    this case when taken in connection with all the other

4    allegations of the complaint including allegations of who the

5    members of the conspiracy are and so forth is sufficient, so

6    that's the false premise that the Mitsubishi Electric motion

7    is based on.

8         I would also point out that we have alleged -- I

9    think our allegations are a little more significant putting

10   aside this allegation which I think goes right to the heart

11   of Mitsubishi's contention.  I would also point out that when

12   you are looking at what circumstances render a conspiracy

13   more plausible the fact that there are -- there is an

14   existing and admitted conspiracy among manufacturers of wire

15   harnesses for passenger vehicles, there are customers,

16   including Fuji Heavy Industries, to whom Mitsubishi Electric

17   sold wire harnesses that themselves through their

18   subsidiaries make not only automobiles, Subaru I believe in

19   the case of Fuji Heavy Industries, but also in that case

20   construction equipment.  So we are talking about sales of

21   wire harnesses to entities whose subsidiaries actually make

22   trucks and equipment.

23        I would also offer the following point for

24   consideration:  In a case like this where you have

25   allegations of bid rigging as part of the structure of the

1    conspiracy, the lack of sales to any particular entity or

2    even into a general part of the market -- a segment of the

3    market doesn't demonstrate that you are not part of the

4    conspiracy.  In fact, these conspiracies can work by agreeing

5    I will not sell to your customer in X market, and in exchange

6    you agree to mark up or not try to sell to my customer in

7    this other piece.  So the lack of sales, if we get that far,

8    and there is no affidavit or declaration or statement in the

9    brief that they never sold directly contradicted by our

10   allegation, but even if we credit that for a moment that in

11   and of itself wouldn't be enough to say we are not in the

12   conspiracy, and as this Court has recognized you have to view

13   these allegations against the backdrop of these other

14   conspiracies and the overall industry being rife with

15   anticompetitive behavior and so forth.  So I will leave it

16   there unless Your Honor has questions?

17             THE COURT:  No.  Okay.  Reply?

18             MR. SKLARSKY:  If I may, Your Honor?

19             THE COURT:  Do you want to address paragraph 98 or

20   99?

21             MR. SKLARSKY:  Yes, it is true, it says what it

22   says, there is no question about it, but it is boilerplate,

23   defendants and others is what it says.  Under the standard in

24   the 6th Circuit and under Twombly it is our view, and I

25   believe it is absolutely correct, you have to have something

1    specific, you have to have a particularized allegation as to

2    what each of the defendants did.  You can't just glom them

3    all together and say that's enough and make the boilerplate

4    allegation, and particularly in light of the fact they can't

5    make that particularized allegation, and under the case law

6    they need to do that under these facts.

7         And let me just say this if I might as to Counsel's

8    last point that it is true, we don't disagree, a defendant

9    could participate in a conspiracy by agreeing not to

10   participate in the market, no question, that's true, but they

11   don't make that allegation, they don't say that the reason

12   Mitsubishi didn't make or sell these parts for trucks and

13   equipment is because it had entered into an agreement not to

14   participate in that market in exchange for some other

15   benefit, they don't say that.  That's not like they haven't

16   had some discovery in this case, they have.  They haven't had

17   it from Mitsubishi Electric because we are a recently added

18   defendant in the case, but other defendants who have been in

19   the wire harness case for years now have produced discovery

20   to these plaintiffs, and one would think if there were facts

21   like that to say that our agreement was not to participate in

22   the market we would see it in the complaint, that there would

23   be a factual basis for it, and it's not there because there

24   was no such agreement.

25         THE COURT:  All right.  Thank you.  All right.

 1    Next is Fujikura.

 2           MR. RUBIN:  Good afternoon, Your Honor.  Mike Rubin

 3    of Arnold & Porter for Fujikura.

