```
1                    UNITED STATES OF AMERICA

2                  EASTERN DISTRICT OF MICHIGAN

3                        SOUTHERN DIVISION

4                          —   —   —

5

     IN RE:  AUTOMOTIVE PARTS          Master File No. 12-md-02311
6    ANTITRUST LITIGATION              Hon. Marianne O. Battani

7    _____/

8

9                       SETTLEMENT HEARING

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
11          Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                       Detroit, Michigan
                  Wednesday, November 18, 2015
13
     APPEARANCES:
14
     Direct Purchaser Plaintiffs:
15
     GERARD V. MANTESE
16   MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
     1361 East Big Beaver Road
17   Troy, MI  48083
     (248) 457-9200
18

19   SHAWN M. RAITER
     LARSON KING, L.L.P.
20   30 East Seventh Street, Suite 2800
     Saint Paul, MN  55101
21   (651) 312-6500

22

23

24

25
```



```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:

 3   ALDEN L. ATKINS
     VINSON & ELKINS, L.L.P.
 4   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
 5   (202) 639-6613

 6

 7   PETER M. FALKENSTEIN
     JAFFE, RAITT, HEUER & WEISS, P.C.
 8   535 W. William Street, Suite 4005
     Ann Arbor, MI  48103
 9   (734) 222-4776

10   MICHELLE K. FISCHER
     JONES DAY
11   51 Louisiana Avenue NW
     Washington, D.C.  20001
12   (202) 879-4645

13

14   ANDREW S. MAROVITZ
     MAYER BROWN, L.L.P.
15   71 South Wacker Drive
     Chicago, IL  60606
16   (312) 701-7116

17   MICHAEL RUBIN
     ARNOLD & PORTER, L.L.P.
18   555 Twelfth Street NW
     Washington, D.C.  20004
19   (202) 942-5094

20

21   WM. PARKER SANDERS
     SMITH, GAMBRELL & RUSSELL, L.L.P.
22   Promenade Two, Suite 3100
     1230 Peachtree Street NE
23   Atlanta, GA  30309
     (404) 815-3684

24

25
```

```
 1   APPEARANCES:   (Continued)

 2   For the Defendants:

 3   JOANNE GEHA SWANSON
     KERR, RUSSELL & WEBER, P.L.C.
 4   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
 5   (313) 961-0200

 6

 7   LINDSEY ROBINSON VAALA
     VINSON & ELKINS, L.L.P.
     2200 Pennsylvania Avenue NW, Suite 500 West
 8   Washington, D.C.  20037
     (202) 639-6585

 9

10   PETER KONTIO
     ALSTON & BIRD, L.L.P.
11   1201 West Peachtree Street
     Atlanta, GA  30309
12   (404) 881-7000

13

14   HOWARD B. IWREY
     DYKEMA GOSSETT, P.L.L.C.
     39577 Woodward Avenue, Suite 300
15   Bloomfield Hills, MI  48304
     (248) 203-0526

16

17   MOLLY M. DONOVAN
     WINSTON & STRAWN, L.L.P.
18   200 Park Avenue
     New York, NY  10166
19   (212) 294-4692

20

21

22

23

24

25
```

Settlement Hearing • November 18, 2015

TABLE OF CONTENTS

Page

Approval of Settlement........................... 33

1    Detroit, Michigan

2    Wednesday, November 18, 2015

3    At about 3:00 p.m.

4                         —   —   —

5              (Court and Counsel present.)

6              THE COURT:  Good afternoon.  This is a nice

7    representative group here.  Okay.  This is the proposed

8    settlement final hearing.  And, Counsel, may I have your

9    appearances, please?

10             MR. RAITER:  Yes, Your Honor.  Shawn Raiter on

11   behalf of the auto dealers.

12             Your Honor, before you today we have two motions.

13   The first is for final approval of the collection of

14   settlements that you have preliminarily approved over the

15   course of about a year to a year and-a-half.  And then the

16   second is the auto dealers' counsels' request for attorney

17   fees, reimbursement of litigation expenses, of future

18   litigation, a reserve fund, and then also service or

19   incentive awards for the named representatives in the auto

20   dealer cases.

21             THE COURT:  You know what, I think we should get

22   defendants' appearances on the record.  It is a small group

23   and I would like to do that formally.

24             MR. KONTIO:  Peter Kontio for the defendant

25   AutoLiv.

1          MS. KINGSLEY:  Meredith Kingsley for the defendant

2     AutoLiv.

3          MR. IWREY:  Howard Iwrey for the TRW defendants.

4          MR. MAROVITZ:  Andy Marovitz for Lear.

5          MR. RUBIN:  Michael Rubin for Fujikura.

6          MR. SANDERS:  Parker Sanders for Kungshun Lears

7     Sales and Engineering.

8          MR. ATKINS:  Alden Atkins for Hitachi Automotive

9     and the HIAMS defendants.

10          MS. VAALA:  Lindsey Vaala for Hitachi Automotive

11     and the HIAMS defendants.

12          MR. SIMMONS:  Peter Simmons for the T. Rad

13     defendants.

14          MS. DONOVAN:  Molly Donovan for the Nippon Seiki

15     defendants and the Panasonic defendants.

16          THE COURT:  Okay.

17          MR. JOHNSON:  Alan Johnson for the TRW defendants.

18          MS. FISCHER:  Michelle Fischer for the Yazaki

19     defendants.

20          MS. SWANSON:  Joanne Geha Swanson for AutoLiv and

21     Fujikura defendants.

22          THE COURT:  Do you want to put your appearance?

23          MR. FALKENSTEIN:  Peter Falkenstein for Kungshun

24     Lear.

25          THE COURT:  Okay.  Thank you.  Got everybody.  With

1    you, Mr. Raiter, is Mr. Mantese.  Do you want to put your

2    appearance on the record?

3            MR. MANTESE:  Gerard Mantese for the auto

4    dealerships.  Thank you.

5            MR. RAITER:  Thank you, Your Honor.  As you know,

6    we have ten defendants or defendant groups before you with

7    settlements that you have previously preliminary approved.

