```
 1                       UNITED STATES DISTRICT COURT
                         EASTERN DISTRICT OF MICHIGAN
 2                            SOUTHERN DIVISION

 3                               —   —   —

 4    IN RE:  AUTOMOTIVE PARTS
      ANTITRUST LITIGATION
 5
                      MDL NO. 2311
 6    _____/

 7

 8              STATUS CONFERENCE & MOTION HEARINGS

 9          BEFORE THE HONORABLE MARIANNE O. BATTANI
                   United States District Judge
             Theodore Levin United States Courthouse
10                231 West Lafayette Boulevard
                        Detroit, Michigan
11

12    APPEARANCES:

13    Direct Purchaser Plaintiffs:

14    THOMAS C. BRIGHT
      GOLD, BENNET, CERA & SIDENER, L.L.P.
15    595 Market Street, Suite 2300
      San Francisco, CA  94105
16    (415) 777-2230

17

      WILLIAM G. CALDES
18    SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
      1818 Market Street, Suite 2500
19    Philadelphia, PA  19103
      (215) 496-0300
20

21    DAVID H. FINK
      FINK & ASSOCIATES LAW
22    100 West Long Lake Road, Suite 111
      Bloomfield Hills, MI  48304
23    (248) 971-2500

24

25
```

```
 1    APPEARANCES:  (Continued)

 2    NATHAN FINK
      FINK & ASSOCIATES LAW
 3    100 West Long Lake Road, Suite 111
      Bloomfield Hills, MI  48304
 4    (248) 971-2500

 5

      LEWIS H. GOLDFARB
 6    McELROY, DEUTSCH, MULVANEY & CARPENTER, L.L.P.
      1200 Mount Kemble Avenue
 7    Morristown, NJ  07962
      (973) 993-8100

 8

 9    GREGORY P. HANSEL
      PRETI, FLAHERTY, BELIVEAU &
10    PACHIOS, L.L.P.
      One City Center
11    Portland, ME  04112
      (207) 791-3000

12

13    JONATHAN M. JAGHER
      SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
14    181 Market Street, Suite 2500
      Philadelphia, PA  19103
15    (215) 496-0300

16

      STEVEN A. KANNER
17    FREED, KANNER, LONDON & MILLEN, L.L.C.
      2201 Waukegan Road, Suite 130
18    Bannockburn, IL  60015
      (224) 632-4502

19

20    JOSEPH C. KOHN
      KOHN, SWIFT & GRAF, P.C.
21    One South Broad Street, Suite 2100
      Philadelphia, PA  19107
22    (215) 238-1700

23

      SARAH GIBBS LEIVICK
24    KASOWITZ, BENSON, TORRES & FRIEDMAN, L.L.P.
      1633 Broadway
25    New York, NY  10019
      (212) 506-1765
```

```
 1    APPEARANCES:  (Continued)

 2    EUGENE A. SPECTOR
      SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
 3    1818 Market Street, Suite 2500
      Philadelphia, PA  19103
 4    (215) 496-0300

 5

      JASON J. THOMPSON
 6    SOMMERS SCHWARTZ, P.C.
      2000 Town Center, Suite 900
 7    Southfield, MI  48075
      (248) 355-0300
 8

 9    RANDALL B. WEILL
      PRETI, FLAHERTY, BELIVEAU &
10    PACHIOS, L.L.P.
      One City Center
11    Portland, ME  04112
      (207) 791-3000
12

13    DAVID YOUNG
      COHEN MILSTEIN
14    1100 New York Avenue NW, Suite 500 West
      Washington, D.C.  20005
15    (202) 408-4600

16
      End-Payor Plaintiffs:
17
      JOYCE CHANG
18    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
19    Burlingame, CA  94010
      (650) 697-6000
20

21    DEMETRIUS LAMBRINOS
      COTCHETT, PITRE & McCARTHY, L.L.P.
22    840 Malcolm Road
      Burlingame, CA  94010
23    (650) 697-6000

24

25
```

```
 1     APPEARANCES:  (Continued)

 2     E. POWELL MILLER
       THE MILLER LAW FIRM, P.C.
 3     950 West University Drive, Suite 300
       Rochester, MI  48307
 4     (248) 841-2200

 5

       WILLIAM V. REISS
 6     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
       601 Lexington Avenue, Suite 3400
 7     New York, NY  10022
       (212) 980-7405
 8

 9     HOLLIS L. SALZMAN
       ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
10     601 Lexington Avenue, Suite 3400
       New York, NY  10022
11     (212) 980-7405

12

       MARC M. SELTZER
13     SUSMAN GODFREY, L.L.P
       190 Avenue of the Stars, Suite 950
14     Los Angeles, CA  90067
       (310) 789-3102
15

16     ELIZABETH T. TRAN
       COTCHETT, PITRE & McCARTHY, L.L.P.
17     840 Malcolm Road
       Burlingame, CA  94010
18     (650) 697-6000

19

       STEVEN N. WILLIAMS
20     COTCHETT, PITRE & McCARTHY, L.L.P.
       840 Malcolm Road
21     Burlingame, CA  94010
       (650) 697-6000
22

23

24

25
```

```
 1    APPEARANCES:   (Continued)

 2    Dealership Plaintiffs:

 3    ALEXANDER E. BLUM
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
 4    1361 East Big Beaver Road
      Troy, MI  48083
 5    (248) 457-9200

 6

 7    KRISTA HOSMER
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
      1361 East Big Beaver Road
 8    Troy, MI  48083
      (248) 457-9200
 9

10    J. MANLY PARKS
      DUANE MORRIS, L.L.P.
11    30 South 17th Street
      Philadelphia, PA  19103
12    (215) 979-1342

13

14    SHAWN M. RAITER
      LARSON KING, L.L.P.
      30 East Seventh Street, Suite 2800
15    Saint Paul, MN  55101
      (651) 312-6500
16

17    VICTORIA ROMANENKO
      CUNEO, GILBERT & LaDUCA, L.L.P.
18    507 C Street NE
      Washington, D.C.  20002
19    (202) 789-3960

20

      For the Defendants:
21

      JEFFREY J. AMATO
22    WINSTON & STRAWN, L.L.P.
      200 Park Avenue
23    New York, NY  10166
      (212) 294-4685
24

25
```

```
 1    APPEARANCES:   (Continued)

 2    BRUCE ALLEN BAIRD
      COVINGTON & BURLING, L.L.P.
 3    850 Tenth Street, NW
      Washington, D.C. 20001
 4    (202) 662-5122

 5
      JOHN A. BARNSTEAD
 6    BARNES & THORNBURG, L.L.P.
      11 South Meridian Street
 7    Indianapolis, IN 46204-3535
      (317) 236-1313
 8

 9    JANE P. BENTROTT
      MORRISON & FOERSTER
10    2000 Pennsylvania Avenue, NW, Suite 6000
      Washington, D.C. 20006
11    (202) 887-1500

12
      MICHAEL G. BRADY
13    WARNER, NORCROSS & JUDD, L.L.P.
      2000 Town Center, Suite 2700
14    Southfield, MI  48075
      (248) 784-5032
15

16    PATRICK J. CAROME
      WILMER HALE
17    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
18    (202) 663-6610

19
      ELIZABETH CATE
20    WINSTON & STRAWN, L.L.P.
      200 Park Avenue
21    New York, NY  10166
      (212) 294-6700

22

23    MATTHEW CELESTIN
      WILMER HALE
24    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
25    (202) 663-6600
```

```
 1    APPEARANCES:  (Continued)

 2    STEVEN F. CHERRY
      WILMER HALE
 3    1875 Pennsylvania Avenue NW
      Washington, D.C.  20006
 4    (202) 663-6321

 5

      HEATHER SOUDER CHOI
 6    BAKER BOTTS, L.L.P.

 7

      JAMES L. COOPER
 8    ARNOLD & PORTER, L.L.P.
      555 Twelfth Street NW
 9    Washington, D.C.  20004
      (202) 942-5000
10

11    MOLLY CRABTREE
      PORTER, WRIGHT, MORRIS & ARTHUR
12    41 South High Street, Suite 2900
      Columbus, OH  43215
13    (614) 227-2015

14

      KENNETH R. DAVIS, II
15    LANE POWELL, P.C.
      601 SW Second Avenue, Suite 2100
16    Portland, OR  97204
      (503) 778-2100
17

18    DAVID P. DONOVAN
      WILMER HALE
19    1875 Pennsylvania Avenue, NW
      Washington, D.C.  20006
20    (202) 663-6868

21

      ABRAM ELLIS
22    SIMPSON, THACHER & BARTLETT, L.L.P.
      1155 F Street, N.W.
23    Washington, D.C. 20004
      (202) 636-5579
24

25
```

```
 1    APPEARANCES:  (Continued)

 2    J. CLAYTON EVERETT, JR.
      MORGAN, LEWIS & BOCKIUS, L.L.P.
 3    1111 Pennsylvania Avenue NW
      Washington, D.C.  20004
 4    (202) 739-5860

 5
      PETER M. FALKENSTEIN
 6    JAFFE, RAITT, HEUER & WEISS, P.C.
      535 W. William, Suite 4005
 7    Ann arbor, MI  48103
      (734) 222-4776
 8

 9    MICHAEL FELDBERG
      ALLEN & OVERY, L.L.P.
10    1221 Avenue of the Americas
      New York, NY  10020
11    (212) 610-6360

12
      MARK. A. FORD
13    WILMER HALE
      60 State Street
14    Boston, MA 02109
      (617) 526-6423
15

16    LARRY S. GANGNES
      LANE POWELL, P.C.
17    1420 Fifth Avenue, Suite 4100
      Seattle, Washington  98101
18    (206) 223-7000

19
      DAVID C. GIARDINA
20    SIDNEY AUSTIN, L.L.P.
      One South Dearborn Street
21    Chicago, IL  60603
      (312) 853-4155

22

23    FRED K. HERRMANN
      KERR, RUSSELL & WEBER, P.L.C.
24    500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
25    (313) 961-0200
```

```
 1   APPEARANCES:  (Continued)

 2   MAURA L. HUGHES
     CALFEE, HALTER & GRISWOLD, L.L.P.
 3   1405 East Sixth Street
     Cleveland, OH  44114
 4   (216) 622-8335

 5

     HOWARD B. IWREY
 6   DYKEMA GOSSETT, P.L.L.C.
     39577 Woodward Avenue, Suite 300
 7   Bloomfield Hills, MI  48304
     (248) 203-0526
 8

 9   WILLIAM R. JANSEN
     WARNER, NORCROSS & JUDD, L.L.P.
10   2000 Town Center, Suite 2700
     Southfield, MI  48075
11   (248) 784-5178

12

     FREDERICK JUCKNIESS
13   SCHIFF HARDIN, L.L.P.
     350 South Main Street, Suite 210
14   Ann Arbor, MI  48104
     (734) 222-1507
15

16   HEATHER LAMBERG KAFELE
     SHEARMAN & STERLING, L.L.P.
17   801 Pennsylvania Avenue, NW
     Washington, D.C.  20004
18   (202) 508-8097

19

     FRANK LISS
20   ARNOLD & PORTER, L.L.P.
     555 Twelfth Street NW
21   Washington, D.C. 20004
     (202) 942-5969

22

23   BRADLEY R. LOVE
     BARNES & THORNBURG, L.L.P.
24   11 South Meridian Street
     Indianapolis, IN 46204
25   (317) 261-7896
```

```
 1    APPEARANCES:  (Continued)

 2    JEFFREY L. KESSLER
      WINSTON & STRAWN, L.L.P.
 3    200 Park Avenue
      New York, NY  10166
 4    (212) 294-4655

 5

      MEREDITH JONES KINGSLEY
 6    ALSTON & BIRD, L.L.P.
      1201 West Peachtree Street
 7    Atlanta, GA  30309
      (404) 881-4793
 8

 9    SHELDON H. KLEIN
      BUTZEL LONG, P.C.
10    41000 Woodward Avenue
      Bloomfield Hills, MI  48304
11    (248) 258-1414

12
      STEVEN M. KOWAL
13    K&L GATES
      70 West Madison Street, Suite 3100
14    Chicago, IL  60602
      (312) 372.1121
15

16    JOHN M. MAJORAS
      JONES DAY
17    51 Louisiana Avenue NW
      Washington, D.C.  20001
18    (202) 879-3939

19
      CARL L. MALM
20    CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
      2000 Pennsylvania Avenue NW
21    Washington, D.C.  20006
      (202) 974-1959
22

23    MICHELLE A. MANTINE
      REED SMITH, L.L.P.
24    225 Fifth Avenue, Suite 1200
      Pittsburgh, PA  15222
25    (412) 288-4268
```

```
 1    APPEARANCES:   (Continued)

 2    ANDREW S. MAROVITZ
      MAYER BROWN, L.L.P.
 3    71 South Wacker Drive
      Chicago, IL  60606
 4    (312) 701-7116

 5

      ALLYSON M. MALTAS
 6    LATHAM & WATKINS, L.L.P.
      555 Eleventh Street NW, Suite 1000
 7    Washington, D.C.  20004
      (202) 637-2200
 8

 9    IAIN R. McPHIE
      SQUIRE PATTON BOGGS, L.L.P.
10    1200 19th Street, N.W., S. 300
      Washington, D.C. 20036
11    (202) 626-6600

12

      MARK MILLER
13    BAKER BOTTS, L.L.P.

14

      KENDALL MILLARD
15    BARNES & THORNBURG, L.L.P.
      11 South Meridian Street
16    Indianapolis, IN 46204
      (317)-231-7461
17

18    BRIAN M. MOORE
      DYKEMA GOSSETT, P.L.L.C.
19    39577 Woodward Avenue, Suite 300
      Bloomfield Hills, MI  48304
20    (248) 203-0772

21

      COURTNEY A. ROSEN
22    SIDLEY AUSTIN, L.L.P.
      One South Dearborn Street
23    Chicago, IL 60603
      (312) 853-7669

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   KAJETAN ROZGA
     WEIL, GOTSHAL & MANGES L.L.P.
 3   767 Fifth Ave,  STE. 3360
     New York, NY 10153
 4   (212) 310-8518

 5

     WM. PARKER SANDERS
 6   SMITH, GAMBRELL & RUSSELL, L.L.P.
     Promenade Two, Suite 3100
 7   1230 Peachtree Street NE
     Atlanta, GA  30309
 8   (404) 815-3684

 9

     LARRY J. SAYLOR
10   MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
     150 West Jefferson Avenue, Suite 2500
11   Detroit, MI  48226
     (313) 496-7986
12

13   AUSTIN SCHWING
     GIBSON, DUNN & CRUTCHER, L.L.P.
14   555 Mission Street
     San Francisco, CA  94105
15   (415) 393-8200

16

     SCOTT T. SEABOLT
17   FOLEY & LARDNER, L.L.P.
     500 Woodward Avenue, Suite 2700
18   Detroit, MI  48226
     (313) 234-7100

19

20   CRAIG SEEBALD
     VINSON & ELKINS, L.L.P.
21   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
22   (202) 639-6585

23

     MICHAEL LEONARD SIBARIUM
24   PILLSBURY ,WINTHROP, SHAW, PITTMAN, L.L.P.
     1200 Seventeenth Street, NW
25   Washington, D.C. 20036-3006
     (202) 663-9202
```

```
 1    APPEARANCES:  (Continued)

 2    CHARLES SKLARSKY
      JENNER & BLOCK
 3    353 N. Clark Street
      Chicago, IL 60654-3456
 4    (312) 923-2904

 5

      ANITA STORK
 6    COVINGTON & BURLING, L.L.P.
      One Front Street
 7    San Francisco, CA  94111
      (415) 591-7050
 8

 9    MARGUERITE M. SULLIVAN
      LATHAM & WATKINS, L.L.P.
10    555 Eleventh Street NW, Suite 1000
      Washington, D.C.  20004
11    (202) 637-2200

12

      JOANNE GEHA SWANSON
13    KERR, RUSSELL & WEBER, P.L.C.
      500 Woodward Avenue, Suite 2500
14    Detroit, MI  48226
      (313) 961-0200
15

16    MATTHEW TABAS
      ARNOLD & PORTER, L.L.P.
17    555 Twelfth Street NW
      Washington, D.C.  20004
18    (202) 942-5000

19

      MICHAEL F. TUBACH
20    O'MELVENY & MYERS, L.L.P.
      Two Embarcadero Center, 28th Floor
21    San Francisco, CA  94111
      (415) 984-8700
22

23    LINDSEY ROBINSON VAALA
      VINSON & ELKINS, L.L.P.
24    2200 Pennsylvania Avenue NW, Suite 500 West
      Washington, D.C.  20037
25    (202) 639-6585
```

```
 1    APPEARANCES:  (Continued)

 2    A. PAUL VICTOR
      WINSTON & STRAWN, L.L.P.
 3    200 Park Avenue
      New York, NY  10166
 4    (212) 294-4655

 5

      ROBERT WIERENGA
 6    SCHIFF HARDIN, L.L.P.
      350 South Main Street, Suite 210
 7    Ann Arbor, MI  48104
      (734) 222-1507
 8

 9    Other Appearances:

10    KEVIN P. NOLL
      FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
11    10 West State Street, Suite 200
      Geneva, IL 60134
12    (630) 492-1846

13

      R. SCOTT PALMER
14    OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA
      The Capital, PL-01
15    Tallahassee, FL  32399
      (850) 414-3300
16

17    KEVIN RYNBRANDT
      RYNBRANDT & ASSOCIATES, P.L.L.C
18    1000 Front Avenue
      Grand Rapids, MI 49504
19    (616) 451-0500

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2                                                              Page

3    STATUS CONFERENCE.................................... 16

4    REPORT BY THE SPECIAL MASTER......................... 40

5    MOTION HEARINGS
         End Payor Plaintiffs' Motion to Adjust
6        Class certification Schedules..................... 45

7        Automobile Dealer Plaintiffs' Concurrence in
         End Payor plaintiffs' Motion to Adjust
8        Class Certification Schedules..................... 55

9        Defendants' Objections to and Motion to Reverse
         in part and Modify the Special Master's
10       9/3/2015 Order................................... 73

11       Automobile Dealership Plaintiffs' Motion to
         Modify the Special Master's 9/29/2015 Order........ 97
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Detroit, Michigan

2   Wednesday, January 20, 2016

3   At about 10:03 a.m.

4                              —   —   —

5          (Court and Counsel present.)

6          THE CASE MANAGER:  Please rise.

7          The United States District Court for the Eastern

8   District of Michigan is now in session, the Honorable

9   Marianne O. Battani presiding.

10         You may be seated.

11         The Court calls Case No. 12-md-2311, In Re:

12  Automotive Parts Antitrust litigation.

13         THE COURT:  Good morning, everyone.

14         ATTORNEYS:  (Collectively) Good morning, Your

15  Honor.

16         THE COURT:  Looks like there are more of you today.

17  I don't know why that is.  Thank you for bringing the

18  president in with you, that's very nice, and the auto show.

19  I hope you all didn't have too much trouble with the various

20  things going on but at least you don't have snow to deal with

21  here, but maybe as you go home you are going to have problems

22  but anyway we don't have a long agenda today so let's see.

23         The first matter on the agenda is the preliminary

24  approval, and I don't -- there is nothing to argue here, the

25  Court has signed these -- will sign these documents.  Does

1    anybody have any comment on that, Fujikura or Sumitomo?

2         MR. REISS:  Good morning, Your Honor.  Will Reiss

3    for the end payor plaintiffs.

4         With respect to the preliminary approval orders,

5    no, we are just requesting that Your Honor sign them, but it

6    is in connection with the motion to disseminate notice that

7    we filed last week.  And what that is is that is a notice as

8    the Court may recall several months ago you approved our

9    motion to disseminate notice of the Hitachi and T.RAD

10   settlements, what we are looking to do now is to do a

11   combined notice program which includes both of those

12   settlements and in addition settlements with nine defendant

13   families, we would include them all on the same track.  We

14   had originally in the papers that we submitted to you in the

15   proposed order requested a final approval hearing date of

16   May 4th, that's what Your Honor had originally scheduled for

17   the T.RAD and Hitachi settlements, but we realize the status

18   conference is the following week on May 11th so if it is

19   convenient for Your Honor what we would request is in the

20   afternoon if Your Honor is available to set aside the

21   afternoon for final approval hearings.  We would have to

22   specify a time in the notice so what we would request I

23   understand some counsel are unavailable in the morning so if

24   we could do 3:00 on May 11th if you are available for --

25        THE COURT:  Okay.  Molly, just take a note of that.

