Case 2:12-md-02311-SFC-RSW   ECF No. 1405, PageID.25113   Filed 07/01/16   Page 1 of 105
Objections to Rule 30(b)(6) Depositions

1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                          —   —   —

 4
        IN RE: AUTOMOTIVE PARTS            Case No. 12-2311
 5      ANTITRUST LITIGATION
                                           Hon. Marianne O. Battani
 6      _____    _____

 7
        THIS RELATES TO:
 8      ALL AUTO PARTS CASES

 9      _____/

10

11              OBJECTIONS TO RULE 30(b)(6) DEPOSITIONS

12           BEFORE THE HONORABLE MARIANNE O. BATTANI
                      United States District Judge
13           Theodore Levin United States Courthouse
                      231 West Lafayette Boulevard
14                         Detroit, Michigan
                      Thursday, June 23, 2016
15

16      APPEARANCES:

17      Direct Purchaser Plaintiffs:

18      DAVID H. FINK
        FINK & ASSOCIATES LAW
19      38500 Woodward Avenue, Suite 350
        Bloomfield Hills, MI  48304
20      (248) 971-2500

21

22

23

24          To obtain a copy of this official transcript, contact:
                   Robert L. Smith, Official Court Reporter
25              (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1    APPEARANCES:   (Continued)

 2    End-Payor Plaintiffs:

 3    MARIELL R. McLATCHER
      THE MILLER LAW FIRM, P.C.
 4    950 West University Drive, Suite 300
      Rochester, MI  48307
 5    (248) 841-2200

 6
      STEVEN N. WILLIAMS
 7    COTCHETT, PITRE & McCARTHY, L.L.P.
      840 Malcolm Road
 8    Burlingame, CA  94010
      (650) 697-6000

 9

10    Dealership Plaintiffs:

11    JONATHAN W. CUNEO
      CUNEO, GILBERT & LaDUCA, L.L.P.
12    507 C Street NE
      Washington, D.C.  20002
13    (202) 789-3960

14
      ANDREW R. SPERL
15    DUANE MORRIS, L.L.P.
      30 South 17th Street
16    Philadelphia, PA  19103
      (215) 979-7385

17

18    For the Defendants:

19    JEFFREY J. AMATO
      WINSTON & STRAWN, L.L.P.
20    200 Park Avenue
      New York, NY  10166
21    (212) 294-4685

22
      JOHN A. BARNSTEAD
23    BARNES & THORNBURG, L.L.P.
      11 South Meridian Street
24    Indianapolis, IN 46204
      (317) 236-1313

25
```

```
 1  │  APPEARANCES:   (Continued)

 2  │  For the Defendants:

 3  │  DAVID BROWNSTEIN
    │  FARMER, BROWNSTEIN & JAEGER, L.L.P.
 4  │  235 Montgomery Street, Suite 835
    │  San Francisco, CA  94104
 5  │  (415) 962-2873

 6  │
    │  STEVEN F. CHERRY
 7  │  WILMER HALE
    │  1875 Pennsylvania Avenue NW
 8  │  Washington, D.C.  20006
    │  (202) 663-6321
 9  │
10  │  MICHAEL R. DEZSI
    │  DETTMER & DEZSI, P.L.L.C.
11  │  615 Griswold Street, Suite 1600
    │  Detroit, Michigan 48226
12  │  (313) 879-1206

13  │
    │  ADAM C. HEMLOCK
14  │  WEIL, GOTSHAL & MANGES, L.L.P.
    │  767 Fifth Avenue
15  │  New York, NY  10153
    │  (212) 310-8281
16  │
17  │  SHELDON H. KLEIN
    │  BUTZEL LONG, P.C.
18  │  41000 Woodward Avenue
    │  Bloomfield Hills, MI  48304
19  │  (248) 258-1414

20  │  FRANKLIN LISS
    │  ARNOLD & PORTER, L.L.P.
21  │  555 Twelfth Street NW
    │  Washington, D.C.  20004
22  │  (202) 942-5000

23  │
    │  ALLYSON M. MALTAS
24  │  LATHAM & WATKINS, L.L.P.
    │  555 Eleventh Street NW, Suite 1000
25  │  Washington, D.C.  20004
    │  (202) 637-2200
```

```
 1   APPEARANCES:  (Continued)

 2   For the Defendants:

 3   RONALD S. NIXON
     KEMP KLEIN LAW FIRM
 4   201 West Big Beaver Road, Suite 600
     Troy, MI  48084
 5   (248) 528-1111

 6
     J. DAVID ROWE
 7   DUBOIS, BRYANT & CAMPBELL
     303 Colorado Street, Suite 2300
 8   Austin, TX 78701
     (512) 457-8000
 9
10   SCOTT T. SEABOLT
     SEABOLT LAW FIRM
11   17199 N. Laurel Park Drive, Suite 215
     Livonia, MI  48152
12   (248) 717-1302

13
     JOANNE GEHA SWANSON
14   KERR, RUSSELL & WEBER, P.L.C.
     500 Woodward Avenue, Suite 2500
15   Detroit, MI  48226
     (313) 961-0200
16
17   LARA TRAGER
     WEIL, GOTSHAL & MANGES, L.L.P.
18   767 Fifth Avenue
     New York, NY  10153
19   (212) 310-8281

20

21

22

23

24

25
```

```
 1    APPEARANCES:   (Continued)

 2    For the Non-Party Original Equipment Manufacturers:

 3    ANTHONY J. ANSCOMBE
      SEDGWICK L.L.P
 4    One North Wacker Drive, Suite 4200
      Chicago, IL  60606
 5    (312) 641-9050

 6

 7    JOSEPH R. ASHBY
      QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
      865 South Figueroa Street, 10th Floor
 8    Los Angeles, CA  90017
      (213) 443-3000
 9

10    JESSICA B. AVERY
      LEE, HONG, DEGERMAN, KANG & WAIMEY, P.C.
11    3501 Jamboree Road, Suite 6000
      Newport Beach, CA 92660
12    (949) 250-9954

13

14    COLIN R. KASS
      PROSKAUER ROSE, L.L.P.
      1001 Pennsylvania Avenue NW, Suite 600 South
15    Washington, D.C.  20004
      (202) 416-6800

16

17    MEREDITH JONES KINGSLEY
      ALSTON & BIRD, L.L.P.
18    1201 West Peachtree Street
      Atlanta, GA  30309
19    (404) 881-4793

20

21    RICHARD E. KRUGER
      JAFFE, RAITT, HEUER & WEISS, P.C.
      27777 Franklin Road, Suite 2500
22    Southfield, MI  48334
      (248) 351-3000

23

24    SUSAN M. McKEEVER
      BUSH, SEYFERTH & PAIGE, P.L.L.C.
      3001 West Big Beaver Road, Suite 600
25    Troy, MI  48084
      (248) 822-7800
```

```
 1    APPEARANCES:  (Continued)

 2    For the Non-Party Original Equipment Manufacturers:

 3    DAVID A. MUNKITTRICK
      PROSKAUER ROSE, L.L.P.
 4    1001 Pennsylvania Avenue NW, Suite 600 South
      Washington, D.C.  20004
 5    (202) 416-6800

 6

      ELLIOT H. SCHERKER
 7    GREENBERG TRAURIG, L.L.P
      3333 Piedmont Road NE, 25th Floor
 8    Atlanta, GA  30305
      (678) 553-2100

 9

10    MICHAEL SCHAPER
      DEBEVOISE & PLIMPTON, L.L.P.
11    919 Third Avenue
      New York, NY  10022
12    (212) 909-6737

13

      JUSTINA K. SESSIONS
14    KEKER & VAN NEST, L.L.P.
      633 Battery Street
15    San Francisco, CA  94111
      (415) 676-2293

16

17    DOMINIC SURPRENANT
      QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
18    865 South Figueroa Street, 10th Floor
      Los Angeles, CA  90017
19    (213) 443-3000

20

      ROBERT J. TUCKER
21    BAKER HOSTETLER
      Capitol Square, Suite 2100
22    65 East State Street
      Columbus, OH 43215
23    (614) 228-1541

24

25
```

```
 1   APPEARANCES:  (Continued)

 2   For the Non-Party Original Equipment Manufacturers:

 3   NEAL WALTERS
     BALLARD SPAHR, L.L.P.
 4   210 Lake Drive East, Suite 200
     Cherry Hill, NJ  08002
 5   (856) 761-3452

 6

 7   S. THOMAS WIENNER
     WIENNER & GOULD, P.C.
 8   950 West University Drive, Suite 350
     Rochester, MI  48307
 9   (248) 841-9400

10   ADAM WOLFSON
     QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN, L.L.P.
11   865 South Figueroa Street, 10th Floor
     Los Angeles, CA  90017
12   (213) 443-3000

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   Detroit, Michigan

 2   Thursday, June 23, 2016

 3   at about 2:00 p.m.

 4                         —   —   —

 5            (Court and Counsel present.)

 6            THE LAW CLERK:  Please rise.

 7            The United States District Court for the Eastern

 8   District of Michigan is now in session, the Honorable

 9   Marianne O. Battani presiding.

10            You may be seated.

11            THE COURT:  Good afternoon.  All right.  We have

12   the objections today, so may I have the appearances of those

13   who will start arguing anyway?

14            MR. WILLIAMS:  Good afternoon, Your Honor.  I won't

15   be starting the argument but Steve Williams on behalf of the

16   end payors.

17            MR. KASS:  Your Honor, Colin Kass on behalf of

18   Chrysler FCA, L.L.C. on behalf of the subpoenaed entities,

19   the objecting parties.

20            THE COURT:  And your name is?

21            MR. KASS:  Colin Kass, K-A-S-S.

22            MR. HEMLOCK:  Good afternoon, Your Honor.

23   Adam Hemlock, Weil, Gotshal & Manges, on behalf of the

24   defendants.  We represent the Bridgestone and Calsonic

25   entities.

```
 1              MR. ASHBY:  Joseph Ashby, Quinn Emanuel.  I
 2   represent Hyundai Motor America and Hyundai AutoEver America,
 3   and arguing on behalf of the domestic distributors and the
 4   non-core subpoenaed entities.
 5              THE COURT:  Okay.
 6              MR. CUNEO:  Jonathan Cuneo on behalf of the auto
 7   dealers, Your Honor.
 8              MR. WIENNER:  May it please the Court, Tom Wienner
 9   on behalf of Hino Motor Manufacturing USA.  Your Honor, at
10   some point along the way I would like to have about two
11   minutes, if I may?
12              THE COURT:  All right.
13              MS. KINGSLEY:  Good afternoon, Your Honor.
14   Meredith Kingsley on behalf of HMMA and Hachi.
15              THE COURT:  Okay.
16              MR. SURPRENANT:  Good afternoon, Your Honor.
17   Dominic Surprenant, Quinn Emanuel.  I represent the 17
18   Daimler entities.
19              THE COURT:  I'm sorry.  How do you spell your last
20   name?
21              MR. SURPRENANT:  S-U-R-P-R-E-N-A-N-T.
22              THE COURT:  Okay.  Thank you.
23              MR. SCHERKER:  May it please the Court, my name is
24   Elliot Scherker.  I represent Kia Motors Manufacturing Group,
25   non-party.
```

1    We filed separate objections and I would request a

2    few moments of the Court's time to address those objections

3    unique to KMMG.  Thank you.

4         MR. WALTERS:  Afternoon, Your Honor.  Neil Walters

5    from Ballard Spahr for Subaru of America, Fuji USA and Subaru

6    Leasing Corporation.

7         THE COURT:  Okay.

8         MR. SPERL:  Good afternoon, Your Honor.

9    Andrew Sperl from Duane Morris representing the truck and

10   equipment dealer plaintiffs.

11        THE COURT:  Okay.

12        MS. SESSIONS:  Good afternoon, Your Honor.

13   Justina Sessions from Kekar & VanNest.  I represent the Honda

14   entities.

15        We did file a separate statement but I'm not

16   planning to argue unless Your Honor has any questions

17   specific to Honda.  Thank you.

18        THE COURT:  All right.  I will ask you as you come

19   up and before you begin your argument if you would please

20   identify yourself again for me and for the record.  Okay.

21        Who wants to start?

22        MR. KASS:  Thank you, Your Honor.

23        THE COURT:  I don't want to be the one to say one

24   is more important than the other so that's why I let

25   you decide.

Objections to Rule 30(b)(6) Depositions

**11**

1      MR. KASS:  I appreciate it, and I think there are a

2  number of issues.  My name is Colin Kass from Proskauer Rose,

3  and I represent Chrysler, which is technically FCA, L.L.C.  I

4  would like to argue on behalf the joint SSE brief, the

5  specific subpoenaed entities, which is sort of a synonym for

6  the OEMs because OEMs does not accurately describe the group

7  of entities that were subpoenaed, so we have been calling

8  ourselves the SSE.

9      We raised two kinds of objections, both

10  jurisdiction objections to the Special Master's order and

11  practical objections.  The jurisdictional objections we

12  believe are straightforward and nondiscretionary.  The

13  practical objections we believe are obvious and sensible and

14  they should be sustained.

15      Before we get to those objections though I would

16  like to provide a little bit of context about how we got here

17  and why these objections are so important.  You have heard

18  from the parties about the, quote, OEM subpoena repeatedly

19  without the presence of the OEMs themselves and the SSEs to

20  explain how this came about and our side of the story.  It

21  begins about a year ago when we got the subpoena that the

22  parties have called the uniform OEM subpoena.  The Special

23  Master having reviewed this subpoena called the subpoena the

24  broadest subpoena ever served in the history of America, that

25  means it is the broadest and most burdensome history (sic) in

1    the 4.5 billion years of the universe.

2         THE COURT:  Is that true or was it just a point of

3    exasperation?

4         MR. KASS:  No, he looked -- I mean, it was not a

5    point of exasperation.  He looked at this subpoena and when

6    you look at it it covers the entire automotive industry, it

7    covers every aspect from the purchasing down to the supplies

8    and everything in between.  It covers 56 part categories,

9    which is hundreds and thousands of parts, it covers every

10   make and model of vehicle in the country, it covers every

11   system that arguably can be linked through, even though there

12   is no system that actually links them together, it covers all

13   of the documents, it covers all of the documents relating to

14   the purchasing, it covers basically everything the automotive

15   industry, the OEMs, everything that they do.  And so when we

16   got this subpoena our jaws dropped, we didn't know what to do

17   with the thing.  It is impossible to actually comply with the

18   subpoena the way it was written.

19        So what we did was we said okay, we have to do

20   something.  What should we do?  Well, what we did is we

21   talked to other SSEs that were subpoenaed and we said, okay,

22   let's put our heads together here.  You know, nobody has a

23   monopoly on great ideas, let's figure out what to do, let's

24   negotiate with the parties.  So we called up the parties and

25   we said let's negotiate.  Let's figure out what do you really

1    need.  What gaps in the information do you not have that you

2    really need in order to litigate this case because what do

3    they have?  We know that they have all of the purchasing

4    information, they are the ones that sold the parts.  We know

5    that they have an unbelievable amount of information about

6    the actual RFPs that are at issue, they participated in every

7    single one.  They got all of the communications back and

8    forth and, I mean, they have produced -- we don't have the

9    access to it but we understand they produced millions of

10   pages on these RFPs.

11        THE COURT:  Do you think that in general the fact

12   that somebody already has the information doesn't prevent a

13   subpoena from seeking that same information?

14        MR. KASS:  So our --

15        THE COURT:  But there is the proportionality and

16   there is the issue of the volume, and therefore in terms of

17   the difficulty in obtaining the information and that

18   balancing act do you think that's where this comes in?

