```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3                          —   —   —

     _____
4                                    )
     IN RE:  AUTOMOTIVE PARTS        )   Master File No. 12-2311
5    ANTITRUST LITIGATION            )   Hon. Marianne O. Battani
     _____)
6                                    )
     IN RE: Ceramic substrates cases )   No. 16-03802
7    _____)   No. 16-03803
                                     )
8    THIS RELATES TO:                )
     Dealership Actions              )
9    End Payor Actions               )
     _____)
10

11                    MOTIONS TO DISMISS

12          BEFORE THE HONORABLE MARIANNE O. BATTANI
                  United States District Judge
13          Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
14                     Detroit, Michigan
                  Wednesday, April 19, 2017
15

16   APPEARANCES:

17   End-Payor Plaintiffs:

18   OMAR OCHOA
     SUSMAN GODFREY, L.L.P.
19   901 Main Street, Suite 5100
     Dallas, TX  75202
20   (214) 754-1913

21
     WILLIAM V. REISS
22   ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
     601 Lexington Avenue, Suite 3400
23   New York, NY  10022
     (212) 980-7405

24
           To obtain a copy of this official transcript, contact:
25             Robert L. Smith, Official Court Reporter
                (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1   APPEARANCES:  (Continued)

 2   Dealership Plaintiffs:

 3   EVELYN LI
     CUNEO, GILBERT & LaDUCA, L.L.P.
 4   507 C Street NE
     Washington, D.C.  20002
 5   (202) 789-3960

 6

 7   For the Defendants:

 8   JEFFREY J. AMATO
     WINSTON & STRAWN, L.L.P.
 9   200 Park Avenue
     New York, NY  10166
10   (212) 294-4685

11

     JEFFREY L. KESSLER
12   WINSTON & STRAWN, L.L.P.
     200 Park Avenue
13   New York, NY  10166
     (212) 294-4655
14

15   STEFAN M. MEISNER
     MCDERMOTT WILL & EMERY
16   500 North Capitol Street, NW
     Washington, D.C. 20001
17   (202) 756-8000

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Page

MOTIONS TO DISMISS................................ 5

```
 1   Detroit, Michigan
 2   Wednesday, April 19, 2017
 3   at about 10:19 a.m.
 4                    —   —   —
 5            (Court and Counsel present.)
 6            THE LAW CLERK:  Please rise.
 7            The United States District Court for the Eastern
 8   District of Michigan is now in session, the Honorable
 9   Marianne O. Battani presiding.
10            You may be seated.
11            THE COURT:  Good morning.
12            THE ATTORNEYS:  (Collectively) Good morning, Your
13   Honor.
14            THE COURT:  All right.  Let's start with
15   appearances.
16            MR. KESSLER:  Good morning, Your Honor.
17   Jeffrey Kessler, Winston & Strawn, and I'm appearing today
18   for the Corning defendants.
19            MR. AMATO:  Jeffery Amato, from Winston & Strawn,
20   for the Corning defendants.  Good morning, Your Honor.
21            MR. MEISNER:  Good morning.  I'm Stefan Meisner,
22   from McDermott Will & Emery, on behalf of NGK Insulator
23   defendants.
24            THE COURT:  Mr. Reiss.
25            MR. REISS:  Good morning, Your Honor.  Will Reiss
```

1    for the end payor plaintiffs.  And for purposes of our

2    argument I'm also going to be speaking on behalf of the auto

3    dealer plaintiffs.

4            MR. OCHOA:  Omar Ochoa, Your Honor, from

5    Susman Godfrey, also on behalf of the end payor plaintiffs

6    and the auto dealer plaintiffs.

7            THE COURT:  How do you say your last name?

8            MR. OCHOA:  Ochoa.

9            THE COURT:  Ochoa?

10           MR. OCHOA:  Yes.  Thank you.

11           MS. LI:  Good morning, Your Honor.  Evelyn Li, from

12    Cuneo, Gilbert & LaDuca, on behalf of the auto dealer

13    plaintiffs.  I will only speak when necessary.

14           THE COURT:  All right.  This is motions to dismiss.

15    Defendant Corning, you want to start?

16           MR. KESSLER:  Thank you, Your Honor.

17           THE COURT:  Mr. Kessler.

18           MR. KESSLER:  Your Honor, if it pleases the Court,

19    there are two issues in our motion; one is the statute of

20    limitations and one is the separate Twombly point with

21    respect to Corning.  We've discussed it among counsel, and we

22    thought it might be most efficient for the Court for NGK's

23    lawyer to speak briefly to the statute of limitations, which

24    they are also asserting, after I complete my argument, and

25    then plaintiffs will finish the argument back and forth for

```
 1    the statute of limitations, and then I would move on to

 2    address the Twombly argument.

 3              THE COURT:  So you want to separate your two

 4    arguments?

 5              MR. KESSLER:  Because the legal points obviously

 6    are very similar, and we thought that would be most

 7    efficient.

 8              THE COURT:  Okay.

 9              MR. KESSLER:  And finally, one other housekeeping

10    item, Your Honor.  If I may approach, we prepared a time line

11    demonstrative that we thought would be useful for the

12    consideration of this argument.

13              THE COURT:  Thank you.

14              MR. KESSLER:  And counsel for the plaintiffs have

15    copies of this as well.

16              THE COURT:  Okay.

17              MR. KESSLER:  So addressing the statute of

18    limitations --

19              THE COURT:  Wait, hold on one second here.  These

20    are multiple copies of the same?

21              MR. KESSLER:  Yes, I provided three in case -- for

22    your clerk or for others.

23              THE COURT:  Okay.

24              MR. KESSLER:  Thank you, Your Honor, and good

25    morning.
```

1        THE COURT:  Okay.

2        MR. KESSLER:  Approaching the statute of

3   limitations, this motion we believe is different from any of

4   the motions to dismiss that you have considered so far in

5   this very large and sprawling MDL.  The reason is that more

6   than -- now it's five years ago Corning issued a public

7   disclosure of the investigation of the specific product that

8   was involved stating that this could have a material effect

9   on Corning's operations and finances depending on how the

10  investigation concluded.

11        This happened on March 30th, 2012, if you look at

12  the time line, the first red dot.  And significantly this was

13  just seven days after this Court took the unusual step of

14  appointing co-lead counsel for this MDL not just for the

15  cases that were filed but for any future cases that were

16  going to be filed.  And we think it is very clear that given

17  that set of circumstances that the plaintiffs here, both

18  their counsel and frankly the companies because the same

19  companies that filed actions back in '11 are many of the same

20  plaintiffs today who have been in this MDL all the time for

21  the indirects for a four-year period of time.

22        THE COURT:  Well, let's say that they -- that they

23  at least knew something was going on because of this filing.

24        MR. KESSLER:  Yes.

25        THE COURT:  Maybe even because they were involved

 1    in some other parts and knew that there was some major

 2    antitrust violations, but I'm curious as to what do they do

 3    then, this inquiry notice thing, what happens with inquiry

 4    notice?  Do they start -- I mean, do they start their own

 5    independent investigations or what?

 6                MR. KESSLER:  Yes, Your Honor.  So to get the

 7    answer to this question we first go to the Dayco case in the

 8    Sixth Circuit, and what Dayco Corporation made clear is that

 9    once they have something sufficient to put them on inquiry

10    notice they have to then plead what reasonable diligence

11    steps did they take over that four-year period of time or

12    else it is dismissed, that's what happened in Dayco.

13                And what's significant about it here is no diligent

14    steps are pled here.  Normally, Your Honor, we have an issue

15    on a motion to dismiss where the plaintiffs say we undertook

16    the following steps of diligence and you have a dispute, was

17    that sufficient or not?  These complaints don't do that.

18    What these complaints do is they dispute that they were on

19    inquiry notice as a result of all of this publicity, and they

20    say therefore they don't -- they didn't have to take any due

21    diligence steps until the Corning CIKK plea of the subsidiary

22    that took place over four years later.

23                And the reason that's wrong, Your Honor has already

24    addressed this as you've addressed many things already, in

25    the trucking motion regarding bearings, what happened there,

1    you may recall, is there was a tremendous amount of publicity

2    regarding the raids that took place on the bearings

3    companies, and the bearings companies in the motion against

4    the truck dealers argued well, this should have put the

5    trucking plaintiffs on inquiry notice.  And what the court

6    said is the following, which I think is very significant.

7    The court said:  Although it is clear, clear, that the

8    publicity put potential plaintiffs on notice of claims

9    against some of these defendants involving passenger

10   vehicles, the notice of claims on trucking weren't as clear.

11        Well, this is right on point for us because it is

12   clear that the notice that was given by Corning which, by the

13   way, received widespread publicity, there is no question

14   about that, and then there's repeated each quarter in the

15   securities filings over and over again over the four-year

16   period of time, so that's much more notice than was at issue

17   in wire harness, so you've already found that type of notice

18   to be clear.

19        So what steps could they have taken to get back to

20   you?  Well, what normally happens is that plaintiffs then,

21   for example, hire an economist and they have an economist

22   study the industry and come up with facts to see if they

23   could find evidence that prices were behaving in a certain

24   way that would suggest conspiracy, that it's a concentrated

25   industry, that there are barriers to entry, et cetera.  They

1    also frequently reach out to companies to see because they

2    knew who the companies were in this industry, there were only

3    three companies that were involved, to find out who is the

4    ACPERA applicant.  And they try to say come tell me now if

5    you want to be timely and try to get information that way.

6          Now, it's interesting because Mr. Williams, okay,

7    who is the -- one of the lead counsel, as you know, here in

8    the resistors case, and this is the reason we cited it, it

9    illustrates the steps.  In resistors there was a public

10   disclosure of the grand jury investigation, Mr. Williams

11   engaged an economist, he studied the industry, he reached out

12   to see who the ACPERA applicants might be and see if he could

13   get any information there.  He did not, but he at least tried

14   that.  He put together though through his economist and other

15   information using the publicity as well as a complaint, and

16   in that case the Court found that that complaint was

17   sufficient on that basis.  In other words, it was no

18   challenge that he could file a complaint there -- actually it

19   was a subsequent complaint.  Now, I should mention that is

20   subject to another motion to dismiss.  But the point here was

21   that in resistors he was able to file a complaint.

22         In the batteries case we cited he filed his first

23   complaint before there was any plea or indictment, but here

24   we have one more fact, and this is very significant, in 2015

25   NGK did its plea agreement.  Well, that was within the four

1     years from when the Corning notice took place.  So if he was

2     pursuing his diligence, even if he claimed prior to NGK he

3     couldn't gather enough information somehow which, by the way,

4     none of which is pled in the complaint, there's no steps of

5     diligence pled, he could have certainly once he had the NGK

6     plea and once he got cooperation there, which he stated in

7     his complaint that he had, he could have stated a claim then

8     which would still be within the four-year period of time.

9         What he can't do is just sit back -- and look, I'm

10     not criticizing him, this case has 38 different parts, he may

11     have -- they may have decided this wasn't such an important

12     case, you know, frankly, that we think the conduct here is

13     not very significant, but put that all aside for whatever

14     reason they decided to wait.  And if the statute is not

15     enforced here, Your Honor, then who knows what next case is

16     going to get added to this MDL based on their claims because

17     what they claim is their second argument is well, even if we

18     were on inquiry notice -- they tried to argue they weren't on

19     inquiry notice, that's the first part, but then they say even

20     if we were we should be able to continue to bring cases as

21     long as there are effects of the conduct that extend into the

22     limitations period under a continuing violations theory.

23         Now, first, Your Honor has to consider the

24     implications of that.  The effects they are focusing on is

25     when consumers bought cars that would have these parts in it.

1    Your Honor, that could be ten years from now.  There could be

2    a used car that is resold with one of these ceramic

3    substrates for which you would first have a consumer who they

4    might claim has an effect, there is no limit at all.  If that

5    were the law this MDL will never end because you're

6    constantly --

7              THE COURT:  It may never end anyway.

8              MR. KESSLER:  Well, it may never end anyway, but

9    the point is we would all like it to end, right?  And to have

10   a rule that the statute never ends because the effects focus

11   on the ultimate consumer is not the law.  Now, how do I know

12   this?  Three cases Your Honor should read:  Peck,

13   Z Technology Corp, those are the two main ones, and I'm going

14   to talk about Lamictal, which is not in this circuit.  Peck

15   and Z Technology Corp are both Sixth Circuit cases.

16         What those cases make clear is the focus of a

17   continuing violation is there must be new wrongful conduct,

18   what they call an overt act, by the defendants, not the

19   conduct of the plaintiffs in purchasing their automobile.  It

20   is the wrong focus, and it is very easy to understand why

21   that is because the statute of limitations is based on

22   witnesses' memories, it's based on documents being lost, it's

23   based on repose, all of those principles would go from the

24   defendants' conduct, not from the issue of some effect

25   happening down the road there.

1           And in Pace this was directly at issue, so Pace was

2   a Section 1 case, there were some other claims, but it was a

3   Section 1 case, and the argument was that the agreement --

4   the unlawful agreement was made outside the limitations

5   period but they kept implementing the agreement inside the

6   limitations period.  Exactly what you have here.

7           What you have here are claims that there were

8   agreements entered into through July of 2011 but that there

9   were agreements entered with the car companies and sales to

10  the car companies continue to take effect later on because of

11  the model years in terms that were covered.  Exactly Peck.

12  And what the court said is the following, this is at the very

13  end of the decision:  Because the timing of the defendant's

14  overt acts, not the timing of the plaintiff's injuries,

15  controls the statute of limitations issue, the plaintiff's

16  antitrust claims are time-barred.

17          And that is reiterated again in Z Technology

18  Corporation, which is a Section 2 case, but it cites back to

19  Peck.  And what it says there is just because you are still

20  having monopoly prices charged later for acts of

21  monopolization long before, that doesn't mean that the

22  statute of limitations is continuing.  To restart the statute

23  of limitations it has to be a new overt act by defendants.

24          Now, one of the things that plaintiffs say is

25  they've actually said in their brief that we somehow

1    misstated their complaint as to what they are alleging about

2    the continuing acts.  So I want to be very clear about this,

3    and I reread the complaint three more times to make sure we

4    are right.  I can represent to the Court that the only

5    specific allegations of the agreements regarding any Corning

6    entity, okay, is through July of 2011, and you can search the

7    complaints over and over again, this is not a case where we

8    are fighting over that they allege some other meetings or

9    agreements later and we are arguing well, is that enough.

10   Okay.  There's zero allegations about that.

11        What they do say is that their class continues as

12   long as the effects continue, that's what they say.  And my

13   point here is that does not get them past Peck.  It does not

14   get them past Z Technologies.

15        Now, they may cite, Your Honor, they have in their

16   brief your Lear holding, so I want to address that.  Your

17   Lear holding is not at all inconsistent with the position we

18   are taking, and I will explain why.  In Lear Your Honor was

19   not presented with the statute of limitations argument, you

20   were presented with an argument of whether or not Lear had

21   discharged all of its liability in bankruptcy, and the issue

22   was has it been alleged in the complaint that Lear engaged in

23   conduct after the discharge that would be sufficient to keep

24   them liable in the case.  Your Honor held that there was.

25        But in Lear there was a plea agreement by one of

