```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION
                               —   —   —
 3
      IN RE: AUTOMOTIVE PARTS
 4    ANTITRUST LITIGATION
      _____
 5                                         Case No. 12-02311
      ALL PARTS
 6    _____     Hon. Marianne O. Battani

 7
      THIS RELATE TO ALL CASES
 8    _____/

 9        CERTAIN NON-PARTY ORIGINAL EQUIPMENT MANUFACTURERS'
      OBJECTION TO ORDER REGARDING THE PARTIES' RENEWED MOTION TO
10    COMPEL DISCOVERY FROM CERTAIN NON-PARTY ORIGINAL EQUIPMENT
             MANUFACTURERS AND THEIR AFFILIATED ENTITIES
11
                BEFORE THE HONORABLE MARIANNE O. BATTANI
12                    United States District Judge
                  Theodore Levin United States Courthouse
13                   231 West Lafayette Boulevard
                           Detroit, Michigan
14                      Thursday, May 4, 2017

15
      APPEARANCES:
16
      For the            ELIZABETH T. TRAN
17    Plaintiffs:        COTCHETT, PITRE & McCARTHY, L.L.P.
                         840 Malcolm Road
18                       Burlingame, CA  94010
                         (650) 697-6000
19
      For the            ADAM C. HEMLOCK
20    Defendants:        WEIL, GOTSHAL & MANGES, L.L.P.
                         767 Fifth Avenue
21                       New York, NY  10153
                         (212) 310-8281
22

23

24
           To obtain a copy of this official transcript, contact:
25             Robert L. Smith, Official Court Reporter
               (313) 964-3303 • rob_smith@mied.uscourts.gov
```

```
 1
     APPEARANCES:   (Continued)
 2
     For the OEMs:          KIMBERLY C. METZGER
 3                          ICE MILLER
                            One American Square, Suite 2900
 4                          Indianapolis, IN  46282
                            (317) 236-2100
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              TABLE OF CONTENTS

2

3                                                                    <u>Page</u>

4      Motion by Ms. Metzger.............................. 5

5      Response by Ms. Tran...............................16 & 48

6      Response by Mr. Hemlock............................34 & 51

7      Reply by Ms. Metzger..............................38 & 54

8      Ruling by the Court...............................57

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Motion Hearing - May 4, 2017

4

```
 1    Detroit, Michigan
 2    Thursday, May 4, 2017
 3    at about 2:31 p.m.
 4                         _   _   _
 5              (Court and Counsel present.)
 6              THE CASE MANAGER:  Please rise.
 7              The United States District Court for the Eastern
 8    District of Michigan is now in session, the Honorable
 9    Marianne O. Battani presiding.
10              You may be seated.
11              THE COURT:  Good afternoon.  All right.  For the
12    record, may I have your appearances, please?
13              MS. METZGER:  Kimberly Metzger for --
14              THE COURT:  I can't hear you.
15              MS. METZGER:  Sorry.  Kimberly Metzger for
16    Subaru of Indiana Automotive.
17              MS. TRAN:  Elizabeth Tran for the end payor
18    plaintiffs.
19              MR. HEMLOCK:  Adam Hemlock, Weil, Gotshal & Manges,
20    on behalf of the Bridgestone and Calsonic defendants.
21              THE COURT:  Okay.  This is the OEMs' objections to
22    the Master's order, so you may -- please take the podium.
23              MS. METZGER:  Good afternoon, Your Honor.  We are
24    requesting -- the OEMs are requesting --
25              THE COURT:  I'm going to ask you to keep your voice
```

1    up and maybe move that microphone a little closer to you.

2              MS. METZGER:  Oh, sure.  How's that, better?

3              THE COURT:  Thank you.

4              MS. METZGER:  The OEMs are requesting three primary

5    types of relief with our motion.  The first is relief under

6    Rule 45(d)(1) related to the cost of the expenses that the

7    OEMs incurred narrowing scope of the subpoena that was

8    originally served.  And then there are two requests -- two

9    separate types of requests under 45(d)(2)(B)(2), these are

10   compliance-related expenses; one is for follow-up questions

11   related to the 30(b)(6) depositions, the expenses related to

12   those, and then the second is for attorney fees related to

13   compliance with the subpoena itself which was excluded from

14   the Special Master's order.

15             If we could address the subpoena issue first under

16   Rule 45(d)(1).  This is not a request for cost shifting, Your

17   Honor, and I think that's an important part of this argument

18   because the portion of Rule 45 under 45(d)(2)(B)(2) is a

19   cost-shifting type of statute and it's not what we are

20   looking for.  What we are looking for is relief under

21   45(d)(1) which is a relief in the form of a sanction for the

22   serving parties related to their failure to exercise

23   reasonable efforts to serve a subpoena that does not impose

24   undue burden and expense on the parties that receive the

25   subpoena.

1          Rule 45(d)(1) imposes an affirmative duty on the

2     parties who serve a subpoena to serve one that takes

3     reasonable steps to serve a subpoena that's not going to

4     impose undue burden and expense, and the operative question

5     here, Your Honor, is not whether the parties -- whose better

6     able to bear the expense, what issue of public importance

7     there may be, that is an argument under Rule 45(d)(2)(B)(1).

8     The operative question for purposes of attorney fees related

9     to narrowing the scope of subpoena is whether or not the

10    serving parties exercised reasonable steps to avoid imposing

11    undue burden and expense, and in this particular case, Your

12    Honor, clearly the parties did not.

13          The fact that the Rule 45(d)(1) describes what we

14    are seeking as sanctions naturally makes everybody cautious,

15    and we are looking for an appropriate case because sanctions

16    are not something that should be lightly imposed, but

17    appropriate caution in this case does not necessarily mean

18    that an award is inappropriate, and in this case it actually

19    is a textbook case where there's an award under

20    Rule 45(d)(1).

21          The subpoena as served included 36 requests in the

22    body, 18 in the attachment and more than 100 subparts.  It

23    sought detailed information and data on 56 automobile parts

24    and all vehicles manufactured from 1992 to 2014.  All of the

25    subpoenas have been described in various ways by the various

1   parties.  The essence of it is that it essentially sought
2   every scrap of paper, every digital byte of data related to
3   the recipient's purchase and sale of auto parts regardless of
4   their size, regardless of the market share, every subpoenaed
5   entity received the same subpoena.
6        The most interesting thing about the subpoena
7   perhaps, Your Honor, is the fact that the parties essentially
8   had a preview of what was going to happen when they actually
9   served it.  This is back in June of 2015 when -- and now
10  Subaru of Indiana Automotive was not a party to the
11  litigation at this point so we are getting this -- and we are
12  not a party at this point, but we were not involved at all,
13  so we are getting this information from the record, but what
14  the record indicates is that the Special Master ordered the
15  parties to serve a single subpoena on the potential
16  subpoenaed entities, the OEMs and some other entities that
17  were not OEMs, and the purpose of serving the single subpoena
18  was supposed to be to lessen the burden and expense on the
19  parties who received it.
20       THE COURT:  That is pursuant to the decision of the
21  Court that there is to be this subpoena, right?
22       MS. METZGER:  Yes, yes.  And instead of curating --
23  taking the universe of what they might like to have and
24  curating that down somehow, instead what appears to have
25  happened is that every party that served the subpoena took

```
 1    every request that they might wish to have and simply lumped
 2    it into a single document and served it.  So there was no
 3    curating, there was no apparent thought to what may be most
 4    important, what may be least important, what can we do
 5    without, and these are the choices that we make in litigation
 6    every day.
 7            For example, if the Court says you can take one 7.5
 8    deposition, you may have to do without some information in
 9    order to meet those deadlines and those time lines, and
10    that's the case here.  What appears to have happened is that
11    each of the parties took the universe of information that
12    they would like to have and simply put it into a single
13    document and that was the document that was served.
14            There was some back and forth in the court in
15    June -- I believe June and July of 2015 related to the scope
16    of this subpoena.  One of the OEMs who was a party to the
17    case at the time served some objections to the -- interposed
18    some objections to the subpoena and some other folks did as
19    well, talking about the monumental breadth, what was to be
20    expected if the subpoena was served, and the Special Master
21    appeared to agree with that and said I'm not going to rule on
22    these objections, what is actually happening here is that the
23    objections are premature, but what the Special Master did
24    recognize is that the subpoenaed entities had what he called
25    a vital interest in avoiding undue burden and expense, and
```

1    the Special Master predicted that there would be litigation

2    by the subpoenaed entities to protect this vital interest if

3    the subpoena was served in the form that it was.  So the

4    parties had a preview of exactly what was going to happen if

5    they served the subpoena and that is precisely what did

6    happen.

7          To be clear, the Special Master never blessed the

8    subpoena, never said it was proportional, never said it was

9    appropriate, simply said that I'm not going to rule on these

10   objections at this point.  We will deal with the objections

11   when the subpoenaed entities receive the subpoena and see

12   what they do with it.  And that, Your Honor, we would say was

13   an inappropriate flipping of the burden.

14          Instead of instructing the parties to curate their

15   subpoena so it truly does encompass the most reasonable

16   request, the most necessary request, and is something that is

17   reasonable and appropriate and proportional under the

18   circumstance, the burden was pushed onto the subpoenaed

19   recipients to work after the fact with the parties to narrow

20   the scope of the subpoena to something that's reasonable, and

21   we would say that was inappropriate because once the subpoena

22   was served, of course, the parties or the subpoenaed

23   recipients had no choice at that point but to try to narrow

24   the scope because compliance would have been virtually

25   impossible.

