Case 2:12-md-02311-SFC-RSW ECF No. 1824, PageID.33911 Filed 10/04/17 Page 1 of 123
Status Conference & Motion Hearings • September 13, 2017

1

```
 1                     UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION
                                 —  —  —
 3

 4   IN RE:  AUTOMOTIVE PARTS
     ANTITRUST LITIGATION              Case No. 12-02311
 5
     _____
 6
     THIS RELATES TO:
 7   ALL ACTIONS
     _____/
 8

 9              STATUS CONFERENCE & MOTION HEARINGS

10          BEFORE THE HONORABLE MARIANNE O. BATTANI
                    United States District Judge
11          Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
12                       Detroit, Michigan
                   Wednesday, September 13, 2017
13

14   APPEARANCES:
     Direct Purchaser Plaintiffs:
15
     THOMAS C. BRIGHT
16   GOLD, BENNET, CERA & SIDENER, L.L.P.
     595 Market Street, Suite 2300
17   San Francisco, CA  94105
     (415) 777-2230
18

19   DAVID H. FINK
     FINK & ASSOCIATES LAW
20   100 West Long Lake Road, Suite 111
     Bloomfield Hills, MI  48304
21   (248) 971-2500

22

23

24       To obtain a copy of this official transcript, contact:
               Robert L. Smith, Official Court Reporter
25            (313) 234-2612 • rob_smith@mied.uscourts.gov
```

```
 1   APPEARANCES: (Continued)
     Direct Purchaser Plaintiffs:
 2
     NATHAN FINK
 3   FINK & ASSOCIATES LAW
     100 West Long Lake Road, Suite 111
 4   Bloomfield Hills, MI  48304
     (248) 971-2500
 5

 6   GREGORY P. HANSEL
     PRETI, FLAHERTY, BELIVEAU &
 7   PACHIOS, L.L.P.
     One City Center
 8   Portland, ME  04112
     (207) 791-3000
 9

10   WILLIAM E. HOESE
     KOHN, SWIFT & GRAF, P.C.
11   One South Broad Street, Suite 2100
     Philadelphia, PA  19107
12   (215) 238-1700

13
     ROD M. JOHNSTON
14   SOMMERS SCHWARTZ
     1 Towne Square, Suite 1700
15   Southfield, MI 48076
     (248) 236-5752
16

17   STEVEN A. KANNER
     FREED, KANNER, LONDON & MILLEN, L.L.C.
18   2201 Waukegan Road, Suite 130
     Bannockburn, IL  60015
19   (224) 632-4502

20
     JOSEPH C. KOHN
21   KOHN, SWIFT & GRAF, P.C.
     One South Broad Street, Suite 2100
22   Philadelphia, PA  19107
     (215) 238-1700
23

24

25
```

Status Conference & Motion Hearings • September 13, 2017

**3**

```
 1      APPEARANCES: (Continued)
        Direct Purchaser Plaintiffs:
 2
        EUGENE A. SPECTOR
 3      SPECTOR, ROSEMAN, KODROFF & WILLIS, P.C.
        1818 Market Street, Suite 2500
 4      Philadelphia, PA  19103
        (215) 496-0300
 5

 6      RANDALL B. WEILL
        PRETI, FLAHERTY, BELIVEAU &
 7      PACHIOS, L.L.P.
        One City Center
 8      Portland, ME  04112
        (207) 791-3000
 9

10      End-Payor Plaintiffs:

11      Mahde Abdallah
        THE MILLER LAW FIRM, P.C.
12      950 West University Drive, Suite 300
        Rochester, MI  48307
13      (248) 841-2200

14
        DEVON ALLARD
15      THE MILLER LAW FIRM, P.C.
        950 West University Drive, Suite 300
16      Rochester, MI  48307
        (248) 841-2200
17

18      ERIN LINDSAY CALKINS
        SUSMAN GODFREY, L.L.P.
19      901 Main Street, Suite 5100
        Dallas, TX  75202
20      (214) 754-1913

21
        JOYCE CHANG
22      COTCHETT, PITRE & McCARTHY, L.L.P.
        840 Malcolm Road
23      Burlingame, CA  94010
        (650) 697-6000
24

25
```

Case 2:12-md-02311-SFC-RSW   ECF No. 1824, PageID.33914   Filed 10/04/17   Page 4 of 123
Status Conference & Motion Hearings • September 13, 2017

4

```
1    APPEARANCES: (Continued)
     End-Payor Plaintiffs:
2
     OMAR OCHOA
3    SUSMAN GODFREY, L.L.P.
     901 Main Street, Suite 5100
4    Dallas, TX  75202
     (214) 754-1913
5

6    WILLIAM V. REISS
     ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
7    601 Lexington Avenue, Suite 3400
     New York, NY  10022
8    (212) 980-7405

9
     HOLLIS L. SALZMAN
10   ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
     601 Lexington Avenue, Suite 3400
11   New York, NY  10022
     (212) 980-7405
12

13   ELIZABETH T. TRAN
     COTCHETT, PITRE & McCARTHY, L.L.P.
14   840 Malcolm Road
     Burlingame, CA  94010
15   (650) 697-6000

16
     STEVEN N. WILLIAMS
17   COTCHETT, PITRE & McCARTHY, L.L.P.
     840 Malcolm Road
18   Burlingame, CA  94010
     (650) 697-6000
19

20   Dealership Plaintiffs:

21   DON BARRETT
     BARRETT LAW OFFICES
22   P.O. Drawer 927
     Lexington, MS  39095
23   (601) 834-2376

24

25
```

```
 1    APPEARANCES: (Continued)
      Dealership Plaintiffs:
 2
      ALEXANDER E. BLUM
 3    MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
      1361 East Big Beaver Road
 4    Troy, MI  48083
      (248) 457-9200
 5

 6    KATHRYN REGEN EISENSTEIN
      MANTESE, HONIGMAN, ROSSMAN & WILLIAMSON, P.C.
 7    1361 East Big Beaver Road
      Troy, MI  48083
 8    (248) 457-9200

 9
      JOHN KAKINUKI
10    KAKINUKI LAW OFFICE, P.C.
      2 Civic Center Drive, #4222
11    San Rafael, CA  94913
      (415) 492-2011
12

13    YIFEI LI
      CUNEO, GILBERT & LaDUCA, L.L.P.
14    507 C Street NE
      Washington, D.C.  20002
15    (202) 789-3960

16
      J. MANLY PARKS
17    DUANE MORRIS, L.L.P.
      30 South 17th Street
18    Philadelphia, PA  19103
      (215) 979-1342
19

20    ANDREW PATE
      NIX, PATTERSON & PEACH
21    3600 N. Capital of Texas Highway, Suite 350
      Austin, TX 78746
22    (512) 328-5333

23
      SHAWN M. RAITER
24    LARSON KING, L.L.P.
      30 East Seventh Street, Suite 2800
25    Saint Paul, MN  55101
      (651) 312-6500
```

```
 1   APPEARANCES: (Continued)
     Dealership Plaintiffs:
 2
     WILLIAM SHOTZBARGER
 3   DUANE MORRIS, L.L.P.
     30 South 17th Street
 4   Philadelphia, PA  19103
     (215) 979-7385
 5

 6   For the Defendants:

 7   RACHEL ADCOX
     AXINN, VELTROP & HARKRIDER
 8   950 F Street, NW
     Washington, D.C. 20004
 9   (202) 912-4700

10
     MATTHEW ANDERSON
11   VARNUM L.L.P.
     333 Bridge Street, N.W., Suite 1700
12   Grand Rapids, MI 49504
     (616) 336-6000
13

14   ALDEN L. ATKINS
     VINSON & ELKINS, L.L.P.
15   2200 Pennsylvania Avenue NW, Suite 500 West
     Washington, D.C.  20037
16   (202) 639-6613

17
     DONALD M. BARNES
18   PORTER, WRIGHT, MORRIS & ARTHUR, L.L.P.
     1919 Pennsylvania Avenue, NW, Suite 500
19   Washington, D.C.  20006
     (202) 778-3056
20

21   EMILY BLACKBURN
     ARNOLD & PORTER, L.L.P.
22   555 Twelfth Street NW
     Washington, D.C.  20004
23   (202) 942-5000

24

25
```

```
1    APPEARANCES: (Continued)
     Defendants:
2
     MATT BOUCHER
3    ALLEN & OVERY, L.L.P.
     1221 Avenue of the Americas
4    New York, NY  10020
     (212) 610-6360
5

6    MICHAEL G. BRADY
     WARNER, NORCROSS & JUDD, L.L.P.
7    2000 Town Center, Suite 2700
     Southfield, MI  48075
8    (248) 784-5032

9
     JEREMY CALSYN
10   CLEARY, GOTTLIEB, STEEN & HAMILTON, L.L.P.
     2000 Pennsylvania Avenue NW
11   Washington, D.C.  20006
     (202) 974-1500
12

13   STEVEN F. CHERRY
     WILMER HALE
14   1875 Pennsylvania Avenue NW
     Washington, D.C.  20006
15   (202) 663-6321

16
     HEATHER SOUDER CHOI
17   BAKER BOTTS, L.L.P.
     1299 Pennsylvania Ave. NW
18   Washington, D.C. 20004
     (202) 639-7859
19

20   EILEEN M. COLE
     WHITE & CASE, L.L.P.
21   701 Thirteenth Street NW
     Washington, D.C.  20005
22   (202) 626-3642

23
     MOLLY CRABTREE
24   PORTER, WRIGHT, MORRIS & ARTHUR
     41 South High Street, Suite 2900
25   Columbus, OH  43215
     (614) 227-2015
```

```
 1   APPEARANCES: (Continued)
     Defendants:
 2
     KENNETH R. DAVIS, II
 3   LANE POWELL, P.C.
     601 SW Second Avenue, Suite 2100
 4   Portland, OR  97204
     (503) 778-2100
 5

 6   DEBRA H. DERMODY
     REED SMITH, L.L.P.
 7   225 Fifth Avenue, Suite 1200
     Pittsburgh, PA  15222
 8   (412) 288-3302

 9
     MICHAEL R. DEZSI
10   DETTMER & DEZSI, P.L.L.C.
     615 Griswold Street, Suite 1600
11   Detroit, Michigan 48226
     (313) 879-1206
12

13   BRANDON W. DUKE
     WINSTON & STRAWN, L.L.P.
14   1111 Louisiana Street, 25th Floor
     Houston, TX  77002
15   (713) 651-2600

16
     CAROLINE DYE
17   BAKER BOTTS
     1299 Pennsylvania Ave. NW
18   Washington, D.C. 20004
     (202) 639-7859
19

20   J. CLAYTON EVERETT, JR.
     MORGAN, LEWIS & BOCKIUS, L.L.P.
21   1111 Pennsylvania Avenue NW
     Washington, D.C.  20004
22   (202) 739-5860

23
     PETER M. FALKENSTEIN
24   JAFFE, RAITT, HEUER & WEISS, P.C.
     535 W. William, Suite 4005
25   Ann arbor, MI  48103
     (734) 222-4776
```

```
 1    APPEARANCES: (Continued)
      Defendants:
 2
      DANIEL T. FENSKE
 3    JENNER & BLOCK
      353 N. Clark Street
 4    Chicago, IL 60654-3456
      (312) 222-9350
 5


 6    MARK A. FORD
      WILMER HALE
 7    60 State Street
      Boston, MA 02109
 8    (617) 526-6423

 9
      JASON R. GOURLEY
10    BODMAN P.L.C.
      1901 Street Antoine Street, 6th Floor
11    Detroit, MI  48226
      (313) 259-7777
12

13    FRED K. HERRMANN
      KERR, RUSSELL & WEBER, P.L.C.
14    500 Woodward Avenue, Suite 2500
      Detroit, MI  48226
15    (313) 961-0200

16
      COURTNEY HOFFMAN
17    SIDLEY AUSTIN
      One South Dearborn Street
18    Chicago, IL 60603
      (312) 853-7669
19

20    ELLEN MAXWELL-HOFFMAN
      BOWLES RICE
21    600 Quarrier Street
      Charleston, WV 25325
22    (304) 343-2867

23

24

25
```

```
 1   APPEARANCES: (Continued)
     Defendants:
 2
     HEATHER LAMBERG KAFELE
 3   SHEARMAN & STERLING, L.L.P.
     801 Pennsylvania Avenue, NW
 4   Washington, D.C.  20004
     (202) 508-8097
 5

 6   JEFFREY L. KESSLER
     WINSTON & STRAWN, L.L.P.
 7   200 Park Avenue
     New York, NY  10166
 8   (212) 294-4655

 9
     SHELDON H. KLEIN
10   BUTZEL LONG, P.C.
     41000 Woodward Avenue
11   Bloomfield Hills, MI  48304
     (248) 258-1414
12

13   FRANKLIN LISS
     ARNOLD & PORTER, L.L.P.
14   555 Twelfth Street NW
     Washington, D.C.  20004
15   (202) 942-5000

16
     RONALD M. McMILLAN
17   CALFEE, HALTER & GRISWOLD, L.L.P.
     1405 East Sixth Street
18   Cleveland, OH  44114
     (216) 622-8621
19

20   STEFAN M. MEISNER
     MCDERMOTT WILL & EMERY
21   500 North Capitol Street, NW
     Washington, D.C. 20001
22   (202) 756-8000

23
     W. TODD MILLER
24   BAKER & MILLER, P.L.L.C.
     2401 Pennsylvania Avenue NW, Suite 300
25   Washington, D.C.  20037
     (202) 663-7822
```

```
1    APPEARANCES: (Continued)
     Defendants:
2
     BRIAN M. MOORE
3    DYKEMA GOSSETT, P.L.L.C.
     39577 Woodward Avenue, Suite 300
4    Bloomfield Hills, MI  48304
     (248) 203-0772
5

6    STEVEN REISS
     WEIL, GOTSHAL & MANGAS L.L.P.
7    767 Fifth Avenue
     New York, NY 10153
8    (212) 310-8174

9
     J. DAVID ROWE
10   DUBOIS, BRYANT & CAMPBELL
     303 Colorado, Suite 2300
11   Austin, TX 78701
     (512) 457-8000
12

13   MICHAEL RUBIN
     ARNOLD & PORTER, L.L.P.
14   555 Twelfth Street NW
     Washington, D.C.  20004
15   (202) 942-5094

16
     LARRY J. SAYLOR
17   MILLER, CANFIELD, PADDOCK & STONE, P.L.C.
     150 West Jefferson Avenue, Suite 2500
18   Detroit, MI  48226
     (313) 496-7986
19

20   SCOTT T. SEABOLT
     SEABOLT LAW FIRM
21   17199 N. Laurel Park Drive, Suite 215
     Livonia, MI  48152
22   (248) 717-1302

23
     STEPHEN J. SQUERI
24   JONES DAY
     901 Lakeside Avenue
25   Cleveland, OH  44114
     (216) 586-3939
```

```
 1   APPEARANCES: (Continued)
     Defendants:
 2
     MARGUERITE M. SULLIVAN
 3   LATHAM & WATKINS, L.L.P.
     555 Eleventh Street NW, Suite 1000
 4   Washington, D.C.  20004
     (202) 637-2200
 5

 6   JOANNE GEHA SWANSON
     KERR, RUSSELL & WEBER, P.L.C.
 7   500 Woodward Avenue, Suite 2500
     Detroit, MI  48226
 8   (313) 961-0200

 9
     JOHN TANSKI
10   AXINN, VELTROP & HARKRIDER
     950 F Street, NW
11   Washington, D.C. 20004
     (202) 912-4700
12

13   MAUREEN T. TAYLOR
     BROOKS, WILKINS, SHARKEY & TURCO
14   401 South Old Woodward, Suite 400
     Birmingham, MI  48009
15   (248) 971-1721

16
     MICHAEL F. TUBACH
17   O'MELVENY & MYERS, L.L.P.
     Two Embarcadero Center, 28th Floor
18   San Francisco, CA  94111
     (415) 984-8700
19

20   A. PAUL VICTOR
     WINSTON & STRAWN, L.L.P.
21   200 Park Avenue
     New York, NY  10166
22   (212) 294-4655

23
     MICHAEL WARLEY
24   PILLSBURY, WINTHROP, SHAW & PITTMAN, L.L.P.
     1200 Seventeenth Street, NW
25   Washington, D.C. 20036
     (202) 663-8383
```

1   TABLE OF CONTENTS

2                                                         Page

3   REPORT OF SPECIAL MASTER.......................... 15

4   STATUS CONFERENCE................................. 16

5   MOTION HEARINGS

6   DIRECT PURCHASERS' MOTION TO APPROVE SUPPLEMENTARY
    DISCOVERY AND DEPOSITION PROTOCOL.................. 43
7
    TRUCK AND EQUIPMENT DEALERS' MOTION FOR FINAL
8   APPROVAL OF SETTLEMENT, APPROVAL OF ALLOCATION
    PLAN AND AWARD OF ATTORNEYS FEES.................. 55
9
    A-C SYSTEMS DEFENDANTS' MOTION TO DISMISS STATE
10  LAW CLAIMS........................................ 78

11  PANASONIC CORPORATION'S MOTION FOR
    JUDICIAL NOTICE................................... 96
12
    PANASONIC CORPORATION'S MOTION TO DISMISS THE
13  CONSOLIDATED AMENDED COMPLAINTS...................106

