**REDACTED**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| In Re: Instrument Panel Clusters | : | 2:12-cv-00202 |
| In Re: Fuel Senders | : | 2:12-cv-00302 |
| In Re: Heater Control Panels | : | 2:12-cv-00402 |
| In Re: Alternators | : | 2:13-cv-00702 |
| In Re: Windshield Wiper Systems | : | 2:13-cv-00902 |
| In Re: Radiators | : | 2:13-cv-01002 |
| In Re: Starters | : | 2:13-cv-01102 |
| In Re: Ignition Coils | : | 2:13-cv-01402 |
| In Re: Motor Generators | : | 2:13-cv-01502 |
| In Re: HID Ballasts | : | 2:13-cv-01702 |
| In Re: Inverters | : | 2:13-cv-01802 |
| In Re: Fuel Injection Systems | : | 2:13-cv-02202 |
| In Re: Power Window Motors | : | 2:13-cv-02302 |
| In Re: Automatic Fluid Transmission Warmers | : | 2:13-cv-02402 |
| In Re: Valve Timing Control Devices | : | 2:13-cv-02502 |
| In Re: Air Conditioning Systems | : | 2:13-cv-02702 |
| In Re: Windshield Washer Systems | : | 2:13-cv-02802 |
| In Re: Spark Plugs | : | 2:15-cv-03002 |
| THIS DOCUMENT RELATES TO: | : : | |
| DEALERSHIP ACTIONS | : | |

## AUTOMOTIVE DEALER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CONSOLIDATE CLAIMS AND AMEND COMPLAINTS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that as soon thereafter as it may be heard before the Honorable Marianne O. Battani, Automotive Dealer Plaintiffs ("ADP" or "Plaintiffs") will and do hereby respectfully move the Court for an order:

**REDACTED**

1.    Consolidating claims in the ADP actions in the following cases:

(a)    *In Re: Instrument Panel Clusters*, Case 2:12-cv-00202;

(b)    *In Re: Fuel Senders*, Case 2:12-cv-00302;

(c)    *In Re: Heater Control Panels*, Case 2:12-cv-00402;

(d)    *In Re: Alternators*, Case 2:13-cv-00702;

(e)    *In Re: Windshield Wiper Systems*, Case 2:13-cv-00902;

(f)    *In Re: Radiators*, Case 2:13-cv-01002;

(g)    *In Re: Starters*, Case 2:13-cv-01102;

(h)    *In Re: Ignition Coils*, Case 2:13-cv-01402;

(i)    *In Re: Motor Generators*, Case 2:13-cv-01502;

(j)    *In Re: HID Ballasts*, Case 2:13-cv-01702;

(k)    *In Re: Inverters*, Case 2:13-cv-01802;

(l)    *In Re: Fuel Injection Systems*, Case 2:13-cv-02202;

(m)    *In Re: Power Window Motors*, Case 2:13-cv-02302;

(n)    *In Re: Automatic Fluid Transmission Warmers*, Case 2:13-cv-02402;

(o)    *In Re: Valve Timing Control Devices*, Case 2:13-cv-02502;

(p)    *In Re: Air Conditioning Systems*, Case 2:13-cv-02702;

(q)    *In Re: Windshield Washer Systems*, Case 2:13-cv-02802; and

(r)    *In Re: Spark Plugs*, Case 2:15-cv-03002 (collectively, with other cases, "Relevant Cases").

against the following defendants (by defendant group):

(a)    DENSO Corp., DENSO International America, Inc., DENSO International Korea Corp., DENSO Korea Automotive Corp., DENSO Products & Services Americas, ASMO Co., Ltd., ASMO North America, LLC,

ASMO Greenville of North Carolina, Inc., ASMO Manufacturing, Inc., and ASMO North Carolina Inc. (collectively, "DENSO");

(b)     Aisan Industry Co., Ltd., Aisan Corp. of America, Franklin Precision Industry, Inc., and Hyundam Industrial Co., Ltd. (collectively, "AISAN");

(c)     Aisin Seiki Co., Ltd. and Aisin Automotive Casting, LLC (collectively, "AISIN SEIKI");

(d)     Alps Automotive, Inc., Alps Electric (North America), Inc., and Alps Electric Co., Ltd. (collectively, "ALPS");

(e)     Calsonic Kansei Corp. and Calsonic Kansei North America, Inc. (collectively, "CALSONIC");

(f)     Continental Automotive Systems, Inc., Continental Automotive Electronics, LLC, and Continental Automotive Korea Ltd. (collectively, "CONTINENTAL");

(g)     Delphi Automotive LLP and Korea Delphi Automotive Systems Corp. (collectively, "DELPHI");

(h)     Diamond Electric Mfg. Co., Ltd. and Diamond Electric Mfg. Corp. (collectively, "DIAMOND");

(i)     Keihin Corp. and Keihin North America, Inc. (collectively, "KEIHIN");

(j)     Koito Manufacturing Co., Ltd. and North American Lighting, Inc. (collectively, "KOITO");

(k)     MAHLE Behr GmbH & Co. KG and MAHLE Behr USA Inc. (collectively, "MAHLE BEHR");

(l)     Mikuni America Corp. ("MIKUNI");

(m)     Mitsuba Corp. and American Mitsuba Corp. (collectively, "MITSUBA");

(n)     Mitsubishi Electric Corp., Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. (collectively, "MELCO");

(o)     Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., and Mitsubishi Heavy Industries Climate Control, Inc. (collectively, "MITSUBISHI HEAVY");

(p)     NGK Spark Plugs (U.S.A.) Holding, Inc., NGK Spark Plugs (USA) Inc., NGK Spark Plugs Co. Ltd., and NTK Technologies, Inc. (collectively, "NGK");

(q)     Robert Bosch LLC and Robert Bosch GmbH (collectively, "BOSCH");

(r)     Sanden International (U.S.A.) Inc. ("SANDEN");

(s)     Showa Denko K.K. and Showa Aluminum Corp. of America (collectively, "SHOWA DENKO");

(t)     Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc. collectively ("STANLEY");

(u)     Tokai Rika Co., Ltd. and TRAM, Inc. (collectively, "TOKAI RIKA");

(v)     Toyo Denso Co. Ltd. and Weastec, Inc. (collectively, "TOYO DENSO"); and

(w)     Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp. (collectively, "VALEO") (collectively, "defendants").

2.      Granting Plaintiffs leave to file a consolidated amended class action complaint ("CAC") alleging claims against all defendants identified, *supra*, for having engaged in a conspiracy to unlawfully fix and artificially raise the prices of automotive parts sold in the United States and elsewhere as set forth in the Proposed CAC submitted with this Motion. *See* Ex. A (ADPs' Proposed CAC).

DENSO is currently named as a defendant in all of the Relevant Cases. Plaintiffs' Proposed CAC alleges an international price-fixing, bid rigging, and market allocation conspiracy coordinated by DENSO. In addition to DENSO, participants in the unlawful conspiracy included many of the largest automotive parts suppliers in the world. Defendants' unlawful conduct resulted in artificially inflated prices for automobiles from and including July 1, 1998 through such time as the anticompetitive effects of the defendants' conduct ceased.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points

**REDACTED**

and Authorities in support thereof, filings in *In re Automotive Parts Antitrust Litigation* ("*Auto Parts*"), and such other arguments as may be presented to the Court.

In accordance with Local Rule 7.1(a)(1), Plaintiffs have engaged in multiple meet-and-confers with defendants since November 2015 concerning Plaintiffs' intention to file a motion to consolidate the claims in the Relevant Cases. During the course of these meet-and-confers, Plaintiffs shared with defendants a draft of a CAC that is substantively similar to the Proposed CAC, and defendants have not concurred in the relief requested by Plaintiffs.

Date: January 7, 2016                              Respectfully submitted,

*/s/* Jonathan W. Cuneo

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone:  (662) 834-2488
Facsimile:  (662)834-2628
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com

*Interim Co-Lead Class Counsel for  Dealership
Plaintiffs*

Gerard V. Mantese
(Michigan Bar No. P34424)
**Mantese Honigman
and Williamson, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 607-9200
gmantese@manteselaw.com

*Interim Liaison Counsel for Dealership Plaintiffs*

**REDACTED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : : : | Master File No. 12-md-02311 Honorable Marianne O. Battani |
| In Re: Instrument Panel Clusters | : | 2:12-cv-00202 |
| In Re: Fuel Senders | : | 2:12-cv-00302 |
| In Re: Heater Control Panels | : | 2:12-cv-00402 |
| In Re: Alternators | : | 2:13-cv-00702 |
| In Re: Windshield Wiper Systems | : | 2:13-cv-00902 |
| In Re: Radiators | : | 2:13-cv-01002 |
| In Re: Starters | : | 2:13-cv-01102 |
| In Re: Ignition Coils | : | 2:13-cv-01402 |
| In Re: Motor Generators | : | 2:13-cv-01502 |
| In Re: HID Ballasts | : | 2:13-cv-01702 |
| In Re: Inverters | : | 2:13-cv-01802 |
| In Re: Fuel Injection Systems | : | 2:13-cv-02202 |
| In Re: Power Window Motors | : | 2:13-cv-02302 |
| In Re: Automatic Fluid Transmission Warmers | : | 2:13-cv-02402 |
| In Re: Valve Timing Control Devices | : | 2:13-cv-02502 |
| In Re: Air Conditioning Systems | : | 2:13-cv-02702 |
| In Re: Windshield Washer Systems | : | 2:13-cv-02802 |
| In Re: Spark Plugs | : | 2:15-cv-03002 |
| THIS DOCUMENT RELATES TO: | : : : | |
| DEALERSHIP ACTIONS | : | |

# AUTOMOTIVE DEALER PLAINTIFFS'
# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO CONSOLIDATE CLAIMS AND AMEND COMPLAINTS

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF THE ISSUES PRESENTED .................................................. vii

CONTROLLING AUTHORITY FOR THE RELIEF SOUGHT .................... viii

I.    INTRODUCTION .................................................................................. 1

II.   RELEVANT FACTS ............................................................................. 3

III.  ARGUMENT ........................................................................................ 7

    A.   The Court should grant consolidation to further the goal of judicial
        economy. ....................................................................................... 7

        1.   The standard for consolidation is broad and requires that cases
            simply involve common question of law or fact. .................... 7

        2.   Courts have broad discretion to consolidate cases when a
            common question of law or fact exists. .................................... 9

        3.   This Court also has broad powers to manage *Auto Parts* per
            28 U.S.C. § 1407. ................................................................. 10

        4.   Plaintiffs have met the standards for consolidation. ............. 10

        5.   The Relevant Cases have characteristics that are amenable to
            consolidation. ....................................................................... 13

        6.   Other factors considered influential in finding in favor of
            consolidation are present. ..................................................... 15

    B.   The Court should grant Plaintiffs leave to amend their complaints in
        the Relevant Cases and to file their Proposed CAC. ........................ 17

        1.   Courts freely grant leave to amend. ...................................... 18

        2.   The standard permitting for amendment is a balancing test of
            several factors that militates in favor of Plaintiffs amending
            their complaints. ................................................................... 18

        3.   Plaintiffs have met the standard for amendment. ................. 190

            a.   Amendment would not result in undue prejudice. ......... 19

            b.   There has been no undue delay ...................................... 20

i

**REDACTED**

   c.  There has been no bad faith...........................................22

   d.  Amendment would not be futile....................................22

 III. CONCLUSION ...........................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Advey v. Celotex Corp.*,
    962 F.2d 1177 (9th Cir. 1992) ...............................................................................8

*Bell v. Allstate Life Ins. Co.*,
    160 F.3d 452 (8th Cir. 1998) ...............................................................................19

*Bridgeport Music, Inc. v. Dimension Films*,
    410 F.3d 792 (6th Cir. 2005) ...............................................................................21

*C.T. v. Liberal Sch. Dist.*,
    562 F. Supp. 2d 1324 (D. Kan. 2008) ..................................................................16

*Cantrell v. GAF Corp.*,
    999 F.2d 1007 (6th Cir. 1993) ...........................................................................2, 9

*Chatham Condominium Ass'ns v. Century Village, Inc.*,
    597 F.2d 1002 (5th Cir. 1979) .........................................................................9, 10

*Colvin v. Caruso*,
    605 F.3d 282 (6th Cir. 2010) ...............................................................................19

*EEOC v. Von Maur, Inc.*,
    237 F.R.D. 195 (S.D. Iowa 2006) ........................................................................14

*Estes v. Kentucky Utilities Co.*,
    636 F.2d 1131 (6th Cir. 1980) .............................................................................20

*Foman v. Davis*,
    371 U.S. 178 (1962) .........................................................................................2, 19

*Garnett-Bishop v. New York Community Bancorp, Inc.*,
    49 F. Supp. 3d 321 (E.D.N.Y. 2014) ...................................................................18

*Hageman v. Signal L.P. Gas, Inc.*,
    486 F.2d 479 (6th Cir. 1973) ...............................................................................20

*Hanes Cos. v. Ronson*,
   712 F. Supp. 1223 (M.D.N.C. 1988) ...................................................................8

*Hayden v. Ford Motor Co.*,
   497 F.2d 1292 (6th Cir. 1974) ........................................................................20
*Head v. Timken Roller Bearing*,
   486 F.2d 870 (6th Cir. 1980) .........................................................................20

*Hemlock Semiconductor Corp. v. Kyocera Corp.*,
   2015 U.S. Dist. LEXIS 138018 (E.D. Mich. Oct. 9, 2015)...................................9

*In re Auto Parts Antitrust Litig.* (*HCP*),
   2014 U.S. Dist. LEXIS 61636 (E.D. Mich. April 30, 2014) ...............................25

*In re Macon Uplands Venture*,
   624 F.2d 26 (5th Cir. 1980) .............................................................................8

*In re Recticel Foam Corp.* (*In re San Juan Dupont Plaza Hotel Fire Litig.*),
   859 F. 2d. 1000 (1st Cir. 1988)......................................................................10

*In re San Juan Dupont Plaza Hotel Fire Litig.*,
   859 F.2d 1007 (1st Cir. 1998)........................................................................10

*In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.*,
   953 F.2d 162 (4th Cir. 1992) .........................................................................10

*In re Wirebound Boxes Antitrust Litig.*,
   128 F.R.D. 256 (D. Minn. 1989) .............................................................. 13, 14

*Jamieson v. Shaw*,
   772 F.2d 1205 (5th Cir. 1985) .......................................................................19

*Jet, Inc. v. Sewage Aeration Sys.*,
   165 F.3d 419 (6th Cir. 1999) .........................................................................19

*Johnson v. Celotex Corp.*,
   899 F.2d 1281 (2d Cir. 1990) ........................................................................16

*Katz v. Realty Equities Corp.*,
521 F.2d 1354 (2d Cir. 1975) ...............................................................17

*KFC Corp. v. Kazi*,
29 F. Supp. 3d 945 (W.D. Ky. 2014)......................................................17

*Lawson v. Truck Drivers, etc.*,
698 F.2d 250 (6th Cir. 1983) ................................................................20

*Lloyd v. Industrial Bio-Test Lab., Inc.*,
454 F. Supp. 807 (S.D.N.Y. 1978) ........................................................15

*Louisiana v. Litton Mortgage Co.*,
50 F.3d 1298 (5th Cir. 1995) ................................................................24

*Milanese v. Rust-Oleum Corp.*,
244 F.3d 104 (2d Cir. 2001) .................................................................25

*Mutual Life Insurance Co. v. Hillmon*,
145 U.S. 285 (1892)................................................................... 2, 8, 16

*Ohio ex rel. Montgomery v. Louis Trauth Dairy*,
163 F.R.D. 500 (S.D. Ohio 1995)............................................................9

*Security Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*,
64 F.3d 1001 (6th Cir. 1995) ................................................................21

*Somers v. Charter Twp. Of Clayton*,
2014 U.S. Dist. LEXIS 28494 (E.D. Mich. Mar. 6, 2014) ....................9

*Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.*,
775 F. Supp. 759 (D. Del. 1991)...........................................................18

*Werner v. Satterlee, Stephens, Burke & Burke*,
797 F. Supp. 1196 (S.D.N.Y. 1992) ......................................................15

Statutes

15 U.S.C. § 1 note

28 U.S.C. § 1407(a) .................................................................... 2, 10

28 U.S.C. § 1407(a). ................................................................................3

**Other Authorities**

The Manual for Complex Litigation (Fourth), § 10 ................................3

Rules

Fed. R. Civ. P. 1 ....................................................................................2

Fed. R. Civ. P. 15(a)..........................................................................2, 17

Fed. R. Civ. P. 16(c)(2)(L) ....................................................................2

Fed. R. Civ. P. 42 ...............................................................................2, 9

Fed. R. Civ. P. 42(a)...............................................................................9

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

1.      Whether the Court should consolidate Plaintiffs' claims against defendants in the Relevant Cases because:

(a)     The claims against each of the defendants in the Relevant Cases present common issues of law and fact such that the criteria of Federal Rule of Civil Procedure ("Rule") 42 are satisfied;

(b)     No party would suffer undue prejudice from consolidation and amendment; and

(c)     Consolidation would decrease costs and reduce delay, carry no risk of prejudice to any defendant, and best serve the interests of justice.

2.      Whether the Court should permit the Plaintiffs to amend their complaints in the Relevant Cases by filing the CAC because:

(a)     The Sixth Circuit has a liberal policy of allowing amendments to complaints;

(b)     Plaintiffs can plausibly allege that each of the defendants had a conscious commitment to a common scheme to fix the prices of automotive parts sold to Original Equipment Manufacturers ("OEMs"); and

(c)     There is no prejudice to any defendant by virtue of the proposed consolidation and amendment.

**REDACTED**

## CONTROLLING AUTHORITY FOR THE RELIEF SOUGHT

Fed. R. Civ. P. 1

Fed. R. Civ. P. 15(a)

Fed. R. Civ. P. 16(c)(2)(L)

Fed. R. Civ. P. 42

28 U.S.C. § 1407(a)

*Cantrell v. GAF Corp.*, 999 F.2d 1007 (6th Cir. 1993)

*Foman v. Davis*, 371 U.S. 178 (1962)

*Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285 (1892)

## I.   INTRODUCTION

For many years, defendants in the above-captioned automotive parts cases—led by DENSO, which is named as a defendant in more cases than any other defendant—have maintained that the almost three dozen cases before the Court involving conspiracies to fix the prices of automotive parts sold to OEMs are independent and have nothing to do with each other. Based on the information obtained to date, Plaintiffs now have a good faith basis to allege that DENSO was at the center of a large, multi-part conspiracy, which DENSO carried out with the other defendants who are the subject of this Motion. For this reason, Plaintiffs now bring this Motion to consolidate and to file a CAC with respect to the automotive parts involved in this conspiracy. The interests of justice and judicial economy support this Motion, and the authorities cited herein provide a firm basis for the requested relief. Plaintiffs bring this Motion:

(a)    To consolidate claims asserted in the 18 currently separate automotive parts cases into a single case; and

(b)    To file a CAC alleging a single conspiracy with DENSO at the center.

As alleged in the Proposed CAC filed herewith (Ex. A), DENSO and each co-conspirator named therein conspired to fix, raise, and maintain the prices of certain automotive parts[1] sold to OEMs in the United States and elsewhere. The illegal conspiracy began at least as early as July 1, 1998 and continued until at least February 2011. The unlawful conspiracy largely targeted large Japanese OEMs, such as like Toyota Motor Co., Honda Motor Co., Ltd., Nissan Motor Co., Ltd.,

---

[1] Instrument Panel Clusters ("IPC"), Fuel Senders, Heater Control Panels ("HCP"), Alternators, Windshield Wiper Systems, Radiators, Starters, Ignition Coils, Motor Generators, HID Ballasts, Inverters, Fuel Injection Systems, Power Window Motors, Automatic Fluid Transmission Warmers, Valve Timing Control Devices, Air Conditioning Systems, Windshield Washer Systems, and Spark Plugs.

and Fuji Heavy Industries, Ltd. (owner of Subaru). The conspiracy began in Japan, and like a flu spread around the world, adversely affecting other OEMs, including, but not limited to, Ford Motor Co., General Motors Co., FCA US LLC (Chrysler), Volkswagen, Daimler AG, and Bayerische Motoren Werke AG (BMW). The conspiracy was carried out through the same type of conduct, which included at least the following:

(1)    Respecting each co-conspirator's so-called "incumbency" or "commercial rights," referred to as "shōken" in Japanese;

(2)    Refraining from competing for customers;

(3)    Allocating customers;

(4)    Allocating geographic markets;

(5)    Coordinating responses to requests for quotation ("RFQs"); and

(6)    Coordinating responses to requests for price reductions.

Among the reasons why the Plaintiffs were not able to bring this Motion earlier is the fact that defendants, and especially DENSO, control the facts about the automotive parts conspiracy and have fought and substantially delayed disclosure of those facts. One defendant that is the leniency applicant in most of the Relevant Cases dribbled facts out[2]—maintaining the pretense that the coordinated conduct, simultaneously carried out by common means and common actors and involving common victims, was merely an extraordinary coincidence of conspiratorial conduct that just happened to arise and be carried out at the same time. It is now time to penetrate the silos that DENSO and its co-conspirators created as part of their joint defense group strategy to defend these cases. It is time

---

[2] Despite the extent of its involvement in the automotive parts conspiracy, Plaintiffs' records reflect that the leniency applicant has only provided around 15 days of proffers between its first proffer in December 2012 and its most recent proffer in December 2015, or the course of three years. Plaintiffs also note that most of these proffers were not full-day proffers.

to provide Plaintiffs—the real victims of this conspiracy—with the opportunity to prove their claims against defendants. It is time to provide the Court with a reasonable and practical means to bring these cases to final resolution. The Motion should be granted because Plaintiffs have met all of the requirements for consolidation and because the Proposed CAC is neither prejudicial nor futile.

All of the goals of this Motion are in accordance with the standards governing these actions. Section 1407 of Title 28 of the United States Code provides that multidistrict litigation should further the "convenience of parties and witnesses and promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Rule 1 also directs courts and parties to work towards the "just, speedy, and inexpensive determination of every action and proceeding." The Manual for Complex Litigation (Fourth), § 10, further provides that:

> Fair and efficient resolution of complex litigation requires at least that . . . the judge and counsel collaborate to develop and carry out a comprehensive plan for the conduct of pretrial and trial proceedings.

Now is the time to carry out these fundamental mandates. Plaintiffs have now developed sufficient information to permit them to plausibly allege the broader conspiracy set forth in the Proposed CAC. The Department of Justice ("DOJ")'s stay of discovery has been lifted, and discovery can proceed, in all of the Relevant Cases that are subject to this Motion.

## II.    RELEVANT FACTS

On February 7, 2012, the United States Judicial Panel on Multidistrict Litigation ("Judicial Panel" or "Panel") transferred actions sharing "factual questions arising out of an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of automotive wire harness systems" to the Eastern District of Michigan. (12-md-02311, Doc. No. 2). In its transfer order, the Judicial Panel noted that the majority of cases were pending in the Eastern District, as was the first filed action, that several defendants were located in this district, and that a related criminal investigation was underway in this district. (*Id.*) The Panel determined that centralizing litigation in this District would eliminate duplicative discovery, prevent inconsistent pretrial rulings and conserve resources. (*Id.*) After complaints were filed alleging

conspiracies to fix prices of three additional component parts, the Judicial Panel determined that including all actions in MDL No. 2311 would result in the most efficient handling of the case. ***The Judicial Panel noted the existence of similar conspiracies with overlapping defendants arising from the same government investigation as well as an overlap of parties and counsel.*** The additional component part cases were transferred to this Court for coordinated pretrial proceedings, and In re: Automotive Wire Harness Systems Antitrust Litigation was renamed "In re: Automotive Parts Antitrust Litigation." (Doc. No. 117 in 12-2311). There are now twenty-eight component part cases pending. (*See* Doc. No. 665 in 12-2311).

