```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                          —    —    —

 4      IN RE: AUTOMOTIVE PARTS

 5      ANTITRUST LITIGATION
                                          Case No. 12-02311
 6      _____/
                                          Hon. Marianne O. Battani
 7      THIS DOCUMENT RELATES TO:

 8      END-PAYOR ACTIONS

 9      _____/

10
                              FAIRNESS HEARING
11
                BEFORE THE HONORABLE MARIANNE O. BATTANI
12                    United States District Judge
                  Theodore Levin United States Courthouse
13                    231 West Lafayette Boulevard
                            Detroit, Michigan
14                    Wednesday, August 1, 2018

15

16

17

18

19

20

21

22

23

24
               To obtain a copy of this official transcript, contact:
25                  Robert L. Smith, Official Court Reporter
                    (313) 234-2612 • rob_smith@mied.uscourts.gov
```

```
 1        APPEARANCES:

 2
          For the End-Payor
 3        Plaintiffs:              MARC M. SELTZER
                                   Susman Godfrey, L.L.P.
 4                                 1900 Avenue of the Stars, Suite 1400
                                   Los Angeles, CA 90067
 5                                 (310) 789-3100

 6        For the Yamasha
          Defendants:             MICHAEL A. RUBIN
 7                                Arnold & Porter, L.L.P.
                                  601 Massachusetts Ave., NW
 8                                Washington, D.C. 20001
                                  (202) 942-6171
 9

10        (Please note, appearances listed are only the attorneys
           presenting before the Court, not to be representative of
11         all attorneys present.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

                                                    Page

Fairness Hearing.................................... 3

1    Detroit, Michigan

2    Wednesday, August 1, 2018

3    at about 10:13 a.m.

4                         —   —   —

5              (Court and Counsel present.)

6              THE LAW CLERK:  All rise.

7        The United States District Court for the Eastern

8    District of Michigan is now in session.  The Honorable

9    Marianne O. Battani presiding.

10             You may be seated.

11             THE COURT:  I can't get used to this perspective.

12   Good morning.

13             THE ATTORNEYS:  (Collectively) Good morning, Your

14   Honor.

15             THE COURT:  Excuse me just one minute.  All right.

16   We have two motions today, and the first motion is the

17   end-payors' motion for final approval of a settlement.  And

18   who is --

19             MR. SELTZER:  Your Honor, if it please the Court,

20   Mark Seltzer for the end-payor plaintiffs for the

21   presentation.

22             THE COURT:  Could you come to the podium,

23   Mr. Seltzer?

24             MR. SELTZER:  Thank you, Your Honor.

25             THE COURT:  I think we should get who's in court

1    first.  Let's get the appearances of everybody who's going to

2    be participating in this motion.  Anybody else here on that

3    side?

4                (No response.)

5                THE COURT:  Over here.

6                MR. RUBIN:  Mike Rubin for the Yamasha defendants,

7    Your Honor.  I'm not sure if we are going to be participating

8    in the motion for the final approval of the settlement, but

9    on the judgment issue we will have something to say.

10                THE COURT:  Okay.

11                MR. SELTZER:  All right.  Your Honor, if I may,

12   first of all, before I begin my remarks I want to note for

13   the record that there was one objection that was filed with

14   respect to two settlements in the spark plugs case.

15                THE COURT REPORTER:  Could you speak up, please.

16                MR. SELTZER:  Yes.  There was one objection filed

17   with respect to the two settlements in the spark plugs case,

18   that was by Ms. Ahern, and this morning that objection was

19   withdrawn with prejudice without costs, so there are no

20   pending objections to any of the settlements in this round

21   three of the end-payor settlements.

22                THE COURT:  Okay.  So there are no pending -- I was

23   going to say I didn't see anything.  No other objections?

24                MR. SELTZER:  No other objections.  That was the

25   only one that was filed, and that has now been withdrawn.

1　　　　　　　THE COURT:  Okay.

2　　　　　　　MR. SELTZER:  And, Your Honor, now --

3　　　　　　　THE COURT:  We have the GEICO issue.

4　　　　　　　MR. SELTZER:  Right, we have the GEICO issue, which

5　is a separate question relating to the timing of the entry of

6　the final judgments, but we can address that at the end.

7　　　　　　　Let me begin by saying this is an important

8　milestone in the history of this case.  The settlements that

9　have been achieved in this litigation are really historic in

10　nature.  And Your Honor has presided over one of the most

11　complex, if not the most complex set of antitrust class

12　action cases ever filed in the United States, and I say that

13　speaking from 45 years of experience in litigating these

14　kinds of cases.

15　　　　　　　The case involves scores of defendants across the

16　globe who are alleged to have colluded on the pricing of

17　component parts of automobiles over many years, and it

18　affected purchasers down a long chain of distribution.  So

19　it's a case that has presented many complexities both legally

20　and factually.

21　　　　　　　And I'm very pleased to report, I think we are

22　nearing or on the verge of nearing the end of this

23　litigation.  There are only a handful of settlements --

24　non-settling defendants left in the case.  We are working at

25　arriving at settlements with them.  It's possible that we may

1    not achieve that result with respect to --

2           THE COURT:  I'm sorry.  We're having a little

3    computer difficulty here.

4           MR. SELTZER:  Very well, Your Honor.  It's possible

5    we may not achieve settlements with all of them, in which

6    case we will have to litigate to a conclusion, but I remain

7    optimistic that at the end of the day, we will.  And the

8    Settlement Master, Judge Weinstein, and his team, have been

9    actively engaged in conducting and mediating settlements, and

10   we have also engaged in bilateral discussions with some of

11   the defendants, so we are moving ahead to try to resolve the

12   rest of the case as well.

13          Now, the settlements that have been reached in this

14   case, including ones that are not included in the third round

15   but have been publicly announced, now total $1.84 billion --

16   that's $1.084 billion.

17          THE COURT:  That's 1.0 --

18          MR. SELTZER:  1.084.

19          THE COURT:  Including this, as I read this --

20          MR. SELTZER:  Including this one, yes, yes.  And

21   this third round is the largest of the rounds we have

22   achieved so far.  The settlement amounts are approximately

23   $433 million.

24          Now, our papers describe in detail the reasons why

25   we believe the settlements are fair, reasonable and adequate

 1   to the classes.  And I think it's important to recognize that

 2   the settlements also provide for important nonmonetary

 3   benefits.  Over and above the tremendous economic monetary

 4   recovery, the settlements all provided for discovery

 5   cooperation, and that discovery cooperation was extremely

 6   helpful to us in bringing other defendants to the negotiating

