1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF MICHIGAN
2             SOUTHERN DIVISION

3                 —  —  —

    IN RE: AUTOMOTIVE PARTS          Master File No. 12-02311
4   ANTITRUST LITIGATION             Hon. Marianne O. Battani

5   _____

6   In Re:  Bearings Cases          Case No. 12-00501

7   _____

8   THIS DOCUMENT RELATES TO:

9   DALC Gear & Bearing Supply
    Corp., et al., vs. Koyo France
10  S.A., et al.
    _____/
11

12              MOTIONS TO COMPEL

13       BEFORE SPECIAL MASTER GENE J. ESSHAKI
       at the Offices of Abbott Nicholson, P.C.
14          300 River Place, Suite 3000
               Detroit, Michigan
15           Monday, August 6, 2018

16  APPEARANCES:

17  For the Plaintiffs:    Michael S. Smith
                           PRETI, PLAHERTY, BELIVEAU & PACHIOS,
18                         LLP

19                         Thomas C. Bright
                           CERA, LLP
20
                           Nathan Fink
21                         FINK + ASSOCIATES LAW

22                         Denirro D. Lazar
                           THE MILLER LAW FIRM
23

24

        *To obtain a copy of this official transcript, contact:*
25        *Robert L. Smith, Official Court Reporter*
         *(313) 234-2612 • rob_smith@mied.uscourts.gov*

```
 1    Appearances:  (Continued)

 2    For the Defendants:    Carl Lawrence Malm
                             Steven J. Kaiser
 3                           Laura K. Conley
                             CLEARY, GOTTLIEB, STEEN & HAMILTON,
 4                           LLP

 5                           Michelle Mantine
                             REED SMITH, LLP
 6
                             James F. Lerner
 7                           Cristina Fernandez
                             WINSTON & STRAWN, LLP
 8
                             Brian M. Moore
 9                           DYKEMA GOSSETT

10
      Also present          Darin M. Sands
11    telephonically:       LANE POWELL, P.C.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  <u>TABLE OF CONTENTS</u>

2

3                                                              <u>Page</u>

4  <u>MOTION TO COMPEL PRODUCTION OF UNREDACTED DOCUMENTS</u>
   Motion by Mr. Smith................................. 5
5  Response by Mr. Malm...............................19
   Reply by Mr. Smith.................................31
6  Ruling by the Special Master......................38

7

8  <u>MOTION TO COMPEL DISCOVERY</u>
   Motion by Mr. Bright...............................47
9  Response by Ms. Mantine...........................57
   Reply by Mr. Bright...............................68
10 Ruling by the Special Master......................80

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Detroit, Michigan

2   Monday, August 6th, 2018

3   at about 9:57 a.m.

4                           —   —   —

5           (Special Master and Counsel present.)

6           (Mr. Sands present via telephone conferencing.)

7           SPECIAL MASTER ESSHAKI:  Good morning.

8           MR. SANDS:  (Unintelligible.)

9           SPECIAL MASTER ESSHAKI:  Would you please repeat

10  yourself?  Would you ask him to repeat himself?

11          UNIDENTIFIED ATTORNEY:  Yes.  Darin?

12          MR. SANDS:  Yes.

13          UNIDENTIFIED ATTORNEY:  For the record, can you say

14  your name and your affiliation again?

15          MR. SANDS:  Darin Sands from Lane Powell on behalf

16  of the Nachi defendants.

17          SPECIAL MASTER ESSHAKI:  I'm afraid I didn't get

18  that.

19          UNIDENTIFIED ATTORNEY:  Sands, Darin Sands.

20          SPECIAL MASTER ESSHAKI:  Lane Powell on behalf of

21  Nachi.  Okay.  Can you try to turn that up a little bit more?

22          Can you hear us, Darin?

23          MR. SANDS:  I can.  Thank you.  It is a little

24  quiet, but I can hear you.

25          SPECIAL MASTER ESSHAKI:  Okay.  Very good.

