```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                            —   —   —

 4   IN RE:  AUTOMOTIVE PARTS
                                        Case No. 12-02311
 5   ANTITRUST LITIGATION
                                        Hon. Marianne O. Battani
 6   _____/

 7

 8            STATUS CONFERENCE / MOTION HEARINGS

 9         BEFORE THE HONORABLE MARIANNE O. BATTANI
                 United States District Judge
10         Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
11                   Detroit, Michigan
                 Thursday, October 3, 2019
12

13   APPEARING ON BEHALF OF THE PLAINTIFFS:

14         DAVID H. FINK
           FINK + ASSOCIATES LAW
15         100 West Long Lake Road, Suite 111
           Bloomfield Hills, MI  48304
16         (248) 971-2500

17
           GREGORY P. HANSEL
18         PRETI, FLAHERTY, BELIVEAU & PACHIOS, L.L.P.
           One City Center
19         Portland, ME  04112
           (207) 791-3000
20

21         STEVEN A. KANNER
           FREED, KANNER, LONDON & MILLEN, L.L.C.
22         2201 Waukegan Road, Suite 130
           Bannockburn, IL  60015
23         (224) 632-4502

24
           To obtain a copy of this official transcript, contact:
25              Robert L. Smith, Official Court Reporter
              (313) 234-2612 • rob_smith@mied.uscourts.gov
```

2

```
 1    APPEARING ON BEHALF OF THE PLAINTIFFS: (Continued)

 2         WILLIAM V. REISS
           ROBINS, KAPLAN, MILLER & CIRESI, L.L.P.
 3         601 Lexington Avenue, Suite 3400
           New York, NY  10022
 4         (212) 980-7405

 5
           SHAWN M. RAITER
 6         LARSON KING, L.L.P.
           30 East Seventh Street, Suite 2800
 7         Saint Paul, MN  55101
           (651) 312-6500
 8

 9         KEVIN PORTERE
           DUANE MORRIS, L.L.P.
10         1540 Broadway
           New York, NY 10036
11         (212) 471-1876

12
      APPEARING ON BEHALF OF THE AVRP DEFENDANTS:
13
           STEVEN REISS
14         WEIL, GOTSHAL & MANGAS L.L.P.
           767 Fifth Avenue
15         New York, NY 10153
           (212) 310-8174
16

17

18

19

20

21

22            Please note, the appearances listed above are
      the attorneys who presented argument before the Court, and
23            does not encompass all attorneys present.

24

25
```

*Status Conference / Motion Hearings • October 3, 2019*

**3**

TABLE OF CONTENTS

MATTER                                                          PAGE

REPORT OF SPECIAL MASTER............................ 5

STATUS CONFERENCE.................................. 5

MOTION HEARINGS FOR FINAL APPROVAL OF SETTLEMENTS...17

MOTION HEARINGS FOR AWARD OF ATTORNEYS' FEES........48

MOTION TO ENFORCE FINAL JUDGMENTS IN AVRP CASES.....73

```
 1 ‖  Detroit, Michigan
 2 ‖  Thursday, October 3, 2019
 3 ‖  at about 10:04 a.m.
 4 ‖                        —   —   —
 5 ‖           (Court and Counsel present.)
 6 ‖           THE CASE MANAGER:  Please rise.
 7 ‖           The United States District Court for the Eastern
 8 ‖  District of Michigan is now in session, the Honorable
 9 ‖  Marianne O. Battani presiding.
10 ‖           All persons having business therein, draw near,
11 ‖  give attention, you shall be heard.  God save these
12 ‖  United States and this Honorable Court.
13 ‖           You may be seated.
14 ‖           The Court calls Case No. 12-md-02311, In Re
15 ‖  Automotive Parts Antitrust Litigation.
16 ‖           THE COURT:  Good morning.
17 ‖           THE ATTORNEYS:  (Collectively) Good morning, Your
18 ‖  Honor.
19 ‖           THE COURT:  Now I remember why we had our meetings
20 ‖  on Wednesdays, it's because Thursday is immigration day.
21 ‖  Okay.  Sorry about that.
22 ‖           Do we think we have most of the people?  Yeah?
23 ‖  Okay.
24 ‖           All right.  Let us begin by starting with
25 ‖  Mr. Esshaki's report.  Gene.
```

 1          MASTER ESSHAKI:  Yes.  Thank you very much, Your

 2   Honor.

 3          Good morning, everybody.  It's good to see you all

 4   again.  I was just reminiscing with Ms. Romanenko; her child

 5   was born during this case, and that child is going to be two

 6   years old next Monday.  It's been fun.

 7          The level of motions have decreased significantly.

 8   I think that's because of several reasons:  One of which the

 9   case is winding down.  Two, I think, as I explained to the

10   Court this morning, there's a body of law out there,

11   "Master Esshaki's Prior Rulings," when you know what I'm

12   going to rule and don't have to bring the motions anymore.

13          But since we were last together, we have had about

14   four discovery motions.  There is one currently pending.  All

15   in all, there have been 98 motions in this case.  It was a

16   nice task.  It was very educational, and enjoyed all the

17   work.  So, please, if you have a motion, please do not

18   hesitate to make contact with me.

19          That's it, Your Honor.  Thank you.

20          THE COURT:  Okay.  Thank you.  Anybody have any

21   questions for the Master?

22          (No response.)

23          THE COURT:  All right.  Thank you, Gene.

24          Let's look at the status.  Direct purchaser, status

25   of settlement.  Who is doing that?  Okay.

```
 1              MR. HANSEL:  Good morning, Your Honor.  Greg Hansel
 2    for the direct purchaser plaintiffs.
 3              THE COURT:  Good morning, Mr. Hansel.
 4              MR. HANSEL:  I'm pleased to report that the direct
 5    purchasers have reached four new settlements since the last
 6    status conference.  We have filed complaints in a total of 24
 7    parts.  We have completely settled 12 of those,
 8    so 50 percent, at least in principle, with some settlement
 9    agreements still being hammered out.
10              So out of the 24 parts, we have settlements in at
11    least -- with at least one defendant in 22 cases.  Seven out
12    of the 24 only have one defendant remaining.  And we have now
13    settled with 34 defendant families, total.
14              THE COURT:  Tell me again, how many are remaining?
15    How many defendants are remaining?
16              MR. HANSEL:  Well --
17              THE COURT:  Or parts, if you want to do it by
18    parts.
19              MR. HANSEL:  So out of 24 parts, we have completely
20    settled 12, at least in principle, so that leaves another 12.
21              THE COURT:  Another 12.  Okay.
22              MR. HANSEL:  But seven of those only have a single
23    defendant remaining.
24              And with respect to those that we have not settled,
25    we continue to litigate and try to bring them to a conclusion
```

1  as soon as possible.

2          THE COURT:  Okay.  How about your mediation

3  schedule with your mediators, how is that going?

4          MR. HANSEL:  Yes.  We continue to mediate and have

5  settlement discussions on a number of fronts.  We had a

6  mediation as recently as last week.  So the mediators are

7  well engaged, and we continue to work with them.

8          There are some cases where there are legal issues,

9  including appeals, that the parties have reached an impasse

10  in either bilateral settlement negotiations or in mediations,

11  and we are waiting for rulings, including from the

12  Sixth Circuit.

13          THE COURT:  All right.  I usually get a summary

14  from the -- from Mr. Weinstein, but I didn't get it.  It's

15  not coming until Monday, so that's why I'm a little bit

16  behind here.  I guess somebody there had a baby, too, so --

17          MR. HANSEL:  Yes.

18          THE COURT:  I mean, I hope we finish this about

19  adulthood.  All right.  Thank you very much.

20          MR. HANSEL:  Thank you, Your Honor.

21          THE COURT:  End payors.  Mr. Reiss.

22          MR. W. REISS:  Good morning, Your Honor.

23  Will Reiss for the end payor plaintiffs.

24          THE COURT:  Good morning.

25          MR. W. REISS:  No new real developments since last

 1    time.  We've settled with every defendant in all 41 cases,

 2    with the exception of Bosal, which is a defendant in the

 3    exhaust system case, and we are currently litigating with

 4    them.

 5            THE COURT:  Okay.  So out of all of your parts, the

 6    only one left is the Bosal?

 7            MR. W. REISS:  Correct, yes.

 8            THE COURT:  Okay.  Thank you.

 9            MR. W. REISS:  Thank you, Your Honor.

10            THE COURT:  Auto dealers.

11            MR. RAITER:  Good morning, Your Honor.

12    Shawn Raiter on behalf of the auto dealers.

13            Since the last status conference, the Court has now

14    authorized the dissemination of notice for our round four

15    settlements, and we have the final fairness hearing scheduled

16    for December 10, before Your Honor.  Notice has not yet gone

17    out.  The order just came across recently, so the notice

18    should go shortly.

19            Our round three settlements, we need to get

20    allocation plan orders in place.  There's, I think, one or

21    two -- or at least a few still outstanding.  Once those are

22    in place, we expect to make payments on our round three

23    settlements within just a few weeks.

24            THE COURT:  Good.

25            MR. RAITER:  Thank you.

```
 1          THE COURT:  Thank you.  Truck and equipment
 2    dealers.
 3          MR. POTERE:  Good morning, Your Honor.
 4    Kevin Potere, with Duane Morris.
 5          So the truck and equipment dealers have settled or
 6    dismissed all of their pending claims.  And I was hoping to
 7    be able to present an argument for final approval of our last
 8    settlement, which is with the TKH Holdings Trust today.
 9          THE COURT:  Right.
10          MR. POTERE:  Unfortunately, we had some issues with
11    the notice to class members.  The cost is quite prohibitive,
12    in terms of mailing.
13          THE COURT:  We have that on right now, right, for
14    the motion?
15          MR. POTERE:  That's correct, Your Honor.  So we
16    move to modify the order that granted preliminary approval to
17    make notice to class members concurrent with other mailings
18    that we would send to class members regarding filing claims
19    with the administrators.  So instructions that are currently
20    pending before Your Honor, we would like to bundle those
21    together, in order to save some of the costs associated with
22    direct mailing.
23          THE COURT:  Why don't we just go ahead and do that
24    right now?  You need new dates on some things, is that --
25          MR. POTERE:  Well, Your Honor, we have a -- we
```

1    filed a motion that sought both approval of plan of

2    allocation for some of our settlements and also authorization

3    to mail out instructions and claims forms.  It was sort of

4    one large motion.  That's still pending before the Court.  As

5    soon as that is addressed by the Court, we can send out a

6    mailing regarding the TKH settlement, and the instructions,

7    and start the claims process for distributing funds.

8                THE COURT:  Okay.  Why don't we address it right

9    now?

10               MR. POTERE:  Absolutely, Your Honor.

11               THE COURT:  Okay.  Go ahead.

12               MR. POTERE:  So -- I apologize, Your Honor.  By

13   address it right now, you mean, address the pending motion

14   for allocation?

15               THE COURT:  The pending motion, yes.

16               MR. POTERE:  Certainly, Your Honor.

17               So we have a plan of allocation pending for cases

18   involving starters, radiators and alternators.  There is a

19   total of, I believe, $10 million in settlements that have

20   already received final approval from the Court, Your Honor.

21   And the plan of allocation basically assigns a point system

22   that has been used in other cases with similar parts, and so

23   we believe it is a fair plan of allocation.

24               In conjunction with that plan of allocation, we

25   have also sought permission to distribute instructions to the

```
 1    class members.  The instructions will be a single sheet of
 2    paper that directs class members to the website, because we
 3    believe that it will be much easier for the class members to
 4    complete a claims form online versus trying to fill in all
 5    the information in paper format, and it will also present
 6    additional savings to the class.
 7          So we have the plan of allocation, the
 8    instructions, the claim form, which a draft, which is
 9    currently part of our motion, and then we respectfully ask
10    permission, assuming that final approval is granted for the
11    TKH settlement, to start distributing funds to the class
12    members.
13          THE COURT:  Okay.  In terms of notice to your class
14    members, you're doing this by direct mail; is that correct?
15          MR. POTERE:  That's correct, Your Honor.  The costs
16    are approximately $125,000 per mailing, so we just -- we
17    wanted to sort of help defray some of those costs by
18    combining mailings together.
19          THE COURT:  Okay.  The Court reviewed the plan of
20    allocation, and I know it is very similar to what we had in
21    other parts, if not almost identical.
22          MR. POTERE:  That's correct, Your Honor.
23          THE COURT:  And I approved it then, and for the
24    same reasons, it appears to be a reasonable and
25    logical -- although I have to say the Court could not do the
```

1   math in detail, on anything, but it appears to be reasonable,

2   with experienced people creating this plan, and the Court

3   does approve that plan.

4            MR. POTERE: Excellent. Thank you, Your Honor.

5            THE COURT: And there was the distribution of the

6   claims form, the form is simple, and I think it's reasonable

7   to do this at one time, and to do the one mailing, and to

8   have the claims form there.

9            But there is another issue, and isn't that

10  to -- determination for dealership groups?

11           MR. POTERE: Yes, Your Honor. I apologize. I

12  failed to mention that.

13           So there is one additional issue, which is an issue

14  that has come before the Court before, where you have a

15  dealership group that is located in an included state, but

16  also has dealerships in non-included states, and so the

17  question arises, how to deal with those dealership groups.

18  And we propose that you adopt the similar strategy that you

19  have adopted in other cases, which is that if the financing

20  and approval for purchasing the truck and equipment is all

21  coming through the dealership group that's in an included

22  state, trucks that are sent to non-included dealerships can

23  also be included in the final settlement claims.

24           THE COURT: Right. Okay. I see no reason to

25  change my determination on that matter, and the Court will

1    approve that.

2             MR. POTERE:  Thank you, Your Honor.

3             THE COURT:  Okay.  So this motion, then, is

4    complete and granted.  And then there was another one, the

5    one to modify the order.

6             MR. POTERE:  Yes, Your Honor.  So originally the

7    final approval for the TKH settlement was scheduled for this

8    hearing.  We would just ask that it be set for the next

9    hearing date before the Court.

10            THE COURT:  Is that the date you want, is the next

11   hearing, or do you want something before that?

12            MR. POTERE:  Well, now that the Court has granted

13   our -- approved our instructions, Your Honor, we can use the

14   next available date, which I believe is in December -- or

15   February.  I apologize.

16            THE COURT:  We are going to talk about that date,

17   actually.  That date -- well, right now, we will talk about

18   it.  I am thinking of doing it in March, March 18th, due to

19   other dates.

20            Everybody, get your calendars out.  Let's figure

21   out the next date for a hearing.

22            Molly, what's December 10th?  Is that a date that

23   we had --

24            THE LAW CLERK:  Auto dealers are coming in on

25   December 10th for four settlements, so we can probably do

1    that the same day.

2              THE COURT:  We have auto dealers coming in for four

3    settlements on December 10th.  If you want to come in that

4    date, we could do it the same date.

5              MR. POTERE:  That would be excellent, Your Honor.

6              THE COURT:  Is that enough time?

7              MR. POTERE:  Yes.

8              THE COURT:  Let's do that.  I would prefer to do it

9    earlier rather than later.

10             MR. W. REISS:  Your Honor, just to remind you, we

11   also have a final approval for the end payor plaintiffs on

12   that date as well.

13             THE COURT:  The same date?

14             MR. W. REISS:  The same date, yes.

15             THE COURT:  So December 10th will be a big date.

16   Do we have a time specifically, Molly?

17             MR. RAITER:  10:00 a.m.

18             THE COURT:  10:00 a.m., everything is 10:00 a.m.

19   Okay.  We will start all of them together.  We have scheduled

20   them all for 10:00 a.m., and we will just proceed.  We may be

21   able to group some, like we are going to group some today.

22             MR. POTERE:  Okay.  Thank you, Your Honor.

23             THE COURT:  All right.  Thank you.

24             All right.  Status of scheduling orders.  I'm going

25   back to the agenda on 2E, status of scheduling orders.

```
 1              MR. W. REISS:  Good morning, again.  Will Reiss for

 2    the end payor plaintiffs.

 3              The only scheduling order that is relevant for us

 4    is the exhaust systems case, and Your Honor entered that

 5    recently.

 6              THE COURT:  We did that.

 7              MR. W. REISS:  We are negotiating, now, a number of

 8    protocols, the ESI stipulation, protective order, and a few

 9    other protocols.  Those will be submitted, I would suspect,

10    very imminently.

11              THE COURT:  Okay.

12              MR. S. REISS:  Thank you.

13              THE COURT:  Very good.  Thank you.  Anyone else?

14    Mr. Hansel?

15              MR. HANSEL:  Your Honor, Greg Hansel, for the

16    direct purchasers.

17              We've been coordinating with the end payors on the

18    exhaust systems case with Bosal, on scheduling.  And then

19    there are some other scheduling orders we have been working

20    on with some of the remaining defendants in cases that are

21    ready to be litigated.  And then there are other cases that

22    are on appeal, that are not ready to do scheduling orders.

23    But we are moving forward on all the ones that are ready.

24              THE COURT:  Okay.  There are no problems that you

25    foresee on the scheduling orders?
```

```
 1              MR. HANSEL:  There have been no problems that would

 2     justify coming to you today, but if there are, we will let

 3     you know.

 4              THE COURT:  Okay.

 5              MR. HANSEL:  Thank you.

 6              THE COURT:  Thank you.  All right.  The next item

 7     is the next status conference, and we are trying to set these

 8     ahead.  We had some problems with February, so I am

 9     suggesting March 18th, which is a Wednesday, so you don't

10     have to worry about immigration.  Okay.  So that's a little

11     bit aways, but we have a number of hearings before that.  And

12     obviously, if any of you come up with anything you need

13     before that date, please just call and we will schedule it.

14              All right.  On the schedule, we have done

15     number 6A-1.

16              Now, B, C, D and E are all motions for final

17     approval of proposed settlements and for attorneys fees.

18     What I would like to do is give you each an opportunity to

19     put your settlement on the -- proposed settlement on the

20     record, but I'm not going to rule -- I'm going to rule as a

21     group at the end, rather than reading everything four times.

22     Okay.  I hope it works.  We've gone through this enough times

23     that I think we know where we are going without doing that,

24     but for purposes of the record, we need to proceed.

25              Okay.  So let's start with the alternators.  Is
```

```
1   anybody going to argue for the alternators?
2           MR. KANNER:  Your Honor, good morning.
3   Steve Kanner on behalf of the direct purchaser plaintiffs.
4           THE COURT:  Good morning, Mr. Kanner.
5           MR. KANNER:  We are thinking along the same lines
6   in terms of how to efficiently proceed with these and --
7           THE COURT:  Do you have a different way of
8   proceeding?
9           MR. KANNER:  No, no.  In fact, I was going to
10  suggest that if it works for the Court, that I would do all
11  four of the motions for final approval --
12          THE COURT:  Oh, wonderful.
13          MR. KANNER:  -- seriatim, and then Mr. Hansel can
14  do the responsive motions for attorneys fees, after those.
15          THE COURT:  Attorney fees.  Okay.  I think that
16  would work.
17          MR. KANNER:  And in between, which, obviously, you
18  would either approve or not approve and --
19          THE COURT:  Yeah -- well, actually I'm going to do
20  it all at the end, so don't worry about it.  Go ahead.
21          MR. KANNER:  Thanks, Your Honor.
22          THE COURT:  So you are on alternators, radiators,
23  starters and fuel injection systems?
24          MR. KANNER:  Slightly different order; I'm going to
25  take fuel injection systems, if I can, before starters.
```

1          THE COURT:  Fuel injection first.  Okay.

2          MR. KANNER:  Very well, Your Honor.  Again,

3   Steve Kanner on behalf of direct purchaser plaintiffs.

4          We have four settlements today.  Those settlements

5   would be alternators, and those are with Mitsubishi Electric,

6   HIAMS, which is the Hitachi defendants, and DENSO, and a

7   proposed plan of distribution for settlement funds.