 4           THE COURT:  All right.

 5           MR. RUBIN:  And when I say Fujikura, there are two

 6    entities, there's Fujikura, Ltd., which is Fujikura's

 7    Japanese parent company that filed a Rule 12(b)(2) motion,

 8    and then there is a separate entity, a subsidiary in the

 9    U.S., Fujikura Automotive America, FAA, which has filed a

10    12(b)(6) motion.  With the Court's permission I would like to

11    address first the 12(b)(2) motion, allow plaintiffs to

12    respond to that, and then come back and address the 12(b)(6)

13    motion since they are separate issues?

14           THE COURT:  Okay.

15           MR. RUBIN:  So why is there no jurisdiction?  It is

16    really not very complicated.  Fujikura, Ltd. did not make or

17    sell wire harnesses for trucks and equipment.  To use

18    plaintiffs' counsel language, they didn't play in that

19    totally different fundamentally different world, they didn't

20    play in the trucks and equipment world.  Nothing Fujikura,

21    Ltd. made or sold has had any affect on these plaintiffs,

22    that's undisputed.  And this isn't your typical 12(b)(2)

23    motion filed at the very beginning of the case.  Plaintiffs

24    have our transactional data, they have our documents, they

25    have our declarations, they have discovery from other

1   defendants, they have had all of that for six months.  No

2   more discovery is needed on this point to determine that

3   Fujikura, Ltd. did not make wire harnesses for trucks and

4   equipment.

5            So what else is there?  Well, there is no evidence

6   that Fujikura, Ltd. engaged in any wrongful conduct relating

7   to wire harnesses for trucks and equipment.  The guilty plea,

8   and this is not my words, it is plaintiffs' counsel words,

9   but also happens to be true, was related to automobiles,

10  cars, passenger vehicles, but in the words of the plea it was

11  automobiles sold to an automobile manufacturer.

12           Plaintiffs again they have our documents, they have

13  the guilty plea, they have the materials surrounding the

14  guilty plea all of which are publicly available, documents

15  from other defendants, interrogatory responses that lay out

16  the nature of the conspiracy, transactional data, they have

17  had all of that for more than six months.  No more discovery

18  is needed on this point, Your Honor.  So these two facts

19  which are undisputed, they have pleadings in their complaint

20  but they have no evidence to rebut or even address the

21  declarations that were submitted.  In our 12(b)(2) motion

22  they can't rest on their pleadings as they do in their

23  opposition when there are declarations that directly refute

24  their jurisdictional allegations.

25           So on these undisputed facts plaintiffs point to no

1    case, not a single one, from this auto part litigation or

2    elsewhere where a court has exercised jurisdiction over a

3    foreign company that, A, do not make a product that either

4    directly or indirectly harmed the plaintiffs in any way, made

5    its way to plaintiffs in any way; or, B, where the plaintiffs

6    can point to no evidence of wrongful conduct aimed at the

7    forum, aimed at these plaintiffs at the market which they

8    allege.

9           Plaintiffs do mention three different tests for

10   specific personal jurisdiction, the effects test, the stream

11   of commerce plus test, the conspiracy theory test.  It is

12   unclear which one they are actually relying upon, Your Honor,

13   because when you look at their opposition they state the test

14   but they never then say how the facts of this case apply to

15   those tests and how they meet the standards, so let's go

16   through them one by one.

17          The effects test.  Their language comes from the

18   Weather Underground opinion from this Court.  As its name

19   suggests, the effects test requires effects on these

20   plaintiffs from this defendant and from this defendant's

21   intentionally tortious conduct, that's the Weather

22   Underground standard.

23          But where Fujikura, Ltd. didn't sell parts that

24   made their way into the products that these plaintiffs bought

25   there can be no effects, and when plaintiffs can point to

1    nothing of intentionally tortious conduct aimed at this

2    forum, aimed at these plaintiffs, there can again be no

3    effects.  The effects test with no effects means there is no

4    jurisdiction.