8    The settlements go across 18 different parts cases.  They are

9    broken down into 23 different settlement classes, in other

10   words, by part or by defendant or by settling defendant

11   group.  The total lump sum cash benefits provided are

12   approximately $59 million to the auto dealers.  These are all

13   settlements that are lump sum cash.  The defendants have

14   already transmitted the funds to trust accounts or qualifying

15   settlement funds to the auto dealers and so the money has

16   already changed hands and is sitting there.

17           These again are lump sum cash settlements.  There

18   are no reversions, no side pay remainders.  These all involve

19   substantial cooperation as Your Honor knows from the

20   preliminary approval hearings.

21           We received your authorization to send notice to

22   the class and disseminate various forms of notice, we did

23   that -- or to the classes, I should say.  We carried out that

24   notice plan.  We have as part of final approval papers

25   submitted a declaration from Kenneth Jue from Gilardi and

1    Company confirming and attesting that the notice plan was

2    carried out.  That was a notice plan that ultimately went to

3    about 6,000 automobile dealerships that sell new cars in the

4    indirect purchaser states.  That number was a little bit

5    smaller than what we thought we were going to have as part of

6    the preliminary approval.  The list available was about

7    6,000.

8              We then also sent e-mails that were e-mail

9    addresses associated with new --

10             THE COURT:  I didn't understand that.  Is that

11   various people within the dealership?

12             MR. RAITER:  Exactly, yes.  So some of these

13   dealerships -- our own class representatives, for example, we

14   know received three or four e-mails of the notice.  The way

15   you get those addresses are people sign up or they are part

16   of some trade organization or they go to some conference or

17   something, and so there are groups that sell lists of

18   information, we've all received e-mails I'm sure and you

19   wonder why, but there are these groups out there.

20             So we had 124,000 e-mail addresses that were

21   associated in some way -- with pretty good knowledge they

22   were associated with automobile dealerships in the indirect

23   purchaser states.  We then published notice in Ward's, Auto

24   World, Automotive News and Auto Dealer Monthly.  There were

25   social media efforts on Facebook and Twitter.  There was a

1    press release issued as well to try to bring attention to the

2    settlements.

3           As you saw from the declaration of Kenneth Jue, the

4    notice plan reached approximately 95 percent of new vehicle

5    automobile dealers in the indirect purchaser states.

6           The class member reaction was excellent.  We have

7    no objectors.  We have no opt outs.  Nobody asked to speak or

8    appear at this hearing.  Those of us who do this type of

9    litigation, that's fairly remarkable that we have a nice

10   uniformly supported settlement before you.

11          THE COURT:  There was one who was going to opt out

12   but did not; is that correct?

13          MR. RAITER:  Yes, exactly.  There was an automotive

14   dealership group called Group One Automotive who initially

15   opted out.  Having considered it further, having spoken with

16   not only counsel for the auto dealers but their own counsel

17   and other people and decided to withdraw that exclusion,

18   which was something that you have allowed in your preliminary

19   approval orders and the notice order, and again that's very

20   common.

21          If you think about that, just as an aside, what

22   happens in cases like this, there are law firms soliciting

23   opt outs.  There are lawyers that go to the big automotive

24   groups, absolutely, the big ones, Auto Nation, Penske, groups

25   like this, all receive multiple letters from law firms

1    soliciting them to opt out of these settlements.  And we as

2    auto dealer counsel get contacted and we speak with those

3    potential class members about the benefits and the risks and

4    the ups and the downs of these settlements.  And having done

5    that in this case, this one group who did elect initially to

6    opt out came back in.  So the fact that we don't have any opt

7    outs from any of the large groups or even the small groups is

8    very remarkable and as you know supports the settlement, it

9    is a very strong factor for you.

10        So we didn't have -- because we didn't have

11   objections, we didn't have any objections to the merits of

12   the settlement, the amounts offered, the terms of the

13   settlement, the attorney fees, the requests for reimbursement

14   of expenses or the service or incentive awards or the notice,

15   quite frankly, sometimes people object to the notice plan, we

16   didn't have any such objections here.

17        So, Your Honor, as you know, the 6th Circuit has

18   seven factors that you are to look at as part of final

19   fairness and final approval.  I don't think we need to go

20   through all of them here.  You are familiar with them.  We

21   have briefed them.

22        THE COURT:  We have done that before in the

23   preliminary.

24        MR. RAITER:  We have.

25        THE COURT:  Nothing has changed?

1          MR. RAITER:  Nothing has changed.  I think in

2    summary the important factors are the amount of relief

3    offered here is substantial.  It is the result of counsel

4    certainly for the auto dealers but I presume the defendants

5    as well looking at the merits, the risks, the benefits of

6    settling now rather than continuing to litigate, and then

7    also looking at what is actually being provided to these

8    automobile dealerships who come forward and file a claim and

9    ask for some reimbursement.  These were certainly

10    arm's-length negotiations.  I think you have seen firsthand

11    that the parties are vigorously and zealously representing

12    their clients, so there is no reason to think that any of

13    these settlements were cooked up in some fashion, and they

14    were certainly the result of counsel who were well armed with

15    ample information about the merits, discovery.

16          As you know, we have not only active discovery

17    going on but we also have cooperation in some of these cases

18    that really does benefit quite a bit the plaintiffs'

19    understanding what is at issue, the conduct, the likely

20    affected commerce and then therefore the merits and

21    weaknesses of our case.

22          We believe these are excellent settlements, counsel

23    for the auto dealers believe that, we believe these are in

24    the best interest of the classes, and they should be finally

25    approved.

1        THE COURT:  Is there anyone else who has any input

2   in the settlement beside plaintiffs and defendants?  Are

3   there any third-party financial folks who are involved here?

4        MR. RAITER:  Do you mean somebody who has an

5   interest in the settlement like a funding company, is that

6   what you mean?

7        THE COURT:  Yes.

8        MR. RAITER:  Not from auto dealers' perspective.

9        THE COURT:  Okay.  Thank you.

10        MR. RAITER:  These are just the auto dealers and

11   their counsel and the settlements, there's no interest, no

12   one has a share of anything.