```
 1              MR. REISS:  Just one thing to add.  In order for us
 2    to commence our notice program I think we have a drop-dead
 3    date of the 27th of this month, so I understand the Court's
 4    busy but if there is any way you could enter the order in
 5    advance of that so we could advance the notice program.
 6              THE COURT:  If you get the orders in here and they
 7    are all set --
 8              MR. REISS:  Yes, I will just need to change it to
 9    specify the new final approval date and we will get that to
10    you today.
11              THE COURT:  That has to be done, like you say,
12    within two weeks?
13              MR. REISS:  Within one week.  Okay.  Thank you.
14              THE COURT:  All right.  Thank you.
15              The next item is the dismissal of the public entity
16    plaintiffs in the wire harness.  I think we did a joint
17    stipulation.  Who is going to speak to that?
18              MR. BARRETT:  Your Honor, are we going to discuss
19    the new settlements?
20              THE COURT:  Pardon me?  Do you want to come up on
21    that?  The parties on that entered a joint stipulation, but I
22    need an order closing this case if that's --
23              MS. SALZMAN:  We are here for the first item on the
24    agenda, I think that's what Mr. Barrett was requesting is the
25    status of settlements if Your Honor wanted that status?
```

1          THE COURT:  I'm sorry.

2          MS. SALZMAN:  Hollis Salzman for end payors.

3          MR. BARRETT:  Don Barrett for auto dealers.

4          THE COURT:  Okay.

5          MS. SALZMAN:  We just want to let the Court know on

6     behalf of our two classes we will have at least three

7     settlements to present to the Court in the upcoming weeks.

8     One of the settlements is with a very important defendant,

9     and it will involve significant cooperation and a significant

10    monetary value for the classes.

11         MR. BARRETT:  It is a defendant involved in a

12    number of cases.

13         THE COURT:  Oh, good.

14         MS. SALZMAN:  Thank you.

15         THE COURT:  Now, do you need a hearing date on

16    that?

17         MR. BARRETT:  Not right now, Your Honor, but within

18    a week or ten days we will be able to talk to the Court about

19    that.  All the parties are moving expeditiously to get it

20    properly papered -- to get them properly papered.

21         MS. SALZMAN:  After the settlements are finalized

22    and we will submit preliminary approval papers likely again

23    without the need for a hearing, but we'll advise the Court at

24    that time.  Okay.  Thank you.

25         THE COURT:  Sounds good.  Thank you.

1          MR. KANNER:  Your Honor, good morning, Steve Kanner

2     on behalf of the direct-purchaser plaintiffs, still on Roman

3     numeral I.

4          THE COURT:  Okay.

5          MR. KANNER:  Before that closes, I wanted to advise

6     the Court that we have two settlements in the wire harness

7     matter.  The first is with Tokai Rika, there is an MOU in

8     place and we'll be putting together the settlement agreement

9     shortly and presenting it to the Court.

10          The second matter is well along, the settlement

11     agreement is not completed, and that defendant prefers not to

12     have its name identified until such time as we have completed

13     the settlement agreement.  In both cases I would expect to be

14     able to notify the Court through your clerk and through

15     motions for preliminary approval within the next few weeks.

16          THE COURT:  Good.  Thank you, Mr. Kanner.

17          MR. KANNER:  Thank you, Your Honor.

18          THE COURT:  Anyone else?

19          MR. PARKS:  Your Honor, Manly Parks on behalf of

20     the truck and equipment dealer plaintiffs.

21          We similarly have reached agreement in principle

22     with one of the defendants in one of the cases.  The

23     defendant again chooses not to have their name identified at

24     this point so we will be reporting to the Court in the near

25     future about that.

```
 1              THE COURT:  Very good.  More?  More settlements?
 2     No.  Okay.
 3              All right.  Then we will move on to B.  Who here is
 4     going to -- anybody on B?
 5              MR. CHERRY:  I will speak to that, Your Honor.
 6              THE COURT:  That's really more information --
 7              MR. CHERRY:  Yes, Your Honor.  Steve Cherry of
 8     Wilmer Hale for Denso, and this case for the wire harness
 9     defendants.
10              Yes, there was an intention for them to just
11     dismiss everything and I believe just to be out of the MDL.
12     Is there something more that needs to be filed?
13              THE COURT:  We need an order to get it off the
14     docket.
15              MR. CHERRY:  A proposed order?
16              THE COURT:  Yes, so even though we know there was
17     this joint stipulation it still requires an order.
18              MR. CHERRY:  Okay.  We will take care of that.
19     Thank you.
20              THE COURT:  Thank you, Mr. Cherry.
21              The next one is the Denso group I believe, the
22     motion to consolidate claims and --
23              MR. WILLIAMS:  Good morning, Your Honor.
24     Steve Williams for the end payor plaintiffs.
25              I don't think there was anything about the
```

1    substance of this to address unless the Court had any

2    questions, but what we did --

3              THE COURT:  No, I think you need a briefing

4    schedule, don't you?

5              MR. WILLIAMS:  We have a briefing schedule, what we

6    do not have is a hearing date.  We have a briefing schedule

7    in which briefing would be completed on February 12th, and

8    what we would like to do is set a date, the Court's next

9    available date after February 12th after you have had

10   sufficient time to review the papers.

11             THE COURT:  Okay.  I think maybe March 16th.  Let

12   me see -- it is not the 16th, it is the 15th.  How about the

13   15th at 10:00 in the morning, is that good?

14             MR. WILLIAMS:  It is for the end payors.

15             THE COURT:  How about for the defendants,

16   Mr. Cherry?

17             MR. CHERRY:  Your Honor, I think I can make that

18   work.

19             THE COURT:  If you have a problem let me know and I

20   can take care of it right now.

21             MR. CHERRY:  I'm just looking.  I'm sorry, I just

22   have a spring break with my children planned right in there.

23             THE COURT:  We want to accommodate that.

24             MR. CHERRY:  Okay.

25             THE COURT:  Is it that week or you don't know?

1          MR. CHERRY:  It is that week or the week after.

2   Can we assume it is okay and I will let you know if that's a

3   problem?

4          THE COURT:  Okay.  Let's set it for March 15th at

5   10:00 a.m.

6          MR. WILLIAMS:  Thank you, Your Honor.

7          THE COURT:  Do you want to get another date just in

8   case so that we don't have to --

9          MR. CHERRY:  The week before, does that work?

10         THE COURT:  Molly is just reminding me that the end

11  payors' motion and then the auto dealers have a same motion

12  that is really the same so we should do them on the same

13  date.

14         MR. WILLIAMS:  I apologize, I should have been more

15  explicit.  That date was for both, for the end payors and the

16  auto dealers, it would all be done at the same time.

17         THE COURT:  All right.  So then let's look to see

18  for a backup date -- I'm not sure if the auto dealers'

19  briefing is done.

20         MR. WILLIAMS:  It is.

21         THE COURT:  Okay.  Good.  Let's go back.  We could

22  do it on Wednesday, March 9th at 10:00 a.m.?

23         MR. CHERRY:  I'm sure that date works.

24         THE COURT:  Okay.  So just to be sure, the

25  March 15th date is the first date, and if that doesn't work

1    then we will go back to March 9th, that's a Wednesday.

2              MR. WILLIAMS:  And both at 10:00 a.m.?

3              THE COURT:  Both at 10:00 a.m.

4              MR. WILLIAMS:  Thank you, Your Honor.

5              MR. CHERRY:  Thank you, Your Honor.

6              THE COURT:  All right.  That takes care of one and

7    two under C, so we are at D, the status of discovery in parts

8    where the stay has been lifted.  The Court just added that

9    because I wanted to know what was next for those parts.

10             MS. TRAN:  Good morning.  Elizabeth Tran with

11   Cotchett, Pitre & McCarthy for the end payor plaintiffs.  I

12   will provide the Court with a brief update in wire harness,

13   bearings and AVRP.

14             In wire harness concerning documents,

15   guilty-pleading defendants made their DOJ productions to us

16   in mid 2012, we have since reviewed this.  After the Court

17   resolved motions to dismiss in June of 2013, we served

18   written discovery, including comprehensive interrogatories

19   and requests for productions, on defendants in 2013, 2014 and

20   2015.  We've completed transactional data negotiations though

21   there are some pending questions for defendants.  The parties

22   have completed custodian and search term negotiations subject

23   to plaintiffs' review of defendants' productions.  And to

24   date we have received some productions from all defendants.

25   Defendants are to complete their productions by next month.

1          As to depositions of wire harness defendants, the

2     Court lifted the stay on merits depositions in June 2014.

3     The parties weren't able to agree on a wire harness

4     deposition protocol until June 2015 after extensive briefing

5     and multiple conferences with the Special Master.

6     Depositions of defendants' witnesses began earlier this

7     month.  Plaintiffs have confirmed roughly 36 depositions so

8     far.  We have also interviewed several key witnesses from

9     various defendant groups in wire harness.

10          THE COURT:  Okay.

11          MS. TRAN:  As to bearings, the Court granted the

12     DOJ's request to stay discovery in bearings among other cases

13     in December 2013.  Although the Court resolved motions to

14     dismiss in August 2014 the discovery stay remained in effect

15     until January 2015 when the Court reported that the DOJ was

16     no longer seeking a stay in bearings, so discovery largely

17     began last spring.

18          Regarding documents, most defendants made their DOJ

19     productions to plaintiffs in April of 2015.  All defendants

20     have since made their DOJ productions to plaintiffs, and we

21     have reviewed these productions.  We served an interrogatory

22     related to affective vehicles in May of 2015.  We served

23     comprehensive discovery in July -- June 2015.  The deadlines

24     have passed for meeting and conferring on transactional data

25     and documents, but the parties are still negotiating

1   transactional data and custodian search terms because while

2   there were a lot of common issues there were a lot of the

3   defendant-specific issues as well and the parties are working

4   through that together.

5           Again, plaintiffs have received some productions

6   from all defendants though defendants' deadline to complete

7   production isn't until March 2016.  The parties have

8   completed negotiations on initial discovery plan and initial

9   orders in bearings.

10          Regarding depositions in bearings, and this goes

11  for all cases after wire harness, depositions can't proceed

12  yet because there aren't deposition protocols in any case but

13  wire harness.  We negotiated deposition protocols in fall of

14  2015, the Special Master heard arguments on the remaining

15  disputes in December 2015 and he entered an order on the

16  deposition protocol disputes that remained last week.  The

17  parties have I believe two weeks to submit objections, if

18  any, and if there are no objections then we would submit the

19  deposition protocols at the end of February.

20          So at the earliest bearings depositions and

21  depositions in other cases beside wire harness likely won't

22  proceed until early April given the obligatory lead time for

23  scheduling and also the potential objections to notices of

24  depositions.  Plaintiffs expect to interview the first set of

25  key witnesses in bearings in late March of this year.

1          And as to AVRP, like bearings, the Court granted

2      the DOJ's stay in December 2013.  The stay remained in effect

3      until January 2015.  The Court resolved --

4          THE COURT:  20 --

5          MS. TRAN:  2015.

6          THE COURT:  So it is done now?

7          MS. TRAN:  Yes.  The Court resolved motions to

8      dismiss in May of 2015.  That same month plaintiff served an

9      interrogatory on AVRP defendants, we also served

10     comprehensive discovery on these defendants in July -- in

11     June of 2015.

12         As to documents in AVRP, the defendants have made

13     their DOJ productions to plaintiffs.  We finished reviewing

14     these.  Regarding the comprehensive interrogatories we

15     served, the defendants sought a three-month extension to

16     respond to them and plaintiffs agreed to that.  We are still

17     discussing transactional data, discovery plans, initial

18     orders, custodian search terms all at once with these

19     defendants, and depositions for the same reasons as bearings,

20     AVRP depositions haven't started yet but we have interviewed

21     key witnesses.

22         THE COURT:  Okay.

23         MS. TRAN:  Also I would like to give the Court a

24     brief update on non-party discovery which is relevant to all

25     cases.

 1          The Court instructed the parties to coordinate

 2    non-party discovery in January 2015.  The parties agreed on a

 3    uniform subpoena to OEMs in April of 2015 after collaborating

 4    diligently on them and receiving a few extensions from the

 5    Special Master to do so.  In light of the direct purchaser

 6    plaintiffs in Ford's objections, the same parties could not

 7    serve the OEM subpoenas until the Special Master ruled on the

 8    objections in June 2015, so the serving parties served these

 9    subpoenas in July.

10          The vast majority of OEMs haven't responded to the

11    subpoenas despite months of negotiations including a summit

12    in October and also proposed compromises on behalf of the

13    serving parties.

14          THE COURT:  The summit is the OEMs group, is that

15    right?

16          MS. TRAN:  It was plaintiffs, defendants and OEMs,

17    yes.  So last month the parties realized that they reached an

18    impasse with the OEMs and we prepared for motion practice on

19    the OEMs' subpoenas.  We filed the motion to compel the

20    subpoenas last night.  My colleague, Mr. Williams, will

21    address non-party discovery in detail during the motion

22    argument later.

23          I'm happy to answer any questions that the Court

24    may have on wire harness, bearings, AVRP discovery.  I'm also

25    happy to discuss discovery in the other cases if the Court

```
 1    wants me to do so.

 2            THE COURT:  Well, what I am concerned about is that

 3    discovery for the three parts be completed and we will be

 4    talking about that obviously in the motions, but I was going

 5    to get into this in just a minute but I'm going to get into

 6    it now.  I was very concerned, very concerned, as I read the

 7    motions that we have on discovery because of what I sense,

 8    and I would hope this isn't true but it obviously has to be,

 9    is that there is a growing sense of acrimony amongst the

10    attorneys.  I mean, I never sensed that when you were here

11    ever.  You all are so professional and you all seem to get

12    along, but I'm concerned about this divisiveness that's

13    coming up.  I'm concerned about -- I'm going to take

14    something that isn't true but this is the general nature of

15    the argument.  Oh, you're one day late in filing this and I'm

16    not giving it to you anymore, or, you know, you asked two

17    people and you should have only asked one.  It is -- there is

18    a lot of pettiness.  I mean, it brings me back to my days in

19    state court in divorce court because that's just what it

20    sounds like, and I thought, oh, my gosh, how can this be

21    happening?

22            So those of you that come up to address the motion

23    you can address this issue.  I'm concerned, and I want to

24    know if there is something that I can do to alleviate that.

25    Is there a process -- is there something innovative that we
```

```
 1    haven't even thought about with all of the brainpower in here
 2    as to how we can handle this massive litigation -- the
 3    discovery in this massive litigation?  Really that's what I'm
 4    looking for.
 5          I am very pleased with what I have seen so far of
 6    the Master -- well, he's going to give his own report, but
 7    what I have seen, I mean, I haven't had that many things come
 8    to me and maybe that's why I didn't know this was growing,
 9    and then all of a sudden I get these motions and strike this
10    from the record, strike that from the record.  We don't need
11    that, we don't need that.  We are all professionals and we
12    can get around this.  I don't like it, and we will see how it
13    goes, but it is not going to continue.  Okay.  All right.
14          MR. CHERRY:  Your Honor, may I speak?
15          THE COURT:  Yes, Mr. Cherry.
16          MR. CHERRY:  Ms. Tran reported on the status of the
17    discovery from the plaintiffs' side, just to give the
18    defendants' side.  Just to report in the wire harness case
19    the defendants are on schedule pursuant to the scheduling
20    order.  We produced what was required to be produced by
21    September 1st, which was for key custodians.  My
22    understanding is we are all on schedule to meet the
23    February 1st deadline for the remainder of the discovery.  We
24    have produced transactional data, most of us quite some time
25    ago, and have exchanged in a number of fairly long
```

1    correspondence responding to questions about transactional

2    data informally to try to accommodate the use of that data.

3           Defendants have also -- are very far along in

4    taking depositions of the plaintiffs.  At this point we have

5    deposed I believe 42 of 52 roughly of the EPPs.  There are a

6    couple scheduled for the next week or two.  I think for the

7    direct purchasers we have deposed four and there are two more

8    scheduled in the next two weeks, and I think the last one may

9    be contemplating dismissal.  So we are very far along on

10   that.

11          We are not nearly as far along in taking the auto

12   dealers depositions, that I think is an area where Your Honor

13   may be referring to, there has been a fair amount of motion

14   practice, but I think the main thing there is we do have a

15   motion -- an objection to one of the Special Master's rulings

16   about the topics in the notice for the 30(b)(6) depositions

17   of the auto dealer plaintiffs, that's been briefed -- is

18   still being briefed but on an expedited schedule so that we

19   can get those depositions going quickly, and that will --

20          THE COURT:  When would that be filed?

21          MR. CHERRY:  That will be completed on the 29th of

22   this month at the latest, so we would ask if Your Honor can

23   rule on that quickly and then we can start taking those

24   depositions?

25          THE COURT:  Are you asking for oral argument on

```
1   that?

2           MR. CHERRY:  I don't think so, Your Honor, just a

3   ruling on the briefs.

4           THE COURT:  Okay.

5           MR. CHERRY:  Thank you very much.

6           THE COURT:  All right.  I know the Master has

7   handled a lot of motions and I'm pleased these are going very

8   timely, so I think if there is any delay it is here because

9   it takes us longer to get to them but it appears that

10  Mr. Esshaki is right on top of it.

11          MR. CHERRY:  Yes, he's been very responsive, Your

12  Honor.  There is one thing and maybe we should raise it with

13  Master Esshaki, as we are getting into all of these

14  depositions it may come that we need sort of to do things by

15  telephone and get sort of informal rulings as we get very

16  busy with depositions, and we assume that that would be

17  within the rules that we --

18          MASTER ESSHAKI:  Just give me a call, drop me an

19  e-mail.

20          MR. CHERRY:  Thank you.  Did you want some briefing

21  on the cases that follow these initial three?

22          THE COURT:  Well, you can tell me something about

23  them.

24          MR. CHERRY:  Well --

25          THE COURT:  I'm so anxious to get these three done.
```

1          MR. CHERRY:  I mean, they are basically the next

2     set of I guess what the plaintiffs have referred to as these

3     tranche one cases which really are the next four or five.

4     Discovery was served over a year ago, we responded to

5     discovery.  There have been a number of meet and confers.

6     All the initial orders are in place.  We are contemplating

7     beginning production within the next week or so, I had hoped

8     to start before today, but those are sort of fairly well

9     along and moving forward.

10          Then there is really another group of cases where

11    there has been rulings on motions to dismiss, there have been

12    answers filed, and those are really ready for a Rule 26(f)

13    conference so they can begin discovery.  And then after that

14    there is really a fourth group where we are really waiting a

15    schedule for motions to dismiss or answers, and those are the

16    more-recently-filed cases.

17          THE COURT:  Okay.

18          MR. CHERRY:  Thank you, Your Honor.

19          THE COURT:  Good, good.  Be sure to let me know if

20    there is something that needs to be done from our end and how

21    quickly it needs to be done as these things, I don't know

22    what they are, but if and when they come up I'd like advance

23    notice.  If you will feel that you just want to send a memo

24    to the Court, I know then you have to notify everybody, but

25    if you just let us know because it is difficult to get you in

```
 1    a timely manner, I want to do it timely, but it is difficult,

 2    I'm trying to reschedule things so the MDL has considerable

 3    priority.

 4              MR. CHERRY:  Yes.  I mean, we should probably talk

 5    to the plaintiffs about particularly those latter filed cases

 6    and a schedule for that.

 7              One thing the plaintiff -- or the defendants

 8    contemplate filing, when we were before you at the last

 9    status conference there was a discussion of a discovery and

10    scheduling order to formalize for the tranche one cases.  In

11    fact, that plaintiffs filed that with Your Honor, and it was

12    mentioned at the last status conference that the parties were

13    discussing that and trying to resolve what were fairly narrow

14    disputes at this point.

15              We have had some other discussions since then

16    that's broken down because of the approach the plaintiffs are

17    taking now with this motion to consolidate and amend, but the

18    defendants plan to file a motion to enter basically the order

19    that they had proposed with the modifications that we have

20    discussed with the plaintiffs.

21              THE COURT:  Okay.

22              MR. CHERRY:  Thank you.

23              MR. WILLIAMS:  Your Honor, Steve Williams for the

24    end payors.