19        MR. KASS:  So there are two aspects of it.  One is

20   the proportionality aspect of it, and the fact they have most

21   of the information that they really need in order to litigate

22   this case weighs heavily on the proportionality analysis, but

23   there is a second analysis and that's really what is core at

24   issue today in this objection, which is under Rule 45 it is

25   not just a proportionality standard, there is a provision in

1    there that says that the parties need to establish that the

2    information -- they have a substantial need that cannot

3    otherwise be met, that's a Rule 45 standard, and that is what

4    distinguishes a party discovery, which is subject to just the

5    proportionality standard, and non-party discovery, which is

6    subject to a heightened standard.

7             THE COURT:  And why you are arguing Rule 45?

8             MR. KASS:  And that's exactly why we are arguing

9    Rule 45.  So it is not just a technical footfall on the part

10   of the parties or the Special Master, it is actually part of

11   a strategy of theirs and of ours to say does Rule 45 apply to

12   the SSEs because if it does apply there is a different

13   standard going forward and that's why we are here to address

14   that issue.

15            THE COURT:  Thank you.

16            MR. KASS:  So when we got the subpoena what we did

17   is we said we need to negotiate this and we have now talked a

18   little bit about this, but what we did is we went to the

19   parties and said what information do you need because we know

20   you have the purchasing information, we know you have a lot

21   of the RFP information, we know you have a reasonable sample

22   of the downstream pricing information that covers virtually

23   every make and model at issue from which a sample -- a

24   statistical analysis could be performed.  Now, you may not

25   have every piece of transactional data on the downstream side

```
 1    but you have a lot of it, you have a sample, okay, and that
 2    was one issue.
 3             Another issue was what the parties are seeking is
 4    not just our invoice price or our basic price to the dealers,
 5    they are seeking every element of a transaction between us
 6    and the dealer, every element of a transaction between a
 7    dealer and an end user regardless of how remote that is.  So,
 8    for example, insurance on a vehicle or a warranty, that
 9    impacts the insurance market.  Okay.  The concept that a
10    piece of copper -- the price of a piece of copper that goes
11    into the wire harness could somehow impact the insurance
12    market for insurance on vehicles is not really reasonable
13    and, in fact, the Special Master after he issued the order in
14    our case he issued an order on April 19th that said
15    information relating to incentives -- dealer incentives is
16    irrelevant.  Okay.  So he already issued the order saying
17    much of what the parties are seeking now is not relevant, it
18    is too remote for it to be relevant even to the issue of
19    passthrough.
20             THE COURT:  Let me ask you a question because you
21    used this phrase and I want to make sure I understand it.
22    The RFP, we talk about RFQs --
23             MR. KASS:  RFQs is fine, I mean the same thing.
24             THE COURT:  Okay.  I thought so but --
25             MR. KASS:  So request for purchase, request for
```

1   quote, but RFQ is probably the right term.

2        Okay.  So that was -- so that was our concern and

3   we went to the parties and ultimately we said to the parties

4   we have an offer of proposal for you, we have an offer of

5   production for you that we are going to propose because we

6   weren't getting an offer of production from the parties.  We

7   said, okay, what you are claiming that you need that you

8   don't have on the purchasing side is you don't have

9   non-defendant data.  Okay.  Now, there's a lot of reasons and

10  we explained in our affidavits and our economist's affidavit

11  as to why non-defendant data is not a suitable benchmark and

12  is not really relevant in this case but we said look, you're

13  saying you don't have it, you say you want it, we are willing

14  to give that to you.  Okay.  And we said for downstream

15  information what you really need is you need -- you know, you

16  need to make sure that you have comprehensive MSRP

17  information and we will give that to you too.

18        So we believed we had a pretty good offer at least

19  as a starting point, and we gave it to the parties.  A few

20  weeks later on Christmas Eve they send back an e-mail and

21  they just say we are at an impasse and we are going to move

22  to compel.  They didn't come back with another proposal, they

23  just moved to compel.  So then we filed our opposition.  In

24  our opposition we had 56 fact declarations, and those 56 fact

25  declarations explain from each of the SSEs, each one of them,

1    we explained why it is that the information they either had

2    it, it was irrelevant, the burdens associated with that

3    information whether we had the information or not and, you

4    know, and so we had 56 declarations and we had two

5    economists' declarations as well.

6            The parties when they moved to compel they had no

7    declarations, okay, and they didn't contest any of the fact

8    declarations on their reply.  They do have one economist's

9    declaration in their reply but that was it.

10           So our factual presentation -- our overwhelming

11   factual presentation stands unrebutted and that is how we

12   went into the mediation -- the hearing on the motion to

13   compel that started with a mediation.  And during that

14   mediation the Special Master recognized he doesn't have any

15   information from the parties on these issues and so what he

16   did was he said look, I'm going to let them cure this by

17   ordering the SSEs to participate in these depositions.  Now,

18   there was no motion on these depositions -- there was no

19   motion to compel testimony, there was no request for

20   depositions prior to this, the parties did not avail

21   themselves of the opportunity to subpoena and seek custodian

22   information or discovery on discovery depositions, but the

23   Special Master recognized that there was a gap and so he said

24   SSEs, submit to this declaration, okay, to these depositions.

25           THE COURT:  Depositions.

1      MR. KASS:  So that's what brings us here today.

2      THE COURT:  Okay.

3      MR. KASS:  So the concept of a deposition -- so one

4  of the issues here -- so that brings us to our objections and

5  our objections are both jurisdictional and practical.  So our

6  jurisdictional objection, the first one is whether or not the

7  Special Master can compel testimony in the absence of a

8  Rule 45 subpoena and that's what we just talked about as to

9  why -- why the Special Master decided not to do that.

10      Now, when we got the proposed order from the

11  parties we recognized look, if you are going do it you need

12  to do it through a subpoena and we put in that provision that

13  said the parties can issue their subpoena -- can issue a

14  subpoena, and the parties rejected that, and the Special

15  Master just wholesale adopted the parties' proposed order, no

16  explanation as to why our proposal to have it done through

17  Rule 45 subpoena, any rationale for rejecting that.  So you

18  ask yourself --

19      THE COURT:  He didn't do an opinion on this, he did

20  an order?

21      MR. KASS:  He just did an order but we submitted

22  dueling orders so the Special Master had both our order and

23  he had their order and he just adopted wholesale their order

24  without explaining why the provisions that we added to cure

25  this jurisdictional defect why he didn't accept that.  So

1    there is no reason -- there is no rationale in the record as

2    to why what he did was actually appropriate and why what we

3    propose is inappropriate.

4           THE COURT:  Well, he had heard discussions

5    though and --

6           MR. KASS:  There was no --

7           THE COURT: -- when he made his decision.

8           MR. KASS:  There was no discussion on this issue.

9    There was a discussion as to whether or not there should be

10   depositions, and we discussed whether or not there should be

11   depositions, but there was no discussion as to whether it

12   should be through Rule 45 or through deposition notice at the

13   hearing at the mediation.  That came about because when we

14   received the parties' proposed order we had assumed they were

15   going to go through the round of subpoena but they did not so

16   we tried to cure it, so we provided it to the Court and in

17   providing our proposal we had an e-mail that sort of

18   explained what the differences were and why our proposal was

19   appropriate.  So in response he just signed the -- you know,

20   he effectively signed the parties' order, he didn't issue an

21   opinion as to why he was taking their version and not our

22   version.

23          THE COURT:  And your argument is that then this

24   deprived you of the opportunity to argue there is no special

25   need?

 1          MR. KASS:  So, no, our position at this point is

 2   that it simply has to go through Rule 45, there are

 3   procedural protections in terms of the location of the

 4   depositions and other things, not the substantial need, which

 5   really goes to the document issue that we are going to face

 6   that down the road.  The principal issue -- the key principal

 7   is whether Rule 45 governs or whether he can dispense with

 8   Rule 45 and treat us like parties, which we are not, and so

 9   that is the principal that we are here basically to argue --

10   to litigate.

11          And our view is that, in fact, the case law, the

12   rules themselves make it clear that you have to proceed by a

13   subpoena, the case law makes it clear, the commentary makes

14   it clear, you always have to compel testimony through a

15   subpoena if it is a non-party, the deposition notice is

16   simply not enough.

17          THE COURT:  Okay.  So let's say that I agree with

18   you, that you need a Rule 45 so they issue Rule 45 subpoenas,

19   what's next?

20          MR. KASS:  So that would cure that objection if

21   they had done that.  We have another jurisdictional

22   objection.  So our other jurisdictional objection is that the

23   Special Master cannot actually compel testimony because there

24   was no dispute referred to him concerning the compulsion of

25   testimony.  What was referred to him was a motion to compel

1    documents, and the -- neither Rule 53, the order of

2    reference, or the order of referral on the motion to compel

3    allows him to order or compel testimony.  What he can do is

4    he can say, look, I feel -- he can tell the parties, look, I

5    feel like there is a dearth of information here, why don't

6    you guys go avail yourself of other discovery tools like

7    depositions, issue sort of an advisory opinion to let the

8    parties say this is what you ought to do before I rule on

9    your motion, he can do that, but what he did instead was he

10   actually ordered us to participate in these depositions and

11   that was a technical error, it is not within his jurisdiction

12   to do that.

13         THE COURT:  I'm not sure on that technical error.

14   I don't think he can give you an advisory opinion, that's

15   not --

16         MR. KASS:  No, he can't give us an advisory opinion

17   but what he can do is he can say I don't have enough

18   information and the parties can then say let us go take

19   depositions and he can say well, okay, in light of that I'm

20   going to adjourn the motion until you renew it or something

21   along those lines.  That's the kind of thing he can do.  And

22   one of the cases the parties cite, I don't have the name but

23   it is cited in my brief, that's exactly what happened, it

24   was -- effectively the judge had said I need more

25   information, let the parties avail themselves of whatever

 1    discovery tools were available and then they came back and

 2    they renewed their motion.  That's how this process is

 3    supposed to work.  He simply does not have the authority

 4    under Rule 53 to compel depositions directly and so that is a

 5    second jurisdictional problem.

 6            Now that too is in a sense curable because the

 7    parties can then issue their Rule 45 subpoenas and will

 8    participate in those depositions and we will be where we

 9    started, but as a technical matter we believe the Special

10    Master exceeded his authority.  Now, why is that important?

11    It is important to us because, as I started out, this is the

12    broadest subpoena in history, okay, we are subject to it, we

13    are the ones that are going to have to go through the burden

14    of complying with it, and our view is that our only

15    protection in this case, our only protection, especially

16    since we are not at every hearing, we don't have an

17    opportunity to talk at every hearing, our only protection is

18    the rules, and we say we want that -- we want those rules

19    followed to a T because that's where we are going to find our

20    protection.  And if the Special Master feels that he has

21    authority that he doesn't have we feel we might get hurt in

22    the long run, so that is why we are making these

23    jurisdictional arguments because even though they can be

24    cured we want to go down the path of saying there are rules

25    and we are going to follow those rules.

1    THE COURT:  They can be cured and you're saying --

2  I think you're saying the Special Master can say to the

3  parties, you know, you need Rule 45 -- I need more

4  information and you could do it by Rule 45 depositions.

5    MR. KASS:  Exactly, exactly, so that gets us to the

6  jurisdictional issues.  There is one other one concerning

7  whether we have a right to object but I don't think it is

8  worth spending the time here about that.

9    Let's go to the practical objections, and there are

10  really two worth talking about.  The first practical

11  objection concerns the scope of these depositions if they

12  were to take place.  During the mediation and then during the

13  hearing the Special Master made it clear that what he needed

14  was more information concerning the location of the

15  information that we had, the availability of that

16  information, and the burden of collecting it.  That's what he

17  said he needed.  Okay.  The parties, what they had done

18  during their 45-minute lunch break where they came up with

19  these five topics that they wanted, they designed them to be

20  as broad as they possibly could be, okay, and they were not

21  limited to the location, availability and burden of getting

22  the data.  So we put into our proposed order that precise

23  limitation that he actually spoke about at the mediation, at

24  the hearing, okay, and we put that as a provision.  The

25  parties didn't like it, they struck it out, allowing them in

1   theory to go into the merits, increasing our burden of

2   preparing for these deposition.

3            THE COURT:  Let me ask you about that because I

4   did -- too many papers here.  I did have a question on that.

5            MR. KASS:  Yes.

6            THE COURT:  In the deposition order, which was

7   page 6, and in it says -- I'm not quoting directly but it

8   says the parties may take up to two depositions of up to

9   14 hours each, and then it lists a number of things.

10           MR. KASS:  Right.

11           THE COURT:  Now, is this -- these things to me are

12   the content of what they want back in the original subpoena,

13   right, the substance?

14           MR. KASS:  In some sense.  So what they are asking

15   for -- so their original subpoena had something like 50 plus

16   requests and it covered everything.  This is sort of a

17   shorthand to cover those things, and you can read these

18   things as though they were asking about the location,

19   availability and burden of getting the data.

20           THE COURT:  That is what I want to ask.  Is this

21   meant to be -- where do you keep -- how do you keep your

22   transactional purchase data?

23           MR. KASS:  So that's what we think it ought to mean

24   but you can read this differently, so we had a provision in

25   our proposal that didn't change the topics at all, it just

1    had another provision that said it is limited to the

2    location, availability and burden so it was just clarifying

3    the scope of that because you can read procurement process

4    can be anything, it can be very broad and it can go into the

5    merits, it can go beyond just what information do you

6    actually have, what are your systems.  Okay.  So we wanted

7    that provision to limit the scope, to limit our preparation

8    obligation, but also to limit the number of times we are

9    going to be subject to depositions on exactly the same topic.

10   This is not going to be -- these depositions are not going to

11   be the last depositions in this case, they are going to want

12   to get documents and after they get documents they are going

13   to want to depose our witnesses on these topics, and we don't

14   want to have to go through that twice.  So what we want to do

15   is have a clear delineation that says you can get location

16   availability and burden now and then later we will do the

17   merits.

18            THE COURT:  And what do you think about -- this may

19   have been GM's idea as I read about the written depositions.

20            MR. KASS:  So I'm getting to that next, that's my

21   next practical issue.  So this one here gets us to just sort

22   of overall scope of the deposition if they were to go

23   forward.  The next one is giving us more information about

24   what will actually be covered at this deposition, and we had

25   two proposals.  The first one was let's proceed under

1   depositions by written question.

2          THE COURT:  Rule 31.

3          MR. KASS:  Rule 31, so that was our first proposal,

4   and we did discuss that at the hearing and the Judge -- the

5   Special Master didn't accept it, I don't believe there was

6   any reason given but he didn't go down that road.  We believe

7   that would be a good approach because then we would actually

8   have the questions, we can go research the answers, and then

9   we can provide them the answers at the deposition because we

10  will have had the questions.

11          Now, we think that when we are talking about

12  discovery on discovery this is actually the most efficient

13  way of getting them the core information that they need in

14  order to participate and --

15          THE COURT:  They are talking about you would

16  like -- because there are two different things here.  You

17  would like written questions before you actually do an oral

18  exam, or are you talking about you don't want the oral at

19  all, you just want the Rule 31?

20          MR. KASS:  So my understanding of how Rule 31

21  works, and I have not actually done deposition on written

22  questions, but my understanding is you get the written

23  questions and then you provide the answers orally is my

24  understanding as to how you do it, but that's my reading of

25  the rule, so we would be fine with that approach.  We also

 1   would be fine, we could do written answers as well, we could

 2   do it either way, but that's my understanding of how Rule 31

 3   actually works.

 4        THE COURT:  I just want to make sure this is what

 5   you are proposing.