```
 1   Lear's co-conspirators that implicated Lear past the
 2   discharge period, and so Your Honor said in this complaint
 3   there is sufficient evidence -- or not evidence, there are
 4   allegations of Lear engaging in competitor meetings, unlawful
 5   conduct after the discharge so therefore it's not discharged.
 6   That has nothing to do with this case.
 7            If they had specific allegations of competitor
 8   meetings by any Corning entity into the limitations period
 9   then we would be in Lear, but because they do not have that,
10   all they have is the general conclusory assertions in their
11   brief that they are seeking relief for the class through
12   today, there is nothing else specific on Corning at all, that
13   is why it has to fail regarding that.
14            THE COURT:  Okay.
15            MR. KESSLER:  Now, besides that, Your Honor, just
16   two more points I want to make about this.  One is they make
17   an argument that well, what about a plaintiff who didn't
18   purchase a product at first until after the limitations
19   period, how would they even know that they had a claim or
20   something like that.  Well, the most important point about
21   that, Your Honor, is that issue is not presented by this
22   complaint.  In order to -- remember, we are not deciding this
23   motion for the class, we are deciding it for the named
24   plaintiffs, that is all we can do on a motion to dismiss
25   here.  And if you dismiss this, by the way, it has no impact
```

1   on any future class action that someone might bring or not

2   bring, okay, it just gets rid of this case because these

3   plaintiffs haven't brought their claims within the statutory

4   period.

5          The point here is that none of these plaintiffs

6   allege at all when they purchased their product except it's

7   sometime from the beginning of the class period in the 1990s

8   through the time of the complaint, we don't know when they

9   purchased their product, but I can tell you because these are

10  the same plaintiffs that we are deposing in all of the cases,

11  okay, they all made purchases prior to the expiration of the

12  limitation period.  The consumers all bought at least one of

13  their cars prior to the limitations period so the dealers

14  were in business prior to the limitations period, so we don't

15  even have the hypothetical case as to whether -- if someone

16  came in who first bought a car today whether they would have

17  a claim.

18          By the way, I would argue they don't but my point

19  is that it is not even before Your Honor to consider that.

20  The point -- because they make no allegations about that.

21  They would have to allege in their complaint here, is a

22  plaintiff who didn't buy until after it expired so this

23  plaintiff somehow because it was too speculative to assert

24  injury should be able to still have a claim under the

25  Zenith Hazeltine case.  I don't think they could actually

1    state such a claim but that claim is not here, so you don't

2    have to worry about that claim.  The claims that are here are

3    barred by the statute of limitations.

4          Finally on the unjust enrichment, just two points

5    on that.  So unjust enrichment is an equitable doctrine and

6    therefore it is not strictly applied by a statute of

7    limitations, but the same analysis applies for two reasons.

8    One is that the Madison case we cited to you in the

9    Sixth Circuit talks about the fact that when you have an

10   equitable claim that is based under the same underlying facts

11   as the statutory claims, and it is just basically another

12   remedy for that, that you apply the same statute of

13   limitations because otherwise it would defeat the purpose of

14   the legislature in having the statute of limitations says if

15   you didn't apply it when it's basically the same claim.  As

16   Your Honor knows, there is no separate facts for this unjust

17   enrichment claim, it is exactly the same facts and therefore

18   applies.

19         And one case that we didn't cite which I would like

20   to add for you that specifically does this for unjust

21   enrichment that we found subsequent to our brief, the case

22   is -- and this is Western District of Michigan, the case is

23   Harden, H-A-R-D-E-N, vs. AutoVest, LLC, and the citation for

24   this is 87 UCC Rep Serve 2nd 272, it is not in the Federal

25   Supp yet but it is in this Reporter which is perhaps why we

1    didn't find it until right now in terms of that.

2         THE COURT:  UCC Reporter?

3         MR. KESSLER:  Yes.  It is 87 UCC Reporting Service,

4    it must be, R-E-P Service 2nd 272, and this specifically was

5    applying Michigan law, which is one of the statutes at issue,

6    and said the following:  The Michigan Supreme Court has long

7    recognized that statute of limitations may apply by analogy

8    to equitable claims.  If legal limitations periods do not

9    apply to analogous equitable suits a plaintiff could dodge

10   the bar set up by a limitation statute simply by resorting to

11   an alternative form of relief provided by equity.  This is

12   basically the law in all the states.  So, in other words, you

13   get to the same place.

14         We believe that the statute of limitations applies

15   to require the dismissal of not all but the vast majority of

16   their claims in this case.  It will leave them, by the way,

17   with, I think, three states have antitrust laws that have a

18   six-year statute of limitations and the legislature can

19   certainly decide that, and I think two states have consumer

20   protection claims they've asserted that have a longer statute

21   of limitations, those would be there, but by having this

22   decided now you will have so narrowed the scope of this case

23   that it obviously will facilitate its resolution or by

24   contrast if this issue were not decided now the disputes over

25   this statute issue would probably prolong this case for a