```
 1              And there is an extensive record on the fact that
 2   the parties went back and forth trying to narrow the scope of
 3   the subpoena, I believe it is ECF Document 1227, and the
 4   exhibits to that show the parties' correspondence and, of
 5   course, we are going to qualify those in various ways.  The
 6   parties are going to qualify them a different way, but the
 7   correspondence speaks to itself.  There was no dragging of
 8   the feet by the OEMs who received the subpoena, there was no
 9   attempt to delay the process.  What the parties will say is
10   that we incurred expenses because we didn't immediately start
11   to comply, we didn't immediately sit down with the parties
12   and begin to say -- help them narrow the scope of the
13   subpoena which is something that should have been done at the
14   outset before the subpoena was served.
15              THE COURT:  But you and the parties met for some
16   time or had different communications regarding narrowing the
17   scope over the period -- an extensive period of time?
18              MS. METZGER:  We did, we did, but that was after
19   the subpoena was served, and those were all expenses that the
20   OEMs naturally needed to retain outside counsel for.  The
21   burden and expense on the employees within the OEM groups to
22   respond to those requests and to prepare those letters and
23   those correspondences, and those never would have occurred if
24   the subpoenaed -- if the parties serving the subpoenas had
25   sat down and thought what do we need the most here, what is
```

 1    most important, not what is everything that we might like to

 2    have in a perfect world but what is most important for our

 3    needs right now, and those are the things that we are going

 4    to ask for.

 5            And there was -- Judge Alsup in the Northern

 6    District of California in the Straight Path vs. Blackberry

 7    case made a statement that we think is particularly

 8    appropriate here.  In awarding fees under 45(d)(1) for an

 9    overbroad subpoena Judge Alsup said the litigants should not

10    be encouraged to demand the moon, thinking they can always

11    fall back on something reasonable.

12            THE COURT:  You know I'm missing what you're saying

13    because you are going so fast.

14            MS. METZGER:  Sorry.

15            THE COURT:  Please slow down.

16            MS. METZGER:  Sure.  Judge Alsup of the Northern

17    District of California in the Straight Path vs. Blackberry

18    case noted that litigants should not be encouraged to demand

19    the moon, thinking they can always fall back on something

20    reasonable; they should be reasonable from the start.

21            So instead of throwing everything against the wall

22    and seeing what sticks, which is what the parties did here,

23    they should have curated the subpoena from the front part and

24    come to us in the first instance with something that was

25    reasonable and something that was workable for us.

Motion Hearing - May 4, 2017

**12**

```
 1              THE COURT:  Okay.
 2              MS. METZGER:  There are several periods of time --
 3    Your Honor, in thinking about what it is that we are actually
 4    asking for, there are several periods of time that are
 5    relevant.  First is the OEM group negotiations that were
 6    conducted to narrow the scope of the subpoena, and the dates
 7    here were approximately July 2015, which was the date of
 8    service, through February 19th, 2016, which was the date of
 9    the SSE's response to the partie' motion to compel.  And in
10    that case, Your Honor, you can see in Document 1227 and the
11    exhibits, you can see the correspondence back and forth
12    between the parties and between the OEMs attempting to narrow
13    the scope of the subpoena.  Almost all of that work was
14    driven by the SSEs, by the OEMs, and there was some periods
15    of delay that were interposed by the parties not responding
16    to our requests, and throughout this process the OEMs
17    attempted to focus the parties on what do you have -- what do
18    you have from each to other, what can you get from each
19    other, what are the gaps in the record that you need us to
20    fill; we never got answers to those questions.  And you can
21    see the documentation flowing back and forth, and do we need
22    to comply with the subpoena at all, do you have what you need
23    already, and are you just trying to get duplicative
24    information from us?  We were also trying to focus the
25    parties on the size of the SSEs and their share of the U.S.
```

1    market of completed autos, and is the information that you

2    get from us actually going to make a difference in your

3    analysis.

4           And then there was the motion to compel that was

5    filed on January 19th, and the OEMs' response to that motion

6    to compel, which was filed on February 19th, 2016.  And as of

7    that date, Your Honor, the OEMs' response -- the parties had

8    made one offer of compromise on the subpoena which came on

9    Thanksgiving eve, the offer was cosmetic, it did not reduce

10   the burden on the SSEs, and you can see our chart of cosmetic

11   changes in Document 1227-4, and despite months of requests by

12   the SSEs the parties had refused to discuss information

13   already in their possession and to identify gaps in the

14   record that the SSEs could fill.

15          Even as cosmetically modified by the date we were

16   required to respond to the motion to compel, the subpoena

17   sought nearly 90 categories of documents for time periods

18   ranging from 12 to 22 years.  This would include every part

19   the OEMs purchased for decades, every vehicle they built,

20   every vehicle they sold, and every vehicle their customers

21   sold.  The subpoena at that point remained facially overbroad

22   and it also violated the rule of proportionality.

23          In responding to the subpoena -- I'm sorry, to the

24   motion to compel, the SSE -- the larger SSE group retained an

25   expert, an economist, who based on his review of the

1    information and his experience in antitrust matters involving

2    questions of impact and damages at the direct purchaser and

3    indirect purchaser level.  He concluded that much of the

4    information that was sought in the subpoena was unnecessary

5    to conduct a reliable estimate of impact and damages.

6        The smaller SSEs also hired an expert, another

7    economist, who opined in an affidavit and in a declaration

8    that the smaller SSEs -- what we called the smaller SSEs,

9    would not contribute appreciably based on their market share

10   to any model of damages that would be created later on by the

11   parties.  So the smaller SSEs should not have had to respond

12   to the subpoena at all.

13       There were a variety of mediations and hearings on

14   the motion to compel.  There was some drafting of orders that

15   was required, and, Your Honor, the narrowed list that the

16   SSEs received from the parties was not received until

17   October 14th of 2016, so more than almost 18 months after the

18   subpoena was served, that's when we got a narrowed request,

19   and even that narrowed request simply recited each type of

20   data or document that was identified in the 30(b)(6)

21   deposition.  So we would say that that narrowed request

22   wasn't even that narrow.

23       So at this point we have been litigating for almost

24   a year and a half and for the first time we are receiving

25   something that is purporting to be a narrowed list of

```
 1    requests, so that's where we are on the subpoena, Your Honor.
 2              THE COURT:  Okay.
 3              MS. METZGER:  In terms of the follow-up questions
 4    for the 30(b)(6) depositions, the Special Master's order
 5    awarded the SSEs some attorney fees related to the 30(b)(6)
 6    depositions but excluded a period of follow-up where the
 7    parties were asking additional questions, and the expenses
 8    and the fees that were related to the 30(b)(6) depositions
 9    did not carry forward into that period where additional
10    follow-up was required, and that should have been included in
11    the Special Master's order.
12              THE COURT:  Were those -- those were the
13    non-attorney fees, right?
14              MS. METZGER:  I'm sorry?
15              THE COURT:  Were those the non-attorney fees?
16              MS. METZGER:  We were awarded outside counsel fees
17    as well related to the 30(b)(6) depositions.
18              THE COURT:  The 30(b)(6)?
19              MS. METZGER:  Yes.  We were not awarded attorney
20    fees related to compliance with the deposition, the actual
21    production of documents, and we are wondering why that is the
22    case when attorney fees were awarded for the 30(b)(6)
23    depositions.  It would be a natural carryover to award them
24    as well for compliance with the subpoena, and that is another
25    portion of our request.
```

Motion Hearing - May 4, 2017

16

```
1          Is there anything I can answer for Your Honor?
2          THE COURT:  I just want to get this clear.
3          MS. METZGER:  Sure.
4          THE COURT:  The question is -- or one of the
5     questions is whether you are entitled to non-attorney costs
6     related to the deposition follow-up questions?
7          MS. METZGER:  The employees who were actually
8     deposed expended time and resources as well in collecting
9     information and gathering information for that follow-up, so
10    that's what that relates to.
11         THE COURT:  And the attorney fees in the last
12    question are related to the document collection?
13         MS. METZGER:  Yes, that's our request.
14         THE COURT:  All right.  Thank you.
15         MS. METZGER:  Thank you, Your Honor.
16         THE COURT:  Counsel?
17         MS. TRAN:  Good afternoon, Your Honor.
18         THE COURT:  Good afternoon, Ms. Tran.
19         MS. TRAN:  My name is Elizabeth Tran.  I represent
20    the end payor plaintiffs, though I will be responding on
21    behalf of the serving parties today.
22         We've been negotiating for 18 months, we've had two
23    motions to compel, we've had three mediations, we've had six
24    30(b)(6) depositions of 14 hours each, and the OEMs are still
25    fighting the subpoena, the very subpoena that this Court
```