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Detroit, Michigan
 2   Wednesday, September 13, 2017
 3   at about 10:01 a.m.
 4                        _   _   _
 5            (Court and Counsel present.)
 6            THE CASE MANAGER:  All rise.
 7            The United States District Court for the Eastern
 8   District of Michigan is now in session, the Honorable
 9   Marianne O. Battani presiding.
10            You may be seated.
11            The Court calls Case No. 12-md-2311.
12            THE COURT:  Good morning.  Okay.  Let's start here
13   with Mr. Esshaki, if you would please, give us a report.
14            MASTER ESSHAKI:  Yes, Your Honor.
15            Good morning, everyone.  It is a pleasure to see
16   you all again.
17            We -- the flow of motions have slowed quite a bit.
18   I think we had one or two last month.  We had one yesterday.
19   And as of this point there are currently no motions pending,
20   but I believe that we are getting to our motions
21   expeditiously and getting them calendared and heard as
22   quickly as possible with briefing deadlines and so forth.
23            So from the Master's standpoint, I think we are
24   doing fine.
25            THE COURT:  Does anybody have any questions for the
```

1    Master or any comment?

2          (No response.)

3          THE COURT:  No.  All right.  Let's go on to our

4    next one, which is the settlements.  Who is going to speak on

5    that?

6          MR. WILLIAMS:  Good morning, Your Honor.  Steve

7    Williams for the end payors.  I believe Mr. Raiter will be up

8    for the auto dealers.

9          We think we are making outstanding progress.  For

10    the end payors, our first round of settlements, which the

11    Court previously approved, we anticipate will be completely

12    final very soon.  The second round of settlements that the

13    Court approved, we are only waiting for this Court to enter

14    the judgments that we recently submitted and those will

15    become final.

16          Since we saw you in June, we have settled an

17    additional 20 cases.  We have been working very hard with the

18    mediation team, and we anticipate presenting a motion for

19    approval of notice to the class of those additional

20    settlements in the next probably couple of months with the

21    notice plan to begin in December.

22          We've filed preliminary approval papers on some of

23    our recent settlements last week.  The Court should

24    anticipate many more coming in over this week and next week.

25    New settling defendants include Hitachi, Bosch, Mitsuba and

Status Conference & Motion Hearings • September 13, 2017

16

1    Nishikawa.  We have many more mediations scheduled at

2    present.  We are doing them all around the country; we are

3    doing them in Detroit, New York, Washington, San Francisco,

4    and Los Angeles.  We have done them both with Judge

5    Weinstein's team, and the parties have also used other

6    mediators with agreement and with the consent of the

7    mediation team.

8         The end payor settlements now exceed a billion

9    dollars.  All of the settlements we have entered into provide

10   for cooperation against remaining non-settling defendants

11   which have been very effective helping us move to the next

12   step and work in resolving further cases.

13        On behalf of the end payors, we are very

14   appreciative for the settlement team.  They have been

15   effective.  They have been diligent.  They follow up with us

16   on a regular basis to make sure that we are taking actions we

17   need to, scheduling mediations, and working on getting cases

18   resolved.

19        It took some time perhaps at the outset to get

20   buy-in from all of the parties because the process has to be

21   voluntary and people have to want to participate.  I think

22   that has been accomplished.

23        THE COURT:  Are you doing this by defendant or part

24   or defendant within parts?  How is this working?

25        MR. WILLIAMS:  In almost all instances for the

1    indirect purchasers we will work with a defendant usually for

2    all of the cases that that defendant is in.

3            THE COURT:  That defendant is in.

4            MR. WILLIAMS:  There have been one or two instances

5    where a defendant has had an interest in resolving only one

6    case, and that has happened.  For example, in Tokai Rika in

7    wire harness resolved just that one case, but there still are

8    other cases.  But usually and more commonly, a defendant and

9    the indirect purchasers will try to resolve all cases

10   involving that defendant at the same time.

11           Thirteen of our cases are completely resolved now.

12   Many of the remaining cases have only a single defendant

13   left, and mediations are being scheduled which we hope would

14   resolve those.  And we feel and hope, it may be aspirational,

15   but that the indirect purchaser cases by the end of October

16   will be complete or substantially complete with the

17   assistance of the mediation team and the parties working very

18   hard to get that done.

19           THE COURT:  Wait a minute.  Let's say this again.

20   I don't want to get the wrong impression here and have my

21   hopes up.  The indirect purchaser cases -- are you talking

22   about all cases or are you talking about --

23           MR. WILLIAMS:  I'm talking about all cases, and it

24   is a goal.  Obviously it is voluntary and things may not work

25   out, but this is the effort that we are making now with the

```
 1    mediation team is to do everything we can to resolve as many
 2    of those by the end of October as is reasonably possible.  We
 3    have a duty to the class to do a good and effective job.
 4    Defendants may have reasons in some cases why it is not the
 5    right time, but we are making progress and we do have reason
 6    to be hopeful.
 7             THE COURT:  Okay.  I want to tell you while you are
 8    reporting, there is a representative here from the mediation
 9    team, Ms. Lelchuk.
10             MR. WILLIAMS:  Ms. Lelchuk.
11             THE COURT:  There she is in the back.  Can you
12    stand up so everybody can see?
13             MS. LELCHUK:  Hi, everyone.
14             THE COURT:  She came in from the mediation team,
15    and I get a report periodically from Judge Weinstein, and so
16    we've had a discussion on the report and the information and
17    you pretty much just told us about the indirect purchasers,
18    and I am asking just for a little more detail in the JAMS
19    report in the sense of when these things are scheduled and
20    what parts and/or defendants are scheduled.  I don't want to
21    know anything about, you know, who is refusing, who is not, I
22    don't want to get into that, but I do want to know a little
23    more detail on the mediation schedule.
24             MR. WILLIAMS:  Understood.  I would like to express
25    our things to Ms. Lelchuk and the mediation team because
```

Status Conference & Motion Hearings • September 13, 2017

19

1   she's really taken the laboring or in making sure we are all

2   working hard.

3           THE COURT:  Good.

4           MR. RAITER:  The only thing I would add, Your

5   Honor, on behalf of the auto dealers -- this is Shawn Raiter.

6           We agree with everything that Mr. Williams has

7   said.  We are largely in the same position as the end payors.

8   We will be coming in shortly to request leave to serve notice

9   or publish notice on our third round of settlements.  So the

10  auto dealers have been through round one and two, the claims

11  period has closed on our round two.  If you recall, we were

12  before you by phone recently about an issue to serve some

13  supplemental notice for claim processing and allocation

14  reasons on round two, but we are going to come in shortly on

15  round three and ask for leave to send notice for that third

16  group of settlements.  We do also have some preliminary

17  approval papers that you will seeing shortly, most of the

18  same as the end payors at this point.

19          THE COURT:  Okay.  Thank you both very much.

20          MR. RAITER:  Thank you.

21          MR. WILLIAMS:  Thank you, Your Honor.

22          THE COURT:  I do want to say, we had -- and right

23  now I don't remember if it was a judgment or something, but I

24  want to say to all of you, it is very hard to keep track of

25  all of these parts, we are trying very hard here, but do not

1    hesitate to call.  You know Molly, call her and say, you

2    know, the Judge didn't sign this yet or it is not entered

3    yet.  Sometimes we need that.  It is -- you know, there might

4    be a miscommunication with the papers, or even we have had

5    with Kay, poor Kay, she has to enter these orders in all

6    kinds of cases.  So there could be -- you know, there could

7    be a very good reason why it's not entered; on the other

8    hand, there could be a very bad reason, it just got put in

9    the wrong spot.  And with the hundreds of entries that we

10   have here I want to know.

11        So what I want to say is don't hesitate to call.  I

12   was rather insulted that somebody called me to say that, hey,

13   why don't you do -- somebody not involved -- because I'm

14   hoping by now you, who are involved, would not hesitate to

15   call and check on what's going on.  I don't hold that,

16   believe me, against anybody.  I want you to do that if you

17   have a question.  Okay.  Thank you.

18        MR. KANNER:  Good morning, Your Honor.

19        THE COURT:  Mr. Kanner.

20        MR. KANNER:  Steve Kanner on behalf of the direct

21   purchaser plaintiffs.

22        With respect to the current issue of settlements

23   and mediations, we are pleased to advise you that we continue

24   to make good progress in both the first and second tranche of

25   cases.  We are working on completing settlements with an

1    entity which I've already disclosed to this Court before, and

2    that's MELCO, and that's six or seven different products.   We

3    are at the final stages of drafting the agreements.   And with

4    another defendant, who I may not mention at this point, that

5    also has at least seven additional products which we intend

6    to present to this Court, both of those defendants, that

7    named and the one which is to remain anonymous, by the next

8    hearing, so we should have a number, all together 14

9    different settlement agreements, by the next hearing.

10           We also with respect to mediation have at least one

11   mediation scheduled within the next month, and we are working

12   to coordinate several more in the coming months.   And, again,

13   Ms. Lelchuk has been indispensable both in terms of herding

14   cats and herding lawyers.

15           THE COURT:  Cats are easier.

16           MR. KANNER:  I'm not sure which is more difficult.

17           We have at least one more direct meeting with a

18   group of defendants scheduled in the next month, so we,

19   again, hope to have some progress developing on that issue.

20           THE COURT:  Good.   Good.   Thank you.

21           MR. KANNER:  Thank you, Your Honor.

22           MR. PARKS:  Good morning, Your Honor.   Manly Parks,

23   from Duane Morris, on behalf of the truck and equipment

24   dealer plaintiffs.

25           I'm happy to report that we have an executed

1   settlement agreement with Mitsubishi Electric that has very

2   recently been signed.  We'll be filing a motion for

3   preliminary approval in connection with that settlement

4   perhaps as soon as the end of the week or certainly by the

5   middle of next week at the latest, now with the goal of

6   having a final settlement approval conference perhaps by the

7   end of the year in our next -- our December status conference

8   time.

9           That represents our first settlement in the

10  starters and alternators cases, so we are pleased about that

11  development.  We are in active discussions with all of the

12  defendants in that case and in our other primary remaining

13  case which is the radiators case.  So we have -- we do have

14  one defendant outstanding in occupant safety systems, but

15  because of the Takata bankruptcy, that matter is basically on

16  hold.  And that represents what's left in our truck and

17  equipment dealer case document.

18          We are in active settlement discussions.  We don't

19  have any mediations scheduled because the discussions are

20  moving forward so far effectively; in many instances direct

21  counsel-to-counsel conversations, in some instances

22  facilitated by Ms. Lelchuk and her colleagues but in all

23  cases overseen by them.  So we are checking in, providing

24  status reports, and things seem to be moving forward perhaps

25  not as quickly as we could hope but moving forward very

```
1    steadily nevertheless, so we are encouraged.
2             THE COURT:  Okay.  Very good.
3             MR. PARKS:  Thanks.
4             THE COURT:  Thank you.
5             All right.  I don't know if defendants have
6    anything else they want to add on settlements?
7             (No response.)
8             THE COURT:  Okay.  All right.  The next thing on
9    the agenda is the status of scheduling orders for the
10   subsequent parts.  Who is speaking to that?  Who put that on?
11            (No response.)
12            THE COURT:  Nobody.  Okay.  Well, that's good.  Let
13   me ask you this, and I have not checked to see this, but all
14   of the subsequent parts, do you have scheduling orders?  Are
15   you working on -- plaintiffs, are you working -- do you have
16   scheduling orders on them?  Who can say something about that?
17   Okay.
18            MR. PARKS:  Your Honor, Manly Parks again.
19            I can speak to radiators and starters and
20   alternators because those are two cases that we were involved
21   in.  On radiators we have exchanged several drafts with the
22   defendants of scheduling orders and we've got the
23   conversation down to a few fine points at this juncture.  We
24   are hopefully going to be able to work through the remaining
25   items, and to the extent that we can't, you know, we will
```

1    certainly present those issues in an expedited way to

2    Special Master Esshaki for his determination, but hopefully

3    we will be able to resolve those issues and then we will be

4    able to present the Court with an agreed-upon order for

5    radiators.

6            Starters and alternators is a later tranche case

7    but we have decided or been authorized among plaintiffs'

8    groups to take the lead on pushing forward with that and hope

9    to have a draft for the defendants' consideration out very

10   shortly.  We have it in the final stages of preparation.  So

11   that at least as far as starters, alternators, and radiators

12   goes, that's the status there.

13           THE COURT:  Thank you very much.

14           Anyone else?

15           MR. FINK:  Yes, Your Honor.  The direct purchaser

16   plaintiffs are in the process of negotiating scheduling

17   orders in the second tranche of cases.  They are proceeding

18   productively but we don't have a definite time on when we

19   will have that.

20           THE COURT:  Okay.  I know the first and the second

21   tranche.  What about the third, et cetera?

22           MR. FINK:  No --

23           THE COURT:  Do we have that?

24           MR. FINK:  No, not yet.  We want to get the

25   second --

Status Conference & Motion Hearings • September 13, 2017

25

1          THE COURT:  We need to move on with that because

2     the cases have been filed long enough now to have scheduling

3     orders.

4          MR. FINK:  Well, that's what we will do, Your

5     Honor.

6          THE COURT:  Okay.  Thank you.

7          MR. REISS:  Good morning, Your Honor.  Will Reiss

8     for the end payor plaintiffs.

9          So we have scheduling orders in a number of cases.

10    In the occupant safety systems case, which is one of the next

11    cases in the tranche scheduled for class cert, we appeared

12    before Special Master Esshaki, we had some differences, I

13    think we are close to resolving those differences, and we are

14    planning on submitting a proposed order memorializing

15    Master Esshaki's ruling hopefully next week.

16         There are a few other cases that we are working on

17    scheduling orders.  I'm happy to say that since we are

18    settling these cases so fast, a number of them are closing so

19    we are not -- we don't have the necessity for scheduling

20    orders, but to the extent there are cases that are still

21    open, we are in the process of negotiating them and we will

22    enter something soon.  Thank you.

23         THE COURT:  Okay.  Thank you.

24         MR. KANNER:  Good morning again, Your Honor.

25    Steve Kanner for direct purchaser plaintiffs.

```
 1              I should add that within those cases that we are in
 2    the process of settling, those would appear in the second
 3    tranche and some in the third tranche.  So, again, setting
 4    scheduling orders for the cases which are in settlement
 5    process --
 6              THE COURT:  Waste of time.
 7              MR. KANNER:  But the good news is there is progress
 8    even without the scheduling order on those cases.  And as we
 9    reach the point where those cases do require the input of
10    both sides, because we are going to continue to litigate,
11    certainly the scheduling order will flow of necessity from
12    those.
13              THE COURT:  Okay.
14              MR. KANNER:  So I don't want you to be under the
15    impression that we are not moving ahead with that.
16              THE COURT:  What I don't want is these cases just
17    floating out there with nothing; you are either in settlement
18    discussions or you are proceeding by way of having a
19    scheduling order.
20              MR. KANNER:  Your Honor, I can safely say we are on
21    the same page with respect to that.
22              THE COURT:  Okay.
23              MR. KANNER:  Thank you.
24              THE COURT:  All right.
25              MR. FINK:  That's what I meant to say.
```

1    THE COURT:  Thank you.  All right.  The next item

2  is the status of assignee plaintiff actions.  Yes, come

3  forward.

4    MR. PATE:  Good morning, Your Honor.  Drew Pate,

5  Nix, Patterson & Roach, on behalf of group one and the other

6  assignee plaintiffs who have opted out of the second wave of

7  dealership plaintiffs.

8    THE COURT:  How do you spell your name, please.

9    MR. PATE:  Drew Pate, P-A-T-E?

10    THE COURT:  P-A-T-E?

11    MR. PATE:  Yes, ma'am.

12    THE COURT:  And you have filed separate cases, I

13  think, what, 30 some cases maybe?

14    MR. PATE:  26 cases.

15    THE COURT:  26.  Okay.  So you are basically

16  starting from the beginning on individual cases, so you need

17  to get started on whatever -- how are you going to proceed?

18  We need to get you on a scheduling order.

19    MR. PATE:  Yes, Your Honor.  And right now we are

20  working with the defendants in the cases we filed for a joint

21  stipulation for an answer and a motion deadline for them.

22  Once we get that -- we hope to have that ready soon to

23  present as to the Court.  Once we get that worked out, we

24  intend to proceed with the discovery and request scheduling

25  orders from there.  We have in the meantime been working with

1    defendants for informal production of documents and things

2    like that since some of these cases are so far along so we

3    can be as efficient as possible.

4         THE COURT:  Yes.  The cases, some of them, are far

5    along so you have some catch-up.

6         MR. PATE:  Some catching up to do, Your Honor.

7         THE COURT:  Okay.  But I do need -- I do need to

8    have you as individual cases put on scheduling orders, and I

9    would anticipate that you, with the defendants, can work on a

10   scheduling order for -- just for the answer, the dispositive

11   motions, and the discovery I would say within the next --

12   this is the middle of September -- by the end of October.

13        MR. PATE:  Yes, Your Honor.

14        THE COURT:  So let me make a note that by

15   October 30th you will file a scheduling order or you will

16   submit a letter to the Court so the Master can work with you

17   on doing the scheduling order and/or the Court.  Somebody

18   needs to get with you if it is not done.

19        MR. PATE:  Yes, Your Honor.

20        THE COURT:  Okay.

21        MR. PATE:  Understood.

22        THE COURT:  Have you -- so have you gotten to a

23   Rule 26 conference yet or --

24        MR. PATE:  We haven't, Your Honor.  I guess you

25   could call it that as far as our discussions about some of

1    the discovery that we intend to seek and I intend to produce

2    and then the response and answer deadlines, but I think we

3    need to get that worked out first and to have our full

4    Rule 26(f) conference.

5              THE COURT:  And how many parts are you involved

6    in -- did you opt out of?

7              MR. PATE:  26 right now.

8              THE COURT:  26 separate parts.  Okay.  All right.

9    Thank you very much.

10             MR. PATE:  Thank you, Your Honor.

11             MR. CHERRY:  Your Honor, may I speak?

12             THE COURT:  Yes.

13             MR. CHERRY:  Obviously we heard you and we will --

14   the defendants, I'm sure, will be working with the auto

15   dealer opt-outs to do that.

16             THE COURT:  Mr. Cherry, you are working on --

17             MR. CHERRY:  Steve Cherry, for Wilmer Hale, on

18   behalf of Denso, but speaking on behalf of the defendants.

19             None of the defendants have been served with any of

20   those complaints yet.

21             THE COURT:  You haven't?

22             MR. CHERRY:  No.  And so I know some defendants are

23   likely to accept service but I know some will want to be

24   served, and we obviously need service before we start working

25   on these other processes, so that's one thing.