Opinion and Order Denying Defendants' Collective Motion to Dismiss ACAP's Consolidated Amended Class Action Complaint at 1-2, Case No. 2:12-cv-00201 (*IPC*), ECF No. 86 (Apr. 30, 2014) (emphasis added). There are currently over 30 automotive parts cases pending before this Court.

By this Motion, Plaintiffs seek to consolidate 18 ADP actions that are part of this multidistrict litigation and to file a CAC alleging a single conspiracy. The earliest of the actions subject to this Motion, *IPC*, was filed on January 31, 2012. The latest of the actions subject to this Motion, *Spark Plugs*, was filed on May 22, 2015. None of the Relevant Cases has progressed to the point that consolidation and amendment would be inappropriate or prejudicial. None of the Relevant Cases is subject to the present schedule for class certification motions. Only three of the Relevant Cases—*IPC*, *Fuel Senders*, and *HCP*—have case management orders, and the case management orders in these cases are only initial case management orders setting very basic parameters. None of them set a final date by which proposed amendments to the pleadings are subject to the higher standards of Rule 16 rather than the more liberal standards of Rule 15.

Few of these actions have proceeded to meaningful discovery and, other than the productions of DOJ documents, virtually none of the Relevant Actions filed after *Fuel Senders* has had any discovery take place whatsoever—in part, due to those defendants' refusal to participate in discovery and, in part, due to the stay

issued at the request of the DOJ. No depositions have yet been taken of any defendant in *Auto Parts*—let alone, the Relevant Cases.

Throughout this coordinated litigation, defendants have repeatedly sought to perpetuate the myth that all of these cases are separate and independent of each other, even while they controlled all of the facts and information that would have revealed that this was not true. For instance, as illustrated below, defendants made the following statements when Plaintiffs sought to coordinate the cases subject to this MDL to create efficiencies for the parties and the Court:

> This litigation "contains 29 sets of unrelated cases that each involves a unique set of facts, distinct products, different alleged conspiracies, and varying groups of defendants—yet all under the same MDL umbrella."[3]

> "IPC & FS Defendants agree with the arguments . . . in the Wire Harness Products Defendants' Opposition to Certain Plaintiffs' Motion to Coordinate All Actions in MDL 2311[.]"[4]

> "As the Court knows all too well, more than two dozen sets of cases, each involving claims by different sets of direct purchasers, auto dealerships, and end-payor plaintiffs, against different (although in some cases overlapping) defendants, based on different alleged conspiracies involving different products, have now been consolidated into this same MDL."[5]

> "By seeking to group these cases, plaintiffs also gloss over the fact that their complaints each allege a different conspiracy, among different defendants, at different time periods, involving different products."[5]

---

[3] Wire Harness Products Defendants' Opposition to Certain Plaintiffs' Motion to Coordinate All Actions in MDL 2311 at 1, Master File No. 2:12-md-02311, ECF No. 714 (May 27, 2014). DENSO was a signatory to this brief.

[4] IPC and Fuel Senders Defendants' Opposition to Motion for End-Payor Plaintiffs, Auto Dealer Plaintiffs, the State of Florida, and the City of Richmond to Coordinate All Actions in MDL 2311 at 1-2, Master File No. 2:12-md-02311, ECF No. 715 (May 27, 2014). DENSO was a signatory to this brief.

[5] HCP Defendants' Opposition to Certain Plaintiffs' Motion to Coordinate All Actions in MDL 2311 at 1, 3 5, 7, Master File No. 2:12-md-02311, ECF No. 708 (May 27, 2014). DENSO was a signatory to this brief.

REDACTED

"The proposal is based on the notion that all of these cases and defendants are similarly situated. There is no factual basis for that premise."[6]

"Each case involves different products and different alleged conspiracies, which took place at varied times and in different contexts and involved different targets and markets."[7]

"The dozens of cases consolidated here should not be thought of as single case just because they have some common plaintiffs and all concern automobile parts."[8]

"Not only do the different cases involve different direct purchaser plaintiffs, different defendants, and different alleged conspiracies with respect to different automobile parts—meaning different actors and alleged conduct regarding different transactions are at issue in each case—but the economic analyses affecting the various automobile parts differ, as well."[9]

" . . . each named plaintiff . . . chose to file a multiplicity of cases against unrelated defendants whose only common connection is that they all manufacture automobile parts."[10]

"The facts, documents, witness testimony, and other issues and considerations differ by each unique product because the conspiracies alleged[ly] differ by product" [*sic*].[11]

Defendants may argue that this Motion is a repeat of the Motion of ADPs, End-Payor Plaintiffs ("EPPs"), the State of Florida, and the City of Richmond to Coordinate All Actions in MDL 2311, Master File No. 2:12-md-02311, ECF No. 703 (May 9, 2014) ("Motion to Coordinate") previously filed by Plaintiffs to which the memoranda of law quoted above were responding—old wine in new bottles. This is not true because this motion seeks entirely different relief than that sought in the Motion to Coordinate. It is worth observing, however, that at least two

---

[6] *Id.*

[7] *Id.*

[8] Response by Certain Defendants Regarding Plaintiffs' Motion to Coordinate All Actions in MDL 2311 at 2, 11, 12, Master File No. 2:12-md-02311, ECF No. 712 (May 27, 2014). DENSO was a signatory to this brief.

[9] *Id.*

[10] *Id.*

[11] *Id.*

salutary procedures were put in place as a result of the Motion to Coordinate, both of which further the purposes of the present Motion.

*First*, it was largely as a result of the Motion to Coordinate that orders ultimately were entered providing that ADPs and EPPs class representatives would only be deposed once for all cases. These orders recognized that as to those two classes, the relevant conduct by plaintiffs was the same—purchasing and/or leasing new cars with price-fixed automotive parts. *Second*, as a result of the Motion to Coordinate, procedures were put in place to coordinate the massive task of seeking discovery from non-party OEMs. The OEM discovery process was based upon a similar rationale—that the discovery from OEMs was the same and was not differentiated based upon any particular case that is part of this MDL. Those orders, supported by the more complete facts now in possession of the Plaintiffs, laid the groundwork that supports this Motion.

## III.   ARGUMENT

### A.   The Court should grant consolidation to further the goal of judicial economy.

#### 1.   The standard for consolidation is broad and simply requires that cases involve common question of law or fact.

Plaintiffs seek an order joining for all pretrial and trial purposes the claims against defendants set forth in the Proposed CAC (Ex. A.). Consolidation provides the Court with a powerful tool to expedite this litigation by drawing together currently separate actions that share common legal and factual questions. This managerial device would assure streamlined litigation of the above-captioned cases, obviating the need for multiple lawsuits and duplicative trials. The articulated standard for consolidating two or more cases is simply that they involve "a common question of law or fact." *Mutual Life Insurance Co. v. Hillmon*, 145

U.S. 285, 286 (1892) ("*Mutual Life*").[12] This standard is an expansive one, allowing consolidation of a broad range of cases brought in federal court.[13] Common questions of law and fact do not have to predominate; all that is required is that the district court find they exist and that consolidation will prove beneficial.[14]

Furthermore, a common factual issue, such as two lawsuits pending in the same court and brought by the same plaintiff, is a sufficient basis for consolidation if combining the two cases will simplify the litigation process.[15] Especially if the alternative (to dismiss the second lawsuit and require the plaintiff to amend its first complaint to add the dismissed allegations) would be a complicated and unnecessary exercise of form over substance, consolidation is generally preferred.[16] Consolidation would unarguably streamline litigation in *Auto Parts*. All 18 Relevant Cases are pending before this Court, and ADPs have brought an action in each of them.

The purpose of consolidation is to "administer the court's business with expedition and economy while providing justice to the parties."[17] Further, under Rule 1, the Rules should be construed to "administer the court's business with expedition and economy while providing justice to the parties." *Hemlock Semiconductor Corp. v. Kyocera Corp.*, 2015 U.S. Dist. LEXIS 138018, * 2 (E.D.

---

[12] The common question standard has a long history, figuring in such landmark decisions as *Mutual Life*, where the Supreme Court issued an order consolidating three separate lawsuits regarding the death of an insured, because the actions were "of like nature and relative to the same question." The Court justified its decision as one calculated to "avoid unnecessary cost and delay." *Id.* at 292.

[13] *In re Macon Uplands Venture*, 624 F.2d 26, 28 (5th Cir. 1980).

[14] *Hanes Cos. v. Ronson*, 712 F. Supp. 1223, 1230 (M.D.N.C. 1988) ("*Hanes*").

[15] *Id.* (court found consolidation of two cases filed by same plaintiff "enhance[d] efficiency and economy for all concerned").

[16] *Id.*

[17] *Advey v. Celotex Corp.*, 962 F.2d 1177, 1180 (9th Cir. 1992) (internal quotations omitted).

Mich. Oct. 9, 2015). A primary consideration in choosing to consolidate is whether consolidation will serve the interests of justice. *See*, *e.g.*, *Ohio ex rel. Montgomery v. Louis Trauth Dairy*, 163 F.R.D. 500 (S.D. Ohio 1995) ("*Louis Trauth Dairy*"). In *Louis Trauth Dairy*, the court found that consolidation is appropriate "if the risks of prejudice and confusion are outweighed by other factors including the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources." *Id.* at 503-504.

### 2. Courts have broad discretion to consolidate cases when a common question of law or fact exists.

Courts have broad discretion in determining whether or not consolidation is proper. *Somers v. Charter Twp. Of Clayton*, 2014 U.S. Dist. LEXIS 28494, *15 (E.D. Mich. Mar. 6, 2014). Courts exercising that discretion will seldom be overruled because the decision to consolidate cases will be upheld on appeal unless the court has committed a clear abuse of discretion. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1011 (6th Cir. 1993). S*ee also Chatham Condominium Ass'ns v. Century Village, Inc.*, 597 F.2d 1002, 1013–1014 (5th Cir. 1979) ("*Chatham Condominium*") (decision to consolidate four treble damages antitrust actions against same defendant involving identical questions of fact and law upheld absent claim of prejudice). Abuse of discretion is usually found only when there are insufficient common questions of law or fact. The standard for consolidation is broad, and simply requires that cases involve common questions of law or fact. Rule 42(a) provides:

> Consolidation. If actions before the court involve a common question of law or fact, the court may:
>
> (1)    Join for hearing or trial any or all matters at issue in the actions;
> (2)    Consolidate the actions; or
> (3)    Issue any other orders to avoid unnecessary cost or delay.

Fed. R. Civ. P. 42(a).

In deciding whether to consolidate, the Court should consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Cantrell v. GAF Corp.*, 999 F.2d at 1011.

### 3.    This Court also has broad powers to manage *Auto Parts* per 28 U.S.C. § 1407.

The aforementioned standards should be viewed through the prism of Section 1407(a) of Title 28 of the United States Code, which provides MDL transferee courts with broad powers to manage the cases before them. "[A] district court needs to have broad discretion in coordinating and administering multi-district litigation." 28 U.S.C. § 1407(a); *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.*, 953 F.2d 162, 165 (4th Cir. 1992) (*citing In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1019 (1st Cir. 1998). "In multi-party, multi-case litigation, the district court's success is largely dependent on its ability to uncomplicate matters." *In re Recticel Foam Corp.* (*In re San Juan Dupont Plaza Hotel Fire Litig.*), 859 F. 2d. 1000, 1004 (1st Cir. 1988). Consolidation of the Relevant Cases centralized before this Court, all of which involve the price-fixing of automotive parts, would result in more streamlined discovery, class certification, and resolution by way of settlement or trial.

### 4.    Plaintiffs have met the standards for consolidation.

Plaintiffs are asserting the same legal claims based upon the same conduct and seeking the same type of relief against all defendants. In *Chatham Condominium*, the Fifth Circuit upheld the district court's consolidation of four treble damages antitrust actions against the same defendant involving identical questions of fact and law absent claim of prejudice. 597 F.2d at 1013–1014.

Among the common issues of fact presented by each of the Relevant Cases subject to this Motion are whether each of the alleged co-conspirators agreed with DENSO to fix the prices of automotive parts sold to OEMs through various means, including:

  a.   Respecting each other's "shōken", the so-called "incumbency" or "commercial rights" which entitled certain defendants to have their existing business with certain OEMs protected from competition[18];

  b.   Refraining from competing for customers;[19]

  c.   Allocating customers;[20]

  d.   Allocating geographic markets;[21]

_____

[18] For example, the Proposed CAC alleges that Subaru issued an RFQ in the first half of 2007 to DENSO, DIAMOND and HITACHI for Ignition Coils to be installed in vehicles with an H4 engine. DIAMOND was the incumbent supplier. In August 2007, DENSO, DIAMOND, and HITACHI met to discuss said RFQ. DENSO informed DIAMOND that DENSO would respect DIAMOND's "commercial rights" to this business and rigged bids to effectuate their agreement. These three defendants met again in October 2007, at which time both DENSO and HITACHI agreed to respect DIAMOND's "commercial rights" and not submit bids at all. Subaru awarded the business to DIAMOND as the parties had intended. *For more illustrative examples, see* Proposed CAC (Ex. A) at Conspiracy Allegations.

[19] For instance, the Proposed CAC alleges that in November 2003, HITACHI and AISAN scheduled a meeting to discuss their business relationship. At one meeting in October 2004, HITACHI and AISAN agreed to refrain from competing against each other to preserve their own market shares and ensure profitability. Specifically, they agreed that HITACHI would supply 75 percent of Nissan's Electronic Throttle Bodies business and AISAN would supply 25 percent of it. This illegal agreement was in place for many years. *For more illustrative examples, see* Proposed CAC (Ex. A) at Conspiracy Allegations.

[20] For example, the Proposed CAC alleges that in early 2008, CONTINENTAL approached DENSO to establish an agreement to respect each other's business. They further discussed this matter at Blowfish Restaurant in Seoul around January 2008. They met again in February 2008, at which time they agreed to generally refrain from competing for each other's business going forward. After this meeting, they exchanged a list of expected RFQs in 2009 with the incumbent suppliers for each RFQ and agreed on the allocation of business between them. *For more illustrative examples, see* Proposed CAC (Ex. A) at Conspiracy Allegations.

[21] For instance, the Proposed CAC alleges that in 2005, Honda issued an RFQ to DENSO and NGK for Spark Plugs to be installed in the 2008 Honda Accord, which included both the L4 and V6 engines. NGK was the incumbent supplier for the L4 engine, and DENSO was the incumbent supplier for the V6 engine. Between August and October 2005, DENSO and NGK discussed exchanging business and bids. They confirmed their agreement that NGK would win the PZEV L4 and V6 business, and DENSO would win non-PZEV L4 business, at an in-person meeting in

e.      Coordinating responses to RFQs;[22] and

f.      Coordinating responses to requests for price reductions.[23]

The examples given in the Proposed CAC and in this motion are only the tip of the iceberg, and more than sufficient for the purposes of pleading a claim. ADPs have learned of hundreds more instances of collusion by the defendants that are subject to this motion which are not set forth in the Proposed CAC.

Among the common questions of law presented by each of the Relevant Cases are:

1.      Whether DENSO and its alleged co-conspirators' conduct constitute a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of automotive parts sold in the United States in violation of the Sherman Antitrust Act and relevant state competition laws;

2.      Whether DENSO and its alleged co-conspirators' conduct violate relevant state antitrust, unfair competition, and consumer protection laws;

---

January 2006. Honda awarded the business consistent with DENSO and NGK's agreement. *For more illustrative examples, see* Proposed CAC (Ex. A) at Conspiracy Allegations.

[22] For example, the Proposed CAC alleges that in 2003, Honda issued an RFQ for front Windshield Wiper Systems and Windshield Washer Systems for the 2006 Honda Civic. DENSO was the incumbent supplier in the United States and MITSUBA was the incumbent supplier outside the United States. At the time, Honda had a dual supplier policy for sourcing because Honda sought to bring in more suppliers. DENSO agreed to respect MITSUBA as one of the two Honda suppliers and to bid higher for the market outside of the United States. Between the end of 2003 and early 2004, DENSO communicated with MITSUBA to confirm their respective bids. As a result of their collusive conduct, both parties were able to maintain their respective business. *For more illustrative examples, see* Proposed CAC (Ex. A) at Conspiracy Allegations.

[23] For instance, the Proposed CAC alleges that in 2001 and 2002, Toyota was implementing a cost-reduction program for Fuel Senders. Toyota was pressuring DENSO and YAZAKI, the only two competitors for Toyota's Fuel Senders business since 2001, to reduce the prices of Fuel Senders. DENSO and YAZAKI exchanged information regarding Toyota's demands and discussed fuel sender RFQs for the Toyota Tacoma and Toyota Avalon. Specifically, they exchanged prices and adjusted bids to effectuate their agreement that YAZAKI would win the Toyota Tacoma business and DENSO would win the Toyota Avalon business consistent with their "commercial rights." Toyota awarded the business consistent with DENSO and YAZAKI's agreement. *For more illustrative examples, see* Proposed CAC (Ex. A) at Conspiracy Allegations.

12

3.    Whether DENSO and its co-conspirators were unjustly enriched as a result of the alleged acts; and

4.    Whether Plaintiffs are entitled to damages as a result of DENSO's and its co-conspirators' conduct.

These common factual and legal issues support consolidation. Further, the Relevant Cases are at a similar stage in the litigation. Other than *IPC*, *Fuel Senders*, and *HCP*, discovery is just beginning in the Relevant Cases. Even as to *IPC*, *Fuel Senders*, and *HCP*, meaningful discovery has not yet begun. No depositions of defendants have been taken in any of these cases, and other than DOJ productions, no defendant has made any substantial production of documents in response to Plaintiffs' discovery requests.

> ### 5.    The Relevant Cases have characteristics that are amenable to consolidation.

The Relevant Cases—and generally, all cases in *Auto Parts*—have five characteristics that courts find amenable to consolidation. ***First***, all Relevant Cases involve ***like claims***. As discussed, *supra*, there are "causes of a like nature, or relative to the same question." *Mutual Life*, 145 U.S. at 292. The allegations in the Relevant Cases all stem from the same DOJ investigation into bid-rigging, price-fixing, and other anti-competitive conduct in the automotive parts industry. Claims arising pursuant to patterns of conduct, such as the ones here, are prototypical candidates for consolidation. *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 256, 259 (D. Minn. 1989) ("*Wirebound Boxes*") (price-fixing cases consolidated).

***Second***, the Relevant Cases have overlapping parties. The presence of overlapping parties in cases enhances the prospects for consolidation, assuming there are other common issues of law, fact, or both. *See EEOC v. Von Maur, Inc.*, 237 F.R.D. 195, 198 (S.D. Iowa 2006) (court consolidated two cases alleging race-based employment discrimination because of overlap in parties, claims and factual basis). Here, DENSO is named as a defendant in each of the 18 Relevant Cases; Mitsuba, in 10 Relevant Cases; MELCO, in eight Relevant Cases; and so on.

DENSO is the hub that connects the other defendants together. Plaintiffs note that the presence of different parties does not prevent cases from being properly consolidated.

*Third*, the Relevant Cases involve *similar products*. Consolidation often is an attractive option in cases where there are multiple tort actions with common factual and legal questions, such as the pursuit of an illegal scheme or plan. *See Wirebound Boxes*, 128 F.R.D. at 259 (price-fixing). As stated above, the Relevant Cases all involve automotive parts that are sold to OEMs in the United States and elsewhere. This litigation is reminiscent of *In re Vitamins Antitrust Litigation*, which involved fixing prices and market allocation of multiple vitamin products *and* choline chloride. 209 F.R.D. 251, 254-55 (D.D.C. 2002). There, at class certification, plaintiffs argued the allegations across vitamin product lines in the vitamins products class and of price fixing in the choline chloride class rest on the same legal theories and allegedly arise out of the same respective courses of conduct by the defendants. *Id.* at 260. Defendants contended that the putative classes would be an amalgam of "diverse businesses, facing different competitive environments and paying widely different prices" and class representatives would not have the incentive to prove all of the elements of their claims because the class is "over broad and comprised of multiple conspiracies." *Id.* The court certified the two classes, finding typicality was met because plaintiffs' theory of an overarching conspiracy to fix prices and allocate the markets for vitamin products and choline chloride in violation of antitrust laws was common to all class members. *Id.* at 260.[24] Here, Plaintiffs likewise allege an overarching conspiracy led by DENSO involving multiple automotive parts. The products here are arguably more similar than vitamins and choline chloride, the latter of which is not even a vitamin. Further, Plaintiffs are doing so at the early stages of discovery—before the Court set any class certification briefing schedule in the Relevant Cases.

---

[24] *See also In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 ("The overarching scheme is the linchpin . . . regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of action arises from a common wrong.")

***Fourth***, there will be substantial ***discovery overlap*** in the Relevant Cases. Discovery in one case that is applicable to discovery in another case is a practical benefit of consolidation, and a court will consider the usefulness of completed and planned discovery when deciding whether consolidation will expedite the cases without prejudice to the parties. *See Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1211–1212 (S.D.N.Y. 1992) (securities violations cases involving same reports and documents). Here, both Plaintiffs and defendants have obviously contemplated discovery overlap. In fact, they have already met-and-conferred on the length of ***depositions of witnesses testifying on multiple parts*** during deposition protocol negotiations in October and November 2015.

***Finally***, as explained *supra*, none of the Relevant Cases is near trial. Cases at different stages of trial preparedness, generally, are not good candidates for consolidation, particularly if one case is ready for trial and one is not. *See Lloyd v. Industrial Bio-Test Lab., Inc.*, 454 F. Supp. 807, 812 (S.D.N.Y. 1978) (in consolidated securities violations cases, delay as result of consolidation considered minimal, and offset by avoidance of duplicative discovery and trial). Here, Plaintiffs have served comprehensive discovery on defendants in all of the Relevant Cases (though most defendants have not responded thereto), and no depositions have as yet been taken in any of them. There is no question that none of the Relevant Cases are ready for trial. Now is the ideal time to consolidate while the parties are still in the early stages of discovery.

### 6.    Other factors considered influential in finding in favor of consolidation are present.

Furthermore, the factors considered influential in finding in favor of consolidation are met. ***First***, consolidation serves the ***interests of justice***. Courts are most likely to approve consolidation when they find that it serves the interests of justice. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1285 (2d Cir. 1990). Here, the efficient resolution of the above-captioned cases through consolidation serves the interests of justice where 38 companies, including most of the defendant parent companies that are the subject of this Motion, and 58 executives, have already

been charged in the DOJ's ongoing investigation into the automotive parts industry and have paid a total of more than $2.6 billion in criminal fines.

*Second*, consolidation will lead to ***expeditious and efficient results***. When courts find that consolidation will achieve significant savings of time or avoid serious duplication of effort, they are likely to embrace it. Avoiding delay and expediting the trial process are two factors frequently cited by courts in ordering consolidation. *See Mutual Life*, 145 U.S. at 286.[25] Here, many defendants are named in multiple cases. Consolidation will make case management more efficient. More importantly, DENSO is named as a defendant in all of the Relevant Cases; Bosch, in five Relevant Cases; Calsonic, in three Relevant Cases; and so on. Plaintiffs should be able to conduct depositions of each defense witness in one deposition related to all parts with which they were involved. Likewise, if the Relevant Cases are consolidated, each defense witness would only have to testify once—instead of once per case.