 7   table and negotiating settlements because we were able to get

 8   information from the cooperating defendants about the who,

 9   what, where and when participation in the conspiracies, and

10   getting detail like that was very helpful in terms of

11   persuading the non-settling defendants to come to the table.

12           The settlements meet every test under Rule 23, and

13   so does the plan of allocation as well.  The Court in its

14   order, approving the round two settlements that was entered

15   on July 10th of last year, went through all of the factors.

16   I don't think I need to go through all of them again here,

17   but they apply with equal, if not greater force to these

18   settlements.

19           The settlements were the subject of a very

20   extensive notice program.  We submitted the declarations of

21   the claims administrator that describes the basis of the

22   notice.

23           THE COURT:  I have a question on the notice.

24           MR. SELTZER:  Yes.

25           THE COURT:  This may not be the time to ask it, but

1    tell me again how many people actually filed claims.  I
2    thought it was like 35,000 or something.
3          MR. SELTZER:  There have been more than 100,000 who
4    have filed claims or registered with the claims
5    administrator, and that's set forth in the declaration of
6    Brian Pinkerton.
7          THE COURT:  That have registered.  What was that
8    35,000 number?
9          MR. SELTZER:  There were earlier numbers in terms
10   of who submitted claims and who submitted registrations, and
11   it has been progressing along, and there were 35,000 in one
12   stage of the case in response to one of the notices, but the
13   total now is more than 100,000.  And that's --
14         THE COURT:  I question that because -- well, maybe
15   you're going to tell me this only because -- I mean, we are
16   into the millions of people who could file claims, so even
17   though that's a very large number, it does not seem to be
18   significant in comparison to the body of those who may file.
19         MR. SELTZER:  Well, here's the reason why that
20   number is likely to increase.  The Court has not yet set a
21   claim submission deadline, and in our experience that
22   deadline is something that focuses the attention of class
23   members because they know they have to submit a claim in
24   order to participate by that deadline.  I was going to get to
25   the claims deadline in a bit but --

1   THE COURT:  You can wait until you get to it, I was

2   just was -- those numbers just didn't ring well with me and I

3   wanted to ask you about that.

4   MR. SELTZER:  Right.

5   THE COURT:  But I thought the claims would be a

6   period when you may get more.

7   MR. SELTZER:  Right, and we also intend to engage

8   in a very extensive additional outreach at the time that the

9   claims deadline is set in order to encourage as many people

10   as possible who are eligible to submit claims.

11   But one thing I want to emphasize about these

12   settlements, these are non-reversionary settlements.  Whoever

13   claims, and whoever has claims that are approved by the

14   Court, will share pro rata in the settlement funds.  So all

15   the money that has been put up by the settling defendants

16   will go to class members.  If class members for some reason

17   don't submit a claim then that's their choice, but those who

18   do and who have valid claims will share pro rata in the

19   settlement funds, so it will all be distributed to class

20   members.  Some of them may get very, very substantial

21   payments if other class members don't file claims who are

22   eligible to do so, and that's something that's not an unusual

23   occurrence in class action cases.

24   One of the cases that I was involved in in the last

25   several years involved the automobile company Toyota,

1    involving the unintended acceleration problem that Toyota

2    had.  And there we had also a very extensive class notice

3    program, and class members would be entitled to receive

4    payments up to $10,000.  You would think that would encourage

5    people to file claims; still the turnout was less than we

6    hoped for in terms of the settlement, so we engaged in

7    additional outreach to increase the number of people who

8    submit claims.  Ultimately the settlement funds were all paid

9    out to class members.

10              So that kind of occurrence is something that is not

11   unusual in these cases.  It is a phenomena that is not unique

12   to this case but, as I say, the claims deadline will likely

13   result in a spike in claims because that's the history of how

14   claims are submitted, and as well we intend to engage in an

15   outreach program to encourage as many people as possible to

16   submit claims.

17              THE COURT:  Tell me, just out of curiosity in terms

18   of that claims process, the ultimate distribution would be

19   when the non-settling defendants have either tried or been

20   resolved?

21              MR. SELTZER:  Well, here's -- let me leap ahead to

22   that subject because we --

23              THE COURT:  I'm sorry.  I'm just curious.

24              MR. SELTZER:  No, no.  Here's what we were going to

25   propose to the Court regarding the claims deadline.  If there

 1  had been an objection to the round three settlements that was

 2  not promptly resolved, we were going to ask that the Court

 3  set a deadline in the next few months so that payments could

 4  be paid out of the round one and two settlements, and then

 5  that would also establish a deadline with respect to those

 6  settlements and thereby raise a number of class members

 7  submitting claims.

 8        However, because we've now seen the objection go

 9  away with the dismissal this morning of the objection, our

10  plan is to ask the Court to set a deadline after we submit an

11  additional round of settlements, be it a fourth round of the

12  new settlements we have achieved, so we would have a combined

13  notice that would include those settlements as well as

14  establishing the claims deadline.

15        The reason for doing that is first and foremost to

16  avoid complexity in the claim process.  The classes all

17  overlap, and if you establish a deadline at time X with

18  respect to certain of the settlements, class members who have

19  a claim in a later case may not submit a claim with respect

20  to the first group of settlements.  We want to encourage as

21  many people to file claims who have claims against each of

22  the settling defendants.

23        And as the Court knows, the case is divided up into

24  settlement classes for each settlement, so you have multiple

25  settlement classes for a single part and you have other

1    settlement classes for other parts all involving overlapping

2    and sometimes nonoverlapping defendants.  So it's a complex

3    claims administration issue.

4           And our notion was that we also wanted to avoid any

5    additional expense of giving class notice.  That set of

6    claims deadline there would need to be a separate notice to

7    the class telling class members now's the time to submit a

8    claim, here's the deadline, and you must abide by that in

9    order to have your claim allowed, but if you combine that

10   notice with the notice of the fourth round, it will save the

11   extra expense of another notice.

12          And the notice is not inexpensive, you know, it is

13   running several million dollars per notice in terms of the