```
 1            All right.  This is the matter of In Re: Automotive
 2    Parts Litigation, Master File No. 12-md-02311, In
 3    Re: Bearings cases.  And this matter relates to DALC
 4    Gear & Bearing Supply Corp. vs. Koyo France,
 5    Case 15-cv-12063.
 6            And we are here this morning on the motion of the
 7    direct-purchaser plaintiffs to compel production of
 8    unredacted documents by Defendant NSK Europe, Ltd.
 9            We are sitting in the conference room of
10    Abbott Nicholson because the federal courthouse is still
11    under construction.  And we will have a list of counsel on
12    the transcript of this matter.
13            Who will be arguing this matter for the
14    direct-purchaser plaintiffs?
15            MR. SMITH:  I will, Your Honor.  Michael Smith.
16            SPECIAL MASTER ESSHAKI:  Okay.  Mr. Smith, you are
17    free to begin.
18            MR. SMITH:  Thank you, Master Esshaki.
19            As you know, Master Esshaki, this is a motion about
20    a number of documents that NSK produced to us in redacted
21    form.  And I thought I would start by briefly walking through
22    two of those documents to give you a sense of just how
23    important these are to our case.
24            The first document I would like to look at was
25    Exhibit F to our motion to compel.  I don't know if you have
```

1    the exhibits in front of you, but I would be happy to provide

2    you with a copy of them, if you would like.

3            SPECIAL MASTER ESSHAKI:  I have them.  Thank you.

4    That's the business cards?

5            MR. SMITH:  Exhibit F is, as you can see, a

6    one-page photocopy of a number of business cards.  These

7    business cards are from representatives of every other

8    defendant in this case.  And as you can see, the NTN

9    individual, the SKF individual, and the Schaeffler individual

10   are all in the sales group.

11           Now presumably these business cards were obtained

12   in person likely or perhaps at a meeting of all of these

13   people.  These documents were produced to the European

14   Commission.  It is fair to assume from a plaintiffs'

15   perspective that these came from a meeting of these sales

16   reps to talk about pricing, which is what this case is about.

17           We don't know the names of any of these people,

18   e-mail addresses, phone numbers.  What are we supposed to do

19   with this document?  What are we supposed to do with this set

20   of depositions?

21           We asked at a meet and confer if we would be able

22   to ask about the redacted information at a deposition, and we

23   were told it is unlikely that they would be able to tell us.

24   So what are we supposed to do with this?

25           The other document I would like to take a look at

1    is Exhibit D.  If you turn to the translation, which is the

2    second page of the document, which ends in Bates Number 296.

3         If you are ever looking for an objective and

4    unquestionable sign that a document is important to a case,

5    it will say please discard after reading in the beginning.

6    Why people continue to write that in e-mails I don't know,

7    but rule number one is if you are going to say please destroy

8    this, you probably shouldn't send the e-mail.

9         But this document is the most incriminating

10   document you will ever find in an antitrust case.  Please

11   discard after reading.  You've got a report from somebody

12   whose name is redacted, and they are talking about all of the

13   competitors' pricing decisions and their communications about

14   that.  You know, at this time they would like NSK to take the

15   lead because NSK has a clear reason such as an appreciation.

16   Further down, SKF has also revised their price list by

17   3.8 percent.  Schaeffler, which fails to catch up to the

18   revision for 2010, quote, should separately catch up with

19   other companies.  Who is that quote from?  We don't know.

20        Right below that there is another quote, I will

21   confirm the market information and reconsider.  That's

22   presumably from a competitor who we don't know whose name

23   that is.

24        At the bottom, the revision of the price list is

25   not related to the exchange rate or the price of materials.

1    It is common sense and an accepted practice in the industry
2    which is brought about through efforts to regularize over the
3    past 20 years.
4         These -- this document goes to the very heart of
5    what we are trying to prove.  We can't see who sent it.  We
6    can't see who received it.  And we have quotes in here
7    presumably from competitors about pricing.  We don't know
8    what competitors.  We don't know who said it.  It's hard to
9    think of a document more important to a case like this than
10   this one, and we don't have any information about who was
11   involved with it.  So that's really what we are talking about
12   here, this kind of material.
13        And it is NSK's position apparently that this
14   doesn't fall within the exception that allows you to produce
15   documents that are necessary to the establishment of a legal
16   claim.  A first-year law student would see this and know that
17   this is necessary to our case.
18        So I would like to give a little background on how
19   we got here because I think it's instructive to the analysis.
20   So Judge Battani has made clear from the bench that she wants
21   this case to move.  At the September 26th, 2017 status
22   conference, she made comments to that effect, and she
23   commanded the parties to come up with a scheduling order and
24   discovery plan within three weeks.  She said if we weren't
25   able to come up with a plan together, we should submit our

1    disputes directly to her.  She didn't want -- presumably she

2    didn't want an appeal, she didn't want to delay, she just

3    wanted to make a decision and move forward.  We asked for

4    oral arguments on our disputes.  She said no, and she entered

5    an order with a very aggressive discovery schedule.

6              In our view defendants have been doing whatever

7    they can since then to thwart that schedule and delay this

8    case, which is why we are hearing this motion in August

9    instead of back in January when we tried to get the

10   information we needed in order to brief this.

11             So the day she entered her scheduling order, we

12   served our discovery requests that day.  We got the responses

13   on December 8th -- that was in the middle of November, and we

14   got the responses on December 8th, and we saw a vague general

15   objection that referred to documents potentially being

16   withheld to the extent that they implicated applicable data

17   privacy laws.

18             First of all, it is a general objection which is

19   generally viewed as irrelevant nowadays.  It didn't mention a

20   country, it didn't mention a law, didn't say what was going

21   to be withheld.  So we saw that, and in light of the need for

22   the case to move forward, we pounced on it; we sent them an

23   e-mail the next week or week after and said would you please

24   tell us in writing what country you are referring to, what

25   statute, what you think that statute covers, what you're

1  planning on withholding, and what U.S. authority you have for

2  doing that.  That's exhibit -- that e-mail is Exhibit C to

3  our motion that was sent on December 28th.

4         The next day NSK offered a meet and confer, and we

5  said we are happy to meet and confer with you about the other

6  issues in your objections, but we want a response in writing

7  about the sworn law issue.

8         I started my career at a defense firm doing

9  securities class action defense; I'm well aware of how

10  foreign law issues are used to delay cases.  We weren't going

11  to -- we weren't willing to put up with it here.

12         So we didn't get that information.  Not only did we

13  not get that information, we were never told that these

14  documents were going to be redacted.  So we waited for

15  production.  We said when are we going to get the EC

16  documents?  The most important documents to the case, it

17  shouldn't be hard to produce them.  December rolled by,

18  January rolled by, February rolled by.  March, they told us

19  they were going to give them to us, but they didn't.  April

20  rolled around; they said they would give them to us by mid

21  April, and they didn't.  We said we are going to move to

22  compel; we need these documents.  We got them May 1st.  We

23  needed to wait five and a half months for 164 documents,

24  which is probably about this binder.

25         Much to our surprise, with no forewarning, we

1  looked through them and we see the first or second document

2  was this business card page with every name redacted.  I will

3  confess, I'm a little embarrassed that I was so surprised by

4  this, but I was genuinely surprised.  We had multiple meet

5  and confers, we sent them e-mails about this issue, we had

6  never been told this was going to happen.

7       And the surprise was the result of the fact that

8  there is no provision in the rules that allows this.  We have

9  a protective order that doesn't allow this.  There is no case

10  law we are aware of that allows this, for a party to just

11  decide what they are going to give and what they aren't, and

12  we will deal with it later.  So five and a half months later,

13  we get these documents and find many of them are essentially

14  useless for discovery purposes.

15       So if this had gone the way it was supposed to have

16  gone, NSK would have responded to our e-mail in December,

17  given us the information about this general objection, made

18  it a specific objection.  We sent this e-mail in good faith,

19  looking for legitimate information that we needed.  We would

20  have addressed this in January.  Perhaps they would have

21  proposed some sort of system, maybe we would have agreed with

22  it, maybe we wouldn't have, but we would have briefed this in

23  February.  They would have moved for a protective order or we

24  would have moved to compel, but instead they sat on it, and

25  so here we are in August dealing with an issue we should have

1   dealt with over the winter.

2           As far as our legal arguments, as you know from the

3   brief, our first argument was waiver, and often waiver is

4   sort of a throwaway argument that people tack on to a brief,

5   but we are serious about it.  We did everything we could to

6   get this information, and we didn't get it.  They made up the

7   rules.  They delayed.  They undertook this process without

8   telling us about it.  It's not permitted anywhere in the

9   rules.  They made them up and delayed and delayed.  There is

10  no specific objection.  We are talking about two requests --

11  really one here.  There's no specific objection to it.  When

12  we asked them about the general objection, they didn't

13  provide the specific information, and they just winged it,

14  and so here we are in August.

15          So, you know, our waiver argument is a serious

16  argument.  You can't do what they did.  This -- there's rules

17  about this.  There's a process.

18          Second, waiver aside, they're arguing that they are

19  prevented from giving us this information because of foreign

20  law.  As it turns out, the foreign law that they are arguing

21  that prevents them from giving this information wasn't in

22  effect during the five and a half months we waited to get it.

23  The GDPR went into force the day we filed our motion.  So

24  they are arguing that applies to these circumstances which

25  just fundamentally is not a plausible legal argument.

1        They acknowledge that there was a German

2    predecessor statute which had the same exception we are

3    dealing with here, the exception that you can produce

4    documents that's necessary to the establishment of a legal

5    claim.

6        So first and foremost, we are arguing over a law

7    that wasn't in effect.  Whether that's why there was so much

8    delay, I don't know, but it wasn't in effect when they

9    produced the documents.

10        The predecessor has the same exception that we are

11    dealing with here, and it's NSK's burden to prove to us why

12    they can't give us these documents.  What they have done is

13    said well, there is this foreign law that says we can't

14    provide personal data, and there's an exception, so you guys

15    figure it out.  You, plaintiffs, need to prove to us for

16    every single one of these documents that's redacted that you

17    want to use in a deposition or for some other purpose that

18    you need the information for, you need to prove to us for

19    each one of these why it is important to your case.

20        So if we are going to have a deposition of 50

21    documents, we need to prove to them why every single one is

22    important to our case such as we can see the information we

23    need, and then we get the documents who knows when, and we

24    have our deposition, and we've already told them the

25    documents that are important to the deposition and why.  The

1  exception to the GDPR and its German predecessor makes no

2  reference to it being up to one's adversary to establish why

3  a document is important to the case.

4       Those two documents we just looked at, our

5  sophisticated opponents across the table are perfectly

6  capable of looking at a document that says please discard

7  after reading and discuss this pricing discussion with

8  competitors.  They are perfectly capable of reaching the

9  conclusion that that document is important to this case; it's

10  not up to us to prove it to them.  The exception doesn't say

11  it is up to us, the case law doesn't say it is up to us, it

12  is their burden.  Their burden applies to the statute itself

13  and what it covers and to the exception.

14       It is noteworthy in their brief they didn't mention

15  a single one of these documents in their opposition.  They

16  didn't pull out a document which was redacted that has to do

17  with a lunch date with somebody and say, look at this, this

18  is what they want.  They didn't cite a single one.  Does that

19  suggest that these are important to the case?  Probably.

20       So it's NSK's burden; they are trying to dump it on

21  us, they are trying to dump it on the Court and say it's up

22  to us to figure out, it's not.

23       Even if the GDPR somehow applies to this situation,

24  despite the fact that it wasn't in effect for the five and a

25  half months we were waiting for the documents, or the German

1   predecessor statute applies to the situation, under the

2   Aerospatiale case they still have to give us this

3   information.

4           And we argued it in our brief, but to go through

5   the factors very briefly, under Aerospatiale there are five

6   factors to consider in this determining whether basically

7   U.S. discovery law trumps foreign law.  The first factor is

8   are the documents important to the litigation?  We've already

9   covered that here.  These are 164 documents, most of which

10  are redacted, which were produced to the European Commission

11  and resulted in a fine of over 60 million euros.

12          The second factor is were the requests specific.

13  Well, in their opposition NSK mentions multiple requests

14  covering a lot of material.  We are talking here about really

15  one request.  There are two that theoretically would have

16  covered this but really one specifically, and it asks for

17  documents that were provided to regulators, either domestic

18  or foreign.

19          It is a very specific request, and if there is any

20  need for evidence that the request is specific, it deals with

21  164 documents.  That's about as specific of a request that

22  you will find in these cases.

23          The third factor has to do with the location of the

24  data or the source of data.  We are not really in a position

25  to discuss that.

1        The fourth factor is are there other means of

2    securing the information.  NSK hasn't suggested any.  We got

3    the documents from them.  They have the documents, obviously,

4    which is how we have them, so they are the only place we can

5    get this.

6        The fifth factor is would allowing or disallowing

7    the request undermine the -- an important interest of the

8    United States.  I'm sure that opposing counsel will argue of

9    the paramount importance of relations with the European Union

10   and the importance of respecting a foreign law, but the

11   United States has an interest in enforcing its antitrust

12   laws.  These are not superfluous documents that are being

13   asked for to harass the defendants; these go to the core of

14   our case.

15       And it needs to be mentioned, we have a protective

16   order in this case -- in all of these cases.  It has two

17   degrees of confidentiality including high confidential,

18   attorneys-eyes only.  It is extremely restrictive.  It

19   protects this information.

20       So last, Master Esshaki, one of the cases we cited

21   in our brief was the Knight Capital case.  That's a case

22   directly on point.  It is from this district, Judge Lawson,

23   decided November of 2017, and it addresses the German statute

24   that preceded the GDPR.  Again, it was the same exception.

25       That case was about tortious interference with a

1    business expectancy.  It had to do with negotiations that had

2    been undermined by the defendant.

3         In that case the discovery requests sought

4    communications and other documents regarding this agreement

5    to disrupt these negotiations.  The defendant refused to

6    produce the information because it involved what was

7    apparently limited personal information.  They cited the

8    German statutes, and they cited the exception saying well, we

9    can't give this to them even under the exception.  And the

10   court found that the communications were necessary to the

11   establishment of plaintiffs' claims, and that there was no

12   conflict of law because the exception applied because these

13   documents were necessary to the establishment of the legal

14   claim, and said that they go to the heart of the case.

15        The court also decided that even if there were a

16   conflict, the Aerospatiale factors required that the

17   documents be produced.  And the court noted with respect to

18   the first factor, that the documents and information

19   requested here certainly are important to the resolution of

20   plaintiffs' claim.  They deal with the agreement -- they deal

21   with whether the parties were going to or not going to enter

22   into an agreement to market these products.  The information

23   -- quote, the information requested goes to the heart of the

24   claims.  That's exactly the same situation here.  These are

25   communications and other documents evidencing agreements that

1      we allege took place among these defendants in which they

2      paid a fine for.

3              The second factor, the court found that the

4      plaintiffs' requests are adequately specific and seek

5      disclosure only if those documents evidence the discussions.

6      The plaintiffs' requests do not demand any substantial mass

7      of unrelated personal information, for example -- of, for

8      example, employees, customers, third-party partners.  This

9      factor does not weigh heavily against disclosure and likely

10     favors compelling disclosures.  These are -- this is a very

11     specific request we are dealing with here.

12             The fourth factor Judge Lawson found that the

13     defendants had not -- just like here, the defendants had not

14     suggested any plausible alternative means for obtaining the

15     requested information.

16             And fifth, the court found that suffering

17     noncompliance with the plaintiffs' discovery requests would

18     undermine, fatally undermine, the important interest of the

19     United States in rendering an adequately informed decision on

20     the rights of a civil plaintiff before this court.  That's

21     exactly what we are arguing here.

22             I would note lastly, Master Esshaki, that we don't

23     have -- NSK didn't submit any sort of declaration from a

24     foreign lawyer.  There is one that they cite to that was

25     submitted by SKF attorneys.  I mean, it doesn't deal with the

1    specific request; it doesn't specifically address why that

2    exception isn't applicable to these facts.

3              So you are here with a couple U.S. lawyers on each

4    side arguing to you about what foreign law says you can and

5    cannot do.  I mean, that's a pretty significant omission in

6    my view.

7              So for those reasons we would respectfully request

8    that our motion be granted, and that if you do decide these

9    documents should be produced, it requires a few clicks of a

10   button.  They already have the documents, and we would ask

11   that they be produced within ten days.  Thank you.

12             SPECIAL MASTER ESSHAKI:  Thank you, Counsel.

13             Who will be arguing on behalf of the defendant?

14             MR. MALM:  Your Honor, Carl Malm on behalf of the

15   NSK Europe Ltd.

16             SPECIAL MASTER ESSHAKI:  Okay.  Counsel, please

17   proceed.

18             MR. MALM:  I think it's useful to start here by

19   walking through the legal arguments.  Counsel focused on the

20   documents and on some of the procedural issues, but I think

21   it's important to understand the legal arguments about what

22   is going on with data privacy currently in Europe and the

23   United States.

24             So we start with in Europe the GDPR which took

25   effect on May 25th.  That has in it a very broad Article 4

1   which defines personal information very broadly.  There's no

2   question that these documents fit into Article 4 of the GDPR.

3          Second, you have Article 45, and Article 45 forbids

4   transfer of personal and sensitive information to third

5   countries that don't have adequate protections.  The

6   United States is a country that doesn't have adequate

7   protection.  I don't think any of this is disputed.

8          So then the question becomes there's a variation in

9   Article 49 and that allows for transfer of documents that are

10  necessary to a legal claim or defense.  So much of this

11  motion from the European perspective hinges on this question

12  of what is necessary.

13         We have cited Mr. Wright's declaration, which I

14  respectfully disagree that we couldn't use a codefendant's

15  declaration that explains the law and cross-cites to it.  I

16  think it would have been a waste of money to develop our own

17  declaration that was duplicative of that declaration.  And

18  that declaration, as well as the European Data Protection

19  Board guidance, which was issued on May 25th, 2018, the day

20  the GDPR went into effect, are very clear about that this

21  necessity is not to be construed broadly.  There needs to be

22  considerations of proportionality; there needs to be

23  considerations of what is actually necessary that the -- that

24  broad American discovery is not going to fit into this

25  necessity exception.  The European Data Protection Board is

1    clear that considering anonymization or pseudo anonymization

2    or data minimization is an important part of this from the

3    European perspective.  So that's kind of step one where the

4    European issues are coming from.

5         Now, there is this question as to whether GDPR or

6    the German predecessor BDSG is the applicable law here.  I

7    think it is clear if the transfer -- if you were to order the

8    transfer today, and it would occur today, then GDPR is the

9    applicable law, so GDPR is what we should be looking toward.

10   Now, plaintiffs maybe don't like how we got there, so on and

11   so forth, but that's the reality of what we face today.

12        It is worth adding that GDPR is basically, as

13   many -- you know, this Article 4, 45, 49, all borrowed from

14   the BDSG, so the analysis wouldn't be -- wouldn't be very

15   different.  To the degree there's a change, it's the -- the

16   enforcement environment is really different.  It's clear that

17   Europe is taking this very seriously.  The penalties here are

18   potentially four percent of worldwide revenues.  There's a

19   lot of money on the line in a discovery dispute, so that's

20   where we are from the European perspective.

21        On the U.S. side we have Rule 26, which also has in

22   it principles of necessity and proportionality, which we talk

23   about in our briefing which, Your Honor, is, of course,

24   familiar with.  And then we balance the two using the

25   Aerospatiale factors, and there -- when we did all of that

1    analysis, that is where NSK came up with its proposed
2    approach to deal with this, which is not what they did in
3    Knight Capital, which is a different approach that would
4    be -- would allow for the parties to balance the interests of
5    Europe in data privacy and the United States in discovery,
6    and produce a very specific set of documents that is very
7    important to the case in plaintiffs' eyes, unredacted.  So
8    that clearly fits the three Aerospatiale factors that we all
9    have identified.  The other two which relate to the origin of
10   the documents, an alternative, I think the parties agree, are
11   not that kind of useful here to the analysis.

12           So this is where we came up with our very
13   reasonable proposal which is to say we will produce these
14   documents as we have, redacted.  Plaintiffs can look at them,
15   and then identify to us the -- you know, it doesn't have to
16   be document by document, we would be happy to deal with these
17   things categorically, documents that they want unredacted.  I
18   think the defendants are prepared to take -- NSK is prepared
19   to take a pretty reasonable and flexible approach to that,
20   and then at the end of the day, they will have the set of
21   documents that they need for their depositions as counsel
22   mentioned, documents that maybe they needed for trial or
23   expert work, those documents will be unredacted, but the vast
24   majority of documents that are responsive to these requests,
25   and we do have over 100,000 documents in train for

 1    production, so to the degree that counsel is trying to narrow

 2    this to this 164, it is just kicking the can down the road,

 3    which is why we wanted to have a process that would kind of

 4    confront the issue head-on and deal with it.

 5         That's where we came up with this proposal, and I

 6    think it is a very reasonable proposal.  I think it deals

 7    with the aspects of balancing EU law and balancing interests

 8    of the United States.

 9         And I think it's important because while counsel

10    has cited you to a bunch of documents that relate to

11    communications between competitors, I would note these

12    companies also sell bearings to each other in a completely

13    legitimate way.  So the fact that there are business cards in

14    people's files is maybe not quite the smoking gun that

15    counsel indicated, but nonetheless we would be willing to

16    produce that document, and we would be willing to produce

17    these other documents that plaintiffs have pointed out, but

18    let's take a look at this document.

19         SPECIAL MASTER ESSHAKI:  We need to get one over to

20    plaintiffs.

21         MR. MALM:  So this is a document from the

22    production and just for the record it is NSKVRGEU, Bates

23    number ending in 1175.  This is a document -- I mean, it kind

24    of gets to -- plaintiffs kind of made a flippant joke about

25    lunch dates.  Well, this is a receipt from a restaurant in

1    Barcelona.  From the context you can tell that the waiter's
2    name is redacted.  That waiter has privacy rights under EU
3    law, and EU law takes those privacy rights very seriously, as
4    we have explained in our briefing.  It is not necessary to
5    this litigation, in my view, that that waiter's name be
6    unredacted.  I don't know what plaintiffs would do with that
7    information.  I don't think they would do anything useful
8    with it.  It is from a lunch that was about seven years ago.
9    I doubt the waiter is locatable or knows anything.
10           So this is the kind of document that we don't think
11   we should produce, and I think that this kind of illustrates
12   the whole point pretty clearly.  So that is why we proposed
13   that we do this; we take a process where we produce it
14   redacted, and then we meet and confer with them and come up
15   with a process for identifying the stuff that would need to
16   be unredacted.
17           I would readily say that the documents that counsel
18   identified here today would probably be unredacted as a
19   result of that process.  Documents like this would remain
20   redacted.  There are other documents in this production that
21   frankly are in the middle that we would have to work
22   something out with plaintiffs.
23           So, for instance, phone records.  There are some
24   phone records in this production.  Well, people use their
25   phones for lots of things.  I'm not conceding, maybe they use

1   their phones to call competitors and that information is

2   important.  Maybe they use their phones to call wives or

3   girlfriends or kids, and the plaintiffs don't need that for

4   this litigation.  And, you know, without -- with the overlay

5   of the European data privacy law, we think it's important to

6   have a system in place that protects that.  We think our

7   approach is a practicable one under the circumstances.

8            And I think it is worth remembering the context

9   from the main case here.  NSK produced 7.9 million documents

10  in the main case in response to these discovery demands.  182

11  of those were used at depositions.  So that -- you know,

12  that's kind of exactly where this is all headed.  We all

13  know, we've all done it, you make broad productions in

14  antitrust cases and there is a small set of documents that

15  ultimately become the deposition exhibits and the trial

16  exhibits, and what -- you know what the experts work with.

17  And I think as a result of the process that NSK has proposed,

18  all of those documents would be unredacted, plaintiffs would

19  have what they need under U.S. law, the European data privacy

20  laws, whether it is the BDSG or GDPR, is the applicable law,

21  would be satisfied, and it is a practical approach to a

22  difficult problem of international law.

23            SPECIAL MASTER ESSHAKI:  Counsel, would you please,

24  for the record, specify the details of what you say are a

25  very reasonable compromised proposal.

1          MR. MALM:  Yes.  So, this is in our brief, but let

2     my lay it out to you clearly.  We would produce -- NSK would

3     produce documents in redacted form as have been presented to

4     you today.  Plaintiffs would look at those documents.  They

5     would send us either a list of categories of documents they

6     want unredacted, or a list of Bates numbers of documents they

7     want unredacted or some combination.  And it's hard, given

8     what has been presented to you today, for plaintiffs to

9     confess not to be able to do that.  We would then take a look

10    at these documents, and giving it -- giving it wide berth, we

11    would produce documents that -- that seem -- that seem to be

12    narrowly tailored and relevant to the -- necessary to the

13    legal claims, and at the end of the day, we will probably

14    produce 100,000-plus documents.  I would hope and anticipate

15    from that process, 1,000 or less would be unredacted and we

16    would be -- we would have kind of worked our way through the

17    problem.

18         SPECIAL MASTER ESSHAKI:  Okay.  Thank you.

19         MR. MALM:  So that's our proposal.  Now to get --

20    to just pick up on a couple of other things that counsel

21    mentioned.  So -- well, so they mentioned waiver, and the

22    fact that in their view of the universe, we were slow to deal

23    with this stuff.  I mean, they had -- they had -- we were

24    clear we were going to redact stuff for European data

25    privacy.  To a certain degree, I think there was perhaps a

1    miscommunication here because originally we objected on

2    blocking statutes, which are a different thing than data

3    privacy, and when they were asking for clarification, we gave

4    clarification that it was data privacy and not blocking

5    statutes.

6            In addition, there's kind of a temporal difficulty

7    here because he points out on December 29th they were asking

8    for more clarity, but we hadn't agreed on custodians yet, so

9    there's a note if we were -- NSK Europe, Ltd. is the parent;

10   it has subs and operations all over Europe.  You know,

11   ultimately we agreed on some custodians we know that Germany

12   and GDPR is the issue, you know, would it have been helpful

13   to e-mail a thing and say maybe it is Poland, Turkey, I don't

14   think so, and to a certain degree it doesn't matter because

15   those laws have in broad strokes similarities on all of what

16   would have this similar issue.

17           And in addition, if they didn't like the pace of

18   stuff, they had the option to go to you or to the Court to

19   make us move faster.  There were multiple opportunities for

20   discovery conferences and hearings that they didn't avail

21   themselves of, so it is kind of fire this e-mail out, not let

22   the response lay in the weeds for five months and then say,

23   well, hell, you've waived everything because of this; it

24   doesn't make sense.

25           And finally I don't think they have this argument

1    against NSK as I have explained.  We have to address the real
2    issue here because, I mean, you know, SKF is going to have
3    the same issue in an hour.  There are other defendants in the
4    room, and everybody is watching this closely.  This case is
5    made up of the European subsidiaries of defendants from the
6    bearing case plus a bunch of other entities that plaintiffs
7    seem to have omitted from the main bearing case, but I think
8    every defendant is going to have this issue substantively,
9    and while they are not here today, I mean, they may not
10   necessarily have something ripe for a decision by the Court,
11   but we are all looking to the Court for some guidance here.
12   And a ruling based on these waiver arguments when in
13   particular we said -- I mean, it says in our objection under
14   no circumstances will we violate data privacy laws, so I
15   think that's kind of a red herring, and I don't want to
16   impune motives but I think the plaintiffs are trying to get
17   you focused on that because they don't want to -- they don't
18   want to deal with the fact that their proposal on how to
19   balance is just to run roughshod over the European
20   considerations.
21        So the Knight Capital case, in some way it's
22   plaintiffs' position that the Knight Capital defendant's
23   position and our position illustrates the reasonableness of
24   our position.  Plaintiffs' position is GDPR and BDR, this is
25   the United States, we get it all.  Knight Capital defendants