8          Next I will be addressing radiators, which includes

9   settlements with Mitsuba, DENSO, Calsonic and T. Rad, and,

10  again, proposed plans for distribution of settlement funds.

11         The third series of settlements will be on fuel

12  injection systems, and that includes settlements with

13  Mitsubishi Electric, HIAMS, Mitsuba and DENSO.

14         And the last one will be for starters, which

15  includes Mitsubishi, HIAMS, Mitsuba and DENSO.

16         With respect to the first of those, and that would

17  be the alternators litigation, the direct purchaser

18  alternators litigation began with initial Complaints filed in

19  May of 2015.  We had an additional Complaint in October

20  of 2015.  The second Complaint added additional class

21  representatives, and also named Mitsuba and Bosch as

22  defendants.  Each Complaint alleged that the defendants

23  conspired to raise, fix, maintain and stabilize prices, and

24  other related conduct, in violation of the United States

25  antitrust laws.

1       The Court previously appointed the four firms here

2   today as defendants -- as direct purchaser plaintiffs'

3   counsel, and we continue to serve in that capacity.

4       And before I forget, Mr. Fink's firm, of course,

5   has been designated as liaison counsel.

6       THE COURT:  Look at how long we have been here,

7   he's grown a beard.

8       MR. KANNER:  Too many things that can be said.

9       THE COURT:  Right.

10      MR. KANNER:  After extensive discovery, series of

11  mediations and negotiations, the DPPs filed our motions to

12  approve the first wave of settlements with Mitsuba Electric

13  in the amount of $7,295,825, and the Hitachi defendants,

14  HIAMS, in the amount $2,210,769.  Those settlements were

15  preliminarily approved on September 24th of 2018.

16      The last settlement was with DENSO, in the amount

17  of $100,000, which Your Honor granted preliminary approval of

18  on April 24th, and as amended on May 23rd.

19      Total settlements is $9,606,594.

20      Let's talk about the terms of the agreements.

21  Cooperation was certainly one of the most important terms.

22  Each of the settlement agreements list the nature and forms

23  of the cooperation for the respective defendant, which

24  generally included production of documents and data not

25  otherwise produced, assistance in understanding those

 1    materials, declarations and affidavits of relevant witnesses,

 2    and proffers by defendants' attorneys.

 3              Counsel believed that this cooperation enhanced

 4    dramatically the prosecution of the then remaining

 5    defendants, and the conclusion of the alternators case.

 6              The next series of comments I'm going to make, Your

 7    Honor, relate to fair, reasonable and adequate, as with

 8    cooperation.  And I would suggest, Your Honor, that in the

 9    next three presentations, if it please the Court, I can

10    incorporate those comments by reference, rather than reading

11    them through again.

12              THE COURT:  You may.

13              MR. KANNER:  Thank you, Your Honor.

14              With respect to fair, reasonable and adequate, the

15    settlements before you today were each obtained through the

16    diligence and hard work of counsel on both sides of the

17    equation.  In each case, the negotiations were, indeed, at

18    arms length, by experienced counsel making decisions,

19    recognizing the inherent uncertainties of law and facts with

20    the related risks and costs of this highly-complex

21    litigation.

22              Plaintiffs' counsel determined, in each case, that

23    the dollar value, coupled with the defendants' cooperation,

24    provided ample justification to enter the settlements.

25              In the course of each of these litigations -- and

 1   this applies for the next three as well -- hundreds of

 2   thousands of documents were produced by defendants and the

 3   class representatives.  Those were all reviewed and analyzed

 4   and put into databases.  Add to those, multiple interviews

 5   with potential witnesses that were provided by defendants

 6   pursuant to the cooperation clauses, as well as detailed

 7   evidentiary proffers by the earliest settling defendants.

 8           Accordingly, Your Honor, we do believe that it is

 9   appropriate for you to conclude that counsels' decision to

10   reach these settlements was well founded and falls well

11   within the range of reasonableness.

12           With respect to the notice of settlement.

13   Following preliminary approval by Your Honor on June 27th of

14   this year, 2,240 individual copies of the notice of proposed

15   settlement were mailed to potential settlement class members

16   identified by defendants.

17           On July 1st, pursuant to Your Honor's direction, a

18   summary notice of proposed settlement with today's hearing

19   date was published in one edition of the Automotive News and

20   posted on its digital website, autonews.com, for a 21-day

21   period.  Additionally, an informational press release of the

22   settlement was issued in PR Newswire's Auto Wire, which is a

23   specific press release that targeted the auto industry trade

24   publication.

25           Copies of the notice were and are posted online at

1    antitrustlitigation.com.  The declaration of

2    Ms. Angie Birdsell, who was the product manager of our

3    settlement administrator, Epiq Class Action and Claims

4    Solutions, is attached as Exhibit 1 to the settlement papers

5    produced to Your Honor.

6         The -- it also includes settlement counsels' report

7    on dissemination of notice of proposed settlements, and they

8    reflect, as of September 13th, 2019, there were 3,725 page

9    views to the website, and 825 unique visits to this site.

10        Finally, counsel for both settling -- for each of

11   the settling defendants have advised us that they have

12   fulfilled their obligations under CAFA, they disseminated the

13   requisite notice to the appropriate federal and state

14   officials on August 17th, 2018, for both Mitsubishi Electric

15   and HIAMS, and on April 11th, 2019 for DENSO.

16        As we discussed earlier, the consideration for

17   settlement consisted of two primary elements.  The first are

18   the amounts, and as I described before, it is $9,606,594.

19   And I'm pleased to say there was no reductions in the total,

20   based on opt-outs.  The second material element, as we

21   discussed, was cooperation, and it's -- the nature of the

22   cooperation was described in detail on pages 4 and 5 in the

23   motion.

24        Let's talk about requests for exclusion, briefly.

25   As the Court knows, the largest members of the class are

1   sophisticated OEMs represented by highly-competent inside and

2   outside counsel.  Here the class members included OEMs and a

3   large number of companies in the auto supply chain.

4         As of September 13th, 2019, Epiq received 16

5   requests for exclusion from the DENSO settlement, seven from

6   the HIAMS settlement, and 113 from the Mitsubishi Electric

7   settlement.

8         THE COURT:  What does that mean for these

9   specific --

10         MR. KANNER:  Well, it means that those -- it can

11   mean a number of things.  Generally, it means those companies

12   have made other arrangements with the defendants.  Sometimes

13   they take the form of payments, sometimes they take the form

14   of discounts or future trade consideration.  That is

15   generally the case.  Others -- some very, very small entities

16   just don't want to have anything to do with it.

17         In this case, it didn't have any impact on the

18   settlement number, which is, I think, perhaps the most

19   important issue.

20         THE COURT:  Okay.  Thank you.

21         MR. KANNER:  And finally, there are no objections

22   by any of the class members to the settlement as received by

23   either counsel or the settlement administrator.

24         So I would conclude with this particular issue,

25   that the direct purchaser plaintiffs obviously believe that

1    their request for final approval of the settlement have met

2    the requirements of Rule 23, in terms of commonality,

3    numerosity, typicality and adequacy.

4          We believe the settlements are fair, reasonable and

5    adequate.  And we submit that the class' interest in this

6    case are served by orders of final approval for these

7    settlements today and the proposed plan for distribution of

8    settlement funds, which are attached to our motions.

9          And if I can, Your Honor, I will just move right to

10   the next one?

11         THE COURT:  Yes, go on.

12         MR. KANNER:  We are going to be discussing

13   radiators now.

14         THE COURT:  Okay.

15         MR. KANNER:  The DPP radiators litigation.  The DPP

16   radiators litigation began with our initial Complaints filed

17   relatively recently, in September of 2017.  In the history of

18   that case, that's a short time.  And we alleged, of course,

19   again, that the defendants conspired to fix, maintain,

20   stabilize prices, and other related conduct, in violation of

21   the United States antitrust laws.

22         After extensive discovery and a series of

23   mediations and negotiations, the direct purchaser plaintiffs

24   reached settlement agreements with, firstly, Mitsuba on

25   November 5th of 2018, in the amount of $2,060,956.  We pushed

1    for every last dollar.

2            We settled with DENSO on April 26th, 2019, in the

3    amount of $100,000.

4            And we settled with Calsonic on February 28th

5    of 2019, in the amount of $1,980,000.

6            And finally, with T. Rad, in the amount

7    of $2,100,000.

8            Those settlements were preliminary

9    approved -- preliminarily approved by Your Honor on

10   September 24th of 2018.

11           And for reference purposes, the total of those

12   settlements is $6,240,956.

13           As we set forth on page 4 of the notice, the

14   Mitsubishi -- Mitsuba, excuse me, Calsonic and the T. Rad

15   settlements were subject to potential recission, based on

16   request for exclusion timely filed.  That was not triggered

17   in this case.  There was no impact.

18           If I can incorporate my references -- by reference,

19   the argument that I made to the previous discussion for the

20   cooperation element and the value of it, and I would ask Your

21   Honor for the same privilege with respect to the argument

22   supporting fair, reasonableness and adequacy?

23           THE COURT:  Yes.

24           MR. KANNER:  With respect to the notice of

25   settlement.  Following preliminary approval, we had 492

|    |    |
|----|----|
| 1  | individual copies of the notice of proposed settlement that |
| 2  | were mailed to potential class members identified by the |
| 3  | defendants.  On July 1st of this year, pursuant to the |
| 4  | Court's direction, a summary notice of proposed settlement, |
| 5  | with today's hearing date, was published in one edition of |
| 6  | the Automotive News and posted on its digital autonews.com |
| 7  | website. |
| 8  | Additionally, copies of the notice were and are |
| 9  | posted online at the direct purchaser plaintiffs' website, |
| 10 | that's autopartsantitrustlitigation.com. |
| 11 | The declaration of the project manager, the same |
| 12 | person, Angie Birdsell, at Epiq, they're attached as |
| 13 | Exhibit 1 to the settlement counsels' report on dissemination |
| 14 | of notice and proposed settlements.  It reflects that as of |
| 15 | September 13th of this year, there were 2,330 page views to |
| 16 | the website, 492 unique visits to the settlement section of |
| 17 | the website. |
| 18 | And finally, as in the previous motion, the |
| 19 | defendants have advised that they have fulfilled the terms of |
| 20 | CAFA by disseminating requisite notice to the appropriate |
| 21 | federal and state officials on July 2nd of this year for |
| 22 | Mitsuba, on April 11th, 2019 for DENSO, April 26th, 2019 for |
| 23 | Calsonic, and on June 26th of this year for DENSO. |
| 24 | Consideration for the settlement consisted of two |
| 25 | parts.  The first, of course, was cooperation and the |

Case 2:12-md-02311-SFC-RSW  ECF No. 2024, PageID.36802  Filed 10/30/19  Page 27 of 119
*Status Conference / Motion Hearings • October 3, 2019*

**27**

1    material benefits to the class.  And the second, of course,

2    were the amounts as I described before.

3         In terms of requests for exclusion, again, I will

4    incorporate my previous arguments, but the numbers are the

5    class members -- Epiq has -- as of September 13th, Epiq

6    received seven requests for exclusion from the Mitsuba

7    settlement, 13 from the DENSO settlement, four from Calsonic,

8    and five from the T. Rad.

9         And I -- it occurs to me, I may have misspoken in

10   the first presentation with respect to DENSO, when I said it

11   was 113.  I believe it was actually 13.

12        THE COURT:  Is that right?

13        MR. KANNER:  It's a typo on my part.

14        THE COURT:  Okay.

15        MR. KANNER:  And, again, there have been no

16   objections by any defendants.

17        In short, Your Honor, direct purchaser counsel

18   believe that the request for final approval of these three

19   settlements before the Court today have, indeed, met the

20   requirements of Rule 23, in terms of commonality, numerosity,

21   typically and adequacy.  We believe the settlements are fair,

22   reasonable and adequate.  And we submit the classes' interest

23   in this case are served by orders of final approval for the

24   radiators settlements and the proposed plan for distribution

25   of settlement funds.

1    Now, obviously, in these first two motions, it
2    resolves those cases entirely; there are no remaining
3    defendants.

4              THE COURT:  You may --

5              MR. KANNER:  The third matter is the fuel injection
6    systems case, Your Honor.

7              We began litigation with an initial Complaint filed
8    in May of 2015, and alleged that defendants, again, conspired
9    to fix -- to raise, fix, maintain and stabilize prices, and
10   other coordinated, related conduct for these products, in the
11   U.S., in violation of U.S. antitrust laws.

12             Again, shortening the history section, I will
13   conclude by saying that after extensive discovery, lengthy
14   series of mediations and negotiations, the DPPs reached
15   settlement agreements with, firstly, Mitsubishi Electric on
16   March 12th, 2018, in the amount of $2,123,810.

17             THE COURT:  Wait minute.

18             MR. KANNER:  $2,123,810.

19             THE COURT:  Is that for Mitsuba?

20             MR. KANNER:  That's for Mitsubishi Electric.

21             THE COURT:  I have that down differently, so -- it
22   is our error, not your error.

23             MR. KANNER:  I believe the record shows it
24   is $2,123,810.

25             THE COURT:  Okay.

```
 1            MR. KANNER:  With HIAMS for $7,356,923.
 2            THE COURT:  Wait a minute.  Say that again.  HIAMS
 3     is --
 4            MR. KANNER:  HIAMS is Hitachi.  That took place on
 5     May 14th of 2018, in the amount, again, of $7,356,923.
 6            We settled with Mitsuba in the amount
 7     of $527 -- I'm sorry, $529,716, and with DENSO in the amount
 8     of $100,000.
 9            THE COURT:  Okay.
10            MR. KANNER:  Your Honor granted preliminary
11     approval of the first two settlements on
12     September 25th, 2018.  The Mitsubishi settlement was approved
13     on -- preliminarily approved on March 7th of this year,
14     followed by the DENSO settlement, as amended, on May 23rd of
15     this year.
16            The total value of the settlements was $10,110,449.
17            Once again, on page 4 of the notice, we indicated
18     that the Mitsubishi Electric settlement was subject to
19     recission based on requests for exclusions timely filed, and,
20     again, that was not triggered in this case.
21            Additionally, Mitsubishi Electric, Hitachi, HIAMS,
22     and Mitsuba and DENSO agreed to cooperate with the
23     prosecution of the remaining defendants, and those include
24     Aisin, Mikuni and Keihin.
25            I would again ask, Your Honor, if I could
```

```
 1    incorporate by reference the previous discussions with
 2    respect to cooperation, and with respect to the argument that
 3    the matters are fair, adequate and reasonable?
 4              THE COURT:  You may.
 5              MR. KANNER:  Thank you.
 6              Let's talk about the notice for a minute.
 7    Following the preliminary approval, 1,090 individual copies
 8    of the notice of proposed settlement were mailed to potential
 9    settlement class members identified by the defendants.
10              On July 1st of this year, pursuant to your
11    direction, a summary notice of proposed settlement with
12    today's hearing date was published in one edition of the
13    Automotive News, and posted on its digital website,
14    autonews.com, for three weeks.  An information press release
15    was also issued on the same day, via PR Newswire's Auto Wire.
16              Copies of notice were and are posted online at
17    autopartslitigation.com.
18              The declaration of Angie Birdsell, again, that's
19    the product -- she was the product manager at Epiq Class
20    Action, our settlement administrator, is attached as
21    Exhibit 1 to our report for dissemination of notice and
22    proposed settlements.  It reflects, as of September 13th of
23    this year, there were 485 page views on the website, and 212
24    unique visits.
25              Finally, counsel for the settling defendants, as in
```

1    the previous case, have advised us that they have fulfilled

2    their obligations under CAFA by disseminating requisite

3    notice to the appropriate federal and state officials on

4    July 10th, 2018 for Mitsubishi Electric, HIAMS on July 3rd

5    of 2018, Mitsuba on June 21st, 2019, and DENSO on April 11th

6    of 2019.

7            So, again, the primary components for the

8    resolution of this case were the settlement amounts, which I

9    have described, and, of course, the cooperation element.