5           You then have the stream of commerce plus test.

6    They talk about Justice O'Connor's opinion, they talk about

7    the cases that have applied it, they cite them -- I guess

8    talk about them is not quite the right word because they cite

9    them, they say it has been applied and adopted but they never

10   then apply or talk about why those -- the stream of commerce

11   plus case supported jurisdiction in the other cases and how

12   this case is analogous, but the problem with the stream of

13   commerce test for them is that it requires something being

14   put into the stream of commerce that then flows through the

15   stream of commerce to the plaintiffs and causes harm there.

16   When Fujikura, Ltd. has never put anything into the stream of

17   commerce itself or through any subsidiary in the U.S. that it

18   controls, there can be no stream of commerce and there

19   certainly isn't worth talking about whether there is a plus

20   factor that is required.

21          This Court has already held in the bearings case

22   with respect to AB SKF and wire harness with respect to

23   S-Y Systems, that the stream of commerce plus test doesn't

24   really apply in this case even where the foreign defendant

25   has a U.S. subsidiary did put things in the stream of

1   commerce that made its way to the plaintiff.  But here

2   Fujikura, Ltd.'s U.S. subsidiary, FAA, and we will talk about

3   this when we get to the motion to dismiss for FAA, but the

4   affidavits were submitted for this motion as well, they did

5   not sell anything for trucks and equipment at all.

6        Plaintiffs also, Your Honor, note the conspiracy

7   theory which Your Honor has rejected multiple times, and in a

8   footnote they urge you to reconsider that but we submit there

9   is no reason to do so here.  They talk about and they cite

10  cases from this Court in which there were no declarations and

11  the Court went by the pleadings, as the Court should have, in

12  assessing the jurisdictional facts.  They talk about the

13  Court's Rule 12(b)(6) plausibility decisions but they don't

14  apply in 12(b)(2), so they are left with nothing.

15       So they point to the two U.S. entities, Fujikura

16  Automotive America, FAA, which never sold the parts for

17  trucks and equipment at Fujikura Ltd.'s direction or

18  otherwise, so FAA can't help them, although FAA is the entity

19  that they do allege with respect to automobiles

20  Fujikura, Ltd. acted through in the U.S.

21       After our initial motion to dismiss, Your Honor,

22  plaintiffs amended their complaint to try to save it because

23  they knew -- we had said, hey, you did nothing to tie

24  Fujikura, Ltd. to the United States, so they added paragraph

25  53, which is these allegations about this joint venture.  It

 1    is a joint venture Fujikura, Ltd. did not control.  As

 2    established, unrebutted in the declaration of Mr. Alexander,

 3    who is vice president of sales and marketing currently at

 4    FAA, but had the same position previously at the joint

 5    venture, the joint venture to the extent sold for trucks and

 6    equipment did not sell Fujikura LTD's parts, it sold the

 7    parts that the joint venture itself made.  Fujikura, Ltd. --

 8    the plaintiffs also affirmatively allege that Fujikura, Ltd.

 9    engaged in unlawful conduct through FAA but not the joint

10    venture, and they don't allege the joint venture itself

11    engaged in unlawful conduct, so they try to mix and match

12    everything, they say this joint venture sold parts for trucks

13    and equipment, it might not have been Fujikura parts but they

14    sold parts for trucks and equipment, but they don't allege

15    anything in the unlawful intentionally tortious conduct by or

16    through that joint venture, they then say there was

17    intentionally tortious conduct through FAA but they don't

18    sell for trucks and equipment.  They can't mix and match and

19    put them together in large part because FAA didn't start

20    operating, didn't make its first sale or anything until the

21    joint venture was dissolved.  The joint venture was dissolved

22    in 2005, FAA didn't start operating until 2006.

23           This Court has been very cautious about pulling --

24    hauling, as the case law says, foreign defendants into this

25    Court when there is not strong personal jurisdiction over

1    them.  Foreign defendants who have no connection to the

2    plaintiffs, who have done nothing to cause harm to these

3    plaintiffs, should not be pulled into U.S. courts and have to

4    defend themselves here, and we would ask this Court to

5    dismiss Fujikura, Ltd. with prejudice.