13        We have put in front of you, Your Honor, four plans

14   of allocation that were developed by Stuart Rosenthal, who

15   was the special allocation consultant that the auto dealers

16   engaged with the Court's approval.  He has spent a great deal

17   of time trying to devise plans that fairly distribute the

18   money that is available in each one of these settlement

19   funds, and essentially the approach he came up with was a

20   weighted point system where he gives more weight to vehicles

21   where we have good evidence of coordination, and when I say

22   good evidence it isn't always perfect given where we are in

23   the litigation and just quite frankly the nature of the

24   evidence we receive often says somebody might have met and

25   might have talked about this particular model, or it could

 1    have been this model or that model, so it isn't always

 2    perfect, but where we think we have pretty good evidence of a

 3    particular model being part of some coordinated activity,

 4    Mr. Rosenthal has given that model the highest weighting

 5    possible.

 6            And so a dealership will come in then and have a

 7    claim form, which we have submitted to the Court as part of

 8    the Jue declaration, and will tell us in each year how many

 9    units of a particular model did they sell.  Those units will

10    then be applied to the weighting or scoring system.  So you

11    get the highest amount for a model that we have good evidence

12    that was coordinated, and you then get a lesser amount for

13    the next three model years of that model.  The idea being

14    these parts sometimes span three or four years, so let's say

15    a 2010 Camry was coordinated, a wire harness that goes into

16    that Camry may be in the 2011, 2012, 2013 model years as

17    well, so that's the next highest weighting.

18            Again, the evidence isn't always perfect here.

19    Sometimes the defendants will say we sold these wire

20    harnesses, we are not entirely sure what model years they

21    went into or even what models they went into, they think they

22    know but they don't always.

23            So the next step then is weighting OEMs who were

24    targets of coordination and then beneath that any other

25    vehicles.  So he's got a graduated kind of weighting system

1    that is intended to provide more relief to automobile dealers

2    who sold more vehicles that we believe were coordinated.

3           He also has a system for assigning points to the

4    parts because if you remember the component parts for repairs

5    or other uses are also at issue in these particular

6    settlements before Your Honor.  These were cases that

7    involved parts allegations and the releases that are before

8    the Court involved parts, so he has allocated certain

9    weighting to parts as well.

10           In order to be sure that we don't overburden these

11   dealers in trying to prove to us which parts they bought

12   because it is not exactly easy sometimes with the different

13   part numbers and identification numbers for different types

14   of wire harnesses, as an example, so what we did there is he

15   looked at it and decided that the idea would be that you can

16   use the volume of your vehicle sales for purchases as a

17   surrogate for parts.  In other words, a large dealership that

18   purchases a lot of these vehicles is likely to also purchase

19   a lot of the parts, so that's an option that the class

20   members have is to essentially say I don't want to submit my

21   parts invoices as part of my proof of claim, what I just want

22   you to do is rely on my vehicle purchase numbers as a

23   surrogate.  If they do choose to come in with their actual

24   parts purchase information that's what will be used in the

25   weighting process.

```
 1            So we have submitted some case law, Your Honor,
 2    that says that your analysis of these plans of allocation is
 3    essentially the same, it is the same standard as Rule 23,
 4    which is are they fair, reasonable and adequate under the
 5    circumstances.  We believe these plans are.  The plans that
 6    we provided to you so far are the wire harness, the occupant
 7    safety systems, inverters and switches.  The reason you don't
 8    have all of them in front of you is that some information is
 9    still coming in, so to speak, with some of these other parts,
10    and the plans are still being essentially put together.
11            The case law when we came to you on preliminary
12    approval is pretty clear that you can enter final judgment
13    without having any plan of allocation before you, and you can
14    let the parties come back later and propose those.
15            THE COURT:  Explain to me a little bit more about
16    what happens -- I see the claims form that the auto dealers
17    have to fill out and they mail this claims form into --
18            MR. RAITER:  Gilardi.
19            THE COURT:  -- Gilardi, and Gilardi has a facility
20    that can handle all of these, and will Gilardi be the ones to
21    apply these plans?
22            MR. RAITER:  Yes.
23            THE COURT:  And then disburse the funds?
24            MR. RAITER:  Yes, yes.
25            THE COURT:  Okay.
```

1       MR. RAITER:  So they will be the claims

2  administrator as well with the Court's approval, and we have

3  that in the proposed omnibus order that I presented to you.

4  The process is also now available electronically so they

5  don't have to just mail it in, they can fill out a form

6  electronically and submit it.  We have asked them to back up

7  their data or their claim with their year-end OEM statements,

8  which defendants are familiar with what those are, it is

9  essentially at the end of the year or actually at the end of

10 each month a dealer submits to the OEM kind of a breakdown of

11 what we purchased, what we sold.  So those are documents that

12 are already in existence for most dealerships, they should be

13 accessible for most dealerships, and that's what they can

14 submit to say I bought 1,000 Corollas, here is my OEM

15 statement that shows that I did.

16      We will accept other documentation as well if there

17 is something else that the dealership has that is good

18 evidence that they actually purchased those vehicles or

19 purchased those parts.

20      What Gilardi will then do is by the end of the

21 claims deadline -- or at the end of the claims deadline will

22 essentially calculate all of these weighted scores for each

23 of these different parts and will assign the dealership some

24 kind of a score for its claim.  From there you then are going

25 to make a pro-rata distribution of the particular settlement

1    fund to those dealers that have made claims to that fund

2    based on their weighted score.

3            THE COURT:  So none of this is done, as I

4    understand it, until the very end, so that's why you end up

5    with no -- I mean, you know you are distributing everything?

6            MR. RAITER:  Correct, we are going to put it all

7    out, right.  So the claims process is just getting underway,

8    and we will obviously make efforts to be sure that the

9    dealers are aware that the process is underway, that they

10   make their claims, that they receive assistance in perfecting

11   their claims.  We have every incentive to get that money paid

12   out to the right people at the right time.

13           THE COURT:  Okay.  And you indicated in your

14   settlement -- or in your papers that there is a minimum of

15   350 --

16           MR. RAITER:  $350, yes.

17           THE COURT:  -- that the auto dealership will get?

18           MR. RAITER:  Correct.

19           THE COURT:  So at the end, what I wasn't quite

20   clear about, if the dealership does not make any claim at all

21   then they wouldn't even be entitled to that or would you

22   automatically send --

23           MR. RAITER:  It has to be a perfected claim form.

24   Keep in mind that some of these class periods start at

25   different times or that certain vehicles may have been

1    coordinated at different times, and if you are an auto dealer

2    that went out of the business before then or just came into

3    business after that you may not have a valid claim based on

4    timing, so we really do need to see a claim come in from

5    somebody that gives us the time frame, gives us the backup

6    documents.