25              I just want to respond briefly to the last comments
```

1  by Mr. Cherry as it is not before the Court now, there is

2  nothing for the Court to do now.  It is correct to say we

3  have a motion pending, we are not presuming it will be

4  granted but if it is there is no reason to have separate

5  orders entered in those cases.  There is no time urgency to

6  those cases at present given the cases that are before them

7  which are progressing in many, many ways.  The most important

8  part of those latter cases is really the OEM discovery which

9  we are doing now for all cases, so it would seem to us that

10 they ought to talk to us before they file a motion, they have

11 not talked to us yet, and we should address whether or not it

12 is an appropriate time to do this now or wait until March 9th

13 when we have a sense.

14         THE COURT:  I'm sure, Mr. Cherry, you will talk to

15 them before you file a motion because it is required under

16 our rules, right?

17         MR. CHERRY:  Yes, Your Honor.  We have had maybe

18 four or five calls about this.  We have exchanged drafts.  It

19 all started frankly with Mr. Williams' filing with the Court

20 and proposal to us, we met and conferred a number of times

21 about this, I thought we were very close to an agreement, and

22 then discussions stopped and they went a different way.  We

23 are -- certainly we reached out to Mr. Williams to see if he

24 would like to have another sort of last discussion before we

25 filed, but we have talked about this a fair amount.

```
 1              MR. WILLIAMS:  I would say, Your Honor, we talked
 2      about it, if my memory is correct, in 2014.
 3              MR. CHERRY:  Your Honor, no, Your Honor.
 4              MR. WILLIAMS:  The last time --
 5              THE COURT:  No, I'm not getting into this, uh-uh,
 6      you call them up before you file your motion and discuss it.
 7              MR. CHERRY:  We will, Your Honor.
 8              MR. WILLIAMS:  Thank you.
 9              THE COURT:  In 2016.
10              MR. CHERRY:  Yes, Your Honor.
11              MR. REISS:  Good morning, Your Honor, again.
12      Will Reiss for the end payor plaintiffs.
13              I'm going to give you just a very brief
14      comparatively discussion about the status of the end payor
15      plaintiffs discovery to date.  We have 55 class
16      representatives across the various cases.  I think, as Your
17      Honor knows, these are folks who purchased or leased
18      automobiles.  In the various cases defendants have served us
19      with discovery requests essentially asking for all documents
20      in connection with our class members' purchases.  We have
21      been diligent to try to produce those.  They have asked for
22      documents beginning in 1996 going all the way to the present,
23      so you can imagine that's a 20-year period.  To the extent
24      our class representatives have those documents, we have
25      produced everything that we are aware of.  We have told them
```

1    that we reserve the right to supplement but we've done

2    everything we can and we feel we have substantially produced

3    everything now.  As Mr. Cherry indicated, the vast majority

4    of our class reps have been deposed.  To the extent that we

5    don't have documents for specific purchases, we have provided

6    information to the defendants so they can go ahead and

7    subpoena the dealers that sold those automobiles.  So we feel

8    we are in a position that we have complied with everything,

9    we have produced these documents across all the cases

10   pursuant to the MDL.

11            THE COURT:  Okay.

12            MR. ROZGA:  Good morning, Your Honor.

13   Kajetan Rozga for Bridgestone in the AVRP case.  I just

14   wanted to briefly add a few details to Ms. Tran's summary of

15   stats in the AVRP discovery.

16            Defendants are proactively trying to move discovery

17   along and produce documents in a timely fashion.  Regarding

18   the transactional data, most of the defendants have now

19   produced transactional data in some form to plaintiffs.  As

20   for interrogatories, the substantive interrogatories were

21   served on us and following the extension all of the AVRP

22   defendants submitted detailed substantive responses to those

23   interrogatories, and we are -- that was actually in

24   October 2015, and we are still anxiously awaiting the

25   opportunity to move forward and discuss those objections.  To

1    the extent that we objected to some of the requests we have

2    not heard from plaintiffs yet on that, but we are ready to do

3    that as soon as you are.

4              THE COURT:  Who do you represent again?

5              MR. ROZGA:  Bridgestone in the AVRP case.

6              THE COURT:  Thank you.

7              MR. AMATO:  Good morning, Your Honor, Jeffery Amato

8    for the NTN defendants in the bearings case.

9              I just wanted to add to the end payor counsel's

10   description of discovery, which was largely accurate, that

11   the case is moving along.  We have cooperated in discovery.

12   We have produced transactional data.  We are beginning the

13   production of substantive documents, and we are hopeful to

14   conclude negotiations on search terms and methodologies.

15             One thing I would like to add is that to the extent

16   that the plaintiffs would like to start taking depositions

17   while the protocols are being negotiated or litigation is

18   still pending on that, we would be open to those discussions

19   so that the depositions can start.  And if any other bearings

20   defendants want to add I welcome that.

21             MS. KAFELE:  Heather Kafele on behalf of the JT

22   defendant.  We are also in the bearing case.

23             I would just add in addition to what Jeff just

24   mentioned, the defendants in the bearings, we have actually

25   substantively responded to the interrogatories, so we have

```
 1   given a lot of information in quite detail, that in addition
 2   to the documents I think well suits the plaintiffs to start
 3   the depositions, so we are moving very fast in our case, we
 4   haven't had as much lead time as in wire harness but we are
 5   on track to meet the deadlines.
 6           THE COURT:  Good, good to hear.  I have a question.
 7   What do plaintiffs -- well, defendants too, what do you do
 8   with all the documents you get, not the electronic stuff, but
 9   do you have a warehouse, I mean, or is somebody's office
10   filled to the ceiling?  I'm just curious.
11           MR. WILLIAMS:  Steve Williams for end payors.  I
12   will try to answer it.
13           I would say the overwhelming majority of the
14   documents are all electronic, not paper.  They are hosted
15   through vendors.  Some firms, not our group, have in-house
16   but hosted through vendors and make them available to
17   reviewers around the country and sometimes around the world,
18   they do their work remotely on computers looking at the
19   documents and all of the work they do is then reflected in
20   the database that shows the attorney work product analysis of
21   those documents.
22           THE COURT:  So we are lucky we are into the
23   electronic age or this case would really be a nightmare.
24           MR. WILLIAMS:  It is a blessing and a curse.
25           THE COURT:  Okay.  Thank you.
```

1          The next status conference is set for May 11th,
2     that's still on, everybody knows that, right, at 10:00?  The
3     suggested date I have for the next conference will be
4     September 14th.  Do you want to check calendars and see if
5     there is something that's up for September 14th?
6     Mr. Williams?  Okay.
7          MR. WILLIAMS:  It seems good on the plaintiffs'
8     side, Your Honor.
9          THE COURT:  Defendants have anything?  All right.
10    Let's schedule it then for September 14th at 10:00.  All
11    right.
12         Other matters?  First, I would like the -- before
13    we get to the other matters, I would like the Master to give
14    a report.  I know it is not specifically on the agenda but I
15    would like him to do that.
16         MASTER ESSHAKI:  Thank you, Your Honor.
17         Good morning, everyone.  It is a pleasure to see
18    you here in Detroit.  You brought the president with you,
19    that's really a compliment to our great city.
20         I wanted to address two significant issues today.
21    First, I want to pick up on a thread that the Judge discussed
22    a moment ago, and that is I also am feeling and sensing a
23    raising of the temperature in the advocacy that's going on in
24    this case.  I have complimented all of the parties since I
25    have became involved for the professionalism, for the

1    cordiality, and for the manner in which they have dealt with

2    each other, and then approximately 60 to 90 days ago I kind

3    of felt a shift.

4         I just want to suggest to you what was suggested to

5    me when I was a very young lawyer by a very fine trial judge

6    who said there is a very fine line between zealous advocacy

7    and acrimony and you have to guard against crossing that

8    line.

9         Additionally, I would like you to keep in mind that

10   what you say to me in a telephone conference or what you say

11   to me in an e-mail is significantly different than what you

12   say in a pleading because a pleading today is going to be

13   part of the Court's permanent record and because of our new

14   electronic storage it is going to be available to be reviewed

15   by anybody at any time, so you need to guard against being

16   acrimonious or personal attacks against opposing counsel

17   because it's going to stay there.  And if you, for example,

18   ask for sanctions for unprofessional conduct, do you really

19   want that if you are the opposing counsel sitting in that

20   record for the next ten years to come?  So just be cognizant

21   of that, that it is a fine line, and I think we are starting

22   to push up against that line and maybe in fact some cases

23   crossing it.

24        So I was thinking what can I do to lower the

25   temperature?  And my procedure has been in those instances

1    where the parties have asked me to discuss a case or a motion

2    in advance, to make myself available and to have that

3    discussion.  We have had, for example, in the protocol

4    discussion we had lengthy discussions as I recall just before

5    the holidays and we worked out a lot of those issues, some of

6    them I had to make a call and I made the call, but sometimes

7    I just make a ruling.  And I decided that in order to -- in

8    an attempt to lower the temperature I'm going to sort of

9    insist that we have a conference call immediately after the

10   motion reply is filed, and my office will arrange it, you

11   just agree to participate in, and we will see if we can't

12   resolve some of the disputes in that call that are involved

13   in the pending motion so, one, they don't reach the Court,

14   and two, we can have a mutual understanding and perhaps

15   agreement on how we resolve matters, and if in the end we

16   can't resolve it then maybe we have limited -- instead of

17   five issues that would come to the Court maybe we have

18   limited it to one or two, so I'm going to start to implement

19   that immediately.

20          The next thing is we are going to now be opening up

21   the case to other parts, and I would like to advise counsel

22   who have not been involved in working with me on what the

23   process is that we follow in addressing discovery-style

24   motions -- predominately discovery-style motions.  I looked

25   at my files and I think within the last 12 to 14 months I

```
 1    have addressed by my count 43 motions.  What happens is a
 2    motion is filed with the Court, I ask that you send a copy to
 3    me if it is a discovery-style motion.  The Court assesses the
 4    motion and makes a determination whether it should be
 5    referred to me.  They then enter a reference order or an
 6    e-mail that they send me referring the matter to me.  Then a
 7    response is filed, and a reply is filed, and an order is
 8    entered.
 9          I would say the majority of the time we have
10    conference calls but a lot of times the issues are relatively
11    clear-cut, the positions of the parties are so entrenched
12    that it is a waste of time to pick up the phone and call, and
13    I just need to make a ruling and issue that order.  Keep that
14    in mind.  You file your motion with the Court, send a
15    courtesy copy to my office, the Court will then send an order
16    of reference to me, the response is filed, the reply is
17    filed, and I will now insert a conference call where I can
18    chat with the parties and see if we can't resolve some of the
19    issues with respect to the motion, and then if there's still
20    issues that need to be resolved I will issue an order which,
21    as you know, will then be subject to objections to file with
22    the Court.
23          But from my standpoint, I have been following the
24    procedure that I do not delay, I think you are all aware of
25    this by now.  The motion is filed, the response is filed, the
```