 6        MR. KASS:  Yes.

 7        THE COURT:  So you want the written questions and

 8   then you would proceed by deposition?

 9        MR. KASS:  Correct.  The second alternative that we

10   had because the parties say, look it doesn't give us the

11   opportunity for follow-up, the second one that we said was

12   this is what we actually proposed in our order, this was our

13   fallback position in our proposed order, the fallback

14   position was just give us your outline, you are going to

15   prepare an outline for these depositions anyway, it will be

16   probably relatively uniform, give it to us in advance so we

17   understand what the scope of this is, we can go research the

18   questions, and it doesn't preclude you from going off script,

19   it just gives us the roadmap so that we can prepare our

20   witnesses without trying to guess what is going to be

21   covered.

22        THE COURT:  And they could ask follow-up questions?

23        MR. KASS:  And they could ask follow-up questions

24   on that.  Our proposed order doesn't say that they can't ask

25   follow-up questions, it doesn't even say they can't raise

1    objections if we don't know the answers to those follow-up

2    questions, but if they go way off the reservation and it is a

3    completely unrelated area then all our proposed order says is

4    a complaint about a witness's failure to know the answer to

5    that would not be, quote, well taken.  Okay.  So that doesn't

6    impose any real penalty, it just basically tells them give us

7    a real good solid outline so that we can prepare, and look,

8    if we don't know the answer to some question the proposed

9    order that we have says we can subpoena the record after with

10   an answer if there is something that we don't know.

11          So we had those provisions in our proposed order

12   and, again, the parties struck that out, we are not sure why

13   because it really benefits them, and the Special Master

14   adopted the plaintiffs' proposal without any explanation.  So

15   again we think our proposal -- either one of our proposals,

16   written questions or the outline, is perfectly sensible, and

17   the outline proposal is actually we believe mandated by

18   Rule 30(b)(6) itself that says not only do you have to

19   provide a list of topics because in some senses the order

20   does have a list of topics, it says you have to provide a

21   particularized list of topics with particularity, and that's

22   what they didn't do, and that's what an outline would

23   require -- would satisfy.  So we believe that the rule

24   certainly contemplates it, may require it, but certainly is

25   sensible and efficient for to us proceed.

1          So those are our objections, Your Honor.

2          THE COURT:  Thank you.  Mr. Williams?

3          MR. WILLIAMS:  Good afternoon, Your Honor.

4    Steve Williams for the end payors.  I have just a

5    clarification --

6          THE COURT:  Do you want to respond one on one or do

7    we want to get some other defendants -- some other OEMs --

8          MR. WILLIAMS:  That was actually going to be my

9    question to the Court is would you prefer us to take them one

10   by one or save everything to the end?  And then, secondly,

11   what our timing issues are for today because I know we don't

12   have unlimited time and there are a lot of people that want

13   to speak, so I wanted to ask the Court those two questions?

14         THE COURT:  We can take it one by one, just so you

15   do it briefly, don't repeat everything for each one.

16         MR. WILLIAMS:  I will do my best.  Thank you.

17         First, I want to focus a little bit on what we are

18   here for, which are the objections to the order providing for

19   depositions, because the history of how we got here is

20   relevant and bears on this a little bit but I don't think it

21   is really the center issue for today, but what I would say

22   does bear on it.  We, the moving parties, stand by the

23   declaration that I submitted as part of the motion to compel,

24   any suggestion that the moving parties haven't throughout

25   this entire process tried to move this along so that I don't

1    have to stand up in front of this Court and ask for class

2    certification schedules to be adjusted is not well taken.   In

3    fact, we have done that throughout and have continued to do

4    that since the time we saw Master Esshaki.   We are working

5    with several of these parties right now to come up with

6    agreements.

7           But to focus on the arguments that were just made,

8    and not in order of importance, and I apologize, but, for

9    example, the suggestions that have been made about how this

10   deposition would be done and you should provide us written

11   questions ahead and it won't be precluding you if you don't,

12   look at the order they submitted.   The order they submitted

13   says unless a specific question was given to the deponent

14   counsels two weeks in advance of the deposition we can't even

15   bring motions related to the failure to answer that question.

16          Now, Master Esshaki was put in a very difficult

17   position and I would submit he was put in a very difficult

18   position because of the history of how we got here.   He

19   didn't say that he couldn't rule on the motion because the

20   parties, the defendants and the plaintiffs, had failed to

21   give him the information.   The reason he couldn't rule on a

22   motion to compel was because from the time we began to meet

23   and confer with the OEMs they have refused to provide the

24   most basic information that any party familiar with

25   litigation would provide in the context of discovery and new

1   Rule 1 and Rule 26 all recognized the duty to cooperate.  The

2   questions that Master Esshaki has said we should be permitted

3   to ask at these depositions are simple questions about where

4   are your documents and data, what are the costs attendant to

5   the production of the documents of data, that's it.  That's

6   what parties normally do in meet and confer.  And the one

7   thing counsel said that I agree with is we have been at this

8   for almost a year and most of them haven't answered those

9   questions, that's why we are forced into a position as

10  Master Esshaki ruled.

11          THE COURT:  Wait a minute.  Most of them haven't

12  answered.  When did they -- you are talking about these

13  subpoenas to get the information, right?

14          MR. WILLIAMS:  I'm talking about since the time we

15  began by serving the subpoenas, and I note that until

16  September of last year when they formed into this monolithic

17  group to fight us we were making a lot of progress so we

18  would ask are their issues about access, have some data gone

19  to legacy systems that are not accessible, we were having

20  those discussions so that we could say okay, fine, pre-2002

21  maybe that's difficult to get, we don't need to go into that,

22  but that was cut off, and it was cut off when they formed

23  into a group and took the position of essentially we are not

24  going to give you anything except things that aren't

25  particularly helpful.

 1          When this Court denied the motions to dismiss in

 2     the wire harness case, the end payor case, it recognized the

 3     truism that in an indirect purchaser case the plaintiffs have

 4     to show the initial passthrough at the first level and the

 5     pass on of the overcharge -- I apologize, the initial

 6     overcharge at the first level and the pass on of that down

 7     the chain of distribution, and we came to the Court in a way

 8     that was designed, and I was standing at this podium saying

 9     this to Your Honor, to minimize the burden on non-parties

10     because we know because of the length of the conspiracies at

11     issue in this case and the nature of the market it is going

12     to be burdensome, we want to make it easier.  We made that

13     effort to do so.

14          And, in fact, we talked about the subpoena, we have

15     cut -- of the original 37 requests in that subpoena before we

16     got to see Master Esshaki we cut it down to just 14 through

17     meet and confer.  We narrowed it that much to make this

18     easier.  So we on our side have done everything we can to

19     mitigate this burden and our view on the defense side is that

20     these parties who are routinely in the federal and state

21     courts in this country engaging in discovery this is not

22     something new or unique to them, they are involved in massive

23     litigation and do discovery on a daily basis, are raising

24     roadblocks and impediments that are not justified.

25          Now to talk about the procedural issues that were

1    mentioned.  All of these OEMs are here because they were

2    served with Rule 45 subpoenas.  Now, a lot of times in this

3    case we talk about the fact that there are novel issues or

4    new issues or different issues but one issue we have never

5    found any law for is the proposition that in this

6    circumstance when they were brought before this Court and

7    jurisdiction was obtained over them pursuant to duly served

8    Rule 45 subpoenas and not one of them has objected that we

9    didn't properly serve them, and after the lack of information

10   in the meet-and-confer process to permit Master Esshaki to

11   rule did he have the authority to order these depositions so

12   he could rule on that motion?  The moving parties have

13   submitted authority to Your Honor that says he does.  The

14   OEMs have failed to submit any authority to Your Honor that

15   says in that circumstance when they have already been brought

16   before the Court pursuant to Rule 45 another subpoena is

17   necessary.

18           THE COURT:  Well, that was for documents about a

19   deposition, the Rule 45, what about that?

20           MR. WILLIAMS:  Understood, but from the authority

21   we have seen and the lack of authority they presented, once

22   the Court has jurisdiction over that party it has

23   jurisdiction for purposes of that discovery dispute, and that

24   discovery dispute is the resolution of the motion to compel

25   related to the subpoena.

1    THE COURT:  You may have jurisdiction over the

2    discovery dispute but you can't just bypass the rules.

3        MR. WILLIAMS:  But we don't think we did.  We think

4    we have jurisdiction over the parties pursuant to the initial

5    subpoena, and it is the conduct of the parties who are before

6    the Court and the Court has jurisdiction that --

7        THE COURT:  They are not parties, though, let's

8    remember that.

9        MR. WILLIAMS:  Understood, I apologize.

10   Jurisdiction over the non-parties was obtained pursuant to

11   the Rule 45 subpoenas that were served on them, and

12   Master Esshaki acted within the scope of both Rule 53 and the

13   powers that rule gives him to resolve discovery disputes and

14   the order that this Court entered which gave Master Esshaki

15   the powers to address discovery disputes referred to him.

16       And in terms of the protections, the only thing

17   counsel referred to is, well, we may have an issue about the

18   locations and if a new subpoena was issued we can raise that.

19   Well, we have already agreed to go to their offices so that's

20   not an issue.  There is no issue about the scope or contents

21   that is relative to Rule 45 so in our view the jurisdictional

22   issue is a red herring, jurisdiction was obtained when the

23   subpoenas were duly served.  And this isn't a merits

24   deposition, this is just a deposition for Master Esshaki to

25   have the ability to resolve a live dispute for which the

```
 1   parties properly were brought within the Court's

 2   jurisdiction.

 3            In terms of the scope of the deposition, the reason

 4   for those topics was those 56 declarations that the OEMs

 5   submitted, and the parties may disagree or dispute those

 6   declarations but we are unable to address the merits of those

 7   without having some understanding of some of the things they

 8   said, and those declarations try to get to the conclusion of

 9   we never passed through any overcharges and therefore all of

10   this discovery is unnecessary because it won't prove what the

11   plaintiffs intended to prove later in the case.  Now, we

12   would take issue with that, but without knowing something we

13   can't intelligently address those points and because they had

14   put those issues in play in their declarations we don't seek

15   to go into details of the substance of those things but we

16   seek enough so that we can understand where would documents

17   that concern those topics be.

18            THE COURT:  Okay.  Is that what you are -- when you

19   read this order, page 6, are you talking about -- I'm talking

20   the Master's order he signed?

21            MR. WILLIAMS:  Yes.

22            THE COURT:  Are you then talking about simply, for

23   instance, number one, transactional purchase data, are you

24   just asking where is it, are you going to ask where is it,

25   how do we get to it, what's the burden?
```

1       MR. WILLIAMS:  That is our view, that the idea of

2   this is what is the location, what is the cost of production,

3   the identification and description of any particular

4   challenges, and what I mean by that is sometimes over the

5   course of a case with this duration some databases are taken

6   offline, they are no longer live, so there are costs

7   attendant to putting that back into a format which data can

8   be pulled.  That's what we want to know because the point of

9   this --

10      THE COURT:  This doesn't say that, that's why -- it

11  doesn't say it.

12      MR. WILLIAMS:  Well, I think that what that is

13  referred to is in paragraph B which immediately follows

14  topics 1 through 5.  My reading of the order is that is what

15  is intended to be the scope of the preceding five topics.

16      THE COURT:  Well, it says include information on

17  format, volume.  That's a big word, include.

18      MR. WILLIAMS:  I agree, Your Honor.

19      THE COURT:  There must be something else, so this

20  order at the very least needs to be modified so it is clear

21  what it is that you are seeking.  You are saying what you are

22  seeking but I don't read it -- or it can be misread, let me

23  put it that way.

24      MR. WILLIAMS:  It could be misread but I believe

25  that was intended in the parties' drafting to be the

 1    limitation on topics 1 through 5 because that was the entire

 2    purpose of this was to prevent Master Esshaki to do the

 3    analysis of the claims burden of production proportionate to

 4    the needs of the parties in the case, and that's what this

 5    was about.

 6            I would like to address briefly, if I can, this

 7    issue of written questions.  We put in a fair amount of

 8    authority of courts explaining why written questions are a

 9    disfavored form of getting information.  I believe in this

10    instance that's heightened because of the fact that the

11    questions we now seek to ask are really the questions that

12    should have been answered during the meet and confer almost a

13    year ago, and now we face a schedule whereby if we were to

14    get together and serve written questions and 30 days go by

15    and we get written responses and then we identify issues or

16    lack of answers or things that we think are missing, we

17    engage in a meet and confer, we would be back seeing

18    Master Esshaki in November filing motions to compel about

19    those.  There comes a point at which putting a witness on the

20    stand and having the ability to ask him questions is the

21    best, most efficient way to get answers to those questions.

22            THE COURT:  But doesn't it seem here that this is

23    so large where these things are, things might be depending

24    upon what you ask in so many different locations, so many

25    different people involved, doesn't it seem like a witness who

 1   is going to be orally deposed would be better prepared by at

 2   least knowing -- you know, I like maybe the outline idea that

 3   they at least know where you are going so they can be

 4   prepared for that?

 5          MR. WILLIAMS:   And, Your Honor, we don't have any

 6   objections to the non-mandatory and non-binding.  We will

 7   give you outlines or descriptions of things we want to ask.

 8   Frankly, Your Honor I don't think there is any lack of

 9   knowledge on their side of what it is.  They have had the

10   subpoena, we have had many meet and confer sessions, we have

11   had letters back and forth, we have those two giant binders,

12   double-sided copies of briefing, we have had full days with

13   Master Esshaki on this, I find it very hard to believe that

14   there is really a lack of understanding what it is we are

15   seeking here.  So if it is not binding, if it is not as they

16   had proposed, if the specific question is not given we have

17   no remedy for a failure to ask it, that's not an issue

18   because we don't want to spend this time doing this, and we

19   are working very cooperatively with the defendants but we

20   should be deposing their witnesses and they should be

21   deposing ours.

22          THE COURT:   How many depositions are we talking

23   about?  I remember last night doing the calculation and I

24   can't remember what it was.

25          MR. WILLIAMS:   Your Honor --

1          THE COURT:  There may be two for some.

2          MR. WILLIAMS:  There may be two if they are in the

3    truck and equipment dealer case, and they are not, and then

4    there is also the issue of the group that comes behind that

5    the Master carved out because they are referred to as smaller

6    but, you know, without having the numbers offhand I think we

7    are talking about something like nine in the beginning group,

8    and somebody may correct me on that but that seems about

9    right to me.

10         THE COURT:  Okay.

11         MR. WILLIAMS:  The point of it really is to me this

12   is unprecedented in an indirect purchaser case as the Court's

13   motion to dismiss order recognized, OEMs, contract

14   manufacturers, they always provide discovery, and companies

15   like Apple and Hewlett-Packard and Dell, they think their

16   information is very confidential and private, they don't like

17   the burdens and disruptions of non-party discovery, but they

18   produce it.  It has not even ever come to this point where we

19   have had to move to compel to have it produced, there is

20   nothing different about these parties here.

21         And also the citation to Rule 53 is a bit

22   misleading in that that's permissive on the Court, that's not

23   mandatory, that's not a shall, that's in the appropriate

24   circumstances.  So if we step back and look at this case, and

25   we worked on our briefs together with the defendants so it

 1   says things like alleged conspiracy, but given the guilty

 2   pleas that have come in this courtroom it is not an alleged

 3   conspiracy, it is a real conspiracy that happened, it took

 4   place over a roughly 15-year period, it affected auto

 5   purchasers throughout this country.  There's no doubt about

 6   any of those things.  We are using the discovery process to

 7   get information that the law says we are entitled to, and all

 8   we have had from the OEMs is a brick wall stopping us,

 9   whereas they have pursued their claims with the defendants

10   but they want to stop the plaintiffs from being able to

11   pursue our claims against the defendants.  If this had come

12   up, Your Honor, last November it would look very different

13   but we are now in almost July and we have now adjusted the

14   schedule two times because of this issue only.