```
 1    very, very long time in terms of our ability to resolve it.
 2              THE COURT:  Okay.  Thank you.
 3              MR. KESSLER:  So unless you have questions, Your
 4    Honor, I'm going to sit down now and turn it over to my
 5    colleague for a brief addition.
 6              THE COURT:  All right.  Mr. Meisner?
 7              MR. KESSLER:  I'm sorry, Your Honor.  There is also
 8    a Westlaw cite for the case which I've been told is better to
 9    give you, which is 215 Westlaw 4583276.  Thank you.
10              MR. MEISNER:  Thank you, Your Honor.
11    Stefan Meisner, from McDermott, Will & Emery, on behalf of
12    NGK Insulators, and I will be brief.
13              We fully agree with what Mr. Kessler has just said
14    with respect to the statute of limitations, but I wanted to
15    highlight just one or two small points that are important for
16    NGK Insulators.
17              The first of this is, is that the statute of
18    limitations, it's the injury, that when plaintiffs should
19    have discovered the injury, not necessarily the names of all
20    of the defendants that begins the period.  And as Mr. Kessler
21    just pointed out, that certainly happened as of the time that
22    Corning disclosed in its SEC documents in 2012 -- March 30th,
23    2012 that it was under investigation.
24              As Mr. Kessler pointed out, there is no
25    allegation -- there are no allegations of an investigation
```

1    that the plaintiffs put forth to try to discover their claim,

2    and we agree with that point as well.  If they had they would

3    have discovered that two months prior to that filing by

4    Corning, Corning also announced in its annual report that in

5    this industry, the specific ceramic substrates industry, its

6    primary global competitors were Denso and NGK Insulators, so

7    it at least had information available to it if it had

8    performed a reasonable investigation to have the identity of

9    NGK insulators at that time.  However, that's not required by

10   the law.  What is required by the law is that once it is on

11   notice of its injury, and, again, as Mr. Kessler just

12   explained, that happened as of March 30th, 2012, the

13   limitations period begins.

14          I want to point out that at that time and any time

15   from that point if the plaintiffs had performed an

16   investigation it could have filed a complaint perhaps against

17   Corning and unnamed defendants.  Have we seen this before in

18   this MDL?  Yes, we certainly have.  In fact, it's in our

19   complaint too.  The complaints in our cases name Corning, the

20   Corning defendants, Denso, the NGK Insulators defendants and

21   unnamed other co-conspirators, so clearly the plaintiffs can,

22   if there is at some point if this case continues, include

23   other potential defendants.

24          Now, has this happened before?  Yes, it has.  In

25   the occupant safety restraint system case the plaintiffs

1    filed a complaint against the defendants that it named and

2    unnamed co-conspirators.  Two years after that this Court

3    allowed the plaintiffs to amend to include another named

4    defendant that they had discovered in that period, and that

5    was unopposed by the defendants at that time.

6          Likewise, in electronic power steering, the end

7    payor's case, the plaintiffs similarly filed a claim against

8    named defendants and, quote, unnamed co-conspirators and

9    subsequent to that time they moved to amend and add named

10   defendants -- new defendants to that case which, again, this

11   Court granted, and it was not opposed by the defendants at

12   that time.  So this is not an unusual position for

13   NGK Insulators to take.

14         All I'm -- I'm going to sit down now unless the

15   Court has some questions, but I just want to highlight that

16   it is the discovery of the injury that puts the plaintiffs on

17   notice, plaintiffs seem to suggest that they need to know the

18   names of NGK Insulators in order to be able to make a claim

19   against NGK Insulators.  They certainly knew of

20   NGK Insulators' participation in the ceramic substrates

21   industry at that time.  And this Court has allowed and the

22   plaintiffs have practiced as shown that they could file a

23   claim against Corning and unnamed co-conspirators and then

24   amend that claim to bring in NGK Insulators if they

25   subsequently discovered that.

1    And that's all we have to say in addition to what

2  Mr. Kessler has said with respect to the statute of

3  limitations.

4        THE COURT:  Okay.  Thank you.

5        MR. MEISNER:  Thank you, Your Honor.

6        THE COURT:  Mr. Reiss.

7        MR. REISS:  Thank you, Your Honor.  Before I get

8  into the fraudulent concealment arguments and the argument

9  that Mr. Kessler has made that we were put on notice as of

10  the date of Corning's public disclosure in 2012, I don't even

11  think you need to address that issue because there are a

12  number of different arguments as to why the statute of

13  limitations has not been tolled.

14        And one of the arguments was not addressed by

15  Mr. Kessler, and that's the fact that we allege a continuing

16  conspiracy with respect to the defendants' conduct.  So

17  Mr. Kessler makes the argument that the conspiracy had to

18  stop in July 2011, that effectively the Corning defendants

19  withdrew from the conspiracy on that date, and he bases that

20  argument on the Corning defendants' guilty plea.  So in the

21  guilty plea they admit that they participated in the

22  conspiracy, that they engaged in conduct with respect to the

23  conspiracy until at the latest July of 2011, but we don't

24  plead that the conspiracy ended on that date and, in fact,

25  our complaints contain illustrative examples throughout the

1    class period, and this Court has repeatedly held that with

2    respect to guilty pleas these are negotiated instruments,

3    they are --

4           THE COURT:  Yes, but once the guilty plea is

5    entered you are saying that they continue this activity or

6    some antitrust activity, right?  So you are looking at what

7    the defendants are doing?

8           MR. REISS:  Well, no, Your Honor, the guilty plea

9    was actually entered in 2016.

10          THE COURT:  I'm sorry.

11          MR. REISS:  But in their guilty plea they admitted

12   to participating in the conspiracy through at least August of

13   2011, so we didn't know about the guilty plea until five

14   years later.  So forgetting about the issue of when we were

15   put on notice, their argument that the statute of limitations

16   has expired is premised on the notion that they withdrew from

17   the conspiracy in 2011.

18          And what I'm saying is that to the extent that they

19   make that argument that's a question of withdrawal, that's a

20   fact question, the burden is on them to demonstrate that.

21   And again the Court has repeatedly held that the guilty plea

22   is in no way limiting in terms of what we are permitted to

23   allege, and the Court has held that on numerous occasions.

24          THE COURT:  But you are agreeing with what

25   Mr. Kessler said in terms of, I think, this continuing

1    violation because you're saying -- you're saying that in 2016

2    they said that they had been -- they admitted behavior from

3    2011 to 2016?

4          MR. REISS:  No, they had admitted behavior from

5    the --

6          THE COURT:  I mean through 2011, excuse me.

7          MR. REISS:  They had admitted participating in the

8    conspiracy from I believe the late '90s until at least 2011,

9    so the question then is because of this admission and, again,

10   it wasn't an admission that the conspiracy stopped on that

11   date, it was just an admission by the Corning defendants -- I

12   should say by Corning International that they continued to

13   participate until at least 2011, and so that's contrary to

14   our allegations in which we say the conspiracy continued

15   beyond that date.

16         Now, it would be one thing if they pleaded guilty

17   in 2011 and then they could make an argument potentially that

18   they withdrew from the conspiracy, but they didn't plead

19   guilty until five years later, so it is certainly plausible

20   based on our allegations that the conspiracy continued beyond

21   that date and the Court has held similarly.

22         THE COURT:  But that's what I'm trying to get

23   straight.  So you are saying -- well, maybe you are saying

24   this, that it is plausible, only that it is plausible, that

25   the conspiracy continued beyond 2011 --

1      MR. REISS:  Correct.

2      THE COURT:  -- even though when they pled they said

3  it ended in 2011?

4      MR. REISS:  They didn't even say it ended, they

5  just admitted that they participated in the conspiracy until

6  at least July 2011.  And, in fact, in their plea allocution

7  they suggest that they conspired with NGK and that was the

8  only defendant that they conspired with, but if you look at

9  NGK's plea agreement NGK's plea agreement is -- they admit to

10  continuing in the conspiracy until 2010, a shorter period.

11  So the clear inference there is that these are negotiated

12  instruments, NGK for better or worse negotiated a better

13  deal, but that is not proof that the conspiracy abruptly

14  stopped in August 2011, and if that's -- or July of 2011, and

15  if that's what the Corning defendants are arguing that's an

16  affirmative defense and the case law is clear that the burden

17  is on them through discovery to demonstrate that they

18  withdrew from the conspiracy on that date.

19      THE COURT:  Do you have any burden to show that the

20  conspiracy continued beyond the 2011 date?

21      MR. REISS:  Well, I think we have a burden to

22  demonstrate that it is plausible and there's certainly no

23  reason to believe that it is not plausible when you have a

24  guilty plea admitting conduct until that date, and when we

25  have illustrative examples throughout the period.  And,

1    again, we are not the Department of Justice, we don't have

2    subpoena power, so the only thing we have in our possession

3    is the guilty plea, and then we have some illustrative

4    examples, but there's certainly no reason to believe, as I

5    said, that the conspiracy abruptly stopped.  And, again, the

6    burden is on them to show that they withdrew from the

7    conspiracy, not on us to show that they were continuing to

8    participate so long as we can allege that it was plausible

9    that the conspiracy was continuing, and there is no

10   suggestion that they withdrew from the conspiracy in 2011,

11   that's for certain.

12            But I would say, Your Honor, that even if you don't

13   agree with that and, again, I think that's a fact question,

14   we do plead that the effects of the conspiracy continued

15   beyond that date.  And I know Mr. Kessler cited some case law

16   and I think a lot of the case law that he cites is

17   distinguishable, but we allege in our complaint that there

18   was basically a three-year period between when the RFQ

19   process started and then when ultimately the substrates,

20   which is the product at issue, went into production, and then

21   beyond that the OEMs awarded the business typically to the

22   customer for four to six years, so you're talking about a lag

23   time of about eight or nine years potentially between the

24   last conspiratorial conduct.

25            So let's take Mr. Kessler at his word and let's

1    assume that the conspiratorial conduct stopped in 2011.

2    Based on our allegations the price-fixed sales were

3    continuing for years after that and, you know, Mr. Kessler

4    argues that your decision in the Lear case with respect to

5    wire harness is not on point but the Court explicitly held in

6    that case and it cited to a Supreme Court opinion in the

7    Klehr case that each subsequent price-fixed sale, each

8    inflated sale resulting from the conspiracy, is a new overt

9    act, and it starts the statute of limitations running anew.

10            And the cases that Mr. Kessler cites to are not

11    price-fixing cases.  One of the cases that he cites to is

12    Z Tech, is a merger case, and that court explicitly

13    distinguishes the Klehr case, it actually cites Klehr in a

14    positive light but it says it doesn't apply to mergers

15    because unlike a conspiracy a merger is a single discreet act

16    so it is not a continuing violation.

17            So Mr. Kessler's attempt to distinguish from these

18    cases is just not on point.  The Sixth Circuit has never held

19    that in the context of a price-fixing conspiracy subsequent

20    sales of inflated prices do not start the running of the

21    statute of limitations anew.

22            So, again, because of this gap, even if their

23    conduct stopped in 2011 it very well may be based on our

24    allegations that they are still selling cars at

25    price-fixed -- or I should say components at price-fixed

1    prices today, and Mr. Kessler --

2            THE COURT:  When would it end?  I mean, the example

3    that Mr. Kessler gave of the used car, if somebody needs a --

4            MR. REISS:  Well, first of all, a used car is not

5    at issue in this case.  Our classes for both dealers and end

6    payors we purchased new vehicles.  And we do have a specific

7    time frame; our complaint says that typically the OEMs award

8    the business for anywhere from four to six years and there is

9    a three-year lag time, so we are talking at most a nine-year

10   gap, that's what we are talking about.  This is all going to

11   be fleshed out, Your Honor, in discovery, it is not

12   appropriate for resolution on a motion to dismiss, but

13   discovery will flesh this out, but it is certainly not going

14   to go on in perpetuity, our allegations don't suggest that,

15   so I think this parade of horribles that Mr. Kessler is

16   suggesting is entirely overblown.

17           THE COURT:  But you are saying that -- say they

18   enter into the contract to produce these things and that is

19   when they gave the inflated prices, that because that

20   continues basically for the life of that contract, which is

21   many years, that is a continuing violation because it is,

22   what, it is renewed every year --

23           MR. REISS:  It is renewed by each --

24           THE COURT:  By every sale?

25           MR. REISS:  -- by each subsequent sale.