```
 1    instructed the parties to get together to draft and negotiate
 2    in January 2015.  This subpoena is comprehensive because it
 3    had to meet the discovery needs of all the parties in the
 4    case.
 5            THE COURT:  What did you do to narrow it down?
 6            MS. TRAN:  You first instructed us to meet and
 7    confer on it in January 2015.  Over the course of three
 8    months the parties worked together to put together the
 9    requests they needed.  Defendants, plaintiffs, subgroups of
10    plaintiffs all had different sorts of needs.  For example,
11    the truck plaintiffs needed truck data, upstream and
12    downstream.  End payors needed -- end payors and auto dealers
13    are in the same distribution chain, but they needed
14    information that was different from what defendants also
15    needed.  So we had to get together and, you know, get
16    everyone's request in the same document.  And what we ended
17    up after three months with was a subpoena with 37 parts -- 37
18    requests.  After the first round of negotiations we narrowed
19    it down to 14 requests, and we were able to do this because
20    we compromised on a lot of the requests that we originally
21    wanted.
22            If you recall from all the pleadings so far with
23    respect to OEM discovery, we say that the OEMs first were
24    willing to negotiate with us individually but then they
25    banded together and refused to meet and confer with us
```

 1    individually.  They were unwilling to tell us basic

 2    questions, just as basic as how far their data systems went

 3    back.  So a lot of what we were doing was feeling our way in

 4    the dark.  Nevertheless, we narrowed it down to 14 requests.

 5         And after the depositions took place, after we went

 6    to mediation with the Special Master, we further narrowed

 7    down the subpoena.  For example, we tabled discovery in wire

 8    harness; we agreed to stagger upstream parts-specific

 9    discovery such that we would prioritize bearings and AVRP

10    which had class certification schedules, and then staggered

11    the rest of the cases.

12         With respect to upstream discovery, we limited the

13    amount of non-defendant suppliers from whom we sought

14    information.  With respect to downstream discovery, we

15    decided that it would be most efficient and -- most efficient

16    and most effective to obtain information from OEMs with

17    respect to vehicle data, so we narrowed our request to just

18    specific vehicles so that they could just produce one set of

19    downstream data that would cover all of our needs.  And that

20    downstream portion today where we have agreements, that's

21    about 75 percent of our subpoena, 25 percent relates to

22    upstream part-specific discovery.

23         I want to go back to the Special Master's order on

24    cost sharing.  He awarded the OEMs -- or he ordered the

25    parties to pay 60 percent of the OEMs' cost for 30(b)(6)

Motion Hearing - May 4, 2017

19