```
 1              The other thing that we are concerned about is, you
 2     know, reading the complaints, there's reference to -- it
 3     looks like these -- this -- these opt-outs may have occurred
 4     because these plaintiffs still don't know what they would
 5     have received from the settlement, and there was a reference
 6     to not receiving any money from the first round.  This all
 7     involves the second round of settlements.  That they didn't
 8     opt out of the first round but they still hadn't received any
 9     money and still don't know how much money they would have
10     received, and so it looks like they have opted out to protect
11     their interest because the deadline for doing so is closing,
12     and, you know, we are concerned about that.  I mean, if
13     they -- if they had known what they were going to receive
14     from these settlements, perhaps they would have made a
15     different decision and Your Honor's interest in resolving all
16     of these cases would have been achieved.  I mean, that
17     certainly was the defendants' interest in settling with the
18     classes.
19              So that's troubling, and, you know --
20              THE COURT:  Let's get Mr. Pate up here and have a
21     response.  Mr. Pate, could you come back up here, please?
22              MR. PATE:  Yes, Your Honor.
23              THE COURT:  Let's talk, first, what Mr. Cherry said
24     about nobody has been served.  Have you not served these
25     complaints?
```

1  MR. PATE: We have been attempting to -- like you

2  said, Your Honor, some of these are very far along so we have

3  been attempting to proceed informally with parties accepting

4  service through their represented counsel in the class cases.

5  My understanding from my conversation with Mr. Cherry was

6  that we would be receiving something from them on that as I

7  referred to about a stipulation about accepting service and

8  answering. So it sounds like he and I need to have further

9  discussions about that as far as who is going to accept

10  service based on what we have sent and the complaints we have

11  sent to counsel and who still needs to be formally served,

12  and we will certainly do that. Anyone who does not accept

13  service, we will serve them.

14  THE COURT: Okay. But that has to be done quickly

15  because if some of these defendants don't accept service,

16  then we have problems, especially for those if you have to go

17  to the Hague, whatever you have to do, could be a --

18  MR. PATE: Yes, Your Honor.

19  THE COURT: -- big and expensive project.

20  MR. PATE: Yes, Your Honor.

21  THE COURT: I would like a status report from you

22  also by the end of October on service.

23  MR. PATE: Okay.

24  THE COURT: And let's talk about what Mr. Cherry

25  said about some of these parties not getting money from the

 1    first round.  Well, most of these monies have not been

 2    disbursed.  Is that what you mean?

 3              MR. CHERRY:  Our understanding is none of it has

 4    been disbursed from any settlement.

 5              THE COURT:  Do you know that?

 6              MR. PATE:  Yes, Your Honor.  We have been in

 7    contact with the settlement administrator on behalf of our

 8    clients for those to try to get a status update on the status

 9    of the first wave of settlement payments, so we are aware

10    that nobody has been paid, Your Honor.

11              THE COURT:  And are you aware of an amount they may

12    be paid?

13              MR. PATE:  No.  We haven't been able to get any

14    information about what the amount they will ultimately

15    receive under the first wave of settlements they didn't opt

16    out of.

17              THE COURT:  Mr. Cherry?

18              MR. CHERRY:  Yes, Your Honor.  I mean, our concern

19    is if that's a significant reason for the opt-outs occurring,

20    that something ought to be done about that.  That perhaps

21    staying these cases, getting that information to them, and

22    then letting that decision be made.  Maybe they would choose

23    to be in the class if they knew what they were receiving from

24    these settlements or maybe they would make the same decision,

25    but at least they would understand what they were giving up.

1    THE COURT:  Well, I think you should be -- let's

2    get a -- let's hear from Mr. Raiter.

3    MR. PATE:  We can certainly talk to the defendants

4    about that and work with the defendants.

5    THE COURT:  Well, it is not the defendants really,

6    it is the plaintiffs who now have the money and the

7    allocation.

8    MR. RAITER:  Your Honor, and the -- one of the

9    reasons for the delay was this last reason we came to talk to

10   you about the allocation of those multi-jurisdictional

11   dealerships.  We need to collect any additional information

12   we may have received from dealerships who didn't give us all

13   of the information in light of the kind of first view of how

14   this would proceed.  Once we have that, the calculations will

15   be done.  We are this close to disbursing round one.  We just

16   need to go through that last process, recalculate the numbers

17   and then disburse.  So we feel like we are a short number of

18   months -- a small number of months away from disbursing round

19   one.  All of the heavy lifting has been done in the claim

20   processing and calculations.  It turned out to be much more

21   challenging than we expected or the claim administrator

22   expected because dealerships were providing us different

23   forms of their data; somebody would give us their data in one

24   way, another would give us in another way.  There has been a

25   lot of follow-up by the claim administrator about what does

Status Conference & Motion Hearings • September 13, 2017

34

1   this mean.  Sometimes they would just give us bulk numbers of

2   vehicles, they didn't break it down by models or years and we

3   would have to go back.

4          So we are to a point where we should be the first

5   group to actually disburse money to class members, but it is

6   just a couple of months away is what we expect, and I'm

7   knocking on wood, crossing my fingers, doing everything

8   possible that's true.  We want to get the money out.

9          The good news for us is as soon as we get round one

10  out, round two should follow relatively smoothly because all

11  of the systems and calculations and databases are in place,

12  and the majority of dealerships are participating in round

13  two.  We do have some new dealerships, hundreds of new

14  dealerships that have submitted new claims, but those are

15  being processed as we speak, so we think round two will

16  follow shortly after round one once it finally gets out.

17          THE COURT:  Well, let's discuss then with Mr. Pate,

18  I'm not sure, because I don't think we got a clear answer

19  here, are you thinking that you are going to proceed with the

20  case or do you want to know what this amount is because maybe

21  rather than having defendants who have already gone through

22  this once that do the -- participate in the discovery, maybe

23  we need to wait and see what the amount of money your clients

24  might be receiving to see if they want to proceed.

25          Because I will tell you this.  If you decide to

1    proceed, you have to proceed and it is going to be expensive.

2    I mean, you could talk to these folks; from everything I have

3    seen, it is astronomical.  I don't know where your funding is

4    or how you are doing it, but I would expect the same thing

5    from you.  So I'm not treating you differently as an

6    individual.  In fact, as an individual I would assume you

7    could proceed much faster than what our class actions have.

8              But, please, don't take this -- I don't care that

9    you have opted out, and to do one individual case on this

10   might be very, very interesting, but it is also going to be

11   very expensive.  And so I want you to seriously consider what

12   is it that you are looking for.  I'm not talking settlement.

13   I'm talking about are you looking for the amount of money so

14   you know whether you want to proceed or not?  And if that's

15   the case, you know, tell me and tell me now because I will

16   stay these proceedings so you don't have to proceed with

17   service and they don't have to proceed with -- they, I mean

18   defendants -- don't have to participate in any other parts of

19   the litigation right now.

20             So, you know, discuss it, let us know if you want

21   to stay.  I don't think Mr. Cherry or other defendants would

22   object until after the distribution maybe of both parts, I

23   don't know, since Mr. Raiter tells us the second allocation

24   is ready to --

25             MR. PATE:  Understood, Your Honor.  Right now our

Status Conference & Motion Hearings • September 13, 2017

36

```
 1   intention, as I said, was to proceed.  Our clients were in a

 2   situation where they were up against certain deadlines and

 3   needed to preserve their rights, which they felt they needed

 4   to do by opting out, but I hear what you're saying and it

 5   makes a lot of sense.  So I would like to discuss with my

 6   colleagues and clients, and we can work with the defendants

 7   and plaintiffs on that to see if that makes sense.

 8              THE COURT:  Okay.

 9              MR. CHERRY:  Thank you, Your Honor.

10              MR. RUBIN:  Your Honor, on behalf of Yamashita, we

11   have also been sued by the opt-outs.  Our case -- sorry.

12   Michael Rubin, Arnold & Porter, for Yamashita defendants in

13   the AVRP case.

14              We are a wave three settlement for which there's

15   preliminary approval but no motion has been filed for final

16   approval so there has been no opt-out period, but we got

17   looped into these cases.  So the interest in -- hopefully

18   they won't opt out from round three if they see how much they

19   are getting from round one and round two from the settlement.

20              So I just wanted to, first off, clarify the record

21   that I think there might be another couple defendants as well

22   in a similar situation, but hopefully if we put these cases

23   off a little bit or if they want to simply dismiss my client,

24   I'm always happy with that, they may decide never to actually

25   bring an opt out of wave three cases.
```

1       THE COURT:  Right, right.  I think you understand

2   what's being said, and certainly once you know in round one

3   you are being treated -- your clients are being treated like

4   all the other --

5       MR. PATE:  Yes, Your Honor.

6       THE COURT:  -- clients and what sums you are

7   getting there, nobody can say -- well, I guess we could say

8   in the second round, but we certainly couldn't say in the

9   third round yet what you are going to get, but obviously --

10  well, it's up to you.  The bottom line is it's up to you, but

11  let's try to take care of this logically because we don't

12  want to create any more work.  I mean, these attorneys are

13  working hard enough without --

14      MR. PATE:  I understand, and that's what we have

15  been trying to do, Your Honor, we have been trying to work

16  with people and defense counsel as best we can.

17      THE COURT:  Okay.  I'm going to ask that you submit

18  to me either -- well, by letter what you plan to do because

19  if you are going to continue the case, then I want to say

20  that I still need your October 30th schedule and status of

21  service report, but if you are willing to stay, just that you

22  are preparing an order, you know, a stip and order to stay

23  the cases.  Okay.

24      MR. PATE:  Yes, Your Honor.  Do you have -- is

25  there a date that you want that letter by?

```
 1              THE COURT:  Well --
 2              MR. PATE:  We will get it to you as soon as
 3   possible either way.
 4              THE COURT:  Do you think a week is enough time for
 5   you?
 6              MR. PATE:  Yes, Your Honor.
 7              THE COURT:  So let's say -- today is Wednesday --
 8   next Wednesday, that would be September 20th.
 9              MASTER ESSHAKI:  Your Honor, could I ask to receive
10   a copy of that letter as well?
11              THE COURT:  Absolutely.
12              MASTER ESSHAKI:  Thank you.
13              THE COURT:  So you will send it to me and the
14   Master.
15              MR. PATE:  Yes, Your Honor.
16              THE COURT:  Okay.
17              MR. CHERRY:  Thank you, Your Honor.
18              MR. RUBIN:  Thank you, Your Honor.
19              THE COURT:  Good.  I'm glad we talked about that.
20              All right.  The next item is dates for the next
21   status conference.  Now, I've been thinking a little bit
22   about this because our agendas are very short now except for
23   the motions, and I'm thinking of canceling the December
24   meeting.  Is there anybody -- I should probably get your
25   input before I even have said that, but is there anybody that
```

```
 1    thinks we need to proceed?
 2              (No response.)
 3              THE COURT:  No.  Okay.  Let's cancel the status
 4    conference.  I would like, however, the -- a copy of the
 5    status report to still be filed because I do follow that
 6    closely, so I would appreciate that if you would file by
 7    December 6th a status report so we will have the --
 8    Mr. Hansel, where are you?
 9              MR. HANSEL:  Yes, Your Honor.
10              THE COURT:  You are doing these status reports
11    still?
12              MR. HANSEL:  Well, my partner, Randall Weill, did
13    the last one with the able assistance of our star paralegal
14    Sonya Belanger (phonetic), who really deserves a lot of
15    credit.
16              THE COURT:  Well, somebody deserves a lot of credit
17    because they are really detailed.  So I just want all of you
18    to know, and your paralegal, if you would inform him or her,
19    that I really appreciate it.  They are done very well.  And I
20    thank you, and I would still like it to come in this
21    December.  Okay.
22              MR. HANSEL:  We will do, Your Honor.  And, of
23    course, everyone in this room was integral in getting it
24    done, and we appreciate that.
25              THE COURT:  Thank you.
```

```
 1            MASTER ESSHAKI:  Your Honor, just to remind, we are
 2   going to keep open the Master's hearing date on the 5th.
 3            THE COURT:  Thank you.  Yes, on the 5th, which is
 4   the day that you would have hearings before the Master, we
 5   are going to keep that date still open for the Master if
 6   there is anything on.  If there is nothing scheduled, what,
 7   within a week or ten days?
 8            MASTER ESSHAKI:  Yes, Your Honor.
 9            THE COURT:  Yeah, if there's nothing scheduled, how
10   about ten days?
11            MASTER ESSHAKI:  Perfect.
12            THE COURT:  Ten days before that, then it is going
13   to be canceled, the Master's hearing will be canceled.  Okay.
14            And then our next scheduled conference, which we
15   will keep, is February 28th, February 28th.  Again, if you
16   need dates for anything before that, just call to get dates
17   scheduled.  All right.  It is just everybody is not going to
18   have to come in on that date.  Okay.
19            MASTER ESSHAKI:  And we will keep open the 27th for
20   another Master motion hearing?
21            THE COURT:  Yes.
22            MASTER ESSHAKI:  Thank you.
23            THE COURT:  And then the next date, which would be
24   three months, I guess we are going to see if we can go back
25   to that, is June 6th.  Is there anything anybody knows of
```