*Third*, consolidation ***conserves resources***. As consolidation economizes both the resources of the parties and of courts, economy is a frequently cited justification for consolidation. *KFC Corp. v. Kazi*, 29 F. Supp. 3d 945, 955 (W.D. Ky. 2014) (consolidation would benefit judicial efficiency when cases arose from same operative facts and none of the parties would be unduly prejudiced). In *Katz v. Realty Equities Corp.*, for example, which featured 17 private Securities Act cases involving five classes, 21 plaintiffs, and 39 defendants before consolidation, the Court emphasized the substantial importance of conservation of resources as justifying its consolidation decision. 521 F.2d 1354, 1358 (2d Cir. 1975). Here, as in *Katz*, the savings resulting from consolidating Plaintiffs' claims in 18 automotive parts cases into one are significant and undeniable. Now that the Court has issued rulings on motions to dismiss in the vast majority of the Relevant Cases, much of the discovery negotiations completed and to

---

[25] *See also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1346 (D. Kan. 2008) (considerations of judicial efficiency weighed "overwhelmingly in favor of" consolidation because most evidence in these three cases would be identical, it would be undue burden on witnesses to present same testimony in three separate trials, and it would be "grossly inefficient use of the court's time and jury resources").

be completed in *Wire Harnesses* now must be repeated, on separate tracks, in those cases if there is no consolidation. The parties have recognized the obvious inefficiencies as they agreed on language in all of the deposition protocols in the Relevant Cases that provides the parties should use "best efforts" to avoid multiple depositions of defendant witnesses if they are "likely to be deposed" in connection with additional cases involving another part.[26] This can best be accomplished here through consolidation with the resulting coordination of discovery.

   *Finally*, consolidation *avoids inconsistent results*. In some cases, consolidation is used to combine actions so as to avoid producing inconsistent or conflicting results. The danger of such results and the inequitable treatment they foster when parties are truly similarly situated have led courts, in a range of cases, to consolidate proceedings. *See Garnett-Bishop v. New York Community Bancorp, Inc.*, 49 F. Supp. 3d 321, 327 (E.D.N.Y. 2014) (one of the main considerations in deciding whether to consolidate is risk of inconsistent adjudications of common factual and legal issues).[27] Here, given the large number of Relevant Cases, consolidation ensures that the Court resolves the common questions of law and fact and common legal issues in a consistent and efficient manner. Having identified the common questions of fact and law among the Relevant Cases, *supra*, these factors plausibly favor the decision to consolidate here.

   **B.    The Court should grant Plaintiffs leave to amend their complaints in the Relevant Cases and to file their Proposed CAC.**

   A party may amend once "as a matter of course" within the time constraints set out by Rule 15(a)(1). After that time, a party may amend its pleading "only with the opposing party's written consent or the court's leave per Rule 15(a)(2). Fed. R. Civ. P. 15(a)(2). Because

---

[26] *See*, *e.g.*, Instrument Panel Cluster Deposition Protocol Order at § IV.I, Defendants' Collective Submission of Global Deposition Protocol Disputes at Ex. 2 (*e.g.*, ECF No. 2:12-cv-00200, ECF No. 160-3) ("Defs. Global Br.").

[27] *See also Waste Distillation Tech., Inc. v. Pan Am. Res., Inc.*, 775 F. Supp. 759, 761 (D. Del. 1991) (two lawsuits alleging various business torts, including fraudulent acquisition of trade secrets, shared same plaintiff, identity of facts, same witnesses and evidence; consolidation found to eliminate the risk of inconsistent results between two proceedings).

defendants did not consent to the relief sought by Plaintiffs, Plaintiffs now seek the Court's leave to amend their complaints in the Relevant Cases and to file their Proposed CAC (Ex. A.).

### 1.      Courts freely grant leave to amend.

Although permission to amend a pleading is not automatic, court approval to amend should be given "freely … when justice so requires." *Id.*; *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("*Foman*") (courts should heed mandate of Rule 15(a) that leave be freely given when justice requires). In *Colvin v. Caruso*, the Sixth Circuit asserted that a motion to amend should be granted unless brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing part, or would be futile. 605 F.3d 282, 294 (6th Cir. 2010). Likewise, in *Jet, Inc. v. Sewage Aeration Sys.*, the Sixth Circuit stated that leave to amend should be freely given because cases should be tried on their merits rather than the technicalities of pleadings. 165 F.3d 419, 425 (6th Cir. 1999) ("*Jet*"). Determining whether to grant leave is an exercise of the court's discretion. *Foman*, 371 U.S. at 182. In exercising its discretion, the court should be guided by the underlying purpose of allowing amendments to facilitate a decision on the merits. *Jet* at 425.

### 2.      The standard permitting for amendment is a balancing test of several factors that militates in favor of Plaintiffs amending their complaints.

In determining whether justice requires granting leave to amend, a court should balance the factors set forth by the Supreme Court in *Foman*. *Id.*, 371 U.S. at 182 (courts should freely grant leave to amend, absent specified factors "such as ***undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment***, etc.") (emphasis added). Prejudice to the moving party if leave is denied should be considered, even if there is substantial reason to deny leave based on the other factors. *See Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985); *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998). Plaintiffs will discuss all factors, *infra*, except repeated failure to cure deficiencies, which does not apply here.

Much of the Sixth Circuit's balancing of the factors turns on substantial prejudice to the opposing party. *Lawson v. Truck Drivers, etc.*, 698 F.2d 250, 256 (6th Cir. 1983) ("*Lawson*"); *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973); *Head v. Timken Roller Bearing*, 486 F.2d 870 (6th Cir. 1980). "[I]n the absence of substantial prejudice to the opposing party," "[t]his Court, as well as others, has freely allowed the amendment of pleadings . . ." *Lawson*, at 256. "The determination of whether the circumstances of a case are such that justice would require the allowance of an amendment to an answer is left to the sound discretion of the district court, and review of such a decision by the district court is normally limited to the question of whether the district court abused its discretion in allowing the amendment." *Estes v. Kentucky Utilities Co.*, 636 F.2d 1131, 1133 (6th Cir. 1980), *citing Hayden v. Ford Motor Co.*, 497 F.2d 1292 (6th Cir. 1974).

### 3.    Plaintiffs have met the standard for amendment.

#### a.    Amendment would not result in undue prejudice.

One of the key factors considered by a court in ruling on a motion for leave to amend is whether permitting the amendment would result in undue prejudice to the non-moving party. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–331 (1971). Here, while *Wire Harnesses*, *Bearings*, and *Anti-Vibrational Rubber Parts* (cases not subject to this Motion) have been proceeding based on the schedules set by the Court in those cases, the Relevant Cases have been relatively "dormant," as indicated, *supra*. Plaintiffs have not begun meeting-and-conferring on custodians and search terms with defendants in the vast majority of the Relevant Cases or taken any depositions of defendant witnesses in any of them. Additionally, there are no Initial Discovery Plans or Initial Orders in any of these cases except *IPC*, *Fuel Senders*, and *HCP*. Defendants cannot demonstrate any prejudice justifying the denial of this Motion. In fact, during Plaintiffs' many meet-and-confer sessions with defendants on this Motion, no defendant identified any prejudice, other than the general nature of being a defendant in the Proposed CAC. A defendant's status is no different whether a defendant is in one automotive parts case or in multiple cases, and it is not a basis to deny this Motion. To the extent that any defendant claims

any prejudice in opposition to this Motion, Plaintiffs shall respond to those claims in their reply to be filed.

### b.      There has been no undue delay.

Prejudice may result from delay by the movant in requesting leave to amend, but the passage of time alone is usually not enough to deny leave to amend. In most cases, a court will deny leave to amend only if the non-moving party is in fact prejudiced by the delay. *Security Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1009 (6th Cir. 1995). *In Bridgeport Music, Inc. v. Dimension Films*, the Sixth Circuit ruled that the defendant would be unfairly prejudiced if required to respond to a distinct new claim with only a few weeks of discovery remaining in the case. 410 F.3d 792, 805–807 (6th Cir. 2005) ("*Bridgeport*"). Unlike *Bridgeport*, however, discovery is in the early stages in the Relevant Cases, and there is no discovery schedule in any of those cases. Undue delay cannot be shown. There are no Rule 16 orders in any of the cases which are the subject of this Motion, no deadlines for the amendments of complaints, and no other scheduling orders in place that would be disturbed if the Motion were to be granted.

Further, since the automotive parts cases began, defendants have routinely and repeatedly advocated before the Court that these cases all involve separate conspiracies and have secured advantageous rulings from the Court on that basis. As a result of the timing of DOJ's announcements of various steps in its investigation such as indictments and guilty pleas and the stay of discovery that was until recently in place, only piecemeal information was being made available to Plaintiffs concerning the massive breadth and scope of the interrelated conspiracy. As a result, only defendants knew the true nature of their unlawful conduct and, until recently, Plaintiffs lacked sufficient information to permit them to allege the facts and claims set forth in the Proposed CAC (Ex. A.). Additionally, as stated, *supra*, one defendant who is the leniency applicant in almost all of the cases at issue in this Motion chose to stagger its cooperation with Plaintiffs to support the joint defense group strategy. It is ADPs' contention that this applicant failed to provide full, timely, and satisfactory cooperation per the Antitrust Criminal Penalty

Enhancement and Reform Act, 15 U.S.C. § 1 note ("ACPERA").[28] Moreover, the joint defense group in the Relevant Cases insisted that the conduct alleged in these cases involved separate conspiracies that ***just happened*** to arise during the same time period; involved the same actors; were directed at the same victims; and were carried out in the same way. It also sought to create the misleading impression that these cases are all separate and independent.

Only through painstaking analysis of information provided by certain defendants under the DOJ leniency program, information provided by certain settling defendants, and independent research and analysis have Plaintiffs recently been able to cut through DENSO's and defendants' smokescreen about the ostensible existence of separate conspiracies to allege the single conspiracy set forth in the Proposed CAC (Ex. A.). Because it was the conduct of DENSO and its co-conspirators which first created and concealed the conspiracy, and then misled the Plaintiffs about its scope, these defendants should not be permitted to benefit from that conduct and now argue that there has been any undue delay in seeking to amend the complaints in the Relevant Cases.

Further, the goals of Rule 1 would be satisfied if the proposed amendments are permitted because, in many ways, the parties are already proceeding as if the cases were consolidated. For example, as set forth above, depositions of Plaintiffs are being taken by defendants for use in all automotive parts cases because, unlike Direct Purchaser Plaintiffs, their transactions are the same for the purposes of all cases. Likewise, ADPs, other plaintiff groups, individual plaintiffs, and defendants across *Auto Parts* are jointly working together to pursue discovery from nonparty OEMs. The next logical—and just—step is to permit Plaintiffs to be masters of their claims and to allege the overall conspiracy that they believe the facts support so that they may seek recoveries on behalf of the classes.

---

[28] For example, the leniency applicant's discussion of the collusive *tomoe-kai* meetings (*i.e.*, annual meetings of key officials of three of the top former *keiretsu*-type companies) described in the Proposed CAC – which description is ***not*** based upon information from the leniency applicant -- came many years after these cases commenced, and was cursory and failed to meaningfully describe the relevant conduct.

### c. There has been no bad faith.

Some courts have denied leave to amend because the amendment is a reassertion of a previously abandoned claim or claims already dismissed. *Louisiana v. Litton Mortgage Co.*, 50 F.3d 1298, 1303–1304 (5th Cir. 1995) (plaintiff's attempt to reassert RICO claim that was abandoned was indicative of bad faith and dilatory motive, and at minimum, was inartful pleading). There is no, nor could any reasonable party suggest the existence of, bad faith or dilatory motive on the part of Plaintiffs. Plaintiffs' goal is to present this case to the Court and a jury that will hear it in the way that most accords with the facts. Plaintiffs have nothing to gain by intentionally delaying bringing this Motion; rather, they have done so in a considered and deliberate manner after ascertaining the information that supports the Motion and the allegations in the Proposed CAC (Ex. A.).

### d. Amendment would not be futile.

Some circuits have denied leave to amend if the amended complaint would not be able to withstand a dispositive motion. *See, e.g.*, *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). Defendants may argue that the proposed amendments are futile because, among other reasons, the DOJ did not charge the defendants with the same conspiracy alleged here. This Court has already rejected that argument when made by defendants in *HCP*, and it should be rejected again for the same reasons:

> The fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action. *Id.* at 1011. Relatively few defendants plead guilty to all of the charges against them, and the limitations on government resources may play as much a role in the agreement as the conduct involved. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-665 (7th Cir. 2002).

*In re Auto Parts Antitrust Litig.* (*HCP*), 2014 U.S. Dist. LEXIS 61636, * 125 (E.D. Mich. April 30, 2014). Given the size, scope, and complexity of *Auto Parts*, and the number of plea agreements and the amount of criminal fines, amendment would patently serve the ends of justice and efficiency.

### III. CONCLUSION

**REDACTED**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion to Consolidate Claims and Amend Complaints.

Date: January 7, 2016                              Respectfully submitted,

_/s/_ Jonathan W. Cuneo

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Evelyn Li
**Cuneo Gilbert & LaDuca, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
David McMullan
Brian Herrington
**BARRETT LAW GROUP, P.A.**
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone:  (662) 834-2488
Facsimile:   (662)834-2628
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Shawn M. Raiter
**LARSON · KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone:  (651) 312-6500
Facsimile:   (651) 312-6618
sraiter@larsonking.com

23

**REDACTED**

*Interim Co-Lead Class Counsel for  Dealership Plaintiffs*

Gerard V. Mantese
(Michigan Bar No. P34424)
**Mantese Honigman
 and Williamson, P.C.**
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 607-9200
gmantese@manteselaw.com

*Interim Liaison Counsel for Dealership Plaintiffs*

**REDACTED**

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2016, I caused the foregoing AUTO DEALER PLAINTIFFS' NOTICE OF MOTION AND MOTION TO CONSOLIDATE CLAIMS AND AMEND COMPLAINTS to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Jonathan W. Cuneo*
Jonathan W. Cuneo

REDACTED

# EXHIBIT A

**REDACTED**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE AUTOMOTIVE PARTS ANTITRUST LITIGATION | Master File No. 12-md-02311 |
| | Honorable Marianne O. Battani |
| | Master Gene J. Esshaki |

| | |
|---|---|
| In Re: Instrument Panel Clusters | 2:12-cv-00202 |
| In Re: Fuel Senders | 2:12-cv-00302 |
| In Re: Heater Control Panels | 2:12-cv-00402 |
| In Re: Alternators | 2:13-cv-00702 |
| In Re: Windshield Wipers | 2:13-cv-00902 |
| In Re: Radiators | 2:13-cv-01002 |
| In Re: Starters | 2:13-cv-01102 |
| In Re: Ignition Coils | 2:13-cv-01402 |
| In Re: Motor Generators | 2:13-cv-01502 |
| In Re: HID Ballasts | 2:13-cv-01702 |
| In Re: Inverters | 2:13-cv-01802 |
| In Re: Fuel Injection Systems | 2:13-cv-02202 |
| In Re: Power Window Motors | 2:13-cv-02302 |
| In Re: Automatic Fluid Transmission Warmers | 2:13-cv-02402 |
| In Re: Valve Timing Control Devices | 2:13-cv-02502 |
| In Re: Air Conditioning Systems | 2:13-cv-02702 |
| In Re: Windshield Washer Systems | 2:13-cv-02802 |
| In Re: Spark Plugs | 2:15-cv-03002 |

| | |
|---|---|
| THIS DOCUMENT RELATES TO: ALL AUTOMOBILE DEALERSHIP ACTIONS | CONSOLIDATED AMENDED COMPLAINT |

Plaintiffs Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers");

Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); V.I.P. Motor Cars Ltd. ("Plaintiff

V.I.P."); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Panama City Automotive

Group, Inc. d/b/a John Lee Nissan ("Plaintiff John Lee"); Rainbow Chevrolet, Inc., d/b/a Cutter

Chevrolet ("Plaintiff Rainbow"); Stoebner Holdings, Inc. d/b/a Honda Windward ("Plaintiff

Windward"); McGrath Automotive Group, Inc. ("Plaintiff McGrath"); Green Team of Clay Center

Inc. ("Plaintiff Green Team"); Lee Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham

1

**REDACTED**

("Plaintiff Topsham"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda");

Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth

Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"); Commonwealth Nissan, Inc.,

d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"); Commonwealth Volkswagen,

Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Hodges

Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Patsy Lou Chevrolet, Inc.

("Plaintiff Patsy Lou"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Cannon Nissan of

Jackson, LLC ("Plaintiff Cannon Nissan"); Hammett Motor Company, Inc. ("Plaintiff Hammett");

John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Ancona Enterprise, Inc. d/b/a Frank

Ancona Honda ("Plaintiff Ancona"); Landers McLarty Lee's Summit Mo, LLC d/b/a Lee's

Summit Chrysler Dodge Jeep Ram and d/b/a Lee's Summit Nissan ("Plaintiff Lee's Summit");

Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Table Rock

Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Bill Pearce Honda

("Plaintiff Pearce"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff

Champion"); Reno Dodge Sales, Inc. d/b/a Don Weir's Reno Dodge ("Plaintiff Don Weir"); Pitre,

Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Hartley Buick GMC Truck, Inc. ("Plaintiff

Hartley"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); John Greene Chrysler Dodge Jeep,

LLC ("Plaintiff John Greene"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet");

Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota"); Landers McLarty

Fayetteville TN, LLC ("Plaintiff Fayetteville"); Central Salt Lake Valley GMC Enterprises, LLC,

d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Stranger Investments d/b/a

Stephen Wade Toyota ("Plaintiff Wade"); Apex Motor Corporation ("Plaintiff Apex"); Shearer

Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Ramey Motors, Inc. ("Plaintiff Ramey");

**REDACTED**

Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); and Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland") (collectively "Plaintiffs"), file this Consolidated Class Complaint on behalf of themselves and all others similarly situated (the "Classes" as defined below).

Plaintiffs, on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment, and allege as follows:

## NATURE OF ACTION

1. This lawsuit is brought as a proposed class against Defendants (all as defined below and named and unnamed co-conspirators, manufacturers and/or suppliers of certain automotive parts defined below) globally and in the United States for engaging in a long-running conspiracy to unlawfully fix, raise, maintain, and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for these automotive parts. In 2013, then-United States Attorney General Eric Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. business, and U.S. consumers. As a result of these conspiracies, Americans paid more for the cars."

2. As the ringleader, DENSO (defined below) coordinated this multi-automotive part conspiracy involving most of the largest automotive parts suppliers in the world. Plaintiffs paid artificially inflated prices for cars containing certain automotive parts as a result of

REDACTED

anticompetitive and unlawful conduct by DENSO and its co-conspirators.  The automotive parts cartel consisted of the following defendant groups, which are described in further detail below:

a.  DENSO Corp., DENSO International America, Inc., DENSO International Korea Corp., DENSO Korea Automotive Corp., DENSO Products & Services Americas, ASMO Co., Ltd., ASMO North America, LLC, ASMO Greenville of North Carolina, Inc., ASMO Manufacturing, Inc., and ASMO North Carolina Inc. (collectively, "**DENSO**");

b.  Aisan Industry Co., Ltd., Aisan Corp. of America, Franklin Precision Industry, Inc., and Hyundam Industrial Co., Ltd. (collectively, "**Aisan**");

c.  Aisin Seiki Co., Ltd. and Aisin Automotive Casting, LLC (together, "**Aisin Seiki**");

d.  Alps Automotive, Inc., Alps Electric (North America), Inc., and Alps Electric Co., Ltd. (collectively, "**Alps**");

e.  Calsonic Kansei Corp. and Calsonic Kansei North America, Inc. (together, "**Calsonic**");

f.  Continental Automotive Systems, Inc., Continental Automotive Electronics, LLC, and Continental Automotive Korea Ltd. (collectively, "**Continental**");

g.  Delphi Automotive LLP and Korea Delphi Automotive Systems Corp. (together, "**DELPHI**");

h.  Diamond Electric Mfg. Co., Ltd. and Diamond Electric Mfg. Corp. (together, "**Diamond**");

i.  Keihin Corp. and Keihin North America, Inc. (together, "**Keihin**");

**4**

j.      Koito Manufacturing Co., Ltd. and North American Lighting, Inc. (together, "**Koito**");

k.      MAHLE Behr GmbH & Co. KG and MAHLE Behr USA Inc. (together, "**Mahle Behr**");

l.      Mikuni America Corp. ("**Mikuni**");

m.      Mitsuba Corp. and American Mitsuba Corp. (together, "**Mitsuba**");

n.      Mitsubishi Electric Corp., Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc. (collectively, "**MELCO**");

o.      Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., and Mitsubishi Heavy Industries Climate Control, Inc. (collectively, "**Mitsubishi Heavy**");

p.      NGK Spark Plugs (U.S.A.) Holding, Inc., NGK Spark Plugs (USA) Inc., NGK Spark Plugs Co. Ltd., and NTK Technologies, Inc. (collectively, "**NGK**");

q.      Robert Bosch LLC and Robert Bosch GmbH (together, "**Bosch**");

r.      Sanden International (U.S.A.) Inc. ("**Sanden**");

s.      Showa Denko K.K. and Showa Aluminum Corp. of America (together, "**Showa Denko**");

t.      Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc. (collectively, "**Stanley**");

u.      Tokai Rika Co., Ltd. and TRAM, Inc. (together, "**Tokai Rika**");

v.      Toyo Denso Co. Ltd. and Weastec, Inc. (together, "**Toyo Denso**"); and

**REDACTED**

      w.      Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp. (collectively, "**Valeo**")

(all as defined below and, collectively, hereinafter "Defendants or co-conspirators").

      3.      DENSO and its co-conspirators manufacture, market, and/or sell automotive parts throughout and into the United States. DENSO and its co-conspirators (both known and unknown) agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids, and allocate the market and customers in the United States, and in addition specifically engaged in conduct targeting *at least* the following automotive parts: Instrument Panel Clusters, Fuel Senders, Heater Control Panels, Alternators, Windshield Wiper Systems, Radiators, Starters, Ignition Coils, Motor Generators, HID Ballasts, Inverters, Fuel Injection Systems, Power Window Motors, Automatic Transmission Fluid Warmers, Valve Timing Control Devices, Air Conditioning Systems, Windshield Washer Systems, and Spark Plugs (collectively, "Automotive Parts") (*see* **Appendix A**). The following charts identify the Automotive Parts with the corresponding Defendants.