14   cost of publication and the other costs that are incurred in

15   giving this kind of nationwide notice.

16          So our thought was to present another round of

17   settlements to Your Honor, it would be the fourth round, and

18   at that time ask for a claims deadline to be set even if the

19   case is then not totally resolved.  We anticipate that would

20   happen sometime early next year at the latest.

21          THE COURT:  Well, it makes a lot of sense to me to

22   do it that way, to wait, because, one, I think you could lose

23   people by going, you know, for a claim after each settlement

24   except for the diehards, but it doesn't make sense.  I --

25   this isn't a case -- a personal injury-type case where people

 1   need the money, et cetera, in order to get health treatment
 2   or something like that, so I have no problem with waiting in
 3   this case at the very minimum until after your next round of
 4   settlements.
 5        MR. SELTZER:  Very well, Your Honor, and that's our
 6   intention.  So as I've said, we've got other settlements that
 7   we've already arrived at, of about -- if my memory serves me,
 8   about 47 or 48 million in new settlements that have not yet
 9   been presented to the Court, and we are working on others, so
10   hopefully we will have a package that will be even larger, to
11   go with that notice which would then go out sometime in the
12   first of next year.
13        THE COURT:  All right.
14        MR. SELTZER:  Okay.  The -- I prepared a whole
15   bunch of things to say about the objection, but now that it
16   has been withdrawn, I'm going to skip over all of that
17   material.  Just to say that in our view, for the reasons we
18   stated in the papers we submitted in response to that
19   objection, it was completely without merit; all of the
20   arguments were boilerplate, they really didn't deal with the
21   facts and circumstances of this very complex litigation, and
22   we think we were optimistic Your Honor would overrule the
23   objection in its entirety, but now that it has been
24   withdrawn, that issue is entirely moot.
25        THE COURT:  And is that objection you talked about

1  this morning, is it formally withdrawn?

2          MR. SELTZER:  Yes.

3          THE COURT:  Is there a document to that effect?

4          MR. SELTZER:  There was an ECF filing this morning

5  which attached a document withdrawing the objection with

6  prejudice.

7          THE COURT:  Thank you.

8          MR. SELTZER:  Now, with respect to the plan of

9  allocation, I will speak very briefly.  That plan is the same

10  one that was previously approved by the Court with respect to

11  the round one and the round two settlements, and as I

12  indicated, it involves a pro rata distribution among class

13  members based upon buying a vehicle or a replacement part

14  that fits within the definition of a particular settlement

15  class.  Each class will have a computation made of the claims

16  that are submitted with respect to that class settlement and

17  the total of all of the allowed claims with respect to that

18  settlement, and then you divide the remaining settlement

19  funds based upon the ratio between the amount of the allowed

20  claim of a particular class member and all of the allowed

21  claims with all class members with respect to that settlement

22  class.  And that's -- that was outlined in the class notice

23  as well as available on the settlement website.

24          The settlement plan does, however, have one

25  variation.  There are certain vehicles that we had evidence

1    from a variety of sources that was specifically targeted by

2    name with respect to the conspiracies, and as to those

3    vehicles, we intend to weight them more heavily than others

4    in terms of determining their pro rata distribution, and that

5    also was laid out in the plan of allocation, but other than

6    that it's a pro rata basis.

7         So on the settlements, I respectfully submit that

8    they meet all of the criteria here.  They were all negotiated

9    at arm's length, often with the assistance of a very

10   experienced settlement mediator.  They were the product of a

11   lot of give and take and back and forth.  Some of the terms

12   were heavily negotiated, most particularly the cooperation

13   terms that I described, and I think they are a remarkable

14   achievement.

15        This case now ranks at the very top, if not the

16   most successful indirect purchaser class action case or set

17   of cases, then very close to the top.  So it is a case of

18   historic significance in terms of this kind of litigation.

19        And our cases are also very important in terms of

20   enforcement tools for the antitrust laws.  The government, of

21   course, brought criminal proceedings against many of these

22   defendants, not all but many, and in the guilty plea

23   arrangements for those defendants, it was expressly stated

24   that the amount that they would pay as fines would not be

25   based upon the notion of restitution.  Instead, the

1   government said they are looking toward these class action

2   cases as providing the vehicle for restitution.  So in a way

3   this goes hand and glove with the law enforcement purposes of

4   the antitrust laws to have this kind of class action and to

5   have it succeed.

6           So I think it has been, again, a remarkable result

7   thus far, and we are not quite finished yet, although we are

8   getting close to the finish line -- at least I hope we are.

9           So that's the settlement.  If the Court has any

10  questions about the settlements?

11          THE COURT:  No.  I have read the documents, and I

12  have no questions, and I rely heavily on counsel.

13          MR. SELTZER:  Very well.  We therefore seek a court

14  order approving the settlements, granting final approval to

15  the settlements and the plan of allocation.  And we would be

16  pleased to submit a proposed form of order as we did last

17  time with respect to the round two settlements.

18          THE COURT:  Okay.  If I have this right, this is --

19  involves 33 additional defendants with 19 component parts?

20          MR. SELTZER:  That's correct, Your Honor.

21          THE COURT:  Is that correct?

22          MR. SELTZER:  Yes.

23          THE COURT:  Okay.  And I take it -- I guess I don't

24  know for sure, but as to the defendants who are settling, are

25  their representatives here?  Everybody's shaking their heads

 1   yes.

 2              UNIDENTIFIED ATTORNEY:  Generally, yes, Your Honor.

 3              THE COURT:  Thank you.  I just want to make sure

 4   that this is on the record that all sides are here.  I'm not

 5   going to go through all of the settling defendants but

 6   certainly they are listed.  I would indicate, too, that they

 7   are listed specifically with their component part and the

 8   amount that the specific defendant is contributing to this

 9   overall settlement.

10              The Court has reviewed this, and I'm not going to

11   repeat what I said in round one and round two because this is

12   really the same standards and the same components.  I would

13   say that the Court does find that the settlement is fair,

14   reasonable and adequate.  And certainly I know the notices

15   went out, the Court questioned the notices just in terms of

16   the number of people who have responded, but I read the

17   notice.  It really was very much the same as in round one and

18   round two, and where it was published.