```
 1    were we are not going to produce because of the German data
 2    privacy laws.  And NSK's position is we are going to come up
 3    with a solution that satisfies the necessity exception
 4    Article 49, that satisfies Rule 26 and that satisfies their
 5    Aerospatiale factors.
 6              And so to a certain degree I think Knight Capital
 7    is actually a useful case to illustrate the reasonableness of
 8    NSK's position and what NSK is proposing to do here.
 9              SPECIAL MASTER ESSHAKI:  Take your time, Counsel,
10    don't be concerned.
11              MR. MALM:  There is also -- counsel mentioned this
12    point about -- we are getting far afield here, but counsel
13    mentioned this point about defendants and foreign defendants
14    using foreign laws to delay and so on and so forth, and how
15    he used to work at a defense firm and he knows all about
16    that.
17              I think it is also important -- there is a good
18    quote at page 546 of Aerospatiale that talks about plaintiffs
19    abusing foreign defendants because of the potential pressures
20    generated by conflicts of laws and so on and so forth.  I
21    don't have it right in front of me, but the Supreme Court has
22    acknowledged kind of the other side of that, which is to say
23    that if your -- if your case -- perhaps your class
24    certification motion in the main case is not strong and you
25    are looking to generate settlement leverage, maybe one way to
```

1    do it would be to make the defendants feel the pain of four

2    percent of worldwide revenue potentially on the line if you

3    were to make a production.

4        So I think -- I just think that kind of -- the

5    foreign law issues cuts both ways here, and I disagree with

6    the idea that defendants are using it for any sort of delay

7    here.

8        Again, plaintiffs -- if the issue is delay,

9    plaintiffs have tools available to them to deal with delay

10   and enforcing a broad production of documents that runs over

11   European law issues is not the solution here.

12       As to burden, we think we've met our burden.  We've

13   explained it very clearly what -- we've explained very

14   clearly what the EU laws are and what the balancing should

15   be.  In addition, it's always the parties' seeking the

16   discovery to show that they have a right to the discovery and

17   so the discovery meets the factors in Rule 26.  So, in any

18   event, we don't think that that's a dispositive issue here.

19   I think that covers kind of what I need --

20       SPECIAL MASTER ESSHAKI:  Thank you, Counsel.

21       MR. MALM:  -- what I need to cover, but I am happy

22   to answer any questions from you.

23       SPECIAL MASTER ESSHAKI:  Counsel, I assume you have

24   a rebuttal.  In your rebuttal would you please clarify for me

25   your position vis-a-vis the, quote, reasonable compromise

1    that is suggested by the defendants.

2          MR. SMITH:  Well, I would like to address that,

3    Master Esshaki.

4          SPECIAL MASTER ESSHAKI:  And then the other thing I

5    would like you to address is counsel has indicated that right

6    now we are dealing with 164 specific documents but that there

7    could be more than 100,000 following.  I need you to address

8    your proposal as to the 164 as well as what you propose to do

9    for the 100,000 that may follow.

10         MR. SMITH:  Well, first, Master Esshaki, this

11   reasonable compromise that has been laid out here,

12   August 6th, 2018 is the first time I have heard the detail of

13   this reasonable compromise.  The first time this compromise

14   was ever mentioned was when we called -- when we sent them an

15   e-mail and asked them to meet and confer about the motion we

16   were filing.  This is about delay, delay, delay, delay.

17         They are saying they might have to pay four percent

18   of sales or whatever.  Where is their motion for a protective

19   order?  If this is an all hands on deck issue, what were they

20   doing about it for the five and a half months we were waiting

21   for these documents for?

22         And to suggest that we are the ones delaying the

23   case because we didn't move to compel when they repeatedly

24   told us they were going to produce this tiny batch of

25   documents for months, so it is our fault when we didn't come

1    before you when we took their representations as serious and

2    believed they were going to produce them.

3              So this reasonable compromise is not a compromise.

4    We should have been discussing this in January.  We should

5    have been discussing this in February at the latest.  We

6    should have moved on this in March.  It's August now.

7              So I will tell you what is in my view completely

8    unreasonable about the compromise.  This is what I was

9    talking about in my argument.  They are putting the burden

10   entirely on us to tell them each specific document that is

11   important to our case.  What this compromise leaves out is

12   their ability to think independently as sophisticated

13   attorneys who know what this case is about.  If they were

14   really serious about doing it this way, they would have

15   produced 70 or 80 of these documents that in their view do

16   meet the exception, and then withheld ones like this one and

17   said look, there's this middle ground, these are documents we

18   don't think are necessary, can you establish for us why you

19   need them?

20             But to suggest that a document saying please

21   discard after reading and the following is detailed pricing

22   discussions with their opponents -- with their competitors;

23   to suggest to us that they are not in a position to determine

24   whether we need that for our case and to put that burden on

25   us.  Master Esshaki, we are going to be taking depositions in

*Motion Hearings before Special Master - August 6, 2018*

**33**