10           THE COURT:  All right.

11           MR. KANNER:  With respect to exclusion, the class

12   members who include, again, large OEMs and companies in the

13   supply chain.  As of September 13th, 2019, Epiq received five

14   requests for exclusion from the Mitsuba settlement, 11 from

15   the DENSO settlement, four from the HIAMS settlement, that's

16   Hitachi, and seven from the Mitsubishi Electric settlement.

17           Finally, the class has indicated its approval of

18   the settlement by lack and the absence of any objections.

19           So concluding, Your Honor, direct purchaser counsel

20   believe that the requests for final approval of these three

21   settlements before the Court have met the requirements for

22   Rule 23, in terms of commonality, numerosity, typicality and

23   adequacy.

24           We firmly believe that the settlements are fair,

25   reasonable and adequate, and submit that the class' interest

1    in this case, as with the other two motions, are served by

2    the orders of -- by orders of final approval for the fuel

3    injection systems case.

4              THE COURT:  All right.  Starters.

5              MR. KANNER:  Final argument.

6              For starters, the DPP starters litigation began

7    with an initial Complaint filed in 2014, and made the same

8    allegations as I have described in previous motions.

9              After extensive discovery, and a lengthy series of

10   mediations and negotiations, the direct purchaser plaintiffs

11   reached settlement agreements with Mitsubishi Electric in the

12   amount of $6,754,285, with HIAMS in the amount of $1,368,462,

13   with Mitsuba in the amount of $2,642,257, and with DENSO in

14   the amount of $100,000.

15             Your Honor granted preliminary approval of the

16   first two settlements on September 18th, 2018, of the Mitsuba

17   settlements on April 4th of this year, and the DENSO

18   settlement on May 23rd of this year.

19             The total value of these settlements

20   is $10,865,004.

21             I would also add that, in addition to the

22   cooperation, Mitsubishi Electric, Hitachi and Mitsuba are

23   cooperating and prosecuting in -- and helping us prosecute

24   the remaining defendants, which, at this point, is Bosch.

25             Again, Your Honor, with your permission, I will

| | |
|---|---|
| 1 | incorporate by reference the previous arguments on |
| 2 | cooperation and on fair, adequate and reasonableness? |
| 3 | THE COURT:  All right. |
| 4 | MR. KANNER:  Thank you. |
| 5 | With respect to the notice, following Your Honor's |
| 6 | preliminary approval, 400 -- strike that -- 4,665 individual |
| 7 | notices of the proposed settlement were mailed out to |
| 8 | potential class members. |
| 9 | On June 27th of this year, pursuant to this Court's |
| 10 | direction, a summary notice of the proposed settlement, with |
| 11 | our hearing date today, was published in one edition of the |
| 12 | Automotive News, and posted on its digital website, |
| 13 | autonews.com, for 21 days, as well as an informational press |
| 14 | release via PR Newswire entity called Auto Wire. |
| 15 | THE COURT:  Can I ask you, on the starters, I was a |
| 16 | little bit confused when I read it.  There was 4,665 claims |
| 17 | mailed? |
| 18 | MR. KANNER:  Individual copies of the claim forms |
| 19 | that were mailed to various entities. |
| 20 | THE COURT:  Okay.  And there were 2,132 returned? |
| 21 | MR. KANNER:  Correct. |
| 22 | THE COURT:  And then remailed was 3,317. |
| 23 | MR. KANNER:  As we learned more and |
| 24 | corrected -- the databases -- unfortunately, the materials |
| 25 | presented by defendants was generally adequate and accurate, |

Case 2:12-md-02311-SFC-RSW  ECF No. 2024, PageID.36809  Filed 10/30/19  Page 34 of 119
Status Conference / Motion Hearings • October 3, 2019

34

 1   but we found that many of the mailing addresses somehow went

 2   to branch offices or subentities.  They did not go to the

 3   appropriate entities in many cases.  When we corrected those,

 4   they were remailed, in many cases, with success.

 5           THE COURT:  Okay.  And I see for that, there were

 6   less than 700 that were undeliverable, which --

 7           MR. KANNER:  Correct.

 8           THE COURT:  Which is good.  Thank you.  I just

 9   wanted to clarify that.

10           MR. KANNER:  No, not at all.  It can be confusing.

11   In some cases, the lists were far more useful and we had far

12   less returns.  Other cases, like this, we had a fair amount

13   of returns, but were able to correct that.

14           THE COURT:  Okay.

15           MR. KANNER:  Copies of the notice were posted on

16   our online websites at antitrustlitigation.com.

17           The declaration of Angie Birdsell, who is again the

18   product manager at Epiq Class Action and Claims Solution, is

19   attached as Exhibit 1 of settlement counsels' report of

20   dissemination of notice and proposed settlements.

21           It reflects that as of September 13th of this year,

22   we had 502 page views, 158 unique visits to the settlement

23   website.

24           Again, the defendants' counsel have advised us that

25   they have satisfied CAFA by disseminating requisite notice to

1    the appropriate federal and state officials on

2    July 10th, 2018 for Mitsubishi Electric, for HIAMS on

3    July 3rd, 2018, and Mitsuba on June 21st, 2019, and DENSO on

4    April 11th of 2019.

5           We have discussed the true primary components of

6    the settlement.  First, the amount of $10,865,004, and the

7    second, of course, being the cooperation by the settling

8    defendants.

9           In terms of requests for exclusion, as of

10   September 13th, Epiq received eight requests for exclusion by

11   the Mitsuba settlement -- for the Mitsuba settlement, 14 for

12   the DENSO settlement, five from the HIAMS, and 11 from the

13   Mitsubishi Electric settlement.

14          And, of course, again, Your Honor, there have been

15   no objections mentioned by any of the class members.

16          In short, Your Honor, direct purchaser counsel

17   believe, for the fourth time today, that our requests for

18   final approval of the settlements before the Court have met

19   the requirements of Rule 23, in terms of commonality,

20   numerosity, typicality and adequacy.  We believe that the

21   settlements are fair, reasonable and adequate, and submit

22   that the class' interest in this case are served by the order

23   of final approval for the starters settlement.

24          THE COURT:  All right.

25          MR. KANNER:  Sorry for the lengthy approach, Your

1   Honor.

2          THE COURT:  You don't have any others?

3          MR. KANNER:  We will, shortly.

4          THE COURT:  Yes.  Okay.  Let me rule on these four,

5   in terms of the settlements, first of all.  And as I said, I

6   am also grouping them -- you may be seated -- I'm also

7   grouping them together.

8          MR. KANNER:  Thank you, Your Honor.

9          THE COURT:  We have the motion for final approval

10  of these components parts, alternators, radiators, starters

11  and fuel injection systems, with various groups of

12  defendants.  And the Court is also asked to certify, for

13  settlement purposes, the classes that I've previously

14  conditionally approved.

15          The lawsuits on behalf of the direct purchasers in

16  the various component parts all allege that defendants

17  conspired to raise, fix, maintain and stabilize prices, rig

18  bids, and allocate the supply of component parts sold here in

19  the United States, in violation of the federal antitrust law.

20          Moreover, plaintiffs and other direct purchasers

21  were injured by paying more for those products than they

22  would have paid in the absence of the alleged illegal

23  conduct.

24          The Court enters orders pre -- entered orders

25  preliminarily approving settlements with the various

 1  defendants.  I'm going to read into the record the total

 2  amount, but not the individual defendants.  The Court accepts

 3  what counsel has indicated as the correct amounts.

 4          And I would indicate that when I stopped you, I had

 5  a wrong note on the parts, so I do have exactly the same

 6  numbers that you have, thank goodness.

 7          All right.  The alternators total settlement

 8  was $9,606,594.  The radiators total settlement

 9  was $6,240,956.

10          Let me go back, because I do want to say that the

11  parties in the alternators were Mitsubishi Electric, HIAMS,

12  and DENSO.  And in radiators, it was Mitsuba, DENSO, Calsonic

13  and T. Rad.

14          For starters, the total settlement -- I think this

15  is a little bit out of order, but it is the way I made my

16  notes, so that's the way I'm going to go.  It's $10,865,004,

17  and the defendants in that one were Mitsubishi, HIAMS,

18  Mitsuba and DENSO.

19          The settlement for fuel injection systems

20  was $10,110,449, and, again, those defendants were Mitsubishi

21  Electric, HIAMS, DENSO and Mitsuba.

22          Although some of the agreements were subject to

23  recission based upon the number of valid and timely requests

24  for exclusions received, the level was not reached in any of

25  the component part cases, so this is the amount -- the total

1    amount of the settlements.

2          The amendment to Rule 23, effective in December of

3    last year, requires that the parties must provide the Court

4    with information sufficient to enable it to determine whether

5    to give notice of a proposed settlement to the class.  Notice

6    is justified by the parties showing that the Court will

7    likely be able to approve the proposal, certify the

8    class -- and certify the class for purposes of judgment on

9    the proposal.

10          The Court here authorized the direct purchaser

11    plaintiffs to disseminate notice of all -- or I should say,

12    of each these four proposed settlements, as well as the fair

13    -- notice of the fairness hearing, and related matters to the

14    settlement class.

15          Counsel went over the number of claims.  I'm not

16    going to go over all of those specifics, except that the

17    general number of forms mailed for the alternators was 2,240.

18          I do want to say that the undeliverables were down

19    to 334.  I was impressed with the number of undeliverables in

20    each of these cases, so I would like to put that on the

21    record.

22          The radiators, the notices mailed were 492, and the

23    undeliverables were just 41.

24          For the starters, there were 4,665 claims mailed

25    initially, that number changed as we discussed, but the

1    undeliverables 698.

2            The fuel injection systems, the number of claim

3    forms and notices mailed were 1,090, with only 139 that were

4    undeliverable.

5            So the summary notices for the settlements also

6    were published in Automotive News.  Additionally, there was

7    an online banner notice that appeared over a 21-day period on

8    autonews.com, which I understand is a digital version of the

9    Automotive News, and an informational press release was

10   issued nationwide, via PR Newswire's Auto Wire, which targets

11   auto industry trade publications.  And finally, a copy of the

12   notice was, and I assume remains, online, on our auto parts

13   antitrust litigation site.

14           The -- going on to the exclusions in these various

15   prices -- various cases which defendant has put on the record

16   the number, and the Court accepts all of those numbers for

17   each of them.  I followed with you, and I have the same

18   numbers from your papers.

19           All right.  The first issue is whether the Court

20   should approve this plan of allocation.  The notice sent to

21   the potential members described the plan recommended by the

22   settlement class counsel for distribution of the funds to

23   members who filed timely and proper claim forms.  The

24   proposed distribution provides for the various settlement

25   fund, which accrued interest, to be allocated among the

1    approved claimants according to the amounts of their

2    recognized transaction, after the payment of attorney fees,

3    litigation and administration costs.  We are going to get

4    into those in the next motion.

5         This Court and numerous others have approved

6    similar pro rata distribution plans in the automotive parts

7    litigation, and I will do so here.

8         The questions raised is, is the proposed settlement

9    fair, reasonable and adequate?  Counsel went over that.  The

10   settlement, in the Court's opinion, reflects a reasonable

11   compromise, in light of the liability, damages and procedural

12   uncertainties facing the parties.

13        Rule 23(e) requires court approval of a proposed

14   settlement, and it must be fair, reasonable and adequate.

15   The 2018 amendments set forth a list of factors for the Court

16   to consider, and they are as follows, and I will discuss each

17   of them.

18        One is the adequacy of representation and arms

19   length negotiations.  Here, considerations include the

20   experience and expertise of plaintiffs' counsel, the quantum

21   of information available to counsel negotiating the

22   settlement, the stage of litigation, the amount of discovery

23   taken, the pendency of other litigation concerning the

24   subject matter, the length of negotiations, and whether a

25   mediator or other neutral facilitator was used, the manner of

1    negotiation, whether attorney fees were negotiated, and other

2    factors demonstrate the fairness.

3        I do find that these factors are satisfied as to

4    each of the four component parts.

5        Plaintiffs share the same interest as the

6    settlement class.  Class counsel has extensive experience in

7    handling cases in this antitrust area, and they have

8    represented the direct purchaser plaintiffs from the

9    inception of the litigation, and negotiated the settlement.

10       Counsels' judgment is that the settlement is in the

11   best interest of the class, and that judgment, in my opinion,

12   is entitled to significant weight.  As I have indicated

13   before, I think that class counsel -- I want to say all

14   counsel in this case have just done a tremendous job, and are

15   highly, highly experienced and knowledgeable in this area.

16       Discovery and available information allowed counsel

17   to evaluate the strengths and weaknesses of the claims and

18   defenses.  The information allowed evaluation of the legal

19   case and the potential value of the promised cooperation,

20   which was a significant factor in each of these cases, along

21   with the settlement amount.

22       Counsel believes the settlement is fair, reasonable

23   and in the best interest of the settlement class.

24       The settlement provides cash payments, and, as

25   indicated, substantial cooperation.

1          In evaluating the proposed class settlement, the
2    Court does not decide the merits of the case or resolve
3    unsettled legal questions for two reasons.  First, the object
4    of settlement is to avoid the determination of contested
5    issues, so the approval process should not be converted into
6    an abbreviated trial on the merits.  And, second, being a
7    preferred means of dispute resolution, there's a strong
8    presumption by courts in favor of settlement.  And when
9    considering the adequacy of the relief to the class in
10   determining the fairness of a class action, the Court
11   assesses it with regard to a range of reasonableness, which
12   recognizes the uncertainties of law and fact in any
13   particular case.

14          The risk must be weighed against the settlement
15   consideration.  And here, the certainty of these cash
16   payments, together with the cooperation by each of these four
17   defendants, strongly militates towards approval of the
18   settlement.

19          While plaintiffs are optimistic about the
20   likelihood of ultimate success in this case, it is certainly
21   not certain.  As this Court has previously noted, success is
22   not guaranteed, even in those instances where settling
23   defendant has pleaded guilty in a criminal proceeding brought
24   by the Department of Justice, but that is because, among
25   other things, the DOJ is not required to prove class-wide

1    impact or damages, both of which require complex and

2    expensive expert analysis, and the outcome of that is

3    uncertain.

4          The case here does not present any difficulties in

5    identifying claimants or distributing settlement proceeds

6    consistent with the practice previously approved in the auto

7    part litigation direct purchaser settlements.  The settlement

8    class counsel intend to distribute the net settlement funds

9    pro rata to approved claimants.

10          Claims will be processed using a settlement claims

11    administrator to review the forms, to assist settlement class

12    counsel, and to make recommendations to the Court concerning

13    the disposition of those, and to mail checks to approved

14    claimants for their pro rata share.

15          Settlement class counsel are also seeking attorney

16    fees, and we will get to that in the next motion.

17          Class members will be treated equitably, relative

18    to each other, in terms of their eligibility for a pro rata

19    share of the funds, and their right to opt out of the

20    settlement classes.  Likewise, each class member gives the

21    same releases.

22          Now, there are incentive awards, and I believe

23    those are also going to be covered in the next motion.  The

24    Court notes that those are awards for the efforts that lead

25    plaintiff to take on the class are recognized, and we'll

1  discuss it when we -- when we get there.

2      Certainly, the settlement of complex litigation,

3  such as this, conserves judicial resources, because these

4  suits are notoriously difficult and unpredictable.  And

5  plaintiffs submit that there is no counter veiling public

6  interest that provides a reason to disprove the proposed

7  settlement, and this factor supports final approval.

8      And I would add to that, of course, that there has

9  been no objections to any of these settlements.

10      In sum, the result appears fair and reasonable in

11  light of the expected duration and uncertainty of continued

12  litigation, and the claims here are complex, and the issues

13  are numerous.

14      The negotiations involved arms length by

15  experienced counsel, and the Court therefore accords

16  counsels' assessment of fairness.

17      The next issue is whether the notice was proper.

18  And we know, under 23(e)(1), the Court must direct notice in

19  a reasonable manner to all members.  It does not require

20  actual notice, but -- nor does it require individual mailed

21  notice, but here, all of that was done, so there is no need

22  to really go into that.

23      The Court, as indicated when I read the numbers,

24  find that -- finds that notice here has been appropriate, and

25  I think actually exceeds most of the cases I have seen, in

 1    terms of the folks who have not been notified because mail

 2    has been returned.

 3              The last question is, should the settlement class

 4    be certified pursuant to Rule 23?  And the Court has looked

 5    at a number of the factors, and finds that it should be.

 6              There is numerosity.  Again, we went through the

 7    numbers of entities:  Alternators, 2,240; radiators, 492;

 8    starters, 4,665; and fuel injection systems, 1,090.  And

 9    these are all distributed throughout the United States, so

10    that makes joinder even -- I mean, it makes it so much more

11    practical to do it as a class action.

12              A class action, next, must implicate questions of

13    law or fact common to the question.  A certifiable class

14    claim must arise out of the same legal or remedial theory.

15    Antitrust price-fixing conspiracy cases, by their nature,

16    deal with common legal and factual questions about the

17    existence, scope and effect of the alleged conspiracy.

18              Here, direct purchasers identify the main issue

19    common to the class, and that is whether settling defendants

20    engaged in a combination and conspiracy amongst themselves to

21    fix, raise, maintain or stabilize the price of component

22    parts sold in the United States.

23              Other common questions noted by the Court in other

24    motions of this sort, include the duration of the illegal

25    contract, combination or conspiracy, and whether non-settling

 1    defendants' conduct resulted in an unlawful overcharge of

 2    these prices.  The Court finds that commonality requirement

 3    is met.

 4         Next is typicality.  To satisfy this third

 5    prerequisite, the claims of the representative parties must

 6    be typical of the claims of the class.  A proposed class

 7    representative can satisfy the prerequisite if his or her

 8    claim arises from the same event, or practice, or course of

 9    conduct that gives rise to the claim of other class members,

10    or the claims are based on the same legal theory.

11         The typicality requirement may be satisfied if

12    there are factual distinctions -- even if there are factual

13    distinctions between the claims of the named parties.

14         Here, typicality is satisfied because the injuries

15    arise from the same wrong that is allegedly injuring the

16    class as a whole.  They were all victims of the same

17    conspiracy.