6              THE COURT:  Okay.  Thank you.  MR. PARKS?

7              MR. PARKS:  Your Honor, it would be a relatively

8    remarkable circumstance where a defendant who has been

9    identified as a conspirator in a conspiracy in the United

10   States, as Fujikura has here, is somehow said to be not

11   subject to the jurisdiction of this Court when its already in

12   front of this Court in this case.  And this is different I

13   would say than other foreign defendants who aren't in front

14   of this Court, there aren't guilty pleas involving activity

15   in the United States and in this forum in particular, there

16   are for Fujikura.  I would also say, Your Honor, that it is

17   particularly remarkable where we allege that Fujikura, Ltd.

18   was a participant in a joint venture that did sell wire

19   harnesses for trucks and equipment during the conspiracy

20   period in the United States.  So I think those two facts

21   distinguish this from some of the Court's other decisions

22   where the entirety of the allegation was that there was a

23   subsidiary's conduct here in the United States.

24             THE COURT:  Okay.  Thank you.  Reply?

25             MR. RUBIN:  Very brief rebuttal on that, and then I

1    will move right into the FAA motion with permission.

2         The Court has already held that a subsidiary that

3    is owned and controlled by a foreign defendant happens to

4    sell the product in the U.S. does not subject the foreign

5    defendant to jurisdiction.  It will be odd for the Court

6    respectfully to then now hold that participation as a

7    minority non-controlling shareholder in a joint venture, that

8    did not sell the foreign company's products would somehow

9    pull the foreign company into the United States for personal

10   jurisdiction purposes.  A subsidiary that is controlled

11   versus a joint venture that is not controlled, it is unclear

12   how the joint venture would extend jurisdiction when this

13   subsidiary would not.

14        In terms of the fact that Fujikura is already in

15   front of this Court in the automobile cases and cases that

16   involve vehicles that include automobiles doesn't mean that

17   every plaintiff gets to haul the foreign defendant into this

18   Court, that's what general jurisdiction is.  Specific

19   jurisdiction has to be tied to the specific plaintiffs.

20        This Court's effects test in Weather Underground

21   talk about intentionally tortious conduct aimed at this forum

22   causing harm to these plaintiffs, not other plaintiffs but

23   these plaintiffs, Your Honor.  That's lacking here, the fact

24   that this Court has exercised jurisdiction and that Fujikura,

25   Ltd. has not challenged jurisdiction in the automobile -- the

 1    cases that arise out of automobiles and other vehicle but

 2    include automobiles that arise from the guilty plea speaks

 3    volumes to the fact that we are challenging it here.

 4              THE COURT:  Thank you.  Okay.  You want to go on?

 5              MR. RUBIN:  Yes, I would, Your Honor.

 6              An essential element of the plaintiffs' claim is

 7    obviously harm to these plaintiffs.  Plaintiffs' basic

 8    argument is that their pleadings here against FAA are

 9    sufficient because similar plaintiffs or similar pleadings by

10    other plaintiffs have been found to be sufficient in other

11    MDL cases, but plaintiffs' counsel got up here and I -- the

12    quote was -- I'm not going to try to quote it, I will

13    paraphrase it, the record will be what it is, that this is

14    the first set of plaintiffs that are bringing claims for

15    trucks and equipment and not including automobiles, that all

16    of those other activities, all of those other cases were all

17    about cars, that the car world and trucks and equipment world

18    are fundamentally different.  It is hard to square that with

19    saying that this Court should simply do what it did with cars

20    and apply it to trucks and equipment, and do that when the

21    plaintiffs fail to allege that Fujikura Automotive America

22    had anything to do with trucks and equipment.

23              These plaintiffs are unlike anyone that have come

24    before this Court and their allegations against FAA are like

25    anyone who has come before this Court.  First, of course,

 1   they exclude the automobiles, and this was by their own

 2   design specifically to try to set themselves apart from the

 3   auto dealers, and then they argue for statute of limitations

 4   purposes that the facts about automobiles wasn't even enough

 5   to raise a suspicion but now it makes it plausible.