7          Mr. Rosenthal came up with the $350 minimum payment

8    essentially as an incentive for people to think to themselves

9    it is worth my time to fill this out, to have somebody at my

10    dealership to fill this form out and go through this process.

11          THE COURT:  And what about like during the

12    recession and when the companies went out of the business and

13    all of these auto dealerships that I've read about, I don't

14    know, that went out of the business, what about those

15    dealerships?

16          MR. RAITER:  Yes, I should have said this.  The

17    notice plan that the 6,000 postal addresses and even the

18    e-mail addresses included dealerships that were once in

19    business and may no longer be in business.  So we made an

20    effort to reach out to those dealerships because they would

21    have a claim here.  Now, how it is presented and who actually

22    holds the claim and all of those fun things are a different

23    issue for the claim process, but certainly if a dealership

24    went out of the business but was in business for the first

25    half of the particular class period they would in theory have

1    a claim and could bring the claim forward and show that they

2    are the right person who owns the claim, so to speak, or is

3    authorized to bring the claim.  So we have -- no one is

4    excluded on that basis, you do not still have to be in

5    business to file a claim.

6         So, Your Honor, we have asked you in the omnibus

7    order before the Court to approve these plans of allocation

8    that you have before you, and we recognize that for any

9    future part and future plans of allocation we will need to

10   come to the Court and get approval for those and we intend to

11   do so as quickly as we possibly can.

12        One thing I should have mentioned is that we also

13   propose in this allocation plan through Mr. Rosenthal, it was

14   really his idea, which was a very good one, which is to put

15   some money into reserve for some period of time from each one

16   of these funds.  The idea being is we may not have all of the

17   information right now about particular models or particular

18   coordination and we don't want to dole all of the money out

19   only to find out later that there was some model that was

20   affected and we didn't account for that properly.  So he has

21   proposed that we set aside via Gilardi and these qualified

22   settlement funds 40 percent initially to sit and to be sure

23   that we have the ability to essentially direct the money to

24   the right people at the right time.  As these cases unfold,

25   wire harness is farthest advanced, it may be that we come to

```
1    the Court and we say we believe we have the information, we
2    would like permission to disburse what we have in reserve, if
3    that makes sense.
4         THE COURT:  So you are going to be doing basically
5    two disbursements, or 60 percent of the fund now and then
6    40 percent at a later date if it is still there?
7         MR. RAITER:  Exactly, exactly, yep, because we want
8    to treat everyone fairly and because the litigation continues
9    there may be new information that is material.  It may turn
10   out that it really isn't and that we have covered it
11   adequately in the plans as they are approved, and if so you
12   would run that 40 percent back through those class members
13   the same way you did the first 60 percent.
14        THE COURT:  So in terms of distribution you're
15   asking to take out 40 percent of the fund and then I know you
16   are asking for five percent for future costs, and then the
17   reimbursement for costs and the attorney fees?
18        MR. RAITER:  Uh-huh.
19        THE COURT:  What do you see as the net amount that
20   is ready to be distributed roughly?
21        MR. RAITER:  That's a good question.  I haven't
22   done that calculation.  The 40 percent may be soon.  Again,
23   we just wanted to be absolutely sure that we didn't have
24   something that shocked us later and said we didn't know about
25   this and now we need to add these vehicles in.  So we are
```

1    trying to work as quickly as possible to get claims paid

2    because the money is just sitting there and it should get in

3    the right hands as soon as we can, so I haven't done that

4    calculation but that would be the idea.

5              We have, as you know, we have Sumitomo, the motion

6    before Your Honor, at least it has been briefed, we have a

7    settlement with Sumitomo for preliminary approval, and there

8    may be some other settlements relatively soon, so we will be

9    adding hopefully to these funds essentially as we go is our

10   hope.

11             THE COURT:  Okay.

12             MR. RAITER:  At least as to the final approval

13   aspect of this settlement, Your Honor, or these settlements,

14   we have submitted to you a set of orders.  The first is what

15   I have called the omnibus order, and that's an order that

16   would apply across all these settlements and has the various

17   Rule 23 findings, has the appointment of settlement counsel,

18   the appointment of the class representatives, it has the

19   approval of the plans of allocation and approval of the

20   notice plan, et cetera.

21             What we have then done with each of the defendant

22   groups is circulate and I think approve final orders for

23   judgment for each of these defendant groups.  There is an

24   exception or two, one might have more than another -- or one

25   may have two of these orders for judgment, and then the Lear

```
 1    and Kale Sales are put together into one document, but the
 2    idea would be that we would ask you to enter some kind of an
 3    omnibus order hopefully like the form we have proposed to you
 4    which also includes defendants' comments and edits.  That
 5    particular omnibus order I will need to submit a very, very
 6    slightly amended version to the Court to clean up some case
 7    number and ECF number mistakes, and then also on paragraph 44
 8    we inadvertently said that we had the starters plan of
 9    allocation before you when, in fact, we have the switches.
10            Defense counsel I believe has signed off on that
11    omnibus order, I'm not suggesting that they joined in it, but
12    they have had the opportunity to submit edits, comments and
13    what we will submit to you today is hopefully something that
14    will be to your approval.
15            Each of their orders for judgment they have
16    essentially signed off on.  We have asked for their input.
17    They look very much the same, there are a few little
18    differences among them, but we'll submit to the Court all of
19    those orders which then direct the entry of final judgment as
20    to these defendant groups.
21            THE COURT:  So you are going to submit, just so I'm
22    clear on this, a whole new set, let's say, of orders, so that
23    I will know these will be the final --
24            MR. RAITER:  Exactly.
25            THE COURT:  Okay.
```

```
 1         MR. RAITER:  I will try to not have a bunch of
 2   things going different ways but they are very, very minor
 3   changes, one to paragraph 44, one to some ECF and case number
 4   citations for the HIAMS or Hitachi Group that we got wrong
 5   when we submitted the proposed order.
 6         So the second order before Your Honor is a request
 7   for reimbursement of costs, disbursements, future litigation
 8   fund, attorney fees and service or incentive awards.  As you
 9   know, you have the ability under Rule 23(h) and 54(d)(2) to
10   award fees and reimbursement of expenses to the auto dealers.
11   Again, we don't have any objections or comments to the fees
12   that we have requested, the reimbursement.  We posted that
13   motion several weeks before the opt out or the objection
14   deadline.  We filed it with the Court, put it up on the
15   settlement website in case anyone wanted to comment before
16   they had to object or opt out.
17         The methodology for our calculations in our
18   request, so you have an idea of what we did, I think we
19   spelled it out but I want to be clear, we submitted to you
20   the Loadstar for the cases in which we have settlements
21   before the Court.  We also submitted what each of our firms
22   essentially call a general auto parts file, and those files
23   are files essentially that reflect the work that is done that
24   benefits all of this -- all of these cases and all of this
25   litigation.  When we come to a status conference we don't
```