```
 1  reply is filed, and generally within 24 to 48 hours after the
 2  reply is filed you have my ruling, so I am doing my best to
 3  stay on top of these things.  I can't help the substance, I'm
 4  going to make calls that go in your favor sometimes, that go
 5  against you sometimes, I'm going to make calls that are right
 6  and I'm going to make calls that are wrong, that's why we
 7  have an objection process.  Please don't feel the least bit
 8  hesitant, I have very thick skin, of filing objections, I
 9  just don't need to sit here when you argue them.  So as I
10  said to one of your fellow attorneys, if I need to hear
11  criticism of my conduct I can always go home.
12          So we will try to work on getting back into a very
13  cordial relationship and trying to voluntarily resolve some
14  of these disputes before they hit the front burner with the
15  Judge.  Thank you, Judge.  I'm all set.
16          THE COURT:  Okay.  Does anybody have any questions
17  for the Magistrate -- for the Magistrate Judge?
18          MASTER ESSHAKI:  I just got a promotion.
19          THE COURT:  Or a demotion, I don't know.  Any
20  questions for the Master?  Okay.  All right.
21          MASTER ESSHAKI:  Thank you, Judge.
22          THE COURT:  Thank you.  I love your raising of the
23  temperature.  I haven't thought of it that way.  I will use
24  that.
25          MASTER ESSHAKI:  Good to see you, Judge.
```

1          THE COURT:  Thank you.

2          Before we go into our motion hearing, Rob has had

3  surgery on his knee, so let's take a ten-minute break and

4  then we will start with the motions.  Thank you.

5          THE LAW CLERK:  All rise.  Court is now in recess.

6          (At 10:45 a.m. court recessed.)

7                              —  —  —

8          (At 11:00 a.m. Court reconvenes, Court, counsel and

9          all parties present.)

10          THE LAW CLERK:  All rise.  Court is again in

11  session.  You may be seated.

12          THE COURT:  While we are regathering, I do want to

13  say I appreciate again the status reports, it is very helpful

14  to have those every session.  Thank you.

15          All right.  The first motion we have is the

16  end payor plaintiffs' motion to adjust the class cert

17  schedule.

18          MR. WILLIAMS:  Hello, again, Your Honor.

19  Steve Williams for the end payors.

20          I believe some other plaintiffs join in this, they

21  may speak for themselves, but I think this relates as well at

22  least to the auto dealers and the truck and equipment

23  dealers.

24          THE COURT:  Okay.

25          MR. WILLIAMS:  I would like to, if I may begin

1   by --

2           THE COURT:  The auto dealers filed a concurrence,

3   is that what you are referring to?

4           MR. WILLIAMS:  Correct.  If I may, I would like to

5   respond to the comment that the Court made this morning.

6           THE COURT:  Okay.

7           MR. WILLIAMS:  It relates to this motion as well.

8   What I would like to say is in this room are some of the

9   finest attorneys in the country, on this side and on this

10  side, and given the complexity --

11          THE COURT:  We have to wait for Mr. Iwrey to come

12  in because he wants to be amongst those.

13          MR. WILLIAMS:  I think he just wanted to be

14  specifically called out.

15          And given the complexity of this case, which no one

16  in this court can doubt, and the number of parties, what I

17  would like to impress upon the Court is how well we have, in

18  fact, worked together.  And the primary issue for the end

19  payors that underlies the motion to continue the schedules

20  concerns the discovery of the OEMs, the non-parties, and

21  that's an effort that is set forth in our brief, particularly

22  in the reply brief, and by declarations.  The end payors, the

23  auto dealers, the truck dealers, the State of Indiana, the

24  State of Florida, the public-entity plaintiffs when they were

25  there, and all the defense counsel all worked together to

1    do -- to draft the subpoena, to serve it on parties, to meet

2    and confer with those parties, to proceed with those

3    discussions even when we hit the roadblocks when they formed

4    into this group to fight us, we did that all together in a

5    cooperative way that I have never experienced in a case

6    before.  It is unprecedented, and it was the right thing to

7    do in this case.  I don't think anyone could ever suggest

8    that it was the wrong idea to minimize the burden to the

9    non-parties and to create the consequence that the later

10   cases are going to catch up to the early cases in this

11   regard.

12           Ms. Tran alluded to the motion to compel that was

13   filed yesterday.  That was done jointly with defense counsel.

14   We all drafted together a brief that we could all sign and

15   even though they might put a different perspective on certain

16   issues than we might, we worked on that and did all of that

17   together.  And the reason for this preface is I do want to

18   assure the Court that I think, and I think most of the

19   attorneys here would say, we have done very well, we are all

20   zealous advocates for our clients, but we have done very well

21   in managing this case and in maintaining the appropriate

22   level of professionalism and courtesy that the Court deserves

23   and that all of our clients deserve and that we deserve.

24           THE COURT:  I did note, Mr. Williams, in terms of

25   the discovery and you joining together, all of you, to get it

1    from the OEMs, I think that's amazing, I did notice that and

2    I wanted to congratulate you on that.  I do think you have

3    worked together, I don't want you to take it like I think you

4    haven't, you have been amazing, that's why this bothers me

5    even more because I just never even expected it, but things

6    happen and we will get through it.

7          MR. WILLIAMS:  And what I have pledged to Your

8    Honor for our group and I think for really everyone here is

9    we will maintain that, we will recognize our duties to each

10   other and to the Court.

11         And when we talk about the joint effort on these

12   subpoenas, if it was just us, if there were just end payors,

13   we could have proceeded with not coordinating with anyone and

14   we would probably be far ahead.  Those requests that were in

15   that subpoena that we didn't want, that the defendants

16   wanted, but we were working collaboratively.  Did doing that

17   slow the process down?  Of course it did.  Did efforts on

18   both sides, us to canvass the plaintiffs and the defendants

19   to talk to each other to reach agreement slow thing downs?

20   Of course it did.  And I don't think the standard for this

21   Court on this motion is to put forth a bunch of anecdotal

22   evidence and give you e-mails and say look at this, Williams

23   didn't answer this e-mail for three days after I sent it,

24   because I can do that for them but that to me is not really

25   the point.

1          We are asking here for a relatively modest

2     extension that in a class action case -- not this class

3     action, not this complex class action case with three

4     separate classes, Ford Motor Company part of this who is

5     involved, Indiana and Florida involved, and other ones, an

6     initial extension of a class cert deadline is routinely

7     granted, it is typically not disputed.  It is disputed here

8     so we should look at the reasons and whether or not the Court

9     should grant the extension because we satisfy Rule 16, it

10    serves the interest of justice and fundamentally the argument

11    that those three classes should be deprived of the ability to

12    go forward because somehow it is all the end payors' fault

13    that this discovery wasn't done sooner, there is no merit to

14    that.

15         So when we came to the Court in June of I think

16    2014 I believe end payors and I think I was the first one

17    that raised with the Court that we need to do this non-party

18    discovery, and what the Court said is we are not there yet.

19    The defendants could have been serving the discovery on their

20    own, they didn't need to wait for us, we didn't hold them up.

21    We didn't do anything that ever stopped them from serving it

22    on their own if they wanted to, but they have agreed, we have

23    all agreed, and the Court has endorsed the idea of trying to

24    minimize the burden to the non-parties and trying to create a

25    benefit to all of these cases.

1   So I think that was the right decision.  Anyone in
2   hindsight can look back and say well, if you didn't do that
3   you might have been ahead, and frankly they don't know that.
4   First of all, we needed some information before we could
5   intelligently draft subpoenas to non-parties, it wasn't just
6   the DOJ productions, that wasn't going to give us the
7   sufficient basis to know who to serve the OEM subpoenas on,
8   to know what information we needed, to know what models were
9   involved, to know what parts were involved, we didn't have
10  that early.  So it is simply speculation to say if you had
11  started this in 2013 or 2014 you would have it all by now, we
12  don't know that, but that's not even really the right
13  standard.
14      We didn't have a scheduling order for wire harness
15  until February of 2015.  We were already working on those
16  subpoenas with the defendants at that time.  We didn't have a
17  scheduling order for AVRP and bearings until September of
18  2015.  We had already served and we were meeting and
19  conferring with the OEMs about the discovery at that time.
20      The information that we are seeking in these
21  subpoenas the defendants agree, it is necessary to us.  They
22  are not saying we can go forward without it, they are saying
23  you should not be permitted to try to certify your classes.
24  That's not the right result here.  Four months in the scheme
25  of this case is a relatively modest extension, and maybe they

1    will say something different today but in their papers they

2    say prejudice but they have not substantiated it.  They are

3    going to have to keep litigating, they will have to keep

4    doing discovery, they will have to oppose a class

5    certification motion or not so --

6          THE COURT:  Let me ask you a question.  On the

7    dates that you suggest moving forward, it is basically the

8    four months in each of them, right, that you are asking to

9    extend it?

10         MR. WILLIAMS:  Yes, Your Honor.

11         THE COURT:  And my question is do you believe that

12   you can, in fact, meet your extended deadlines or is this

13   just are we looking at this is what we hope to do and then we

14   may have another extension, because I can tell you how many

15   people ask me how my case ended.  Has it ended, you know, no

16   way.  So there is certainly interest in resolving this case

17   but I agree four months is not such a long time, but I would

18   like to know how firm is that four-month date?

19         MR. WILLIAMS:  And I'm glad you asked.  That was

20   the shortest period that we thought we could live with with

21   the premise being our motion to compel is filed, that

22   speaking for the plaintiffs' side and we will talk with the

23   defendants, we are not going to do an extended briefing

24   schedule with the OEMs, we want this in front of the Master

25   as soon as possible.  And we just filed our papers last

1   night, you will see if you read them, they are with

2   Master Esshaki right now, what I have proposed for the end

3   payors is I think there should be a date set for a hearing,

4   we spend the morning with the Master, the OEMs, all parties,

5   mediate what we can resolve, we spend the afternoon with a

6   hearing and get rulings because Master Esshaki moves very,

7   very quickly and there is a short time frame to respond.

8           The motion prioritizes the production of the

9   transactional data with non-transactional data, I'm referring

10  to OEM productions, coming later, that's the key for all of

11  us.  We need action from the Court to keep the schedule in

12  place.  I think Master Esshaki is perfectly suited to do

13  that.  So provided we can keep that schedule and that the

14  OEMs are not given two months to answer then I think we can

15  provided we are more diligent in not giving extensions.

16          And frankly, Your Honor, you know, we have given

17  defendants -- we heard about the three-month extension to

18  answer interrogatories in AVRP, we do those things, and when

19  we started this process with the OEMs before they formed into

20  this collective to fight us we granted them extensions

21  because that's a reasonable thing for an attorney to do, it

22  is in accordance with the rules that govern attorneys in this

23  court, but that burned us because we didn't get anywhere

24  after we granted those extensions, and now we are in a

25  position where I can say the OEM's position has been you're

1    not getting one thing from us without a court order.  I

2    didn't anticipate -- I should say there's a few, two or

3    three, who didn't join the group who produced, but for the

4    key OEMs across the board their position right now is you are

5    not getting a thing from us without an order so we know what

6    we have to do; we need an order from Master Esshaki, we will

7    need an order from Your Honor, so we will be looking to the

8    Court --

9         THE COURT:  Is that we are not going to cooperate

10   or it is just that we want to deal under court orders to

11   protect ourself, whatever?

12        MR. WILLIAMS:  As I interpret the positions and as

13   set forth in the motion we filed yesterday, the first

14   position, until you agree ahead of time that you will pay

15   every penny we spend to respond we won't do anything, that's

16   not the law, that's in our brief and you will see -- in our

17   joint brief, you will see arguments on that, they are wrong.

18        Two, the other things they have offered to give us,

19   even if we were to agree ahead of time to pay them

20   everything, are just two small categories subject to

21   negotiations to be held at some point in the future.  They

22   agree they will give us some information about their

23   manufacturer-suggested retail prices, which frankly we could

24   probably go on the Internet and find that out, and they give

25   us some information about non-defendant documents.  As to

1    everything else, their position is get it from the

2    defendants, get it from public sources, don't bother us.  So

3    it is as stark as I'm presenting.

4            THE COURT:  Okay.

5            MR. WILLIAMS:  I think I have covered most of the

6    points I wanted to with just one or two that I would like to

7    briefly mention, which is I mentioned in the papers I don't

8    think they have stated any cognizable prejudice to them, they

9    are going to continue litigating the case.  I think they are

10   really seeking the windfall of preventing these classes from

11   having an opportunity to be certified.  We would prefer not

12   to have made this motion.  And I didn't mean to be flippant

13   in saying if it was just us and we didn't have to coordinate

14   with anyone we would have just served it, we would be farther

15   along, but we did have to coordinate because we're in the

16   centralized MDL proceeding.  We don't have the ability to

17   simply act unilaterally, I don't think that's what the Court

18   wants, I don't think that's what serves the parties.  We

19   don't take scheduling orders lightly.

20           If you look at the cases that are cited, and I

21   don't think you need to look at defendants' cases, they cite

22   a case -- a medical malpractice case, a non-published 6th

23   Circuit case where somebody sent in an expert report nine

24   months after it was due.  That's not the case.  That has

25   nothing to do with this case.  Nor is this some tactical

1    effort to stall or to somehow have the motion to consolidate

2    rulings, it has nothing to do with this, these cases aren't

3    part of that and we are not seeking a stall.  We have as much

4    interest, if not more, in getting to the class certification

5    date because all the risk is on our side until we get there.

6            THE COURT:  Okay.

7            MR. WILLIAMS:  Thank you, Your Honor.

8            MR. RAITER:  Your Honor, Shawn Raiter on behalf of

9    the auto dealers.

10           You are correct, we concur and join in the end

11   payors' motion.

12           THE COURT:  Okay.  Thank you.

13           MR. KESSLER:  Jeffery Kessler representing NTN in

14   the bearings case, and I'm going to speak for the bearings

15   defendants and also the AVRP defendants as well.  Mr. Cherry

16   will separately speak for the wire harness defendants on this

17   motion.

18           Let me start out, Your Honor, by saying that we

19   welcome the Court's comments about the need for all the

20   parties here to work together.  This is a unique matter, a

21   unique MDL, that has been put before the Court, and if all

22   the parties are not rowing together in the same direction we

23   are never going to get this ship across the water.  We

24   appreciate the Court's efforts, the Special Master's efforts

25   and both sides' efforts in working to do that.

 1          So Your Honor might then say, Mr. Kessler, okay,

 2     why don't you just agree to their four months?  Be a good

 3     guy.  You know, in the spirit of civility that's not such a

 4     long period of time.  Let me try to articulate what is the

 5     defendants' concern because we have thought very carefully

 6     about this.

 7          Our first objective here, and I know it is the

 8     Court's objective, is to make sure that everything that can

 9     be done is done to try to get these class certification

10     motions decided within five years of when this matter

11     started.  That's hardly an ambitious objective.  We are not

12     in a normal case.  Mr. Williams, for example, mentioned how

13     the parties readily agreed to a few months' extension in the

14     capacitors case.  The capacitors case was filed in July --

15     the first complaint in July of 2014, and with the extension

16     readily agreed to there will be class certification rulings

17     in less than two years from the first complaint, not the

18     consolidated complaints.  I'm not criticizing anyone, we have

19     a different situation, a different set of parameters, but we

20     think it is imperative to make sure we are doing everything

21     we can.

22          So our first problem with the request is we think

23     it is premature.  Why do we think this request is premature?

24     We are not trying to deprive them of the ability to do what

25     they want to do to certify their class, I want to say that,

1    but we think the request is premature.  First of all, they

2    have made a statement that they ideally, I think is the word

3    that was used in Mr. Williams' affidavit, their experts would

4    like six months to study the data.  I start out with the fact

5    that they didn't put in any expert declaration, all we have

6    is the declaration of Mr. Williams, and in all due respect

7    our experts looked at it and said they don't understand why

8    it takes six months to be able to be in a position to utilize

9    this piece of the data.

10            The defendants' data, which is the main data that

11   they are going to be utilizing first, is already long

12   available in terms of that, so we don't really have an

13   understanding of where the six-month number comes from, but

14   even if you assume it is six months, well, if the data is

15   produced let's say now that the motion to compel has been

16   filed, let's say it is produced within 60 days from now,

17   well, then their four-month request isn't necessary because

18   even using the six-month period of time you wouldn't need

19   four months for them to have six months of that time.

20            So I think until we know how long it is going to

21   take to resolve the OEM issue, and until we get an actual

22   record as to how long it really takes to utilize that data,

23   we would be happy to put in expert materials on this if they

24   put in expert materials, I don't think we are in a position

25   for the Court to say there is good cause for this delay

1    which, of course, is the standard, we all agree on the

2    standard.  And we share the Court's concern that if there is

3    going to be an extension at some point in the extension there

4    should only be one request ever made for an extension.  I can

5    tell you the defense side will never make a request for an

6    extension in the class action schedule, okay, so we think

7    there should only be one request.

8         We are not in the position yet to consider that,

9    and since the class certification deadline is still very far

10   off, we are talking now, remember, the summer of this year

11   before they have to do anything, we would suggest that this

12   issue be revisited only if it is necessary, okay, at the next

13   status conference where we can decide whether or not there

14   has to be any extension or not.  And I think that discipline,

15   that internal discipline for the parties, for the Court, will

16   give us a better chance of getting to that finish line as

17   soon as we possibly could get.  So that's our first concern

18   about just saying yes, well, it is just four months, why

19   don't we agree to it.  We don't know if that's the right

20   number.  We think it is probably too much, and we don't

21   really know it is needed in terms going forward.

22        But my second point, Your Honor, is that -- and in

23   the spirit of avoiding acrimony, I don't want to revisit the

24   issue of diligence even though that's one of the standards

25   here, but the reality is that this issue of OEM discovery has

1    been known to the plaintiffs since they filed their cases in

2    2011, and while Mr. Williams says that he wanted the

3    information to tailor the responses, which is why he couldn't

4    do it for so many years, the fact is there has been no

5    tailoring.  The plaintiffs' theory of the case from day one

6    has been that all the automakers are affected regardless of

7    what's in the pleas, regardless of what's in the defendants'

8    documents, regardless of any of our interrogatory answers, so

9    that, in fact, they are seeking OEM discovery from numerous

10   companies who are not mentioned in a single document, in a

11   single plea, in a single case.  So there has been no

12   tailoring, there was no need to wait for this tailoring

13   because they haven't done any tailoring for that.  Perhaps,

14   by the way, the OEMs may say something about that in their

15   opposition, I don't know.  The point here is this argument

16   could have been teed up, Your Honor, a very, very long time

17   ago.

18          Now, I heard Mr. Williams fairly say well,

19   defendants didn't tee it up a long time ago but defendants'

20   position is this is plenty of time, so we had no reason to

21   tee this up some long time ago.  This information is

22   information plaintiffs deemed to be critical, and I don't

23   begrudge them that, but it should have been pursued.  There

24   was no stay in place.  Certainly the Court's comments, and I

25   was here when the Court made her comments back in June of

```
 1   2014, I don't think it was meant to preclude the plaintiffs
 2   from going forward with their third-party discovery when the
 3   Court said we are not up to that yet.  Your Honor knows far
 4   better than I do what the Court meant.  I did not interpret
 5   the Court's comment being an admonition not to pursue
 6   discovery at that point.
 7            So the point here is I don't think we are at a
 8   record point at this moment where this request should be
 9   granted.  And, you know, I looked at what the 6th Circuit
10   said about this and the 6th Circuit was talking about why
11   courts don't readily grant extensions to their orders, and
12   they spoke about the fact it would undermine -- I'm quoting
13   the 6th Circuit in Smith vs. Holston Medical Group, it would
14   undermine the Court's ability to control its docket.  Okay.
15   There is no more important concern from the MDL here than the
16   Court's ability to control its docket, and it would disrupt
17   the agreed-upon course of the litigation.  We agreed upon
18   this course, Your Honor, just at the last status conference,
19   and now we are one status conference removed already and now
20   suddenly there is a request for a four-month delay even
21   though plaintiffs acknowledged at the last status conference
22   they thought that they could meet the schedule.  In fact, the
23   original wire harness schedule was stipulated and put in for
24   Your Honor before we joined on and our schedule follows a few
25   months before.
```

```
 1              So, Your Honor, I would love to just say yes but I
 2     don't think it is in the interest of this Court, I don't
 3     think it is in the interest of this docket, so instead I
 4     would say please defer, let's hold this off, let's see how
 5     the OEM discovery goes, let's see how all the other discovery
 6     goes, we are going to try to do this as fast as possible,
 7     maybe we can find ways to facilitate the use of the data when
 8     it comes out, we don't know what it is going to look like, we
 9     don't know if it is going to be complicated or not
10     complicated, we just don't know until we get there, and then
11     in May we can have a discussion with the parties beforehand,
12     perhaps we will agree upon a short extension, perhaps we will
13     agree it is not necessary, but at this moment we would say
14     please defer, Your Honor.  Thank you.
15              THE COURT:  Okay.  Response?
16              MR. WILLIAMS:  Can I respond to Mr. Kessler and
17     then --
18              MR. CHERRY:  Sure.
19              MR. WILLIAMS:  Is that okay with Your Honor?
20              THE COURT:  Yes.
21              MR. WILLIAMS:  Thank you.  Just I want to briefly
22     respond to Mr. Kessler's arguments while they are fresh.
23              First, the five years of when it started, that's --
24     I'm sorry, Mr. Kessler said well, we think the case should be
25     resolved within five years from when it started.  It is just
```

```
 1    an arbitrary date.  He's talking about the first complaint
 2    that was filed before the MDL sent it here, before leadership
 3    was appointed, before complaints were filed, and frankly he's
 4    talking about bearings and AVRP, those motions to dismiss
 5    weren't decided I think until 2014 and 2015 and stays were in
 6    place until 2015, stays even as to their DOJ productions,
 7    which they didn't produce to us until April of this year.  So
 8    pointing to 2011 saying five years, it doesn't have a
 9    rational relationship, but more importantly I think the idea
10    of deferring this is the worst possible idea.
11            So, first of all, I looked at the standards too and
12    one of the standards is we are required to bring this to the
13    Court at the first time we believe there is an issue in
14    adhering to the schedule, and that's what we did.  I don't
15    think it is the appropriate standard to say we think we are
16    going to have a problem but let's just wait and see how it
17    pans out and then I will bring it up in May at that time.
18            The argument was made, well, the motion to compel
19    is filed so maybe we will have the data 60 days from now.  We
20    will not have an order at best until 45 days from now, and
21    I'm fairly confident that whatever side comes out on the
22    other side of the order is going to bring it to Your Honor so
23    there's not going to be a final order in all likelihood for
24    60 days, much less a production of documents.
25            In terms of the argument about if you do grant it
```

1   that should be the last one, I think you have to wait to see

2   what happens.  We don't want to ask for another one but we

3   are just making the request --

4          THE COURT:  You are waiting on specifically the

5   OEMs' information, is that what you are --

6          MR. WILLIAMS:  Yes.

7          THE COURT:  The basic thing?  And we know there is

8   a motion filed on that.

9          MR. WILLIAMS:  For purposes of this motion and the

10  main reason why we are seeking the extension is for us, for

11  the indirect purchasers and the end payors, we need to see

12  what happens after the OEMs buy the parts from defendants,

13  build a car and sell it to our clients.  So having the

14  defendants' transactional data is only part one.  As Your

15  Honor ruled in the motion to dismiss order, we then have to

16  show that the overcharge was passed through to us and we

17  can't do that without their data.  We are talking about an

18  extraordinary amount of transactional data from the largest

19  automakers in the world covering a period of in excess of ten

20  years, so the idea that you will have it in 60 days and, you

21  know, it will all work out fine, I would not be satisfying my

22  duty of candor to the Court if I didn't get up and tell you

23  that that's an impossibility.  There is no way that in

24  60 days we will have data to work with.

25          As to the lack of an expert dec, we could have put

```
 1   one in but there is no law that says you have to have an
 2   expert declaration to support this.  I have done class
 3   certifications, I have worked with experts.  I talked with
 4   the experts and the information in my declaration is what
 5   they tell me.  Frankly, Your Honor, they like a year.  I told
 6   them they could have a year.  Six months is cutting pretty
 7   tight in terms of what they need to do with this huge volume
 8   of data when they get it.
 9            So those are my responses to Mr. Kessler's
10   arguments.  Thank you.
11            THE COURT:  All right.  Mr. Cherry?
12            MR. PARKS:  Your Honor, before we move on, could I
13   just briefly respond as well, 30 seconds?
14            THE COURT:  All right.
15            MR. PARKS:  Manly Parks on behalf of the truck and
16   equipment dealer plaintiffs.
17            I just briefly wanted to note there were some
18   representations made about when these cases were filed.  We
19   are by this Court's determination part of the schedule in
20   wire harnesses and bearings, not withstanding that our cases
21   were filed in 2014, so we are on a much tighter schedule as a
22   practical matter than a lot of the other parties and
23   certainly then the representations Mr. Kessler made about the
24   other groups.  I just wanted to remind the Court of our
25   existence in this and the fact that we really have been
```

1   sprinting to catch up in the two of the three lead cases

2   since we've gotten involved.

3           THE COURT:  Thank you.  Mr. Cherry?

4           MR. CHERRY:  Thank you, Your Honor.  Mr. Kessler

5   covered most of the points I would want to make, but just a

6   couple of points.

7           Mr. Williams likes to -- or wants to really focus

8   on the period in 2015 from I think the June -- or from the

9   January status conference and our cooperation together since

10  that point, but as we pointed out in our brief, everyone has

11  known for a long time that this discovery was necessary, and

12  the initial complaints in wire harness were filed way before

13  bearings, I mean, our complaints were filed in October of

14  2011, and so that's four and-a-half years ago.  By the time

15  the motions are filed on the current schedule it will be

16  almost five years, and by the time there is a ruling it will

17  be almost six years.  I'm not aware of a case that has taken

18  nearly that long to get to a ruling on class certification,

19  and Your Honor has multiple times commented that that's just

20  far too long, it is taking too long.

21          And so the plaintiffs themselves were saying and we

22  pointed out back in 2012 opposing discovery from us saying we

23  are going to get that very quickly from the OEMs, so we

24  assumed they would and they didn't.  So by early 2014 the

25  defendants were trying to push that along and reaching out to

1    the plaintiffs and saying let's do this together, we can

2    cooperate and serve a subpoena on the OEMs, and we were shut

3    down repeatedly and repeatedly.

4           And Mr. Williams tries to shift the blame to Your

5    Honor to a comment that you made at the status conference in

6    June of 2014 where we were talking about a number of things

7    and Your Honor said that we are not there yet, and I think

8    what Your Honor was really referring to was you didn't want

9    to get into a lot of discovery disputes, you wanted to get a

10   special master in place.  And immediately after that

11   conference we reached out and said well, we may not have a

12   dispute about the subpoena, let's -- there is no reason not

13   to be talking about it, we could reach agreement on the

14   subpoena and have that ready to go and present it to the

15   Special Master who was appointed a few months later in August

16   of 2014 but, again, we were rejected in that, and so they

17   wouldn't talk to us until January 2015 shortly before the

18   status conference.  Now, from that point we have had the

19   process that they have described to you, but there was over a

20   year wasted where were we were trying to push that forward.

21          And, by the way, when we did start talking in

22   January of 2015 there were no disputes, there was nothing to

23   present, we came to agreement on a subpoena without having to

24   resolve anything.  Now, there was an objection by the direct

25   purchasers but that could have been presented back in August

1    or September of 2014 if we had just been talking in the

2    meantime, which is what we were trying to do, and so there

3    was just no reason for that delay.

4          And then ignoring that, which I don't think you

5    should, but ignoring that delay, in 2015 we did start

6    cooperating and I think we have all done our best to

7    cooperate, but there is just a certain amount of

8    insufficiency in that given the number of parties.  I think

9    granting an extension just feeds into that.  We need the

10   schedule to hold our feet to the fire, to hold their feet to

11   the fire, our feet to the fire.  The defendants I think

12   recognize that we are the ones who frankly pushed for this

13   motion to compel and said there has just been too much time

14   wasted talking to the OEMs when they are not giving us

15   anything, and frankly insisted on moving forward with a

16   motion.  We were able to agree on a joint brief and that's

17   great, but we have been doing everything we can to push this

18   process along, and I think granting an extension may not be

19   conducive to that, that it gives more time for people to drag

20   their feet and not be efficient in getting what we need to

21   keep the case on schedule.

22             THE COURT:  Okay.  Thank you.

23             MR. WILLIAMS:  May I, Your Honor?

24             THE COURT:  Reply?

25             MR. WILLIAMS:  A couple things first.  Of course