15           What Master Esshaki did, and in my view he did it

16   in a very even-mannered way.  I might in my advocate's

17   position had said the reason for this is there has been

18   obstruction, but he did it in an even-manner way to get to

19   the end result of what is it I will order produced, if

20   anything.  The depositions are only an interim step to get to

21   that point.  So we are again faced with the situation where

22   our time is so constricted and no legitimate basis has been

23   identified by the OEMs to say either the meager offer we made

24   to you last September should be accepted or we should just

25   keep delaying this, we should issue new subpoenas, we should

1    issue written questions, it is time to bring this part of

2    this proceeding to its conclusion and the only way to get

3    there I would submit respectfully is what Master Esshaki

4    ordered, there is no abuse of discretion in it, it is frankly

5    much less burdensome than what he might have done, which

6    would have been to say I'm ordering production, it is

7    something that's really intended to help in a practical way.

8                THE COURT:  Okay.  Thank you.

9                MR. WILLIAMS:  Thank you.

10               THE COURT:  Do you want to reply?

11               MR. KASS:  Yes, Your Honor.  Just a couple points.

12               THE COURT:  Wait a minute.

13               MR. HEMLOCK:  I was going to speak on behalf of the

14   defendants but I don't know whether you want to hear from the

15   OEMs first, I have some follow-up to what Mr. Williams said.

16               THE COURT:  No, let's hear from you and then he can

17   respond to both of you.

18               MR. HEMLOCK:  Thank you, Your Honor.  Adam Hemlock,

19   Weil, Gotshal & Manges, on behalf of the Bridgestone and

20   Calsonic defendants, and speaking for the defendants jointly.

21               Let me just echo very briefly a couple points

22   Mr. Williams said.  We are on a tight schedule and Your Honor

23   has indicated repeatedly that we need to keep things moving

24   forward.  And so in thinking about what to do here we have to

25   be mindful of the fact that there are going to be several

1   steps subsequently, it is not just resolving this dispute but

2   thinking about how it is going to work down the road.  So we

3   have been at this now for a year and-a-half -- I should say a

4   year, it has been a long process, we have not made meaningful

5   progress.  These depositions, in terms of burden it is

6   minimal, it is 14 hours, it is just a little, but what they

7   represent, what they reflect, what they are intending to do

8   is have a meaningful impact on what the burden is going to be

9   once we get to the documents.

10           I can assure you that the serving parties are very

11  interested in ensuring that we do not unduly burden the OEMs.

12  We have a set of things we want, as Mr. Williams pointed out,

13  it started off as a big subpoena because that's the way it

14  goes in these cases, you start big and then you sit down and

15  negotiate and figure out what the burdens are and what is

16  really important.  We haven't had an opportunity to do that

17  because in our view the OEMs have not provided us sufficient

18  information to have that meaningful dialogue.  So Master

19  Esshaki noted that, that's the basis for him having ordered

20  the depositions.

21           We are eager to have those depositions because once

22  we have those then we can sit down with the OEMs or Special

23  Master Esshaki can sit down and evaluate our motion to compel

24  and he will do it in an educated and informed manner because

25  what we really care about here is getting to the documents,

1   figuring out what we need, what we truly need, not everything

2   under the sun, what's reasonable, what's reasonable also in

3   light of the costs and burdens associated with the OEMs,

4   which we don't want to overdo, and then move forward with

5   litigating the case because we do need those documents and so

6   on.

7          I would also point out that much of the discovery

8   that we are trying to figure out whether it exists, where it

9   exists is hugely relevant to this case.  Your Honor pointed

10  out at the last hearing the relevance of the declarations

11  that were provided by the OEMs and the fact that they say

12  that changes in parts prices would not have an impact on car

13  prices.  As I believe you realized at that point, that's a

14  meaningful issue and it covers all of the cases, not just the

15  lead three.  So isn't it important for us to really make sure

16  we get this right?

17         You asked the question about whether depositions

18  upon written questions are appropriate here.  Speaking for

19  the defendants we think that would not be a good idea because

20  we only have one chance to do this and our concern would be

21  that they come back, and even if they behave in good faith

22  they come back with responses that necessarily and reasonably

23  lead to follow-up questions.  They, by their own admission,

24  the OEMs in their declarations have pointed out these systems

25  are very complicated, there is going to be lots of back and

Case 2:12-md-02311-SFC-RSW   ECF No. 1405, PageID.25156   Filed 07/01/16   Page 44 of 105

Objections to Rule 30(b)(6) Depositions

44

forth of databases and tapes and so on and so forth, and I
think even if they in their best effort in good faith tried
to provide the information required we would have reasonable
follow-up questions.  Why not just do it in a deposition?
There is no real additional burden.  Either way they still
have to prepare their witnesses, and they still have to sit
down for a deposition, we still need to get a court reporter
and so on, but Mr. Kass pointed out that he has never done a
Rule 31 deposition, I have never done one either and there is
probably a good reason for that, it is because it is not the
most efficient way to get the information we need.

        One other point and then I want to talk about a
couple of other things, but on the issue of the subject
matter of depositions, we agree with Mr. Kass, we are not
looking to do a far-ranging deposition on how these companies
conduct their business, how they price their cars and how
they purchase parts and so on, but we just have to be a
little bit cautious, Your Honor, because there is going to be
a need for just a little bit of questioning on how they
conduct their business so that we can understand what
documents and data are generated and transferred between
different entities and so on.  So I don't think it would be
unreasonable if we were taking a deposition in front of the
OEMs to just ask a few questions, a few minutes, we just need
a little bit to understand how do you price your cars or how

12-02311 • June 23, 2016

1    do you purchase your parts because we need that for context

2    to reasonably understand what documents and data exist and

3    what we need and what we don't need and what we might be able

4    to do away with.

5           THE COURT:  If you ask them how they price their

6    cars though, I understand you need some context but you are

7    getting to the heart of what --

8           MR. HEMLOCK:  It is true.

9           THE COURT:  -- this is.

10          MR. HEMLOCK:  It is true, and it is tricky, Your

11   Honor, I will concede that, and I will also concede I don't

12   know how I would articulate drawing that line.  But, again, I

13   come back to the point that if we don't get this right at

14   this round we are going to be delayed again and I think Your

15   Honor wants this case to move forward.  I would just be

16   afraid we sit down and some of the questions bleed a little

17   bit beyond just where something is and say, well how do you

18   do what you do, and then the OEMs would say the Court said

19   you can't ask about that and then we are going to be a little

20   stuck.

21          Let me briefly address another issue that was

22   raised in the OEMs' briefing regarding the distributor and

23   non-core entities.  One of the issues that the OEMs have

24   objected to is whether some of those entities need to be

25   within the framework of this 30(b)(6) deposition that this

1    Special Master ordered, and we think the answer is absolutely

2    yes, again, because we only have one bite at the apple here.

3         We don't know how the OEMs are structured, it could

4    be the case for one OEM that they have a single entity that

5    buys the parts, prices the cars and sells the cars, does

6    everything, and if that entity is subject to the subpoena

7    then that's great and in the 30(b)(6) deposition we will

8    learn all about what they have and we will be happy.  The

9    problem is we get the sense that in some cases some of these

10   non-core entities might have documents and data that are

11   within the scope of the documents we are seeking in the

12   discovery and are going to be highly relevant to the case,

13   but if those entities are not within the scope of the

14   witness's preparation for the 30(b)(6) we won't learn what

15   they have.

16        What I'm afraid of is if they are out and let's say

17   we sit down with an OEM, I depose an OEM, and I say okay,

18   well, where is your information regarding the pricing of

19   cars?  And they say, well, the entity that I checked has a

20   little bit of it but they mentioned that so and so non-core

21   entity is really where most of that resides.  And I said

22   okay, tell me about that, and he says well, I didn't check

23   because they were non-core and the Court didn't order me to

24   go check with them.

25        We really think of this as nine OEM families within

1    the United States, we are not asking them to go abroad

2    because we understand the implications there, but within the

3    U S., within those OEM families we need to understand where

4    the documents and data reside again so that either

5    Master Esshaki or you can work with us to order the

6    appropriate scope of discovery.

7            One other point I would note, Your Honor, and

8    probably we will get to this, is Hyundai and Kia.  They have

9    suggested that they are smaller OEMs and therefore should not

10   be subject to the scope of this.  I would just say briefly

11   throughout the end of the meet-and-confer process and through

12   the motion to compel they did not take that position.  The

13   draft order that they provided to the other side with respect

14   to the 30(b)(6) depositions did not define themselves to

15   include Hyundai and Kia, they are a meaningful player in the

16   market, they currently together account for --

17           THE COURT:  They haven't given their objections

18   yet.

19           MR. HEMLOCK:  That's correct, I didn't know what

20   you wanted me to do when but if --

21           THE COURT:  I don't want you to have to argue in

22   response and then I get you twice.

23           MR. HEMLOCK:  Fair enough.

24           THE COURT:  Once is all you get.

25           MR. HEMLOCK:  So do you want me to sit down?

 1          THE COURT:  Yes, you can sit down assuming you are

 2     done with the main argument.

 3          MR. HEMLOCK:  Yes.

 4          MR. KASS:  Thank you, Your Honor.  Just a couple of

 5     points.

 6          First, with respect to the outline issue

 7     Mr. Williams started to quote our proposed order but then on

 8     the key provision he started to paraphrase and it is not what

 9     we said.  What we said was unless a specific question was

10     provided to the deponent's SSE counsel two weeks in advance

11     of the deposition, motion practice against any deponent

12     unable to answer a given question or set of questions will

13     not be well taken.  To the extent a witness does not know or

14     is unable to recall certain information during a deposition,

15     the deponent SSE group may supplement its response at a later

16     time and in an appropriate manner.  It doesn't preclude them

17     from filing a motion if we have gone off -- if we have not

18     answered or were not adequately prepared.  It basically tells

19     them, look, give us a detailed set of -- a detailed outline,

20     let us prepare, we have two weeks to do it, it doesn't impose

21     any extra delay, it is a reasonable method pass forward for

22     us to be able to prepare and respond to the depositions to

23     the questions.

24          On the other issue, on the other practical issue on

25     the limitation, it says -- what we proposed was for avoidance

1    of doubt no party may ask any SSE substantive questions about

2    the auto parts cases, for example, and by way of illustration

3    but not limitation the party may not ask questions about

4    price fixing, overcharges, passthrough, damages, internal

5    investigations or external discussions relating to those

6    cases.  So it says location, availability and burden, that's

7    what you are allowed to ask about.

8          And so that was our proposal and we think that that

9    makes eminent sense.  It limits the deposition, makes it

10   defined, gives us time to prepare and allows us to answer the

11   questions.

12         The other thing I want to respond to was sort of

13   the concept that the SSEs might have somehow been delaying

14   this process.  If you go back to our original opposition in

15   response to the motion to compel we included all the

16   correspondence.  We explained our leadoff ground was that the

17   parties have failed to negotiate in good faith, and we made

18   an unbelievably powerful presentation on that point.  The

19   parties were taking a months to get back to us from a letter

20   or weeks to get back to us in response to our proposal.  They

21   say they cut back the subpoena from 30 something requests

22   down to 14, all they did was eliminate the duplicative

23   requests that asked for exactly the same information, they

24   didn't narrow the scope of the subpoena at all.  Okay.

25         So when you are talking about did they negotiate in

1   good faith, our position is they didn't and we have the
2   backup to prove it, okay, all you have to do is read our
3   opposition and the exhibits where we quoted from this.  So we
4   don't agree we have been -- we don't agree that we have been
5   delaying the process, if anything it is the other way around.
6   What we asked for, and this is our position under Rule 45,
7   was what information do you really need that you don't
8   already have because you have an unbelievable amount of
9   information, tell us, and we will tell you -- we will try to
10  come up with ways that we can fulfill those gaps, and when we
11  weren't getting any proposal we offered a proposal and in
12  response rather than say, well, this isn't sufficient or
13  that's not sufficient, how about this, they said no, we are
14  declaring impasse and we are going to file our motion.
15  That's where we are today.

16          And Special Master Esshaki did not say that the
17  reason he's ordering depositions is because the SSEs didn't
18  provide information that they should have provided.  He noted
19  that he didn't have enough information on these issues and so
20  he asked for depositions on it.  He didn't say that we
21  didn't -- we provided 56 declarations that went into detail
22  about the burdens associated with this deposition and our --
23  how the information is kept, and the concept that they have
24  in their minds and in some of the letters that there is some
25  magical database out there that somehow connects a wire

1    harness to the end-user price on a vehicle by vehicle basis,

2    that doesn't exist, and the burden of trying to recreate it

3    is impossible, and our declarations explained why that is.

4         Now, at the mediation the Special Master said I

5    would like some more information about that, and then he

6    ordered the depositions to clarify.

7         THE COURT:  So he determined that these

8    declarations were insufficient for him?

9         MR. KASS:  He did not determine that the

10   declarations were insufficient, what he said was he didn't

11   have enough information generally to rule but he didn't say

12   the declarations were insufficient.  That may be an

13   implication of what he ruled but he didn't actually say that.

14        THE COURT:  Okay.  All right.  Who wants to go

15   next?

16        MR. ASHBY:  Joseph Ashby of Quinn Emanual.  I

17   represent Hyundai Motor America and Hyundai AutoEver, but

18   arguing on behalf of the domestic distributors and non-core

19   subpoenaed entities.

20        THE COURT:  Okay.

21        MR. ASHBY:  Your Honor, I would first like to

22   clarify what the definition of what those two groups are

23   because in some of the ways that the parties have referred to

24   them it creates confusion as to who was included in those

25   groups.

 1          THE COURT:  Just one minute.  Is this microphone

 2    on?  It is very quiet.  Try it again.

 3          MR. ASHBY:  Are you able to hear me now?

 4          THE COURT:  Yes, that's better.

 5          MR. ASHBY:  Thank you.  The domestic distributors

 6    are entities in the United States that distribute cars

 7    predominately manufactured by foreign automakers.  The

 8    domestic distributors are not part of the major U.S. OEMs.

 9    In fact, the domestic distributors are not OEMs themselves,

10    they do not have any manufacturing capacity, they don't buy

11    parts, they don't design cars, they distribute and sell cars.

12    The non-core entities are not part of the automotive supply

13    chain.  They are within, to use a term used in the briefing,

14    the corporate families of OEMs but they themselves do not

15    manufacture cars, they don't design cars, they don't sell

16    cars to consumers, they don't distribute cars.  They have

17    other roles such as research and development, regulatory --

18    interacting with regulatory entities in the United States,

19    providing capital finance support for an OEM and other

20    similar functions, but they themselves are not part of the

21    automotive supply chain, they are not part of the entity

22    determining what the price of a car is, they are not part of

23    that process of getting a car from the factory floor to a

24    consumer.

25          With that background, at the March 24th hearing the

1    Special Master ruled at pages 42 to 43 and 46 of the

2    transcript unequivocally that the domestic distributors and

3    the non-core subpoenaed entities were to be excluded or

4    carved out from these depositions.  However, the order does

5    not include that carve-out.  The parties have explained that

6    based on an exchange that occurs on page 47 that makes no

7    reference to the domestic distributors or the non-core

8    subpoenaed entities.  Throughout the hearing when he made --

9    when the Special Master made those two rulings and then also

10   earlier in the hearing the Special Master had specifically

11   used those two terms, domestic distributors and non-core

12   subpoenaed entities, but then later there is an exchange

13   where counsel for one of the parties asked a question about

14   how the depositions would apply to an OEM making no reference

15   to domestic distributors, making no reference to non-core

16   subpoenaed entities, and the parties used that exchange as a

17   basis to say that the order should not include the express

18   carve-out.