```
 1              I mean, that's what the Klehr decision held and,
 2    Your Honor, that's what you held in the wire harness case
 3    with respect to Lear.  I mean, what happened in Lear is you
 4    had a bankruptcy and essentially a new Lear entity emerged
 5    from the bankruptcy, and Lear made the argument we didn't
 6    have any allegations or significant allegations regarding its
 7    conduct, and we emphasize that even if we didn't have
 8    significant allegations regarding its conduct we did have
 9    allegations that it continued to sell wire harnesses at
10    price-fixed inflated prices.  And your Court cited to the
11    Supreme Court holding in Klehr, which is directly on point
12    for the proposition that subsequent sales and inflated prices
13    do, in fact, start the statute of limitations.  It is an
14    overt act by which the defendant is benefiting from the
15    conspiracy.  It is different than just passively sitting back
16    and doing nothing.
17              THE COURT:  Okay.  Let's go back to the inquiry
18    notice though if you need that.  What do you allege you did,
19    if anything, with this inquiry notice?
20              MR. REISS:  So I have two points there.  The first
21    point, Your Honor, is that I disagree with Mr. Kessler that
22    this -- what I would say is an opaque disclosure in NGK
23    financial statements regarding potential antitrust violations
24    for a host of automotive products -- by the way, we haven't
25    filed in a number of these products -- that that was
```

1    sufficient to put us on notice of our claims.

2            Now, I think Mr. Kessler actually recognizes this

3    and so he makes this big point that the disclosure received

4    widespread public dissemination, and that's simply not the

5    case.  So Mr. Kessler cites to I think four articles that

6    were published within a three-day period of the initial

7    disclosure and then he cites to a blog.  This is in stark

8    contrast to wire harness, for instance, when the Department

9    of Justice announced the government investigation and you had

10   widespread publicity, you had the Wall Street Journal, the

11   New York Times, enormous dissemination throughout the

12   country, that's just simply not what happened here.

13           And even if, in fact, Your Honor, we were put on

14   notice of the facts of the disclosure, and I would argue that

15   we were not, that was not sufficient, Your Honor, for us to

16   have notice to bring a claim.  I think those are two very

17   different questions.  Again, the disclosure didn't say the

18   entities that were involved in the price-fixing conspiracy.

19   In fact, it is notable that the disclosure came from Corning,

20   Inc., that's the U.S. parent, and Mr. Kessler is going to get

21   up in a few minutes and he's going to argue to you that

22   Corning, Inc. didn't participate in the conspiracy.

23   Corning International is nowhere referenced and so --

24           THE COURT:  Well, they promise to cooperate though

25   in the plea.

1          MR. REISS:  They did promise to cooperate, but we

2    would not have known from that that Corning International

3    participated, and Mr. Kessler presumably would have had us

4    file several years ago naming Corning, Inc. and then he would

5    have filed a motion to dismiss and he would have said,

6    gotcha, Corning, Inc. didn't participate in the conspiracy.

7    And moreover there is case law he would have cited to, and

8    I'm not saying that this case law is definitive, but he would

9    have cited to cases saying the mere disclosure of an

10   investigation is not sufficient to state a claim against the

11   defendant.

12          And beyond that, Your Honor, this argument that we

13   didn't perform due diligence, first of all, the case law is

14   pretty clear that due diligence is an objective standard, it

15   is not a subjective standard, so to the extent that some of

16   our plaintiffs have filed other automotive parts cases or

17   some of the lawyers filed cases in different actions, that's

18   not binding on us, and Mr. Kessler I think represents four or

19   five other defendants in the auto parts cases and he's a

20   great lawyer, so he argued to you, and I think persuasively

21   then, that these are separate conspiracies with separate

22   defendants and what happens in one conspiracy is not

23   necessarily binding on another conspiracy, right?  And so as

24   mentioned before in wire harness, that case received

25   widespread publicity but that doesn't put us on notice as to

1  Corning's participation in an entirely separate conspiracy.

2          And I want to address Mr. Kessler's point that we

3  didn't engage in due diligence.  The case law is clear that

4  that's an objective standard, so the standard is would a

5  reasonable plaintiff in our position be put on notice and

6  exercise due diligence, and if they do would they learn about

7  the violation sooner than what we allege?  And we allege

8  that's not the case, but more importantly we actually do,

9  contrary to what Mr. Kessler argues, we do have allegations

10  about due diligence.  In fact, we state that in 2014 we had

11  communications with a confidential witness that provided us

12  with information about NGK's participation in the conspiracy

13  and Denso's participation in the conspiracy, and so the clear

14  inference from those allegations is that we were performing

15  an investigation, but that at that time we still did not have

16  information sufficient to name the Corning defendants in the

17  conspiracy.

18          And another point that Mr. Kessler makes, and I

19  think this decision is actually on point for us, you know,

20  your decision with respect to the truck dealers in the wire

21  harness case, so the truck dealers admitted that they

22  potentially were put on notice of the wire harness

23  investigation as it pertained to vehicles but they said they

24  didn't necessarily have notice as it pertained to trucks and

25  equipment -- and I'm sorry, I think that's the occupant

1    safety systems case, not wire harness, but in any event the

2    truck dealer said well, we may have had some notice about

3    some potential investigation but it wasn't sufficient until a

4    subsequent disclosure by the JFTC, and that's exactly what we

5    are arguing here, that even if you think that we are on

6    notice of this potential disclosure about potential

7    violations, that didn't give us sufficient notice about the

8    conspiracy, didn't give us sufficient notice to name the

9    Corning defendants until a subsequent disclosure by the

10   Department of Justice.  And so for purposes of the motion to

11   dismiss you should construe every inference in our favor, and

12   subsequently if after discovery if there's evidence that

13   comes out that we didn't do our homework and we didn't

14   investigate well maybe that's a different question then but

15   for purposes of a motion to dismiss it should not be resolved

16   now.

17        And the final point that I want to make is, you

18   know, Mr. Kessler cites to these other complaints that were

19   filed by Mr. Williams or by plaintiffs in other auto parts

20   cases in which we, Mr. Kessler would say, we allege that we

21   were put on notice as of the date of the government

22   investigation, we filed on that date.  And, first of all,

23   those are different cases and so they are not binding in any

24   way on us, and as I mentioned, there may have been different

25   disclosures there that did put plaintiffs on notice, very

1    different than here.

2           But Mr. Kessler, with all due respect, he omits a

3    very important portion of those allegations.  What we say in

4    those allegations is that we were put on notice at the

5    earliest of the date of disclosure about a DOJ investigation

6    or a government investigation and so those allegations were

7    not a concession that the investigation and disclosure of the

8    investigation put us on notice, they were intended as a floor

9    anticipating a potential motion to dismiss, they were

10   intended as a floor to say even if this were, in fact, the

11   case the statute of limitations doesn't bar our claims, but

12   whether they constitute a concession or not they are

13   certainly not binding here.

14          So unless you have any other questions, Your Honor,

15   thank you.

16          THE COURT:  Thank you.

17          MR. OCHOA:  Just briefly, Your Honor, to address

18   the NGK point.  There is no support for NGK's assertion that

19   Corning's filing provided plaintiffs inquiry notice as to

20   claims against NGK.  There was no case law that was cited in

21   NGK's opening brief or its reply and, in fact, there is case

22   law to the opposite, plenty of cases that have been brought

23   up by defendants in previous motions to dismiss that you

24   can't simply name a competitor in the industry through guilt

25   by association, so the fact that there was no announcement,

1   there was no disclosure about any of NGK's specific

2   activities does mean that the plaintiffs were not on inquiry

3   notice as to NGK.

4        And the two specific examples that they cited, the

5   OSS complaint and the EPSA complaint, which were just

6   different.  The ability for plaintiffs to add new defendants

7   after filing the initial complaint had nothing to do with

8   whether the plaintiffs had named -- or had referred to

9   unnamed co-conspirators and it had everything to do with we

10  just didn't have the ability to name those defendants until

11  the point when we did so --

12        THE COURT:  Okay.

13        MR. OCHOA:  Thank you.

14        MR. REISS:  Your Honor, I'm sorry, with the Court's

15  indulgence, there was one additional point I would like to

16  make if that's okay?

17        THE COURT:  All right.

18        MR. REISS:  You had me moving up to the fraudulent

19  concealment allegations but I wanted to address one other

20  argument under the statute of limitations.  You know, we,

21  again, as I discussed before, explained that there is this

22  lag time in our allegations, right?  You have the RFQ process

23  and, again, if Corning defendants assert that their last

24  conspiratorial conduct was in 2011 you have a lag time

25  between when the actual parts go into production and then

1    when the vehicles are produced and when they are sold to our

2    class members.  So that means, again, that a number of our

3    class members are not purchasing vehicles until potentially

4    2014, 2015, maybe later, maybe earlier, but the case law is

5    clear and Mr. Kessler referenced this Zenith case and there

6    is Sixth Circuit authority that is also supportive of this

7    that a plaintiff cannot be put on notice -- cannot be found

8    to have a statute of limitations run against it prior to

9    having a cause of action.

10          So here where our plaintiffs and our class members

11   didn't even purchase their vehicles in many instances, how is

12   it that they could be found to not have a claim to be barred

13   by the statute of limitations?  It is just common sense, Your

14   Honor, that a statute of limitations cannot begin to run and

15   a cause of action cannot begin to accrue until a plaintiff

16   purchases the price-fixed product.

17          THE COURT:  What about named plaintiffs as

18   Mr. Kessler addressed?

19          MR. REISS:  Well, Your Honor, I think defendants

20   have moved to dismiss on this ground in earlier cases and

21   Your Honor found that we weren't required to actually specify

22   the dates in which our plaintiffs purchased vehicles.  And,

23   Your Honor, I mean, it is common sense that our plaintiffs

24   are continuing to purchase vehicles, right, throughout the

25   class period and, in fact, if Your Honor requires it we would