```
 1    depositions which included employee costs and attorney fees
 2    for outside counsel to not only attend the depositions but to
 3    also prepare for the depositions.  Furthermore, he also
 4    ordered the parties to pay 70 percent of OEM cost for
 5    document collection and production which includes their
 6    employee costs.  He declined --
 7              THE COURT:  That's 70 percent?
 8              MS. TRAN:  70 percent.
 9              THE COURT:  I'm sorry.  I thought you said --
10              MS. TRAN:  70 percent.  He declined at the
11    December 9th, 2016 hearing to award costs for negotiating the
12    subpoena.  He said this was a foreclosed issue but the Court,
13    of course, had the ability to overturn his decision.
14              So this cost-sharing decision, the 60 percent, the
15    70 percent, this was a procedural decision and it is
16    unprecedented.  In fact, we mentioned in our brief, none of
17    the hundreds of attorneys that represent plaintiffs and
18    defendants in auto parts are aware of such significant cost
19    shifting in similar price-fixing cases.  The parties could
20    have and probably should have objected to the cost-sharing
21    order given what we perceive as the law being on our side,
22    but we did it in the interest of obtaining the OEM discovery
23    as quickly as possible, especially since it has been two
24    years now.
25              So our position is the OEMs are just causing more
```

Motion Hearing - May 4, 2017

20

1    delay by seeking even more than what the Special Master

2    generously ordered, and the parties respectfully request that

3    the Court affirm the Special Master's cost-sharing order and

4    overrule the OEMs' objection.

5        And as an initial matter, the OEMs misstate the

6    standard of review in their objection.  It is not de novo.

7    Rule 53 governs review of special master's decision and

8    Rule 53(f) provides that the Court may, quote, set aside a

9    master's ruling on a procedural matter only for an abuse of

10   discretion, close quote.

11       Here the Special Master arrived at this

12   cost-sharing decision after multiple rounds of mediation and

13   multiple rounds of motion practice.  He did not issue this

14   cost-sharing order at whim.  The Court should therefore

15   review this order for the vast discretion afforded to a

16   District Court in supervising discovery.

17       So Ms. Metzger emphasizes that the Court should

18   grant sanctions in the form of attorney fees.  This is a big

19   deal.  The parties' view is that we only put together a

20   subpoena pursuant to the Court's instructions.  As I

21   mentioned, we got together -- we put together a subpoena that

22   covered all parties and all parts cases so that we could just

23   serve one subpoena on the OEMs, and we did that in the summer

24   of 2015.

25       The OEMs now claim that it was overly broad and

Motion Hearing - May 4, 2017

21

1   imposed an undue burden on them, but how could we know what

2   was unduly burdensome?  Based on our best understanding of

3   what was out there and what they had, we put together a

4   subpoena that covered four different plaintiff groups -- I'm

5   sorry, three plaintiff groups and 60-plus defendant families

6   and covering over 40 different parts.  It would have been

7   more burdensome for different parties to serve their own

8   subpoenas at different times relating to different parts, so

9   this was the best way to proceed, and we were just following

10  the Court's order on that.

11          Yes, the Special Master did not rule substantively

12  on the subpoena but he's been at three mediations at this

13  point.  The substantive agreements that we've reached with

14  OEMs, the Special Master was part of those agreements and we

15  entered those stipulated orders in January 2017.  So I don't

16  think the question of undue burden is an issue at this point,

17  we are past that, now we are just talking about cost

18  shifting.

19          So -- let's see.  At the June 23rd, 2016 hearing on

20  the OEMs' objection to the Special Master's order on 30(b)(6)

21  depositions, you first heard about the cost-sharing issue,

22  and you flatly asked the parties why shouldn't we pay for it

23  all?  The answer is because of Blue Cross and dozens of

24  similar decisions that follow the balancing test set forth in

25  that case.

 1            Now, you're aware from the briefs that there is a

 2   breadth of case law on cost shifting, and the parties and

 3   OEMs both cite to dozens of cases from various districts but

 4   only one case comes out this Court, and it is Blue Cross

 5   Blue Shield of Michigan.  It's an antitrust case written by

 6   the magistrate judge in Auto Parts.  And in that case as to

 7   costs, Blue Cross explicitly rejects cost shifting where the

 8   OEMs have an interest in the outcome of the case, where they

 9   can readily bear the costs, and where the litigation is of

10   public importance.

11            So there is no case in the Sixth Circuit that

12   addresses shifting of non-parties' attorney fees.  However,

13   other courts have applied the same test in Blue Cross to

14   cases that do involve attorney fee shifting, and in most of

15   those cases courts have found that non-party attorney fees

16   incurred as a result of responding to the subpoena are

17   generally not reimbursable.  Even in the rare instances where

18   they are, as a sanction for imposing undue burden on a

19   non-party, courts apply the same balancing test set forth in

20   Blue Cross.

21            So going back to Blue Cross, Blue Cross indicates

22   that the parties shouldn't pay for everything because, first,

23   the OEMs have an interest in the outcome of auto parts.  They

24   are named plaintiffs and potential members of the direct

25   purchaser class.  As of now we don't know which of them have

1    opted out so they are still part of the class.  They have a

2    substantial relationship with the parties.  The OEMs are the

3    defendants' main customers, the dealers are their main

4    suppliers -- I'm sorry, they are the main suppliers to the

5    dealers, and the end payors purchased billions of dollars of

6    OEMs' new vehicles every year.  So while the OEMs may be

7    non-parties they are parties to both the purchase and sale

8    transactions at issue in this case.

9           They also claim they are the biggest victims of

10   this conspiracy.  Well, what does the data show?  If the OEMS

11   passed through or all or some of the price fix, who would be

12   the biggest victims then?  This is the heart of the indirect

13   purchaser action.

14          While some OEMs may have settled their claims

15   against defendants for large sums, other OEMs are likely

16   watching this litigation, trying to assess the value of their

17   claims, whether they should settle their claims or whether

18   they should bring a direct action, like Ford.  They are

19   invested in this litigation despite what they say.

20          Second point in Blue Cross:  The OEMs have the

21   ability to pay for their own costs.  They are large,

22   sophisticated multi-national corporations that can reasonably

23   undertake this expense.  In Blue Cross this Court determined

24   that plaintiffs and non-parties can both readily bear the

25   costs, yet this Court only shifted 15 percent to the

Motion Hearing - May 4, 2017

24

1    plaintiffs.

2         Like the OEMs here, the non-parties there were two

3    large and important health systems in Michigan.  One had

4    gross revenues of 1.1 billion, the other one had 4,000

5    employees.  In our case the Special Master has already

6    shifted 60 percent of deposition costs and 70 percent of

7    document collection and production costs to the parties.

8    This is four to five times the percent of cost shifting in

9    Blue Cross.  It is an extraordinarily rich result for the

10   OEMs.

11        But let's look outside of this circuit.  Let's look

12   at another case.  In re First American Corporation, Southern

13   District of New York, that court shifted 35 percent of costs

14   to plaintiffs where the non-party was involved in the

15   underlying transactions at issue and they were also involved

16   in separate but related litigation, and that case also

17   involved a strong public interest.

18        The last point on Blue Cross -- or last element of

19   the test set forth.  This litigation is indisputably a public

20   interest.  The OEMs don't contest this.  They contend it is

21   of lesser importance than government actions, but the

22   criminal fines, you know, in the government actions only go

23   to the treasury.  The settlement amounts here actually go to

24   businesses and consumers.  Auto parts is one of the largest,

25   if not the largest, MDL in history, and it impacts almost

1    every person and business that purchased a new car in the

2    United States within the last 20 years.  It is indisputably

3    of public importance.

4           So these three factors set forth in Blue Cross

5    weigh against cost shifting, and these same factors weigh

6    against the shifting of attorney fees in a slew of other

7    cases.

8           As to Ms. Metzger's argument on why they should get

9    attorney fees and costs for narrowing the subpoena.  An award

10   of attorney fees from the OEMs' prospective compliance with

11   the subpoena is not in line with case law.  A non-party's

12   attorney fees associated with litigating a subpoena are just

13   not reimbursable compliance expenses; Stormans v. Selecky

14   addresses this.  This is especially true where as here the

15   subpoena did not require a different level of cooperation

16   that would exist in any other case.  The OEMs were just

17   expected to meet and confer with the parties to provide

18   information and negotiate objections.  These obligations are

19   set forth in Rule 26 and Rule 45.  For a long time the OEMs

20   refused to do so because their opinion was that the subpoena

21   was overly broad and unduly burdensome, but how are we going

22   to get from something so big to narrow and reasonable if you

23   don't talk about it?  Although negotiating a subpoena has

24   likely been more complex and time-consuming in auto parts

25   than in other case because it involves the coordination of

1    hundreds of attorneys in 42 parts cases and the fact is that

2    subpoenas are commonly litigated in price-fixing cases and

3    costs associated with negotiations are not shifted.

4            In CRT, ODD, Batteries, LCD, all of these cases

5    involve non-party discovery, they involve indirect purchaser

6    actions, it involves subpoenas to over 50 non-parties each

7    sitting in different parts of the distribution chain,

8    involved discovery, cost level of discovery, purchase

9    discovery, sales discovery at a transactional level to huge

10   OEMs such as Apple, Dell, Microsoft, Costco, Walmart, Target.

11   There was absolutely no cost shifting in any of those cases.

12           And as I mentioned before, if we had served

13   individual responses on the OEMs in each parts case the

14   burden on the OEMs would have been exponentially greater, so

15   we proceeded in such a way that we thought would be the most

16   efficient and actually the least burdensome for the OEMs.

17           Further, the OEMs' reimbursement for attorney fees

18   and costs incurred was partially as a result of their own

19   delay and obstruction.  I know the Court doesn't want to hear

20   about the fights between the OEMs and the parties, but we are

21   here today two years later because of, you know, what we view

22   as the OEMs' refusal to meet and confer on very basic

23   questions from the beginning.  They refused to tell us

24   individually the availability of their responsive data and

25   documents, the accessibility of that data, and even the

1   burdens and costs associated with producing such data and

2   documents.  This is why we've had the unnecessary delay and

3   extensive litigation on OEM discovery that we have had.

4         Our view is that the OEMs' failure to cooperate has

5   caused the parties to incur exorbitant attorney fees and

6   costs of their own, and now we shouldn't be paying for the

7   OEMs' attorney fees and costs as well.

8         We cite to a bunch of cases in our brief; Heartland

9   Surgical Specialty Hospital, Apple v. Samsung, West

10  Convenient Stores v. Suncore Energy.  All of these cases say

11  where the non-party is obstructing the non-party discovery

12  process in some way, they should not be entitled to any costs

13  or attorney fees.

14        THE COURT:  What about the non-attorney costs

15  relating to the follow-up questions?  I don't think the

16  Master ruled on that, it hasn't been before him probably, so

17  what's your position on that?

18        MS. TRAN:  Sure.  So the Special Master only ruled

19  on the deposition costs, which includes preparation and

20  attendance, you're right that he didn't discuss the

21  post-deposition follow-up questions.  But here the Court

22  shouldn't grant it for various reasons.  First being the

23  Special Master already shifted more than this Court had

24  actually said at the June 2016 hearing on depositions.  If

25  you recall, you had said, quote, the cost of actually

1   attending the depositions, that cost at a minimum would be

2   split between the parties and the non-parties, and I may

3   later hear that it may be more but I'm saying at least that's

4   the cost you know you are going to be split, close quote.

5           So not only has the Special Master ordered the

6   parties to pay more than 15 percent, he's also ordered

7   parties to pay the employee costs and the attorney fees for

8   outside counsel for preparing for and attending the

9   depositions.  This surpasses what the OEMs are entitled to

10  under the relevant law, and the parties didn't object to this

11  ruling in the interest of bringing this discovery process to

12  an end, but at this point the OEMs are just being greedy.

13          The reason why we had the depositions in the first

14  place was because the OEMs were not cooperating during the

15  meet-and-confer process.  They were not providing the

16  information that we needed to narrow the subpoena

17  substantially; for example, what relevant data and documents

18  they possess, where the information is located, what burdens

19  they face in collecting and producing this highly relevant

20  discovery.  We didn't know the answer to any of that.  That's

21  why the Special Master at his March 2016 hearing said I don't

22  have enough information; you parties are going to take the

23  depositions of the OEMs to find this out so I can get more

24  information to issue a ruling on the motion to compel.

25          The parties should not now be required to reimburse

 1   the OEMs for employee costs related to follow-up questions.

 2   It is not unusual where a witness is not able to provide

 3   complete information that questions may arise thereafter.

 4   This happens in this litigation.  Defendants provide -- we

 5   meet and confer on transactional data and our document

 6   requests; they give us responses, they give us documents, and

 7   we follow up with questions.  We didn't need to take

 8   depositions of defendants, you know, we engaged in a very

 9   cordial process.

10         The need for the depositions was caused by the OEMs

11   and so our reasonable follow-up questions thereto stem from

12   that process.  The follow-up questions that we asked the OEMs

13   were largely the result of gaps in the record.  Some

14   witnesses, for example, I can think of a GM witness.  He

15   came, he had only been in the position for eight months.  He

16   could not talk about any sort of purchase strategy, sales

17   strategy; he could not talk about anything in his prior role

18   at GM and he provided contradictory testimony.

19         A Fiat Chrysler witness basically said that he

20   didn't have any information on the document retention policy

21   because another part of the Fiat Chrysler knew about that and

22   he didn't.  So these are all -- all the follow-up questions

23   were part of the outlines and the questions that we provided

24   to the OEMs at their request, before the depositions, so that

25   they could prepare their witnesses, but as it turned out some

1   of their witnesses were not prepared so we followed up with

2   questions.

3          Finally, I'm not putting the blame on OEMs here but

4   discovery in complex cases like this one frequently leads to

5   follow-up questions.  So it occurs in every case, there are

6   follow-up questions after depositions.  It is part of the

7   litigation process.  It is part of complying with the

8   subpoena, so they should not be awarded anything beyond what

9   the Special Master has ordered.  Sixty percent is very, very

10  generous for discovery on discovery depositions that we

11  shouldn't have had in the first place.

12         THE COURT:  Okay.

13         MS. TRAN:  And finally, on Ms. Metzger's last point

14  regarding seeking attorney fees for document collection and

15  production.  The Special Master already awarded 70 percent of

16  costs here.

17         THE COURT:  Excluding attorney fees.

18         MS. TRAN:  Excluding attorney fees, yes.  Courts

19  routinely distinguish between costs and attorney fees when

20  they evaluate the appropriateness of cost shifting and often

21  finds that costs are shifted but attorney fees should not be.

22  Bell v. GE Lighting says this, Maximum Human Performance v.

23  Sigma-Tau Healthscience, all of these cases are other

24  districts, but they are insightful in that they show that

25  costs are routinely shifted but attorney fees are not.

1        We mentioned in our brief that the Supreme Court
2    established American rule dictates that litigants pay their
3    own attorney fees absent statute or enforceable contract.
4    This is Alyeska Pipeline Circle v. Wilderness Society.
5    Courts have extended this American rule to cases involving
6    non-parties, including non-parties that receive documents and
7    deposition subpoenas for use in antitrust cases.  This is
8    United States v. CVS.
9        So in the CVS case the Supreme Court said -- the
10   District Court said the Supreme Court had foreclosed the
11   ability of the District Court to award fees, denying
12   reimbursement of counsel fees for review of documents,
13   representation at depositions, negotiations of protective
14   orders and other matters.
15       Finally, what does this even entail, attorney fees
16   for document collection and production?  We can guess that it
17   concerns a privilege, confidentiality relevance review,
18   though none of these are reimbursement under various case
19   law.  Steward Healthcare System vs. Blue Cross Blue Shield
20   said that the privilege and confidentiality review only
21   benefits the non-party, it doesn't benefit the parties in
22   that case.  And the relevance review, that also doesn't
23   benefit the parties.  We have to do -- the parties have to do
24   their own relevance review of the documents as well, and it
25   is not like the non-parties are going to give us their work

1    product.  We cite to a half dozen cases that stand for the

2    same proposition.

3            Finally, we cite the -- I'm sorry, not finally.

4    Fourth, the OEMs don't cite to any authority for an award of

5    attorney fees in a price-fixing case like Auto Parts where

6    the subpoenas seek the same types of documents and where

7    efforts and collection and production would be the same.

8    They cite to Blue Cross Blue Shield but in that case, as I

9    mentioned before, only 15 percent of the costs were shifted

10   to the parties.  When the Court found that both the

11   non-parties and the parties could bear the cost, only

12   15 percent shifted.  Here we are dealing with 60 and

13   70 percent already.

14           THE COURT:  Did that 15 percent include the

15   attorney fees that we are talking about now?

16           MS. TRAN:  No, that case did not address attorney

17   fees.

18           The OEMs cite a slew of other cases but all of

19   those cases are in different districts and they are all

20   distinguishable.  You know, they -- in those cases the facts

21   are such that the non-party did not have an interest in the

22   litigation, the non-parties were individual people who could

23   not afford it or the cases weren't of public importance.  For

24   every case that they cite that supports their point of view

25   we have three to four more that say -- that support our point

1   of view.  There's just a lot of cases on this issue, but we

2   urge the Court to follow Blue Cross Blue Shield here.

3          If the Court deems that non-party attorney fees are

4   reimbursable under Rule 45 and the Court would have to make a

5   finding that the non-parties imposed an undue burden such

6   that they are deserving of sanctions, courts decided whether

7   to shift such cost to the serving parties nevertheless

8   applied the same balancing test as I stated in Blue Cross.

9   And all of these factors in this case weigh against shifting

10  of attorney fees.

11         To my final point, which is a policy argument.  If

12  the Court awarded OEMs with further attorney fees and costs

13  for their mere compliance with the judicial process it would

14  establish a dangerous precedent nationwide.  The OEMs should

15  not be awarded attorney fees and costs just for merely

16  cooperating with the judicial process.  Blue Cross is clear

17  on this.  A non-party is not entitled to cost sharing just

18  because it was served with a subpoena.  That is exactly the

19  OEMs' position here.

20         As I mentioned, CRT, LCD, Batteries, ODD, S-RAM,

21  they are all antitrust cases with indirect purchasers

22  involving non-parties.  In each of those cases over 50

23  non-parties each received and complied with subpoenas seeking

24  transactional level purchase data, transactional level sales

25  data, cost data, and none of the OEMs there, HP, Dell,

1    resisted the subpoenas.  No costs were shifted.  In about

2    half of the six -- five cases that I mentioned there were

3    motions to compel but only one, Maximum One, and only with

4    respect to a small OEM, and all of those motions to compel

5    were resolved in the parties' favor.

6         The special master of the court in those cases

7    granted the motion to compel and did not order any costs or

8    attorney-fee shifting.  And all of these we had in our reply

9    to the first motion to compel, we have a chart, and we have a

10   declaration setting forth all of this.

11        Even when a court finds that a non-party's costs

12   are significant within the meaning of Rule 45, and some cost

13   shifting is in order, it is critical that only reasonable

14   expenses are shifted, and this is according to G & E Real

15   Estate, Inc. vs. Avison Young-Washington.

16        The Special Master already shifted 60 percent of

17   deposition costs including attorney fees and 70 percent of

18   document and collection -- document collection and production

19   excluding attorney fees to the parties.  This is more than

20   reasonable for the OEMs and does not suggest an abuse of

21   discretion -- of his vast discretion.

22             THE COURT:  Okay.

23             MS. TRAN:  Thank you.

24             THE COURT:  Thank you.  Reply?

25             MS. METZGER:  Yes, thank you.