```
 1    that is now scheduled for June 6th?  So the next date will be
 2    June 6th with the Master's hearing June 5th.
 3            Does anyone have any other matters that they need
 4    to bring up?
 5            (No response.)
 6            THE COURT:  Nothing.  You are so cooperative.  Did
 7    anybody in Texas get hurt by that -- nobody here is from
 8    Florida but one of you is from Texas, right?
 9            MR. OCHOA:  Yes, Your Honor, everything was fine.
10    Thank you.
11            THE COURT:  And I know our new opt-out, you're from
12    Texas, I could tell by your accent.
13            MR. PATE:  Yes, Your Honor.  Thank you.
14            THE COURT:  You're okay.
15            MR. PATE:  Thank you for the kind ways.
16            THE COURT:  Okay.  Very good.  Then we will see you
17    in the snow in February.  Thank you.
18            We will start our motions -- let's take a
19    ten-minute break, and then we'll start the hearing on the
20    motions.
21            THE LAW CLERK:  All rise.  Court is in recess.
22            (Court recessed at 10:40 a.m.)
23                           —   —   —
24            (Court reconvened at 10:54 a.m.; Court, Counsel and
25            all parties present.)
```

Status Conference & Motion Hearings • September 13, 2017

42

1    THE LAW CLERK:  All rise.  Court is again in
2    session.  You may be seated.
3    THE COURT:  All right.  The first thing we have is
4    TED's motion for final approval, but that's set for 11:15.
5    MR. SHOTZBARGER:  That's correct, Your Honor.
6    William Shotzbarger, of Duane Morris, for the truck and
7    equipment dealer plaintiffs.
8    That's a set time, 11:15.
9    THE COURT:  Yes.
10   MR. SHOTZBARGER:  When the notice of the hearing
11   went out it said TBD, but we updated the website to say
12   11:15.
13   THE COURT:  Okay.  Let's hold this for 20 minutes.
14   We will do another motion and then come back to you.
15   MR. SHOTZBARGER:  I think that makes sense, Your
16   Honor.  Thank you.
17   THE COURT:  And then the next motion is the direct
18   purchaser's motion to approve supplementary discovery and
19   deposition protocol.
20   MR. HOESE:  May it please the Court, I'm William
21   Hoese, H-O-E-S-E, for the direct purchaser plaintiffs.
22   The first thing I would like to tell the Court is I
23   want to assure you we are not here to ask you to consolidate
24   the two cases.  What we are here to do is to ask that the
25   Court order -- or to authorize us to begin discovery in the

1    Dalc action, D-A-L-C.

2            The case was filed in June 2015.  The Court last

3    December consolidated the Dalc case and initial bearings case

4    for discovery, and Your Honor wrote at time that given the

5    current procedural posture, judicial economy is better served

6    by keeping the cases together for pretrial discovery.

7            However, the defendants' position, as I read it,

8    would effectively nullify the Court's order combining the

9    cases for discovery.

10            THE COURT:  No, they don't want to do any discovery

11    until after your class cert --

12            MR. HOESE:  That's correct, Your Honor.  After --

13    that's correct, Your Honor.  As I said, this case has now

14    been pending since 2015, June 2015.

15            THE COURT:  So if your class is not certified,

16    presumably that's the end of that and everybody goes away,

17    right?

18            MR. HOESE:  Well, at this juncture, because the

19    cases are separate, I would have to disagree with that, Your

20    Honor.  Apparently we would go forward with the second case,

21    the class certification, the way things stand right now.  If

22    the Court were to later consolidate the cases, we might have

23    to take a look at where we are, but right now we are on two

24    separate tracks, and what we are asking the Court to do is to

25    approve our supplemental discovery plan for the Dalc case

Status Conference & Motion Hearings • September 13, 2017

44

1    because we have not obtained any discovery, no documents, no

2    deposition discovery, no interrogatory responses.

3           And I want to emphasize too that earlier when the

4    defendants opposed consolidation, they said it would be

5    prejudicial to allow the claims that were brought in the Dalc

6    case, which in effect are the same claims in the original

7    case, and they said that their ability to defend against the

8    claims, this is in the Dalc case, were prejudiced due to the

9    passage of time and the failing of memories.  That was two

10   years ago.

11          So for us we think it is prejudicial not to allow

12   us to go forward.  Our experience in the initial case with --

13   at least my experience with one of the defendants is the

14   conspirators, some of them, were at a very high level in the

15   companies, they were older and they have since retired, and

16   they declined our offers to be deposed, and these are people

17   who were maybe in Germany, in Japan, in France and Sweden.

18   So if we can't get discovery started now, realistically it is

19   possible we may never have an opportunity to depose

20   conspirators just because they happen to meet with their

21   competitors in Europe as opposed to the U.S. or in Japan

22   where we have gotten the discovery.

23          One thing I would like to emphasize is that taking

24   discovery in the Dalc case will have no effect on the current

25   class certification schedule, no effect, and that's moving

1    forward.  The defendants' part is actually done now.  We

2    filed our brief, they filed their opposition, their Daubert

3    motions were filed, and they have deposed all expert

4    witnesses.  What's left is our filing of our -- deposing

5    their experts and filing our reply in mid-November, so...

6            THE COURT:  And the scheduling order that you

7    propose, there has been nothing, as I see, in these briefs

8    objecting to the scheduling order; it is objecting to the

9    discovery period?

10           MR. HOESE:  That is the defendants' current

11   position as I read it, yes.

12           THE COURT:  All right.  Let's hear what they have

13   to say.

14           MR. HOESE:  Thank you, Your Honor.

15           MS. KAFELE:  Good morning, Your Honor.

16   Heather Kafele, K-A-F-E-L-E.  I represent the JTEKT

17   defendants, Koyo France, Koyo Deutschland, and I will be

18   speaking on behalf of the bearings defendants in both cases.

19           So I want to address the discovery issue that

20   Mr. Hoese talked about first because I think he sort of took

21   the consolidation point off the table.  What I hear him

22   saying is, listen, we've been trying to get discovery, we've

23   been waiting two years and we can't wait anymore.  And I

24   would like to put that in a little bit of context, Your

25   Honor, because from my perspective, this really ignores a lot

Status Conference & Motion Hearings • September 13, 2017

46

1    of the reality that has happened in this case, and it is a

2    bit of a manufacture delay problem.

3           If you recall, the European Commission decision

4    came down in March 2014.  It was that decision that the

5    plaintiffs came to you and said because of that decision, we

6    want to add the European defendants to this action, but they

7    did that one year after that decision, Your Honor, in June of

8    2015.  So they waited a whole hear after that happened.

9           Then what happened next?  In 2015 did they try to

10   seek discovery -- enter a discovery plan?  No.  Did they do

11   it in 2016?  No.  They waited until August 2017 to come

12   before you and say now we need a discovery plan and it's

13   urgent.  Question why they have waited two years since this

14   case was filed, three years since the European Commission

15   case is filed, and all of a sudden it is an urgency as though

16   we are causing this problem.  It's a manufacture delay.

17          And frankly the biggest issue for us here is where

18   we are in the case.  We are less than four months in the

19   initial case from the class certification hearing, four

20   months.  At that hearing we are going to -- or as a result of

21   that decision we are going to get some insight into what is

22   left, if anything, of both of these cases.

23          So to start discovery now in Dalc after all of this

24   delay of two and three years that frankly was their own

25   making when after the class cert decision, we are going to

 1    really understand what's left.  Is there a case at all?  Has

 2    the case been narrowed?  And as a result of that, we will

 3    understand what discovery really makes sense and is

 4    necessary.

 5         If we start today, it's a very strong likelihood,

 6    Your Honor, we are going to be indulging in discovery that

 7    might not even be necessary.  And the reason this is

 8    important is because these are defendants in groups of

 9    defendants who have already produced 13 million documents.

10    We have subjected our -- we made our witnesses available in

11    60-plus depositions.  And to require us to go and do this

12    again in this later filed case when it might not be necessary

13    and we don't understand exactly where the scope of that case

14    is, frankly -- and the delay that's already been happening, I

15    see no reason why they can't wait another period of time.

16    And then once we get that ruling, we figure out what's left

17    and what needs to happen after that.

18         THE COURT:  It may all be left, you don't know,

19    right?

20         MS. KAFELE:  Correct.

21         THE COURT:  In terms of the millions of pieces of

22    paper, I assume they already have -- plaintiffs already have

23    those 30 million pieces of paper so I don't see you having to

24    do that again.  I do see the depositions, and he's raised

25    some interesting issues with the depositions in terms of the

1    people who need to be deposed, their age, et cetera.

2            MS. KAFELE:  Right.  But, Your Honor, first of all,

3    on the documents, they are asking for documents from the

4    European entities as well, comprehensive document requests

5    that as drafted are voluminous.

6            Second, on the witnesses, they are asking for new

7    witnesses from European entities that haven't been deposed

8    before.  I have some sympathy; they are worried about people

9    retiring, et cetera, but this case has been going on for two

10   years.  They have done nothing to contact us with a list of

11   people and ask if those people are going to be retired.  They

12   have taken no steps, and now sort of on the eve of a decision

13   that's going to probably clarify a lot of what's left, all of

14   a sudden it is urgent.  I suggest it's actually because they

15   want to get evidence that they are potentially going to use

16   in our class case or use to delay the future cases.

17           So I -- our proposal is not no discovery ever, we

18   are not saying that.  What we are saying is let's take this

19   in reasonable steps.  Let's have the class cert hearing,

20   let's get that hearing decision.  We will evaluate then, both

21   sides, what's left here.  What's the class cert case in the

22   second -- what's the class cert hearing in the second case

23   going to look like, what discovery is necessary as a result

24   of that, and come up with a plan that makes sense to proceed

25   in that second case.

1           To do it now is going to be extremely burdensome on

2   the defendants who have already incurred a lot of expense and

3   this Court frankly with a lot of motion practice that is

4   going to be related to these issues.

5           I think, you know, you had asked Mr. Hoese if the

6   defendants had any objections to the scheduling order.  We

7   object to any scheduling order being entered at this time.

8   We have not made line items or line edits to this particular

9   order, and we would have such because the way it's written

10  right now is if you enter that order, we are going to be

11  producing documents and initial disclosures within 20 days.

12  That would cause -- that's going to be directly relevant to

13  the class hearing that's coming up, it's going to potentially

14  delay things.  That's something we don't think is necessary

15  for anybody.

16          THE COURT:  Okay.  Whichever way, it is not

17  delaying the class hearing, God willing, I'm telling you

18  that.  This is --

19          MS. KAFELE:  I mean, that's not clear -- that's not

20  even clear because there will be information produced before

21  the January hearing.  I don't know, are they stipulating --

22          THE COURT:  It is clear.  Listen to me, it is

23  clear.  It is not delaying the class hearing.

24          MS. KAFELE:  Okay.

25          THE COURT:  I mean, other things might intervene,

Status Conference & Motion Hearings • September 13, 2017

50

1   we know that, hopefully not, but this is not delaying the

2   class hearing.

3          MS. KAFELE:  Okay.

4          THE COURT:  Let's hear the reply.

5          MR. HOESE:  The only thing I really have to say,

6   Your Honor, is, of course, since it will not affect the class

7   certification hearing, is that we have given the -- we have

8   served discovery requests on the defendants in Dalc that

9   answered the complaint in December 2015.

10         THE COURT:  You served the discovery requests in

11  December of 2015?

12         MR. HOESE:  We did, and we were told repeatedly

13  that there would be no discovery provided to us pending

14  essentially Your Honor's decision on the motions for personal

15  jurisdiction, so although we have tried, we tried to engage

16  the defendants earlier, we were brushed aside.

17         THE COURT:  When was the motion for personal

18  jurisdiction decided?

19         MR. HOESE:  In March of this year, Your Honor.  So

20  we promptly moved after that, and this is where we find

21  ourselves now.

22         THE COURT:  Okay.

23         MR. HOESE:  Thank you very much, Your Honor.

24         THE COURT:  All right.

25         MS. KAFELE:  Just briefly, Your Honor, I would say

1   on that is I understand that they served discovery requests
2   and I understand that at that time the defendants took the
3   position it doesn't makes sense to do discovery while
4   personal jurisdiction is pending, but two points on that.
5   One, there were some defendants who were not subject to
6   personal jurisdiction motions so there was nothing
7   prohibiting them from coming to the Court and saying we want
8   a discovery plan in place then.  The same motion that they
9   are seeking today they could have sought a year ago, two
10  years ago, even though the defendants had objected at that
11  time.  So I understand their point.
12          And also I would note that when the Court decided
13  to consolidate or coordinate the discovery in the two cases,
14  that was in December of 2016, at that point in time they
15  didn't say, okay, let's sit down and get a discovery plan in
16  order or -- and if defendants objected, come to you with this
17  motion at that time.  They waited again another eight months
18  to even file the papers or engage with us.
19          So I would again just reiterate to the Court that
20  there has been continual delay in this Dalc case on behalf of
21  the plaintiffs, and to suggest now they can't wait just a
22  little bit longer to gain more clarity that would provide
23  sort of an efficient, logical approach to these cases just
24  rings a little hollow.  I think we are all going to benefit
25  by knowing more of what's left.

Status Conference & Motion Hearings • September 13, 2017

**52**

```
 1              THE COURT:  Okay.  I will tell you, I -- maybe
 2    these motions certainly, maybe and certainly don't go
 3    together, do they?  Certainly these motions could have been
 4    brought at an earlier time, but there is I think a reasonable
 5    and logical reason why they weren't.  And I have been loath
 6    to delay anything and I don't intend to delay this discovery.
 7    I think we are really not on the eve of a decision.  I mean,
 8    we are looking at four months now almost before argument on
 9    the class cert and a couple of months for a decision, I don't
10    know.  So we could be at a minimum of six months away from a
11    decision on class cert, and I don't see any reason to delay
12    the discovery on -- for six months, it doesn't help.  I am
13    not delaying the class cert for you to search for something
14    in this new discovery but I think the discovery needs to go
15    on.
16              I appreciate what you are saying about the
17    scheduling order, that you have not gone over it line by line
18    because of this motion, so I'm going to ask you two to get
19    together and develop a scheduling order.  If you cannot, then
20    I want you to ask the Court for a scheduling conference so I
21    can put one in order, and I would say that you should have a
22    scheduling order in place by -- do you think three weeks
23    would do it?
24              MR. HOESE:  For us that would be fine, Your Honor.
25              THE COURT:  Defense?
```

1          MS. KAFELE:  Yeah, I think that's fine.

2          THE COURT:  Okay.  So let's say three weeks.  All

3   right.

4          MR. HOESE:  Thank you, Your Honor.

5          THE COURT:  Motion is denied.  I'm sorry, the

6   motion it granted.  This is defendants' motion.  Okay.

7          So the second motion, which actually is plaintiff's

8   motion to approve discovery plan, I guess I have to say for

9   the computer it is partially granted and partially denied

10  because of the -- I'm not approving the discovery plan, I'm

11  only approving the fact that there be a discovery plan.

12         MS. KAFELE:  Your Honor, just for clarification as

13  well, the motion was two parts; it was the discovery plan and

14  the consolidation coordination.  So I don't think we've

15  argued or presented on that issue.  So just that the order be

16  clear that it is only relating to the scheduling.

17         THE COURT:  That is only relating to the

18  scheduling.  I'm not going to hear any motions about the

19  coordination at this point.  Let's get the scheduling.  It

20  will remain as is in terms of we are proceeding with

21  discovery in this case on both cases but not consolidation at

22  this point except for discovery.

23         MS. KAFELE:  Thank you.

24         MR. HOESE:  Yes, Your Honor.

25         THE COURT:  So we are not changing anything.

Status Conference & Motion Hearings • September 13, 2017

54

```
 1              All right.  And our next are the air-conditioning
 2   systems.  We have a few minutes.
 3              THE LAW CLERK:  It's 11:15.
 4              THE COURT:  It's 11:13, Molly.  Yeah, I think we
 5   are close enough to start on it.  You're right.  Let's go
 6   back to the truck and equipment dealers.
 7              Okay.  This is the truck and equipment dealers'
 8   motion for final approval of settlement with certain
 9   defendants, and certification of the class, and allocation
10   and attorney fees.  I think you have two other motions too.
11              MR. SHOTZBARGER:  Yes, Your Honor.  And I believe
12   there was an issue with our motion for approval of allocation
13   plan that was raised by one of the defendants, and I think we
14   are perhaps going to put that one on hold.
15              Mr. Davis, do you have any more --
16              MR. DAVIS:  No, I think it is best to put it on
17   hold.
18              THE COURT:  It is what?
19              MR. SHOTZBARGER:  Okay.  So there was an issue with
20   our motion for approval of allocation plan related to claims
21   that had -- state law claims that had been dismissed, and
22   this was spotted after the motion was filed on Thursday and
23   before we arrived today.  So we are -- if it's okay with the
24   Court, we would like to put that motion on hold to rework the
25   allocation plan for all of the bearings settlements, which is
```

Status Conference & Motion Hearings • September 13, 2017

1    permissible under Your Honor's prior order.  We would just

2    have to amend it by a written submission to the Court, and we

3    would just take care of the prior allocation plan and this

4    allocation plan, which is going to be the same for all of the

5    bearings cases, the bearings settlements.  So we will submit

6    another motion by the end of this week or early next week at

7    the latest --

8                THE COURT:  Okay.

9                MR. SHOTZBARGER:  -- and we will take care of the

10   allocation plan, but, of course, the allocation plan is going

11   to come after final approval anyway.  So we would like to

12   stick with the final approval motion and the motion for

13   attorney fees.

14               THE COURT:  We will.

15               MR. SHOTZBARGER:  Thank you, Your Honor.

16               Again, this is William Shotzbarger on behalf of the

17   truck and equipment dealer plaintiffs.

18               Your Honor, this -- the current motion for final

19   approval covers three settlements in the bearings case, but

20   more importantly, this completely resolves the bearings case

21   for the truck and equipment dealer plaintiffs.

22               The three defendant groups at issue for this

23   position are SKF USA, NSK defendants, and the Nachi

24   defendants.

25               These three settlements total $4.475 million in

 1   cash benefits.  Added together to the prior bearing

 2   settlement for the bearing case, overall the total is

 3   $10.49 million in cash benefits.

 4          In addition to the cash benefits, certain

 5   settlements, specifically Nachi in this round, provided and

 6   did provide and did provide cooperation which we believe was

 7   really instrumental in securing other settlements that are

 8   here this round.  That that cooperation was very timely

 9   because it came not at the very end of the case but there

10   were certain defendants who were, like we would say, the last

11   one standing.  And so Nachi's cooperation was, in our

12   opinion, very crucial to the settlement as that was one of

13   the terms included in the Nachi settlement agreement.

14          And as we have set forth if our moving papers,

15   these settlements are meaningful, substantial, fair,

16   reasonable, and adequate, and they should be granted final

17   approval.

18          Each settlement has similar language defining the

19   class; any variations are insignificant.  Of course, we are

20   representing dealers of medium duty, heavy duty trucks,

21   construction equipment, agricultural equipment, other

22   vehicles who indirectly purchased bearings that we allege

23   were price fixed and affected by the defendants' conduct.

24          The specific definitions for each settlement class

25   are included in the respective settlement agreements.  These

1    settlement agreements are public and have been public and

2    they are a part of the record in this case.

3         The chart on page 3 of our motion sets out

4    specifically the cash benefits, and the amount of each

5    settlement was a result of several factors.  We weighed the

6    evidence of that defendant's conduct and our assessment of

7    it.  We also weighed the volume of commerce that we as

8    plaintiffs believe was affected or potentially affected, and

9    we also weighed the value of non-cash components of the

10   settlements such as cooperation.

11        Accounting for the likelihood of success on the

12   merits, the strength of the defendants -- the strength of the

13   defenses asserted by all of the defendants specifically for

14   damages, the volumes of commerce, the risk in proceeding and

15   other risks involved in any litigation, we think the

16   settlements truly represent a great outcome for the class of

17   truck and equipment dealers.

18        Regarding notice, notice was provided according to

19   the notice plan approved by this Court.  This notice plan was

20   similar to the approved plan previously approved by the Court

21   in bearings as well as earlier cases.  Specifically for the

22   truck and equipment dealers, those earlier cases would be

23   wire harnesses and occupant safety systems.

24        The notice plan was believed to be reasonable and

25   appropriate by RG/2 Claims.  They are a firm with a lot of

1   experience in this field and the firm that we've hired with

2   the Court's approval to handle notice and claims

3   administration once that process gets going.  RG/2's opinions

4   are set forth in the declaration of Tina Chiango who was --

5   her declaration was attached to our moving papers.

6         We used the settlement website which was already up

7   and running; truckdealersettlement.com.  Notice was e-mailed

8   to approximately 51,000 executives at truck and equipment

9   dealerships.  We also used registrants on the website who had

10  signed up for earlier notice in the earlier cases.  So after

11  adjusting for mail that was not delivered as well as adding

12  certain online registrants, notice was mailed and we believe

13  delivered to about 43,000 truck and equipment dealerships.

14        Further, advertisements regarding the settlements

15  were published in the Wall Street Journal, Work Truck

16  magazine, Automotive News and the weekly newsletters of the

17  National Trailer Dealers Association as well as the American

18  Truck Dealers.

19        Finally, notice of the settlement was also released

20  via a PR newswire.

21        In our opinion, the notice program was thorough and

22  was designed to reach and did reach a large percent of

23  potential class members.

24        The reaction to the settlements has been

25  overwhelmingly positive.  There have been no objections,

1    there have been no opt-outs.  This is significant, we think,

2    because these are sophisticated commercial businesses with

3    individuals who are aware of the legal process.  They are in

4    a position to speak up if they are not happy with it or if

5    they were to raise any issues.  They have not done so, and we

6    think that really speaks volumes.

7          We believe the requirements of Rule 23 are

8    satisfied by the settlements.  The Sixth Circuit sets forth

9    seven factors.  The first, likelihood of success on the

10   merits weighed against the amount and form of relief in the

11   settlement.

12         When we weighed the risks, we noted that we were

13   providing large cash benefits to the class.  These are in no

14   way nuisance value settlements.  The lowest settlement is

15   almost half a million dollars and the largest is over

16   $3 million, so we are providing substantial cash benefits to

17   the class.

18         The second factor is the complexity, the expense

19   and likely duration of further litigation.  I don't think I

20   need to speak too much on this point.  The Court is well

21   aware of these factors in the bearings case.  This is one of

22   the most complex cases pending in the country and certainly

23   one of the largest.

24         There is a -- there would be a significant expense

25   were the parties to pursue this case, both the plaintiffs and

1    the defendants.

2        Regarding duration, we did not have a motion for

3    class certification deadline scheduled.  Litigation could

4    have gone not forever but quite some time until the OEM

5    third-party discovery issue was concluded.  And as the Court

6    is aware, that too is a very expensive issue and process that

7    remains ongoing.

8        Finally, experts is a big cost in any indirect

9    purchaser case, and that would be a further factor leaning

10   towards resolving these cases.

11       Our opinions are set forth in the moving papers and

12   are being set forth today.  We would not be here today if we

13   did not think that these were reasonable and fair settlements

14   for the class.

15       The fourth factor, the amount of discovery has been

16   extensive.  There were over 50 depositions.  There were

17   millions and millions of pages produced, and the amount of

18   third-party discovery not only with the OEMs but the

19   defendants in bearings actually subpoenaed unnamed truck and

20   equipment dealers.  So all of these factors lean towards a

21   great amount of discovery that had been conducted through the

22   time we moved for preliminary approval and now final approval

23   of these settlements.

24       Again, the reaction of absent class members was

25   positive.  No objections, no opt-outs, and we believe they

```
1   have spoken with their silence.

2           The sixth factor, there was not any fraud or

3   collusion in negotiating the settlements.  The Court has seen

4   how hard fought the bearings case has been for us and is

5   being fought by the other plaintiffs.  Negotiations for the

6   truck and equipment dealers settlements took place over many

7   months in person, over the phone, through e-mail, with

8   consultation done by the experts as well.  The parties were

9   always at arm's length with one another.

10          And finally, we certainly believe these settlements

11  are in the public interest.  Settlements generally are,

12  especially when resources here are being diverted to the

13  class members instead of funding for the litigation.

14          These settlements meet the requirements of Rule

15  23(a) and Rule 23(b).  Numerosity.  Joinder here would be

16  impractical.  We alone had 29 named plaintiffs all part of

17  the Rush Enterprise Company.  We sent notice to 40,000,

18  50,000 truck and equipment dealers, so there's simply too

19  many parties to join with the case.

20          Commonality.  Common questions of law generally

21  occur in price-fixing conspiracy cases such as this one.  The

22  main question was did the defendants enter into an illegal

23  arrangement to affect the price of bearings, and that

24  question was common for all plaintiffs and all defendants.