6

REDACTED

# Parts & Manufacturers



**Instrument Panel Clusters**
Continental • Denso • Nippon Seiki • Yazaki

**Fuel Senders**
Denso • Yazaki

**Automatic Transmission Fluid Warmers**
Calsonic Kansei • Denso • T.RAD

**Power Window Motors**
Denso • Mitsuba

**Motor Generators**
Denso • Hitachi

**Ignition Coils**
Denso • Diamond Electric • Hitachi • Melco • Toyo Denso

**Inverters**
Denso • Hitachi

**Fuel Injection Systems (Inc. Air Flow Meters & Electronic Throttle Bodies)**
Aisan • Bosch • Denso • Hitachi • Keihin Mikuni • Mitsuba • Melco

**Valve Timing Control Devices**
Aisin Seiki • Delphi • Denso • Hitachi • Mikuni • Melco

**Air-Conditioning Systems**
Denso • Calsonic Kansei • MAHLE BEHR Mitsubishi Heavy • Sanden Showa Denko • Valeo

**Heating Control Panels**
Alps • Denso • Sumitomo Tokai Rika

**Windshield Wipers**
Bosch • Denso • Mitsuba

**Windshield Washer Motors**
Denso • Mitsuba

**Spark Plugs**
Denso • Denso • NGK

**High Intensity Discharge Ballasts**
Denso • Koito • Melco Stanley Electric

**Radiators**
Denso • Mitsuba • T.Rad Calsonic Kansei

**Starters**
Bosch • Denso • Hitachi Mitsuba • Melco

**Alternators**
Denso • Hitachi • Mitsuba • Melco Bosch

1

**REDACTED**

## Parts Index



4.      The vehicles affected by DENSO's conspiracy include some of the most popular automobiles sold throughout the world and in the United States from the late 1990s to the present. These vehicles include, but are not limited to:

5.      In the late 1990s, Carlos Ghosn, of European OEM Renault, became the chief executive officer of Japanese OEM Nissan Corporation. In that capacity, he disbanded Nissan's keiretsu-type system. This action had serious consequences for all Japanese automotive parts makers, not just those that were part of the Nissan keiretsu-type system.

2

**REDACTED**

6.       When Nissan disbanded its keiretsu in the late 1990's in favor of cutting costs and spurring competition among its automotive suppliers, Toyota (and other OEMs) followed suit to meet this new competitive environment. Toyota's *keiretsu* companies included DENSO, Toyoda Gosei, AISIN SEIKI, KOITO, TOKAI RIKA, and AISAN. In response, the Toyota *keiretsu* companies sought to preserve their existing Toyota business by having discussions among themselves and unlawfully entering into a collusive agreement with other automotive parts suppliers, whose way of doing businesses was also now at risk. Defendants, their co-conspirators, and other suppliers were quick to agree and join the conspiracy because they also did not want to lose their valuable existing keiretsu-type business customers (*e.g.*, HITACHI was afraid of losing Nissan, MELCO was afraid of losing Mitsubishi). Defendants entered into the collusive, anticompetitive agreements alleged herein based on what they called their "shōken" or "commercial rights," a code term for their claimed right not to be subject to open competition for their customers' business because they were the OEM's "incumbent suppliers." Their unlawful anticompetitive arrangements were intended to preserve the status quo of their customer allocation among the Defendants while the keiretsu system was undergoing major changes and uncertainties.

7.       DENSO colluded with those in the Toyota keiretsu to preserve their "shōken" as to their respective supply arrangements with Toyota, their OEM. DENSO also colluded with additional companies to preserve its share of Toyota's business even if it meant not competing for other manufacturer's business, like Suzuki. Denso instructed other Toyota keiretsu companies to do the same so that Toyota would continue to award business to Toyota keiretsu companies. DENSO threatened to take away other suppliers' current business with OEMs if they tried to encroach on its Toyota business. DENSO was able to do this because of its status as the major automotive parts industry player. Other Defendants and co-conspirators, aware of these

3

REDACTED

unlawful bid-rigging and customer allocation agreements, copied this behavior, *i.e.*, engaging in confidential discussions and reaching anticompetitive agreements with other automotive parts suppliers, all as part of a coordinated effort among Defendants and their co-conspirators to protect their business from competition after their *keiretsu*-type systems had been disbanded by the OEMs.

*8.*     In 2000, DENSO was the fourth largest auto parts supplier in the world and the largest auto parts supplier based in Japan. The next largest Japanese auto parts supplier was AISIN SEIKI (also a Toyota *keiretsu* company) at number 10 and Yazaki (non-*keiretsu*) at number 13. DENSO had the most to lose to competition if it did not collude with Defendants and other co-conspirators. DENSO was much larger than other big automotive parts suppliers like MELCO and HITACHI. Defendants sought to preserve their existing business with OEMs during this period, while major changes were occurring in the Japanese automotive supply business, particularly with respect to the disintegration of the well-established automotive keiretsu arrangements, and willingly entered into collusive agreements with DENSO. Given DENSO's size and resources, if the other Defendants and co-conspirators did not cooperate with DENSO and join the conspiracy, DENSO could have punished them by threatening to take their business away. This collusive conduct continued during the Class Period because it worked so well—all Defendants and their co-conspirators were winning because, based on their collusive understandings and arrangements, they were not losing their automotive supply business to competition.

9.     Defendants' massive and long-running conspiracy to unlawfully fix, raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Automotive Parts. The following illustrations depict the massive conspiracy led by DENSO involving    dozens of the largest automotive suppliers in the world.

4

**REDACTED**

10.     Defendants conspired to avoid competing with each other on the basis of price and to avoid taking business from each other. Among the means by which Defendants and their co-conspirators carried out their conspiracy were:

**REDACTED**



## The Conspiracy

Everyone's involved.

**REDACTED**

## The Conspiracy



Denso's at the center.

11. The vehicles affected by DENSO's conspiracy include some of the most popular cars sold throughout the world and in the United States from the late 1990s to the present. These cars include, but are not limited to:

REDACTED

**Toyota Camry**

**Toyota Corolla**





**Honda Accord**

**Honda Civic**





**Honda CR-V**

**Mazda 6**





**Kia Forte**

**Hyundai Genesis**

**REDACTED**





**Lexus RX350**

**Toyota Tundra**





**Toyota Sequoia**

**Toyota Yaris**





**9**

**REDACTED**

**Acura RDX**



**Subaru Legacy**



**Mitsubishi Galant**



**Subaru Grand Vitara**



12.     Plaintiffs seek to represent all automobile dealers in the United States who, during the period from and including June 1997 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period"), purchased a new four-wheeled passenger automobile, van, sports utility vehicle, crossover, or pick-up truck (collectively, "Vehicles") that included an Automotive Part manufactured by Defendants. For purposes of this Consolidated Complaint, "Automotive Part" means any automotive part made by DENSO or at least one other Defendant or co-conspirator and sold to an OEM, including, but not limited to, Toyota Motor

**10**

**REDACTED**

Corporation, Honda Motor Company, Ltd., American Honda Motor Company, Inc., Fuji Heavy Industries (Fuji Heavy Industries markets its vehicles under the "Subaru" brand), Mazda Motor Corporation, Mazda Motor of America, Inc., Mitsubishi Motors, Mitsubishi Motors North America, Daihatsu, Daewoo, Jaguar, Land Rover, Kia, Nissan Motor Company Ltd., Nissan North America, Inc., Suzuki Motor Corporation, Audi, Volkswagen, Volvo, Daimler, Isuzu, BMW, General Motors, Ford Motor Company, Chrysler Group, and Aston Martin. Defendants manufacture, market, and sell Automotive Parts throughout the world and in and into the United States.DENSO's conspiracy began no later than June 1997, and ended no earlier than February of 2010.

## CONSPIRACY ALLEGATIONS

13.     DENSO was the ringleader of this multi-part conspiracy, and all of the other Defendants and their co-conspirators willingly agreed to and did conspire with DENSO and by doing so, conspired with each other. A key part of the conspiracy was annual meetings of key officials of three of the top former *keiretsu*-type companies, DENSO, MELCO, and HITACHI. These meetings were called "Tomoe-kai" meetings.

**TOMOE-KAI MEETINGS**

14.     DENSO, HITACHI, and MELCO were leaders of the Toyota, Nissan, and Mitsubishi *keiretsu*-type systems, respectively. Beginning at least as early as May of 2001, senior officials of DENSO, HITACHI, and MELCO held clandestine Tomoe-kai meetings to coordinate the activities of their own employees and of the co-conspirators. Such meetings took place on at least the following dates at secret locations:

May 15, 2001;

October 15, 2002;

October 15, 2003;

**REDACTED**

May 24, 2004;

May 12, 2005;

May 9, 2006;

March 12, 2007;

July 30, 2007;

June 10, 2008; and

July 2, 2009.

No meeting was held in 2010 because law enforcement investigators began to discovery the conspiracy in February of 2010.

15.     Sometimes  code words were used to refer to the participants in the Tomoe-kai meetings. For example, HITACHI would refer to MELCO as "Himeji" and DENSO as "Kariya." A HITACHI document prepared in 2008, and which includes the instruction "*<Delete after reading>*," describes the Tomoe-kai meetings as "*[r]ound-table conference attended by the tops* from" DENSO and MELCO, *i.e.*, "executive officers." Among the purposes of the meetings was, "*[i]n case that coordination at the field level goes wrong, arrangements are made for the tops to be able to coordinate at the end to make sure there will be merits to each of the three companies*." In the 2008 document HITACHI officials reported internally on the Tomoe-kai meeting held in 2008, and state:

■     Held  in  June  with  [MELCO]  organizing  @  Takanawa  "Kaitokaku  (████
████)"

■     Notification of member change

■     No disagreements in particular. Confirmed to defend market share, *at all costs*, of the Japan coalition.

**12**

(emphases added)

16.     Then United States Attorney General Eric Holder described the Tomoe-kai meetings as follows:

> Company executives [met] face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to.

### GOTENBA-KAI MEETINGS

17.     So-called "Gotenba-kai" meetings were held three times a year and included DENSO, MELCO, and HITACHI. These meetings were called "Gotenba-kai" because they were held in the outskirts of Gotenba in Japan. The purpose of these meetings was to coordinate the pricing of electric components and discount rates. The reason why three meetings were held each year was to (1) exchange demand information at the beginning of the year, (2) coordinate figures in the summer, and (3) follow up in the fall.

18.     DENSO also served as the facilitator and intermediary among the Defendants, sometimes establishing links between other conspirators, and at other times acting as the link between conspirators who did not interact directly. Set forth below are just a few illustrative examples of DENSO acting in its capacity as the link between other Defendants and co-conspirators in effectuating their unlawful big-rigging, price fixing, and market allocation conspiracy.

### DENSO, DIAMOND, HITACHI COLLUSION

19.     In 2007, Fuji Heavy Industries issued an RFQ to DENSO, HITACHI, MELCO, and DIAMOND for engine parts. At that time, DIAMOND was an incumbent supplier of Fuji Heavy Industries. Mr. ███ of DENSO called Mr. ███ of HITACHI to inform Mr. ███

13

REDACTED

that DENSO had spoken to DIAMOND, and that this discussion led to an agreement whereby DENSO would submit a collusive bid that would let DIAMOND win the business. The rationale for this was that DIAMOND was Fuji's supplier pursuant to Defendants' agreed-upon market division, *i.e.*, the "Japan Coalition."

20.     HITACHI objected to the agreement that DENSO had reached with DIAMOND, as it desired to supply the part to Fuji. In a telephone call between Mr. ▮▮▮▮ and Mr. ▮▮▮▮ and a subsequent meeting in August of 2007, at DENSO's headquarters, HITACHI persuaded DENSO to refrain from bidding to try to win the business with Fuji. Notwithstanding DENSO's agreement to stand down, DENSO conveyed to HITACHI that Fuji was DIAMOND's business and DENSO continued to try to persuade HITACHI not to compete with DIAMOND for the Fuji business in order to preserve the broader collusive relationship amongst suppliers that DENSO and its co-conspirators had established. Among the threats made were that DIAMOND would seek to take away some of HITACHI's Nissan business if HITACHI competed for the Fuji business. After a further meeting between DENSO and HITACHI on October 23, 2007, HITACHI agreed with DENSO not to compete with DIAMOND for the Fuji business and carried out this agreement by deliberately submitting a losing bid for the Fuji business.

21.     As alleged in the immediately preceding paragraphs, HITACHI and DIAMOND collusively rigged the bidding for the Fuji RFQ response without ever dealing with each other directly. Instead, DENSO was the ringleader, and acted as the intermediary to effectuate this collusive agreement. DENSO's interest was in preserving and maintaining the larger cooperative relationship through which the Defendants fixed the prices of many automotive parts.

22.     This coordination led to unforeseen complications for DENSO and HITACHI. Hanshin was a supplier to HITACHI that stood to profit had HITACHI won the Fuji RFQ, and was upset that the price was coordinated without its knowledge. Hanshin expressed its

**14**

REDACTED

unhappiness to HITACHI, which responded by allowing Hanshin to pursue "protected" business

in the European market.

23.     DENSO objected to this, as it viewed Hanshin as a threat which would disrupt the

scheme it already had in place in Europe. DENSO demanded that Hanshin withdraw entirely

from Europe, and in return Hanshin demanded that DENSO make a 50% capital investment in

Hanshin

24.     In March 2009, ████████████ and Mr. ████ of DENSO met with Hanshin,

rejected the offer to make a 50% capital investment in Hanshin, and insulted Hanshin. Mr.

████████, the President of Hanshin, stormed out of the meeting and vowed to compete globally

in response to DENSO's "declaration of war."

25.     In order to prevent this, DENSO pressured HITACHI into purchasing a majority

share of Hanshin and replacing Mr. ████████ so that the collusive scheme DENSO had put in

place would be preserved.


### DENSO, AISAN, AND HITACHI COLLUSION

26.     Before it was disbanded by Toyota, DENSO was the leader of the Toyota

*keiretsu*. AISAN was part of the Toyota *keiretsu*, and was introduced to HITACHI by DENSO.

Before AISAN had entered the market in 2001, HITACHI was Nissan's exclusive supplier of

electronic throttle bodies.

27.     Before DENSO's introduction, HITACHI had approached AISAN in 2003 but

had been rebuffed. This led to HITACHI winning business from Nissan for the 2003 ZK3

engine, but at a disadvantageous price, because AISAN competed with HITACHI for the

business.

28.    In October of 2003, ███████████ and ███████████ of DENSO mediated a meeting between AISAN's ███████████, ███████████, Mr. Funesaki, Mr. ███████, and Mr. Tsunekawa of HITACHI. At this time, DENSO was already coordinating conduct with AISAN, and hoped to broker a peace between HITACHI and DENSO so that HITACHI would coordinate their conduct and refrain from competing.

29.    As a result of this meeting, AISAN agreed to meet and exchange information with HITACHI. This agreement was reached as a result of pressure placed on AISAN by DENSO.

30.    On November 13, 2003, Mr. Funesaki of HITACHI spoke with Mr. ███████ of AISAN to set up a meeting to discuss a "business relationship." At a meeting on October 29, 2004, Mr. Funesaki of HITACHI met with Mr. ███████ of AISAN and the two agreed that their companies would refrain from competing against each other so that they could insure profitability and preserve their companies' respective market shares. The two agreed that AISAN would supply 25% of Nissan's electronic throttle bodies, and HITACHI would supply 75% of Nissan's electronic throttle bodies. This unlawful agreement remained in place for many years.

31.    Thereafter, HITACHI and AISAN continued to exchange confidential competitive information about their business plans and their customers.

32.    On September 19, 2007, Mr. ███████ and Mr. ██████ of AISAN met with Mr. Itakura and Mr. ███████ of HITACHI to discuss pricing for parts for the HK and ZV engines, and the sourcing of an upcoming common engine. An email on November 14, 2007 reflects the fact that HITACHI and AISAN agreed to raise prices for these parts.

33.    On July 11, 2008, Mr. Tsunekawa and Mr. ███████ of HITACHI met with AISAN's Mr. ███████ and Mr. ██████ to continue discussions on teflon coated electronic throttle bodies. They agreed on exact prices to be quoted and to allow AISAN to win this business in China and North America.

**REDACTED**

34.     After AISAN had expressed its desire to increase prices, HITACHI demanded Nissan increase its price for the V6 engine in North America or find a new supplier.

35.     AISAN's collusion with HITACHI about these prices took place as a result of DENSO's role as the mediator and persuading AISAN to collude with HITACHI.

### DENSO, HITACHI, AND KEIHIN COLLUSION

36.     In February of 2005, DENSO employees had a telephone call with HITACHI employees. During this call, DENSO's employees said DENSO would decide upon prices between it and KEIHIN, and would then report back to HITACHI about what those prices would be.

37.     Mr. ▮▮▮▮ of DENSO spoke with Mr. ▮▮▮▮ of HITACHI regarding pricing for the Honda CRV and Accord. The two agreed to make a table containing the prices contemplated by DENSO, HITACHI, and KEIHIN. On December 26, 2006, Mr. ▮▮▮▮ and Mr. ▮▮▮ of HITACHI met at DENSO with Mr. ▮▮▮▮ and Mr. ▮▮▮ of DENSO regarding RFQs for the Honda CRV and Accord. DENSO told HITACHI that KEIHIN would not "raise its hand" for these products. As a result, HITACHI and DENSO won the business for these two products.

### DENSO, AISIN SEIKI, HITACHI COLLUSION

38.     After DENSO, AISIN SEIKI was the next largest member of the former Toyota *Keiretsu*. DENSO was a conduit between HITACHI and AISIN SEIKI for engine parts sold in North America. DENSO tried to persuade HITACHI to refrain from competing with AISIN SEIKI in order to permit AISIN to win business from Nissan. In August, September, and October of 2007, HITACHI and DENSO discussed a Nissan RFQ for engine parts relating to United States markets. During these meetings, DENSO suggested to HITACHI that it agree to share some of the business with AISIN SEIKI. This suggestion was made during a meeting between Mr. ▮▮▮▮ and Mr. ▮▮▮ of HITACHI with Mr. ▮ of DENSO. In September of 2007,

17

**REDACTED**

these same people met along with Mr. ▆▆▆▆ of DENSO. During this meeting, DENSO told HITACHI it would not seek to take any of this business because it was AISIN's "zone."

39.     There are many other examples of DENSO, Defendants, and their co-conspirators engaging in the conspiracy alleged herein. While a primary means of carrying out the conspiracy was the agreement not to compete for the business of OEMs, in some instances it was not possible to simply adhere to prior divisions of customers or markets because, for example, new products were being developed or customers specifically asked for responses to RFQs or price reductions. In these instances, DENSO, Defendants, and their co-conspirators would coordinate their responses to the OEMs in order to carry out their conspiracy. Set forth below are just a few examples of this type of collusive conduct.

### DENSO AND HITACHI COLLUSION

40.     In or about 2009, General Motors issued an RFQ for motor generators for its GFE hybrid vehicle for which manufacturing was to start in 2013. In September 2009, HITACHI reached out to ▆▆▆▆ of DENSO International America, Inc. to claim priority, on the grounds that HITACHI was already developing a motor generator for GM. DENSO America then emailed DENSO Japan to hand-off discussions to Japan.

41.     On September 28, 2009, Tomiya Itakura, Kazunobu Tsunekawa, and ▆▆▆▆ ▆▆▆▆ of HITACHI and ▆▆▆▆, ▆▆▆▆, ▆▆▆▆, and ▆▆▆▆ ▆▆▆▆ of DENSO met at DENSO's office. DENSO told HITACHI it did not think it could meet GM's technical specifications, but did want to bid close to HITACHI to be considered for future GM business. The next day, Mr. ▆▆▆▆ and Mr. ▆▆▆▆ spoke over the phone twice. On the first call, HITACHI gave DENSO its price, and DENSO agreed to raise its price on the second call. The same two individuals spoke on October 2, 2009, both expressing that it would look awkward if the bids were too far apart. HITACHI was awarded this business.

**18**

REDACTED

## DENSO AND MITSUBA COLLUSION

42.     In 2008, Nissan issued a bundled sourcing request for many vehicles including the X12G and X12H Leaf models and the Armada X61J. Mr. ███████ of DENSO and Mr. ███████ of MITSUBA spoke over the phone, exchanging proposed bids. DENSO agreed to bid higher than MITSUBA. MITSUBA won both Leaf models and the Armada business.

## DENSO AND NGK COLLUSION

43.     In 2005, Honda issued an RFQ to DENSO and NGK for spark plugs in the model year 2008 Accord, which included both the L4 and V6 engines. NGK was the incumbent for the L4 business, and DENSO was the incumbent for the V6 business. Throughout August, September, and October of that year, Mr. ██████ and Mr. ███████ of DENSO and Mr. ██████ and Mr. ██████ of NGK discussed NGK's proposal to swap business and exchanged proposed bids. NGK would bid lower and win the V6 business for strategic reasons relating to future bids, and DENSO would bid lower and win the L4 business as compensation and preserve business for each other. On January 11, 2006, DENSO's ████████ and NGK's Mr. ██████ met in person to confirm the agreement that NGK would win the PZEV L4 and V6 Accord business, and DENSO would win non-PZEV L4 business. Honda awarded the business consistent with DENSO's and NGK's prior agreement.

## DENSO, CALSONIC AND T.RAD COLLUSION

44.     Fuji Heavy Industries issued an RFQ for radiators and cooling fans for its 2012 Impreza and FR models in 2008. CALSONIC was the incumbent supplier for these products in the Impresa. Mr. ██████ and Mr. ██████ of CALSONIC and Mr. ███████ and Mr. ██████ of DENSO met twice in August 2008, exchanging bids and agreeing that DENSO would bid higher

**19**

than CALSONIC for the Impreza bid, and CALSONIC would bid higher than DENSO for the FR, a new vehicle that DENSO wanted given its *keiretsu* relationship with Toyota. DENSO also met separately with T.RAD's Mr. Tomura, Mr. ▮▮▮▮, and Mr. ▮▮▮▮ regarding the FR. DENSO shared its proposed bid, and T.RAD agreed not to bid "unnecessarily" low. As planned, CALSONIC won the Impreza business, and DENSO won the FR business.

### DENSO AND T.RAD COLLUSION

45.     Honda issued an RFQ in 2005 for radiators and cooling fans in the 2008 model year Fit. DENSO and T.RAD held multiple phone calls and in-person meetings about this RFQ. Mr. ▮▮, Mr. ▮▮▮, Mr. ▮▮▮, Mr. ▮▮▮, and Mr. ▮▮▮▮▮ were involved for DENSO, and Mr. Tomura was involved for T.RAD. T.RAD was the incumbent supplier for all radiators, and both T.RAD and DENSO were supplying some cooling fans. Honda's RFQ covered multiple regions, including the U.S. In their communications, DENSO and T.RAD agreed that DENSO would submit higher bids than T.RAD in all regions, including the U.S, with the exception of China and Thailand.

### DENSO, DIAMOND, HITACHI COLLUSION

46.     Subaru issued an RFQ in the first half of 2007 to DENSO, DIAMOND, and HITACHI for ignition coils to be installed in vehicles with the H4 engine. DIAMOND was the incumbent supplier. In August 2007, DENSO's ▮▮▮▮▮▮▮▮ talked with DIAMOND's ▮▮▮▮▮ and ▮▮▮▮▮▮▮ and HITACHI's ▮▮▮▮▮▮. DENSO informed DIAMOND that it would respect DIAMOND's "commercial rights," and exchanged a planned bid that was higher than DIAMOND's. HITACHI replied to DENSO that it needed to have internal discussions, but would meet at a later date. The three companies met again on October 23, 2007. Mr. ▮▮▮▮, Mr. ▮▮▮, and Mr. ▮▮▮▮▮ were in attendance. Both DENSO and

20

REDACTED

HITACHI agreed to respect DIAMOND's "commercial rights" as the incumbent and not submit bids at all. DIAMOND was awarded the business.