19              I think we need to do more with claims when we get

20   there, I want to say that; we have to do something a little

21   bit more.

22              I have one question about that, too.  Has social

23   media been involved -- I don't recall this -- like Facebook

24   or whatever social media --

25              MR. SELTZER:  Well, I'm hardly the social media

 1   guru, Your Honor, but I'm told and I think the declaration

 2   from Mr. Pinkerton lays out all of the steps that were taken

 3   through social media and the internet to have like banner

 4   headlines, so when people go to search on Google, they will

 5   find this case.  In fact, if you look up auto parts

 6   settlement on Google you go immediately to the settlement

 7   website.  So there is --

 8            THE COURT:  Yes, I saw that, and I did that.

 9            MR. SELTZER:  Right.

10            THE COURT:  But I just want to make sure the people

11   have the notice that there is such a case because I obviously

12   don't read the same publications that were in the notices

13   because I haven't seen a notice, and I'm kind of inquiring of

14   folks I know, did you see a notice, and that's what brought

15   this to my attention.

16            MR. SELTZER:  Yes.  And the notice, Your Honor --

17   the notice administrator who, by the way, is very, very

18   experienced and skilled in class notices, estimated that the

19   combined program which included internet notice, mailed

20   notice, e-mailed notice, publication notice, had a reach of

21   about 80.4 percent of all new vehicle owners and new vehicle

22   lessees, and that they would have seen a notice of the

23   settlement an average of 2.9 times.  That's an extraordinary

24   reach that's used, for example, by very sophisticated

25   advertising companies when they are designing an advertising

1    program.  So it's with that kind of use of multiple

2    techniques of giving notice that we think the notice is more

3    than adequate.

4         But I think as I mentioned earlier though, when we

5    set the claims deadline, we intend at that time to engage --

6    even go over and beyond whatever has been done before to go

7    the extra mile to encourage as many people as possible to

8    file claims.

9         THE COURT:  All right.  And I do find that the

10   Rule 23 provisions are complied with.  Obviously the case is

11   very complex, and certainly the attorneys who are working on

12   this case really have to delve into a lot of different

13   factors in order to resolve it.  I'm very pleased with the

14   progress of the settlements as you have mentioned; though I

15   say in my naiveté that I said to Mr. Weinstein, you know, six

16   months, let's get this resolved.  You're getting close

17   though.  Okay.

18        Certainly the judgment of counsel, and I have said

19   this before, that given the complexity of this case the Court

20   depends on counsel to have the know with all to handle such

21   complexities, and I find that you've done a marvelous job.

22   And as I read these settlements, and as I read the pleadings,

23   and even the allocation notice, I mean, as I went through the

24   allocation and how they determined the factors and all of

25   those things, it's amazing, it seems to work, and I commend

 1    you for that.  And I note that the class members are

 2    apparently quite satisfied with what you are doing, there

 3    having been only one objection that was withdrawn.  I was

 4    looking to -- for the objections in this end-payor action,

 5    thinking that we may get a couple, but I'm glad that we

 6    haven't, and I think that shows how well put together this

 7    action is.

 8         Certainly the public have benefitted from this --

 9    or will benefit from the resolution of this matter because

10    the issues are very complex and they are very numerous, and

11    the agreement takes care of that.  I like the idea what you

12    had before about the nonmonetary benefits, I think that's

13    very important.  And I agree with you from what I have read

14    that this seems to be a real tool in resolving these cases.

15    So that was -- that was very good.

16         And certainly we couldn't do these on an individual

17    basis, and there is this numerosity issue which is great

18    here.  I think we have been talking about that; I don't have

19    to go into any detail on it.

20         And the -- the class certainly demonstrates there's

21    common question; everybody has been subject to this issue of

22    whether there has been this agreement, et cetera, amongst the

23    defendants to artificially inflate these costs.

24         And the Court finds that there's adequate

25    representation here, and that goes both to not only the

 1    individual plaintiffs but specifically, and I think more

 2    importantly in this case, to the attorneys, and that the

 3    attorneys are well versed in the action and also in the

 4    procedural mountain in Rule 23 class action cases of this

 5    size and nature.

 6           So the Court confirms the appointment of counsel,

 7    first of all, for the class, and I affirm the class, the

 8    settlement class in this action -- in these actions, and

 9    there's all different ones so I don't want to -- I'm not

10    going to begin to state these classes, but the Court has

11    reviewed the documents, and I find that the classes are well

12    defined and the Court does confirm them.

13           That plan of allocation, as I said, I think is

14    excellent.  I'm interested in the specific targeting that

15    that was -- that was done.  I know there was some mention of

16    that in some of the motions, and so I agree that those

17    particular vehicles would get weighted more heavily than

18    others.

19           So all in all, I approve the settlement as fair,

20    reasonable and adequate.

21           Thank you, Counsel.

22           MR. SELTZER:  Thank you very much, Your Honor.

23           Then the next item we have on the agenda is our fee

24    application.  Would you want to hear about that first or go

25    to the GEICO question?

 1          THE COURT:  I would like to do the GEICO question

 2    while we are at it right now for the judgment.

 3          MR. SELTZER:  All right.  And if I may, there was a

 4    filing by the settling defendants suggesting that the Court

 5    defer entry of the final judgments pending the outcome of

 6    resolution of issues that have been raised regarding the

 7    effectiveness and if effective, the scope of the claims that

 8    GEICO retains as an opt-out.

 9          We have been parties to discussions about that that

10    began only this last Friday, so this is kind of a new issue

11    that was raised for -- at least from the end-payors'

12    perspective.

13          THE COURT:  Well, I received today the pleading --

14    yes, the document from GEICO -- I mean, I just reviewed it

15    today, so I don't recall right now when it was filed.

16          MR. RUBIN:  Your Honor, did you say you received

17    something from GEICO as opposed to a notice from the

18    defendants?

19          MR. SELTZER:  Because I have not seen something

20    from GEICO.  There was something from --

21          THE COURT:  Not GEICO.  Let me find it.  It was

22    just the notice of outstanding issues, that's all.

23          MR. SELTZER:  Right.

24          MR. RUBIN:  We just wanted the Court to know the

25    defendants did have an issue with respect to GEICO's opt out