```
 1    this case in 2030 if we follow this system.
 2              What they didn't address is --
 3              SPECIAL MASTER ESSHAKI:  I hope you get a very good
 4    Master.
 5              MR. SMITH:  Well, it's a serious issue.  It's a
 6    serious issue.  We want to move forward with this case.
 7              So these business cards, they've proposed a few
 8    theories about what the business cards might be about.  Very
 9    interesting theories.  It's our case, we are bringing this
10    case.  This is a case about a conspiracy.  These documents
11    were provided to foreign regulators that resulted in a fine
12    of over 60 million euros.  Okay.
13              THE COURT REPORTER:  Excuse me just a minute.
14              (An off-the-record discussion was held at
15              10:40 a.m.)
16              MR. SMITH:  So what's completely absent from this
17    belated spring on you at the hearing compromise is any role
18    for them -- any role for them in assessing these documents as
19    smart, sophisticated attorneys in determining what is
20    obviously important to our case.  So we send them an e-mail
21    about these business cards, and they say we are not
22    convinced.  You know, these guys talk to competitors all the
23    time, it could be a number of reasons.  So then what do we
24    do?  We move, we blow another month and a half, this is for
25    one document.
```

1          This system is ridiculous.  It is impractical.  It

2     is going to delay this case forever, and it is not required

3     under the case law.  This isn't a balancing test.  There is

4     an exception that applies to this limited number of

5     documents.  This is about a small group of documents that we

6     think are the most important ones in the case and we need

7     them.

8          So if they don't want to produce this, and they

9     tell us, look, we noticed there's a receipt in here with a

10    waiter's name, okay, but it's not up to us to prove to them

11    every single one.

12         So they haven't addressed what happens when we have

13    a disagreement.  Well, we have to move.  We are going to be

14    moving a thousand times, and I know that they are of the

15    understanding that they will be very reasonable about this,

16    but if it took five and a half months to produce these 164

17    documents, I have serious doubt about how smoothly this is

18    going to go.

19         Second, they mentioned about 100,000 documents that

20    are going to come after this.  So, first of all, as we

21    mentioned in our brief, in our experience in 20-something of

22    these cases, documents provided to the government are the

23    most important documents in the case; that's why

24    Judge Battani ordered defendants in all of these cases to

25    produce documents given to the DOJ even when there wasn't a

*Motion Hearings before Special Master - August 6, 2018*

35

1    pending document request.  This is the same category.  So

2    their mission is to make this bigger than it is.  These

3    are -- this is a limited number of documents that we need,

4    and they are very important.

5            With respect to the 100,000 additional documents

6    they say they are going to produce, who knows when.  The

7    same -- the same protest about this compromise.  So we are

8    going to get 100,000 redacted documents, and they are talking

9    about putting them in categories or they will find an

10   efficient way to do it.  They need to give us the documents

11   that a reasonable lawyer would know are important to the

12   case, unredacted, to start, no question.  That is their

13   obligation.  There is an exception that allows them to do

14   that.  It is not our burden to prove that the exception

15   applies.  If there are documents that we get like a receipt

16   with a waiter's name, they are not going to be getting a

17   follow-up e-mail from us asking them to produce it.

18           So on its face, this proposal -- and I would also

19   like to clarify, they never once mentioned they were going to

20   redact documents.  There is no miscommunication here.  If

21   they told us they were going to do that, we would have moved

22   to compel immediately.  They never told us they were going to

23   do this.  That is a fact.

24           SPECIAL MASTER ESSHAKI:  Okay.

25           MR. SMITH:  So there's an exception that applies.

```
 1   They are perfectly capable of determining which cases are
 2   objectively important to this case.  Where there is a middle
 3   ground, again, we are not going to be filing a motion to
 4   compel for this document, but do we need to argue over
 5   whether a document about when your competitor is going to
 6   raise prices and who is going to do it and who is making the
 7   decision, do we really need to send them an e-mail to
 8   establish why that's important?  They are capable of doing
 9   that themselves, and this all should have been addressed
10   months ago.  This is about delay, delay, delay.
11             SPECIAL MASTER ESSHAKI:  Counsel, anything else?
12             MR. MALM:  Yes.  Well, I just wanted to address
13   some of the -- so, first of all, this business -- this
14   business cards document.  They asked us about it, we asked
15   them to represent that it was necessary, and we were going to
16   produce it, and they wouldn't.  So part of the issue here is
17   we were just trying to get a process going, and they haven't
18   engaged.
19             Second of all, the idea that this is sprung at the
20   hearing is just wrong.  It is in our papers, and it was
21   discussed in the context of this document -- of this business
22   card document back in May, so it is just not true that this
23   is being sprung at the hearing.  It has been something we
24   have been proposing for a long time now as a way to get
25   through all of this stuff.
```

```
1              As to who is going to figure out which documents
2    are necessary, again, I think that a discussion that has, you
3    know, if there are categories of documents, for instance,
4    reflecting competitor communications that we can agree on
5    that needs to be produced in the first instance, I think we
6    could work through that very quickly, and I don't think that
7    that process is at all impractical.  I think it's the only
8    practical thing that we can come up with given that
9    imperative we face under both Europe and U.S. law.
10             The other thing I would say about practicality is
11   people have rights.  This waiter has a right.  They can't
12   just be like it is going to be -- it's going to be difficult
13   for litigation so we just run over this guy's rights.  We
14   need to have a process that accounts for people's rights
15   under European law and that balances the needs of the
16   interest of the United States and the interest of the EU, and
17   that's what we've come up with.
18             As to this issue of, you know, whose burden it is,
19   it's their burden in the first instance to show that the
20   discovery is something that they need.  That's straight from
21   Rule 26.  I don't think if we were to embark on a process
22   starting with categories and maybe ending with specific
23   documents, that this would actually be an issue.  And I think
24   given the legal imperatives on both sides of the Atlantic, I
25   think it is important -- it is important that we try.
```

1          SPECIAL MASTER ESSHAKI:  Thank you.  All right.

2    I'm going to grant the motion in my discretion with some

3    limitations that I will discuss in a moment.

4          This is a very serious matter, one of the most

5    serious matters that I have undertaken as a Special Master in

6    this case since my appointment because it does require

7    balancing the protective needs of European individuals that

8    has been codified in the GDPR and its predecessor statutes

9    against the need for a court -- a United States District

10   Court, sitting in an antitrust case, having to determine

11   whether antitrust violations have occurred, and if they have

12   whether they have impacted individuals in the United States

13   and therefore must issue a remedy to correct the damage that

14   the misconduct caused.

15         I believe that both sides point to the leading

16   case of -- I'm not as trained as they are -- Aerospatiale for

17   the elements that need to be considered.  There are five.

18   One, the importance to the litigation of the documents or

19   other information requested.  Two, the degree of specificity

20   of the request.  Three, whether the information originated in

21   the United States.  Four, the availability of alternative

22   means of securing the information.  And, five, the extent to

23   which noncompliance requests would undermine an important

24   interest of the United States, or compliance with the request

25   would undermine an important interest of the foreign state

*Motion Hearings before Special Master - August 6, 2018*

1   where the information is located.

2         It is my considered opinion that the information

3   requested, specifically the 164 documents, are, in fact,

4   critical to establishment of a legal claim.  I believe that

5   the 164 documents clearly fall within the area of specificity

6   and are proportional at this point.  Neither side has

7   addressed whether the information originated in the

8   United States, and I'm going to make the assumption that it

9   did not.  Neither side has addressed the availability of

10  alternative means of securing the information, and I'm going

11  to assume there are not alternative means.

12        The most critical factors is the extent to which

13  noncompliance with the request would undermine important

14  interest of the United States, or compliance undermine the

15  important interest of the foreign state.

16        The GDPR has specific exceptions for disclosing

17  information where it is necessary to establish a legal claim.

18  I believe that provision is completely on point with this

19  motion, and these documents are critical.  I believe that the

20  information that has been provided already demonstrates the

21  critical nature of the documents.

22        Now, I will also acknowledge that the exhibit that

23  was presented to me today by the defendants, which is a

24  lunch chit with the name of the waiter redacted, is not a

25  critical document and that name should have been redacted.

1          As to the 164, I'm going to order that they be

2    produced.

3          As to any documents that are to follow along, I'm

4    going to order that the defendants use their best

5    professional judgment and weed out documents such as this

6    lunch chit where the name of the waiter has been redacted to

7    redact that truly personal information in a document that

8    freely is not critical to the establishment of the claims in

9    this case.

10          MR. MALM:  Your Honor, may I ask one question

11    for --

12          SPECIAL MASTER ESSHAKI:  I'm not quite done.  You

13    can at the end.

14          The defendants argue that the direct-purchaser

15    plaintiffs must identify each critical document on a

16    document-by-document basis based upon redacted documents that

17    they have produced.  This is really imposing an impossible

18    position on the direct-purchaser plaintiffs because they

19    cannot determine the critical nature of documents based upon

20    redacted documents.

21          I also note that there is a significant protection

22    order in place in this case which will provide the

23    protections of inappropriate disclosures.  I believe that the

24    United States District Court for the Eastern District of

25    Michigan has an overriding interest in protecting the

1    residents of the United States against antitrust conspiracies

2    and damages caused by antitrust conspiracies in other

3    countries which impact residents here, and must have the

4    ability to create a remedy for the damages that such conduct

5    causes.

6              So the 164 will be produced.  As to any future

7    documents, that is not a blanket approval of that production.

8    I am asking that the defendants use their best professional

9    abilities to redact the type of information that is

10   referenced in this luncheon chit or anything that is not of a

11   critical nature in establishing a claim.

12             I don't want to see 20 or 30 more motions coming

13   after this.  I'm assuming that the standards that I have

14   given you can be followed.

15             Now, Counsel, you wanted to ask a question?

16             MR. MALM:  I just wanted to clarify because you

17   said the 164 would be produced, but you also said that

18   document would not be produced which is one of the 164, so I

19   think what you are saying is 163 will be produced but not

20   that one.

21             THE SPECIAL MASTER:  Correct, correct.

22             MR. KAISER:  What about the other --

23             THE COURT REPORTER:  I'm sorry.  Your name?

24             MR. KAISER:  Steve Kaiser.  I'm sorry.  What about

25   other documents that are of the nature of this that might be

1    in the 164, would they be ones we can hold back or --

2        SPECIAL MASTER ESSHAKI:  Counsel, what are your

3    thoughts?

4        MR. SMITH:  We need these documents ASAP,

5    Master Esshaki.  I think the time has passed to go through

6    and decide which of these are important or not, but I will

7    say that if they do produce them to us, that there is a

8    protective order if they identify any subsequently that they

9    want back, we would be happy to -- you know, assuming it is

10   reasonable and it's exactly, you know, this kind of thing, we

11   would be happy to confirm to them that we have removed that

12   from the production and that we are not going to --

13       SPECIAL MASTER ESSHAKI:  I'm going to accept that

14   suggestion that 163 be produced, and if counsel for

15   direct-purchaser plaintiffs determine that there are any

16   among these 163 that are similar to the document produced

17   today, which is the luncheon chit, they will be returned and

18   it will be acknowledged that they have not been used or

19   copied.

20       And finally I'm going to order that the documents

21   be produced within ten days after the order is final.  The

22   documents have been segregated, the documents are not

23   significant in number, and they should be readily available

24   for production.  I see no reason for them to be delayed.

25       So counsel for plaintiffs, I ask that you draft an