18         Next is adequacy of representation.  Here, the

19    Court must find that the representative parties will fairly

20    and adequately protect the interest of the class.  This is a

21    two-pronged inquiry.  One relates to the adequacy of the

22    named plaintiffs' representation of the class, and requires

23    there be no conflicts between the interest of the

24    representative and those of the class in general.  And the

25    other, of course, relates to the adequacy of class counsels'

1    representation.

2         Here, the DPP representatives will fairly and

3    adequately protect the interest of the class because they

4    have the same interest, and the distribution plans do not

5    give preferential treatment to the named plaintiffs, though

6    they are asking for awards.

7         In addition, class counsel is qualified,

8    experienced and able to conduct the litigation.

9         Accordingly, the Court finds that the individual

10   plaintiffs and the attorneys adequately represent the

11   classes.

12        Because the direct purchasers meet the requirements

13   of Rule 23(a), the Court turns to the additional requirement

14   of 23(b)(3), that class plaintiffs demonstrate that common

15   questions predominate over questions affecting only

16   individual members, and that class resolution is superior.

17        Here, the claims involve a global conspiracy from

18   which all proposed settlement class members' injuries arise.

19   This conspiracy theory suggests the existence of shared

20   issues relative to the scope of the conspiracy, the market

21   impact, the aggregate amount of damages suffered by the class

22   as a result of the violations.

23        Evidence that shows a violation as to one

24   settlement class member is common to the class and will

25   provide the violation to all.

1    The anticompetitive conduct is not dependent on the

2    separate conduct of the individual settlement class members.

3    Finally, a class action is a superior method to

4    adjudicate these claims, and the MDL has been centralized in

5    this Court. The interest of settlement class members in

6    individually controlling the prosecution of separate claims

7    is outweighed by the efficiency of the class mechanism.

8    Certainly, litigating the same issues in individual

9    suits would unduly burden the Court, and I would say, would

10   last through many courts' lifetime.

11   Therefore, the proposed settlement, the Court finds

12   that the prerequisites for it, pursuant to Rule 23 of Federal

13   Rules of Civil Procedure, have been met, and I hereby certify

14   the class for direct purchaser plaintiffs.

15   So the Court grants final approval of the

16   settlement and certifies the class members -- the classes for

17   purposes of settlement, and approves the plan of distribution

18   for all four of these settlements -- or these parts -- not

19   four settlements, because there are more -- four parts.

20   All right. I think that covers it.

21   MR. KANNER: Thank you, Your Honor.

22   THE COURT: Now, with that, let's go on to attorney

23   fees.

24   MR. HANSEL: May it please the Court, Your Honor,

25   Greg Hansel for the direct purchaser plaintiffs.

 1           THE COURT:  Yes, Mr. Hansel.

 2           MR. HANSEL:  All four of these parts, the direct

 3   purchaser plaintiffs filed the first Complaint in 2013,

 4   six years ago.  Sometimes our clients joke with us, you know,

 5   that we are working for free.  And we do have to tell them

 6   that we will ask the Court for a fee, but they do take

 7   comfort in the idea that a judge is deciding our fee, that we

 8   just can't take it.  So we do discuss that with our clients,

 9   and frankly, I think they are very comfortable with the idea

10   that a court is deciding the attorney fee.

11           So I will try to be as streamlined in my

12   presentation as my colleague, Mr. Kanner, was.

13           I will start with alternators.  The settlements

14   with the three alternators settling defendants, Hitachi or

15   HIAMS, Mitsubishi Electric, which we sometimes call MELCO,

16   and DENSO, total $9,606,594.

17           The Court has just reviewed the settlement notice

18   facts, so I will not repeat all of the facts about settlement

19   notices, but I will highlight that with respect to attorney

20   fees, expenses and incentive or service awards, the notice is

21   of particular importance because it provides notice and an

22   opportunity to be heard to all class members with respect to

23   the fact that class counsel will request -- and in each of

24   the four cases, we said will request up to 30 percent

25   attorney fees, and we are, indeed, requesting 30 percent.

1        The notice also states that counsel will request

2    reimbursement of litigation expenses and settlement

3    administration and notice expenses, and refers to service

4    awards in the cases where we intended to request service

5    awards, which are two out of the four parts today, we are

6    requesting service awards.  The others we will defer to a

7    later date.

8        So the Court is familiar with the notice and --

9        THE COURT:  Why are you deferring those two?  I'm

10   just curious.

11       MR. HANSEL:  Well, it is because we have additional

12   negotiations or mediations occurring in those parts.  The

13   settlement funds for existing settlements are in the bank or

14   otherwise subject to the terms of settlement agreements as to

15   the timing of payment, so the settlement funds will not be

16   distributed yet.

17       As the Court is aware, we are trying to be as

18   efficient as possible by combining settlements for approval

19   and also for the claims process and the attorney fees and the

20   incentive awards.  So in the judgment of our group, it made

21   sense to request the service awards in two of the parts

22   today, and we intend to request service awards in the other

23   two, later.

24       THE COURT:  Okay.

25       MR. HANSEL:  So what I have said applies to

1   alternators, starters, fuel injunction systems and radiators.

2           The settlement amounts -- I mentioned the

3   settlement amount in the alternators case.  In the starters

4   case, the total settlements are $10,865,004, with the four

5   defendants in that case; Mitsubishi, HIAMS, DENSO and

6   Mitsuba.

7           In fuel injection systems, the total amount of the

8   settlements is $10,110,449, with four defendants; Mitsubishi,

9   Hitachi or HIAMS, Mitsuba and DENSO.

10          And in the radiators case, the total amount of the

11  four settlements is $6,240,956, with Mitsuba, DENSO, Calsonic

12  and T. Rad, those four defendant groups.

13          I will say that the opt-outs -- the low number of

14  opt-outs relative to the number of class members is also an

15  indication that the attorneys fees requested are reasonable,

16  and the -- and in the cases where it applies, that the

17  service awards to be requested are reasonable, and the

18  absence of any objections to the attorney fees, expense

19  reimbursement requests and service awards.  Those are a

20  common element in all of these settlements, that there have

21  been no objections to any of those planned requests.

22          So in each of the four parts, plaintiffs' counsel

23  requests 30 percent of the proceeds of the settlement funds.

24  And I want underscore this point, because the Court has been

25  clear in the past, this is after deducting litigation costs

1   and expenses.  We are not requesting the 30 percent on

2   amounts out of these settlements that are devoted to paying

3   litigation expenses, in this instance.

4           So we would support this request by -- by stating

5   that each of the settlements is fair, reasonable and

6   adequate, and, indeed, the Court has just ruled from the

7   bench that Your Honor is approving the settlements and

8   certifying the settlement classes.

9           The reaction of the class members indicates broad

10  support, and that the indicators of that are the low opt-outs

11  and the absence of objections.

12          In this MDL, the Court has consistently applied the

13  percentage of the fund approach.  I will get into that a

14  little bit more, including in the direct purchaser cases

15  where the Court has awarded fees before.

16          The benefits of that approach are several, as the

17  Court has noted and the Sixth Circuit has held.  The

18  percentage of the fund approach conserves judicial resources.

19  It eliminates disputes about the reasonableness of rates and

20  hours.  It aligns the interests of counsel with the class.

21  And it is typical in this type of litigation.

22          Thirty percent, the requested fee, is within the

23  range of other class action fees awarded in the Sixth Circuit

24  and by this Court in this MDL, including, for example, in the

25  direct purchaser settlements with the ten or 11 defendants in

 1   the wire harness litigation, the first part brought, the

 2   Court awarded a 30 percent fee.

 3          This Court has actually also awarded higher fees in

 4   this MDL, from time to time, and lower fees.  For example,

 5   higher fees were awarded to the automotive -- automobile

 6   dealer plaintiffs and the truck and equipment dealer

 7   plaintiffs in the wire harness case, where the Court awarded

 8   a 33.3 percent fee.

 9          I would like to talk about what the class counsel

10   have done to earn their fee.  So we investigated the

11   industry.  And the industry is -- the automotive industry as

12   a whole, but each one of these parts has its own industry

13   that specializes in manufacturing and distributing the

14   particular parts at issue here.  So we studied the industries

15   in detail.

16          We investigated the facts of the conspiracy.  We

17   participated in extensive cooperation, meetings and proffers,

18   with the ACPERA applicant in each of the four parts.  We

19   drafted Complaints and other pleadings and briefing and

20   motions.  We have attended all the hearings in the case.  We

21   negotiated the terms of settlements.  We have reviewed and

22   coded and analyzed hundreds of thousands of documents -- or

23   millions of documents, when you add them together, including,

24   perhaps, the original group, where the documents were

25   originally produced to or seized by the Department of

1  Justice, and then we received additional documents from the

2  ACPERA applicant.  We received additional documents as the

3  settlements have occurred.  We have, in each case, secured

4  cooperation with settling defendants, which included the

5  production of documents.  So we have had massive document

6  review and coding and analysis, both by actual humans and

7  with the aid of computers.

8          We have negotiated the terms of the settlement, and

9  oftentimes for several months after reaching a settlement in

10  principle, in a mediation or a negotiation, we have then had

11  to negotiate the terms of the settlement agreements which

12  also are somewhat difficult to negotiate.  And it's a slow

13  process, going back and forth, often with overseas

14  defendants, and it does take a long time to bring these to a

15  conclusion.

16          And then there have been lots of work with the

17  claims administrator and the notice administrator in these

18  cases, to make the notices as effective as we believe they

19  have been, and preparing other motions in connection with

20  settlement.

21          So just turning to the factors listed by the

22  Sixth Circuit, for example, in the *Bowling vs. Pfizer*

23  case, 102 F.3rd 777.  The Sixth Circuit announced six factors

24  to be considered.

25          One is that to earn a fee, counsel must have

1   obtained a valuable benefit for each of the classes.  In this

2   case, the primary benefit is the cash recovery.  And in those

3   cases where there are additional defendants remaining, the

4   cooperation is also a major benefit to the class.  And, in

5   fact, the cooperation in the ones without any more defendants

6   left was a factor in concluding the settlements with the

7   remaining defendants after we got the first one.  So the

8   cooperation really helps.

9        The value of services on an hourly basis, also

10  referred to as the lodestar crosscheck.  I will walk through

11  that in each of the parts in a moment, but in this case, we

12  suggest to the Court that that value confirms that the

13  requested fee is reasonable.

14       Third, services were undertaken on a contingent fee

15  basis.  That's certainly the case here.  There is a risk in

16  any such case that plaintiffs' counsel will earn nothing,

17  will recover nothing as an attorney fee, or an amount

18  insufficient to meet the amount of time they have spent on

19  the case, times hourly rates.

20       There is an important public policy, it is the

21  fourth factor.  Society has an important stake in rewarding

22  attorneys who produce such benefits, in order to maintain an

23  incentive to others to deter similar future conduct, and to

24  achieve recoveries that amount to restitution for the

25  victims.  Society gains from competitive markets that are

1    free from collusion.  And we also are a complement in the

2    related parallel criminal proceedings, in which the

3    Department of Justice does not purport to seek restitution

4    for the victims.  They focus on criminal penalties, prison

5    time, fines, but they do not undertake to get compensation to

6    the victims.

7         Fifth, antitrust class actions are inherently

8    complex.  I won't belabor that point.  I think we can all

9    agree on that.

10        And counsel on both sides are skilled and

11    experienced, which is the sixth factor.

12        So turning to the lodestar crosschecks.  In each of

13    the four parts, we provided our lodestar with our original

14    motion for attorneys fees, both in hours and dollars, and

15    then, later in our notice reports, which were filed recently

16    with the Court, we updated the dollars of lodestar and then

17    recalculated the lodestar multiplier crosscheck.

18        So, for example, in alternators, the attorneys fee

19    that class counsel request today, 30 percent, works out to

20    $2,873,804.63, which is 30 percent of the settlement after

21    costs and expenses are deducted.

22        At the time of the motion for fees, direct

23    purchaser counsel had expended 2,804 hours in the alternators

24    case, all together.  That was in June, June 30th -- as of

25    June 30th.

1    Since then, through August 31st, counsel have spent

2  approximately $60,000 of additional time, and so the

3  multiplier now -- and this is in our notice report, the

4  multiplier as of August 31st is 2.09 times the lodestar.

5  That is the highest of these four, and they descend after

6  that.

7    And I would note that that multiplier is similar to

8  the multiplier that the Court calculated in the occupant

9  safety systems case in the first fee application in that

10  case, and the Court approved.

11    The next part is starters.  In this

12  part, 30 percent of the fund after deducting

13  fees -- deducting costs and expenses is $3,243,460.72.

14    Robert, tell me if I'm going too fast.

15    And at the time, that's June 30th, the number of

16  hours was 3,937 hours.  There was additional time after that,

17  and the current multiplier is 1.6 of lodestar, that we are

18  requesting.

19    Turning to fuel injection systems.  The 30 percent

20  after costs and expenses is $3,017,382.28.  The number of

21  hours as of June 30th was 4,811.  The current lodestar

22  multiplier is 1.19, so it's a little bit over the lodestar.

23    Turning to radiators.  The 30 percent after costs

24  and expenses is $1,853,477.05.  The number of hours as of

25  June 30th was 3,889.  And with the additional time through

```
 1   August 31st, the requested fee represents a negative

 2   multiplier of 0.97 times the August 31st lodestar.

 3            THE COURT:  Could you tell me again, what is the

 4   attorney fee on the fuel injection?  It is 1.19, but what is

 5   the amount?

 6            MR. HANSEL:  The amount is $3,017,328.28.

 7            THE COURT:  Thank you.

 8            MR. HANSEL:  Changing the subject slightly, to

 9   allocation.

10            In each of the parts for all the settlements, we

11   ask the Court authorize interim lead counsel to allocate the

12   fee among the law firms who have contributed the work.  This

13   Court, and courts generally, have approved a joint fee

14   application such as this, that requests a single aggregate

15   fee award with allocations to be determined by lead counsel

16   among the various law firms that work on the case.

17            Lead counsel know the most about the work that the

18   team of firms have performed, including each other and the

19   other firms who support the case, and who have all

20   contributed to litigation funds to pay for the expenses, as

21   well as contributing their time.

22            Those firms have generally not attended all of

23   those hearings.  We have tried to keep that very efficient.

24   Mr. Fink is the court-appointed liaison counsel, and

25   obviously, he's one of the preeminent firms that's working on
```

 1   these cases, in addition to lead counsel, but there are other

 2   firms, as well, who have made a substantial contribution both

 3   in their skill and time and experience, as well as expenses.

 4           THE COURT:  Have there been any disputes between

 5   lead counsel and others who are allocated amounts of any

 6   import?

 7           MR. HANSEL:  Nothing that we haven't worked out.

 8   There have been a few minor -- I would say, minor

 9   disagreements or disappointments.

10           THE COURT:  We had some at the beginning of this

11   case.

12           MR. HANSEL:  I beg your pardon?

13           THE COURT:  We had a dispute in the beginning of

14   this --

15           MR. HANSEL:  Yes.  That was more of a leadership

16   contest, I would call it, and that was resolved.  And -- but

17   there have been no significant issues among the supporting

18   counsel.  We really try to treat everyone fairly and work out

19   any questions that are raised.

20           THE COURT:  Thank you.

21           MR. HANSEL:  That's been successful.  If there was

22   a problem, I'm sure Your Honor would hear about it, and

23   nothing has bubbled up, so --

24           THE COURT:  Okay.

25           MR. HANSEL:  So I will turn now to reimbursement of

1    litigation costs and expenses, if I may?

2              We have excluded some particular items that the

3    Court has previously indicated we were not, you know, to

4    request or receive reimbursement of those, I guess, because

5    they are overhead like; telephone, fax, and internal copying

6    costs are those expenses, and they are not included in these

7    requests.

8              So in alternators, the expenses are $27,245.25.

9              In starters, $53,468.25.

10             In fuel injection systems, $52,508.06.

11             Radiators, $62,699.17.

12             Finally, incentive awards or service awards.  In

13   the alternators case, Your Honor, there are two proposed -- I

14   guess, since the Court has approved the settlements, there

15   are two class representatives of the settlement class; they

16   are Irving Levine Automotive Distributors, Inc., in

17   Connecticut, and All European Auto Supply, here in Michigan.

18   We are requesting $20,000 for each of them.

19             And in the radiators case, there is a single class

20   representative, Irving Levine, who did distinct work in that

21   case, distinct from alternators and other cases.  And as the

22   only class representative carrying the ball in that case,

23   radiators, we are requesting $25,000 incentive award for

24   Irving Levine Automotive Distributors, Inc.

25             THE COURT:  What, specifically, did they do?  I

 1     don't have any specific information on these two parts.

 2          MR. HANSEL:  Well, I can say they have spent an

 3     awful lot of time with me on the telephone, primarily, and

 4     with other co-counsel, for more than six years.  And one

 5     thing that impresses me about their service to the class is

 6     the -- how they have sustained their attention and commitment

 7     to this case over a multi-year period.  To just be willing to

 8     spend the time and attention for over six years, largely for

 9     the benefit of others, is impressive.

10          First of all, none of the class representatives

11     were promised incentive awards.

12          But actually, to focus on the Court's question,

13     what did they do?  They assisted counsel in understanding the

14     market, the industry.  They have really a lifetime of

15     experience in purchasing auto parts, in understanding the

16     automotive industry and, in particular, the radiators

17     industry and the alternators industry.  They educated counsel

18     on those industries.

19          We discussed with them preservation of hard copy

20     and electronic records, and took steps to implement those

21     preservation plans.