 6        Secondly, these claims by the plaintiffs against

 7   FAA are different because they do not actually allege that

 8   FAA purchased parts -- I'm sorry, that they purchased parts

 9   from FAA.  I know we will hear about paragraph either 98 or

10   99 about the all-defendant allegations, and I reread their

11   opposition last night, Your Honor, and I noted that they have

12   a whole bunch of quotes from the complaint, notably not a

13   single one of them says anything about FAA, it is all of

14   these other defendant allegations, all defendants have done

15   this, defendants and their co-conspirators have done that.

16   We know the 6th Circuit says that's not enough.

17        We also know this Court has distinguished the

18   6th Circuit's holdings in the past by combining allegations

19   about the market structure with guilty pleas concerning that

20   market, and the fact that each defendant allegedly sold the

21   parts to these -- that were made in either directly or

22   indirectly of the products the plaintiffs purchased.  The

23   Court has never faced a case which there is no guilty plea

24   connecting anyone to this market according to plaintiffs

25   themself.  The Court has never faced a case where the

1   plaintiffs do not allege because they know they can't that

2   they purchased parts from the defendant that is moving.

3           They had their chance, Your Honor.  We filed this

4   motion before, they chose not to respond to it and they chose

5   to amend their complaint.  They did the best they could with

6   the facts they had.  They added paragraph 53 about the joint

7   venture, we just spoke about that, but that paragraph doesn't

8   even allege that FAA was involved in the joint venture.  It

9   is very careful gymnastic pleadings where they've been and

10  contort themselves into a pretzel in order to define Fujikura

11  in paragraph 52 as either Fujikura, Ltd. or FAA and then they

12  say Fujikura, quote/unquote, sold through this joint venture,

13  but except for a moment that they -- that FAA did sell

14  through this joint venture, that's -- or the joint venture

15  sold something or somehow connected, put away the temporal

16  chronology, and just imagine that they don't allege any

17  wrongful conduct by the joint venture either, and to state a

18  plausible claim they need to say somewhere in their complaint

19  the joint venture did something wrong or Fujikura acted

20  wrongly, broke the law through the joint venture.  They do

21  that for a Fujikura, Ltd., they allege that Fujikura, Ltd.

22  engaged in its unlawful conduct through FAA for automobiles,

23  there is nothing similar for trucks and equipment with

24  respect to the joint venture.

25          But, Your Honor, this motion is different than I

```
 1    think every one that you faced before in which you denied the

 2    12(b)(6) motion because the Court doesn't here need to play

 3    with the pleadings, doesn't need to assess whether really all

 4    defendants' allegations are sufficient because the Court has

 5    in front of it declarations that are undisputed that provide

 6    that despite the allegation that all defendants sold wire

 7    harness parts that went into trucks and equipment, that's now

 8    refuted by allegation -- by affidavits and other evidence

 9    saying we did it.  They want to rest back on their pleadings

10    but the Court can and should convert this to a Rule 56 if

11    there is any doubt about the sufficiency of the pleadings,

12    and in doing so the Court need not give the plaintiffs more

13    time for discovery.  Again, as I indicated earlier, they have

14    had our discovery for six months.  We are not --

15         THE COURT:  Let me just ask this to clarify again,

16    FAA didn't come into existence until this joint venture was

17    dissolved?

18         MR. RUBIN:  Correct, and then FAA did not itself

19    sell parts for trucks and equipment, so it wasn't connected

20    to the joint venture itself when it came into existence,

21    didn't sell any parts that made it into the products that

22    these plaintiffs purchased.

23         So what do they have in terms of discovery that

24    could help them corroborate what we are saying or challenge

25    it?  Well, they have transactional data, five minutes they
```

1    could have looked through the transactional data and

2    confirmed for themselves that FAA has no sales before 2006.