         1    come for only wire harness, we come for all of the cases.
         2    When we work with some of our experts we work for all of the
         3    cases rather than any particular case at times. What we have
         4    done as lead counsel is directed our auto dealer counsel to
         5    try to attribute time and expenses as best possible to a
         6    particular case or to a particular part so that we are
         7    tracking that time and that investment and those fee requests
         8    when we come to you based on the settlements.
         9              THE COURT: So the 41,000 hours you are talking
        10    about -- yeah, 41,000, relate to these parts only and they
        11    have been pulled out from --
        12              MR. RAITER: Correct.
        13              THE COURT: -- all of the parts?
        14              MR. RAITER: With the exception of the general
        15    time. Again, if I come to a status conference I would put my
        16    time down as auto parts general because I'm here for not just
        17    wire harness but all of the other cases. So the 41,000 hours
        18    includes what we have deemed general billing that would apply
        19    across the litigation.
        20              THE COURT: So it won't be duplicated in the next?
        21              MR. RAITER: Absolutely not, and that's what we are
        22    trying to be clear about is we have a system in place so we
        23    know what our time and expenses are. You will know what fees
        24    you have awarded or what expenses you have awarded. We
        25    directed our people when we made the preliminary -- excuse

1    me, the filing for the motion for attorney fees and expenses

2    we basically said okay, now we need to draw a line because we

3    need to know what expenses are incurred going forward, we

4    need to know what time is incurred going forward because if

5    we are fortunate enough to get an attorney fee award from you

6    today or shortly hereafter we know that we can't come back in

7    and double dip and ask for the same time again.  So what we

8    would probably intend to do is come in and say here is our

9    time on these cases where we have settlements again, here is

10   the aggregate amount of time and expense, here is what you

11   have already awarded and here is the difference, that seems

12   to be the only way we can think of to do this because the

13   litigation continues.

14        So, again, the time before you has parts' specific

15   time for each part involved in the settlements, those cases

16   will continue against other defendants, and there will be

17   time spent there, and then we will have the general time

18   where it benefits more than one case essentially, so that was

19   the methodology.  Again, we don't have any objections to any

20   aspect of this request.

21        We have requested reimbursement for past expenses

22   as of essentially the beginning of October, incurred of

23   $1,661,946 that counsel for the auto dealers have advanced

24   from their firms to benefit these settlement class members.

25   We asked for the establishment of a future expense fund.  As

```
 1    you know from the case law, the Packaged Ice and the Manual
 2    for Complex Litigation, and I believe you also did it for the
 3    direct purchasers in this litigation as well, setting aside
 4    some money from these settlements to pursue the claims in the
 5    parts cases at issue here.  So I want to be very clear about
 6    this; the settlement fund here if we don't have a settlement
 7    in bearings, which we don't have before you, the fund that we
 8    have before you would not be used for the bearings litigation
 9    because that would not be fair to those settlement class
10    members, so we would use this future fund only for the parts
11    cases at issue before you, the 18 different parts that we
12    have.  So, again, we are trying to be sensitive to where the
13    money should be used and how.
14         We have asked for five percent of the gross
15    settlement funds, which would be $2,947,395, as a future
16    litigation fund.  That would be something that we would
17    obviously keep records for, both what is in the fund, what
18    goes out of the fund, how it was spent, and certainly if the
19    Court had questions as we proceed we would be happy to
20    provide accountings to you as we go.
21         We have asked for an award of attorney fees.
22    Again, interim fee awards as the litigation continues are
23    well accepted, the Air Cargo case, the Diet Drugs case, Your
24    Honor awarded fees to the direct purchasers in this
25    litigation as well.
```

1    We ask that you apply a percentage of the fund

2    approach which is favored in the 6th Circuit.  What we have

3    asked for is one-third of the net settlement funds remaining

4    after the deduction of two things, and that is the cost of

5    notice and settlement administration, which we estimate at

6    about $500,000, and then after the future litigation costs

7    set aside the 2.947 million.  So, in other words, we are not

8    asking to take a fee off of those things, we don't believe

9    what -- we are not asking for that.

10    So the calculation as we see it is $58,947,900 is

11    the gross amount of the settlement funds.  You would take

12    away $2,947,395 for the five-percent litigation fund set

13    aside, and you would also then remove $500,000 for settlement

14    claims notice and administration.  You would take that number

15    and divide it by three, and this is in my declaration that

16    supports the fee request, that would leave $18,500,168 for

17    attorney fees.  If you looked at that instead of being

18    one-third of the fund minus those deductions, if you looked

19    at it instead as what percentage of this -- is this of the

20    gross settlement funds it would be 31.38 percent.

21    The Loadstar cross check on this, you've already

22    mentioned the 41,000 hours of attorney time, 6,000 hours

23    approximately of paralegal/law clerk/professional staff time,

24    the Loadstar total is approximately $26.1 million as of about

25    the beginning of October.  If you were to award the fee

1    request of 18,500,000 that would be a 0.70 Loadstar, it would

2    be a negative multiplier, and that's simply the product of

3    litigating these cases for three and-a-half years and the

4    amount of the settlement that we have before you or the

5    settlements we have before you, so we are not asking for a

6    positive multiplier, in fact, it would be a negative

7    multiplier.  And if we were to come forward again for a

8    request for fees we would obviously do the accounting for you

9    so we can give you a big-picture view of multipliers,

10   negative-positive disbursements as we need to have a good

11   accounting for that as we go.