```
 1   there are other cases that have taken longer than this to get
 2   to class certification.  The Air Cargo case in Eastern
 3   District of New York presided over by Judge Gleeson took more
 4   than eight years to get to class certification, and we don't
 5   want to do that here but I'm just saying --
 6            THE COURT:  No.
 7            MR. WILLIAMS:  -- it is not accurate to suggest
 8   that no case has ever had the history of this case.
 9            In terms of what I didn't want to do, which is the
10   finger pointing and back and forth, it is not true we shut
11   them done.  They said we want to talk to you about issuing
12   subpoenas, we said so do we, we want to talk to all
13   defendants; they said no, we won't, so we will just be
14   pointing fingers.  We ended up with the Court telling us and
15   agreeing with us to do it the way we kept asking to do but
16   that they refused.  And I certainly am not trying to shift
17   blame to Your Honor in any way whatsoever.  I don't think
18   blame needs to be shifted to anyone.  I think we did the
19   right thing here in the right way.  We are not at some
20   exaggerated long term here, we have I believe successfully
21   put our arms around a very complicated case and made it
22   manageable in a way, and I said this a few times but it is
23   very true, that this process is advancing the later cases in
24   a very, very material way as to the indirect purchaser
25   classes, there can be no doubt about that, so no one has to
```

1    have blame put on them.

2         I very much disagree with the suggestion that

3    somehow granting the extension is going to encourage us not

4    to be diligent, we have been to this point, and I do think

5    the relevant time period to look at is 2015, and the things

6    that happened then, providing the subpoena to the direct

7    purchasers in Ford, they had an opportunity to comment and

8    they should have, but that added six weeks to the process.

9         So all of those things put together I don't think

10   there can be any doubt that we have met the standard.  It is

11   the first request for an extension, it is a modest request

12   for an extension in a case that we all know is looked at

13   around the country as one of the most complex MDLs that are

14   going on.  And in this instance on these facts I think the

15   only just result is to grant the extension and to put us on

16   that timetable, to not leave us all uncertain and come back

17   and see you in May and then tell you how we are doing and can

18   we meet the dates when they are six weeks away.

19        THE COURT:  Okay.

20        MR. WILLIAMS:  Thank you.

21        THE COURT:  The Court has reviewed this motion and

22   obviously heard argument.  I can appreciate what defendants

23   are saying but I do still believe that with the discovery,

24   whatever happened in the past like maybe they should have

25   started before and did the Court stop them from doing that by

```
 1    whatever comment I made, and it is interesting because you
 2    all remember the comments I made more than I remember the
 3    comments that I made, whatever I said, you can blame me, I'm
 4    a mother so I'm used to taking that, but I do think that
 5    there is a lot of legitimacy in what the moving party says.
 6    There was some question of when this discovery would start,
 7    there were the last two of the three parts that came in in
 8    the last couple of years, there is objections by the OEMs and
 9    this group formed by the OEMs to deal with this case, which
10    probably is very smart so you can get them all in one entity,
11    but I think that takes time, and as a realistic matter from
12    this point forward by the time the rulings are issued in the
13    motion to compel in the OEMs it is going to be two or three
14    months from now, I think it is foolish or foolhardy to think
15    it is going to be less than that, and therefore I don't think
16    that the November 4th date is a bad date for the motion to be
17    filed, that's a four-month extension.
18            I believe that it was brought to the Court's
19    attention as soon as it could be.  I don't believe the moving
20    party here, plaintiffs, were dilatory, and I don't think the
21    adverse party is going to be harmed.  We all want to move
22    this forward.  This class cert motion is so critical, but
23    because it is so critical I want to make sure everything is
24    in it, not that we didn't have time to do this or we didn't
25    have time to analyze that, so I'm going to grant the motion
```

1     for the extension, it is a four-month extension.  I will

2     grant the dates that have been put in the pleadings by the

3     plaintiffs.  They are the motions for certification in wire

4     harness November 4th, response March 1st, reply June 29th and

5     hearing August 31st.  The bearings motion for cert is

6     November 21st, then response March 29th, reply July 2nd, we

7     are talking 2017, and the hearing September 25th, 2017.  And

8     for the AVRP, the motion for cert is December 12th of 2016,

9     response December -- excuse me, April 13th, 2017, reply

10    August 14th, 2017, the hearing October 2nd, 2017.

11         I hope there are no further adjournments in this,

12    that's all of our wish certainly that there be no further

13    adjournments, and obviously they are not going to be granted

14    very readily.

15         MR. WILLIAMS:  Understood, Your Honor.  I only had

16    one clarification.  The reply date for the class

17    certification reply brief in the bearings case, the proposed

18    date was July 27th, and the Court had said July 2nd, that --

19         THE COURT:  It is July 27th?

20         MR. WILLIAMS:  July 27th.

21         THE COURT:  I do have it as July 2nd, so the reply

22    date would be July 27th, which is logical, that's the

23    four-month extension.

24         MR. KESSLER:  Your Honor, just a point of

25    clarification.  Does the Court also intend to move the direct

```
 1   purchaser class motions to the same schedule even though they
 2   did not request that extension because you had ruled that
 3   they all should be heard together?  I would like to know what
 4   the Court's view is about that.
 5            THE COURT:  I hadn't even considered it, it would
 6   be good to have them all together but --
 7            MR. SPECTOR:  I was about to ask the same question
 8   on behalf of direct purchasers.  Our view is that the Court
 9   has stated that you wanted everything on the same schedule,
10   and we are assuming that it would be but I just wanted to
11   clarify that, Your Honor.
12            Eugene Spector on behalf of the direct purchasers.
13            THE COURT:  Okay.  Let's just --
14            MR. KESSLER:  That's amenable to the defendants.
15            THE COURT:  Let's make that official.  Okay.  We
16   will do the direct also so please present an order to that
17   effect.
18            MR. CHERRY:  And, Your Honor, and Rush Trucks and
19   trucks and equipment?
20            THE COURT:  Yes.  Everybody will be on that same
21   schedule.
22            MR. KESSLER:  Your Honor, I think it would be
23   helpful if the Court could issue this in the form of an order
24   following the hearing, that would be helpful to all?
25            THE COURT:  We'll do that.
```

1          MR. KESSLER:  Thank you.

2          THE COURT:  We will do that, so this is to all the

3  parties then, this schedule for the class cert -- well, to

4  the parties involved here.

5          The next motion is regarding the September 3rd

6  order of the magistrate judge, the objections.  These I know

7  could get very long so I'm going to limit you to

8  15 minutes --

9          MR. DONOVAN:  Your Honor, I think that's plenty.

10          THE COURT:  -- if you need that.

11          I have read them, and I'm going to be doing an

12  opinion shortly on this.

13          MR. DONOVAN:  Yes, Your Honor.  Dave Donovan from

14  Wilmer Hale representing Denso, and I think 15 minutes would

15  be plenty.

16          THE COURT:  Okay.

17          MR. DONOVAN:  Let me start with a little bit of

18  background, it is laid out in the briefs.  Back almost a year

19  ago the defendants began serving subpoenas duces tecum on the

20  non-party auto dealers who sold or leased vehicles upon which

21  the end payors' claims were based to get the documents, the

22  dealer files, the other information because, as Your Honor

23  knows, and I think the end payors suggested, at various times

24  the end payors themselves tend to have very little in terms

25  of documentation, especially regarding older sales but

1  frankly regarding almost any of the sales, so what we really

2  needed were the documents from the auto dealers that sold or

3  leased the cars so that we could get behind the transaction,

4  find out how the pricing was really determined and the

5  economics of the transaction to evaluate whether any

6  overcharge -- if there was any overcharge and to the extent

7  that it was passed on.  That process was essentially

8  non-controversial.  We noticed these subpoenas to the end

9  payors and the auto dealers.  There were no objections by the

10  auto dealers at all and, of course, no objections by the end

11  payors.  There were no motions to compel, there were no

12  motions for protective order.

13        We worked out the objections to the extent that

14  there were any with the non-party auto dealers, collected the

15  documents and, in fact, with respect to the one dispute that

16  came up from the end payors about the presence of certain

17  confidential information about their clients in some of these

18  documents.  For example, the auto dealers would often have a

19  copy of the end payor's driver's license or something like

20  that, and we worked out a procedure with the end payors so we

21  would have the third-party auto dealers, the non-party auto

22  dealers, send the documents first to the end payors who would

23  redact what they thought was appropriate to redact and we had

24  an agreed-upon list of things they could redact, and forward

25  on the documents to us with a time line and a schedule by

1     which all of that would happen.  There were no problems with

2     any of that.

3             In July of 2015 we took the next obvious logical

4     step, which was to begin serving notices of depositions on

5     the third party -- the non-party auto dealers who sold the

6     cars to the end payors.

7             THE COURT:  So no problems with the document

8     production, it is now the depositions that --

9             MR. DONOVAN:  Your Honor, I don't want to suggest

10    there were no objections by some of these non-party auto

11    dealers, there were, but we worked them all out.

12            THE COURT:  Okay.

13            MR. DONOVAN:  There were no motions filed by

14    anybody.  So we noticed the depositions of the first three of

15    the non-party auto dealers at the end of July 2015, and right

16    up on the due date for objections for those notices of

17    depositions, those subpoenas, counsel for auto dealers came

18    in and moved to preclude all of that discovery complaining

19    both about the subpoenas that had been being served for the

20    last six months as well as whether any depositions could go

21    forward at all, and the Special Master after a hearing

22    granted in large part the relief they sought.

23            There are two issues to which we noticed objections

24    to Your Honor at the end of September.  First was the Special

25    Master's order barring all depositions -- all depositions of

1    the non-party auto dealers absent a special separate showing

2    of particularized need, and second was his order barring all

3    contact -- all further contact that defense counsel could

4    have with non-party auto dealers including counsel for the

5    non-party auto dealers directing that all communications that

6    we needed to have with the non-party auto dealers had to go

7    through counsel for the auto dealers.

8            Now, since the September ruling and the objections

9    that we filed, defendants have, as has been described earlier

10   this morning, taken the depositions of most of the end

11   payors.  There are still about 20 whose depositions have not

12   been taken but we have taken the depositions of the bulk of

13   them.  We established what we thought we had made clear in

14   our opposition to the auto dealers' motion for protective

15   order, that the end payors know nothing about the auto

16   dealers' side of any of those transactions.  The end payors

17   comes in and maybe they have a document or two, maybe they

18   know what they paid, in many instances they don't even know

19   what they paid, maybe they know a few of the terms of the

20   negotiations, in general they don't, and certainly when we

21   show them the documents we obtained from the non-party auto

22   dealers they have no way to interpret those records, they've

23   never seen any of them before, they obviously can't establish

24   that they are business records, and they can shed no light on

25   the auto dealers' decision-making process, the auto dealers'

1    thought process in reaching the negotiated purchase price

2    that they reached with all the associated pieces of the

3    transaction; the determination of the trade-in value, the

4    extended warranties, the financing, et cetera, et cetera,

5    et cetera.

6         So after we took those depositions there was

7    another round of briefing while this appeal and while these

8    objections were pending, another round of briefing to the

9    Special Master.  We needed to take these depositions so he

10   told us we needed to show particularized need, so we filed

11   another motion to show particularized need, and we got an

12   order from the Special Master, he agreed that we showed

13   particularized need.  In fact, he ruled specifically that the

14   information was critical information, the information from

15   the non-party auto dealers was critical information necessary

16   to the defense.

17        THE COURT:  Wait a second.  I'm going to slow you

18   down there.

19        MR. DONOVAN:  I'm sorry.  I know I talk fast, but

20   15 minutes, you know.

21        THE COURT:  Okay.  You went before the Master to

22   show particularized need in what -- against whom?

23        MR. DONOVAN:  This was a motion to obtain from the

24   Special Master an order pursuant to a September 3rd ruling

25   that we needed to show particularized need in order to get

1    permission to take any of the non-party auto dealers'

2    depositions.  We asked for permission to take whichever

3    depositions we thought we needed, but we offered a fallback

4    and we said if you are not prepared to kind of bite that big

5    of a chunk off the apple right now at least give us

6    permission to take 15, and we named who the 15 were.  He said

7    you are right, you have shown that this is critical

8    information necessary to the defense of the end payor claims,

9    you defendants have shown that to me, so I'm going to give

10   you permission to take those 15 depositions.

11         There was then another round of briefing about the

12   scope of the 30(b)(6) notice that we could send to the these

13   non-parties, and that was finally resolved yesterday, wasn't

14   it?  Just very recently, within the last few days.  The first

15   of these depositions is finally scheduled to take place

16   actually tomorrow, Your Honor, in I think Providence.  We

17   have lost five months as a consequence of all of this, and

18   that's water under the bridge, you can't fix that.  We have

19   lost the opportunity to coordinate, you know, these

20   depositions of the end payors and the auto dealers and the

21   cities they go to, and so somebody is going to have to go to

22   Waterloo again, that's okay for me, I get to see my mom, she

23   is happy, but not everybody wants to go to Fargo twice.

24         But perhaps more prejudicial from the process we

25   have gone through so far and the reason why this is still a

1    live issue is that we have been precluded from using the

2    information that we would have gotten from these auto dealers

3    in the depositions of the end payors.  There are still 15 or

4    so end payors to depose.  Ideally we would have taken at

5    least some of these non-party auto dealers' depositions

6    before we took the end payor, that way when I depose Jennifer

7    Chase in Waterloo we would have had the benefit of the

8    information from the auto dealer that sold or leased her her

9    cars.  We didn't, we had to go in there with what we had and

10   we only get one deposition of Jennifer Chase, just like every

11   other end payor, so there is still a live issue here.  We

12   don't have permission to depose the remainder of these

13   non-party auto dealers, we need this resolved so we don't

14   have to go through another round of motions practice before

15   the Special Master.

16          THE COURT:  But the Master has said that you have

17   shown the need for these 15?

18          MR. DONOVAN:  Right.

19          THE COURT:  What would differ in the next 15 --

20          MR. DONOVAN:  I don't know.

21          THE COURT:  -- or the rest of the group in terms of

22   critical need?

23          MR. DONOVAN:  It shouldn't differ at all but we

24   have to file -- he expressly said we may take no more without

25   coming back to him with another motion for particularized

1    need.

2            And, Your Honor, what I think makes this simpler is

3    that the Master, with all due respect, was incorrect both

4    legally and factually in granting the initial relief he

5    granted, both with respect to whether we have to show

6    particularized need and with respect to the communications

7    with these non-parties and their lawyers.  I will address the

8    first issue first and I will try to be even more brief about

9    that.  These are witnesses to the transactions upon which the

10   end payors are basing their claims.  They are the only source

11   of information about the facts about how these transactions

12   were priced and whether pass on occurred.  The rationale for

13   restricting discovery of absent class members is simply

14   legally inapplicable here.  The non-party auto dealers are

15   not absent class members in the end payor case, period, full

16   stop.  That alone should have entitled us to take the

17   depositions of the non-party auto dealers.  And as the

18   Special Master just held, the non-party auto dealers have

19   critical information necessary to the defense by the

20   defendants of the end payor claims.

21           So, number one, just as a legal matter we never

22   should have gotten this far.  Number two, even if there were

23   something to the notion that these non-party auto dealers are

24   members of the provisionally-certified class -- settlement

25   class in the auto dealer case such that somehow that's

1     relevant to the end payor case as a matter of law, and we

2     think it is not, one of the premises of the auto dealers'

3     motion was undue burden.  There is no undue burden on any of

4     these third-party auto dealers, Your Honor.  In fact, before

5     the auto dealers' counsel got involved to stop the deposition

6     of Dan Derry Motors in Waterloo back last August, counsel for

7     Dan Derry Motors had negotiated with us the scope of the

8     deposition, he negotiated with us a day for the deposition, a

9     time for the deposition, a location for the deposition, he

10    even identified who it was that would be testifying on behalf

11    of Dan Derry Motors.  He never raised an issue of burden,

12    neither did any of the other non-party auto dealers whose

13    deposition we noticed.  They were on the way to get

14    scheduled, they were going to produce a witness, he testified

15    for four, five, six hours, whatever it took one day.  There

16    was no -- and in the motion that auto dealers filed to stop

17    these from going forward there was no declaration from

18    anybody asserting burden.

19          The concern they raised is equally unsubstantiated

20    in the record.  The concern the auto dealers raised was that

21    somehow -- whether you are talking about depositions or

22    talking about communications, somehow the fact of this

23    deposition would disincentivize or discourage these non-party

24    auto dealers from participating in the settlements in the

25    auto dealer case.  Even as a hypothetical matter I don't

1    think you can come up with a reasonable theory as to why that

2    would be, why it is that noticing a deposition of Dan Derry

3    Motors with respect to Jennifer Chase's claim in the end

4    payors' case would cause Dan Derry Motors to opt out of a

5    settlement that had been arranged for in the auto dealer

6    case.

7            Nonetheless, the Special Master said that he was

8    balancing the need to protect the non-party auto dealers from

9    some interference with their willingness to participate in

10   the settlements against our need for the discovery, which

11   he's now found we have a critical need for, so even if you

12   engage the balancing that courts apply with respect to

13   discovery of absent class members, which we don't think is

14   even relevant here, we think there is no basis for his

15   finding that we hadn't met that test and the depositions

16   would go forward.

17           Now, with respect to communication with these

18   non-party auto dealers, Your Honor, let me be clear, this is

19   just a question of logistics.  We were talking since -- for

20   almost a year we have been talking up until the Master ruled

21   on September 3rd, we have been talking to these non-party

22   auto dealers, principally to their lawyers, most of them have

23   lawyers but not always when they would call us when they

24   received a subpoena and they would say what is this, what do

25   you really want, where do I send it, I can't find it, they

1     would send us something but it was incomplete, there were

2     pages missing, I need a check for copying costs, send me your

3     FedEx label, whatever the issue, that's the kind of stuff we

4     were discussing with the non-party auto dealers.

5          When it came time to notice their depositions the

6     conversations were very similar, again, principally with

7     their lawyers, their own lawyers would call us and say I got

8     your subpoena, what's this about?  We would explain it to

9     them and say okay, I can't do it the day you noticed it for,

10    can I do it the next week, what are you looking for from this

11    witness, nobody seems to remember this, and we would say it

12    is 30(b)(6), we need them to look at the documents, we will

13    send you another set if you won't.  Well, I can't do it that

14    day.  Where do you want to do it, can I do it here in the

15    showroom?  That's the kind of conversations we were having.

16         In response to that we received a motion from the

17    auto dealers seeking to quash all of those communications on

18    two grounds.  Number one was the argument that as a matter of

19    the code of professional responsibility they argued

20    any communications -- the communications we had had with

21    counsel for Dan Derry Motors violated the New York Code of

22    Professional Conduct because there was communication with a

23    represented person.  Well, we had spoken to his lawyer.  No

24    one from my firm spoke to anyone at Dan Derry Motors, there

25    wouldn't have been anything wrong with that, but they hadn't.

1    Auto dealers' counsel knew that.

2          And I think, in fact, the Special Master earlier

3    today was talking about making personal allegations and the

4    inappropriateness of that, and I think this is the genesis of

5    his comments this morning.  There was a specific allegation

6    that one of my colleagues had violated the New York Code of

7    Professional Responsibility by speaking to Dan Derry's

8    lawyer, and they went so far as to identify him by name in

9    their brief and to even provide the website -- the link in

10   our website where the Court or anyone else could be real sure

11   exactly who they were talking about.

12         The Special Master ruled that it was an unwarranted

13   personal attack on my colleague, and he suggested that that

14   portion of brief be stricken from the record, although the

15   Special Master observed that he didn't think he had the

16   authority to do that.  I understand as of this morning auto

17   dealers' counsel have agreed or figured out a procedure to

18   remove or I guess replace the brief that they had filed with

19   a different brief that excises the specific identification of

20   the attorney that they had leveled these accusations at, and

21   we appreciate that, so it is a little late but we appreciate

22   that.

23         Nonetheless, the argument is still false.  There is

24   nothing in the code of professional responsibility that

25   prohibits counsel for defendants from speaking to a lawyer

1    for a non-party auto dealer and, in fact, until such time as

2    we are advised that there is counsel in place for that

3    non-party auto dealer with respect to the end payor case we

4    are free to reach out to those people.  In fact, to discuss

5    logistics that's the most routine thing there is.

6         The second argument that auto dealers' counsel made

7    was that the provisional approval of the settlement classes

8    in the auto dealers' case created an attorney-client

9    relationship with the non-party auto dealers for the

10   depositions -- for their depositions as witness in the

11   end payor case.  There is literally no legal authority for

12   that proposition, certainly none has been cited, we are not

13   aware of any.  At most the provisional settlements in the

14   auto dealer's case created a limited attorney-client

15   privilege between auto dealer counsel and non-party auto

16   dealers with respect to those settlements.  Okay.  That's not

17   what these depositions are about.  These depositions had

18   nothing to do with the settlements.  These depositions were

19   exclusively about the transactions in which the end payors

20   purchased or leased the vehicles at issue in their case.

21        THE COURT:  Okay.

22        MR. DONOVAN:  Again, the Special Master applied a

23   balancing test, and he balanced the auto dealers' interest

24   again of concerning whether somehow these depositions were

25   going to discourage these non-party auto dealers from

1    participating in these settlements, and the risk that somehow

2    they would be persuaded to opt out of these settlements as a

3    consequence of our communications with them against our right

4    to speak to them and to their lawyers.  There was nothing in

5    the record to suggest really anything on their side of the

6    balance of the argument.  There was nothing in the record to

7    suggest any of our communications had been improper, nothing

8    in the record to suggest we had ever discussed any of these

9    settlements in the auto dealer case with any of these

10   non-parties, it was preposterous that we would have done

11   that, we never did.  They obviously had every opportunity to

12   speak to these non-party auto dealers, had no evidence that

13   we had any untoward conversation with any of them or, in

14   fact, that we had ever discussed anything with any of them

15   other than dates, times and places for these depositions,

16   that's all it was.

17          The Supreme Court in Gulf Oil which both sides

18   cited to Your Honor, lays out the standard.  Even if the

19   non-party auto dealers are absent class members with respect

20   to the discovery in the end payor case and, again, they are

21   not, but even if they were, the Court has held that any

22   restriction on communications requires a clear record with

23   specific findings, and there was neither a record nor

24   findings by the Special Master to justify any restriction on

25   our communications much less the absolute prohibition on our

1  communications.

2           So why does this matter?  Why does any of this make

3  a difference?  It makes a difference because we continue to

4  experience wasted time and delay in getting further documents

5  from these auto dealers and now that depositions are being

6  permitted to go forward in communicating with them to try to

7  set dates and times and places that are convenient to the

8  witnesses.  The logistics of this are -- they are not a

9  nightmare, okay, we have been working with auto dealers ever

10 since September but it is just a pointless waste of time.

11 For months we had a weekly conference call in which we would

12 go through the status of the production from all of the 30 or

13 40 non-party auto dealers who had yet to produce documents

14 pursuant to our subpoena.  We would say, all right, what's

15 the latest you heard from them, have you reached out to them,

16 have they received the subpoena, are they raising objections,

17 are they producing documents, do they have any questions, and

18 they would come back a week later and say, okay, we talked to

19 these five, we haven't reached these other six, we are

20 playing telephone tag with them, and so we have this two- or

21 four- or six-way conversation where we have a conversation

22 with auto dealers, auto dealers have a conversation with the

23 non-party auto dealer, the non-party auto dealer reports back

24 to auto dealers, the auto dealers report back to us just to

25 get the documents.

1          THE COURT:  Okay.  Let me go on because we have to
2    move along.  There was an issue about the -- I think Sheehy
3    Auto Stores?
4          MR. DONOVAN:  Sure.
5          THE COURT:  The $50,000 it would cost for
6    depositions -- well --
7          MR. DONOVAN:  Your Honor, I'm not familiar.  I know
8    there was one auto dealer who said he expected to get paid
9    but we don't have --
10          THE COURT:  You don't have an issue with costs from
11    the auto dealers here?
12          MR. DONOVAN:  It would depend on what they were for
13    and what they did, but I'm not aware of any dispute that has
14    come to that point.
15          THE COURT:  Okay.  I just wanted to clarify that.
16    Thank you.
17          MR. DONOVAN:  Thank you, Your Honor.
18          MR. RAITER:  Thank you, Your Honor.  Shawn Raiter
19    on behalf of the auto dealers.
20          This is a solution looking for a problem.  This
21    motion really has no legitimate basis to be here right now
22    because what happened was they did not follow -- the
23    defendants served discovery on absent class members, and all
24    of the authority says you can't do that without leave of
25    court.  Huge amount of authority in our brief that says you