19        The domestic distributors and non-core subpoenaed

20   entities submit that the order should be conformed to the

21   Special Master's ruling at the March 24th hearing which

22   reached the correct conclusion that under proportionality

23   analysis they are not appropriately subject to the

24   depositions.  The domestic distributors are not appropriately

25   subject to the depositions because they are only a small part

1    of their corporate families.  The parties in their briefing

2    make the point that they need the domestic distributors so

3    that they would be able to have a complete corporate picture,

4    but as counsel for defendants acknowledge, the parties have

5    not served the foreign entities.

6         So for the entities such as that one that I

7    represent, Hyundai Motor America, its parent entity that

8    manufactures the majority of the cars it distributes is a

9    South Korea corporation, Honda Motor Company, that has not

10   been subpoenaed.  So no matter how many questions they ask of

11   Honda entities they won't be able to get to that information

12   because the parties made a decision not to subpoena those

13   foreign companies, and so subjecting the domestic

14   distributors to the burden of a deposition when their

15   declarations have already explained that that information in

16   terms of the parts, the manufacturing of cars, procuring of

17   parts reside with the foreign entities is disproportionate to

18   the amount of information they can get from them.

19        The domestic distributor declarations also explain

20   that it is disproportionate because they don't have

21   information about the final retail sales, they would at most

22   have information about who purchased the vehicle and maybe

23   their address, telephone number and e-mail address, but they

24   won't have information about the final purchase price of the

25   car or any of the other details of that transaction, all they

1    will have is the VIN and who ultimately purchased it.  So for

2    the domestic distributors it imposes a disproportionate

3    burden to require them to submit and prepare for a deposition

4    when they have already provided declarations explaining their

5    limited function.

6         Turning to the non-core entities, they are

7    similarly disproportionate because the parties have not

8    explained why they are pursuing entities that have such a

9    limited role.  The non-core entities have submitted

10   declarations that explain that they have very limited

11   functions.  For example, Honda Auto Ever is a consolidated IT

12   department, one of the non-core entities.  Subaru Leasing is

13   an entity that provides leasing to Subaru employees.

14   Fuji USA is an entity that interacts -- that does some

15   emission testings and interacts with regulatory entities.

16   Hachi, H-A-T-C-I, is an entity on behalf of Hyundai and Kia

17   that interacts -- that does emission testing and interacts

18   with regulatory agencies.

19        THE COURT:  Did you discuss this with the Master?

20        MR. ASHBY:  I was not permitted to make argument at

21   the hearing and the domestic distributors and the non-core

22   entities were excluded from the mediation.  The mediation

23   occurred in the morning, the Special Master limited it to the

24   OEMs, and then at the hearing the domestic distributors were

25   presented to present argument, and when I stood to present

```
 1    argument on behalf of the non-cores the Special Master told
 2    me that he already reached his conclusion and did not want to
 3    hear argument on behalf of the non-cores.
 4         THE COURT:  But he carved you out but not in the
 5    order, is that --
 6         MR. ASHBY:  That's correct, the domestic
 7    distributors and the non-cores were carved out at the
 8    hearing, twice he made an express statement, but then the
 9    order that was entered does not carve out the domestic
10    distributors and the non-cores.
11         So each of the non-core entities, although they may
12    have some small sliver of information subjecting them to a
13    deposition on the potential that somebody -- that they might
14    have something that the partes are not able to obtain from
15    another source imposes a disproportionate burden.  Counsel
16    for the parties suggested that they're concerned about the
17    possibility that one of the other entities would be deposed
18    and would sort of point to them, but in the parties' briefing
19    they haven't identified the specific circumstance where they
20    have that concern, and the burden would be proportionate,
21    so --
22         THE COURT:  If the concern came up they could then
23    do something else, right?  If through the other depositions
24    they find they need information from you and they can
25    articulate the information they need from you that could be
```

1   cured?

2          MR. ASHBY:  Certainly, Your Honor, and as I had

3   understood the carve-out from the Special Master is that the

4   part of the process was that the -- these groups were carved

5   out so the parties can gain a better understanding of the

6   OEMs and once they had that better understanding if there is

7   a need to revisit some group later, revisit an entity later,

8   they would not be precluded from doing that.  So if they were

9   to take a deposition and there was somebody that would

10  testify there is a non-core entity, there is nothing in the

11  order or nothing in the request by the non-cores that would

12  preclude some follow-up occurring at that later stage.

13         And one other point, although the non-core entities

14  are part of corporate families that are OEMs and regularly

15  engaged or have some frequency in litigation, they are

16  smaller entities within those families and many of them

17  seldom, if ever, have cause to be in litigation, so for them

18  the burden of preparing someone for a deposition, even if it

19  is just a few hours, their in-house process isn't built

20  around the idea of regularly being in litigation so it is

21  fundamentally disruptive to them in a way that is

22  disproportionate to the prospect that they may have some

23  small sliver of relevant information.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

1    MR. SURPRENANT:  Good afternoon, Your Honor.

2    Dominic Surprenant, Quinn Emanuel, and I'm speaking on behalf

3    of the 17 Daimler entities, each of whom have been ordered to

4    produce Rule 30(b)(6) designees on five broad but importantly

5    non-overlapping topics.

6         Now, seven of those entities, Your Honor, are

7    Daimler Truck entities, they filed their separate objections,

8    which presumably I will argue later.  I want to talk about

9    the ten Daimler entities that are non-truck, that are

10   automotive domestic distributors and non-core entities.

11   There's ten of them.

12        Now, in the normal course, Your Honor, if I

13   represented one entity and I looked at the Special Master's

14   order and I looked at the five broad topics that don't

15   overlap I would say well, I think likely the best way to

16   present the 30(b)(6) designees is to find the employer,

17   employee or officer that knows the most about topic number

18   one and knows the most -- a separate person about topics two

19   through five.  So in the normal course I would anticipate if

20   I represented one entity presenting five designees because

21   that would be the most efficient way to do it.  And the fact

22   that the issuing parties departed dramatically from what the

23   Special Master said in this courtroom, and I have ten

24   entities, doesn't change that analysis.  I have entities in

25   Oregon, in California, in Alabama, in Atlanta, in New Jersey

 1   and in Michigan, and after -- if the order is not modified as

 2   to my ten Daimler entities, after I complete the process of

 3   traveling around the country and interviewing dozens of

 4   people I may well present 50 designees.

 5          I told the issuing party my concern at the

 6   beginning of the month.  I said, hey,  guys, I have 50

 7   potential designees, that does not make any sense.   In

 8   14 hours that's 840 minutes, divided in two, plaintiff and

 9   defendant, that's 420.  If I have 50 designees you are going

10   to have 8 minutes and 24 seconds per witness.  Maybe the

11   plaintiff will be able to do the admonitions, the background

12   and the preparation and may even get a question or two in,

13   and that simply, Your Honor, cannot be proportionate for a

14   non-party.

15          Your Honor, I don't know if the number would be 50,

16   it may be less but it is not going to be 5, it is not going

17   to be 10, it is not going to be 20, these are distinct

18   entities and distinct topics.  And so I think, Your Honor,

19   that the issue -- that the Special Master's order as to my

20   ten Daimler automotive entities is -- I hate to use the

21   adverb wildly disproportionate and it should be stricken.

22          But at the same time, Your Honor, understand the

23   incredible burden this multi-district litigation has imposed

24   on Your Honor, Your Honor's staff and the Special Master.

25   And so I would propose in the interest in moving things ahead

1    a compromise as to my ten Daimler entities, and that is first

2    of all, Your Honor, while I disagreed with what most of

3    Mr. Williams and Mr. Hemlock said, I do agree, as

4    Mr. Williams said, it is not a merits deposition, it is not

5    important that you catch some particular phrase that is

6    useful in a litigation that would be useful at trial.  This

7    is information about what documents and data we have, it

8    should proceed by written questions and written answers.  And

9    what I would propose, Your Honor, for the ten Daimler

10   entities is the issuing parties can pick two, I would

11   strongly recommend it be Mercedes-Benz USA, a domestic

12   distributor and Mercedes-Benz USI, it is in Tuscaloosa,

13   Alabama, it is a very small outfit.

14        The notion that these are gigantic companies that

15   can push a button and give answers is false.  Mercedes-Benz

16   USI puts together certain vehicles with parts that are bought

17   by other entities, and I think those two as a compromise,

18   Mercedes-Benz USA, Mercedes-Benz USI, ought to answer 20

19   written questions from the five topics.  The issuing parties

20   and myself can meet and confer, we can decide what those

21   questions would be, if there is some limited disagreement we

22   can officially put it to the Special Master.  I think the

23   answers -- the questions should be written, the answers

24   should be written.  This is simply not a topic where oral

25   depositions make any sense.

1    Now, Mr. Hemlock raised a concern maybe they won't

2    get an answer.  Well, you can ask follow-up written questions

3    just as you can ask follow-up questions at a deposition but,

4    Your Honor, it will take hundreds of thousands of dollars for

5    me to visit with the ten Daimler entities all over the

6    country and figure out who the appropriate designee is,

7    prepare them to memorize information so they can then give it

8    at an oral deposition, that is is not proportionate, I think

9    my compromise position is much more efficient and will

10   provide the defendants with the information -- the issuing

11   parties with the information they need.

12   One important proviso, Your Honor, is these

13   companies, there are 17 of them in automotive, they are for

14   the most part quite small, this would be a very costly

15   burden, and what I would propose is there be cost shifting

16   decided in advance by a percentage, a ceiling and a floor.

17   The floor would be 60 percent in my proposal, the ceiling

18   would be 90, but I think there is an important --

19   THE COURT:  60 percent of what?

20   MR. SURPRENANT:  Of the attorney fees and costs

21   that the Daimler entities incur in preparing the discovery.

22   This is a Rule 45 non-party, there is abundant authority

23   cited --

24   THE COURT:  Wait a minute.  Are you asking that

25   they pay 60 percent to 90 percent?

```
 1            MR. SURPRENANT:  Yes, Your Honor.  And there is
 2   abundant authority cited to the Special Master that --
 3            THE COURT:  Why shouldn't they pay it all?
 4            MR. SURPRENANT:  I was trying to be -- I was trying
 5   to be conservative, Your Honor.
 6            THE COURT:  Well, I mean, that's usual.
 7            MR. SURPRENANT:  Well then I would propose that,
 8   Your Honor, but I'm not that dumb.  But serious, Your Honor,
 9   just to end, is this makes no sense.  We were told by
10   Mr. Williams that there would be nine depositions, we were
11   told by Mr. Hemlock that they -- that they wanted to impose
12   minimal burden, that's simply not true.  I asked them -- I
13   said, look, guys, we are going to have 50 automotive
14   designees, maybe it won't be 50, maybe it will be 40, would
15   you please give me a draft declaration that I can take to my
16   clients what they would have to swear to be excused from one
17   or more topics so we don't have 50 designees, and I was met
18   with silence, I have never been given such a draft
19   declaration.
20            So, Your Honor, to conclude --
21            THE COURT:  So you're saying there is not the nine
22   that he's saying, there is at least --
23            MR. SURPRENANT:  From my --
24            THE COURT:  -- 40 to 50 on your one part?
25            MR. SURPRENANT:  Yes, and it is going to be eight
```

 1    minutes.  What meaningful information can the plaintiffs get

 2    in an 8-minute, 24-second deposition?  Of course they can't.

 3    We can have written questions, written answers, we will meet

 4    and confer, I'm sure we can come to 80, 90 percent agreement,

 5    efficiently put it to the Special Master, have 20 questions

 6    and 20 answers with availability of limited follow-up on

 7    things they don't think are as complete as they should be.

 8                THE COURT:  Where does the number 20 come from?

 9                MR. SURPRENANT:  It seems to me it is a reasonable

10    number, Your Honor, there are five topics.  And these again

11    are not merits issues, it is where's your documents, where's

12    your data, how much will it cost.  There is no reason to pour

13    all of that data and information into a witness so he can

14    regurgitate it on the record, that doesn't advance anything.

15    Maybe the number is 25, I mean, nothing in this proposal is

16    set in concrete, but what is set in concrete is as to the ten

17    Daimler entities this order is wildly disproportionate.  It

18    departs dramatically from what the Special Master indicated

19    and it results in something that simply makes no sense, and

20    so I would suggest, Your Honor, you simply strike the ten

21    Daimler automotive entities or in the alternative some

22    fashion of the compromise that I have suggested.

23                THE COURT:  Okay.

24                MR. SURPRENANT:  Thank you, Your Honor.

25                THE COURT:  Thank you.

1          MR. WILLIAMS:  Your Honor --

2          THE COURT:  Response?

3          MR. WILLIAMS:  -- I just want to very briefly

4   respond at this point to some of the things just said, in

5   particular --

6          THE COURT:  Were you prepared to take so many

7   depositions on this?

8          MR. WILLIAMS:  Well, it seems to me that there is a

9   lot of advocacy going on here.  There is nine 30(b)(6)--

10          THE COURT:  You're in a courtroom so don't worry

11   about it.

12          MR. WILLIAMS:  Understood, and there is no jury.

13   So there are nine 30(b)(6) depositions, you can give me one

14   witness, you can give me two, you can give me five, that's in

15   your control, it is not going to be 50.  He doesn't have to

16   fly around the country, he can prepare the witnesses -- since

17   the topics apparently are as simple as counsel just

18   represented I don't see why anyone is flying around the

19   country to multiple locations to sit down and interview

20   people about it, but that's not the most important point

21   because we talked about cost shifting and when this process

22   started we were open to it, we told them we are open to

23   considering it, let's have a discussion, a good-faith meet

24   and confer so we can understand it, but what strikes me

25   inappropriate about them raising this topic now is they --

1    I'm sorry, Mr. Kass, counsel said we put in a brief and it is

2    an incredible showing.  I'm not going to get up here and tell

3    you that we wrote the greatest brief, I will say it is in the

4    record, and the Master had it.  So the record of who tried to

5    meet and confer is set forth in the documents before the

6    Court, but my point is at this point at least the end payors

7    we object to cost shifting on this because --

8              THE COURT:  Why?

9         MR. WILLIAMS:  Because the 20 questions that

10   Counsel just said we will give you answers to those are

11   questions that parties answer and non-parties answer when

12   they meet and confer to avoid having to bring discovery

13   motions.  We never should have had to gotten to this point if

14   they had answered those questions nine months ago when we

15   asked them to answer those questions.

16             THE COURT:  Well, you talk about money and the

17   costs of this, the parties seeking the information, I mean,

18   maybe this discovery on discovery is a little different but

19   ultimately you are going to get into this production and you

20   are going to be paying, you, not you personally, but you, the

21   seeking parties, are going to be paying, they are the -- they

22   are the non-parties, why should they pay to give you that

23   information?

24             MR. WILLIAMS:  Well, I want to break it down, Your

25   Honor.  There are two points, there is the cost of

1   production, which in some circumstances may be shifted, and

2   when there is a record before the Court about that the Court

3   may decide that cost shifting is appropriate and may

4   determine as between the moving parties as to when that cost

5   shifting is appropriate, but what we are talking about now is

6   something different.  What we are talking about now is what

7   we contend is the information they had a duty to provide

8   during the meet-and-confer process so we could have avoided

9   the delay and avoided the motion to compel, and they are

10  saying we should pay them just for that, just for the

11  information about is there some impediment to producing it,

12  where is it located, what form is it in?