```
 1   be happy if we need to, I don't think we need to because we
 2   have a lot of other arguments here, but if we needed to we
 3   could amend certainly to express the dates in which our
 4   plaintiffs purchased vehicles and the deposition testimony
 5   that has taken place, a number of our class reps, nearly all
 6   of them have already been deposed reflects that they didn't
 7   purchase their vehicles until long after 2011, so, you know,
 8   maybe Mr. Kessler wants to prolong this and force additional
 9   amendments but, Your Honor, it is a no-brainer that our
10   plaintiffs and our class reps purchased vehicles beyond 2011
11   and well throughout that time.
12            THE COURT:  Okay.
13            MR. REISS:  Thank you.
14            THE COURT:  Mr. Kessler.
15            MR. KESSLER:  Your Honor, the problem with
16   virtually every one of plaintiff's arguments is that they are
17   arguments that have no corresponding factual allegation in
18   the complaint.  This is a motion to dismiss, it is not about
19   counsel's arguments.  For example, starting with the first
20   one, you asked him flatly are you contending there were
21   conspiratorial acts continuing into the limitations period,
22   and he said to you yes, we are.  Not in his complaint.  I
23   will represent -- he cited you no paragraph.  He can get up
24   now if he likes and cite to you any paragraph in the
25   complaint, there are none, Your Honor.  All that the
```

1    complaint does for specific acts is identify the facts in the

2    plea agreements of both NGK and Corning.  It doesn't have any

3    other factual allegations.

4        And I want to be clear, we are not arguing he could

5    not allege facts beyond the plea agreements if he had a basis

6    to allege such facts.  That is a complete diversionary

7    argument.  We are not arguing he is limited by the pleas.

8    What we're arguing is the only thing that he's put in a

9    complaint allegation is what is in the pleas and the

10   allocutions, and the pleas and the allocutions state clearly

11   and specifically that there is nothing beyond July of 2011.

12       Now, if he said on -- he had some facts to show

13   there was continuing meetings, he -- Your Honor said well,

14   don't you have some burden?  Yes, he has the Twombly burden,

15   not just to say it is plausible.  I know that word is used in

16   Twombly but plausible has been well established by the case

17   law; it doesn't mean that anything is possible, Your Honor.

18   It is possible that anything happened, that's not plausible.

19   What plausible means under Twombly, and Your Honor has said

20   this, I think you said conclusory assertions are not enough,

21   you said that many times, there has to be some facts pled

22   beyond 2011, something.  That was Lear.  Okay.

23       Lear -- now Your Honor should go back, obviously

24   you are very familiar with Lear, Lear was there were facts

25   pled about conspiratorial conduct after the discharge.  Here

1    there is zero.  What is pled is effects.  The only thing

2    that's pled is that there were effects, so we are going to be

3    down to the effects argument.  I want to be very clear and I

4    stand by this, there is nothing in this complaint -- as an

5    officer of the court I represent to you there is nothing in

6    this complaint of a conspiratorial act after 2011 identified,

7    if there was he would tell you the paragraph in either of

8    these complaints, and that's number one.

9         THE COURT:  How would they know these things if

10   this was a concealed -- you know, if there was concealment of

11   this, that's what's alleged, how would they know the

12   conspirator --

13        MR. KESSLER:  Your Honor, he didn't have to know

14   these things.  What he had to do is after he was put on

15   inquiry notice he had to allege and do the facts of due

16   diligence in order to assert a claim within four years after

17   being named co-lead counsel for all future automotive parts

18   and bringing case after case and obviously monitoring as part

19   of his responsibilities.  This is not a plaintiff and a

20   counsel unrelated to this matter.  That's what he had to do

21   and he would have asserted his complaint.  Remember, when you

22   say how would he know, that's a fraudulent concealment

23   argument, and there is a doctrine of fraudulent concealment,

24   but that only applies in this circuit if after inquiry notice

25   you took steps of reasonable diligence to try to establish

1    your claim in that four-year period.

2           That's what didn't happen here.  Dayco is directly

3    on point.  Dayco says if you do not allege due diligence

4    steps, assuming you agree with me to put them on inquiry

5    notice, which is all it had to do, and I stand by the fact

6    that if you go back and look at your decision in the truck

7    distributors you would find that you've already recognized

8    that for passenger automobiles this was enough for just

9    inquiry, and the inquiry would have been get an economist,

10   try to contact the -- find out who the ACPERA applicant is,

11   do other things that plaintiffs do in other cases, but most

12   importantly when they got the NGK plea they certainly had

13   enough to file then which was within the four years, and they

14   chose not to file for whatever reason, that's where they are

15   stuck.

16          So the first point has to be rejected because there

17   is no complaint allegations to show continuing facts.  The

18   second one is the effects argument.  Your Honor, I stand by

19   the discussion in Peck.  I just urge you to read Peck and

20   then read Z Technologies, which shows that Peck is still good

21   law in the Sixth Circuit because it's cited very favorably

22   with respect to that.  Peck was a Section 1 case, an

23   agreement case, and what the argument was was the prior

24   agreement in effect continued to be applied, and here is what

25   the court said about that, it is very important.  The court