```
1              MR. HEMLOCK:  Your Honor, may I have a few words?
2              THE COURT:  Certainly.
3              MR. HEMLOCK:  I will be brief.  Thank you, Your
4    Honor.
5              Adam Hemlock, again, on behalf of the Bridgestone
6    and Calsonic defendants, Your Honor.
7              Just a few quick points I would like to follow up
8    with.  First is Ms. Metzger, again, brought up this notion of
9    sanctions, and that's serious stuff.  I want to point out
10   that the Special Master repeatedly throughout this process
11   has lauded the serving parties for having cooperated, for
12   having been reasonable and so on.  Never once has he ever
13   said anything leading anyone to believe that the serving
14   parties were so unreasonable or so unfair that they should be
15   sanctioned, and he was intimately involved in the process.
16   There were multiple mediations, he had multiple briefings and
17   so on.  So there is absolutely no basis whatsoever for there
18   to be kind of a sanctions conversation regarding the costs at
19   issue here.
20             Second, the OEMs are talking about avoiding undue
21   burden and undue expense.  They have talked about how many
22   topics that were in the initial subpoena.  Well, let me point
23   out, the last offer that the OEMs provided for what they
24   would produce had two topics, one of which was MSRPs, which
25   is frankly public information.  Okay.  Special Master Esshaki
```

 1   eventually ordered, I believe it was, 14 topics.  So should

 2   we, the serving parties, should we get our money back for

 3   having to narrow the subpoena where we did?  We narrowed it

 4   to 14, we actually narrowed it to where the judge thought it

 5   was reasonable, but they came back with two.  Why shouldn't

 6   they pay the money we had to spend -- our clients had to

 7   spend on me and the other counsel negotiating to get where we

 8   were?  That's point number two.

 9          Point number three, we talked about the follow-up

10   on deposition questions, Your Honor, this happens all the

11   time, especially with 30(b)(6) deposition where a witness has

12   to be well prepared on certain topics.  We've had it in our

13   cases, we've had 30(b)(6) depositions where the EPPs and the

14   ADPs ask a lot of questions and there are a few points that

15   the witness doesn't know, doesn't recall.  You know what,

16   during the break every time I go up and say that was a

17   reasonable question, we will get you an answer to that.

18   That's normal, that's the way it works.  It's unreasonable to

19   expect that through seven hours of testimony a witness is

20   going to remember everything.  I'm actually, kind of in a

21   sense, defending the OEMs in I'm not saying I'm not surprised

22   that there were certain questions they were unable to answer

23   but we count on the fact that reasonably after a deposition

24   there may be some questions that are squarely within what was

25   called for that they should have known and if they didn't

 1    they just tell us afterward.  That's entirely appropriate.

 2            Finally, Ms. Metzger spoke of the analogy of

 3    throwing everything up there and seeing what sticks.  Well,

 4    there's some truth to that but it is not unreasonable for two

 5    reasons.

 6            One, never did the OEMs give us any indication of

 7    what they had, what was electronic, what was paper, what was

 8    burdensome, what wasn't, so we had no choice but to start

 9    with the broad subpoena, but the point was we did count on

10    the meet-and-confer process because in every discovery

11    dispute, every discovery process I've ever been in, I bet

12    everyone in this room, you meet and confer and you negotiate

13    it out.  What the OEMs said is we are not even talking to you

14    guys until we have an agreement on costs, and all the case

15    law says very clearly that you first figure out the scope of

16    discovery and then you address costs.  So they put the cart

17    before the horse and then the cart and the horse couldn't go

18    anywhere because they wouldn't give us the information that

19    we needed to have an educated conversation about discovery.

20            Finally, you know, in terms of equity and fairness

21    and who is paying for what, look at my clients, Your Honor,

22    Bridgestone and Calsonic.  They've paid for me to come to

23    this Court, to mediate, to do all of these things on behalf

24    of all the defendants in this case with respect to OEM

25    discovery.  Now, I will concede they didn't do this out of

1     the goodness of their hearts, they did it because they

2     thought it was in their interest, but there are tons of

3     defendants in this case who have not spent a single penny

4     litigating these OEM discovery issues.  Should we come to the

5     Court and ask for an order from you that we get reimbursed

6     for that?  Or how about Mr. Cherry who stood up here for

7     years representing the interest of all the defendants in the

8     MDL and advocating things on everybody's behalf.  Should he

9     come now and get reimbursed for these things?  There are just

10    certainly costs that we undertake, including attorney fees,

11    that are natural and reasonable in litigation.  They are what

12    happens, and I really doubt that this Court wants to start

13    now doing what I would call litigation on litigation; every

14    time there is a dispute and it is figured out outside of this

15    courtroom then there is going to be dispute about who should

16    be reimbursed for it.  It would be wholly unreasonable.

17            And lastly, this is a point that Ms. Tran made, but

18    I want to echo it, the policy considerations here are huge.

19    If I want to try to meet and confer with the other side,

20    should I really have to worry that ultimately I will have to

21    pay for their costs to meet and confer?  No, I will just come

22    to the court because I don't want to have to deal with that

23    uncertainty, and then the courts are going to be bogged down

24    with all of these disputes about dollars and cents here and

25    there which I'm sure they don't want.

1           Thank you very much, Your Honor.

2           THE COURT:  Thank you.  Reply?

3           MS. METZGER:  Thank you, Your Honor.  To address a

4    few of Ms. Tran's points.  To say that the OEMs are still

5    fighting the subpoena is simply not true.  We've come to

6    conclusions about what we are going to produce, that's done.

7    What we are fighting for right now, Your Honor, is our

8    right -- the clients' right as non-parties to this litigation

9    who had no part in helping to draft this omnibus subpoena,

10   who simply received it.  There was no meet and confer

11   beforehand.

12           I was a little confused about something Mr. Hemlock

13   said about we wouldn't provide them information about what we

14   had therefore they had no choice but to serve this huge

15   subpoena.  We had no conversations with them before they

16   served the subpoena.  We simply got the subpoena, this

17   omnibus subpoena, with everybody's requests conglomerated

18   into one giant mass.  There was no meet and confer

19   beforehand.

20           THE COURT:  So there was no request for a meet and

21   confer?

22           MS. METZGER:  There was no request for a meet and

23   confer from my clients and any other that I am aware of that

24   received the subpoena, we simply received the subpoena, and

25   that was the first thing we heard about this.  We were not

 1    involved in the negotiation stage.  I think Ford Motor

 2    Company was a party at the time and they may have been

 3    involved, but as to the rest of us we were not parties, we

 4    were not part of the negotiation.  We simply received the

 5    subpoena and the subpoena is what it is.

 6           Ms. Tran talked about having narrowed the subpoena

 7    down to 14 requests.  That did not occur, Your Honor, until

 8    October 14th of 2016, we received the subpoena in July of

 9    2015.  So we are going on, what, 15 months of litigation

10    before we received those narrowed requests.  And as to the

11    narrowed requests themselves I would direct Your Honor to

12    please review Exhibit 3 on Document 1227.  I've got a copy

13    here if you would like it right now, I will be happy to

14    provide it for you.  It is a chart that we put together --

15    the OEMs put together showing what requests were withdrawn

16    and how those requests were duplicated, most of those

17    requests were duplicated in the requests that remain.

18           So the 14 -- the narrowing down from 37 to 14 was a

19    cosmetic change, it was a reduction in number, it was not a

20    reduction in burden.  And, again, Document 1227-4 sets forth

21    our analysis of that issue and I've got a copy of that here

22    if you would like it, Your Honor.

23           THE COURT:  Thank you.

24           MS. METZGER:  As for the OEMs banding together,

25    that was a move that was designed to address common issues,