25          Typicality.  The claims of class representative are
```

1    indistinguishable from those of any absent class members.

2    And finally adequacy.  The class representatives

3    have adequately and fairly protected the interests of the

4    class in our opinion.

5    There is one more issue for final approval I did

6    want to mention to the Court and as we set forth in our

7    moving papers as well as the preliminary approval papers.

8    The settlement agreement with the JTEKT defendants, which

9    was -- our first round of settlements in bearings contained a

10   Most Favored Nation Provision in which -- which will be

11   triggered because of our settlement with NSK.  The provision

12   required a subsequent settlement after JTEKT with a defendant

13   who pled guilty in the United States.  The difference of the

14   settlements would be paid back to JTEKT.  And so we are

15   proposing that a portion of the NSK settlement be paid back

16   to JTEKT; that amount is $90,000.

17   The reason we agreed to this with JTEKT was it was

18   a very essential term to them, and we are still going to

19   provide over $3 million in settlements for JTEKT

20   defendants -- for the JTEKT settlement class as well as over

21   $3 million for the NSK settlement class.  And for all the

22   numbers we have set forth, it is the net settlement amount

23   after that $90,000 pursuant to the Most Favored Nation

24   Provision is paid from the JTEKT -- excuse me, from the NSK

25   settlement amount to the JTEKT defendants.

1       The reason this makes sense in our minds is

2   weighing the risks of litigation against the form of relief

3   being sought, we easily would have burned through $90,000 in

4   litigation expenses had we pursued the case against NSK

5   alone.  Simply the costs of the document database would

6   have -- for one month would have cost $90,000.  And so we

7   thought it made sense to get everything we could from NSK and

8   trigger the MFN, the Most Favored Nation Provision in JTEKT.

9       In sum, the settlements are fair, reasonable, they

10  meet the Sixth Circuit factors as well as the Rule 23

11  requirements, and we respectfully ask that they be granted

12  final approval.

13          THE COURT:  Thank you.  All right.  On this motion

14  the Court is aware of the settlement amount that the TED

15  plaintiffs will receive; $1,100,000 from SKF, $475,000 from

16  Nachi, and $3,170,000 from NSK, although from the -- it is to

17  be noted that that NSK, it includes a $90,000 -- or the

18  settlement includes a Favored Nations offset of $90,000 to

19  JTEKT, and therefore the -- that amount is $3,170,000; isn't

20  that correct?

21          MR. SHOTZBARGER:  That's correct, Your Honor.

22          THE COURT:  That was my understanding.  Okay.

23      And the Court notes that with the previous first

24  round settlements, it comes to roughly $10 million that is

25  the total settlement amount, is that correct, on bearings?

1    MR. SHOTZBARGER:  It is about ten and a half

2  million, Your Honor.

3    THE COURT:  Ten and a half million.  Thank you.

4  All right.  And we know, of course, in addition to the money,

5  there is a cooperation in the prosecution of claims against

6  the remaining defendants.

7    I would like to start with notice because it is

8  11:30 here almost and nobody has come here to object, nobody

9  has filed an objection, and nobody has opted out in this

10 settlement.  And we know that the notice went to -- through

11 mail and e-mail to approximately 51,794 executives

12 representing truck and equipment dealership addresses in the

13 United States, and I think you also published in the

14 Wall Street Journal.

15    MR. SHOTZBARGER:  Correct, Your Honor.  Wall Street

16 Journal, Automotive News, Work Truck Magazine, as well as

17 those newsletters that I mentioned.

18    THE COURT:  Okay.  So the notice the Court is

19 satisfied is certainly adequate and, again, the Court notes

20 that the fact that there were no objections and no opt-outs

21 are a reflection of the satisfaction with the settlement.

22    The first issue is to determine if this settlement

23 is fair, reasonable and adequate, and the Court finds under

24 Rule 23(a) that -- 23(e)(2), excuse me, that the settlement

25 is fair, reasonable, and adequate.  The Court considered the

1    factors that you just put forth on the record as set forth in

2    our rule.

3           We look at the likelihood of success weighed

4    against the amount and the form of the settlements offered,

5    and the Court finds that this factor, as described by

6    counsel, has been fully outlined.  Counsel believes the

7    settlement is excellent, and the Court agrees with this.

8           It is complex, this case, and expense goes without

9    saying as we have been dealing with this, and the expenses,

10   of course, are in the attorney fee motion I believe laid out

11   more clearly.  It's very expensive, and to continue the

12   litigation would be -- create even greater expense.  So it

13   eliminates the expense and any delay from -- with respect to

14   the settling defendants and it ensures a substantial payment

15   to the settlement class.

16          The judgment of experienced counsel is considered,

17   and you've laid out, Counsel, what you have done, and the

18   Court agrees that your judgment is to be given high credence.

19   I find you to be -- all counsel actually to be well --

20   extremely well qualified, and I feel that the information and

21   the discovery that you have done enabled you to evaluate both

22   the strengths and weaknesses of your case.

23          The Court notes in terms of reaction of class

24   members, I've already referenced that there were no opt-outs

25   or objections.

1    The settlements have gone on with experienced

2    counsel litigating at arm's length.

3    And certainly the next factor, the public interest,

4    is satisfied in resolving claims such as this which are

5    notoriously difficult and unpredictable.

6    So, in sum, the result appears fair and reasonable

7    in light of the expense, duration, and uncertainty of

8    continued litigation in these complex claims and numerous

9    issues, so the Court approves the settlement.

10    I found -- I said this in the beginning I

11    believe -- that the notice was proper and that class members

12    were, and the public, sufficiently notified of what was going

13    on in this case.

14    The settlement class issue, that is, should the

15    settlement class itself be certified pursuant to Rule 23 for

16    purpose of effectuating the proposed settlement, and the

17    Court finds it should.  Under Rule 23(a)(1), class

18    certification is appropriate where a class contains many

19    members that joinder of all would be impractical, and here we

20    know this class there were, what, 43-some thousand, over

21    40,000 notices sent, that this class is very numerous and

22    also geographically dispersed throughout the United States,

23    so that qualification is met.

24    In terms of the next one, which is the commonality,

25    questions of law or fact common to the class, you stated

Status Conference & Motion Hearings • September 13, 2017

67

1    those, but also the Court notes that antitrust price-fixing

2    conspiracy cases by their nature deal with common legal and

3    factual issues about the existence, scope, and effect of the

4    alleged conspiracy.  Whether defendants engaged in a

5    combination and conspiracy amongst themselves or stabilized

6    the price of the component parts sold in the United States

7    are common questions that exist for the whole class.

8         In terms of typicality, the claims of the

9    representative parties must be typical of the claims of the

10   class, and here typicality is satisfied because the truck and

11   equipment dealer plaintiffs' injuries arise from the same

12   wrong that is allegedly injured -- that has allegedly injured

13   the class as a whole.

14        In terms of adequacy of representation in which we

15   are talking about the named plaintiffs' adequacy and

16   counsels' adequacy, and the Court finds that the plaintiffs'

17   representatives will fairy and adequately protect the

18   interest of the class.

19        And also I want to note that the allocation plan as

20   it stands and I think will still stand does not give any

21   preference to the named plaintiffs outside of the service

22   awards.

23        MR. SHOTZBARGER:  That's correct, Your Honor.  The

24   allocation plan is going to be based on points as we have

25   done in previous cases.  It will be based on models of

```
 1    vehicles that we know or at least highly, highly believe were
 2    affected, the parts of those vehicles, and so it would be
 3    based off of that and, you know, we agree that allocation
 4    plan will not be preferential to any of the named plaintiffs.
 5              THE COURT:  Okay.  Thank you.
 6              And then next turning to Rule 23(b)(3), that the
 7    class plaintiffs demonstrate common questions predominate
 8    over questions affecting only individual members, then the
 9    class resolution is a superior method.  And here the global
10    conspiracy theory suggests the existence of shared issues
11    relative between the scope of the conspiracy, the market
12    impact, et cetera.  The evidence to the Court clearly shows a
13    violation to one settlement class member, it is common to the
14    class, and will be a violation to all.  So a class action is
15    the superior method to adjudicate these claims.  Certainly
16    doing this individually would be impossible.
17              All right.  The Court therefore approves the class
18    as defined in the -- the settlement classes as defined in the
19    settlement agreement.
20              The next issue, of course, is the allocation plan,
21    and we are holding the allocation plan for future discussion.
22              The last is -- motion that you have is the attorney
23    fees and the service awards, I believe.  So do you want to
24    address that?
25              MR. SHOTZBARGER:  Yes, Your Honor.  First, the
```

1    motion is for attorney fees and reimbursement of litigation

2    expenses.  We are actually not seeking service awards this

3    round because service awards were ordered in the first round

4    of settlements.

5            THE COURT:  Okay.

6            MR. SHOTZBARGER:  And the --

7            THE COURT:  I added that note because I didn't know

8    you had that already.  You did that already.  All right.

9            MR. SHOTZBARGER:  And just one final note with the

10   final approval.  After a final approval order is entered, as

11   we have done in the past, we will confer with the defendants

12   about judgments that we will submit for the Court to enter

13   for defendants, and we'll make sure to coordinate with the

14   defendants on that after the final approval order is entered.

15           THE COURT:  Okay.  Then you have your attorney fee

16   argument.

17           MR. SHOTZBARGER:  Yes, Your Honor, on the motion

18   for attorneys' fees and reimbursement of litigation expenses.

19   This motion for attorneys' fees and reimbursement of expenses

20   covers the period of January 1, 2017 through July 31, 2017.

21   As the Court is aware, this was a very active period in the

22   bearings case.  Discovery was truly going full throttle at

23   the winter and the beginning of spring of this year.

24           THE COURT:  Let me ask you about the reimbursement

25   of litigation expenses.  You list in your attorneys lists

1    paralegals at, I forget, close to $400 an hour; is that

2    right?

3              MR. SHOTZBARGER:  Yes, Your Honor.  One paralegal

4    is $395 an hour, one is $245 an hour.  Those are experienced

5    paralegals who have worked at Duane Morris longer than I

6    have, and those are the rates that we would normally bill

7    them out to for our hourly billing clients.  They are

8    Duane Morris employees, they are paralegals, and they are in

9    some sense integral to our prosecution of these cases, the

10   reason being that they pick up a lot of the work dealt with

11   prepare for depositions, attending depositions, getting

12   documents translated for depositions, as well as just

13   arranging the information that we need to attend and take the

14   depositions in the bearings case.

15             And there's also two project managers --

16             THE COURT:  I wanted to ask, what is a project

17   manager, what are the backgrounds of the project managers?

18             MR. SHOTZBARGER:  Your Honor, the project managers

19   work in our information support group.  They are essentially

20   IT, which is crucial in a case like this where you've got

21   document databases full of millions and millions of pages.

22   They are very helpful in receiving documents that come in

23   from the named plaintiffs, processing so that we can

24   ourselves as attorneys can sit at our desks and review at our

25   computer.  They know the language of the type of e-mail files

1    and all the types of files.  They facilitate the transfers of

2    the documents and they also deal with the vendor that we've

3    engaged to host all of the millions of documents that we've

4    gotten from the defendants, and so they are extremely crucial

5    to our team as well.

6            And I think these two project managers for this

7    round of settlements, the total was only 7.7 hours.  A lot of

8    that work was done in the beginning of the case loading the

9    documents and collecting documents from our clients, but in

10   sum these are, you know, IT folks who are a lot more versed

11   in the technologies than the attorneys.

12           And as I said, this is the -- this will be the --

13   would be the second award of attorney fees in the bearings

14   case for the truck and equipment dealers.  Our previous

15   motion covered from the inception of the case in 2014 through

16   December 31, 2016, and now we are talking about the period of

17   January 1 of this year through the end of July of this year,

18   which I said was very active.  We've been litigating this on

19   a contingency fee basis with no guarantee of any recovery of

20   fees.  In this motion we are seeking fees equal to one-third

21   of the total net settlement amount for this final round of

22   settlements.

23           One-third would equal $1,479,000.  We calculated

24   that amount by taking the net settlement amount, not the

25   total settlement amount but the net settlement amount, minus

1    notice and claims administration costs, minus escrow agent

2    costs.  And this fee, when we are looking at the bearings

3    case as a whole, would represent 85 percent of the lodestar.

4          The net payments to the parties for this round of

5    settlements would be approximately $2.73 million out of the

6    4.745 net total settlement amount, and that's calculated

7    after backing out the litigation expenses which Duane Morris

8    has forwarded.

9          The lodestar includes attorney hours for attorneys

10   from Duane Morris, and, like we just discussed, it also

11   includes those two paralegals and two project managers.

12   Total for Duane Morris employees and attorneys, 1,938 hours,

13   that's all calculated after January 1, 2017.  For the case in

14   total, we are up to 7,604 total hours in the bearings case

15   since 2014 when we were first getting ready to file the

16   complaint.

17         I just want to note that these totals do not

18   include hours spent after July 31st, that would be hours

19   spent preparing these motion papers as well as dealing with a

20   lot of settlement administrative issues with the defendants

21   as well as with RG2, the claims administrator.

22         The hours and the amounts are set forth in my

23   declaration attached to this motion for attorney fees and

24   reimbursement of litigation expenses, I'm talking about

25   Exhibit 1-B and 1-C to my declaration.

Status Conference & Motion Hearings • September 13, 2017

73

1        I think one factor that's important to note here is

2   that the Department of Justice investigations as well as the

3   Japanese Fair Trade Commission investigations, as far as we

4   know and are publicly available, they were not focused on

5   trucks and construction equipment and agricultural equipment.

6   Those investigations and criminal cases were based on

7   passenger cars largely focused on those vehicles as opposed

8   to the claims that we have brought in the bearings case.  And

9   so needless to say, we had to do a lot of work to build the

10  case and prosecute it through discovery, and I think that

11  hard work is reflected in the figures that we have submitted

12  to the Court.

13        As an example, just talking about from January 1,

14  2017 through about the end of March when we settled,

15  completely settled, we had Duane Morris attorneys of which

16  there's only -- we have a team of seven or eight attorneys,

17  we attended 40 depositions, and these were mostly two-day

18  depositions requiring a lot of travel.  My colleague,

19  Mr. Parks, and I were attending depositions in Seattle on a

20  weekly basis to the effect where he would be in one

21  conference room handling one deposition, I would be in the

22  other conference room handling another deposition, and then

23  we would get home on Saturday after the deposition and gear

24  up to do it again the next week.  While all of that was going

25  on, the other members of our team were attending depositions