### DENSO, MELCO, DIAMOND, AND TOYO DENSO COLLUSION

47.     In February 2006, GM issued an RFQ to DENSO, MELCO, DIAMOND, and TOYO DENSO for ignition coils. DENSO was the incumbent supplier for ignition coils in the L850 and HFV6 engines. MELCO was the incumbent supplier for the Generation 4 engine. DENSO's ████████ and MELCO's Hideyuki Saito and Mr. ████ met on February 21, 2006. At the meeting, DENSO agreed to bid higher for the Generation 4, and MELCO agreed to bid higher for the L850 and HFV6. The two exchanged bids to effectuate this preservation of their commercial rights. A March 2, 2006 phone call and an in-person meeting between DENSO's Mr. ████ and MELCO's ████████ on approximately March 16, 2006 confirmed the agreement to coordinate bids. At that March 15, 2006 meeting, MELCO informed DENSO that it was also coordinating with DIAMOND. ████████ of MELCO and ███ ████ of DIAMOND also participated in these discussions. ████████ of DENSO America then contacted Mr. ████ of DIAMOND on March 5, 2006, which resulted in an agreement to respect both DENSO's and MELCO's "commercial rights." As a result, DIAMOND told GM it would not submit a bid at all.

48.     DENSO also had discussions with TOYO DENSO. TOYO DENSO, a Toyota Group company, won the L850 engine. DENSO won the HFV6 business, and MELCO won the Generation 4 as the conspirators planned.

### DENSO AND TOYO DENSO COLLUSION

49.     Honda issued an RFQ for ignition coils for V6 engines in the 2012 model year to DENSO and TOYO DENSO. HITACHI, the current supplier at the time, was withdrawing from this business. Mr. ████, Mr. ████, and Mr. ████████ of DENSO had communications



REDACTED

with ████████, ████████, and ████████ of TOYO DENSO. On October 19, 2009, DENSO's Mr. ████████ and Mr. ████████ met with TOYO DENSO's Mr. ████████ and Mr. ████. Proposed bids were exchanged, and DENSO informed TOYO DENSO that it intended to bid lower than TOYO DENSO. As planned, DENSO won the business.

### DENSO, AISIN SEIKI, AND HITACHI COLLUSION

50.     In February and April 2003, DENSO spoke with AISIN SEIKI and HITACHI following a joint RFQ issued by BMW and Peugeot called the Prince Project. Mr. ████ of DENSO and ████████ of AISIN SEIKI were involved. AISIN SEIKI asked DENSO to give AISIN SEIKI priority to win the business, and DENSO agreed. The two exchanged bids, and DENSO subsequently submitted a higher bid than AISIN SEIKI's. As planned, DENSO did not win the business.

### DENSO, MIKUNI, HITACHI, AISIN SEIKI, AND MELCO COLLUSION

51.     In 2004, Suzuki issued an RFQ to DENSO, MIKUNI, HITACHI, AISIN SEIKI, and MELCO for Valve Control Timing Devices—Variable Valve Timing Systems ("VVT"), Oil Control Valves ("OCV"), and Solenoid Valves ("VCT")—for the JB and KB engines to be installed in the Vitara model. MIKUNI communicated with DENSO, arguing it should have "commercial rights" to the VVT because MIKUNI already had similar business. MIKUNI also requested that DENSO meet with HITACHI and AISIN SEIKI. After those meetings, HITACHI and AISIN SEIKI agreed to respect MIKUNI's "commercial rights," and DENSO allowed MIKUNI to win by bidding higher. In August 2004, after Suzuki requested a second round of bidding, MIKUNI sent DENSO a proposal that included final bids from MIKUNI, HITACHI, and DENSO. Following Suzuki's third round of bidding, it was agreed that DENSO and MIKUNI would submit quotes for only VCT and OCV, and HITACHI and MELCO would only submit quotes for OCV. DENSO won the VCT in the KB engine, and MIKUNI won the VCT in

REDACTED

the KB and both for the JB engine.


### DENSO, HITACHI, AND MELCO COLLUSION

52.     Mazda issued an RFQ in 2006 to DENSO, HITACHI, and MELCO for variable valve timing systems, a Valve Timing Control Device, to be installed in the V-6 engine for the CX9 model. DENSO was the incumbent supplier for this part, and had phone calls with both MELCO and HITACHI to allocate business and coordinate bids. DENSO's Mr. ███ and MELCO's Mr. ███ spoke and agreed that MELCO would respect DENSO's "commercial rights" and bid higher than DENSO. Mr. ███ also spoke with HITACHI's Mr. ███. The two exchanged bids and agreed DENSO would be allowed to submit a lower bid. As planned, DENSO ultimately won the business.

### DENSO AND KEIHIN COLLUSION

53.     As of 2005, DENSO and KEIHIN had an arrangement by which they collaboratively manufactured and sold electronic throttle bodies, part of the Fuel Injection System, to Honda (the "Collaborative Product"). Beginning in 2005, KEIHIN began manufacturing its own electronic throttle body, which ostensibly competed against the Collaborative Product. In 2005, Honda issued two separate RFQs for electronic throttle bodies to be installed in the Honda Accord, Model Year 2008. The first RFQ was issued to DENSO and KEIHIN together for the Collaborative Product. The second RFQ was issued to KEIHIN for its electronic throttle body that ostensibly competed against the Collaborative Product. In late 2005, KEIHIN and DENSO met in-person to discuss their bids for both the Collaborative Product and the electronic throttle body that was to be manufactured and sold by KEIHIN. ███████ attended for DENSO and ████████████ and ████████ attended for KEIHIN. During the meeting, the parties discussed the bids that would be submitted for both the Collaborative

23

REDACTED

Product and KEIHIN's electronic throttle body. DENSO and KEIHIN believed that Honda had a preference for the Collaborative Product. The parties agreed that KEIHIN would submit a slightly lower bid for its electronic throttle body than DENSO and KEIHIN would submit for the Collaborative Product. As planned, Honda awarded the business to DENSO and KEIHIN for the Collaborative Product.

### DENSO, STANLEY, KOITO, MELCO, AND PANASONIC COLLUSION

54.     In or around October 2001, DENSO, STANLEY, KOITO, MELCO, and PANASONIC met to discuss market shares and bid levels for HID Ballasts and lamps sold to Nissan, Mazda, Fuji Heavy Industries, Daihatsu, Isuzu, Toyota, and Honda. They agreed on a minimum bid level, and they agreed that they would discuss specific RFQs amongst themselves in smaller groups rather than at high-level, multi-defendant meetings. They also agreed that they would discuss bid levels in 2002 or 2003 if there was a need to revisit the levels they had agreed upon due to, for example, price reduction requests from OEMs.

### DENSO, HITACHI, MELCO, MIKUNI, AND AISAN COLLUSION

55.     In August 2008, Mazda issued an RFQ for electronic throttle bodies, part of the Fuel Injection System for the I4 Next Generation Direct Injection Engine. Between September and October 2008, DENSO participated in telephone calls with AISAN, HITACHI, MIKUNI, and MELCO to coordinate their bids. During these telephone calls, the companies exchanged bids and agreed to respect DENSO's commercial rights. DENSO's ████████, ████████, ████, ████████, and ████████ participated in the phone calls along with MELCO's ████████ and ████████ and MIKUNI's ████████. AISAN was resistant to coming to an agreement until the very end, but ended up agreeing to not submit a quote at all. As planned, Mazda ultimately awarded the business to DENSO.

### DENSO AND BOSCH COLLUSION

24

**REDACTED**

56.     Isuzu issued RFQs in 2001 and 2002 for a particular type of engine. BOSCH was the incumbent supplier for these engines, and DENSO was generally the incumbent supplier for Isuzu. DENSO's Mr. ███, Mr. ███, Mr. ████, and Mr. ██ met with BOSCH's Mr. ████, among others, and both generally agreed to respect each other's business. In line with this, DENSO generally retained its Isuzu business, and BOSCH retained the specific Isuzu engine business at issue in the RFQs.

## DENSO, PANASONIC, MELCO, STANLEY, AND KOITO COLLUSION

57.     In 1998, PANASONIC requested a meeting to discuss MELCO's bid for HID ballasts. ██████, ████████, and ██████████ attended on behalf of DENSO; ████ attended on behalf of MELCO; ██████████ or ██████████ attended on behalf of STANLEY ELECTRIC; ███████ attended on behalf of KOITO; and it is unclear who attended on behalf of PANASONIC. In 1998, the companies agreed to minimum bids for the 2000 year models for ballasts. The parties also agreed to an administration fee or maximum handling fee of 10%. In 2000, PANASONIC hosted a meeting in Tokyo. Nissan had initiated a revival plan for its business and was looking to drastically reduce prices by 30% over the next three years. PANASONIC called the meeting to inform all the participants that it would have to lower its bids in order to retain their business. In October 2001, the parties (KOITO, STANLEY, DENSO, and PANASONIC) met at DENSO's Tokyo office. The companies exchanged their bids regarding market shares and agreed on new, coordinated bids for the years 2002 and 2003 in light of PANASONIC's announcement regarding Nissan's revival plan.

## DENSO AND MELCO COLLUSION

58.     Fuji issued an RFQ in 2001 for electronic throttle bodies, part of the Fuel Injection System, to be installed in the model year 2004 Legacy. DENSO and MELCO, who both received the RFQ, agreed to coordinate bids, because MELCO was the incumbent supplier

25

REDACTED

for similar electronic throttle bodies in the Subaru Impreza. DENSO's Mr. █████ met with MELCO's Mr. █████ and Mr. █████ to discuss the basis for MELCO having incumbency supplier rights. DENSO ultimately agreed to respect MELCO's "commercial rights" for this part and allow MELCO to submit a lower bid. As planned, MELCO would go on to win the business for electronic throttle bodies in the Legacy.

### DENSO, MELCO, AND KOITO COLLUSION

59.     In August 2001, MELCO asked DENSO about its prospective bid for an HID ballast. DENSO and MELCO met together in Tokyo to discuss the level of DENSO's bid because MELCO was interested in maintaining its incumbency. An e-mail from DENSO to KOITO instructed KOITO to not disturb MELCO's incumbency.

60.     DENSO and KOITO had discussions between 2009 and 2010 regarding HID lamps and ballasts. DENSO and KOITO both sought to maintain their 50% share of Toyota's business, and continued to discuss with each other how to do so through collusion.

### DENSO AND HITACHI COLLUSION

61.     In late 2005, Honda issued an RFQ to DENSO and HITACHI for air flow meters, part of the fuel injection system, to be installed in the 2008 model year Fit engines. Mr. █████, Mr. █████, and Mr. █████ of DENSO met with Mr. █████ and Mr. █████ of HITACHI to discuss the RFQ. At this meeting, DENSO and HITACHI agreed that the business would be allocated so that DENSO would be allowed to win the NP2 engine, and HITACHI would be allowed to win the NP1 and NP4 engines. After effectuating this arrangement, the business was awarded in this manner.

### DENSO AND YAZAKI COLLUSION

62.     In 2001, Toyota issued an RFQ for the 2006 Toyota Tundra, with a subsequent RFQ in 2004. YAZAKI was the incumbent supplier. During a meeting between DENSO and

YAZAKI in Japan, YAZAKI requested that DENSO respect its commercial rights for the part. DENSO agreed and as a result, YAZAKI won the business. █████████ participated in this exchange, along with others, on behalf of DENSO. Mr. ████████ and ███████████ participated on behalf of YAZAKI.

63. The above-named participants also conspired in 2007 during discussions on the Toyota Sienna 580L. Toyota issued an RFQ, for which DENSO was the incumbent supplier. DENSO and YAZAKI discussed this RFQ either over the phone or in person, as well as in YAZAKI's engineering office in Detroit, Michigan. DENSO and YAZAKI agreed to respect each other's "commercial rights." As a result, DENSO won the business.

64. During 2001 and 2002, Toyota was implementing a cost-reduction program for fuel senders. To that end, Toyota was pressuring DENSO and YAZAKI – the only two competitors for Toyota's fuel senders business since 2001 – to reduce the prices of fuel senders. DENSO and YAZAKI exchanged information regarding the demands Toyota was placing upon them, and engaged in discussions regarding the RFQs for the Toyota Tacoma and Toyota Avalon in 2002. Specifically, they exchanged prices and adjusted bids. The parties came to the understanding that YAZAKI would win the bid for the Toyota Tacoma and DENSO would win the bid for the Toyota Avalon, as was consistent with their "commercial rights." The parties exchanged their bid prices, and both parties followed through with their illicit mutual agreement: as previously agreed, YAZAKI won the Toyota Tacoma business, and DENSO won the Toyota Avalon business.

65. DENSO and YAZAKI communicated during the first half of 2002 regarding Toyota's RFQ for the Tacoma and Avalon. Consistent with their "commercial rights," the parties agreed that YAZAKI would retain the business for the Tacoma and that DENSO would retain

the business for Avalon. The parties exchanged bids with each other, and after adjusting their prices accordingly, YAZAKI won the Tacoma business, and DENSO won the Avalon business.

### DENSO AND MITSUBA COLLUSION COLLUSION

66.     In 2003, Honda issued an RFQ for front wiper and washer systems for the 2006 MY Honda Civic. DENSO was the incumbent supplier in the United States and MITSUBA was the incumbent supplier outside the United States. At the time, Honda had decided to follow a dual-supplier policy for the sourcing because it sought to bring in more suppliers. DENSO agreed to respect MITSUBA as one of the two Honda suppliers and to bid higher for the market outside of the United States. At the end of 2003 and into early 2004, DENSO communicated with MITSUBA to confirm their respective bids. As a result of their collusive conduct, both parties were able to maintain their respective market shares: DENSO won the business for the United States region, and MITSUBA won the business for the non-U.S. regions.

67.     Between 2008 and 2009, Honda issued an RFQ for windshield washer systems in the 2011 Honda Civic (development code: 2HC). DENSO was the incumbent supplier in the United States and MITSUBA was the incumbent supplier outside the United States. DENSO and MITSUBA both wanted to retain their respective incumbencies and held discussions to exchange bids. During these discussions, the parties agreed to respect each other's markets. As a result, DENSO won the business for the U.S. market and MITSUBA won the business for the non-U.S. market.

### DENSO, SUMITOMO, TOKAI RIKA, AND ALPS COLLUSION

68.     In 2007, DENSO, SUMITOMO, TOKAI RIKA, and ALPS colluded to allocate Heater Control Panels installed in the 2010 Toyota Sienna. The RFQ was issued to the above-named participants and concerned the front manual HCP, rear manual HCP, and rear automatic HCP. SUMITOMO was the incumbent for the front manual HCP and TOKAI RIKA was the

28

**REDACTED**

incumbent for the rear manual HCP. DENSO, SUMITOMO, and TOKAI RIKA met in the United States and Japan and agreed to allocate the front manual HCP business to SUMITOMO, the rear manual HCP business to TOKAI RIKA, and the automatic HCP business to DENSO. SUMITOMO then met with ALPS to coordinate the remaining parts of the RFQ, and agreed that ALPS would not pursue the business so as not to disrupt the plan. ALPS agreed, and Toyota ultimately awarded the business consistent with Defendants' plan.

### SUMITOMO AND DENSO COLLUSION

69.     In 2009, Toyota issued an RFQ for high-grade HCPs for the 2012 Next Generation Avalon to DENSO and SUMITOMO, amongst others. DENSO was the incumbent supplier and coordinated with SUMITOMO to maintain its business. After the first bid, Toyota suspended the RFQ and re-issued it in late 2009. In response to this second RFQ, SUMITOMO and DENSO again coordinated and agreed to allow DENSO to win. Toyota ultimately awarded the business to DENSO as Defendants had planned.

### DENSO AND CONTINENTAL COLLUSION

70.     In February 2004, an RFQ was issued for the Hyundai Genesis. ███████████ from DENSO discussed this RFQ with ██████████ or ███████████ of CONTINENTAL, and DENSO agreed to bid higher for the part so CONTINENTAL could retain its incumbency. As agreed, CONTINENTAL won the business.

71.     On December 6, 2005, an RFQ was issued for the Kia Forte, with bids due on December 26, 2005. ████████████ from DENSO and ██████████ or ███████████ from CONTINENTAL discussed the RFQ over the phone, and CONTINENTAL agreed to bid higher for the part, allowing DENSO to retain its incumbency. As a result of this agreement, DENSO won the instrument panel clusters business.

29



72.     In early 2008, CONTINENTAL approached DENSO about establishing an agreement to respect each company's market share. DENSO contacted CONTINENTAL to arrange an in-person meeting to discuss this issue. Both parties agreed to meet, and ███████ ██ and ████████ from DENSO secretly met with CONTINENTAL General Manager ███ █████ and ████████ or ███ (████████ boss) at Blowfish Restaurant around January 2008 in Seoul, Korea. During the meeting, Continental indicated that it had been significantly harmed by the loss of the Hyundai Sonata YF. Similarly, DENSO indicated that it had been harmed by the loss of the XM (Kia Sorento). Both companies agreed that they should talk more in the future, and in February 2008, DENSO and CONTINENTAL reached an agreement to generally not compete for each other's customers' business going forward. Subsequent to this meeting, DENSO and CONTINENTAL exchanged a document that contained anticipated RFQs that would be released in 2009. The document indicated which company was incumbent supplier for each RFQ, essentially showing how the business should be allocated between both companies. Both companies signed this document.

73.     On August 7, 2008, an RFQ was issued for the Hyundai Grandeur (Azera). ████ ████████ from CONTINENTAL requested that DENSO submit a price within a price range provided by CONTINENTAL. ████████ from DENSO agreed to do so, and as a result, CONTINENTAL won the RFQ.

74.     On October 8, 2008, an RFQ was issued for the Hyundai Veloster. ████████ from CONTINENTAL called ████████ from DENSO and discussed the RFQ. During the conversation, DENSO agreed to submit a higher bid, and as a result, CONTINENTAL won the RFQ.

## DENSO AND NIPPON SEIKI COLLUSION

75.     In 2003 or 2004, DENSO and NIPPON SEIKI had contact regarding the Cadillac

CTS. DENSO was the incumbent supplier for the predecessor model, and NIPPON SEIKI

submitted a low price without DENSO's knowledge, winning the desired business. DENSO and

NIPPON SEIKI met and discussed sourcing and NIPPON SEIKI's low bid, and ███████████

from DENSO informed ████████████ from NIPPON SEIKI that going forward, NIPPON

SEIKI would be interested in conducting collusive discussions.

76.     In 2002, there was an RFQ for the 2005 Legend. The vehicle was manufactured in

Japan, but may have been sold as the Acura RL in the United States. ███████████ of

DENSO discussed this RFQ with ███████████ of NIPPON SEIKI. During these

discussions, DENSO agreed to bid higher for the parts because it was not interested in winning a

small volume business. DENSO believed it had submitted a bid higher than NIPPON SEIKI in

its effort to allow NIPPON SEIKI to win this RFQ, but actually bid lower than NIPPON SEIKI.

███████ of DENSO contacted ████████ of NIPPON SEIKI to inform him of this error, so

NIPPON SEIKI lowered its price. As a result, NIPPON SEIKI won the business.

## DENSO AND SANDEN COLLUSION

77.     In 2006 or 2007, ███████████, ███████████, ███████████, ███████ and

███████████ of DENSO met with ███████████, ███████████, and ███████████ of

SANDEN, regarding air conditioner compressors for General Motors' automobiles referred to as

Gamma, Epsilon, and Zeta Platforms.  SANDEN was the incumbent supplier for the Epsilon

Platform compressor business and DENSO was the incumbent for the Zeta Platform business.

With regard to the Gamma Platform, DENSO was the incumbent supplier for European business,

while DELPHI was the incumbent supplier for other regions.  During the meeting between

SANDEN and DENSO, SANDEN agreed to respect DENSO's existing business.  As a result,

the incumbents kept their respective business.  SANDEN won the business for the Epsilon Platform.  DENSO won the business for the Zeta Platform and the European business for the Gamma Platform.  DELPHI won the non-European business for the Gamma Platform.

### DENSO AND VALEO COLLUSION

78.     In 2007, ██████, ████████, and ████████████ of DENSO met with individuals from VALEO, in Tokyo, Japan, regarding the air conditioner compressor for a General Motors V8 engine.  VALEO and DENSO discussed General Motors splitting the business between the two companies.  DENSO won some of this compressor business.

### DENSO, MITSUBISHI HEAVY, SANDEN, AND VALEO COLLUSION

79.     During 2008 and 2009, DENSO met multiple times with its competitors regarding air conditioning compressors for General Motor's Wave 1 of the Next Generation Gamma Platform, M300 Platform, and the T300 Platform, which included the Chevy Spark, GSV SUV, Chevrolet Trax, Buick Encore, Chevrolet Aveo, and Chevrolet Sonic.

> a.     Prior to GM issuing the RFQ for these vehicles on June 16, 2009, DENSO AND MITSUBISHI HEAVY met on January 31, 2008 (████████ of DENSO with ██████████ and █████ of MITSUBISHI HEAVY); April 2009; and June 4, 2009.  DENSO and MITSUBISHI HEAVY discussed DENSO winning the Gamma portion of the RFQ (GSV SUV and T300), DENSO not seriously competing for the M300 portion of the RFQ, and GM splitting its business between the two suppliers.  Meetings between DENSO AND MITSUBISHI HEAVY occurred on January 31, 2008 (████████ of DENSO with ████████████ and █████ of MITSUBISHI HEAVY); February 2008; March 31; April 2009; June 4, 2009.  After the RFQ was issued, during July and August of 2009,



████████ and ████████ for DENSO and ████████ and ████████ for MITSUBISHI HEAVY exchanged general bid ranges, and discussed, among other things, submitting higher bids than they had submitted for a Suzuki vehicle and bidding above General Motor's target bid rate.

b.    DENSO also had discussions with SANDEN regarding this RFQ.  Prior to GM issuing the RFQ, DENSO and SANDEN discussed in Japan and the United States, among other things, MHI attempting to win the air conditioning compressor business in North America; DENSO wanting to win the GSV, SUV, and T300 business.  These discussions involved ████, ████████, ████████, and ████████ of DENSO, and ████████, ████████, ████████, and ████████ of SANDEN.

c.    DENSO and VALEO also had discussions about bids for General Motors.  In 2008, DENSO and VALEO had calls during which they discussed their general bid ranges.  ████████ and ████████ of DENSO were involved with the communications with VALEO about these bids.

**DENSO AND SHOWA COLLUSION**

80.    From January 2001 to December 2003, DENSO and SHOWA had contacts regarding condensers for Honda vehicles, including the Honda CRV and Honda Civic.  During this time period ████████, ████████, ████████, and ████████ of DENSO and ████████ for SHOWA discussed bids after RFQs were issued, discussed a floor for bids, agreed on bids, and agreed to respect incumbent suppliers.

**DENSO, VALEO, AND BEHR COLLUSION**

81.     From at least 2005 to 2009, DENSO, VALEO, and BEHR would meet and exchange information several times per year in Germany about competition and sales to German OEMs such as Volkswagen, Audi, BMW, and Daimler.  These communications involved at least ▮▮▮▮▮▮ and ▮▮▮▮ of DENSO, ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮, and ▮▮▮ ▮▮▮▮ of VALEO, and ▮▮▮▮▮▮, and ▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮ of BEHR.  Meetings occurred on at least November 11, 2005; February 16, 2006; April 11, 2006; July 21, 2006; August 3, 2006; July 10, 2007; November 26, 2007; March 12, 2008; November 20, 2008; January 29, 2009; August 4, 2009; October 23, 2009; December 2, 2009; August 5, 2010; and in October or November 2011.  At these meetings the parties discussed bidding, maintaining similar bid ranges for certain RFQs, and their intentions for business.