```
 1   and the effect.  We are in the process of meeting and
 2   conferring, and I don't think it is ripe for the Court; I
 3   think the timing under the settlement agreement says sometime
 4   next week -- end of next week we would file something with
 5   the Court if we are not able to reach an agreement on it.
 6             THE COURT:  Okay.
 7             MR. SELTZER:  And, Your Honor, we have requested --
 8   actually the settling defendants requested and we've agreed
 9   to participate in the meet-and-confer process this Friday to
10   discuss these issues and see if we can arrive at some
11   resolution or process for going forward.  And if it happens
12   then, great, it may be a couple days after that, I'm not
13   sure, because we haven't gotten confirmation from GEICO that
14   that date works.
15             But in any event, I want to make it clear for the
16   record that the end-payor plaintiffs reserve all of their
17   rights with respect to their position about the timing of the
18   entry of the judgments, when it should take place, regardless
19   of how this objection issue is resolved.  So just for the
20   record, I want to make that observation.
21             MR. RUBIN:  And for the Yamasha defendants and the
22   others who joined in with the notice, we agree with class
23   counsel that the orders with respect to final approval
24   certainly should be entered.  With respect to any rulings on
25   the allocation plan and fees, all of that stuff can proceed
```

```
 1    as the Court would otherwise do.  It's only the final
 2    judgment that there's a question that we are going to confer
 3    with class counsel over as to whether to -- when and how the
 4    language should read in the final judgment itself.  If that
 5    makes sense, Your Honor.
 6              THE COURT:  Well, you are going to submit a
 7    judgment.
 8              MR. SELTZER:  Actually judgments have been prepared
 9    that would be virtually identical to what was previously
10    submitted with respect to the prior settlements, and we would
11    ask that they be entered.  But what the settling defendants
12    said is they want to have a discussion first about this GEICO
13    opt out, whether it's effective and what it means, before the
14    Court acts to enter those judgments.  And we told the
15    settling defendants that we will discuss this issue with
16    them, but we reserve all of our rights.  If we have a
17    disagreement, and they want to have a further deferral of the
18    entry of judgment, we reserve the right to come to the Court
19    and say, no, they should be entered now.
20              THE COURT:  Okay.  So you will do the order
21    approving the settlement?
22              MR. SELTZER:  Yes.
23              THE COURT:  And then the judgment you are going to
24    hold pending this resolution; is that correct?
25              MR. SELTZER:  Yes, Your Honor, that's the idea.
```

 1          MR. RUBIN:  Right, because the issue with the final

 2    judgment, Your Honor, if you recall from the last rounds, it

 3    has a paragraph in it that says identify the specific

 4    entities or persons who opted out and states that they timely

 5    and validly opted out and thus are not covered by the

 6    settlement.  That can't be -- we don't believe that can be

 7    entered -- that language can be used until we address the

 8    issue of GEICO, but we are going to confer with class counsel

 9    over that and see if there's a way to do that interim or not.

10          THE COURT:  Okay.  And then you are going to let us

11    know or file something if there needs to be a hearing --

12          MR. SELTZER:  Yes.

13          THE COURT:  -- let's say in September.  It's August

14    so --

15          MR. RUBIN:  Yes, Your Honor.  We will file

16    something on or before August 13th.

17          THE COURT:  Okay.

18          MR. SELTZER:  And then we would advise the Court of

19    whether we need a hearing if there is a dispute that needs to

20    be resolved, and then we would ask that that takes place as

21    soon as is convenient to the calendar of the Court.

22          THE COURT:  All right.

23          MR. RUBIN:  Okay.  Thank you.

24          THE COURT:  Sounds like an agreement, and we will

25    see what happens --

1    MR. SELTZER:  Right.

2    THE COURT:  -- after you negotiate.  Okay.

3    MR. SELTZER:  Your Honor, just for the record, we

4    think there's a way to resolve this question with the final

5    judgments without necessarily having a final resolution of

6    the GEICO opt out, but that's going to be part of our

7    discussion.

8    THE COURT:  Right, later.  Okay.  So the attorney

9    fee issue.

10   MR. SELTZER:  On the attorneys' fee application, as

11   the Court knows, we've applied for attorneys' fees equal to

12   25 percent of the round three settlements, net of the

13   expenses.  And as we previously said we would do, we have

14   applied in each round for progressively lower percentages;

15   the round two percentage was 27 and a half percent as Your

16   Honor may recall, and then the round one was a bit higher

17   than that.

18   Let me just begin by saying that to achieve these

19   really historic results, class counsel have had to devote an

20   enormous amount of time and effort and money to these cases.

21   Through March of this year more than 341,000 hours of time

22   have been devoted by class counsel firms to this litigation.

23   And unlike our opponents who are among the --

24   THE COURT:  For what period of time?

25   MR. SELTZER:  This is from the beginning of the

1    case through March of 2018, and the beginning of the case is

2    the date that we were appointed as interim class counsel; the

3    time before that is not included in that total.

4         And I was going to say that unlike our opponents,

5    and our opponents are really among the finest antitrust

6    lawyers in the land, our compensation is dependent entirely

7    upon our obtaining recoveries for the class.  We took the

8    risk of litigation, and if we were unsuccessful, we wouldn't

9    get paid.  So we were on a contingency basis in this

10   litigation.

11        And with respect to the percentage we are asking

12   for, our papers lay out in detail why we believe our fee

13   request is in line with other class action precedence, and

14   it's also supported by a market test in terms of what private

15   litigants pay their lawyers.  For the class action context,

16   we cited, for example, the Alapata vs. Exxon Corporation

17   case, and that was a case in which a court awarded

18   31.5 percent of a $1.06 billion class settlement fund, and

19   noted there were many other cases awarding -- and listing

20   those cases, awarding fees between 25 percent and 35 percent

21   of the funds.

22        In the LCDs class action case, which was also an

23   indirect purchaser class action, the court there awarded

24   28.6 percent of the $1.08 billion settlement fund, which is

25   comparable to where we are at with the brand new settlements