```
 1    order once you receive the transcript that reflects my
 2    opinion here, and that it contains the magic language this
 3    order is subject to approval pursuant to the order appointing
 4    Special Master, dated such and such, which will obviously
 5    grant the defendants an opportunity to appeal this matter,
 6    and it is of significance.
 7            But when the ultimate order is final, the documents
 8    must be produced within ten days.  Understood?  Counsel?
 9            MR. MALM:  Your Honor, two other questions just for
10    clarity as we go to implement this.  There are two other
11    categories of documents that I think are worth addressing
12    specifically here today so we don't end up back before you,
13    and that is there are a number of phone records, and these
14    phone records -- I get the argument, maybe the phone numbers
15    are competitors' phone numbers, but it is also -- I mean, all
16    of us have an adversarial reaction to having your phone
17    records made available in a place where data privacy isn't
18    viewed to be in the same way.
19            So I guess the question is can we redact
20    information in phone records that we don't have reason to
21    believe relates to this case?
22            SPECIAL MASTER ESSHAKI:  You are really asking me
23    to -- for an advisory opinion on a matter that really has not
24    been brought up or briefed, so my inclination is to decline
25    to address that with the proviso that I would ask that meet
```

1    and confer -- both sides meet and confer and attempt to come

2    up with a solution for phone records because I understand the

3    concerns about calling your family, calling your mistress,

4    calling whoever, your best friends.  That should not be

5    disclosed, and I'm assuming that when presented with that

6    information, counsel for the plaintiffs will acknowledge

7    that, but I'm not going to make a ruling on that today.

8              Now, your second point.

9              MR. MALM:  In the second category of documents

10   there are travel expenses -- there are a number of travel and

11   expense reports in this body of documents that there are some

12   travel expense reports that in all candor say travel to

13   wherever for meeting with Koyo is one that comes to mind, but

14   those I understand, but there are also travel expense reports

15   that don't on their face have anything to do with anything

16   other than maybe the EC asked for travel expense reports from

17   a certain time period or a certain person or something, but

18   all the travel expense report does is say, you know,

19   so-and-so was at the Hyatt on this date in Barcelona or

20   whatever.  So that's another category of documents that I

21   think is just going to --

22             SPECIAL MASTER ESSHAKI:  I would take that in the

23   same posture as with the telephone records.  It is a matter

24   that is really not before me today within the motion that has

25   been filed, but I would ask that the parties meet and confer

*Motion Hearings before Special Master - August 6, 2018*

**45**

| | |
|---|---|
| 1 | and come to some agreement with the understanding that |
| 2 | personal travel records or travel records that have nothing |
| 3 | to do with meeting with competitors should not be produced. |
| 4 | Understood, Counsel? |
| 5 | MR. SMITH:  Yeah.  May I make one point, |
| 6 | Master Esshaki? |
| 7 | SPECIAL MASTER ESSHAKI:  Sure. |
| 8 | MR. SMITH:  I'm afraid that we are witnessing |
| 9 | surgery being conducted on your decision in real time before |
| 10 | it is final, and so -- |
| 11 | SPECIAL MASTER ESSHAKI:  I have not made a |
| 12 | decision.  I have made a suggestion for how it should be |
| 13 | followed. |
| 14 | MR. SMITH:  Well, one point of clarification.  I |
| 15 | think it is clear per your order that 163, now, documents |
| 16 | will be produced -- |
| 17 | SPECIAL MASTER ESSHAKI:  Correct. |
| 18 | MR. SMITH:  -- ASAP, and the meet and confers don't |
| 19 | have to deal with that? |
| 20 | SPECIAL MASTER ESSHAKI:  Correct. |
| 21 | MR. SMITH:  Second, as to phone records -- I |
| 22 | mean -- |
| 23 | SPECIAL MASTER ESSHAKI:  I have made no ruling. |
| 24 | MR. SMITH:  I understand, I understand, but I would |
| 25 | just ask that -- what we don't want obviously is for things |

 1   to be held up anymore, so I would ask defense counsel while

 2   we are here in the room to proceed with your production as

 3   appropriate, and we don't need to be meeting and conferring

 4   about phone records which would hold up the entire production

 5   on that one issue.  That's what I'm concerned about.  But we

 6   will meet and confer on that, and the travel records, I think

 7   they are important to the case, but we can meet and confer on

 8   those two discrete categories, and otherwise I think your

 9   order is clear.

10          SPECIAL MASTER ESSHAKI:  All right.  Thank you very

11   much.

12          MR. SMITH:  Thank you, Master Esshaki.

13          SPECIAL MASTER ESSHAKI:  Can we take about a

14   ten-minute break to give the reporter a chance to recoup?

15   Very good.

16          (A brief recess was taken at 11:00 a.m.)

17                          —   —   —

18          (At 11:14 p.m. hearing reconvenes; Special Master

19          and Counsel are present.)

20          SPECIAL MASTER ESSHAKI:  The next matter on the

21   docket today is DALC, D-A-L-C, Gear & Bearing Supply Corp.,

22   McGuire Bearing Company and Sherman Bearings, Inc. vs.

23   Koyo France, S.A., et al., Case No. 2-15-cv-12068.  And this

24   matter is direct-purchaser plaintiffs' motion to compel

25   discovery from the defendants AB SKF, SKF GmbH and

1    SKF USA, Inc.

2              May I ask who will be addressing this on behalf of

3    the moving party?

4              MR. BRIGHT:  Thomas Bright for the direct-purchaser

5    plaintiffs, Master Esshaki.

6              SPECIAL MASTER ESSHAKI:  Very good, sir.  You may

7    proceed.

8              MR. BRIGHT:  So the direct-purchaser plaintiffs'

9    motion presents three issues for Your Master to decide.  The

10   first is whether AB SKF must search for documents and data in

11   the custodial files of their wholly own subsidiaries that are

12   not named defendants.  The second is whether in the first

13   instance AB SKF and SKF GmbH must search their central files,

14   databases, shared drives and company intranet for responsive

15   documents.  And the third issue has to do with the -- their

16   production of European documents and whether they will be

17   redacted, and they have told us in their papers that they

18   will be able to do that by August 15th; however, in light of

19   your ruling this morning, we will see if they are still able

20   to meet that schedule and still conform with Your Master's

21   ruling.

22             So with the control issue, whether AB SKF must

23   search for documents and data in the custodial files of the

24   wholly-owned subsidiaries that are not named defendants, we

25   have shown in our papers why the requests are relevant.  I

1    don't believe there is much dispute about that.  If they want

2    to direct me to a particular request, we can do that, but I

3    think they have been fully addressed in our moving papers.

4              As to the custodians that we had narrowed our

5    requests for.  We have 14, I believe they have five.  My

6    math -- I mean, I may not have the numbers exactly right, but

7    there are a number that we request that are, indeed, employed

8    by an SKF entity that is not a defendant in this action.

9              All of the custodians that we are seeking documents

10   from, with the exception I believe of three, we have a very

11   good faith belief based on the -- based on their

12   co-conspirators and the documents that have been produced so

13   far that these individuals had direct involvement in the

14   conspiratorial conduct that we allege in our complaint.  And

15   there are three other custodians that have played unwittingly

16   or wittingly a key role in implementing the goals that were

17   achieved -- that were the goals of the conspiracy.

18             And our -- we show control -- one way we establish

19   control is by the 100 percent ownership, and we cite cases

20   admittedly out of this district.  The defendants take issue

21   with that, and cite authority for the other side that are

22   outside of this district.

23             One of the cases they rely heavily on is the

24   Vivendi Universal S.A. Securities litigation out of the

25   Southern District of New York.  However, that ruling and in

```
 1    that case the court said that the moving party could not get
 2    documents from the non-defendant entity.  But in that case,
 3    unlike this one, the resisting party submitted a declaration
 4    of the company's general counsel, and in that declaration the
 5    general counsel said that the company does not have
 6    possession, custody or control of the documents, that the
 7    documents are protected by bank secrecy, that the company has
 8    its own management and the company had its own policies and
 9    procedures.
10         SKF -- I will use that to mean the SKF defendants
11    here.  The SKF defendants here have not submitted such a
12    declaration, nor have they argued that they don't control the
13    subsidiaries.  Their argument is that just the fact that they
14    are wholly owned is not enough.  We disagree with that, but
15    even if you agree with that, Master Esshaki, we've shown
16    other reasons or other indicia of legal control.
17         For instance, in the 2017 annual report, AB SKF
18    admits that it controls these groups and says that control
19    exists when the group has the right to direct the relevant
20    activities of the company.  That's their annual report.  I
21    don't know how more specific one can get about whether they
22    have control over the documents.
23         In addition to that -- by the way, during our meet
24    and confer SKF has represented, and I certainly don't doubt
25    it that they don't have organizational charts, and -- nor do
```

```
 1    they have -- if they do have organizational -- or if they
 2    don't have traditional organizational charts as I understand
 3    it, and I don't know if they have any documents that by
 4    themself would be considered reporting responsibility
 5    documents.  I think that was told during the meet and confer
 6    that that type of information may be found in custodial
 7    files.
 8            Nevertheless, we've been able to piece together
 9    through some of the productions but we did get -- we did get
10    some -- we did get a number of documents in -- from SKF USA
11    in the previous bearings -- the initial bearings case
12    pursuant to a subpoena which Your Master ruled on.
13            In any event, through -- with those documents we
14    were able to show that there is a management system of
15    crossover business units in which you -- individuals in the
16    United States are reporting directly to supervisors in
17    Europe, and some of these people's supervisors are in
18    companies that are not defendants here.  So there is
19    management -- cross-border management -- you know, management
20    goes and extends beyond the legal entities themselves.  And
21    we give in our motion examples of the people -- the
22    custodians we are looking for documents from and show how --
23    how -- you know, certain ones of those do report to people
24    overseas, or how those people have U.S. people reporting to
25    them.
```

 1             There is also -- I believe in our reply we showed
 2     in federal court discovery, SKF admitted that they have
 3     control over their wholly-owned subsidiaries, and its
 4     statements there, I believe, were admissions that were based
 5     off of their annual reports.  So the language from the
 6     request for admission was, I believe, taken from the annual
 7     report, and SKF admitted to it.
 8             So control -- and then there is a case, I believe
 9     we cited in our reply, Motorola Corp. case, which is from the
10     Southern District of New York, which acknowledges the Vivendi
11     case, I believe it's Judge Rakoff, and he said, look, I
12     wouldn't have agreed with that ruling.  But anyway in this
13     case presented to the court, the Motorola case, it's a
14     different situation, and we are going to -- he's going to
15     allow the discovery because it was overlapping management
16     between the parent and the sub, which we have here, there was
17     a parent-established basic of principles of coordination of
18     activities of the subsidiaries, and we have demonstrated,
19     with all of those exhibits there, some of their common
20     pricing, which is paramount in this case.  There are common
21     document retention policies and other policies that the
22     company has that are common throughout.  They do allow for an
23     exception to conform with local law, but other than that you
24     need to follow the general thing, and we have cited a number
25     of them, and I'm not going to list them here.