22          We worked with them on collecting documents for

23     production to defendants, as needed, and for review.  We

24     provided them with Complaints before filing, for their review

25     and approval.  We gave them regular updates and status

```
 1    reports throughout the six-year period.  And then, whenever
 2    we were in a position to recommend a settlement, we would
 3    reach out to them and seek their input and hopefully their
 4    approval, and in each case, they have approved the
 5    settlements.  So we --
 6              THE COURT:  Let me ask you --
 7              MR. HANSEL:  Yes.
 8              THE COURT:  -- did they have any contact with other
 9    class members?  I mean, obviously, like the one Levine is the
10    only one, but do other class members contact them to say,
11    what do you think?  Do you know that?  I'm just curious.
12              MR. HANSEL:  I think, when they -- I think, when
13    they -- I think they see other people in their industry at
14    meetings from time to time.  We've discouraged them from
15    talking about the case, because whenever you do that, you
16    know, you open yourself up to being asked about that in a
17    deposition, and there can be a waiver of privilege and things
18    like that, so we try to avoid that.  But we know -- I mean,
19    it is public that they are doing that, and we are --
20              THE COURT:  But they not spending -- we are not
21    talking about -- it doesn't cost them time to relay to other
22    class members?
23              MR. HANSEL:  No.  They are not like a
24    clearinghouse, where they get called all the time and asked
25    what the status is.  But I think they -- they have -- since
```

```
 1    they have done this publicly, and whenever a Complaint is
 2    filed, there are news reports, as the Court is aware, in
 3    various publications, industry publications, Automotive News,
 4    so there's some buzz, and they do get asked about it from
 5    time to time, and they tell the truth about, you know, what
 6    they are doing and why, you know.  I think they do, frankly,
 7    get some pats on the back, which doesn't buy you a cup of
 8    coffee, but I think it helps them feel like they are doing
 9    the right thing.
10              THE COURT:  Okay.
11              MR. HANSEL:  So these incentive awards that we are
12    requesting of $20,000 and $25,000 today are less than what
13    the Court -- what Your Honor has awarded, for example, in
14    wire harness, where the Court awarded $50,000 to each of
15    seven, I believe, class representatives.
16              And just to conclude, there were no objections to
17    the requested fees, expense reimbursements or incentive award
18    requests by any of the class members, in any of the four
19    parts, for any of the multiple defendant settlements.
20              We did furnish, already, to the Court, via ECF
21    Utility, a proposed order on attorney fees, costs and
22    incentive awards in each of the four parts.  We also have
23    hard copies, here today, of those orders and the final
24    approval orders.  If Your Honor would like, we can hand those
25    up.  And if there are any changes that the Court wishes to
```

1    make, of course we are happy to assist with those in word

2    processing and resubmit anything to the Court.

3              THE COURT:  Okay.  Thank you.

4              MR. HANSEL:  Thank you, Your Honor.

5              THE COURT:  All right.  The motion before the Court

6    on each of these cases is for an award of attorney fees,

7    litigation costs and expenses in the -- I shouldn't say in

8    each of these cases, in each of the component parts, the four

9    parts, and the incentive awards.

10             The direct purchasers asked for 30 percent of the

11   settlement for attorney fees after deductions for

12   reimbursement of litigation costs and expenses.

13             Let us discuss first the grant of attorney fees,

14   should the Court grant this.  And the Court, of course, under

15   Rule 23(h) may award, and should award, really, reasonable

16   attorney fees and nontaxable costs that are authorized.

17             The Court looks first at the expenses.  And before

18   I go to the attorney fees, the expenses, here, have been

19   outlined by the parties and appear, from a look at them, to

20   be reasonable.  The Court does not, I should state, like some

21   courts do, have an auditor review these expenses, which under

22   these circumstances, I find would be an extra cost that need

23   not be incurred, but rely on the integrity of the attorneys.

24   I have found, certainly, throughout the years, that these are

25   attorneys of the highest integrity, and I, therefore, in

1    looking at the costs, I don't question any of them.  They all

2    appear to the Court to be reasonable.

3            And the Court would award the unreimbursed past

4    expenses in the alternator case of $27,245.25, the radiator

5    case of $62,699.17, and the starters -- is the starters

6    $53,468 or 268?  I may have a typo here, and that's why I'm

7    asking.

8            MR. HANSEL:  468.

9            THE COURT:  468?

10           MR. HANSEL:  It is $53,468.25 --

11           THE COURT:  All right.

12           MR. HANSEL:  -- starters.

13           THE COURT:  Pardon me?  Did you say something else

14   after that?

15           MR. HANSEL:  No.  That was starters.

16           THE COURT:  All right.  The Court will accept that.

17   The fuel injection systems of $52,508.06.

18           As indicated, the law firms who have incurred these

19   costs have provided documents for -- to support their costs,

20   including travel and other expenses, and they did not include

21   the expenses for telephone calls, faxes and internal copying.

22           There is no dispute that class counsel are entitled

23   to reimbursement of all reasonable out-of-pocket litigation

24   expenses and costs in the prosecution of claims, including

25   those in connection with document production, consulting with

Case 2:12-md-02311-SFC-RSW  ECF No. 2024, PageID.36841  Filed 10/30/19  Page 66 of 119
*Status Conference / Motion Hearings • October 3, 2019*

66

 1    experts/consultants, travel and other litigation expenses.

 2            So the Court does grant these, and this comes off

 3    the top of the awards -- the settlement awards.

 4            Next, I would like to address the incentive payment

 5    to the class representatives, and I had counsel put on the

 6    record the specifics of what these persons or entities did.

 7    Certainly, their effort throughout the years to provide

 8    counsel with understanding of the automotive parts industry

 9    generally, and the parts specifically, preservation of

10    electronic and hard copy documents, and various discussions

11    and the other items as counsel has indicated they have done,

12    though I don't know how much time this involved, I think it

13    is very reasonable to offer -- to award these people and

14    these companies -- I believe they were companies; is that

15    correct?

16            MR. HANSEL:  Yes.

17            THE COURT:  For the -- let me find it.  For the

18    alternators, $20,000, and that's to two companies.  And for

19    the radiators, $25,000, and Levine is the only company

20    involved in that.  And I do think that that is a reasonable

21    amount.  I just questioned what they did because I do know or

22    assume that most of the discovery had to do with the DOJ

23    discovery -- or a lot of the discovery did, and so that was

24    already there, but clearly, you could not have proceeded with

25    these without a class member who kept you informed and did

Case 2:12-md-02311-SFC-RSW ECF No. 2024, PageID.36842 Filed 10/30/19 Page 67 of 119
*Status Conference / Motion Hearings • October 3, 2019*

**67**

1  these things you indicated that they did.

2          The next item is attorney fees.  I think most of

3  you know I have struggled with this attorney-fee issue as

4  each case came along.  And I do note here, as in many of the

5  others, that one-third was the amount, I believe, that was in

6  the notice sent to the claimants.

7          The Court may award reasonable attorney fees and

8  nontaxable costs that are authorized by law or by the

9  parties' agreement, but a claim for such award must be made

10  by motion, which we are doing here.  And the Court engages in

11  a two-part analysis when assessing the reasonableness of a

12  petition seeking an award for attorney fees.

13          The Court first determines the method of

14  calculating the attorney fees by applying either the

15  percentage of the fund approach or the lodestar approach.  I

16  have determined that, for me, the best method -- the most

17  appropriate method here is the percentage of the fund award.

18  Of course, the Court uses the lodestar method as a crosscheck

19  to that particular method.

20          And I really do believe that this fund -- this

21  percentage of the fund does avoid these conflicts that comes

22  up, sometimes, in the reasonableness of the hours -- the

23  hourly rate, excuse me, between counsel.  When you have

24  counsel from all over the country and different rates, it

25  creates -- it definitely creates a conflict.

```
 1            And courts also look at, you know, in that respect,
 2    in the lodestar method, the number of hours, and it requires
 3    the Court to review the number of hours that counsel puts
 4    into the record.  Again, I don't have an auditor.  I have
 5    listened to judges who have done this, but I find it very
 6    difficult to apply, as a practical matter, as to how much
 7    time.  I mean, is it too much time that you spent four hours
 8    on a telephone conversation versus one hour; or ten hours in
 9    a settlement negotiation one day versus, you know, 20 hours?
10    I don't know.  And therefore, I think that this -- the Court
11    is willing to accept the hours that counsel indicates and
12    determine that lodestar, but I think the percentage is much
13    more reasonable and fair.
14            I know that throughout -- well, here in Michigan
15    anyway, and in the cases that I have read, generally
16    percentages have been -- I don't know.  I did see one as low
17    as ten, but very common 20, 30, and 33 percent.
18            And the Court -- I kind of went beyond this looking
19    at what do -- how are they handled in other cases?  I know
20    antitrust is very unique, but you do look at other cases, and
21    what percentage, if they are taken on a percentage basis,
22    what percentage of the final award do attorneys receive?  And
23    the 30 percent, across the board, on all different kinds of
24    cases, seems to be a very standard number, and therefore,
25    this Court has finally come to that conclusion.  I think I
```

```
 1   told you in the last settlement that it would be a 30 percent
 2   award.
 3           And I did consider the factors, the factors that
 4   Counsel mentioned, and for percentage of the fund, and I
 5   think that, certainly, when we look at this, some of those
 6   factors, in looking at them individually, society's stake in
 7   awarding attorneys who produce such benefits.  This is a very
 8   unique case that I don't think anybody would have -- no
 9   individual automobile owner would say I paid too much more
10   for my car.  They don't know this.  In a way, it's a kind of
11   case that is comforting to the Court, because I'm not worried
12   about somebody getting money for their medical needs to
13   proceed.  But people are injured, even though they didn't
14   know that they were injured economically, and if it weren't
15   for the attorneys bringing this case, there would be no
16   award.  And if it weren't for the attorneys of exceptional
17   experience and knowledge, such as yourself, there probably
18   would not be such an award, so the Court considers that.
19           I also consider that you took this under a
20   contingency-fee basis.  And I think the interesting thing in
21   this case is, even though we had pleas from some defendants,
22   there were some very valid reasons why those pleas did not go
23   into liability or may not go into liability.  So this was not
24   an open and shut case, but took work and skill.  And the
25   skill of counsel on both sides, as the Court has indicated,
```

1    is tremendous.

2            So I also note that there were some kinds of cases,

3    as I went through cases, even in domestic, which absolutely

4    blows my mind, where there is awards for good results.  So

5    they take certain percentages and then they add money to

6    them, et cetera.

7            Well, I considered all of those factors, and here,

8    clearly, the test of the criteria are met.  The results

9    achieved are excellent.  There is a strong national interest

10   in antitrust informant to vindicate the public

11   policy -- antitrust enforcement, excuse me.  And class

12   counsel have worked on a contingent basis, putting it -- also

13   bearing expenses that are quite extreme, without any

14   indication that they would be reimbursed for those.

15           So the Court is, in fact, awarding the 30 percent.

16   I have looked at the lodestar, and the lodestar, as counsel

17   just went through, now the highest is 2.09 and lowest was a

18   negative of 0.90 (sic).  So those lodestars are all within

19   the realm of allowable by case law.

20           So, in sum, the Court grants the motion for the

21   award of attorney fees and reimbursement of litigation

22   expenses.  The Court would also authorize the lead counsel to

23   determine the allocation of these fees amongst other counsel.

24           And I would like to clarify one thing about

25   the -- whether the service awards to the class reps are

```
1    deducted before or after the attorney fees.  I would say to

2    you that I think the -- it seems to be that the next -- that

3    the most logical thing is that these fees -- these service

4    awards come out of the back fees -- excuse me, the net

5    settlement to the clients.  So they don't come out, as the

6    costs do, from the settlement amount.  Do you understand what

7    I'm saying, or no?

8              MR. HANSEL:  Not really, Your Honor.

9              THE COURT:  Okay.  Let me go over that.  You take

10   out -- from the total settlement, you take out your costs,

11   and then you determine the attorney fees, right?

12             MR. HANSEL:  Correct.

13             THE COURT:  That being one-third, and so that

14   attorney fee is yours, totally, and these awards to the

15   individual plaintiffs, the named plaintiffs, come out of the

16   amount that all of the plaintiffs are getting, so you --

17             MR. HANSEL:  Understood, Your Honor, yes.

18             THE COURT:  Okay.  Is that will clear?

19             MR. HANSEL:  Yes.

20             THE COURT:  Because I just thought of that and went

21   through it, and I didn't want you to think of it as an

22   expense and, therefore, take it out before you determine your

23   award.

24             MR. HANSEL:  Thank you, Your Honor.

25             THE COURT:  All right.  That's it.  Is there
```

```
 1    anything else?  That's it on the settlements.  Molly?
 2              MR. FINK:  There is another motion, Your Honor.
 3              THE COURT:  You want to take a break first?  Okay.
 4    We are going to take a break before we do that.
 5              MR. FINK:  Your Honor, if we are taking a break, I
 6    would make this request:  We requested of -- this is the
 7    motion related to anti-vibration rubber parts.
 8              THE COURT:  Right, right.
 9              MR. FINK:  And we asked opposing counsel to extend
10    the courtesy of providing a copy of any presentation
11    materials they intended to use.  That request was denied.  I
12    would ask, now, that we be able to review them during this
13    break.
14              MR. S. REISS:  I have no problem with that, Your
15    Honor.
16              THE COURT:  All right.  You may so do.  Then we
17    will make the break -- it's 11:54.  Can we start again
18    at 12:15?  Would that be enough time?
19              MR. S. REISS:  That's fine, Your Honor.  Thank you.
20              THE LAW CLERK:  All rise.  Court is in recess.
21              (Court recessed at 11:54 a.m.)
22                          —   —   —
23              (Court reconvened at 12:21 p.m.; Court and Counsel
24              present.)
25              THE LAW CLERK:  All rise.  Court is again in
```

```
 1   session.  You may be seated.
 2        THE COURT:  Before you begin your motion, I just
 3   wanted to ask -- it looks like everybody left -- if there was
 4   anything else for the record?  No, because this the only
 5   motion that we have now.  All right.
 6        MR. S. REISS:  Thank you, Your Honor.  The best
 7   laid plans; so we had a PowerPoint which doesn't seem to be
 8   working, but that's fine.  I think Your Honor has a hard
 9   copy, and we have provided hard copies to plaintiffs' counsel
10   as well -- direct purchaser counsel.
11        THE COURT:  I do.
12        MR. S. REISS:  And I will just refer to the pages,
13   which are on the bottom-right-hand side of the hard copy, as
14   I go along here.
15        I'm Steve Reiss --
16        THE COURT:  I have read the motion.  I find this a
17   very interesting motion so I'm looking forward to the
18   argument.  I'm sorry your PowerPoint didn't work, but we've
19   got it here anyway, so it doesn't make any difference.
20        MR. S. REISS:  Thank you, Your Honor.  Steve Reiss,
21   and I represent the Bridgestone defendants.  And I'm also
22   here on behalf of the other three AVRP defendants; Toyo,
23   Yamashita and Tokai.
24        And as Your Honor knows, you've read the papers,
25   this is the motion by the AVRP defendants to enforce the
```

1    settlement and the injunction that went along in this

2    settlement in the end payor settlements of the AVRP case.

3            And just to provide a little bit of context, the

4    Court certainly knows it, but I thought it would be

5    useful -- this starts with page 2 -- just to go over where we

6    are, generally, and then to bring it back to the specific

7    AVRP end payor settlement.

8            Over 40 end payor cases have been settled.  I think

9    the Court was advised this morning, there's only one, only

10   one left.  And the end payor settlements were for a total of

11   about $1.2 billion, and there are 147 separate end payor

12   settlements, including the AVRP settlement, and that's going

13   to become relevant later on.

14           THE COURT:  One hundred forty-seven separate

15   settlements?

16           MR. S. REISS:  Yes, Your Honor.

17           THE COURT:  I know that --

18           MR. S. REISS:  You have been very busy.  It's

19   remarkable.

20           In every one of those cases, in every one, the

21   Court ensured the integrity and the finality of the

22   settlements, just as the Court did today.  It approved the

23   terms of the settlement agreements.  It approved the

24   procedures to notify absent class members.  It carefully

25   certified each settlement class.  And finally, it entered an

1   injunction enjoining class members who did not opt out from

2   proceeding with any further litigation relating to or arising

3   out of the Complaints that were settled.

4        So as a result, basic class action law, every

5   member of the class, end payor class, in every one of

6   those 147 settlements, that did not opt out, is bound by the

7   settlement.  Basic class action law.

8        Now let me focus on this particular case, because

9   in some ways this case was -- was -- was different, because

10   it was actually litigated.  So the end payor case, in AVRP,

11   the end payors brought their indirect purchaser case in June

12   of 2014, and they alleged -- this is on page 3 -- it's

13   important, they allege that they indirectly purchased AVRPs

14   from defendants in one of two ways, either as component

15   parts, that is, parts installed in the new vehicles they

16   purchased, or as replacement parts purchased standalone or as

17   part of the repair process.  That was the EPP complaint.

18        And the EPP counsel, who obviously were highly

19   respected and very capable, as the Court noted, they filed

20   notice of appearance as an interested party in the EPP case

21   in 2014, the same year that the EPP case was actually

22   initiated.

23        Now, I say the EPP case is a bit different from a

24   number of the other AVRP EPP cases, and different in this

25   respect, it was litigated, and we have some of the highlights

```
 1    of the litigation.  But the AVRP defendants produced millions
 2    of pages of documents, there were depositions of virtually
 3    every EPP class representative in every state, there were
 4    over 100 third-party depositions of auto dealers, there were
 5    depositions of OEM representatives, and there were
 6    depositions of numerous employees from each of the
 7    defendants.
 8            After all of that, as often happens and has
 9    happened repeatedly in these matters, the case is finally
10    settled.  And having litigated those cases extensively, the
11    four AVRP defendants settled the EPP cases for a total
12    of $81.5 million.  By the way, I think that dwarfs any of the
13    EPP settlements that came before the Court today.
14            And as was true of all of the other 147 EPP
15    settlements, each settlement agreement contained a full
16    release -- this is on page 4, Your Honor -- which, quote,
17    completely released, acquitted and forever discharged the
18    defendants, quote, from any and all claims, demands, actions,
19    suits, causes of actions, in any way arising out of or
20    relating in any way to the alleged conspiracy.  That's a
21    fairly standard release.
22            And critically, each settlement agreement -- and I
23    should note here, Your Honor, that the settlement agreements
24    for each of the four AVRP defendants and all of the
25    surrounding legal documents are virtually identical.
```

 1          So each settlement agreement contained the

 2    following class settlement -- the following settlement class

 3    definition, and it appears at the bottom of page 4.  All

 4    persons and entities that from March 1st, 1996, through the

 5    execution date, purchased or leased a new vehicle in the

 6    United States, not for resale, which included one or more

 7    anti-vibration rubber parts as a component part, or -- and

 8    this is the critical part, Your Honor -- or indirectly

 9    purchased one or more anti-vibration rubber parts as a

10    replacement part, which were manufactured or sold by a

11    defendant, any current or former subsidiary of a defendant,

12    or any co-conspirators of a defendant.