3    Ten minutes later they could have gone through the list of

4    customers to whom FAA sold products and discovered that there

5    are no trucks and equipment OEMs on that list.  Probably an

6    hour long exercise they could have run the name of the joint

7    venture through the two million pages of documents we have

8    produced and have the full history of the joint venture and

9    FAA's commencement after the dissolution of the joint

10   venture.  A couple hours they could have read interrogatory

11   responses from FAA, from Fujikura, Ltd., from all the other

12   defendants both in other parts cases and then in this case as

13   well -- I'm sorry, in the wire harness parts cases but for

14   the direct purchasers and indirect purchasers, and would have

15   found nothing linking FAA to trucks and equipment or wrongful

16   conduct relating to trucks and equipment.

17          Plaintiffs have known we are not in the trucks and

18   equipment business since the spring when we told them during

19   the meet and confers, and we also told them we weren't

20   excluding trucks and equipment because other plaintiffs have

21   asked for those.  In their discovery they said we want

22   anything dealing with any type of motor vehicle, and we

23   didn't object to that, and so we see a document, it mentions

24   trucks and equipment, it gets produced regardless of the fact

25   that we don't sell for those parts.  If it mentions it they

 1   have it.

 2           They had six months to run more extensive searches

 3   to find something, and they made a strategic decision not to

 4   do that, Your Honor.  Presumably they want me to tell this

 5   Court we need more time, we need discovery, we need something

 6   else, but that type of decision-making, that type of

 7   strategic gamesmanship should not justify holding FAA to the

 8   burdens and pulling FAA through the burdens of further

 9   discovery, further litigation in this case when this Court

10   can and should resolve this either on a 12(b)(6) motion or

11   convert it to summary judgment.

12           THE COURT:  Okay.  Thank you.  Response?

13           MR. PARKS:  Yes, Your Honor.

14           THE COURT:  MR. PARKS.

15           MR. PARKS:  Your Honor, our complaint is clear that

16   there is a broad conspiracy involving wire harnesses that

17   initially was thought to be limited to passenger vehicles but

18   subsequently based on subsequent discovered information was

19   actually broader and included commercial vehicles.  We have

20   alleged that the Fujikura entities were involved in that

21   conspiracy, and Fujikura understands I believe based on the

22   fact that it has introduced matters outside of the pleadings

23   that if this Court is considering the question purely on the

24   pleadings the 12(b)(6) motion should be denied, so Fujikura

25   has come forward with declarations from certain of its folks

1    about what it did and didn't do and the folks to whom it did

2    and didn't sell.  Our position on that, Your Honor, is that

3    it is in this Court's discretion to decide whether to permit

4    discovery on those -- further discovery on those issues.

5            Now, counsel for Fujikura points out that we have

6    had documents from them for some time, that's true.  We also

7    are the recipients of literally millions, Your Honor,

8    millions of pages of paper in this case.  We came into this

9    case as is clear from discussions today much later than

10   everyone else.  We filed our wire harness complaint November

11   of 2014.  Other parties in this case have had literally years

12   to begin to digest the millions of pages of paper in this

13   case, we have had months, and we certainly haven't had the

14   opportunity to examine the particular issues identified in

15   these declarations.  We certainly haven't obviously had the

16   opportunity to depose these witnesses and dig into exactly

17   what -- how accurate those allegations are and what documents

18   may undermine them or add different nuances or shed different

19   light on the issue.  We would ask the Court for that

20   opportunity.

21           Now, I think it is particularly appropriate here,

22   Your Honor, since it is not going to change the scope of

23   discovery in this case in any meaningful way.  As counsel for

24   Fujikura has said, they are producing documents about

25   vehicles irrespective of cars or commercial vehicles or what

1    have you, so that part of the process is already ongoing.