12          Finally, Your Honor, the service awards we have

13   requested for the auto dealers are $50,000 each for those who

14   are named representatives in the operative complaints.  As

15   you know from the Haddocks and other cases in the

16   6th Circuit, these fees or awards are intended to encourage

17   people or businesses to come forward to serve in these roles

18   and to also recognize their efforts, their service and their

19   commitment to bringing cases to a conclusion.

20          I think you're pretty familiar with the amount of

21   discovery that has been directed to the auto dealers.  It has

22   been daunting for many of them.  We have produced, for

23   example, or been asked to produce invoices for all the

24   purchases of cars going back to 1998 to the present.  For

25   some dealers that is tens of thousands of vehicles at issue.

1    We have also asked to produce certain electronic DM'S data.

2    We have been asked to produce certain incentive and other

3    documents from the OEMs or to and from the OEMs.

4         THE COURT:  How many of these representative

5    dealerships do you have?

6         MR. RAITER:  I don't -- we have a couple that are a

7    little bit in limbo, as you know.  We have got one that has

8    been allowed to move out of the case, Holdsbower.  We have

9    two motions for dealerships that would like to be out of the

10   litigation, so it is in the low 40s, less than 45 and more

11   than 40.

12        The reason for that -- this is an interesting issue

13   because if we were to come in often with a dealer who

14   purports to represent people from a state other than the one

15   in which they reside, we often get a motion from the

16   defendants saying you have to have a dealership

17   representative in each state.  So in order to carry out

18   litigation like this on a nationwide basis we have to have

19   that many dealers in order to not have this argument

20   advanced.  We don't agree with the argument but that's the

21   reason you do it.

22        So we would ask Your Honor that you award that

23   amount to these dealers.  It is well supported in the case

24   law.  Again, we have cited 6th Circuit District Court cases

25   like the Liberty Capital which was $97,000 and $95,000;

1  Cardizem, which was $75,000 for each class representative,

2  that was a 2003 decision; Revco Securities Litigation, which

3  is Northern District of Ohio in 1992 awarded $200,000.

4          THE COURT:  So how did you come up with $50,000?  I

5  shouldn't have asked that question.

6          MR. RAITER:  You try to use your best judgment

7  based on the results, based on the amount of effort.  These

8  dealerships obviously are still facing additional discovery,

9  they have depositions that they will have to sit for, and so

10  it is kind of we believe supported by the case law and

11  supported by where we are at right now in the litigation.  So

12  that's how we got there.  There is no magic to it.  All of

13  this is in your discretion; the attorney fees, the

14  reimbursement of the expenses, the incentive awards are all

15  up to Your Honor's good judgment.

16          We have submitted a proposed order for the attorney

17  fees and expenses.  Again, I will circulate that as part of

18  this e-mail back to the Court so you have that handy, but we

19  ask that you make these awards.  Unless you have questions

20  I'm happy to pass the microphone.

21          THE COURT:  Okay.

22          MR. RAITER:  Thank you.

23          THE COURT:  Defense, anyone want to speak?

24          MR. IWREY:  Your Honor, I have a very brief

25  housekeeping issue.

1          THE COURT:  Okay.

2          MR. IWREY:  Could I clarify, Your Honor, one thing

3   with Mr. Raiter before that?

4          (An off-the-record discussion was held at

5          3:10 p.m.)

6          MR. IWREY:  Your Honor, Howard Iwrey on behalf of

7   the TRW defendants, and also speaking on behalf of the

8   AutoLiv defendants.

9          First of all, the clarification that I wanted to

10  make was that 16,000 notices were mailed out, not 6,000 as

11  Mr. Raiter stated.

12         THE COURT:  Right.

13         MR. IWREY:  Which is even better.

14         THE COURT:  Yes.

15         MR. IWREY:  What I wanted to point out, Mr. Raiter

16  mentioned to you that some of the defendants' specific

17  proposed judgments have slightly different provisions.  The

18  provisions in AutoLiv and TRW have slightly different

19  provisions.

20         As you recall at the last hearing in September when

21  the Court approved dissemination of the dealer notices, I

22  said that TRW and AutoLiv have a motion pending in the Rush

23  Trucks case that could relate to this settlement we think in

24  a very small way.  The dealer proposed orders for TRW and

25  AutoLiv do make reference to that motion, and that motion is

```
 1    ECF Number 7 in the Rush Trucks case, which is 15-cv-12050.
 2            Your Honor, that motion is pending, fully briefed
 3    and ready for oral argument, and we would suggest that the
 4    Court consider ruling on the motion promptly so that the
 5    claims administration process in the dealers' case can
 6    proceed smoothly.  And we are happy to speak with Rush, I
 7    don't believe counsel for Rush Trucks is here, but we are
 8    happy to speak with Rush's counsel and your chambers so we
 9    can set up a hearing date on that.
10            THE COURT:  Would that hearing date be set up
11    for -- we have a conference in December, right?
12            MR. IWREY:  I believe it is January 9th.
13            THE COURT:  You want it before that?
14            MR. IWREY:  If possible.
15            THE COURT:  Okay.
16            MR. IWREY:  Okay.  Thank you very much, Your Honor.
17            MR. RAITER:  Mr. Iwrey was correct about the
18    number, it was approximately 16,000 direct mailings.
19            THE COURT:  I have that in my notes.
20            MR. RAITER:  And we did agree on the language in
21    their final order and judgment and so I don't have anything
22    further on that.
23            THE COURT:  Okay.  Anyone else have any comment?
24            (No response.)
25            THE COURT:  No other comments.  Okay.  I would like
```

1   to rule on these things right now so we can proceed.  Okay.

2   We have got a -- the motion is for, I believe, ten

3   previously-approved settlements with certain defendants in

4   this MDL involving 18 of the component parts.  I'm not going

5   to list the defendants but we all know who they are.

6       First of all, we have the notice and as we have

7   just discussed there were 16,000 actual mailings as I

8   understand it in addition to 124,000 e-mails to addresses

9   associated with these dealerships, and finally, of course, we

10  have the notices as counsel indicated that were published,

11  and we have the website.  So I think that the notice plan

12  which is alleged to have reached 95 percent of the eligible

13  automotive dealers worked out very well.  I think that's a

14  tremendous number of dealerships to have reached.