```
 1   don't get to serve absent class member discovery because that
 2   would defeat the purpose of class actions.  They went ahead
 3   and did that anyway, they did that first with the document
 4   subpoenas and we, as counsel noted, didn't get in the way of
 5   those document subpoenas because we understood that they may
 6   have some legitimate concern about having the complete deal
 7   records from these auto dealers.  But then they went ahead
 8   and served -- started serving deposition notices for absent
 9   class members, these are people in our settlement classes,
10   they are people in our punitive litigation classes, and now
11   they are -- having responded to document requests are now
12   being asked to sit for depositions.  We lodge objections and
13   we say by the way, Counsel, are you talking about one
14   deposition, and they wouldn't commit to one.  They said well,
15   we can only imagine one but maybe more of these absent class
16   members who under normal Rule 23 procedures should have to do
17   nothing, they shouldn't have to do a darn thing in this
18   litigation except if there is a settlement participate in the
19   settlement because they didn't choose to do anything.
20           Now, we are in a unique case, we are in a unique
21   MDL, we know that, and the uniqueness is that our absent
22   class members also are fact witnesses as to the transaction
23   with the end payors.  Okay.  So we do have an interesting
24   dilemma here because they want the information and yet
25   Rule 23 and the great weight of authority -- what you didn't
```

1    hear today was any case cited by counsel that there is some

2    reason that this discovery should go forward without prior

3    court approval, that's the key, you have to come in and tell

4    the court and show to the court why you should be allowed to

5    take absent class member discovery.  They didn't do that.  We

6    then objected when they started sending the deposition

7    notices, we moved for protective order, and Special Master

8    Esshaki rightly followed the case law in this district, in

9    this circuit, that says that you need to come here first and

10   you need to apply for essentially the right or leave to take

11   discovery.  The defendants waited about three months after

12   first having served these deposition notices before they took

13   the Special Master up on his request, which is simply follow

14   the law, follow the rules.  So they are on a parallel track.

15          What they did was appeal his first ruling saying

16   the case law requires you to come ask for leave and, by the

17   way, you shouldn't be communicating with these represented

18   automobile dealers because once they are punitive settlement

19   classes and now there are actual settlement classes for

20   purposes of communicating with those dealerships about this

21   litigation, and remember this is an MDL that has an umbrella

22   across all the top of this litigation, they must communicate

23   through class counsel.  Because they didn't do that the

24   Special Master said, number one, your deposition subpoenas

25   are quashed and, by the way, if you want to come ask me the

1    way you are supposed to using the standards you are supposed

2    to apply I will be happy to entertain that motion, and number

3    two, please stop communicating with these dealers and run

4    these communications through counsel for the auto dealers.

5    That is the motion that is before you on objection.

6            Now, while we heard a lot of re-argument of that

7    motion what we didn't hear much of was an abuse of discretion

8    or that he got the law wrong.  The law that he applied was

9    the right law.  They don't like the outcome but he was well

10   within his discretion in the outcome because he was, in fact,

11   balancing the interest of this unique litigation, that's

12   exactly what he did.

13           The other thing that you didn't hear this morning

14   was how many additional depositions they want to take of

15   these absent dealers.  It is something in total well over

16   100.  So they came back in to the Special Master and they

17   made their motion and said we have a particularized need for

18   this discovery in this litigation and they went through

19   various things related essentially to pass-on defenses or

20   antitrust injury defense, and they said we want to take the

21   depositions of every absent automobile dealership that sold a

22   vehicle to one of the end payor class representatives.  They

23   then said alternatively if you won't let us do that, please

24   let us take 15 and they named the 15 they wanted to take, so

25   he granted their motion for leave to take 15 depositions.

1    Those depositions, as counsel noted, start tomorrow.  They

2    have all been scheduled with the exception of a few that the

3    parties agree that they are communicating about scheduling

4    for those depositions, so the supposed administrative trouble

5    and communication troubles have resulted in the depositions

6    being ready to go and they will be completed by the end of

7    February.

8         The documents that were requested via the subpoenas

9    have all been produced with the exception of a few follow-ups

10   and later-served subpoenas.  And has that added a layer of

11   communication and administration?  Sure it has.  We have been

12   doing the majority of the work, the auto dealers.  We have

13   been interfacing with the dealers saying when are you going

14   to get the documents, when can you give us, the defendants

15   want dates, they always want dates from us, when will you

16   have them, when will we get them, when can we get them, when

17   are you going to call me back, when are you going to e-mail

18   me, they do it all the time.  It is burdensome but we have

19   taken on the majority of the burden, the auto dealers have.

20   So, again, it is a solution looking for a problem.  These 15

21   depositions have been scheduled.  The dealerships have

22   produced the documents.

23        So what you have before you is simply this -- you

24   have really two questions before you and they have kind of

25   merged them together.  You have two questions.  The first is,

1    did the Special Master apply the appropriate law when asked

2    to look at whether absent class members should be subject to

3    discovery, and there is no question that he applied the

4    correct law.  Cases in this circuit -- the district court

5    cases from this circuit, the Groth case, the Polyurethane

6    case, the Skelaxin case, the Khaliel case, all applied the

7    same procedure that the Special Master demanded of the

8    defendants here.

9         Now, they said well, the auto dealers aren't

10   members of the end payor class.  The first testimonial

11   subpoena they served was served in both the end payor class

12   and the auto dealer class, the Dan Derry subpoena they served

13   in the auto dealer case with the auto dealer caption.  Now,

14   when they realized it caused them a problem they withdrew the

15   subpoena and served it again but only in the end payor case

16   like, well, sorry about that, we now are only going to take

17   these in the end payor case, but keep in mind what it is that

18   they want here through this testimony.  They want to show

19   either that the end payor didn't receive any passed-on

20   overcharge or they did, and they are in the middle of the

21   pass-on defense which, guess what, that's where we reside

22   right in the middle of it.  These auto dealers are going to

23   be asked to provide testimony that very well may be used

24   against them by the same lawyers who are asking to

25   communicate freely with them, to talk with their lawyers, to

1    gather documents.  I think most lawyers in this room, it is

2    striking to think that all of these defense lawyers could be

3    talking to people in our class about this litigation, about

4    pass on, about testifying about things that will very well be

5    used against them by the same lawyers who now act like they

6    want to play nicely with these parties.  It is not fair, and

7    that's why the rules exist to prevent it.

8              THE COURT:  Okay.

9              MR. RAITER:  And the Special Master on the

10   communication side, Your Honor, he said I have to strike a

11   balance here.  They have interest to get this discovery but

12   you have interest in making sure the communications are

13   proper and there is no undue influence and he struck a

14   balance, and when you look at his orders and you look at how

15   he got here he clearly was within his discretion.  He clearly

16   applied the right law.  They don't suggest otherwise, they

17   say the law doesn't apply because of the unique facts of the

18   case but he's well within his discretion, and you should

19   affirm this order.  Thank you.

20             MR. DONOVAN:  Briefly, Your Honor.

21             Let me be real clear, we specifically assert and I

22   think made very clear in our briefs we believe the Special

23   Master was completely wrong as a matter of law in applying

24   the absent class member case law cited to him by the auto

25   dealers, the depositions of these non-party auto dealers in

1    the end payor case.  We would need this discovery in the

2    end payor case if the auto dealer class didn't exist, we

3    would need this discovery in the end payor case if there was

4    no class action at all.  We need this discovery in the

5    end payor case to find out the facts about whether or not

6    there was pass on in the specific transactions on which the

7    end payors are basing their claims.  There is no case -- not

8    any case cited by anybody that suggests that the principles

9    that govern discovery of absent class members apply in the

10   circumstances here.  It was wrong as a matter of law.

11          And even if there were such cases he misapplied the

12   balance as a matter of law.  The principle under which

13   discovery of absent class members is restricted is because of

14   the expectation that the class representatives, the auto

15   dealers, will provide discovery necessary to litigate the

16   claims.  Everybody agrees from day one, the Special Master

17   acknowledged in his September 3rd order that the auto dealer

18   plaintiffs can shed no light at all with respect to the

19   purchases by the end payors.  None of the auto dealer

20   plaintiffs, none of the class representatives sold any of the

21   cars to the end payors.  The only auto dealers who can shed

22   light on these transactions, who have the key evidence to

23   those transactions, are non-parties and they are not parties

24   in the auto dealer case and they are not parties in the

25   end payor case, and to the extent to which they are

```
 1   participants in a provisional settlement class that
 2   settlement is in the auto dealer case and it has absolutely
 3   nothing to do with the discovery which we are entitled as a
 4   matter of law in the end payor case.
 5           THE COURT:  Okay.  Thank you.
 6           MR. DONOVAN:  Thank you, Your Honor.
 7           THE COURT:  Interesting issue and interesting
 8   argument.  The first issue is whether or not the Master
 9   applied the appropriate law when he ruled regarding the
10   absent -- his ruling that the auto dealers are absent class
11   members, and the Court finds that he did err as matter of
12   law.  The auto dealers are not absent class members in the
13   end payor case.  This is a separate case.  Even though we
14   have provisional settlements in the auto dealers' case those
15   provisional settlements which, of course, affect these absent
16   auto dealers does not change the circumstances under which
17   they are fact witnesses, and I would assume critical fact
18   witnesses because it is the only place you can get this
19   information in the end payor case.
20           So I do find that there was an error of law.  I
21   respect what the Master tried to do to balance things and get
22   things moving along, but we can't balance that which doesn't
23   exist, so that's the Court's ruling.  Along with that court
24   ruling, then counsel for the defendants may speak to lawyers
25   for the non-party auto dealers and there is nothing improper
```

```
 1   about that, or the auto dealers themselves if they do not
 2   have lawyers.
 3        Now, there is still -- having said that and that is
 4   my ruling, whatever cooperation again you can do with the
 5   class counsel versus the individual counsel letting class
 6   counsel know what's going on I think you need to do that.
 7   That's a matter of -- that's a matter of litigation respect
 8   but it doesn't change the law as this Court is determining it
 9   to be.  Okay.
10        The next case is the September 29th order I
11   believe.
12        MS. ROMANENKO:  Good afternoon, Your Honor.
13   Victoria Romanenko for dealership plaintiffs.
14        Your Honor, before we get started I would like to
15   note there is a possibility of highly confidential
16   information being disclosed in this argument.  If possible,
17   we don't have an issue with any counsel being in the
18   courtroom but if it is possible not to have the media we
19   would appreciate it.
20        THE COURT:  The media?
21        MS. ROMANENKO:  Or the press.
22        THE COURT:  Do we have any press here?  I guess we
23   have one.  I didn't even know that.  Okay.
24        When you get to parts that are confidential would
25   you note that for the record so that would be sealed in
```

```
 1    whatever information that it is that you want to be sealed?
 2              MS. ROMANENKO:  Yes.
 3              THE COURT:  Okay.  Thank you.
 4              MS. ROMANENKO:  Your Honor, this appeal before you
 5    today is very different from other appeals Your Honor has
 6    heard before.  This is an order on a series of very important
 7    issues that were never briefed to the Master or analyzed
 8    below.  You will see from reviewing the order and the
 9    briefing in conjunction with the provisions in the order that
10    they simply do not match up with what was argued to the
11    Master below and what the Master analyzed.  Also the
12    defendants' brief to the Master focused on a couple of
13    missing fields of data, what we got was an order calling for
14    extensive non-testifying expert discovery, backup discovery
15    that had altered our negotiated stipulation with the
16    defendants, and a series of other issues that were never
17    briefed or analyzed.
18              THE COURT:  Let me stop you there because I have
19    some questions on experts and what you consider an expert.
20              Now, as I read I believe it was an affidavit from
21    one of the -- what is it, the DMS folks, the data is the data
22    gotten from the dealer so it is the dealer's information,
23    right?
24              MS. ROMANENKO:  I'm sorry.  You referred to an
25    affidavit?
```

1       THE COURT:  Well, one of the DMS providers talked

2    about this isn't our information, it is the dealer's

3    information.  I agree with them, all of this information that

4    they gather is from the dealer and they are almost like a

5    keeper of the records, it is a way to keep the records, to

6    organize the records in this electronic age.  So these DMS,

7    as I understand it, really provide a software function, they

8    provide a program to process all of this or store this

9    information.  Is that your understanding?

10      MS. ROMANENKO:  Correct.  The DMS provider provides

11   the software and the functionality and the support for the --

12   to host the dealer's data.

13      THE COURT:  Okay.  Now, may the DMS person or

14   company they may have the data in their own location on their

15   computers or it may be in the dealer's -- I think this one

16   affidavit said mostly it was in the dealer's, which I was

17   surprised?

18      MS. ROMANENKO:  It depends on where it is hosted,

19   but to clarify, that's not who our consultant is.

20      THE COURT:  Well, that's what I wanted to get to.

21   Who was your consultant?  Is your consultant somebody who

22   works with the DMS to pull out this information?

23      MS. ROMANENKO:  So to go back for a second, the

24   defendants came to us saying we want all of this data from

25   your clients, get it from their systems.  Most of our

1    clients, you know, are small businesses, they are lay people,

2    they wouldn't be able to perform a large 200-field extraction

3    covering ten years.  So what we did was we did some footwork

4    and we located a consulting entity, it is not a DMS provider,

5    who worked with our clients on our behalf to gather their

6    data from their system.  They did not -- they are not the DMS

7    provider or an extension of the DMS provider, they are an

8    expert in DMS systems who specialize in mining those systems

9    for data, creating these kinds of reports that we produced to

10   the defendants.  They are an entity that we retained to work

11   with us as an extension of counsel in order to be able to

12   produce to the defendants these data sets that they were

13   seeking from our clients.  And we have been interfacing with

14   that entity in order to learn and better understand how these

15   systems work.  We have had them interfacing with our clients,

16   gaining their confidences, their special information about

17   their systems, going in over and over again to locate this

18   information to produce to the defendants.  So it is similar

19   to any other expert in a litigation like this that is aiding

20   with and shedding light upon a discovery function like, for

21   instance --

22            THE COURT:  But these experts are really extracting

23   information requested by the defendant, they are not

24   analyzing the information, right, or are they?

25            MS. ROMANENKO:  They are analyzing how to get the

1    information.  We have had a number of communications with

2    them in which they have educated us on how these systems

3    work.  That's been a persistent issue in this litigation.

4         THE COURT:  Well, because you need education on how

5    the systems work, but in terms of what they are doing they

6    are not doing any analysis for you saying this is what this

7    means or they are not doing any analysis for the defendants,

8    they are simply pulling out fields in a record?

9         MS. ROMANENKO:  Well, no.

10        THE COURT:  No?

11        MS. ROMANENKO:  No.  For instance, we will say what

12   does this field mean or what does it mean that there is this

13   kind of value in this field, and they will tell us because

14   this is a specialist that has been in a lot of different DMS

15   systems and they will explain to us.  Or, for instance,

16   different of our clients use different DMS providers and that

17   sometimes changes --

18        THE COURT:  But isn't that the client that says

19   this is the information I need to save, this is the price?

20   Now, maybe DMS calls the price field amount maybe and maybe

21   they use A, B or C but it is -- they are not determining what

22   the information is, this is the information that is given to

23   them by the dealership, right, that the dealership wants to

24   maintain, so they set up a system?

25        MS. ROMANENKO:  The dealership doesn't usually make

1    its own determinations about what a field is or --

2         THE COURT:  Well, maybe not but they certainly have

3    to make their own determination as to what's to be preserved.

4    I mean, why would a data management system person come in and

5    say well, I want to preserve just half of your information or

6    I want to preserve A, B and C, how would they know?  They've

7    got to learn the business from the auto dealers, right?

8         MS. ROMANENKO:  Well, for instance, we will say to

9    them I see that there isn't -- I see this field and there

10   isn't data in there, what could that mean?

11        THE COURT:  You see what?

12        MS. ROMANENKO:  We see a particular field, a

13   category, and there isn't -- it is not populated with data,

14   I'm looking at my spreadsheet and there is nothing there,

15   what could that mean?

16        THE COURT:  Right, and they might say well, this is

17   a cash deal so there is no amount of a loan, say, or -- but

18   that would be something the auto dealer would have told them

19   when they set up the system that what we want to preserve is

20   this piece of information, so why would you be -- you would

21   be asking them because they probably have the protocol for it

22   all written down but technically it came from the auto

23   dealer, right?

24        MS. ROMANENKO:  They don't ask the dealer to answer

25   our questions.  So, for instance, if we say I'm looking in

1    the CDK system for my client X and I see this name, what does

2    that mean and does it have this kind of information or this

3    kind of information?  Because they have seen a lot of

4    different dealer systems and because they have had a lot of

5    experience with this they can tell us what that means, or if

6    we say, for instance, they have -- there's this many years of

7    data and I'm trying to understand why that is, and they can

8    explain to us why that is.  A dealership sometimes they don't

9    even know how many years of data they have.  Like, for

10   instance, you know, a lot of our clients told us we might

11   have five years and then later we find out no, no, no, there

12   is actually quite a bit more there.

13          THE COURT:  But that would be because the DMS

14   system didn't purge the records of the previous five years so

15   we only have five years of information but when you go to

16   look at it you've really got 10 or 15, maybe 20 because

17   that's a data processing thing and they didn't bother to

18   purge it, so there may be more information than the

19   dealership knows.  I agree with you on that, your client may

20   not know that and the DMS provider would.  I'm just trying to

21   get to what makes them an expert in this case.  I mean, they

22   are experts in data management, there is no question about

23   that, but are they -- they are all of your records, they are

24   all of your records?

25          MS. ROMANENKO:  Right, so they are an expert for

1    instance like any kind of predictive coding expert that a
2    defendant might hire, an entity that will run an algorithm to
3    allow them to make a determination about what documents might
4    be responsive, what documents may not be responsive.  Rule 26
5    with regard to expert -- testifying and non-testifying
6    experts doesn't say we don't apply this rule to an expert
7    that's being used in a discovery process, it doesn't have
8    exceptions, it creates a non-waivable concrete protection for
9    any kind of consulting expert that we, the attorneys, might
10   be working with in order to aid us in carrying out the
11   functions of the litigation.
12          So like, for instance, we cited to Your Honor the
13   Genesco case where the law firm hired a computer consultant
14   to help with carrying out the litigation.  That's similar to
15   our consultant.  What makes them an expert and covered by the
16   rule is that they are a specialized entity working with and
17   at the direction of counsel to carry out these functions.  It
18   is something that we need done in the case that we can't do,
19   that our clients can't do, and it is something where we need
20   to get an understanding of how these systems work and our
21   clients, they are lay people, they can't provide us with that
22   understanding.  We have had a large amount of briefing on
23   this issue, Your Honor I am sure saw it come across the
24   docket, so we have needed to have many hours of consultation
25   with this entity to get an education on how this system works

 1    and how one would go about extracting data.

 2            THE COURT:  Let me ask you this, if you had a small

 3    dealership and it is keeping its records on the computer and

 4    has somebody who works for the dealership there entering, you

 5    know, a data record, say, let's look at a small data record,

 6    ten fields, it might have the name of the purchaser, the type

 7    of car, very small records, and the employee is a direct

 8    employee of the dealer.  The defendants come in and they say

 9    we want to know how many cars were sold and how much they

10    were sold for total, and this person at the computer, you

11    know, hits these buttons and he comes up with these totals,

12    would they be able to ask this person, an employee of the

13    auto dealer, well, how did you find that information?  Would

14    they be able to ask them that?

15            MS. ROMANENKO:  Would the defendants be able to ask

16    them that?

17            THE COURT:  Yes.

18            MS. ROMANENKO:  If the employee had the ability to

19    run that kind of report they might be able to ask them that.

20    In this instance what we found is the kind of comprehensive

21    report that's being requested, most of our clients probably

22    can't run, and that's why we have had to go out and get help

23    from a consultant.  So I guess your question is if a

24    defendant wanted to ask one of my clients -- let's take one

25    of my smaller --

1    THE COURT:  What if the defendant wanted to ask

2  your consultant how did you get that information?

3    MS. ROMANENKO:  If they wanted to ask the

4  consultant the consultant would have an answer but, of

5  course, here because it is work product they are working at

6  the direction of counsel, they would provide the information

7  to counsel, counsel would provide it to the other side, just

8  like the defendants are entitled to protections.  To be

9  clear, it is not just they are non-testifying consulting

10  experts under Rule 26, they are also entitled to work product

11  protections even if it were --

12    THE COURT:  Their own work product, in other words,

13  whatever programs they designed to draw out this information

14  would be their work product, right?

15    MS. ROMANENKO:  Well, any communication or anything

16  created for counsel would be their work product so just like,

17  for instance, there would be any protection accorded to

18  somebody that worked on a document, like if somebody hired an

19  outside entity to work on a document production with a

20  client, the communications with counsel, e-mails that pass

21  back and forth, that would be work product because if counsel

22  is entitled to work product protections and counsel is

23  working with a vendor or an expert that is working as an

24  extension of counsel to perform a function that counsel can't

25  perform and that counsel's client can't perform, then

1    necessarily those work product protections have to extend.

2    Otherwise, all of the information that passes between counsel

3    and the expert or the vendor is going to get revealed, it is

4    going to be thought processes, it is going to be opinions,

5    what did so-and-so say to you, what did you say back, what

6    was the thought here about how we are going to go about

7    getting this, why is it needed, what was the initiative of

8    this?

9         THE COURT:  Do you have like one consultant for all

10   of your dealerships or is there different consultants for

11   different DMS systems?

12        MS. ROMANENKO:  So as far as producing data from a

13   live DMS we have one consultant who does that, we have other

14   consultants who deal with some of the backup tapes.

15        THE COURT:  Then there was one case in which the

16   data from the DMS provider was different from the data from

17   the consultant that was cited in the brief.  How do you

18   explain that?

19        MS. ROMANENKO:  So early last year when the

20   defendants had subpoenaed these DMS providers there was one

21   fairly small one that was willing to produce some data, and

22   they produced data for a couple of our clients.  There are a

23   couple of things that we need to note.  First of all, as we

24   have mentioned, there are differences between a DMS provider

25   and an entity like our consultant.  The DMS provider, they