13          THE COURT:  I'm not talking about that.  I'm

14  talking about what about when you attend a deposition, and

15  there's hourly costs for attending a deposition I assume?

16          MR. WILLIAMS:  Yes.

17          THE COURT:  Why should you not pay for that?

18          MR. WILLIAMS:  Because the questions that we are

19  going to go to these depositions to answer are questions that

20  should have been answered during the meet-and-confer process

21  before the motion was filed.

22          THE COURT:  I don't agree, I think you are going to

23  end up paying for it so you should keep that in mind.

24          MR. WILLIAMS:  Thank you, Your Honor.

25          MR. SURPRENANT:  May I respond briefly, Your Honor?

```
 1          THE COURT:  Yes.

 2          MR. SURPRENANT:  Mr. Williams just told you

 3   essentially that I made up the fact that there are going to

 4   be 50 designees or some large number, it is not true.  With

 5   respect to the truck entities where I have done the most work

 6   I can tell you there are seven truck entities, I would

 7   probably have 30 designees, not 35, but 25 to 30, these are

 8   different topics.  The people -- if Your Honor thinks about

 9   it, automotive industry there is procurement, what you pay,

10   what you buy and what you pay, there's costing throughout the

11   process and there is pricing.  Those are different topics,

12   the same people won't know the answer.  So there is a very

13   real likelihood as to my ten automotive clients that we are

14   talking some large -- I hate to be hyperbolic and I'm not --

15   ridiculous amount of designees, it is non-proportionate.

16          Now, Mr. Williams just told you --

17          THE COURT:  Well, that would be their problem so

18   you just supply the people and they will have to deal with

19   the depositions, right?

20          MR. SURPRENANT:  Well, if they want to take

21   8-minute, 24-second depositions I think it is

22   disproportionate, Your Honor, and I don't think my clients --

23   they can't pay for the disruption.  They could pay for my

24   fees, they could pay for the cost, they can't pay for the

25   disruption that these depositions will impose on non-parties,
```

1    they can't pay for that.

2          Mr. Williams said well, they shouldn't have to pay

3    because, citing no authority, this is information that should

4    have been provided in the meet and confer, and in a very

5    general, very superficial level I agree with that in the

6    normal course.  In the normal course if I had a Rule 45

7    subpoena I would say hey, folks, this is going to be trouble,

8    difficult, here is my issues, but this subpoena was so broad

9    they didn't cut it down at all.  There is a very good section

10   I can say because my firm wrote it, Mr. Kass's brief about

11   how the so-called reduction was simply removing duplicates.

12   They didn't narrow the subpoena at all in a meaningful

13   substantive way.  And so the very effort, the very effort to

14   do what we are now doing, where is the data, where are the

15   documents, how much will it cost, would itself have been a

16   very substantial burden.  And so, Your Honor, if they are

17   ordered to pay 100 percent of my fees and costs I think that

18   would be helpful, that's not going to solve the disruption.

19          The reason there are so many entities, ten plus

20   seven truck entities, is because they are relatively small

21   entities with a specialized focus, and it will be hugely

22   disruptive to order them to appear for oral depositions.  So

23   I would urgently suggest to Your Honor that my proposal of

24   written answers, written questions to two of the ten Daimler

25   entities, the ones that are most relevant, MB USA and MB USI,

 1   ought to be modified, and unless Your Honor has any questions

 2   that's all I have.

 3            THE COURT:  Thank you.

 4            MR. HEMLOCK:  May I have 60 seconds?

 5            THE COURT:  Yes.

 6            MR. HEMLOCK:  Very briefly, Your Honor.  First of

 7   all, with respect to the domestic distributors, counsel for

 8   the domestic distributors said it all, they buy and sell

 9   cars.

10            THE COURT:  Keep your voice up.

11            MR. HEMLOCK:  They buy and sell cars, that's what

12   this case is about.  The ADPs and EPPs are claiming that they

13   bought cars that cost more than they would otherwise because

14   of the defendants' conduct, so the domestic distributors are

15   selling those cars, and they point out it is -- they are

16   selling cars that came from abroad, all the more reason that

17   we need discovery possibly from those entities because those

18   other entities are abroad and because of procedural --

19   certain procedural difficulties it is difficult for us to get

20   discovery from them.  We are at least entitled to a

21   deposition just to find out what they have and then we can

22   figure out the burdens from there.

23            On the non-core entities they point out they are

24   not part of the supply chain but that's not standard.  The

25   standard, Your Honor, is whether they have relevant

1    information.  Now, their rolling supply chain may ultimately

2    be relevant to whether you order certain discovery or not

3    certain discovery to be produced but, again, on a deposition

4    where we are just trying to find out who has what, how could

5    they not at least tell us what they have?

6         The third point that I would make is to some extent

7    the burden issues here are scaling.  They make a point that

8    many of these entities don't have anything, there is no

9    burden, they just have to give us a declaration or some

10   statement that says we have nothing.  Whoever the 30(b)(6)

11   witnesses that would prepare for that OEM family would have

12   almost no work to do with many of those entities.

13        Now, Mr. Surprenant mentioned the many entities in

14   the Mercedes-Benz case.  We have not had this come up with

15   any of the other OEMs, it is not clear to me why it is such a

16   problem with his, it may be because Mercedes-Benz is

17   organized differently but I have to think despite there being

18   so many legal entities at issue that ultimately the same

19   functions are being performed and I can't imagine there are

20   exponentially more documents and data being created by

21   Mercedes vis-a-vis any of the other OEMs because they are

22   structured that way from a cooperate standpoint.  So I have

23   to think that if it is going to work for all the other OEMs,

24   and we have already been talking to some OEMs about how many

25   depositions, no one else said you are only going to get nine

 1    minutes per witness, and I have to think there is a little

 2    bit of exaggeration there, that we could work it out, I would

 3    be surprised if we couldn't.

 4         Finally on the cost shifting, Your Honor, I would

 5    just like to repeat what Mr. Williams said, we are here today

 6    because we did give this the old college try for a year.  I

 7    can tell Your Honor on our side we have spent a lot of money

 8    litigating this issue with the OEMs, it is not just the

 9    burden that they have had.  Thank you very much.

10         THE COURT:  Mr. Ashby?

11         MR. ASHBY:  I want to briefly respond to those

12    points.  First off, for the domestic distributors, what is

13    missing for the domestic distributors is that they buy cars

14    but they don't build them so in terms of trying to figure out

15    the passthrough of the cost of the end consumer they don't

16    have that information because they don't know how much the

17    cars cost to build, they don't have that information, they

18    don't have access to that information, and they -- the

19    entities put in declarations substantiating that point, that

20    they simply are not privy to that.  So they can -- the

21    parties will be able to get information about what the

22    information going to the dealers which the dealers should

23    already have and the parties could obtain from the dealers,

24    but the domestic distributors won't be able to give them any

25    of the upstream information so even if the parties get

 1   everything the domestic distributors have and impose a

 2   tremendous burden on them in getting it, they won't be able

 3   to pair that information with the upstream information so all

 4   they will know is one little middle piece and they won't be

 5   able to figure out how much the car cost to build on the

 6   manufacturing side, and so that makes the domestic

 7   distributors fundamentally different from other entities

 8   where they are not to be able to get a complete picture

 9   because the parties made a decision not to pursue the foreign

10   OEMs, and so the parties simply won't be able to get that

11   information.  If it was critical for them to pursue these

12   entities one would expect they would have made a different

13   choice in terms of the foreign OEMs.

14           In terms of the burden on the non-core entities,

15   the question isn't that they have nothing, the issue here is

16   that this subpoena is so broad that by virtue of the fact

17   that they are affiliated with companies that manufacture

18   cars, they may have some documents.  The question isn't do

19   you have something, it is whether to get that one little

20   piece it is proportionate to subject you to a deposition, so

21   for the non-core entities, many of whom are very small, they

22   have to sort of run down and figure out where in this

23   extremely expansive subpoena they might have a couple little

24   pieces and then prepare someone for a deposition to explain

25   those couple little pieces, but the parties haven't explained

1    why they would be pursuing those tiny little pieces from the

2    non-cores as opposed to some other source, which also goes to

3    the related point for the -- tied back to the domestic

4    distributors where if they don't have a complete picture the

5    parties won't be able to engage in the type of passthrough

6    analysis that this discovery is intended to serve, so there

7    may be some little piece they pull from one of the non-cores

8    but if they are not able to pair that with the rest of the

9    information from the corporate family because for many of the

10   non-cores they are in foreign OEM families and so the entity

11   with the largest information won't be responding to the

12   subpoena because they weren't served, then the non-core

13   entities are being subjected to a significant burden to

14   prepare for deposition, little slivers of information that is

15   disproportionate to what the parties could potentially gain

16   from learning about that information.  Thank you.

17              THE COURT:  Thank you.  Who else wants to speak?

18              MR. SCHERKER:   May it please the Court,

19   Elliot Scherker on behalf of KMMG.

20              KMMG operates one manufacturing facility in the

21   United States which first began production in 2009.  For the

22   period covered by the subpoena, 1992 to 2015, the vehicles

23   sold by KMMG, and I have to be somewhat elliptical because a

24   lot of these were filed outside of attorneys' eyes only and

25   are under seal, the percentage of vehicles manufactured by

1    KMMG and sold in the United States is slightly more than the

2    publicly filed 0.3 percent of the BMW manufacturer in the

3    United States and by multiple magnitudes less than the rather

4    arbitrary but apparently applicable 2.5 percent market share

5    cap for the definition of smaller SSEs.  We adopt the

6    arguments as to the subpoena in general presented on behalf

7    of the smaller SSE, but if the Court allows anything to go

8    forward under the Special Master's order there is no rational

9    basis for treating KMMG differently than the parties agreed

10   to treat, for example, BMW with its 0.3 percent market share,

11   BMW Manufacturing.

12            Now, the House declaration -- Dr. House's

13   declaration is the linchpin for much of what has been said in

14   terms of what is a smaller SSE and what is not a smaller SSE.

15   And interestingly in Dr. House's declaration he treated the

16   so-called family, if you will, entities separately and

17   analyzed market share, for example, BMW manufacturing in the

18   United States and the BMW distributor in the United States.

19   The parties ultimately created these families and lumped KMMG

20   with KMA as part of the same family, and their main argument

21   in response is well, if you put together the numbers for KMA

22   and KMMG you come up with a number that is north of the

23   2.5 percent so they are properly not carved out as a smaller

24   SSE.  Now, we object to the notion of these artificial

25   families, these are separately owned entities.  KMMG

1    manufactures Kia vehicles in the United States, its vehicles,

2    its small percentage of vehicles along with a much greater

3    share of vehicles manufactured in Korea, are sold by the

4    separate KMA entity, which is only a distributor of vehicles.

5        Artificially combining these two entities in light

6    of Dr. House's findings as to the smaller SSEs simply makes

7    no sense.  I'm referring to Dr. House's declaration, which is

8    docket entry 123-1 and is cited in our papers.  And what

9    Dr. House ultimately concludes, this is paragraph 19, is that

10   any documents or data at the smaller SSEs, meaning the

11   smaller SSEs that he analyzed in the declaration, might be

12   able to provide would not be statistically significant even

13   assuming regression models could be constructed, being

14   statistically insignificant the inclusion of additional data

15   from the smaller SSEs is not expected to provide any

16   meaningful benefit to the analysis.

17       The penultimate statement is it is unlikely that

18   the inclusion or exclusion of data on small players in the

19   market such as those with less than 2.5 percent market share

20   individually and 8 percent in aggregate would materially

21   affect industrywide analysis in any way.  That could have

22   been written with KMMG in mind.  But as we also point out in

23   our reply, the publicly available data on the KMA's sales in

24   the United States belies the snapshot that the parties use in

25   their response of the three-point something percent market

1   share for one particular year, and as Dr. House points out in

2   his declaration, you don't analyze market share for these

3   purposes to determine whether it would be useful in a

4   regression analysis based on a snapshot, you do it over the

5   period of time that the subpoena covers, and the data that we

6   have attached to our reply shows that KMA's market share

7   during that period when combined with KMMG's market share is

8   nowhere near the historical 2.5 percent between 1992 and

9   2015.

10          Of course, Your Honor, the last thing the

11   plaintiffs do is they try to move us into a different family.

12   If it being in the Kia family doesn't get them across and

13   make us a no longer smaller SSE they want to lump us with

14   Hyundai family, and all that shows is that you can't move us

15   around like an orphan child from family to family to try to

16   find a place where the numbers can be jiggered to come up

17   with something more than 2.5 percent, so we are properly

18   considered a smaller SSE, we should be carved out under the

19   unobjected to by the parties carve-out that the Special

20   Master created for the smaller SSEs.  To the extent that

21   there is any revisiting of the need to get further discovery

22   either by deposition or production from the smaller SSEs the

23   Special Master said that would be revisited down the road

24   after whatever takes place.  With respect to the larger SSEs

25   we belong in the carve-out.  Thank you very much.

```
 1              THE COURT:  Thank you.
 2              MS. KINGSLEY:  Good afternoon, Your Honor.  This is
 3   Meredith Kingsley from Alston & Bird, speaking right now on
 4   behalf of HMMA.
 5              HMMA, like KMMG, is a domestic manufacturer of a
 6   foreign entity.  Much like KMMG, HMMA has not been around for
 7   the entire subpoena, period which covers 1992 to 2015.  HMMA
 8   only began producing vehicles in 2005, which means they have
 9   been in production for less than half of the subpoenaed
10   period.  Much like KMMG, they -- the numbers again that were
11   filed under seal, and I don't want to represent on the
12   record, put them very clearly within what the smaller SSEs'
13   expert defined as a smaller SSE, and we submitted a
14   declaration with that data that is filed under seal.
15              And then again like KMMG, when you combine HMMA and
16   HMA sales data, HMA being the domestic distributor of Hyundai
17   vehicles in the United States, both of those that are
18   produced recently in the United States and those that are
19   produced in Korea, when you combine those two the Hyundai
20   family, if you will, although we all hate that term, is still
21   under the 2.5 percent, again, the self-defining term that the
22   smaller SSEs use.
23              One thing that Mr. Shirker didn't point out that I
24   want to remind the Court is that when the Special Master
25   defined what he called the smaller OEM group that was carved
```

 1    out of the requirement of this first round of pre-discovery

 2    discovery, he defined that in reference to parties who joined

 3    in the smaller SSE brief that was filed in response to the

 4    original motion to compel.  Since that time HMMA has joined

 5    that brief, notified the Special Master of that, and sought

 6    to be included as part of the smaller SSE categorization, and

 7    we repeat that here, it seemed to be ignored by the

 8    Special Master, it wasn't addressed in his order or any

 9    communications.

10            Finally, the parties raise in their brief that we

11    haven't demonstrated any burden or shown that there is a

12    burden in complying with the deposition or producing

13    documents.  Again, we have submitted declarations that

14    explain HMMA's role, what they do and don't have, and so we

15    would refer the Court to those to the extent that any

16    proportionality analysis needs to be engaged in here, but

17    submit to the Court that certainly that HMMA should be

18    considered an entity on its own, that numbers are well below

19    the threshold for smaller SSEs and there is no justification

20    for not including it in that group and treating it as such

21    for purposes of this first phase of discovery.

22            THE COURT:  Okay.

23            MS. KINGSLEY:  Thank you, Your Honor.

24            MR. WIENNER:  May it please the Court, Tom Wienner

25    on behalf of Hino Motors Manufacturing USA.