```
 1   said the following:  Thus even when a plaintiff alleges a
 2   continuing violation, an overt act by the defendant is
 3   required by the defendant, not by the plaintiff doing
 4   something, to restart the statute of limitations and the
 5   statute runs from the last overt act.  The Pecks contend that
 6   the action is not time barred, this was their argument,
 7   sounds just like plaintiffs here, because they felt the
 8   adverse impact of GMC and GMAC's conspiracy as recently as
 9   1988.  Now, this sentence is key.  However, the fact that
10   Pecks' injuries have a rippling effect into the future only
11   establishes that they might have been entitled to future
12   damages if they had brought suit within the four years of the
13   commission of the last antitrust violation.
14        And it goes on to be clear that when the conduct
15   alleged is an agreement, which is exactly what you had there
16   was an agreement, the fact that you then pay under the
17   agreement, they actually use that phrase in both Peck and
18   Z Technologies, is not enough.
19        And here remember what the agreement was, the
20   agreement that was pled was through '11, let's say it was
21   Toyota, just make up a company, that there was a collusive
22   discussion to a contract with Toyota outside of the
23   limitations period and they are saying because the RFQs apply
24   later on, later on we sold cars pursuant to that RFQ and
25   pursuant to the award, but the overt acts other than
```

1 reaffirming -- applying the agreement all took place before

2 it. That's their problem, they have to plead something else.

3 Again, I believe Peck makes this clear, Z Technologies make

4 this clear. Your Honor, I will rest on those two cases --

5        THE COURT: Okay. Thank you.

6        MR. KESSLER: -- with respect to that.

7        Finally, the last point that they made at the end,

8 so they argued that again, well, maybe we have plaintiffs who

9 bought cars later, and Your Honor quite rightly said well,

10 where is it? And they said well, Your Honor said I don't

11 have to plead when they bought it, and Your Honor did say

12 that, but that doesn't mean if they want to rely upon that

13 they should avoid pleading it. In other words, when they

14 come in and said well, Your Honor, you should let this go

15 because maybe I have a plaintiff who didn't buy a car until

16 after -- it would have to be, by the way, after 2016, it

17 would have to be after the limitation.

18        Remember, the period went until 2016, you know,

19 into March, they would not have to after 2011, they could say

20 maybe I have a plaintiff who didn't first buy until now,

21 2017. Well, first of all, that is not true because every

22 single one of their plaintiffs bought before that, we know

23 that from discovery in this case, so it is just not true,

24 they couldn't say it under Rule 11. Okay. And so it is

25 completely hypothetical and invoking Your Honor saying you

1  don't have to plead the date of purchase, that's okay, but if
2  they decide not to plead the date of purchase, which they
3  obviously know, they know what the date of purchase is, then
4  they can't come into the court and say don't dismiss my case
5  because hypothetically there might be a plaintiff in the
6  future who claims they couldn't have any injury until after
7  2016, and maybe they have another case.  By the way, Your
8  Honor, if they ever file such a case I believe you will
9  reject it but that's not an issue for today.
10            THE COURT:  Okay.
11            MR. KESSLER:  Thank you.
12            THE COURT:  Thank you.  Mr. Meisner, do you have
13  anything else?
14            MR. MEISNER:  Yes, just very briefly, Your Honor.
15  Your Honor, I just would like to respond very briefly to the
16  points made by Mr. Ochoa.
17            First of all, with respect to the idea that it's
18  the injury that puts -- that begins the tolling period, we
19  did cite Rotella vs. Wood, which is a United States Supreme
20  Court case, that's 528 US 549.  Ruiz-Bueno is another to look
21  at, that's 2016 Westlaw 4473238.  Again, we have cited this
22  in our papers.  And the Lamictal case which Mr. Kessler
23  mentioned is cited very prominently in our papers, that's
24  172 F. Supp 3d 724.
25            I would also like to draw the Court's attention

1   with respect to one other point made earlier, and this is

2   with respect to whether an AK report puts plaintiff on

3   inquiry notice.  And I take this out of actually Corning's

4   brief, Corning's reply, this is at page 8 of Corning's reply:

5   IPPs have pled before this Court in this MDL that tolling

6   ceases upon, this is quoting the plaintiffs' complaint, the

7   date that the defendant publicly disclosed an AK report that

8   it received a subpoena from the DOJ's antitrust division

9   related to a global investigation because, again quote, that

10  is the date when plaintiffs discovered or reasonably could

11  have first discovered their inquiry.  That's in the exhaust

12  systems case.  Thank you, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          All right.  Let's move on to the second issue.

15          MR. KESSLER:  Your Honor, this argument I think

16  could be done very briefly.

17          THE COURT:  Okay.

18          MR. KESSLER:  Which is as follows:  Okay.  Out of

19  the more than 269 paragraphs in one of the complaints and the

20  239 paragraphs in the other complaint, there are a total of

21  four paragraphs that reference Corning Corporation.  And,

22  again, remember what Your Honor can only evaluate is what

23  they've put in the complaint, so if counsel comes up and

24  starts arguing other things, if it is not in the complaint it

25  is not there, you can only evaluate what they've chosen to

1    put in.

2            So we look at those four paragraphs and what do

3    those four paragraphs say?  They say that Corning is

4    incorporated in the State of New York, that it makes ceramic

5    substrates, which is one of the products at issue in this

6    case, that it owns -- wholly owns or controls CIKK as its

7    subsidiary, that's the allegation, and that CIKK performs

8    services for Corning in terms of marketing and selling its

9    products.  That's it.  That is the entire sum and substance.

10           There is not one allegation that Corning Corp. was

11   aware of any of the alleged conspiracies, that its employees

12   ever attended an alleged conspiracy, that it directed its

13   subsidiary to engage in conspiracy, nothing, it is just

14   barren of any of the allegations.  In the other cases where

15   you've looked at this type of Twombly argument, in every one

16   of the other cases there was a claim that the other entity

17   participated in some way, was involved in some way, knew

18   about it in some way.  Again, this complaint has none of it,

19   you can't look beyond the four paragraphs.  Every other

20   paragraph doesn't even mention Corning Corp.

21           Now, we further know that even if you dismiss with

22   leave to plead that they couldn't add in Corning Corp.

23   allegations consistent with Rule 11, so there is no reason to

24   let them replead, and why is that?  Because what they rely

25   upon is the CIKK plea agreement and allocution which we have

1    submitted, and what that makes clear is that the CIKK facts

2    involve a single employee, this is what they rely upon, so it

3    all comes before Your Honor because you can look at the full

4    plea agreement and allocution that they cited, a single

5    employee who formerly worked at NGK who was engaged in

6    certain discussions that it should not have engaged in, but

7    there is no indication at all that Corning Corp. had anything

8    to do with this, in fact, so much so that the government gave

9    them a non-prosecution agreement after investigating the

10   whole matter as a result of this plea.

11          Now, again, I'm not arguing what the government did

12   binds them, that's not the point.  The point here is they

13   have no allegations to make about Corning Corp. and it is not

14   sufficient for them to say, well, maybe if I engage in a

15   discovery fishing expedition some day I will find out

16   something about Corning Corp. that they could allege.  I will

17   represent to you that they won't, but even that argument

18   doesn't get them anywhere.

19          What they have to do now for this defendant is have

20   something.  We are not making this argument for CIKK.  CIKK

21   entered a guilty plea.  The facts about its one plea is set

22   forth there.  They allege it in the complaint.  That's fine,

23   and that's the conduct through July of 2011.  CIKK has the

24   statute of limitations issue but it is not making a Twombly

25   argument here.

1    So that is really my entire argument, Your Honor.
2    It is just they can't go beyond the four paragraphs and the
3    four paragraphs are not enough.

4    THE COURT:  Let's see what they have to say.
5    Mr. Reiss.

6    MR. REISS:  So, Your Honor, I'm not sure if that
7    argument is familiar to you because numerous defendants have
8    made the same exact argument in this case, in fact, numerous
9    defendants where the affiliate company pleaded guilty and the
10   other entity did not made the same exact argument.  And I
11   think, Your Honor, the Court's opinion in the occupant safety
12   system case with respect to TRW is directly on point.

13   So there TRW, the U.S. entity, made the same exact
14   argument, they said, well, look, Your Honor, our foreign
15   subsidiary pleaded guilty, we didn't plead guilty, there is
16   nothing in the guilty plea that references us, and so there
17   is just nothing here, there's very few allegations.  And the
18   Court, as I urge you to do in our complaint, you looked at
19   that complaint and you found a number of allegations that
20   were suggestive of their participation.

21   You found first that we allege that TRW sold and
22   manufactured occupant safety systems in the U.S., you found
23   that was relevant.  You found that allegations that there
24   were a number of defendants who pleaded guilty were relevant
25   including in that case TRW's wholly-owned subsidiary, the

1    foreign entity.  You found that we alleged that the market

2    was ripe for collusion, and that was relevant and probative

3    of our plausibility.  You also found that it was relevant

4    that the parent company was located in the United States and

5    that was the place where the conspiracy occurred, that that

6    was probative, and for all of those reasons you denied a very

7    similar motion to dismiss.

8           Now Mr. Kessler, being the good lawyer that he is,

9    he recognizes that opinion, and he really takes pain to try

10   to distinguish that case.  So how does he try to distinguish

11   it, what does he do?  He cites to the guilty plea, the

12   Corning International guilty plea.  And he says unlike TRW

13   and the Corning International guilty plea, the Department of

14   Justice explicitly agreed not to prosecute Corning so somehow

15   that's probative and that just renders our allegations

16   implausible.  But quite the opposite, Your Honor, if you take

17   a close look at that guilty plea the provision that deals

18   with the non-prosecution agreement is expressly conditioned

19   on Corning, Inc.'s agreement to cooperate with the government

20   throughout the investigation involving substrates.

21          And in Your Honor's opinion in HID ballast with

22   respect to MELCO is directly on point, and there MELCO had

23   pleaded guilty to fixing a number of different parts but HID

24   ballast was not one of those parts, but in the guilty plea

25   they pledge to provide the DOJ with cooperation, even though

1    HID ballast was not a part that they pleaded guilty to, and

2    in return they, the government, assured them they wouldn't

3    prosecute the case.  And so Your Honor said, and this is a

4    quote, the Court finds a strong inference of involvement

5    arises from MELCO's agreement to cooperate in the HID ballast

6    investigation.

7            That's exactly what we are saying here, Your Honor,

8    that there should be a strong inference from the fact that

9    they are prominently referenced throughout the guilty plea,

10   they agreed to provide cooperation.  And then you have

11   Mr. Kessler making, you know, a big deal out of the fact that

12   there was this public disclosure from Corning, Inc., the U.S.

13   entity, that put us on notice where Corning, Inc. admitted it

14   was being investigated and that it was subject to potential

15   antitrust violation.

16           So all of these facts suggest that it is plausible

17   that they participated in the conspiracy, and as Mr. Kessler

18   concedes, we are not limited by the fact that the DOJ

19   ultimately decided not to indict it and it didn't plead

20   guilty, it quite possibly could have been a trade off, but it

21   doesn't limit us in any way.

22           And so the second argument that Mr. Kessler makes

23   is he looks at the plea allocution by the Corning

24   International executive, and the Corning International

25   executive makes a statement that Mr. Kessler says is

1    suggestive that the conspiracy was just limited to Corning

2    International and not Corning, Inc.  Well, Your Honor, that's

3    a self-serving statement, it wasn't subject to cross

4    examination by anybody, let alone the plaintiffs.  And there

5    is clear law in the Sixth Circuit that for purpose of taking

6    judicial notice and just general evidence principles an

7    out-of-court statement used for the truth of the matter being

8    asserted is improper.  It is hearsay in its strongest form.

9    So that certainly doesn't support Mr. Kessler's argument.

10            So for all of these reasons we allege that the

11    allegations are sufficient here with respect to

12    Corning, Inc., they are no different than numerous other

13    defendants where you have upheld our complaint.  Thank you.

14            THE COURT:  Okay.  Thank you.

15            MR. KESSLER:  Very quickly, Your Honor.  So let's

16    look at TRW because this makes my point.  This is what the

17    Court pointed out in TRW:  The complaint further alleges that

18    TRW Automotive directly participated in meetings and

19    submitted rigged bids in furtherance of the conspiracy.  Your

20    Honor, there are no such allegations about Corning in this

21    case, that's why I said this is very different.  It says this

22    is not a case where they have made allegations, and what TRW

23    was arguing is that the allegation was not detailed enough,

24    and you said it is detailed enough.  Okay.  Your Honor, there

25    are no details, there's no allegations, very, very different.

1          MELCO, MELCO was a case where it was a U.S.
2     subsidiary of a Japanese parent where the allegation was the
3     Japanese parent engaged in all the conspiratorial meetings
4     and then directed the subsidiary which it owned and
5     controlled as to how to sell in the United States, and Your
6     Honor citing Carrier Corp. said that was sufficient for now
7     to keep in the subsidiary of the parent who controlled it.
8          This is the reverse.  Okay.  Again, a unique case.
9     Here the parent is not alleged to have done anything.  The
10    parent is not alleged to have known about what this rogue
11    employee of the subsidiary was doing.  The subsidiary was in
12    Japan where this took place.  And it is nothing like MELCO.
13    There is no allegation here that CIKK sent its products and
14    directed and controlled its parent to sell the allegedly
15    price-fixed products on its behalf, that's not these facts at
16    all.
17         So, again, the problem with plaintiffs' case is
18    their complaint.  Their complaint does not have allegations
19    that match up with any of these other cases, and it is no
20    accident, Your Honor, because, as I would submit, if they
21    came in with a new complaint and said, oh, CIKK controlled
22    Corning who sold for it, I would move under Rule 11.  If they
23    came in with a new complaint that said oh, Corning Corp.
24    engaged directly in conspiratorial meetings, I would move
25    under Rule 11 to strike those allegations.  The reason these

1    allegations are not here and they were in the other cases is

2    because they know they have no Rule 11 basis to make them.

3         Your Honor, this is one of the few cases I think

4    you will find in this docket where Twombly requires that

5    there must be a dismissal of this defendant.  Thank you.

6         THE COURT:  Thank you.  All right.  Mr. Meisner?

7         MR. MEISNER:  Thank you, Your Honor.

8    NGK Insulators has two additional arguments to dismiss the

9    claim that it has put before the Court.  One is with respect

10   to application of the FTAIA to certain sales that plaintiffs

11   allege in their complaint, and the other is with respect to

12   antitrust standing.  And with the Court's indulgence I would

13   like to spend just a few moments on this, it has already been

14   quite a morning so far.

15        THE COURT:  Okay.

16        MR. MEISNER:  I think with respect to the FTAIA it

17   is important for me to say right at the outset that there has

18   been recent case law that the Court has not addressed in this

19   context that I think provides a lot of illumination onto why

20   a particular group of sales that the plaintiff specifically

21   allege should be removed from this case, and I would like to

22   describe those sales.

23        Plaintiffs have alleged three categories or we call

24   them groups of sales, A, B and C.  A sales are sales that

25   occur within the United States of ceramic substrates.  We

1    don't -- the FTAIA argument that we make here does not apply

2    to those sales.  Group B sales are sales of ceramic

3    substrates that are imported into the United States from

4    elsewhere, Japan and elsewhere, but they come to the United

5    States as ceramic substrates, and we, again, don't argue that

6    those sales should be out of this case under the FTAIA.

7         Instead it is what are called Group C sales which

8    the plaintiffs specifically allege are ceramic substrates

9    that are processed into catalytic converters and exhaust

10   systems that are installed into automobiles in Japan and

11   elsewhere outside of the United States, and then those

12   automobiles come to the United States not because NGK

13   Insulators or Corning or Denso export those cars into the

14   United States but because the car manufacturers do.  In other

15   words, the defendants have no role in those automobiles

16   coming into the United States.

17        With respect to those Group C sales that plaintiffs

18   have specifically alleged are subject to their damages

19   claims, there have been two important recent decisions, one,

20   Motorola Mobility by the Seventh Circuit, and the other by

21   Judge Cox in this Court in the In Re Refrigerant Compressors

22   case, that decision was last October of 2016, and -- excuse

23   me -- Motorola Mobility was in 2015.

24        I would like to describe those cases for the Court.

25   In those cases the court looked at situations where sales of