```
 1   common objections to the subpoena, common problems with the
 2   subpoena that were frontline issues that needed to be
 3   resolved before we got into the leads individually.  When we
 4   came to the meet-and-confer process wondering and asking
 5   whether we needed to produce any documents at all, and we've
 6   heard some testimony or some conversation from the parties'
 7   counsel today about what we would not provide.  We asked at
 8   the outset that the parties tell us what do you already have,
 9   what can you get from each other, what are the gaps in the
10   record that you think we can reasonably fill?  That was in
11   our first communication to the parties as a group.  Those are
12   frontline issues because if they already have what they need
13   we don't need to produce anything at all.  So the OEMs went
14   into this global summit, the October 2015 communication with
15   the parties, banding together as a group to ask questions
16   which would lead us to wonder whether we needed to produce
17   any documents at all.  The group, whether there were things
18   that we could produce in the record, that there were gaps in
19   the record that we could fill, we never got an answer to that
20   question.  We never got an answer to what do you already
21   have?  We never got an answer to what can you get from each
22   other, even though there had been extensive discovery going
23   back and forth, we know they had a million pages of
24   documents, we asked those questions repeatedly.
25              The exhibits to Document 1227 in the record show
```

1    our exchanges back and forth.  There were a series of

2    letters, it is all documented there, we can all put our

3    individual spins on what that looked like; were we

4    withholding, were we obstructing, were they obstructing, the

5    letters speak for themselves.  And you will see, Your Honor,

6    when you review those letter that from the very beginning we

7    were asking questions about whether or not there needed to be

8    any production from us at all, not the scope of production,

9    that would come afterward, but we needed to know and the

10   smaller SSEs, the ones that had insignificant market share in

11   the US market, would we contribute -- my client is one of

12   those, Subaru of Indiana Automotive, would we contribute

13   anything to your analysis?  We had an expert that said no, we

14   would essentially not contribute anything to that analysis.

15        So our questions going into the meet and confers

16   was why do we need to produce documents in the first place?

17   Why don't you get things from other people first, from each

18   other, perhaps what has been offered from some of the other

19   SSEs in response to the subpoena, look at those first and

20   then turn to us.  So that's what we were litigating up until

21   October 14th of 2016 when we got this narrowed list of

22   document requests that were not really narrowed at all, they

23   were just renumbered and made to look like they were less but

24   were not, in fact, less.

25        As to the unprecedented scope of what has been

```
 1    characterized as what the Special Master has done for us, we
 2    would ask Your Honor to please consider that the scope of the
 3    subpoena itself is unprecedented.  So what relief we are
 4    entitled to in response to our request under Rule 45(d)(1)?
 5    This is the largest subpoena of its type, no one has ever
 6    pointed to a subpoena that is broader and larger, so we don't
 7    know what the largest subpoena ever served on a group of
 8    individuals will get in response to a request for relief
 9    under Rule 45(d)(1).
10            So maybe what the Special Master gave us, given the
11    small sample size, we don't know if that's generous or not
12    generous.  We think we are entitled to more, not because we
13    are being greedy, not because we are being selfish.  In fact,
14    what we are asking for here is 60 percent, not our entire
15    award of attorney fees; we are asking for the same number to
16    be applied to the attorney fees and other costs associated
17    with narrowing the scope of the subpoena.
18            And that brings me perhaps to my biggest point.
19    There are two possible awards under Rule 45.  It is not
20    Rule 45, there's Rule 45(d)(1) and there's Rule
21    45(d)(2)(B)(2), and they are two different things.  The cases
22    that cite the Blue Cross standard, the four-factor test on
23    whether cost shift is appropriate, those are awards under
24    Rule 45(d)(2)(B)(2), those are cost of compliance.  We are
25    not asking -- with regard to subpoena, we are not asking for
```

1    cost of compliance, we are asking for a sanction -- I will

2    say it both.  We are asking for a sanction for service of a

3    subpoena that is wholly inappropriate, that was wholly

4    uncurated, that impose considerable burden and expense on us,

5    on the SSEs, and that is not subject to the four-factor Blue

6    Cross test.  And if there is a case out there in which that

7    test is applied I will be happy to stand corrected, if the

8    other side would like to cite one that would be wonderful,

9    but the cases that we've seen, the cases that's award under

10   Rule 45(d)(1) do not apply the four-factor test.

11            What the test is for an award of sanctions under

12   Rule 45(d)(1) is whether the person who served the subpoena

13   took reasonable steps to avoid imposing undue burden and

14   expense, and if that is found to be the case that they did

15   not, that they did not take reasonable steps to avoid

16   imposing undue burden and expense, the Court is constrained

17   because the rule says the court must enforce this duty and

18   impose an appropriate sanctions which may include lost

19   earnings and reasonable attorney fees.

20            So if Your Honor finds that the parties did not

21   take reasonable steps to avoid imposing undue burden and

22   expense, our position is that the Court must impose sanctions

23   upon the parties which may include lost earnings and

24   reasonable attorney fees.

25            And in order for the Court to find that the parties

 1    did not fail to take reasonable steps to avoid imposing undue

 2    burden and expense, the Court would have to find that the

 3    subpoena as served was reasonable, that the back and forth

 4    between the parties and the SSEs that's documented in our

 5    correspondence, which we would direct Your Honor to, showed

 6    some unreasonableness on our part and perfect reasonableness

 7    on their part when from the beginning we were asking please

 8    tell us what do you have -- simple questions, what do you

 9    have, what do you need, what are the gaps in the record, and

10    how can we fill them?  We never got an answer to those very,

11    very basic questions which would make it clear that if they

12    already have what they need they don't need anything else

13    from us.  So that was our purpose going into this

14    meet-and-confer process.  We never got an answer to that

15    question, nor did we ever get an answer to the question what

16    did you do to curate the subpoena?  Your Honor asked that

17    question 15 or 20 minutes ago and didn't get a response.  You

18    know, what steps did you take to avoid imposing undue burden

19    and expense?  We've heard nothing about that.

20           What we did hear, there was some testimony that we

21    cited in our reply brief that the parties testified at some

22    point that they put together their collective requests into a

23    single document and that is what they say comported with the

24    Special Master's directive to serve a single subpoena to

25    avoid imposing undue burden and expense.  It is not just

1    serve a single subpoena; it is serve a single subpoena that

2    lessens the burden, and how can that possibly be the case if

3    all they did was take all the subpoenas that they would have

4    served separately and serve them in one document?  That's a

5    single subpoena but it doesn't lessen the burden and expense

6    on us.

7         And that's what we are fighting for is our clients

8    who are not parties to the litigation.  My client in

9    particular, Subaru of Indiana Automotive, is a very small

10   company, it is not Apple, it is not Dell.  As a matter of

11   fact, when I talked to my client and said we are being

12   compared to Apple and Dell, he laughed and he said we are a

13   mom-and-pop shop compared to Apple.  You know, we have a

14   three-person legal team.  We have, aside from DOJ subpoenas

15   that we received in this case, we have not had any

16   significant litigation at Subaru of Indiana Automotive that

17   involved more than a nominal discovery burden, and that's in

18   our general counsel's affidavit that is in Document 1227, I

19   believe it is Exhibit 44 or 47, I'm sorry I don't remember

20   which one, but we are not in the same position as Apple or

21   Dell or some of the larger SSEs here.  So to step Subaru of

22   Indiana Automotive aside a little bit we've got those issues.

23        Further, to my client, when we were told that after

24   the mediation in March, I believe, of 2016 the Special Master

25   said he did not have enough information and ordered the

1    30(b)(6) depositions, Subaru did not take part in those

2    mediations.  We were there but we were not asked to

3    contribute any information.  So, you know, there could have

4    been no fault on our clients since our information was not

5    taken at that mediation, nor was there any complaints by the

6    parties about the quality of the testimony provided by our

7    deponent in the 30(b)(6) depositions, so, you know, those are

8    some issues in which Subaru of Indiana Automotive is

9    separate.

10           As for the public policy argument, we can make an

11   equal and perhaps stronger public policy argument.

12   Judge Alsup from the Northern District of California, as I

13   cited before, said that parties need to be reasonable at the

14   outset.  They can't just throw things up against the wall and

15   see what sticks, otherwise other parties would be in the

16   same -- other non-parties would be in the same position that

17   our clients are in right now.  So the countervailing public

18   policy argument is why not impose these sanctions upon the

19   parties for their failure to take reasonable steps to avoid

20   imposing undue burden and expense so this doesn't happen to

21   anybody else?  They have a responsibility to curate the

22   subpoena before they serve it, decide what's important,

23   prioritize like we do in litigation all the time, make those

24   tough choices, decide what you really need and not just shoot

25   for the moon and leave it to us to pick up the ball, spend

1    money that we don't have to spend trying to narrow the scope

2    of that subpoena.

3              To call our efforts to narrow the scope of the

4    subpoena prospective compliance is really interesting.  I

5    believe that was something that Ms. Tran said.  Prospective

6    compliance is not what we are talking about here.  To try to

7    conflate attempting to narrow the scope of the subpoena as a

8    Rule 45(d)(2)(B)(2) cost of compliance and apply the

9    cost-shifting analysis is completely disingenuous.

10             Again, we are looking for sanctions under

11   Rule 45(d)(1) for the parties' failure to take reasonable

12   steps to impose undue burden and expense.

13             THE COURT:  Thank you.

14             MS. METZGER:  Thank you.

15             THE COURT:  Okay.

16             MS. METZGER:  Thank you, Your Honor.

17             MS. TRAN:  If I may, just in response?

18             THE COURT:  Ms. Tran.

19             MS. TRAN:  Ms. Metzger suggested that the parties

20   should have reached out to the OEMs prior to serving the

21   subpoena.

22             THE COURT:  Well, Mr. Hemlock said that they tried

23   that and they said they never knew that they were getting a

24   subpoena.

25             MS. METZGER:  Respectfully, we are not saying they

Motion Hearing - May 4, 2017

49

1    should have reached out to us prior to serving a subpoena.

2        MS. TRAN:  Ms. Metzger doesn't point to any case

3    law that suggests we had a duty or an obligation to do this.

4    Typically in cases like this and others, the parties serve

5    the subpoenas and then the parties and non-parties meet and

6    confer on the subpoena to then narrow the scope.  So it feels

7    like she is putting forth an obligation that didn't exist and

8    is not backed by case law.

9        On the argument that the parties did not take

10   reasonable steps to narrow the subpoena until October 2016,

11   that's just absolutely false.  When we filed the reply in

12   support of our initial motion to compel, it attached the

13   declaration of Steven N. Williams, which attached Exhibit A.

14   It listed every request and sub request and the status, it

15   indicated where we stood, which requests had been withdrawn

16   by the parties, the few requests that -- I think it was the

17   two requests that OEMs had actually agreed to produce

18   responsive documents, and the rest of the issues were

19   impasse, so we did make efforts and that document, Exhibit A

20   to the declaration of Steven N. Williams supports that.

21       And we can go back to all the correspondence but I

22   think the Court has seen enough paper here to know that the

23   parties have been making efforts, and, as Mr. Hemlock said,

24   the Special Master has commended us all along the way with

25   our efforts to work together and to work with the OEMs to try