```
 1    in San Francisco, Ann Arbor, New York, as well as other
 2    places and, where appropriate, attending depositions by
 3    phone.
 4           It was certainly an active period this winter in
 5    the bearings case, and that is reflected in this motion for
 6    award of attorneys' fees and litigation expenses.
 7           In our opinion, a 33 percent fee based on the
 8    percentage of the fund approach that we set forth in our
 9    motion, this fee would be well within the range of
10    reasonableness, approved by -- awarded and approved by courts
11    within the Sixth Circuit as well as this Court in the truck
12    and equipment dealers prior settlements, and so we
13    respectfully request that award as well as reimbursement of
14    our litigation expenses.
15           Should the Court have any questions, I would be
16    glad to answer them.
17           THE COURT:  Where do you get the 33 and a third?
18           MR. SHOTZBARGER:  Your Honor, that's a common -- it
19    is common for plaintiffs' cases taking cases on a contingency
20    fee.  However, as set forth --
21           THE COURT:  It is common in personal injury cases.
22           MR. SHOTZBARGER:  It is common, but as our motion
23    sets forth, it's common and well within reason of certain
24    fees awarded in complex MDL antitrust cases as well.  Our
25    motion, I believe we cited cases where 35 percent under the
```

1   percentage of the fund approach was awarded.  Even upwards to

2   40, 45 percent has been awarded in percentage of the fund

3   approach cases in antitrust cases, not solely personal

4   injury.

5           And this is the second case that we are handling.

6   As Mr. Parks represented earlier, we are only in five cases.

7   Wire harnesses is completely settled.  Now bearings is

8   completely settled.  OSS there is just Takata remaining, so

9   that case is on hold.  And then we only have three more down

10  the line, so this is the second case.

11          And I should also note that it is the first case

12  that we filed.  We filed bearings as our first case filed

13  back in 2014, and then came wire harnesses, and then came the

14  subsequent cases.  But as I stated, we believe that

15  33 percent is certainly reasonable here, the reason being

16  that when you look at bearings as a whole doing the lodestar

17  crosscheck, it is only 85 percent of our time spent on the

18  file, and so because it comes in under a one multiplier under

19  the percentage of fund approach, and even with the lodestar

20  crosscheck, we believe 33 percent is certainly reasonable.

21          THE COURT:  Thank you.  The Court has reviewed the

22  expenses and you have answered my questions on some of these,

23  and I will order the reimbursement to you of all of the

24  expenses that you have incurred as noted in your papers.

25          From the balance, the question is how much of an

1    attorney fee is appropriate, and as you may or may not know,

2    the Court has struggled with this in other cases.  In the

3    other cases, I think at this point we have set 20 percent as

4    the floor with the -- certainly with the knowledge that more

5    may be sought and received in the future.

6          In looking at yours, which are very few parts, the

7    Court in the first round because of this awarded you your --

8    I believe your request was 33 and a third in the first round

9    and you did receive that.  I have looked at the hours here as

10   you stated, and I'm not going to repeat those hours.  I do

11   know that crosschecking them with the lodestar, it's a

12   percentage of less than one.  I think it's the -- the actual

13   lodestar, the actual lodestar for the bearings based on

14   7,604 hours is 85.6 percent of the settlement.  Thus, as I

15   have indicated, that multiplier is less than one and that's

16   usually a good crosscheck.

17         I would further note that it is my experience only

18   from discussions with other judges that many of them do hire

19   accountants, et cetera to look at the hours that the

20   attorneys are putting in.  I'm not doing that, I don't

21   believe in that.  I hire you because I believe you are honest

22   and I assume you are putting in the actual hours.

23         Now, do I think extra hours are added in because

24   just mathematically they get in there by rounding off,

25   et cetera?  Absolutely.  But I'm much more for the percentage

1    of the fund approach as you indicated, and I like to look at

2    the crosscheck but I give it very little weight.  The -- you

3    certainly deserve what you earn.  You have worked hard as you

4    said in this particular case.  The DOJ did not offer you much

5    support, so to speak, and you had to do it on your own.

6            But I don't know what the magic number; that's why

7    I asked you why a 33 and a third.  Well, yes, it's given,

8    maybe more is given sometime, less is given a lot of times, I

9    don't know, but I'm looking for a number, and I think looking

10   at what is common in these cases and what is common in really

11   a lot of litigation in other cases where attorneys take

12   these -- take a case on a contingency fee basis, I think from

13   25 to 35 is a pretty -- percentage is a pretty common one

14   from what I've studied.  So I'm going to grant you 30 percent

15   of the attorney fee, for the attorney fee in this matter.

16   Okay.

17           All right.  Anything else.

18           MR. SHOTZBARGER:  That's it, Judge Battani.  I

19   appreciate it.  Thank you.

20           THE COURT:  Thank you.  All right.

21           Now we have the air-conditioning system motion,

22   right?  We have the defendants' joint motion to dismiss the

23   state law claims.

24           MR. DUKE:  Yes.  My name is Brandon Duke, and I

25   will be addressing that first motion for defendants.

1          THE COURT:  Okay.  All right.

2          MR. DUKE:  Defendants filed a -- or are moving to

3    dismiss on two discrete state law claims with respect to two

4    discrete issues.  First, with respect to ADPs, their claim

5    under South Carolina's antitrust law, and then second,

6    plaintiffs' -- both plaintiffs' unjust enrichment claims

7    under Florida law.

8          And our motion is different than previous motions

9    for two distinct reasons.  For the South Dakota claim, unlike

10   prior actions, ADPs here failed to allege that a specific ADP

11   either purchased or resided in South Dakota.  And for the

12   Florida claims, since this Court last addressed this issue,

13   the Florida Supreme Court has made clear that in order for a

14   claim to prevail under unjust enrichment, it has to -- the

15   benefit has to be conferred directly to defendants.

16         THE COURT:  What has to be conferred directly to

17   defendants, the --

18         MR. DUKE:  The benefit, the benefit.

19         So with respect to the South Dakota claim, ADP's

20   claim fails for two reasons based off of this Court's prior

21   holdings.  There is no named ADP -- no named ADP is alleged

22   to reside in South Dakota nor is a named ADP alleged to have

23   made any purchases in South Dakota.  This is different than

24   any of the prior ADP cases and is perfectly in line with the

25   Court's decision in the LTD wire harness case where the Court

1    rejected a similar claim under South Dakota law for failure

2    to have either one of these allegations.

3            Instead, with South Dakota, ADPs only include

4    boilerplate conclusory allegations, which this Court has

5    explained that such allegations are insufficient to state a

6    claim under the South Dakota statute, and the South Dakota

7    statute specifically requires an interstate nexus between the

8    defendants and -- the defendants' conduct and interstate

9    commerce -- I'm sorry, intrastate commerce, and unless ADPs

10   are able to plead such in-state purchases, they have not

11   shown that required interstate nexus.

12           Lastly, despite previously agreeing that the

13   intrastate nexus is a requirement under South Dakota law,

14   plaintiffs now attempt to minimize that standard in the cases

15   they cite.  However, those cases that they address in their

16   opposition relate to antitrust injury cases as opposed to

17   here which is focused on the elements of a South Dakota

18   claim.

19           With respect to the Florida unjust enrichment

20   claims, in January the state --

21           THE COURT:  Isn't the TED -- if we can just stick

22   to the South Dakota for a minute.

23           MR. DUKE:  Sure.

24           THE COURT:  The truck and equipment dealers is the

25   only one that I ruled the other way on.

1    MR. DUKE:  That's correct, but you used the same

2  reasoning in at least three or four prior case involving ADPs

3  where they agreed that the intrastate nexus was a

4  requirement, and you found that in those cases ADPs either

5  alleged instate purchases or they alleged that they resided

6  in the state and meeting the standard that you set which was

7  the same standard that you applied later in the TED case.

8    THE COURT:  Well, the effect was in the state here,

9  right?  People paid more in South Dakota for their vehicles

10  allegedly.

11    MR. DUKE:  Well, they have included a single

12  boilerplate allegation that there was -- and I want to be

13  accurate in -- that there was price competition was

14  restrained and that prices were raised in South Dakota, but

15  they haven't provided any specific allegations which in the

16  TED decision the Court explained was necessary to meet this

17  intrastate nexus requirement, that you have to claim specific

18  allegations as opposed to general boilerplate claims.

19    THE COURT:  All right.  As I recall in the TEDs,

20  they also didn't raise any of these cases that were cited

21  here.

22    MR. DUKE:  That may be correct.  I'm not going to

23  admit to going through every single one of the briefs, but

24  this issue has also been before the Court in cases involving

25  ADPs where they too agreed that the intrastate nexus

1   requirement was relevant for South Dakota and didn't object

2   to the Court's approach in those cases either, so this is the

3   first time that they have raised this issue with respect to

4   South Dakota.

5          THE COURT:  Okay.  How about the Florida Supreme

6   Court decision?

7          MR. DUKE:  So in -- so with respect to the Florida

8   Supreme Court in the Kopel decision in January, the court

9   made seemingly clear that in order for a plaintiff to prevail

10  on an unjust enrichment claim, the benefit has to be directly

11  conferred to defendants.  The facts there are -- the facts

12  from Kopel are -- with respect to the benefit are directly

13  applicable here.

14         And subsequent to that decision, the Eleventh

15  Circuit in Johnson v. Catamaran Health Solutions has followed

16  Kopel to confirm that indirect benefit -- an indirect benefit

17  is not sufficient to establish an unjust enrichment claim.

18         Now, the plaintiffs in their briefs cited a number

19  of cases from the Florida district courts that don't address

20  Kopel, either predate Kopel or slightly after, and just don't

21  address this issue.  But the two controlling courts, either

22  the Eleventh Circuit for the federal courts in that district

23  or, more importantly, the state's highest court, which is, as

24  you know, the controlling -- is the controlling court for the

25  Florida state law, has made clear that the benefit must be

 1    directly conferred, and there is no mitigation -- mitigating

 2    that in the court's ruling.

 3            THE COURT:  Yes.  Okay.

 4            MR. DUKE:  Thank you.

 5            THE COURT:  Thank you very much.  Plaintiff.

 6            MS. LI:  Good morning, Your Honor.  Evelyn Li,

 7    Cuneo, Gilbert and LaDuca, representing automobile dealership

 8    plaintiffs.

 9            I would like to address the South Dakota antitrust

10    law issue.  In all previous decisions by Your Honor in the

11    automobile dealership action, our South Dakota antitrust

12    claim was allowed to proceed.  It was --

13            THE COURT:  That's what I thought, except for that

14    TED decision.

15            MS. LI:  I'm saying in our action, in automobile

16    dealership action, you allowed us to proceed with our

17    South Dakota antitrust claim, and it was allowed to proceed

18    whenever the defendants moved to dismiss based on the theory

19    that our allegation does not meet the interstate commerce

20    requirement under South Dakota law.

21            Now, the defendants bring back the same issue again

22    which Your Honor has already considered and determined

23    numerous times.  We therefore see no reason to deviate from

24    the previous rulings, and we believe we have properly alleged

25    a claim under South Dakota antitrust law.

1        And defendants emphasize in their motion that ADPs

2   do not specifically point to a named plaintiff who resides in

3   South Dakota or made purchases in South Dakota, but that is

4   not the issue.  The issue is not whether we allege a named

5   plaintiff who resided or purchased in South Dakota.  The

6   issue is whether the South Dakota antitrust law requires that

7   allegation, and the statute of South Dakota antitrust law

8   does not have that requirement.  The statute simply states a

9   contract, combination or conspiracy between two or more

10  persons in restraint of trade or commerce, any part of which

11  is within this state, is unlawful.  And what we have alleged

12  in our complaint meets the statutory requirement.

13       For example, in paragraph 253 we allege defendants

14  have entered into an unlawful agreement in restraint of

15  trade, the effects of which were that A/C system price

16  competition was restrained, suppressed and eliminated

17  throughout South Dakota, and also A/C system prices were

18  raised, fixed, maintained, and stabilized at artificially

19  high levels throughout South Dakota.  This allegation

20  demonstrate that defendants' conspiracy raised prices in

21  South Dakota.

22       We additionally alleged members of the damage class

23  who resided in South Dakota and/or purchased A/C systems or

24  vehicles in South Dakota were deprived of free and open

25  competition in South Dakota, and also members of the damage

1    class who resided in South Dakota and/or purchased

2    air-conditioning systems or vehicles in South Dakota paid

3    super-competitive, artificially inflated prices for A/C

4    systems and vehicles containing A/C systems in South Dakota.

5    These specific allegations made clear that A/C systems and

6    vehicles are sold in South Dakota.

7         So contrary to what the defendant counsel just

8    said, our allegations were not conclusory; they were very

9    specific and they demonstrate there was an effect in South

10   Dakota because of the conspiracy.  The prices were raised.

11        The statutory language says nothing about that only

12   South Dakota residents have the ability to pursue an

13   antitrust claim under South Dakota law.  Instead, it simply

14   says any part of a conspiracy contract, or combination in

15   restraint of trade or commerce that is within South Dakota is

16   unlawful.

17        The defendant cannot point to any part of that

18   statutory language to impose a residency requirement upon us

19   or an instant purchase requirement upon us.  They cannot

20   point to any part of that statutory language that imposes

21   such a specific requirement, and, in fact, they do not make

22   that argument.

23        The theory that they are trying to advance here is

24   just like what they have done in the OSS case where they

25   moved to dismiss our South Dakota antitrust claim, and they

1    told Your Honor that the South Dakota law requires a specific

2    allegation that we -- that we have to put in in our complaint

3    that the defendants sold OSS in South Dakota, and Your Honor

4    considered and rejected that argument.  Your Honor ruled

5    that, I quote here, plaintiffs' allegations likewise

6    satisfies South Dakota's antitrust statute.  The law does not

7    require that defendants sell the price-fixed product

8    themselves in South Dakota, and these allegations satisfy the

9    pleadings standard.

10          Failing to convince Your Honor in OSS that they can

11   randomly insert a specific requirement into the statutory

12   language, they now come back, rephrase that argument under

13   the same theory and say that we need to specifically allege

14   the instate residency or instate purchase in South Dakota in

15   order to plead an antitrust claim under the same statute, of

16   course Your Honor should again reject that argument because

17   we have demonstrated that the defendants participated in a

18   nationwide conspiracy that raised prices in South Dakota and

19   that irrelevant products were sold in South Dakota and these

20   allegations satisfy the statute.

21          And regarding the authorities that we cited to,

22   they say in their brief that all of the authorities we cited

23   to were inapplicable, but that's not true.  All of the

24   authorities we cited there support our interpretation of the

25   statute.  For example, in the In re Processed Egg case --

1          THE COURT REPORTER:  I'm sorry, the case name?

2          MS. LI:  In re Processed Egg case that we cited in

3   our brief.

4          THE COURT:  I still didn't get it.  In re Processed

5   Egg --

6          MS. LI:  Egg Product antitrust litigation.  Sorry.

7          THE COURT:  Okay.

8          MS. LI:  That court looked at the language of the

9   South Dakota statute and held South Dakota antitrust law does

10  not contain statutory language that explicitly requires an

11  interstate -- intrastate injury.

12         The Court also stated that as to South Dakota

13  statute and several other similarly worded state statutes,

14  that on their faces the four state statutory provisions can

15  plainly be construed to not require instate residency or an

16  instate purchase but rather only that some of the defendants'

17  conduct occurred or that the effects of which were felt

18  within the state.  This shows that our allegation is

19  sufficient.

20         Also in the In re Chocolate Confectionary antitrust

21  litigation, the Court held a plaintiff must allege only that

22  defendant's conduct produced anticompetitive effects within

23  South Dakota, and the Court found that plaintiffs state a

24  claim under South Dakota law by alleging a nationwide

25  conspiracy that produced increased prices in South Dakota,

1    and that's -- that is what we have alleged in our complaint.

2         And we also cited to the In re Intel Corp.

3    Microprocessor antitrust litigation case which held the same.

4    And also in the In re New Motor Vehicles antitrust

5    litigation, the Court similarly held that it is logical to

6    assume that the state intended its antitrust coverage to be

7    as broad as possible.  Therefore, the Court held that the

8    plaintiff need only allege that a part of the trade or

9    commerce occurred within South Dakota and that the sales of

10    motor vehicles in South Dakota satisfy that requirement.

11         THE COURT:  Okay.  Let's talk about Florida and

12    Kopel.

13         MS. LI:  Sure.  So for Florida, Your Honor has

14    previously held that there is no requirement that the benefit

15    be bestowed upon defendants through direct contact.  Your

16    Honor further explained that, even though the indirect

17    purchaser plaintiffs did not have a direct relationship with

18    the defendants, they do allege they conferred a benefit on

19    the defendants, and this was in Your Honor's fuel senders --

20         THE COURT:  But that was before Kopel, and now we

21    have Kopel and Kopel seems to say it has to be a direct

22    benefit.

23         MS. LI:  Correct.  So the single argument that the

24    defendants rely on is Kopel, and what the Kopel says -- the

25    Florida -- the Florida Supreme Court in Kopel in one sentence