82.     These are just a few examples of DENSO's role in the center of and as a principal organizer of this conspiracy.  There are many more instances of which DENSO and its co-conspirators are aware and which will be the subject of discovery.

83.     The U.S. Department of Justice's ("DOJ") Antitrust Division is nearing the conclusion of a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry. As part of the criminal investigation, the DOJ has uncovered information about unlawful anticompetitive conduct in the market for automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry. These raids precipitated the orchestrated destruction of documents by many Defendants. This document destruction was directed by executives of Defendants, and has led to the loss of evidence reflecting the criminal conduct engaged in by Defendants.

84.     Set forth below are certain of the plea agreements by and criminal charges against Defendants and their executives in the United States.

34

85. **DENSO Corporation** has pled guilty in the United States to violating the Sherman Antitrust Act, 15 U.S.C. §1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. DENSO conspired with each Defendant and co-conspirator named in this Consolidated Complaint.

86. **Aisan Industry Co., Ltd**. has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix prices of Automotive Parts manufactured and sold in the United States and elsewhere. AISAN conspired with DENSO.

87. **Aisin Seiki Co. Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. AISIN SEIKI conspired with DENSO.

88. **Mitsubishi Electric Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to allocate the supply of Automotive Parts sold in the United States and elsewhere. MELCO conspired with DENSO.

89. **Robert Bosch GmbH** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. §1, for its role in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. BOSCH conspired with DENSO.

90. **Continental Automotive Electronics LLC** and **Continental Automotive Korea Ltd** have each pled guilty in the United States to charges of violating the Sherman Antitrust Act, 15 U.S.C. § 1, for their roles in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. CONTINENTAL conspired with DENSO.

**REDACTED**

91.    **Tokai Rika Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. TOKAI RIKA also pled guilty to violating 18 U.S.C. § 1519 by destroying and hiding evidence in order to conceal its wrongdoing, thus obstructing justice. TOKAI RIKA conspired with DENSO.

92.    **Diamond Electric Mfg. Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. DIAMOND ELECTRIC conspired with DENSO.

93.    **Koito Manufacturing Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. KOITO conspired with DENSO.

94.    **Mitsuba Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. MITSUBA also pled guilty to violating 18 U.S.C. § 1519 by destroying and hiding evidence in order to conceal its wrongdoing, thus obstructing justice. MITSUBA conspired with DENSO.

95.    **Stanley Electric Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. STANLEY conspired with DENSO.

96.    **Valeo Japan Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the

**REDACTED**

prices of Automotive Parts manufactured and sold in the United States and elsewhere. VALEO conspired with DENSO.

97. **Mitsubishi Heavy Industries, Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. MITSUBISHI HEAVY conspired with DENSO.

98. **Sanden Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. SANDEN conspired with DENSO.

99. **Hitachi Automotive Systems, Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. HITACHI conspired with DENSO.

100. **Nippon Seiki Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. NIPPON SEIKI conspired with DENSO.

101. **Panasonic Corporation** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of Automotive Parts manufactured and sold in the United States and elsewhere. PANASONIC conspired with DENSO.

102. **T.RAD Co., Ltd.** has pled guilty in the United States to a charge of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to fix the prices of

**REDACTED**

Automotive Parts manufactured and sold in the United States and elsewhere. T.RAD conspired with DENSO.

103.    In addition to the corporate defendants described in the paragraphs above, the following employees of these companies have pled guilty to conduct relating to the conspiracy alleged in this Consolidated Complaint.

104.    **Kazuaki Fujitani**, a DENSO employee and Japanese national, pled guilty in the United States to violating 18 U.S.C. § 1512(c)(1) by corruptly destroying and concealing records and documents with the intent to impair their integrity or availability for use in an official proceeding and agreed to serve one year and one day in a U.S. prison.

105.    **Makoto Hattori**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 14 months in a U.S. prison and pay a $20,000 criminal fine.

106.    **Satoru Horisaki**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $20,000 criminal fine.

107.    **Norihiro Imai**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $20,000 criminal fine.

108.    **Yuji Suzuki**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a

REDACTED

conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 16 months in a U.S. prison and pay a $20,000 criminal fine.

109. **Hiroshi Watanabe**, a DENSO employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

110. **Tsuneaki Hanamura**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve two years in a U.S. prison and pay a $20,000 criminal fine.

111. **Kazuhiko Kashimoto**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 14 months in a U.S. prison and pay a $20,000 criminal fine.

112. **Ryoji Kawai**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve two years in a U.S. prison and pay a $20,000 criminal fine.

113. **Shigeru Ogawa**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 15 months in a U.S. prison and pay a $20,000 criminal fine.

114. **Toshio Sudo**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating

**REDACTED**

in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 14 months in a U.S. prison and pay a $20,000 criminal fine.

115.   **Hisamitsu Takada**, a YAZAKI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 15 months in a U.S. prison and pay a $20,000 criminal fine.

116.   **Shigehiko Ikenaga**, a DIAMOND employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $5,000 criminal fine.

117.   **Tatsuo Ikenaga**, a DIAMOND employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 13 months in a U.S. prison and pay a $5,000 criminal fine.

118.   **Kosei Tamura**, a T.RAD employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve one year and one day in a U.S. prison and pay a $20,000 criminal fine.

119.   **Takashi Toyokuni**, a HITACHI employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 15 months in a U.S. prison and pay a $20,000 criminal fine.

120.   **Kazumi Umahashi**, a MITSUBA employee and Japanese national, pled guilty in the United States to one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry and was sentenced to serve 13 months in a U.S. prison and pay a $20,000 criminal fine.

121.   In addition to the individuals who have pled guilty or agreed to plead guilty in relation to the conspiracy alleged in this Consolidated Complaint as identified above, the following individuals have been indicted for conduct relating to the conspiracy alleged in this Consolidated Complaint.

122.   **Hitoshi Hirano**, a TOKAI RIKA employee and Japanese national, was indicted in the United States on May 22, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

123.   **Hiroyuki Komiya,** a MITSUBA employee and Japanese national, was indicted in the United States on February 5, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

124.   **Hirofumi Nakayama**, a MITSUBA employee and Japanese national, was indicted in the United States on February 5, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

125.   **Norio Teranishi,** an NGK employee and Japanese national, was indicted in the United States on May 21, 2015 on one count each of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

REDACTED

126.     **Hisashi Nakahishi**, an NGK employee and Japanese national, was indicted in the United States on May 21, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

127.     **Michitaka Sakuma**, a T.RAD employee and Japanese national, was indicted in the United States on May 14, 2015 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

128.     **Ken Funasaki,** a HITACHI employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

129.     **Kazunobu Tsunekawa,** a HITACHI employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

130.     **Tomiya Itakura**, a HITACHI employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

131.     **Atsushi Ueda ("UEDA"),** a MELCO employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry.

**REDACTED**

132. **Minoru Kurisaki ("KURISAKI"),** a MELCO employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry. KURISAKI was also indicted on one count of Obstruction of Justice, for violating: 18 U.S.C. § 1512(c)(1) by corruptly destroying and concealing records, documents, or other documents with the intent to impair their integrity or availability for use in an official proceeding; 18 U.S.C. § 1512(b)(2)(B) for corruptly persuading or attempting to corruptly persuade other persons with intent to cause or induce those other persons to destroy or conceal records and documents with the intent to impair their integrity or availability for use in an official proceeding; and 18 U.S.C. § 1519 for destroying, concealing, or covering up any record, document, or tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department or agency of the United States.

133. **Hideyuki Saito ("SAITO"),** a MELCO employee and Japanese national, was indicted in the United States on September 18, 2014 on one count of violating the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a conspiracy to suppress and eliminate competition in the automotive parts industry. SAITO was also indicted on one count of Obstruction of Justice, by violating: 18 U.S.C. § 1512(c)(1) for corruptly destroying and concealing records, documents, or other documents with the intent to impair their integrity or availability for use in an official proceeding; 18 U.S.C. § 1512(b)(2)(B) for corruptly persuading or attempting to corruptly persuade other persons with intent to cause or induce those other persons to destroy or conceal records and documents with the intent to impair their integrity or availability for use in an official proceeding; and 18 U.S.C. § 1519 for destroying, concealing, or covering up any record, document, or tangible object with the intent to impede, obstruct, and

43

**REDACTED**

influence the investigation and proper administration of any matter within the jurisdiction of any department or agency of the United States.

### DEFENDANTS' CONSPIRACY CAUSED AMERICAN BUSINESSES AND AUTOMOBILE DEALERS TO PAY MORE THAN THEY SHOULD HAVE

134.    On September 26, 2013, then-United States Attorney General Eric Holder presented the DOJ's findings as of that date in the ongoing automotive parts investigation. He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automotive parts sold to U.S. car manufacturers." Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."

135.    The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.6 billion in criminal fines. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers. The Japanese Fair Trade Commission ("JFTC") and the Korean Fair Trade Commission ("KFTC") have also conducted investigations, levied fines, and made findings of collusion in the automotive parts industry.

136.    Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry and to fix, stabilize, and maintain the price of automotive parts sold to automobile manufacturers and automobile dealers

44

REDACTED

throughout the world and in the United States. The combination and conspiracy engaged in by Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment.

137.    Plaintiffs and class members paid higher prices for components of the Vehicles they bought.

138.    As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for automotive parts during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

139.    Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection laws, and the common law of unjust enrichment, and seek to obtain restitution, recover damages and secure other relief against Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

140.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state

**REDACTED**

different from Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

141.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

142.    This Court has *in personam* jurisdiction over Defendants because Defendants, either directly or through the ownership and/or control of their subsidiaries, inter alia: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of automotive parts throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conducted business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

143.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

144.    The activities of Defendants and their co-conspirators directly targeted the United States' vehicle market and were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

145.    Automotive parts manufactured abroad by Defendants and sold for use in automobiles in the United States, or sold as parts integrated into automobiles which are imported and sold in the United States, are goods brought into the United States for sale, and therefore constitute import commerce. To the extent any automotive parts are purchased in the United States, and such automotive parts do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

146.    By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for automotive parts, which conspiracy unreasonably restrained trade and adversely affected the market for automotive parts.

147.    Defendants' conspiracy and wrongdoing described herein adversely affected automobile dealers in the United States who purchased vehicles which included one or more Automotive Parts.

**REDACTED**

## PARTIES

### Plaintiffs

148.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota, Scion dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Landers purchased and received the afore-mentioned Vehicles in Arkansas.

149.     Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California. Plaintiff Empire Nissan is an authorized Nissan dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Empire Nissan purchased and received the afore-mentioned Vehicles in California.

150.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California. Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff V.I.P. purchased and received the afore-mentioned Vehicles in California.

151.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized Nissan dealer. During the Class Period, Plaintiff Lee was an authorized Nissan, GMC, Pontiac, Oldsmobile, and Jeep dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators.  Plaintiff Lee purchased and received the afore-mentioned Vehicles in Florida.

152.     Plaintiff John Lee is a Florida corporation with its principal place of business in Panama City, Florida. During the Class Period, Plaintiff John Lee was an authorized Nissan

dealer that purchased Vehicles containing Automotive Parts manufactured by the Defendants or their co-conspirators and/or their co-conspirators.  Plaintiff John Lee purchased and received the afore-mentioned Vehicles in Florida.

153.    Plaintiff Rainbow is a Hawaii corporation, with its principal place of business in Honolulu, Hawaii. Plaintiff Rainbow is an authorized Chevrolet dealer who, during the Class Period, purchased Vehicles containing Automotive Parts manufactured by the Defendants or their co-conspirators and/or their co-conspirators during the Class Period. Plaintiff Rainbow purchased and received the afore-mentioned Vehicles in Hawaii.

154.    Plaintiff Windward is a Hawaii corporation, with its principal place of business in Kaneohe, Hawaii. Plaintiff Windward is an authorized Honda dealer who purchased Vehicles containing Automotive Parts manufactured by Defendants or their co-conspirators during the Class Period. Plaintiff Windward purchased and received the afore-mentioned Vehicles in Hawaii.

155.    Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa. Plaintiff McGrath is an authorized Buick, Cadillac, Chevrolet, GMC, Pontiac, Chrysler, Jeep, Dodge, RAM, Kia, Mazda, and Volkswagen dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff McGrath purchased and received the afore-mentioned Vehicles in Iowa.

156.    Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas. Plaintiff Green Team is an authorized Jeep, Dodge, and Ram dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Green Team purchased and received the afore-mentioned Vehicles in Kansas.

157.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota and Scion dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Topsham purchased and received the afore-mentioned Vehicles in Maine.

158.     Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda, Oldsmobile, Cadillac, and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lee Honda purchased and received the afore-mentioned Vehicles in Maine.

159.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff Commonwealth Motors purchased and received the afore-mentioned Vehicles in Massachusetts.

160.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Commonwealth Nissan purchased and received the afore-mentioned Vehicles in Massachusetts.

161.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period.  Plaintiff

Commonwealth Volkswagen purchased and received the afore-mentioned Vehicles in Massachusetts.

162. Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hodges purchased and received the afore-mentioned Vehicles in Michigan.

163. Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan. Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Patsy Lou purchased and received the afore-mentioned Vehicles in Michigan.

164. Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore currently an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. During the Class Period, Plaintiff Superstore was an authorized Buick, Pontiac, GMC, and Hyundai dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators. Plaintiff Superstore bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Superstore purchased and received the afore-mentioned Vehicles in Minnesota.

165. Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon Nissan is an authorized Nissan dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants

REDACTED

and/or their co-conspirators during the Class Period. Plaintiff Cannon Nissan purchased and received the afore-mentioned Vehicles in Mississippi.

166.    Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is currently an authorized Ford dealer. During the Class Period, Plaintiff Hammett was an authorized Ford and Mercury dealer who bought Vehicles containing Automotive Parts manufactured by one or more Defendants and/or their co-conspirators. Plaintiff Hammett purchased and received the afore-mentioned Vehicles in Mississippi.

167.    Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi. Plaintiff Johnson is an authorized Toyota dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Johnson purchased and received the afore-mentioned Vehicles in Mississippi.

168.    Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period. Plaintiff Ancona was an authorized Honda dealer during the Class Period, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ancona purchased and received the afore-mentioned Vehicles in Kansas.

169.    Plaintiff Lee's Summit is a Missouri corporation with its principal place of business in Lee's Summit, Missouri. Plaintiff Lee's Summit is an authorized Chrysler, Dodge, Jeep, RAM dealer and a Nissan dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Lee's Summit purchased and received the afore-mentioned Vehicles in Missouri.

REDACTED

170.    Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Archer-Perdue purchased and received the afore-mentioned Vehicles in Nebraska.

171.    Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska. Plaintiff Table Rock is an authorized Hyundai dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Table Rock purchased and received the afore-mentioned Vehicles in Nebraska.

172.    Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period. Plaintiff Pearce was an authorized Honda dealer during the Class Period, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pearce purchased and received the afore-mentioned Vehicles in Nevada.

173.    Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada. Plaintiff Champion is an authorized Chevrolet dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Champion purchased and received the afore-mentioned Vehicles in Nevada.

174.    Plaintiff Don Weir is a Nevada corporation with its principal place of business in Reno, Nevada. Plaintiff Weir is an authorized Chrysler, Dodge and Jeep dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators

REDACTED

during the Class Period.  Plaintiff Don Weir purchased and received the afore-mentioned Vehicles in Nevada.

175.   Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick, Hummer, Pontiac, and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Pitre purchased and received the afore-mentioned Vehicles in New Mexico.

176.   Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York. During the Class Period, Plaintiff Hartley was an authorized Honda, Buick, and GM dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Hartley purchased and received the afore-mentioned Vehicles in New York.

177.   Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York. Plaintiff Westfield is an authorized Dodge dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Westfield purchased and received the afore-mentioned Vehicles in New York.

178.   Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene was an authorized Chrysler, Dodge, Jeep, RAM, Plymouth, and Oldsmobile dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff John Greene purchased and received the afore-mentioned Vehicles in North Carolina.

179.    Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon. Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Chevrolet purchased and received the afore-mentioned Vehicles in Oregon.

180.    Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon. Plaintiff Capitol Toyota is an authorized Toyota and Scion dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Capitol Toyota purchased and received the afore-mentioned Vehicles in Oregon.

181.    Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee. Plaintiff Fayetteville is an authorized Toyota and Scion dealer who bought Vehicles containing Automotive Parts manufactured by Defendants or their co-conspirators during the Class Period.  Plaintiff Fayetteville purchased and received the afore-mentioned Vehicles in Tennessee.

182.    Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah. Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Salt Lake Valley purchased and received the afore-mentioned Vehicles in Utah.

183.    Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah. Plaintiff Wade is an authorized Toyota dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Wade purchased and received the afore-mentioned Vehicles in Utah.

REDACTED

184. Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Apex purchased and received the afore-mentioned Vehicles in Vermont.

185. Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont. Plaintiff Shearer is an authorized Honda dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Shearer purchased and received the afore-mentioned Vehicles in Vermont.

186. Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia. Plaintiff Ramey was an authorized Scion, Buick, Chevrolet, Pontiac, and Oldsmobile dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Ramey purchased and received the afore-mentioned Vehicles in West Virginia.

187. Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia. Plaintiff Thornhill was an authorized Chevrolet, Buick, Pontiac, and GMC dealer, who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Thornhill purchased and received the afore-mentioned Vehicles in West Virginia.

188. Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. During the Class Period, Plaintiff Lakeland was an authorized Toyota, Scion, Honda, Mazda, and Subaru dealer who bought Vehicles containing Automotive Parts manufactured by Defendants and/or their co-conspirators during the Class Period. Plaintiff Lakeland purchased and received the afore-mentioned Vehicles in Wisconsin.

## Defendants

### DENSO Defendants

189.    Defendant **DENSO Corporation** is a corporation organized and existing under the laws of Japan. DENSO was a primary actor in designing and executing the conspiracy alleged herein. DENSO conspired to fix the prices of Automotive Parts sold to customers in the United States and elsewhere from at least as early as July 1998 until at least February of 2010. DENSO's co-conspirators include, but are not limited to, AISAN, AISIN SEIKI, MELCO, KEIHIN, MIKUNI, BEHR, BOSCH, CONTINENTAL, SHOWA, TOKAI RIKA, CALSONIC, ALPS, TOYO DENSO, DIAMOND ELECTRIC, KOITO, MITSUBA, STANLEY, NGK, NIPPON SEIKI, SUMITOMO, YAZAKI, T. RAD, HITACHI, and PANASONIC.

190.    Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of, and wholly owned and/or controlled by, its parent, DENSO Corporation. DENSO International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the class period, DENSO International America, Inc.'s activities were under the direction and control of its parent DENSO Corporation.

191.    Defendant DENSO International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. Defendant DENSO International Korea Corporation manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times

REDACTED

during the class period, DENSO International Korea Corporation's activities were under the direction and control of its parent, DENSO Corporation.

192.     DENSO Korea Automotive Corporation is a Korean corporation with its principal place in Changwon, South Korea.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  Denso Korea Automotive Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

193.     Defendant Denso Automotive Deutschland GmbH is a German company with its headquarters in Eching, Germany.  It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation.  DENSO Automotive Deutschland GmbH's President serves as one of DENSO Corporation's executive directors.  DENSO Automotive Deutschland GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Spark Plugs, Standard Oxygen Sensors, and Air Fuel Ratio Sensors that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Spark Plugs, Standard Oxygen Sensors, and Air Fuel Ratio Sensors to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

194.     Defendant ASMO Co., Ltd. is a Japanese corporation with its principal place of business in Shizuoka, Japan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. ASMO Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances.

195. Defendant ASMO North America, LLC is a Delaware corporation with its principal place of business in Statesville, North Carolina. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. ASMO North America, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales, and finances. According to DENSO's website, ASMO North America, LLC is the "[r]egional headquarters for ASMO affiliates in North America" and "coordinates the business activities of all affiliates in North America.

196. Defendant ASMO Manufacturing, Inc. is a Michigan corporation with its principal place of business in Battle Creek, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent, which controlled its policies, sales and finances. ASMO Manufacturing, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, ASMO Manufacturing, Inc.'s activities were under the direction and control of its parent DENSO Corporation.

197. Defendant ASMO Greenville of North Carolina, Inc. is a North Carolina company with its principal place of business in Greenville, North Carolina. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, DENSO Corporation. ASMO Greenville of North

REDACTED

Carolina, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

198.    Unless otherwise specified, the Denso defendants listed above shall be collectively referred to herein as "DENSO."

199.    DENSO agreed to and did conspire with each other Defendant named in this Consolidated Complaint to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. DENSO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**AISAN Defendants**

200.    Defendant Aisan Industry Co., Ltd. is a Japanese corporation with its principal place of business in Obu, Japan. Aisan Industry Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

201.    Defendant Franklin Precision Industry, Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky. Franklin Precision Industry, Inc. is a subsidiary of, and is wholly owned and/or controlled by, its parent, Aisan Industry Co., Ltd. Franklin Precision Industry, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its Japanese parent Aisan Industry Co., Ltd.

REDACTED

202. Defendant Aisan Corporation of America is an Illinois corporation with its principal place of business in Franklin, Tennessee. Aisan Corporation of America is a subsidiary of, and is wholly owned and/or controlled by, its parent, Aisan Industry Co., Ltd. Aisan Corporation of America manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its Japanese parent, Aisan Industry Co., Ltd.

203. Defendant Hyundam Industrial Co., Ltd. is a Korean corporation with its principal place of business in Asan-si, South Korea. Hyundam Industrial Co., Ltd. is a subsidiary of, and is wholly owned and or/controlled by, its parent, Aisan Industry Co., Ltd. Defendant Hyundam Industrial Co., Ltd. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its Japanese parent, Aisan Industry Co., Ltd.

204. Unless otherwise specified, the Aisan defendants listed above shall collectively referred to herein as "AISAN."

205. AISAN agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. AISAN agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**AISIN SEIKI Defendants**

61

**REDACTED**

206.     Defendant Aisin Seiki Co., Ltd. is a Japanese corporation with its principal place of business in Kariya, Japan. Defendant Aisan Seiki Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

207.     Defendant Aisin Automotive Casting, LLC is a Kentucky limited liability company with its principal place of business in London, Kentucky. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Aisin Seiki Co., Ltd. Aisin Automotive Casting, LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Aisin Automotive Casting, LLC were under the direction and control of its parent Aisin Seiki Co., Ltd.

208.     Unless otherwise specified, the Aisin Seiki defendants referred to above shall be collectively referred to herein as "AISIN SEIKI."

209.     AISIN SEIKI agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. AISIN SEIKI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**DELPHI Defendants**

210.     Defendant Delphi Automotive LLP is a public limited company incorporated under the laws of England and Wales with its principal place of business in Troy, Michigan.

Defendant Delphi Automotive LLP – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Valve Timing Control Devices that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Valve Timing Control Devices to Plaintiffs and class members.

211.    Defendant Korea Delphi Automotive Systems Corp. is a Korean corporation with its principal place of business in Daegu, South Korea. It is a subsidiary of and wholly owned and/or controlled by its parent, Delphi Automotive LLP. Korea Delphi Automotive Systems Corp. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Valve Timing Control Devices to Plaintiffs and class members. At all times during the Class Period.