```
 1    that are not part of round three, but we are going to
 2    increase that amount based on agreements we have reached in
 3    principle with other defendants that are not yet public.  And
 4    that 28.6 percent is higher than the 25 percent that, of
 5    course, we are asking for now.  The market also supports our
 6    application.
 7              I might tell Your Honor again, speaking just for
 8    myself and my firm, we are hired a lot to represent private
 9    plaintiffs in nonclass action cases on a contingency basis.
10    We are also hired to represent companies on an hourly basis
11    or on a fixed fee basis or any number of different ways.  Our
12    standard customary percentage arrangement with a client, and
13    it's all subject to negotiation so in a sense there is no
14    standard, but the starting point we start from is if we are
15    paying the expenses, then the contingency percentages are 40,
16    45 percent and 50 percent depending upon the point in time
17    when the case is resolved, and many very, very sophisticated
18    companies have agreed to those terms of our representation.
19              In other cases private plaintiffs have also agreed
20    to similar kinds of percentages that we are requesting here.
21    For example, there was a case involving the National Credit
22    Union Administration that was brought on behalf of failed
23    federal credit unions against various banks involving the
24    mortgage-backed security fiasco that was involved in the
25    great recession we just went through.  There the NCUA, which
```

1    is a governmental entity, agreed to a 25 percent fee with its

2    lawyers, and they were paid a little more than a billion

3    dollars in fees for recovery of about 4.3 billion on behalf

4    of the NCUA.

5            So the private market is one that is looked to as a

6    guidepost by courts in determining whether a fee request is

7    fair or reasonable, and examples like the ones I gave can be

8    multiplied and they appear in our papers.

9            So we think that the percent is a fair, reasonable

10   percentage based upon those benchmarks.  And, of course, this

11   litigation has been exceptionally complicated.  This may be

12   the most complicated set of class actions -- antitrust class

13   actions ever prosecuted.

14           Now, there's another metric that the courts look to

15   in looking at the fairness or reasonableness of the fee

16   request, and that's the lodestar multiplier cross-check.  It

17   is not required, but courts often engage in it to test the

18   reasonableness of the percentage amount.  Here the total

19   lodestar that has been incurred by the class counsel is

20   $140,283,627, again, as of March of this year.  The

21   multiplier that would be applied if we were granted a

22   25 percent request against all of the awards that the Court

23   has previously made, the two interim awards of 20 percent

24   from the round one and round two settlements, together with

25   the 25 percent we're asking for out of the round three

 1    settlements, would yield a multiplier of 1.63 times class

 2    counsels' time.  That is on the lower side of many cases.

 3            For example, the LCDs case, which I cited, where

 4    the court awarded 28.6 percent of the settlement funds, the

 5    multiplier there for lead counsel and liaison counsel range

 6    between 3.24 and 4.24 times their time.

 7            THE COURT:  What numbers did you use to get this

 8    multiplier because I divided and I didn't come up with this

 9    1.63?

10            MR. SELTZER:  Well, we added up all of the awards

11    the Court has previously made, plus the 25 percent we are

12    asking for from this round three of settlements, to come up

13    with the total amount of the fees, which would be the one

14    part of the ratio as against -- as against the --

15            THE COURT:  You used all of the settlements?

16            MR. SELTZER:  -- the lodestar, the lodestar, using

17    all of the -- all the time, and again that's consistent with

18    what other courts have done and what this Court said was

19    appropriate for the round two, which is -- this was like one

20    common effort, you know, the work that we did with respect to

21    one part of the case assisted in another part, and it is

22    really impossible to bifurcate the work, you know --

23            THE COURT:  I agree, but I question why 25 percent

24    for round three versus 20 for round one and round two?

25            MR. SELTZER:  Well, the reason why we asked for