```
 1              Certain people hold positions that involve all
 2    entities, and a clear vision of a global business requiring
 3    corporation, and coordination.  And that's clearly here where
 4    SKF presents itself to the public in its annual report as the
 5    SKF Group.
 6              So I think that is all I have on the control part,
 7    Master Esshaki.  I'm not sure if you want to question me
 8    about that or --
 9              SPECIAL MASTER ESSHAKI:  No.
10              MR. BRIGHT: -- you want me to move to the -- or do
11    you want --
12              SPECIAL MASTER ESSHAKI:  Please.
13              MR. BRIGHT:  -- them to go ahead and --
14              SPECIAL MASTER ESSHAKI:  No, go ahead, we will
15    address all three.
16              MR. BRIGHT:  Okay.  The next issue is whether SKF
17    and SKF GmbH must search in the first instance central files,
18    databases, shared drives and the company intranet for
19    responsive documents.
20              We determined through our -- what we were able to
21    review from SKF USA that they do maintain a central database,
22    one called Spider, and that shows -- so the -- when the
23    SKF USA people, at least the documents we have had so far,
24    when they communicate with one another, rather than attach
25    pricing lists or pricing instructions or any group-wide
```

1    instructions, they just refer to it on Spider, they don't

2    actually attach the document.

3            So if we only got the custodial documents in the

4    first instance, it would just be referral to these

5    company-wide documents, intranet and databases, which we have

6    already found and shown with specific examples in our motion.

7            And also only a select number of people had access

8    to certain parts of the database, and we have an example of

9    that in our motion, too, showing that.

10           I think our example also shows that with the

11   SKF group-wide instructions, again, like I said earlier, they

12   must be followed unless required to do something otherwise by

13   local law.  It shows that the European price list is becoming

14   the leading reference price list throughout the SKF Group,

15   and that's also very, very important here in our case where

16   we, you know, allege there's a global conspiracy but also

17   acknowledge that most of the meetings occurred in Europe,

18   that that was one reason the European Commission fined them

19   over 300 million euros.  So the European price list is of

20   critical importance to our case, and we believe that the

21   agreements that were reached in these meetings in Europe were

22   the basis for pricing in the United States.  And, three, the

23   custodians that I have listed is the conduit through which

24   that information got through the U.S.

25           And there is another database called GADD.  These

*Motion Hearings before Special Master - August 6, 2018*

**54**

```
 1    are -- it's also -- it's the same type of thing where people
 2    that are e-mailing one another refer to the database as
 3    opposed to attaching documents.  We put all of that in our
 4    opening paper, and the defendants never denied that, they
 5    didn't deny the existence, the relevance, or the fact that
 6    people referred to them.  So that's why we need those in the
 7    first instance.
 8            The defendants said, well, we'll give you the
 9    custodial documents and then you tell us what's not there.
10    We can't do that.  It shouldn't be our burden.  Yes, there
11    will be certain known omissions that we will be able to
12    identify and tell them.  However, there is also some
13    known/unknowns that we are not going to be able to identify
14    and say this is not in Custodial A's documents.  So that's
15    why we are prejudiced by their approach on these central
16    files and databases.
17            And then the third issue is the European document
18    production.  In their papers they said that they were
19    scheduled to do so on August 15th.  They did submit a
20    declaration that indicated there may be certain redactions;
21    they weren't specified as to what those redactions would look
22    like, what they would be like, whether it's something similar
23    to the restaurant bill that we saw earlier today or whether
24    it's something as extensive as the exhibits Mr. Smith showed
25    to yourself, so I just don't know what's going on with that.
```

```
 1              I assume your ruling earlier today will apply to
 2   the SKF production on the European documents as well and
 3   going forward to other documents that had data privacy
 4   issues.
 5              SPECIAL MASTER ESSHAKI:  Can you tell me how you
 6   think my ruling today would apply?
 7              MR. BRIGHT:  Well, they submit -- the SKF
 8   defendants have indicated they are going to redact their
 9   European documents, and they submitted a declaration from an
10   individual Robin --
11              SPECIAL MASTER ESSHAKI:  Apparently well educated.
12              MR. BRIGHT:  Very well educated, much better
13   educated than I am.  However, it doesn't appear that
14   Mr. Hopkins -- it doesn't indicate that he saw the European
15   Commission documents, doesn't specifically state that he read
16   the request or the meet-and-confer correspondence.  He did
17   say he had personal knowledge following reasonable inquiry;
18   it sounds like counsel may have told him, I don't know.  He
19   doesn't say that he read the motion to compel.  He doesn't
20   indicate that he knew that the DPPs narrowed their request.
21   He doesn't acknowledge that the information is pretty stale
22   as far as time's concerned, it's old.
23              During our meet-and-confer discussions the SKF
24   defendants have told us that most, if not all, of the
25   custodians, there may be two or three exceptions, are former
```

*Motion Hearings before Special Master - August 6, 2018*

1    employers, they no longer work there, their e-mail addresses

2    are no longer current, their contact information is no longer

3    current.

4          And we are not -- the DPPs are not seeking, as he

5    mentions in passing, you know, different types of privacy

6    matters.  DPPs are not seeking information about criminal

7    history, they are not seeking information about political

8    beliefs or religious beliefs or sexual orientation or

9    anything like that, as he indicated were -- you know, we

10   expected to get a higher level of privacy.

11         But as I understand your ruling, you were saying

12   that the European Commission documents that you saw today

13   should have been produced without redaction.  I would have

14   been told by the SKF defendants that their European

15   production is not voluminous.  It is, as I think I get this

16   right, it is comprised of two, five-inch binders.  The number

17   of documents I haven't been told, but it is not a voluminous

18   production.  They are very critical.

19         I mean, in this case, you know, he is a little

20   different than SKF because here SKF is headquartered in

21   Europe and SKF paid a much bigger fine, and most of the

22   activities pursuant to the conspiracy that involved SKF

23   occurred in Europe.

24         SPECIAL MASTER ESSHAKI:  Okay.  Thank you.

25         MR. BRIGHT:  So I don't think I have anything more

```
 1  │  on those.
 2  │         SPECIAL MASTER ESSHAKI:  All right.  Very good,
 3  │  Counsel.
 4  │         Who will be addressing this on behalf of SKF?
 5  │         MS. MANTINE:  Michelle Mantine on behalf of the SKF
 6  │  defendants.
 7  │         SPECIAL MASTER ESSHAKI:  Very good.  Counsel, you
 8  │  may proceed.
 9  │         MS. MANTINE:  Good morning, Special Master Esshaki,
10  │  Counsel.
11  │         SPECIAL MASTER ESSHAKI:  Good morning.
12  │         MS. MANTINE:  I just want to take a step back from
13  │  Mr. Bright's points that he made, the three points in his
14  │  motion that he articulated here this morning, and put a bit
15  │  more framework around that for you, Special Master, because
16  │  to me this -- this motion boils down to one thing, and that's
17  │  proportionality.
18  │         It is not an instance where the SKF defendants are
19  │  stonewalling or saying no; we are not giving anything or
20  │  taking some sort of unreasonable approach.  Rather, the SKF
21  │  defendants are defendants who have already been subject to
22  │  more than 7 million pages of discovery in the prior action as
23  │  a third party, our U.S. entity, that is SKF USA.  So we are
24  │  sitting here today focused primarily on the European
25  │  discovery which plaintiffs now seek.
```

1           So in order to provide reasonable good faith

2     response to plaintiffs and to move this case forward, which

3     is frankly all we have been trying to do for several months

4     now, we provided with our opposition to plaintiffs' motion a

5     proposed order that we submitted via ECF that I will pass to

6     you now, Special Master, for your reference.

7           SPECIAL MASTER ESSHAKI:  Okay.

8           MS. MANTINE:  What we think strikes the appropriate

9     balance of proportionality under the Federal Rules of Civil

10    Procedure 26 and our obligations, our obligations as a party

11    to this litigation, and that's important so I will come back

12    to that, and also balancing some of the other issues we spoke

13    about today regarding necessity and burden and compliance

14    with foreign laws.

15          Now, the direct-purchaser plaintiffs, DPPs as I

16    will refer to them, really seek basically carte blanche

17    authority to go after a dozen or more custodians of foreign

18    entities to require us to produce simultaneously with that

19    e-mail production, which, by the way, is expensive and

20    burdensome, and I will talk more about that in a bit.

21    Simultaneously search central file areas for documents that

22    they claim are somehow critical as e-mails that were produced

23    to government or custodial e-mail files of the parties.

24          And when we tried to work with them to say, listen,

25    we would like to take it in this order, we would like to

1    start with the most important discovery, the things that we

2    think you need most based on your allegations, they just shot

3    us down.

4              And then to make matters worse, rather than

5    focusing on the named SKF defendant entities, and there are

6    three:  AB SKF, the parent whose headquarter is in Sweden,

7    SKF GmbH, the German entity, and finally SKF USA, Inc., who

8    is here in the United States.  They want to include

9    custodians from SKF entities who are not a named defendant in

10   this case, not a named defendant in the original direct

11   purchaser bearing action or any other auto parts case who

12   have nothing to do with this.

13             In fact, Special Master, our negotiations went so

14   far as to the only sort of compromise the plaintiffs were

15   willing to make -- the DPPs were willing to make is if we

16   could somehow promise the depositions of foreign employees

17   who we no longer control.  And, again, in a good faith effort

18   to meet the DPPs halfway here and to move forward, because we

19   are tired of negotiating, we want to move forward too, right?

20   We said, okay, we will try to reach out to them, we will take

21   the last known address and we will see what we can do, but we

22   don't know these people, these are former employees, and they

23   have been gone for years, and to this day, Special Master, we

24   have not heard from them.

25             So after countless meet-and-confer conferences --

 1    luckily counsel and I get along pretty well -- our side, the

 2    SKF defendants drafted that proposed ordered in conjunction

 3    with our opposition motion to try to relay to you,

 4    Special Master, what we think is a reasoned, logical and

 5    sensible approach in this case.  We focus on discovery of the

 6    named defendants, the parties that the DPPs actually sued,

 7    and, of course, that wouldn't prejudice their rights at all

 8    to go subpoena third parties via, you know, a Rule 45 or the

 9    Hague Convention, that's certainly within their right, and it

10    has been within their right since they filed the original

11    direct purchaser case in 2012.

12           But as we sit before you today in the DALC action,

13    this is the first time that SKF is a named defendant and

14    actually has stayed in the case and not been dismissed.  We

15    are sitting with the U.S. arm of our company and

16    SKF US, Inc., having produced more than 7 million pages, more

17    than 42 custodians as a third party in the initial

18    direct-purchaser bearings matter, and yet us offering them

19    nine custodians from our additional defendant entities is

20    enough.  Us saying we are going to produce to you REC

21    documents just as soon as we figure out this GDPR stuff and

22    issues that are peculating so we can move forward in a

23    practical and logical way with a sense of process, moving

24    forward to protect in court and European rights, that wasn't

25    enough.  And it also wasn't enough for us to say, listen,

*Motion Hearings before Special Master - August 6, 2018*

1    like our SKF USA production that you have seen that refers to

2    these central file sources, pertinent, relevant, arguably

3    relevant portions of those sources get attached to e-mails

4    that you are going get, so why don't we start with that

5    production, why don't we start there, plaintiffs, and then go

6    on to any sort of central file production you supposedly need

7    so bad, which makes me laugh a little bit, Special Master,

8    because --

9              SPECIAL MASTER ESSHAKI:  I'm sorry to interrupt

10   you, Counsel.  I do apologize.

11             MS. MANTINE:  No.

12             SPECIAL MASTER ESSHAKI:  But did you just say that

13   when you -- it is your intention that when you produce

14   e-mails that reference attachments that were stored on the

15   central files, you will produce those attachments with the

16   e-mails?

17             MS. MANTINE:  Let me clarify a little bit,

18   Special Master.  Yes, the attachment comes with the e-mail,

19   we don't separate them.  So if the attachment is something

20   from the GADD database or Spider, that Mr. Bright mentioned

21   in his argument, absolutely.

22             SPECIAL MASTER ESSHAKI:  No, we are sort of missing

23   this.  What he indicated is that there are e-mails that say,

24   dear co-employee, go -- I reference Document Number 234 in

25   the Spider system, you will understand the policy based upon

1  a review of that document.

2          MS. MANTINE:  Yes.

3          SPECIAL MASTER ESSHAKI:  That e-mail did not attach

4  document number 234, it says go to the Spider system to find

5  it.  Are you saying you will attach it, or are you saying you

6  will only send the e-mails that actually have physical

7  attachments?

8          MS. MANTINE:  Understood.  If that attachment is

9  there, and plaintiffs request it --

10          SPECIAL MASTER ESSHAKI:  Physical attachments?

11          MS. MANTINE:  We would be happy to -- we would

12  automatically attach the physical attachments.  And if they

13  looked at me and said, Ms. Mantine, you have not produced

14  this document and it references this relevant pricing policy,

15  we would absolutely turn it over.  We have not in the six

16  years we've been dealing with this discovery on our U.S.A.

17  entities, we have never received separate inquiries from the

18  plaintiffs.

19          In fact, Special Master, these same plaintiffs were

20  very much amenable to this approach for the non-party

21  discovery sought against SKF USA, so we were slightly baffled

22  when the approach now didn't seem to make sense or wasn't

23  enough.  And we got to the point where we realized very

24  quickly nothing was going to be enough.  That for whatever

25  reason the DPPs felt that we needed to be before you before

 1  we were going to move forward.

 2       So to address Mr. Bright's arguments, each one by

 3  one and then more specifically, I'm going to start with where

 4  he left off, which is really what I consider the easy one,

 5  which are the EC documents.  And, you know, we have talked a

 6  lot today, and you said more than once, and I think both

 7  sides have said more than once about documents being provided

 8  to the government being the most important documents in the

 9  case.  Absolutely, I understand that.  It is a case involving

10  an alleged global conspiracy.  We haven't tried to run from

11  that.  We have been trying to produce them, we really have.

12       But once they filed this motion, the NSK motion

13  which related to ours, and in their motion papers on two

14  occasions they insisted that every one of those documents be

15  produced without redaction.  We felt stuck, Special Master.

16  We felt stuck because we needed to balance the right that,

17  you know, my co-counsel for NSK discussed this morning and

18  that are very important to both of our clients as well as

19  other defendants in the case and in the auto parts litigation

20  at large.

21       Again, that's why in the proposed order, I think in

22  paragraph 3 we said we were willing -- excuse me, I

23  apologize, wrong paragraph, paragraph 1 that we would produce

24  those by August 15th under the assumption that we would have

25  a final ruling from you and some direction now.  So any

1    argument there that we tried to delay that production again,

2    that was the plaintiffs' doing, not ours.

3           Turning to the central file sources, which I think

4    you have already really addressed very well.  Again, it sort

5    of comes as a surprise to us that they would say that there's

6    these documents they can't get from any other source, which

7    is just not true.  They've gotten them in the e-mails, and if

8    they pointed to one and said, Michelle, this wasn't in the

9    e-mail, we need it, we would absolutely endeavor to go get

10   it.

11          Now, in all fairness they haven't seen our European

12   custodial discovery so they don't know what's going to be in

13   there, but based on the experience with our U.S. entities'

14   discovery we have every reason to believe that their request

15   will be met with, you know, our production of relevant

16   non-privilege information.  And there is no reason to

17   second-guess that now, other than an excuse to waste some

18   time and money and your time, Special Master.

19          Going to what I think we really saw as the

20   reason -- the reason that the plaintiffs wanted to get before

21   you today with respect to the custodial discovery, and unlike

22   NSK said this morning, they were able to agree to custodians

23   rather quickly, we have not been able to agree to custodians,

24   which really has been the delay on our end.  And

25   interestingly enough, every custodian they have proposed from

1     our European entity, and even the additional ones on top of

2     the 42 U.S. custodians that we've produced, the additional

3     ones, we have said, well, wait, we will give it to you, we

4     are not -- we will give it to you, it's done, and that's

5     what's in the order.  Paragraph 2 bears the names.  Fine,

6     those are the people you want, that's what you get, and they

7     are still saying it's not good enough, no, because now they

8     want to reach their hands into our affiliated entities and

9     their wholly-owned subsidiaries; we get their documents, go

10    get their documents, go find them, and then they want to

11    reserve the right to keep going.

12            So when's it going to end?  When is the

13    reasonableness and the proportionality, when does that part

14    of this kick in?  Because right now, Special Master, we are

15    continuing to review documents because we don't want to

16    delay.  And I can tell you we are spending on that effort

17    alone in this case approximately 40 grand a week.  Now, to

18    them that's meaningless, right?  That's my problem.  But it's

19    not something that comes free, cheap, or easy, and then

20    adding custodians to it and then saying then they need this,

21    then they need that, when they attached -- they went through

22    the alphabet at least once with exhibits of documents from

23    those custodians.  And to the extent those people they now

24    want and they seek spoke to people in the United States, they

25    have their e-mails, that's what's in all of the attachments.