13          I'm going to come back to that, because it's why

14    this motion is so valid.

15          THE COURT:  Come back to why it's more indirectly

16    purchased.  What does that mean, indirectly purchased?

17          MR. S. REISS:  Well, what it means, Your Honor, is

18    very simple, it means purchased from someone other than a

19    defendant.  Purchased from someone other -- I'm going to

20    explain why that is absolutely clear, but purchased from

21    someone other than the antitrust violator.  That's an

22    indirect purchase.  If you purchase from the antitrust

23    violator -- from the named antitrust violator defendant,

24    that's a direct purchase.  If you purchased from someone

25    other than the named antitrust violator defendant, that's an

1    indirect purchase.  And that's just not common sense plain

2    meaning, it is also -- and I'm going to get to that in a

3    minute -- what the Supreme Court has said and what this Court

4    has said.

5        So just to sort of square the circle on the EPP

6    settlements in this case, in the round two -- and this is on

7    page 5, Your Honor.  In the round two and round three orders,

8    this Court approved each settlement agreement in the AVRP

9    case and certified each EPP settlement class.  This Court

10   approved the settlement class definitions, which included

11   anyone who purchased an AVRP, quote, as a replacement part

12   from, quote, a defendant, or any current or former subsidiary

13   of a defendant.  I'm going to come back and show why that's

14   so important.

15       This Court also approved the nationwide class

16   notice procedures, and ruled they satisfied both due process

17   and Rule 23(e)(1).  The Court has done this numerous times,

18   in numerous settlements, throughout the course of the auto

19   parts litigation.

20       Now, the only EPP class members in the AVRP cases

21   who opted out of the settlement were GEICO -- Your Honor, I

22   know, is quite familiar with GEICO -- a Mr. Terry Sershion,

23   who opted out of Bridgestone, Yamashita and Toyo settlement

24   classes, and a Mr. Willis Jonson who opted out of the Tokai

25   class settlements.  None of the three named plaintiffs in the

1    direct -- in the so-called direct purchaser case, Anderson,

2    LaRue or Lee, opted out of any of the AVRP EPP settlements.

3    There's no dispute about that.  So --

4            THE COURT:  Let me get these dates right.  They

5    filed their direct purchaser claim -- these three

6    individuals, when, again?

7            MR. S. REISS:  They filed -- and Your Honor, if the

8    Court can refer to it, we have a timeline of everything on

9    page 8.

10           THE COURT:  Oh, I will wait until you get there.

11           MR. S. REISS:  But to answer the Court's question,

12   the DPP Complaint was filed on November 15th, 2016, more than

13   two years after the EPP claim.  And Your Honor may remember,

14   because we made a point of it, the DPP claim with these

15   supposed named -- with these named plaintiffs were filed the

16   day before the Statute of Limitation ran.  And Mr. Fink, when

17   we had the argument on the Motion to Dismiss, explained to

18   the Court, look, we got the best plaintiffs we could, which I

19   agree with him, only they are not real direct purchasers.

20           Now having gone through the required procedures,

21   this Court approved each of the settlement agreements for

22   each of the four AVRP defendants.  And in the final

23   judgments, all of which have been issued, this Court

24   permanently enjoined every member of the settlement classes

25   from pursuing any further litigation against the defendants

1    relating to or arising out of the antitrust complaint.

2          And again, we quote this, the injunction on page 6

3    of our presentation:  All persons and entities who are the

4    releasors -- that's the class members -- are barred and

5    enjoined from commencing, prosecuting, or continuing in an

6    individual or representative or derivative capacity against

7    the defendants in this or any other jurisdiction, any and all

8    claims, causes of action or lawsuits which they have, had, or

9    in the future may have, arising out of or related to any of

10   the released claims as defined in the settlement agreement.

11         I don't think there is any dispute that that

12   release prevented the members of the EPP class, who didn't

13   opt out, from continuing any more litigation relating to the

14   settled antitrust suits.

15         Now, let's get very specific about what happens

16   now, in the current direct purchaser case.  So Jerry -- this

17   is on page 7, Your Honor.  Jerry Anderson, Laura LaRue and

18   Christopher Lee, they are the three named plaintiffs in the

19   DPP case.  They all allege that they had their cars repaired

20   at a repair shop that is ultimately owned, through three or

21   four tiers, by Bridgestone.  An auto -- the name of the

22   stores, I think, were WheelWorks and Tires Plus, and I will

23   get to that.  And they maintain, as I'm sure you will hear

24   from Mr. Fink, that they are direct purchasers capable of

25   bringing a direct purchaser suit.

1           They then asked, in May of this year, plaintiffs'

2   counsel asked for us to turn over the discovery that we had

3   provided in the DOJ investigations.  And we said your three

4   plaintiffs are bound by the EPP settlement, they can't

5   continue any litigation, they are enjoined.  Obviously, the

6   plaintiffs' lawyers have a different view of that.

7           And on June 4th, we filed -- the AVRP defendants

8   filed this Motion to Enforce the Final Judgment to rebar

9   these plaintiffs, the EPP class members, from continuing

10  their action.

11          Now, you know, plaintiffs' lawyers are very good

12  and they are going to keep pushing, so on August 27th of this

13  year, the plaintiffs' counsel, the releasors, filed a motion

14  with this Court to compel the DOJ discovery, and they did

15  that even though this motion was pending -- fully briefed and

16  pending.  This Court had denied the releasors' request for

17  DOJ discovery at the status conference on June 5th.  And the

18  Court referred this motion to Special Master Esshaki, and

19  Mr. -- Special Master Esshaki, last week, denied their

20  request for DOJ discovery, saying it would require a

21  substantive ruling that EPP settlement does not extend to

22  DPPs, that is not within the purview of the Special Master.

23  That ruling was, obviously, quite correct.

24          The next page, Your Honor, is just a timeline which

25  we provided for the Court's information, that sets forth both

 1    the meaningful events in both the end payor AVRP litigation

 2    and the -- and in this litigation, as well, and that's, I

 3    think, a handy reference.  If the Court has any questions

 4    about when events occurred, we can always refer back to that.

 5         So now let me get to the punch line.  The named DPP

 6    plaintiffs are members of the EPP settlement class, and they

 7    are bound by this Court's final judgment and injunction that

 8    attended it in the EPP settlement class.  And let me explain,

 9    in detail, why that is.  This starts -- this is on page 9,

10    Your Honor.

11         Even though they styled their Complaint as a direct

12    purchaser case, the three plaintiffs assert claims based on

13    their indirect purchase of replacement AVRPs from an entity

14    of which one of the defendants is the ultimate parent.  I'm

15    going to show you the chain, according to them, in a minute.

16         The releasors claim they purchased replacement

17    AVRPs from a fourth tier Bridgestone subsidiary, not from

18    Bridgestone, the defendant Bridgestone itself, or from the

19    other Bridgestone named defendant, BAPM.  They admit it is

20    not contested that they purchased from a Bridgestone

21    subsidiary, it's a fourth tier subsidiary, at best, that's

22    not alleged to have committed an antitrust violation, that's

23    not named as a defendant.  Okay.  Those are the retail

24    WheelWorks and Tire Plus stores.

25         The releasors -- this is critical -- they do not

Case 2:12-md-02311-SFC-RSW  ECF No. 2024, PageID.36858  Filed 10/30/19  Page 83 of 119
*Status Conference / Motion Hearings • October 3, 2019*

83

1  dispute, first, that their purchase of replacement AVRPs is

2  the exact type of purchase included in the EPP settlement

3  class.  They also don't dispute that their purchases are not

4  different from those of thousands, and it may be millions,

5  who knows, but thousands of other absent class EPP settlement

6  class members, just like those other absent settlement class

7  purchasers.

8          They also don't dispute they didn't opt out of the

9  AVRP EPP settlements, because that's clear that they didn't.

10  And they didn't opt out, even though, as this Court found

11  with respect to each of those four settlements, the EPPs

12  provided constitutionally adequate nationwide notice to the

13  settlement classes, and even more, four of the releasors'

14  counsel filed notices of appearance in the EPP case, received

15  docket alerts about each settlement release, class

16  definition, class certification and final judgment.

17          To put a fine point on it, Your Honor, if there

18  were three indirect purchaser class members in the

19  United States that had the best conceivable notice of each of

20  these four settlements, it was Anderson, LaRue and Lee.  Why?

21  Because their lawyers are in this very courtroom.  So there

22  is no question that they knew what was going on.  There no

23  question that they received adequate notice.

24          Here, it comes down to this:  Their sole argument

25  that Anderson, LaRue and Lee are not bound by this Court's

 1    injunction and final judgment in the four AVRP settlements
 2    comes down to this.  Those settlements excluded direct
 3    purchasers, and they say, Anderson, LaRue and Lee are direct
 4    purchasers, they are not indirect purchasers, despite the
 5    fact that they look like every other indirect purchaser in
 6    the settlement class.
 7            Now, there are four reasons -- at least four, four
 8    reasons why Anderson, LaRue and Lee are not direct
 9    purchasers.
10            First, is just common sense.  A direct purchaser is
11    somebody who purchased from a defendant, the antitrust
12    violator.  And by the way, when you read class definitions
13    and when you read settlement agreements, it is a contract.
14    It is clear, those are the plain meanings of those words.
15    You purchased directly from a defendant who is the alleged
16    antitrust violator, that's a direct purchase.
17            Second, were that not clear enough, the Supreme
18    Court last year, in Apple, said just that, it said it in
19    words in one syllable.  Here is what the Supreme Court said.
20    The Supreme Court said -- they affirmed -- excuse me, Your
21    Honor -- they reaffirmed -- what the Supreme Court said was,
22    quote, the simple enough rule that, quote, the immediate
23    buyers from the alleged antitrust violators -- that's direct
24    purchasers -- may maintain a suit against the antitrust
25    violators, but indirect purchasers who are two or more steps

Case 2:12-md-02311-SFC-RSW ECF No. 2024, PageID.36860 Filed 10/30/19 Page 85 of 119
Status Conference / Motion Hearings • October 3, 2019

85

 1    removed from the violator in a distribution chain may not

 2    sue.  That is exactly who Anderson, LaRue and Lee are.

 3         How do we know that?  Your Honor, we have a chart

 4    on page 10 that comes from the plaintiffs' own brief on the

 5    Motion to Dismiss.  This is their chart, not ours.  We said

 6    this chart was inaccurate, but put that aside.  This is their

 7    chart.  Their chart has Defendant Bridgestone Corp., BSJ,

 8    defendant, alleged antitrust violator.  Bridgestone Americas,

 9    Inc., not a defendant, not an alleged antitrust violator.

10    That's who they claim Bridgestone's parent company sold the

11    AVRPs to.  Then they say Bridgestone Americas, Inc., which

12    not named as a defendant, which is not named as an antitrust

13    violator, sold the AVRPs to Bridgestone retail operations, a

14    subsidiary, not named as a defendant, not alleged to be an

15    antitrust violator.  And they then say that BSRO sold the

16    AVRPs to the WheelWorks and Tires Plus store, fifth tier, not

17    named as a defendant, not an antitrust violator.

18         So by their very own chart, Anderson, LaRue and Lee

19    are indirect purchasers from a fourth or maybe fifth-tier

20    subsidiary of a defendant, they are not direct purchasers.

21    And if there is any question about that, this Court has

22    already recognized that they are not direct purchasers.

23         They rely -- their whole argument is, we are direct

24    purchasers because we've alleged that we are entitled to an

25    exception to the Illinois Brick rule that bars indirect

 1    purchasers from suing.  We allege that we are entitled to the

 2    ownership and control exception to Illinois Brick.  On that

 3    basis, they claim that makes us direct purchasers.  Well, the

 4    short answer is, no, it doesn't; it makes you indirect

 5    purchasers who may, if you satisfy your burdens -- and by the

 6    way, the Sixth Circuit has never found a case in which those

 7    burdens were satisfied.  It makes you an able -- it makes

 8    you -- it gives you standing to sue as a direct purchaser, if

 9    you can prove the ownership and control exception.  But even

10    if you can prove the ownership and control exception, that

11    does not transmogrify a direct purchaser -- I'm sorry, an

12    indirect purchaser into a direct purchaser.

13          Now, direct purchasers never have to make use of or

14    prove an exception to Illinois Brick.  They don't have to

15    allege that.  They don't have to prove that.  They don't

16    carry the burden, and it is their burden, of proving an

17    exception to Illinois Brick.  It is never an issue, they are

18    direct purchasers.  And Your Honor has seen this in all of

19    the direct purchaser cases, except this one that they

20    brought.  No one has come in and said, oh, they are going to

21    have to prove an ownership and control exception.  They

22    say -- they have alleged they purchased directly from the

23    named defendant antitrust violator.

24          And this Court has recognized that simply because

25    you may be able to prove an exception to Illinois Brick -- by

1    the way, we think they will never be able to prove it, but

2    that's besides the point.  This Court recognized, just

3    because you may be able to prove an exception to Illinois

4    Brick, that doesn't make you a direct purchaser.  That's what

5    the Court said, and this is on page 11, Your Honor.  The

6    owned or controlled exception to Illinois Brick permits suits

7    brought by indirect purchasers when the direct purchaser to

8    whom they pay the passed-on overcharge is owned or controlled

9    by a conspirator.  This Court recognized that Illinois

10   Brick -- the exceptions to Illinois Brick only apply to

11   indirect purchasers.

12          And the releasors, themselves, recognize this.

13   This is in their own brief, they say, this Court stated that

14   the Supreme Court expressly recognized an exception to the

15   Illinois Brick rule in those situations where direct

16   purchaser is owned or controlled by its customers, and the

17   courts have expanded the exception to include instances where

18   the defendant owns or controls the intermediary that sold the

19   goods to the indirect purchaser plaintiff.  They recognize

20   that their plaintiffs are indirect purchasers.

21          Now, even if they could prove, after some years of

22   litigation, that these named plaintiffs are entitled to the

23   Illinois -- the ownership or control exception to Illinois

24   Brick, that does not somehow magically, ex post facto,

25   transform an indirect purchaser into a direct purchaser.

Case 2:12-md-02311-SFC-RSW  ECF No. 2024, PageID.36863  Filed 10/30/19  Page 88 of 119
*Status Conference / Motion Hearings • October 3, 2019*

88

1    Here's why, and it's really practical, Your Honor.  This is

2    why it is so radical, what they are suggesting.

3            At the time the EPP cases are settled, class notice

4    goes out, and the class notice goes out to the class members

5    who clearly include these three indirect purchasers.  No

6    dispute about that.  They are purchasers of replacement parts

7    from a subsidiary of a defendant.  They are squarely within

8    the definition of the class.

9            Their argument is that, wait a second, Your Honor,

10   we may be able to prove, in two or three years, that the

11   ownership or control exception applies to these three

12   plaintiffs.  How exactly, as a practical matter, does that

13   work?  They are indirect class members at the time of the

14   final judgment in the class notice.  They can't magically be

15   transformed, two or three years later, even if they can carry

16   their burden, into direct purchasers.  And if they are, what

17   does that mean?  That they are no longer indirect purchasers.

18   If they made a claim, they have to give that money back?

19           And what about direct purchasers, if they are

20   right, that people who purchase indirectly magically become

21   direct purchasers?  What about direct purchaser class

22   notices?  It is not going out to the people who purchased at

23   WheelWorks or Tire Plus stores.  They are not being included

24   in the direct purchaser notices.  You know why?  Because they

25   are not direct purchasers.

*Status Conference / Motion Hearings • October 3, 2019*

1          So to summarize, Your Honor, four reasons, minimum,
2   why these indirect purchasers are not and can never be direct
3   purchasers.  One, common sense plain meaning of the words
4   direct purchaser.  Two, the Supreme Court decision in Apple
5   explained very clearly the simple enough rule that direct
6   purchasers are those that purchased from the alleged
7   antitrust violator.  Three, this Court has already recognized
8   that even if you can make the case that you are entitled to
9   an exception, the ownership or control exception to Illinois
10  Brick, even if you're still -- start out a direct purchaser.
11  And fourth, the practicalities of being able to retroactively
12  transform an indirect purchaser, who received notice as an
13  indirect purchaser, and probably made a claim as an indirect
14  purchaser, two or three or four years later to transform that
15  person into a direct purchaser, would utterly create chaos in
16  this Court's settlements, both the indirect settlements and
17  the direct settlements, because those people now say, we are
18  direct, do we get to claim in the direct?  Well, the claims
19  period may be over.  What happens?
20          THE COURT:  What happened in the -- when
21  the -- when they filed their Complaint, did you raise this as
22  a defense?
23          MR. S. REISS:  Oh, Your Honor, we moved to dismiss
24  for numerous reasons.  Your Honor, may recall, and I know
25  it's --

```
 1          THE COURT:  I did some ruling on it, but I don't
 2   remember what.
 3          MR. S. REISS:  We allege that they lack both
 4   constitutional standing, because they couldn't even allege
 5   they bought a part made by any defendant, they didn't know
 6   what part they bought, and we also challenge their antitrust
 7   standing.  And Your Honor denied that motion, but Your Honor
 8   did, you may recall, certify the appeal.  You granted
 9   our 1291(b) motion.  The Sixth Circuit said well, we might
10   like to see some more facts, so they didn't accept the case,
11   but we clearly raised this.
12          We also, frankly, raised the question of whether
13   the Court should strike the class allegations, because these
14   three plaintiffs were so clearly incapable of representing a
15   class of major OEMs who were the purchasers of these parts.
16   So, yes, Your Honor, we have raised this issue from the very
17   start.
18          THE COURT:  If the Court finds that the plaintiffs
19   are part of the end payor class, should they proceed as
20   opt-outs or --
21          MR. S. REISS:  Well, Your Honor, I guess the
22   question is, to what purpose?  If they -- if they -- if they
23   admit that they are members of the end payor class, which
24   they are, if they are going to opt out --
25          THE COURT:  Every other --
```

 1          MR. S. REISS:  Yeah, and if they want to do that in

 2     order to be able to pursue the DPP case, then it becomes

 3     clear they can't be class representatives.  They are indirect

 4     purchasers trying to represent a class of direct purchasers,

 5     and the issues are much, much different.