2    There are protocols in place about how long the depositions

3    are going to be in this case and who is going to have to ask

4    questions and so forth.  Those depositions aren't going to be

5    materially longer, if any longer, based on some of the

6    inquiries that we would make on these issues.  I understand

7    if we are talking about bringing a party that is not

8    otherwise in the case or introducing aspects of new

9    depositions, new discovery that is not otherwise involved,

10   that the Court might say, well, you know, on a Rule 56

11   scenario and in balancing these various considerations I will

12   want to deal with this now, but here, Your Honor, it is not

13   going to change the scope of discovery to allow these claims

14   to proceed, and it is, we would contend, considerably unfair

15   given the volume of the information that has been thrust upon

16   us in this case to have to deal with trying to cobble

17   together responses to the assertions in these declarations

18   under these circumstances and without the benefit of the

19   deposition testimony.

20        But as a starting point and as an ending point I

21   would say that the fact that there is Rule 56 requests here

22   on these matters outside of the pleadings introduced by

23   Fujikura I think demonstrates that they know fully well the

24   allegations are sufficient against the Fujikura entities and

25   that they are trying to move this into a scenario where they

1   can add additional facts and rebut some of the facts we have

2   alleged.

3           THE COURT:  Okay.

4           MR. RUBIN:  Very briefly, Your Honor.  The

5   pleadings are not sufficient.  I think we have walked through

6   and explained why they are not sufficient, especially in the

7   context of this case, especially in the case where the

8   plaintiffs have walked away from the guilty pleas that

9   support and bolstered this Court's prior Rule 12(b)(6)

10  decisions, but the fact that we have some very narrow facts

11  that compel judgment in our favor that are not reasonably

12  subject to a dispute, that are easily verifiable, that we

13  didn't sell these parts for trucks and equipment, and that

14  the guilty plea relates to automobiles, not trucks and

15  equipment, a point they concede, and that there is no other

16  evidence that they point to or allege that somehow ties us to

17  the truck and equipment market, the Court can if there is any

18  question decide this on Rule 56.

19          In terms of discovery burdens, the fact that truck

20  and equipment dealers are going to be asking questions may

21  very well lead other plaintiffs to say we didn't get enough

22  time.  Not only do we face the trucks and equipment dealers,

23  we also have Ford who is going to be asking questions of

24  Fujikura at depositions.  It would not surprise me for the

25  plaintiffs to not be able to agree on how they allocate time.

```
 1    I believe there would be additional burdens, additional

 2    preparation needed for witnesses, and just simply the costs

 3    of monitoring the litigation, reviewing briefs, reviewing

 4    their briefs, reviewing discovery, participating in discovery

 5    from Rush Trucks is substantial and is not a justification

 6    when the facts are clear when they have had a single summary

 7    judgment motion pending for -- I think the briefing in this

 8    has lasted four months.

 9            They have a single defendant's documents they could

10    have run searches through, found documents and looked at them

11    on these particular points.  They've served discovery,

12    they've gotten their responses, we have verified

13    interrogatory responses to them stating that no -- actually,

14    Your Honor, they were objections but objecting on the basis

15    of and representing as counsel and also sworn affidavits that

16    we didn't sell these parts for your vehicles.  Under these

17    facts the Court should not delay resolving this case at this

18    point.  Thank you, Your Honor.

19            THE COURT:  Thank you.  Thank you very much.  I

20    will issue opinions as soon as we can.  Thank you.

21            THE LAW CLERK:  All rise.  Court is adjourned.

22            (Proceedings concluded at 3:40 p.m.)

23                        _     _     _

24

25
```

```
 1                        CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of Automotive Parts Antitrust Litigation,

 9    Case No. 12-md-02311, on Tuesday, October 6, 2015.

10

11

12                        s/Robert L. Smith
                          Robert L. Smith, RPR, CSR 5098
13                        Federal Official Court Reporter
                          United States District Court
14                        Eastern District of Michigan

15

16

17    Date:  10/16/2015

18    Detroit, Michigan

19

20

21

22

23

24

25
```