15      I am somewhat amazed that we haven't gotten any

16  more objections but today is the date set, it was in the

17  notice and we don't have any other objections except for the

18  one that was withdrawn, and I think that does speak to the

19  reasonableness of the settlement.

20      We have Mr. Rosenthal's plan of allocation.  I

21  cannot speak as to how that plan will work, but I believe he

22  is experienced in allocating things such as this and that the

23  plan for allocation sounds fair and reasonable and adequate

24  to give weight appropriately to the various dealerships.

25      The issue of whether the proposed settlement is

 1    fair, reasonable and adequate, the Court, of course, has gone

 2    over this in the preliminary rulings, and there are any

 3    number of items that have to be taken into consideration and

 4    we dealt with these before but I will simply touch on them.

 5    The likelihood of success, I guess that's disputed between

 6    the parties but the settlement resolves that.  The likelihood

 7    of success on these indirect purchasers are -- is a little

 8    risky and therefore that has to be taken into consideration.

 9    There is also the value that has been discussed before as to

10    icebreaker settlements.

11            The next issue is the complexity, expense and

12    duration of continued litigation.  Certainly we know

13    antitrust cases in themselves, at least in my experience, are

14    complex.  I think this case has many unique twists and is a

15    very complex case that could go on and may for some parts and

16    some defendants a very long time at a great expense.  I think

17    we can see the expenses that have already been incurred to

18    proceed with this litigation.

19            Another factor is the judgment of experienced

20    counsel and I have addressed this before, I think both by

21    reviewing the resumes of counsel involved here and by judging

22    the work that has been done and the pleadings and the briefs

23    that have been submitted and in observing counsel in court,

24    the Court finds that settlement counsel is very experienced

25    and well able to evaluate the strengths and the weaknesses of

1    the claims and defenses that exist in this case, and I

2    believe that counsel believes the settlement is fair,

3    reasonable and in the best interest of the settlement class.

4            Another item is the reaction of class members and,

5    of course, we have already touched on that that there has

6    been basically with one exception no input from class

7    members.  The settlement class counsel have negotiated this

8    the Court believes at arm's length.

9            Another factor is the public interest and of course

10   the settlement of complex litigation such as this conserves

11   judicial resources and that's in the best interest of the

12   public but also it is important for the public to see a

13   result which is determined to be fair and reasonable given

14   the nature of this litigation.

15           The Court -- well, we know the notice sent out was

16   the notice proper.  The Court reviewed the notice and it does

17   seem that the notice covered all of the issues that would

18   come up and well informed the recipients of what was going

19   on.  I did think -- I want to comment on this.  I thought

20   that was very good in the notice where you talked about what

21   does it mean to me, how do I do this, et cetera.  I thought

22   that there was plain English, plain English used, which kind

23   of surprised me with your hourly rates that you could come

24   down to such plain language.

25           And the next issue is should the settlement class

1     be certified for purposes of effectuating the proposed

2     settlement.  We have gone through this before when we talked

3     about the classes -- the proposed classes.  There is

4     numerosity, clearly we know there is numerosity by the number

5     of notices that had to go out.  There is commonality,

6     questions of law and fact common to the whole class.  There

7     is typicalities, the claims of the respective parties are

8     typical of the claims in this antitrust of each and every

9     person or entity, and the injuries also affect each member in

10    the same way.  There is adequacy of representation, and the

11    Court has already addressed the qualifications of counsel and

12    the qualifications of the representative dealerships,

13    plaintiffs' counsel has referenced those dealerships and what

14    they had to go through, and they are representative of all of

15    the dealerships.  We know that common questions predominate

16    over questions affecting only individuals and would satisfy

17    Rule 23(b)(3).

18           The next issue is whether the plan of allocation

19    and settlement class and auto dealer class should be

20    approved, and the Court has indicated that the plan of

21    allocation pleadings appear to it to be a fair and adequate

22    plan, and that the counsel -- the Court will appoint counsel

23    to represent the settlement class and also appoint the auto

24    dealers -- or approve of the auto dealers' class

25    representatives.

1    So the Court will approve the settlement in these

2    actions with the plan of allocation, however, only for the

3    four parts that were submitted to the Court.

4    The next issue has to do with the funds -- multiple

5    issues with the fund.  There is a request to set aside

6    40 percent of the fund for future and unknown, I guess I

7    should say, items that might come up to be resolved.  The

8    Court will approve that 40 percent at this time, and it would

9    be held but I hope distributed as soon as possible.

10    The request for reimbursement for past expenses.

11    The Court has been looking at the expenses amongst various

12    parts as they have been submitted basically quarterly these

13    past years.  You know there are expenses that I have no way

14    of knowing.  You charge for travel and, you know, I don't

15    know if you are staying at the Ritz or Motel 6, I mean, I

16    have no way of knowing that.  But I think when a court

17    appoints a group of attorneys such as I have here we depend

18    on your own credibility and honesty, and I have no intention

19    of delving into these individual expenses regardless of the

20    multitude of expenses for various people and entities,

21    experts, document reviews, the hosting of the papers, the

22    computer systems, et cetera.  The Court will approve the

23    $1,661,946.95 for the expenditures.

24    I stop to say this because the last conference I

25    went to they delved into these expenses and had CPAs -- a

1    number of the MDLs had CPAs appointed to look at these

2    expenses, but when I look at the cost of hiring such folks

3    versus the cost of the expenses I think I'm going with your

4    honesty on the expenses, so that's basically where I come

5    down on that issue.

6         We know that we have only 18 parts here and only

7    some of the defendants so the Court does agree with the

8    future litigation expenses, that's that five percent that has

9    been requested, and I think that comes to $2,947,395 for

10   future expenses against the non-settling defendants, and I

11   think that that is very fair and it is fair to the individual

12   plaintiffs because they are continuing their litigation

13   against these defendants and therefore should share in these

14   costs.

15        In terms of the service award for the dealership

16   representatives, the request is for 50,000 with somewhere

17   between 40 and 45 dealership representatives.  I think that's

18   a fair number considering all of the state issues that we

19   have.  Whether $50,000 is adequate is really like pulling

20   numbers out of the air based on educated guesses, and I think

21   given the number of years and the amount of work -- as I

22   understand it there is some 700,000 pages of documents that

23   have been gotten from the dealer representatives, and

24   depositions to come, so the Court is going to award the

25   $50,000.