```
 1    design the system, work with it constantly, they can run
 2    whatever report they want.  They are in a different position
 3    than a third-party consultant like ours who comes in as a
 4    stranger and goes in from the back end and is looking for
 5    data.
 6            But more importantly, our stipulation with the
 7    defendant says we have to produce non-duplicative data so the
 8    defendants say we received certain fields of data from the
 9    DMS provider and we didn't receive it from your consultant.
10    Our understanding from our stipulation that we negotiated is
11    that we didn't have to produce duplicative fields of data
12    that they had already received from the DMS provider.
13            THE COURT:  So you give them a blank record then
14    because we already did that?
15            MS. ROMANENKO:  Right, so with regard --
16            THE COURT:  What kind of program would do that?
17    I'm just trying to think why would you write a program to
18    say -- I mean, how would the program even know you got it
19    from somebody else?
20            MS. ROMANENKO:  Well, I'm saying that with regards
21    to these specific fields, these are fields I think we have
22    mentioned in our briefing, these are fields that are more
23    difficult to get and considered to be more ancillary, they
24    are not the core fields like what was the VIN number and how
25    much did the car cost, how much did you sell it for.  They
```

1   are things like

2          .  They are more removed, they are more difficult to

3   get, and we understood -- so we understood that when our

4   consultant went in they didn't have to do the extra work to

5   get those fields that had already been provided from the DMS

6   provider.

7          THE COURT:  I see, so you excluded those fields,

8   you didn't ask them to get those fields basically, your

9   consultant?

10         MS. ROMANENKO:  No, we sent the full list of fields

11  to our consultant but we didn't push for those fields for the

12  entities where the data had already been delivered because we

13  already had a stipulation in place that stated we didn't need

14  duplicative data.  For the record, we did ask, you know, what

15  would you do if you needed to get this and they said well, we

16  have to alter our processing tool.

17         THE COURT:  Right.

18         MS. ROMANENKO:  So that would be the extra burden

19  to get those other fields which we understood these are taken

20  care of, you got these in March, you didn't need to also get

21  them from our provider.

22         THE COURT:  Are you asking for the depositions of

23  the defendants' data processing people, I mean, is this a

24  reciprocal thing?

25         MS. ROMANENKO:  It is not reciprocal.  I'm glad you

```
 1   asked that because the defendants put in a deposition notice
 2   that we are seeking information about data processing systems
 3   the defendants use, and what they said is we are going to
 4   answer those questions by letter from counsel, and they said
 5   we want to -- we want to deal with any data issues not by
 6   providing testimony, not by giving you any outside entities
 7   that work on this, but by counsel making representations via
 8   letter about any questions you have about data.  That's the
 9   same thing we have offered to do is to have counsel respond
10   by letter to make -- to provide any answers that they need
11   regarding the data so that we agree, there doesn't need to be
12   testimony, we don't need to take away the protections of work
13   product and Rule 26 and get behind how all the discovery was
14   done, go back over it, spend a bunch of time on that.  We
15   should exchange letters so that everybody can have the
16   questions, we can do it in an efficient manner and counsel
17   can continue to be the primary point person for providing
18   this information as has always been accepted.  And Your Honor
19   will see the representations about discovery available,
20   unavailable, it is always done in letters from counsel.  If
21   we have to have a declaration from any entity that ever
22   worked with any counsel we would be here for years, not just
23   because it is a highly --
24            THE COURT:  We are going to be here anyway.
25            MS. ROMANENKO:  Even more years.
```

1           Not just because it is highly inefficient and

2    expensive but also because everybody would be objecting,

3    everybody would be filing motions for protection.  The

4    defendants don't want to put their experts or vendors or

5    consultants up either.  It is a violation of work product and

6    Rule 26 protections.  There is a reason why counsel is an

7    officer of the court appointed to interface with opposing

8    counsel to iron out these issues, to answer any questions

9    that need to be answered and to contend with this in the way

10   that the rules contemplate.  If we take all of that away

11   nobody is going to be able to use their experts anymore.

12           THE COURT:  Okay.  Thank you.  Response?

13           MS. ROMANENKO:  Your Honor, may I briefly address

14   the backup issues?

15           THE COURT:  All right.  Briefly.

16           MS. ROMANENKO:  I will be brief.  So with regard to

17   the backup issue, this is another situation --

18           THE COURT:  Are we talking here specifically about

19   backup tapes?  I know that was referenced.

20           MS. ROMANENKO:  We are talking about backup media

21   which includes backup tapes.

22           THE COURT:  Okay.

23           MS. ROMANENKO:  On the backup issue, again, that

24   was not briefed or analyzed by the Master, that was not an

25   issue in the motion to compel.  What happened is that at the

1   end of the conference counsel for defendants suggested to the

2   Master that we agreed to provide counsel for defendants with

3   a list of all backup media, and that's not correct.  What we

4   agreed to do in our stipulation on discovery regarding backup

5   media was that we would provide a list of any backup media

6   that covered a temporal period that was not covered by our

7   existing data production but which backup media wasn't used

8   for our production because we found it was not reasonably

9   produceable.  So we really tried to narrow this dispute.  We

10  don't want to fight about this expensive and burdensome type

11  of media when we don't have to, it is not going to add

12  anything.

13          Giving a list, that's an invitation for more back

14  and forth, maybe more motion practice.  We said we are going

15  to give you a list if there is something out there that we

16  didn't produce to you because we couldn't and maybe it would

17  have some value for you in filling in gaps.  That was very

18  specifically negotiated.  The only reason that the Master

19  rendered a ruling that changed this order is because he

20  was -- he was misrepresented to regarding what the order

21  said.  There was no briefing about we want to expand the

22  order, we don't like what we negotiated with the plaintiffs,

23  we want more information.  Simply what occurred is that

24  counsel for the other side suggested to the Master that the

25  provision was different than what it really was, and we are

1    simply submitting that we not be put to the extra burden,

2    that there not be extra fights created because the Master was

3    misinformed about what the order said.

4         THE COURT:  The backup data, as I understand,

5    backup data could be extremely expensive to go through,

6    particularly if it is tapes it is almost impossible?

7         MS. ROMANENKO:  Correct.

8         THE COURT:  Okay.  All right.  Let's hear a

9    response.

10        MR. CAROME:  Your Honor, this is Pat Carome from

11   Wilmer Hale, counsel for Denso, and speaking on behalf of

12   wire harness defendants.

13        This objection is subject to the abuse of

14   discretion standard.  This is a matter that Master Esshaki

15   has been riding herd on for more than a year.  In fact, it

16   was back in 2013 that this transactional data was first

17   sought from the plaintiffs.

18        We have been having to fight tooth and nail, first

19   just to get the plaintiffs -- the auto dealer plaintiffs to

20   admit that this data even existed.  For more than a year we

21   were told there was no such transactional data, that this

22   information was only going to be available in paper form in

23   individual deal files.  We, back in December of 2014,

24   14 months ago, learned on our own -- the defendants learned

25   on our own that, no, it is commonplace for auto dealers and,

```
 1    in fact, it is true for all auto dealers as far as we can
 2    tell, they have these DMS services and these DMS systems.
 3    And this is the information they put in -- they input it at
 4    the dealership into these systems.  They -- the DMS providers
 5    provide software and sometimes provide hosting for it.  Now,
 6    we had to spend more than a year and a half dealing with a
 7    situation where we are being misled that this didn't even
 8    exist.  Then in --
 9          THE COURT:  Is it because counsel didn't know
10    existed or --
11          MR. CAROME:  Your Honor, I'm not going to speculate
12    about that.  I find it stunning that counsel as experienced
13    as this could not have known well before they filed this suit
14    that the most basic information -- the most basic
15    transactional information relevant to their claims didn't
16    know its existence.  It is astonishing to us that this
17    happened.  We are past that.  That's water under the bridge.
18          The defendants learned on their own through their
19    own investigation that these systems do exist.  And so in --
20    there was a motion to compel the production of this
21    information that was to be heard by Master Esshaki last
22    December, over a year ago, and there were also -- that is
23    when the defendants started to go to the DMS providers
24    themselves, the vendors, to try to get it from them.  Auto
25    dealers screamed bloody murder about that.  Ultimately on the
```

1    eve of that hearing auto dealers said no, no, we don't need

2    to have a motion to compel heard before Master Esshaki, we

3    will go get the data from -- on our own from our -- from the

4    DMS providers, and there was a stipulation that was signed

5    and entered by the Court in the beginning of January,

6    January 7th, over a year ago, saying that the auto dealers

7    would go and get all of this DMS data from their DMS

8    providers and produce it all by March 15th.

9            Well, the result of that was near complete failure.

10    They came up with -- the DMS providers produced the -- the

11    auto dealers came forward with DMS data for only three of the

12    then 45 auto dealer plaintiffs, and they turned over to us

13    two of those sets of data, they came from the

14    DMS provider.  The third, the dealer at the last minute

15    decided that they didn't want it to be turned over and that

16    dealer, Holtzhauer, is now out of the case.  So that was a

17    complete failure that Master Esshaki had attempted to manage,

18    and so we had to start again, and so we brought on motions to

19    compel directly against the auto dealers that they produce

20    the data, however they needed -- wherever they had to get it

21    from, whether from their own computers on site or if it is

22    easier to get it from the DMS provider, well, then go and get

23    it from the DMS provider.  And on the day before that motion

24    to compel was to be heard before this -- before

25    Master Esshaki, it was to be heard the afternoon of I think

1    the May 6th status conference last year, we reached a

2    stipulation finally in which -- again, with the auto dealers

3    in which some 200 listed fields of data for each auto dealer

4    plaintiff would be produced to us.  And there was a --

5              THE COURT:  And did the auto dealers agree on these

6    200 fields ultimately?

7              MR. CAROME:  Yes, auto dealer counsel signed a

8    stipulation to that effect that all 200 fields would be

9    produced to the extent --

10             THE COURT:  Did it include those fields,

11   field and --

12             MR. CAROME:  Each -- every three of those was

13   specifically laid out, specifically laid out and agreed to.

14             THE COURT:  Okay.

15             MR. CAROME:  That set a schedule for a rolling

16   production of that DMS data starting in July and ending

17   September 9th.  I have to tell you, Your Honor, even today

18   here in January we do not yet have all of that data.  We are

19   still waiting for supplemental productions.  We were promised

20   in December just almost two months ago -- I'm sorry, a month

21   and-a-half ago that oh, yeah, there is another supplemental

22   production, it is coming out, we will get it next week, we

23   will get it to you.  We haven't gotten that.  There is a huge

24   amount of data that they have admitted exist that we still

25   dont have, but that's not really what we are talking about

1    here.

2            So we did get some of those productions of DMS

3    data, and the hearing before Master Esshaki -- when we got

4    the first tranche of that data we noticed immediately that

5    those three fields were altogether missing, altogether empty,

6    even though we had seen those fields in the data we had

7    gotten through              for two of the dealers.

8            There was also a lot other missing data.  I mean,

9    for some dealers produced no data at all, some dealers who

10   have -- sell multiple brands of vehicles produced data for

11   only one of those brands but not the others, and we saw these

12   problems with that very first production that they made in

13   July.  We wrote them a letter and said hey, there are

14   problems here, data is missing, these particular fields are

15   missing, we don't understand why there is no data for some

16   dealers, we don't understand why there are so few years for

17   other dealers, it seems like a mishmash.  We said whatever

18   but we asked them please talk to us about these problems now

19   so that your second and third tranches under the stipulation

20   aren't similarly problematic.  Well, we -- they refused to

21   talk to us.

22           They made their second tranche and it still had the

23   same problems including those three missing fields but other

24   problems as well.  And then they -- and they then finally

25   made their third, and we said hey, look, there is still all

1    of this missing stuff, we don't understand it, it is

2    inconsistent with what was produced before, we need to get a

3    clear expedited date by which you will promise to give us

4    complete production.  This is just a production of data.  We

5    have been trying since 2013.  Master Esshaki has been having

6    to intervene repeatedly.  They refused to provide us with any

7    deadline or to really discuss at all what those problems

8    were, so we then brought another motion before the Master to

9    say look, there are problems with the productions that we are

10   seeing, we want to get an order that fixes a fixed date for

11   all of the data that is reasonably accessible and produceable

12   that is within the scope of the stipulation to be produced.

13            We had a hearing on September 24th.  Now, by

14   September 24th, the date of that hearing, they had completed

15   the third tranche of production, if you can call it

16   completed, they made that third tranche.  They had also told

17   us about some backup data that the stipulation clearly

18   required them to provide a list to us, one, it required them

19   to produce to the extent they didn't have live DMS data, it

20   required them to produce backup data to fill the temporal

21   gaps to the extent that it was reasonably accessible and

22   produceable.  They produced zero backup data even though they

23   had promised to produce that to them.  Now, maybe it is

24   possible that there's none that's reasonably accessible, but

25   we are somewhat dubious of that, but to the extent that they

1    had backup data that might fill these temporal gaps and that

2    they had deemed to be not accessible or produceable they had

3    to provide us with a complete list of that data so we could

4    access it, perhaps even have our experts look at the backup

5    data and see if we find it to be reasonably accessible.

6         So there was a hearing that lasted about two hours.

7    Now, there were a couple of other motions that were heard but

8    by far the bulk of that hearing before Master Esshaki was

9    about these DMS data production issues and the backup, and

10   Master Esshaki --

11        THE COURT:  Are those hearings on the record?

12        MR. CAROME:  It was not, it was not on the record

13   unfortunately, but the -- we brought to Master Esshaki the

14   full range of problems we had now seen in the incompleteness,

15   the mishmash of data, the very small periods of time for some

16   dealers, the fact that various brands that dealers were

17   selling we were seeing no DMS data for, all of these things

18   we brought to his attention, and I think he, recognizing that

19   this had been going on far too long, said I'm finally going

20   to issue an order that tries to get this long-running problem

21   that he's been managing to the best of his ability resolved

22   as quickly as he can.  And so he issued an order on

23   September 29th which provided the auto dealers with a 30-day

24   deadline to finish this up once and for all, and it was to

25   produce all of the data they were required to produce under

1    the order to the extent it exists and is reasonably

2    accessible and produceable, 30 days from then, so by

3    October 29th.

4          THE COURT:  Was that date earlier than a

5    previously-scheduled date?

6          MR. CAROME:  No.  In fact, that date was -- this

7    was all supposed to be done by early September, the entire

8    process was -- at least the DMS productions was to be done by

9    early September.  There was some additional deadlines for

10   sorting through the backup data.  The stipulation was very

11   clear in spelling that out and there are other provisions for

12   if there is no data at all for us to get the hard copy files,

13   that's not subject of this -- that will be subject of motion

14   practice shortly but that's not subject of the order on

15   review here.

16         So Master Esshaki set a firm deadline, finish it

17   all.  He didn't add one wit to what the May 12th stipulation

18   required, not one wit.  He also said because there is so much

19   confusion over why data is missing, why what we are seeing

20   here is different, why there are these inconsistencies and

21   because we were not able to get any information at all from

22   auto dealers about this because they said well, our -- what

23   the auto dealers said is, look, our vendor does what our

24   vendor does, and we are not going to tell you who our vendor

25   is, we are not going to -- our vendor -- we just get what the

1  vendor gives us and that's what you get, and that -- well,

2  let me finish the story.  So ultimately he issued this order

3  and he also required that there be some affidavits, one from

4  the data-retrieval technician and one from the backup

5  service -- their backup analyst, and the purpose of those

6  declarations --

7          THE COURT:  But you say data retrieval technician?

8          MR. CAROME:  That's right, that's what this is.

9          THE COURT:  Is this the expert that --

10         MR. CAROME:  Well, that's their, quote, consultant.

11         THE COURT:  That's their consultant.

12         MR. CAROME:  We've heard more about who this

13  consultant is today than we have ever heard before, it is not

14  actually a person, it is a company, but it is a vendor doing

15  what in most litigation is done by the litigant itself,

16  retrieving from its own files, here electronic files,

17  information that is required to produce in discovery.  This

18  is information that employees of the auto dealers entered

19  into some system sitting at some computer and now it is --

20  and now it is highly relevant to this litigation and we are

21  entitled to it.  There is no -- this -- this data-retrieval

22  technician or consultant, whatever you want to call it, is by

23  no means an expert in the sense that Rule 26 covers it.  They

24  are doing nothing relating to the merits of this case, this

25  is just the basic collection of data, and we are left right

1  now in a situation of being told this black box did whatever
2  it did and we are not going to tell you what it did and it
3  has produced this data and you just take it or leave it.

4          And we see all kind of reasons to believe that the
5  data is incomplete and lots of doubt, and Master Esshaki saw
6  that as well, and he said I'm going to have this vendor that
7  you want identified, he or she has to provide an affidavit
8  saying these are the procedures I used at each of these auto
9  dealers, here is what I was able to find, here is why I
10  wasn't able to find the other things that are supposed to be
11  produced.  It is very straight forward.  If this was normal
12  litigation of course we could take discovery of the employee
13  at the litigant that handled that discovery.

14          Auto dealers and the other plaintiffs in this case
15  in their 30(b)(6) deposition notices to defendants sought
16  precisely that kind of information in the notices they
17  originally issued.  Now we have -- those -- it may not be
18  necessary for the defendants, defendants have been
19  answering -- have written hundreds of pages of letters
20  responding to questions about our transactional data, and it
21  may be that the -- a deposition of somebody at one of the
22  defendants isn't going to be necessary on that topic.  Here
23  they have refused to -- we sent them some questions about
24  this data two months ago, haven't gotten a single response to
25  it, and we can tell given all of the back and forth to date

1    about this being just tooth and nail to try to pull this

2    stuff, we need to get to the person who is pulling the data

3    to understand why aren't you finding the other things that we

4    would expect you to see.  It couldn't be more basic.

5            THE COURT:  But are you in seeking from this

6    consultant -- this affidavit I'm concerned about, are you

7    seeking that consultant's work product?

8            MR. CAROME:  No.

9            THE COURT:  This is the program that we have

10   developed?

11           MR. CAROME:  No, not at all, we are seeking the

12   basic facts; what data exists, what data were you able to

13   retrieve, if data is unable to be retrieved, why can't it be

14   retrieved.  We are not asking anything about whatever

15   processes it is using, whatever its secrets are it uses to

16   pull data, and we are not asking the sorts of things that

17   auto dealers' counsel suggested about the communications

18   between auto dealers' counsel and that vendor.  We don't have

19   any need to hear a word about that, we just need to know what

20   did the vendor do to go in there and pull data, and to the

21   extent required data isn't being located and produced what's

22   the reason.  That is just basic fact discovery.  It has

23   nothing to do with work product.  It has nothing to do with

24   experts.  We are not even in the right box when we are

25   hearing objections based on work product or Rule 26 grounds

1    to this.  It just couldn't --

2              THE COURT:  So of these 200 fields, let's say, that

3    you are requesting and you have stipulated.

4              MR. CAROME:  Yes, auto dealers agreed that these

5    were to be produced.

6              THE COURT:  Okay.  And these 200 fields are

7    technically fields in the record of most auto dealers, maybe

8    some didn't keep track of all of them?

9              MR. CAROME:  That's right, sometimes these fields

10   are going to be empty because that particular dealer just

11   never kept track of that particular item.

12             THE COURT:  Is there a standard amongst these DMS

13   for these fields for auto dealers or not?

14             MR. CAROME:  There's certainly a lot of -- amongst

15   all the DMS providers as far as we can tell there is -- I

16   would say 85, 95 percent of the data is all the same, you are

17   keeping track of all the same pieces of data.

18             THE COURT:  So are you asking basically for a

19   printout -- not a printout -- well, an electronic printout

20   let's say of this data that they have in their systems?  Are

21   you asking for it to be manipulated in some way?

22             MR. CAROME:  Your Honor, that's a very interesting

23   question.  We would have been happy to just get the data

24   however it is.

25             THE COURT:  Then you can manipulate it however you

1    want?

2         MR. CAROME:  Yes, exactly.  Now, auto dealers

3    through this May 12th stipulation said no, no, here's what we

4    will do, we will agree on these particular 200 fields, we

5    will have -- and apparently what -- they didn't tell us this

6    but apparently what they had in mind is that they would try

7    to produce a single common report of data from each of the

8    dealers using whatever approach the vendor had.  They didn't

9    need to do it that way, they could have just given us the

10   whole data as is, that would have been fine, or they would

11   have -- they said well, all right, in fact, there are 220

12   fields, they could have stripped out the 20 and given it to

13   us as is, that would have been fine too.

14        Instead they've gone in and decided to just

15   outsource to this vendor the process of pulling it and

16   apparently deciding to sort of present it in some uniform

17   format.  We don't need it that way but they have gone to the

18   trouble to do that.  The problem here is the vendor is -- we

19   can see particularly with these                          it

20   is some -- it should be there and for a whole bunch of the

21   dealers it is not there, it is not just the two where there

22   is this overlapping issue, and it is not the case they

23   thought it would be easier since we already gave it to you

24   before we are not going to --

25        THE COURT:  Did they give it to you before?