1        Your Honor, as the Court is aware, the Special

2    Master did carve out -- did identify in his order a group of

3    smaller OEMs who he ordered discovery as to them should be

4    held in abeyance until discovery as to the other OEMs is

5    conducted.  My client, Hino, was one of the members of that

6    smaller OEM group identified by the Special Master in his

7    order.  The parties did not object to that order by the

8    Special Master, but in their response to the objections filed

9    by other OEMs they did take the position in writing that it

10   was a mistake for Hino to be included in the smaller OEM

11   group and argued that Hino should not be carved out and

12   discovery as to Hino held in abeyance.

13        I respectfully submit that the parties are mistaken

14   on that score for two reasons.  Number one, their position is

15   procedurally defective.  If they wanted to take -- if they

16   wanted to object to the Special Master's finding that Hino

17   belonged in the smaller OEM group then it was incumbent on

18   them under Rule 53 to file an objection to that portion of

19   the Special Master's order, they did not do so.

20        More importantly, substantively, it was certainly

21   correct for the Special Master to determine that Hino does

22   belong in the smaller OEM group.

23        Your Honor, Hino is a small medium-duty truck

24   manufacturer that has only participated in the United States

25   vehicle market since 2003.  This very broad subpoena covers

1    the period from 1992 through 2015, a 23-year period.  For 11

2    of those years, from 1992 through 2003, Heno's market share

3    was zero because they were not part of the U.S. market.  From

4    2003 through 2015 Hino manufactured a total of 67,908

5    medium-duty trucks.  That is an infinitesimal percentage of

6    the overall United States vehicle market, it was about

7    5/100ths of one percent.  The parties have taken a position

8    well, it is wrong to look at Hino as part of the overall

9    vehicle market, you need to look at them as part of the

10   medium-duty truck market, a separate market.

11           Well, that's fine, but this is -- their response to

12   the OEMs' objections was literally the first time that they

13   have ever advised me that that's the market they consider

14   Hino to be a part of, but, fine, let's look at the

15   medium-duty truck market.  It depends on be how you define

16   that market, Your Honor, but the generally accepted

17   definition in the automotive industry and the truck industry

18   is that medium-duty trucks are classes four through eight,

19   five classes of truck, which are basically different

20   definitions of the size of the truck involved.  Hino

21   manufactures trucks in four of those five market segments,

22   classes four, five, six and seven.

23           If you look at the medium-duty truck market as

24   classes four through eight, then Heno's 67,908 trucks from

25   2003 through 2015 represent 1.8 percent of the medium-duty

1    truck market, so by any reasonable definition Hino is, in

2    fact, a small OEM.  The Special Master was correct to treat

3    them as such.  The request by the parties now that discovery

4    should not be held in abeyance as to Hino should be rejected

5    by this Court.  Thank you.

6            THE COURT:  Thank you.

7            MR. HEMLOCK:  Briefly?

8            THE COURT:  Yes.

9            MR. HEMLOCK:  Briefly with respect to Hyundai and

10   Kia, we think it is not appropriate to measure the market

11   share based on how many Hyundais or Kias are manufactured in

12   the United States as a proportion of the number of cars sold

13   in the United States.  Throughout the meet-and-confer process

14   and the negotiations, the question of whether an entity or an

15   OEM family was smaller versus larger was based on how many

16   cars were sold by that OEM family in the United States as a

17   proportion to the total number of cars.  What Hyundai and Kia

18   are doing now is a matter of convenience.  What they are

19   focusing on is how many cars they make here but that's not

20   relevant.  The fact of the matter is there are six named

21   plaintiffs that base their claims upon purchases of Hyundai

22   and Kia cars and of course they represent a class of many

23   purchasers of Hyundai and Kia cars.  Together Hyundai and Kia

24   in 2015 had 8 percent of the market.

25            Now, counsel pointed out that they don't think they

1    should be treated together but they are both part of the

2    Hyundai conglomerate and, in fact, our understanding is that

3    the Hyundai Santa Fe and the Kia Sorento are both

4    manufactured at KMMG and to some extent there are parts that

5    are put in both Hyundai and Kia cars, so we don't think they

6    are independent, they should be looked at together, they are

7    a meaningful number of cars on the road today that were built

8    by them whether in the United States or abroad, claims are

9    based on those cars, and they should be included at least in

10   the depositions and we can figure out what to do with

11   documents later.  Thank you.

12           THE COURT:  Thank you.

13           MR. WILLIAMS:  Your Honor, 60 seconds on this

14   point, please?  Thank you.  Steve Williams for the

15   end payors.

16           I just want to comment that the market share

17   terminology that you are hearing about is just something that

18   some of the OEMs invented, it was not adopted by

19   Master Esshaki as the rationale for his decision in any way,

20   it was just terminology.  And as to that point, and this is

21   page 28 of the brief the parties submitted, but another

22   criteria that was important was the relevance of the

23   information, and in this case both Hyundai and Kia were

24   identified in DOJ press releases as being specific targets of

25   price-fixing conduct by defendants.  We have claims by

1    purchasers of Hyundais and Kias.  I would submit that was the

2    reason that Master Esshaki included them in the deponent

3    group rather than a determination about relative market

4    shares.  Thank you.

5              MR. SPERL:  May it please the Court, Your Honor,

6    Andrew Sperl for truck and equipment dealer plaintiffs.  I

7    would like to address the argument regarding Hino

8    Manufacturing.

9              First of all, with respect to the waiver issue I do

10   understand Counsel's argument on that issue.  I would submit

11   that it is appropriate for the Court to nonetheless consider

12   the issue that was raised in the parties' brief with respect

13   to the misclassification of Hino.  I don't think anyone is

14   arguing that this Court somehow lacks the ability to consider

15   that as a matter of law, and because what we are talking

16   about is really a misclassification error I think it is

17   appropriate for the Court to consider it, it is not unduly

18   prejudicial on Hino for the Court to consider at this time.

19             With respect to the substantive issue as to how

20   Hino should be classified.  First of all, counsel for Hino

21   doesn't appear to dispute that it is appropriate to look at

22   the medium-duty truck markets in determining this percentage

23   although there is a disagreement as to what the percentage

24   is.  Considering the market properly as the medium-duty truck

25   market, that means that Hino's percentage of commerce is

 1    certainly not the 0.5 percent, that is the number that was

 2    before the Special Master when he made his decision, it is

 3    something else.

 4         We've submitted with the parties' brief on Hino's

 5    objections or with respect to the SSE's objections an exhibit

 6    to that what was an article demonstrating that Hino trucks

 7    are significant, I think 11 percent portion of the

 8    medium-duty truck market.  Now, granted that was a snapshot

 9    for a particular year but it does demonstrate that Hino is a

10    significant player in this market, it is not a trivial

11    player.  Hino in its brief suggests that that article was

12    referring to a different Hino entity but it is not really

13    clear why that is the case, why that wouldn't be in reference

14    to Hino Manufacturing.

15         Finally just with respect to the point that Hino

16    Manufacturing, the subpoenaed entity, hasn't been

17    manufacturing for the entire class period, to the extent that

18    they have no data and no information for part of the class

19    period then there is no burden for them to say that.

20         Unless Your Honor has any further questions that's

21    it?

22         THE COURT:  No.

23         MR. SPERL:  Thank you.

24         THE COURT:  Thank you.

25         MR. SCHERKER:  Very briefly, Your Honor, as to

 1   KMMG.  The unrebutted affidavit that we submitted refers to

 2   the total number of cars manufactured by KMMG, not sold by

 3   KMA, not sold under the Kia name, the total number of cars,

 4   and it is infetisimal compared to the 2.5 percent, the

 5   2.5 percent supposed cap.

 6           As to our convenience we are actually merely

 7   following the methodology laid out in Dr. House's

 8   declaration, which has never been challenged.  I think it is

 9   important to pause for just a second, that the parties never

10   challenged Dr. House's analysis, which very specifically

11   explains that we look at market share over the entire period

12   of the subpoena and that if we are not above a certain

13   number -- if an individual entity is not above a certain

14   number nothing useful is going to come of forcing that entity

15   to go through the massive production which you have been

16   hearing about all morning, much less the preliminary

17   discovery and discovery.  Nothing is to be gained.  If

18   nothing is to be gained from forcing KMMG to go through that

19   exercise and nothing is to be gained from forcing KMA to go

20   through that exercise separately, separate corporate

21   entities, what is possibly to be gained by forcing them to

22   both do it and then putting it all together?  The smaller

23   SSEs are not an exclusive club as to which a velvet rope got

24   dropped at a certain point in time, it is a definitional

25   decision driven by analytical data that has never been

1   challenged before this Court.  Okay.

2          THE COURT:  Okay.  Thank you.  Let me ask this

3   question -- no, you may be seated.  I think Mr. Williams --

4          MR. WILLIAMS:  Thank you, Your Honor.  I appreciate

5   you letting me speak.

6          I just want to respond to Dr. House because it is a

7   misleading issue because his analysis isn't tied to the fact

8   that there are claims based on those purchases and the

9   discovery is for the purpose of evaluating the overcharge and

10  impact as to those purchases.  What he's talking about is

11  just in the abstract because they are smaller, it might not

12  be statistically significant as to a broader analysis, but

13  that's divorced from the point of we are alleging collusion

14  as to those particular vehicles which is why the discovery is

15  relevant as to those particular vehicles.  That declaration

16  does not relate to that point.

17         THE COURT:  What are your largest vehicles, I mean

18  groups, you've got Chrysler, GM --

19         MR. WILLIAMS:  So, Your Honor, the way I would

20  frame it is I always look at it in two ways, there are the

21  larger vehicles -- if I may just grab a document -- and then

22  there are the vehicles which are the largest subjects of

23  collusion, so to us those are the ones we put in the front,

24  we front load.  Within that group are all of the defendants

25  who are identified in the OEM deponent group in the Master's

1    order, meaning obviously -- I shouldn't say obviously, I

2    apologize -- Toyota, Nissan --

3              THE COURT:  What did you say first?

4              MR. WILLIAMS:  Toyota, Nissan, Honda, Subaru, as we

5    have talked about many times those are the entities who

6    probably for the longest time and probably had the most

7    prevalent conduct affecting their vehicles.  However, at

8    other parts of the period alleged in these cases Chrysler,

9    Daimler, GM, Hyundai and Kia became the focus targets of

10   collusion in these cases.  So for us those are the primary

11   OEMs, those are the ones we articulated that we thought

12   should be at the front in terms of discovery, and there is

13   the secondary smaller OEM group referred to in the order, and

14   those are the ones that I would suggest most of the sales

15   that will be at issue in this case are going to be focused

16   on.

17             THE COURT:  All right.

18             MS. KINGSLEY:  I have one point, Your Honor, on

19   behalf of HMMA.

20             I think it is important here, again, we get globbed

21   together as families, we get globbed together as Hyundai and

22   Kia.  Mr. Williams just referenced sales of cars that are

23   very important.  KMMG and HMMA, HMMA who I'm representing

24   today, do not sell vehicles to any --

25             THE COURT:  You are talking about the Hyundai and

1    Kia group?

2          MS. KINGSLEY:  Yes, Your Honor, but HMMA does not

3    sell vehicles, HMMA manufactures vehicles, and so the

4    defendants stood up and said we are focusing on the wrong

5    number, we need to be focusing on vehicle sales.  HMMA cannot

6    focus on that nor can KMMG because those entities don't do

7    that, they only manufacture vehicles.

8          THE COURT:  Okay.

9          MS. KINGSLEY:  I think that is important to realize

10   that each of these entities that have been subpoenaed have

11   very distinct purposes and functions that are getting lost in

12   this process.  Thank you.

13         THE COURT:  All right.

14         MR. SURPRENANT:  Sorry to pop up again, Your Honor.

15   Dominic Surprenant.  This time I'm speaking on behalf of the

16   separate objections filed by the seven Daimler Truck

17   entities.

18         We briefed -- our moving paper was document 1318,

19   and our reply was document number 1379.  I will be brief, I

20   know it is late in the day.

21         Before the Special Master the truck and equipment

22   plaintiffs did nothing, they did nothing.  They signed the

23   brief, they said we are represented, but what they didn't do

24   is address the threshold requirement of relevance.  The

25   subpoena is designed for automotive manufacturers.  The truck

1    entities, the Daimler Truck entities, don't make automobiles,

2    they make commercial trucks, and both the case law that we

3    cited and the declaration that we submitted, which is

4    document 1227-29, explains that the Daimler Trucks are really

5    individual custom-made vehicles.

6         What discovery, if we get there, will show is a

7    truck and equipment dealer has a customer, the customer has

8    literally hundreds, if not thousands, of options, and that

9    truck or two or three or four trucks is made specifically for

10   that individual customer.  It is a completely separate model

11   than the automotive model where you have a vehicle, you have

12   a few trim levels and some options, and that's reflected in

13   the manufacturer suggested retail price, it is a different

14   industry.

15        And so the problem we had when we opposed their

16   brief is we said before the Special Master is you didn't say

17   anything, you did not explain, you didn't issue a word, you

18   didn't write a word in your motion to compel why the subpoena

19   would even elicit relevant information from the truck

20   entities, and we put a declaration in saying it wouldn't, and

21   the entire sum and substance before the Special Master of the

22   truck and equipment was in the reply where they said in the

23   face of our subpoena -- in the face of our declaration,

24   Exhibit 1227-29, saying it is a completely different model.

25   In the face of Supreme Court precedent recognizing that

1    commercial trucks are custom, specially ordered vehicles,

2    they said well, yeah, it is true we didn't write a line in

3    the motion to compel but it is relevant for all the same

4    reasons it is relevant to the automotive entities.  Well,

5    that doesn't respond, that doesn't join issue.

6           So, Your Honor, with respect to the seven

7    Daimler Truck entities before the Special Master that was not

8    even a threshold showing of relevance, absent a showing of

9    relevance one cannot determine proportionality because we

10   have no idea why they want discovery from us.

11          Now, in their briefing before Your Honor they put

12   in -- they made new arguments for the first time and they put

13   in a highly general declaration from an economist, Dr. Riser

14   (phonetic).  And as we pointed out at page 7 in our reply,

15   document number 1379, at pages 6 and 7, absent extraordinary

16   circumstances a party is limited to the record they establish

17   before the Special Master when they appeal to Your Honor.

18   What we cited I believe is Michigan -- Eastern District of

19   Michigan precedent, and there is no extraordinary

20   circumstances.

21          So with respect to the seven Daimler entities, my

22   first argument is they should be stricken, they should not be

23   included, the truck and equipment plaintiffs completely

24   failed to show why any discovery is even relevant and

25   therefore they cannot show proportionality.

1          As a backup, Your Honor, again, because I'm trying

2     to be constructive, I would suggest that if Your Honor

3     doesn't simply strike the seven Daimler Truck entities that

4     the umbrella organization, Daimler Trucks of North America,

5     answer 20 or 25 written questions that we can meet and confer

6     on, and that there would be 100 percent cost shifting in that

7     enterprise if it is not stricken.

8          And unless Your Honor has any questions, that's my

9     argument on behalf of the Daimler Truck entities?