```
 1    an allegedly price-fixed component in Refrigerant
 2    Compressors, refrigerant compressor is part of a refrigerator
 3    or some other finished product.  In the case of Motorola
 4    Mobility it was display panels that wound up being
 5    incorporated into cellular phones.  Those products were sold
 6    outside of the United States to other entities in a supply
 7    chain, incorporated into their relative finished products
 8    outside of the United States and brought into the
 9    United States.
10         The Seventh Circuit reasoned that under the FTAIA
11    those were not import commerce to begin with.  So is -- did
12    those sales outside of the United States then have an
13    effect -- a reasonably foreseeable direct effect on commerce
14    within the United States, and did the conduct that is
15    asserted give rise to the antitrust claim?  Two important
16    components that must be satisfied in order for those
17    particular sales of those components incorporated outside of
18    the United States into finished products in order for
19    plaintiffs to have the ability to sue with respect to those
20    sales.
21         First, the Seventh Circuit addressed this issue and
22    said it does not give rise to a damages claim.  The
23    Seventh Circuit, with Judge Posner writing for the
24    Seventh Circuit, relied on principles of international
25    commodity as well as the notion that the sales took place
```

1    entirely outside of the United States of the price-fixed --

2    allegedly price-fixed component, and that it was not the

3    defendants who brought that final product into the

4    United States but rather in those situations it was the

5    plaintiff who did so who -- or the plaintiff's subsidiaries

6    who did so.

7         Now, in this situation we have an actual much more

8    difficult situation for the plaintiffs because as the

9    plaintiffs have alleged and incorporated in the plea

10   agreements by reference, and they don't dispute that the

11   Court can take judicial notice of those plea agreements, a

12   ceramic substrate passes through multiple layers from the

13   manufacturers to companies that are called coaters who apply

14   a catalyzing substance and transform that ceramic substrate

15   into something that can actually remove noxious toxins from

16   exhaust that comes out of a car.  Those catalyzed components

17   then get incorporated into a catalytic converter, which is

18   something you might be able to see underneath your car, and

19   that catalytic converter then goes to another entity that

20   creates an exhaust system before it is then provided to the

21   OEM and assembled into a car.

22        So the chain of distribution for ceramic substrates

23   from when it is manufactured to when it is actually put into

24   a finished vehicle or product that these plaintiffs -- that

25   it is then exported into the United States and the plaintiffs

1    get to, is a substantially longer chain than either that was

2    described with respect to the cell phones at issue in

3    Motorola Mobility and the refrigerators that were at issue in

4    In Re Refrigerant Compressors.  Both those courts said that

5    while there may be some instance in which a tiny ripple

6    effect occurs in the United States that doesn't matter

7    because the claims -- the sales of those products all took

8    place outside of the United States and therefore under the

9    FTAIA they do not arise -- their claims do not arise under

10   the laws of the United States.

11        The plaintiffs make two assertions with respect to

12   this argument.  The first is that the FTAIA does not apply to

13   their state law claims, and I want to address that by saying

14   that this Court in two prior parts cases has looked at the

15   issue of whether the substantive antitrust law is applicable

16   to plaintiffs' claims, and it was in the context of standing.

17   And the Court concluded in those situations that the various

18   states either had a statute -- a harmonizing statute with

19   respect to federal law, including case law that interprets

20   it, or the highest court in the other states that didn't have

21   that sort of harmonizing statute also looked to federal law

22   to describe the contours of the state antitrust claims.

23        In the bearings case, the bearings -- a bearings

24   defendant brought a different argument -- type of argument

25   under the FTAIA and presented lengthy briefing to the Court

1    on this issue of whether the FTAIA applied.  And, Your Honor,

2    the Court looked at that, acknowledged all the arguments and

3    all of the authority that was presented to the Court and then

4    went on to analyze the particular issue in that case with

5    respect to the FTAIA.

6              And, again, I want to also highlight that this is a

7    very recently developing situation, and I just want to point

8    the Court to another decision in a different case, and it is

9    the Capacitors antitrust case, I can give you a cite for

10   this, that is 2016 U.S. District Lexis 136224, that's

11   Northern District of California, in which that court has

12   recently addressed this exact same issue and concluded that

13   the scope of state antitrust claims with respect to foreign

14   extra jurisdictional effect can be no broader than what is

15   interpreted under federal law and the scope of the FTAIA.  So

16   the FTAIA certainly applies to the plaintiffs' claims.

17             THE COURT:  Is -- let's see, is bearings the only

18   other part in this case that we looked at the FTAIA?

19             MR. MEISSNER:  To the best of our ability to look

20   through every single motion to dismiss --

21             THE COURT:  I tried to do that too.

22             MR. MEISSNER:  -- that was the one we could find

23   so, Your Honor, to the best of our understanding that's the

24   case.

25             The other thing that the plaintiffs say in response

 1    to this argument is that what we are really arguing is that

 2    they are indirect purchasers and that Illinois Brick does not

 3    apply in this situation.  And they looked to the Refrigerant

 4    Compressors case and also the Motorola Mobility case and say

 5    that those cases are really just analyzing whether the

 6    indirect purchaser rule applies.  While there is some analogy

 7    to the way the analysis unfolds under both the FTAIA and also

 8    under the Illinois Brick indirect purchaser rule, both courts

 9    have made it quite clear that the FTAIA is a completely

10    separate ground for which the Court can look to the proper

11    scope of plaintiffs' claims and rule whether a claim can be

12    dismissed even if they have standing under the Illinois Brick

13    doctrine, which we don't dispute that these plaintiffs have

14    Illinois Brick, obviously we know that from many years of

15    litigation in this case and before, we are not addressing

16    Illinois Brick, the Illinois Brick aspects of both of those

17    cases, rather we are squarely within the FTAIA.  And, again,

18    both of those decisions, Refrigerant Compressors as well as

19    Motorola Mobility, make it quite clear that these are

20    alternative grounds for which plaintiffs' claims must

21    survive.

22         I want to very, very briefly talk about antitrust

23    standing here.  This is a very unique issue with respect to

24    ceramic substrates, and I want to describe just very --

25    hopefully briefly and clearly what happens in the production

1   process from a ceramic substrate being released from our

2   factories to when it winds up in an automobile, and these

3   facts, again, plaintiffs do not dispute that are properly

4   before the Court.

5          The ceramic substrate is basically a cylinder and

6   that thing in and of itself cannot perform the function of

7   converting gas that flows through it from something that is

8   noxious to something that is much better for the environment.

9   It has to be catalyzed through a chemical process, and that

10  chemical process alters fundamentally this thing that comes

11  out of our factories into something that can have gas go

12  through it and its chemical properties transform that gas

13  from the noxious gas into something that is acceptable under

14  our environmental standards, for instance, in the

15  United States.

16         Once that happens, once that catalyzing process

17  happens, it is not possible to go back and alter or change

18  back to the substrate that comes out of our factories; it is

19  changed, it is altered.  Once that substrate is catalyzed, it

20  is a catalyzed product, it gets incorporated into a can, a

21  tin can, and essentially that's what your catalytic converter

22  is, and that catalytic converter is installed on an exhaust

23  system, which again are big tailpipes with these catalytic

24  converters on it, and then that exhaust system gets installed

25  on a car and we buy the car.

1           The transformation of ceramic substrates into

2      something that becomes a catalytic converter that can take

3      exhaust and change it from something noxious to something

4      that is not so noxious that is good or better for the

5      environment transforms the product in a fundamental way.  And

6      under this Court's reasoning in previous cases in which the

7      Court has analyzed antitrust standing it has said that in

8      looking at the AGC factors, the Associated General

9      Contractors factors, and in particular the first one, which

10     is the link between the plaintiffs and the harm, you look to

11     whether the product is traceable in its form, whether it has

12     not been altered or transformed in the supply chain, and here

13     it clearly has.

14          And so taking a look at weighing the AGC factor in

15     terms of that first factor, if you -- again, the Court has

16     relied on the Flat Panel and other cases that look at this

17     particular issue, none of the parts that we have seen that

18     have come before ceramic substrates is so fundamentally

19     transformed.  You can pluck them out of a car in some way,

20     shape or form and it is the same thing that came out of the

21     factory.  That is simply not the case with ceramic substrates

22     and why we very respectfully ask the Court to look at this

23     issue anew with respect to ceramic substrates.

24          Once we got past that issue, the transformation

25     issue, that changes the balance on the first factor of

1    Associated General Contractors in favor of the plaintiffs or

2    in favor of the defendants.  We submit the factor now weighs

3    more importantly toward us because that connection between

4    the plaintiffs and what comes out of our factory has been

5    changed by the process that absolutely alters it into

6    something completely different that is useful for the, as I

7    say, the OEMs and also for the plaintiffs.  Plaintiffs have

8    no interest in buying a ceramic substrate or anything like

9    it.  Plaintiffs are interested in the catalyzed product that

10   actually performs the function of removing pollutants from

11   the air.  That makes it different.

12           If you look at the rest of the AGC factors,

13   factor 2 we concede weighs in favor of the plaintiffs, but

14   factors 3, 4 and 5 goes to tracing things like duplicative

15   recovery, the amount of impact that goes to the supply chain,

16   those type of things because of this fundamental change that

17   removes the product, ceramic substrate, and changes it into

18   something else.  We contend, as we said in our papers, that

19   those factors should weigh in our benefit.  The fundamental

20   value of the thing is forever changed, you can't go back to

21   it once it is transformed into the way that it is.

22           And, Your Honor, that's what we have to say with

23   respect to that.  Thank you.

24           THE COURT:  Okay.  Thank you.

25           MR. OCHOA:  Hello.  Omar Ochoa again on behalf of

1    the end payors and auto dealers.

2         With respect, first, to the FTAIA argument -- well,

3    let me just back up and put some context on this.  So both

4    issues have been addressed by the Court, whether the FTAIA

5    applies and bars plaintiffs from bringing claims and whether

6    the plaintiffs have antitrust standing under AGC.  And the

7    Court in each time that it has analyzed these issues have

8    found in favor of the plaintiffs.  And so essentially what

9    NGK is doing today is trying to differentiate itself under

10   both instances but neither differentiates it from this

11   Court's previous decisions.

12        As far as the FTAIA goes, Your Honor, there was

13   some confusion I think in the initial briefing.  There are

14   two express exceptions to the FTAIA.  Your Honor, there is

15   the exception which has been at issue today in the argument