```
 1    to get this done.

 2            Ms. Metzger insists on the Court imposing sanctions

 3    on parties.  I just want to give an example of a case where a

 4    court has imposed sanctions on a party in the form of

 5    attorney fees.  Straight Path IP Group, Inc. v. Blackberry,

 6    in that case the serving party subjected the non-party,

 7    NetFlix, to multiple rounds of duplicative and repeated

 8    discovery requests in multiple-related actions.  We don't

 9    have that here.  We have one subpoena, one round of requests

10    covering all 45 actions, all parties, all cases.

11            The court's decision in Straight Path to impose

12    sanctions and award NetFlix's attorney fees rested on, quote,

13    a parade of overbroad discovery abuse in four actions

14    involving the same patents, close quote.  And the fact that

15    the serving party, quote, twice propounded oppressive

16    discovery requests only to ask for a broad subset once

17    briefing is required, closed quote.

18            The facts are clearly different here, but I just

19    wanted to point out this case to show the type of case where

20    courts award attorney fees as sanctions.  I don't think we

21    have the same facts here.

22            As to Ms. Metzger's argument that the OEMs served

23    various initial preliminary questions on the parties and the

24    parties didn't answer them, between September 2015 and

25    January 2016 when we filed the first motion to compel we
```

1    exchanged 15 meet-and-confer letters.  We repeated our

2    willingness to discuss appropriate cost sharing once OEMs had

3    the opportunity to determine what responsive information they

4    have and what reasonable costs would be associated with

5    production.  However, they said they wouldn't even begin

6    searching and producing documents until we had an agreement

7    on costs.  So there was only so much we could do in the early

8    months of OEM discovery because they wanted a cost agreement

9    when we didn't even have a substantive agreement.  In fact,

10   we just got substantive agreements four months ago in

11   January.

12            So it is not that we weren't -- we were refusing to

13   answer their questions, we were, but they were just refusing

14   to substantively meet and confer with us until we said we

15   would pay for everything.

16            Finally, Ms. Metzger mentions Subaru's size and how

17   it is so much smaller than all of the other OEMs.  Well, that

18   doesn't matter because the component cases I mentioned, ODD,

19   CRT, Batteries, all of those cases involved non-party

20   discovery and subpoenas to various non-parties of different

21   sizes.  I mentioned Apple and Dell but CompUSA, Fries

22   (phonetic), Jabble (phonetic), they were also subpoenaed, and

23   they all complied, and they all paid for costs.  None of them

24   resisted the subpoena, and none of them asked for costs or

25   attorney fees.

1           Thank you.

2           THE COURT:  Thank you.

3           MR. HEMLOCK:  Two minutes, Your Honor, may I?

4   Thank you.  I promise I will be very brief.

5           Just to clarify, and Ms. Metzger is correct, I did

6   not mean to imply -- so to be clear I believe the subpoenas

7   were served and then afterward, of course, there was an

8   effort made to meet and confer.  I think the fact that we

9   didn't meet and confer before we served the subpoenas is not

10  really such a meaningful point because if we had called up

11  the OEMs and said, oh, we would like some documents and data

12  from you they would have said well, what would you like, and

13  we would have sent over our draft subpoena.  So whether we

14  served it and then had a productive meet-and-confer process

15  or we sent the draft really doesn't change anything.

16          You know, Your Honor, Ms. Metzger has talked about

17  duplicative discovery, what do we have, what do we not have.

18  There was a huge entire body of discovery that we would not

19  have had which is about how they priced their cars, how they

20  sell them, who they sell them to, data about sales of cars,

21  et cetera, that was not available.  We have a discrete number

22  of ADPs who are named plaintiffs in the case and they know

23  who they bought cars from and so on, but only they have that,

24  and it is not like they said -- -

25          THE COURT:  Did you ask for duplicative -- did you