```
 1    affirmed that the lower court was correct in citing to a 1996
 2    case for the ruling on an unjust enrichment claim, and after
 3    that -- after that one sentence, there is no discussion or
 4    analysis whatsoever about the facts of the case or the
 5    application of the law of the case whatsoever.  The court
 6    just says the lower court was correct in citing to a 1996
 7    case in ruling on the unjust enrichment claim, that's it.
 8          So our view here is Kopel does not change Your
 9    Honor's ruling, Your Honor -- all the previous rulings by
10    Your Honor on the issue.  The issue is not that whether there
11    is a direct benefit being conferred upon the defendants.  The
12    issue is whether we need to have a direct contact with the
13    defendants, whether the Florida law requires us to plead a
14    direct contact with the defendants in order to proceed with
15    our unjust enrichment claim under that state law.  And we
16    don't believe that Kopel changes that ruling where Your Honor
17    has stated before there is no requirement under Florida law
18    for us to have a direct contact with the defendants to plead
19    such claim.
20          We understand even if -- even if Kopel stated that
21    there has to be a direct benefit conferred upon the
22    defendants, we understand that direct benefit to be a
23    non-incidental benefit.  And what that means, we cited to the
24    Processed Egg case again to explain what is an incidental
25    case.  The egg case said payment where services performed by
```

 1     the plaintiff for his own advantage and from which the

 2     defendants' benefit incidentally is not recoverable.  So

 3     incidental benefit is not direct benefit, therefore is not

 4     recoverable.

 5          In our case the defendants realized their profit

 6     from the sale of their products to the indirect purchaser

 7     plaintiffs.  They intended and they knew that we would

 8     purchase those parts and cars, and therefore that profit is

 9     not incidental.  And, of course, we didn't overpay for those

10     cars and vehicles for our own benefit, so it cannot be argued

11     that the benefit the defendants realized from these sales are

12     incidental.

13          Also the Eleventh Circuit has defined incidental as

14     occurring merely by chance or without intention or

15     calculation, or met or encountered casually or by accident.

16     A Florida state court also said incidental is something that

17     happened by accident or chance.

18          In our case, again, defendants sold A/C systems

19     with the intention that the plaintiffs would purchase them

20     and the defendants would benefit from the overpayment that

21     would be borne by the plaintiffs.  So even if it is the case

22     that there is a requirement for direct benefit, we believe we

23     have pleaded a direct benefit that was conferred upon the

24     defendants that is a non-incidental benefit.

25          In support of our position, we also cited to

 1    authorities here in our brief and also in the past response

 2    to the same argument.  We also -- we even cited to the cases

 3    that were decided after Kopel.  They -- there was the case

 4    Melton v. Century Arms, Inc.  In that case the defendants

 5    argue, like the defendants here, there is no direct benefit

 6    because no named plaintiffs purchased a rifle directly from

 7    the defendants.  And the court in that case responded --

 8    rejected the argument and said defendant's argument is

 9    contrary to Florida law which provides that no direct contact

10    is required for a direct benefit to be conferred, so this

11    supports our argument and position here.

12          And also we have another case, the State Farm v.

13    Brown case.  That case similarly rejected an argument that

14    was similar to what the defendants argued here.  The court

15    stated PPMS argues that the unjust enrichment claim fails

16    because State Farm has not alleged that it paid any money to

17    PPMS.

18          This argument is unpersuasive.  When defendants act

19    in concert to unjustly obtain benefits, each can be held to

20    have been unjustly enriched by virtue of the benefit derived

21    from the scheme even if the benefit was not conferred on them

22    directly.  Florida federal courts and others across the

23    country have consistently rejected the same argument that

24    they make here, and we have provided those authorities in our

25    briefs so I won't repeat them.

Status Conference & Motion Hearings • September 13, 2017

91

1    And another important point that we want to stress

2 here is that it would not be -- it would not serve the

3 principle of justice and equity to agree with the defendants

4 here because it would simply preclude an unjust enrichment

5 claim merely because the benefit passed through an

6 intermediary before being conferred on the defendant, and

7 this was the holding by a Southern District Florida court in

8 the General Motors case that we cite in our brief.

9    THE COURT:  And was that before or after?

10    MS. LI:  This was a 2014 case so before.

11    Defendant also argued that our authorities are not

12 controlling because they didn't cite to Kopel, but as I just

13 point out, that misses the point.  We believe Kopel does not

14 speak to the issue here.  The issue is whether the law

15 requires a direct contact between us and a defendant in order

16 to plead unjust enrichment claim under Florida law, and Kopel

17 did not speak to that issue, and that's why the authorities

18 we cited did not cite to Kopel.

19    THE COURT:  Okay.

20    MS. LI:  And also the last point I want to make for

21 Florida here is they could not point to any Florida Supreme

22 Court opinion that speak to this issue about the direct

23 contact that I just described.  So that means there is no --

24 there is no reason that Your Honor's ruling should change

25 because there is no Supreme Court opinion -- Florida Supreme

Status Conference & Motion Hearings • September 13, 2017

1    Court that would overturn all the good authorities that we

2    cited before and here on the very issue.

3          THE COURT:  All right.

4          MS. LI:  There was just one point that I missed to

5    mention for this South Dakota antitrust claim, and since the

6    defendants' counsel raised it, I want to address it, the

7    truck dealers' opinion.  I think Your Honor has slightly

8    mentioned, and it is true that Your Honor has ruled

9    differently in the truck dealers case, but that's a different

10   case, that's not the auto dealers' case.  And also another

11   important point is they didn't cite to, and Your Honor

12   pointed out in your opinion on page 7 for the truck dealers'

13   case, that they did not provide Your Honor with anything,

14   with any authority that would support their position that

15   residency or in-state purchase is not required, they did not

16   provide any authority for that position.

17         So we believe that ruling leaves open the

18   possibility that it can change in the circumstances when

19   appropriate authority and arguments are presented, which is

20   what we have done here, and we have cited to the Eggs case,

21   the Chocolate case, the Motor Vehicles case, the Intel Corp.

22   Case, the LCD case that Your Honor could look at in our

23   brief.

24         THE COURT:  Okay.  Thank you.

25         MS. LI:  Thanks.

1          THE COURT:  Reply?

2          MR. DUKE:  I -- just couple of quick points.

3          With respect to South Dakota, the intrastate

4    commerce requirement is not something that defendants

5    randomly pulled up out of -- and isn't a new issue with

6    respect to ADPs.  As I mentioned before, it has been an issue

7    in other motions to dismiss.  And, again, reading from this

8    Court's ruling in bearings, which involved ADPs, certain

9    jurisdictions, including South Dakota, require a plaintiff to

10   allege a nexus between a defendant's conduct and intrastate

11   commerce; boilerplate allegations are insufficient.  What the

12   Court has explained is sufficient is the two requirements

13   that we discussed.

14         And then with respect to Florida, defendants sell

15   products to OEMs and their suppliers and receive a benefit

16   from those parties.  We do not have -- we do not receive any

17   benefits from ADP or EPPs.  That's where the line is drawn in

18   Kopel and in the Eleventh Circuit cases and in the cases they

19   just mentioned.

20         Specifically State Farm is one they relied on in

21   their brief, and in that case one defendant received a -- a

22   single defendant received a direct benefit whereas the others

23   were indirect.  Whereas here, no defendants received any

24   direct benefit at all from plaintiffs or do they get any

25   direct benefits before the products are resold to their

Status Conference & Motion Hearings • September 13, 2017

1    indirects.

2            So we think that the controlling law from Florida

3    should guide the Court to reevaluate this issue, and also the

4    Eleventh Circuit case has shown that the subsequent working

5    decisions from the Florida District Court haven't properly

6    incorporated Kopel into Florida law and unjust enrichment.

7            THE COURT:  Thank you.

8            MR. DUKE:  Thank you.

9            THE COURT:  All right.  The Court will issue an

10   opinion on this.

11           I would like to next go to the judicial notice

12   since it's argued --

13           MR. KESSLER:  Your Honor, I think there is one more

14   motion pending for Panasonic in this --

15           THE COURT:  Yeah.  I'm talking about the Panasonic

16   judicial notice motion because you reference it in your other

17   motion.

18           MR. KESSLER:  Thank you.  Sorry.

19           THE COURT:  So it is out of order here.

20           MR. KESSLER:  Sorry.

21           THE COURT:  Who is --

22           MR. KESSLER:  I am, Your Honor.  Jeffery Kessler,

23   Your Honor, from Winston & Strawn appearing for Panasonic

24   Corporation.

25           Good morning.

Status Conference & Motion Hearings • September 13, 2017

95

1          THE COURT:  Good morning -- good afternoon.

2          MR. KESSLER:  On the issue of judicial notice, so

3     plaintiffs made certain allegations about a trade association

4     which they identified as the Nichireiko meetings without

5     explaining what they were.  And it turned out that when you

6     go website of the Japan Refrigeration Air Conditioning

7     Industry Association, it becomes very clear that the

8     Nichireiko meetings they are referring to was not some type

9     of like clandestine, secret, suspicious sounding meeting

10    because they used a Japanese word that was really an acronym

11    that translated to the Japan Refrigeration Air Conditioning

12    Industry Association.  So these were normal, publicly

13    promoted trade association meetings which goes to our

14    argument about what significance you should draw from them.

15         So we believe you have the ability to take judicial

16    notice of that because it cannot reasonably be contested

17    that, in fact, that's what this association is, these

18    Nichireiko meetings.  I don't think they've actually

19    contested that, but they -- you know, it is really

20    undisputed, and that's exactly the type of situation where

21    courts do take judicial notice of that type of a thing so

22    that you could understand the allegation.

23         THE COURT:  I'm not sure what I'm taking judicial

24    notice of.

25         MR. KESSLER:  Oh, just the attached website

1    information we provided --

2         THE COURT:  I have read that.

3         MR. KESSLER: -- and --

4         THE COURT:  But what, is it the fact that this

5    association has this name Nichireiko.

6         MR. KESSLER:  Two things.  One, that this is the

7    Nichireiko meeting, and, number two, that this is a

8    publicized open trade association which we think is going to

9    be significant, and we'll talk about what inferences under

10   the case law you should draw about the fact that they

11   reference two meetings from this group, that's all.

12        THE COURT:  Okay.  Let me go over that.  Then it's

13   a publicized trade association.

14        MR. KESSLER:  Correct.

15        THE COURT:  And that there was a meeting or

16   Nichireiko means meeting?

17        MR. KESSLER:  Nichireiko is a Japanese abbreviation

18   of Japanese words that translate into Japan Refrigeration Air

19   Conditioning Industry Association.  It is simply -- it is

20   simply a Japanese term that --

21        THE COURT:  For these --

22        MR. KESSLER:  -- is referred to for this

23   association which in English is described this way.

24        THE COURT:  Okay.  So if we say Nichireiko, we

25   could just as easily substitute Japan Air Conditioning

```
 1   Meeting Association, same thing?
 2            MR. KESSLER:  That's correct.
 3            THE COURT:  One is in Japanese, one is in English?
 4            MR. KESSLER:  That's correct.
 5            THE COURT:  Okay.  Okay.  The thing I note is that
 6   this website is 2017 and the allegations here occurred in
 7   2009 or something.  How do we know this was true back then?
 8            MR. KESSLER:  Again, if you look at the website
 9   this association has existed for many, many years in Japan
10   predating 2009.  So, again, I don't think there is any
11   dispute that this is the association.  It is not that some
12   other association existed then and a different one now.  And,
13   again, I don't think there is any dispute about this.  It is
14   just more for Your Honor to be able to interpret from this
15   public information what their allegation is referring to,
16   that's all.
17            THE COURT:  Okay.  Let me hear what they have to
18   say.
19            MS. CALKINS:  Good afternoon Your Honor.
20   Lindsey Calkins, of Susman Godfrey, on behalf of the
21   end payor plaintiffs.
22            THE COURT:  Do you agree, Ms. Calkin, that -- is it
23   Calkin or Calkins?
24            MS. CALKINS:  Calkins with an S.
25            THE COURT:  Spell it for me.
```

1    MS. CALKINS:  C-A-L-K-I-N-S.

2    THE COURT:  Okay.  Ms. Calkins, do you dispute that

3    Nichireiko is another name for Japan Air Conditioning Meeting

4    Association or something?

5    MS. CALKINS:  I dispute that the websites that

6    Panasonic has put forward are an appropriate place to get

7    that information.

8    THE COURT:  Okay.  But that wasn't my question.  Do

9    you dispute that interchangeability, that this is an

10   English -- Japan Air Conditioning Meeting Association is a

11   translation for Nichireiko?

12   MS. CALKINS:  I'm not in a position to dispute a

13   certified translation that would translate Nichireiko that

14   way.

15   THE COURT:  Okay.

16   MS. CALKINS:  So the answer is no.  But going to

17   the question of whether or not we can actually take the

18   information from the websites for what it means, I think that

19   the answer is no.  It is interesting that counsel said that

20   the information from those websites was precisely the type of

21   information that courts typically take judicial notice of but

22   then cited no case law.  And Your Honor saw in our briefing

23   that we cited several cases where courts have said, look,

24   information coming from private websites is not reliable and

25   its accuracy cannot be ascertained.  This information is not

1    coming from a government website or another source that a

2    court would typically take judicial notice of.

3         I would refer you to the Dingle vs. BioPort Corp.

4    Case that we cited, as well as Ruiz vs. Gap.  Those cases

5    both clearly laid out the reasoning for why courts shouldn't

6    take judicial notice of information from websites like these.

7         A second reason, even if we do take the information

8    from the websites as accurate, that the Court should reject

9    Panasonic's offer is that the website lists Panasonic as a

10   regular member of this industry association.  So how do we

11   know that Panasonic didn't design some of the information on

12   the website?  How do we know they weren't responsible for it?

13   Again, we cited case law in our briefs that shows that courts

14   should be especially skeptical of information that might have

15   been put on websites by a party to the case.

16        There is an independent reason beside the case law

17   that the Court should reject Panasonic's request, and that is

18   that the information is completely irrelevant.  As Your Honor

19   already noted, the websites they submitted were pulled this

20   year and the Nichireiko meetings that we are concerned with

21   took place in 2007 and 2009.  In Panasonic's reply brief they

22   submitted some earlier archived versions of that website, but

23   I would submit those are also irrelevant and their

24   verification just cannot be -- cannot be confirmed.

25        This will go to Panasonic's principal motion, but

```
 1   the information on the website is also irrelevant because it
 2   doesn't help Panasonic at all with any claim or defense in
 3   the case.  Plaintiffs are not alleging that the simple
 4   attendance at Nichireiko is evidence in and of itself of
 5   collusion.  Plaintiffs have made independent allegations,
 6   number one, that Panasonic employees had conversations at
 7   those Nichireiko meetings about their negotiations with OEMs
 8   and also that there were separate bid rigging that occurred
 9   with Nissan.  So, Your Honor, plaintiffs respectfully ask the
10   Court to deny Panasonic's request.
11           THE COURT:  Okay.
12           MR. KESSLER:  Just very briefly, Your Honor.  I
13   don't understand the assertion that we have cited no
14   authority for this.  The two cases we cited, one from the
15   Sixth Circuit, is City of Monroe, which is 387 Fed. 3d 468,
16   472, note one, that specifically took judicial notice of
17   an -- in that case a National Association Security Dealers
18   website, to get information from that website.
19           And the second one in this District Court is
20   Liberty Mutual Insurance Company vs. Consolidated Evidence,
21   which is also cited in our brief, that's a 2007 Eastern
22   District of Michigan case.  And what the case law makes
23   clear, the ones we cite and they cite, is that websites today
24   are, if it is facts which are not reasonably disputed, is a
25   perfect source for the judge to take judicial notice of.  The
```

1    cases they cite were trajected is because the facts cited on

2    the websites were, in fact, in dispute.  But you asked

3    counsel directly whether these are in dispute and she had no

4    basis to dispute them, and I would submit you couldn't

5    because all we did was provide a certified translation of

6    what the term meant, and I will get to the significance of

7    this for the motion because that I think is our next

8    argument, not this argument, but certainly it is the type of

9    thing that courts in this district and the Sixth Circuit take

10   notice of.

11           Finally, Your Honor, I would just note with respect

12   to this subject that we did put in when they raised this the

13   archived versions that go back to 2007 and they are the same,

14   the same points.  So there is no dispute that the fact that

15   we used a current version originally was an issue when we

16   attached that as exhibits I think it is A and B to our reply

17   brief which made it clear that there is no dispute that, in

18   fact, this is the accurate information.

19           Thank you, Your Honor, unless you have any

20   questions about the judicial notice.

21           THE COURT:  I do because I'm still grappling with

22   this.  From this website it appears that this Nichireiko does

23   mean Japan Refrigeration Air Conditioning Industry

24   Association?

25           MR. KESSLER:  Correct, and that's the only thing --

1      THE COURT:  Is that what you want to get out of

2  this?

3      MR. KESSLER:  That's number one.  And number two is

4  that this is a publicly advertised trade association which

5  states a whole variety of normal trade association purposes

6  which is going to trigger certain case law authority I'm

7  going to discuss when we get to the main argument.

8      THE COURT:  But are you asking this Court to take

9  notice that there is a lecture meeting in July 2016, that

10  there was a meeting then?

11      MR. KESSLER:  No, no, that's their allegation.  So

12  I'm not asking you to take notice of what meetings there

13  were.  What I'm simply asking you to do is they made an

14  allegation that we are going to get to that there were two

15  meetings of the Nichireiko group that Panasonic attended, and

16  I'm going to get to that.  And in order for me to argue that

17  the case law applicable to how the Court should interpret

18  allegation about trade associations, normal trade

19  associations apply, I need you to take judicial notice that

20  what they are referring to is a publicly known, legitimate

21  trade association, and then we'll get to the content of what

22  they allege, which is really --

23      THE COURT:  Why do I need to take judicial notice

24  of that?  I mean, if you say it in your argument, what -- I

25  don't understand.

Status Conference & Motion Hearings • September 13, 2017