212.    Defendant Delphi Powertrain Systems Korea Ltd. ("DPSK") is a limited liability company under the laws of South Korea, with its principal place of business in Changwon, South Korea.  It is a joint venture owned and/or controlled by Delphi Automotive LLP.  DPSK – directly and/or indirectly – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, DPSK's activities were under the control and direction of Delphi Automotive LLP, which controlled its policies, sales, and finances.

213.    Unless otherwise specified, the Delphi defendants referred to above shall be collectively referred to herein as "DELPHI."

214.    DELPHI agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

maintain the prices of Automotive Parts. DELPHI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers and coordinated responses to requests for price reductions made by its customers.

**MELCO Defendants**

215. Defendant Mitsubishi Electric Corporation ("MELCO") is a Japanese corporation with its principal place of business in Tokyo, Japan. MELCO —directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

216. Defendant Mitsubishi Electric US Holdings, Inc. is Delaware corporation with its principal place of business in Cypress, California. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Electric Corporation. Defendant Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Mitsubishi Electric Corporation.

217. Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Electric US Holdings, Inc. Mitsubishi Electric Automotive America, Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class

64

**REDACTED**

Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Mitsubishi Electric Corporation.

218.    Unless otherwise specified, the Mitsubishi defendants identified immediately above shall be referred to as "MELCO."

219.    MELCO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. MELCO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**KEIHIN Defendants**

220.    Defendant Keihin Corporation is a Japanese Corporation with its principal place of business in Tokyo, Japan. Keihin Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

221.    Defendant Keihin North America, Inc. is an Indiana corporation with its principal place of business in Anderson, Indiana. Keihin North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and or sold Automotive Parts throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the direction and control of its parent Keihin Corporation.

222.    Unless otherwise specified, the Keihin defendants are collectively referred to herein as "KEIHIN."

REDACTED

223.    KEIHIN agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. KEIHIN agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**MIKUNI Defendants**

224.    Defendant Mikuni Corporation is a Japanese Corporation with its principal place of business in Tokyo, Japan. Defendant Mikuni Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

225.    Defendant Mikuni American Corporation is a California corporation with its principal place of business in Northridge, California. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mikuni Corporation. Defendant Mikuni American Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Mikuni American Corporation's activities were under the direction and control of its parent Mikuni Corporation.

226.    Unless otherwise specified, the Mikuni defendants are collectively referred to herein as "MIKUNI."

227.    MIKUNI agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

maintain the prices of Automotive Parts. MIKUNI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**BEHR Defendants**

228.    Defendant MAHLE Behr GmbH & Co. KG ("BEHR") is a German corporation with its principal place of business in Stuttgart, Germany. In 2013, BEHR acquired the Air Conditioning Systems business of Behr GmbH & Co. KG, and, upon information and belief, assumed Behr's liabilities. As a result of the acquisition, BEHR – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

229.    Defendant MAHLE Behr USA Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, MAHLE Behr. MAHLE Behr USA Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

230.    Unless otherwise specified, the Behr defendants identified above shall be collectively referred to herein as "BEHR."

231.    BEHR agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of, and to fix, raise, and maintain the prices of, Automotive Parts. BEHR agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated

geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**BOSCH Defendants**

232. Defendant Robert Bosch GmbH is a German company with its headquarters in Stuttgart, Germany. Robert Bosch GmbH – directly and or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

233. Defendant Bosch Electrical Drives Co., Ltd. is a Korean company with its principal place of business in Sejong, South Korea. It is a subsidiary of, and is wholly owned by, Robert Bosch GmbH. Bosch Electrical Drives Co., Ltd. – directly and/or through its affiliates, which it wholly controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Robert Bosch GmbH.

234. Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan. It is an affiliate of, and is wholly controlled by, Bosch Electrical Drives Co., Ltd. Robert Bosch LLC – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Periods. At all times during the Class Period, its activities in the United States were under the control and direction of Robert Bosch GmbH.

235. Unless otherwise specified, the Bosch defendants referred to above shall be collectively referred to herein as "BOSCH."

236. BOSCH agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. BOSCH agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**CONTINENTAL Defendants**.

237. Defendant Continental Automotive Electronics LLC is a Korean company with its principal place of business in Bugang-myeon, South Korea. Continental Automotive Electronics LLC – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

238. Defendant Continental Automotive Korea Ltd. is a Korean company with its principal place of business in Seongnam-si, South Korea. It is an affiliate of, and wholly controlled by, Continental Automotive Electronics LLC. Continental Automotive Korea Ltd. – directly and/or through its affiliates, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Continental Automotive Korea Ltd. were controlled by its parent, Continental Automotive Electronics LLC.

239. Defendant Continental Automotive Systems, Inc. is a Delaware company with its principal place of business in Auburn Hills, Michigan. It is an affiliate of, and is wholly controlled by, Continental Automotive Electronics LLC. Continental Automotive Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

REDACTED

marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Continental Automotive Systems, Inc. were controlled by its parent, Continental Automotive Electronics LLC.

240.   Unless otherwise specified, the Continental defendants identified above shall be collectively referred to herein as "CONTINENTAL."

**SHOWA DENKO Defendants**

241.   Defendant Showa Denko K.K. is a Japanese company with its principal place of business in Tokyo, Japan. Showa Denko K.K. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

242.   Defendant Showa Aluminum Corporation of America is an Ohio corporation with its principal place of business in Mt. Sterling, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Showa Denko K.K. Defendant Showa Aluminum Corporation of America – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Showa Aluminum Corporation was under the direction and control of Showa Denko K.K.

243.   Unless otherwise specified, the Showa defendants identified above shall be collectively referred to herein as "SHOWA."

244.   SHOWA agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

REDACTED

maintain the prices of Automotive Parts. SHOWA agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**TOKAI RIKA Defendants**

245. Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Toyota, Japan. Defendant Tokai Rika Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the class period.

246. Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan Corporation with its principal place of business in Plymouth, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent Tokai Rika Co., Ltd. During the Class Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Tokai Rika Co., Ltd.

247. Unless otherwise specified, the Tokai Rika defendants identified above shall be collectively referred to herein as "TOKAI RIKA."

248. TOKAI RIKA agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. TOKAI RIKA agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers,

allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**CALSONIC Defendants**

249.    Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama, Japan. Defendant Calsonic Kansei Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

250.    Defendant Calsonic Kansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Calsonic Kansei Corporation. Defendant Calsonic Kansei North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled– manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Calsonic Kansei North America, Inc. was under the direction and control of Calsonic Kansei Corporation.

251.    Unless otherwise specified, the Calsonic defendants identified above shall be collectively referred to herein as "CALSONIC."

252.    CALSONIC agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. CALSONIC agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

REDACTED

**ALPS Defendants**

253.    Defendant Alps Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Alps Electric Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

254.    Defendant Alps Electric (North America), Inc. is a California corporation with its principal place of business in Campbell, California. It is a subsidiary of wholly owned and/or controlled by its parent, Alps Electric Co., Ltd. Defendant Alps Electric (North America), Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Alps Electric Co., Ltd.

255.    Defendant Alps Automotive Inc. is a Michigan corporation with its principal place of business in Auburn Hills, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Alps Electric Co., Ltd. Defendant Alps Automotive Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Alps Electric Co., Ltd.

256.    Unless otherwise specified, the Alps defendants identified above shall be collectively referred to herein as "ALPS."

257.    ALPS agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

maintain the prices of Automotive Parts. ALPS agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**TOYO DENSO Defendants**

258.    Toyo Denso Co. Ltd. is a Japanese Corporation with its principal place of business in Tokyo, Japan. Defendant Toyo Denso Co. Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

259.    Defendant Weastec Inc. is an Ohio corporation with its principal place of business in Hillsboro, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Toyo Denso Co. Ltd. Defendant Weastec, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Toyo Denso Co. Ltd.

260.    Unless otherwise specified, the Toyo Denso defendants identified above shall be collectively referred to herein as "TOYO DENSO."

261.    TOYO DENSO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. TOYO DENSO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers,

allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**DIAMOND ELECTRIC Defendants**

262.    Defendant Diamond Electric Mfg. Co., Ltd. is a Japanese company with its principal place of business in Osaka, Japan. Diamond Electric Mfg. Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

263.    Defendant Diamond Electric Mfg. Corporation is a Michigan corporation with its principal place of business in Dundee, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Diamond Electric Mfg. Co., Ltd. Diamond Electric Mfg. Corporation manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the direction and control of its parent Diamond Electric Mfg. Co., Ltd.

264.    Unless otherwise specified, the Diamond Electric defendants identified above shall be collectively referred to herein as "DIAMOND ELECTRIC."

265.    DIAMOND ELECTRIC agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. DIAMOND ELECTRIC agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**KOITO Defendants**

266.    Defendant Koito Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Koito – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

267.    Defendant North American Lighting, Inc. is a Michigan corporation with its principal place of business in Illinois. It is a subsidiary of, and is wholly-owned and/or controlled by, its parent, Koito Manufacturing Co., Ltd. North American Lighting, Inc. manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, North American Lighting, Inc. was under the direction and control of Koito Manufacturing Co., Ltd.

268.    Unless otherwise specified, the Koito defendants identified above shall be collectively referred to herein as "KOITO."

269.    KOITO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. KOITO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**MITSUBA Defendants**

270.    Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan. Mitsuba – directly and/or through its subsidiaries, which it wholly owned

**REDACTED**

and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

271. Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan. It is a subsidiary of, and is wholly-owned and/or controlled by, its parent, Mitsuba Corporation. American Mitsuba Corporation manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, American Mitsuba Corporation was under the direction and control of Mitsuba Corporation.

272. Unless otherwise specified, the Mitsuba defendants identified above shall be collectively referred to herein as "MITSUBA."

273. MITSUBA agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. MITSUBA agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**STANLEY Defendants**

274. Defendant Stanley Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Stanley – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

275. Defendant Stanley Electric U.S. Co., Inc. is an Ohio corporation with its principal place of business in Ohio. It is a subsidiary of, and is wholly-owned and/or controlled by, its

parent, Stanley Electric Co., Ltd. Stanley Electric U.S. Co., Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period Stanley Electric U.S. Co., Inc. was under the direction and control of Stanley Electric Co., Ltd.

276.    Defendant II Stanley Co., Inc. is a Michigan corporation with its principal place of business in Michigan. It is a subsidiary of, and is wholly-owned and/or controlled by, its parent, Stanley Electric Co., Ltd. II Stanley Co., Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Stanley Electric U.S. Co., Inc. was under the direction and control of Stanley Electric Co., Ltd.

277.    Unless otherwise specified, the Stanley defendants identified above shall be collectively referred to herein as "STANLEY."

278.    STANLEY agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. STANLEY agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**NGK Defendants**

279.    Defendant NGK Spark Plug Co., Ltd. is a Japanese corporation. NGK Spark Plug Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

REDACTED

280.     Defendant NGK Spark Plugs (U.S.A.), Inc. is a California corporation with its principal place of business in Wixom, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, NGK Spark Plug Co., Ltd. Defendant NGK Spark Plugs (U.S.A.), Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, the activities of NGK Spark Plugs (U.S.A.), Inc. were controlled by its parent NGK Spark Plug Co., Ltd.

281.     Unless otherwise specified, the NGK defendants identified above shall be collectively referred to herein as "NGK."

282.     NGK agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. NGK agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**VALEO Defendants**

283.     Valeo Japan Co., Ltd. is a Japanese corporation with its principal place of business in Gunma, Japan. Defendant Valeo Japan Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

284.     Defendant Valeo Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is an affiliate of, and is wholly controlled by, Valeo Japan Co., Ltd. Valeo Inc. – directly and/or through its subsidiaries, which it wholly owned and/or

controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

285.    Defendant Valeo Electrical Systems, Inc. is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Valeo Inc. Valeo Electrical Systems, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

286.    Defendant Valeo Climate Control Corp. is a Delaware corporation with its principal place of business in Bingham Farms, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Valeo Electrical Systems, Inc. Valeo Climate Control Corp. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

287.    Defendant Valeo S.A. is a French société anonyme with its principal place of business in Paris, France.  Valeo S.A. – directly and/or through its subsidiaries, which it wholly controlled – manufactured, marketed and/or sold Air Conditioning Systems that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such Air Conditioning Systems to Plaintiffs and Class members.

288.    Unless otherwise specified, the VALEO defendants identified above shall be collectively referred to herein as "VALEO."

289.    VALEO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. VALEO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated

geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**MITSUBISHI HEAVY Defendants**

290.    Defendant Mitsubishi Heavy Industries, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Heavy Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

291.    Defendant Mitsubishi Heavy Industries America, Inc. is a Delaware corporation with its principal place of business in New York, New York. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Heavy Industries, Ltd. Defendant Mitsubishi Heavy Industries America, Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

292.    Defendant Mitsubishi Heavy Industries Climate Control, Inc. is an Indiana corporation with its principal place of business in Franklin, Indiana. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Mitsubishi Heavy Industries, Ltd. Defendant Mitsubishi Heavy Industries Climate Control, Inc. manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

293.    Unless otherwise specified, the MITSUBISHI HEAVY defendants identified above shall be collectively referred to herein as "MITSUBISHI HEAVY."

294.    MITSUBISHI HEAVY agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and

maintain the prices of Automotive Parts. MITSUBISHI HEAVY agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**SANDEN Defendants**

295.     Sanden Automotive Components Corporation is a subsidiary and wholly owned and controlled by its parent, Sanden Holdings Corporation. Sanden Holdings Corporation is a holding company formed after the restructuring of the former Sanden Corporation. Sanden Corporation pled guilty to violations of the Sherman Act as set forth above. Sanden Automotive Components Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

296.     Sanden Automotive Climate Systems Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. It is a subsidiary of, and is wholly owned and controlled by, its parent, Sanden Holdings Corporation. Sanden Automotive Climate Systems Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period.

297.     Defendant Sanden International (U.S.A.) Inc. is a Texas corporation with its principal place of business in Wylie, Texas. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Sanden Corporation. Sanden International (U.S.A.) Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were sold and purchased throughout the United Sates, including in this District, during the Class Period.

82

**REDACTED**

298.   Unless otherwise specified, the SANDEN defendants identified above shall be collectively referred to herein as "SANDEN."

299.   SANDEN agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. SANDEN agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**HITACHI Co-Conspirators**

300.   Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Hitachi Automotive Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

301.   Hitachi Automotive Systems Americas, Inc. is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky. Hitachi Automotive Systems Americas, Inc. is a subsidiary of and wholly owned and/or controlled by its parent, Hitachi Automotive Systems, Ltd. Hitachi Automotive Systems Americas, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities were under the control and direction of its parent, Hitachi Automotive Systems, Ltd.

302.   Unless otherwise specified, the Hitachi co-conspirators identified above shall be collectively referred to herein as "HITACHI".

303.    HITACHI agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. HITACHI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers and coordinated responses to requests for price reductions made by its customers.

**NIPPON SEIKI Co-Conspirators**

304.    Nippon Seiki Co., Ltd. is a Japanese corporation with its principal place of business in Nagaoka, Japan. Nippon Seiki Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

305.    N.S. International, Ltd. is a California corporation with its principal place of business in Troy, Michigan. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Nippon Seiki Co., Ltd. Defendant N.S. International, Ltd. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Nippon Seiki Co., Ltd.

306.    New Sabina Industries, Inc. is an Ohio corporation with its principal place of business in Sabina, Ohio. It is a subsidiary of, and is wholly owned and/or controlled by, its parent, Nippon Seiki Co., Ltd. New Sabina Industries, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Nippon Seiki Co., Ltd.

307.   Unless otherwise specified, the Nippon Seiki co-conspirators identified above shall be collectively referred to herein as "NIPPON SEIKI."

308.   NIPPON SEIKI agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. NIPPON SEIKI agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**PANASONIC Co-Conspirators**

309.   Panasonic Corporation is a Japanese company with its principal place of business in Osaka, Japan. Panasonic Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Parts Systems that were sold and purchased throughout the United States, including in this District, during the Class Period.

310.   Panasonic Corporation of North America is a Delaware corporation with its principal place of business in Secaucus, New Jersey. It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Panasonic Corporation. Panasonic Corporation of North America manufactured, marketed and/or sold Automotive Parts that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Panasonic Corporation of North America was under the direction and control of Panasonic Corporation.

311.   Unless otherwise specified, the Panasonic co-conspirators identified above shall be collectively referred to herein as "PANASONIC."

312.    PANASONIC agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. PANASONIC agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers and coordinated responses to requests for price reductions made by its customers.

313.    Unless otherwise specified, when Plaintiffs refer to a corporate family or companies by a single name in the Consolidated Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know of, or care about, the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

**SUMITOMO Co-Conspirators**

314.    Sumitomo Electric Industries, Ltd. is a Japanese corporation. Sumitomo Electric Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

315.    Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed and/or sold HCPs that were purchased throughout

the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

316.    Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Sumitomo Wiring Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of Sumitomo Wiring Systems, Ltd. were under the direction and control of its parent Sumitomo Electric Industries, Ltd.

317.    Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky. Sumitomo Electric Wiring Systems, Inc. is a joint venture between Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Sumitomo Electric Wiring Systems, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its joint venture participant owners, both of whom are named defendants in this Consolidated Complaint.

318.    Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed, and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

319.     K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee. K&S Wiring Systems, Inc. is a subsidiary of, and is wholly owned and/or controlled by, its parent, Sumitomo Electric Industries, Ltd. K&S Wiring Systems, Inc. manufactured, marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its parent Sumitomo Electric Industries, Ltd.

320.     The Sumitomo co-conspirators identified above shall be collectively referred to herein as "SUMITOMO."

321.     SUMITOMO agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. SUMITOMO agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**T.RAD Defendants**

322.     T. RAD Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. T. RAD Co, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled manufactured, marketed, and/or sold Automotive Parts throughout the United States, including in this District during the Class Period.

323.     Defendant T.RAD North America, Inc. is a Delaware corporation with its principal place of business in Hopkinsville, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, T.RAD Co., Ltd. Defendant T.RAD North America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

**REDACTED**

marketed, and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period.

324. T.RAD Co., Ltd. agreed to and did conspire with other Defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. T. RAD Co., Ltd. agreed to and did refrain from competing with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers, and coordinated responses to requests for price reductions made by its customers.

**YAZAKI Co-Conspirators**

325. Yazaki Corporation is a Japanese corporation. Yazaki – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Parts throughout the United States, including in this District, during the Class Period.

326. Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, Yazaki Corporation. Yazaki North America Inc. manufactured, marketed and/or sold Automotive Parts that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, Yazaki North America, Inc. was under the direction and control of Yazaki Corporation.

327. The Yazaki co-conspirators identified above shall be collectively referred to herein as "YAZAKI".

328. YAZAKI agreed to and did conspire with other defendants named in this Consolidated Complaint, including DENSO, to allocate the supply of and to fix, raise, and maintain the prices of Automotive Parts. YAZAKI agreed to and did refrain from competing

**REDACTED**

with its competitors, allocated the supply of Automotive Parts sold to its customers, allocated geographic markets for Automotive Parts, coordinated responses to RFQs issued by its customers.

**Defendants' Representatives who Attended Conspiratorial Meetings and Engaged in Collusive Conduct Participated in Discussions on Behalf of Entire Corporate Families and Failed to Distinguish Between Corporate Entities in the Same Corporate Family**

329.    In many instances of meetings and communications between and among Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege which corporate family was represented in a particular meeting or communications. This is because, as documents reviewed to this date demonstrate, the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "DENSO," "HITACHI," "MITSUBA," or "YAZAKI." Indeed, the employees from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective U.S. subsidiaries. Further, because of their generic uses of Defendants' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts, nor did they distinguish between entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and U.S. affiliates. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

330.    Further, Defendants knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.

**REDACTED**

Defendants acted as the principals of or agents for the other, unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.**Family**

331.     In many instances of meetings and communications between and among Defendants in furtherance of their conspiracies alleged in this Complaint, Plaintiffs allege which corporate family was represented in a particular meeting or communications. This is because, as documents reviewed to this date demonstrate, the individual participants in the conspiratorial meetings and discussions did not distinguish between entities within a particular corporate family, referring to themselves or others, for example, merely as "DENSO," "HITACHI," "MITSUBA," or "YAZAKI." Indeed, the employees from Defendants appear to have attended the conspiratorial meetings on behalf of their entire corporate families, including their respective U.S. subsidiaries. Further, because of their generic uses of Defendants' names, individual participants in the conspiratorial meetings and discussions did not always know the specific corporate affiliation of their counterparts, nor did they distinguish between entities within the respective corporate families. Participants in the conspiratorial meetings entered into agreements on behalf of, and reported these meetings and discussions to their respective corporate families and U.S. affiliates. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in those meetings.

332.     Further, Defendants knew the individuals at the conspiratorial meetings represented their entire respective corporate family; otherwise, Defendants would not have entered into the illegal agreements if affiliate companies could simply undercut the agreements reached.

Defendants acted as the principals of or agents for the other, unnamed co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

## AGENTS AND CO-CONSPIRATORS

333.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Consolidated Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

334.    Whenever in this Consolidated Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## MARKET ALLEGATIONS

### A.    The Automotive Parts Industry

335.    Defendants are the world's largest automotive parts suppliers. Each of them supplies Automotive Parts to OEMs and other customers, and all of them had a conscious commitment to join the conspiracy alleged in this Consolidated Complaint.

336.    Beginning at a time no later than July 1, 1998, Defendants began a conspiracy to fix, maintain, and raise prices for automotive parts sold to customers including, OEMs. which ultimately came to include, among others, Toyota Motor Corporation, Honda Motor Company, Ltd., American Honda Motor Company, Inc., Fuji Heavy Industries (Fuji Heavy Industries markets its vehicles under the "Subaru" brand), Mazda Motor Corporation, Mazda Motor of America, Inc., Mitsubishi Motors, Mitsubishi Motors North America, Daihatsu, Daewoo, Jaguar, Land Rover, Kia, Nissan Motor Company Ltd., Nissan North America, Inc., Suzuki Motor

REDACTED

Corporation, Audi, Volkswagen, Volvo, Daimler, Isuzu, BMW, General Motors, Ford Motor Company and Chrysler Group.

337. The conspiracy was accomplished through several means.

338. One of the primary means by which the conspiracy was effectuated was an agreement not to compete for certain customers. Among the terms used by Defendants when describing this means of effectuating the conspiracy were "respecting commercial rights" or "respecting incumbency." These terms meant that if one Defendant had an existing relationship with a customer, other Defendants agreed that they would not compete to take away that business from the Defendant which had the existing relationship. In some cases, certain Defendants would pretend to compete for a customer's business but would ensure that their proposals would be non-competitive so that the Defendant that had a pre-existing relationship could maintain its business.

339. A second means by which the conspiracy was effectuated was by agreeing to pursue business only in certain geographic regions and not to compete in others. Thus, certain Defendants might agree, for example, to divide business to a customer so that one Defendant would win the customer's business in China in exchange for the other Defendant winning that customer's business in North America.

340. A third means by which the conspiracy was effectuated was by agreeing to "rig bids" submitted in response to requests for quotation, or RFQs, submitted by automakers. These RFQs would typically seek proposals by Defendants to supply Automotive Parts for particular vehicles for particular model years. Thus, for example, Toyota might issue an RFQ to Defendants to supply certain automotive parts for a model year Camry. Those Defendants who won the business would then sell those parts on the terms agreed to Toyota for the life of that

model, typically four years. Defendants coordinated their responses to these RFQs in order to submit higher prices to the automakers than they would have in the absence of collusion.