```
 1    that is, first of all, that's what we said we were going to
 2    do when we originally --
 3              THE COURT:  Pardon me?
 4              MR. SELTZER:  That's what we said we were going to
 5    do when we responded to Your Honor's request for briefing on
 6    this issue a couple years ago.
 7              THE COURT:  Right.
 8              MR. SELTZER:  But the 20 percent awards, the Court
 9    expressly made those interim.  In other words, the Court
10    reserved judgment on whether --
11              THE COURT:  Correct.
12              MR. SELTZER:  -- to award more money out of those
13    settlements at the end of the cases.  So we are asking for
14    the 25 percent out of this round because we are getting close
15    to the end of the case, we are not there yet, but that was
16    the reason for doing that at this time.
17              I mean, we could do the -- if the Court were
18    inclined, the Court could follow what was done previously and
19    award 20 percent on an interim basis, but we think the
20    25 percent is fully justified on the facts of the cases as
21    they now sit.
22              And as I was going to say with the LCDs case on
23    multipliers there, there they were at the end of the case
24    pretty much, the overall multipliers for all of lawyers --
25    all the plaintiffs' counsel was between 2.4 and 2.6, much
```

1    higher than the 1.63 that we are asking for here.

2            So, again, if you look at the multipliers that have

3    been used as crosschecks in other cases, we think the

4    25 percent is an eminently reasonable amount from these

5    settlements, and then, of course, we will have the round four

6    settlements, and there will be a further application with

7    respect to them.  So that's the basis of the application.

8            And we also have a request for reimbursements of

9    expenses of about $500,000, and we are also using the

10   litigation fund/cost fund the Court established in the first

11   round to pay expenses mainly of experts, document-hosting

12   charges, and all of that.  That's all laid out in the

13   declaration of Mr. Zapala, whose firm acts as the treasurer,

14   so to speak, of the litigation fund in this case.  And that

15   is not part of any application at this point; we are just

16   using those funds for those purposes, but those are basically

17   third-party expenses from experts and other third-party

18   vendors we deal with for the common effort in the litigation.

19           So that's our application, Your Honor.  I'm happy

20   to answer any questions that you may have about it.

21           THE COURT:  Well, I will always have difficulty

22   with the attorney fees, not to underestimate them and not to

23   overestimate particularly with the end payors because I

24   see -- I'm anticipating a large number of claimants at the

25   end, so we want the pot to be as large as can be.

1          But in listening to you now and in applying the

2    factors and looking at round one and round two at 20 percent,

3    I think the average -- and I recalculated this, and I think

4    you had it in your papers, it was like -- it would come to

5    like 22 percent.

6          MR. SELTZER:  Yes, Your Honor.  If this application

7    were granted, then if you combine all of the prior awards and

8    use that as a percentage of the settlements achieved to date,

9    including round three, it would be about 22 percent.

10          THE COURT:  Okay.  And the Court knows that it has

11    to consider a number of factors, though there is no set way

12    of doing this.  Certainly lodestar you start with lodestar,

13    and we did that here as you indicated, and I think I

14    calculated out there must have been a blended average of

15    about $410 an hour, which I think is fair given the work

16    involved in this particular case.  And certainly there's a

17    great benefit to the end payors for the work that's done in

18    this case because they wouldn't have individually filed, they

19    probably don't know, and most people maybe still don't know

20    that they were harmed by this antitrust.  And that your

21    services were taken on a contingency fee basis with great

22    costs here, and while I am at costs, I will award the costs

23    that have been submitted which the Court has reviewed, it's a

24    little over 500,000 --

25          MR. SELTZER:  I think it is about $508,000,