```
 1    They absolutely have it.  So for us to go and then say now we
 2    need to get them more, when it is going to end, right?
 3             And then the only case -- I agree with Mr. Bright
 4    there's a lot of case law on this issue about control, and
 5    really what does it mean here.  And for whatever reason --
 6    maybe we have bad luck, most of it is not in this district or
 7    in this circuit, but the one case we cited, the Bosch case,
 8    is, it's Michigan -- it's a Michigan case.  It's
 9    precedential, and it went all the way.  They said they didn't
10    show enough to show that the parent company controlled the
11    subsidiaries.
12             So whether they point to, you know, one case in
13    another district or another, that one is the only one really
14    of any precedential value here, and it takes the position
15    that we do, that it is their burden to show we have this
16    control that, you know, I don't know where they get it, I
17    don't have it, I don't know.
18             So by all means, Special Master, our hope here
19    today is that as we are reviewing these probably hundreds of
20    thousands of records or at least 100,000 records no doubt, of
21    these e-mails trying to move this case forward, that you help
22    us in looking at this order and this approach and seeing if
23    it is something that seems reasonable and proportionate under
24    Rule 26, and that it focuses on party discovery.  And it by
25    no means prejudices the plaintiffs; I mean, there is nothing
```

1    stopping them from going through the third-party discovery

2    process on any entity, just like they did to SKF several

3    years ago.

4         Now, one other point Mr. Bright made, and he's

5    exactly right, for whatever reason I don't have -- produced

6    more than 600 pages of organizational charts for our U.S.

7    entities because we have them and that's what you do with

8    organizational charts.  For the European entities we don't

9    have that, so I worked very well with Mr. Bright trying to

10   convey to him what we know about the structure and trying to

11   give him comfort in the fact that these names, these

12   custodians, these are the people they need, and that's all I

13   can do.

14        Now, I did, thanks to a lot of good help, create my

15   own little chart, and if it is helpful to you, it gives you a

16   sense --  Tom, I will pass one down to you as well.  This

17   gives you a sense of what that structure looks like.  And it

18   is no surprise to Mr. Bright, it is exactly what he conveyed

19   to you about the various segments; automotive, industrial and

20   the service or the aftermarket, and then some of those who

21   report up in the company.

22        I'm -- we are giving -- SKF defendants are saying

23   you can have all of them, and we have, by the way, also given

24   them some local sales directors as custodians, ones that work

25   for the defendant entities.  So this isn't a situation where

 1   we are saying no, no, no, you don't need to talk, let's focus

 2   down here, let's give you some lower echelon employees,

 3   right, and we will distract you.  We are saying we'll give

 4   you the people that if your alleged conspiracy had happened,

 5   they would have known about it, and they would have

 6   communicated it to the U.S., and we'll give you them, but,

 7   no, we are not willing to go dip our hands into -- or try to

 8   dip our hands into documents of non-defendant entities who we

 9   don't control their e-mails and their files.

10          SPECIAL MASTER ESSHAKI:  Counsel, what about the

11   proposal that they will make their European production by

12   August 15th, they will give you their European custodians,

13   and after that they will go to central files; why is this not

14   an acceptable resolution?  And can you then after that --

15   after going through the European custodians, you can then

16   discuss the U.S. custodians.

17          MR. BRIGHT:  Okay.

18          SPECIAL MASTER ESSHAKI:  What about that?

19          MR. BRIGHT:  With respect to why should they give

20   us custodians first and then give central files, we

21   thought -- what would happen then is they would provide, as

22   your hypothetical suggests, the custodians would -- however

23   you end up ruling on what custodians they are, we review

24   those documents, and she's already admitted it takes a good

25   bit of time to review these documents because she's still

```
 1   doing it.  We have finished our review; we would then have to

 2   identify the specific documents and central files that are

 3   relevant.  We have already done that.  We have already shown

 4   that it is a common practice for SKF Group employees to

 5   reference the central files as opposed to attach a document.

 6            When you ask counsel for SKF, well, what if a

 7   document is referenced in an e-mail but not attached, would

 8   you give them that document?  And in the first instance, if I

 9   understood her answer correctly, the answer's no.

10            SPECIAL MASTER ESSHAKI:  Yes, that's correct, I

11   think that's correct.

12            MR. BRIGHT:  It is incumbent upon us to make that

13   identification, and then we have to go back to them and say

14   by the way, here's a document that was referenced, we need

15   that document.

16            That doesn't necessary mean -- and they are putting

17   all of their pricing policies -- I mean, she's -- what we

18   haven't heard is why any of those documents are not relevant.

19   We've given you examples of them, attached examples or at

20   least references to them, because we don't have -- and

21   showing, look, this is the types of documents that are there.

22            MS. MANTINE:  Mr. Bright --

23            MR. BRIGHT:  So we have shown the relevancy.  I

24   don't think it's that burdensome to produce them from the

25   central files.
```

SPECIAL MASTER ESSHAKI: You will have an opportunity.

MS. MANTINE: No worries.

MR. BRIGHT: She hasn't demonstrated any specific burden.

SPECIAL MASTER ESSHAKI: Okay.

MR. BRIGHT: Let me go back to a couple other points that counsel just mentioned. It's correct that we did subpoena SKF USA, and it's correct that they produced 7 million pages of documents, and it's correct -- I mean, her custodial number is probably correct, I have no reason to doubt it. However, a little more background.

In the initial bearing's case the indirect plaintiffs -- the indirect-purchaser plaintiffs, the end payors, the auto dealers and the truck and equipment dealers, they served discovery on SKF USA. SKF USA was a party to their case, not a party to our case.

After they served the discovery and after the meet and confer on the indirect discovery had begun, the direct-purchaser plaintiffs served their subpoena. Prior to us serving our subpoena, I asked if I could be part of the meet-and-confer negotiations between the indirect-purchaser plaintiffs and SKF USA. SKF USA said no, this isn't your discovery, and I did not participate.

By the time that my subpoena was served, they

1   served their objections, and I was then allowed to

2   participate in the meet-and-confer discussions, much had

3   already been agreed upon; the volume of documents and

4   basically most of the custodians.

5          Because our case was broader and included

6   industrial and aftermarket automotive, SKF USA added

7   custodians for our case.  So I didn't negotiate the 42, I

8   negotiate -- and I'm not saying if I was there at the

9   beginning I would have negotiated less, I can't tell you

10  that, I don't know, but when I got on board they were well

11  beyond 20, I think they were high 20s, maybe even low 30s.

12  They did give us additional custodians that I specifically

13  requested, and there was no motion practice at the custodians

14  for SKF USA, which is another point counsel made.

15         She said, oh, we haven't taken it to what she views

16  as a different approach here.  As I mentioned earlier,

17  SKF USA is important because that's where some of the prices

18  were implemented, but the negotiations as we know -- all of

19  the custodians that we are asking for, again, we have good

20  faith belief based on the documents and their co-conspirators

21  that they were directly involved in the conspiracy.  And the

22  ones -- I believe but I might be wrong but I think I'm right,

23  the ones that implemented it, the three or four, I believe

24  they are part of the defendants but I'm not sure, there may

25  be one exception.

*Motion Hearings before Special Master - August 6, 2018*

**72**

1     SPECIAL MASTER ESSHAKI:  All right.

2     MR. BRIGHT:  So we are not -- our approach isn't

3  that different.  Actually we have narrowed the custodians

4  because if we had done the custodians that we had a good

5  faith belief were involved in the conspiratorial conduct for

6  SKF USA, we would have none under that category probably, and

7  we may have some without implementation.

8     SPECIAL MASTER ESSHAKI:  Would you please summarize

9  for me exactly the nature of the relief that you are asking

10  for today?

11     MR. BRIGHT:  Yes.  That they produce responsive

12  documents that are found on the central files, and by central

13  files I mean the company-wide database, all of that,

14  responsive and relevant, as well as the custodians that we

15  have put forth.

16     SPECIAL MASTER ESSHAKI:  And the European

17  Commission documents?

18     MR. BRIGHT:  We would like all of those European

19  Commission documents on the schedule that you put forth in

20  your early order.

21     SPECIAL MASTER ESSHAKI:  Okay.  Counsel.

22     MS. MANTINE:  Thank you, Special Master.  I wanted

23  to clarify --

24     MR. BRIGHT:  I'm sorry.

25     SPECIAL MASTER ESSHAKI:  Was there more?