 6          THE COURT:  Or they could opt out and file their

 7     own end payor class -- I mean, not class, but end payor case.

 8          MR. S. REISS:  I -- I -- Your Honor, I'm willing to

 9     bet my bank account they wouldn't do that.

10          THE COURT:  Okay.

11          MR. S. REISS:  Thank you, Your Honor.

12          THE COURT:  All right.  Mr. Fink.

13          MR. D. FINK:  Your Honor, before I begin, I have to

14     acknowledge something referenced by the Court earlier.  Yes,

15     my beard has come and gone, but I want to note that it was

16     brown when we started this process.

17          THE COURT:  Yeah.

18          MR. FINK:  More importantly, at the time that these

19     cases started, none of my children were married and I was.

20     Now, both of my children are married, and I'm not.

21          THE COURT:  I hope not due to this case?

22          MR. D. FINK:  No, no.  I also want to note that I

23     had no grandchild, and thanks to the very hard work of my

24     son, Nate, I now have five grand children, four from him, and

25     one from my daughter.  So times have changed a bit.

1        THE COURT:  Okay.

2        MR. D. FINK:  Your Honor, the Court asked a very

3  pertinent question, and got the wrong answer.  The Court

4  said, did you raise this as a defense?  And the answer is no.

5  They did file a Motion to Dismiss, and that's very important,

6  because this Court looked at that Motion to Dismiss, where

7  they were saying, oh, these folks are indirect purchasers and

8  so they can't represent a class of direct purchasers, and the

9  Court understood our argument, which was this -- these three

10  individuals directly purchased -- directly purchased from a

11  wholly-owned subsidiary of a member of the conspiracy -- of

12  the price-fixing conspiracy.

13        So in the end -- and we are going to cover all of

14  this, but in the end, this entire motion is a rehash of their

15  previous Motion to Dismiss, which was denied.  I understand,

16  Mr. Reiss has been clear, he does not like our plaintiffs.

17  He does not think they should be class representatives.  He

18  does not think they should be able to go forward with the

19  case.  But he made that argument in a motion that was filed

20  two years ago and argued over a year ago, and the Court ruled

21  against him.  The Court found that when these individuals

22  purchased -- as the Court will recall, we had a lot of fun

23  that day, they had a PowerPoint that was working, and we

24  talked about that every one of our purchasers alleges that

25  they directly purchased from a Firestone, a Bridgestone, or

Case 2:12-md-02311-SFC-RSW   ECF No. 2024, PageID.36868   Filed 10/30/19   Page 93 of 119
*Status Conference / Motion Hearings • October 3, 2019*

93

1    other retail outlet that is wholly owned, ultimately, by a

2    parent company that is part of the conspiracy.  It couldn't

3    be more clear.

4         THE COURT:  Okay.  Let me go through that chart

5    that they have on page 10.

6         MR. D. FINK:  Okay.  What that chart shows is

7    that -- and why they say this is five levels, I don't know.

8    But it doesn't matter whether it is one level or two levels

9    or 105 levels; as long as every level is wholly owned,

10   ultimately, by the parent, it is and can be deemed a direct

11   purchase from the parent.  That's all this is about.

12        They talk about the Apple case.  In the Apple case,

13   the court -- which had nothing to do with the facts in this

14   case, but the principles set forth in the Apple case are

15   perfectly okay with us.  One of the things that the Apple

16   case said -- that the Supreme Court said, and I don't

17   often -- I didn't expect myself to be in court agreeing with

18   Brett Kavanaugh, but what was said in the Apple case was that

19   if they went with Apple's theory, it would furnish

20   monopolistic retailers with a how-to guide for evasion of the

21   antitrust laws.  That's exactly what they are looking for

22   here, a how-to guide to evade the antitrust laws, because

23   here is how they do it.

24        We are Bridgestone -- and by the way, they throw

25   their self at the mercy of the Court by saying we have

1  already paid $81 million or we have agreed to pay

2  $81 million, in total, to the end payors, how could we expect

3  to pay more?  I will tell you how you could expect to pay

4  more.  Bridgestone alone -- this -- what they did here was so

5  outrageous, so incredibly outrageous, that Bridgestone,

6  alone, paid a criminal fine of $425 million, $425 million for

7  their price fixing of anti-vibration rubber parts.  And they

8  are trying to avoid liability with this subterfuge, and the

9  subterfuge is, we don't sell directly from a retailer to you.

10  Instead, we own a company that owns a company that owns the

11  retailer, and that's this chart.  Bridgestone wholly owns

12  Bridgestone Americas, Bridgestone Americas wholly owns

13  Bridgestone retail operations, and Bridgestone retail

14  operations wholly owns outlets, some are Firestone, some have

15  different names.  We are going to have to prove that, but we

16  can prove that.  We are going to have to prove that.  We do

17  allege that.  So Bridgestone is still the parent.

18       Now, just to be clear, Your Honor, the Court has

19  already ruled on this.  You ruled in our favor on that very

20  subject.  They keep saying you ruled that we were indirect.

21  That's insanity, and I will explain why.  It makes no sense

22  at all.  It is just a semantic argument.  It has nothing to

23  do with the substance of what this Court did.  This Court saw

24  through the subterfuge, and this Court has already ruled that

25  our clients can be deemed direct purchasers for purposes of

1    this case.

2           Now, they were upset with that ruling.  You could

3    hear, Mr. Reiss doesn't like our plaintiffs.  I understand

4    that.  So he did the best he could.  He sought permission

5    from this Court to go to the Sixth Circuit.  This Court did

6    not interfere.  This Court said you want to go to the

7    Sixth Circuit, you can go to the Sixth Circuit.  It might

8    avoid unnecessary litigation.  Instead, of course, it created

9    unnecessary litigation and delay because they went to the

10   Sixth Circuit, we all briefed this in the Sixth Circuit, and

11   the Sixth Circuit did not take the interlocutory appeal.  The

12   Sixth Circuit did not review or reverse this Court's ruling.

13          The law of this case is established already, and

14   the law of this case is that these individuals, because of

15   the special way that the facts are laid out, these

16   individuals are, in fact, direct purchasers.

17          So I would like to take the Court through what they

18   are really arguing, and as I did before, I will go through

19   their brief.

20          THE COURT:  I have a question, a little bit off

21   point, but --

22          MR. D. FINK:  I doubt it is off point.

23          THE COURT:  -- but are any of the named direct

24   purchasers from non-repealer states?

25          MR. D. FINK:  You stumped the band, Your Honor.  I

1    don't know.  I can find out for the Court, but I really don't

2    know.  To be very honest with you, I don't know what states

3    they are in.  I would to have look back.  I hadn't looked at

4    that question.  It's a good question.  It's an interesting

5    question.

6           And it might be relevant, if we were wrong in the

7    rest of our argument, but the rest of the argument actually

8    flows pretty neatly and pretty cleanly when we lay it out and

9    we look at the words of these settlement agreements,

10   et cetera.

11          At page 4 of their PowerPoint -- I don't know what

12   you call a PowerPoint that doesn't project.  I guess we call

13   it a not so powerful PowerPoint.

14          But at page 4, the second paragraph, which was read

15   to you by Mr. Reiss, describes, in bold, what the full

16   release is.  It says, each settlement agreement contained a

17   full release.  And he's right, they are virtually identical.

18   And the words that he shows there, the words that they

19   present, are, in fact, in the release.

20          But the same paragraph -- now, just to be specific,

21   there are different paragraphs in different matters, but

22   let's go with the Bridgestone release, because -- Bridgestone

23   settlement agreement, because that's the one he talked about

24   the most.  That's his client.  So in the Bridgestone

25   settlement agreement, it is paragraph 23, yes, these words

1    are there, but here are the words he didn't read to you.  In

2    paragraph 23 it says, provided, however, that nothing in

3    herein shall release, one, any claims made by direct

4    purchasers of anti-vibration rubber parts.  They're

5    explicitly excluded from his release.  Made claims for direct

6    purchasers are not barred by this release, they are

7    explicitly excluded from the release, and he can't say,

8    therefore, that our claims were barred.

9         It is -- believe it or not, that would be the

10   beginning and the end, but we will go further.  There are

11   plenty of other reasons that he's wrong -- that they are

12   wrong.

13        The release does not release us because the release

14   carves out, even if we are defined as releasors, which we are

15   not, but even if we are defined as releasors, this would not

16   release us, because it does not release any claims made by

17   direct purchasers of anti-vibration rubber parts.

18        THE COURT:  The real issue is, are you a direct or

19   an indirect purchaser, that's the bottom line, right?  Can

20   you be both?

21        MR. D. FINK:  In the end, that is the real issue,

22   and this Court has already ruled that we can proceed as

23   direct purchasers.  The Court has ruled that on -- in denying

24   their Motion to Dismiss.

25        But let me take it a little bit further, and we are

Case 2:12-md-02311-SFC-RSW   ECF No. 2024, PageID.36873   Filed 10/30/19   Page 98 of 119
*Status Conference / Motion Hearings • October 3, 2019*

98

1    going to actually look at the language.  It will be more and

2    more clear to this Court, the closer the Court looks at what

3    it ruled before and then looks at this, that this is really

4    just a collateral attack on a ruling that this Court already

5    made.

6              I want to take a moment to look at their timeline,

7    because the Court asked the question, "Did you raise this as

8    a defense?"  The answer the Court got related to the Motion

9    to Dismiss, which didn't address this, but it is a much more

10   interesting question than that, because they say it should be

11   obvious that these people are released.  It should be obvious

12   that their claims have already been released, that they were

13   part of the class.  And the example they give in their brief

14   is the Tokai rubber settlement, which occurred in September

15   of 2016.

16             So if you look at the timeline, they don't show

17   that, but if you look on their timeline, it should show on

18   September 7th, 2016, a Tokai settlement was submitted to the

19   Court for approval.  The settlement was reached early in the

20   year, but it was submitted to the Court for approval on

21   September 7th.  We filed our lawsuit on November 15th.  Well,

22   a lot happened between the time that we filed our lawsuit and

23   their filing of an answer.  Among other things, they filed

24   the Motion to Dismiss, which was denied by the Court.

25             So they don't end up filing an answer, and this

 1    should be on the timeline.  April 12th, 2018, right after the

 2    order on the Motion to Dismiss, April 12th, 2018, answers and

 3    affirmative defenses were filed, including the answers of

 4    Sumitomo Rubber, and -- I might be getting the name a little

 5    wrong, but it is Sumitomo, who was now in place of Tokai, and

 6    DTR or DTR Industries.  And those answers, including

 7    affirmative defenses, don't raise release as an affirmative

 8    defense.  They didn't think they released our claims.  They

 9    didn't think we had released our claims.  They didn't even

10    put it in their affirmative defenses, when they filed

11    affirmative defenses -- when Sumitomo filed their affirmative

12    defenses.

13          Now, Your Honor, they say in here and throughout

14    their argument, that our clients are indistinguishable from

15    the releasors, and that's because they reject this Court's

16    ruling.  They don't see any distinction.  They see no

17    distinction between an individual that purchases a

18    price-fixed product from a subsidiary of the defendant.  They

19    don't see a distinction between that person and a person who

20    purchases a price-fixed product from some third party, like

21    an OEM or car dealership that purchased the product from the

22    defendant.  It is an enormous difference, and it is a

23    difference that this Court recognized.  It is completely

24    distinguishable.

25          We are representing people who purchased from

1    someone is owned by the defendant.  These other people, who

2    we do not say we are the same, because we are not the same as

3    these other people, the people they call the releasors.  We

4    are not the same as the others, because they purchased from

5    third parties; they didn't purchase from the companies that

6    are owned by the defendants.  It is an enormous difference.

7    It is a complete difference.

8            Now, they want to reject that, they are free to

9    reject that.  But they don't get to change who we are by just

10    calling us something.  Interestingly, in the brief,

11    they -- it is not until the beginning of the third argument,

12    they had already defined releasors, because they used the

13    language from the releases that defined releasors, but in the

14    beginning of the third argument, they define our three

15    clients as releasors.  And then, from there to the end of the

16    brief, on 50 -- yes, I was bored and I counted -- 50 separate

17    times they use the word releasors to describe our clients, as

18    though we are in agreement, that we have released, but we

19    want to file this suit anyway.  We are not in agreement that

20    we released.  We are not part of the release.

21            Now I want to go through the words of the release.

22    Again, if you go to -- does the Court have the briefs that

23    the parties filed before it?

24            THE COURT:  I do.

25            MR. D. FINK:  That would be wonderful.  If the

1    Court could pull out defendants' brief, on page 10 of

2    defendants' brief, they say -- is the Court on page 10?

3              THE COURT:  No.

4              MR. D. FINK:  Okay.  I can wait.

5              THE COURT:  Just one second.  Okay.

6              MR. D. FINK:  On page 10 it says at the beginning

7    of argument number one, and I will try not to talk fast when

8    I read.  Based on the allegations contained in their own

9    pleadings, they argue, the releasors -- that's what they are

10   calling us now, but we aren't releasors -- releasors are

11   clearly members of the EPP settlement classes.  These

12   settlement classes included every purchaser in the

13   United States who purchased AVRPs as, quote, a replacement

14   part, which were manufactured or sold by a defendant, any

15   current or former subsidiary of the defendant -- I'm

16   sorry -- or any co-conspirator of a defendant.

17             What's missing from that definition?  What's

18   missing -- and by the way, they do the same thing in their

19   PowerPoint.  The second paragraph on page 5 of their

20   PowerPoint says this Court approved the settlement class

21   definitions -- they say -- which included anyone who

22   purchased an AVRP as a replacement part from a defendant, or

23   any current or former subsidiary of a defendant.

24             But, no, that's not what the class definition said,

25   as this Court correctly pointed out to Counsel during his

1     argument. The actual language of the settlement agreement

2     reads -- as soon as I pull it up, I will read it accurately.

3     It reads, not anyone who purchased AVRPs as a replacement

4     part, but it reads -- and maybe I should back up just a

5     minute.

6             There are two separate types of members of their

7     settlement class. There are two types that are defined in

8     the definition of releasors. All persons and entities during

9     the class period who purchased or leased a new vehicle in the

10    United States, not for resale, which included one or more

11    anti-vibration rubber parts as a component part. Now, notice

12    that doesn't say indirectly or directly. It says, all

13    persons and entities that purchased or leased a new vehicle.

14    They are all in this class, absolutely.

15            But then it says, or -- this is the second

16    group -- or indirectly purchased one or more anti-vibration

17    rubber part as a replacement part. Indirectly purchased. It

18    has the word indirectly. The Court noticed that when he was

19    reading before, and the Court said, well, is it an indirect

20    or isn't it an indirect?

21            Our clients directly purchased one or more

22    anti-vibration rubber parts as a replacement part, which were

23    manufactured or sold by a defendant, or a former

24    subsidiary -- a current or former subsidiary of a defendant.

25    It could not be more clear. We are literally defined out.

1    We are not part of their definition.  Their definition says

2    indirectly purchased.  We only address those who directly

3    purchased.  Our folks purchased at their stores, that's an

4    enormous difference, an enormous difference.

5           Now they don't want to acknowledge that, so that if

6    we look at the PowerPoint, on page 9.  On page 9, they say

7    the releasors do not dispute -- this is the third bullet

8    point.  The releasors do not dispute -- and Mr. Reiss said

9    this is critical -- that their purchase of replacement AVRPs

10   is the exact -- the exact type of purchase included in the

11   EPP settlement class.  He then says, we don't dispute that

12   their purchases are not different from those of the thousands

13   of other absent EPP settlement class members.

14          We absolutely dispute that.  That's -- our whole

15   case is disputing that.  From the beginning, we have disputed

16   that.  We have always said we only represent those who

17   directly purchased.  And there are thousands -- he's right,

18   probably hundreds of thousands, they hurt a lot of people,

19   maybe it was a million.  Lots of people who were hurt by

20   them, who are members of the indirect class.  Those are the

21   ones who didn't purchase from a Firestone, a Bridgestone, or

22   other wholly-owned business entity.  It's a wholly-owned

23   entity.

24          THE COURT:  Let me ask you, Mr. Esshaki entered an

25   order this summer, requiring the defendants to identify class

1  members of your case -- of the DPP case.

2      MR. D. FINK:  I'm sorry, Your Honor.  I'm not sure

3  I know what the Court is referring to.

4      THE COURT:  I don't have that order, here, but I

5  thought it was entered on July 18th.

6      MR. D. FINK:  In this case, in the AVRP case?

7      THE COURT:  I thought so.  Maybe not.  Let me --

8      MR. D. FINK:  The only order I'm familiar with --

9      THE COURT:  Oh, no, that might be in the end payor

10  case.

11      MR. D. FINK:  Right, because we are not there yet.

12  The only order I'm familiar with is his recent order that

13  essentially said it's premature.  We had a Motion to Compel,

14  which was assigned to Judge Esshaki -- or Magistrate

15  Esshaki -- or Special Master Esshaki.  I keep promoting him.

16  And what he said was, no, at the status conference, the Judge

17  specifically said that we would cross that bridge when we

18  come to it, essentially, and we haven't come to it, so let's

19  let the judge do this.  And also he thought it was beyond the

20  scope of the his assignment, because it involved a

21  substantive decision that he didn't think was properly before

22  him.