1          The next issue, which is probably the most

2    difficult, is the question of attorney fees where the Court

3    looks at a number of approaches.  There is the percentage of

4    the fund approach, the Loadstar approach, what is that third

5    one called, the percent -- the Loadstar percentage that is

6    frequently used or called Loadstar crosscheck.  The Court did

7    a number of things.  Let me tell you, first of all, I

8    considered the fact that I am told there's 41,000 attorney

9    hours and 6,000 paralegal hours or clerk hours, assuming

10   though I know you all work much more than this, just to

11   eyeball this, that you work 1,500 hours a year, and for

12   41,000 hours I basically get 27.3 attorneys and this is for

13   over four years, so it will equal out to be roughly 6.8

14   attorneys a year.  That doesn't seem to be enough at all.

15   But anyway those hours which looking at them in and of

16   themself are somewhat staggering but when you consider it is

17   over four years in all of this complex litigation the Court

18   is just taking an eyeball figure to say is that a reasonable

19   number of hours for attorneys to work, and I think in this

20   case it certainly is.

21          In terms of the approach to this, whether the

22   Loadstar or percentage as between those two approaches, the

23   Loadstar I think is a much more difficult approach to take.

24   One, you get into the hourly rate, and I think some of these

25   hourly rates I will tell you are ridiculous but if you get

1    them I guess that's more power to you, but I would have a

2    very difficult time looking at the specific hours and

3    applying the hourly rates that have been submitted to the

4    Court.

5        But what I did do, if I can find it here, is I

6    looked at a blended rate, and when I look at the blended rate

7    by taking the amount requested here, the 18 some million,

8    divided by the 47,000 hours, that's adding both the attorneys

9    and the paralegals, I get a $393 an hour blended rate. If I

10   take just the attorney, the 41,000 hours, I get a $451

11   blended rate, and I think that that blended rate is a

12   reasonable hourly rate with some attorneys with more

13   experience obviously getting more and some less.

14       The Loadstar in this case is 26.1 million, I

15   believe, and the requested fee is $18,500,158, which counsel

16   has indicated is that multiplier of 0.70, which is a negative

17   multiplier, which are generally considered reasonable and

18   appropriate, so that crosscheck I think works out well.

19       The Court has to weigh a number of factors in the

20   fee award; one, the value of the benefits to the class. We

21   know here that the class, of course, is getting fair cash

22   settlement plus cooperation as to against the other

23   defendants. The society benefits by awarding reasonable

24   attorney fees because this does encourage the bringing of

25   suits and the ending of these antitrust transgressions. And

1    the Court also notes that in this case specifically the

2    Department of Justice has received I think it is $2.6

3    billion, something like that, $2.9 billion in fines but they

4    did not seek any restitution, none of that is for

5    restitution.  I also consider the fact that these cases are

6    worked on a contingent basis, and certainly there is a risk

7    of non-recovery specifically for indirect plaintiffs.

8           The complexity of the litigation.  As the Court has

9    referenced already, it is very complex, multiple classes,

10   number of parts, multiple defendants.  I mean, everything is

11   complex, even the fact that it goes across countries and has

12   various languages, it just keeps going.  And we know, as the

13   Court has referenced before, that the skill of counsel is

14   extremely competent and very experienced.

15          So the Court in considering all of this in trying

16   to figure out the best way to determine the attorney fees and

17   considering the numbers that come out when you look at the

18   Loadstar and the crosscheck, finds that the requested amount

19   of the attorneys' fees, which is, I believe -- you said it

20   and I don't remember, it is just under a third, maybe

21   31 percent, the Court will award that.  I find that it is a

22   fair, reasonable and adequate sum.  Okay.

23          Okay.  What did I forget?  Plaintiff, you're going

24   to present all of the orders to the Court, and I will sign

25   it, and then you will work as fast as you can in getting

1    these other settlements.  If at all possible we can --

2              MR. RAITER:  We will, Your Honor.

3              THE COURT:  -- get them together.

4              MR. RAITER:  Yes.  I know that this is off the

5    topic, but the Sumitomo preliminary approval that the

6    indirect purchasers, so the end payors and auto dealers have

7    submitted to the Court, we had called at one time trying to

8    schedule a hearing and we had a phone issue where we didn't

9    get with your assistant to get it scheduled, so I think that

10   would be one that we would want to get on for preliminary

11   approval hearing no later than the January conference, but if

12   there was another hearing for something else we might ask to

13   join in before that.

14             THE COURT:  Okay.  You wanted another hearing for

15   the settlement --

16             MR. RAITER:  You have preliminary approval, this is

17   not part of the final approval, but the Sumitomo settlement

18   between the end payors and the auto dealers have been fully

19   briefed and submitted for preliminary approval.  The auto

20   dealers were willing to forego a hearing, and my

21   understanding is either and/or Sumitomo and the indirects

22   would like to have a hearing, so we tried to schedule it by

23   having a call, the call had a glitch, we didn't get on the

24   phone with Your Honor's chambers, so that's just hanging out

25   there, but that would be another one that we should try to

Settlement Hearing • November 18, 2015

**44**

1    move forward so we can get it to a final approval at some

2    point.

3              THE COURT:  Okay.  We will work on a date and let

4    you know if we can get that in in the next month.

5              MR. RAITER:  Thank you, Your Honor.

6              THE COURT:  Okay.  Anything else?

7              (No response.)

8              THE COURT:  Thank you, and I wish you all a very

9    happy Thanksgiving.

10             THE LAW CLERK:  All rise.  Court is in recess.

11             (Proceedings concluded at 3:35 p.m.)

12                              _   _   _

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of In re: Automotive Parts Antitrust

 9    Litigation, Case No. 12-02311, on Wednesday,

10    November 18, 2015.

11

12

13                             s/Robert L. Smith
                               Robert L. Smith, RPR, CSR 5098
14                             Federal Official Court Reporter
                               United States District Court
15                             Eastern District of Michigan

16

17

18    Date:  12/17/2015

19    Detroit, Michigan

20

21

22

23

24

25
```