```
 1              MR. CAROME:  For some of the months, but it
 2     didn't -- it only went through the spring of 2015, there
 3     wasn't a complete overlap.  In fact, it -- there are six
 4     months where there is no overlap and we didn't get it before,
 5     the more recent six months, but the bottom line is it is not
 6     just those two dealers for whom we didn't get those critical
 7     fields, it is more than half of the dealers I think, it is
 8     certainly a very substantial amount of the dealers, so their
 9     explanation that that's why you are not seeing it just
10     completely collapses.
11              With respect to the backup issue, maybe I have said
12     this partly already, counsel suggests that there is some new
13     requirement to provide a list of the backup data that they --
14     that may fill the gaps where there isn't live data but that
15     their vendor deemed not accessible for some reason.  They
16     have to -- they already had to give us that list.  The
17     May 12th stipulation point blank requires that.  What
18     Master Esshaki added, and it was perfectly reasonable, was
19     that I wanted to get that backup vendor to tell me why, you
20     know, which backup media did you look at from each dealer and
21     to the extent that you deemed it not accessible you can't get
22     data off of there, give me a reason why.  That, again, they
23     outsourced that function, that is a perfectly reasonable
24     thing to do, and during that September 24th hearing
25     Ms. Romanenko herself told Master Esshaki that they had sent
```

1    -- either had or was about to send hundreds of backup tapes

2    to some vendor which they have never identified to us in any

3    of the lists they are required to produce, they have only

4    identified two or three pieces of backup media to us.

5           THE COURT:  Now, are these backups strictly for

6    temporal, like we don't have any records --

7           MR. CAROME:  Right, we don't need --

8           THE COURT:  -- beyond the last five years?

9           MR. CAROME:  That's right.  Some of these auto

10   dealers have DMS data even though it is a 15-year class

11   period only for the last couple years, so if there is backup

12   data from which transactional data can be pulled for part of

13   that period that would be highly valuable.  Actually I would

14   think the auto dealers themselves would be scrambling to get

15   that themselves to be able to prove their claims, but in any

16   event it is highly relevant, it is needed, maybe some of it

17   won't be able to be used, maybe a lot of it won't be able to

18   be used, but if some of it is there and can extract a useful

19   data from it we are entitled to it, and so this declaration

20   or affidavit that Master Esshaki required again is just a

21   very reasonable thing to be doing to try to bring some

22   closure to a problem that has been festering for years in

23   this case.  He did a very smart thing, the notion that it

24   could possibly be an abuse of discretion to do that I suggest

25   is astonishing.

1          THE COURT:  Okay.  Thank you.

2          MR. CAROME:  Thank you.

3          THE COURT:  Reply, briefly?

4          MS. ROMANENKO:  Your Honor, you spoke about

5    acrimony earlier today, and most of what we just heard from

6    opposing counsel's argument is not an analysis of work

7    product, is not an analysis of Rule 26, is not any argument

8    about why there might be exceptional circumstances to take

9    away the protections of Rule 26, what kind of undue hardship

10   would be posed for defendants by not getting the information.

11   It is a mischaracterization by counsel of the history of this

12   dispute.  It is exactly the kind of acrimony that we have

13   been talking about avoiding, and it is also incorrect.  What

14   counsel points to, the letter that was sent from my colleague

15   in the spring of 2014, was with regard to specific

16   procurement information.  Opposing counsel asked us please

17   give us all the information on an invoice, and so we asked

18   our clients how do we get that and they said you have to copy

19   the invoice.  Now, wouldn't it be the case that if we could

20   just get it electronically, if our clients could do this for

21   us, that's how we would get it?  Of course.  There is no

22   misrepresentation made to opposing counsel about this.

23          As far as you know our other statements and

24   opposition to their motion to compel, we asked our clients,

25   again, defendant served these broad requests asking for every

1    detail of a sale, what would you do if you have to produce

2    this?  We would have to copy the deal file.

3         Mr. Carome mentioned the January stipulation we

4    entered into.  They had subpoenaed the DMS providers, the

5    entities that hold our clients' data, because we opposed,

6    which is a procedure the Master has now found is improper,

7    and we said okay, if that's going to do it for you then we

8    will agree that if these subpoenaed entities are willing to

9    produce the data to you then you will get this data.  Those

10   subpoenaed entities, the vast majority of them, they opposed,

11   they filed motions to quash, there was only one that served a

12   minority of our clients that agreed to cooperate, so it is

13   not that we didn't do our job or we missed a deadline, the

14   third-party entity that we agreed could produce this data

15   declined to produce data.

16        THE COURT:  Well, wait a minute.  This is your data

17   so how can they decline to produce it?  I mean, they may need

18   to be paid to do it, I don't know, were you trying to get it

19   for free or something, but it is your data, they can't say.

20        MS. ROMANENKO:  We offered to pay them because they

21   have to do a specialized process to locate it, to perform the

22   extraction, to clean it up, to process it and to present it

23   to opposing counsel.  Believe me, we would have loved for

24   these DMS --

25        THE COURT:  Well, they should have been brought in

1    because I don't understand that, they have your data.

2         MS. ROMANENKO:  Well, what they said is this is

3    extremely burdensome for us, for us to find all of these

4    fields of data that cover this huge time period poses more

5    than a burden than we are willing to undertake, even if you

6    paid us we need to have this many programmers working to

7    build tools for this, we need to unearth this much archived

8    information, we won't do it, we have too much else to do,

9    this is excessive.  And, Your Honor, you can imagine that if

10   a professional data management systems provider says this is

11   burdensome how burdensome it is for our clients and how much

12   extra specialized work it is for our consultant.

13        THE COURT:  But I guess I'm going back to try to

14   figure out what this data is because I'm still on these 200

15   fields.  Is this something besides these 200 fields?

16        MS. ROMANENKO:  What the subpoenaed DMS providers

17   were initially asked for was more than the 200 fields.

18        THE COURT:  You have narrowed it down to the 200

19   fields?

20        MS. ROMANENKO:  Well, after the subpoenaed entities

21   filed motions to quash we located a consultant and we

22   provided 200 fields to defendants -- actually it was less

23   than 200 fields, they added a couple, and they actually asked

24   us can we add these fields and we said, yeah, if they are

25   reasonably produceable and reasonably accessible, meaning our

1    consultant -- they knew about the consultant all along has to

2    be able to locate them and, again, as I have said, they have

3    to do a lot of specialized work, it is not as simple as some

4    core piece of data.  Now Mr. Carome said we are not asking

5    about their work or their method or opinion but that's not

6    the case, the Master ruled they have to disclose the

7    processes that they use to come upon this data and then

8    provide their opinions about why some of it might or might

9    not be available, and the Master did this without ever doing

10   an analysis of work product protections, protections for

11   non-testifying consultant expert witnesses -- not witnesses,

12   non-testifying consultant experts without doing any kind of

13   analysis, and so this review has to be de novo, it is not

14   abuse of discretion.  If he didn't follow the protections

15   that the federal rules provide for there has to be a de novo

16   review by Your Honor.

17          Now the defendants make a lot of noise about what

18   was missing.  They filed the motion that dealt essentially

19   with these three fields that they mentioned.  Our consultant

20   provided huge amounts of data, they did an enormous amount of

21   work, we did three waves of production, and then, Your Honor,

22   after we met with the Master we did a supplemental

23   production, they have gotten a lot of this information and so

24   this is not a remedy or a punishment to somehow deal with a

25   defective production.  200 data fields is more than some of

1    the defendants have been willing to produce, this is an

2    enormous undertaking that we have done and we have done this

3    with the understanding that this is going to satisfy them, we

4    made that supplemental production thinking that this is going

5    to be the end, not that there is going to be more discovery

6    going behind what our consultant was thinking, what were

7    their methods, how communications with us might have informed

8    them, what happened when they didn't find this, what happened

9    then, and all of this extra discovery into what they did and

10   essentially our work product.

11        So, Your Honor, regardless of whether you agree

12   that this is an expert or that discovery experts are excluded

13   under the non-testifying expert provision, this is work

14   product and even on that basis it shouldn't be produced.

15        Now, Mr. Carome said they need this information.

16   They have never asked for this information.  They have been

17   getting data since March of last year, they never made a

18   request, it wasn't in their motion, it wasn't anywhere.

19        THE COURT:  Wait a minute.  For what information,

20   what are you talking about?

21        MS. ROMANENKO:  For the affidavit from our

22   consultant describing what they did and why something might

23   not be there.  And, Your Honor, they have tried to paint this

24   as a way to deal with multiple deficiencies but, again, their

25   motion focused on three fields, it is not a way to deal with

1   excess deficiencies and I can't imagine that all of these

2   protections should be taken away because they raised a motion

3   about three fields being missing.  Your Honor, we didn't say

4   our consultant will do whatever they will do and we can't

5   provide an explanation.  We provided an explanation and we

6   said there are lots of -- we asked them, why may data might

7   not be found?  There are lots of reasons.

8

9          -- I'm getting into highly confidential right now.

10

11

12

13

14

15

16

17

18

19

20

21

22          Mr. Carome also said they are missing data for a

23   number of dealers.  As I think is made clear, the dealers for

24   whom data is missing are a couple of out-of-business dealers,

25   not dealers that had a live DMS system that our consultant

Status Conference & Motion Hearings - January 20, 2016

1    could go into and perform a data pull to create the report

2    that defendants were looking for.  So it is not a deficiency

3    on our consultant's behalf that caused the lack of data.

4           Now, as far as the backup we certainly never said

5    we wouldn't produce backup but unfortunately after spending

6    thousands of dollars we found that the backups that we have

7    identified that do fill a temporal period not filed by the

8    live data are not accessible.  For instance, a lot of them

9    are encrypted with old software that our backup consultant

10   can't get anymore, so they can't get the data off of them.

11   We have not refused to provide anything, we have not declined

12   to engage with them, we are fully willing and able to answer

13   any questions there are.  We have already made an immense

14   production and the notion that this was needed for some

15   reason and that the rules didn't apply here because our

16   production was problematic is completely incorrect.

17           THE COURT:  Okay.  Thank you.

18           MR. CAROME:  If I could have just --

19           THE COURT:  One minute.

20           MR. CAROME:  -- 30 -- thank you.

21           THE COURT:  Or 30 seconds if you want.

22           MR. CAROME:  Your Honor, the Special Master didn't

23   ask for these affidavits as some punishment for deficiencies.

24   The Special Master heard some of what we heard just now about

25   well, we couldn't find this, we couldn't find that, and he

1   threw up his hands and said I can't listen to a lawyer

2   telling me this stuff secondhand and even figure out whether

3   there is a problem here or not, I have to get direct

4   information.  So he said I need these affidavits so I can do

5   my job as a special master of deciding whether they have met

6   their discovery obligations.  He needs it, he said he needed

7   it, it is not an abuse of discretion to have done so.  Okay.

8          THE COURT:  Thank you very much.

9          MS. ROMANENKO:  Just one just very quickly.

10         Your Honor, again, if the Master needs something we

11  are happy to submit it in camera.  He also certainly didn't

12  say that unlike all of the other counsel in the case auto

13  dealer counsel is not qualified to provide answers to data

14  questions or forward explanations from its hired consultants

15  about why something isn't there.  To the extent that there is

16  a small amount that is missing, again, we are willing to

17  provide information from counsel, we are willing to send

18  things in camera, but to open up this huge amount of

19  discovery on something that is supposed to be done and over

20  with, that we are supposed to move from so like you said we

21  can meet the class cert deadline is excessive and not in

22  keeping with the rules.

23         THE COURT:  Okay.  Thank you.  I'm going to issue

24  an opinion in this matter.  Anything else before we break?

25         MR. KESSLER:  Your Honor, this is just a

 1    housekeeping matter, but you inquired during the argument

 2    whether there was a record before the Special Master?

 3            THE COURT:  Yes.

 4            MR. KESSLER:  The Court's order actually provides

 5    that there be such a record available for the Court so you

 6    can see exactly what happened before the Master, but we

 7    haven't had a consistent pattern of that being done in terms

 8    of a report and transcript.  We are more than happy to pay --

 9    on the defense side to pay for the court reporter, but if the

10    Court agrees that would be useful under the order that's

11    something defendants would appreciate having so that when we

12    come up here you could see yourself what the Master was

13    thinking and saying.

14            THE COURT:  I thought we had agreed to have a

15    record?

16            MR. CHERRY:  Yes, Your Honor, the order appointing

17    the Special Master actually provides that there should be a

18    transcript of a hearing, it just hasn't been adhered to.  I

19    think the Special Master interprets it also as requiring him

20    to use your reporter, and I think that's been seen as an

21    obstacle perhaps to doing things quickly.

22            MR. KESSLER:  Logistically.

23            MR. CHERRY:  Logistically.

24            THE COURT:  I will talk to him about this because

25    it would be very beneficial.  I mean, most of the things I

1    don't see so, I mean, I guess in a way it would be a waste

2    but those things that come before me it would be extremely

3    beneficial to be able to read the transcript if I am ruling

4    de novo or ruling on abuse of discretion.

5             MR. CHERRY:  I mean, Your Honor, we are obviously

6    happy to use your reporter as well, but if that is a

7    logistical issue I don't think the parties would have any

8    objection to the parties just arranging for a reporter?

9             THE COURT:  Plaintiffs have any objection to use of

10   a reporter.

11            MR. KANNER:  For the direct purchasers, no, Your

12   Honor.

13            THE COURT:  No.  Okay.  Well, I will work that out

14   and I would appreciate it.  I know that Mr. Esshaki said

15   today that he's going to do these telephone calls first,

16   those don't have to be reported, obviously it is just when it

17   goes to a formal hearing.  Thank you very much.

18            MR. KESSLER:  Thank you.

19            MR. CHERRY:  Thank you.

20            THE COURT:  Have a good day.  We will see you in a

21   few months.  Thank you.

22            (Proceedings concluded at 1:19 p.m.)

23                      —    —    —

24

25

```
 1                        CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4     the United States District Court, Eastern District of

 5     Michigan, appointed pursuant to the provisions of Title 28,

 6     United States Code, Section 753, do hereby certify that the

 7     foregoing pages comprise a full, true and correct transcript

 8     taken in the matter of In re: Automotive Parts Antitrust

 9     Litigation, Case No. 12-md-02311, on Wednesday,

10     January 20, 2016.

11

12

13                            s/Robert L. Smith
                              Robert L. Smith, RPR, CSR 5098
14                            Federal Official Court Reporter
                              United States District Court
15                            Eastern District of Michigan

16

17

18     Date:  02/24/2016

19     Detroit, Michigan

20

21

22

23

24

25
```