10          THE COURT:  Thank you.

11          MR. WIENNER:  Tom Wienner for Hino.

12          Your Honor, I wanted to respond very quickly about

13     what was said about Hino in the -- by counsel for the truck

14     and equipment dealers.  Your Honor, the only information that

15     the parties have put in front of the Court to suggest that

16     Hino has a statistically significant share of the medium-duty

17     truck market is an article that he referred to from a website

18     called truckinginfo.com that focuses on sales, not

19     manufacturing, sales in one year of two classes of

20     medium-duty trucks, the year is 2013, the classes are classes

21     six and seven of medium-duty trucks.  To suggest -- and the

22     percentage attributed to the Hino sales in that one year for

23     those two classes was 11 percent, but to suggest that that

24     number means that Hino Motors Manufacturing had a significant

25     share of the medium-duty truck market for the five classes in

1  that market for the 12-year period in which Hino has

2  participated in the market is ridiculous.  It would --

3  11 percent is -- would vastly overstate Hino's share of that

4  market.

5        Moreover, it is clear that although the author of

6  that article on the website refers only to Hino, it is clear

7  from the numbers he's using that he's not talking about my

8  client, Hino Motors Manufacturing USA, Inc., he's talking

9  about a separate entity, Hino Motor Sales USA, Inc., which

10  has never been subpoenaed and is not before this Court.  The

11  correct number to look at if we are talking about the

12  medium-duty truck market, Your Honor, is 3.7 million vehicles

13  in classes four through eight from the years that Hino has

14  been in that market, 2003 through 2015.  Of those -- and

15  that's an approximate number, the actual number is 3,685,987

16  medium-duty trucks manufactured in the United States in those

17  12 years, of that number Hino manufactured 67,908, which is

18  1.8 percent.  In other words, we are smaller than some of the

19  other smaller OEMs which has been carved out of the Special

20  Master's order and to which there has been no objection.  It

21  was quite correct for the Special Master to treat us the same

22  way.

23        THE COURT:  All right.

24        MR. SPERL:  Your Honor, Andrew Sperl for the truck

25  and equipment dealers.

```
 1              I'm going to address the arguments relating to the
 2     Daimler Truck entities, as I will call them the seven
 3     entities identified --
 4              THE COURT:  You will call them what?
 5              MR. RAITER:  The Daimler Truck entities, the seven
 6     entities identified by Mr. Surprenant.
 7              So there is a procedural argument here and then I
 8     think there is a more substantive argument.  The procedural
 9     argument has to do with whether or not it was proper for us
10     to join in the briefing by the parties before the
11     Special Master and whether that was sufficient for us to
12     establish our burden of relevance.  I would submit that there
13     can't really be a serious argument that there is a problem
14     merely with the fact that we joined a brief because this is a
15     big case, people join in briefs frequently, and particularly
16     given the unique way in which these subpoenas arose with the
17     parties coming together and issuing them collectively it was
18     appropriate for there to be a common brief.
19              But setting aside a technical procedural issue, I
20     will assume that counsel for the Daimler Truck entities would
21     also suggest that even if we had submitted a brief that said
22     in substance basically the same thing as the parties'
23     collective brief but we did it ourselves that that would
24     still be insufficient as I understand the argument because it
25     doesn't talk specifically about trucks, and I would submit
```

 1   that that's not correct because for the reasons that were in

 2   the parties' brief the documents and data that we seek from

 3   the Daimler Truck entities are necessary to show the

 4   overcharge to those entities and the pass on of that

 5   overcharge to our clients, the dealers, and that's not really

 6   any different than it is in any other type of case of this

 7   nature where you are talking about price fixing and then a

 8   passthrough.  It doesn't even have to be vehicles for that

 9   general proposition to hold true.

10          Now, certainly, and this goes to counsel's waiver

11   argument, you know, certainly Daimler Trucks has the right to

12   suggest that despite that -- despite that, we nonetheless

13   need to say more about trucks but they didn't do that in any

14   effective way.  The only -- the main point that Daimler

15   Trucks makes is that trucks are more custom built than are

16   automobiles.  We concede that, we say that in our own

17   briefing, but that doesn't mean you don't need data from the

18   manufacturer of the part to the OEM and that you don't need

19   documents and data reflecting sales from the OEM to the

20   dealers to establish the elements of this case, nor does

21   Daimler Trucks effectively establish that we aren't able to

22   somehow show that there was an overcharge and show that there

23   was passthrough.

24          The only thing that was established by them is that

25   trucks are different for this reason that they can be

1    customized, which is something we don't dispute, and for the

2    reasons as we indicate in our brief that makes it all the

3    more important that we have these data.

4         The Supreme Court cases that Mr. Surprenant

5    references again, other than establishing this point that

6    trucks are different for those reasons, are really

7    inapposite, they don't have anything to do with discovery.

8    One of them has to do with -- not with even the type of price

9    fixing that's in this case, the Volvo case.

10        One more word on the waiver issue and whether you

11   can consider the affidavit and declaration that we submitted

12   on these objections.  Before the Special Master in opposition

13   to the parties' motion to compel the Daimler Trucks entities

14   basically just made the same point that I just indicated in

15   the page, that trucks are different.  They didn't say that

16   the fact that trucks are different make it impossible for us

17   to show overcharge or passthrough.  There is a declaration

18   that was submitted but the declaration is also fairly

19   conclusory and it essentially says again that these are more

20   customized vehicles.  Essentially the Daimler Truck entities

21   really didn't do anything to suggest that our initial showing

22   of relevance was insufficient because not much was said by

23   the Daimler Truck entities in their brief before the Special

24   Master initially, we met that in our reply by explaining why

25   their authority was inapposite and why the fact that these

1    were customized vehicles means that we need the discovery all

2    the more.  Thank you, Your Honor.

3              THE COURT:  Thank you.

4              MR. SURPRENANT:  I will be brief, Your Honor.

5              THE COURT:  Really?

6              MR. SURPRENANT:  Your Honor, they could have joined

7    the brief, they could have written a separate brief.  What

8    they had to do is to explain why a subpoena that was

9    specifically crafted for automotive -- automobile --

10   passenger automobiles were relevant to their dramatically

11   different commercial truck industry.  They really needed to

12   write a separate document demand and to explain why they

13   could get information.  They didn't, they didn't.  They said

14   it is relevant for all the same reasons.  It is not that the

15   commercial trucks are somewhat more custom, they are

16   completely custom, they are designed literally for individual

17   customers with hundreds, if not literally thousands, of

18   options, so what that means is we need at least an

19   explanation from the truck and equipment plaintiffs.  Yes, we

20   understand that this is an automobile subpoena but here

21   specifically why it is relevant and proportionate, we got

22   nothing, we got one line in a reply it is relevant for all

23   the same reasons.

24             So I think they have wholly failed to show

25   relevance and proportionality, it should be stricken, and in

1    the alternative, Your Honor, I would suggest the proposal I

2    made in my opening comments, which is written questions and

3    whatever is the cost shifting.  Thank you, Your Honor.

4              THE COURT:  All right.  I guess --

5              MS. AVERY:  Your Honor, may I be heard?

6              THE COURT:  Come on up.

7              MS. AVERY:  Good afternoon, Your Honor.  My name is

8    Jessica Avery, and I represent Kia Motors America and also

9    Hyundai Capital America.

10             I just wanted to respond to a point that we have

11   heard raised numerous times here at the hearing and

12   previously raised by the parties that they simply do not know

13   what information the non-cores or domestic distributors would

14   have and therefore they need these depositions regarding what

15   information that is, where it would be found and what the

16   burdens are.  That representation is just simply not correct.

17             I would direct you to the HCA, Hyundai Capital

18   America, declaration, which is quite detailed and outlines as

19   follows:  They provide both floor plan financing for the sale

20   of vehicles from the distributor to the dealership, they also

21   provide consumer financing for the sale of vehicles from the

22   dealership to the consumer.  In both instances the dealership

23   is involved with the purchasing and sale of this information.

24   The information about the price is simply reflected in

25   financing documents that are provided to HCA.  The dealership

 1   has this information.  The dealership would have HCA and

 2   similar non-core entities undertake substantial burdens to

 3   obtain and produce information that the dealership already

 4   has.

 5           Specifically in this declaration it continues that

 6   there are electronic documents and also there are a host of

 7   documents in storage that are physically stored.  There are

 8   over 1.5 million live accounts that will require an

 9   electronic search.  In addition to that, there are over

10   23,000 boxes in storage containing physical documents that

11   need -- would be hand searched, over 1,000 of those apply to

12   floor plan financing, over 22,000 boxes contain consumer

13   financing documents.

14           It is almost impossible to gauge the cost to do a

15   full search of compliance with this extremely overbroad

16   subpoena.  So what we have done and what we could do is

17   provide an estimate to simply have these 23,000 documents

18   that reflect the consumer financing portion of the sales

19   documents, to have those physical boxes pulled from storage

20   and staged for review would be $194,000.  That is merely to

21   take boxes from storage and have a company lay them out to

22   then undertake the enormous task of searching these

23   documents.  That figure would also not include the cost and

24   the burden and expense to go through the 1.5 million live

25   accounts.  So you are dealing with significant burdens here,

1    and I have yet to hear from the parties what substantial need

2    they have for this type of information that, A, they already

3    have, and B, that these very limited involvement by the

4    non-cores should be provided and why they should undertake

5    the efforts to obtain these documents is simply not

6    proportional.

7         Thank you, Your Honor.

8         THE COURT:  Thank you.  All right.  What this tells

9    me is we are getting nowhere in this case.  It really bothers

10   me that we have had this going on for over a year and we

11   don't have the basic discovery that is at the core of this

12   litigation, and I think that to continue to litigate all of

13   this simply at this point is a waste of time.  I think we

14   need to look at what can we do to proceed in this action.

15        I am going to set aside the Master's order.  I

16   believe that the rules require that a Rule 45 subpoena be

17   issued for non-party depositions.  I am going to limit this

18   information that you have -- the basic areas that were

19   outlined in these orders, both the ones submitted by the

20   parties and the ones submitted by the non-parties.  I don't

21   think you are that far apart in what you are asking for now

22   that -- at least now that I understand you really are looking

23   for where is this information that relates to these

24   particular areas.

25        So what I'm going to do is I'm going to require, if

1    you wish, for the parties to submit Rule 45 subpoenas with an

2    outline of the questions to be asked to the larger non-party

3    groups, that would be Chrysler, GM, Toyota, Nissan, Honda.

4    At this point I'm going to exclude the Daimler Trucks and all

5    of the non-core groups and the rest of the manufacturers.  I

6    think we need to start with getting some information here.

7    We need to move on.  And this -- these -- or this discovery

8    is discovery on discovery as the Master had ordered, and it

9    will then go back to the Master for his determination on the

10   main motion.

11          In terms of the smaller groups and the non-core and

12   Daimler Trucks, et cetera, those other groups, they are --

13   I'm not barring their subpoena at a later date, I'm simply

14   saying at this point we are starting with these groups so

15   that we can move along.  We need to narrow this so we can get

16   some answers.  I think that your narrowing the non-parties --

17   oh, Subaru was the other one, did I say Subaru?

18          MR. WILLIAMS:  You did not mention Subaru.

19          THE COURT:  But Subaru.

20          MR. RAITER:  Are they in the group that will go

21   forward?

22          THE COURT:  They will go forward.  Did I miss any

23   of the other main parties, Mr. Williams?  I'm sorry.  I

24   didn't intend to even do this until after listening to your

25   argument so --

1            MR. WILLIAMS:  I think you have included in the

2     group to go forward Chrysler, GM, Toyota, Nissan, Honda and

3     Subaru?

4            THE COURT:  Correct.

5            MR. WILLIAMS:  You said you referred to the smaller

6     that I took that to mean Kia and Hyundai?

7            THE COURT:  Yes.

8            MR. WILLIAMS:  Thank you.

9            THE COURT:  You are not going forward with the

10    smaller --

11           MR. WILLIAMS:  Correct.

12           THE COURT:  Right.  Okay.  My intent is that if you

13    get this information and you can get it to the Master and you

14    can then move ahead on the main motion that by getting some

15    information from these non-parties you are going to know

16    where you are going and what you are going to get, and I hope

17    that would even open up or enlighten you as to these other

18    non-parties that I have -- I guess the word used in these is

19    carved out at this point in time.  So this isn't to say this

20    is banded, I don't mean to say that, I'm just saying I want

21    you to move forward, we have got to move this case forward.

22    Okay.

23           Is there anything else that I should consider here

24    beside costs?

25           MR. HEMLOCK:  One quick point, Your Honor.  So in

1    the spirit of moving things forward, Special Master Esshaki

2    had ordered the parties to reach out to the OEMs to start

3    scheduling the depositions pending the result of today's

4    hearing, and there is -- Special Master Esshaki's order had

5    accounted for the fact or had considered that 30 days from

6    whenever you would decide those depositions would start, they

7    would go on for a 45-day period.  Is it possible that Your

8    Honor's order today could keep that schedule and that way

9    move --

10          THE COURT:  Yes.  I'm going to ask you to prepare

11   the order so you look at all the different specifics in both

12   orders.  I'm not trying to eliminate anything here, and I

13   know there are probably some things I didn't consider because

14   I don't have it written out but, yes, I think that's very

15   practical.

16          In terms of the outline for the questions to be

17   asked, I would like to make that -- I just want to note for

18   the record that that's an outline, that doesn't mean you

19   can't, you know, do follow-ups and maybe something else comes

20   to mind, and if it isn't in the outline let the objection be

21   noted in the deposition, that's all, and then you will

22   continue.

23          In terms of, you know, the length of the outline

24   I'm not limiting you, you're the ones who have to prepare it

25   and you know much better than I do what information you need,

1    so I am not limiting it, you know, I may get some objections,

2    I hope not, I hope we can go forward.  I hope that any

3    substantive objections or if a non-party has an objection to

4    a particular question that that is put forth at the

5    deposition and on the record and that can be ruled on later.

6              I think that's all that you had.

7              MR. HEMLOCK:  Thank you.

8              THE COURT:  In terms of costs, that's much more

9    difficult and I was being facetious in saying you all pay

10   your own costs but I'm not far off.  I think that ultimately

11   I'm not going into who is responsible for delay because I

12   have spent hours reading all of your e-mails and the

13   information in the briefs and it could go either way who is

14   at fault.  I'm not going to be here to lay fault because we

15   have way too much to do to start dealing with that so, you

16   know, ultimately I know that the party asking for the

17   information is the one who pays the cost but I'm not really

18   going to rule on that now, I just want you to be aware of my

19   feelings.  I know that once you get to the substantive orders

20   and the actual production then that's going to be another

21   issue.

22             The costs -- let me address this, the costs of

23   actually attending the depositions, that cost will at a

24   minimum be split between the parties and the non-parties at a

25   minimum, and I may hear later that it should be more but I'm

1    saying at least that cost you know is going to be split.

2            Okay.  Anything else?  Mr. Williams, anything that

3    you can think of?

4            MR. WILLIAMS:  Nothing comes to mind, Your Honor.

5            THE COURT:  I know this is a different result but I

6    hope it tells you how I do intend to push this.  We have got

7    to move on in this case.  Thank you very much.  I appreciate

8    it.

9            THE LAW CLERK:  All rise.  Court is adjourned.

10            (Proceedings concluded at 4:22 p.m.)

11                        _    _    _

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          *CERTIFICATION*

2

3              I, Robert L. Smith, Official Court Reporter of

4     the United States District Court, Eastern District of

5     Michigan, appointed pursuant to the provisions of Title 28,

6     United States Code, Section 753, do hereby certify that the

7     foregoing pages comprise a full, true and correct transcript

8     taken in the matter of In re:  Automotive Parts Antitrust

9     Litigation, Case No. 12-02311, on Thursday, June 23, 2016.

10

11

12                          *s/Robert L. Smith*
                            _____
13                          Robert L. Smith, RPR, CSR 5098
                            Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15

16

17    Date:  07/01/2016
      _____

18    Detroit, Michigan

19

20

21

22

23

24

25