16   and in the briefing, which is the domestic effects exception,

17   and there is also the foreign import commerce exception.  I

18   think it has been cleared up now that allegations about

19   ceramic substrates that have been sold in the U.S. are not at

20   issue for the motion to dismiss, so we do appreciate that

21   clarification.

22        But even as far as the domestic effects exception

23   goes, which is what is at issue today, there are two elements

24   that need to be met.  The first is that the defendant's

25   conduct has a direct and substantial and reasonably

1    foreseeable effect on domestic commerce, and the second is

2    that the conduct gives rise to a Sherman Act claim.  And so I

3    think enunciating these two elements are important to really

4    distill down to what the decisions in Motorola and

5    Refrigerant Compressors came out to be.

6         In that case the first issue -- the first element,

7    whether the defendant's conduct had a direct substantial

8    reasonably foreseeable effect, was not at issue.  It is not

9    at issue here either.  The defendants have not asserted any

10   arguments as to why the plaintiffs' allegations in the

11   complaint are not such that the defendant's conduct had a

12   direct and substantial effect.

13        So the only real issue is whether or not the

14   plaintiffs' claims give rise to a Sherman Act claim, and the

15   obvious answer to that is yes.  That -- since that is the

16   only basis it is clearly wrong because this Court has found

17   over and over again that the plaintiffs have properly alleged

18   antitrust causes of action as indirect purchasers.  NGK's

19   argument is essentially seeking to undo the notion that these

20   automotive parts case are proper.

21        And pointing specifically to the two cases cited by

22   NGK, Motorola Mobility and Refrigerant Compressors, those

23   cases are just not really on point for the Court's decision

24   today.  The -- NGK's counsel characterized us as describing

25   those cases as analyzing whether the indirect purchaser rule

 1   applies but that's not at all what those cases say.  There
 2   really is just kind of a fundamental misunderstanding of the
 3   cases between plaintiffs and between NGK, and that
 4   disagreement is this:  In those cases the court determined --
 5   the Seventh Circuit in Motorola Mobility determined that the
 6   plaintiff who had brought the claim was bringing that claim
 7   on behalf of its subsidiaries, and because it was doing so it
 8   was bringing a derivative claim and that's the reason why an
 9   antitrust claim did not lie.
10           It wasn't that the conduct that was alleged can in
11   no way ever be the basis for an antitrust claim, it is the
12   specific plaintiff in that case did not have the antitrust
13   claim at issue, and that's very clear from the Court's
14   opinion on page 820 where it sums up after its analysis this
15   is thus a case of derivative injury and derivative injury
16   rarely gives rise to a claim under antitrust law.  So it had
17   nothing to do with the actions of the defendant, whether or
18   not those can come under an antitrust law, it was that the
19   specific plaintiff in that case cannot carry forward that
20   claim, and as a result the Court found that those claims were
21   barred.
22           Similar analysis in the Refrigerant Compressors
23   claim, Your Honor, basically citing to the same analysis, it
24   is the same set -- kind of facts, the same claims, and so the
25   same results, so the interpretation of one case can be used

1   in the other.  As a result, those claims are completely

2   different from what we have here.

3          Plaintiffs are obviously bringing indirect

4   purchaser claims, those indirect purchaser claims had been

5   found proper over and over and over again, and so the notion

6   that these two, quote/unquote, new cases somehow are

7   dispositive and changed this Court's analysis previously

8   found in FTAIA is just not correct, Your Honor.

9          As to the plaintiffs' antitrust standing, that also

10  boils down to a simple issue, Your Honor, and that's whether

11  the process of coating a substrate somehow alters it or makes

12  it unidentifiable and untraceable.  Noticeably NGK does not

13  offer any analogous case to demonstrate that a simple coating

14  over a product makes it untraceable or unidentifiable because

15  it is just not true.

16         THE COURT:  He says you can't pick out the product

17  from the car now?

18         MR. OCHOA:  Well, you can, it just has a coating on

19  it.  So the substrate keeps its form, keeps its same physical

20  properties, but the coating on it does not change being able

21  to identify the substrate in the car.  It is just simply not

22  true.  This is not similar to other cases where courts have

23  found the product to be untraceable.

24         One of those that we cited in our brief is the

25  Los Gatos case out of the Northern District of California.

1    There the product at issue was titanium dioxide, which is a

2    chemical ingredient that becomes part of a finished product

3    that it is applied to, so chemicals are mixed together to

4    create a whole other product.  That's the type of a process

5    that makes a product become unidentifiable and untraceable,

6    not simply putting a coating over a product and then putting

7    it into a catalytic converter.

8           So because there is no transformation of the

9    process, because the substrate continues to be identifiable

10   even with the coating surrounding it, again, that -- the fact

11   of the coating does not change this Court's analysis and does

12   not render that product unidentifiable, and for those reasons

13   Your Honor's analyses stand also in this particular case.

14          THE COURT:  Okay.  Thank you.  Mr. Meisner, I have

15   a question to ask you.

16          MR. MEISNER:  Please.

17          THE COURT:  Do you think that Motorola leaves open

18   the door for the pass-along damages, the Motorola case?

19          MR. MEISNER:  So I think the issue there -- it is a

20   very related issue.  The issue is whether the substrates that

21   are made and sold in the United States, whether there is pass

22   on to the plaintiffs -- let's just take Group A sales for

23   example.  NGK and others sells ceramic substrates in the

24   supply chain to a domestic OEM, hypothetically GM.  In that

25   situation the FTAIA would not apply because that is totally

1     domestic commerce, and all of the issues of pass-through,

2     well, that's a completely separate analysis which is

3     completely outside of the issue of the FTAIA.  The way that

4     it is similar in a way to the issue is that the sales that

5     the FTAIA is concerned about are all of those sales that take

6     place outside of the United States and, again, I'm just going

7     to quote the Motorola Mobility case in this respect.  What

8     trips up -- this is 775 F3rd at 819.  What trips up

9     plaintiff's suit is the statutory requirement that the effect

10    of anticompetitive conduct on domestic U.S. commerce gives

11    rise to an antitrust cause of action.  It is a bigger

12    question.

13            And, again, in those -- in that situation the idea

14    of the effect, the direct substantially reasonable

15    foreseeable effect on U.S. commerce, that's a wholly separate

16    inquiry, and counsel is right, for this motion we are not

17    disputing that plaintiffs have alleged that, but what they

18    have failed -- where they have failed is by alleging all of

19    the specific facts about the sales of ceramic substrates

20    abroad, and the way in which ceramic substrates move through

21    the supply chain into -- once it's catalyzed and becomes a

22    catalytic converter into an exhaust system into a car that

23    comes into the United States.

24            Looking at the Motorola Mobility decision in

25    particular, the Seventh Circuit focuses on the locus of all

1    of those sales outside of the United States and concludes

2    that those claims with respect to those particular sales do

3    not give rise to a U.S. antitrust claim.  That's what we are

4    focused on here.

5              So it is a slightly different issue than the

6    pass-on issue, which, again, would be something that we would

7    have to address if we have to address Group A and Group B

8    sales.

9              THE COURT:  Is that what the Seventh Circuit said,

10   that they had waived that argument?

11             MR. MEISSNER:  The Seventh Circuit assumed a way --

12   so we assumed that, yes, indeed there have been -- that the

13   claimant in that particular situation would have satisfied

14   that particular prong, the direct reasonably substantially

15   foreseeable, although the Seventh Circuit cast some doubts

16   about the ability to actually prove that, they assumed that

17   they had satisfied that --

18             THE COURT:  Okay.

19             MR. MEISSNER:  -- particular element.

20             Okay.  I want to get back to the standing argument

21   in just a sense because I think that the idea that a product

22   has to be -- the only products in terms of transformation

23   that would be say sufficient transformation in order for

24   there not to be standing would be chemical products that are

25   mixed together that become a completely new sort of chemical

1    compound, and the Titanium Dioxide case was pointed to.

2            In this situation the cases say transformed or

3    altered, and we are saying altered.  The ceramic substrate is

4    inert and it has to have this chemical process that changes

5    it in order for it to become something that is useful, much

6    like titanium dioxide would be combined with other chemicals.

7    You can still probably identify the titanium dioxide in that

8    product or get back to it in some way through another

9    chemical process, but it is altered, it's mixed, it's

10   blended, it becomes something different that performs a

11   chemical reaction or some different type of chemical effect,

12   much like a catalyzed substrate does exactly the same thing

13   in a catalytic converter.

14           The idea that this is a coat of paint, I'm not sure

15   exactly what plaintiffs are getting at here, but this coat of

16   paint issue I like to take it akin to is if the product --

17   let's just take a coat of paint, a painter painting a work of

18   art on a canvas, and in my analogy the canvas would be the

19   ceramic substrate and the paints would be the complex blend

20   of chemical products that are coated -- that the ceramic

21   substrate goes through in order to become something that is

22   useful for the end consumer.

23           And my analogy to an actual painting, you have the

24   canvas but the many different paint colors that are applied

25   to a painting to yield a work of art like that or something

1    very different, perhaps a masterpiece by Rembrandt or by

2    Monet, the value -- the value of that -- the reason why

3    transformation is important here in terms of tracing the

4    injury is that the plaintiffs or the end consumer of this

5    painting or the end consumer of a Rembrandt would pay

6    whatever the value of that product is to them, and that is

7    why transformation is important in terms of the traceability

8    of the argument in these coats of paint analogy of the

9    plaintiffs here.

10             It is not as simple as just washing it in water or

11   an acid bath in which you pull it out and the ceramic

12   substrate is clean, it is forever changed by the chemical

13   coating processes.  That's why this is different.  Thank you,

14   Your Honor.

15             THE COURT:  Okay.  Thank you very much.

16             All right.  The Court will issue an opinion.  Thank

17   you.

18             THE LAW CLERK:  All rise.  Court is adjourned.

19             (Proceedings concluded at 12:03 p.m.)

20

21

22

23

24

25

```
 1                            CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4      the United States District Court, Eastern District of

 5      Michigan, appointed pursuant to the provisions of Title 28,

 6      United States Code, Section 753, do hereby certify that the

 7      foregoing pages comprise a full, true and correct transcript

 8      taken in the matter of Automotive Parts Antitrust Litigation,

 9      Case No. 12-02311, on Wednesday, April 19, 2017.

10

11

12                            s/Robert L. Smith
                              Robert L. Smith, RPR, CSR 5098
13                            Federal Official Court Reporter
                              United States District Court
14                            Eastern District of Michigan

15

16

17      Date:   05/03/2017

18      Detroit, Michigan

19

20

21

22

23

24

25
```