```
 1    ask for information that you already had?
 2          MR. HEMLOCK:  Well, we did in a sense but bear in
 3    mind, Your Honor, that the parties were in the discovery
 4    process, the lead cases were in the discovery process, there
 5    were deadlines to that discovery process.  To figure out what
 6    everybody had and only then ask the OEMs for the discovery
 7    would have set back the case, I would guess by six months to
 8    a year.  There's a lot of case law that says that the parties
 9    don't have a duty to figure out what is duplicative.
10    Furthermore, it also comes back to the burden issue.  In
11    other words, we might have had a sense that we might have
12    some documents and information that would be duplicative, but
13    if we know that they have it readily available sitting on a
14    hard drive versus say, 400 boxes of documents say, in a
15    warehouse somewhere, that would have been relevant to the
16    analysis.  I think at the end of the day the bottom line is
17    if we had had a healthy discussion about all of this we would
18    have figured it out, but there was zero interest on behalf of
19    the OEMs to do so.
20          Finally, just one more quick point.  Ms. Metzger
21    has talked about undue burden several times.  I'm not sure
22    what undue burden she is talking about.  Okay.  The subpoena
23    was served on the OEMs, there is no undue burden there except
24    her having a piece of paper that they received.  Let's say
25    instead of 15 topics we had served a request for six topics,
```

1    and bear in mind again that their last offer was only to

2    produce two topics, we still would have had to meet and

3    confer.  We still would have had to do that.

4           By the way, among the OEMs they split up the

5    meet-and-confer process.  The letters that we received were

6    not from Ms. Metzger's firm, they were from Proskauer Rose

7    which represented Chrysler, I believe, so I'm not sure what

8    huge burden she's undertaken, even up until now.  And now we

9    sit here with Special Master Esshaki having educatedly

10   decided what a reasonable scope of discovery was with respect

11   to the OEMs.  We are talking about the cost but he's decided

12   what the scope should be, and so, you know, to some extent we

13   are dealing with a reasonable burden, the only question is

14   the cost.  We don't think they are entitled to anything but

15   certainly not entitled to more than the generous amounts that

16   have been provided already.

17          Thank you very much.

18          THE COURT:  Thank you.  Ms. Metzger?

19          MS. METZGER:  Thank you.

20          THE COURT:  You will have the final word.

21          MS. METZGER:  Thank you, Your Honor.  Somebody has

22   to stop, right?

23          With respect to what the Special Master has done

24   and has not done, to be very clear, the Special Master has

25   never blessed the subpoena, has never said this is a

Motion Hearing - May 4, 2017

55

1    reasonable subpoena, this is a proportional subpoena, this is
2    an appropriate subpoena, he has never said that.  He has
3    never made any pronouncements whatsoever about whether the
4    scope of discovery either at the outset or as we have
5    narrowed it individually with the serving parties is
6    appropriate or inappropriate.  Those were negotiated
7    resolutions, they were not the Special Master saying you must
8    produce, this is reasonable, this is unreasonable, it is not
9    that.  These were negotiated solutions.
10           The Straight Path case that Ms. Tran talked about
11   as an example of an award of sanctions under Rule 45(d)(1).
12   Yes, the facts are different, they are, we can't deny that.
13   But the Straight Path court never said these are the only set
14   of facts under which sanctions under Rule 45(d)(1) are
15   appropriate, this is simply an example.  And for the reasons
16   that I spoke about early, the scope of the subpoena, the
17   parties' effort to narrow, this is another example of when
18   that is appropriate.
19           As to what Mr. Hemlock and Ms. Tran said about our
20   refusal to engage in the meet-and-confer process about what
21   we had.  The initial question, Your Honor, when we started to
22   meet and confer as a group -- and by the way, the letters
23   came from the group, they had to be drafted by somebody, but
24   to say that my client incurred no significant burden when we
25   were all working together as a group to come up with one

1    letter is not appropriate.   That letter was written by

2    someone, it is the result of the group's negotiations.

3         At any rate, to say that we would not engage in

4    discussions about what we had before we talked about money,

5    that's true because the initial question when we started to

6    meet and confer is do we need to produce anything at all.

7    Are we too small to need to produce anything and/or do you

8    already have what you need, in which case we don't need to

9    search for documents, we don't need to look for documents, we

10   don't need to use employee time, employee effort, if you

11   already have what you need or if we are so small we are not

12   going to make a difference.

13        So, yes, if they wanted us, before answering those

14   questions, which they never answered about do you already

15   have what you need, if they wanted us to start in on the

16   process of engaging on what we had, we did want an agreement

17   on cost sharing because we didn't think we had to produce

18   anything at all or at least we were questioning whether we

19   needed to produce anything at all.   So that's the purpose of

20   that part of the meet and confer.

21        And finally, Your Honor, when Ms. Tran said that

22   the size -- to speak of my client particularly, when she said

23   size doesn't matter, it is precisely the problem, that the

24   same subpoena was served on a wide swath of OEMs, non-OEMs,

25   huge OEMs, small OEMs, OEMs that were eventually dismissed

```
 1    for -- relieved of their obligations to produce documents
 2    because of their size.  Everybody received the same subpoena.
 3              So to say that, yes, size doesn't matter and to be
 4    apprised about that, size in this case did matter because we
 5    had an expert, Dr. House, who testified that our size was
 6    such -- Subaru of Indiana Automotive size was such that our
 7    documents would not have made the difference in the final
 8    analysis.  The larger SSE group had Dr. McDonald as an expert
 9    who testified essentially to the same thing, and those
10    declarations from those two experts are available in our
11    response to the original motion to compel.
12              Thank you, Your Honor.
13              THE COURT:  You're arguing today though on behalf
14    of defendants, not only your client, the other defendants
15    that have signed the document?
16              MS. METZGER:  Are you talking to me?
17              THE COURT:  I'm sorry, not defendants, OEMs.
18              MS. METZGER:  Yes.
19              THE COURT:  Like Toyota and Honda, they are not so
20    small.
21              MS. METZGER:  No.  Well, that smaller SSE argument
22    is particular to the smaller SSEs, but the larger issue such
23    as was this subpoena reasonable to begin with, were the
24    negotiations entered in good faith, how soon did they
25    actually narrow the scope of the subpoena, that applies to
```

1   all of us, everybody who received the subpoena.

2        THE COURT:  Okay.  This subpoena has taken up an

3   undue amount of time, both the parties, the OEMs, the Master

4   and the Court.  I'm sure when it was submitted it was like a

5   lead balloon because it was so large, there is no question

6   about that, that it was a behemoth subpoena but so is this

7   case unfortunately.  And the Court gives due respect to the

8   Master in this case, and I note on this that the Master's --

9   excuse me, that the standard here of review on this

10  procedural matter is abuse of discretion, not de novo, and

11  the Court looks at that and considers it very carefully

12  because there have been so many hearings and the subpoena

13  arguments have gone over such a lengthy period of time and,

14  you know, now we are talking about costs of discovery on

15  discovery.  It is somewhat bizarre that we are in this

16  position on a discovery of discovery motion.

17       The first issue that the Court will address is

18  whether there should be additional costs awarded to the OEMs

19  for their efforts in narrowing the subpoena.  The OEMs look

20  at this as a sanction under 45(d)(1) and I -- the OEMs

21  present documents and statements of what they went through

22  trying to narrow this subpoena, the parties talk about what

23  they went through to try to get the OEMs to talk to them and

24  that the OEMs would not talk to them until they had the cost

25  issue resolved so that it couldn't be narrowed.

1    I don't know, you know, there are a lot of dogs in

2    that fight and I don't know who is to win, and I have no

3    intention of going through hearings on this discovery on

4    discovery subpoena because I haven't heard anything that

5    tells me there was an abuse of discretion by the magistrate,

6    and, again, I stress that is the standard that we have to

7    use.

8         The Court therefore finds that in terms of the

9    narrowing this motion is denied, the additional cost or

10   sanctions, as they are called, are denied.

11        In terms of the OEMs' notice or whether the OEMs

12   are entitled to non-attorney cost related to the

13   post-deposition follow-up questions, this cost shifting that

14   we have been talking about here today, I think they are, and

15   the reason I think they are is had those deponents known the

16   information they would have taken time and would have been

17   reimbursed to refresh and to garner that information.

18        Obviously there's follow-up questions, and I agree

19   with the parties that there usually always are some follow-up

20   questions to this scenario, but because of the follow-up

21   questions relating to what was in the depositions for which

22   costs were -- non-attorney costs were allowed, I think it

23   should apply to the follow up.  I don't find this

24   duplicative.

25        If, for instance, as was mentioned, one person who

 1   was testifying didn't know about something that was on the

 2   sheet, the list of what you were going to go into for

 3   depositions, it is unfortunate but one person can't know

 4   everything, and it is not unusual that this type of thing

 5   would happen in a circumstance like this, so you need

 6   somebody else to find that information and answer the

 7   question, and that is exactly the type of costs that was

 8   referred to by the Master.  So even though the Master did not

 9   address this subsequent question, I think it should be just

10   as if this happened at deposition.

11          And as to the attorney fees related to -- should

12   there be attorney fees related to document collection and

13   production, the Court finds that there -- that it should

14   again reject this position and the Court finds that the

15   subpoena was not, in fact, unduly burdensome given the scope

16   of this litigation as it was narrowed down, and I don't

17   believe that there should be any additional reimbursement for

18   that.  I don't believe that there has been a showing at all

19   that the Master abused his discretion in splitting the costs

20   as he ordered.  And that is the order of court.  Thank you.

21   The Court will prepare an order.

22          MS. METZGER:  Excuse me, Your Honor.  Your Honor,

23   could I make one statement?  Just to preserve the record, we

24   would request that the Court reconsider its ruling as to the

25   standard of review for the Special Master's determinations;

1    that the appropriate standard of review is actually a de novo

2    review and not abuse of discretion because the Special Master

3    failed to issue findings of fact and conclusions of laws, and

4    to the extent that he did those were incorrect.

5           THE COURT:  Do you want to respond to that for the

6    record?

7           MS. TRAN:  I just have one point to make.  Despite

8    Ms. Metzger saying the standard of review is de novo, I will

9    point to the OEMs' objection, Document Number 1602, at

10   page 13; the parties note that despite the OEMs arguing that

11   the standard of review is de novo, the OEMs contend, quote,

12   the Special Master abused his discretion in refusing to order

13   the parties to pay these costs as Rule 45(d)(1) requires,

14   close quote.  So although they've said that the standard of

15   review is de novo the analysis was based on abuse of

16   discretion.

17          THE COURT:  I mean, the Court ruled on it on abuse

18   of discretion, and your request for the Court to reconsider

19   it is noted for record.

20          Counsel, do you have anything else that you wanted

21   to add?

22          MR. HEMLOCK:  No, just that, of course, we oppose

23   that motion.

24          THE COURT:  Okay.  Thank you.

25          MS. TRAN:  Thank you.

```
 1              MS. METZGER:  Thank you, Your Honor.
 2              THE LAW CLERK:  All rise.  Court is adjourned.
 3              (Proceedings concluded at 4:03 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Motion Hearing - May 4, 2017

63

```
 1                          CERTIFICATION

 2

 3              I, Robert L. Smith, Official Court Reporter of

 4     the United States District Court, Eastern District of

 5     Michigan, appointed pursuant to the provisions of Title 28,

 6     United States Code, Section 753, do hereby certify that the

 7     foreoing pages comprise a full, true and correct transcript

 8     taken in the matter of In re Automotive Parts Antitrust

 9     Litigation, Case No. 12-02311, on Thursday, May 4, 2017.

10

11

12                              s/Robert L. Smith
                                Robert L. Smith, RPR, CSR 5098
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17     Date:   05/17/2017

18     Detroit, Michigan

19

20

21

22

23

24

25
```