```
 1          MR. KESSLER:  Well, because their allegation, if
 2    you read it, reads like these are clandestine, secret
 3    meetings of conspirators using a nefarious code name of
 4    Nichireiko for which if that were the case, I couldn't argue
 5    you should interpret this under the trade association law, so
 6    I need you to get to the -- because they omitted --
 7          THE COURT:  Why couldn't you argue it?  Why
 8    couldn't you say my defense is this is a --
 9          MR. KESSLER:  Well, I can, but I think I have to go
10    with their factual -- see, I'm limited by their allegations,
11    so they omitted from their allegations what this -- what
12    these meetings were.  If Your Honor says that you don't need
13    to take notice and you are just going to apply the trade
14    association law, I'm totally content, but I anticipated an
15    argument from them saying we didn't claim it was a trade
16    association meeting, we claimed it was a secret Nichireiko
17    meeting so Your Honor should assume bad things happened
18    there, you can't argue it is a trade association.  So the
19    whole purpose of the judicial notice was just to negate that
20    argument from them, which they could say you are locked into
21    their pleadings, not what I tell you it really is.  So that's
22    the only purpose for this.  Your Honor could decide in the
23    next argument whether you need the judicial notice or not.  I
24    think that is probably the best way to treat this.
25          THE COURT:  I think you are right.
```

1      MR. KESSLER:  Okay.

2      THE COURT:  I think you are right.  I think,

3  however, that the argument you raise -- I'm not taking

4  judicial notice of this website because there's a lot on this

5  website that I don't know, may be fake news, I don't know

6  what comes from Japan, but I can't do that.  I don't believe

7  the judicial notice rules would allow this Court to take

8  judicial notice of something like this.  But having looked at

9  it and having your statement that this is an industry

10  association, I am accepting that for this purpose, and if

11  they want to later defeat that, that's fine.

12      MR. KESSLER:  Okay.

13      THE COURT:  I think right now all we need -- from

14  what I understand, all we need is to say that this Nichireiko

15  is a Japan Refrigeration and Air Conditioning Association,

16  and I will accept your word on that based on what is on this

17  website to support it, and that you submitted that to them

18  and they did not submit anything in response to say no, it is

19  not an association.

20      Now, could they use this word to say it also means

21  something else?  They can.  I don't know.  And I don't know

22  that they have put anywhere that it was a clandestine

23  association, so we will hear what the argument is.

24      MR. KESSLER:  We will see what their response is.

25  Should I move to the main argument now, Your Honor?

1      THE COURT:  Yes, please.

2      MR. KESSLER:  So, Your Honor, I believe the issue

3  we are presenting here is virtually the identical issue that

4  you ruled upon on April 13th of 2016 when you rejected the

5  motion to consolidate and amend the complaints in 18

6  different individual parts conspiracies by the indirect

7  plaintiffs who allege that they were all connected together

8  by, you will remember, by in part Denso who was in these

9  different parts, and also I -- I think it was also by --

10  maybe by Mitsubishi as well.  They had different connections,

11  and they tried to change the 18 individual cases to be one

12  overarching conspiracy, says -- and they said therefore it

13  all should be together.

14      Your Honor's analysis of that issue is squarely

15  applicable here and I'm -- so I'm looking at Your Honor's

16  opinion and I really could not have said this better in terms

17  of how parallel this is.  So, first of all, in that case they

18  try to use the word automotive parts and defined it to be all

19  of these 18 different parts, and then they put it in an

20  allegation that said defendants each sold an automotive part,

21  but, of course, that could be any one of the 18 parts would

22  qualify.  And what Your Honor pointed out is that couldn't

23  substitute for the fact that there was some connection

24  between all of these parts in the conspiracy.

25      And I'm now reading from Your Honor's opinion.

1    What you say is in contrast to IPP's characterization of the

2    conduct, defendants focus on the 28 different defendants and

3    co-conspirator families named in the CACs and the different

4    component parts made by these defendants.  Defendants contend

5    that IPPs merely replaced the names of specific component

6    parts with the more global term automotive parts in their

7    proposed CACs.  The use of the term auto parts market is an

8    attempt to suggest that the auto parts are interchangeable

9    when they are not.

10         You then say the question this Court must resolve

11   is whether the factual allegations in the CACs satisfy

12   plaintiffs' pleading burden to allege the existence of a

13   single conspiracy rather than multiple conspiracies.

14         And you then went on and you looked at the fact

15   that all the specific allegations were for different

16   defendants at different time periods involving different

17   products without any allegation thread to weave this together

18   into a single conspiracy.  And you point out, for example,

19   there are no allegations in the CAC of deals between makers

20   of different component parts, people -- I made one, you made

21   a different one, and no inference arises of knowledge outside

22   of each defendant's own specific deals.  There are no

23   allegations that the defendants competed for the sales of all

24   of the 18 parts.  There are no allegations to support that

25   each defendant knew of other defendants' conduct for other

1    products.  The CACs merely advance allegations of separate

2    conspiratorial conduct between different defendants making

3    different parts.

4         I submit when you look at this complaint, and I'm

5    now applying it to Panasonic in particular, I will get to,

6    okay, that's exactly what this is.  They took more than ten

7    different parts that could go into an A/C system, and in

8    paragraph 3 of their complaint, in both of them, they define

9    A/C system to be either the whole system, which makes sense I

10   would say, or any of these other more than ten different

11   parts.

12        Then they have an allegation in paragraph 4 that

13   says each defendant sold an A/C system, but that was a trick

14   because -- it's a word trick.  It doesn't mean that

15   plaintiffs -- that defendants sold an A/C system because my

16   client doesn't sell any A/C systems and neither do any of the

17   others, but we sold one part that could go into an A/C

18   system.

19        And then when you look at the allegations of the

20   complaint beyond that, so they are each like the allegations

21   against Panasonic.  So there is one allegation paragraph that

22   is specific to Panasonic in this whole gigantic complaint and

23   that's paragraph 188 in the end payor action, and it is

24   identical in the actions involving the others as well, so

25   they just copied in both complaints.

1    So what is the allegation that they make?  The

2    allegation is that Panasonic entered into one alleged

3    agreement with one other company, Denso, in one year, 2007,

4    for one RFQ involving Nissan for the Fuga Hybrid, a single

5    model, end of discussion.  That's the entire allegation for

6    Panasonic.

7    Then when you look at the allegations for everyone

8    else, they have no connection to Panasonic.  They allege this

9    one engaged in a discussion with this other company related

10   to a different time period involving a different part that

11   Panasonic doesn't make, is not alleged to make, involving a

12   different customer, and this repeats itself throughout the

13   complaint, just what was presented to you in the case where

14   they tried to put the 18 different conspiracies together, so

15   you can't get anywhere.

16   And the problem with allowing this, Your Honor, is

17   that it takes what are 10 or 11 different cases -- I'm not

18   asking you to dismiss with prejudice.  If they want to allege

19   a claim against Panasonic regarding this one agreement,

20   alleged agreement with Denso involving the one component that

21   Panasonic made, maybe they can state a claim for that and we

22   will file a motion to dismiss.

23   But the point Your Honor made, if you mush this all

24   together, you put impossible discovery burdens.  Think about

25   this.  So Panasonic has to be in a case now where it has to

1    attend and defend depositions about all of these parts that
2    it doesn't make, all of these meetings that it didn't went to
3    and knows nothing about, all of these things that it is not
4    connected to.

5         And how do we ever settle this case?  Because we
6    have got one allegation of one thing and they are saying no,
7    you are in the conspiracy involving all of these businesses
8    that you know nothing about.  There's no allegation we ever
9    met with these other companies, we ever discussed these other
10   parts, that we ever knew about them.  So you can't do that.

11        Now, the one last thing they cite, and I'm back to
12   my judicial notice thing, and they go, ah-ha, we have the
13   Nichireiko meetings.  So the only glue -- that's why I had to
14   file my motion I thought but now I don't think I do.  The
15   only glue they tried to say would tie people together, they
16   say, and this is in paragraphs 188 to 190 of this and you can
17   read what they are, they say in 2007 and 2009 -- by the way,
18   not the whole period of this alleged conspiracy, they just
19   pick these two years -- there were group meetings between
20   several air conditioning system suppliers, okay, and these
21   meetings were referred it as the Nichireiko.  Okay.
22   Generally the meetings would be held over dinner or golf and
23   the host, all of which were rotated, would choose the
24   location.  That's one allegation.

25        Then they have two other allegations about this,

1    only two.

2          THE COURT:  So say that they attended those

3    meetings, just going back to your other motion, and they said

4    these meetings were referred to as the Nichireiko.

5          MR. KESSLER:  Right, they say two other things.

6          THE COURT:  They were Japanese trade meetings?

7          MR. KESSLER:  Yes, that's correct.  And so you then

8    have to look -- they go but we allege a lot more.  So what do

9    they allege?  Well, the first thing, and this is important,

10   in paragraph 190 what they allege is simply that a meeting

11   took place hosted by Calsonic and Panasonic attended, end of

12   allegation.  They allege who attended, the other people too.

13   I could read it.  They allege Denso, Sanden, Valeo,

14   Mitsubishi, Panasonic, they all attended.  That's the

15   allegation.

16         So what inference -- what value added can you draw

17   that in a public trade association there was a meeting and

18   Panasonic attended with no other allegation?  The answer is,

19   Your Honor, you could draw no adverse inference from that.

20   The case law is overwhelming that when you are dealing with

21   public normal trade associations for a lot of different

22   meetings, which could have a million legitimate purposes, the

23   mere fact there was such a meeting and Panasonic attended in

24   that one year tells you nothing.  That's why I had to

25   establish it wasn't some secret meeting for which there would

1    be no explanation.  The case law that we cited goes off of

2    the fact of what kind of inferences you should and should not

3    draw from trade association meetings.  That's number one.

4         The other allegation which they could say we have a

5    much better allegation -- and, by the way, you should read

6    this allegation through the prism that they have cooperation

7    we believe from Denso.  I don't think they deny that.  Denso

8    settled with them.  Denso is the source of most of these

9    allegations here.

10        So they know exactly what they could allege about

11   this meeting now.  And here's what they allege, you know,

12   their smoking gun allegation about the trade association

13   meetings is as follows:  During the meeting the

14   representatives from Denso, Sanden, Valeo, Calsonic, and

15   Panasonic discussed, among other things, the general air

16   conditioning systems market.  That tells you absolutely

17   nothing.  They were a trade association about the air

18   conditioning systems market so they could have discussed, you

19   know, that fact that, hey, you know, the demand is up,

20   business is good, you know, they could have done a million

21   legitimate things about the air conditioning system market.

22   That tells you nothing.

23        And then they have one more allegation, and the

24   status of their respective companies' negotiations with OEMs.

25   So that's the one they are going to say, ah, there's my

| | |
|---|---|
| 1 | allegation.  At one meeting in 2007, in one year for this |
| 2 | whole, you know, more than ten-year period of conspiracy, |
| 3 | they allege they was a discussion of their respective |
| 4 | companies' negotiations with OEM.  It doesn't say price was |
| 5 | discussed.  They spoke to Denso.  If price was discussed, you |
| 6 | could be sure there was price.  They didn't say there were |
| 7 | any agreements discussed at the meeting.  They didn't say |
| 8 | there was any customer allocation discussed at the meeting. |
| 9 | They say the status of their negotiations with OEMs.  That |
| 10 | could be anything.  That could be a company simply saying you |
| 11 | know what, I am going to be doing business with Toyota next |
| 12 | year, that could be the status.  That one discussion of one |
| 13 | meeting could not possibly provide the glue for this global |
| 14 | conspiracy claim. |
| 15 | So I would suggest, Your Honor, that if you reread |
| 16 | your decision and what you said on 4/13/2016, this is a case |
| 17 | where they should have to proceed, if they want to proceed |
| 18 | against Panasonic, for what they actually can allege, which |
| 19 | is going to be for the one part that Panasonic made, for the |
| 20 | one agreement that, you know, that they had.  In fact, if |
| 21 | they want -- even if Your Honor required them to limit it to |
| 22 | that product and discussions with Denso, it would |
| 23 | dramatically take out this attempt to conglomerate together |
| 24 | into one case what needs to be separate cases together going |
| 25 | forward. |

Status Conference & Motion Hearings • September 13, 2017

1    The last thing I will say, Your Honor, they are

2  going to come up and say Your Honor has dealt with this

3  before adversely.  You have not.  The cases they cite the

4  other way are even the following.  Even their cases where

5  somebody came in, like in wire harness, and said my plea

6  agreement only says X, you should be limited by the plea

7  agreement.  Your Honor has rejected that on numerous

8  occasion.

9    We are not making that argument here.  In fact,

10  Panasonic has no plea agreement.  The Department of Justice

11  did not bring -- this is important too.  They have plea

12  agreements involving other parts and other companies that

13  Panasonic doesn't make, doesn't make the parts in this

14  complaint, other parts.  There has been no action by the

15  Department of Justice against Panasonic or anyone else

16  regarding this part of this discussion regarding that.  So

17  I'm not arguing anything about limited to the plea

18  agreements.

19    I'm also not making the argument that Your Honor

20  has rejected that the mere fact that you don't sell a part

21  means you can't be alleged to be part of a conspiracy

22  involving that part.  That's not my claim.  Okay.  That's

23  something else Your Honor's looked at.

24    My claim is that there is no necessary,

25  nonspeculative beyond boilerplate glue to tie together the

1   very, very specific separate allegations of what looked like

2   individual agreements involving different parts into one

3   overarching conspiracy claim and dragging Panasonic into a

4   position where we are going to have to try to defend a case,

5   99 percent of which we were not in the business, know nothing

6   about, are not alleged to have met with these people and

7   frankly are not even in a position to defend what other

8   people did.

9        Your Honor, that's my argument unless you have any

10  questions.

11       THE COURT:  You know, in wire harness it was

12  defined as a bunch of other parts.  How about air

13  conditioning systems, isn't that what's happening here?

14       MR. KESSLER:  No.  So in wire harnesses there was

15  lots of allegations in the plea agreements and others about

16  multiple defendants getting together and discussing things,

17  you know, that, you know, that apply to wire harnesses, and

18  the claim was, well, I didn't make this specific component or

19  not in the wire harness, but there were clear allegations

20  against every one of those companies that would link them in

21  to a claim of a single conspiracy, at least for purposes of a

22  motion to dismiss, which is what Your Honor said.  Okay.

23       Here, and you can compare wire harness to this,

24  this is like the other case where when you look at the

25  allegations, they are totally distinct.  They involve

Status Conference & Motion Hearings • September 13, 2017

**115**

1    different parts, at different times, involving different

2    defendants who don't overlap, who are not in the same

3    businesses.   Everyone in wire harnesses made some part of the

4    wire harnesses thing; it wasn't that they were not wire

5    harness companies.

6            So the point here is that we are companies that our

7    businesses aren't even related to each other for most of

8    these parts.   There is no claim that we ever saw or knew of

9    it.   So, again, you could -- if you find the allegations like

10   are in wire harness, then I guess I lose, but I believe when

11   you compare the allegations to wire harness and to your case

12   denying the consolidation amendment, you're going to find we

13   are squarely on the other side of this in terms of their

14   allegations here.

15           THE COURT:   Okay.   Thank you.

16           MR. KESSLER:   Thank you.

17           THE COURT:   Response?

18           MS. CALKINS:   Your Honor, counsel mentioned in this

19   case that he thought that the defendants were in businesses

20   that were completely unrelated to one another.   I'm having

21   trouble squaring that with counsel's request that you take

22   judicial notice of the fact that these people allegedly from

23   different industries all attended a trade association meeting

24   together.

25           In reference to the Court --

1          THE COURT:  Trade association meeting of -- what

2    was that other word for --

3          MS. CALKINS:  The Nichireiko.

4          THE COURT:  The Japanese Air Conditioning Meeting

5    Association, that was the name --

6          MS. CALKINS:  Correct, Japanese Refrigeration and

7    Air Conditioning Industry Association I believe.

8          THE COURT:  So presumably they all were involved in

9    refrigeration or air conditioning?

10          MS. CALKINS:  That's the allegation, Your Honor.

11          When it comes to the consolidation order, counsel

12    suggests that you should look back at it, and I would agree

13    because in that case Your Honor explained pretty clearly that

14    those cases could not be consolidated because each separate

15    case involved a different fact pattern, a different

16    defendant, different automobile parts and different

17    conspiracies.  In this case we are only talking about the

18    single conspiracy as to air conditioning systems.

19          This case is, in fact, much closer to the wire

20    harness case, which counsel mentioned, when Denso attempted

21    to argue that just because they manufactured one part of a

22    wire harness, they couldn't be liable for a conspiracy as to

23    the whole system, and in that case they manufactured electric

24    control units and they did plead guilty as to that part.  But

25    this Court did not only hold that they were not bound solely

Status Conference & Motion Hearings • September 13, 2017

1    to that guilty plea, this Court held that they could still be

2    part of the conspiracy as to the larger wire harness system.

3              This case is also similar to this Court's order on

4    Mitsuba's motion to dismiss in the radiators case where they

5    made the same argument that just because they made only a

6    radiator fan, they couldn't be liable for conspiracy as to

7    radiators as a whole.  Your Honor rejected that argument and

8    said that Mitsuba could be guilty because radiators were

9    defined to include radiator fans.  That's no different than

10   here.  A/C systems are defined to include compressors which

11   Panasonic manufactured and fixed prices for.

12             In both the briefing and their argument Panasonic

13   tried to gloss over the real specific allegations in the

14   complaint.  In 2007 the first allegation is that Nissan

15   issued an RFQ to Denso and Panasonic for compressors to be

16   installed in the hybrid vehicle.  Panasonic at that time was

17   the incumbent supplier.  At Panasonic's request, employees of

18   Panasonic and Denso met to discuss the RFQ at a hotel in

19   Japan.  During that meeting Denso agreed to bid higher than

20   Panasonic so Panasonic would win the business.  Denso and

21   Panasonic agreed on a floor that the parties would not bid

22   below, and when invited to bid lower, Denso respected the

23   floor so Panasonic won the business.

24             THE COURT:  Was the business for a compressor,

25   period, or was it for an air conditioning system which

1    included a compressor?

2           MS. CALKINS:  The bid was for a compressor that

3    would form a part of an air conditioning system that would go

4    in a hybrid vehicle.

5           THE COURT:  But the manufacturer requested an air

6    conditioning bid -- excuse me, a compressor bid solely, not

7    combined with any other part?

8           MS. CALKINS:  The exact contents of the RFQ is

9    something that we would hope to learn through further

10   discovery.

11          But, Your Honor, these are the type of very

12   specific allegations that make -- that would plausibly

13   suggest an agreement or conspiracy under Twombly, those

14   combined with the fact that we know that employees from

15   Panasonic along with other defendants who had pled guilty

16   attended Nichireiko meetings in 2007 and 2009 and discussed

17   the status of their respective negotiations with the OEMs.

18          THE COURT:  Okay.  Thank you.

19          MS. CALKINS:  Thank you.

20          THE COURT:  Reply?

21          MR. KESSLER:  Very, very quick, Your Honor.

22          So I would state right now if Your Honor dismisses

23   with prejudice and they file a new complaint alleging that

24   that discussion in 2007 was an agreement with Denso

25   regarding -- and, by the way, these are a specific type of

1  compressors called E compressors which go into hybrid

2  vehicles, they don't go into air conditioning systems for

3  other cars, and it was a specific -- and their allegation is

4  it was an RFQ for compressors. Okay. So you have to go by

5  their allegations now. It is not that it was an RFQ for air

6  conditioning systems in which Panasonic sold the compressor.

7      THE COURT: Okay. You pled guilty -- Panasonic

8  pled guilty --

9      MR. KESSLER: No, it did not, Your Honor. There

10  has been no Panasonic plea involving this product at all

11  anywhere.

12      THE COURT: Well, I'm going to ask you, I know that

13  you pled and you paid 49 million to what product?

14      MR. KESSLER: Okay. That involved HID ballasts

15  which are products that go -- they are a type of a headlight

16  that go underneath the -- they are called high intensity, you

17  know, ballasts that go into certain types of modern

18  headlights. That was one case that was settled, there was a

19  plea for that. There was also a plea involving switches and

20  sensors, okay, solely for Toyota vehicles in an agreement

21  with Tokai Rika. Those were the two pleas. Okay. There was

22  no Department of Justice action against Panasonic at all or,

23  frankly, you know, any government action anywhere in the

24  world regarding this claim of this issue involving Denso in

25  this discussion.

1      So, again, I'm not saying I wouldn't file -- I
2  would not file a Twombly against this allegation in a proper
3  case that said this is -- this should be a different track
4  that alleged E compressors, you know, against Panasonic and
5  Denso, although I think Denso has already settled so they
6  probably would just be Panasonic and Denso as a
7  co-conspirator but as Denso settled and cooperated with them,
8  and that's the proper case; a case that could be defended, a
9  case that could be settled, a case that makes judicial sense
10  for this Court, and that's exactly what you looked at again
11  when you didn't combine the 18 different allegations.
12      Finally, I just want to respond to the comments
13  about the trade association.  So there are a lot of companies
14  that go to the same trade association meeting that are not
15  related to each other in any way in product.  For example,
16  every year in Las Vegas there is a famous trade association
17  called the Consumer Electronic Show.  Lots of different
18  companies go to that show.  You may have someone there like
19  Apple who makes phones and computers and things like that,
20  and you may also have at that same show somebody who makes
21  digital cameras or somebody who makes hovercrafts that work
22  electronically or somebody who sells semiconductors that go
23  into consumer products.  You could have retailers who buy --
24      THE COURT:  Well, that's a little bit different
25  than a refrigeration show.

1              MR. KESSLER:  No, but I'm suggesting, Your Honor,

2     is that the association could have common industry issues.

3     For example, one of the big issues with anyone who's involved

4     in any business regarding refrigeration is the environment

5     today because of the use of what type of chemicals you use in

6     the products that they are working with for refrigeration to

7     try to deal with global warming in those issues.  So there

8     are a lot of reasons why in a broad refrigeration industry --

9     it is really called the refrigeration air conditioning

10    thing -- you could have people there who are making other

11    types of products that use those refrigeration components

12    too.  All I'm saying is you can't draw from the fact that

13    they simply attended this meeting, that that means there's

14    some connective tissue regarding the alleged conspiracy here.

15             THE COURT:  Okay.  Thank you.

16             MR. VICTOR:  May I have one moment with my

17    colleague?

18             (An off-the-record discussion was held at

19             1:03 p.m.)

20             MR. KESSLER:  Mr. Victor points out that -- and I

21    don't know if you are referring to this, if that was in the

22    complaint -- outside of the auto parts world there is a

23    different Panasonic entity that had a plea agreement, I don't

24    know if Your Honor is referring to it, that involved non-auto

25    parts products involving refrigerators.  And so they may have

Status Conference & Motion Hearings • September 13, 2017

```
 1   cited that in one of their complaints as an unrelated
 2   product, but that plea had nothing to do with auto parts at
 3   all or had nothing to do with air conditioning.
 4           THE COURT:  It was in the complaint, I think that's
 5   where --
 6           MR. KESSLER:  It may have been, so Mr. Victor may
 7   be right, so but that product in that settlement involved
 8   parts -- it was compressor parts that went into a
 9   refrigerator that would like be in your home if you had a
10   Frigidaire or something, and it had nothing to do with this
11   case as well.
12           THE COURT:  Okay.
13           MR. KESSLER:  Thank you.
14           THE COURT:  Thank you very much.  The Court will
15   issue opinions on that.
16           Is there anything else.
17           (No response.)
18           THE COURT:  All right.  Thank you.  Have a good day
19   and a safe trip back.  Thank you.
20           THE LAW CLERK:  All rise.  Court is in recess.
21           (Proceedings concluded at 1:04 p.m.)
22                        —   —   —
23
24
25
```

*CERTIFICATION*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of Automotive Parts Antitrust Litigation, Case No. 12-02311, on Wednesday, September 13, 2017.


                          *s/Robert L. Smith*
                          Robert L. Smith, RPR, CSR 5098
                          Federal Official Court Reporter
                          United States District Court
                          Eastern District of Michigan



Date:  10/04/2017

Detroit, Michigan