341. A fourth means by which the conspiracy was effectuated was by agreeing to coordinate responses made by automakers for reductions in prices. Periodically during the lifespan of a given vehicle, automakers would ask Defendants to provide reductions to the prices that were being charged for Automotive Parts. Instead of responding individually and competing, Defendants coordinated their responses so that they could maintain higher prices to the automakers than they would have if they had competed.

342. A fifth means by which the conspiracy was effectuated was by agreeing to use code words, subterfuge, and clandestine meetings in order to avoid detection. This included efforts to destroy evidence of the conspiratorial conduct, for which some defendants have pled guilty to charges of obstruction of justice. It was also reflected in the common use of terms such as "delete after reading" in written documents, and in directions to discuss matters orally, rather than in writing, when discussing collusive conduct.

343. OEMs purchase Automotive Parts directly from Defendants. Automotive Parts may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are sometimes referred to as "Tier 1 Manufacturers." Tier 1 Manufacturers purchase Automotive Parts which are then incorporate into modules or parts of new motor vehicles.

344. When purchasing Automotive Parts, OEMs sometimes issue Requests for Quotation, or RFQs, to automotive parts suppliers on a model-by-model basis for model specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years. Typically, the bidding process for a particular

model begins approximately three years prior to the start of production of a new model. OEMs

procure parts for U.S.-manufactured vehicles in the United States and elsewhere.

345.    Defendants and their co-conspirators supplied Automotive Parts to OEMs for

installation in vehicles manufactured and sold throughout the world, including in the United

States. Defendants and their co-conspirators manufactured Automotive Parts (a) in the United

States for installation in vehicles manufactured and sold in the United States, and (b) in other

countries, including Japan, for installation in vehicles manufactured in Japan and other countries,

some of which were then imported to and sold in the United States.

346.    Plaintiffs and members of the proposed Classes purchased Automotive Parts

indirectly from Defendants.  By way of example, an owner of a vehicle may indirectly purchase

one or more Automotive Parts from the Defendants as part of purchasing or leasing a new

vehicle.

**B.      The Structure and Characteristics of the Automotive Parts Market
          Facilitated the Conspiracy, and Defendants Took Advantage of This to Carry
          Out Their Conspiracy**

347.    The structure and other characteristics of the Automotive Parts market throughout

the world and in in the United States are conducive to a price-fixing agreement, and have made

collusion particularly attractive in this market. Specifically, the Automotive Parts market: (1) has

high barriers to entry; and (2) has inelasticity of demand.

**1.      The Automotive Parts Market Has High Barriers to Entry**

348.    A collusive arrangement that raises product prices above competitive levels

would, under basic economic principles, attract new entrants seeking to benefit from the supra-

competitive pricing. Where, however, there are significant barriers to entry, new entrants are less

likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

**95**

349.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Parts market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

350.    Defendants own multiple patents related to the manufacture of Automotive Parts. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

351.    In addition, OEMs cannot change Automotive Parts suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that the Automotive Parts they purchase for a vehicle are then integrated with the other components of the particular vehicle model. Thus, the design must be synergized by the Automotive Parts manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for new Automotive Parts

352.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. Demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

353.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

96

354.   Demand for Automotive Parts is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Parts as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### C.   Government Investigations

355.   A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada, and Japan, aimed at suppliers of Automotive Parts. A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen, because the automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

356.   Some say that the probe originated in Europe as the result of several European OEMs coming together to bring a complaint to EC. The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

357.   On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers. The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. The DOJ has levied more than $2.6 billion in criminal fines against various automotive parts manufacturers.

358.   The coordinated global government investigations include investigations by the United States, the EC, the JFTC, and the Korean Fair Trade Commission. These investigations have uncovered collusive conduct by Automotive Parts suppliers, including by many Defendants

**REDACTED**

named in this Consolidated Complaint, which employed the same means and targeted the same industry as is set forth in this Consolidated Complaint.

359.    "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena. "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

360.    The scheme drove up costs for consumers since the prices were illegally fixed on Automotive Parts that have risen in cost as vehicles have become more complex in recent years. Jim Gillette, an analyst with the firm HIS Automotive, estimated that the price-fixing of even a single Automotive Part alone cost automobile makers hundreds of millions of dollars.

    D.    **Likely Existence of Cooperating Defendants**

361.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

362.    At least one of the Defendants named in this Consolidated Complaint is an ACPERA "amnesty applicant" in this case.

REDACTED

## CLASS ACTION ALLEGATIONS

363.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, purchased new Vehicles in the United States which included one or more Automotive Part(s) as a component part, which were manufactured or sold by any Defendant, any current or former subsidiary of a Defendant or any co-conspirator of a Defendant.

364.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois.  The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiffs on behalf of themselves and entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers in the Indirect Purchaser States that, during the Class Period, indirectly purchased new Vehicles in the Indirect Purchaser States which included one or more Automotive Part(s) as a component part, which were manufactured or sold by any Defendant, any current or former subsidiary of a Defendant or any co-conspirator of a Defendant.

365.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, persons who purchased

**REDACTED**

Automotive Parts directly, persons in the End-Payor Class, as defined in the End-payor complaint,, and any judicial officer or employee who presides over this case.

366.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

367.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Automotive Parts sold in the United States;

b)    The identity of the participants of the alleged conspiracy;

c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

e)    Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law, as alleged in the Second and Third Claims for Relief;

f)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

**REDACTED**

g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Consolidated Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h)      The effect of the alleged conspiracy on the prices of Automotive Parts sold in the United States during the Class Period;

i)      Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

j)      Whether Defendants and their co-conspirators took steps to conceal the conspiracy's existence from Plaintiffs and the members of the Classes;

k)      The appropriate injunctive and related equitable relief for the Nationwide Class; and

l)      The appropriate class-wide measure of damages for the Damages Class.

368.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Parts purchased indirectly from Defendants and/or their co-conspirators.

369.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

REDACTED

370. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

371. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

372. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

373. Defendants' price-fixing conspiracy had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to Automotive Parts;

b. The prices of Automotive Parts have been fixed, raised, maintained, or stabilized at artificially inflated levels;

c. Indirect purchasers of Automotive Parts have been deprived of free and open competition;

      d.     Indirect purchasers of Automotive Parts paid artificially inflated, fixed, and stabilized prices.

374.    During the Class Period, Plaintiffs and the members of the Classes paid supracompetitive prices for Automotive Parts.

375.    An increase in the prices of Automotive Parts caused an increase in the price of Vehicles during the Class Period.

376.    Automotive Parts comprise a significant portion of the price of a Vehicle.

377.    The markets for Automotive Parts and Vehicles are inextricably linked and intertwined because the market for Automotive Parts exists to serve the Vehicle market. Without the Vehicles, the Automotive Parts have little to no value because they have no independent utility. Indeed, the demand for Vehicles creates the demand for Automotive Parts. As stated in the 2010 Annual Report of Lear Corporation, an automobile parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

378.    Automotive Parts are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Parts follow a traceable physical chain of distribution from Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Parts can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

379.    Just as Automotive Parts can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of Automotive Parts affect prices paid by indirect purchasers of new motor Vehicles containing Automotive Parts.

380.    The inflated prices of Automotive Parts in new motor vehicles resulting from Defendants' and their co-conspirators' bid-rigging and price-fixing conspiracy have been borne by Dealership Plaintiffs and other class members.

381.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Automotive Parts and, as a direct and foreseeable result, the price of new motor vehicles containing Automotive Parts. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis – called regression analysis – is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Automotive Parts on prices for new motor Vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Automotive Parts affects changes in the price of new motor Vehicles. In such models, the price of Automotive Parts would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Automotive Parts impact the price of new motor Vehicles containing Automotive Parts while controlling for the impact of other price-determining factors.

382.    The precise amount of the overcharge impacting the prices of new motor Vehicles containing Automotive Parts can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge borne by Dealership Plaintiffs. Thus, the economic harm to Plaintiffs and class members can be quantified.

**REDACTED**

383. On February 15, 2013, Scott Hammond, then the Deputy Assistant Attorney General in the Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. I say the *biggest with respect to the impact on U.S. businesses and consumers*, and the number of companies and executives that are subject to the investigation." (emphasis added).

384. On September 26, 2013, then United States Attorney General Eric Holder presented the DOJ's recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Attorney General Holder also described how the conspiracies worked: "[c]ompany executives face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to." Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

385. On May 25, 2014, news sources reported that Brent Snyder, a Deputy Assistant Attorney General in the Antitrust Division, said with respect to the automotive parts conspiracies, "[i]t's a very, very safe assumption that U.S. consumers paid more, and sometimes significantly more, for their automobiles as a result of this conspiracy."

386.    By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Parts than they would have paid in the absence of Defendants' and their co-conspirators' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

387.    Plaintiffs repeat and re-allege the allegations set forth above.

388.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until a date within four years of the filing date of this Consolidated Complaint.

389.    Plaintiffs and the members of the Classes are automobile dealers who purchased new Vehicles. They had no direct contact or interaction with Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Consolidated Complaint.

390.    No information in the public domain was available to the Plaintiffs and the members of the Classes within four years prior to the filing date of this Consolidated Complaint that revealed sufficient information to suggest that Defendants were involved in the conspiracy alleged herein. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendant's dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

391.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Consolidated Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

392.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until a date within four years of the filing date of this Consolidated Complaint.

393.    Before that time, Plaintiffs and the members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices for Automotive Parts throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the conspiracy alleged herein.

394.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. This conduct includes denying the conspiracy alleged in this Consolidated Complaint, and instead asserting that these Defendants engaged in a multitude of separate conspiracies that are not related to each other.

395.    Further, as former Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the automotive parts industry, "[i]n order to keep their illegal conduct secret, Defendants used code names and met in remote locations."

**REDACTED**

396.     By their very nature, Defendants and their co-conspirators' anticompetitive conspiracy was self-concealing. Automotive Parts are not exempt from antitrust regulation, and thus, Plaintiffs reasonably considered the Automotive Parts industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Automotive Parts prices prior to four years before the filing date of this Consolidated Complaint.

397.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

398.     Throughout the course of the conspiracy, Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of Defendants. Further, as reflected in the obstruction of justice paragraphs above, Defendants took steps to destroy evidence of the collusion described herein.

399.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until a date within four years prior to the date of filing of this Consolidated Complaint.

400. For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

401. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

402. Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

403. The acts done by Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by officers, agents, employees, or representatives while actively engaged in the management of their affairs.

404. During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Parts, thereby creating anticompetitive effects.

405. The anticompetitive acts were intentionally directed at the United States market for Automotive Parts and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Parts throughout the United States.

406. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Parts.

407. As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Parts have been harmed by being forced to pay inflated, supracompetitive prices for Automotive Parts.

408. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and

**REDACTED**

conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

409.    Defendants' and their co-conspirators' conspiracy had the following effects, among others:

a.    Price competition in the market for Automotive Parts has been restrained, suppressed, and/or eliminated in the United States;

b.    Prices for Automotive Parts sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.    Plaintiffs and members of the Nationwide Class who purchased Automotive Parts indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

410.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Parts purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

411.    The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

412.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**REDACTED**

### SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

413.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

414.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Automotive Parts in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

415.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive levels the prices for Automotive Parts and to allocate customers for Automotive Parts in the United States.

416.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

   a.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Parts at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Parts sold in the United States;

   b.    allocating customers and markets for Automotive Parts in the United States in furtherance of their agreements; and

   c.    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

111

417.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices, and to allocate customers with respect to Automotive Parts.

418.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

419.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

420.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

421.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

422.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

423.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

424.    Defendants entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

**REDACTED**

425. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Parts at supracompetitive levels.

426. The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Parts.

427. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of Automotive Parts; and (2) Allocating among themselves the production of Automotive Parts.

428. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the sale of Automotive Parts has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Parts sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased vehicles containing Automotive Parts manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

429. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Parts than they otherwise would have paid in the absence of Defendants'

113

unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

430. Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

431. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, , including those who resided in the District of Columbia and/or purchased vehicles in the District of Colombia, were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts, including in the District of Colombia.

432. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

433. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

434. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

**REDACTED**

435.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

436.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

437.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

438.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

439.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*   Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

440.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

441.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the

**115**

**REDACTED**

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

442.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

443.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

444.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, *et seq.*   Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[1]

445.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

446.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

447.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

---

[1] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

448.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

449.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

450.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

451.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

452.     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

453.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of Damages Class have been injured in their business and property and are threatened with further injury.

454.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

117

455.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

456.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Maine; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

457.     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

458.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

459.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

460.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

461.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the

118

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

462.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

463.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

464.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

465.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

466.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

467.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

468.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

469. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

470. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

471. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

472. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

473. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

474. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

475. Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

476. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and

120

eliminated throughout Nebraska; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

477.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

478.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

479.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

480.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

481.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

482.    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

**REDACTED**

483.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

484.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

485.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

486.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

487.   During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

488.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

489.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

490.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

491.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

492.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

493.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

494.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

495.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

496.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Parts prices were raised, fixed, maintained,

and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts when they purchased vehicles containing Automotive Parts, or purchased products that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators' illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

497.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

498.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

499.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

500.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

501.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

502.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

503.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

504.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, et. seq.

505.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

506.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

507.    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

508.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

125

509.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

510.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

511.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

512.    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

513.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

514.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

515.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

126

516.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

517.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

518.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

519.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

520.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

521.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

522.    During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

523.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

524.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

525.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

526.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

527.    During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

528.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

529.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly, Plaintiffs and

128

REDACTED

members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

530.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

531.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

532.    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

533.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

534.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

535.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

536.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Parts prices were raised, fixed, maintained,

**REDACTED**

and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

537.    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

538.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

539.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

540.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

541.    Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

542.    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

543.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

544.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

545.     Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' and their co-conspirators' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid more for Automotive Parts than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

546.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

547.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

548.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

549.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

REDACTED

550.    Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

551.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Parts were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

552.    The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

553.    Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Parts.

554.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and purchasers.

555.    As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

556.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

REDACTED

557.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

558.     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

559.     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

560.     Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

561.     Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

133

562.    Defendants' acts or practices are unfair to purchasers of Automotive Parts (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code.

563.    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

564.    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

565.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

566.    The unlawful and unfair business practices of Defendants have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Automotive Parts (or vehicles containing them). Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

567.    The conduct of Defendants as alleged in this Consolidated Complaint violates Section 17200 of the California Business and Professions Code.

568.    As alleged in this Consolidated Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

134

**REDACTED**

569.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

570.    Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

571.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and purchasers of vehicles.

572.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

573.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

574.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

575.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Parts were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

135

576.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Parts. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Parts because they were unaware of the unlawful overcharge and because they had to purchase Automotive Parts in order to operate their vehicles. Defendants' conduct with regard to sales of Automotive Parts, including their illegal conspiracy to secretly fix the price of Automotive Parts at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.

577.     The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Parts as set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles.

578.     Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

579.     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and vehicle purchasers.

**REDACTED**

580.   As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

581.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

582.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

583.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Parts were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

584.   The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in injuries to purchasers and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

585.   Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Parts, including in New York.

586.   Because of Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Automotive Parts were misled to believe that they

137

REDACTED

were paying a fair price for Automotive Parts or the price increases for Automotive Parts were for valid business reasons; and similarly situated purchasers were affected by Defendants' conspiracy.

587.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce and New York purchasers.

588.    During the Class Period, Defendants, directly, or indirectly, and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Automotive Parts in New York.

589.    Defendants knew that their unlawful trade practices with respect to pricing Automotive Part would have a broad impact, causing class members who indirectly purchased Automotive Parts to be injured by paying more for Automotive Parts than they would have paid in the absence of Defendants' unlawful trade acts and practices.

590.    Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

591.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*

592.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Parts were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

593.    The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in injury to purchasers and broad adverse impact on the public at large, and harmed the public interest of

138

North Carolina purchasers in an honest marketplace in which economic activity is conducted in a competitive manner.

594.     Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts, including in North Carolina.

595.     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce and purchasers in North Carolina.

596.     Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

597.     During the Class Period, Defendants directly, or indirectly, and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Automotive Parts in North Carolina.

598.     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

599.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

600.    Defendants' combinations or conspiracies had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Parts.

601.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

602.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

603.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.[2]

604.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

605.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Parts were sold, distributed, or obtained in Vermont.

606.    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Automotive Parts. Defendants owed a duty to disclose such facts, and considering the relative

---

[2] Plaintiffs include this claim for the purpose of preserving appellate rights.

140

lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their Automotive Parts prices were competitive and fair.

607. Defendants' unlawful conduct had the following effects: (1) Automotive Parts price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Parts.

608. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

609. Defendants' deception, including their omissions concerning the price of Automotive Parts, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Parts at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**REDACTED**

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

610. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

611. Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*, except California. Plaintiffs also bring this claim under the laws of South Carolina, Missouri, Massachusetts, and Illinois on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those three states.

612. As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Parts.

613. Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Automotive Parts.

614. Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

615. Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased vehicles containing Automotive Parts subject to Defendants' conspiracy would have been futile, given that those firms did not take part in Defendants' conspiracy.

**REDACTED**

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

616.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

617.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

      a.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

      b.    A *per se* violation of Section 1 of the Sherman Act;

      c.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

      d.    Acts of unjust enrichment by Defendants as set forth herein.

618.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

619.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

143

620.    Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

621.    Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

622.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Consolidated Complaint;

623.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

624.    Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED: January 7, 2016

Respectfully submitted,

/s/ Jonathan W. Cuneo
Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Yifei Li
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com
evelyn@cuneolaw.com

Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Gerard V. Mantese
(Michigan Bar No. P34424)
Alexander E. Blum
(Michigan Bar No. P74070)
Mantese Honigman P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com
ablum@manteselaw.com

Shawn M. Raiter
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO 63101
Telephone: (314) 226-1015
mflannery@cuneolaw.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211

Thomas P. Thrash
Marcus Bozeman
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201

145

**REDACTED**

Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com


Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

Telephone: (501) 374-1058
tomthrash@sbcglobal.net
bozemanmarcus@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

*Attorneys for Dealership Plaintiffs*

146

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| IN RE AUTOMOTIVE PARTS | : | Master File No. 12-md-02311 |
| ANTITRUST LITIGATION | : | Honorable Marianne O. Battani |
| | : | |
| | : | |
| In Re: Instrument Panel Clusters | : | 2:12-cv-00202 |
| In Re: Fuel Senders | : | 2:12-cv-00302 |
| In Re: Heater Control Panels | : | 2:12-cv-00402 |
| In Re: Alternators | : | 2:13-cv-00702 |
| In Re: Windshield Wiper Systems | : | 2:13-cv-00902 |
| In Re: Radiators | : | 2:13-cv-01002 |
| In Re: Starters | : | 2:13-cv-01102 |
| In Re: Ignition Coils | : | 2:13-cv-01402 |
| In Re: Motor Generators | : | 2:13-cv-01502 |
| In Re: HID Ballasts | : | 2:13-cv-01702 |
| In Re: Inverters | : | 2:13-cv-01802 |
| In Re: Fuel Injection Systems | : | 2:13-cv-02202 |
| In Re: Power Window Motors | : | 2:13-cv-02302 |
| In Re: Automatic Fluid Transmission Warmers | : | 2:13-cv-02402 |
| In Re: Valve Timing Control Devices | : | 2:13-cv-02502 |
| In Re: Air Conditioning Systems | : | 2:13-cv-02702 |
| In Re: Windshield Washer Systems | : | 2:13-cv-02802 |
| In Re: Spark Plugs | : | 2:15-cv-03002 |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| DEALERSHIP ACTIONS | : | |
| | : | |

## [PROPOSED] ORDER GRANTING AUTOMOTIVE DEALER PLAINTIFFS'
## MOTION TO CONSOLIDATE CLAIMS AND AMEND COMPLAINTS

Before the Court is Auto Dealer Plaintiffs ("ADPs")' Motion to Consolidate Claims and Amend Complaints ("Motion") in the above-captioned cases ("Relevant Cases"). Because good cause exists therefor, the Court hereby GRANTS the Motion.

The Court consolidates ADPs' claims against the following defendants:

(a)    DENSO Corp., DENSO International America, Inc., DENSO International Korea Corp., DENSO Korea Automotive Corp., DENSO Products &

1

**REDACTED**

Services Americas, ASMO Co., Ltd., ASMO North America, LLC, ASMO Greenville of North Carolina, Inc., ASMO Manufacturing, Inc., and ASMO North Carolina Inc.;

(b)     Aisan Industry Co., Ltd., Aisan Corp. of America, Franklin Precision Industry, Inc., and Hyundam Industrial Co., Ltd.;

(c)     Aisin Seiki Co., Ltd. and Aisin Automotive Casting, LLC;

(d)     Alps Automotive, Inc., Alps Electric (North America), Inc., and Alps Electric Co., Ltd.;

(e)     Calsonic Kansei Corp. and Calsonic Kansei North America, Inc.;

(f)     Continental Automotive Systems, Inc., Continental Automotive Electronics, LLC, and Continental Automotive Korea Ltd.;

(g)     Delphi Automotive LLP and Korea Delphi Automotive Systems Corp.;

(h)     Diamond Electric Mfg. Co., Ltd. and Diamond Electric Mfg. Corp.;

(i)     Keihin Corp. and Keihin North America, Inc.;

(j)     Koito Manufacturing Co., Ltd. and North American Lighting, Inc.;

(k)     MAHLE Behr GmbH & Co. KG and MAHLE Behr USA Inc.;

(l)     Mikuni America Corp.;

(m)     Mitsuba Corp. and American Mitsuba Corp.;

(n)     Mitsubishi Electric Corp., Mitsubishi Electric US Holdings, Inc., and Mitsubishi Electric Automotive America, Inc.;

(o)     Mitsubishi Heavy Industries, Ltd., Mitsubishi Heavy Industries America, Inc., and Mitsubishi Heavy Industries Climate Control, Inc.;

(p)     NGK Spark Plugs (U.S.A.) Holding, Inc., NGK Spark Plugs (USA) Inc., NGK Spark Plugs Co. Ltd., and NTK Technologies, Inc.;

(q)     Robert Bosch LLC and Robert Bosch GmbH;

(r)     Sanden International (U.S.A.) Inc.;

(s)     Showa Denko K.K. and Showa Aluminum Corp. of America;

2

REDACTED

(t)     Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc.;

(u)     Tokai Rika Co., Ltd. and TRAM, Inc.;

(v)     Toyo Denso Co. Ltd. and Weastec, Inc.; and

(w)     Valeo Japan Co., Ltd., Valeo Inc., Valeo Electrical Systems, Inc., and Valeo Climate Control Corp.

in the Relevant Cases because (1) the claims against the defendants in the Relevant Cases present common issues of law and fact such that Federal Rule of Civil Procedure 42 is satisfied; (2) no party would suffer undue prejudice from consolidation; and (3) consolidation would decrease costs and reduce delay, carry no risk of prejudice to any defendant, and best serve the interests of justice.

The Court permits ADPs to amend their complaints in the Relevant Cases by filing their Proposed Consolidated Amended Class Action Complaint because (1) the Sixth Circuit has a liberal policy of allowing amendments to complaints; (2) Plaintiffs can plausibly allege that each of the defendants had a conscious commitment to a common scheme to fix the prices of automotive parts sold to Original Equipment Manufacturers; and (3) there is no prejudice to any defendant by virtue of the proposed amendment.

**IT IS SO ORDERED.**

Date: _____, 2016          _____
                                              Hon. Marianne O. Battani
                                              United States District Court Judge