```
 1    something like that.

 2              THE COURT:  The Court will award that exact amount.

 3    And I think the most important factor here is the

 4    professional skill of the attorneys.  And I also have gone

 5    through different cases and reread what we did before on

 6    attorney fees.  And I think that a determination -- I don't

 7    think there is anything magic about 25 percent, I don't think

 8    there's anything magic about 30 percent, I know where all of

 9    that started from.  And certainly when we get to figures of

10    over a billion dollars, we know that there's a substantial

11    attorney fee that's going to be involved there regardless of

12    the percentage.

13              So considering all of these factors, and I would

14    say the primary factor here to me is the skill of counsel,

15    but I do offset that by what is a reasonable -- a fair and

16    reasonable fee.  I mean, we can go up and it just becomes not

17    reasonable, the numbers are just too high.  But the Court

18    looked also at the multiplier and I look at that lodestar,

19    and I -- to be perfectly blunt, I don't find that as helpful.

20    Yes, it gives some kind of a measure, but when you are in a

21    case like this with 341,000 hours, we know that there's time

22    in there that actually has not been spent, not because of

23    dishonesty of lawyers, I'm not speaking of that at all, but

24    you round up, maybe you round down sometimes, I don't know,

25    but it's -- we know that there's -- it's just hard to keep
```

1    accurate time.

2         So I think the percentage method really is the only

3    method, and I give little weight to the lodestar though the

4    Court has gone over it and calculated it.  I did it a little

5    differently than you did considering just the settlement, but

6    I think that -- I think what's fair is probably somewhere

7    between the 20 and 25 percent, and I think you struck it when

8    you said 22 and I did that, and I think that that's probably

9    a fair resolution in a case with over a billion dollar

10   recovery.

11        So I'm going to grant the 25 percent, which would

12   equal roughly 22 -- it's 22 point-something, and I want you

13   to stick with that for your round four.  I'm telling you that

14   now.  I think that that would be a fair resolution for an

15   adequate and well deserved attorney fee.

16        MR. SELTZER:  Very well, Your Honor.

17        THE COURT:  Thank you.  Okay.  Anything else?

18        MR. RUBIN:  Nothing else, Your Honor.

19        THE COURT:  All right.  Please present the orders.

20   Does anybody else have anything to --

21        (No response.)

22        THE COURT:  All right.  Thank you for coming into

23   my new quarters for today.  Next month it will be somewhere

24   different, so make sure you check where you are going.

25        MR. SELTZER:  Very well, Your Honor.  We will

1    submit proposed form of order on the settlements and the plan

2    of allocution and the attorneys' fee award.

3              THE COURT:   Thank you.

4              MR. SELTZER:   Thank you, Your Honor.

5              MR. RUBIN:   Thank you very much, Your Honor.

6              THE LAW CLERK:   All rise.   Court is in recess.

7              (Proceedings concluded at 11:01 a.m.)

8                              —   —   —

1

2                              *CERTIFICATION*

3

4              I, Robert L. Smith, Official Court Reporter of

5      the United States District Court, Eastern District of

6      Michigan, do hereby certify that the foregoing pages comprise

7      a full, true and correct transcript taken in the matter of

8      IN RE: AUTOMOTIVE PARTS ANTITRUST LITIGATION, Case

9      No. 12-02311, on Wednesday, August 1, 2018.

10

11                            *s/Robert L. Smith*
                       Robert L. Smith, CSR 5098
12                     Federal Official Court Reporter
                       United States District Court
13                     Eastern District of Michigan

14

15

16      Date:   08/10/2018

17      Detroit, Michigan

18

19

20

21

22

23

24

25