```
 1              MR. BRIGHT:  Yes --
 2              SPECIAL MASTER ESSHAKI:  Please.
 3              MR. BRIGHT:  -- because she talked on a bunch of
 4      things.
 5              She also said maybe we could go get discovery
 6      through other means like the Hague Convention.  You and I
 7      both know how laborious that is, how time consuming it is,
 8      and --
 9              SPECIAL MASTER ESSHAKI:  I think she was only
10      referencing that as to former employees of SKF Europe where
11      they no longer have the ability to control those employees.
12              MR. BRIGHT:  Well, Master Esshaki, that's correct
13      for depositions, and either way we will pursue depositions,
14      however, they do have their documents.
15              SPECIAL MASTER ESSHAKI:  Understood.  Okay.  Very
16      good.
17              MR. BRIGHT:  And she mentioned that, you know,
18      there are certain custodians that we have agreed upon, and
19      that's true.  One of them is someone, Phil Knights, who we
20      have every reason to believe is not employed by a defendant,
21      he's employed by their Belgium subsidiary, so they do have
22      control.
23              The other thing is with the agreed-upon custodians
24      there could have been a rolling production.  Today we have
25      received transactional data from SKF GmbH, we've received
```

*Motion Hearings before Special Master - August 6, 2018*

**74**

1    responsive documents to the subpoena in the initial bearings

2    action that we've already referenced and counsel for SKF has

3    referenced.  We have not received another document.

4          The other thing, the discovery plan ends discovery,

5    I believe like 200 days after document productions begin, so

6    that's another reason that this two-tiered -- multiple-tiered

7    approach isn't practical for us.

8          And her chart, which is the first I've seen it, I

9    appreciate it, thank you, doesn't say when.  We know from

10   what we have been able to tell from the documents that we do

11   have is that they went over multiple -- and from some of

12   their annual statements, multiple reorganizations.  So I

13   don't know when this -- there is no date on here, so I don't

14   know when this is applicable, but it differs; people move

15   around, they change responsibilities because it is a long

16   class period.

17         And finally she said Bosch went her way.  Bosch

18   actually -- the motion to compel, one was granted and one was

19   denied.  There was a subsidiary there, and that one was

20   denied, but they did require the parent, who was not a party,

21   to produce documents when the subsidiary was a party.  And if

22   you give me a minute, I can find my notes on that case.  I

23   apologize for not having them ready.

24         In Bosch they denied discovery from one subsidiary

25   because, quote, the defendants have not offered any evidence

*Motion Hearings before Special Master - August 6, 2018*

75

1    to demonstrate that Bosch has control over the documents.
2    Okay.  That's certainly not the case here.  And I still
3    haven't heard from them any address -- they have not
4    addressed the 2017 annual report where they say they
5    control -- I'm sorry, let me see -- where they say they
6    control the relevant activities of the company -- I think
7    I've misquoted that but I can't find a quote.  The
8    cross-border reporting, they don't deny that; that's another
9    indicia that wasn't present in the Bosch case.  The shared
10   intranet databases, that shows a level of control.  I think
11   once -- if we did get the documents from the central
12   databases, you will see how AB SKF controls its subsidiary.
13   And the common corporate practices including prices allowing
14   for exceptions based on local law, which I mentioned.  Those
15   were not present in the Bosch case.  What Bosch did do is
16   they said okay, we will allow discovery from the parent
17   because they provided similar documents in another case.  And
18   here AB SKF is going to give us documents from Phil Knights,
19   who is in Belgium.
20            SPECIAL MASTER ESSHAKI:  All right.
21            MR. BRIGHT:  I read Bosch differently, not
22   surprising.
23            SPECIAL MASTER ESSHAKI:  Very good.  Counsel.
24            MS. MANTINE:  Thank you, Special Master.
25            Going back to the central file argument, I wanted

 1    to be clear because I think I misunderstood you the first

 2    time and perhaps I wasn't clear enough the second time.  The

 3    first time I ever saw them -- at least arguably ask for

 4    central file documents that were referenced in e-mails was in

 5    this motion and when they attached those documents

 6    referencing GADD or Spider or whatever other database they

 7    are referring to.  We would be happy to work with them in a

 8    meet and confer and say, okay, fine, when we see that in our

 9    production, we will produce the relevant page and the

10    information.  I have not to date because it has never been an

11    issue.  We produced 7 million pages, SKF did, for several

12    million dollars several years ago.  I was glad to see that

13    they looked at them before they filed the motion.  We hadn't

14    heard anything like that on GADD, on these databases, on

15    these attachments.  But to be clear, we would absolutely work

16    with them on that to avoid spending hundreds of thousands of

17    dollars producing central files that, as my codefendants

18    explained this morning, they will not get used in a

19    deposition, they will not be attached to any motion, they

20    will not be part of anything.  We have seen how small that

21    ultimate pool of documents actually is.  And these aren't the

22    EC documents.  These aren't the documents produced to the

23    government or an investigative authority that are not

24    critical to this case.

25              On the SKF USA discovery, yes, SKF USA because the

*Motion Hearings before Special Master - August 6, 2018*

**77**

```
 1    DPPs which was never named in the initial bearings case, the
 2    only SKF entity that was originally listed was AB SKF who was
 3    dismissed in the second round of settlements.  So then the
 4    DPPs did ask SKF for third-party discovery via Rule 45, and
 5    got the indirect purchaser discovery first.  But we by no
 6    means should just hand them that and walk away because they
 7    do have industrial bearings in their case, and we negotiated
 8    several other custodians, and this is a substantial amount of
 9    additional discovery as a third party long ago on that.  So
10    they had all of that.  They had their opportunity to ask for
11    custodians.  So acting like we didn't really get it, we had
12    to ask for one or two more; it's a little trying when you
13    spend the money and time that we have, given what they asked
14    for originally, when they keep coming back for more.
15             Now, in moving forward with this DALC action and
16    the documents that they are requesting, you made a comment
17    about former employees.  And just to be clear, paragraph 2 of
18    this order we do have and are willing to produce this e-mail,
19    the files of the former employees of the defendant entity.
20    Where we have a problem is for these people they are naming
21    who have never -- not in their entire nearly two-decade time
22    period, worked for a defendant entity.
23             So while I'm not aware of Phil Knights working for
24    Belgium, maybe he did for a year, but I know one thing is he
25    worked at one of the defendant entities.  And if it's an
```

```
 1   appropriate affiliate given where he falls on this chart in
 2   your request, happy to produce him.  Again, a reasonable
 3   proportioned approach.
 4          If they were an employee of AB SKF, SKF GmbH or
 5   SKF USA during this time period, it's a different story.  The
 6   people we're saying no to, at least to the best of our
 7   knowledge and investigation, were never employed by a
 8   defendant entity throughout the entire almost two decades of
 9   the time period that they are alleging.
10          So it's a different animal than someone who may
11   have been -- if we were saying, oh, they were a former
12   employer, we don't want to give them, or, you know, saying
13   they only worked for AB SKF for a year, we are not saying
14   that at all.  We gave all of these people on here.
15          And as I said to counsel before, this is not any
16   sort of official document.  That is my demonstrative and my
17   way of really sitting back and saying to my client and my
18   colleagues, you know, is what we are proposing here really
19   reasonable?  Are we really -- and when you look at it
20   generally over the majority of the time period, the
21   structure, this market segment that Mr. Bright was talking
22   about that has been rearranged undoubtedly lots and lots of
23   times, we're giving them the people at the top of that, and
24   we are giving them the other people they asked for who were
25   actually employees and representatives of the defendant
```

1     entities.  It is reasonable and proportional.

2              And all I'm hearing in his -- I mean, when

3     Mr. Bright was asking, specifically tell you, please describe

4     the nature of your release requested, and he said we need

5     responses to documents found in central files.  We are not

6     disagreeing with that.  We are saying let us do it the way

7     that makes sense within conjunction with the custodial file

8     production, so it is not unnecessarily duplicative,

9     burdensome, expensive.  So we not just sitting on that, we

10    want every custodian we've asked for.  We are telling you, we

11    are giving you the ones -- the people of the entities of the

12    defendants you named.  I mean, they filed DALC in June of

13    2016, three years after the initial bearings case was filed.

14    You've got to know who you are suing by then, right?  And

15    then we are saying with the EC documents, yes, will give you

16    them to you, we just needed clarity with respect to various

17    issues that were raised in oral argument here this morning.

18             So when we look at that sort of in the totality of

19    where we have been in this case and where we are, and I think

20    our efforts to move forward -- our proposed order presents a

21    reasonable approach to the rest of this discovery and will

22    allow us to move forward in an efficient way, we believe,

23    without bothering and wasting any more of your time or the

24    Court's time.

25             SPECIAL MASTER ESSHAKI:  Thank you.  It is -- we're

1    good, Counsel.  Thank you.

2            MR. BRIGHT:  Well, there is one point that was

3    neglected on my part --

4            SPECIAL MASTER ESSHAKI:  All right.

5            MR. BRIGHT:  -- talking about relief.  You know,

6    she was -- she mentioned SKF USA and they produced all of

7    those custodians.  We did ask in our motion for one

8    additional SKF USA custodian, just to be clear, and I don't

9    think they opposed it -- they may have opposed it, but I

10   don't think they addressed it in their papers.

11           SPECIAL MASTER ESSHAKI:  Very good.

12           MS. MANTINE:  Just to be clear, Your Honor,

13   paragraph 2 we list it, and plaintiffs have had this order

14   since June and they have had this proposed resolution from us

15   long before they filed their motion.

16           SPECIAL MASTER ESSHAKI:  Okay.  Thank you, Counsel.

17   It was well presented, it was well briefed.  I want you to

18   know that I read the entire annual report with the European

19   parent company.

20           I'm going to grant the motion.  I'm going to use my

21   discretion to grant the motion.  I'm going to order that, as

22   offered by the defendants, the European Commission documents

23   be produced no later than August 15th, 2018.  That the

24   redactions, if any, to those documents will be strictly

25   limited as in our prior ruling on SKF to something that is

1   blatantly irrelevant such as the name of a waiter on a

2   luncheon chit.

3           Secondly, there's absolutely nothing wrong and, in

4   fact, probably the preferable method of operation for a

5   multinational corporation to organize wholly-owned

6   subsidiaries throughout the various host countries in which

7   they operate throughout the world.  The subsidiaries can then

8   comply with the laws and the rules of the host companies in

9   conducting their business operations.

10          In reviewing the annual statement of the defendant,

11  it does seem clear to me that the defendant controls the

12  subsidiaries.  I think that control is present, and as a

13  consequence I will also order that the documents and

14  custodians requested of those subsidiaries be produced.

15          You cannot operate worldwide operations through a

16  network of subsidiaries that you direct prices to, that you

17  direct policies to, that you direct the operations of, and

18  then when misconduct is allegedly discovered stand back and

19  say we don't control them; I don't believe that is

20  appropriate.  I believe there is sufficient control under the

21  case law as I understand it to order that they be produced.

22          With respect to the central files, I understand the

23  significant burden that this represents.  I understand the

24  millions of pages of documents that have been produced.  But

25  I'm going to order that they be produced.

1      To me I understand the attractiveness of staging

2   this production.  However, I believe plaintiffs are entitled

3   to direct and manage their claims in their case as they see

4   fit.  Seven million documents five years ago would have been

5   mind-boggling to me.  However, it is my understanding that to

6   date in excess of 1.5 billion documents have been generated

7   in this case.  And if my rulings in the OEM production

8   motions are ever implemented, it will add another 1.5 billion

9   documents to these cases.  I'm not talking pages, I'm talking

10  documents.

11      So I understand the burden.  It is part of major

12  antitrust litigation.  And I'm going to permit the plaintiffs

13  to get centralized files as well.

14      Counsel, would you please prepare a draft order --

15      MR. BRIGHT:  Yes.

16      SPECIAL MASTER ESSHAKI:  -- once you get the

17  transcript so you can get the ruling correctly, add the magic

18  language about this order is appealable to Judge Battani

19  pursuant to the order appointing Special Master, dated

20  whenever it was, review -- submit that order to opposing

21  counsel for her review.

22      MR. BRIGHT:  Yes.

23      SPECIAL MASTER ESSHAKI:  And hopefully you will be

24  able to give me an order that is stipulated as to form only,

25  and then counsel will be free to appeal this matter to

1   Judge Battani.

2           All right.  Thank you all for coming in, for all

3   the good work.

4           (Proceedings concluded at 12:08 p.m.)

5                       –   –   –

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:12-md-02311-SFC-RSW  ECF No. 1940, PageID.36165  Filed 08/17/18  Page 84 of 84
*Motion Hearings before Special Master - August 6, 2018*

84

*CERTIFICATION*

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of Automotive Parts Antitrust Litigation Case No. 12-02311, on Monday, August 6, 2018.


*s/Robert L. Smith*
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan


Date:  08/16/2018

Detroit, Michigan