23      THE COURT:  Okay.

24      MR. D. FINK:  So -- now the same definition -- the

25  same definition that we are referring to, and there's no

 1   dispute as to what the definition is, it is all over the

 2   place.  I mean, it's repeated in each one of these settlement

 3   agreements.  The same definition says -- and they don't give

 4   this by the way.  When they give you their -- their -- I have

 5   to find this now.  I'm sorry.

 6           On page 4, where they give you -- the settlement

 7   agreement gives the settlement class definition, which

 8   includes indirectly purchased, there's a period there, but

 9   that's not actually the end of the quotation.  It then says,

10   excluded from the settlement class are, and it lists some

11   obvious defendants, their parents, subsidiaries, et cetera,

12   and then it says, and persons who purchased anti-vibration

13   rubber parts directly.  They are explicitly excluded from the

14   class.  And there was no reason for our clients to opt out,

15   they purchased directly, and there is absolutely no reason

16   for them to opt out.  It made no sense for them to opt out.

17           THE COURT:  So how -- in defining your class, who

18   would be members of your class, those who purchased from

19   subsidiaries?  Do you list the subsidiaries or how do you do

20   that?

21           MR. D. FINK:  Well, the members of our class are

22   all of the direct purchasers of these price-fixed products.

23   So the members of our class include not just people who

24   purchased from the subsidiaries, although it does include

25   those, but it's also anybody who purchased directly from the

1    defendants, and that includes OEMs, that includes first-tier

2    suppliers, that includes retailers.  Anybody that's

3    purchasing directly is a member of the class.

4         THE COURT:  How do you notify them of these

5    subsidiaries?  How would anybody ever know that this

6    Firestone little store was --

7         MR. FINK:  We will have done it through discovery.

8    As the case goes on, we will establish which locations were,

9    in fact -- you know, which locations were wholly owned.  It

10   is not really that difficult, because they advertise -- I

11   think the Court may remember, they are very proud of their

12   vertical integration, and we showed that from some slides

13   before.  They are very, very proud of the fact that they go

14   from the rubber plantation to the road.  They go the whole

15   route.  And so we have the names.  There is always -- there

16   is often complications in proving these things out, and we

17   will need assistance to do it, but we'll do some of the

18   proofs.  Some of it, ultimately, in terms of notice, will

19   involve a claims administrator that will assist us.

20        You know, the fact is those are issues way down the

21   road.  Right now, the issue is, did they directly purchase

22   from a member of the conspiracy?  The Court has already ruled

23   on that, in denying their Motion to Dismiss.  The Court has

24   already made that ruling.  They just asking the Court to

25   reconsider it.  They can say it any way they want, but they

1  are asking the Court to reconsider it.  Somebody in their

2  office one day, woke up and said, oh, we will call it a

3  release.  If they thought it before, they would have plead it

4  before, they would have filed a motion before, but they

5  waited.

6        THE COURT:  In your interpretation of what I did,

7  you are saying that I have made a determination that your

8  clients are direct purchasers and not indirect purchasers, I

9  have said that specifically.

10        MR. D. FINK:  Well, you have made a determination

11  that our clients can go forward as representatives of -- for

12  now, obviously you haven't made an final determination on

13  class cert or anything like that, but you have made the

14  determination that -- that our plaintiffs, who allege that we

15  purchased directly from one of the defendants' wholly-owned

16  subsidiaries, that our plaintiffs can go forward, in part

17  based on the ownership control exception to Illinois Brick.

18        They make an argument today --

19        THE COURT:  Well, then you have the opportunity to

20  go forward, but I didn't decide it, per se.

21        MR. D. FINK:  Well, you decided that we could go

22  forward.

23        THE COURT:  Yes.

24        MR. D. FINK:  Correct.  I'm sorry.  The Court

25  decided that we could go forward.  The Court certainly hasn't

1    ruled on the merits, the Court hasn't any evidence on the

2    merits, except for our allegations.  Trust me, we will prove

3    it, but that's not really before the Court yet.

4            The -- in the Court's ruling in March of 2018,

5    March 29th, 2018, the Court said the parties dispute whether

6    plaintiffs can establish that they are direct purchasers.

7    You went through that.  You say the owned or controlled

8    exception to Illinois Brick permits suits brought by -- and

9    this is where they get excited that you used the word

10   indirect purchasers, when the direct purchasers to whom they

11   paid the passed-on charges owned or controlled by a

12   conspirator.

13           That's a semantic argument.  We are direct

14   purchasers.  We might be direct purchasers with an asterisk,

15   but we are direct purchasers.  We purchased directly from a

16   defendant or a defendant's, in this case, subsidiary.

17           THE COURT:  Okay.

18           MR. D. FINK:  And, you know, they get excited and

19   say, nobody has done this before.  It is the ruling.  It is

20   what we are dealing with.  It is the law of the case.  This

21   isn't new.

22           They tried to get the Sixth Circuit to reverse it,

23   and the Sixth Circuit didn't reverse it.  I'm not saying the

24   Sixth Circuit ultimately will accept our view, but the

25   Sixth Circuit did not want to intervene at this stage of the

1    proceedings, and let the case go forward.

2            Now, I want to be clear, while we are on this whole

3    semantic thing, they keep saying that because in one sentence

4    you say "permits suits brought by indirect purchasers," and

5    then they talk about the Apple ruling.  I will come back to

6    the Apple ruling, but this Court didn't say we are indirect

7    purchasers.  This Court, in fact, repeated our allegations,

8    which is that we say that we directly purchased.  I'm not

9    saying that you accepted our allegations, but you repeated

10   our allegations.  We directly purchased from a wholly-owned

11   subsidiary, and that makes us a direct purchaser.  We

12   directly purchased from a wholly-owned subsidiary.  We are

13   not indirect.

14           Indirects are people that buy from some third party

15   that got taken advantage of by the defendant.  The

16   defendants' subsidiaries did not get taken advantage of by

17   the defendant, a third party did.  If I buy from the third

18   party, then you have the whole issue of pass-on defenses and

19   issues like that.  Those issues are irrelevant when you are

20   dealing with a wholly-owned subsidiary that is part of the

21   parent company.

22           THE COURT:  Okay.  All right.

23           MR. D. FINK:  Now -- I'm sorry, Your Honor.

24   In -- I think I have already made this point.  I want to make

25   sure I don't repeat myself.  Okay.

```
 1              So just to finish out, what I was saying was they
 2     say we don't dispute those points, that's exactly what our
 3     case is about, we dispute exactly those points.  We do not
 4     agree, at any level, that this is the exact type of purchase.
 5     It's a very different type of purchase.  It is a completely
 6     different purchase.
 7              Now, interestingly, when they describe -- let me
 8     back up.  It's not an accident -- it is no accident that the
 9     release has the words "indirectly purchased."  They wouldn't
10     have wanted to do that.  The defendants wanted the broadest
11     possible release they could ever get.  Of course, they wanted
12     as broad of a release as possible.  And as to the motor
13     vehicles, they got that broad release.  It doesn't say
14     indirectly, it just says purchased or leased a vehicle.  But
15     why does it say indirectly for the replacement parts?  And
16     the reason is because that was the class definition in the
17     indirect case.  The end payor plaintiffs -- at paragraph 155
18     of their complaint, the end payor plaintiffs define these two
19     different types of plaintiffs, one who buys a car and the
20     other who buys a replacement part.  And for the ones that buy
21     the replacement part, they explicitly say indirectly, and it
22     says "indirectly" in their language.  It has to mean
23     something.  It has to mean that you can buy it one way or
24     another, and we are saying that we bought it another way.  We
25     bought it directly from a subsidiary.
```

1          Interestingly, in their motion they -- as part of

2     their world view that indirect purchasers always look exactly

3     the same, they -- and purchasers of -- and we, to them, look

4     like indirect purchasers.  But if you look at page 3 of their

5     motion, they describe the EPP complaint, and here is what

6     they say, on the second paragraph of page 3 in their

7     background description.  According to the EPP complaint, they

8     say, once defendants manufactured these AVRPs, they were

9     directly purchased by OEMs and tier-one suppliers.  That's

10    what they say, and they cited to the paragraphs in the EPP

11    Complaint.  By the way, they are right, that is what it says

12    in the EPP Complaint.

13          Then they say, following this direct purchase, the

14    EPPs allege that they then indirectly purchased these AVRPs

15    in one of two ways.  That's correct.  In those instances

16    where OEMs or tier-one suppliers purchased the AVRPs, that

17    created the indirect purchase, when someone else came and

18    purchased from the OEMs, for example, at an auto dealership,

19    or from the tier-one suppliers.

20          But what's missing from this is some of those AVRPs

21    were neither directly purchased by OEMs or tier-one

22    suppliers.  Some of these AVRPs were directly purchased by

23    our clients, people who went into the dealerships that they

24    owned.  They don't even refer to them, as though they don't

25    exist, because they don't want them to exist.  They don't

1   want this class to be around.  They just define it away, but

2   it is right there, even in their description of what occurred

3   here.

4           THE COURT:  Counsel, we have to wrap up, because we

5   have another case coming in.

6           MR. D. FINK:  Uh-oh.  No one told me the Court was

7   doing other work.  I don't recall agreeing to that.

8           Your Honor, in the end, we talked about the

9   exclusions, but the one exclusion that I want to go back to

10  and I want to make sure that we have been very clear with the

11  Court about it.  The one exclusion I want to go back to is

12  each settlement agreement says in the release and covenant

13  not to sue, the release, discharge and covenant not to sue,

14  that language we quoted earlier, nothing herein shall release

15  any claims by direct purchasers of anti-vibration rubber

16  parts.  So it doesn't matter if they can somehow magically

17  convince the Court -- I don't know how they would -- that we

18  are releasors, because we are defined out of being releasors,

19  but even if we were releasors, which we are not, it wouldn't

20  release claims by direct purchasers, and those are the claims

21  that we are going forward with.  Those are the claims this

22  Court said we can go forward with.

23          Now, very briefly, they talk about the Apple case.

24  They say that the Apple case, as though -- although it was

25  related to this, and it is not, but that's okay, there is

 1    nothing wrong with the Apple case.  The Apple case included a

 2    reference to black letter law.  Indirect purchasers -- and we

 3    can just go to their language and then we will be done with

 4    this.  I have to find their language, but I think it is

 5    on -- where did they have the Apple case?  I'm sorry, Your

 6    Honor.  I know it's in here.  It was here yesterday -- I mean

 7    this morning.  Where is the Apple case referred to?

 8             MR. S. REISS:  I think it is the last page.  It

 9    should be the last page.

10             MR. D. FINK:  Well, that's Illinois Brick.  Did I

11    drop a page?

12             MR. S. REISS:  Page 10.

13             MR. D. FINK:  I'm sorry, Your Honor.  On page 10 --

14             THE COURT:  No, page 11.

15             MR. D. FINK:  Your Honor, at the top of page 10 of

16    their PowerPoint, or weak point, the Supreme Court recently

17    reaffirmed, they say, the simple enough rule that, quote,

18    immediate buyers from the alleged antitrust violators may

19    maintain a suit against the antitrust violators.  But

20    indirect purchasers who are two or more steps removed from

21    the violator in a distribution chain may not sue.

22             That doesn't affect us, because our -- the folks we

23    purchased from are not any steps removed from the violator.

24    They are owned by the violator.

25             The Court is referring to a classic indirect case,

```
 1    where an OEM or someone else purchases and then the third
 2    party purchases from the OEM.  That's a second step.  We are
 3    not looking at that.
 4            In this case, what Apple -- what the court was
 5    looking at was, you look at the substance.  That's something
 6    else that the court specifically said in the Apple case.  In
 7    the Apple ruling, the court said Apple's argument -- Apple
 8    lost -- Apple's argument would elevate form over substance,
 9    and that's exactly what is trying to be done here.  They are
10    trying to suggest that because we purchased after two tiers
11    internally, that makes us indirect.  That's not what this
12    Court ruled.  That's not what the law suggests.  And when
13    they say there is no ruling like this in the Sixth Circuit
14    before, frankly, there's no set of facts like this, because
15    it's outlandish to think that they think they can avoid
16    liability for it.  It makes no sense at all.
17            They talked about common sense, that only common
18    sense would tell you that we are not direct purchasers.  I
19    don't know where that comes from.
20            THE COURT:  Okay.
21            MR. D. FINK:  Thank you, Your Honor.  I will try
22    not to have any more grand children before we come back.
23            THE COURT:  All right.  Thank you.
24            MR. S. REISS:  Thank you, Your Honor.
25            THE COURT:  Mr. Reiss, you have five minutes.
```

| | |
|---|---|
| 1 | MR. S. REISS:  Yes.  On the timing, Your |
| 2 | Honor -- first on the notion that the Court decided this is, |
| 3 | obviously, flatly wrong.  All the Court did was deny our |
| 4 | Motion to Dismiss.  And I would note, and it is clear from |
| 5 | the timeline, at the time the Court denied our Motion to |
| 6 | Dismiss, three of the four settlements were not final, were |
| 7 | not approved.  We didn't have the ability to make this motion |
| 8 | at the time of the Motion to Dismiss.  Court clearly did not |
| 9 | decide that these guys are direct purchasers at the time of |
| 10 | the Motion to Dismiss.  The first time that issue, whether |
| 11 | they are barred by the EPP settlements, arose was after the |
| 12 | last AVRP settlement was final, and that was in December of |
| 13 | last year, that's when we moved.  Okay.  So it's completely |
| 14 | and flatly wrong that the Court has decided this. |
| 15 | And that goes to the timing of when we moved.  Did |
| 16 | we raise this as a defense in the DPP case?  No, because we |
| 17 | didn't have the Court's orders, decisions and final judgments |
| 18 | at that time.  That was early in the DPP litigation.  As soon |
| 19 | as all four AVRP defendants settled the EPP class, had the |
| 20 | Court's order, had the injunction, we moved.  We couldn't do |
| 21 | that before this. |
| 22 | Second, Mr. Fink makes a big deal about the |
| 23 | difference between the two indirect purchasers in the EPP |
| 24 | settlement class.  He says they didn't qualify the first |
| 25 | group, the people who purchased an automobile.  Well, do you |

 1    know why that is?  If you purchased an automobile, you are by
 2    definition an indirect purchaser.  You are buying a car, you
 3    are not buying the part.  Every purchaser of an automobile is
 4    an indirect purchaser.  There is no question about that.  We
 5    didn't have to qualify that, because on its -- I'm sorry.  On
 6    its face, if you buy a car containing a price-fixed part, you
 7    are an indirect purchaser of that part.  You are buying the
 8    car, you are not buying the part.
 9         And we are clear in the second half -- I think
10    Mr. Fink's argument is exactly wrong.  We noticed in the
11    second half of the class definition that it applies to sales
12    from purchases from subsidiaries, and that's because those
13    are indirect purchasers unless the subsidiary is a named
14    defendant or an antitrust violator -- a named antitrust
15    defendant violator, which is what the Apple court said.  The
16    simple enough rule.
17         Mr. Fink struggles mightily, I'll give him credit
18    for that, to try to get around the clear wording of the
19    Supreme Court.  That's what they said.
20         And finally, Mr. Fink also does not deal with the
21    practicalities of what he wants to bring on to this Court,
22    but let me raise a very simple point.  Your Honor asked about
23    notice to the DPP class.  In none of the prior DPP
24    settlements did they -- and, by the way, they would have
25    included parts sold by the Tires Plus or the WheelWorks

1    stores.  They didn't send notice from the DPP settlements to
2    people who bought parts from those stores.  They never asked
3    us for those lists, and there is a really good reason, they
4    are not direct purchasers.
5          So you would have all of these other parts, DPP
6    settlements, that they send notice to, that clearly don't
7    include the three named plaintiffs in this case.  Why?
8    Because they not direct purchasers.  Mr. Fink can say we are
9    direct purchasers, we claim they are direct purchasers, we
10   are direct purchasers.  Your Honor, I can say I'm
11   Spiderman 20 times, but it doesn't make me Spiderman.
12         Thank you, Your Honor.
13         THE COURT:  All right.
14         MR. D. FINK:  Your Honor, may I respond just to the
15   points -- just two quick points?
16         THE COURT:  One minute, no more.
17         MR. D. FINK:  One, he says that it says purchasers
18   from subsidiaries and, of course, that makes it indirect, but
19   he neglects to point out that it says indirect purchasers
20   from subsidiaries, so we are back where we started.
21         Also, the reason that we don't send out notice for
22   our direct classes to the other people who purchased from
23   these stores is because we don't have another situation -- we
24   didn't see another situation where the stores were owned by
25   the conspirators.  This is a unique situation, where the

1    stores where the folks are buying these products are owned by

2    the defendant conspirators.  That's why we didn't need to

3    send notice, there was no other member of a class like this

4    before.

5              Thank you.  I'm done.

6              THE COURT:  Thank you.  The Court is going to issue

7    an opinion on this.  Very good argument.  Thank you.

8              THE LAW CLERK:  All rise.  Court is adjourned.

9              (Proceedings concluded at 1:34 p.m.)

10                          —    —    —

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3             I, Robert L. Smith, Official Court Reporter of

 4    the United States District Court, Eastern District of

 5    Michigan, appointed pursuant to the provisions of Title 28,

 6    United States Code, Section 753, do hereby certify that the

 7    foregoing pages comprise a full, true and correct transcript

 8    taken in the matter of In re Automotive Parts Antitrust

 9    Litigation, Case No. 12-02311, on Thursday, October 3, 2019.

10

11

12                        s/Robert L. Smith
                          Robert L. Smith, RPR, CSR 5098
13                        Federal Official Court Reporter
                          United States District Court
14                        Eastern District of Michigan

15

16

17    Date:  10/29/2019

18    Detroit, Michigan

19

20

21

22

23

24

25
```